1    other creditors of the estate so that Personal Voice's position vis-a-vis the Debtor and such other

2    creditors is neither diminished nor enhanced by Debtor's use of Cash Collateral and Personal

3    Voice's receipt of replacement liens.

4        21.    The replacement liens granted to Personal Voice shall be subordinated to

5    any expenses of this bankruptcy case including without limitation fees and expenses of

6    professionals retained by the Debtor and any official committee appointed in this bankruptcy case

7    as well as those of any trustee subsequently appointed in the bankruptcy case and such trustee's

8    professionals.

9        22.    Notwithstanding anything to the contrary set forth in this Order, this Order

10    does not determine whether Personal Voice has any valid, perfected or enforceable prepetition

11    liens or security interests in the Cash Collateral or any of the Debtor's other assets, and both the

12    Debtor and Personal Voice reserve all rights and defenses with respect thereto.  The replacement

13    liens granted to Personal Voice pursuant to this Order are effective only to the extent that Personal

14    Voice's prepetition liens in the Cash Collateral are valid, perfected and enforceable.

15        23.    The Debtor may use Cash Collateral in which Public Communication has an

16    alleged interest.

17

18        24.    Public Communication is granted, pursuant to Bankruptcy Code

19    sections 361(2) and 363(e), valid, perfected and enforceable replacement liens upon all post-

20    petition property of the Debtor of the same type and character of any pre-petition property as to

21    which Public Communication had valid, perfected and enforceable security interests or liens, but

22    only to the extent of Cash Collateral used by the Debtor.  The replacement liens granted to Public

23    Communication shall be automatically perfected pursuant to this Order and Public

24    Communication shall not be required to take any further action to perfect such liens.

25        25.    Public Communication's replacement liens on the post-petition property

26    shall have the same priority vis-a-vis other liens and interests as Public Communication's pre-

27    petition liens and security interests have vis-a-vis such other liens and interests.  The replacement

28    liens granted to Public Communication by this Order are intended to preserve Public

W02-WEST:FJR\400316998.5                    -7-

1  Communication's position vis-a-vis the Debtor and other creditors of the estate so that Public

2  Communication's position vis-a-vis the Debtor and such other creditors is neither diminished nor

3  enhanced by Debtor's use of Cash Collateral and Public Communication's receipt of replacement

4  liens.

5       26.    The replacement liens granted to Public Communication shall be

6  subordinated to any expenses of this bankruptcy case including without limitation fees and

7  expenses of professionals retained by the Debtor and any official committee appointed in this

8  bankruptcy case as well as those of any trustee subsequently appointed in the bankruptcy case and

9  such trustee's professionals.

10       27.    Notwithstanding anything to the contrary set forth in this Order, this Order

11  does not determine whether Public Communication has any valid, perfected or enforceable

12  prepetition liens or security interests in the Cash Collateral or any of the Debtor's other assets, and

13  both the Debtor and Public Communication reserve all rights and defenses with respect thereto.

14  The replacement liens granted to Public Communication pursuant to this Order are effective only

15  to the extent that Public Communication's prepetition liens in the Cash Collateral are valid,

16  perfected and enforceable.

17       28.    The use of Cash Collateral shall be in the amounts, and for the purposes, set

18  forth on the budget attached to the Motion, or such other budget that the Court approves.

19       29.    The Debtor shall, on or before _____, serve by either personal

20  service, overnight delivery service, courier service, facsimile service, or email service a copy of

21  this Order and a notice regarding the Final Hearing, to (i) the parties having been given notice of

22  the Interim Hearing, and (ii) any other party ordered by the Court or requesting service pursuant to

23  Bankruptcy Rule 2002. Such notice shall state that any party in interest objecting to the approval

24  of the Motion on a final basis shall file a written objection with the Court no later than

25  _____, which objection shall be filed with the Court and served so that it is received

26  on or before 5:00 p.m. (Pacific Time) of such date by the Office of the United States Trustee and

27  the following counsel:

28

W02-WEST:FJR\400316998.5

-8-

Counsel to Debtor:

Sheppard, Mullin, Richter & Hampton LLP
Four Embarcadero Center, Suite 1700
San Francisco, CA 94111
Attn:   Michael H. Ahrens, Esq.
        Jeffrey K. Rehfeld, Esq.
        Ori Katz, Esq.
Email: mahrens@sheppardmullin.com
        jrehfeld@sheppardmullin.com
        okatz@sheppardmullin.com

30.    If a timely objection is filed, served and received, a written reply thereto shall not be required but may be filed with the Court and served so that it is received by the objecting party no later than _____ on or before 5:00 p.m. (Pacific Time).

** END OF ORDER **

W02-WEST:FJR\400316998.5

-9-

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

<u>COURT SERVICE LIST</u>

<u>Office of the U.S. Trustee</u>
Office of the U.S. Trustee
Attn: Edwina Dowell, Esq.
280 South First Street, Room 268
San Jose, CA 95113

<u>The Billing Resource dba Integretel</u>
The Billing Resource dba Integretel
Attn: Ken Dawson
5883 Rue Ferrari
San Jose, CA 95138

<u>Proposed counsel for The Billing Resource dba Integretel</u>
The Billing Resource dba Integretel
c/o Sheppard, Mullin, Richter & Hampton LLP
Attn: Michael H. Ahrens, Esq.
4 Embarcadero Center, 17th Floor
San Francisco, CA 94111-4106

<u>Counsel for PaymentOne Corporation</u>
PaymentOne Corporation
c/o O'Melveny & Myers LLP
Attn: Steve Warren, Esq.
400 South Hope Street
Los Angeles, CA 90071-2899

<u>POL, Inc.</u>
POL, Inc.
c/o Joel R. Dichter, Esq.
Klein, Zelman, Rothermel & Dichter, Inc.
485 Madison Avenue, 15th Floor
New York, NY 10022

POL, Inc.
c/o Joel R. Dichter, Esq.
Dichter Law Group, LLC
10 Rockefeller Plaza, Suite 816
New York, New York 10020
Email: info@dichterlaw.com
Fax: (212) 757-5002

POL, Inc.
c/o Corporation Service Company
(Registered Agent for Service of Process)
2711 Centerville Road, Suite 400
Wilmington, DE 19808

W02-WEST:FJR\400316998.5

-10-

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

RER-2    0047

1

<u>Personal Voice, Inc.</u>
Personal Voice, Inc.

2
Attn:  David Giorgione

3
16807 A U.S. Highway 19 North, Suite A
Clearwater, FL  33764

4

Personal Voice, Inc.

5
Attn:  Thomas C. Little
(Registered Agent for Service of Process)

6
2123 NE Coachman Rd., Suite A
Clearwater, FL  33765

7

<u>Network Telephone Services, Inc.</u>

8
Network Telephone Services, Inc.
Attn:  Gary Passon

9
(Registered Agent for Service of Process)
21135 Erwin Street

10
Woodland Hills, CA  91367

11

Network Telephone Services, Inc.

12
Attn:  Officer, managing or general agent
21135 Erwin Street

13
Woodland Hills, CA  91367

14

<u>Public Communication Services, Inc.</u>
Public Communication Services, Inc.

15
Attn:  Paul Jennings, CEO
11859 Wilshire Boulevard, Suite 600

16
Los Angeles, CA  90025

17

Public Communication Services, Inc.
Attn:  Daniel L. Barbakow

18
(Registered Agent for Service of Process)

19
301 North Canyon Drive, Suite 303
Beverly Hills, CA  90210

20

21

22

23

24

25

26

27

28

W02-WEST:FJR\400316998.5

-11-

# EXHIBIT E

RER-2    0049

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2        Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  GERALDINE A. FREEMAN, Cal. Bar No. 111483
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4106
   Telephone:   415-434-9100
6  Facsimile:   415-434-3947

7  Proposed Bankruptcy Reorganization Counsel
   for Debtor and Debtor-in-Possession
8  The Billing Resource, dba Integretel

9

10

11            UNITED STATES BANKRUPTCY COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                 SAN JOSE DIVISION

14

15

16  In re:                          Case No. 07-52890

17  THE BILLING RESOURCE, dba       Chapter 11
    INTEGRETEL, a California corporation
18                                  **STIPULATION WITH PAYMENTONE
            Debtor.                 CORPORATION REGARDING SHORT
19                                  TERM USE OF CASH COLLATERAL
                                    AND ADEQUATE PROTECTION**
20

21

22

23

24

25

26

27              **EXHIBIT E**

28                  -1-

W02-WEST:FKA\400433123.1                                    STIP. W/ PAYMENTONE CORP
                                                      RE USE OF CASH COLLATERAL

1      IT IS HEREBY STIPULATED by and between THE BILLING RESOURCE, dba

2    INTEGRETEL (the "Debtor") and PAYMENTONE CORPORATION ("PaymentOne") as

3    follows:

4           1.    The Debtor commenced the above-captioned bankruptcy reorganization

5    case by filing a voluntary chapter 11 petition. The Debtor continues to operate and manage its

6    business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Debtor provides

7    various billing and collection related services in the telecommunications industry and the Debtor's

8    revenues are generated from the Debtor's agreements related thereto.  PaymentOne is a majority-

9    owned subsidiary of the Debtor.

10          2.    On or about January 26, 2005, PaymentOne and the Debtor entered into a

11   security agreement (the "Security Agreement"), a copy of which is attached hereto as Exhibit "A."

12   All Capitalized terms used herein that are not otherwise defined have the meanings ascribed to

13   them in the Security Agreement.  The Security Agreement granted PaymentOne a security interest

14   in the Collateral, as defined therein.  Without limiting the generality of the foregoing, Collateral

15   includes Accounts, Chattel Paper, Money and Deposit Accounts, General Intangibles, Payment

16   Intangibles, Software, Goods, Inventory, Equipment, Fixtures, Instruments, Investment Property,

17   Letter of Credit Rights, Supporting Obligations, Records, Commercial Tort Claims and all

18   Proceeds and Accessions.  PaymentOne asserts that it perfected its security interest in the

19   Collateral through UCC-1 financing statements filed on or about January 27, 2005 and October

20   18, 2006. PaymentOne claims to hold valid, perfected security interests in certain assets of the

21   Debtor which constitute "cash collateral" as defined in Bankruptcy Code section 363(a) (such

22   assets of the Debtor shall be referred to herein as the "Cash Collateral") as a result of the Security

23   Agreement. Specifically, PaymentOne asserts a claim against the Debtor in the approximate sum

24   of $15.4 million.[1]  PaymentOne claims to hold valid, perfected security interests in various assets

25   of the Debtor including without limitation the Collateral.  PaymentOne further asserts that the

26

27   ──────────────
     [1] The parties reserve all of their respective rights regarding the determination of the nature

28   and amount of PaymentOne's claim.

-2-

1  Debtor is in possession of certain property (the "Collection Property") that belongs to PaymentOne
2  and is otherwise held in trust for it under one or more agreements, including without limitation a
3  Support Services Agreement dated as of July 1, 2000 (together with any written or unwritten
4  agreement or arrangement concerning collection services, a "Collection Agreement"). Debtor
5  does not concede that the Collection Property exists, that it is in possession of such Collection
6  Property, that the Collection Property is held in trust for PaymentOne, or that the Collection
7  Agreements are effective.

8          3.      The Debtor must use Cash Collateral in order to continue to operate its
9  business. The terms and conditions for use of Cash Collateral set forth in this Stipulation have
10  been negotiated at arms length for reasonably equivalent value and are fair and reasonable under
11  the circumstances. The Debtor and PaymentOne have acted in good faith in connection with the
12  negotiation of this Stipulation and in moving the above-captioned Bankruptcy Court (the "Court")
13  for an Order approving the Stipulation.

14          4.      PaymentOne consents to the Debtor's use of Cash Collateral and the Debtor
15  is immediately authorized to use Cash Collateral for the purpose of funding the expenses of
16  operating the Debtor's business set forth on the budget attached hereto as Exhibit "B" (the
17  "Budget") upon approval of this Stipulation by the Court. Notwithstanding the foregoing or
18  anything to the contrary herein, PaymentOne does not consent to the use of Cash Collateral or
19  Collection Property for the purposes of directly or indirectly pursuing any claims or causes of
20  action of any kind against PaymentOne, although all of the Debtor's rights with respect to the
21  direct or indirect pursuit of any claims or causes of action against PaymentOne are reserved.

22          5.      As adequate protection of PaymentOne's interests in the Collateral and Cash
23  Collateral and the Debtor's use of the same, the Debtor hereby grants to PaymentOne, to the extent
24  that PaymentOne's prepetition liens are valid, perfected and enforceable, replacement liens in all
25  categories of assets of the Debtor's estate both real and personal, including without limitation, the
26  Collateral (subject only to valid, existing prepetition liens that are senior thereto up to the amount
27  of such senior claims existing on the Petition Date), including both existing and after-acquired
28

-3-

W02-WEST:FKA\400433123.1

STIP. W/ PAYMENTONE CORP
RE USE OF CASH COLLATERAL

Case: 07-52890    Doc #: 8    Filed: 09/17/2007    Page 4 of 11

RER-2

0052

1 property, to the fullest extent necessary to realize all Cash Collateral and to protect against any

2 diminution in the amount or value of its Collateral (pre-petition and post-petition) in which

3 PaymentOne has an interest. PaymentOne's replacement liens as provided in this Stipulation shall

4 be automatically perfected pursuant to the Court's Order approving this Stipulation and

5 PaymentOne shall not be required to take any further action to perfect such liens. Provided,

6 however, the Debtor shall execute such further documents as PaymentOne may reasonably request

7 to evidence such perfection. PaymentOne shall additionally be entitled to a super-priority

8 administrative expense pursuant to Bankruptcy Code Section 507(b). The foregoing protections

9 shall further secure and cover any damages under the Collection Agreements to the extent such

10 agreements are effective and damages accrue after the Petition Date and during the term of this

11 Stipulation.

12       6.     Notwithstanding anything to the contrary, PaymentOne reserves all rights it

13 may have, as the alleged owner of the Collection Property and proceeds thereof or as beneficiary

14 of a trust concerning such alleged property. If and to the extent it is determined that the

15 Collection Property exists and the Debtor uses any Collection Property, an equal amount of other

16 property held by the Debtor shall be deemed impressed with PaymentOne's trust and ownership

17 rights with the same validity as the trust and ownership claims concerning the original Collection

18 Property used, as well as the other rights set forth in this Stipulation. Such protections are in

19 addition to those provided above. Notwithstanding anything to the contrary, the Debtor reserves

20 all rights it may have to dispute the validity or effectiveness of the Collection Agreements, the

21 existence of any Collection Property and the rights of any party in and to the Collection Property.

22       7.     PaymentOne's replacement liens on the post-petition property shall have the

23 same priority vis-a-vis other liens and interests as PaymentOne's pre-petition liens and security

24 interests have vis-a-vis such other liens and interests. The replacement liens granted to

25 PaymentOne pursuant to this Stipulation are intended to preserve PaymentOne's position vis-a-vis

26 the Debtor and other creditors of the estate so that PaymentOne's position vis-a-vis the Debtor and

27 such other creditors is neither diminished nor enhanced by Debtor's use of Cash Collateral and

28

-4-

1   PaymentOne's receipt of replacement liens.

2          8.       The replacement liens granted to PaymentOne pursuant to this Stipulation

3   are subordinated to the allowed  fees and expenses of professionals retained by the Debtor and any

4   official committee appointed in this bankruptcy case as well as those of any trustee subsequently

5   appointed in the bankruptcy case and such trustee's professionals, but only to the extent such fees

6   and expenses are provided for in the Budget and were actually incurred before this Stipulation

7   terminated.  In exchange for the benefit of the foregoing subordination, the parties entitled to the

8   benefits of the subordination shall not be entitled, directly or indirectly, to charge the Collateral or

9   the property covered by the replacement liens, whether by operation of Sections 105 or 506(c) of

10  the Bankruptcy Code or otherwise.  Notwithstanding anything to the contrary, PaymentOne does

11  not subordinate its replacement liens to any fees or expenses incurred in the direct or indirect

12  effort to pursue any claims or causes of action against it (whether pursuant to Chapter 5 of the

13  Bankruptcy Code or otherwise) or to seek to invalidate any of its liens in the Collateral or its rights

14  related to the Collection Property.  PaymentOne reserves the right to object to any fees or

15  expenses.

16         9.       Notwithstanding anything to the contrary set forth in this Stipulation, the

17  Debtor does not concede that PaymentOne has any valid, perfected or enforceable prepetition liens

18  or security interests in the Collateral or any of the Debtor's other assets, and the Debtor and

19  PaymentOne reserve all rights and defenses with respect thereto.  The replacement liens granted to

20  PaymentOne pursuant to this Stipulation are effective only to the extent that PaymentOne's

21  prepetition liens in the Collateral are valid, perfected and enforceable or to the extent that

22  PaymentOne has valid ownership rights, beneficial rights or other rights concerning the Collection

23  Property.

24         10.      The Debtor has informed PaymentOne that the Debtor is or will be

25  negotiating with any other parties who allege a security interest in the Debtor's Cash Collateral

26  (the "Other Liens") and, in connection therewith, may enter into stipulations with such entities or

27  otherwise move the Court for authority to grant other postpetition liens in assets of the Debtor's

28

-5-

1   estate, which requested postpetition liens may be senior to any liens or security interests possessed

2   by PaymentOne (but only to the extent that the Other Liens were senior to the security interests or

3   other rights and interests of PaymentOne as of the Petition Date, or pursuant to an order of the

4   Court) . PaymentOne reserves the right to review and object to any other agreement that may be

5   reached between the Debtor and other allegedly senior lienholders.

6             11.    If any party in interest objects to the Stipulation and such objection is

7   sustained, or if the Court does not approve this Stipulation, PaymentOne shall be fully protected to

8   the extent of the Debtor's actual use of Cash Collateral in which PaymentOne has an interest prior

9   to entry of a Court Order curtailing or otherwise modifying the provisions of this Stipulation.

10            12.    PaymentOne may terminate this Stipulation and the Debtor's use of Cash

11  Collateral pursuant thereto upon fifteen (15) days prior written notice to the Debtor and the

12  Debtor's counsel. Notwithstanding the foregoing, this Stipulation (including without limitation

13  PaymentOne's consent to the Debtor's use of Cash Collateral) shall terminate immediately and

14  automatically upon the occurrence of the following:

15            a.     Entry of an order dismissing or converting the Debtor's chapter 11

16  case to a chapter 7 case;

17            b.     Entry of an order appointing a chapter 11 trustee; or

18            c.     Written agreement of the Debtor and PaymentOne to terminate this

19  Stipulation.

20            d.     Filing of a contested matter or adversary proceeding challenging

21  PaymentOne's security interests in the Collateral.

22            e.     November 9, 2007, provided, however, that this period may be

23  extended by written agreement of the parties.

24            13.    The termination of this Stipulation shall not affect or in any way impair any

25  right, interest or lien granted to PaymentOne under this Stipulation and the Order approving the

26  same. Any security interests and other rights granted hereunder shall survive any termination of

27  this Stipulation. Except as specifically set forth in this Stipulation, neither the Debtor nor

28

-6-

1    PaymentOne waive any rights provided to them under the Bankruptcy Code or any other

2    applicable law, including the Debtor's right to move for authority to use Cash Collateral after

3    termination of this Stipulation.  Moreover, by executing this Stipulation, the parties hereto have

4    not waived any of their rights or remedies contained in any of the Security Agreements, the

5    Collection Agreements or any other agreements between the parties.

6        14.    The terms of this Stipulation shall be binding upon the successors and

7    assigns of the Debtor and PaymentOne and shall be binding upon any superseding chapter 11

8    trustee in this case, or in the event of a conversion of the case to a chapter 7 case, upon the chapter

9    7 trustee.

10        15.    The Court shall retain exclusive jurisdiction over the subject matter of this

11   Stipulation in order to resolve any dispute in connection with the rights and duties specified

12   hereunder.

13        16.    This Stipulation is made and entered in the State of California and shall be

14   interpreted and enforced to the extent that State law is applicable under and pursuant to the laws of

15   said jurisdiction.

16        17.    All notices other correspondence or information to be transmitted to the

17   parties pursuant to this Stipulation shall be transmitted via email and also deposited in the United

18   States mail, postage prepaid, addressed as follows, or to such other addresses as may hereinafter

19   be designated in writing by respective parties hereto:

20        If to the Debtor:

21        The Billing Resource
          Attn:  Ken Dawson, President
22        5883 Rue Ferrari
          San Jose, CA  95138
23        Email: kdawson@integretel.com

24        With a copy to:

25        Sheppard, Mullin, Richter & Hampton LLP
26        Attn:  Michael H. Ahrens, Esq.
               Jeffrey K. Rehfeld, Esq.
27        Four Embarcadero Center, 17th Floor
          San Francisco, California  94111-4106
28

-7-

Email:  mahrens@sheppardmullin.com
        jrehfeld@sheppardmullin.com

If to PaymentOne:

        PaymentOne Corporation
        Attn:  Officer, Managing or General Agent
        5883 Rue Ferrari
        San Jose, CA  95138
        Email:  _____

With a copy to:

        O'Melveny & Myers LLP
        Attn:  Steve Warren, Esq.
        and Victoria Newmark
        400 South Hope Street
        Los Angeles, CA  90071-2899
        Email:  swarren@omm.com

18.    No modification, amendment or waiver of any of the provisions of this Stipulation shall be effective unless in writing signed by the parties.

19.    This Stipulation has been prepared and negotiations in connection therewith have been carried on by the joint efforts of the parties.  This Stipulation is to be construed simply and fairly and not strictly for or against any of the parties hereto.  Each of the parties acknowledges that it has been represented by independent legal counsel of its own choice during all of the negotiations which preceded the execution of this Stipulation and that is has executed this Stipulation with the consent and on the advice of such independent legal counsel.

20.    This Stipulation may be executed in any number of counterparts, any and all of which shall be deemed to be the original.

21.    Each person signing this Stipulation as a representative of a named party hereby represents and warrants that he or she is authorized to so sign; and that the execution, formation, and performance of this Stipulation by the parties is duly authorized, subject to Court approval, if necessary.

-8-

1        22.    This Stipulation is subject to and conditioned upon approval of the Court.

2    Each of the parties agree to make every reasonable effort to obtain such approval.

3

4    Dated: _Sept 16_ , 2007

5                                               THE BILLING RESOURCE, dba INTEGRETEL, a

6                                               California Corporation

7                                               By: _____

8                                               Ken Dawson
                                                President

9    Dated: _____ , 2007

10                                              PAYMENTONE CORPORATION, a Delaware

11                                              Corporation

12                                              By: _____
                                                Name: _____
13                                              Its: _____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-9-

W02-WEST:FKA\400433123.1

STIP. W/ PAYMENTONE CORP
RE USE OF CASH COLLATERAL

1          22.    This Stipulation is subject to and conditioned upon approval of the Court.

2     Each of the parties agree to make every reasonable effort to obtain such approval.

3

4     Dated: _____, 2007

5                                    THE BILLING RESOURCE, dba INTEGRETEL, a

6                                    California Corporation

7                                    By: _____

8                                        Ken Dawson
                                 President

9     Dated: SEPT    16 , 2007

10                                   PAYMENTONE CORPORATION, a Delaware

11                                   Corporation

12                                   By: _____
                               Name: ___EVAN B. MEYER_____

13                                   Its:   ___CFO_____

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   -9-

W02-WEST:FKA\400433123.1
                                         STIP. W/ PAYMENTONE CORP
                                         RE USE OF CASH COLLATERAL

Case: 07-52890    Doc #: 8    Filed: 09/17/2007    Page 11 of 11

                                                 RER-2    0059

**RER - 3**

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
        A Limited Liability Partnership
2        Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  JEFFREY K. REHFELD, Cal. Bar No. 188128
   ORI KATZ, Cal. Bar No. 209561
4  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4106
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6  Email:        mahrens@sheppardmullin.com
                 jrehfeld@sheppardmullin.com
7                okatz@sheppardmullin.com

8  Proposed Attorneys for The Billing Resource,
   dba Integretel

9

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                   SAN JOSE DIVISION

13

14  In re                              Case No. Case No. 07-52890

15  THE BILLING RESOURCE, dba           Chapter 11
    INTEGRETEL, a California corporation,
16                                      DECLARATION OF KEN DAWSON IN
                    Debtor.            SUPPORT OF EMERGENCY MOTION
17                                      FOR USE OF CASH COLLATERAL AND
    Tax ID: 33-0289863                  GRANTING REPLACEMENT LIENS
18

19                                      Date:      [TBD]
                                        Time:      [TBD]
20                                      Place:     United States Bankruptcy Court
                                                   280 South First Street
21                                                 San Jose, California
                                        Judge:     [TBD]
22                                      Courtroom: [TBD]

23

24

25

26

27

28

W02-WEST:FJR\400317012.4

1      I, Ken Dawson, declare as follows:

2      1.    I am the President and Secretary of The Billing Resource, dba Integretel, a

3 California corporation (the "Debtor"), the named debtor in this case. I make this declaration in

4 that capacity. I was one of the Debtor's founders in 1988 and I have been with the company ever

5 since. I have personal knowledge of the matters set forth below. If called upon to testify as to

6 those matter I could and would do so competently.

7      2.    This declaration is submitted in support of the Debtor's "Emergency Motion For

8 Use Of Cash Collateral And Granting Replacement Liens" (the "Motion"). Capitalized terms not

9 defined herein shall have the meanings ascribed to them in the Motion.

10      3.    The Debtor has filed a voluntary petition for relief under Chapter 11 of the

11 Bankruptcy Code. The Debtor is operating its business pursuant to Sections 1107 and 1108 of the

12 Bankruptcy Code.

13      4.    The Debtor was originally formed in 1988 based on a need for aggregators to

14 facilitate billing and collections on behalf of smaller telecommunications companies that

15 otherwise could not afford to compete with the larger local exchange carriers ("LECs" or

16 "Telcos") such as AT&T. At that time "alternative operator services" ("AOS") was a growing

17 market segment and affordable billing solutions allowed private companies to compete with the

18 LECs in niche areas like public payphones, hotels, and prisons. In the payphone market, for

19 example, many of the incumbent LECs' phones were perceived to be relatively poorly maintained

20 and expensive to use. Today, most LECs have exited the payphone market.

21      5.    In the pre-subscribed long distance business, typically the service provider

22 establishes a long-term service relationship with the consumer. In contrast, AOS involves a casual

23 relationship where often the consumer uses the service provider's assets or services without the

24 consumer or the service provider even knowing at that time each other's identity. For example, a

25 service provider owning the service contract for a hotel chain has no idea what the true identity is

26 of the consumer using its phones. When a collect call is placed, often the only information that

27 the AOS provider has are the basic elements of the call itself, i.e., the telephone number the call is

28 placed from, the telephone number to which the call is placed, the date and time of the call, and

W02-WEST:FJR\400317012.4

-1-

DECLARATION

RER-3          0061

1  the duration of the call. While the called party may have accepted the charges, the AOS provider
2  can only bill such collect calls by one of two methods: (1) using a direct invoice; or (2) via the
3  consumer's home LEC (the AOS provider could have required the caller to use a credit card or
4  charge his or her hotel room, but that is not a competitive offering for a consumer wishing to make
5  a collect call). Each of these methods has many drawbacks.

6      6.    In addition to AOS providers, the Debtor services customers offering enhanced
7  products and services such as voice mail, online directory listings and bundled calling plans.
8  While these services may be billed to credit cards, often consumers are hesitant to use their credit
9  cards for such intangible purchases and, therefore, may prefer alternate billing choices such as the
10  LEC phone bill.

11      7.    Under the direct invoice method, the service provider would need to first purchase
12  the consumer's billing name and address from a reliable source and then print, stuff and mail an
13  invoice. The per unit cost of these administrative functions could be prohibitively high without a
14  substantial volume. As many service providers' names are not well known, a high percentage of
15  these invoices are also likely to be thrown away or ignored. Since the average billing charge may
16  be very small, collections efforts are cost prohibitive. Unless the service provider has a powerful,
17  household brand name, the direct invoice billing method is typically impracticable.

18      8.    Similarly, billing the consumer's home LEC also presents numerous difficulties.
19  With this method, the service provider needs to have first invested millions of dollars in
20  specialized software to interface with each LEC's billing system as well as to decipher their
21  resulting reports and data streams. In addition, the service provider would need billing and
22  collection contracts with every LEC, which would cost about $2 million to obtain and implement,
23  take 6-12 months to set up, and require ongoing fee minimums of over $100,000 per month. The
24  AOS provider needs every LEC agreement because it has no way to know in advance the identity
25  of the billed party.

26      9.    The Debtor addressed a significant industry void by creating a service bureau
27  focused entirely on billing-related services. As the cornerstone to its billing capability, the Debtor
28  maintains a full compliment of billing and collection agreements with an estimated 1,400 or more

---

W02-WEST:FJR\400317012.4

-2-

DECLARATION

1  LECs, including all major LECs and numerous independents.    This infrastructure enables
2  telecommunication service providers to incorporate their charges within the phone bills of greater
3  than 90% of business and residential consumers throughout the United States and Canada.  By
4  using a billing aggregator like the Debtor, the fixed overhead is already in place and the per unit
5  billing cost is typically lower than the direct approach.  Moreover, the LEC bill adds credibility to
6  the charge and provides a substantially higher collection rate.

7       10.    The Debtor quickly established itself as a leader in providing LEC billing solutions
8  for diverse and emerging products and services.  The Debtor presently offers a complete array of
9  complimentary services including validation and fraud control, internet-delivered management and
10  settlement reporting, direct billing, customer care and collection support.  As a strategic back-
11  room business partner, the Debtor frees its clients to focus their efforts on promoting and selling
12  products and services.

13      11.    The Debtor has served thousands of service providers over the years.  The vast
14  majority of the processed billings have been in support of smaller sized businesses that otherwise
15  would not have been able to compete.  It is the competitive pressure of these smaller companies
16  that has forced down the rates charged to consumers by the larger telecommunication companies.

17      12.    The Debtor's office is in San Jose, California.  The Debtor leases that office space.
18  The Debtor has no other offices or real estate leases.  The Debtor owns no real estate.  The Debtor
19  has approximately thirty-seven employees.  Twenty-two of those employees have been with the
20  company for over five years, and thirteen have been with the Debtor  for over ten years.  In
21  addition, the Debtor's services support, through outsourced relationships, approximately 30 call
22  center personnel in several different call centers who are employed by a third-party vendor.  This
23  function used to be internally managed by the Debtor until a few years ago.

24      13.    In July of 2000, the Debtor formed a subsidiary called eBillit, Inc., now known as
25  PaymentOne Corporation (hereinafter, "PaymentOne"), a Delaware corporation, to address the
26  specialized billing and support requirements of the internet.  PaymentOne is a majority-owned
27  subsidiary of the Debtor.  In 2002, the Debtor formed another subsidiary, Inmate Calling
28  Solutions, LLC, dba ICSolutions (hereinafter, "ICSolutions"), to target the correctional industry.

1   ICSolutions provides a full, end-to-end call processing and support system to facilitate inmate
2   calling including collect and pre-paid calling as well as a variety of complimentary products and
3   services. ICSolutions is a majority-owned subsidiary of the Debtor. In 2004, the Debtor formed
4   another subsidiary, Information Services 900 LLC (hereinafter, "IS 900"), to target the
5   provisioning, rating, formatting and billing of 900 call traffic. IS 900 is a majority-owned
6   subsidiary of the Debtor.

7       14.     The typical contract between the Debtor and its service provider customers
8   provides that the customer submit to the Debtor the customer's billing transactions (the "Billing
9   Transactions") in a data format acceptable to the Debtor. Such typical contract provides that if the
10  Billing Transaction is not satisfactory then the Debtor may reject it. Such typical contract
11  provides that if not rejected then the accounts receivable submitted as part of the Billing
12  Transaction becomes an account receivable of the Debtor and not the customer. The typical
13  contract provides that "Client [i.e., the customer] acknowledges that the Billing Contracts with
14  Telcos [i.e., LECs] are structured as a purchase of accounts receivable..."

15      15.     It is the Debtor's belief that the customers have no ownership interest in the
16  proceeds of the billing transactions after the Billing Transactions are submitted to the Debtor. It is
17  the Debtor's belief that after the Billing Transactions are submitted and the accounts receivable
18  from the LECs becomes property of the Debtor, the customer is only an unsecured creditor of the
19  Debtor, with claims for certain "distributions" under the contract between the Debtor and the
20  customer. Generally, those "distributions" will be payable by the Debtor about 90 or so days after
21  the Billing Transaction is submitted to the Debtor by the customer. Detailed formulas are set forth
22  in the contracts for computing the amounts that the Debtor is required to pay the customers. The
23  Debtor is authorized to withhold from the customer amounts to resolve disputes, its fees, and other
24  adjustments. The reserves are merely bookkeeping entries. The Debtor does not have any
25  accounts segregated by individual client which hold any reserves.

26      16.     Under the typical contract it is provided that each week the Debtor shall transfer by
27  wire to the customer's bank account the Net Proceeds identified in the prior week. "Net Proceeds"
28  is defined as the gross value of the Billing Transactions that are remitted to the LECs, less

-4-

1   amounts withheld by the LECs, less amounts due to the Debtor, and less other fees and reserves.
2   This amount is due only as such amounts are determined from the information provided from the
3   LECs, and that is generally 90 days after submission of the Billing Transactions.

4       17.    On February 27, 2006, the Federal Trade Commission (the "FTC") commenced a
5   lawsuit (the "Florida Action") in the United States District Court for the Southern District of
6   Florida (the "Florida Court") against Nationwide Connections, Inc. ("Nationwide"), Access One
7   Communications, Inc. ("Access One") and Network One Services, Inc. ("Network One"), three
8   AOS providers, as well as their principals, alleging deceptive and unfair practices for unauthorized
9   billing of charges on phone bills – referred to as "cramming" – in violation of the Federal Trade
10  Commission Act (the "FTCA").  The Florida Action is captioned <u>Federal Trade Commission v.</u>
11  <u>Nationwide Connections, Inc., et al.</u>, Case No. 06-80180-Civ-Ryskamp, United States District
12  Court for the Southern District of Florida.  The Florida Court entered a temporary restraining
13  order and later a preliminary injunction.  The Florida Court appointed a receiver (the "Receiver")
14  for Nationwide, Access One and Network One and certain of their affiliates.  An "Amended
15  Preliminary Injunction Order" was filed on September 25, 2006.  On or about September 21, 2006,
16  the FTC filed an amended complaint which included claims against the Debtor and another billing
17  aggregator.   Access One and Network One were two of the Debtor's prior AOS provider
18  customers (Access One and Network One collectively shall be referred to as the "Prior
19  Customers").  The FTC alleged in its amended complaint that the Debtor caused certain of the
20  Prior Customers' fraudulent charges to be placed on end users' phone bills and that the Debtor was
21  liable under the FTCA.  The Debtor filed an answer denying the FTC's allegations.

22      18.    The Receiver filed a motion seeking to hold the Debtor in contempt for allegedly
23  failing to turn over to the Receiver, on behalf of the Prior Customers, certain reserves under the
24  Prior Customers' contracts with the Debtor (the "Subject Contracts") in an alleged amount
25  exceeding $1.4 million.  The Debtor filed response opposing such relief on numerous grounds.
26  The grounds included without limitation that the Debtor had no obligation to pay any funds to the
27  Receiver under the Subject Contracts.  In addition, the Debtor asserted that it did not hold any
28  specific designated funds allocable to reserves for the Prior Customers, because consistent with the

1  Debtor's general practice regarding reserves, the Debtor treated them solely as bookkeeping
2  entries, without segregating or otherwise designating specific funds for purposes of the reserves.

3      19.     The Florida Court filed an order dated September 14, 2007 (the "Payment Order")
4  requiring that the Debtor pay the disputed substantial moneys into a segregated receivership
5  account. Though the FTC is a party to the Florida Action, the Payment Order which caused the
6  filing of this bankruptcy case was entered upon the motion of the Receiver, not a motion by the
7  FTC.

8      20.     The Debtor believes that it will ultimately prevail in the Florida Action, including
9  with respect to amounts which are the subject of and required to be paid under the Payment Order,
10 and contends that it currently owes nothing to the Receiver. However, the Debtor's business could
11 not endure parting with such a substantial amount of money, as even the temporary loss of such a
12 large amount of funds would have had devastating consequences on the Debtor's business
13 operations, and consequently on the Debtor's creditors, employees and stakeholders. The Debtor
14 does not have sufficient funds to pay the monies required under the Payment Order and at the
15 same time make payments required for the Debtor's business operations. In addition, making the
16 payment required by the Payment order would gravely impair the Debtor's ability to pay other
17 customers any amounts that the Debtor determines should be paid in accordance with the reserve
18 provisions of the respective contracts. There is no segregated reserve account for any customer,
19 and the Debtor does not have enough cash to cover the full amount of reserves for all customers.
20 Thus, paying the Receiver under the Payment Order would give the Receiver preferential
21 treatment as compared to all of the Debtor's other customers. Accordingly, the Debtor filed for
22 bankruptcy protection to allow for an orderly and equitable administration of its assets for the
23 benefit of all claimants and stakeholders and to preserve its business operations and the
24 livelihoods of its employees.

25     21.     The Debtor needs immediate use of the Cash Collateral to permit it to continue to
26 operate, including without limitation for payment of its vendors, employees, as well as its other
27 business operations necessary for its continued viability, all as set forth on the budget (the
28 "Budget") attached hereto as <u>Exhibit A</u>. Without the ability to use cash collateral, the Debtor

1 cannot meet these expenses and is in jeopardy of having to cease business operations, which

2 would result in instant and irreversible harm to the Debtor, its creditors, its employees, and its

3 entire bankruptcy estate. It would also be extremely detrimental to the Debtor's customers who

4 depend upon the Debtor for the services the Debtor provides. The Debtor needs the use of cash

5 collateral now to avoid immediate and irreparable harm to the Debtor and its bankruptcy estate.

6    22.    The Debtor does not have a traditional bank lender. However, PaymentOne, POL,

7 Inc. ("POL"), Network Telephone Systems, Inc. ("Network Telephone"), Personal Voice, Inc.

8 ("Personal Voice") and Public Communication Services, Inc. ("Public Communication")

9 (collectively referred to herein as the "Alleged Cash Collateral Secured Creditors") claim to hold

10 valid, perfected and enforceable security interests in certain assets of the Debtor which constitute

11 "cash collateral" as defined in Bankruptcy Code section 363(a) (such assets of the Debtor shall be

12 referred to herein as the "Cash Collateral").

13    23.    In addition to the Alleged Cash Collateral Secured Creditors who assert certain

14 interests in the Debtor's assets, it is my understanding that Highline Capital Corp. and CIT

15 Technology Financing Services, Inc. assert security interests in certain of the Debtor's office and

16 computer equipment.

17    24.    The Debtor does not concede that any entity possesses a valid, perfected and

18 enforceable security interest in the Debtor's Cash Collateral and reserves all rights and defenses in

19 connection therewith. However, in light of the Debtor's urgent need to use Cash Collateral and in

20 order to avoid having to immediately resolve any disputes regarding creditors' alleged security

21 interests in Cash Collateral of the Debtor, the Debtor proposes that each of the entities be granted a

22 replacement lien of the same kind and type as it possessed prepetition which replacement lien shall

23 be effective only to the extent that each such entity's prepetition liens were valid, perfected and

24 enforceable. Moreover, to the extent that each such entity's prepetition liens were valid, perfected

25 and enforceable at all, each such entity's replacement liens on post-petition property shall have the

26 same priority vis-a-vis other liens and interests as each of the respective entity's pre-petition liens

27 and security interests have vis-a-vis such other liens and interests.

28    25.    Attached as <u>Exhibit B</u> hereto is a balance sheet of the Debtor (the "Balance Sheet").

W02-WEST:FJR\400317012.4

-7-

1  The Balance Sheet shows that as of the date thereof, the Debtor had current assets of $24 million,

2  including $13.8 of accounts receivables from LECs (the "LEC Accounts Receivable"). Because of

3  my position and my experience with the Debtor, I am aware of the Debtor's financial status and

4  operations on both an historical and current basis. Based upon the Debtor's business history and

5  my review of the Debtor's books and records, I believes that as of the date of this Motion, the

6  Debtor's current assets as well as its LEC Accounts Receivable are in amounts similar to the

7  amounts listed for each of those categories on the Balance Sheet. Based upon the Debtor's

8  business history, I believe that the Debtor should collect the LEC Accounts Receivable on a

9  rolling basis over the next ninety (90) days.

10      26.    PaymentOne asserts a claim against the Debtor in the approximate sum of $15.4

11  million. PaymentOne purports to hold valid, perfected and enforceable security interests in

12  various assets of the Debtor pursuant to a security agreement between PaymentOne and the

13  Debtor. PaymentOne has a filed a UCC-1 financing statement and an amendment thereto, copies

14  of which are attached hereto as Exhibit C, which states that it covers accounts and other Cash

15  Collateral. PaymentOne is a majority-owned subsidiary of the Debtor. The Debtor believes that it

16  may have certain objections to the security interest alleged by PaymentOne, including as set forth

17  in the Motion relating to a name change of the Debtor which occurred in February 2005.

18      27.    POL, Inc. ("POL") asserts a claim against the Debtor in the approximate sum of

19  $196,000. Pursuant to an agreement and release between POL and certain related parties,[1] on the

20  one hand, and the Debtor on the other hand, POL claims to hold valid, perfected and enforceable

21  security interests in various assets of the Debtor. POL has a filed a UCC-1 financing statement, a

22  copy of which is attached as Exhibit D, and a security agreement which states that POL possesses

23  a security interest in accounts and other Cash Collateral of the Debtor.

24      28.    The Debtor has LEC Accounts Receivable in excess of approximately $24 million.

25  The only two entities that appear to have an alleged security interest in the accounts of the Debtor

---

[1] Those POL-related parties are listed on and exhibit to the Emergency Motion. To the extent those related parties assert an interest in the Cash Collateral of the Debtor, the Debtor in its motion moves for relief to use such Cash Collateral consistent with the relief being sought against POL.

-8-

1   are PaymentOne and POL. Together their claims amount to approximately $15.6 million. I

2   believe that as long as operations continue post petition these receivables should be maintained at

3   the same level. No post petition financing is sought, and the only parties with an arguable claim

4   on these accounts are Payment One and POL. Hence, there is a substantial equity cushion that

5   both of these creditors have in the accounts, and I believe that equity will be maintained as they

6   are being granted a replacement lien in the receivables that are generated post petition.

7        29.    Network Telephone asserts a claim against the Debtor in the approximate sum of

8   $1.3 million. Network Telephone purports to hold valid, perfected and enforceable security

9   interests in various items pursuant to a master services agreement between Network Telephone

10  and the Debtor. Network Telephone has a filed a UCC-1 financing statement, a copy of which is

11  attached as Exhibit E, which states that it covers the following collateral:

12       Security interest in any Net Proceeds and IGT Reserve that may become due to
         Secured Party under the Master Services Agreement and related documentation
13       entered into between Integretel, Incorporated and Network Telephone Services,
         Inc. dated as of August 1, 2004.
14

15       30.    Network Telephone's contract with the Debtor, excerpts of which are attached

16  hereto as Exhibit F, provides in relevant part that:

17       6.    Settlement of Amounts Due. [Network Telephone] shall be entitled to all
         collected amounts, up to an including the gross value of the Billing Transactions
18       remitted to the Telcos, less any amounts due and owing to IGT hereunder
         including, without limitation, Unbillables, Adjustments, Telco Holdback, excess
19       Uncollectables (pursuant any True-up), Fees, Telco Fees and IGT Reserves (such
         difference being the "Net Proceeds").
20

21

22       31.    It is the Debtor's position that Network Telephone does not possess any security

23  interests in the Debtor's Cash Collateral – since Network Telephone's alleged security interest is

24  not in any assets of the Debtor, but instead purports simply to be in amounts to which Network

25  Telephone may be entitled under its contract with the Debtor. Moreover, the Debtor maintains no

26  account containing reserves segregated by client, and as such it is the Debtor's position that

27  Network Telephone does not possess a security interest in the Debtor's Cash Collateral based upon

28  on an alleged security interest in any reserves under the parties' contract.

-9-

W02-WEST:FJR\400317012.4

RER-3        0069

32.     Personal Voice asserts a claim against the Debtor in the approximate sum of $1.9 million.  Personal Voice purports to hold valid, perfected and enforceable security interests in various items pursuant to a billing services agreement between Personal Voice and the Debtor. Personal Voice has a filed a UCC-1 financing statement, a copy of which is attached hereto as Exhibit G, which states that it covers the following collateral:

> Integretel Incorporated ("IGT") hereby grants Personal Voice ("PV") a first position security interest in all collected amounts due and owing to PV pursuant to that certain billing services agreement dated April 19, 2000 and amended October 01, 2001, and any amendments thereto, ("Agreement") by and between IGT and PV, arising from Billing Transactions, as such term is defined under the Agreement, generated and submitted by PV to IGT, after consideration of all amounts which are or will become due to IGT or may be retained or held by IGT pursuant to the Agreement.

33.     Personal Voice's contract with the Debtor, excerpts of which are attached hereto as Exhibit H, provides in relevant part that:

> 9. Remittal Of Customer Funds.  Customer shall be entitled to the gross value of its Billing Transactions less any applicable deductions set forth in Sections 6 and 8 hereunder (such difference being the "Net Proceeds"). . . .

34.     The Debtor contends that Personal Voice does not possess any security interests in the Debtor's Cash Collateral for, among other reasons, the same reasons that Network Telephone did not possess any such security – i.e., Personal Voice's alleged security interest is not in any assets of the Debtor, but instead purports simply to be in amounts to which Personal Voice may be entitled under its contract with the Debtor.  Similarly, the Debtor maintains no account containing reserves segregated by client, and as such the Debtor contends that Personal Voice does not possess a security interest in the Debtor's Cash Collateral based upon on an alleged security interest in any reserves under the parties' contract.

35.     Public Communication asserts a claim against the Debtor in the approximate sum of $500,000.  Public Communication purports to hold valid, perfected and enforceable security interests in various items pursuant to a master services agreement between Public Communication and PaymentOne (which was then known as eBillit and sometimes referred to in the parties' master services agreement as "EBI").  The Debtor and PaymentOne subsequently entered into an

-10-

1    assignment agreement whereby PaymentOne assigned all of its rights and obligations under that

2    master services agreement to the Debtor. A UCC-1 financing statement has been filed, a copy of

3    which is attached as Exhibit I, which lists PaymentOne as the secured party and which states that

4    it covers the following collateral:

> 9.    Pursuant to that certain Support Services Agreement dated July 1, 2000, as
> may be amended, ("Agreement") by and between Integretel, Incorporated ("IGT")
> and PaymentOne Corporation ("P1"), IGT does hereby grant to P1's client, Public
> Communication Services, Inc. ("PCS"), a first priority security interest in any and
> all Net Proceeds, as such term is defined under the Agreement, that may be in
> IGT's possession from time to time, arising from or relating to the processing of
> Accounts of PCS as such Accounts are designated by P1 under the Agreement.

10    36.    The UCC-1 financing statement does not list Public Communication as the secured

11    party.

12    37.    The Debtor contends that Public Communication does not possess any security

13    interests in the Debtor's Cash Collateral for the same reasons that neither Network Telephone nor

14    Personal Voice possessed any such security – i.e., Public Communication's alleged security

15    interest is not in any assets of the Debtor, but instead purports simply to be in amounts to which

16    Public Communication may be entitled under its contract with the Debtor. The UCC-1 financing

17    statement asserts that the Debtor granted Public Communication a security interest in the "Net

18    Proceeds" under the Support Services Agreement between the Debtor and PaymentOne arising

19    from or related to the processing of Public Communication account, however, it is my belief that

20    the Support Services Agreement: (1) does not grant any security interests; (2) provides for no

21    third-party beneficiaries and thus does not provide any rights to Public Communication; and (3)

22    the definition of Net Proceeds under that agreement provides yet again that Net Proceeds are

23    simply amounts due to PaymentOne under the Support Services Agreement, not assets of the

24    Debtor. Excerpts of the Support Services Agreement are attached hereto as Exhibit J, and that

25    agreement provides in relevant part that:

> (d).  . . . In the event that EBI, at its option, has elected to utilize a billing page
> under Integretel's Billing Contracts, then Integretel shall remit to EBI all funds
> received from Telcos with respect to Data Records submitted to Telcos under
> Integretel's Billing Contracts, after adjusting for applicable Adjustments,
> Unbillables and True-up, less any amounts necessary to cover Reserves and

1    unpaid Service Fees (such net amount being the "Net Proceeds").

2    38.    The security interest granted to Public Communication in its contract with EBI

3    (who since assigned its rights and obligations thereunder to the Debtor), excerpts of which

4    contract are attached hereto as Exhibit K, does not mention any security interest in any accounts

5    being granted to Public Communication and is narrower than the description of collateral listed in

6    the UCC-1 financing statement purportedly in Public Communication's favor.    The security

7    interest granted to Public Communication in its contract with EBI provided in relevant party that:

8        7. Settlement of Amounts Due.  [Public Communication] shall be entitled to all
         collected amounts, up to an including the gross value of the Billing Transactions
9        remitted to the Telcos, less any amounts due and owing to EBI hereunder
         including, without limitation, Unbillables, Adjustments, Telco Holdback, excess
10       Uncollectables (pursuant any True-up), Fees, Telco Fees and EBI Reserves (such
         difference being the "Net Proceeds"). . . . IN RECOGNITION OF CLIENT'S
11       RIGHTS TO ANY NET PROCEEDS HEREUNDER, EBI HEREBY GRANTS
         TO CLIENT A FIRST PRIORITY SECURITY INTEREST IN ANY AND ALL
12       NET PROCEEDS, THAT MAY BE IN EBI'S POSSESSION FROM TIME TO
         TIME AND EBI SHALL FILE A UCC-1 AND TAKE ALL OTHER
13       REASONABLE STEPS TO ACKNOWLEDGE AND PERFECT CLIENT'S
14       SECURITY INTEREST IN SUCH PROCEEDS.

15   39.    The Debtor contends that Public Communication does not possess any security

16   interests in the Debtor's Cash Collateral for, among other reasons, the same reasons that neither

17   Network Telephone nor Personal Voice possess any such security – i.e., Public Communication's

18   alleged security interest is not in any assets of the Debtor, but instead purports simply to be in

19   amounts to which Public Communication may be entitled under its contract with the Debtor.

20   Similarly, the Debtor maintains no account containing reserves segregated by client, and as such

21   the Debtor contends that Public Communication does not possess a security interest in the Debtor's

22   Cash Collateral based upon on an alleged security interest in any reserves under the parties'

23   contract.

24   40.    It is the Debtor's intention that the replacement liens on the post-petition property

25   the Debtor proposes to grant to each of the Alleged Cash Collateral Secured Creditors pursuant to

26   the Motion shall be valid, perfected and enforceable replacement liens upon all post-petition

27   property of the Debtor of the same type and character of any pre-petition property as to which the

28

-12-

1   respective Alleged Cash Collateral Secured Creditor had valid, perfected and enforceable security
2   interests or liens, but only to the extent of Cash Collateral used by the Debtor.  It is the Debtor's
3   intention that the replacement liens proposed to be granted to each of the Alleged Cash Collateral
4   Secured Creditors pursuant to the Motion shall have the same priority vis-a-vis other liens and
5   interests as each respective Alleged Cash Collateral Secured Creditor's pre-petition liens and
6   security interests have vis-a-vis such other liens and interests.  It is the Debtor's intention that the
7   replacement liens the Debtor proposes to grant to each of the Alleged Cash Collateral Secured
8   Creditors pursuant to the Motion are intended to preserve each such Alleged Cash Collateral
9   Secured Creditor's position vis-a-vis the Debtor and other creditors of the estate so that as each
10  such Alleged Cash Collateral Secured Creditor's position vis-a-vis the Debtor and such other
11  creditors is neither diminished nor enhanced by Debtor's use of Cash Collateral and each such
12  Alleged Cash Collateral Secured Creditor's receipt of replacement liens.  It is the Debtor's
13  intention that the replacement liens proposed to be granted to each of the Alleged Cash Collateral
14  Secured Creditors pursuant to this Motion are effective only to the extent that each respective
15  Alleged Cash Collateral Secured Creditor's prepetition liens in the Cash Collateral are valid,
16  perfected and enforceable.

17      41.    Notwithstanding anything to the contrary set forth in the Motion or this
18  Declaration, the Debtor does not concede that any of the Alleged Cash Collateral Secured
19  Creditors have any valid, perfected or enforceable prepetition liens or security interests in the Cash
20  Collateral or any of the Debtor's other assets, and the Debtor reserves all rights and defenses in
21  connection therewith.

22      42.    I believe that the level of adequate protection proposed to be provided by the
23  Debtor in the Motion to the Alleged Cash Collateral Secured Creditors, in return for the use of the
24  Cash Collateral, is reasonable.

25      43.    PaymentOne has stipulated to the use of cash collateral and it is my understanding
26  that a copy of that stipulation (the "PaymentOne Stipulation") is attached to the Motion.  I believe
27  that the PaymentOne Stipulation is in the best interest of the Debtor and its bankruptcy estate and
28  that good cause exists to approve the stipulation.

44.    I believe that good cause exists, and has been shown, for entry of an order approving the Motion on both an interim and final basis.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on September 16, 2007, at Pleasanton, California.

                                            /s/ Ken Dawson
                                            KEN DAWSON

# EXHIBIT A

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Three Week Period Ending October 5, 2007**

| | 1 | 2 | 3 | |
| --- | --- | --- | --- | --- |
| Week Ending | 9/21/07 | 9/28/07 | 10/5/07 | Total |
| Operating Costs and Expenses | | | | |
| 1  Personnel | $ 10,000 | $ 130,000 | $ 40,000 | $ 180,000 |
| 2  Telco billing & collection costs | 0 | 0 | 180,000 | 180,000 |
| 3  Other direct costs | 5,000 | 5,000 | 5,000 | 15,000 |
| 4  Selling, general & administrative expenses | 80,000 | 80,000 | 80,000 | 240,000 |
| 5  Total operating costs and expenses | 95,000 | 215,000 | 305,000 | 615,000 |
| Bankruptcy Costs (1) | | | | |
| 6 | 0 | 0 | 0 | 0 |
| 7 | 0 | 0 | 0 | 0 |
| 8 | 0 | 0 | 0 | 0 |
| 9  Total bankruptcy costs | 0 | 0 | 0 | 0 |
| 10  TOTAL EXPENSES | $ 95,000 | $ 215,000 | $ 305,000 | $ 615,000 |
| Beginning Available Cash | $ 1,945,598 | $ 1,850,598 | $ 1,635,598 | $ 1,945,598 |
| Expenses | (95,000) | (215,000) | (305,000) | (615,000) |
| Ending cash | $ 1,850,598 | $ 1,635,598 | $ 1,330,598 | $ 1,330,598 |

NOTE:
(1) Assumes counsel paid through retainers previously established.

**EXHIBIT A**

# EXHIBIT B

**THE BILLING RESOURCE dba Integretel**
**BALANCE SHEET**

|  | -UNAUDITED-<br>-PRELIMINARY-<br>6/30/07 |
|---|---:|
| ASSETS | |
| Cash | $       578,281 |
| Accounts receivable - customers, net | 10,065,525 |
| Accounts receivable - LEC and other | 13,824,768 |
| Intercompany receivable - ICS | 3,795,563 |
| Prepaid expenses and deposits | 267,045 |
| Total current assets | 28,531,182 |
| Investment in PaymentOne | 6,315,010 |
| Investment in ICS | 4,600,000 |
| Property and equipment, net | 71,683 |
| TOTAL ASSETS | $   39,517,875 |
| | |
| LIABILITIES AND STOCKHOLDERS' DEFICIT | |
| Accounts payable and accrued expenses | $     9,885,588 |
| Due to customers | 24,504,650 |
| Due to customers - withheld reserves | 15,872,254 |
| Deferred revenues | 2,625 |
| Note payable | 733,593 |
| Intercompany payable - PaymentOne | 15,428,310 |
| Total current liabilities | 66,427,020 |
| Common stock | 13,075,018 |
| Accumulated deficit | (39,984,163) |
| Total stockholders' deficit | (26,909,145) |
| TOTAL LIABILITIES AND STOCKHOLDERS' DEFICIT | $   39,517,875 |

# EXHIBIT B

-PRELIMINARY and UNAUDITED-
-Subject to Adjustment by Independent Auditors-

# EXHIBIT C

JAN-27-2005  09:14      CT CORP UCC SERVICES          800 828 3056    P.02/02

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

lease return copy to:
:T CORPORATION SYSTEM
.ttn:Michael Ruden/UCC/TEAM 2
295 Gateway Oaks Drive, Suite 185
acramento, CA 95833
6290427

**05-7013728538**
**01/27/2005 11:59**

**FILED**
SOS     CALIFORNIA
SECRETARY OF STATE

2375020002     UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTEGRETEL, INCORPORATED | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | CORPORATION | CALIFORNIA | C2304674 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PAYMENTONE CORPORATION | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | USA |

4. This FINANCING STATEMENT covers the following collateral:

All of Debtor's right, title and interest in and to all of the personal property of Debtor including the following, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located (the "Collateral"): all Accounts; all Chattel Paper; all Money and Deposit Accounts, together with all amounts of deposit from time to time in such Deposit Accounts; all Documents; all General Intangibles (including patents, trademarks, service marks, copyrights, and other intellectual property, Payment Intangibles and Software; all Goods, including Inventory, Equipment and Fixtures; all Instruments; all Investment Property; all Letter-of-Credit Rights and other Supporting Obligations; all Records; all Commercial Tort Claims; and all Proceeds and Accessions with respect to any of the foregoing Collateral. Each category of Collateral described herein shall have the meaning set forth in the Uniform Commercial Code, as it exists on the date this Financing Statement is filed with the California Secretary of State or as it may hereafter be amended, in the State of California.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

CA SOS: 656,390-004

FILING OFFICE COPY— UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

American LegalNet, Inc.
www.USCourtForms.com

TOTAL P.02

# EXHIBIT C

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

**A. NAME & PHONE OF CONTACT AT FILER** [optional]

**B. SEND ACKNOWLEDGMENT TO:** (Name and Address)

Please return copy to:
CT CORPORATION SYSTEMS/UCC
Attn: Melissa Guglielmana
2295 Gateway Oaks Drive, Suite 185
Sacramento, CA 95833
800-874-8820

6760841 – 01

**06-70889580**

**10/18/2006 16:47**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

**10068610002** UCC 3 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 05-7013728538 filed January 27, 2005 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☑ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.
☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☑ ADD name: Complete item 7a or 7b, and also item 7c; Also complete items 7a-7d (if applicable).

6. **CURRENT RECORD INFORMATION:**

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. **CHANGED (NEW) OR ADDED INFORMATION:**

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **THE BILLING RESOURCE** | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 7c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| **5883 RUE FERRARI** | **SAN JOSE** | **CA** / **95138** | **USA** |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | **CORPORATION** | **CALIFORNIA** | **C2304674** | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only one box.
Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The address maybe: 5883 RUE FARRARI, SAN JOSE, CA 95138.

9. **NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT** (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **PAYMENTONE CORPORATION** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA

CA SOS; 656,390-005

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)
CAUCC3PXAT - 10/01/02 CT System Online

# EXHIBIT D

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER (optional)
Joel Dichter, Esq. (212) 935-6020

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Joel R. Dichter, Esq.
Klein, Zelman, Rothermel & Dichter, LLP
485 Madison Avenue - 15th Floor
New York, New York 10022

**06-7078611258**
**07/19/2006 17:00**

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

8934850002    UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | The Billing Resource | | | | |
|---|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | US |

| 1d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corp. | California | C1554405 | NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | Integretel, Inc. | | | | |
|---|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | US |

| 2d. TAX ID #: SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | California | | ☒ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | POL, Inc. | | | | |
|---|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| Klein Zelman, 485 Madison Ave., 15 | New York | NY | 10022 | US |

4. This FINANCING STATEMENT covers the following collateral:

This financing statement covers all of the right, title and interest of the Debtor in, to and under all of the following, whether now existing or hereafter from time to time acquired (all of the following, collectively, the collateral), and Debtor hereby grants Secured Party a continuing lien upon and security interest in:

All general intangibles and contract rights as they pertain to the Reserves held by Debtor;
All accounts, assets, receivables and cash of Debtor;
All ownership interest that Debtor has in PaymentOne Corporation, Inmate Calling Solutions, LLC, and Information Services 900, LLC;
Any interest that Debtor obtains in any thing of value by virtue of a sale of all or substantially all of the assets of PaymentOne Corporation, Inmate Calling Solutions, LLC, or Information Services 900 LLC.

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. [This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors   Debtor 1   Debtor 2 | |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

## EXHIBIT D

# EXHIBIT E

**05-7017533940**
**02/28/2005 17:00**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

2739620002    UCC 1 FILING

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Daniel Coleman (818) 992-4300

B. SEND ACKNOWLEDGMENT TO:   (Name and Address)

Daniel H. Coleman
21135 Erwin Street
Woodland Hills CA 91367

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTEGRETEL, INCORPORATED | | | | |

OR | 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | US |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION California | 1g. ORGANIZATIONAL ID #, if any C1554405 | | NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR | 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | | NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| NETWORK TELEPHONE SERVICES INC. | | | | |

OR | 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 21135 Erwin Street | Woodland Hills | CA | 91367 | US |

4. This FINANCING STATEMENT covers the following collateral:

Security interest in any Net Proceeds and IGT Reserve that may become due to Secured Party under the Master Services Agreement and related documentation entered into between Integretel, Incorporated and Network Telephone Services Inc. dated as of August 1, 2004.

| 5. ALTERNATIVE DESIGNATION [if applicable] | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA | | | | | | |

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

## EXHIBIT E

# EXHIBIT F

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into as of August 1, 2004 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Network Telephone Services, Inc., a California corporation ("Client").

**WHEREAS,** Client is a provider of certain telecommunications related products and services primarily consisting of, for the purpose of this Agreement, 900-dialed information and/or entertainment services; and

**WHEREAS,** IGT is engaged in the business of providing validation, data processing, billing, reporting and related services to the telecommunications industry; and

**WHEREAS,** IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

**NOW, THEREFORE,** the parties hereto agree as follows:

**1.  DEFINITIONS.** Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

**2.  IGT SERVICES.** IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Sched# | Service Order Options | Included |
|--------|-----------------------|----------|
| I | Validation/Registration | ( ) |
| II | PhoneBill Services (Telco Billing) | ( X ) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry | ( X ) |
|  | (required with Service Order II or III) | |
| VII | Collection Services | ( ) |
| VIII | Pre-Pay Services | ( ) |

**3.  TERM.** The initial term of this Agreement shall be for three (3) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of one (1) year (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

**4.  CLIENT SUBMISSION AND IGT EDIT.** Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing Transactions to exclude records that are not likely to pass the

IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

**5.  SERVICE FEES.** IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the third annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period. Notwithstanding the foregoing, if at any time throughout the Term hereof IGT offers its services to another client, similar in all material respects to Client, at fee rates more favorable than the Fees, then Client shall be entitled to receive the Services at the more favorable rates for as long as such condition exists.

**6.  TAXES.** Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause each Telco to apply such Telco's then-current rates and logic to Client's Billing Transactions and any Taxes collected by a Telco in relation to Client's Billing Transactions shall be remitted to the appropriate taxing authorities by IGT. Except with respect to the remittance of such Taxes collected by a Telco, Client shall indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

**7.  CLIENT REPRESENTATIONS AND WARRANTIES.** Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

**8.  IGT's REPRESENTATION AND WARRANTY.** IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

**9.  PROOF OF COMPLIANCE.** Each party agrees to provide reasonable proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance.

## SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)

This Service Order for PhoneBill Services shall be effective as of the Effective Date of the Agreement. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.    SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

**2.    TELCO SUBMISSION, UNBILLABLES.** IGT shall submit to the Telcos those Billing Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process. Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format. IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**3.    INQUIRY SUPPORT, ADJUSTMENTS.**    A separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**4.    HOLDBACK, TRUE-UP, UNCOLLECTABLES.** Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due to Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at four percent (4%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up").

IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

**5.    OTHER DEDUCTIONS.**
a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at five percent (5%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. However, in exercising such discretion, IGT shall include the estimated Net Proceeds, if any, that may be outstanding with respect to Clients Billing Transactions as of such adjustment event. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds (the "LEC Cash Reserve"). This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos and, based upon such review, adjusted accordingly including, if applicable, refunding any excess reserve amounts to Client. The quarterly review of the IGT Reserve shall be in the form of the 'Client Position Analysis', the components of which to be mutually agreed upon by the parties. Client's share of the LEC Cash Reserve is calculated by dividing Client's total recourse for each of the applicable Telcos and time periods by IGT's aggregate recourse for those clients for which the LEC Cash Reserve is applicable within such time periods (the resulting quotient being the "Participation Percentage"). This Participation Percentage is multiplied by the LEC Cash Reserve to determine Client's share.

Notwithstanding the foregoing and Section 4 of this Service Order, at no time shall the sum of all reserves, including, without limitation, the Telco Holdback and IGT Reserve, exceed IGT's reasonable risk of losses specific to Clients Billing Transactions and the related obligations hereunder with consideration given both to cash funding requirements at Telcos and the estimated Net Proceeds, if any, that may be outstanding with respect to Clients Billing Transactions.

**6.    SETTLEMENT OF AMOUNTS DUE.**    Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net

Master Services Agreement
(REV. 09/03) NTS - MSA4

- CONFIDENTIAL -

Page 12

Case: 07-52890    Doc #: 9    Filed: 09/17/2007    Page 14 of 15

RER-3    0088