Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.

7. **REPORTS.**

(a) <u>Standard Reporting.</u>  IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein. Client may request that IGT provide additional reports or a different formatted report. To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b) <u>Report Review.</u>  Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c) <u>Report Detail.</u>  Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d) <u>Audit.</u>  Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos. The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated

amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8. **BILLING APPEARANCE.**  Where a Telco provides the capability, Client's Billing Transaction shall appear on such Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9. **RESALE OF ACCOUNTS.** Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users. Therefore, Client agrees, and does hereby transfer to IGT any rights in the Billing Transactions that may be necessary for IGT to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

10. **TELCO CONFIDENTIALITY.** Client hereby acknowledges and agrees that, without the express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services.    Client shall indemnify IGT and hold it harmless from any and all claims and/or damages that may arise as a result of Client's violation of this Section 10.

11. **SECURITY INTEREST.** IGT hereby grants to Client a continuing security interest in any Net Proceeds and IGT Reserve that may be or may become due to Client hereunder. Client shall be entitled to record a UCC-1 financing statement in connection with such security interest and Client agrees to promptly terminate such financing statement when all payment obligations of IGT to Client hereunder have been fully satisfied. The duties of the parties under this Section 11 shall survive termination of this Service Order.

*{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }*



# EXHIBIT G

RER-3    0090

**0207260419**

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Chris Parlove (408) 362-4188

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

LexisNexis Document Solutions
1029 J Street
Suite 100
Sacramento, CA  95814

**P6-0000-767-8**

**FILED**
**SACRAMENTO, CA**
**MAR  12, 2002 AT 1232**
**BILL JONES**
**SECRETARY OF STATE**

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Integretel, Incorporated | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5883 Rue Ferrari | San Jose | CA | 95138 | USA |

| 1d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| 33-0289863 | | CORP | CA | 1554405 □NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| 2d. TAX ID #:  SSN OR EIN | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | □NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Personal Voice, Inc. | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 16809-B U.S. Highway 19 N. | Clearwater | FL | 33764 | USA |

4. This FINANCING STATEMENT covers the following collateral:

See attached Exhibit A

5. ALTERNATIVE DESIGNATION (if applicable):  □LESSEE/LESSOR  □CONSIGNEE/CONSIGNOR  □BAILEE/BAILOR  □SELLER/BUYER  □AG. LIEN  □NON-UCC FILING

6. □ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum   7. Check to REQUEST SEARCH REPORT(S) on Debtor(s)  [ADDITIONAL FEE]  [optional]   □All Debtors  □Debtor 1  □Debtor 2

8. OPTIONAL FILER REFERENCE DATA
SoSCA                    B1722568-1

FILING OFFICE COPY — NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 07/29/98)

---

**EXHIBIT G**

Exhibit A – Wording for UCC-1 Filing

Integretel Incorporated ("IGT") hereby grants Personal Voice ("PV") a first position security interest in all collected amounts due and owing to PV pursuant to that certain billing services agreement dated April 19, 2000 and amended October 01, 2001, and any amendments thereto, ("Agreement") by and between IGT and PV, arising from Billing Transactions, as such term is defined under the Agreement, generated and submitted by PV to IGT, after consideration of all amounts which are or will become due to IGT or may be retained or held by IGT pursuant to the Agreement

020726 0419

RER-3    0092

# EXHIBIT H

CONFIDENTIAL

# BILLING SERVICES AGREEMENT
# (MISCELLANEOUS RECORDS)

**THIS BILLING SERVICES AGREEMENT** ("Agreement") is entered into as of the
_19th_ day of _April_, ~~1999~~ 2000 ("Effective Date"), by and between
INTEGRETEL, INCORPORATED ("IGT"), a California corporation and PERSONAL VOICE,
INC., a Florida corporation ("Customer").

## RECITALS

**WHEREAS**, Customer is the provider of traditional voicemail services, and Customer
represents and warrants that such services **do not include any entertainment and/or
information value**; and

**WHEREAS**, IGT is engaged in the business of providing telephone company billing
and collection and associated services to the telecommunications industry; and

**WHEREAS**, IGT is willing to provide its services to Customer and Customer desires
to obtain such services from IGT upon the terms and conditions stated herein;

**NOW, THEREFORE**, the parties hereto, in consideration of mutual covenants and
agreements contained herein, do hereby agree as follows:

## TERMS AND CONDITIONS

1.    **DEFINITIONS**.  For purposes of this Agreement, the following terms shall have
the meaning set forth below:

2162 (02/99 REV)
Billing Services Agreement - Miscellaneous
Personal Voice, Inc.
Page 1

*EXHIBIT* **H**

Client ID _____
(IGT Use Only)

11/28/2001  11:35    7275367620                                              PAGE  02

AMENDMENT number ONE ("Amendment")
To the BILLING SERVICES AGREEMENT
Dated 4/19/2000 ("Agreement")
Between INTEGRETEL, INCORPORATED ("IGT")
and PERSONAL VOICE, INC. ("Customer")

WHEREAS, Customer and IGT wish to amend the Agreement to provide for a scheduled pre-payment and reconciliation process in lieu of IGT's standard settlement process.

NOW, THEREFORE, the parties agree as follows:

1.     All capitalized terms not defined herein shall have the meaning ascribed to them under the Agreement.

2.     The term "Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

3.     Section 9 of the Agreement is hereby amended in its entirety to read as follows:

"9.     REMITTAL OF CUSTOMER FUNDS.  Customer shall be entitled to the gross value of its Billing Transactions less any applicable deductions set forth in Sections 6 and 8 hereunder (such difference the "Net Proceeds").  IGT shall calculate a "Pre-Pay Rate" by dividing the actual Net Proceeds for the three most recently settled Deposit Months by the face value of the Billing Transactions for such Deposit Months, and multiplying such quotient by 95%.  On the first scheduled payment date (the "Pre-Pay Date") occurring 60 days following the end of a Deposit Pay Rate for the Billing Transactions relating to the Pre-Paid Deposit Month (hereafter the "Pre-Paid Proceeds").  Within 30 days of each Pre-Pay Date, IGT shall determine the difference, if any, between actual Net Proceeds and Pre-Paid Proceeds for the subject Pre-Paid Deposit Month and IGT shall either (i) remit any excess Net Proceeds to Customer; (ii) apply any difference on the next scheduled Pre-Pay Date; or (iii) invoice Customer for any shortfall in Net Proceeds.  All payments to  Customer shall be by bank wire and Customer is reasonable for providing complete and accurate wire instructions in writing to IGT."

4.     This amendment to Section 9 of the Agreement also shall allow Personal Voice, Inc. to file a UCC-1 in California pursuant to the language provided by IGT, on the Personal Voice Receivables.  See attached wording to be part of UCC-1 filing which arises from this agreement as amended (See Exhibit A).

5.     Except as amended hereby, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of October 1, 2001.

Integretel, Inc. (IGT)

By: _____

Name: _Ken Dawson_

Title: _President 11/29/01_


Personal Voice, Inc. (Customer)

By: _____

Name: _David Giagu_

Title: _Pres    11/28/01_

11/28/2001  11:35    7275367620

## Exhibit A – Wording for UCC-1 Filing

Integretel Incorporated ("IGT") hereby grants Personal Voice ("PV") a first position security interest in all collected amounts due and owing to PV pursuant to that certain billing services agreement dated April 19, 2000 and amended October 01, 2001, and any amendments thereto, ("Agreement") by and between IGT and PV, arising from Billing Transactions, as such term is defined under the Agreement, generated and submitted by PV to IGT, after consideration of all amounts which are or will become due to IGT or may be retained or held by IGT pursuant to the Agreement

# EXHIBIT I

RER-3    0098

## Exhibit A to UCC-1

Pursuant to that certain Support Services Agreement dated July 1, 2000, as may be amended, ("Agreement") by and between Integretel, Incorporated ("IGT") and PaymentOne Corporation ("P1"), IGT does hereby grant to P1's client, Public Communications Services, Inc. (PCS"), a first priority security interest in any and all Net Proceeds, as such term is defined under the Agreement, that may be in IGT's possession from time to time, arising from or relating to the processing Accounts of PCS as such Accounts are designated by P1 under the Agreement.

0233160683

# EXHIBIT J

# SUPPORT SERVICES AGREEMENT

## BY AND BETWEEN

## <u>Integretel, Incorporated</u>

### AND

## <u>eBillit, Inc.</u>

July 1, 2000

**EXHIBIT J**

## SUPPORT SERVICES AGREEMENT

This **SUPPORT SERVICES AGREEMENT** ("**Agreement**") is entered into as of the 1st day of July, 2000 by and between eBillit, Inc., a Delaware corporation ("**EBI**"), located at 5883 Rue Ferrari, San Jose, California 95138, and Integretel, Incorporated, a California corporation (the "**Integretel**"), located at 5883 Rue Ferrari, San Jose, California 95138. EBI and Provider may each be individually referred to as "**Party**" and may be referred to collectively as the "**Parties**."

WHEREAS, EBI is a wholly-owned subsidiary of Integretel; and

WHEREAS, Integretel intends to provide certain services, resources and support to EBI, and EBI intends to provide certain services, resources and support to Integretel;

WHEREAS, the Parties desire to enter into a definitive agreement setting forth the specific services, resources and support to be provided by the Parties to each other, and the terms and conditions under which such will be provided;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

Section 1. **Definitions.** The following terms shall have the meanings set forth below. Other terms are defined in other sections of this Agreement.

(a) "**LEC**" means a local exchange carrier also commonly referred to as a local telephone company or the company that provides dial tone service to business or residential consumers.

(b) "**Licensed Materials**" shall have the meaning given such term under that certain Exclusive License of Technology entered into between the Parties of even date herewith.

(c) "**Services**" is defined in Section 2(a).

Section 2. **Services; Fees.**

(a) **Services.**

(1) **Integretel Services.** EBI (in this context, a "**Principal**") hereby engages Integretel (in this context, a "**Provider**") to provide on the terms set forth in this Agreement the "**Transitional Services**" described on the attached Exhibit 1, the "**Transaction Processing and Reporting Services**" described on the attached Exhibit 2, the "**End-User Inquiry Services**" described on the attached Exhibit

RER-3    0103

to be provided by such Provider hereunder, provided however that such Provider shall remain liable in the event that such assignee or third party does not fulfill its obligations under the terms of this Agreement.

(f)    **Headings.**    The headings of the various articles and sections of this Agreement are inserted merely for purposes of convenience and do not expressly, or by limitation, limit, define or extend the specific terms of the section so designated. Nor shall such headings be used for purposes of interpreting or applying provisions of this Agreement.

(g)    **Severability.**    If any provisions of this Agreement shall be adjudicated to be invalid or unenforceable in any action or proceeding, whether in its entirety or any portion, then such part shall be deemed amended, if possible, or deleted, as the case may be, from the Agreement in order to render the remainder of the Agreement and any provisions thereof both valid and enforceable; provided however that no such amendment or deletion shall be made if the result thereof would be to deprive either Party of a substantial benefit of the bargain anticipated by such Party when it entered into this Agreement.

(h)    **Counterparts.**    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument.

(i)    **No Third Party Beneficiary.**    Nothing contained in this Agreement shall be construed to give any person other than the Parties hereto any legal or equitable right, remedy or claim under or with respect to this Agreement.

(j)    **Controlling Law.**    This Agreement shall be governed by and construed in accordance with the internal substantive and procedural laws of the State of California; provided, however, that if any law or laws of the State of California shall require or prevent the laws of any other jurisdiction to be applied, such California law or laws shall be disregarded with the effect that the remaining laws of the State of California shall nonetheless apply.

(k)    **Employees.**    The Parties agree that they shall not solicit the employment or otherwise employ any employee of the other Party during the term of this Agreement and for a period of six (6) months after the termination or expiration of this Agreement, unless otherwise agreed in writing by the other Party.

EXHIBIT 2

## TRANSACTION PROCESSING AND REPORTING SERVICES

1. <u>Certain Definitions</u>.  With respect to this <u>Exhibit 2</u>, the following definitions shall apply:

(a)    "<u>Account</u>" shall mean a separate code, representing a customer of EBI, under which Data Records and related Net Proceeds are tracked and reported.

(b)    "<u>Adjustment</u>" shall mean a post-billing adjustment made to an End-User's bill, in relation to Data Records billed to such End-User, and arise from End-User disputes regarding such billed amount.  Adjustments are authorized by (i) the Telcos in accordance with the Billing Contracts; (ii) EBI based on its direct contact with the End-User; or (iii) Integretel in accordance with End-User Inquiry Services.

(c)    "<u>Billing Contracts</u>" shall mean the billing and collection agreements entered into between either EBI or Integretel and certain Telcos.

(d)    "<u>Data Records</u>" shall mean electronic transactions evidencing the use by End-Users of internet-related services, including without limitation, the amount to be charged for such services.

(e)    "<u>End-User(s)</u>" shall mean the users of the services which are the subject of Data Records.

(f)    "<u>End-User Inquiry Services</u>" shall mean the bill inquiry services, which are provided to End-Users in response to direct contact from such End-Users or through the Telco.  End-User Inquiry Services are further described on <u>Exhibit 4</u> to this Agreement.

(g)    "<u>Reserve</u>" shall mean an amount withheld from the money otherwise owed EBI for Data Records processed under Integretel's Billing Contracts, to reasonably protect Integretel from credit losses or to cover reserves imposed by a Telco.

(h)    "<u>Taxes</u>" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes imposed on or with respect to Customer's Billing Transactions.

(i)    "<u>Telco(s)</u>" shall mean those telephone companies with which either Integretel or EBI has entered into Billing Contracts.

(j)    "<u>True-up</u>" shall mean the process by which Integretel reconciles the Reserves held in anticipation of Uncollectables and the actual Uncollectables reported by

the Telcos. Such True-up shall be conducted in accordance with Integretel's internal methodology and shall be based on the time periods and Data supplied to Integretel or EBI by the Telcos.

(k)    "**Unbillables**" shall mean Data Records rejected by a Telco as not billable based on such Telco's own internal editing process.

(l)    "**Uncollectibles**" shall mean amounts designated by a Telco as not collectable and, therefore, written off by such Telco.

2.  Transaction Processing and Reporting Services ("**TP&R Services**") shall consist of the following:

(a)    Integretel shall process Exchange Message Interface transactions ("**Data Records**") submitted to Integretel by EBI in order to format and batch such Data Records for submission to Telcos at the direction of EBI either: (i) under EBI's Billing Contracts; (ii) under Integretel's Billing Contracts; or (iii) under Billing Contracts dedicated to the underlying customer of EBI.

(b)    Integretel shall process Data and reports returned by Telcos and assimiliate such information in a manner acceptable to EBI's customer settlement system or otherwise as reasonably requested by EBI.

(c)    Integretel shall provide its standard reports with respect to each customer Account for which EBI has submitted Data Records to Integretel. Such standard reports may be modified by Integretel based upon reasonable prior written request from EBI and EBI shall pay Integretel's reasonable costs to perform such modifications.

(d)    EBI will receive funds directly from the Telcos in accordance with its Billing Contracts with such Telcos. In the event that EBI, at its option, has elected to utilize a billing page under Integretel's Billing Contracts, then Integretel shall remit to EBI all funds received from Telcos with respect to Data Records submitted to Telcos under Integretel's Billing Contracts, after adjusting for applicable Adjustments, Unbillables and True-up, less any amounts necessary to cover Reserves and unpaid Service Fees (such net amount being the "Net Proceeds"). If the calculation of Net Proceeds yields a negative value (i.e., the amounts deducted exceeds the gross amount received), EBI shall immediately pay such amount to Integretel upon notification thereof.

3.  Service fees for TP&R Services:

| (a) | Data Records Processed per Month | Fee per Data Record* |
|---|---|---|
| | First 1,000,000 | $ .050 |
| | All Remaining | .010 |

# EXHIBIT K

RER-3     0107

# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (the "Agreement") is entered into as of Oct 1 , 2002 ("Effective Date"), by and between eBillit, Inc., a Delaware corporation ("EBI"), and Public Communications Services, Inc., a California corporation ("Client").

WHEREAS, Client is a provider of certain telecommunications related products and services; and

WHEREAS, EBI is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

WHEREAS, EBI is willing to provide its services to Client, and Client desires to obtain such services from EBI, upon the terms and conditions stated herein;

NOW, THEREFORE, the parties hereto agree as follows:

1.      DEFINITIONS. A certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

2.      EBI SERVICES. EBI shall provide one or more of the following services (each a "Service Option") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, Service Options may be ordered by Client in accordance with the terms set forth in the applicable Schedule.

| Schedule | Service Options | Initial Order |
|---|---|---|
| I | Validation/Registration | ( ) |
| II | PhoneBill Services (Telco Billing) | (X) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| | - with WebBill option | ( ) |

Master Services Agreement
EBI (REV. 06/28/02)                    - CONFIDENTIAL -                         Page 1

## EXHIBIT K

6. **OTHER DEDUCTIONS.**

a) <u>Telco Fees</u>. EBI shall be entitled to recover from or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) <u>EBI Reserve</u>. EBI may withhold, from any amounts otherwise due to Client, an amount necessary to fund the EBI Reserve. The EBI Reserve rate for each Account under this Agreement will initially be established at zero percent (0%) of gross value of Client's Billing Transactions. EBI may, in its reasonable discretion, adjust the EBI Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account;  (ii) adjusting or offsetting the EBI Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable. Notwithstanding the foregoing, in the event that EBI imposes an EBI Reserve in an amount that does not either: (a) represent Client's pro-rata share of a Telco-imposed reserve; or (b) represent an amount reasonably necessary to cover EBI's exposure to future charges relating specifically to Client's Billing Transactions; then Client, in its reasonable discretion, terminate this Service Order by providing thirty (30) days prior written notice to EBI.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds.  This requirement may necessitate an increase in the EBI Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos.  The adequacy of this component of the EBI Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

7. **SETTLEMENT OF AMOUNTS DUE.** Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to EBI hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and EBI Reserves (such difference being the "Net Proceeds").  Each week EBI shall transfer, by wire to Client's designated bank account, the Net Proceeds

identified the prior week. It shall be Client's responsibility to provide EBI with complete and accurate written wire transfer instructions. In addition to the Net Proceeds, Client shall be entitled to any excess Telco Holdback from prior period True-ups and any excess EBI Reserve as such are determined from time to time in accordance with Sections 5 and 6, above.

Master Services Agreement
EBI (REV 08/26/02)

- CONFIDENTIAL -

Page 26

" IN RECOGNITION OF CLIENT'S RIGHTS TO ANY NET PROCEEDS HEREUNDER, EBI HEREBY GRANTS TO CLIENT A FIRST PRIORITY SECURITY INTEREST IN ANY AND ALL NET PROCEEDS, THAT MAY BE IN EBI'S POSSESSION FROM TIME TO TIME AND EBI SHALL FILE A UCC-1 AND TAKE ALL OTHER REASONABLE STEPS TO ACKNOWLEDGE AND PERFECT CLIENT'S SECURITY INTEREST IN SUCH NET PROCEEDS.

8.    **REPORTS**.

(a)    Standard Reporting. EBI agrees to provide Client with EBI's standard reports identified in Exhibit II-C attached hereto and incorporated herein. Client may request that EBI provide additional reports or a different formatted report. To the extent EBI can comply with such request with reasonable effort, EBI shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)    Report Review. Client agrees that it is solely responsible for inspecting and reviewing all reports provided by EBI within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)    Report Detail. Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to EBI for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) EBI shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) EBI's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)    Audit. Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to EBI's records pertaining to Client's Billing Transactions, including, but not limited to, the information EBI receives from Telcos. Notwithstanding the previous sentence, in the event that EBI files for protection under the bankruptcy laws or has a receiver or trustee appointed to oversee its assets, then Client shall have an additional right to audit within the eighteen

Master Services Agreement
EBI (REV. 06/26/02)

- CONFIDENTIAL -

Page 27

Case: 07-52890    Doc #: 9    Filed: 09/17/2007    Page 22 of 22

RER-3        0111

**RER - 4**

1  HOWARD KOLLITZ (State Bar No. 059611)
   WALTER K. OETZELL (State Bar No. 109769)
2  STEVEN J. SCHWARTZ (State Bar No. 200586)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5  Email:   sschwartz@dgdk.com

6  JEFFREY C. SCHNEIDER
   TEW CARDENAS LLP
7  Four Seasons Tower, Fifteenth Floor
   1441 Brickell Avenue
8  Miami, Florida 33131-3407
   Telephone: (305) 539-2481
9  Facsimile:  (305) 536-1116

10  Co-Counsel for Creditor David R. Chase, Federal Receiver
    of Access One Communications, Inc., and Network One
11  Services, Inc.

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re | ) Case No. 07-52890-ASW |
| | ) |
| THE BILLING RESOURCE, dba Integretal, a | ) Chapter 11 |
| California corporation, | ) |
| | ) **OPPOSITION OF FEDERAL** |
| [Taxpayer's Identification No. 33-0289863] | ) **RECEIVER TO: (1) EMERGENCY** |
| | ) **MOTION FOR USE OF CASH** |
| | ) **COLLATERAL AND GRANTING** |
| | ) **REPLACEMENT LIENS; (2)** |
| | ) **EMERGENCY MOTION FOR ORDER** |
| | ) **AUTHORIZING USE OF EXISTING** |
| | ) **BANK ACCOUNTS AND CASH** |
| Debtor. | ) **MANAGEMENT SYSTEMS; AND (3) EX** |
| | ) **PARTE APPLICATION FOR ORDER** |
| | ) **APPROVING KEN DAWSON AS** |
| | ) **DEBTOR'S DESIGNATED** |
| | ) **RESPONSIBLE INDIVIDUAL;** |
| | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES** |
| | ) |
| | ) **[Declaration of David R. Chase, Federal** |
| | ) **Receiver filed as a separate document** |
| | ) **concurrently herewith]** |
| | ) |
| | ) Date:    September 21, 2007 |
| | ) Time:    1:30 p.m. |
| | ) Ctrm:   3020 |

-1-

314289.02 [XP]    23086

RER-4    0112

1  **TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES**
2  **BANKRUPTCY JUDGE:**

3      **PLEASE TAKE NOTICE** that creditor David R. Chase, the United States District Court-
4  Appointed Receiver (the "Federal Receiver") of Access One Communications, Inc. ("Access One"),
5  and Network One Services, Inc. ("Network One") (collectively, the "Receiverships"), submits
6  herewith his Opposition to the Motions of The Billing Resource, dba Integretal, a California
7  corporation (the "Debtor") (1) For Use of Cash Collateral and Granting Replacement Liens (the
8  "Cash Collateral Motion"); (2) For an Order Authorizing Use of Existing Bank Accounts and Cash
9  Management Systems (the "Motion for Use") and the (3) Ex Parte Application For Order
10  Approving Ken Dawson as Debtor's Designated Responsible Individual (the "Application"), filed
11  and served in this matter on or about September 17, 2007 (collectively, the "Motions"). The
12  grounds for such opposition are as described below.

13                                                **I.**

14                                        **INTRODUCTION**

15      This filing and "Emergency" Cash Collateral Motion is a transparent and outrageous
16  attempt to use this Court to negate at least two orders entered by the United States District Court
17  for the Southern District of Florida in respect of an action by the Federal Trade Commission (the
18  "FTC") against the Debtor and others for defrauding consumers. The first of these orders required
19  Debtor to disclose the existence of and turn over to a Federal Receiver, David R. Chase,
20  $1,762,762.56 in receivership assets (the Receivership Funds"). The second entered last Thursday,
21  September 13, 2007 (the "Omnibus Order"), required the Debtor to appear and show cause why it
22  should not be held in contempt of court for failing to do so. Because of the latter order, the Debtor
23  filed its Petition herein on Monday, September 17, 2007.

24      However, the Debtor went further in his scheme than simply filing its Petition. It crafted
25  and filed the subject "Emergency" Cash Collateral Motion, the purpose and the effect of which is
26  to deceive this Court into frustrating the District Court's Order and give permission to the Debtor to
27  spend that money. As this Court will see, if the Debtor is allowed to consummate this scheme, the

28

                                                -2-

1 Receivership Funds, which constitute redress [restitution] of consumers, will be rapidly dissipated
2 rendering the District Court's orders ineffective and destroying a remedy to defrauded consumers.

3       This scheme becomes clear when the Debtor's actions and the Cash Collateral Motion are
4 examined. Initially, it is clear that the Omnibus Order triggered the filing here, and the Debtor
5 admits this. However, the Debtor does not get around to discussing this until eight pages into the
6 Cash Collateral Motion, and when it does, its discussion and its statements misstate the terms and
7 import of the orders. The Debtor never attaches the September 13 Order as an Exhibit. If it had, the
8 Court would see this is more than a simple "Payment Order" as Debtor describes it. Instead, it
9 orders the Debtor to show cause why it should not be held in contempt of court for failing to pay
10 over the funds to the Federal Receiver, something that had long since been required. The Court
11 would see that the Debtor will not "ultimately prevail in the Florida Action." In fact, the District
12 Court, in addition to requiring the turnover of the Receivership Funds has held that neither
13 indemnification nor contractual claims allow the Debtor to retain them. The Court would see that
14 the District Court is exercising its in rem jurisdiction over the funds, inter alia, as an ancillary relief
15 measure in an action by a Federal agency. Finally, the Court would see that the District Court has
16 held the procedure it has employed is proper and there is no further need for separate proceedings,
17 and that this in rem jurisdiction and procedure is proper against Debtor to provide an ancillary
18 redress for defrauded consumers, where the Debtor's conduct may imperil the District Court's
19 ability to render effective judgment.

20       The "Emergency" Cash Collateral Motion here is designed to frustrate the District Court's
21 ability to render an effective judgment. It is clear from the proposed budget that the Debtor will
22 spend almost 40% of these funds in the next three weeks. No where in the Cash Collateral Motion
23 is there any attempt at adequately protecting the Federal Receiver's interests in the funds. Finally,
24 the "Emergency" nature of this Motion and its treatment as a "First Day Order" is obviously
25 designed to catch the Federal Receiver unaware. However, it did not.

26       This Court is respectfully requested to deny the Cash Collateral Motion before it and to
27 order the Debtor to comply with the District Court's Order or require the Debtor to segregate and
28 account for the funds.

-3-

## II.

## FACTS

The history of the Federal Receivership and the September 14, 2007 District Court Order are set forth in detail in the Declaration of David R. Chase (the "Receiver's Declaration") filed herewith. To summarize, the FTC filed the United States District Court for the Southern District of Florida in the case entitled <u>Federal Trade Commission v. Nationwide Connections, Inc., et. al.,</u> Case no. 06-80180-CIV-RYSKAMP/VITUNAC (the "District Court Action") against numerous entities including Access One and Network One, claiming that they were running a fraudulent billing scheme that generated more than $25 million in bogus call charges in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 53(b). David R. Chase was appointed by the District Court on the FTC's motion as receiver for Access One and Network One, among others. The Debtor was added as a defendant to the District Court Action on or about September 14, 2006.

On February 27, 2006, the District Court issued a Temporary Restraining Order and Order to Show Cause,[1] which required any business entity served therewith to provide to the FTC a sworn statement identifying each account or asset held in the name of or on behalf of, or for the benefit of a Defendant, and the balance or description of the nature and value of each such asset.[2] On March 6, 2006, in response to the TRO, the Debtor wrote a misleading letter to the FTC (which letter was not a "sworn statement") that "no amounts are currently due and owing" to the Receiverships. This statement was a lie. In fact, the Debtor was holding over $1.35 million in reserves that belonged to the Receiverships. The Receiver learned of this fact on October 11, 2006 and on October 16, 2006, filed a revised motion for an Order to Show Cause why the Debtor should not be held in contempt of court for violating the TRO and failing to disclose the reserves, among other things (the "Contempt Motion").[3] The Debtor countered with several motions, including a motion to modify

---

[1] A copy of the TRO is attached to the Receiver's Declaration, marked as Exhibit "B" and incorporated herein by this reference.

[2] See TRO at Section VI(C)(1)

[3] See, Exhibit "F" to the Receiver's Declaration

-4-

1 | prior injunctive orders, a motion to stay contract claims, as well as a pending appeal to the 11th

2 | Circuit Court of Appeals.[4]

3 |     Last Thursday, on September 13, 2007, the District Court Judge issued the Omnibus Order

4 | granting the Contempt Motion, denying the Debtor's motions, and ordering the Debtor to transfer

5 | the reserve funds to the Receiver, and ordering the Debtor to show cause, within 10 days, why it

6 | should not be held in contempt for "failure to turn over the reserves." The Omnibus Order

7 | recognized that "[t]he Receiver is seeking to recover the reserve funds pursuant to the Court's in

8 | rem jurisdiction over receivership property, as memorialized in the TRO and the Amended

9 | Preliminary Injunction."[5]

10 |     On Monday, September 17, 2007, the Debtor filed the herein bankruptcy case.

11 | III.

12 | ARGUMENT

13 | **A.**    **The Filing of an "Emergency" Cash Collateral Order and Motion Was a Scheme to**

14 | **Render Orders of the District Court Ineffective.**

15 |     The instant "emergency" cash collateral motion is a transparent attempt to render

16 | ineffective at least two orders of the U.S. District Court for the Southern District of Florida in

17 | respect of the Receivership Funds. As set forth in the Declaration of David R. Chase, the Federal

18 | Receiver (the "Chase Declaration"), in 2006, the FTC instituted an action against several telecom

19 | companies for fraudulent liability of consumers (the "FTC Action") and Mr. Chase was appointed

20 | Receiver (Chase Declaration, paras. 4 and 5). Debtor was joined as a defendant (Chase

21 | Declaration, para. 7).

22 |     The District Court issued several orders in the FTC Action which, inter alia, required

23 | Debtor to identify and turn over funds which it was holding for the benefit of the Federal Receiver

24 | (Chase Declaration, paras. 3, 5 to 15).

25 |

---

26 | [4] See, Exhibits "G" through "I" to the Receiver's Declaration.

27 | [5] See, Exhibit "A" at p. 4.

28 |

-5-

1  Finally, on Friday September 14, 2007, after the Debtor's failure to comply, the District
2  Court entered an '"Omnibus Order" discussing the action and previous orders, requiring the Debtor
3  to show cause if it did not turn over the Receivership Funds, and making it clear that the Debtor
4  would not prevail in the FTC action in respect of the Receivership Funds. (Chase Declaration,
5  paras. 3, 11-16, and Exhibit " A"). On Monday, September 17, 2007, the Debtor filed its Petition
6  and the "Emergency" Cash Collateral Motion herein.

7  It is clear that this "emergency" motion is designed to render the District Court's orders
8  ineffective. Initially, the Debtor fails to disclose to this Court the true nature of the Omnibus
9  Order. Although Debtor makes reference to the order, it does not discuss its terms nor attach a
10  copy. Instead, it brushes it off as a "Payment Order" and makes the incredible assertion that it will
11  ultimately prevail. The most cursory review of the Omnibus Order (Exhibit "A") demonstrates
12  how incorrect this description and assertions are. Payment had long since been required and the
13  Court rejected each of Debtor's arguments.

14  The order was also clear that there is no issue as to the ownership of the $1,762,762.56.
15  Those funds are not property of the Bankruptcy Estate of the Debtor; rather, the Debtor has been
16  ordered to immediately transfer those funds to the Federal Receivership Estate. The District Court
17  recognized the propriety of the proceedings. Finally it found that its exercise of in rem jurisdiction
18  and the procedures were proper to insure a remedy for defrauded consumers.

19  The "Emergency" Cash Collateral Motion renders the orders ineffective. The budget
20  attached calls for nearly 40% of the Receivership Funds to be spent in the next three weeks. It
21  offers no adequate protection at all for the use of these funds. Finally, it is difficult to see why this
22  motion should be heard as an "emergency" if it were not to catch the Federal Receiver unaware.

23  **B.    The Receiver is not Adequately Protected.**

24  Section 363(e) of the Bankruptcy Code provides that, at any time, on request of an entity
25  with an interest in property which is proposed to be used, the court, with or without a hearing, shall
26  prohibit or condition such use, as is necessary to provide adequate protection.

27  The requirement of adequate protection is mandatory. In re Heatron, Inc., 6 B.R. 493
28  (Bankr. W.D. Mo. 1980); Lyons v. Fed. Savs. Bank (In re Lyons), 193 B.R. 637 (Bankr. D. Mass.

-6-

1   1996). Adequate protection, by its nature, must be determined on a case-by-case basis. In re

2   Martin, 761 F.2d 472 (8th Cir. 1985), In re Belco, Inc., 38 B.R. 525, 527 (Bankr. W.D. Okla.

3   1984). This inquiry as to adequate protection is limited to the interest of the creditor in the

4   property involved. First Bank of Miller v. Wieseler, 45 B.R. 871, 875 (D. S.D. 1985).

5       Adequate protection means that the interests of the secured creditor are adequately

6   protected by such use or other collateral is provided to secure any diminution and loss by such use.

7   A preliminary step in determining whether adequate protection is afforded the secured creditor for

8   the use of cash collateral is to conduct a valuation of the cash collateral. See In re George Ruggiere

9   Chrysler - Plymouth, Inc., 727 F.2d 1017, 1020 (11th Cir. 1984). Typically, this valuation is to be

10   made as at the date of the filing of the Debtor's chapter 11 petition. Id.

11       In the case of In re Bear River Orchards, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) the court

12   described the analysis that should be made in determining whether the debtor-in-possession is

13   entitled to use cash collateral, as follows:

14       In any given case, the bankruptcy court must necessarily (1) establish the value of

15       the secured creditor's interests, (2) identify the risk to the secured creditor's value resulting

16       from the debtor's request for use of cash collateral; and (3) determine whether the debtor's

17       adequate protection proposal protects value as nearly as possible against risk to that value

18       consistent with the concept of indubitable equivalence.

19       Additionally, the Debtor in Possession is obligated to segregate and account for any cash

20   collateral in its possession, custody or control. 11 U.S.C. § 363(c)(4).

21       As evidenced by the District Court's rulings, at least $1,762,762.56 of the $1,945,598 that

22   the Debtor intends to use as cash collateral is not cash collateral at all, as it is property of the

23   Federal Receivership Estate and must be returned to the Federal Receiver forthwith. Nevertheless,

24   the Debtor does not even attempt to offer the Federal Receiver adequate protection in the form of

25   replacement liens, or otherwise, since it knows that the only form of adequate protection that would

26   be the indubitable equivalent of the Federal Receiver's interest in cash in the hands of the Federal

27   Receiver in the amount of $1,762,762.56, which is precisely what the District Court determined in

28   its Omnibus Order.

1    Moreover, the Debtor offers no evidence of the value or collectible nature of the accounts
2  receivable that the Debtor proposes to offer as adequate protection in the form of replacement liens.
3  The only "evidence" presented, other than self-serving, conclusory statements of Ken Dawson, is a
4  "Preliminary and Unaudited" Balance Sheet which shows total accounts receivable of
5  approximately $26 million. See, Exhibit "B" to the Cash Collateral Motion. Dawson "believes"
6  that $13.8 million in LEC Accounts Receivable should be collectible "on a rolling basis over the
7  next ninety (90) days." Dawson Declaration at para. 25.  Dawson does not offer any projections,
8  forecasts or historical evidence to support this belief, other than his own assertion. If it is in fact
9  true that $13.8 million will be collected "on a rolling basis" over the next 90 days, then there is no
10  need for the Debtor to use the Receivership Funds which were ordered to be delivered to the
11  Federal Receiver to operate its business. The Debtor should be able to find post-petition financing
12  to continue to operate in the near term. Of course, any lender would require more evidence of the
13  value and collectibility of those accounts than was furnished to the Court in support of the Cash
14  Collateral Motion.

15    The Federal Receiver requests "adequate protection." The Federal Receiver hereby requests
16  this Bankruptcy Court to direct the Debtor to comply with the Omnibus Order of the District Court
17  and turn over the $1,762,762.56 to the Federal Receiver.

18  C.    **Immediate Relief from the Automatic Stay is the Only Remedy to Protect the**
19  **Diminution of the Receivership Property.**

20    Section 363(p) expressly provides that the trustee (or debtor in possession) has the burden
21  of proof on the issue of adequate protection but that the entity asserting an interest in the property
22  has the burden of proof on the issue of the validity, priority and extent of such interest. 11 U.S.C.
23  363(p).

24    When a creditor seeks relief under section 362 of the Bankruptcy Code, it is entitled to
25  protection against all of the risks of the trustee's continued possession of the collateral. Alan N.
26  Resnick and Henry J. Sommer, Collier on Bankruptcy, ¶ 363.05[1]  (15th Ed. Rev. 2007). This
27  encompasses any decline in market value that occurs during the delay as well as any depreciation
28  that results from the continued use of the collateral. See, e.g., In re Continental Airlines, Inc., 154

-8-

1 | B.R. 176 (Bankr. D. Del. 1993), *appeal dismissed as moot*, 91 F. 3d 553 (3rd Cir. 1996); In re Best
2 | Products Co., Inc., 138 B.R. 155 (Bankr. S.D.N.Y. 1992).

3 |      This Bankruptcy Case follows a pattern of deceit on the part of this Debtor. The Debtor,
4 | through its president Ken Dawson, lied to the Receiver, the FTC and the District Court as to the
5 | existence of money in reserves held for the benefit of the Receiverships. Now, the Debtor is asking
6 | this Court to approve the use of not less than $615,000 of cash held by the estate, in order to
7 | continue its business operations, with Mr. Dawson at the helm. The Debtor does so without so
8 | much as an offer of adequate protection to the Federal Receiver or a segregation or accounting of
9 | the cash sought to be used, or evidence that the Federal Receiver (or any other secured creditor, for
10 | that matter) is adequately protected. The Debtor's is unable to satisfy its burden of proof regarding
11 | adequate protection.

12 |      By contrast, the Federal Receiver has already satisfied his burden of proof regarding his
13 | interest in the property sought to be used as cash collateral. Accordingly, the only rights that the
14 | Debtor might have with regard to the Federal Receiver's property must be asserted in the District
15 | Court and/or the 11th Circuit Court of Appeals. For this Court to compel the parties to re-litigate
16 | their disputes in this Bankruptcy Case would be a waste of judicial resources and would be contrary
17 | to the principles underlying the doctrine of Collateral Estoppel. MCA Records, Inc. v. Charly
18 | Records, Ltd. 865 F.Supp. 649. 654 (C.D.Cal.,1994) ("[I]n deciding whether to apply collateral
19 | estoppel, the court must balance the rights of the party to be estopped against the need for applying
20 | collateral estoppel in the particular case, in order to promote judicial economy by minimizing
21 | repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial
22 | system, or to protect against vexatious litigation"); Montana v. United States, 440 U.S. 147, 153, 99
23 | S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

24 | **IV.**

25 | **CONCLUSION**

26 |      For the foregoing reasons, the Debtor's Motions, and each of them, should be denied. The
27 | Federal Receiver believes that the appropriate remedy is relief from the automatic stay in order to
28 | effectuate the orders of the District Court with respect to property of the Receiverships, which

-9-

1    motion the Federal Receiver intends to file forthwith, should the Court not *sua sponte* order such

2    relief. The Federal Receiver also respectfully requests that this Court order the Debtor to comply

3    with the Omnibus Order of the District Court and immediately turn over the $1,762,762.56 to the

4    Federal Receiver. The Federal Receiver further requests all other appropriate relief in the premises.

5

6    Dated: September 19, 2007                DANNING, GILL, DIAMOND & KOLLITZ, LLP

7

8
                                             By:  _____
9                                                  STEVEN J. SCHWARTZ
                                                   Attorneys for David R. Chase, Court-
10                                                 Appointed Receiver of Access One
                                                   Communications, Inc., and Network One
11                                                 Services, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

314289.02 [XP]    23086                                            RER-4    0121

## Miscellaneous:

<u>07-52890 The Billing Resource</u>
Type: bk                    Chapter: 11 v                Office: 5 (San Jose)
Judge: ASW                  Assets: y                    Case Flag: PlnDue, DsclsDue

### U.S. Bankruptcy Court

### Northern District of California

Notice of Electronic Filing

The following transaction was received from Schwartz, Steven J. entered on 9/19/2007 at 7:00 PM PDT
and filed on 9/19/2007
**Case Name:**        The Billing Resource
**Case Number:**      <u>07-52890</u>
**Document Number:** <u>24</u>

**Docket Text:**
Brief/Memorandum in Opposition to *(1) Emergency Motion for Use of Cash Collateral and Granting
Replacement Liens; (2) Emergency Motion for Order Authroizing Use of Existing Bank Accounts and
Cash Management Systems; and (3) Ex Parte Application for Order Approvin Ken Dawson as Debtor's
Desgnated Resopnsible Individual; Memorandum of Points and Authorities* (RE: related document(s)[8]
Motion to Use Cash Collateral, [7] Motion Miscellaneous Relief, [6] Application to Designate
Responsible Individual). Filed by Creditor David R Chase (Schwartz, Steven)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**J:\CYC\Integretel opposition.PDF
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1017961465 [Date=9/19/2007] [FileNumber=6728397-0
] [7eb91a3b75cdc6587b0893511763b877ffd18ec56145af120a5ee72601fbb3ca7f3
8a1b932a8a5624596e10c8ff28d222c8d5c1fb2e1ad8fe222d162bd710ee7]]

**07-52890 Notice will be electronically mailed to:**

Leslie A. Cohen    lcohen@linerlaw.com, jparrott@linerlaw.com;skozhaya@linerlaw.com

Ori Katz    okatz@sheppardmullin.com, dwhitehead@sheppardmullin.com

Office of the U.S. Trustee / SJ    USTPRegion17.SJ.ECF@usdoj.gov

Jeffrey K. Rehfeld    jrehfeld@sheppardmullin.com, ewalters@sheppardmullin.com

Steven J. Schwartz    sschwartz@dgdk.com

**07-52890 Notice will not be electronically mailed to:**

**RER - 5**

ELECTRONICALLY
FILED:
Date: 9/19/07
Docket No: 25

1  HOWARD KOLLITZ (State Bar No. 059611)
   WALTER K. OETZELL (State Bar No. 109769)
2  STEVEN J. SCHWARTZ (State Bar No. 200586)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5  E-mail    sschwartz@dgdk.com

6  JEFFREY C. SCHNEIDER
   TEW CARDENAS LLP
7  Four Seasons Tower, Fifteenth Floor
   1441 Brickell Avenue
8  Miami, Florida 33131-3407
   Telephone: (305) 539-2481
9  Facsimile:  (305) 536-1116

10 Co-Counsel for Creditor David R. Chase, Federal Receiver
   of Access One Communications, Inc., and Network One
11 Services, Inc.

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

In re

THE BILLING RESOURCE, dba Integretal, a
California corporation,

        Debtor.

Taxpayer's Identification No. 33-0289863

) Case No. 07-52890-ASW
)
) Chapter 11
)
) **FIRST REQUEST FOR JUDICIAL**
) **NOTICE OF DAVID R. CHASE,**
) **FEDERAL RECEIVER, IN**
) **OPPOSITION TO: (1) EMERGENCY**
) **MOTION FOR USE OF CASH**
) **COLLATERAL AND GRANTING**
) **REPLACEMENT LIENS; (2)**
) **EMERGENCY MOTION FOR ORDER**
) **AUTHORIZING USE OF EXISTING**
) **BANK ACCOUNTS AND CASH**
) **MANAGEMENT SYSTEMS; AND (3) EX**
) **PARTE APPLICATION FOR ORDER**
) **APPROVING KEN DAWSON AS**
) **DEBTOR'S DESIGNATED**
) **RESPONSIBLE INDIVIDUAL**
)
) Date:    September 21, 2007
) Time:   1:30 p.m.
) Ctrm:   3020
)
)

-1-

314330.01 [XP]    24774                                   RER-5    0123

1   **TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES BANKRUPTCY**

2   **JUDGE:**

3          Pursuant to Rule 201(d) of the Federal Rules of Evidence, David R. Chase, the duly

4   appointed, qualified and acting Receiver serving under the authority of the United States District

5   Court for the Southern District of Florida in pending case number 06-80180-CIV-RYSKAMP,

6   entitled <u>Federal Trade Commission vs. Nationwide Connections, Inc., Access One</u>

7   <u>Communications, Inc., Network One Connections, Inc., et al.</u> (the "District Court Action"), hereby

8   requests that this Court take judicial notice of the Omnibus Order entered in the District Court

9   Action on September 14, 2007.  A copy of the Omnibus Order is attached hereto as **Exhibit A**.

10

11  Dated:  September 19, 2007                              DANNING, GILL, DIAMOND & KOLLITZ, LLP

12

13                                                          By: _____

14                                                              STEVEN J. SCHWARTZ
                                                                Attorneys for David R. Chase, Court-
15                                                              Appointed Receiver of Access One
                                                                Communications, Inc., and Network One
16                                                              Services, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# EXHIBIT A

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-CIV-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC., et al.,

     Defendants.

_____/

### OMNIBUS ORDER

THIS CAUSE comes before the Court pursuant to a series of motions:

- The Receiver's Revised Motion for Order to Show Cause Why Integretel Should Not Be Held in Contempt of Court, filed October 16, 2006 **[DE 246]**;

- Integretel's Motion to Modify Prior Injunctive Orders, filed October 30, 2006 **[DE 294]**;

- Integretel's Motion to Stay Contract Claims, filed December 29, 2006 **[DE 363]**; and

- The Receiver's Motion Requesting BSG Defendants To Transfer Additional Reserves, filed January 12, 2007 **[DE 371]**.

The Court held a hearing on these motions on April 12, 2007. These motions are fully briefed and are ripe for adjudication.

Both BSG and Integretel had agreements in place with Nationwide and Access One/Network One that permitted them to withhold monies that were "owed to" Nationwide and/or Access One/Network One as "reserves," in the event that any users complained about

---

**EXHIBIT A**

SEP-19-2007 03:37PM FROM-TEW CARDENAS REBAK +3055361116 T-375 P.004/013 F-269
Case 5:07-cv-06210-JW    Document 12-4    Filed 04/06/2008    Page 40 of 55

Case 9:06-cv-80180-KLR    Document 610    Entered on FLSD Docket 09/14/2007    Page 2 of 11

2

charges and requested refunds and/or credits directly from the Aggregators. Shortly after this

receivership was initiated, BSG advised the Receiver and the FTC of reserves that it was holding

relating to Nationwide as of the commencement of the receivership (slightly over $1 million).

BSG turned that money over to the Receiver.

Integretel did not advise either the Receiver or the FTC that it was holding reserves.

Rather, its president informed the FTC on March 6, 2006 that "no amounts are currently due and

owing" to Access One or Network One. As of August 26, 2006, Integretel was holding

$1,186,430.36 in reserves for Access One and $173,918.66 in reserves for Network One. These

amounts have increased, and as of June 30, 2007, the reserve amount being held by Integretel

(and/or its affiliates) is $1,762,762.56. As of August 6, 2007, the reserve amount being held by

BSG (and/or its affiliates) is $930,052.99.

The Receiver notes that the temporary restraining order required any business entity

served with a copy thereof to:

> provide to the Commission's counsel, within five (5) business days
> of receiving a copy of this [TRO], a sworn statement setting forth:
>
> 1.    The identification number of each such account or asset
> titled in the name, individually or jointly, of a Defendant, or held
> on behalf of, or for the benefit of a Defendant;
>
> 2.    The balance of each such account, or description of the
> nature and value of each such asset as of the close of business on
> the day on which this [TRO] is served...

Exhibit A to the Integretel/Access One Master Services Agreement defines the reserve as

follows:

3

an amount withheld, from the amount otherwise owed to Client
with respect to Billing Transactions, to protect IGT for credit
losses or otherwise to cover other reserves or offsets, other than
Uncollectibles imposed by a Telco.

The Integretel/Network One Master Services Agreement contains an identical definition of the
reserves.

Integretel maintains that "the reserves do not take the form of any actual funds that
[Integretel] has segregated or otherwise set aside..." and maintains that it keeps the reserves in a
pooled account it tracks via an internal accounting entry. Such is a distinction without a
difference, since the TRO captures funds "held on behalf of, or for the benefit of, a Defendant."

Integretel also maintains that it was not Access One's or Network One's "agent, partner,
joint venturer, trustee, fiduciary, or legal representative," and so was not "in any way acting 'on
behalf of' of the two clients." An entity need not be an agent, partner, joint venturer, trustee,
fiduciary, or legal representative to possess funds that one is holding "on behalf of" another
person or entity, however.

Integretel also maintains that the "reserves have been set to account for, among other
things, any liability that might be claimed against [Integretel] for any improper billings by Access
One or Network One such as alleged by the FTC in the First Amended Complaint." The Court
has reviewed the agreements in question. The agreements between Integretel and each of Access
One and Network One allow Integretel either to notify the indemnifying party of the request to be
indemnified and turn over the defense of the action to the indemnified party or defend itself and
seek reimbursement of its attorneys' fees and costs from the indemnifying party. The agreements
did not give it the right to use the reserves to fund the indemnity. Furthermore, the FTC has sued

SEP-19-2007 03:38PM FROM-TEW CARDENAS REBAK +3055361116 T-375 P.006/012 F-269
Case 5:07-cv-06210-JW    Document 12-4    Filed 04/06/2008    Page 42 of 55

Case 9:06-cv-80180-KLR    Document 610    Entered on FLSD Docket 09/14/2007    Page 4 of 11

4

Integretel for its own independent violations of the Federal Trade Commission Act. If the FTC

succeeds, Integretel itself will be financially responsible for its actions and will not be able to

look to Access One or Network One for indemnification under the operative agreements.

Finally, Integretel argues that "Access One and Network One failed to provide proof of

their compliance with contract requirements..." Integretel evidently maintains that since it is of

the opinion that Access One and Network One allegedly breached the agreements, it was entitled

to keep the reserve monies. The agreements do not, however, contain a liquidated damages

provision that would permit retention of those funds under the circumstances, nor do the

agreements give it the right to make an independent, unilateral decision about Access One's or

Network One's breach of the agreements without court involvement.

Integretel also moves to stay litigation of the aforementioned contract claims pending

arbitration thereof, maintaining that the Receiver stands in the shoes of Access One and Network

One and may assert only those rights and remedies that those entities themselves could have

asserted. In particular, the Receiver is supposedly bound by the arbitration clause in each

company's contract. The Receiver's claim is not a claim at law governed by pre-receivership

contracts, however, but one governed by this Court's jurisdiction over receivership property

based on the TRO and Amended Preliminary Injunction. The Receiver does not claim that the

funds must be turned over according to, or by adopting, a contract signed between Integretel and

Access One/Network One. The Receiver is seeking to recover the reserve funds pursuant to the

Court's in rem jurisdiction over receivership property, as memorialized in the TRO and the

Amended Preliminary Injunction. A federal court possesses broad authority to issue various

ancillary relief measures in enforcing actions brought by federal agencies. See FTC v.

5

Productive Mktg., Inc., 136 F. Supp. 2d 1096, 1104 (C.D. 2001); SEC v. Wenke, 622 F.2d 1363,

1371 (9th Cir. 1980) ("the Supreme Court has repeatedly emphasized the broad equitable powers

of the federal courts to shape equitable remedies to the necessities of particular cases, especially

where a federal agency seeks enforcement in the public interest."). A receivership order issued to

preserve the assets of the receivership estate is a classic example of a district court's exercise of

in rem jurisdiction over receivership property. See Productive Mktg., 136 F. Supp. 2d at 1105;

Wenke, 622 F.2d at 1369 (stating that a federal district court's power to issue a stay against all

persons concerning all proceedings against the receivership entities "rests as much on its control

over the property placed in receivership as on its jurisdiction over the parties to the securities

fraud action"). "[R]eceivers are not bound by the contracts of the entity that they are appointed to

protect. The receiver becomes bound only when it affirmatively adopts the obligations of the

entity that it is protecting." City Bank, NA v. Nyland (CF8) Ltd., 839 F.2d 93, 98 (2d Cir. 1987).

The Court declines to stay adjudication of the contract claims.

Integretel argues that the TRO and Amended Preliminary Injunction would be invalid if

they enabled the Court to determine Integretel's ownership interest (or lack thereof) in the reserve

funds without first requiring the Receiver to institute a new, separate legal proceeding. Issues

concerning entitlement to disputed receivership property, in fact, are the types of issues typically

determined via summary proceedings in the federal court equity receivership context. See

Wenke, 783 F.2d at 837-38 (stating that claims of nonparties to property claimed by receivers can

be resolved via summary proceedings, which reduced the time necessary to settle disputes,

decrease litigation costs and prevent dissipation of receivership assets, as long as there is notice

to the non-party and an opportunity to be heard, thereby satisfying due process).

SEP-19-2007 03:38PM FROM-TEW CARDENAS REBAK +3055361116 T-375 P.008/013 F-269
Case 5:07-cv-06210-JW Document 12-4 Filed 04/06/2008 Page 44 of 55
Case 9:06-cv-80180-KLR Document 610 Entered on FLSD Docket 09/14/2007 Page 6 of 11

6

Integretel maintains that the Court deprived it of due process when it issued the TRO and
Amended Preliminary Injunction without previously providing notice and an opportunity to be
heard. A temporary restraining order or injunction is properly issued and binding so long as the
party against whom it is being issued had a chance to defend fully the legitimacy of the eventual
claim. Accordingly, it is irrelevant whether the party had been given a chance to oppose the
order prior to its issuance. See FTC v. Assail, Inc., 410 F.3d 256, 268 (5th Cir. 2005) (finding
that attorney for non-parties to receive fees that resulted from fraud had opportunity to defend
self at hearing to determine whether disputed funds were subject to turnover order and thus had
adequate notice and opportunity to be heard). Here, Integretel has briefed these issues in three
separate briefs, its response, its motion to modify, and its motion to stay. It has, without
question, had an opportunity to be heard on this issue.

Integretel argues that the TRO and Amended Preliminary Injunction are invalid because
the FTC and the Receiver thereby have unbridled discretion to decide what cooperation is
required and from whom, which is allegedly further compounded by the fact that the FTC and
Receiver are interested in maximizing the amount of money, and subsequent recovery, in the
receivership estate. While Integretel has accurately pinpointed the Receiver's and the FTC's
goals, its attacks on the Court's orders fail. That cooperation clauses are standard in federal court
receivership orders goes without saying. In Productive Mktg., when a non-party argued it was
not bound by the cooperation clause, the district court disagreed because the injunction, as a
receivership order, was required to be read reasonably in light of its stated purpose, to account for
and preserve the assets of the receivership estate. 136 F. Supp. 2d at 1109-10. Otherwise stated,
the receiver could not unreasonably use the cooperation clause for whatever purpose he wished.

SEP-19-2007   03:39PM   FROM-TEW CARDENAS REBAK   +3055363116   T-379 P.007/001   F-269
Case 5:07-cv-06210-JW    Document 12-4    Filed 04/06/2008    Page 45 of 55

Case 9:06-cv-80180-KLR    Document 610    Entered on FLSD Docket 09/14/2007    Page 7 of 11

7

Rather, the only reasonable interpretation of the clause was for it to be used consistently with the objective of the injunction, to require non-parties (and parties) that hold assets of the receivership estate to disclose information to the receiver relating to those assets and, if necessary, turn over such assets to the receiver. <u>See id.</u> at 1110. Cooperation clauses are enforceable, even against non-parties.

Integretel concedes that it was bound by the TRO if it acted in concert or participated with Access One and/or Network One, but Integretel claims that no such allegation has been made (or could be made, for that matter). The FTC has made such allegations in its First Amended Complaint, alleging that Integretel participated and acted in concert with Access One and Network One in the alleged fraud. (<u>See</u> First Amended Complaint, Paragraphs 24, 27, 28, 30, 37.)

Integretel also argues that the TRO is overbroad because it allows the Receiver to demand a turnover of disputed funds. To that end, Integretel posits that in rem jurisdiction only applies to undisputed receivership property and does not apply when funds are disputed and not in the possession of the Court. District courts have in rem jurisdiction over disputed receivership property and therefore can bind non-parties (such as Integretel), through orders to protect and preserve disputed receivership property, and district courts have jurisdiction to enforce orders against non-parties concerning ownership of disputed funds, whether or not such funds are in the non-parties' possession. <u>See Productive Mktg.</u>, 136 F. Supp. 2d at 1106 ("if the Court cannot compel [the non-party] to turn over assets in its possession belonging to the receivership estate, the receiver will be unable to provide adequate redress to consumers who have been defrauded by

8

Defendants because [the non-party's] conduct imperiled the Court's ability to render an effective judgment, the Court may properly enjoin it, even though it is not a party to the action.").

Integretel also maintains that the turnover clause is invalid and, in any event, was never triggered, because the Receiver never made a "formal" demand for the reserve funds. The purpose of a federal district court's jurisdiction over receivership property via a preliminary injunction (or similar order) is to preserve the assets resulting from the improper actions of the receivership defendants, whether held by parties or non-parties, to provide redress for the legitimately defrauded investors. See Productive Mktg., 136 F.Supp. 2d at 1105-1106. Thus, it is not reasonable to expect the Receiver to know about the reserves, and thereafter make a "formal" demand for them if it had not been previously informed of their existence.

Integretel, as a party, also argues that the Amended Preliminary Injunction is invalid under Rule 65 because it did not receive notice of its issuance. Integretel also maintains that neither the FTC nor the Receiver has made the requisite showing in their unverified papers to enforce an injunction against it. An injunction is properly issued and binding so long as the party opposing it is given a chance to defend the legitimacy of the claim being made under it. It is of no consequence whether the party has been given a chance to oppose the injunction prior to its issuance. See SEC v. Elfindepan, S. A., 2002 WL 31165146 at*5 (finding that party in the context of contempt motion had been given full opportunity to defend ownership interest in disputed funds; that party did not have opportunity to defend itself prior to issuance of the injunction did not render the injunction invalid).

Integretel believes it has acted properly from "day one" and had no reason to ask for clarification of the subject Orders until the Receiver filed its show cause motion because it

SEP-19-2007 03:39PM FROM-TEW CARDENAS REBAK +3055361116 T-375 P.011/013 F-269
Case 5:07-cv-06210-JW Document 12-4 Filed 04/06/2008 Page 47 of 55

Case 9:06-cv-80180-KLR Document 610 Entered on FLSD Docket 09/14/2007 Page 9 of 11

9

believed that its interpretation of the Orders was proper, or at least in good faith. One's state of mind is irrelevant for purposes of unilateral interpretation of court orders, however. See Goya Foods, Inc. v. Wallack Management Co., 290 F.3d 63, 75-76 (1st Cir. 2002) ("When a legitimate question exists as to the scope or effectiveness of the court's order, those who know of the decree, yet act unilaterally, assume the risk of mistaken judgments. Adhering to this principle, the appellants could have asked the district court for clarification...but they eschewed that course....They chose instead to rely on their own judgment as to whether the orders remained in effect. In so doing, the appellants acted at their peril.").

Integretel also seeks to modify the TRO, Preliminary Injunction and Amended Preliminary Injunction. Because the subject Orders are valid for the reasons stated herein, there is no reason to modify them. Furthermore, the requested modifications would unnecessarily increase litigation costs by forcing the Receiver to obtain an extra precondition order by litigating every potential act that constitutes proper cooperation and affect every potential target of such corporation, thereby exponentially increasing the amount of time it would take for the Receiver to obtain receivership property. The proposed modifications would also be unwieldy because they would make pre-receivership contracts that the Receiver does not ratify nevertheless binding on him, and would require separate, plenary proceedings when a summary proceeding can adequately account for determination of these issues.

The Receiver also moves to request that the BSG Defendants transfer additional reserves in the amount of $328,050.83 as of December 8, 2006, and, as noted $930,052.99 as of August 6, 2007. These Defendants previously transferred $952,045.67 in reserves to the Receiver on or about March 24, 2006. The Receiver requests that these Defendants transfer these additional

reserves, produce all documents relating to the reserves withheld since March 24, 2006, and to produce any future reserves that they collect to the Receiver along with any documents relating thereto.

The BSG Defendants join in Integretel's arguments as to the validity of the TRO and the Amended Preliminary Injunction. Additionally, the BSG Defendants request modification of the injunctive orders and request a stay of the underlying contract claims. The Court has already rejected these arguments. As to the contract claims, the contracts the BSG Defendants attach in support of their argument to retain the Reserves are incomplete, undated, unsigned and do not reflect the parties thereto. The Court, based on these incomplete documents, cannot say that the BSG Defendants are entitled to retain the reserves. It is hereby

ORDERED AND ADJUDGED that the Receiver's Revised Motion for Order to Show Cause Why Integretel Should Not Be Held in Contempt of Court, filed October 16, 2006 [DE 246], is GRANTED. Integretel shall show cause in writing within 10 days of the date of this Order why it should not be held in contempt for failure to turn over the reserves. In addition, Integretel shall provide a sworn statement identifying the amount of reserves as of the issuance of the TRO. The Court further orders that these funds shall be placed in a segregated Receivership account. It is further

ORDERED AND ADJUDGED that Integretel's Motion to Modify Prior Injunctive Orders, filed October 30, 2006 [DE 294], is DENIED. It is further

ORDERED AND ADJUDGED that Integretel's Motion to Stay Contract Claims, filed December 29, 2006 [DE 363], is DENIED. It is further

SEP-19-2007 03:40PM FROM-TEK CARDENAS REBAK Case 5:07-cv-082'10-SW Document 12-4 +3056363H80 04/06/2008 375 Page 349 of 5369

Case 9:06-cv-80180-KLR    Document 610    Entered on FLSD Docket 09/14/2007    Page 11 of 11

11

ORDERED AND ADJUDGED that the Receiver's Motion Requesting BSG Defendants To Transfer Additional Reserves, filed January 12, 2007 [DE 371], is GRANTED. The BSG Defendants are ordered to transfer the additional reserves they have withheld since their initial transfer of reserves to the Receiver on or about March 24, 2006. The BSG Defendants shall also produce any future reserves they collect so as to avoid future motions to this effect. The BSG Defendants shall also produce all documents relating to the reserves held since March 24, 2006. The Court requests that this money be placed in a segregated receivership account.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 13th day of September, 2007.

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

**RER - 6**

1   HOWARD KOLLITZ (State Bar No. 059611)
    WALTER K. OETZELL (State Bar No. 109769)
2   STEVEN J. SCHWARTZ (State Bar No. 200586)
    DANNING, GILL, DIAMOND & KOLLITZ, LLP
3   2029 Century Park East, Third Floor
    Los Angeles, California 90067-2904
4   Telephone: (310) 277-0077
    Facsimile: (310) 277-5735
5   E-mail:  sschwartz@dgdk.com

ELECTRONICALLY
FILED: 9/19/07
Date: _____
Docket No: 26

6   JEFFREY C. SCHNEIDER
    TEW CARDENAS LLP
7   Four Seasons Tower, Fifteenth Floor
    1441 Brickell Avenue
8   Miami, Florida 33131-3407
    Telephone: (305) 539-2481
9   Facsimile: (305) 536-1116

10   Co-Counsel for Creditor David R. Chase, Federal Receiver
    of Access One Communications, Inc., and Network One
11   Services, Inc.

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re | )   Case No. 07-52890-ASW |
| | ) |
| THE BILLING RESOURCE, dba Integretal, a | )   Chapter 11 |
| California corporation, | ) |
| | ) |
| | )   **DECLARATION OF DAVID R. CHASE,** |
| [Taxpayer's Identification No. 33-0289863] | )   **FEDERAL RECEIVER IN OPPOSITION** |
| | )   **TO: (1) EMERGENCY MOTION FOR** |
| | )   **USE OF CASH COLLATERAL AND** |
| | )   **GRANTING REPLACEMENT LIENS;** |
| | )   **(2) EMERGENCY MOTION FOR** |
| | )   **ORDER AUTHORIZING USE OF** |
| | )   **EXISTING BANK ACCOUNTS AND** |
| | )   **CASH MANAGEMENT SYSTEMS; AND** |
|               Debtor. | )   **(3) EX PARTE APPLICATION FOR** |
| | )   **ORDER APPROVING KEN DAWSON** |
| | )   **AS DEBTOR'S DESIGNATED** |
| | )   **RESPONSIBLE INDIVIDUAL** |
| | ) |
| | )   Date:    September 21, 2007 |
| | )   Time:    1:30 p.m. |
| | )   Ctrm:    3020 |

-1-

1

## DECLARATION OF DAVID R. CHASE

2    I, David R. Chase, declare as follows:

3         1.        I am duly appointed, qualified and acting Receiver serving under the authority of the

4    United States District Court for the Southern District of Florida in pending case number 06-80180-

5    CIV-RYSKAMP, entitled <u>Federal Trade Commission vs. Nationwide Connections, Inc., Access</u>

6    <u>One Communications, Inc., Network One Connections, Inc., et al.</u> (the "District Court Action"). I

7    was appointed to serve as the Receiver in the District Court Action on February 27, 2006. The

8    Order appointing me Receiver in the District Court Action made me an "agent of [the District

9    Court]" and, in that capacity, obligated me to "[a]ssume full control" of all of the assets of the

10   Receivership Defendants. I have personal knowledge of the facts set forth in this Declaration and,

11   if called as a witness, I could and would competently testify to such facts.

12        2.        I am filing this Declaration in opposition to the (1) Emergency Motion for Use of

13   Cash Collateral and Granting Replacement Liens, (2) Emergency Motion for Order Authorizing

14   Use of Existing Bank Accounts and Cash Management Systems, and (3) Ex Parte Application For

15   Order Approving Ken Dawson as Debtor's Designated Responsible Individual (collectively, the

16   "Motions") pending before the Bankruptcy Court and filed by The Billing Resource, dba Integretel

17   (the "Debtor"), because the Motions seek to mislead the Bankruptcy Court and circumvent an

18   Order issued last week in the District Court Action which, among other things, expressly

19   determined that the Debtor is holding $1,762,762.56 which is property of the Federal Receivership

20   Estate and which order commanded the Debtor to immediately transfer the $1,762,762.56 to me as

21   Receiver in the District Court Action.

22        3.        Indeed, in its attempts to mislead the Bankruptcy Court about the $1,762,762.56, the

23   Debtor has mischaracterized its objectives in filing a petition under the Bankruptcy Code on

24   September 17, 2007, fabricated a "cash collateral" matter that seeks to undermine the United States

25   District Court Judge's ruling in the District Court Action, and even failed to provide to the

26   Bankruptcy Court a copy of the District Court Order that was entered on September 13, 2007 (the

27   "September 13, 2007 District Court Order") which expressly determined that the $1,762,762.56 is

28   property of the Federal Receivership Estate that must be immediately transferred to me as Receiver.

-2-

314325.01 [XP]    24774

1   So this Court is not fooled by the Debtor, a copy of the September 13, 2007 District Court Order is

2   attached as **Exhibit A**. The history of the Federal Receivership and the September 13, 2007

3   District Court Order are as follows:

4          4.       On February 27, 2006, the Federal Trade Commission (the "FTC") initiated the

5   District Court Action by filing a Complaint for Injunctive and Other Equitable Relief against

6   Access One Communications, Inc. ("Access One"), a creditor of the Debtor, Network One

7   Services, Inc. ("Network One"), another creditor of the Debtor, and others, in the United States

8   District Court for the Southern District of Florida.

9          5.       The FTC claims in the District Court Action that Access One and Network One

10  (among others) conducted a fraudulent billing scheme – known as "cramming" – that generated

11  more than $25 million in bogus call charges in violation of Section 5 of the Federal Trade

12  Commission Act, 15 U.S.C. § 53(b). The FTC requested, among other things, the entry of an Ex

13  Parte Temporary Restraining Order and the appointment of a receiver. On February 27, 2006, the

14  Honorable United States District Court Judge Kenneth L. Ryskamp ("USDC Judge Ryskamp")

15  granted the FTC's Motions, issued a Temporary Restraining Order and Order to Show Cause (the

16  "TRO"), and appointed me as Receiver for Access One, Network One, and others. A copy of the

17  TRO is attached as **Exhibit B**.

18         6.       On March 8, 2006, after conducting a hearing, USDC Judge Ryskamp issued a

19  Preliminary Injunction. A copy of the Preliminary Injunction is attached as **Exhibit C**. On

20  September 22, 2006, after conducting another hearing, USDC Judge Ryskamp issued an Amended

21  Preliminary Injunction. A copy of the Amended Preliminary Injunction is attached as **Exhibit D**.

22  (The Preliminary Injunction and the Amended Preliminary Injunction shall collectively be referred

23  to as the "Preliminary Injunction.").

24         7.       Shortly after my appointment, it became apparent that Access One and Network

25  One did not act alone. Both entities used the services of what is called a billing aggregator, which

26  is the entity that actually caused Access One's and Network One's fraudulent charges to be placed

27  on the end user's phone bill. The Debtor was the billing aggregator that worked with both Access

28  One and Network One. As a result, on September 14, 2006, the FTC filed an Amended Complaint

-3-

1    in the District Court Action in which it included the Debtor as an additional defendant. A copy of
2    the FTC's First Amended Complaint is attached as **Exhibit E.**

3        8.    On October 11, 2006, more than seven months after my appointment as Receiver for
4    Access One and Network One, I learned that the Debtor was holding over $1.35 million in
5    "reserves" that belonged to Access One and Network One. The Debtor had never before disclosed
6    to me – or to USDC Judge Ryskamp, for that matter – that it was holding these reserves, or the
7    circumstances under which it came into possession of these reserves, even though numerous
8    provisions of USDC Judge Ryskamp's TRO and Preliminary Injunction required such disclosures.

9        9.    For example, the TRO – which had been served on the Debtor – required all
10    recipients to provide a sworn statement to the FTC, within five days, identifying any "account" or
11    "asset" titled in the name of Access One or Network One or being held on behalf of or for the
12    benefit of Access One or Network One. See TRO at Section VI(C)(1). The Debtor's president
13    (Mr. Ken Dawson) wrote a letter to the FTC in response to the TRO which was, in fact, served five
14    business days later, but the letter was not "sworn," which later became telling because the letter did
15    not disclose the existence of the reserves.

16        10.   Other provisions of USDC Judge Ryskamp's Orders worth noting are (a) Section
17    II(A) of the TRO, which precludes those who receive notice of the TRO from "concealing" assets
18    held for the benefit of Access One or Network One; (b) Section IX, which requires those who
19    receive a copy of the TRO to "fully cooperate and assist the Receiver," including by "advising [of]
20    all persons who owe money to the Receivership Defendants"; and (c) Section IX(F), which
21    precludes those who have received a copy of the TRO from "[d]oing any act or refraining from any
22    act whatsoever to interfere with the Receiver managing, or taking custody, control, or possessions
23    of, the assets or documents subject to this receivership.

24        11.   As a result of the Debtor's failure to turn over or even disclose the existence of
25    Access One's and Network One's reserves, on October 16, 2006, I filed a Revised Motion for an
26    Order to Show Cause why The Billing Resource, d/b/a Integretel, Should Not be Held in Contempt
27    for Violating this Court's Temporary Restraining Order and Amended Preliminary Injunction
28    Order (the "Contempt Motion"). A copy of the Contempt Motion is attached as **Exhibit F.**

-4-

314325.01 [XP]    24774

1      12.    In response to the Contempt Motion, the Debtor filed a series of pleadings seeking

2  to ameliorate its unilateral, calculated decision to not disclose to me or to USDC Judge Ryskamp

3  the fact that it was holding well over one million dollars in reserves that belonged to Access One

4  and Network One.  The Debtor's various pleadings included (a) a 52-page Response (not including

5  exhibits) to my Contempt Motion (copy attached as **Exhibit G**); (b) a Motion to Modify Prior

6  Injunctive Orders (copy attached as **Exhibit H**);(c) a Motion to Stay Contract Claims (copy

7  attached as **Exhibit I**); and (d) an appeal of the Preliminary Injunction to the United States Court of

8  Appeals for the Eleventh Circuit (copy attached as **Exhibit J**), which the Debtor thereafter had

9  stayed pending USDC Judge Ryskamp's adjudication of my Contempt Motion and the Debtor's

10  various motions.

11      13.    USDC Judge Ryskamp thereafter held a lengthy hearing at which my counsel and

12  the FTC's counsel argued that the Debtor should be held in contempt for failing to turn over the

13  reserves.  The Debtor had three attorneys appear at the hearing, two of whom argued before USDC

14  Judge Ryskamp.  Just last Friday, USDC Judge Ryskamp issued the September 13, 2007 District

15  Court Order that the Debtor failed to attach to its "cash collateral" motion.  As is clear from a

16  review of the September 13, 2007 District Court Order (**Exhibit A**), there is no issue as to the

17  ownership of the $1,762,762.56 – those funds are not property of the Bankruptcy Estate of the

18  Debtor; rather, the Debtor has been ordered to immediately transfer those funds to the Federal

19  Receivership Estate.   Indeed, in the September 14, 2007 District Court Order, USDC Judge

20  Ryskamp rejected all of the Debtor's arguments (which the Debtor tries rearguing in the "cash

21  collateral" motion), granted my Contempt Motion, ordered the Debtor to transfer the $1,762,762.56

22  to me, and even ordered the Debtor to show cause, within 10 days, why it should not be held in

23  contempt "for failure to turn over the reserves."  The Debtor failed to bring these facts to the

24  Bankruptcy Court's attention.

25      14.    USDC Judge Ryskamp's September 13, 2007 District Court Order recognized that

26  "[t]he Receiver is seeking to recover the reserve funds pursuant to the Court's in rem jurisdiction

27  over receivership property, as memorialized in the TRO and the Amended Preliminary Injunction.

28  September 14, 2007 District Court Order, at p. 4.  In other words, USDC Judge Ryskamp ruled –

-5-

314325.01 [XP]    24774