Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up"). IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

5.    **OTHER DEDUCTIONS.**

a) <u>Telco Fees.</u> IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) <u>IGT Reserve.</u> IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at zero percent (0%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds. This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

6.    **SETTLEMENT OF AMOUNTS DUE.** Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice for same and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.



TBR NCI 000310    00164

RER-6    0301

7.   **REPORTS.**

(a)   **Standard Reporting.** IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein. Client may request that IGT provide additional reports or a different formatted report. To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)   **Report Review.** Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)   **Report Detail.** Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)   **Audit.** Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos. The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.   **BILLING APPEARANCE.** Where a Telco provides the capability, Client's Billing Transaction shall appear on such Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.   **TELCO CONFIDENTIALITY.** Client hereby acknowledges and agrees that, without express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services. In the event of a violation of this section, Client shall pay to IGT, as liquidated damages, for loss of reputation and business good will, and not as a penalty, $10,000 for each such violation.

*{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }*

## EXHIBIT "II-A"
### Telco Billing Contracts
Page 1 of 1

| Ameritech | – Ohio Bell | NYNEX | – New England Tel |
| | – Michigan Bell | | – New York Tel |
| | – Indiana Bell | | |
| | – Wisconsin Bell | Pacific Bell | – Pacific Bell |
| | – Illinois Bell | | – Nevada Bell |
| Bell Atlantic | – New Jersey Tel | Southwestern Bell | |
| | – Bell PA | | |
| | – Diamond State | U.S. West | – Northwest Bell |
| | – C&P DC | | – Mountain Bell |
| | – C&P MD | | – Pac NW Bell |
| | – C&P VA | | |
| | – C&P WVA | Alltel | |
| Bell South | | Cincinnati Bell | |
| GTE | – GTE North | Illuminet | |
| | – GTE Florida | | |
| | – GTE South | NECA | |
| | – GTE South West | | |
| | – GTE California | SNET | |
| | – GTE West | | |
| | – GTE North West | Sprint United | – United Florida |
| | – GTE Hawaii | | – CT & T |
| | | | – United Indiana |
| GTE Contel | – GTE North Contel | | – United Midwest |
| | – GTE South Contel | | |
| | – GTE S-W Contel | Telecom Canada | |
| Citizens Telephone | | | |

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.



00166

TRD NCL000313

RER-6      0303

## EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology

**Rejects:**

| | |
|---|---|
| **Full Key:** | **Bill To Number (BTN)** |
| | **Originating Number** |
| | **Terminating Number** |
| | **Call Date** |
| | **Call Time** (Seconds excluded) |
| | **Call Duration** (Seconds excluded) |

A reject call record that matches a history record based on the above Full Key is considered an exact match and is returned to the Client with the IGT return code in position 70-71.

**Unbillables:**

| | |
|---|---|
| **Full Key:** | **Bill To Number (BTN)** |
| | **Originating Number** |
| | **Terminating Number** |
| | **Call Date** |
| | **Call Time** (seconds excluded) |
| | **Call Duration** (seconds excluded) |

An unbillable call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable experience compared to the total specific unbillable amount for each particular Telco.

**Adjustments 4501XX:**

| | |
|---|---|
| **Pass # 1-Full Key:** | **Bill To Number (BTN)** |
| | **Originating Number** |
| | **Terminating Number** |
| | **Call Date** |
| | **Call Time** - (seconds excluded) |
| | **Call Duration** (seconds excluded) |

An adjustment call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the original call record that it matched.

| | |
|---|---|
| **Pass # 2-Partial Key:** | **Bill To Number (BTN)** - Optional\Required |
| | **Originating Number** - Optional\Required |
| | **Terminating Number** - Optional |
| | **Call Date** - Optional |
| | **Call Time** - Optional |
| | **Call Duration** - Optional |

### EXHIBIT "II-B"
#### Telco Returns
#### Matching Process & Allocation Methodology

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

Pass # 3-Matrix Key:

| | |
|---|---|
| Bill To Number (BTN) | - Optional/Required |
| Originating Number | - Optional/Required |
| Terminating Number | - Optional/Required |
| Call Date | – Optional |
| Call Time | – Optional |
| Call Duration | – Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required Key in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

#### Adjustments 4550XX:

Bulk Match Key:

Bill To Number (BTN)
Call Date
CIC

Bulk logic is a <u>one-to-many</u> matching process and utilizes the call date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.



TRR NCI 000314    00168

RER-6    0305

### EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

   *Step 1* -- Identify all Clients that deposit to that particular Telco for the given two month period.

   *Step 2* -- Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

   *Step 3* -- For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

   *Step 4* -- Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

   *Step 5* -- Determine each Client's percentage of the sum total of the Step 4 calculation.

   *Step 6* -- Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

00169

TRQ NCI000045

RER-6    0306

OCT-11-2006 WED 02:37 PM 1    Patton Armstrong    FAX NO.    42805    P. 54

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

| Client # | Billings Deposited With XYZ Telco for Sept & October | X | Historical Adjust % Telco >50% supporting detail for June, July & August | = | Step 2 x Step 3 | Each Client contribution in relation to total in Step 4 (% of $123,200) | $ Allocated (% in Step 5 x $50,000) |
|---|---|---|---|---|---|---|---|
| 444 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| 445 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00% | $50,000 |

**Uncollectables 4501XX & 4650XX (Used for True-Ups):**

Write-Off Match Logic:    Bill To Number (BTN)
                          Call Date
                          CIC

Uncollectable write-off logic is a one-to-many matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates equal or older than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off" is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Write-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, for Telcos that do provide write-off detail, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

TRB NCL000316    00170

RER-6    0307

OCT-11-2006 WED 02:37 PM T... Patton Armstrong     FAX NO. 7024542805     P. 55

### EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

Step 1 – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

Step 2 – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

Step 3 – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

Step 4 – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

Step 5 – Determine each Client's percentage of the sum total of the Step 4 calculation.

Step 6 – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner:

| Client # | Actual Billing Deposited In XYZ Telco | X | Historical Write-Off % with Telco > 50% supporting detail | = | Step 2 x Step 3 | Each Clients' contribution in relation to total in Step 4 (% of 123,200) | $ Allocated (% in Step 5 x $50,000) |
|---|---|---|---|---|---|---|---|
| 111 | $55,000 | X | 10% | = | $5,500 | 4.46% | $2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $9,740 |
| 333 | $35,000 | X | 22% | = | $7,700 | 6.25% | $3,125 |
| 444 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $9,000 | 7.31% | $3,655 |
| | | | | | $123,200 | 100.00 | $50,000 |

True-Up Procedure :

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.


00171

TRP_NCI000317     RER-6     0308

OCT-11-2006 WED 02:31 PM P.  Patton Armstrong   FAX NO. 342805   P. 56

## EXHIBIT "II-C"
### Delivery Schedule of Reports & Data Files

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |
| True up Summary (Actual) Report | Wednesday After 5:00pm PST |

00172

ITP NOI000048   RER-6   0309

OCT-11-2006 WED 02:38 PM T: alton Armstrong    FAX NO. ...2805    P. 57

## EXHIBIT "II-D"
### Telco Fees

| Telco Group | SID | Telco Name | Bill Render | Interstate Per Msg. | Intrastate Per Msg. | Bulk 4256 Per Msg. | SSM 010118 Per Msg. | Pay/Call 010116 Per Msg. | End-User Adjust |
|---|---|---|---|---|---|---|---|---|---|
| Ameritech | 9321 | Ohio Bell | 0.4879 | 0.0535 | 0.0535 | 0.1070 | 0.1070 | 0.7200 | 9.63 |
| | 9323 | Michigan Bell | 0.4660 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9325 | Indiana Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9327 | Wisconsin Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9329 | Illinois Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 07200 | 9.00 |
| Verizon | 9102 | New Eng Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9104 | New York Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9206 | New Jersey Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9208 | Bell Penn. | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 9210 | Diamond State | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9211 | C&P DC | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9212 | C&P MD | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 9213 | C&P VA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 9214 | C&P WVA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| Bell South | 8417 | Bell South | 0.5800 | 0.0475 | 0.0475 | .04+2.86% | 0.0475 | 2.86% | 6.40 |
| GTE Companies | 169 | GTE North | 0.9100 | 0.0200 | 0.0200 | 0.135 | 0.135 | 0.2500 | 15.00 |
| | 328 | GTE Florida | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 479 | GTE South | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2060 | GTE S-West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2319 | GTE California | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2320 | GTE West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 2416 | GTE N-West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 3100 | GTE-Hawaii | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| GTE Contel | 170 | GTE N-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 480 | GTE S-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| | 2081 | GTE SW Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 16.00 |
| Citizens Tel | 2308 | Citizens Tel | - | 0.1276 | 0.1276 | 0.3775 | 0.3775 | 0.3776 | - |
| Pacific Bell | 9740 | Pacific Bell | 0.3632 | 0.0300 | 0.0300 | 0.3775 | 0.3775 | 0.7200 | 9.00 |
| Nevada Bell | 9742 | Nevada Bell | 0.4632 | 0.0300 | 0.0300 | 0.0300 | 0.0300 | 0.7200 | 9.00 |
| SW Bell | 8633 | S-West Bell | 0.4132 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 0.7200 | 9.00 |
| QWEST | 9631 | North West Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9636 | Mountain Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9638 | PAC N-W Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| Alltel | 3995 | Alltel | 0.5890 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | - |
| Cincinnati Bell | 9346 | Cinn. Bell - 402 | 0.6820 | 0.0309 | 0.0309 | 0.3309 | 0.0309 | 0.0609 | 15.00 |
| Cincinnati Bell | 9348 | Cinnl Bell - 803 | 0.7300 | 0.0330 | 0.0330 | 0.0330 | 0.0330 | 0.0630 | 15.00 |
| Illuminet | 9999 | Illuminet | - | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | - |
| NECA | 9996 | NECA | - | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 | - |
| SNET | 9147 | SNET | 0.5406 | 0.1174 | 0.1174 | 0.1174 | 0.1174 | 0.7200 | - |
| Sprint United | 341 | United Florida | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 470 | Carolina T&T | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 832 | United Indiana | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 9993 | United Midwest | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| Telcom Canada | 8050 | Telcom Canada | - | 0.560 | 0.560 | 0.560 | 0.560 | 0.560 | - |

The above information is current at the time of printing and is to be used for informative purposes only. The information contained in this exhibit is not constant, permanent, all inclusive and/or final and is subject to change without notice.

Note: The US West End-User Adjustment Fee is based on each line item adjusted

QK    00173

RER-6    0310

**Exhibit "II-E"**
**Payment Instructions**

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby
instructed to remit any Net Proceeds to which  Client is entitled under this Agreement to the
account listed below. These wire instructions may only be modified or revoked by a written notice
signed by Client.  Client agrees to indemnify and hold IGT harmless from any and all claims or
expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

Company      Network One Services, Inc.

Address      222 Lakeview Ave. Suite 160-157

             West Palm Beach, FL 33401

Bank Name    Wachovia

Bank Address 303 Banyan Blvd

             West Palm Beach, FL 33401

Account Name Network One Services, Inc.

Account Number 2000015609553

Bank (ABA)
Transfer Number  047006432

Signature: R M          Print name: Ronny Morillo

Title: Secretary / Treasurer   Date: 2/25/03

                                                                        00174
                                    TRD  NCI000330
                                                        RER-6        0311

## SCHEDULE III - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the Effective Date of the Agreement ("Order Date") and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User inquiries to Client, ii) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

2.    **CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto. IGT shall refer or transfer End-User Inquiries to Client based on mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User refuses to be referred or transferred to Client or otherwise initiates a subsequent inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such subsequent inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

3.    **IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT. IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries. When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) **Adjustments.** IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) **Regulatory Complaints.** IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

*( - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - )*

    00175

RER-6    0312

OCT-11-2006 WED 02:38 PM T:   Patton Armstrong      FAX NO. :   342805          P. 60

## EXHIBIT "III-A"
### Inquiry Standards

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

00176

TBR_NCI_000322          RER-6        0313

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

### ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
Third Floor
WASHINGTON, DC 20006-4604

———

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

STEVEN A. LANCELLOTTA
WRITER'S DIRECT DIAL: (202) 454-2836
EMAIL: slancellotta@tighepatton.com

October 11, 2006

By Facsimile and U.S. Mail

Jeffrey C. Schneider, Esq.
Tew Cardenas
Four Seasons Tower, 15th Floor
1441 Brickell Ave.
Miami, FL 33131

Re:     *Federal Trade Commission v. Nationwide Connections, Inc.*
        Case No. 06-80180-CIV (S.D. Fla.)

Dear Mr. Schneider:

We represent The Billing Resource (d/b/a Integretel) ("TBR"), which has recently been named as a defendant in the above-referenced action and which formerly provided billing-aggregation and related services to two of the receivership defendants: Access One Communications, Inc. and Network One Services, Inc.

I am writing to you because the FTC has contended that TBR is holding funds belonging to Access One and Network One and is required to turn those funds over to the receiver. We are aware that the staff has referred this matter to you as the receiver's counsel. The purpose of this letter is (1) to explain why TBR is not holding any funds that the receiver has any legitimate claim to, and does not currently owe any debt to Access One or Network One that the receiver would be entitled to enforce; and (2) to explain why, if the receiver decides to proceed against TBR, it would be inappropriate to utilize the summary procedures set out in § XI.B of the preliminary injunction.

First, by way of background, by letter dated March 6, 2006, TBR put the FTC on notice that although TBR had received payments from LECs that TBR attributes to billing transactions originated by Access One and Network One, both companies were in default of their agreements with TBR and no monies were due and owing. TBR indicated that if proceeds became due to Access One or Network One in the future, TBR would deposit those funds into a separate bank account and notify the FTC. Although the March 6 letter did not use the word "reserves," it clearly put FTC staff on notice of the reserves' existence. Moreover, counsel for TBR told FTC

EXHIBIT
4

00177

RER-6        0314

OCT-11-2006 WED 02:29 PM Ti:   .lton Armstrong        FAX NO.  :.~~42805              P. 03

Jeffrey Schneider, Esq.
October 11, 2006
Page 2

staff about the reserves, beginning several months ago after the FTC served a subpoena on TBR.
The reserves were also discussed with one or more FTC commissioners in the presence of staff,
and specifically identified in counsel's letter to the staff of August 29, 2006. In short, FTC staff
was on notice of the reserves more than six months ago, and was expressly informed of the
reserves more than a month before a meeting between the FTC and TBR on September 28, 2006,
at which staff seems to contend that they first learned of the reserves.

*I.   TBR holds no assets belonging to Access One or Network One and does not
      owe either entity any debt that is currently due and owing.*

     Because the receiver steps into the shoes of Access One and Network One. he can assert
no claim against TBR other than what Access One and Network One could have asserted if the
receiver had not been appointed. And, as we will explain, and have explained to the FTC
through our letters enclosed herewith, neither entity could assert any claim against TBR.
Specifically, TBR neither holds any assets belonging to either entity nor owes either entity any
enforceable debt at this time. Under its contracts with Access One and Network One (copies of
which are enclosed), the funds that TBR receives from the LECs on account of billing
transactions originated by the clients belong to TBR and TBR has no obligation to pay Access
One or Network One any portion of the dollar amounts received from the LECs until payment
becomes due under the terms of the contracts. For the reasons explained below, no funds have
become due and owing to either entity. As a result, not only does TBR not hold any funds
belonging to Access One or Network One but the receiver does not currently have any claim
against·TBR for amounts due and owing Access One or Network One under the contracts.

     *First,* both contracts expressly provide that TBR is not the client's agent, partner, joint
venturer, trustee, fiduciary, or legal representative.[1] Thus, when TBR received funds from LECs
on account of billing transactions originated by Access One and Network One, it was not in any
way acting "on behalf" of the two clients. Those clients therefore have no claim against TBR for the
specific funds received by TBR from the LECs.

     *Second,* TBR is entitled under the contracts to withhold from payments otherwise due to
Access One and Network One sums in any amount necessary to fund what the contracts refer to
as "the IGT Reserve," which is defined as "an amount withheld, from the amount otherwise
owed to Client with respect to Billing Transactions, to protect IGT from credit losses or
otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[2] And in
this regard, the contracts obligate each of the clients to indemnify TBR from any claims and
expenses arising out of the billing transactions processed by TBR.[3] The reserves that the FTC
contends should be paid over to the receiver are the IGT Reserves relating to Access One and

---

1.  Master Services Agreement between TBR and Access One ("Access One Contract") at 4, § 19(k);
    Master Services Agreement between TBR and Network One ("Network One Contract") at 9, § 19(k).

2.  Access One Contract at 5 (Exhibit A). 10 (Schedule II, § 5.b); Network One Contract at 11 (Exhibit
    A), 19 (Schedule II, § 5.b).

3.  Access One Contract at 2, § 11(a); Network One Contract at 3. § 11(a).

Jeffrey Schneider, Esq.
October 11, 2006
Page 3

Network One. These reserves have been set to account for, among other things, any liability that may be claimed against TBR for any improper billings by Access One or Network One such as alleged by the FTC in the First Amended Complaint. For these reasons, the IGT reserves are not funds that belong to either Access One or Network One, nor are they funds that either Access One or Network One has been entitled to be paid at any time since the receiver was appointed.

*Third,* because Access One and Network One failed to provide proof of their compliance with contract requirements upon TBR's demand, TBR was entitled to (and did) suspend its performance under the two contracts.[4] This provides further support for the conclusion that no funds have been due and owing to Access One or Network One at any time since the receiver was appointed.

*Fourth,* the Access One contract provides that TBR has all rights in Access One's billing transactions necessary to comply with its obligations under its billing contracts with the LECs.[5] This further confirms that TBR has title to all funds collected by TBR on account of Access One's transactions.

*Finally,* the reserves do not take the form of any actual funds that TBR has segregated or otherwise set aside as being currently owed to Access One or Network One, and we believe based on the information we have been provided to date that TBR currently holds little if any money that could be traced to payments resulting from Access One or Network One's billing transactions. Therefore, even if Access One or Network One could somehow have asserted an equitable claim to such payments when TBR received them, that claim would no longer be viable given the inability to trace those payments to funds currently in TBR's possession.

For all of these reasons, TBR is holding no funds belonging to Access One or Network One. Neither company has any currently enforceable claim against TBR. At most, they might have contingent claims that could become ripe at some time in the future, and in that event they would be general unsecured creditors with no claim on any particular assets in TBR's possession. Alternatively, the "balance" in the reserves could become negative, in which case TBR would have claims against these companies. Because Access One and Network One have no enforceable rights against TBR, the receiver (whose rights are derivative of the rights of the receivership defendants) has none.

2.  *If the receiver nevertheless decides to proceed against TBR, it would be inappropriate to use the summary procedures set out in § XI.B of the preliminary injunction.*

Under § XI.B of the preliminary injunction, if any person or entity fails to turn over assets belonging to the receivership estate, the receiver may file an *ex parte* affidavit of noncompliance and the court may then issue writs of possession or sequestration or grant other equitable remedies without additional process or hearing. If the receiver decides to proceed

---

4.  Access One Contract at 1, § 9; Network One Contract at 3, § 9.

5.  Access One Contract at 11 (Schedule II, § 9).

Jeffrey Schneider, Esq.
October 11, 2006
Page 4

against TBR despite the arguments we have set out above, it would be inappropriate to use these summary procedures.

An *ex parte* remedy is out of place where, as here, the receiver's entitlement to relief is seriously disputed. Even if the receiver concludes that there is a basis to assert a claim against TBR, no one could reasonably deny that TBR has substantial grounds on which to dispute that claim. Under those circumstances, proceeding *ex parte* would be unfair and would raise substantial due-process concerns. Those concerns are heightened by the fact that the receiver acts as an arm of the court.

The dispute over the receiver's right to relief is not limited to the question of liability. Rather, there are serious questions as to whether the sorts of remedies referred to in § XI.B— writs or possession or sequestration or other equitable writs—would be appropriate at this point even if the receiver could ultimately make out a valid claim. TBR is not holding any specific asset in which the receiver has any equitable interest or to which the receiver can assert a right to immediate possession. As noted above, the receiver's claim is nothing more than an ordinary unsecured contract claim. He therefore has no claim on any of TBR's assets unless and until he obtains a judgment and acts to enforce it. If the receiver were to proceed on an *ex parte* basis against the general liquid assets of TBR, it would cause serious damage to TBR and possibly jeopardize the ability of TBR to continue to do business, for which TBR would seek redress out of the receivership assets.

Finally, if the receiver decides—despite the foregoing—to pursue an *ex parte* remedy, we believe that as his counsel, your duty of candor to the court would require you to inform the court that TBR disputes both the merits of the receiver's claim and the appropriateness of any extraordinary relief that the receiver might seek. We therefore request that if the receiver proceeds *ex parte*, you provide the court with a copy of this letter and the accompanying contracts, so that the court can make a fully informed decision.

We would welcome the opportunity to discuss this matter further. Please feel free to contact me or TBR's local counsel, Scott Newman of Holland & Knight. His phone number is 561-650-8310.

Yours truly,

Steven A. Lancellotta

Enclosures

cc: Scott Newman, Esq.
    Richard Gordin, Esq.
    Neal Goldfarb, Esq.
    Laura Kim, Esq., FTC

OCT-11-2008 WED 02:29 PM Tig⸱ ⸱ton Armstrong          FAX NO. ⸱ ⸱ ⸱ ⸱⸱805          P. 05

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

### ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
Third Floor
WASHINGTON, DC 20006-4604

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

RICHARD H. GORDIN
WRITER'S DIRECT DIAL: (202) 454-2811
EMAIL: rgordin@tighepatton.com

October 5, 2006

<u>By Facsimile and U.S. Mail</u>
Michael J. Davis Esq.
Laura Kim, Esq.
Collot Guerard, Esq.
Federal Trade Commission
600 Pennsylvania Avenue, N.W., Room H-288
Washington, D.C. 20580
Fax No. (202) 326-3395

Re:    *Federal Trade Commission v. Nationwide Connections, Inc., et al.*

Dear Mr. Davis, Ms. Kim, and Ms. Guerard:

This is in response to two letters from the FTC staff dated October 4, 2006: (a) Mr. Davis's letter transmitting the summons to The Billing Resource, the first amended complaint, and other documents relating to the above-referenced action and (b) Ms. Kim's letter responding to my letter of October 3, 2006 regarding the reserves attributable to billing transactions originated by Access One Communications, Inc. and Network One Services, Inc.

Mr. Davis states in his letter that last week I "confirmed with FTC staff that [I] have been appointed by [my] client to accept service of the file-stamped Summons and file-stamped First Amended Complaint[.]" That statement is inaccurate. When I discussed the issue with the staff, I indicated a willingness to ask my client for authority to accept service, but I did not state that I already have such authority, and in fact I did not have such authority. (Indeed, it is not reasonable to think that before staff had even raised the issue I had already asked my client to appoint me to accept service.) Nor do I now have authority to accept service on behalf of my client.

After my conversation with staff last week, I did not ask for authority to accept service, because I was under the impression that the staff was engaging in settlement negotiations with us. Staff did not raise the matter again. I assumed that if settlement discussions ended, staff would then request me to formally accept service, at which point I would ask my client for authority to do so. Frankly, I was surprised when the box was delivered via FedEx this morning. We negotiated with staff in good faith. Staff never responded to TBR's settlement proposal. You did not even provide us with advance notice.

00181

OCT-11-2006 WED 02:29 PM T    Patton Armstrong    FAX NO.    4542805    P. 06

Michael J. Davis, Esq.
Laura Kim, Esq.
Collot Guerard, Esq.
October 5, 2006
Page 2

Moreover, even if I had had authority to accept service, sending the summons and complaint by Federal Express is not a permissible mode of service under Fed. R. Civ. P. 4. That said, we will contact The Billing Resource to find out whether we are authorized to accept service and to waive the foregoing defects. We will inform you of the answer within at most two business days.

With respect to Ms. Kim's letter, there is no basis for the suggestion that the reserves attributable to the Access One and Network One billing transactions were not disclosed until last week. As I pointed out in my letter of October 3 (and as Ms. Kim does not deny), although Ken Dawson's letter of March 6 did not use the word "reserves," it clearly put the staff on notice of the reserves' existence.

Moreover, I told members of the staff about the reserves, beginning several months ago after the FTC had served a subpoena on The Billing Resource. And I informed the staff of the reserves in writing in my letter to Ms. Guerard of August 29. That letter stated:

Reserve Amount Remaining: We understand that as of Friday, August 25, 2006, the reserve amount remaining for Access One was $1,186,430.36 and the amount remaining for Network One was $173,918.66. As we informed you, these are accounting entries only; there are no separate holding accounts. Under the respective contracts with [The Billing Resource], the reserves are to be applied for various purposes.

In short, the staff was on notice of the reserves more than six months ago, and was expressly informed of the reserves more than a month before the September 28 settlement meeting at which Ms. Kim seems to contend that the staff first learned of the reserves.

Ms. Kim's letter concludes by asking whether we object to having Mr. Dawson's March 6 letter sent to counsel for the receiver. We would prefer that the staff not turn this matter over to the receiver, because we believe that the interests of *all* parties would be best served by a negotiated resolution. If the staff does send Mr. Dawson's letter to counsel to the receiver, we would ask that copies of my letter of October 3 and of this letter be sent along with it, so that the receiver and his counsel will be made aware of our position that The Billing Resource is not holding any assets that belong to any of the receivership defendants or that the receiver otherwise has a legitimate claim to.

Finally, please note that I will be out of the country until October 18. In the meantime, please direct any communications regarding this matter to my colleagues Steve Lancellotta (slancellotta@tighepatton.com; 454-2836) and Neal Goldfarb (ngoldfarb@tighepatton.com; 454-2826).

Sincerely,

Richard H. Gordin

00182

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

### ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
Third Floor
WASHINGTON, DC 20006-4604

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

RICHARD H. GORDIN
WRITER'S DIRECT DIAL: (202) 454-2881
EMAIL: rgordin@tighepatton.com

October 3, 2006

**By Facsimile and U.S. Mail**
Laura Kim, Esquire
Federal Trade Commission
600 Pennsylvania Avenue, N.W., Room H-288
Washington, D.C. 20580
Fax No. (202) 326-3395

Re:    *Federal Trade Commission v. Nationwide Connections, Inc., et al.*

Dear Ms. Kim:

This is in response to your letter of October 2, 2006, in which you asked me to contact counsel for receiver for Access One and Network One "to arrange for the immediate transfer of the reserve accounts belonging to Access One and Network One to the Receiver." As discussed below in more detail, your contention that The Billing Resource is obligated to turn over any funds to the receiver is unfounded, for several reasons, the most important of which is that The Billing Resource is not currently holding any funds that belong to either Access One or Network One and is not currently indebted to Access One or Network One.

As you are aware, The Billing Resource's president, Ken Dawson, put the FTC on notice six months ago that although The Billing Resource had received payments from LECs that The Billing Resource attributes to billing transactions originated by Access One and Network One, both companies were in default and "no amounts are currently due and owing."[1] Mr. Dawson stated that if proceeds became due to Access One and/or Network One in the future, The Billing Resource would deposit those funds into a separate bank account and notify the FTC.

Nothing has changed since Mr. Dawson informed the FTC of these facts. Under the contracts, the funds that The Billing Resource obtains from the LECs belong to The Billing Resource unless and until they become due under the terms of the contract. Because of the defaults by Access One and Network One and other circumstances, no funds have become due and owing to either entity. As a result The Billing Resource holds no funds against which the receiver currently has a claim.

---

1.  Letter dated March 6, 2006 from Ken Dawson to Roberto C. Menjivar.

Laura Kim, Esquire
October 3, 2006
Page 2

*First*, both contracts expressly provide that The Billing Resource is not the client's agent, partner, joint venturer, trustee, fiduciary, or legal representative.[2] Thus, when The Billing Resource received funds from LECs on account of billing transactions originated by Access One and Network One, it was not in any way acting "on behalf" of the two clients.

*Second*, The Billing Resource is entitled under the contracts to withhold from payments otherwise due to Access One and Network One sums in any amount necessary to fund what the contracts refer to as "the IGT Reserve," which is defined as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[3] And in this regard, the contracts obligate each of the clients to indemnify The Billing Resource from any claims and expenses arising out of the billing transactions processed by The Billing Resource.[4] The reserves to which you refer in your letter are the IGT Reserves relating to Access One and Network One, and as such they are not funds that—to use your terminology—"belong[]  to" those companies. Nor are they funds that either Access One or Network One has been entitled to be paid at any time since the receiver was appointed.

*Third*, because Access One and Network One failed to provide proof of their compliance with contract requirements upon The Billing Resource's demand, The Billing Resource was entitled to (and did) suspend its performance under the two contracts.[5] This provides further support for the conclusion that no funds have been due and owing to Access One or Network One at any time since the receiver was appointed.

*Fourth*, the reserves are nothing more than an accounting entry on The Billing Resource's books, and do not take the form of any actual funds that The Billing Resource has segregated or otherwise set aside as being currently owed to Access One or Network One. Because no funds have become due and owing to either company, The Billing Resource has had no occasion to establish a separate bank account as described in Mr. Dawson's letter, and has not done so.

For all of these reasons, The Billing Resource is holding no funds belonging to Access One or Network One. Neither company has any currently enforceable claim against The Billing Resource. At most, they might have contingent claims that could become ripe at some time in the future, and in that event they would be general unsecured creditors with no claim on any particular assets in The Billing Resource's possession. Alternatively, the "balance" in the accounts could become negative, in which case The Billing Resource would have claims against these companies. Because Access One and Network One have no enforceable rights against The

---

2. Master Services Agreement between The Billing Resource and Access One ("Access One Contract") at 4, § 19(k); Master Services Agreement between The Billing Resource and Network One ("Network One Contract") at 9, § 19(k).

3. Access One Contract at 5 (Exhibit A), 10 (Schedule II, § 5.b); Network One Contract at 11 (Exhibit A), 19 (Schedule II, § 5.b).

4. Access One Contract at 2, § 11(a); Network One Contract at 3, § 11(a).

5. Access One Contract at 1, § 9; Network One Contract at 3, § 9.

Laura Kim, Esquire
October 3, 2006
Page 3

Billing Resource, the receiver (whose rights are derivative of the rights of the receivership defendants) has none, either.

Your letter states that the staff only recently became aware of the reserves discussed above. That statement is inaccurate. First, although Mr. Dawson's letter of March 6 did not use the word "reserves," it clearly put the staff on notice of the reserves' existence. Second, I have told members of the staff about the reserves, beginning several months ago after the FTC served a subpoena on The Billing Resource. I also discussed the reserves — and the fact that this was only an accounting entry — with one or more commissioners in the presence of staff. Third, in view of the Commission's actions against the reserves of Billing Concepts, staff clearly knew about such accounting practices generally, and almost certainly knew — especially in light of Mr. Dawson's letter — that The Billing Resource maintained such an account on its books.

Finally, with respect to the TRO and preliminary injunction, though your letter states that The Billing Resource was served with the TRO, it does not state that it was served with the preliminary injunction. We take that as a concession that The Billing Resource was *not* served with the preliminary injunction, which is consistent with our understanding. If we are mistaken on this point, please provide us with proof that the preliminary injunction was in fact served.

In any event, for the reasons previously discussed, The Billing Resource is not holding any assets of either Access One or Network One. Thus, the asset-turnover requirements of the Preliminary Injunction would not apply. A request to turn over funds that do not belong to the receivership defendants and against which the receivership defendants currently have no claim is legally unfounded and unreasonable.

As we have previously stated, The Billing Resource remains willing to negotiate with the staff regarding an amicable resolution of this entire matter, and to include the issue of the reserves in those discussions. However, we believe that neither the Commission nor the receiver have any basis for summarily requiring The Billing Resource to pay anything to the receiver.

Please contact me if you would like to discuss this matter further.

Sincerely,

Richard H. Gordin

OCT-11-2006 WED 02:30 PM Tig⊦    ...ton Armstrong    FAX NO. 2⁻⁻ ....805    P. 10

08/28/2006 15:08 FAX ▲ .8 362 2795    Integretel,Inc.    ☑002/002



**Integretel**
BILLING SOLUTIONS

March 6, 2006

Mr. Roberto C. Menjivar                    Via FAX (202) 326-3395
Federal Trade Commission                   and express courier
600 Pennsylvania Avenue NW. Room 238
Washington, DC 20580

RE:    FTC v. Nationwide Connections, Inc. et al
       TRO and Order to Show Cause dated February 27, 2006 ("Order")

Dear Mr. Menjivar:

Please be advised of the following with respect to the above captioned Order:

1) To the best of our knowledge, we have not conducted any business with defendant
   Nationwide Connections, Inc.

2) We have a service contract with a Florida corporation called Access One
   Communications ("AOC"). Pursuant to this contract, AOC would be entitled to certain
   proceeds from billing transactions. However, AOC is in default of this contract and,
   therefore, no amounts are currently due and owing. We have not processed any
   billing for AOC since May of 2005. To the extent proceeds become due to AOC in
   the future, we will establish a separate bank account into which such funds will be
   deposited and notify your office accordingly.

3) We have a service contract with a Florida corporation called Network One Services,
   Inc. ("NOSI"). Pursuant to this contract, NOSI would be entitled to certain proceeds
   from billing transactions. However, NOSI is in default of this contract and, therefore,
   no amounts are currently due and owing. We have not processed any billing for
   NOSI since June of 2003. To the extent proceeds become due to NOSI in the future,
   we will establish a separate bank account into which such funds will be deposited
   and notify your office accordingly.

Except as noted above, we are in possession of no assets relating to any defendant in
this matter. If you wish additional information or need to discuss any of the foregoing,
please call me directly at 408-362-4177.

Sincerely,

Ken Dawson,
President

INTEGRETEL, INC ▪ 5883 RUE FERRARI ▪ SAN JOSE ▪ CA ▪ 95138 ▪ 408.362.4000 TEL

00186

# EXHIBIT G

00187

RER-6       0324

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

            Plaintiff,

    vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

            Defendants.

_____/

**Response and Incorporated Memorandum of Law
of  Defendant The Billing Resource d/b/a Integretel
In Opposition to the Receiver's Motion for an Order to Show Cause
Why Integretel Should Not Be Held in Contempt of Court**

Richard H. Gordin
Pro hac vice application to be filed
Tel:     (202) 454-2881
E-mail rgordin@tighepatton.com
    and
Neal Goldfarb
Pro hac vice application pending
Tel:     (202) 454-2826
E-mail ngoldfarb@tighepatton.com
TIGHE PATTON ARMSTRONG TEASDALE PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
Fax:     (202) 454-2805

October 30, 2006

Scott B. Newman, Florida Bar No. 339717
Tel:     (561) 650-8310
E-mail scott.newman@hklaw.com
    and
Martin J. Alexander, Florida Bar. No. 346845
Tel:     (561) 650-8306
E-mail marty.alexander@hklaw.com
HOLLAND & KNIGHT LLP
222 Lakeview Ave., Suite 1000
West Palm Beach, Florida 33401
Fax:     (561) 650-8399

*Counsel for The Billing Resource d/b/a
Integretel*

EXHIBIT G

## Table of Contents

Statement of Facts..................................................................................................3

   A.  Integretel's services for Network One and Access One......................................3

   B.  The temporary restraining order ......................................................................7

   C.  The service of the TRO on Integretel and Integretel's response........................11

   D.  The seven-month period during which Integretel was not subject to any
      injunctive order and did not receive any communications from the
      Receiver ......................................................................................................13

   E.  Integretel's further disclosures of the reserves, and the FTC's referral of
      the matter to the Receiver ............................................................................14

   F.  The amended complaint and the amended preliminary injunction ....................16

Argument .................................................................................................................17

I.  Civil contempt sanctions are unavailable because the TRO and amended
   preliminary injunction are—if interpreted as the Receiver reads them—
   invalid. ..............................................................................................................17

   A.  If the orders at issue are interpreted to require Integretel to pay the amount
      of the reserves to the Receiver, they are invalid because the Court may not
      grant equitable relief on a common-law claim for damages due to a breach
      of contract. ................................................................................................18

      1.  The Receiver's underlying claim is a simple claim at law for an
         alleged breach of contract, which makes the Receiver merely a general
         unsecured creditor who has no legal or equitable interest in any of
         Integretel's property. ..............................................................................19

      2.  The Court may not grant equitable relief—either permanent or
         preliminary—on a claim at law for breach of contract .............................20

   B.  As applied to Integretel in this case, a turnover order would conflict with
      long-established rules of receivership law and violate Integretel's right to
      due process and (potentially) to a jury trial. .................................................22

   C.  As applied here, the provisions purporting to require those served with the
      orders to cooperate with and assist the Receiver and the FTC constitute
      improper delegations of judicial power and violate due process....................24

   D.  The orders at issue were not (and are not) binding on Integretel because
      there has been no proof that could support injunctive relief against
      Integretel as either a party or a nonparty...................................................26

1.  If the orders are regarded as injunctions against a party, they were and
    are invalid because there has been no showing that could justify
    injunctive relief against Integretel. ........................................................................27

2.  The prerequisites for imposing injunctive relief against a nonparty are
    not satisfied. ............................................................................................................28

E.  Certain provisions the Receiver relies on are—as applied to Integretel in
    the circumstances here—too indefinite to be enforceable. ..............................30

    1.  The asset-turnover and asset-identification provisions are
        unenforceable against Integretel. ..............................................................31

    2.  The cooperation provisions are also unenforceable, either on their face
        or as applied to Integretel. .........................................................................33

II.  Even if the Court holds that the orders are valid and enforceable, the Receiver
     is not entitled to the issuance of a show-cause order. ...........................................34

    A.  The turnover provision of the TRO was inapplicable on its face, and
        Integretel was not asked to turn over any assets while the TRO was in
        effect. ...........................................................................................................................34

    B.  Integretel cannot be held in contempt of the turnover provision of the
        amended preliminary injunction because contracts' ADR and choice-of-
        forum provisions bar this Court from deciding the underlying breach-of-
        contract issue. .........................................................................................................34

    C.  If the Court nevertheless reaches the underlying contract issue, it should
        find that Integretel did not violate the turnover order because it owes
        nothing to Access One or Network One and therefore has no obligation to
        pay the Receiver. .....................................................................................................36

    D.  Integretel did not violate the other provisions of the orders. ...........................42

III.  The Receiver's accusation that Integretel acted improperly is unfounded. .............47

Conclusion ..............................................................................................................................49

00190

RER-6      .0327

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
et. al.,

Defendants.

_____/

### Response and Incorporated Memorandum of Law of Defendant The Billing Resource d/b/a Integretel in Opposition to the Receiver's Motion for an Order to Show Cause Why Integretel Should Not Be Held in Contempt of Court

Defendant The Billing Resource d/b/a Integretel ("Integretel") opposes the Receiver's motion for an order requiring Integretel to show cause why it should not be held in contempt of court for allegedly violating various provisions of the temporary restraining order and amended preliminary injunction previously entered in this case.

The Receiver's motion attempts to transform a disputed, contingent, and unsecured claim for failure to pay a debt into an occasion for invoking the "potent weapon" of the judicial contempt power[1] As we will show, the Receiver has not presented a sufficient basis for the Court to even issue an order to show cause, much less hold Integretel in contempt.

To begin with, the injunctive provisions that Integretel is alleged to have violated are, if interpreted as the Receiver reads them, invalid and therefore cannot provide the basis for imposing civil contempt sanctions. (Although the Receiver's motion cites the criminal contempt

---

1.    *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967).

statute and criminal contempt case, his counsel has confirmed that the Receiver is seeking civil

contempt sanctions only.) The provisions in question are invalid on multiple independent

grounds.

First, as applied to the Receiver's claim, the orders exceed the permissible bounds of

equitable relief by granting an injunction based on a purely legal claim. Second, as applied to

Integretel, the ex parte asset-turnover order violates well-settled rules of receivership practice,

denies Integretel due process, and may violate Integretel's right under the Seventh Amendment to

trial by jury. Third, as applied to Integretel, the provisions requiring that persons served with the

order cooperate with and assist the Receiver and the FTC impermissibly delegate judicial power

to persons other than a judge and violate due process because the persons to whom that power

has been delegated are not neutral and disinterested. Fourth, The injunctions are invalid as

applied to Integretel because there has been no showing that preliminary injunctive relief is

appropriate with respect to Integretel and the conditions under which an injunction may bind a

nonparty are not met. Sixth, as applied to Integretel, certain portions of the injunctions are

indefinite in their meaning and therefore may not be enforced by contempt sanctions.[2]

Moreover, even if the orders were valid and enforceable, a show-cause order would not

be appropriate. The Receiver's claim is based on his contention that Integretel owes money to

two of the receivership defendants under contracts with them. But those contracts contain

alternative-dispute-resolution and forum-selection provisions that preclude the Receiver from

litigating the underlying contract issues in this Court. Because he stands in the receivership

defendants' shoes, the Receiver is bound by those provisions. And even if the Receiver were

entitled to litigate the contract issues here, his claims would still fail, because his arguments

---

2.  Simultaneously with the filing of this opposition, we are moving to modify the orders to eliminate or
    at least mitigate the features that make them objectionable.

-2-

under the contracts are unfounded. Integretel has a clear contractual right to withhold the disputed funds from Access One and Network One, so it has no obligation to pay the Receiver the sums he demands.

The Receiver's interpretation and application of the injunctive provisions he relies on is also seriously flawed. So, too, is his charge that Integretel has acted in bad faith and sought to conceal facts from the Receiver and the FTC. As we will show, Integretel has acted properly and reasonably at all times.

In sum, the Receiver's show-cause motion is unfounded and should be denied.

### Statement of Facts

#### A.  *Integretel's services for Network One and Access One*

**The contracts.** Integretel provided billing-aggregation and  services for Network One and Asset One under contracts that were, except as noted below, identical in all relevant respects.[3] The contracts required the clients to obey all governing laws and to comply with a detailed set of billing and collections guidelines designed to protect against unauthorized charges.[4] If the FTC's allegations against Network One and Access One are correct, both entities breached their contracts with Integretel.

Nowhere in either contract is there any language purporting to give either client any rights against Integretel with respect to payments due to the client other than those of a general unsecured creditor. Neither contract contains language granting the client a security interest—or any other property interest, either legal or equitable—in any funds Integretel receives from a telephone company on account of a billing transaction. Indeed, the Access One contract includes

---

3.    Ken Dawson ("Dawson Decl.") Ex. 1, 2.

4.    Dawson Decl. Ex. 1 at 1, 7–8 (Access One); Dawson Decl. Ex. 2 at 14–16 (Network One).

00193

RER-6       0330

language making it unmistakably clear that Access One would have no ownership interest in proceeds of the billing transactions:

> Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users. Therefore, Client agrees, and does hereby transfer to [Integretel] any rights in the Billing Transactions that may be necessary for [Integretel] to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.[5]

Further, each contract explicitly provides that Integretel was not the client's agent, partner, joint venturer, trustee, fiduciary, or legal representative.[6] The contract with Network One provides that Integretel is not authorized to act for the client except as expressly set out in the contract,[7] and the Access One contract provides that Integretel has no authority to act for the client at all.[8] It also expressly defines Integretel's relationship to Access One as that of an independent contractor.[9]

Both contracts set out detailed formulas for computing the amounts that Integretel was required to pay Network One and Access One. Integretel is authorized to withhold from the client any amounts Integretel may pay to resolve disputes with consumers about billing transactions; such deductions are referred to in the contracts as "Adjustments."[10] In addition, and of particular relevance here, the contracts authorize Integretel to withhold any amounts necessary to fund what the contracts refer to as "the IGT Reserve." Each contract provides, "[Integretel] may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT

---

5.  Dawson Decl. Ex. 1 at 11 (Sched. II, § 10).

6.  Dawson Decl. Ex. 1 at 4, § 19(k) (Access One); Dawson Decl. Ex. 2 at 9, § 19(k) (Network One).

7.  Dawson Decl. Ex. 2 at 9, § 19(k).

8.  Dawson Decl. Ex. 1 at 4, § 19(k).

9.  Dawson Decl. Ex. 1 at 4, § 19(k).

10. Dawson Decl. Ex. 1 at 5 (Ex. A), 10 (Sched. II, § 3) (Access One); Dawson Decl. Ex. 2 at 11 (Ex. A), 18 (Sched. II, § 3) (Network One).

-4-

Reserve."[11] Integretel's right to withhold amounts attributable to the IGT Reserve is also

recognized in a separate provision: "Client shall be entitled to all collected amounts, up to and

including the gross value of the Billing Transactions remitted to the Telcos, *less any amount due

and owing to [Integretel] hereunder, including, without limitation, . . . IGT Reserves . . . .*"[12]

The IGT Reserve is defined in each contract as "an amount withheld, from the amount

otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses

or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[13] The

contracts give Integretel the right to adjust the amount of the IGT reserve in its reasonable

discretion.[14]

Both contracts required the client to provide Integretel with written proof of its

compliance with applicable legal requirements and with Integretel's billing guidelines within five

days after Integretel's written request.[15] If Integretel made such a request and the client failed to

comply, the contracts granted Integretel "the right immediately to suspend its performance . . .,

without liability to the other party[.]"[16]

The contracts include indemnification provisions requiring the clients to indemnify

Integretel from "all obligations, liabilities, claims, demands, losses, damages, costs or expenses,

---

11. Dawson Decl. Ex. 1 at 10 (Sched. II, § 5.b) (Access One); Dawson Decl. Ex. 2 at 19 (Sched. II, § 5.b) (Network One).

12. Dawson Decl. Ex. 1 at 10 (Sched. II, § 6) (Access One) (emphasis added); Dawson Decl. Ex. 2 at 19 (Sched. II, § 6) (Network One) (emphasis added).

13. Dawson Decl. Ex. 1 at 5 (Exhibit A), 10 (Schedule II, § 5.b) (Access One); Dawson Decl. Ex. 2 at 11 (Exhibit A), 19 (Schedule II, § 5.b) (Network One).

14. Dawson Decl. Ex. 1 at 10 (Sched. II, § 5.b) (Access One); Dawson Decl. Ex. 2 at 19 (Sched. II, § 5.b) (Network One).

15. Dawson Decl. Ex. 1 at 1, § 9 (Access One); Dawson Decl. Ex. 2 at 3 § 9 (Network One).

16. *Id.*

-5-

00195

RER-6    0332

including attorney's fees, arising out off or relating to: (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; . . . or (iii) the Billing Transactions processed by [Integretel.]"[17]

Finally, the contracts include alternative-dispute-resolution and forum-selection provisions. The ADR clause requires that any disputes be resolved through a two-step process under which the parties must first engage in a period of good-faith negotiation, and then if negotiation proves unsuccessful submit the dispute to binding arbitration in California.[18] The only litigation that is permitted is "an action seeking a temporary restraining order or injunction relating to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process."[19] And the forum-selection clause requires that any litigation that is permitted under the ADR clause must be brought in a federal or state court in Santa Clara County, California.[20]

**The services provided to Network One and Access One, Integretel's suspension of the contracts, and the reserves at issue.** Although Integretel provided billing-aggregation and other services to Access One and Network One for a period of time, it discontinued those services after questions arose as to whether some of the charges were properly authorized. Integretel asked each client to provide documentation supporting the charges, and when the clients failed to provide an adequate response, Integretel discontinued its services.[21]

---

17. Dawson Decl. Ex. 1 at 2, § 10 (Access One); Dawson Decl. Ex. 2 at 3 § 10 (Network One).

18. Dawson Decl. Ex. 1 at 3, § 18 (Access One); Dawson Decl. Ex. 2 at 7 § 18 (Network One).

19. Dawson Decl. Ex. 1 at 3, § 18 (Access One); Dawson Decl. Ex. 2 at 7 § 18 (Network One).

20. Dawson Decl. Ex. 1 at 3, § 15 (Access One); Dawson Decl. Ex. 2 at 6 § 15 (Network One).

21. Dawson Decl. ¶ 6.

00196

RER-6        0333

Once Integretel discontinued its services for Access One and Network One, it set the amount of the IGT Reserve for each client at 100%.[22] As a result, Integretel stopped sending any payments to either client.[23] Integretel's interpretation of the contracts is that because it is entitled to withhold the amount of the IGT Reserves, Integretel is not currently indebted to either Access One or Network One.[24]

The Receiver has submitted no evidence that the IGT Reserves relating to Access One and Network One take the form of a segregated fund of money, and in fact they do not. Rather, they represent nothing more than a bookkeeping entry. Thus, Integretel holds no identifiable pool of money that one can point to as constituting the IGT Reserves for these clients.[25]

## B.  The temporary restraining order

The temporary restraining order that Integretel is alleged to have violated was entered on February 27, 2006 and, unless extended, was to remain in effect only until March 9.[26] When the TRO was issued, Integretel was not a party to the case.

Although the Receiver accuses Integretel of violating the TRO, his discussion of what the TRO actually says is fragmented and incomplete; some of the crucial language is not quoted at all, while other portions are presented in snippets quoted out of context. It is therefore necessary to take a more complete look at the provisions on which the Receiver's motion relies.

The asset-turnover provisions. Contrary to the Receiver's contention, the TRO did not purport to require Integretel to turn over any funds to the Receiver on its own, without having

---

22. Dawson Decl. ¶ 6.

23. Dawson Decl. ¶ 6.

24. Dawson Decl. ¶ 8.

25. Dawson Decl. ¶ 9.

26. TRO at 15 § XXV (D.E. 18).

00197

RER-6    0334

first gotten a reasonable request to turn them over. Two provisions of the TRO are relevant here:

§ X.A.1 ("Delivery of Receivership Property") and § XI ("Transfer of Funds to the Receiver").

Section X.A.1 did not purport to impose any obligations on nonparties such as Integretel.

Rather, it was directed solely to the named defendants:

> Immediately upon service of this Order upon them, or within such period as may be permitted by the Receiver, Defendants shall transfer or deliver possession, custody, and control of the following to the Receiver:
>
> 1. All assets of the Receivership defendants. [27]

In this respect, the TRO differs from the preliminary injunction, in which the corresponding

provision imposed the turnover obligations on "Defendants *and any other person or entity served*

*with a copy of this Order*[.]"[28]

Section XI applied more broadly than § X.A.1, in that it purported to impose obligations

on nonparties, including billing agents, but it did not require those entities to turn over any assets

unless they first received a reasonable request to do so from the Receiver or (arguably) the FTC:

> [U]pon service of a copy of this Order, . . . all third party billing agents . . shall cooperate with all reasonable requests of the FTC and the Receiver relating to implementation of this Order, including transferring funds at the Receiver's direction.[29]

(As discussed below, Integretel received no request to turn over any funds while the TRO was in

effect.)

**The disclosure and nonconcealment provisions.** The TRO contained several provisions

requiring the disclosure of information (or prohibiting its concealment) by various entities: § II.A

("Asset Freeze"), § VI.C ("Retention of Assets and Records by Financial Institutions"), and § IX

("Cooperation with Temporary Receiver"). As discussed below, some of these provisions did not

---

27.  TRO at 15–16 (D.E. 18).

28.  Prelim Inj. at 16, § XI.A.1 (D.E. 29); Am. Prelim. Inj. at 17, § XI.A.1 (D.E. 233).

29.  TRO at 17 (D.E. 18). *See also* Am. Prelim. Inj. at 18, § XII (D.E. 233).

00198

RER-6      0335

purport to apply to an entity in Integretel's position, and others left room for differing interpretations.

Section II.A applied only to "Defendants, and those persons in active concert or participation with them who receive actual notice of this Order[,]" and it restrained them from concealing their assets.[30] (The Receiver's motion inaccurately describes this provision as applying more broadly to "those who receive actual notice of the TRO," without disclosing the limitation to persons "in active concert or participation" with the defendants.[31]) The Receiver does not contend that Integretel has at any relevant time acted in concert or participation with any of the Nationwide defendants, and the accompanying declaration of Integretel's president confirms that Integretel has not done so.[32]

Section VI.C applied only to "any financial or brokerage institution, business entity, or person served with a copy of this Order that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset since the date of entry of this Order[.]"[33] Any entity meeting those criteria was required to provide certain information to the FTC in the form of a sworn statement.

Section IX required anyone served with the TRO to "fully cooperate with and assist the Receiver." This cooperation was to include "providing information to the Receiver that the Receiver deems necessary to exercise the authority and discharge the responsibilities off the

---

30. TRO at 5 (D.E. 18). *See also* Am. Prelim. Inj. at 6, § III.A (D.E. 233).

31. Receiver's Mtn. at 9.

32. Dawson Decl. ¶ 12.

33. TRO at 8 (D.E. 18). *See also* Am. Prelim. Inj. at 9–10, § VII (D.E. 233).

00199

RER-6      0336

Receiver under this Order" and "advising all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Receiver."[34]

The Receiver also relies on § IX.F, which prohibited the defendants or anyone in concert or participation with them "[d]oing any act or refraining from any act whatsoever to interfere with the Receiver managing, or taking custody, control, or possession of, the assets or documents subject to this receivership[.]"[35] The Receiver's motion mistakenly describes this prohibition as applying to "those who have received a copy of the TRO," not just to the defendants and those active in concert with them.[36] However, similar language appears in § XX.A.5, which does apply to anyone served with the order.[37]

**The other provisions cited by the Receiver.** The Receiver relies on two additional provisions: § VIII.F ("Receiver's Duties") and § XX.A.2 ("Stay of Actions").

Section VIII.F is part of the provision outlining the Receiver's duties and powers. It authorized and directed the Receiver to "[p]revent the inequitable distribution of assets[.]"[38] This provision was directed solely at the Receiver; it did not purport to impose any duties or restrictions on persons or entities other than the Receiver.

Finally, § XX.A.2 prohibited the defendants' creditors or other persons asserting any claims, rights, or interests against the defendants from doing the following:

> Accelerating the due date of any obligation against a Receivership Defendant; filing or enforcing any lien against a Receivership Defendant; taking or attempting to take possession, custody or control of any asset of a Receivership Defendant; [or] attempting to foreclose, forfeit, alter, or terminate any interest in

---

34. TRO at 14 (D.E. 18). *See also* Am. Prelim. Inj. at 15 § X (D.E. 233).

35. TRO at 15 (D.E. 18). *See also* Am. Prelim. Inj. at 16, § X.F (D.E. 233).

36. Receiver's Mtn. at 9.

37. TRO at 22–23 (D.E. 18). *See also* Am. Prelim. Inj. at 23 § XIX.A.5 (D.E. 233).

38. TRO at 12 (D.E. 18). *See also* Am. Prelim. Inj. at 13, § IX.F (D.E. 233).

00200

RER-6     0337

any asset of a Receivership Defendant, whether such acts are part of a judicial
proceeding, are acts of self-help, or otherwise.[39]

The Receiver apparently relies in his motion on the prohibition against foreclosing, forfeiting,

altering, or terminating any interest in an asset of a receivership defendant.[40]

## C.  *The service of the TRO on Integretel and Integretel's response*

The FTC served the TRO on Integretel by faxing it to Integretel's president, Ken Dawson

on March 3, 2006.[41] The cover letter accompanying the TRO said that the TRO "freezes" any

assets held on behalf of the receivership defendants, but did not instruct or request Integretel to

turn over any funds to the Receiver. Quite the contrary: the letter said that the TRO *prohibited*

any transfer of funds held on behalf of the receivership defendants.

When Mr. Dawson received the TRO, he did not notify or consult with counsel. Instead,

he prepared a response on his own, which he sent to the FTC by fax and express courier on

March 6.[42]

Mr. Dawson's letter stated that Integretel had service contracts with Access One and

Network One and that under these contracts, Access One and Network One "would be entitled to

certain proceeds from billing transactions." He then added that each entity "is in default of this

contract and, therefore, no amounts are currently due and owing." He also said, "To the extent

proceeds become due to [the client] in the future, we will establish a separate bank account into

which such funds will be deposited and notify your office accordingly." Mr. Dawson closed his

letter by stating, "Except as noted above, we are in possession of no assets relating to any

---

39.  TRO at 22–23 (D.E. 18). *See also* Am. Prelim. Inj. at 22, § XIX.A.2 (D.E. 233).

40.  *See* Receiver's Mtn. at 8.

41.  Dawson Decl. ¶ 13 & Ex. 3.

42.  Dawson Decl. ¶ 14 & Ex. 4.

00201

RER–6        0338

defendant in this matter. If you wish additional information or need to discuss any of the foregoing, please call me directly[.]"[43]

Although the Receiver claims that Mr. Dawson's March 6 letter was evasive because it did not use the word "reserves," the Receiver has offered no evidence indicating that Mr. Dawson's letter was insufficient to put a reasonable person on notice that Integretel might well have established reserves with respect to Access One and Network One. Moreover, he points to nothing in the TRO or the accompanying letter (or anywhere else) requiring Mr. Dawson to use the word "reserves" in his letter or to mention Integretel's reserves at all. The cover letter stated only that Integretel was required to provide "certain information about each account or asset titled or maintained in the names of any of the defendants[.]"[44] The TRO similarly required information to be provided only by those who held such assets or accounts.[45] The IGT Reserves do not constitute an account or asset titled or maintained in the name of any of the defendant. There was therefore no reason for Mr. Dawson to use the word "reserves" in his letter.

Despite the Receiver's accusation that Mr. Dawson acted in bad faith, Mr. Dawson believed and continues to believe that his letter was both honest and accurate. He believed and continues to believe that under its contracts with Network One and Access One, Integretel was neither holding any funds that belonged to either of those entities nor holding any funds on behalf of either entity. He believed and continues to believe that the IGT Reserve for each entity were merely bookkeeping entries and that Integretel had not segregated, earmarked, or otherwise

---

43. Dawson Decl. Ex. 4.

44. Dawson Decl. Ex. 3.

45. TRO at 8–9, § VI (D.E. 18).

-12-

00202

RER-6      0339

set aside any specific funds corresponding to those reserves. He believed and continues to believe that no funds were due and owing to either entity.[46]

### D. The seven-month period during which Integretel was not subject to any injunctive order and did not receive any communications from the Receiver

On March 8, 2006—two days after Mr. Dawson sent his letter to the FTC—the TRO was superseded by the entry of a preliminary injunction.[47] To the best of Mr. Dawson's recollection, the FTC did not instruct him to turn any funds over to the Receiver during the short time that Integretel was subject to the TRO.[48] Similarly, Mr. Dawson received no any communications from the Receiver or the Receiver's counsel during that time.[49] Nothing in the Receiver's motion is inconsistent with Mr. Dawson's recollection on these points.

The March 8 preliminary injunction was identical to the TRO in all relevant respects but one: the asset-turnover provision of the preliminary injunction applied not only to the defendants but also to anyone served with the injunction.[50] Integretel had no advance notice that this provision would be included in the preliminary injunction.[51]

It is undisputed that the March 8 injunction was never served on Integretel.[52] Indeed, the Receiver's motion seeks to have Integretel held in contempt for violating the TRO and the amended preliminary injunction entered on September 22, 2006, but not the original preliminary

---

46. Dawson Decl. ¶ 15.

47. D.E. 29.

48. Dawson Decl. ¶ 16.

49. Dawson Decl. ¶ 17.

50. Prelim. Inj. at 16, § XI.A (D.E. 29).

51. Dawson Decl. ¶ 18.

52. Dawson Decl. ¶ 19.

-13-

injunction.[53] The amended preliminary injunction was served on Integretel on October 10,

2006.[54] Thus, for all but a tiny fraction of the time since the Receiver was appointed, Integretel

has not been subject to any order issued by this Court.

During the seven months during which Integretel was not subject to any injunction,

neither the Receiver nor anyone representing him contacted Mr. Dawson,[55] despite the fact that

the Receiver was aware that billing aggregators generally maintain reserves with respect to their

clients' billing transactions,[56] and was presumably aware from the allegations in the complaint

that Integretel had provided billing-aggregation services for one or more of the defendants.[57]

Indeed, it is unclear whether the FTC forwarded Mr. Dawson's letter to the Receiver or whether

the Receiver asked the FTC about how Integretel had responded to the TRO.

### E.    Integretel's further disclosures of the reserves, and the FTC's referral of the matter to the Receiver

While the Receiver accuses Integretel of trying to conceal its reserves from the FTC,

he fails to mention that Integretel's counsel referred to the reserves with FTC attorneys several

times in the months after the preliminary injunction. These references occurred in the context of

discussions with FTC attorneys regarding a subpoena *duces tecum* that the FTC had served on

Integretel in the underlying action.[58] One of these discussions took place on August 21, when an

---

53.  *See* Receiver's Mtn. at 1–2.

54.  *See* Declaration of Steven A. Lancellotta ("Lancellotta Decl.") ¶¶ 4-5; Declaration of Richard H. Gordin ("Gordin Decl.") ¶¶ 12–13

55.  Dawson Decl. ¶ 17.

56.  *See* First Report of Receiver David R. Chase at 10 (filed May 3, 2006) (D.E. 78) (stating, that "in the performance of its duties, a billing aggregator maintains a reserve account of money from a long distance service provider—like the Receivership Entities claimed at one time that they were—from which credits are paid to callers who complain about charges on their phone bills").

57.  *See* Compl. ¶ 19 (D.E. 3).

58.  Gordin Decl. ¶¶ 3–7.

00204

RER–6      0341

FTC attorney asked about the amount of the reserves.[59] On August 29, Integretel's counsel sent the FTC a letter providing that information. The letter stated, "We understand that as of Friday, August 25, 2006, the reserve amount remaining for Access One was $1,186,430.36 and the amount remaining for Network One was $173,918.66. As we informed you, these are accounting entries only; there are no separate holding accounts."[60] Counsel for Integretel also referred to the reserves during meetings with at least one of the FTC Commissioners and FTC staffers in the first week of September.[61] It is unclear why the Receiver fails to mention these disclosures, given that his counsel was informed of them before the show-cause motion was filed.[62]

The FTC apparently did not forward this information to the Receiver or otherwise take any prompt action to follow up on the Integretel's written disclosure of the amount of the reserves. The FTC's attitude toward the reserves changed on September 28, however. Integretel's counsel had a meeting with counsel for the FTC that day, and when Integretel's counsel mentioned the reserves again during that meeting, the FTC attorneys acted as though they were surprised to learn that there were reserves.[63]

Shortly afterward, on October 2, one of the FTC lawyers claimed in a letter that the existence of the reserves had "recently come to staff's attention" and asserted that Integretel should transfer them to the Receiver.[64] Although the Receiver now argues that Mr. Dawson had

---

59. Gordin Decl. ¶ 6.

60. Gordin Decl. ¶ 7.

61. Gordin Decl. ¶ 8.

62. *See* Letter dated October 11, 2006 from Steven Lancellotta to Jeffrey Schneider at 1–2 (included in Ex. 4 to the Receiver's motion).

63. Gordin Decl. ¶ 9.

64. Gordin Decl. ¶ 1.

00205

RER-6      0342

attempted in his March 6 letter to the conceal Integretel's reserves, the FTC attorney did not

make that contention in her October 2 letter (or in a subsequent letter dated October 4).[65]

Integretel's counsel disputed the FTC's position that such a transfer was required.[66] But

on October 11—the day after Integretel was served with the amended preliminary injunction—

the FTC referred the matter to the Receiver.[67] On the same day, Integretel's counsel wrote to the

Receiver's counsel setting out Integretel's position that Integretel was not holding any funds that

the Receiver was entitled to.[68] After attempts to resolve the matter proved unsuccessful, the

Receiver filed his show-cause motion on October 13—three days after Integretel was served with

the amended preliminary injunction.[69]

## F.    *The amended complaint and the amended preliminary injunction*

On September 21, 2006, the FTC amended its complaint to add Integretel as a defendant.

The amended complaint does not allege that Integretel knew or should have known about the

original defendants' wrongdoing. And while the amended complaint alleges that the original

defendants acted together as a common enterprise, it does not allege that Integretel was a part of

that enterprise.[70]

Shortly after the amended complaint was filed, but before it was served on Integretel, the

Court entered an amended preliminary injunction.[71] The FTC's motion seeking entry of this

---

65.  Gordin Decl. ¶ 2.

66.  Gordin Decl. ¶ 11.

67.  Lancellotta Decl. ¶ 6.

68.  Lancellotta Decl. ¶¶ 7–8.

69.  Lancellotta Decl. ¶¶ 7–8.

70.  *See* First Am. Comp. ¶ 21 (D.E. 255).

71.  D.E. 233.

-16-

00206

RER-6      0343

amended injunction had been filed before Integretel was named as a defendant, and Integretel was not given notice of the motion.[72] With respect to the issues raised by the Receiver's motion, the amended preliminary injunction is identical to the original preliminary injunction. One point should be noted, however. The references in the amended preliminary injunction to "Defendants" do not include Integretel, because that term is defined in the amended preliminary injunction to mean only the original defendants.[73]

Contemporaneously with the filing of this memorandum, Integretel is filing its answer, in which it asserts, among other things, that it acted in good faith and that it did know have reason to know that the billing transactions originated by Access One and Network One were false, deceptive, or unfair.

## Argument

**I.    Civil contempt sanctions are unavailable because the TRO and amended preliminary injunction are—if interpreted as the Receiver reads them— invalid.**

Civil contempt sanctions may not be imposed if the order that was allegedly violated is invalid.[74] This is because the purpose of civil contempt is purely remedial—to coerce obedience to the order or to compensate for damages caused by the violation.[75] "The right to remedial relief falls with an injunction which events prove was erroneously issued."[76] The Court must therefore determine whether the relevant provisions of the orders are valid before it can decide whether to

---

72.  D.E. 176; Gordin Decl. ¶ 15.

73.  Am. Prelim. Inj. at 3 (D.E. 233).

74.  *United States v. United Mine Workers*, 330 U.S. 258, 294 (1947); *ITT Community Dev. Corp. v. Barton*, 569 F.2d 1351, 1356 (5th Cir. 1978) (binding in the Eleventh Circuit under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

75.  E.g., *Martin v. Guillot*, 875 F.2d 839, 845 (11th Cir. 1989).

76.  *United Mine Workers*, 330 U.S. at 294.

-17-

issue a show-cause order. As the discussion below will demonstrate, if the orders are interpreted as the Receiver interprets them, they are invalid on multiple independent grounds.

**A.**  *If the orders at issue are interpreted to require Integretel to pay the amount of the reserves to the Receiver, they are invalid because the Court may not grant equitable relief on a common-law claim for damages due to a breach of contract.*

Because a receiver steps into the shoes of the receivership entity, he may assert only those rights and remedies that the entity itself could have asserted.[77] This means that a receiver's ability to obtain equitable relief is no greater than any litigant's.[78] "The receiver, although an officer of the court, is entitled to no privilege that would not be accorded there to any other suitor."[79]

Furthermore, the only rights the Receiver may assert are those of Access One and Network One. He has no standing to assert any claims on behalf of the FTC or of consumers.[80]

---

77. *See, e.g., White v. Ewing,* 159 U.S. 36, 39 (1895); *Javitch v. First Union Securities, Inc.,* 315 F.3d 619, 625 (6th Cir. 2003); *Shore Block Corp. v. Lakeview Apts.,* 377 F.2d 835, 840 (3d Cir. 1967); *Nova Ins. Group, Inc. v. Florida Dep't of Ins.,* 606 So. 2d 429, 433 (Fla. 1992); 65 Am. Jur. 2d *Receivers* § 111.

78. *See, e.g., Whelan v. Enterprise Transp. Co.,* 164 F. 95 (D. Mass. 1908) (sustaining demurrer where receiver sought equitable relief on legal claim); *Kenney v. 149 North Ave. Corp.,* 170 A. 822, 824 (N.J. Ct. Err. & App. 1934) (receiver had no equitable claim where his legal remedy was adequate); *Cohen v. Miller,* 68 A.2d 421, 425 (N.J. Super. 1949) (receiver must proceed at law if his legal remedy is adequate); *see also Wood v. National Corp.,* 265 F. 791, 793 (E.D. Pa. 1919) ("all the rules of law pertaining to remedies, the jurisdiction of courts, and otherwise remain in full force and must be followed"); *Marandola v. Marandola Mechanical, Inc.,* 2005 WL 1331198 at *2 (R.I. Super. Ct. 2005) (same).

79. James Fraser Gluck & August Becker, *The Law of Receivers of Corporations* § 60 at 276 (2d ed. 1896). *See also* William A. Alderson, *Law of Receivers* § 536 at 739 (1905).

80. *See, e.g., United States v. Goodman,* 182 F.3d 987, 991–92 (D.C. Cir. 1999) (receiver appointed in action brought by FTC lacked standing to assert claims on behalf of those whom the receivership entity had defrauded); *Scholes v. Schroeder,* 744 F. Supp. 1419, 1421–23 (N.D. Ill. 1990) (receiver for corporation lacked standing to sue on behalf of corporation's defrauded investors; "a receiver or like surrogate cannot pursue claims that belong, not to the receivership estate as such, but rather to those who have an ultimate derivative interest in the estate"). *Cf. Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 429 (1972) (receiver for corporation may not sue on behalf of corporation's

-18-

So even if equitable relief might be available to the FTC or to consumers, the Receiver would not be entitled to seek such relief on their behalf. Rather, he may obtain equitable relief only if Access One and Network One could have done so if they had not been put into receivership. And because Access One and Network One could not have obtained equitable relief (as we explain below), the Receiver cannot do so either.

1. *The Receiver's underlying claim is a simple claim at law for an alleged breach of contract, which makes the Receiver merely a general unsecured creditor who has no legal or equitable interest in any of Integretel's property.*

The Receiver's claim against Integretel can be simply stated: Integretel, he contends, owes Access One and Network One money under the terms of their contracts. That is a garden-variety breach-of-contract claim. Assuming for the moment that Integretel does owe the money to Access One and Network One (and thus to the Receiver), the only relationship between Integretel and the Receiver is that of debtor and unsecured creditor.

It has long been the law that such a general unsecured creditor has no legal or equitable interest in any of the debtor's assets unless and until he reduces his claim to judgment and obtains a judgment lien or otherwise levies on the debtor's property.[81] Nothing in either contract gives Access One or Network One any additional rights.

The contracts do not grant either client a security interest, and they expressly provide that Integretel is not the client's agent, partner, joint venturer, trustee, fiduciary, or legal

---

bondholders); *Jarrett v. Kassel*, 972 F.2d 1415, 1427 (6th Cir. 1992) (receiver had no authority to represent legal interests of receivership entity's customers or assert claims on their behalf).

81. *See, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund*, 527 U.S. 308, 330 (1999); *Pussey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923); *Adler v. Fenton*, 65 U.S. 407, 410–13 (1860); *381651 Alberta, Ltd. v. 279298 Alberta, Ltd.*, 675 So.2d 1385, 1387–88 (Fla. App. 1996) (citing *Adler, supra*); *Lamb v. Stone*, 11 Pick. 527, 544, 1831 WL 2742 at *6 (Mass. 1831); *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 729 N.E.2d 683, 66 (N.Y. 2000).

-19-

representative.[82] The contracts therefore disclaim any intention to create a relationship that could result in the clients' having any equitable interest in the proceeds generated by their billing transactions. And as previously noted, the Access One contract includes language making it clear that Access One retained no interest the proceeds of any billing transactions processed by Integretel.[83]

The Receiver offers no reason to think that any claim that Access One and Network One might have against Integretel is equitable rather than legal. He offers nothing more that the conclusory statement, unsupported by any authority, that "one need not be an agent, partner, joint venturer, trustee, fiduciary, or legal representative to come into possession of funds that one is holding 'on behalf of' another person."[84] While that may be true, only certain legal relationships give one party an interest in property held by another, and the Receiver has not shown that any such relationship existed here. In fact, he does not even say what he thinks the relationship was. In short, the Receiver has not shown that he has any status other than that of a general unsecured creditor.

2.  *The Court may not grant equitable relief—either permanent or preliminary—*
    *on a claim at law for breach of contract*

If either of the orders at issue is interpreted to require Integretel to pay the amount of the reserves to the Receiver, it is invalid because equitable relief is not available on a breach-of-contract suit to collect a debt. This is true regardless of whether the orders are interpreted as

---

82.  Dawson Decl. Ex. 1 at 4, § 19(k) (Access One); Dawson Decl. Ex. 2 at 9, § 19(k) (Network One).

83.  Dawson Decl. Ex. 1 at 11 (Sched. II, § 10) (quoted above at page 4).

84.  Receiver's Mtn. at 6.

-20-

00210

RER-6      0347