granting the Receiver final relief on his claim to the reserve amounts or instead as granting only interim relief pending further litigation on the merits.[85]

If Access One or Network One had sued Integretel for breach of contract in this Court, the final relief available to them would have been governed by Florida law.[86] And under Florida law, the appropriate remedy for an ordinary breach-of-contract claim is a judgment at law for damages, not an injunction.[87] Equitable relief is unavailable when the plaintiff has an adequate legal remedy, and a judgment for damages typically constitutes such a remedy.[88] The Receiver has identified no reason why such a judgment would not be an adequate remedy here.

The conclusion that injunctive relief is unavailable holds true even if the turnover provisions of the Court's orders are interpreted as only interim remedies. The governing rule is the same under both federal law and Florida law: interim equitable relief such as a turnover order

---

85. Neither the TRO nor the amended preliminary injunction indicates whether the provisions directing the turnover of assets to the receiver are intended as final or interim relief on the issue of whether the asset belongs to the receivership estate. However, they are best interpreted as granting final relief. They do not set out any procedure for the conflicting claims to be litigated or decided. Nor do they restrict the receiver's use or disposition of the assets pending a final decision. Indeed, the Court's order granting the receiver's first fee petition authorized the payment of fees from any funds that were then in the receiver's possession or that might subsequently come into his possession. (Order Granting First Fee Pet. at 2 [D.E. 150].) That authorization undermines any suggestion that the turnover provisions were intended as merely interim relief.

86. Contract rights are governed by state law. In deciding which state's law to apply, the Court should follow Florida's choice-of-law rules. Because the Court's jurisdiction over the receiver's claims is ancillary to its original jurisdiction over the FTC's claims, *see, e.g., White*, 159 U.S. at 39; *U.S. v. Fidelity Capital Corp.*, 920 F.2d 827 at 829 n.1 (11th Cir. 1991), it is appropriate to follow the approach used in the analogous context of state-law claims over which a federal court exercises pendent or supplemental jurisdiction. In that context, the courts apply the forum state's choice-of-law rule. *E.g., Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986) (citing cases). Thus, Florida's choice-of-law rules are applicable, and under those rules, issues relating to remedies are governed by the law of the forum. *Automated Med. Labs., Inc. v. Armour Pharm. Co.*, 629 F.2d 1118, 1122 n.3 (5th Cir. 1980); *Wingold v. Horowitz*, 292 So. 2d 585, 586 (Fla. 1974); *Osler v. Collins*, 870 So. 2d 65, 67 (Fla. App. 2003).

87. *George Vining & Sons, Inc. v. Jones*, 498 So. 2d 695 (Fla. 1986); *B.L.E. Realty Corp. v. Mary Williams Co.*, 134 So. 47, 49 (1931).

88. *See, e.g., Weinstein v. Aisenberg*, 758 So. 2d 705, 706 (Fla. Dist. App. 2000).

-21-

00211

RER-6          0348

or asset freeze is not available when the only relief the plaintiff could obtain upon final judgment

is an award of damages.[89]

**B.    As applied to Integretel in this case, a turnover order would conflict with long-established rules of receivership law and violate Integretel's right to due process and (potentially) to a jury trial.**

1. It is a basic and widely recognized rule of receivership law, dating back to before the

Civil War, that a receivership court may not summarily order a third party to turn over property

to a receiver where the third party asserts that it owns the property. Instead, the receiver must file

an ordinary lawsuit to recover the property or (as some courts have held) join the third party in

the receivership action and have the receivership extended to the property.[90]

The Florida courts have applied this rule as recently as 1996, when the Florida Supreme

Court held that when a bank refused to transfer funds in an account to a receiver on the ground

that it had a right of setoff, a summary turnover order was improper.[91] Similarly, in 1992 a

Florida appeals court reversed a turnover order in an insurance-company receivership on the

ground that such an order was inappropriate where a third party claimed that it owned the money

---

89.  *E.g., Grupo Mexicano de Desarrollo, S.A,* 527 U.S. at 318–33; *Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520, 1526–31 (11th Cir. 1994) (discussing both federal and Florida law); *Konover Realty Assoc., Ltd. v. Mladen,* 511 So. 2d 705, 706 (Fla. Dist. App. 1987).

90.  *Davis v. Gray,* 83 U.S. 203, 218 (1872); *Dold Packing Co. v. Doermann,* 293 F. 315, 322 (8th Cir. 1923); *Wheaton v. Daily Telegraph Co.,* 124 F. 61, 62 (2d Cir. 1903); *People v. District Court of First Jud. Dist.,* 218 P.2d 742, 743 (Colo. 1923); *Southtrust Bank of Southwest Florida, N.A. v. Krause,* 677 So. 2d 368, 369–70 (Fla. 1996); *Harvey v. Lewis,* 114 N.W.2d 214, 218–19 (Mich. 1962); *Grobholz v. Merdel Mtg. Inv. Co.,* 170 A. 815, 822 (N.J. Ct. Err. & App. 1934); *State v. Stanley,* 77 P.2d 178, 179 (N.M. 1938); *Rodman v. Henry,* 17 N.Y. 482, 1858 WL 7419 (1858); *Mine Safety Appliances Co. v. Best,* 76 N.E.2d 108, 110–11 (Ohio Ct. Com. Pl. 1947); *Cusack v. Prudential Ins. Co.,* 134 p. 984, 987 (Okla. 1943); *Roberts v. Golden Flake Doughnut Shops,* 167 A. 259, 260 (R.I. 1933); *Ex parte Renfro,* 273 S.W.2d 813, 814 (Tex. 1925); *First Nat'l Bk. of Plano v. State,* 555 S.W.2d 200, 202–03 (Tex. Civ. App. 1977); *Gloyd v. Rutherford,* 380 P.2d 867, 868 (Wash. 1963); *Evans v. Orgel,* 266 N.W.2d 176, 177 (Wis. 1936); Annot., 40 A.L.R. 903 (1926).

91.  *Southtrust Bank of Southwest Florida, N.A,* 677 So. 2d at 369–70.

00212

RER-6     0349

at issue.[92] The court explained that a receiver stands in the shoes of the entity in receivership, and if that entity could not have recovered the money in dispute without filing a lawsuit, the receiver could not do so, either.[93] The fact that Florida recognizes this rule is significant because to the extent that this issue is governed by state law, the remedies available to a receiver of a Florida corporation who was appointed by a court in Florida would be governed by Florida law.[94]

   2. Even if the Receiver were not required to file a separate lawsuit against Integretel, the due-process clause would still apply. A receivership court may not follow procedures under which affected parties are "deprived of a full and fair opportunity to present their claims and defenses."[95] Thus, the Eleventh Circuit has held that parties whose rights were adjudicated in receivership proceedings were denied due process when the court did not allow them an adequate opportunity for a hearing.[96]

   In this case the TRO and amended preliminary injunction were issued without affording Integretel *any* process, let alone due process. In *SEC v. Elliott*, the Eleventh Circuit held that claimants who were held to have received fraudulent transfers were denied due process because the mechanism for objecting—a blank form on which they could set out their objection—was inadequate to allow them to fully present their evidence and arguments.[97] In this case, Integretel was not even given a blank objection form.

---

92. *Nova Insurance Group, Inc.*, 606 So. 2d at 432–33.

93. 606 So. 2d at 433

94. *See* note 86, above.

95. *SEC v. Elliott*, 953 F.2d 1560, 1567 (11th Cir. 1992).

96. *SEC v. Elliott*, 953 F.2d at 1567–68, 1571–73.

97. 953 F.2d at 1568. *See also id.* at 1572–75 (summary procedure denied party adequate opportunity to assert claim of setoff).

00213

RER-6    0350

Integretel was seriously prejudiced by this complete lack of any procedure. As we will discuss in more detail, Integretel has substantial grounds for arguing that it owes no debt to the Receiver. Yet Integretel was given no chance to even plead those defenses, let alone present evidence and argument in support of them.[98]

**C.   *As applied here, the provisions purporting to require those served with the orders to cooperate with and assist the Receiver and the FTC constitute improper delegations of judicial power and violate due process.***

The orders at issue require anyone served with a copy of the order to "cooperate fully with and assist the Receiver."[99] They also require certain businesses, billing aggregators among them, to "cooperate with all reasonable requests of the FTC and the Receiver relating to implementation of this Order, including transferring fund at the Receiver's direction[.]"[100] If these provisions are read to require Integretel to comply with demands by the FTC and the Receiver to pay the Receiver a debt that Integretel disputes, they are invalid because they impermissibly delegate judicial power and violate due process.

**1.** Although a court may delegate ministerial or administrative functions, it may not delegate any power that is inherently judicial in nature. Thus, the Eleventh Circuit has held that in imposing a criminal sentence, a court may not delegate to a probation officer basic decisions

---

98. If the turnover order was intended to grant the Receiver final rather than interim relief, then it also violated Integretel's right under the Seventh Amendment to trial by jury. We argue below that any disputes under Integretel's contracts with Access One and Network One must be resolved by arbitration rather than litigation, and if the Court agrees with that argument the jury-trial issue will be moot. But if the Court holds that the Receiver is entitled to have his claims decided in court rather than through arbitration, then Integretel is entitled to trial by jury—a right that was denied if the effect of the turnover order was to grant the Receiver final relief.

99. TRO § IX (D.E. 18); Am. Prelim. Inj. § X (D.E. 233).

100. TRO § XI (D.E. 18); Am. Prelim. Inj. § XII (D.E. 233).

00214

RER-6        0351

regarding the conditions of supervised release.[101] For example, while a court may order the defendant to participate in a mental-health treatment program and give the probation officer the power to approve the choice of the program, it may not delegate to the probation officer the power to decide whether the defendant must attend a treatment program in the first place, because that is a substantive decision as to the scope of the sentence.[102]

As applied to the demand for payment that has been made by the FTC and the Receiver in this case, the cooperation clauses are invalid under this analysis. The clauses require those who are served with the order to perform affirmative acts, but do not identify what specific acts are required, leaving the identification of those acts to the Receiver or the FTC at some point after the injunction is entered. In effect, then, the injunction is a blank check to be filled in by the Receiver or the FTC. And in this case, the Receiver and the FTC have chosen to wield that power by demanding that a private entity pay a disputed debt, on pain of contempt if it dares to disobey.

The determination whether one private party owes a debt lies at the core of the judicial function. So, too, does the decision as to what specific conduct should be mandated or prohibited by an injunction—a decision that defines what acts are subject to contempt-of-court sanctions. Yet if the cooperation clauses are read as the Receiver interprets them, they delegate those judicial determinations to entities who are not judges (one of which is not even under the Court's supervision). That delegation is invalid.

2. As applied here, the cooperation provisions also violate due process. One of the bedrock requirements of due process is the requirement that the decisionmaker be neutral and

---

101. *United States v. Nash*, 438 F.3d 1302, 1304–05 (11th Cir. 2006); *United States v. Heath*, 419 F.3d 1312, 1314–15 (11th Cir. 2005).

102. *Nash*, 438 F.3d at 1305–06; *Heath*, 419 F.3d at 1315.

-25-

00215

RER-6      0352

disinterested.[103] But neither of the entities to whom the injunctions delegate judicial power meet

that test. Now that Integretel has been named as a defendant, the FTC is a litigant adverse to

Integretel, and part of the relief it seeks is the payment of the very funds that the Receiver is

seeking. And the Receiver has a personal financial interest in his claim against Integretel,

because the assets he recovers for the receivership estate provide the source for his

compensation. Thus, even if the FTC or a receiver could otherwise be authorized to exercise

judicial power, the exercise of that power in this case would be unconstitutional.

### D.  The orders at issue were not (and are not) binding on Integretel because there has been no proof that could support injunctive relief against Integretel as either a party or a nonparty.

This case is in an unusual posture because Integretel was not originally a party but has

now been brought into the case as a defendant. Integretel was not a party when the TRO was

served on it, when the preliminary injunction was issued, or when the FTC moved to amend the

preliminary injunction. It had been named as a party by the time the amended preliminary injunc-

tion was entered but it had not been served. And it was served with the amended preliminary

injunction at the same time that it was served with the summons and complaint.

For purposes of deciding whether Integretel violated the TRO, Integretel must be treated

as a nonparty. But with respect to the amended preliminary injunction, Integretel's status is more

complicated given that it has now become a defendant. Despite Integretel's new status as a party,

the most appropriate course would be to determine the amended preliminary injunction's validity

based on the standards applicable to nonparties. This is so for several reasons. The injunction

does not purport to bind Integretel in its capacity as a party, but only as a person on whom the

---

103. *See, e.g., Ward v. Village of Monroeville*, 409 U.S. 57, 59–62 (U.S.1972); *In re Murchison*, 349 U.S. 133, 136–39 (U.S. 1955); *Tumey v. Ohio*, 273 U.S. 510 (U.S., 1927).

00216

RER-6    0353

injunction was served. Moreover, the provisions of the amended preliminary injunction that Integretel is alleged to have violated were part of the original preliminary injunction and were not changed when the preliminary injunction was amended, so they should arguably be regarded as having been entered before Integretel was made a party. And Integretel was not yet a party when the FTC requested the amendment and was not given notice of the request.

However, the Court need not decide whether Integretel should be regarded as a party or as a nonparty, because the amended preliminary injunction is invalid either way.

1.  *If the orders are regarded as injunctions against a party, they were and are invalid because there has been no showing that could justify injunctive relief against Integretel.*

If the amended preliminary injunction is to be deemed an injunction against a party, its validity must be measured against the procedural and substantive standards that apply to such injunctions. It is beyond doubt that those standards have not been satisfied.

The FTC did not follow the procedures required for obtaining a preliminary injunction against a party. Under Fed. R. Civ. P. 65(a)(1), "No preliminary injunction shall be issued without notice to the adverse party." But the amended preliminary injunction was issued without notice to Integretel and without giving Integretel any opportunity to be heard.

Similarly, the FTC did not make the sort of substantive showing that would be needed for it to obtain a preliminary injunction against Integretel. Indeed, the FTC has not made any showing against Integretel at all. It has done nothing more than to file an unverified complaint and has not shown that it would be entitled to a preliminary injunction of any kind, much less a mandatory injunction that would change the status quo—a type of injunction that is warranted only in rare cases.[104]

---

104. *E.g., Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979).

00217

RER-6          0354

2.   *The prerequisites for imposing injunctive relief against a nonparty are not satisfied.*

a. The general rule, codified in Fed. R. Civ. P. 65(d), is that the only nonparties bound by an injunction are (1) the parties' officers, agents, servants, employees, and attorneys, and (2) "those persons in active concert or participation with [an enjoined party] who receive actual notice of the order by personal service or otherwise." As the Supreme Court has explained, courts "may not grant an enforcement order or injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law."[105]

Under these principles, the TRO and amended preliminary injunction were never binding on Integretel. Integretel has never been any party's officer, agent, servant, employee, or attorney. Therefore, Integretel may be bound by the injunction only if in resisting the Receiver's demand for payment it is acting in concert with one or more of the original defendants. The Receiver makes no such allegation, and Mr. Dawson's declaration shows that no such allegation can be made.

b. We recognize that some cases hold that courts have a broader power to bind nonparties in the context of a receivership, on the theory that the court has the power to act *in rem* in order to protect its jurisdiction over the receivership estate.[106] But because *in rem* jurisdiction over nonparties represents an exception to the ordinary limitations on the courts' power, it should extend only as far as is necessary to protect the court's power over the *res*. Under the Receiver's interpretation, the orders here go far beyond what is necessary to accomplish that goal. They go

---

105. *Regal Knitwear Co. v. NLRB*, 324 U.S. 478, 481 (1945). *See also Chase Nat'l Bk. v. Norwalk*, 291 U.S. 431, 437 (1934); *Alemite Mfg. Co. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930) (L. Hand, J.).

106. *E.g., SEC v. Wencke*, 622 F.2d 1363, 1368–72 (9th Cir. 1980) (upholding injunction staying litigation by nonparties).

00218

RER-6        0355

beyond merely staying acts against the receivership entities or against property that clearly belongs to the receivership estates. They also go beyond temporarily preserving assets claimed by the Receiver, in order to allow his claim to be litigated. They even go beyond giving the Receiver a lien on the assets such as he could obtain by way of prejudgment attachment. Rather, as interpreted by the Receiver, the orders require a nonparty to pay the Receiver the amount of a disputed debt, despite the fact that the nonparty had no opportunity to oppose the orders before they were was issued. The Receiver has cited no authority (and we are aware of none) suggesting that a court's *in rem* power can be stretched to this extreme.[107]

Indeed, such authority as exists on this issue supports precisely the opposite conclusion. As discussed above, the well established rule is that a receivership court lacks the power to summarily order a nonparty to turn over property that it holds under a bona fide claim of right. Moreover, at least two circuits have held that a receivership court may not impose an asset freeze—much less a turnover order—on a nonparty in circumstances such as those here.[108]

Furthermore, the Court cannot assert *in rem* jurisdiction over Integretel unless Integretel is in possession of assets belonging to the receivership estate. But that is the very issue in dispute, and the determination of that issue must logically precede any finding that the Court has

---

107. The contrast between what the Receiver contends he is entitled to under the Court's orders and what he could obtain by way of prejudgment attachment is especially striking. Even assuming that the standards for obtaining a prejudgment were satisfied, this Court could issue such an attachment only if the Receiver posted a bond in an amount "at least double the debt demanded[.]" F.S.A. § 76.12. In this case, the amount of the required bond would be substantially more than $2 million. Yet the Receiver has filed no attachment bond, and the amount of his general receiver's bond is only $10,000. (TRO at 18 [D.E. 18].)

108. *SEC v. Black*, 163 F.3d 188, 196–97 (3d Cir. 1998) (affirming district court's release of nonculpable third party's funds from freeze order); *SEC v. Cherif*, 933 F.2d 403, 413–15 (7th Cir. 1991) (holding that asset freeze against nonparty is improper unless it is shown that the nonparty has no interest in the assets or that they constitute illegally obtained profits). Although these cases hold that an asset freeze may be appropriate if it is shown that the third party is culpable, there has been no such showing here with respect to Integretel. The FTC has made allegations, but has not moved for an asset freeze against Integretel or shown that such a freeze would be appropriate.

-29-

*in rem* jurisdiction. Such jurisdiction may not be based on the Receiver's mere assertion of a property interest. A court's power over property in its control "is not to be confounded with the exercise of jurisdiction over persons claiming adverse rights in property which has never been in the custody of the court."[109] Because the Receiver's claim is disputed, *in rem* jurisdiction does not exist.

Our discussion of *in rem* jurisdiction has focused so far only on the asset-turnover provisions, but other provisions that the Receiver seeks to enforce are similarly beyond the Court's authority to act *in rem*. We are referring to the provisions that purport to require nonparties to take affirmative action to cooperate with the Receiver and provide him with information upon request.[110] These provisions do not operate *in rem* upon property. Rather, they are mandatory injunctions that operate *in personam* by directing those to whom they are directed to perform actions that may have no direct relationship to any property interests. Although it is undoubtedly more convenient for the Receiver to be able to compel cooperation and demand information from whomever he pleases, that is not enough to establish that these provisions of the orders operate *in rem*.

### E.  Certain provisions the Receiver relies on are—as applied to Integretel in the circumstances here—too indefinite to be enforceable.

Even if an injunction is otherwise valid, it must be "clear, definite, and unambiguous" in order to be enforceable by contempt sanctions.[111] As Rule 65(d) requires, the injunction "shall describe in reasonable detail, and not by reference to the complaint or other document, the act or

---

109. *Wheaton*, 124 F. at 62.

110. TRO at 14, § IX, 17 § XI (D.E. 18); Am. Prelim. Inj. at 15, § X, 18, § XII (D.E. 233).

111. *McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). *See Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (contempt sanctions may not be based on injunction that is vague).

00220

RER-6        0357

acts sought to be restrained[.]" Thus, a person to whom an injunction is directed should be able to determine what he is required to do without having to consult anything outside the injunction's four corners,[112] and should not be left in doubt about what is required.[113] In the circumstances of this case, several of the provisions the Receiver relies on do not satisfy these requirements.

*1. The asset-turnover and asset-identification provisions are unenforceable against Integretel.*

Section XI.A of the amended preliminary injunction provides that anyone served with the order must turn over to the Receiver "[a]ll assets of the Receivership Defendants[.]"[114] A separate provision of the TRO and amended preliminary injunction required persons holding assets or accounts of any of the original defendants to provide a sworn statement setting out certain information about the asset or account.[115] Although these requirements may well be sufficiently clear in many cases, they are not clear enough to support a contempt citation where, as in this case, the person served with the injunction denies that it holds any asset on which the Receiver may currently assert a claim.

The question whether Integretel holds any assets belonging to Access One and Network One turns on several disputed legal issues: first, whether Integretel is obligated under its contract to pay Access One and Network One the amount of the IGT Reserves; second, assuming Integretel owes a debt to the two entities, whether that debt is can be offset against Integretel's pre-receivership claims against Access One and Network One; and third, assuming Integretel has any net liability to Access One and Network One, whether those entities have any legal or

---

112. *See, e.g., Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1532 n.12 (11th Cir. 1996).

113. *Int'l Longshoremen's Ass'n*, 389 U.S. at 75

114. As discussed previously, the asset-turnover provision of the TRO did not purport to apply to anyone other than the original named defendants. *See* page 17, above.

115. TRO at 8–9, § VI.C (D.E. 18); Am. Prelim. Inj. at 9–10, § VII.C (D.E. 233).

-31-

equitable interest in any of Integretel's property. Integretel has a reasonable (indeed, compelling) basis for answering these questions, "No." Integretel's arguments regarding the first two issues are set out below. With respect to the third issue, we have already pointed out that a general unsecured creditor has no interest in any of the debtor's property until after he obtains a judgment. We would add here that the injunction does explicitly require that a person who owes even an undisputed a debt to one of the receivership entities (much less a person who denies that he owes any debt at all) pay the debt to the Receiver. Nor does it expressly require the turnover of property that the person served with the injunction reasonably believes does not belong to the receivership estate.

At all times, therefore, Integretel has had a reasonable basis for concluding that it is not subject to the asset-turnover provisions and thus was not required to pay anything to the Receiver. Even if Integretel's arguments on the merits are ultimately rejected, it would be inappropriate to hold Integretel in contempt of court based on nothing more than an after-the-fact disagreement with Integretel's conclusion. Any ambiguities or doubts about the scope of an injunction must be resolved against the person charged with contempt.[116]

The Second Circuit has held in comparable situations that injunctions (or proposed injunctions) failed the specificity requirement. In one case the court affirmed the denial of a preliminary injunction that would have prohibited a union from violating its duty of fair representation.[117] The court held that such injunctive relief was properly denied because the issue of the union's duties was the subject of "a bona fide dispute over two conflicting interpretations

---

116. *See, e.g., In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litigation)*, 770 F.2d 328, 339 (2d Cir. 1985); *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure 2d* § 2955, text at n.9.

117. *Sanders v. Air Line Pilots Association, International*, 473 F.2d 244 (2d Cir. 1972).

-32-

00222

RER-6    0359

of an ambiguous contract term."[118] Given that dispute, the union could not know with certainty what its legal obligations were.[119] In another case the court held that a party could not be held in contempt, because it had reasonably acted in the belief that its conduct was permitted under the less-than-clear injunction and acted promptly to resolve the issue with the court once a dispute arose.[120]

Integretel has similarly acted promptly to obtain a ruling from the Court, the Receiver's claim to the contrary notwithstanding. Integretel had no reason to ask for a clarification regarding the TRO, because as we discuss below, the TRO clearly did not purport to require Integretel to turn any funds over to the Receiver. Then for the seven months after the TRO expired—up until Integretel was served with the amended preliminary injunction on October 10— Integretel was not subject to any injunctive order. This opposition and the accompanying motion to modify the injunction are being filed only 20 days after Integretel was served with the amended preliminary injunction, which is a reasonable time under the circumstances.[121]

2. *The cooperation provisions are also unenforceable, either on their face or as applied to Integretel.*

We have shown that the provisions in the TRO and amended preliminary injunction purporting to require cooperation with the Receiver and the FTC constitute improper delegations of judicial power. The same characteristic that invalidates those provisions for that reason—they permit the Receiver or the FTC to dictate what specific acts the orders require to be performed—

---

118. 473 F.2d at 247.

119. *Id.*

120. *Town of Islip v. Eastern Air Lines, Inc.*, 793 F.2d 79, 83–85 (2d Cir. 1986).

121. We discuss this issue in more detail on pages 48–50, below.

00223

RER-6    0360

also causes them to violate the four-corners rule, because one cannot determine what specific acts must be performed simply by reading the order.[122]

## II. Even if the Court holds that the orders are valid and enforceable, the Receiver is not entitled to the issuance of a show-cause order.

### A. The turnover provision of the TRO was inapplicable on its face, and Integretel was not asked to turn over any assets while the TRO was in effect.

By its own terms, the turnover provision of the TRO (§ X.A) applied only to the original named defendants. The language purporting to impose turnover requirements on nonparties did not show up until the preliminary injunction, which was not served on Integretel. Because § X.A of the TRO did not apply to Integretel in the first place, Integretel could not possibly have violated it.

Moreover, the Receiver has not alleged that Integretel failed to comply with a turnover request made to it while the TRO was in effect. And as we have shown, no such request was made. Therefore, Integretel could not have violated the provisions of the TRO that required billing aggregators to transfer funds upon the Receiver's reasonable request (§ XI) and to cooperate with and assist the Receiver and the FTC (§ IX).

### B. Integretel cannot be held in contempt of the turnover provision of the amended preliminary injunction because contracts' ADR and choice-of-forum provisions bar this Court from deciding the underlying breach-of-contract issue.

The Receiver may not use a contempt proceeding as the vehicle for litigating the issue of whether Integretel breached its contracts with Network One and Access One (at least not in this

---

122. *Cf. Thomas v. County of Los Angeles*, 978 F.2d 504, 509–10 (9th Cir. 1992) (injunction requiring compliance with all departmental policies for conducting searches and using force was too vague because it did not define the policies or state how they could be identified).

-34-

00224

RER-6    0361

Court), because both contracts include mandatory ADR and venue provisions that the Receiver has disregarded.

Under the ADR provisions, any dispute must be submitted for resolution under a two-step process. [123] First, the parties must engage in a period of good-faith negotiations, and if those negotiations fail, the party asserting that the contract was breached must pursue arbitration in California. (There is an exception permitting an injunction "related to the purposes of this Agreement," but as we have pointed out, the Receiver's claim is not one on which injunctive relief is available.)

Because a receiver stands in the shoes of the company in receivership, and may pursue only those remedies that the company itself could have pursued, an arbitration clause in the company's contract is binding on the receiver.[124] The Receiver has not alleged that he complied with the contracts' ADR provisions or that either Access One or Network One invoked those provisions and obtained an arbitration award against Integretel before the Receiver was appointed. And in fact neither of those events has occurred.[125] The Receiver is therefore barred from asking the Court to decide his underlying breach-of-contract claim.

The Receiver is also barred from seeking relief in this Court because the contracts provide that to the extent litigation is permitted, it must be brought in Santa Clary County, California.[126] Forum-selection clauses such as this one are presumptively valid under the law of

---

123. Dawson Decl. Ex. 1 at 3, § 18 (Access One); Dawson Decl. Ex. 2 at 7, § 18 (Network One).

124. *E.g., Javitch*, 315 F.3d at 624–27; *Capitol Life Ins. Co. v. Gallagher*, 839 F. Supp. 767, 769 (D. Colo. 1993); *ISP.COM LLC v. Theising*, 805 N.E.2d 767, 774–75 (Ind. 2004); *Theising v. ISP.COM LLC*, 805 N.E.2d 778, 780 (Ind. 2004).

125. Dawson Decl. ¶ 11.

126. Dawson Decl. Ex. 1 at 3. § 15 (Access One); Dawson Decl. Ex. 2 at 6, § 15 (Network One).

-35-

both Florida and California (whose law the contract designates as controlling).[127] Because the

Receiver has not even attempted to show that the clauses here are unenforceable, venue over the

Receiver's claims is not properly laid in this district.

**C.  *If the Court nevertheless reaches the underlying contract issue, it should
find that Integretel did not violate the turnover order because it owes
nothing to Access One or Network One and therefore has no obligation to
pay the Receiver.***

Even if the Receiver were not bound by the ADR and venue provisions, he still would

have no enforceable breach-of-contract claim.[128]

1.  Under the contracts Integretel is entitled in its reasonable discretion to withhold from

the client any amounts necessary to cover the IGT Reserve established by Integretel. Both

contracts provide that Integretel "may withhold, from any amounts otherwise due to Client, an

amount necessary to fund the IGT Reserve."[129] Elsewhere, they provide, "Client shall be entitled

to all collected amounts, up to and including the gross value of the Billing Transactions remitted

to the Telcos, *less any amount due and owing to [Integretel] hereunder, including, without

limitation, . . . IGT Reserves . . . .*"[130] Because Integretel is not required to pay the client any

amount allocated to the IGT Reserve, the failure to pay that amount to the client (or the

Receiver) is not a breach of contract.

---

127. *E.g., America Online, Inc. v Booker*, 781 So. 2d 423, 424 (Fla. Dist. App. 20010; *Lu v. Dryclean-
U.S.A. of California, Inc.*, 14 Cal. Rptr. 2d 906, 907–08 (Ct. App. 1992).

128. In addressing the merits of the breach-of-contract issues, Integretel reserves its rights under the ADR
and venue provisions. We are addressing the merits only conditionally, as a precaution against the
possibility that the Court concludes that it may decide the claims itself.

129. Dawson Decl. Ex. 1 at 10 (Sched. II, § 5.b) (Access One); Dawson Decl. Ex. 2 at 19 (Sched. II,
§ 5.b) (Network One).

130. Dawson Decl. Ex. 1 at 10 (Sched. II, § 6) (Access One) (emphasis added); Dawson Decl. Ex. 2 at 19
(Sched. II, § 6) (Network One) (emphasis added).

00226

RER-6      0363

Despite Integretel's clear right to withhold amounts allocated to the IGT Reserve, the Receiver argues that under the contracts' definition of the IGT Reserve those amounts are owed to the client. He is mistaken. The contracts define the IGT Reserve as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[131] In arguing that this language supports his position, the Receiver ignores the word "otherwise," which as used in the definition means "in different circumstances" or "under other conditions."[132] Thus, the phrase, "amounts otherwise owed to Client" means amounts that *would be* owed to the client if they were not withheld to cover the reserve. Once they are withheld to cover the reserve, by definition they are not owed.

2. Integretel acted well within its discretion in setting the IGT Reserves for Access One and Network One at 100% and in continuing to maintain the reserves at that level. The receiver has acknowledged in a previous filing that one reason billing aggregators maintain reserves is to cover "credits [that] are paid to callers who complain about charges on their phone bills."[133] And Integretel's contracts with Access One and Network One expressly permit it to withhold from the client any amounts Integretel may pay to resolve disputes with consumers about billing transactions.[134] (Such deductions are referred to in the contracts as "Adjustments," and Integretel's right to make Adjustments arises from contract provisions entirely separate from the indemnification provision, which we discuss below.)

---

131. Dawson Decl. Ex. 1 at 5 (Exhibit A), 10 (Sched. II, § 5.b) (Access One); Dawson Decl. Ex. 11 (Exhibit A), 2 at 19 (Sched. II, § 5.b) (Network One).

132. *Webster's Third New International Dictionary* 1598 (1986).

133. Receiver's First Report at 10 (filed May 3, 2006) (D.E. 78).

134. Dawson Decl. Ex. 1 at 5 (Ex. A), 10 (Sched. II, § 3) (Access One); Dawson Decl. Ex. 2 at 11 (Ex. A), 18 (Sched. II, § 3) (Network One).

-37-

Given the evidence suggesting that the Nationwide defendants were engaged in billing fraud, Integretel is exposed to potential liability for refunds to consumers. If telephone companies give refunds to consumers for charges originated by Access One or Network One, the telephone companies will charge the amount of the refunds back to Integretel.[135] Similarly, if telephone companies are sued by consumers on account of charges billed by Access One and Network One (as has already happened), they have the right under their contracts with Integretel to seek indemnification from Integretel for liability they may incur.[136] Moreover, the FTC is seeking monetary relief from Integretel on behalf of consumers in this case. Although Integretel disputes the FTC's claim, we obviously do not know at this point how the Court will rule. Finally, Integretel faces the risk of being named as a defendant in class-action suits on behalf of consumers—a risk that is increased by the fact that the FTC has publicized its claims against Integretel on its website.[137] When a government agency takes enforcement action against a company, class-action lawyers frequently bring follow-on lawsuits closely tracking the agency's allegations.

Given this potential exposure, Integretel is well within its rights in rejecting the Receiver's demand that it pay him the amount of the Reserves. If Integretel were compelled to pay the amount of the reserves to the Receiver, most of that money would in all likelihood be used for purposes other than paying consumer claims arising from the transactions that Integretel processed. It will be available to pay the Receiver's administrative expenses and—of greater concern—to pay claims completely unrelated to Integretel's transactions. Although the Court has placed multiple entities into receivership, the Receiver is acting as if he were administering a

---

135. Dawson Decl. ¶ 20.a.

136. Dawson Decl. ¶ 20.b.

137. Dawson Decl. ¶ 20.d & Ex. 5.

-38-

single receivership estate and is apparently commingling all receivership funds in a single account.[138] Thus, any money paid by Integretel will be available to pay consumer claims arising from transactions processed by the other aggregator defendants as well as the claims of other creditors of the receivership defendants. The dollar amount of the transactions processed by the other aggregator defendants are alleged to be several times the volume of Integretel's transactions.[139] This means that only a small percentage of any money Integretel paid to the Receiver would be used to pay claims on which Integretel is potentially liable, and that as a result Integretel would face a substantial risk of incurring multiple liability. Integretel therefore has an entirely reasonable and legitimate reason for contesting the Receiver's claim.

3. Above and beyond Integretel's right to use the IGT Reserve to cover potential Adjustments due to consumer claims, Integretel is entitled to use the reserve to cover its own claims against Access One and Network One for indemnification. Each contract includes an indemnification clause under which the client agreed to indemnify Integretel from, among other things, all liabilities, claims, and attorney's fees arising from the client's breach of the contract or from the clients' billing transactions.[140] That obligation is triggered here for two reasons. First, the fact that Access One and Network One committed billing fraud means that they breached their warranty that they would comply with the law throughout the term of the contracts.[141] Second, Integretel is being exposed to claims and potential liability, and is incurring attorney's fees, as a result of Access One and Network One's billing transactions.

---

138. *See, e.g.*, Receiver's First Interim Fee App. at 3 (referring to "the receivership estate" in the singular); *id.* at 4 (referring to "the receivership account" in the singular); *id.* at 10–11 (presenting fee claim as lump sums rather than providing entity-by-entity breakdown).

139. *See* First Am. Compl. ¶¶ 41, 42 (D.E. 255).

140. Dawson Decl. Ex. 1 at 2, § 11 (Access One); Dawson Decl. Ex. 2 at 3, § 11 (Network One).

141. Dawson Decl. Ex. 1 at 1, § 7 (Access One); Dawson Decl. Ex. 2 at 3, § 7 (Network One).

00229

RER-6        0366

The Receiver's arguments regarding the indemnification clause are unconvincing. He contends that the contracts do not permit Integretel to use the IGT Reserves to cover the clients' indemnification obligations, but that is wrong. Under the contract funds may be allocated to the IGT Reserve "to protect IGT from credit loss *or otherwise to cover other reserves or offsets, other than uncollectibles imposed by a Telco.*"[142] The italicized language authorizes Integretel to use the IGT Reserve for the purposes of covering potential claims against the clients for indemnification.

Contrary to what the Receiver contends, Integretel's remedies under the indemnification clause are not limited to the procedure set out in § 11(c) of the contracts. That section merely deals with the question of who will control defense of any suit that is filed against the indemnitee. Nothing in the contract suggests that this is Integretel's exclusive remedy under the indemnification clause or that Integretel is barred from reserving against its indemnification claim.

The Receiver is also mistaken in his contention that Integretel may not entitled to indemnification for any liability it may incur what the Receiver describes as Integretel's "independent wrongdoing"[143] If a duty to indemnify against liability can be defeated on the ground that the indemnitee's conduct violated the law, then such indemnification clauses are meaningless, for by definition liability can be imposed only if one is found to have violated a legal duty.

One must also keep in mind that the only rights the Receiver may assert against Integretel are those of Access One and Network One, both of which deliberately engaged in fraudulent

---

142. Dawson Decl. Ex. 1 at 5 (Exhibit A) (emphasis added) (Access One); Dawson Decl. Ex. 11 (Exhibit A), 2 at 19 (emphasis added) (Network One)

143. Receiver's Mtn. at 7.

00230

RER-6    0367

billing.[144] In contrast, while the FTC alleges that Integretel violated the FTC Act, it does not contend that Integretel acted knowingly or even negligently. Rather, the FTC apparently claims that Integretel is strictly liable for having processed Access One and Network One's billing transactions, regardless of whether it knew or should have known that the transactions were unauthorized.. Thus, the Receiver is in essence arguing that an intentional wrongdoer—a scam artist—should be excused from its contractual duty to indemnify the unwitting company whose services it exploited in carrying out the fraud. The Receiver cites no authority to support this startling notion, and we are aware of none.

4. The receiver contends that when Integretel concluded that Access One and Network One had breached their contracts, it was not entitled to stop paying them without first obtaining judicial approval.[145] But the receiver points to no contract provision supporting this claim, and the clear language of the contracts is to the contrary. As noted above, the contracts expressly authorize Integretel to adjust the level of the IGT Reserve in its reasonable discretion and to withhold payment of any amounts allocated to the reserves.[146] Noting in the contracts requires Integretel to go to court in order to exercise this right. Indeed, § 9 of the contracts explicitly gives Integretel the right to act on its own. Under that provision, Integretel may demand that its clients provide written proof of their compliance with legal requirements, and if the client fails to provide such proof, Integretel "shall have the right to immediately suspend its performance under this Agreement . . . without liability to the other party[.]"[147]

---

144. *See* cases cited in note 80, above.

145. Receiver's Mtn. at 8.

146. Dawson Decl. Ex. 1 at 10, § 5(b) (Access One); Dawson Decl. Ex. 2 at 19, § 5(b) (Network One).

147. Dawson Decl. Ex. 1 at 1, § 9 (Access One); Dawson Decl. Ex. 2 at 3, § 9 (Network One).

-41-

00231

RER-6    0368

5. Finally, the Receiver's breach-of-contract argument ignores the fact that any debt that Integretel is found to have owed Access One and Network One may be set off against any pre-receivership claims that Integretel has against them, such as a claim for fraud in the inducement for misrepresenting the nature of their telecommunications "services."[148]

## D.  *Integretel did not violate the other provisions of the orders.*

1. Integretel has not violated either of the cooperation provisions in the TRO or the amended preliminary injunction.

To begin with, it is beyond dispute that Integretel did not violate the cooperation provisions of the TRO. The only way in which Integretel was asked to cooperate while the TRO was in effect was to provide information about any assets or accounts that were titled in the name of a defendant or held on behalf of or for the benefit of a defendant. The Receiver has not made even a prima facie showing that Integretel was holding any such assets or accounts. Whatever else one might say about the IGT Reserve, it was neither an asset or account titled in the name of a defendant nor an asset or account held on behalf of or for the benefit of a defendant.

Nor has Integretel violated the cooperation provisions of the amended preliminary injunction, despite the fact that it has rejected the Receiver's demand that it pay him the amount of the reserves. It has not violated § XII of the amended preliminary injunction, which requires billing aggregators to "cooperate with all reasonable requests of the FTC and the Receiver relating to implementation of this Order, including transferring funds at the Receiver's direction,"[149] because the obligation to cooperate is by the order's plain language limited to

---

148. *See SEC v. Elliott*, 953 F.2d at 1571–75 (receiver is subject to offset of pre-receivership claims); *Erlich v. Superior Court of Los Angeles County*, 407 P.2d 649 (Cal. 1965) (setoff is permitted even if claim is unliquidated).

149. Am. Prelim. Inj. at 18, § XII (D.E. 233).

00232

RER-6     0369

*reasonable* requests. (The obligation to transfer funds at the Receiver's direction is a subset of the broader obligation to "cooperate with all reasonable requests off the FTC and the Receiver" and is therefore subject to the condition that the request be reasonable). As a matter of law, It is unreasonable for a receiver demand that a company pay a disputed debt before the receiver's entitlement to payment has been determined.

The amended preliminary injunction also includes a cooperation provision purportedly directed to anyone served with the order, which is not on its face limited to reasonable requests.[150] But unless a requirement of reasonableness is read into it, this provision is preempted by the provision that applies specifically to billing aggregators. Under commonly accepted rules of interpretation, when two provisions of a legal document are inconsistent with one another, the more specific provision is controlling.[151] That rule applies here, because the two cooperation provisions are inconsistent to the extent that one requires compliance with unreasonable requests for cooperation while the other clearly does not. Moreover, in light of this rule of interpretation the injunction is at a minimum ambiguous, and any ambiguities must be resolved in Integretel's favor.[152]

Thus, if the broader cooperation provision is interpreted as requiring compliance with all requests for cooperation, regardless of whether they are reasonable, it does not apply here and Integretel therefore cannot have violated it. On the other hand, if a condition of reasonableness is read into the provision, Integretel is not in violation because the request was unreasonable.

---

150. Am. Prelim. Inj. 15, § X (D.E. 233).

151. *See, e.g., Balfour Beatty Bahamas, Ltd. v. Bush*, 170 F.3d 1048, 1050 (11th Cir. 1999) (specific provision of statute controls over more general provision); Restatement (2d) of Contracts § 236(c) (same principle as to contracts).

152. *See* note 116, above.

-43-

00233

RER-6    0370

**2.** Integretel did not violate the stay provision of the TRO or the amended preliminary injunction. Under that provision, the defendants' creditors or other persons asserting any claims, rights, or interests against the defendants from doing the following:

> Accelerating the due date of any obligation against a Receivership Defendant; filing or enforcing any lien against a Receivership Defendant; taking or attempting to take possession, custody or control of any asset of a Receivership Defendant; [or] attempting to foreclose, forfeit, alter, or terminate any interest in any asset of a Receivership Defendant, whether such acts are part of a judicial proceeding, are acts of self-help, or otherwise.[153]

The Receiver apparently contends that Integretel violated the prohibition against foreclosing, forfeiting, altering, or terminating any interest in an asset of a receivership defendant.[154]

That argument is unfounded because what Integretel did not take any of those prohibited actions. All that Integretel did was to not pay a disputed, contingent, unmatured debt. And even if the debt had been undisputed, noncontingent, and matured, the failure to pay it would not constitute a foreclosure on an interest in a receivership entity's asset or a forfeiture, alteration, or termination of such an interest.

Moreover, the Receiver does not allege (and could not allege) that Integretel's nonpayment of the alleged debt to Access One and Network One after the receivership was instituted represented a change in the status quo. Integretel was not paying the alleged debt before the Receiver was appointed, and it merely continued not to pay it afterward. That does not even remotely constitute a violation of the stay.

The stay provision also prohibits "[d]oing any act or thing whatsoever to interfere with the Receiver managing, or taking custody, control, or possession of, the assets or documents

---

153. TRO at 22–23, § XX.A.2 (D.E. 18); Am. Prelim. Inj. at 22, § XIX.A.2 (D.E. 233).

154. *See* Receiver's Mtn. at 8.

-44-

00234

RER-6      0371

subject to this receivership."[155] Integretel has not violated that provision, either. The provision applies by its own terms applies only to instances of active interference—"[d]oing any act or thing . . . to interfere"—not to mere omissions. (If there is any doubt on this point, it must be resolved in Integretel's favor.[156]) The Receiver has not accused Integretel of actively interfering with him. His claim is merely that Integretel has failed to pay the money he has demanded—an omission, not an affirmative act of interference. In any event, if the noninterference provision is interpreted to apply here, it is invalid for the reasons we have previously discussed with respect to the asset-turnover and cooperation provisions.

3. The TRO and amended preliminary injunction both require that within five days after receiving the order, any entity that has at any time since the Receiver's appointment held, controlled, or maintained custody of any account or asset belonging to one of the original defendants must provide counsel for the FTC with a sworn statement providing certain information about the asset or account.[157] Integretel has not violated this provision because it is not within the category of persons to whom the provision applies. At no time since the Receiver was appointed has Integretel been in possession, custody, or control of any assets or accounts that belong to any of the original defendants or that are being held on behalf of any of the original defendants.

In any event, even though Integretel is not required to provide a sworn statement of any sort, Mr. Dawson's declaration, which is signed under penalty of perjury, states the balance of the IGT Reserves for Access One and Network One as of the date of the Receiver's appointment and as of October 25.

---

155. TRO at 22–23, § XX.A.5 (D.E. 18); Am. Prelim. Inj. at 23 § XIX.A.5 (D.E. 233).

156. See note 116 & accompanying text, above.

157. TRO at 8–9, § VI (D.E. 18); Am. Prelim. Inj. at 9–10, § VII (D.E. 233).

00235

RER-6     0372

4. The Receiver contends that Integretel has violated Section II.A of the TRO and § III.A of the amended preliminary injunction, which restrained "Defendants, and *those persons in active concert or participation with them* who receive actual notice of this Order" from concealing their assets.[158] As the italicized language shows, the only persons other than the original named defendants who are subject to these provisions are those who are acting in concert or participation with the original defendants. (As previously noted, the term "Defendants" is defined in the order as including only the original defendants.[159]) The Receiver inaccurately describes this provision as applying simply to "those who have received a copy of the TRO," without mentioning the limitation to persons acting in concert with the defendant[160]

As we have pointed out previously, the Receiver does not allege that Integretel has acted in concert or participation with any of the original defendants, and Integretel has not in fact done so. This provisions does not bind Integretel, and Integretel therefore could not possibly have violated it. Furthermore, the Receiver has not shown that Integretel committed any act of concealment.

5. The Receiver also relies on § VIII.F of the TRO (§ IX.F of the amended preliminary injunction. But this provision imposes no duties on Integretel. In fact it imposes no duties on anyone other than the Receiver himself. It is part of the provision that sets out the Receiver's duties and powers. The specific subsection that the Receiver relies on authorized and directed the Receiver to "[p]revent the inequitable distribution of assets[.]"[161] But that language cannot be

---

158. TRO at 5 (D.E. 16) (emphasis added); Am. Prelim. Inj. at 5–6 (D.E. 233) (emphasis added).

159. Am. Prelim. Inj. at 3 (D.E. 233).

160. Receiver's Mtn. at 9.

161. TRO at 12 (D.E. 18).

-46-

00236

RER-6    0373

read as imposing on Integretel (or on anyone other than the Receiver) any obligation to do or refrain from any act.

Moreover, the assets whose inequitable distribution the Receiver is supposed to prevent do not include assets in the hands of third parties who have valid claims against them; this is clear from the fact that a receiver's claim against a third party is subject to being offset by pre-receivership claims by the third party against the entity in receivership.[162] And in any event, the Receiver has no standing to rely on the rights of other claimants to an equitable distribution of assets. As we have noted more than once, the Receiver stands in the shoes of Access One and Network One, and not assert any claim against Integretel that they could not have asserted.[163]

6. Finally, the Receiver relies on the provision of the orders that requires persons served with the order to "advis[e] all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Receiver."[164] However, he does not even begin to explain how Integretel violated this provision.

**III. The Receiver's accusation that Integretel acted improperly is unfounded.**

According to the Receiver, it was "inexcusable" for Integretel not to have "disclosed that there was a reserve, the amount of the reserve, and the circumstances under which it came into possession of the reserve, so that this Court—rather than Integretel—could have decided the issue of whether the reserve should have been immediately transferred to the Receiver."[165] This accusation, like the Receiver's other arguments, is incorrect.

---

162. *SEC v. Elliott*, 953 F.2d at 1571–75.

163. *See* cases cited in note 80, above.

164. TRO at 14, § IX (D.E. 18); Am. Prelim. Inj. at 15, § X (D.E. 233).

165. Receiver's Mtn. at 6.

-47-

00237

RER-6    0374

To begin with, Integretel has not tried to conceal the facts. Mr. Dawson's March 6 letter to the FTC did not fail to disclose any information that the TRO required Integretel to disclose. On the contrary, it truthfully reported facts sufficient to put the FTC on notice of the possible existence of reserves. And Integretel's counsel subsequently mentioned the reserves to the FTC multiple times, at one point stating the amount of the reserves in writing.

Furthermore, the Receiver ignores the fact that for seven months—from March 8 until October 10—Integretel was not subject to any injunctive order. Given that fact, there is no basis for the Receiver's suggestion that Integretel should have acted on its own initiative to obtain a declaratory ruling of some kind from the Court.

The fact is that Integretel has acted responsibly and appropriately. When the FTC asked that the amount of the reserves be paid to the Receiver (at a time when Integretel still was not subject to any injunction), Integretel explained to the FTC why the Receiver had no legitimate claim to the funds. When the FTC nevertheless referred the matter to the Receiver (on the day after Integretel was finally served with the preliminary injunction), Integretel did not sit back and do nothing. Rather, on the same day as the FTC's referral, Integretel's counsel wrote to the Receivers' counsel to explain why the Receiver was not entitled to be paid. That was on October 11. Two days later, on October 13, counsel for the parties had discussions aimed at attempting to resolve the dispute, and when those discussions failed the Receiver filed his show-cause motion that day. Thus, the Receiver sought contempt sanctions only three days after Integretel was served with the amended preliminary injunction.

Integretel cannot be blamed for not seeking a ruling from the Court during those three days. Indeed, under Local Rule 7.1(A)(3) Integretel could not have filed a motion without first trying to resolve the dispute informally. Now that it has become clear that such a resolution is

-48-

impossible, Integretel has done the right thing by asking that the injunction—which Integretel

did not have an opportunity to oppose before it was issued—be modified.

### Conclusion

For the foregoing reasons, the Receiver's motion to show cause should be denied.

Dated: October 30, 2006

Respectfully Submitted,

Richard H. Gordin
Pro hac vice application to be filed
Tel:    (202) 454-2881
E-mail rgordin@tighepatton.com
    and
Neal Goldfarb
Pro hac vice application pending
Tel:    (202) 454-2826
E-mail ngoldfarb@tighepatton.com
TIGHE PATTON ARMSTRONG TEASDALE PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
Fax:    (202) 454-2805

By: /s/ Scott B. Newman
Scott B. Newman, Florida Bar No. 339717
Tel:    (561) 650-8310
E-mail scott.newman@hklaw.com
    and
Martin J. Alexander, Florida Bar. No. 346845
Tel:    (561) 650-8306
E-mail marty.alexander@hklaw.com
HOLLAND & KNIGHT LLP
222 Lakeview Ave., Suite 1000
West Palm Beach, Florida 33401
Fax:    (561) 650-8399

*Counsel for The Billing Resource d/b/a Integretel*

-49-

### Certificate of Service

I HEREBY CERTIFY that on October 30, 2006, I electronically filed the foregoing

memorandum and the accompanying supporting declarations of Ken Dawson, Richard H.

Gordin, and Steven A. Lancellotta with the Clerk of the Court using CM/ECF. I also certify that

the foregoing documents are being served this day on all counsel of record or pro se parties

identified on the attached Service List in the manner specified, either via transmission Notices of

Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or

parties who are not authorized to receive electronic Notices of Electronic Filing.

/s/ Scott B. Newman
Scott B. Newman

**SERVICE LIST**
Federal Trade Commission vs. Nationwide Connection, Inc., et al
Case No. 06-80180-Civ-Ryskamp/Vitunac

**CM/ECF Notice List:**

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade
Commission*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
305-347-6517 telephone
347-6500 facsimile
*Attorneys for Defendants Billing Concepts,
Inc., ACI Billing Services, Inc. d/b/a OAN, and
BSG Clearing Solutions North America, LLC*

CHAD A. DEAN, ESQ.
chad@schuylaw.com
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial
Services and Ford Motor Co. Credit Co.*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
MICHELLE T. VISIEDO, ESQ.
mtv@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower – 15th Floor
1441 Brickell Avenue
Miami, FL 33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

ANDREW ALITOWSKI, ESQ.
andrew@wjlawyers.com
Wedderburn, Jacobs and Alitowski, PA
16300 NE 19th Street, Suite 244
North Miami Beach, FL 33162
305-919-9222 telephone
305-919-9880 facsimile
*Attorneys for Receivership Defendants
Grunspan Trust, et al*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center – Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust et. al*

00241

RER–6        0378

JERRY M. MARKOWITZ, ESQ.
jmarkowitz@mdrtlaw.com
ROSS R. HARTOG, ESQ.
rhartog@mdrtlaw.com
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, FL 33156
305-670-5000 telephone
305-670-5011 facsimile
*Attorneys for First Churchill Way, LLC*

MARK DOUGLAS JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida 34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika
Riaboukha and Qaadir Kaid*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way, LLC*
Method of Service: CM/ECF

ROBERTO MARIO VARGAS, ESQ.
rvargas@jones-foster.com
Jones Foster Johnston & Stubbs
Flagler Center Tower, Suite 1100
505 South Flagler Drive (33401)
P.O. Box 3475
West Palm Beach, FL 33402-3475
561-650-0459 telephone
561-650-0436 facsimile
*Attorneys for Defendants Willoughby Farr and
Mary Lou Farr*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Creditor Denise McCann*

**Manual Notice List (via U.S. Mail):**

ANDREW G. BERG, ESQ.
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4704
202-626-2924 telephone
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts,
Inc., ACI Billing Services, Inc. d/b/a OAN, and
BSG Clearing Solutions North America, LLC*

GARY M. DUNKEL, ESQ.
dunkel@gtlaw.com
Greenberg Traurig
Phillips Point – East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL 33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for BHD/WEB, LLC*

00242

RER-6    0379

LISA FIALCO, ESQ.
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
*Attorneys for Plaintiff Federal Trade
Commission*


THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

MICHELLE VISIEDO-HIDALGO, ESQ.
Tew Cardenas LLP
Four Seasons Tower – 15th Floor
1441 Brickell Avenue
Miami, FL 33131-3407
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

SCOTT G. HAWKINS, ESQ.
shawkins@jones-foster.com
Jones Foster Johnston & Stubbs
Flagler Center Tower, Suite 1100
505 South Flagler Drive (33401)
P.O. Box 3475
West Palm Beach, FL 33402-3475
561-650-0459 telephone
561-650-0436 facsimile
*Attorneys for Defendants Willoughby Farr and
Mary Lou Farr*

00243

RER-6    0380

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

Defendants.

_____/

### Declaration of Ken Dawson

1. I am president of The Billing Resource, d/b/a Integretel (formerly known as Integretel, Incorporated) ("Integretel"). I submit this declaration in opposition to the receiver's motion for an order requiring Integretel to show cause why it should not be held in contempt of court.

2. Integretel is a California corporation with its only place of business in San Jose, California.[1] Integretel recently changed its corporate name from "Integretel, Incorporated" to "The Billing Resource," but it continues to do business under the name Integretel. I will refer to the company by that name here.

3. Integretel is a billing aggregator. As such, it provides services that enable its clients, who are independent telecommunications companies and other service providers, to have charges for their services appear on consumers' local telephone bills. Integretel also provides additional services to some of its clients.

_____

1. Eight employees on Integretel's payroll work out of their homes in other states (though not in Florida), but they actually work for one of Integretel's subsidiaries, not for Integretel itself.

4.  The billing-aggregation process is extremely complicated, but it can be explained in very general terms as follows. Integretel receives transaction data from its clients and forwards that data to the telephone companies (often referred to as "LECs" which stands for "Local Exchange Carriers"). The LECs then include these transactions on their bills unless the LECs determine that it is unable or unwilling to bill a particular transaction for some reason. Based on a variety of accounting and transactional factors, including gross LEC fees, holdback, edit rejects, adjustments, and bad debt, the LECs periodically send payments to Integretel that are based on all submissions by Integretel that the LECs had previously accepted for billing. The LEC payments to Integretel are based on the combined submissions and receipts for all of Integretel's clients and are neither made nor segregated on a client-by-client basis by any of the LECs. From the proceeds received from the LECs, Integretel applies various accounting mechanisms to attribute funds and deductions to particular clients. Integretel then determines pursuant to its contracts with the clients how much, if any, is due each client.

5.  Integretel formerly provided billing-aggregation and other services to Access One Communications, Inc. and Network One Services, Inc. True and correct copies of Integretel's contracts with Access One Communications, Inc. and Network One Services, Inc. are attached hereto as Exhibits 1 and 2, respectively.

6.  Integretel discontinued services to Access One and Network One after questions arose as to whether some of the charges were properly authorized. Integretel asked each client to provide documentation supporting the charges, and when the clients failed to provide an adequate response, Integretel immediately discontinued its services.

7.  As provided in its contracts, Integretel is entitled to withhold from Access One and Network One any amounts necessary to cover the "IGT Reserve," which is defined in the

-2-

contracts as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco." The contracts authorize Integretel to adjust the amount of the IGT Reserve from time to time.

8. Once Integretel discontinued its services for Access One and Network One, it set the amount of the IGT Reserve for each client at 100%. As a result, Integretel stopped sending any payments to either client. My understanding of the contracts, and Integretel's interpretation as a party to the contracts, is that the amount allocated to the IGT Reserve is not owed to the client. Rather, it is an amount that would, in the language of the contract, "otherwise [be] owed" if it had not been allocated to the IGT Reserve.

9. The IGT Reserves relating to Access One and Network One do not take the form of a segregated fund of money. Rather, they represent nothing more than a bookkeeping entry. Thus, Integretel holds no identifiable pool of money that one can point to as constituting the IGT Reserves for these clients.

10. A client's right to receive any of the sums allocated to the IGT Reserve is contingent, on a variety of factors, and the amount the client is entitled to, if any, can only be finally determined after all expenses, costs, and other charges against the reserve are fully and finally taken account of. Thus, the IGT Reserve is a running balance that does not result in an amount due until a final accounting can be taken based on all outstanding costs, contingencies, expenses and obligations attributable under the contract to the IGT Reserve. That has not yet occurred with respect to Access One and Network One.

11. Integretel's contracts with Access One and Network One require that any disputes be submitted to alternative-dispute-resolution procedures that include a period of negotiations

00246

followed, if necessary, by arbitration in San Jose, California. Neither Access One nor Network One invoked these provisions before the receiver was appointed. The receiver has not invoked them, either.

12. At no time since the receiver was appointed has Integretel had any communications or other dealings with Access One, Network One, or any other of the original defendants in this action. In declining to pay the receiver the money he claims that Access One and Network One are owed, Integretel has acted independently of Access One, Network One, and the other original defendants. Integretel's purpose in declining to pay the receiver is not to assist any of the original defendants in evading their duties under any of the Court's orders, or to cooperate with any of the original defendants in any way.

13. The FTC sent a copy of the temporary restraining order in this case to me by fax on March 3, 2006. Attached as Exhibit 3 is a true and correct copy of the fax I received, consisting of the fax cover sheet, a cover letter, and the order.

14. When I received the order, I did not notify or consult with Integretel's counsel. Instead, I prepared a response on my own, which I sent to the FTC by fax and express courier on March 6. A true and correct copy of my response is attached hereto as Exhibit 4.

15. I believed then and believe now that my letter to the FTC was both honest and accurate. I believed and continue to believe that under its contracts with Network One and Access One, Integretel was neither holding any funds that belonged to either of those entities nor holding any funds on behalf of either entity. I believed and continue to believe that the balances reflected in the IGT Reserve for each entity were merely bookkeeping entries and that Integretel had not segregated, earmarked, or otherwise set aside any specific funds corresponding to those

-4-

reserves. I believed and continue to believe that no funds were then due and owing to either
entity.

16. To the best of my recollection, nobody from the FTC ever asked or instructed me to
transfer any funds to the receiver. Although I have a vague recollection of having spoken with
one of the FTC's lawyers shortly after I received the temporary restraining order, I believe that
any conversation that might have occurred was nonsubstantive, and did not involve any request
that Integretel turn funds over to the receiver. Certainly, if someone from the FTC had asked or
instructed Integretel to turn over funds to the receiver, I would remember it. In addition, I would
have contacted Integretel's counsel.

17. At no time after receiving the temporary restraining order was I contacted by the
receiver, by the receiver's lawyer, or by anyone else acting on the receiver's behalf.

18. To the best of my knowledge, Integretel was not notified before the preliminary
injunction in this case was entered on March 8, 2006 that the preliminary injunction would
include language stating that all persons served with a copy of the injunction were required to
turn over to the receiver any assets of the defendants that they held. I did not receive any such
notification, and I did not receive any information indicating that Integretel had received such
notification by any other means. If Integretel *had* received such notification, under Integretel's
customary business practice I would have been made aware of it.

19. To the best of my knowledge, Integretel was never served with the preliminary
injunction that was entered on March 8, 2006. I was not served with a copy of that order, and it
never came to my attention that Integretel had been served by any other means. If Integretel *had*
been served by some other means, under Integretel's customary business practice I would have
been made aware of it.

-5-

20. If Integretel were to pay the receiver the amount of the IGT Reserves for Access One and Network One, it would be exposed to the risk of liability on multiple fronts:

   a.   If telephone companies give refunds to consumers for charges originated by Access One or Network One, the telephone companies will charge the amount of the refunds back to Integretel, and on top of that will charge Integretel a substantial fee for processing the refund, in most cases greater than the refund itself.

   b.   If telephone companies are sued by consumers on account of charges billed by Access One and Network One, they have the right under their contracts with Integretel to seek indemnification from Integretel both for any liability they may incur and for their attorney's fees. At least one such lawsuit has been filed—a class action against Sprint that includes allegations relating to charges by Access One that were processed by Integretel. Sprint has put Integretel on notice of its intention to enforce its indemnification rights.

   c.   The FTC is seeking monetary relief from Integretel in this case. I understand that the FTC's position is that Integretel is liable for the entire amount of the charges billed by Access One and Network One that were processed by Integretel, less amounts already refunded to consumers. Although Integretel does not believe that it violated the FTC Act or that if it did violate the Act it could be held liable in the amount sought by the FTC, the FTC contends otherwise and its claims have not yet been decided.

   d.   Finally, Integretel faces the risk of being named as a defendant in class-action suits on behalf of consumers. This risk is increased by the fact that the FTC has

00249

RER-6        0386

publicized its claims against Integretel. It has issued a press release describing

those claims and has posted the press release on its website, along with a copy of

its first amended complaint. (A true and correct copy of the relevant page from the

FTC website is attached as Exhibit 5.) I understand that when a government

agency takes enforcement action against a company, class-action lawyers file

lawsuits piggybacking on the agency's suit.

21. As of February 27, 2006, the day the receiver was appointed, the amount of the IGT

Reserve for Access One was $1,035,525.76 and the amount for Network One was $194,954.13.

22. As of October 25, 2006, the amount reflected on Integretel's books as the IGT

Reserve for Access One was $1,383,435.51 and the amount for Network One was $191,445.50.[1]

The reason the Access One amount is higher than at the time the receivership began is that

Integretel has made certain internal bookkeeping adjustments in the ordinary course of its

business relating primarily to the allocation of the independent reserves, based on gross billings,

held by LECs. Those reserves are known as "Telco Reserves." These periodic adjustments

reallocate the amount of the Telco Reserves among Integretel's clients based on a formula having

to do with each client's share of the aggregate factors used by the LECs to determine their

respective Telco Reserve held against Integretel as a whole. The effect of the most recent

reallocation was to decrease the requirement for Telco Reserves relating to Access One and

thereby increase the amount of the IGT Reserve relating to Access One.

---

1. These amounts do not reflect certain items that Integretel believes that it is entitled to charge against
the reserves but that are not currently being charged against them. Integretel's decision not to charge
these items against the reserves at this time is not an admission that Integretel thinks it is not entitled
to make the charges. Rather, Integretel has decided, in its discretion, to withhold such charges until
the Court can rule on the pending relevant motions. Subject to this Court's order, Integretel reserves
the right to make the charges in the future.

00250

RER-6    0387

I DECLARE under penalty of perjury that the foregoing is true to the best of my

knowledge, information, and belief.

Executed on October 27, 2006.

Ken Dawson

-8-

00251

RER-6    0388

# Exhibit 1

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into as of 6 /30 , 2004 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Access One Communications, a Florida corporation ("Client").

**WHEREAS,** Client has and will purchase certain accounts receivable, as evidenced by the Billing Transactions, from _____ N/A _____, a _____ N/A _____, who] is a provider of certain telecommunications related products and services; and

**WHEREAS,** IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

**WHEREAS,** IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

**NOW, THEREFORE,** the parties hereto agree as follows:

**1.   DEFINITIONS.** Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

**2.   IGT SERVICES.** IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Sched# | Service Order Options | Included |
|---|---|---|
| I | Validation/Registration | ( ) |
| II | PhoneBill Services (Telco Billing) | (X) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry (required with Service Order II or III) | (X) |
| VII | Collection Services | ( ) |
| VIII | Pre-Pay Services | ( ) |

**3.   TERM.** The initial term of this Agreement shall be for two (2) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of two (2) years (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

**4.   CLIENT SUBMISSION AND IGT EDIT.** Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

**5.   SERVICE FEES.** IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

**6.   TAXES.** Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; or provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions. IGT shall otherwise cause the then-current taxing rates and logic, including such rates and logic of applicable LECs, to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

**7.   CLIENT REPRESENTATIONS AND WARRANTIES.** Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

**8.   IGT's REPRESENTATION AND WARRANTY.** IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

**9.   PROOF OF COMPLIANCE.** Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance. Each party agrees to notify the

TBR_NCI 000262

00253

RER-6      0390

other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

**10. LIMITATION OF LIABILITY.** IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

**11. INDEMNIFICATION.**
(a)  By Client.  Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to: (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; (ii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

(b)  By IGT.  IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

(c)  Enforcement.  In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and, thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

**12. EVENTS OF DEFAULT.** Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):
(a)  The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or
(b)  The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or not reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or
(c)  Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

(d)  The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or
(e)  Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or
(f)  The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

**13. EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees for the most recent three months in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

**14. CONFIDENTIALITY.**
(a)  As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.
(b)  Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.
(c)  Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:
(i)  Information that now or hereafter comes into the public domain without breach of this Agreement;
(ii)  Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;
(iii)  Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;
(iv)  Information approved for release by the written authorization of the Disclosing Party; or
(vi)  Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party

TBR_NCI 000263

00254

RER−6        0391

to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d)  All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party. Upon written request by a Disclosing Party, the Receiving party shall return to the Disclosing party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

**15.  CHOICE OF LAW AND VENUE.** THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

**16.  PUBLIC ANNOUNCEMENTS.** Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

**17.  NOTICES.** All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation. All notices and other communications shall be deemed given when actually received by a party as evidenced by an appropriate confirmation. Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

Integretel, Incorporated
5863 Rue Ferrari
San Jose, CA 95138
Attention: General Counsel
FAX: 408-362-2795

Access One Communications
222 Lakeview Ave., 157-160
West Palm Beach, FL 33401
Attention: German Miranda
FAX: 561-366-9734

**18.  DISPUTE RESOLUTION AND ARBITRATION.** Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a)  Dispute Resolution. At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement,

exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b)  Arbitration. If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules. The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration. The arbitration shall be held in San Jose, California. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures. A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents. The parties shall share equally the fees of the arbitration and the arbitrator.

**19.  GENERAL PROVISIONS.**

(a)  Attorney's Fees. In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b)  Severability. If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c)  Captions. The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)  Assignment. Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e)  Amendments; No Waiver. Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto. No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f)  Third Party Rights. The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g)  Further Assurances. The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h)  Force Majeure. Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event"). Upon the

Master Services Agreement
(REV. 03/03) Access One Contract.doc

- CONFIDENTIAL -

Page 3

TBR_NCI 000264

00255

RER-6        0392

occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

(i).  _Counterparts_.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(j)  _Integration of Agreement_.  This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k)  _Relationship of the Parties_.  Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party. In the performance of its obligations hereunder, IGT is acting as an independent contractor to Client.

(l)  _Corporate Authority_.  The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date set forth above.

Integretel, Inc. (IGT)

By: _____

Name: _Ken Danson_

Title: _President_

Date: _7/7/04_

Access One Communications (Client)

By: _____

Name: _GERMAN MIRANDA_

Title: _PRESIDENT_

Date: _06/30/04_

TBR_NCI 000265

00256

RER-6          0393

## EXHIBIT "A"
### Definition of Certain Terms

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User Inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial-tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

TBR_NCI 000266

00257

RER-6    0394

## EXHIBIT "B"
### Fees

The following Fees shall apply:

**2)** **PhoneBill Services (Telco Billing)**

   a) Initial Account setup (sub-CIC) fee:      $3,500.00  one time
     - each additional Account:        $1,750.00  one time

   b) IGT Processing Fees:

| Transactions per Deposit Month | | Fee Rate per Transaction |
|---|---|---|
| FIRST | 250,000 | $ 0.070 each |
| NEXT | 250,000 | $ 0.065 each |
| NEXT | 250,000 | $ 0.060 each |
| ALL REMAINING | | $ 0.055 each |

A Minimum monthly fee shall apply consisting of the greater of: i) 1% of the gross value of the Billing Transactions in each Deposit Month; or ii) $5,000 per Account commencing September 2004.

**6)** **End-User Inquiry**

   a) Verbal End-User Inquiry     $ 3.95 each
   b) Transferred or auto-referred   $ 0.08 per minute
   c) Written End-User Inquiry    $40.00 each
   d) Written regulatory complaints  $95.00 each
   e) Adjustment record processing  $ 0.75 each