thing whatsoever to interfere with the Receiver managing, or taking custody, control, or possession of, the assets or documents subject to this receivership, or to harass or interfere with the Receiver in any way, or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of the Receivership Defendants."

Although this provision is unobjectionable in most of its potential applications, there are certain cases in which it would be invalid as applied. For example, it would be an invalid application for the Receiver to contend that it constituted an interference with his efforts to take possession of receivership assets for a person in possession who claims an adverse interest in the asset to refuse to turn it over to the Receiver, or for a person to refuse to pay a disputed debt that the Receiver claimed was owed. In such a case, the provision would operate in an invalid manner, for the same reasons set out above with respect to the other provisions at issue.

An interpretation of the sort that is referred to above would be a strained one, but the Receiver seems to be advancing just such an interpretation in his pending show-cause motion. In order to reduce the risk that this provision could be applied in an invalid manner, therefore it should be modified to make it clear that it is not intended to be applied in a way that would defeat any of the protections granted by our other proposed modifications.

**C. The modifications should be made effective *nunc pro tunc.***

Although some courts have held that an order may be entered *nunc pro tunc* only for the purpose of making the record reflect something that happened earlier but was not recorded, others hold that a *nunc pro tunc* entry is permitted " to achieve equity even though so doing supplies an action that did not occur on the earlier date."[3] The latter rule is the appropriate one

---

3.  *Drabkin v. Midland-Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 275 (D.C. Cir. 1987). *See, e.g., In re Arkansas Co.*, 798 F.2d 645, 648–50 (3d Cir. 1986) (bankruptcy court has power to authorize employment of attorney *nunc pro tunc* in extraordinary circumstances).

00370

RER-6     0507

here, because a request to modify an injunction should be governed by equitable principles rather than strict legal technicalities.[4]

Moreover, this case presents extraordinary circumstances warranting retroactive relief. The defects that invalidate the portions of the injunctions that are at issue have been present from the moment the orders were entered. Furthermore, the injunctions were issued without adequate notice to, or participation by, the third parties who are adversely affected by the defects in the orders. This is especially troubling in view of the fact that the orders were drafted by counsel representing an agency of the federal government, who had a professional obligation not only to seek victory in litigation but to see that justice is done. As a result, they had a heightened duty to ensure that the relief they sought would not unfairly prejudice the rights of nonparties.

Finally, granting relief *nunc pro tunc* will not harm any party's legitimate reliance interests. Because the provisions at issue were invalid from their inception, no party can claim entitlement to whatever benefits or advantages those provisions might have provided. Any such benefits constituted a legally unjustified windfall.

### Conclusion

For the foregoing reasons, Integretel requests that Court order that the TRO, the preliminary injunction, and the amended preliminary injunction be modified as set out above, *nunc pro tunc*.

### Certification

Pursuant to Local Rule 7.1.A.3, counsel for Integretel has conferred with counsel for the FTC (Collot Guerard) in an attempt to resolve the issues raised in this motion, but was not able to resolve them. Counsel for Integretel also sent emails to counsel for the other potentially

---

4.   *Cf. In re Arkansas Co.*, 798 F.2d at 648.

00371

RER-6          0508

affected parties (including counsel for the Receiver), setting out the substance of the relief that

Integretel intended to seek and asking them to confer. The only responses that were received

were from counsel for Billing Concepts, Inc. ACI Billing Services, Inc. d/b/a OAN, and BSG

Clearing Solutions North America, LLC, stating that they do not object to this motion, and from

counsel for BHD/Web LLC, who stated that his client had no position on this motion, and would

neither object nor reply to it.

Dated: October 30, 2006

Respectfully submitted,

Richard H. Gordin
Pro hac vice application to be filed
Tel:    (202) 454-2881
E-mail rgordin@tighepatton.com
    and
Neal Goldfarb
Pro hac vice application pending
Tel:    (202) 454-2826
E-mail ngoldfarb@tighepatton.com
TIGHE PATTON ARMSTRONG TEASDALE
PLLC
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
Fax:    (202) 454-2805

By:    /s/ Scott B. Newman
Scott B. Newman, Florida Bar No. 339717
Tel:    (561) 650-8310
E-mail scott.newman@hklaw.com
    and
Martin J. Alexander, Florida Bar. No. 346845
Tel:    (561) 650-8306
E-mail marty.alexander@hklaw.com
HOLLAND & KNIGHT LLP
222 Lakeview Ave., Suite 1000
West Palm Beach, Florida 33401
Fax:    (561) 650-8399

*Counsel for The Billing Resource d/b/a
Integretel*

00372

RER-6    0509

## Certificate of Service

I HEREBY CERTIFY that on October 30, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronic Notices of Electronic Filing.

*/s/ Scott B. Newman*
Scott B. Newman

## SERVICE LIST
### Federal Trade Commission vs. Nationwide Connection, Inc., et al
### Case No. 06-80180-Civ-Ryskamp/Vitunac

**CM/ECF Notice List:**

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade Commission*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
MICHELLE T. VISIEDO, ESQ.
mtv@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower – 15th Floor
1441 Brickell Avenue
Miami, FL 33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
305-347-6517 telephone
347-6500 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

ANDREW ALITOWSKI, ESQ.
andrew@wjlawyers.com
Wedderburn, Jacobs and Alitowski, PA
16300 NE 19th Street, Suite 244
North Miami Beach, FL 33162
305-919-9222 telephone
305-919-9880 facsimile
*Attorneys for Receivership Defendants Grunspan Trust, et al*

CHAD A. DEAN, ESQ.
chad@schuylaw.com
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial Services and Ford Motor Co. Credit Co.*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center – Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust et. al*

00374

RER-6        0511

JERRY M. MARKOWITZ, ESQ.
jmarkowitz@mdrtlaw.com
ROSS R. HARTOG, ESQ.
rhartog@mdrtlaw.com
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, FL 33156
305-670-5000 telephone
305-670-5011 facsimile
*Attorneys for First Churchill Way, LLC*

MARK DOUGLAS JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida 34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika Riaboukha and Qaadir Kaid*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way, LLC*
Method of Service: CM/ECF

ROBERTO MARIO VARGAS, ESQ.
rvargas@jones-foster.com
Jones Foster Johnston & Stubbs
Flagler Center Tower, Suite 1100
505 South Flagler Drive (33401)
P.O. Box 3475
West Palm Beach, FL 33402-3475
561-650-0459 telephone
561-650-0436 facsimile
*Attorneys for Defendants Willoughby Farr and Mary Lou Farr*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Creditor Denise McCann*

**Manual Notice List:** (via U.S. Mail)

ANDREW G. BERG, ESQ.
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4704
202-626-2924 telephone
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

GARY M. DUNKEL, ESQ.
dunkel@gtlaw.com
Greenberg Traurig
Phillips Point – East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL 33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for BHD/WEB, LLC*

00375

RER-6      0512

LISA FIALCO, ESQ.
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
*Attorneys for Plaintiff Federal Trade
Commission*

THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

MICHELLE VISIEDO-HIDALGO, ESQ.
Tew Cardenas LLP
Four Seasons Tower – 15th Floor
1441 Brickell Avenue
Miami, FL 33131-3407
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

SCOTT G. HAWKINS, ESQ.
shawkins@jones-foster.com
Jones Foster Johnston & Stubbs
Flagler Center Tower, Suite 1100
505 South Flagler Drive (33401)
P.O. Box 3475
West Palm Beach, FL 33402-3475
561-650-0459 telephone
561-650-0436 facsimile
*Attorneys for Defendants Willoughby Farr and
Mary Lou Farr*

-15-

00376

RER-6        0513

# EXHIBIT I

00377

RER-6    0514

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

        Defendants.

_____/

**Defendant The Billing Resource d/b/a Integretel's**
**Motion to Stay Litigation of the Contract Claims**
**Underlying the Receiver's Show-Cause Motion Pending Arbitration**
**and Incorporated Memorandum of Law in Support Thereof**

Defendant The Billing Resource d/b/a Integretel ("Integretel") hereby moves pursuant to

9 U.S.C. § 3 that any litigation as to the contract claims raised by the Receiver's pending show-

cause motion be stayed pending compliance by the Receiver with the ADR/arbitration provisions

in the contracts at issue.

As explained in greater detail below, the Receiver's breach-of-contract claims are barred

by the ADR/arbitration provisions. Specifically, (1) the ADR/arbitration provisions are valid and

enforceable under the Federal Arbitration Act, (2) the provisions apply to the Receiver's claims,

and (3) the Arbitration Act requires that litigation of those claims be stayed pending arbitration.

**Background**

As the Court is aware, Integretel is a billing aggregator that provided services to two of

the original corporate defendants in this action: Access One Communications, Inc. and Network

**EXHIBIT I**

One Services, Inc. The Court has appointed David Chase as Receiver for both Access One and Network One.

Integretel's services for Access One and Network One were provided under written contracts that were identical in all respects relevant here.[1] The contracts involved interstate commerce. Integretel is based in California[2] and Access One and Network One were based in Florida.[3] Moreover, the contracts called for Access One and Network One to transmit telephone-call billing information to Integretel, which was then to submit that information to local telephone companies across the country to be included on line-subscribers' bills.[4]

The Receiver contends that Integretel is required under the terms of its contracts with Access One and Network One to pay him the amount of certain reserves. The Receiver has sought to litigate that claim by arguing that Integretel's failure to pay the amounts he claims constitutes a violation of the temporary restraining order and amended preliminary injunction in this case. He has filed a motion for an order requiring Integretel to show cause why it should not be held in contempt.

Integretel has opposed the Receiver's motion, and one of the grounds for its opposition is that the contracts contain ADR/arbitration clauses that bar the Receiver from pursuing his claim by means of litigation. Those provisions state as follows:

> 18. *DISPUTE RESOLUTION AND ARBITRATION.* Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

---

1. Declaration of Ken Dawson ("Dawson Decl.") Ex. 1, 2.

2. *See* Dawson Decl. ¶ 2.

3. First Am. Compl. ¶¶ 6, 7.

4. Dawson Decl. ¶ 5.

-2-

(a) *Dispute resolution.* At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement, exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b) *Arbitration.* If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules. The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration. The arbitration shall be held in San Jose, California. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures. A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents. The parties shall share equally the fees of the arbitration and the arbitrator.

The breach-of-contract claims underlying the Receiver's motion have not been submitted to arbitration as required by the two contracts.[5]

The Receiver's show-cause motion is not yet fully briefed. The Receiver has sought and obtained two extensions of the time for responding to Integretel's opposition; his reply is currently due on January 5, 2007.

### Argument

The Receiver's breach-of-contract claims against Integretel are barred by the ADR/ arbitration provisions in Integretel's contracts with Access One and Network One. As we will

---

5.  Dawson Decl. ¶ 8.

00380

RER-6      0517

show, (1) the ADR/arbitration provisions are valid and enforceable under the Federal Arbitration

Act, (2) the provisions apply to the Receiver's claims, and (3) the Arbitration Act requires that

any litigation of those claims be stayed pending arbitration.

## A.   The arbitration provisions of Integretel's contracts are valid and enforceable.

Under the Federal Arbitration Act, written arbitration provisions in contracts evidencing a

transaction involving interstate commerce are valid and enforceable:

> A written provision in any maritime transaction or a contract evidencing a
> transaction involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction, or the refusal to perform the whole or
> any part thereof, or an agreement in writing to submit to arbitration an existing
> controversy arising out of such a contract, transaction, or refusal, shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at law or in equity
> for the revocation of any contract.[6]

Indeed, the Federal Arbitration Act establishes a strong federal policy favoring arbitration.[7]

This provision applies to Integretel's contracts with Access One and Network One,

because both contracts involved interstate commerce. The phrase "involving commerce" in the

Act has been held to be synonymous with "affecting commerce" and therefore to be as broad as

Congress's power to regulate interstate commerce.[8] Under that broad standard, there is no doubt

but that the contracts are subject to the Act. As noted above, the contracting parties were located

in different states (Integretel in California, Access One and Network One in Florida), and the

services to be provided under the contracts were themselves interstate in nature. Access One and

Network One transmitted telephone-call billing information across state lines to Integretel, and

---

6.  9 U.S.C. § 2. *See also* 9 U.S.C. § 1 (defining "commerce" as used in § 2 to include "commerce among
    the several States").

7.  *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 225–261 (1987); *Moses H. Cone Mem.
    Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *Seaboard Coast Line R. Co. v. Trailer
    Train Co.*, 690 F.2d 1343, 1348 (11th Cir. 1982).

8.  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273–77 (1995).

00381

RER-6      0518

Integretel then submitted that information to local telephone companies across the country to be included on line subscribers' phone bills.[9] Indeed, the contracts identified by name a number of LECs to which transactions would be submitted, including LECs in Ohio, Michigan, Indiana, Wisconsin, Illinois, New York, New Jersey, Pennsylvania, the District of Columbia, Virginia, West Virginia, Hawaii, and Nevada.[10] Moreover the contracts provided that Integretel would make certain reports and data available to Access One and Network One over the internet.[11] They also provided that Integretel would pay any funds due to Access One and Network One by wire transfer to a bank located in Florida, and the account from which Integretel made such transfers was located in California.[12]

### B.    The Receiver's claims against Integretel are covered by the contracts' ADR/arbitration provisions.

The Receiver, as successor to the rights of Access One and Network One under their contracts with Integretel, claims that Integretel owes money under those contracts. That claim is within the scope of the ADR/arbitration clause of each entity's contract. The clause applies broadly to "any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach[,]" and it expressly sets out the "sole remedy" for such claims.

The Receiver stands in the shoes of Access One and Network One, and may assert only those rights and remedies that those entities themselves could have asserted.[13] In particular, the Receiver is bound by the arbitration clause in each company's contract.[14]

---

9.  Dawson Decl. ¶ 5.

10. Dawson Decl. Ex. 1 at 19, Ex. 2 at 28.

11. Dawson Decl. Ex. 1 at 18, Ex. 2 at 27.

12. Dawson Decl. ¶ 6 & Ex. 1 at 20, Ex. 2 at 29.

13. *See, e.g., White v. Ewing*, 159 U.S. 36, 39 (1895); *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 625 (6th Cir. 2003); *Shore Block Corp. v. Lakeview Apts.*, 377 F.2d 835, 840 (3d Cir. 1967);

00382

RER−6       0519

The conclusion that the arbitration provisions apply here is not changed by the exception in the ADR/arbitration provisions for actions "seeking a temporary restraining order or injunction related to the purposes of this Agreement[.]" The exception must be construed narrowly, because the federal policy favoring arbitration requires that any doubts be resolved in favor of arbitration.[15] And under *any* reasonable interpretation, the exception does not apply here.

To begin with, the injunctive orders that the Receiver seeks to enforce did not grant relief "related to the purpose" of the contracts. The purpose of the injunctions was to enforce the FTC Act against the Nationwide Defendants, not to enforce the alleged rights of Access One and Network One against Integretel. The injunctions were not granted at the request of Access One, Network One, or anyone acting on their behalf. More importantly, the contract claims that the Receiver asserts were not before the Court when it issued the injunctions, and in issuing the injunctions the Court did not consider or purport to adjudicate those claims.

Even if the Receiver's show-cause motion can be regarded as a request for an injunction, the Receiver's claim is not one for which an injunction may be granted. The Receiver's underlying claim—that Integretel has failed to pay money that it allegedly owes under the two contracts—is a legal claim for which the proper remedy is an action for damages, not a suit in

---

*Nova Ins. Group, Inc. v. Florida Dep't of Ins.*, 606 So. 2d 429, 433 (Fla. 1992); 65 Am. Jur. 2d *Receivers* § 111.

14. *E.g., Javitch*, 315 F.3d at 624–27; *Capitol Life Ins. Co. v. Gallagher*, 839 F. Supp. 767, 769 (D. Colo. 1993); *ISP.COM LLC v. Theising*, 805 N.E.2d 767, 774–75 (Ind. 2004); *Theising v. ISP.COM LLC*, 805 N.E.2d 778, 780 (Ind. 2004).

15. *See, e.g., Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability"); *Seaboard Coast Line R. Co.*, 690 F.2d at 1348.

00383

RER-6        0520

equity for an injunction.[16] As the Supreme Court has held, "it would be difficult to conceive of an action of a more traditionally legal character" than "an action on a debt allegedly due under a contract[.]"[17]

The ADR/arbitration provisions would be rendered useless if the Receiver may escape their effect simply by dressing up his legal claim in equitable clothing. A useful analogy is provided by the law governing the Seventh Amendment right to a jury trial, because it, too, focuses on whether the claim at issue is legal or equitable.[18] And in that context, a claim at law remains a claim at law even if it can be characterized as being somehow "incidental" to a claim for equitable relief.[19]

### C.  Any litigation of the Receiver's claims under Integretel's contracts must be stayed pending arbitration.

Because the two arbitration clauses apply to the Receiver's claims, the Federal Arbitration Act requires that any litigation on those claims be stayed:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.[20]

---

16. *George Vining & Sons, Inc. v. Jones*, 498 So. 2d 695 (Fla. 1986); *B.L.E. Realty Corp. v. Mary Williams Co.*, 134 So. 47, 49 (Fla. 1931).

17. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962).

18. *See, e.g., Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm.*, 430 U.S 442, 449 (1977).

19. *Dairy Queen, Inc.*, 369 U.S. at 470–73.

20. 9 U.S.C. § 3.

00384

RER-6        0521

Where, as here, the Arbitration Act's stay provision applies, a stay may be denied only if the party seeking the stay is in default in proceeding with arbitration. There has been no such default here.

As the Eleventh Circuit has held, "default" as used in the Arbitration Act is synonymous with "waiver," and it occurs "when a party seeking arbitration substantially participates in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party."[21] Because there is a strong federal policy in favor of arbitration, a party arguing that its opponent has waived the right to arbitrate bears a heavy burden of proof.[22]

The Receiver cannot meet that burden here. Integretel asserted its rights under the arbitration provisions at the earliest possible moment: in its opposition to the Receiver's show-cause motion. Integretel's opposition made it clear (and we now reiterate) that Integretel is not asking this Court to decide the contract issue underlying the Receiver's claim.[23]

### Conclusion

For the foregoing reasons, the Court should stay any litigation of the question whether Integretel is obligated under its contracts with Access One and Network One to pay the Receiver the amount of the IGT reserves relating to Access One and Network One.

---

21. *Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1316 n.17 (11th Cir. 2002).

22. *Stone v. E.F. Hutton & Co., Inc.*, 898 F.2d 1542, 1543 (11th Cir. 1990).

23. Integretel would not oppose a request by the Receiver to defer further briefing on the merits of his contract claim until the threshold arbitration issue is resolved.

-8-

00385

RER-6      0522

**Certification**

Pursuant to Local Rule 7.1.A.3, counsel for Integretel has conferred with counsel for the

Receiver (Jeffrey Schneider) and counsel for the FTC (Collot Guerard and Laura Kim) in an

attempt to resolve the issues raised in this motion, but was not able to resolve them.

Respectfully submitted,

| | |
|---|---|
| */s/ Neal Goldfarb* | */s/ Scott B. Newman* |
| Richard H. Gordin, Pro hac vice | Scott B. Newman, Florida Bar No. 339717 |
| Neal Goldfarb, Pro hac vice | Martin J. Alexander, Florida Bar. No. 346845 |
| TIGHE PATTON ARMSTRONG TEASDALE PLLC | HOLLAND & KNIGHT LLP |
| 1747 Pennsylvania Ave., N.W., Suite 300 | 222 Lakeview Ave., Suite 1000 |
| Washington, D.C. 20006 | West Palm Beach, Florida 33401 |
| rgordin@tighepatton.com | scott.newman@hklaw.com |
| ngoldfarb@tighepatton.com | marty.alexander@hklaw.com |
| Tel.:   (202) 454-2800 | Tel.:   (561) 833-2000 |
| Fax:   (202) 454-2805 | Fax:   (561) 650-8399 |

*Counsel for The Billing Resource d/b/a Integretel*

00386

RER-6        0523

## Certificate of Service

I HEREBY CERTIFY that on December 29, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

and the accompanying affidavit are being served this day on all counsel of record or pro se

parties identified on the attached Service List in the manner specified, either via transmission

Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those

counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

_/s/ Scott B. Newman_____
Scott B. Newman

### SERVICE LIST
### Federal Trade Commission vs. Nationwide Connection, Inc., et al
### Case No. 06-80180-Civ-Ryskamp/Vitunac

#### CM/ECF Notice List:

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade Commission*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
MICHELLE T. VISIEDO, ESQ.
mtv@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL 33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
305-347-6517 telephone
STEVEN E. SIFF, ESQ.
ssiff@mwe.com
305-347-6511 telephone
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
347-6500 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

ANDREW G. BERG, ESQ.
ABerg@kslaw.com
202-626-2924 telephone
CAROLYN TAPIE, ESQ.
CTapie@kslaw.com
202-626-2919 telephone
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4704
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

MARK DOUGLAS JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida 34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika Riaboukha and Qaadir Kaid*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center—Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust et. al*

JERRY M. MARKOWITZ, ESQ.
jmarkowitz@mdrtlaw.com
ROSS R. HARTOG, ESQ.
rhartog@mdrtlaw.com
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, FL 33156
305-670-5000 telephone
305-670-5011 facsimile
*Attorneys for First Churchill Way, LLC*

ANDREW ALITOWSKI, ESQ.
andrew@wjlawyers.com
Wedderburn, Jacobs and Alitowski, PA
16300 NE 19th Street, Suite 244
North Miami Beach, FL 33162
305-919-9222 telephone
305-919-9880 facsimile
*Attorneys for Receivership Defendants
Grunspan Trust, et al*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Creditor Denise McCann*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way, LLC*
Method of Service:  CM/ECF

CHAD A. DEAN, ESQ.
chad@schuylaw.com
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial
Services and Ford Motor Co. Credit Co.*

**Manual Notice List:  (via U.S. Mail)**

WILLOUGHBY FARR
Prison # 653-974
South Florida Reception Center
14000 NW 41st Street
Doral, FL 33178
*Defendant, Pro Se*

MICHELLE VISIEDO-HIDALGO, ESQ.
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL 33131-3407
305-539-2481 telephone
305-536-1116 facsimile
*Attorney for Receiver David R. Chase*

MARY LOU FARR
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
*Defendant, Pro Se*

LISA FIALCO, ESQ.
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
Attorneys for Plaintiff Federal Trade
Commission

THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

GARY M. DUNKEL, ESQ.
dunkel@gtlaw.com
Greenberg Traurig
Phillips Point—East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL 33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for BHD/WEB, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

   vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.,*

        Defendants.

_____/

### Declaration of Ken Dawson

1. I am president of The Billing Resource, d/b/a Integretel (formerly known as Integretel, Incorporated) ("Integretel"). I submit this declaration in support of Integretel's motion for a stay pending arbitration.

2. Integretel is a California corporation based in California.

3. Integretel is a billing aggregator. As such, it provides services that enable its clients, who are independent telecommunications companies and other service providers, to have charges for their services appear on consumers' local telephone bills. Integretel also provides additional services to some of its clients.

4. Integretel formerly provided billing-aggregation and other services to Access One Communications, Inc. and Network One Services, Inc. True and correct copies of Integretel's contracts with Access One Communications, Inc. and Network One Services, Inc. are attached hereto as Exhibits 1 and 2, respectively.

5.  Integretel's services under its contracts were interstate in nature. In the course of providing billing-aggregation services to Access One and Network One, Integretel received transaction data that was sent by Access One and Network One from Florida. Integretel received this data in California. Integretel then forwarded that data to telephone companies (often referred to as "LECs" which stands for "Local Exchange Carriers") across the country, including LECs located in states other than California. The LECs then included those transactions on their bills to individual consumers (except for those that the LECs determined it was unable or unwilling to bill for some reason).

6.  The contracts also provided that Integretel would pay any funds due to Access One and Network One by wire transfer to a bank located in Florida. The bank account from which Integretel made such transfers was at all relevant times located in California.

7.  Integretel's contracts with Access One and Network One require that any disputes be submitted to alternative-dispute-resolution procedures that include a period of negotiations followed, if necessary, by arbitration in San Jose, California. Neither Access One nor Network One invoked these provisions before the receiver was appointed. The receiver has not invoked them, either.

I DECLARE under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

Executed on December 12, 2006.

Ken Dawson

-2-

# Exhibit 1

## MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (the "Agreement") is entered into as of ____6 /30____, 200_ ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Access One Communications, a Florida corporation ("Client").

WHEREAS, Client has and will purchase certain accounts receivable, as evidenced by the Billing Transactions, from ____N/A____, a ____N/A____, who is a provider of certain telecommunications related products and services; and

WHEREAS, IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

WHEREAS, IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

NOW, THEREFORE, the parties hereto agree as follows:

**1.    DEFINITIONS.** Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

**2.    IGT SERVICES.** IGT shall provide one or more of the following services (each a "Service Order" as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Sched# | Service Order Options | Included |
|---|---|---|
| I | Validation/Registration | ( ) |
| II | PhoneBill Services (Telco Billing) | (X) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry | ( ) |
| | (required with Service Order II or III) | (X) |
| VII | Collection Services | ( ) |
| VIII | Pre-Pay Services | ( ) |

**3.    TERM.** The initial term of this Agreement shall be for two (2) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of two (2) years (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

**4.    CLIENT SUBMISSION AND IGT EDIT.** Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing

Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

**5.    SERVICE FEES.** IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

**6.    TAXES.** Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; or provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions. IGT shall otherwise cause the then-current taxing rates and logic, including such rates and logic of applicable LECs, to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

**7.    CLIENT REPRESENTATIONS AND WARRANTIES.** Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

**8.    IGT'S REPRESENTATION AND WARRANTY.** IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

**9.    PROOF OF COMPLIANCE.** Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance. Each party agrees to notify the

TBR_NCI 000262

00394

RER-6        0531

other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

**10. LIMITATION OF LIABILITY.** IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

**11. INDEMNIFICATION.**
(a) By Client. Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to: (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; or (iii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

(b) By IGT. IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

(c) Enforcement. In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

**12. EVENTS OF DEFAULT.** Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):
(a) The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or

(b) The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or not reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or

(c) Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

(d) The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or

(e) Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or

(f) The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

**13. EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees, for the most recent three months in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

**14. CONFIDENTIALITY.**
(a) As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.

(b) Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.

(c) Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:
(i) Information that now or hereinafter comes into the public domain without breach of this Agreement;

(ii) Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;

(iii) Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;

(iv) Information approved for release by the written authorization of the Disclosing Party; or

(vi) Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party

TBR_NCI 000263

00395

RER-6         0532

to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d) All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party. Upon written request by a Disclosing-Party, the Receiving party shall return to the Disclosing Party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

**15. CHOICE OF LAW AND VENUE.** THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

**16. PUBLIC ANNOUNCEMENTS.** Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

**17. NOTICES.** All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation. All notices and other communications shall be deemed given when actually received by a party as evidenced by an appropriate confirmation. Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

| | |
|---|---|
| Integretel, Incorporated | Access One Communications |
| 5883 Rue Ferrari | 222 Lakeview Ave., 157-160 |
| San Jose, CA 95138 | West Palm Beach, FL 33401 |
| Attention: General Counsel | Attention: German Miranda |
| FAX: 408-362-2795 | FAX: 561-366-9734 |

**18. DISPUTE RESOLUTION AND ARBITRATION.** Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a) Dispute Resolution. At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement,

exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b) Arbitration. If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules. The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration. The arbitration shall be held in San Jose, California. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures. A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents. The parties shall share equally the fees of the arbitration and the arbitrator.

**19. GENERAL PROVISIONS.**

(a) Attorney's Fees. In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b) Severability. If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c) Captions. The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d) Assignment. Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e) Amendments; No Waiver. Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto. No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f) Third Party Rights. The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g) Further Assurances. The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h) Force Majeure. Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargos, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event"). Upon the

TBR_NCI 000264

00396

RER-6        0533

occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

(h). Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(i) Integration of Agreement. This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k) Relationship of the Parties. Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party. In the performance of its obligations hereunder, IGT is acting as an independent contractor to Client.

(l) Corporate Authority. The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date set forth above.

| Integretel, Inc. (IGT) | Access One Communications (Client) |
|---|---|
| By: | By: |
| Name: _Ken Dawson_ | Name: _German Miranda_ |
| Title: _President_ | Title: _PRESIDENT_ |
| Date: _7/7/04_ | Date: _06/30/04_ |

TBR_NCI 000265

00397

RER-6        0534

Case 5:07-cv-06210-JW    Document 12-12    Filed 04/06/2008    Page 29 of 50

Case 9:06-cv-80180-KLR    Document 363-2 . Entered on FLSD Docket 12/29/2006. . Page 8 of 57.

## EXHIBIT "A"
### Definition of Certain Terms

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial-tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

TBR_NCI 000266

00398

RER-6        0535

## EXHIBIT "B"
### Fees

The following Fees shall apply:

2)  **PhoneBill Services (Telco Billing)**

   a) Initial Account setup (sub-CIC) fee:          $3,500.00  one time
      - each additional Account:                    $1,750.00  one time

   b) IGT Processing Fees:

   | Transactions per Deposit Month | | Fee Rate per Transaction |
   |---|---|---|
   | FIRST | 250,000 | $ 0.070 each |
   | NEXT | 250,000 | $ 0.065 each |
   | NEXT | 250,000 | $ 0.060 each |
   | ALL REMAINING | | $ 0.055 each |

   A Minimum monthly fee shall apply consisting of the greater of: i) 1% of the gross value of the Billing Transactions in each Deposit Month; or ii) $5,000 per Account commencing September 2004.

6)  **End-User Inquiry**

   a) Verbal End-User Inquiry            $ 3.95 each
   b) Transferred or auto-referred       $ 0.08 per minute
   c) Written End-User Inquiry           $40.00 each
   d) Written regulatory complaints      $95.00 each
   e) Adjustment record processing       $ 0.75 each

TBR_NCI 000267

00399

RER-6          0536

## EXHIBIT "C"
## Billing and Collections Guidelines

IGT has adopted the anti-cramming consumer protection guidelines of the Coalition to Ensure Responsible Billing (CERB). By adopting these guidelines, IGT is committed to billing standards and practices to ensure a maximum level of consumer protection. Client hereby agrees to the following in consideration of IGT providing its billing services.

### 1. COMPANY INFORMATION. Client shall provide IGT with the following information:

- Client's company name, including dba's, and address.
- Names of all officers, directors and principals of Client.
- Proof of corporate or partnership status.
- Copies of certifications as required.
- Foreign corporation filings as required.
- Any applicable tariffs upon request.
- The names and addresses of any telemarketing companies to be used by the Client.
- The names and addresses of any third party verification companies to be used by the Client.

### 2. PROGRAM, PRODUCT AND SERVICE SCREENING. For all monthly subscription or other recurring services, Client shall provide IGT with the following information:

- Marketing materials relating to the programs or services to be billed by IGT.
- Sample advertisements (print or other media) relating to the programs or services to be billed by IGT.
- Applicable fulfillment package (which must include cancellation information if not included elsewhere and a toll free Client service telephone number).
- Complete scripts for sales verification. Client shall not change scripts or programs without first providing changes to IGT.
- Honest, clear, and understandable text phrase for appearance on the bill.

NOTE: IGT will not provide billing for services employing the following practices and Client hereby agrees it will not provide Billing Transactions to IGT for the following:

- Box, sweepstakes, or contest -- type entry forms.
- Negative option sale offers.
- 800 pay-per-call
- Collect callback
- Phantom billing (charging for calls never made or services never provided).
- Such other programs, products, or services that regulatory agencies, IGT or Telcos, where applicable, determine to be deceptive to consumers.

### 3. COMPLIANCE MONITORING. IGT requires Client to:

- Minimize End-User inquiries and complaints it receives.
- Minimize End-User complaints to government agencies.
- Maintain up-to-date records regarding complaints and inquiries that it receives.
- Promptly adopt action plans to respond to complaints and inquiries.
- Assist and cooperate with investigations of End-User disputes.
- Promptly cease billing any recurring charges to an End-user when there is a clear indication that such End-User is no longer utilizing Client's product or service.

### 4. MANDATORY AUTHORIZATION. Where State or Federal agencies (or Telcos, where applicable) require consumer pre-authorization for the services, products or programs provided by Client, Client must employ one of the following forms of authorization. Such authorization must be retained for a period of two (2) years and made available upon request.

Additionally, if State/Federal agencies or Telcos amend their requirements, Client is responsible for its full compliance thereto:

- Recorded independent third party verification
- Written or electronic sales order or letter of authorization
- Voice Recording of telephone sales authorization

An authorization must legibly include the following to be valid:

- The date of authorization.
- The telephone number and, if utilizing ANI capture, name and address of the consumer.
- Assurance that the consumer is responsible for the billing telephone number or is otherwise authorized to incur billing charges.
- A complete description of the product or service.
- A description of the applicable charges.
- An explicit acknowledgment by the consumer as to how the charges for the product or service will appear on his/her bill.
- Affirmative acceptance by the consumer of the offer.
- A toll-free number that subscribers may call to make inquiries concerning the service.

In addition, when verifying with an independent third party, authorization must include:

- Initial statement that the purpose of the verifications is to confirm the consumer's intention to accept the sales offer.
- A statement that the service provider is not affiliated with a LEC, where there is no affiliation.
- A unique consumer identifier.
- A review by third party personnel of the entire verification where the verification is automated.

An independent third party verifier must meet the following criteria:

- It must be completely independent of the service provider and the telemarketer.
- It must not be owned, managed, controlled or directed by Client or the telemarketer.
- It must not have any financial incentive in the completion of the sale.
- It must operate in a location physically separate from the service provider and the telemarketer.

### 5. HIGH STANDARD BILLING PRACTICES. Central to a consumer's right to ensure that they have not been billed inappropriately is the ability to understand and read the bill. Client shall use it's best efforts to ensure that the information provided to IGT fairly and accurately describes the service(s) provided to the End-User including, but not limited to:

- Identification of the Client providing the services.
- Detailed description of products or services.
- Detailed identification of the charges.

### 6. END-USER SATISFACTION. As End-Users must be able to easily and quickly address potential billing disputes, IGT may provide the End-User or a regulatory agency on request:

- The name, address, phone & fax number of the Client.
- The nature of any charge
- The method of authorization.
- Information as to how an End-User may cancel a service or product.

In conjunction with the Agreement IGT, or Client, will provide:

- A toll-free customer service number.

TBR_NCI 000268

00400

RER-6     0537

- Dedicated staff to respond to End-Users inquiries.
- Full and timely investigation of any written dispute.
- A credit or response to the End-User within 30 days of the End-User's dispute.

7. DISCLOSURE. Client hereby agrees that IGT may share the following with federal and state enforcement agencies:

- Identifying information with respect to terminated billing for Client programs or services.
- A description of specific problems relating to "Slamming" or "Cramming" that IGT has encountered, and the steps taken to correct such problems.

- Summary and detailed data with regard to End-User complaints, inquiries and Adjustments.
- This Agreement and any sales and/or promotional materials related to Client's services.

8. REIMBURSEMENT TO IGT. Client acknowledges and agrees to fully reimburse IGT, within ten (10) days, any fines or penalties charged IGT by Telcos and/or State/Federal agencies pursuant to Client's Billing Transactions billed by IGT.



(These guidelines may be amended from time-to-time by IGT providing thirty (30) days prior written notice.)

TBR_NCI 000269

00401

RER-6        0538

## SCHEDULE I – VALIDATION/REGISTRATION

This Service Order for Validation/Registration shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.    SERVICE ORDER SUMMARY.** This Service Order shall generally include the processing of validation requests from a Client's sales support application in order to determine the billable risk of End-User's billing telephone numbers (BTNs).

**2.    VALIDATION REQUESTS.** Client shall cause its prospective End-User to dial in and log on to IGT's host validation server and deliver a validation request in accordance with specifications provided to client by IGT. This dial in step will allow IGT to also capture the dialed from number, or ANI, for each End-User to be validated.

**3.    VALIDATION RESPONSES.** IGT shall process Client's validation requests against proprietary databases that screen for, among other things, blocked BTN's, billing coverage, and known non-billable devices such as payphones. IGT shall provide a response to each request, including the original ANI together with a result code, in a format to be mutually agreed upon by the parties.

*{ - End of Schedule I. Remainder of page intentionally left blank. - }*

TBR_NCI 000270

00402

RER-6    0539

## SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)

This Service Order for PhoneBill Services shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.   SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

**2.   TELCO SUBMISSION; UNBILLABLES.** IGT shall submit to the Telcos those Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process. Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format. IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**3.   INQUIRY SUPPORT, ADJUSTMENTS.** A separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**4.   HOLDBACK, TRUE-UP, UNCOLLECTABLES.** Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at eight percent (8%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up").

IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

**5.   OTHER DEDUCTIONS.**
a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.
b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at five percent (5%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds. This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

**6.   SETTLEMENT OF AMOUNTS DUE.** Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-Up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.

**7.   REPORTS.**
(a)   Standard Reporting. IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein. Client may request that IGT provide additional reports or a different formatted report. To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)   Report Review. Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)   Report Detail. Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a

TBR_NCI 000271

00403

RER-6        0540

higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)    Audit.  Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos.  The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.    BILLING APPEARANCE.  Where a Telco provides the capability, Client's Billing Transaction shall appear on such

Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.    RESALE OF ACCOUNTS.  Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users.  Therefore, Client agrees, and does hereby transfer to IGT any rights in the Billing Transactions that may be necessary for IGT to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

10.    TELCO CONFIDENTIALITY.  Client hereby acknowledges and agrees that, without the express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services.    Client shall indemnify IGT and hold it harmless from any and all claims and/or damages that may arise as a result of Client's violation of this Section 10.

{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }

TBR_NCI 000272

00404

RER-6        0541

## EXHIBIT "II-A"
### Telco Billing Contracts
Page 1 of 1

| | | |
|---|---|---|
| Alltel | Sprint United | - United Florida |
| | | - CT & T |
| Bell South | | - United Indiana |
| | | - United Midwest |
| Cincinnati Bell | | |
| | Telecom Canada | |
| Citizens Telephone | | |
| | Verizon - GTE | - GTE North |
| Illuminet | | - GTE Florida |
| | | - GTE South |
| NECA | | - GTE South West |
| | | - GTE California |
| Qwest | - Northwest Bell | - GTE West |
| | - Mountain Bell | - GTE North West |
| | - Pac NW Bell | - GTE Hawaii |
| | | - GTE North Contel |
| SBC - Ameritech | - Ohio Bell | - GTE South Contel |
| | - Michigan Bell | - GTE S-W Contel |
| | - Indiana Bell | |
| | - Wisconsin Bell | Verizon - North | - New England Tel |
| | - Illinois Bell | | - New York Tel |
| | | | |
| SBC - Pacific Bell | - Pacific Bell | Verizon - South | - New Jersey Tel |
| | - Nevada Bell | | - Bell PA |
| | | | - Diamond State |
| SBC - Southwestern Bell | | | - C&P DC |
| | | | - C&P MD |
| SBC - SNET | | | - C&P VA |
| | | | - C&P WVA |

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.

TBR_NCI 000273

00405

RER-6        0542

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 1 of 5

**Rejects:**

Full Key:    Bill To Number (BTN)
             Originating Number
             Terminating Number
             Call Date
             Call Time        (Seconds excluded)
             Call Duration    (Seconds excluded)

A reject call record that matches a history record based on the above Full Key is considered an exact match and is returned to the Client with the IGT return code in position 70-71.

**Unbillables:**

Full Key:    Bill To Number (BTN)
             Originating Number
             Terminating Number
             Call Date
             Call Time        (seconds excluded)
             Call Duration    (seconds excluded)

An unbillable call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable experience compared to the total specific unbillable amount for each particular Telco.

**Adjustments 4501XX:**

Pass # 1-Full Key:    Bill To Number (BTN)
                      Originating Number
                      Terminating Number
                      Call Date
                      Call Time        (seconds excluded)
                      Call Duration    (seconds excluded)

An adjustment call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the original call record that it matched.

Pass # 2-Partial Key:    Bill To Number (BTN) - Optional\Required
                         Originating Number   - Optional\Required
                         Terminating Number - Optional
                         Call Date            - Optional
                         Call Time            - Optional
                         Call Duration        - Optional

TBR_NCI 000274

00406

RER-6        0543

### EXHIBIT "II-B"
#### Telco Returns
#### Matching Process & Allocation Methodology
Page 2 of 5

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional\Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

| | |
|---|---|
| **Pass # 3-Matrix Key:** | Bill To Number (BTN) - Optional/Required |
| | Originating Number   - Optional/Required |
| | Terminating Number  - Optional/Required |
| | Call Date         - Optional |
| | Call Time         - Optional |
| | Call Duration      - Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

#### Adjustments 4550XX:

| | |
|---|---|
| **Bulk Match Key:** | Bill To Number (BTN) |
| | Call Date |
| | CIC |

Bulk logic is a <u>one-to-many</u> matching process and utilizes the call date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.

TBR_NCI 000275

00407

RER-6      0544

**EXHIBIT "II-B"**
<u>Telco Returns</u>
<u>Matching Process & Allocation Methodology</u>
Page 3 of 5

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

> *Step 1* – Identify all Clients that deposit to that particular Telco for the given two month period.

> *Step 2* – Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

> *Step 3* – For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

> *Step 4* – Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

> *Step 5* – Determine each Client's percentage of the sum total of the Step 4 calculation.

> *Step 6* - Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

TBR_NCI 000276
00408

RER-6    0545

**EXHIBIT "II-B"**
Telco Returns
Matching Process & Allocation Methodology
Page 4 of 5

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|--------|--------|---|--------|---|--------|--------|--------|
| Client # | Billings Deposited With XYZ Telco for Sept & October | X | Historical Adjust % Telco >50% supporting detail for June, July & August | = | Step 2 x Step 3 | Each Client contribution in relation to total in Step 4 (% of $123,200) | $ Allocated (% in Step 5 x $50,000) |
| 444 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| 445 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00% | $50,000 |

**Uncollectables 4601XX & 4650XX (Used for True-Ups):**

      **Write-Off Match Logic:**      Bill To Number (BTN)
                                     Call Date
                                       CIC

Uncollectable write-off logic is a one-to-many matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates equal or older than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off " is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Writer-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, for Telcos that do provide write-off detail, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

TBR_NCI 000277

00409

RER-6      0546

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology
Page 5 of 5

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

**Step 1** – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

**Step 2** – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

**Step 3** – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

**Step 4** – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

**Step 5** – Determine each Client's percentage of the sum total of the Step 4 calculation.

**Step 6** – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner:

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|---|---|---|---|---|---|---|---|
| Client # | Actual Billing Deposited in XYZ Telco | X | Historical Write-Off % with Telco > 50% supporting detail | = | Step 2 x Step 3 | Each Clients' contribution in relation to total in Step 4 (% of 123,200) | $ Allocated (% in Step 5 x $50,000) |
| 111 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
|  |  |  |  |  |  |  |  |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
|  |  |  |  |  |  |  |  |
| 444 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
|  |  |  |  |  | $123,200 | 100.00 | $50,000 |

**True-Up Procedure :**

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.

Master Services Agreement
(REV. 09/03) Access One Contract.doc                - CONFIDENTIAL -                                    Page 17

## EXHIBIT "II-C"
### Delivery Schedule of Reports & Data Files
Page 1 of 1

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |
| True up Summary (Actual) Report | Wednesday After 5:00pm PST |

TBR_NCI 000279

00411

RER-6        0548

## EXHIBIT "II-D"
### Telco Fees

| Group | SID | Telco Name | Bill Render | Interstate Per Msg. | Intrastate Per Msg. | Bulk 4250 Per Msg. | SSM 010118 Per Msg. | Pay/Call 010116 Per Msg. | End-User Adjust |
|---|---|---|---|---|---|---|---|---|---|
| Ameritech | 9321 | Ohio Bell | 0.4879 | 0.0535 | 0.0535 | 0.1070 | 0.1070 | 1.7000 | 9.63 |
| | 9323 | Michigan Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9325 | Indiana Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9327 | Wisconsin Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9329 | Illinois Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| Verizon | 9102 | New Eng Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.3000 | 15.00 |
| | 9104 | New York Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.3000 | 15.00 |
| | 9206 | New Jersey Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9208 | Bell Penn. | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9210 | Diamond State | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9211 | C&P DC | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9212 | C&P MD | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9213 | C&P VA | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9214 | C&P WVA | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| Bell South Companies | 9417 | Bell South | 0.5800 | 0.0475 | 0.0475 | .04+2.85% | 0.0475 | 2.85% | 6.40 |
| | 169 | GTE North | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 328 | GTE Florida | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 479 | GTE South | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2080 | GTE S-West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2319 | GTE California | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2320 | GTE West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2416 | GTE N- West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 3100 | GTE Hawaii | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| TE Contel | 170 | GTE N-Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 480 | GTE S-Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2081 | GTE SW Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| Citizens Tel | 2308 | Citizens Tel | - | 0.1275 | 0.1275 | 0.3775 | 0.3775 | 0.3775 | - |
| Pacific Bell | 9740 | Pacific Bell | 0.3632 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| Nvada Bell | 9742 | Nevada Bell | 0.4632 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| SW Bell | 9533 | S-West Bell | 0.4132 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| QWEST | 9631 | North West Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| | 9636 | Mountain Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| | 9638 | PAC N-W Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| Alltel | 9995 | Alltel | 0.6890 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | - |
| Cinnati Bell | 9348 | Cinn. Bell - 402 | 0.6820 | 0.0309 | 0.0309 | 0.3309 | 0.0309 | 0.0809 | 15.00 |
| Cinnati Bell | 9348 | Cinnti Bell - 903 | 0.7300 | 0.0330 | 0.0330 | 0.0330 | 0.0330 | 0.0830 | 15.00 |
| Illuminet | 9999 | Illuminet | - | 0.8000 | 0.8000 | 0.8000 | 0.8000 | 0.8000 | - |
| NECA | 9996 | NECA | - | 0.5500 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | - |
| SNET | 9147 | SNET | 0.5406 | 0.1174 | 0.1174 | 0.1174 | 0.1174 | 1.7000 | - |
| Int United | 341 | United Florida | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 470 | Carolina T&T* | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 832 | United Indiana | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 9993 | United Midwest* | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| n Canada | 8050 | Telcom Canada | - | 0.5600 | 0.5600 | 0.5600 | 0.5600 | 0.5600 | - |

The above information is current at the time of printing and is to be used for informative purposes only. The information contained in this exhibit is not constant, permanent, all inclusive and/or final and is subject to change without notice.

Note: The US West End-User Adjustment Fee is based on each line item adjusted

TBR_NCI 000280

00412

RER-6    0549

**Exhibit "II-E"**
**Payment Instructions**

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby instructed to remit any Net Proceeds to which Client is entitled under this Agreement to the account listed below. These wire instructions may only be modified or revoked by a written notice signed by Client. Client agrees to indemnify and hold IGT harmless from any and all claims or expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

Company _Access One Communications, Inc._

Address _222 Lakeview Ave_
_Suite 157-160_
_West Palm Beach, Fl. 33401_

Bank Name _Wachovia Bank_

Bank Address _1801 Palm Beach Lakes Blvd_
_West Palm, Beach, Fl. 33401_

Account Name _Access One Communications, Inc._

Account Number _2000016108431_

Bank (ABA)
Transfer Number _063000021_

Signature: _[signature]_   Print name: _German Miranda_
Title: _President_   Date: _06/30/04_

TBR_NCI 000281

00413

RER-6        0550

## SCHEDULE VI - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the [Amendment Date/Effective Date of the Agreement] and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

**1.    SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User Inquiries to Client, II) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

**2.    CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto.    IGT shall auto-refer or transfer End-User Inquiries to Client based on mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User (i) fails to enter into IGT's call processing system a telephone number that was billed only by Client; (ii) refuses to be referred or transferred to Client; or (iii) initiates a subsequent Inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such Inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

**3.    IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT.  IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries. When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) Adjustments. IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) Regulatory Complaints. IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

*{ - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - }*

TBR_NCI 000282

00414

RER-6        0551

**EXHIBIT "VI-A"**
**Inquiry Standards**

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

TBR_NCI 000283

00415

RER-6        0552

# Exhibit 2

# MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into as of March 1, 2003 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Network One Services, Inc. a Florida corporation ("Client").

**WHEREAS**, Client is a provider of certain telecommunications related products and services; and

**WHEREAS**, IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

**WHEREAS**, IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

**NOW, THEREFORE**, the parties hereto agree as follows:

1.    **DEFINITIONS**.  Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

2.    **IGT SERVICES**.  IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Schedule | Service Order Options | Initial Order |
|---|---|---|
| I | Validation/Registration | ( X ) |
| II | PhoneBill Services (Telco Billing) | ( X ) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry (required with Service Order II or III) | ( X ) |
| VII | Collection Services | ( ) |

3.    **TERM**.  The initial term of this Agreement shall be for two (2) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of one (1) year (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior

Master Services Agreement
(REV. 01/02) R3-045
E03-045

TBR_NCI 000292

to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

4.    **CLIENT SUBMISSION AND IGT EDIT.** Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

5.    **SERVICE FEES.** IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

6.    **TAXES.** Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either (initial which applies): (i) [_____] include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; (ii) [_____] provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions; or (iii) [ X ] direct IGT to cause its then-current taxing rates and logic to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

TBR_NCI 000293

00418

RER-6        0555

7.     **CLIENT REPRESENTATIONS AND WARRANTIES.**  Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

8.     **IGT's REPRESENTATION AND WARRANTY.**  IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

9.     **PROOF OF COMPLIANCE.**  Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance. Each party agrees to notify the other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

10.     **LIMITATION OF LIABILITY.**  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

11.     **INDEMNIFICATION.**

(a)     **By Client.**  Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to:  (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; (ii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

(b)     **By IGT.**  IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands,

Master Services Agreement
(REV. 01/02) 103-045
E03-045

Page 3

TBR_NCI 000294

00419

RER-6       0556