losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

(c)    Enforcement. In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and, thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

12.    EVENTS OF DEFAULT. Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):

(a)    The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or

(b)    The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or

(c)    Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

(d)    The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or

(e)    Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or

Master Services Agreement
(REV. 01/02) R3-045
E03-045

Page 4

TBR_NCI 000295

(f)     The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

13.     **EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees, for the most recent three months in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

14.     **CONFIDENTIALITY.**

(a)     As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.

(b)     Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.

(c)     Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:

(i)     Information that now or hereinafter comes into the public domain without breach of this Agreement;

(ii)     Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;

(iii)     Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;

TBR_NCI 000296

00421

RER-6          0558

(iv)     Information approved for release by the written authorization of the Disclosing Party; or

(vi)     Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d)     All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party.  Upon written request by a Disclosing Party, the Receiving party shall return to the Disclosing Party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

15.     **CHOICE OF LAW AND VENUE.**  THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA.  THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA.  EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

16.     **PUBLIC ANNOUNCEMENTS.**  Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

17.     **NOTICES.**  All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation.  All notices and other communications shall be deemed given when actually received by a party as evidenced by an appropriate confirmation.  Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

TBR_NCI 000297

00422

RER-6          0559

Integretel, Incorporated

Network One Services, Inc.

5883 Rue Ferrari

222 Lakeview Ave., STE 160-157

San Jose, CA 95138

West Palm Beach, FL 33401

Attention: General Counsel

Attention: Ronny Morillo

FAX: 408-362-2795

FAX: _____

18.    **DISPUTE RESOLUTION AND ARBITRATION**. Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a)    Dispute Resolution. At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement, exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b)    Arbitration. If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules. The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration. The arbitration shall be held in San Jose, California. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures. A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents. The parties shall share equally the fees of the arbitration and the arbitrator.

QK

TBR_NCI 000298

00423

RER-6    0560

### 19.    GENERAL PROVISIONS.

(a)    Attorney's Fees. In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b)    Severability. If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c)    Captions. The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)    Assignment. Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e)    Amendments; No Waiver. Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto. No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f)    Third Party Rights. The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g)    Further Assurances. The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h)    Force Majeure. Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event"). Upon the occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

QK

TBR_NCI 000299

00424

RER-6      0561

(i)    Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(i)    Integration of Agreement. This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k)    No Agency. Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party other than as expressly set forth in this Agreement.

(l)    Corporate Authority. The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

*{ - Signature page follows. Remainder of page intentionally left blank. - }*

TBR_NCI 000300

00425

RER-6    0562

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date set forth above.

Integretel, Inc. (IGT)

By: _____

Name: Ken Dawson

Title: President

Date: 3/4/03

Network One Services, Inc. (Client)

By: _____

Name: Qaadir Kaid

Title: President

Date: Feb. 25, 2003

TBR_NCI 000301

00426

RER-6     0563

## EXHIBIT "A"
### Definition of Certain Terms

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User

QK

TBR_NCI 000302

00427

RER-6        0564

Inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

TBR_NCI 000303

00428

RER-6        0565

## EXHIBIT "B"
### Fees

The following Fees shall apply:

I   **Validation/Registration**

a) Integration Development & setup                TBD

b) Processing Validation Events                   TBD


II   **PhoneBill Services (Telco Billing)**

a) Initial Account setup (sub-CIC) fee:           $3,000.00  one time

   – each additional Account:                     $1,500.00  one time

b) IGT Processing Fees:

| Transactions per Deposit Month | | Fee Rate per Transaction |
|---|---|---|
| FIRST | 250,000 | $ 0.0525 each |
| NEXT | 250,000 | $ 0.0475 each |
| NEXT | 250,000 | $ 0.0425 each |
| ALL REMAINING | | $ 0.0375 each |

A Minimum monthly fee shall apply consisting of the greater of  i) 1% of the gross value of the Billing Transactions in each Deposit Month; or ii) $3,500.00 per Account commencing June 2003.


III   **End-User Inquiry**

a) Verbal End-User Inquiry                        $  3.95 each

b) Referral (live agent)                          $  1.75 each

c) Transferred or auto-referred                   $  0.90 each

d) Written End-User Inquiry                       $40.00 each

e) Written regulatory complaints                  $95.00 each

f) Adjustment record processing                   $  0.75 each

TBR_NCI 000304

00429

RER–6        0566

## EXHIBIT "C"
### Billing and Collections Guidelines

IGT has adopted the anti-cramming consumer protection guidelines of the Coalition to Ensure Responsible Billing (CERB). By adopting these guidelines, IGT is committed to billing standards and practices to ensure a maximum level of consumer protection. Client hereby agrees to the following as consideration for IGT billing for its services.

1.    **COMPANY INFORMATION**

Client shall provide IGT with the following information:

- Client's company name, including dba's, and address.
- Names of all officers, directors and principals of Client.
- Proof of corporate or partnership status.
- Copies of certifications as required.
- Foreign corporation filings as required.
- Any applicable tariffs upon request.
- The names and addresses of any telemarketing companies to be used by the Client.
- The names and addresses of any third party verification companies to be used by the Client.

2.    **SCREENING OF PROGRAMS, PRODUCTS AND SERVICES**

Prior to IGT's billing for any Client services, Client shall provide IGT with the following information:

- A complete set of its marketing materials pursuant to the programs or services to be billed by IGT.
- A complete set of its advertisements (print or other media) pursuant to the programs or services to be billed by IGT.
- Applicable fulfillment package (which must include cancellation information if not included elsewhere and a toll free Client service telephone number).
- Complete scripts for sales verification. Client shall not change scripts or programs without first providing changes to IGT.
- Honest, clear, and understandable text phrase for appearance on the bill.

NOTE: IGT will not provide billing for services employing the following practices and Client hereby agrees it will not provide Billing Transactions to IGT for the following:

- Box, sweepstakes, or contest – type entry forms.
- Negative option sale offers.
- 800 pay-per-call
- Collect callback
- Phantom billing (charging for calls never made or services never provided).
- Such other programs, products, or services that regulatory agencies, IGT or Telcos, where applicable, determine to be deceptive to consumers.

TBR_NCI 000305

00430

RER-6      0567

### EXHIBIT "C"
### Billing and Collections Guidelines

3.    COMPLIANCE MONITORING

IGT requires Client to:

- Minimize End-User inquiries and complaints it receives.
- Minimize End-User complaints to government agencies.
- Maintain up-to-date records regarding complaints and inquiries that it receives.
- Promptly adopt action plans to respond to complaints and inquiries.
- Assist and cooperate with investigations of End-User disputes.
- Promptly cease billing any recurring charges to an End-user when there is a clear indication that such End-User is no longer utilizing Client's product or service.

4.    MANDATORY AUTHORIZATION

Where State or Federal agencies (or Telcos, where applicable) require consumer pre-authorization for the services, products or programs provided by Client, Client must employ one of the following forms of authorization. Such authorization must be retained for a period of two (2) years and made available upon request. Additionally, if State/Federal agencies or Telcos amend their requirements, Client is responsible for its full compliance thereto:

- Recorded independent third party verification
- Written or electronic letter of authorization (LOA)
- Written or electronic sales order
- Voice Recording of telephone sales authorization.

An authorization must legibly include the following to be valid:

- The date of authorization.
- The telephone number and, where practical, name and address of the consumer.
- Assurance that the consumer is qualified to authorize billing.
- A complete description of the product or service.
- A description of the applicable charges.
- An explicit acknowledgment by the consumer as to how the charges for the product or service will appear on his/her bill.
- Affirmative acceptance by the consumer of the offer.
- A toll-free number that subscribers may call to make inquiries concerning the service.

In addition, authorization verified by an independent third party must include:

- An initial statement that the purpose of the verifications is to confirm the consumer's intention to accept the sales offer.
- A statement that the service provider is not affiliated with a LEC, where there is no affiliation.
- A unique consumer identifier.
- A review by third party personnel of the entire verification where the verification is automated.

An independent third party verifier must meet the following criteria:

- It must be completely independent of the service provider and the telemarketer.
- It must not be owned, managed, controlled or directed by Client or the telemarketer.
- It must not have any financial incentive in the completion of the sale.

TBR_NCI 000306

00431

RER-6        0568

- It must operate in a location physically separate from the service provider and the telemarketer.

## EXHIBIT "C"
### Billing and Collections Guidelines

5.    **HIGH STANDARD BILLING PRACTICES**

Central to a consumer's right to ensure that they have not been billed inappropriately is the ability to understand and read the bill.  Client shall use it's best efforts to ensure that the information provided to IGT fairly and accurately describes the service(s) provided to the End-User including, but not limited to:

- Identification of the Client providing the services.
- Detailed description of products or services.
- Detailed identification of the charges.

6.    **END-USER SATISFACTION**

As End-Users must be able to easily and quickly address potential billing disputes, IGT may provide the End-User or a regulatory agency on request:

- The name, address, phone number and fax number of the Client.
- The nature of any charge
- The method of authorization.
- Information as to how an End-User may cancel a service or product.

In conjunction with the Agreement IGT, or Client, will provide:

- A toll-free customer service number.
- Dedicated staff to respond to End-Users inquiries.
- Full and timely investigation of any written dispute.
- A credit or response to the End-User within 30 days of the End-User's dispute.

7.    **DISCLOSURE**

Client hereby agrees that IGT may share the following with federal and state enforcement agencies:

- Identifying information with respect to terminated billing for Client programs or services.
- A description of specific problems relating to "Slamming" or "Cramming" that IGT has encountered, and the steps taken to correct such problems.
- Summary and detailed data with regard to End-User complaints, inquiries and Adjustments.

8.    **REIMBURSEMENT TO IGT**

Client acknowledges and agrees to fully reimburse IGT, within ten (10) days, any fines or penalties charged IGT by Telcos and/or State/Federal agencies pursuant to Client's Billing Transactions billed by IGT.

(These guidelines may be amended from time-to-time by IGT providing thirty (30) days prior written notice.)

TBR_NCI 000307

00432

RER-6    .    0569

## SCHEDULE I – VALIDATION/REGISTRATION

This Service Order for Validation/Registration shall be effective as of the Effective Date of the Agreement ("Order Date"). This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.     SERVICE ORDER SUMMARY.** This Service Order shall generally include the processing of validation requests from a Client's sales support application in order to determine the billable risk of End-User's billing telephone numbers (BTNs).

**2.     VALIDATION REQUESTS.**  Client shall cause its prospective End-User to dial in and log on to IGT's host validation server and deliver a validation request in accordance with specifications provided to client by IGT. This dial in step will allow IGT to also capture the dialed from number, or ANI, for each End-User to be validated.

**3.     VALIDATION RESPONSES.** IGT shall process Client's validation requests against proprietary databases that screen for, among other things, blocked BTN's, billing coverage, and known non-billable devices such as payphones. IGT shall provide a response to each request, including the original ANI together with a result code, in a format to be mutually agreed upon by the parties.

*{ - End of Schedule I. Remainder of page intentionally left blank. - }*

QK

TBR_NCI 000308

00433

RER-6      0570

<u>**SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)**</u>

This Service Order for PhoneBill Services shall be effective as of the Effective Date of the Agreement (the "Order Date"). This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.**     **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

**2.**     **TELCO SUBMISSION, UNBILLABLES.** IGT shall submit to the Telcos those Billing Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process. Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format. IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**3.**     **INQUIRY SUPPORT, ADJUSTMENTS.** A separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**4.**     **HOLDBACK, TRUE-UP, UNCOLLECTABLES.** Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due to Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at six percent (6%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's

TBR_NCI 000309

00434

RER-6      0571

Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up"). IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

5.    OTHER DEDUCTIONS.

a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at zero percent (0%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds. This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

6.    SETTLEMENT OF AMOUNTS DUE. Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice for same and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.

TBR_NCI 000310

00435

RER-6    0572

7.    **REPORTS.**

    (a)    Standard Reporting. IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein. Client may request that IGT provide additional reports or a different formatted report. To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

    (b)    Report Review. Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

    (c)    Report Detail. Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

    (d)    Audit. Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos. The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.    **BILLING APPEARANCE.** Where a Telco provides the capability, Client's Billing Transaction shall appear on such Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.    **TELCO CONFIDENTIALITY.** Client hereby acknowledges and agrees that, without express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services. In the event of a violation of this section, Client shall pay to IGT, as liquidated damages, for loss of reputation and business good will, and not as a penalty, $10,000 for each such violation.

    { - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }

TBR_NCI 000311

00436

RER-6    0573

EXHIBIT "II-A"
**Telco Billing Contracts**
Page 1 of 1

| Ameritech | - Ohio Bell | NYNEX | - New England Tel |
|---|---|---|---|
| | - Michigan Bell | | - New York Tel |
| | - Indiana Bell | | |
| | - Wisconsin Bell | Pacific Bell | - Pacific Bell |
| | - Illinois Bell | | - Nevada Bell |
| Bell Atlantic | - New Jersey Tel | Southwestern Bell | |
| | - Bell PA | | |
| | - Diamond State | U.S. West | - Northwest Bell |
| | - C&P DC | | - Mountain Bell |
| | - C&P MD | | - Pac NW Bell |
| | - C&P VA | | |
| | - C&P WVA | Alltel | |
| Bell South | | Cincinnati Bell | |
| GTE | - GTE North | Illuminet | |
| | - GTE Florida | | |
| | - GTE South | NECA | |
| | - GTE South West | | |
| | - GTE California | SNET | |
| | - GTE West | | |
| | - GTE North West | Sprint United | - United Florida |
| | - GTE Hawaii | | - CT & T |
| | | | - United Indiana |
| GTE Contel | - GTE North Contel | | - United Midwest |
| | - GTE South Contel | | |
| | - GTE S-W Contel | Telecom Canada | |
| Citizens Telephone | | | |

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.

Master Services Agreement
(REV. 01/02) K03-045
E03-045

Page 21

TBR_NCI 000312

00437

RER-6        0574

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

Rejects:

Full Key:        Bill To Number (BTN)
                 Originating Number
                 Terminating Number
                 Call Date
                 Call Time        (Seconds excluded)
                 Call Duration    (Seconds excluded)

A reject call record that matches a history record based on the above Full Key is considered an exact match
and is returned to the Client with the IGT return code in position 70-71.

Unbillables:

Full Key:        Bill To Number (BTN)
                 Originating Number
                 Terminating Number
                 Call Date
                 Call Time        (seconds excluded)
                 Call Duration    (seconds excluded)

An unbillable call record that matches a history record based on the above Full Key is considered matched
and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is
applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable
experience compared to the total specific unbillable amount for each particular Telco.

Adjustments 4501XX:

Pass # 1-Full Key:      Bill To Number (BTN)
                        Originating Number
                        Terminating Number
                        Call Date
                        Call Time      (seconds excluded)
                        Call Duration   (seconds excluded)

An adjustment call record that matches a history record based on the above Full Key is considered matched
and is returned to the Client with the original call record that it matched.

Pass # 2-Partial Key:       Bill To Number (BTN) - Optional\Required
                            Originating Number   - Optional\Required
                            Terminating Number - Optional
                            Call Date          - Optional
                            Call Time          - Optional
                            Call Duration      - Optional

TBR_NCI 000313

00438

RER-6      0575

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

| | |
|---|---|
| **Pass # 3-Matrix Key:** | Bill To Number (BTN) - Optional/Required |
| | Originating Number   - Optional/Required |
| | Terminating Number  - Optional/Required |
| | Call Date            - Optional |
| | Call Time            - Optional |
| | Call Duration        - Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

Adjustments 4550XX:

| | |
|---|---|
| **Bulk Match Key:** | Bill To Number (BTN) |
| | Call Date |
| | CIC |

Bulk logic is a <u>one-to-many</u> matching process and utilizes the call date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.

Master Services Agreement
(REV. 01/02) IB3-045
EB3-045

Page 23

QK

TBR_NCI 000314

00439

RER-6     0576

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

Step 1 – Identify all Clients that deposit to that particular Telco for the given two month period.

Step 2 – Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

Step 3 – For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

Step 4 – Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

Step 5 – Determine each Client's percentage of the sum total of the Step 4 calculation.

Step 6 – Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

TBR_NCI 000315

00440

RER-6      0577

EXHIBIT "II-B"
**Telco Returns**
**Matching Process & Allocation Methodology**

| Client # | Billings Deposited With XYZ Telco for Sept & October | X | Historical Adjust % Telco >50% supporting detail for June, July & August | = | Step 2 x Step 3 | Each Client contribution in relation to total in Step 4 (% of $123,200) | $ Allocated (% in Step 5 x $50,000) |
|---|---|---|---|---|---|---|---|
| 444 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| 445 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
|  |  |  |  |  | $123,200 | 100.00% | $50,000 |

**Uncollectables 4601XX & 4650XX (Used for True-Ups):**

**Write-Off Match Logic:**     Bill To Number (BTN)
                               Call Date
                               CIC

Uncollectable write-off logic is a one-to-many matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates equal or older than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off " is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Writer-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

TBR_NCI 000316

00441

RER-6        0578

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

**Step 1** – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

**Step 2** – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

**Step 3** – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

**Step 4** – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

**Step 5** – Determine each Client's percentage of the sum total of the Step 4 calculation.

**Step 6** – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner:

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|---|---|---|---|---|---|---|---|
| Client # | Actual Billing Deposited in XYZ Telco | X | Historical Write-Off % with Telco > 50% supporting detail | = | Step 2 x Step 3 | Each Clients' contribution in relation to total in Step 4 (% of 123,200) | $ Allocated (% in Step 5 x $50,000) |
| 111 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| | | | | | | | |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| | | | | | | | |
| 444 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00 | $50,000 |

**True-Up Procedure :**

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.

TBR_NCI 000317

00442

RER-6      0579

## EXHIBIT "II-C"
### Delivery Schedule of Reports & Data Files

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |
| True up Summary (Actual) Report | Wednesday After 5:00pm PST |

TBR_NCI 000318

00443

RER-6     0580

**EXHIBIT "II-D"**
**Telco Fees**

| Telco Group | SID | Telco Name | Bill Render | Interstate Per Msg. | Intrastate Per Msg. | Bulk 4250 Per Msg. | SSM 010118 Per Msg. | Pay/Call 010116 Per Msg. | End-User Adjust |
|---|---|---|---|---|---|---|---|---|---|
| Ameritech | 9321 | Ohio Bell | 0.4879 | 0.0535 | 0.0535 | 0.1070 | 0.1070 | 0.7200 | 9.63 |
| | 9323 | Michigan Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9325 | Indiana Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9327 | Wisconsin Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 07200 | 9.00 |
| | 9329 | Illinois Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| Verizon | 9102 | New Eng Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9104 | New York Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9206 | New Jersey Tel | 1.0600 | 0.020 | 0.020 | 0.1360 | 0.1350 | 0.2500 | 15.00 |
| | 9208 | Bell Penn. | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9210 | Diamond State | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9211 | C&P DC | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9212 | C&P MD | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9213 | C&P VA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1360 | 0.2500 | 15.00 |
| | 9214 | C&P WVA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| Bell South | 9417 | Bell South | 0.5800 | 0.0475 | 0.0475 | .04+2.85% | 0.0475 | 2.85% | 6.40 |
| GTE Companies | 169 | GTE North | 0.9100 | 0.0200 | 0.0200 | 0.135 | 0.135 | 0.2500 | 15.00 |
| | 328 | GTE Florida | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 479 | GTE South | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2080 | GTE S-West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2319 | GTE California | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2320 | GTE West | 0.9100 | 0.0200 | 0.0200 | 0.1360 | 0.1350 | 0.2500 | 15.00 |
| | 2416 | GTE N- West | 0.9100 | 0.0200 | 0.0200 | 0.1360 | 0.1350 | 0.2500 | 15.00 |
| | 3100 | GTE Hawaii | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1360 | 0.2500 | 15.00 |
| GTE Contel | 170 | GTE N-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 480 | GTE S-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2081 | GTE SW Contel | 0.9100 | 0.0200 | 0.0200 | 0.1360 | 0.1360 | 0.2500 | 15.00 |
| Citizens Tel | 2308 | Citizens Tel | - | 0.1275 | 0.1275 | 0.3775 | 0.3775 | 03775 | - |
| Pacific Bell | 9740 | Pacific Bell | 0.3632 | 0.0300 | 0.0300 | 0.0300 | 0.0300 | 0.7200 | 9.00 |
| Nevada Bell | 9742 | Nevada Bell | 0.4632 | 0.0300 | 0.0300 | 0.0300 | 0.0300 | 07200 | 9.00 |
| SW Bell | 9533 | S-West Bell | 0.4132 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 0.7200 | 9.00 |
| QWEST | 9631 | North West Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9636 | Mountain Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9638 | PAC N-W Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| Alltel | 9995 | Alltel | 0.6890 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | - |
| Cincinnati Bell | 9348 | Cinn. Bell - 402 | 0.6820 | 0.0309 | 0.0309 | 0.3309 | 0.0309 | 0.0809 | 15.00 |
| Cincinnati Bell | 9348 | Cinni Bell - 903 | 0.7300 | 0.0330 | 0.0330 | 0.0330 | 0.0330 | 0.0830 | 15.00 |
| Illuminet | 9999 | Illuminet | - | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | - |
| NECA | 9996 | NECA | - | 0.550 | 0.550 | 0.650 | 0.550 | 0.550 | - |
| SNET | 9147 | SNET | 0.6406 | 0.1174 | 0.1174 | 0.1174 | 0.1174 | 0.7200 | - |
| Sprint United | 341 | United Florida | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 470 | Carolina T&T | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 832 | United Indiana | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 9993 | United Midwest | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| Telcom Canada | 8050 | Telcom Canada | - | 0.560 | 0.560 | 0.560 | 0.560 | 0.560 | - |

The above information is current at the time of printing and is to be used for informative purposes only. The information contained in this exhibit is not constant, permanent, all inclusive and/or final and is subject to change without notice.

Note: The US West End-User Adjustment Fee is based on each line item adjusted

TBR_NCI 000319

00444

RER-6     0581

**Exhibit "II-E"**
**Payment Instructions**

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby instructed to remit any Net Proceeds to which Client is entitled under this Agreement to the account listed below. These wire instructions may only be modified or revoked by a written notice signed by Client. Client agrees to indemnify and hold IGT harmless from any and all claims or expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

Company          Network One Services, Inc.

Address          222 Lakeview Ave. Suite 160-157
                 West Palm Beach, FL 33401

Bank Name        Wachovia

Bank Address     303 Banyan Blvd
                 West Palm Beach, FL 33401

Account Name     Network One Services, Inc.

Account Number   2000015605553

Bank (ABA)
Transfer Number  067006432

Signature: _____     Print name: Ronny Morillo

Title: Secretary/Treasurer   Date: 2/25/03

Master Services Agreement
(REV. 01/02) E03-045
E03-045                                                                Page 29

TBR_NCI 000320

00445

RER-6        0582

## SCHEDULE III - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the Effective Date of the Agreement ("Order Date") and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User inquiries to Client, ii) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

2.    **CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto.  IGT shall refer or transfer End-User Inquiries to Client based on mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User refuses to be referred or transferred to Client or otherwise initiates a subsequent Inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such subsequent Inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

3.    **IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT.  IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries.  When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) Adjustments. IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) Regulatory Complaints. IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

*{ - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - }*

TBR_NCI 000321

00446

## EXHIBIT "III-A"
### Inquiry Standards

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of Inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

TBR_NCI 000322

00447

RER-6    0584

# EXHIBIT J

SEP-19-2007 04:29PM  FROM-TEW CARDENAS REBAK  +3055361116  T-385  P.003/009  F-277

Case 5:07-cv-06210-JW   Document 12-13   Filed 04/06/2008   Page 30 of 36
Case 9:06-cv-80180-KLR   +269   Entered on FLSD Do     /08/2007   Page 1 of 1

UNITED STATES DISTRICT COURT
**Southern District of Florida**

CLARENCE MADDOX
Clerk of Court

Clerk, United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

FILED by _J.A._ D.C.
APPEALS

JAN 0 5 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

Appeal Section
305-523-5080

Date: December 20, 2006

IN RE:

District Court No.:  06-80180-CV-KLR         U.S.C.A No. **06-16635E**

Style:  FEDERAL TRADE COM. v. NATIONWIDE CONNECTION

Enclosed are documents regarding an appeal in this matter. Please acknowledge receipt on the enclosed copy of this letter.

| | |
|---|---|
| X | Certified copy of Notice of Appeal, docket entries, judgment, opinion/order appealed from, enclosed. If opinion/order was oral, please check _____. |
| X | First Notice of Appeal:   YES |
| | Date(s) of other notice(s): _____ |
| | _____ volume(s) of pleadings; _____ volume(s) of transcripts; |
| | _____ volume(s) of exhibits/depositions; other: _____ |
| ___ | There was no hearing from which a transcript could be made. |
| ___ | Copy of CJA form appointing counsel enclosed. |
| ___ | The following materials were SEALED in this court (order enclosed): |
| X | The appellate docket fee has been paid   YES |
| | Date paid   11/28/06   Receipt No.   538807 |
| ___ | Appellant has been granted leave to appeal In Forma Pauperis (copy of order granting IFP is enclosed) |
| X | The Judge or Magistrate appealed from is:  KENNETH L. RYSKAMP |
| X | The Court Reporter(s):  VACANT/STEPHEN FRANKLIN |
| ___ | This is an appeal of a bankruptcy order. |
| | Bankruptcy Judge: _____ |
| ___ | This is a DEATH PENALTY appeal. |

Sincerely,

Clarence Maddox, Clerk of Court

_____
Deputy Clerk

court file

301 N. Miami Avenue
Room 150
Miami, FL 33128
305-523-5100

☐ 299 E. Broward Boulevard
Room 108
Ft. Lauderdale, FL 33301
954-769-5400

☐ 701 Clematis Street
Room 402
W. Palm Beach, FL 33401
561-803-3400

☐ 301 Simonton Street
Room 130
Key West, FL 33040
305-295-8100

☐ 300 South Sixth Street
Ft. Pierce, FL 34950
561-595-9691

EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
et. al.,

        Defendants.

_____/

### Notice of Appeal

Defendant The Billing Resource d/b/a Integretel ("Integretel") hereby appeals to the United States Court of Appeals for the Eleventh Circuit from the amended preliminary injunction entered on September 26, 2006.

Integretel is filing this notice of appeal in order to preserve its rights with respect to the amended preliminary injunction, and this filing is without prejudice to Integretel's pending motion to modify the amended preliminary injunction. Integretel intends to ask the court of appeals (a) to remand the record to permit this Court to rule on that motion and (b) to stay the appeal pending that ruling.

Dated: November ____, 2006

Respectfully submitted,

By:  /s/ Neal Goldfarb                              By:  /s/ Scott B. Newman
Richard H. Gordin                                  Scott B. Newman, Florida Bar No. 339717
Pro hac vice                                       Tel:    (561) 650-8310
Tel:    (202) 454-2881                             E-mail scott.newman@hklaw.com
E-mail rgordin@tighepatton.com                         and
    and                                            Martin J. Alexander, Florida Bar. No. 346845
Neal Goldfarb                                      Tel:    (561) 650-8306
Pro hac vice                                       E-mail marty.alexander@hklaw.com
Tel:    (202) 454-2826                             HOLLAND & KNIGHT LLP
E-mail ngoldfarb@tighepatton.com                   222 Lakeview Ave., Suite 1000
TIGHE PATTON ARMSTRONG TEASDALE                    West Palm Beach, Florida 33401
PLLC                                               Fax:    (561) 650-8399
1747 Pennsylvania Ave., N.W., Suite 300
Washington, D.C. 20006
Fax:    (202) 454-2805


                                                   Counsel for The Billing Resource d/b/a
                                                   Integretel



TO THE CLERK:

        A copy of this notice of appeal should be sent to the attorneys and unrepresented parties

listed on the accompanying service list.

                                /s/ Scott B. Newman
                                Scott B. Newman


                                        -2-

## Certificate of Service

I HEREBY CERTIFY that on November __, 2006, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronic Notices of Electronic Filing.


/s/ Scott B. Newman
Scott B. Newman

SEP-19-2007  04:38PM  FROM-TEW CARDENAS PERAK        +3055861116    T-385  P.007/009  F-327
Case 5:07-cv-06240-JW    Document 12-13    Filed 04/06/2008    Page 34 of 36

Case 9:06-cv-80180-KLR    Document 341    Entered on FLSD Docket 1/22/2006    Page 4 of 6

## SERVICE LIST
### Federal Trade Commission vs. Nationwide Connection, Inc., et al
### Case No. 06-80180-Civ-Ryskamp/Vitunac

**CM/ECF Notice List:**

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade Commission*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
305-347-6517 telephone
STEVEN E. SIFF, ESQ.
ssiff@mwe.com
305-347-6511 telephone
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
347-6500 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

MARK DOUGLAS JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida 34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika Riaboukha and Qaadir Kaid*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
MICHELLE T. VISIEDO, ESQ.
mtv@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL 33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

ANDREW G. BERG, ESQ.
ABerg@kslaw.com
202-626-2924 telephone
CAROLYN TAPIE, ESQ.
CTapie@kslaw.com
202-626-2919 telephone
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4704
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts, Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center—Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust et. al*

SEP-19-2007 04:31PM    FROM-TEW CARDENAS REBAK          +3055361116          T-385  P.008/009  F-277
Case 5:07-cv-06210-JW    Document 12-13   Filed 04/06/2008   Page 35 of 36
Case 9:06-cv-80180-KLR   (    ent 341   Entered on FLSD D(    ,/22/2006   Page 5 of 6

JERRY M. MARKOWITZ, ESQ.
jmarkowitz@mdrtlaw.com
ROSS R. HARTOG, ESQ.
rhartog@mdrtlaw.com
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, FL 33156
305-670-5000 telephone
305-670-5011 facsimile
*Attorneys for First Churchill Way, LLC*

ANDREW ALITOWSKI, ESQ.
andrew@wjlawyers.com
Wedderburn, Jacobs and Alitowski, PA
16300 NE 19th Street, Suite 244
North Miami Beach, FL 33162
305-919-9222 telephone
305-919-9880 facsimile
*Attorneys for Receivership Defendants
Grunspan Trust, et al*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way,LLC*
Method of Service: CM/ECF

CHAD A. DEAN, ESQ.
chad@schuylaw.com
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial
Services and Ford Motor Co. Credit Co.*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Creditor Denise McCann*

**Manual Notice List: (via U.S. Mail)**

WILLOUGHBY FARR
Jacket 0145123
Sheriff's Headquarter's Complex
Main Detention Center
Release Visitation Center
3228 Gun Club Road
West Palm Beach, FL 233406
*Defendant, Pro Se*

MARY LOU FARR
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
*Defendant, Pro Se*

-2-

LISA FIALCO, ESQ.
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
*Attorneys for Plaintiff Federal Trade
Commission*


THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

MICHELLE VISIEDO-HIDALGO, ESQ.
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL 33131-3407
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

GARY M. DUNKEL, ESQ.
dunkel@gtlaw.com
Greenberg Traurig
Phillips Point – East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL 33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for BHD/WEB, LLC*

-3-