proceeding initiated by the NLRB for [the debtor's] noncompliance with the [National Labor Relations Act]."). Although the Contempt Proceeding at issue here was initiated by the Receiver, the Receiver is enforcing the Amended Preliminary Injunction obtained by the FTC pursuant to the agency's exercise of its regulatory enforcement powers, and in doing so the Receiver is acting in his capacity as an agent of this United States District Court. [DE 233, ¶ 8] Moreover, the FTC effectively joined the Receiver's motion by filing a response in support thereof. [DE 399]. Accordingly, the Contempt Proceeding is also exempt from the automatic stay pursuant to Bankruptcy Code § 362(b)(4).

Third, regardless of whether § 362(b)(4) applies, Integretel's bankruptcy filing does not stay the Contempt Proceeding because it does not deprive this Court of its inherent power to enforce the integrity of its orders and take steps necessary to ensure that defendant Integretel complies with its orders. "[C]ontempt orders to uphold the dignity of the court are excepted from the automatic stay." *NLRB v. Sawulski*, 158 B.R. 971, 975 (E.D. Mich. 1993); *see also SEC v. Wolfson*, 309 B.R. 612, 620 (D. Utah 2004); *U.S. Sprint Communications Co. v. Buscher*, 89 B.R. 154, 157 (D. Kan. 1988); *Guariglia v. Community Nat'l Bank & Trust Co.*, 382 F. Supp. 758, 761 (E.D.N.Y. 1974), *aff'd*, 516 F.2d 896 (2d Cir. 1975) (decided under the former Bankruptcy Act of 1898); *In re Montana*, 185 B.R. 650, 652 (Bankr. S.D. Fla. 1995) (Cristol, C.J.); *accord In re Gedeon*, 31 B.R. 942, 946 (Bankr. D. Colo. 1983) (court held that civil contempt fine "imposed to uphold the dignity of the court" is nondischargeable under Section 523 of the Code); *In re Marini*, 28 B.R. 262, 265 (Bankr. E.D.N.Y. 1983) (same).

The *Wolfson* case is particularly instructive. In that civil securities fraud case, the defendants filed for bankruptcy literally four hours before a district court hearing on a civil contempt motion filed by the SEC against the defendants. The SEC sought the return of funds taken by the defendants in violation of the district court's order freezing defendants' assets. After concluding that the SEC's prosecution of the underlying securities fraud action was excepted from the automatic stay pursuant to § 362(b)(4) of the Bankruptcy Code, the court, citing a string of analogous cases, held that "[i]nherent in this conclusion is the determination that the civil contempt proceeding against [defendant] is not stayed." 309 B.R. at 320.

Accordingly, contrary to the sweeping and unsubstantiated "Notice of Bankruptcy" filed by Integretel, the commencement of Integretel's bankruptcy case does not stay either the pending

-10-

Contempt Proceeding against Integretel, including the turnover order, or the FTC's prosecution of this consumer protection action against Integretel.

## IV.    CONCLUSION

For the foregoing reasons, the FTC urges this Court to clarify that the automatic bankruptcy stay does not apply to the prosecution of the FTC's case in chief to the point of judgment or the prosecution of the Contempt Proceeding. Because the Bankruptcy Court has scheduled a hearing for September 21, 2007 at 1:30 p.m. PST, the Commission seeks emergency relief.

Dated:  September 20, 2007

Of Counsel:

MICHAEL MORA
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC  20580
(ph) 202-326-3373
(fax) 202-326-2558

Respectfully Submitted,

LAURA KIM (A550099)
lkim@ftc.gov
COLLOT GUERARD  (A5500480)
cguerard@ftc.gov
RICHARD McKEWEN (A5501046)
rmckewen@ftc.gov
ROBERT SCHOSHINSKI (A5500684)
rschoshinski@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave., NW, H-286
Washington, DC  20580
(ph) 202-326-3734 (Kim)/202-326-3338 (Guerard)
202-326-3071 (McKewen)/202-326-3219 (Schoshinski)
(fax) 202-326-3395

ATTORNEYS FOR PLAINTIFF
FEDERAL TRADE COMMISSION

### Statement Pursuant to Local Rule 7.1.A.3

Counsel for the FTC attempted to resolve this matter in good faith with Integretel but was unable to do so prior to filing this motion.

Laura Kim

-11-

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2007, I served the foregoing document on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via email or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

LAURA KIM

## SERVICE LIST
### Case No. 06-80180 - CIV-RYSKAMP/VITUNAC

Mark D. Johnson, Esq.
markdjohnsonpa@bellsouth.net
10 Central Pkwy., Ste. 210
Stuart, FL 34994
Telephone: 772-223-7700
Facsimile: 772-223-1177
*Attorney for Defendants Yaret Garcia,*
*Qaadir Kaid, and Erika Riaboukha*

Willoughby Farr
DC # 653974
Avon Park Correctional Institution
P.O. Box 1100
County Road 64 East
Avon Park, FL 33826-1100
*pro se Defendant*
*(by U.S. Mail)*

Mary Lou Farr
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
Telephone: 561-582-2876
*pro se Defendant*
*(by Federal Express)*

Andrew G. Berg, Esq.
agberg@kslaw.com, kdinan@kslaw.com,
ctapie@kslaw.com, tgoldman@kslaw.com,
jthomas@kslaw.com, jpollack@kslaw.com
King & Spalding LLP
1700 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: 202-626-2924
Facsimile: 202-626-3737
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

Jeffrey Schneider, Esq.
JCS@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower, 15th Fl.
1441 Brickell Ave.
Miami, FL 33131-3407
Telephone: 305-539-2481
Facsimile: 305-536-1116
*Attorney for Receiver David R. Chase*

Steven E. Siff, Esq.
Ssiff@mwe.com
Maustin@mwe.com
McDermott Will & Emory LLP
201 S. Biscayne Blvd., Ste. 2200
Miami, FL 33131
Telephone: 305-358-3500
Facsimile: 305-347-6500
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

Derick J. Rodgers
drodgers@lawdcm.com
Davis Cedillo & Mendoza Inc
McCombs Plaza Suite 500
755 E Mulberry Avenue
San Antonio, TX 78212
Telephone: 210-822-6666
Fax: 210-822-1151
*Attorney for Defendants BSG Clearing*
*Solutions, North America, LLC,*
*ACI Billing Services, Inc., d/b/a OAN, and*
*Billing Concepts, Inc.*

## SERVICE LIST
### Case No. 06-80180 - CIV-RYSKAMP/VITUNAC

**Michael Woodbury, Esq.**
michael.woodbury@woodbury-santiago.com
Woodbury & Santiago, P.A.
Two Datran Center - Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
Telephone: 305-669-9570
Facsimile: 305-669-8616
*Attorney for Grunspan Trust, et al.*

**Chad A. Dean, Esq.**
chad@schuylaw.com
118 W. Adams St., #800
Jacksonville, FL 32202
Telephone: 904-353-5884
Facsimile: 904-353-5994
*Attorney for Primus Automotive
Financial Services and Ford Motor Credit
Co.*

**Thomas G. Long, Esq.**
tlong@barnettbolt.com
hwanders@barnettbolt.com
Barnett, Bolt, Kirkwood, Long
601 Bayshore Blvd., Ste 700
Tampa, FL 33606
Telephone: 813-253-2020
Facsimile: 813-251-6711
*Attorney for BMW Financial Services*

**Michael David McDonough, Esq.**
12798 Forrest Hill Boulevard
Wellington, FL 33414
Telephone: 561-791-0590
*Attorney for Third Party Defendants/Cross
Defendants German Miranda, Jesus Sandoval
(by Federal Express)*

**Richard Gordin, Esq.**
rgordin@tighepatton.com
slancellotta@tighepatton.com
ngoldfarb@tighepatton.com
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: 202-565-2881
Facsimile: 202-454-2805
*Attorney for Defendant The Billing Resource,
d/b/a Integretel*

**Martin John Alexander**
marty.alexander@hklaw.com
scott.newman@hklaw.com
Holland & Knight
222 Lakeview Avenue, Suite 1000
West Palm Beach, FL 33401
Telephone: 561-650-8036
Facsimile: 561-650-8399
*Attorney for Defendant The Billing Resource,
d/b/a Integretel*

**Rosanne Brady, Esq.**
Rosanne@macalusolaw.com
peter@macalusolaw.com
The Law Office of Peter N. Macaluso
3302 N. Tampa Street
Tampa, FL 33603
Telephone: 813-251-2831
Facsimile: 813-228-7004
*Attorney for Third Party Defendant/Cross
Defendant Ronny Morillo*

**Jessy Mendoza**
6117 Blue Grass Circle
Lake Worth, FL 33463
*Third Party Defendant
(by Federal Express)*

RER-10    0642

**RER - 11**

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  TERRENCE V. PONSFORD, Cal. Bar No. 42648
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   Email:        mahrens@sheppardmullin.com
7                jrehfeld@sheppardmullin.com
                 okatz@sheppardmullin.com
8
   Proposed Attorneys for THE BILLING
9  RESOURCE,
   dba INTEGRETEL
10

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                    SAN JOSE DIVISION

14  In re                              Case No. 07-52890

15  THE BILLING RESOURCE, dba          Chapter 11
    Integretel,
16  a California corporation,           **SUPPLEMENTAL MEMORANDUM
                                        OF DEBTOR IN SUPPORT OF
17               Debtor.               MOTION TO APPROVE USE OF
                                        CASH COLLATERAL
18  Tax ID: 33-0289863                  AND IN REPLY TO CERTAIN
                                        FURTHER OBJECTIONS TO SUCH
19                                      USE**

20                                      Date:      September 26, 2007
                                        Time:      2:15 p.m.
21                                      Place:     United States Bankruptcy Court
                                                   280 South First Street
22                                                 San Jose, California
                                        Judge:     Hon. Arthur S. Weissbrodt
23                                      Courtroom:  3020

24

25

26

27

28

W02-WEST:FJR\400439539.4                    SUPPL. MEMO. OF DEBTOR ISO MOTION TO
                                            APPROVE USE OF CASH COLLATERAL
                                            & REPLY TO OBJECTIONS TO SUCH USE

RER-11    0643

1    At the initial hearing on Debtor's Motion to Use Cash Collateral held on September
2 21, 2007 ("Initial Hearing"), the Debtor disclosed to the Court that it had entered into a
3 more comprehensive stipulation with its 97% owned subsidiary, PaymentOne Corporation
4 ("P1") for the use of cash collateral. It informed the Court that the Stipulation attached to
5 the original motion to use cash collateral was very temporary in nature and a more
6 permanent stipulation was finally reached which would allow for longer use of cash
7 collateral. A blacklined version of that new stipulation, entitled "First Amended
8 Stipulation with PaymentOne Corporation Regarding Use of Cash Collateral and Adequate
9 Protection" ("First Amended Stipulation") was marked as Exhibit "1" at the Initial
10 Hearing, distributed to those parties present in Court, and served on parties in interest
11 during the Initial Hearing. Such blacklined version compared the new First Amended
12 Stipulation to the prior stipulation filed with the Cash Collateral Motion. In addition a new
13 cash budget was marked as Exhibit "2" at the Initial Hearing and similarly distributed and
14 served. ("New Budget.").

15    Immediately prior to the Initial Hearing the Debtor received at counsel table the
16 following: (a) "Order Granting Motion for Clarification as to Scope of Stay" dated as of
17 September 21, 2007 in the Florida Litigation ("Florida Order"); and (b) the Opposition of
18 Thermo Credit to the use of cash collateral ("Thermo Credit Opposition").

19    During the hearing the Court had certain questions regarding the financial
20 information of the Debtor. To address these matters the Debtor has concurrently filed
21 declarations of Ken Dawson, Evan Meyer[1] and Joe Lynam.

22    In this Memorandum, the Debtor will do the following:

23    1.    Explain in further detail the First Amended Stipulation and the New Budget,
24         as outlined in the concurrently filed declarations.

25 _____

26 [1] As discussed further below, Mr. Meyer has submitted two declarations in connection with this Supplemental Memorandum, the Evan Meyer Declaration Re Certain Payment One Transactions (the "P1 Meyer Declaration") and the "Declaration of Evan Meyer in
27 Support of Motion to Approve Use of Cash Collateral and in Reply to Certain Further Objections to Such Use" (the "Debtor Meyer Declaration"
28                              -1-

W02-WEST:FJR\400439539.4

SUPPL. MEMO. OF DEBTOR ISO MOTION TO
APPROVE USE OF CASH COLLATERAL
& REPLY TO OBJECTIONS TO SUCH USE
Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 2 of 15

RER-11    0644

1      2.     Reply to the Thermo Credit Opposition;

2      3.     Explain to the Court the financial situation of the Debtor and P1 as outlined

3                in the concurrently filed declarations.

4        As the Debtor explained at the Initial Hearing, the Debtor filed an Adversary

5 Complaint on Wednesday, September 19, 2007 ("Adversary Complaint").   In that

6 Adversary Complaint, Debtor sought clarification that the automatic stay applied to the

7 Florida Action and also sought a Section 105 Injunction with respect to the Florida Action.

8 Debtor has now filed an application for a Temporary Restraining Order in connection with

9 the Adversary Complaint, and the arguments in such papers will not be repeated herein.

10 The Debtor's reply to the objections of the Receiver to the use of cash collateral have

11 already been briefed, and will not be repeated in this supplemental brief.[2]

12        Various parties in interest objected to the grant to P1 of a superpriority interest.

13 Prior to the Initial Hearing the Debtor attempted to solve this problem by indicating that it

14 would grant to all holders of a security interest a super priority claim as well as a

15 replacement lien, which lien would be effective to the same extent and priority as the pre-

16 petition lien.  The Court, at the Initial Hearing, also indicated concern about the grant of a

17 superpriority lien.  The Debtor and P1 have negotiated this issue since the Initial Hearing.

18 As a result of those negotiations, P1 counsel has informed counsel for the Debtor that they

19 will not require a grant of a superpriority lien as part of the Interim Cash Collateral Order.

20

### I.

21

### THE FIRST AMENDED STIPULATION WITH P1 ALLOWS

22

23

24

[2] Earlier today the Receiver filed in the Florida Action an emergency motion in furtherance of the pending contempt proceeding to which the Debtor filed an opposition in the Florida Action.   The Debtor advises the Bankruptcy Court that the Florida Court denied the Receiver's emergency motion in a written order a copy of which is attached to this Supplemental Memorandum as Exhibit A.   Therein, the Florida Court references the upcoming September 26, 2007 continued hearing on the Debtor's cash collateral motion and near the end of the order states that the Florida Court "declines to grant the Receiver its requested relief on the grounds that the Bankruptcy Court should have the opportunity to make its own determination as to Integretel's motion."

-2-

## THE DEBTOR TO USE CASH COLLATERAL

## AND SHOULD BE APPROVED

The filing of this bankruptcy case was necessitated due to the order in the Florida Litigation which required payment of substantial moneys by the Debtor to the Receiver for the benefit of two of the Debtor's prior customers (the "Payment Order").    As the Declaration of Michael Ahrens filed in connection with the Debtor's reply to the Receiver's objections sets forth, the Receiver and the FTC had been informed in November of 2006 that the Debtor would have to file bankruptcy if such an order were entered.   The entry of the Payment Order required a bankruptcy filing with only three days preparation.   During that three day period, which included a Saturday and Sunday, counsel for the Debtor and P1 had extensive negotiations.   The counsel for the Debtor (Michael Ahrens and Jeffrey Rehfeld) negotiated with the counsel for Payment One (Steve Warren and Victoria Newmark).   Although P1 is a 97% owned subsidiary of the Debtor, counsel for the Debtor has a fiduciary duty to protect the interests of the Debtor and the Debtor's estate.

As counsel for the Debtor informed the Court, the Stipulation that was worked out with only three days opportunity did not provide for a long term use of cash collateral. There was simply not enough time to address all of the issues needed to reach such a stipulation.   The matter was complicated since counsel for the Debtor initially felt that the Debtor's Estate had a good argument with respect to the avoidance of the lien claimed by P1.   P1 asserts that it perfected its security interest in the Collateral through a UCC-1 financing statement filed on January 27, 2005.   During 2005 the Debtor changed its name from "Integretel" to "The Billing Resource."   The Commercial Code requires that a secured creditor file a UCC-2 Amendment within four months of any name change in order to acquire rights in new collateral acquired by a debtor more than four months after the name change.   P1 filed a UCC-2 amendment more than four months after such change. P1 filed such an amendment on October 18, 2006.   Hence, during the three days of negotiations counsel for the Debtor took the position that P1 had an avoidable security interest.   Counsel for P1 disagreed.   Among other things, P1 asserts that its liens are fully

-3-

1   perfected and that the Debtor would bear the burden to prove a preference in any event

2   (including insolvency as of October 18, 2006). P1 further takes the position that the

3   Debtor continued to operate as Integretel and, therefore, the name change was either

4   ineffective or not so seriously misleading to make an amendment necessary. It also asserts

5   that even if the amendment were "avoidable," P1 would still have a valid lien in all

6   property that the Debtor held as of four months after the name change plus all proceeds

7   thereof. P1 asserts that all or virtually all of the Debtor's property either existed as of the

8   date that was four months after the name change or is proceeds of such property. The

9   parties could not reach agreement on these issues at that time and all that was negotiated

10  was an agreement for a temporary use of cash collateral that could be withdrawn on 15

11  days notice from counsel for P1.

12      During the days after the filing of the Bankruptcy Case P1 and the Debtor worked

13  out a more permanent "First Amended Stipulation" a Blacklined version of which has been

14  served on the parties in interest. Counsel for the Debtor was convinced by counsel for P1

15  that it does have a good security interest in the Collateral for at least $6.4 million of new

16  value. After the filing of the UCC amendment new credit was extended by P1 to the

17  Debtor of approximately $6.4 million. Under Bankruptcy Code Section 547(c)(4) a trustee

18  may not avoid a transfer to the extent that after such transfer the creditor gave new value

19  for the benefit of the creditor. Moreover, these extensions of credit may not be subject to

20  preference rules at all because they were made after the amendment was in place and/or

21  the liens securing such loans may have attached contemporaneously with the extension of

22  the loan (making them subject to the defense set forth in Bankruptcy Code Section

23  547(c)(1)). Due to such new value, counsel for the Debtor felt that adequate protection

24  payments to P1 were fair and appropriate.[3] However, the First Amended Stipulation that

---

[3] P1 also asserts that these defenses apply to amounts due to it for new "pipeline" billing
26  transactions submitted to the Debtor by P1 after the amendment was filed to its UCC-1.
P1 claims that approximately $4.14 million in such transactions were submitted to the
27  Debtor in addition to the $6.4 million in new loans (making $10.54 million subject to these
defenses). The Debtor is evaluating this position and has not reached a conclusion.

28

-4-

1   was agreed to by the Debtor did not admit the validity of the security interests of the

2   Debtor.  All arguments with respect to the perfection of the interests in the Collateral are

3   preserved both by the Debtor, the Committee and any other party in interest.

4       The First Amended Stipulation does the following:

5       a.    P1 enters into a more permanent stipulation for the use of its cash collateral.

6       The right of P1 contained in the original stipulation to terminate a use of cash

7       collateral for any reason on 15 days notice is eliminated.  Now it may only

8       be terminated for cause as defined;

9       b.    P1 agrees to the use of collateral until December 31, 2007, which will allow

10      the Debtor reasonable time to consider and proceed with a Plan with its

11      creditors.  The First Amended Stipulation provides that this time may be

12      extended by stipulation of the parties.

13      c.    P1 agrees to consent to the use of its cash collateral on a final basis at the Final

14      Hearing in accordance with a budget that is reasonably satisfactory to P1.

15      d.    P1 agrees that as long as the First Amended Stipulation is in effect, P1 shall

16      continue to submit to the Debtor accounts for payment processing, enabling

17      the Debtor to continue to operate on behalf of its major customer, P1.  Thus,

18      payments made to P1 will be replenished with new transactions that would

19      otherwise not be submitted to the Debtor for processing because its

20      subsidiary P1 would no longer be able to generate such business without

21      receiving its share of the pipeline payments.  In essence, P1 will "repay"

22      pipeline payments made to it through these new transactions, leaving the

23      Debtor in substantially the same position it was in before the pipeline

24      payments were made to P1.

25      e.    In consideration for the agreements to allow the Debtor to use cash

26      collateral, and to continue to use the Debtor to process the accounts of P1,

27      the Debtor agrees to make adequate protection payments to P1 to preserve

28      the value of the Debtor's asset, its 97% owned subsidiary.  Without these

-5-

1    payments P1 would itself go out of business and a valuable asset of the

2    Debtor would be lost.

3    f.    It is agreed that during the term of the First Amended Stipulation, as further

4    adequate protection, the Debtor shall promptly and no later than Wednesday

5    of each week, wire to P1 an amount that is equal to P1's share of the total

6    collections received by Debtor from the LECs, provided that the total

7    payment will not exceed the amount of $4,142,044. This amount is defined

8    in the Stipulation as the "Pipeline Collection Property". This amount has

9    been determined to be the maximum amount that that P1 would be entitled to

10    receive with respect to the amounts turned over by P1 pre-petition to the

11    Debtor for collection.

12    g.    To the extent that it is determined that P1 does not have a valid and perfected

13    security interest in the Pipeline Collection Property, the Debtor can reduce

14    these payments, and the rights of the Debtor to seek disgorgement are

15    preserved.

16    h.    All rights of the Committee to be appointed in this case, and any other party

17    in interest, to seek disgorgement of the Pipeline Property if it is determined

18    that P1 does not have a valid and perfected security interest in the Pipeline

19    Collection Property is preserved.   All other claims that the Debtor,

20    Committee, or any other party in interest may have with respect to P1 are

21    preserved.

22    The P1 Meyer Declaration and the declaration of Joe Lynam are concurrently being

23    filed in support of approval of the First Amended Stipulation. They demonstrate that it is

24    crucial to maintain the going concern value of P1.  They demonstrate that the demand for

25    the business of P1 is increasing and that there are potential buyers who have expressed an

26    interest in the purchase of P1. At this time all that is being requested of the Court is

27    approval for a three week period of interim use of cash collateral. If the Debtor is not

28    allowed to give to P1 the approximately $2 million of adequate protection payments set

-6-

1 | forth in the budget during the next three weeks, P1 would have no other source of cash and
2 | would have to close its doors.  The adequate protection payments are appropriate so that
3 | the Debtor may allow formation of a Committee and meet with a Committee to discuss its
4 | plan and sale possibilities with respect to the assets or stock of P1.

5 |     As the declarations set forth, cash is needed by September 27 so that P1 may settle
6 | with its customers and meet payroll.  Without that cash a valuable subsidiary would be
7 | lost.

8 | II.

9 | **THE THERMO CREDIT OPPOSITION SHOULD BE OVERRULED**

10 |     Thermo Credit, LLC ("Thermo Credit") boldly requests that the Court deny the use
11 | of cash collateral "to the extent that it seeks the use of proceeds from Thermo Credit's
12 | accounts receivable."   It also correctly calls to the attention all of the documents that are
13 | needed to analyze the rights of Thermo Credit's claims, and even attaches to the Thermo
14 | Credit Opposition what it properly calls the "tri-party agreement," dated June 14, 2004.
15 | ("Tri-Party Agreement").  But, it fails to attach the Master Services Agreement between
16 | the Debtor and Inmate Calling Solutions ("ICS") that it refers to in the Thermo Credit
17 | Opposition, and that is referred to in the Tri-Party Agreement.   That Master Services
18 | Agreement is attached to the Dawson Declaration filed concurrently herewith.  A reading
19 | of the Master Services Agreement together with the Tri-Party Agreement clearly
20 | demonstrates that the receivables involved are property of the Debtor's estate, and not
21 | property of Thermo Credit or ICS.

22 |     ICS is a subsidiary of the Debtor.  It, like P1, is also a customer of the Debtor.  But,
23 | unlike P1 it has no security interest in any of the assets of the Debtor.  In particular, ICS
24 | does not have a security interest in the accounts receivable of the Debtor.  It also has no
25 | security interest in the cash of the Debtor.

26 |     It is apparent from the Tri-Party Agreement that in June, 2004, ICS had entered into
27 | an agreement whereby it sold its receivables to Thermo Credit.  That Tri-Party Agreement
28 | further directed that "...with respect to that certain Master Services Agreement dated July

-7-

1   1, 2002 between [ISC] and Integretel (the "Billing Contract") you are instructed to remit

2   via wire transfer all payments on Receivable, otherwise due [ISC] to:.........[address

3   omitted]." The Tri-Party Agreement therefore acknowledged the existence of the Billing

4   Contract, also known as the Master Services Agreement, and directed the Debtor to make

5   all payments under such Master Services Agreement not to ISC, but to Thermo Credit. As

6   the Dawson Declaration sets forth, the Debtor did from and after June 14, 2004 make all

7   payments to Thermo Credit and not ISC under the Tri-Party Agreement and the Master

8   Services Agreement.

9       However, what Thermo Credit fails to tell the Court is that under the Master

10  Services Agreements the receivables of ISC that are assigned to Thermo Credit, are in turn

11  assigned to the Debtor under the Master Services Agreement. This is similar to all of the

12  other contracts that the Debtor has with its customers. As set forth in the Debtor's prior

13  Memorandum responding to the objections of the Receiver, the accounts of customers

14  MUST be assigned to the Debtor so that it can "aggregate" all of the receivables of its

15  approximately 54 customers and forward them to the LEC's. Unless the receivables are in

16  fact "assigned" or "transferred" to the Debtor, it cannot aggregate the receivables and the

17  Debtor would have no right to collect the money from the LEC's. Hence, the receivables

18  that have been assigned by Thermo Credit and ICS to the Debtor are receivables of the

19  Debtor. Thermo Credit, as opposed to ICS, does possess the unsecured claim against the

20  Debtor with respect to the receivables that were in fact validly assigned to it. But, once the

21  receivables are accepted as a Billing Transaction under the Master Services Agreement,

22  they are no longer property of Thermo Credit, but are the property and asset of the Debtor.

23      The ICS Master Services Agreement is similar to all of the other contracts with the

24  customers of the Debtor. Under paragraph 4 of the Master Services Agreement the Debtor

25  is entitled to review the "Billing Transactions". First the Debtor conducts an "edit process"

26  and reviews the Client's Billing Transactions that are submitted to it. If any of the Client's

27  Billing Transactions fail to satisfy the criteria of the Debtor, the Debtor "shall return such

28  Billing Transactions to Client and IGT [Debtor] shall have no further responsibility for any

-8-

1 | such returned Billing Transactions." See Dawson Declaration.

2 |     Schedule II of the Master Services Agreement, commencing at page 18 then
3 | explains what happens to those Billing Transactions that are not returned. The Debtor
4 | shall submit to the Telcos "those Billing Transactions of Client that have passed the IGT
5 | Edit Process." See Page 18, part II, para. 2, Exhibit 1 to Dawson Declaration. Paragraph 9
6 | of part II, page 20 of the Master Services Agreement could not be clearer. It makes clear
7 | that the Client transfers and assigns all of its rights in its receivables to the Debtor to allow
8 | collection:

9 |       "9. Resale of Accounts. Client acknowledges that the Billing
10 | Contracts with Telcos are structured as a purchase of accounts
receivable, with recourse, in order for theTelco to be
empowered to bill and collect the underlying charge amounts
11 | from End-Users. Therefore, Client agrees, and does hereby
transfer to IGT [Debtor] any rights in the Billing Transactions
12 | that may be necessary for IGT to fulfill its obligations
hereunder in compliance with the Billing Contracts with the
13 | Telcos."

14 |     Hence it is clear that the Debtor, not Thermo Credit, is the owner of all accounts
15 | receivable that have been part of the Billing Transactions transferred to it pre-petition.
16 | Thermo Credit, just like the other customers, is an unsecured creditor. Under Paragraph 6,
17 | page 19 of the Master Services Agreement, the amount it is entitled to collect upon
18 | payment by the Telcos to the Debtor is set forth. But, that is a right as an unsecured
19 | creditor. Without a security agreement, Thermo Credit has no interest in the receivables
20 | assigned to it under the Master Services Agreement. Thermo Credit took such receivables
21 | from ICS subject to the same rights and claims that ICS had. Neither ICS nor Thermo
22 | Credit have a security interest.

23 | **III.**

24 | **P1 IS AN IMPORTANT ASSET OF THE DEBTOR — FINANCIAL**
25 | **INFORMATION RELATING TO THE DEBTOR**

26 |     In this section of the Supplemental Memorandum the Debtor will discuss the value
27 | of P1 to the Debtor, and will also discuss other financial matters bearing on the cash
28 | collateral motion.

-9-

**A.    Value of P1 to the Debtor.**

P1 has been a primary source of money for the Debtor. P1 is owed over $16 million by the Debtor. P1 is also the largest single customer of the Debtor. In the first section of this Supplemental Memorandum, the Debtor explained why as a matter of law it was appropriate to give to P1 as a secured creditor the adequate protection that it deserves with its claim in the Collateral. In this section the Debtor will discuss why interim use of cash collateral and the adequate protection payments suggested for three weeks also is in the best interests of the Debtor.

The Declarations of Joe Lynam and Evan Meyer, both officers of P1, are filed concurrently herewith. They demonstrate that P1 is a valuable company and that negotiations have been underway to sell that company. A sale of such a company may generate revenues for the Debtor. In addition, the sale of P1 may result in a positive forgiveness of the large debt that the Debtor owes to P1.

P1 has investigated possible sales transactions with third party buyers and is in negotiations concerning such a transaction. The management of both P1 and the Debtor believe that sale of the P1 business will benefit both entities. The loans of approximately $16.6 million to BR from P1 have starved the P1 business for working capital and prevented it from increasing its operations and improving profitability. While P1's business currently operates at approximately a break-even EBITDA basis, management is confident that a new owner who allows working capital to remain with P1 (or infuses an investment) will be able to use the existing base of customers to develop a much larger enterprise. Thus, the business would have more value in the hands of another owner.

As a result, P1 has reached substantial agreement on terms with a potential buyer and negotiations are on-going. The parties have agreed on an exclusivity provision. P1 anticipates receiving a purchase agreement from the proposed buyer within a week. If for any reason that does not happen, there are several other potential buyers who have expressed an interest in the P1 business. The sales effort is designed to maximize the return of P1's stakeholders including the Debtor. A sale may result in substantial value

-10-

1  being accorded to the Debtor and its estate, including possible forgiveness of debt owed by
2  the Debtor to P1.    In order to maximize the value of its business (and return to
3  stakeholders), P1 is working to remain current on its obligations to its customers.  In order
4  to do so, it is important that P1 obtain access to the collections that are in the "pipeline"
5  from the LECs as it would in the ordinary course of business.  The management team of P1
6  believes that failure to do so could catastrophically reduce the value of P1's business and
7  thereby jeopardize the value that may otherwise be obtained for the benefit of stakeholders,
8  particularly the Debtor.  Unless P1 obtains access to the pipeline amounts, it will be unable
9  to settle with its customers as early as September 27, 2006.  Accordingly, it is paramount
10 that P1 be given access to the pipeline funds sufficiently in advance of that date to permit
11 the funds to be remitted to customers.

12       As part of the negotiations with the Debtor, P1 has agreed that if it continues to get
13 access to the funds presently in the pipeline and the cash collateral agreement negotiated
14 by the parties is approved, P1 will continue to follow customary practices of delivering its
15 business to the Debtor.   Ordinarily, that would mean that P1 would submit a similar
16 amount of new collections (on a net value basis) as it is getting paid through the pipeline
17 transactions.  Thus, any funds paid to P1 from the "pipeline" will be replenished with new
18 transactions submitted to BR.  While these values may fluctuate from week to week, they
19 tend to average out over a short time period of time.  If P1 does not get access to the funds
20 in the pipeline, it may not be able to continue to generate the new collections necessary to
21 refill the pipeline which new collections benefit both the Debtor and P1.

22       The First Amended Stipulation between the Debtor and P1 is clearly in the best
23 interests of the Debtor's bankruptcy estate.  P1 is both a subsidiary and at the same time is
24 the Debtor's largest customer.  Approval of the First Stipulation is needed for P1 to remain
25 viable and P1's viability is in the best interests of the Debtor's bankruptcy estate.  It is in
26 the best interests of the Debtor's estate that P1 remain viable so that as the Debtor's largest
27 customer, P1 continues giving its substantial amount business, the largest provided by any
28 customer, to the Debtor so that the Debtor may continue in operation as a going concern.

-11-

1  It is also in the best interests of the Debtor's estate that P1 remain viable so that a sale may
2  be effectuated for P1. Such a sale would have the dual benefits to the Debtor's bankruptcy
3  estate of likely providing debt relief for a very significant amount of the Debtor's debt as
4  well as possibly providing a much needed cash infusion into the Debtor's bankruptcy
5  estate.

6  **B.    Further Financial Information Relating to Cash Collateral Motion.**

7          At the Initial Hearing the Court asked questions about the operations of the Debtor
8  and possible collections of receivables in the future. In this section the Debtor will address
9  those questions.

10          As the Court knows, this case was filed on an emergency basis. It was filed to
11  protect the interests of creditors so that a preference would not be paid to one creditor, in
12  detriment to the interest of other creditors. Due to such emergency filing, the Debtor had
13  only a skeleton budget attached to the initial cash collateral motion. At the Initial Hearing
14  the Debtor submitted to those parties present in court a more complete three week budget.
15  That three week budget was served on certain parties in interest on Saturday, September
16  22, which included all parties who were present at the Initial Hearing. That three week
17  budget was also attached to the Meyer Declaration Re Certain Payment One Transactions
18  which has been served on parties in interest concurrently with this Supplemental
19  Memorandum.[4]

20          Since the Initial Hearing the Debtor has worked on a 27 week Operating Budget.
21  That is attached to the Debtor Meyer Declaration filed concurrently herewith. That 27
22  week budget shows that P1 can be paid the cap amount which is provided for under the
23  First Amended Stipulation, and substantial moneys remain from the collection of
24  receivables.

25

26  [4] Mr. Meyer has submitted two declarations in support of this Supplement, the Evan Meyer
    Declaration Re Certain Payment One Transactions (the "P1 Meyer Declaration") and the
27  "Declaration of Evan Meyer in Support of Motion to Approve Use of Cash Collateral and
    in Reply to Certain Further Objections to Such Use" (the "Debtor Meyer Declaration").
28

-12-

1    As is set forth in the Debtor Meyer Declaration, the Debtor has made the business
2  judgment that it will negotiate with its customers to pay them in advance for Billing
3  Transactions that are delivered to the Debtor.  The Debtor feels that such a plan would
4  encourage existing customers to continue to deliver to the Debtor such Billing
5  Transactions.   Hence, while there is excess cash showing, that money is needed for
6  continuing business operations should the Debtor work out such a prepayment plan.  It is
7  also needed for an eventual plan of reorganization.

8    The Debtor anticipates that the Receiver may argue that such cash should be paid to
9  it so that it can use such cash.  However, as we have established in Debtor's prior briefs,
10  the Receiver does not have a UCC-1 filed, does not have an interest in the cash of the
11  debtor by virtue of a Control Agreement, and is simply an unsecured creditor.   The
12  Receiver should receive no preference over other unsecured present or prior customers.
13  That is the primary reason this case was filed:  so that one unsecured creditor does not get
14  a preference over another while the Debtor is in the zone of insolvency

15    The 27 week budget attached needs to be refined, and it will.  It shows an operating
16  loss; however, as the Debtor Meyer Declaration sets forth, the Debtor will attempt to cut
17  costs to solve that loss.

18
19
20
21
22
23
24
25
26
27
28

-13-

1    The Debtor submits that it has demonstrated through the declarations already filed,
2    and those filed concurrently herewith, that it should be allowed to use cash collateral for
3    the interim period of three weeks until a final hearing.  During that time it will attempt to
4    refine the attached budget and cut costs.  It will also hopefully meet with an Unsecured
5    Creditors Committee that will be formed and develop further its plan.

6

7    Dated: September 24, 2007          Respectfully submitted,

8                                       SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

9

10                                By     _____
                                                /s/ Michael H. Ahrens
11                                             MICHAEL H. AHRENS
                                       Proposed Attorneys for Debtor The Billing
12                                            Resource, dba Integretel

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-14-

# EXHIBIT A

RER-11    0658

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-80180-CIV-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC., et al.

      Defendants.

_____/

## ORDER DENYING RECEIVER'S EMERGENCY MOTION IN FURTHERANCE OF THE PENDING CONTEMPT PROCEEDING

THIS CAUSE comes before the Court pursuant to the Receiver's Emergency Motion in

Furtherance of Pending Contempt Proceeding, filed September 24, 2007 **[DE 623]**. Integretel

objected to the motion on September 24, 2007 **[DE 622]**.

On September 16, 2007, Integretel filed a petition for Chapter 11 bankruptcy in the

United States Bankruptcy Court, Northern District of California, San Jose Division, Case No. 07-

52890. The Bankruptcy Court conducted a hearing on Friday, September 21, 2007 on

Integretel's Motion for Use of Cash Collateral. During the hearing, Integretel argued that it need

not transfer the reserve funds to the Receiver. The Bankruptcy Judge has requested additional

briefing, with said briefs to be filed and served on Monday, September 24, 2007. A hearing on

the Motion for Use of Cash Collateral has been rescheduled for Wednesday, September 26, 2007

at 2:15 p.m., Pacific Time.

The Receiver requests that Integretel wire transfer before 5:00 p.m., Eastern Standard

## EXHIBIT A

2

Time, on Tuesday, September 25, 2007, the $1,762,762.56 in reserve funds that this Court had specifically ordered Integretel to "immediately" transferred to the Receiver. In the event that Integretel does not effect said transfer, the Receiver requests that Integretel's designated control person, Ken Dawson, appear before this Court in person on September 26, 2007.

The Court declines to grant the Receiver its requested relief on the grounds that the Bankruptcy Court should have the opportunity to make its own determination as to Integretel's motion. Accordingly, it is hereby

ORDERED AND ADJUDGED that the motion, filed September 24, 2007 **[DE 623]**, is DENIED.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 24th day of September, 2007.

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

1 SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
2   Including Professional Corporations
  MICHAEL H. AHRENS, Cal. Bar No. 44766
3 TERRENCE V. PONSFORD, Cal. Bar No. 42648
  JEFFREY K. REHFELD, Cal. Bar No. 188128
4 ORI KATZ, Cal. Bar No. 209561
  Four Embarcadero Center, 17th Floor
5 San Francisco, California 94111-4106
  Telephone:     415-434-9100
6 Facsimile:     415-434-3947
  Email:         mahrens@sheppardmullin.com
7                jrehfeld@sheppardmullin.com
                 okatz@sheppardmullin.com
8
  Proposed Attorneys for The Billing Resource,
9 dba Integretel

10                UNITED STATES BANKRUPTCY COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14
  In re                              | Case No. 07-52890 ASW
15
  THE BILLING RESOURCE, dba          | Chapter 11
16 INTEGRETEL, a California corporation,
                                      | **DECLARATION OF EVAN MEYER IN**
17              Debtor.               | **SUPPORT OF SUPPLEMENTAL**
                                      | **MEMORANDUM OF DEBTOR IN**
18 Tax ID: 33-0289863                 | **SUPPORT OF MOTION TO APPROVE**
                                      | **USE OF CASH COLLATERAL**
19                                    | **AND IN REPLY TO CERTAIN FURTHER**
                                      | **OBJECTIONS TO SUCH USE**
20

21                                    | Date:     September 26, 2007
                                      | Time:     2:15 p.m.
22                                    | Place:    United States Bankruptcy Court
                                      |           280 South First Street
23                                    |           San Jose, California
                                      | Judge:    Hon. Arthur S. Weissbrodt
24                                    | Courtroom: 3020

25

26

27

28

1    I, Evan Meyer, declare as follows:

2    1.    I am over the age of 18 years and if called upon to testify could and would testify

3    competently to the matters set forth herein based upon my own personal knowledge. I have a

4    Bachelor's of Science degree from California State Polytechnic University, Pomona, and a

5    Masters of Business Administration from the University of Washington. I am also a Certified

6    Public Accountant. I was a senior member of the Corporate Finance, Recovery and Disputes

7    group at Price Waterhouse LLP in San Francisco, California, from 1994 to 1998 where I assisted

8    management of financially troubled companies to achieve financial and operational stability. In

9    1998, I became Director of Finance of the debtor The Billing Resource dba Integretel (the

10   "Debtor") and later became Vice President of Finance of the Debtor. At the Debtor, I was

11   responsible for all finance, treasury, legal, human resources, and administrative functions.

12   2.    I have been the Chief Financial Officer of PaymentOne Corporation ("P1") since

13   the formation of P1 in 2001. I am not an officer of the Debtor, but continue to provide financial

14   services to them through a contract arrangement. P1 is a subsidiary of the Debtor, with the Debtor

15   owning more than ninety-seven percent (97%) of P1's voting stock. Both P1 and the Debtor are in

16   substantially the same business, performing collection services for customers.

17   3.    This declaration is submitted in support of the Debtor's "Supplemental

18   Memorandum Of Debtor In Support Of Motion To Approve Use Of Cash Collateral" (the

19   "Supplement"). Capitalized terms not defined herein shall have the meanings ascribed to them in

20   the Supplement.

21   4.    I have prepared a weekly operating cash budget for the Debtor for the period

22   commencing on the filing of this bankruptcy case and ending on March 21, 2008. That operating

23   cash budget is attached hereto as Exhibit "A." This 27 week operating budget assumes that there

24   are no cost savings by the Debtor over that period. It also assumes that there is no payment at all

25   by the Debtor with respect to the Receiver's claim for approximately $1.7 million. The cash flow

26   also assumes that the Debtor retains its current customers. I have run other scenarios, assuming

27   losses of customers, and under these other scenarios the Debtor can still operate with no need for

28   additional cash.

-1-

5.      The attached cash flow indicates that the Debtor will be able to continue to operate during this bankruptcy case with no new infusion of cash from an investor.  The Debtor will immediately work on cost savings in its operations.  It is possible that certain measures that it will take will result in cost savings.  The attached cash flow indicates that with no operational cut backs there would be an operational loss over the 27 week period.  However, with cost savings, it is possible that eventually the Debtor could operate at a break even basis.

6.      It is the plan of the Debtor to meet with its creditors after the Interim Cash Collateral hearing.  Hopefully a Creditors Committee will be appointed.  It is my belief that many of our creditors and customers welcome continued operations so that the Debtor can continue to process these receivables.  If the Debtor would not continue to process the receivables as it talks to its creditors, employees would be lost and havoc would result with respect to the processing and aggregating of its customers receivables.

7.      The attached cash budget also demonstrates that P1 can be paid the $4,142,044 with respect to the pre-petition receivables.  This is the "cap" referred to in the First Amended Stipulation on the amounts to be paid P1 under that stipulation.  I feel that the assumptions in the attached cash flow are accurate and reasonable and that P1 can receive this cap amount under the First Amended Stipulation, while the ending cash will increase in such model for the benefit of the Debtor and its creditors.

8.      The attached cash budget indicates that there will be significant ending cash at all times available for the Debtor.  However, that does not mean that this cash is available for payment to the Receiver or to any other unsecured creditor.  The excess cash is needed to formulate a plan of reorganization for all creditors under the auspices of this Court.  In addition, the attached cash flow assumes that 100% of the existing customers continue to assign their receivables to the Debtor.  While it is anticipated that something less than that will occur, to incentivize existing customers to continue to assign their receivables to the Debtor, Debtor plans to meet with the customers and creditors and offer a pre payment plan.  It is the business judgment of the Debtor that it should, at the time that existing customers submit new Billing Transactions, it may prepay for a portion of those receivables so submitted.  The exact amount of the prepayment

-2-

1   is not known at this early stage of the Chapter 11 case; but, the excess moneys are needed not only

2   for reorganization, but also for such a possible prepayment plan that would be in the interests of

3   the Debtor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

1
2      I declare under penalty of perjury under the laws of the United States of America that the
3  foregoing is true and correct. Executed on September 24, 2007, at San Jose, California.
4
5                                                         
6                                EVAN MEYER
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

W02-WEST:FJR\400439597.1                                 DECLARATION

# EXHIBIT "A"

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

**100% of pre-petition pipeline submitted by customers**
**\*\*NO PAYMENT TO RECEIVER\*\***

| | Week Ending | 1 9/21/07 | 2 9/28/07 | 3 10/5/07 | 4 10/12/07 | 5 10/19/07 | 6 10/26/07 | 7 11/2/07 | 8 11/9/07 |
|---|---|---|---|---|---|---|---|---|---|
| | **Inflows** | | | | | | | | |
| 1 | CIC 402 pipeline collections remitted to TBR by LECs-pre | $ 918,762 | $ 1,727,641 | $ 1,242,446 | $ 1,713,182 | $ 1,746,332 | 996,767 | 677,586 | 969,338 |
| 2 | CIC 402 pipeline collections remitted to TBR by LECs-post (less service fees) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | TBR service fees embedded in CIC 402 pipeline collections (2) | 50,000 | 50,000 | 50,000 | 325,000 | 50,000 | 50,000 | 50,000 | 325,000 |
| 4 | Total Inflows | 968,762 | 1,777,641 | 1,292,446 | 2,038,182 | 1,796,332 | 1,046,767 | 727,586 | 1,294,338 |
| | **Outflows** | | | | | | | | |
| 5 | Total operating costs and expenses (2) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) |
| 6 | Bankruptcy costs (1) | 0 | 0 | 0 | 0 | (75,000) | (75,000) | (75,000) | (75,000) |
| 7 | Florida receiver payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | CIC 402 pipeline collections remitted to P1-pre | (580,432) | (994,684) | (433,265) | (495,421) | (491,859) | (605,991) | (302,996) | (237,397) |
| 9 | Pre-payment of post-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | Recoupment of pre-payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | CIC 402 pipeline collections remitted to ALL CUSTOMERS-post | 0 | 0 | 0 | 0 | 0 | 0 | (677,586) | (969,338) |
| 12 | Total Outflows | (710,432) | (1,124,684) | (563,265) | (625,421) | (696,859) | (810,991) | (1,185,582) | (1,411,734) |
| 14 | Beginning available cash | $ 1,945,598 | $ 2,203,928 | $ 2,856,885 | $ 3,586,066 | $ 4,998,827 | $ 6,098,300 | $ 6,334,076 | $ 5,876,081 |
| 15 | Net cash flow | 258,330 | 652,957 | 729,181 | 1,412,761 | 1,099,473 | 235,776 | (457,996) | (117,397) |
| 16 | Ending cash | $ 2,203,928 | $ 2,856,885 | $ 3,586,066 | $ 4,998,827 | $ 6,098,300 | $ 6,334,076 | $ 5,876,081 | $ 5,758,684 |

65,599

**NOTES:**
(1) Assumes counsel paid through retainers previously established through October 19, 2007.
(2) LEC fee income and LEC costs are considered a wash and, therefore, NOT reflected on this schedule.
Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process are not reflected on the schedule.

**EXHIBIT "A"**

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|
| Week Ending | | 11/16/07 | 11/23/07 | 11/30/07 | 12/7/07 | 12/14/07 | 12/21/07 | 12/28/07 | 1/4/08 |
| **Inflows** | | | | | | | | | |
| 1 | CIC 402 pipeline collections remitted to TBR by LECs-pre | 1,022,233 | 1,297,950 | 486,116 | 1,098,821 | 594,056 | 562,704 | 868,762 | 1,677,641 |
| 2 | CIC 402 pipeline collections remitted to TBR by LECs-post (less service fees) | 50,000 | 50,000 | 50,000 | 50,000 | 325,000 | 50,000 | 50,000 | 50,000 |
| 3 | TBR service fees embedded in CIC 402 pipeline collections (2) | | | | | | | | |
| 4 | Total Inflows | 1,072,233 | 1,347,950 | 536,116 | 1,148,821 | 919,056 | 612,704 | 918,762 | 1,727,641 |
| **Outflows** | | | | | | | | | |
| 5 | Total operating costs and expenses (2) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) |
| 6 | Bankruptcy costs (1) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) | (75,000) |
| 7 | Florida receiver payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | CIC 402 pipeline collections remitted to P1-pre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | Pre-payment of post-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | Recoupment of pre-payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | CIC 402 pipeline collections remitted to ALL CUSTOMERS-post | (1,022,233) | (1,297,950) | (486,116) | (1,098,821) | (594,056) | (562,704) | (868,762) | (1,677,641) |
| 12 | Total Outflows | (1,227,233) | (1,502,950) | (691,116) | (1,303,821) | (799,056) | (767,704) | (1,073,762) | (1,882,641) |
| 14 | Beginning available cash | $ 5,758,684 | $ 5,603,684 | $ 5,448,684 | $ 5,293,684 | $ 5,138,684 | $ 5,258,684 | $ 5,103,684 | $ 4,948,684 |
| 15 | Net cash flow | (155,000) | (155,000) | (155,000) | (155,000) | 120,000 | (155,000) | (155,000) | (155,000) |
| 16 | Ending cash | $ 5,603,684 | $ 5,448,684 | $ 5,293,684 | $ 5,138,684 | $ 5,258,684 | $ 5,103,684 | $ 4,948,684 | $ 4,793,684 |

**NOTES:**
(1) Assumes counsel paid through retainers previously established
through October 19, 2007.
(2) LEC fee income and LEC costs are considered a wash and,
therefore, NOT reflected on this schedule.
Assumes LEC costs netted from PAR and recovered from customer
through settlement process, but inflows and outflows related to process
are not reflected on the schedule.

RER-11    0668

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | | 1/11/08 | 1/18/08 | 1/25/08 | 2/1/08 | 2/8/08 | 2/15/08 | 2/22/08 | 2/29/08 |
| **Inflows** | | | | | | | | | |
| 1 | CIC 402 pipeline collections remitted to TBR by LECs-pre | 917,446 | 1,663,182 | 1,696,332 | 946,767 | 631,485 | 356,485 | 677,586 | 969,338 |
| 2 | CIC 402 pipeline collections remitted to TBR by LECs-post (less service fees) | 325,000 | 50,000 | 50,000 | 50,000 | 50,000 | 325,000 | 50,000 | 325,000 |
| 3 | TBR service fees embedded in CIC 402 pipeline collections (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | Total Inflows | 1,242,446 | 1,713,182 | 1,746,332 | 996,767 | 681,485 | 681,485 | 727,586 | 1,294,338 |
| **Outflows** | | | | | | | | | |
| 5 | Total operating costs and expenses (2) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) | (130,000) |
| 6 | Bankruptcy costs (1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | Florida receiver payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | CIC 402 pipeline collections remitted to P1-pre | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | Pre-payment of post-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | Recoupment of pre-payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | CIC 402 pipeline collections remitted to ALL CUSTOMERS-post | (917,446) | (1,663,182) | (1,696,332) | (946,767) | (631,485) | (356,485) | (677,586) | (969,338) |
| 12 | Total Outflows | (1,047,446) | (1,793,182) | (1,826,332) | (1,076,767) | (761,485) | (486,485) | (807,586) | (1,099,338) |
| 14 | Beginning available cash | $ 4,793,684 | $ 4,988,684 | $ 4,908,684 | $ 4,828,684 | $ 4,748,684 | $ 4,668,684 | $ 4,863,684 | $ 4,783,684 |
| 15 | Net cash flow | 195,000 | (80,000) | (80,000) | (80,000) | (80,000) | 195,000 | (80,000) | 195,000 |
| 16 | Ending cash | $ 4,988,684 | $ 4,908,684 | $ 4,828,684 | $ 4,748,684 | $ 4,668,684 | $ 4,863,684 | $ 4,783,684 | $ 4,978,684 |

**NOTES:**

(1) Assumes counsel paid through retainers previously established through October 19, 2007.

(2) LEC fee income and LEC costs are considered a wash and, therefore, NOT reflected on this schedule. Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process are not reflected on the schedule.

RER-11    0669

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | Week Ending | 25 | 26 | 27 | |
| --- | --- | --- | --- | --- | --- |
| | | 3/7/08 | 3/14/08 | 3/21/08 | Total |
| **Inflows** | | | | | |
| 1 | CIC 402 pipeline collections remitted to TBR by LECs-pre | 0 | 0 | 0 | $ 8,345,130 |
| 2 | CIC 402 pipeline collections remitted to TBR by LECs-post (less service fees) | 1,022,233 | 1,297,950 | 486,116 | 19,920,126 |
| 3 | TBR service fees embedded in CIC 402 pipeline collections (2) | 50,000 | 50,000 | 50,000 | 3,000,000 |
| 4 | Total Inflows | 1,072,233 | 1,347,950 | 536,116 | 31,265,256 |
| **Outflows** | | | | | |
| 5 | Total operating costs and expenses (2) | (130,000) | (130,000) | (130,000) | (3,510,000) |
| 6 | Bankruptcy costs (1) | 0 | 0 | 0 | (900,000) |
| 7 | Florida receiver payment | 0 | 0 | 0 | 0 |
| 8 | CIC 402 pipeline collections remitted to P1-pre | 0 | 0 | 0 | (4,142,044) |
| 9 | Pre-payment of post-petition pipeline | 0 | 0 | 0 | 0 |
| 10 | Recoupment of pre-payment | 0 | 0 | 0 | 0 |
| 11 | CIC 402 pipeline collections remitted to ALL CUSTOMERS-post | (1,022,233) | (1,297,950) | (486,116) | (19,920,126) |
| 12 | Total Outflows | (1,152,233) | (1,427,950) | (616,116) | (28,472,170) |
| | | | | | |
| 14 | Beginning available cash | $ 4,976,684 | $ 4,898,684 | $ 4,818,684 | 1,945,598 |
| 15 | Net cash flow | (80,000) | (80,000) | (80,000) | 2,793,086 |
| 16 | Ending cash | $ 4,898,684 | $ 4,818,684 | $ 4,738,684 | $ 4,738,684 |

**NOTES:**
(1) Assumes counsel paid through retainers previously established through October 19, 2007.
(2) LEC fee income and LEC costs are considered a wash and, therefore, NOT reflected on this schedule.
Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process are not reflected on the schedule.

RER-11        0670

1  STEPHEN H. WARREN (S.B. #136895)
   VICTORIA A. NEWMARK (S.B. #183581)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, CA 90071-2899
   Telephone:    (213) 430-6000
4  Facsimile:    (213) 430-6407

5  Counsel to PAYMENTONE CORPORATION

6

7

8              UNITED STATES BANKRUPTCY COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12 | In re                              | Case No. 07-52890

13 | THE BILLING RESOURCE, dba          | Chapter 11
   | Integretel, a California corporation,
14 |                                    | **Declaration of Joe Lynam**
   |                    Debtor.
15 |                                    | Date:        September 26, 2007
   | Tax ID: 33-0289863                 | Time:        2:15 p.m.
16 |                                    | Place:       United States Bankruptcy Court
   |                                    |              280 South First Street
17 |                                    |              San Jose, California
   |                                    | Judge:       Hon. Arthur S. Weissbrodt
18 |                                    | Courtroom:   3020

19

20

21

22        I, Joe Lynam, do hereby state and declare as follows:

23        1.    I am over the age of 18 years and if called upon to testify could and

24 would testify competently to the matters set forth herein based upon my own personal

25 knowledge. I am a graduate of Santa Clara University where I earned a Bachelor's

26 Degree in Finance. I was a founder and former President of VRS Billings Systems and

27 served as its Chief Executive Officer from 1991 to 1995 when VRS was sold to AT&T

28 Corp. From 1995 to 1998, I was Director of Billing Operations at AT&T Corp. I have

LA3:1139102.1

DECLARATION OF JOE LYNAM

1  been the Chief Executive Officer of PaymentOne Corporation ("P1") since the formation

2  of P1 in 2000.

3      2.    P1's headquarters are in San Jose, California, and P1 also has offices

4  in Boston and Los Angeles. P1 is a leading provider of alternative billing in the United

5  States. P1's bill-to-phone business leverages integrated relationships covering more than

6  1,000 carriers in the United States. P1 has generated more than $2 billion in incremental

7  revenue for its merchant clients since 2002, including several Fortune 500 customers such

8  as AOL, United Online, Time Warner, Qwest, Nicor and others.

9      3.    P1's success has been driven by the proven benefits of the

10  alternative billing and future continued growth is anticipated for P1. P1's alternative

11  payments option has proven to increase online sales by between 15% and 35%. In many

12  segments, P1's Bill-to-Account process (including phone, broadband and mobile account

13  billing) has outperformed credit card and other non-card alternatives. Consumers value

14  low "friction" and enhanced security of carrier billing for small Internet transactions and

15  subscription services. The Bill-to-Account alternative also appeals to younger consumers

16  and light users or those who may not have credit cards. Additionally, merchants can reach

17  more households through P1. P1, through its carrier partners, has access to approximately

18  150 million active consumer accounts, while other alternative payment processors such as

19  PayPal, BillMeLater and Click-N-Buy combined have only a fraction of that amount of

20  active user accounts.

21      4.    Industry research which I rely upon in my position as CEO of P1,

22  demonstrates that consumers show a strong preference for charging small purchases

23  through carriers. Such research includes work by Javelin Research. Over 60% of

24  consumers polled in a Javelin Research study stated a preference for billing through their

25  phone or broadband billing account for small online transactions. Beyond digital content

26  as a newly enabled growth area, international mobile and broadband carrier billing

27  markets open significant potential future growth opportunity for P1. P1 also has several

28  new significant top tier domestic deals closed and in deployment. P1 anticipates revenue

LA3:1139102.1

2

DECLARATION OF JOE LYNAM

1    to increase in all segments (led by top tier large scale digital media as well as small and

2    mid tier markets and mobile markets) and projects that by 2011, P1's annual revenue will

3    equal approximately $101.6 million.

4         5.    P1's new carrier contracts (including AT&T, Verizon, Qwest and

5    Sprint) have established P1 to target large media companies. P1's new contracts include

6    Vivendi Universal, Habbo (Sulaki, Inc.), Blizzard Entertainment, Gaia, and Sierra Online.

7    These new digital media contracts provide a sizable new growth opportunity for P1.

8    Allowing P1 to facilitate purchase transactions for the growing digital content revolution

9    which includes all forms of media such as music (iTunes), online games, social networks

10   and information and entertainment services. This newly enabled market and contracted

11   business is currently not represented in our cash flows. P1 had already been identified on

12   the Forbes' Technology First 50 and 500 lists. Its growth rate had earned it mention on

13   the Forbes Midas List of private companies and the Deloitte Technology Fast 50 for top

14   technology companies to watch. These awards were based on its business before the

15   digital expansion mentioned above. The management of P1 believes that the digital

16   products that P1 can now offer will presents great opportunities going forward.

17        6.    Unfortunately, its current ownership structure has hobbled P1 in a

18   number of ways. Much of its working capital has been used to make loans to its parent,

19   The Billing Resource dba Integretel ("BR"). This drain of working capital is preventing

20   P1 from making investments in its own business which hold the promise of faster growth

21   and improved margins. The association with BR has limited P1's opportunities in other

22   ways, as well. For example, some potential business partners have required disclosure of

23   BR's finances as part of their discussions with P1. BR's financial weakness has cost P1

24   contracts and a variety of other prospects and opportunities. As a result of these factors

25   (and the debt owed to P1 from BR), the management teams of both BR and P1 have

26   concluded that P1 should be sold to a new owner who can better capitalize on its

27   opportunities.

28        7.    P1 is presently in on-going negotiations with a potential buyer and

3

LA3:1139102.1

DECLARATION OF JOE LYNAM

1    has reached substantial agreement on terms of a transaction.  We expect to receive a draft

2    asset purchase agreement and other documentation within the next week or so.  Moreover,

3    there are at least three other potential buyers (both strategic buyers and financial buyers)

4    who have expressed serious interest in the P1 business  --  with a particular interest in the

5    new digital opportunities that are imbedded in P1's business.  Based on the foregoing, it is

6    my belief that there is a substantial market for P1's assets.  I believe that if the value of P1

7    is preserved, the sale of P1 will yield value for P1's stakeholders, including BR, whether

8    in the form of cash or debt forgiveness and assumption.

9          8.     However, if P1 cannot make settlements with its customers on

10    Thursday, September 27, 2007, I fear that P1's value may be devastated.  The base

11    customers will move away quickly to shift new business away from P1, and carrier billing

12    and newly signed large scale clients will likely change launch plan dramatically.  In order

13    to make its settlement payment, P1 must receive its share of the cash BR has collected

14    from certain Local Exchange Carriers on account of a billing code shared by both P1 and

15    BR.  If the P1 business does not remain intact, the only options available for P1 may be to

16    try to maximize the recovery on the debt owed to it by BR rather than focus on

17    maximizing the joint value of the on-going business.  The management teams for both BR

18    and P1 believe that the sale option is a far superior route for the benefit of the stakeholders

19    of both enterprises.

20

21

22

23

24

25

26

27

28

4

LA3:1139102.1

DECLARATION OF JOE LYNAM

1   I declare under penalty of perjury that the foregoing is true and correct.

2   Executed this 24ᵗʰ day of September, 2007 in San Jose, California.

3

4                           Joe Lynam

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA3:1139102.1

DECLARATION OF JOE LYNAM

1  STEPHEN H. WARREN (S.B. #136895)
   VICTORIA A. NEWMARK (S.B. #183581)
2  O'MELVENY & MYERS LLP
   400 South Hope Street
3  Los Angeles, CA 90071-2899
   Telephone:  (213) 430-6000
4  Facsimile:   (213) 430-6407

5  Counsel to PAYMENTONE CORPORATION

6

7

8            UNITED STATES BANKRUPTCY COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12  In re                              Case No. 07-52890

13  THE BILLING RESOURCE, dba          Chapter 11
    Integretel, a California corporation,
14                                     **Declaration of Evan Meyer re Certain**
                  Debtor.              **PaymentOne Transactions in Support of**
15                                     **Motion to Approve Cash Collateral**
    Tax ID: 33-0289863                 **Stipulation and Ordinary Course**
16                                     **Transfers**

17                                     Date:        September 26, 2007
                                       Time:        2:15 p.m.
18                                     Place:       United States Bankruptcy Court
                                                    280 South First Street
19                                                  San Jose, California
                                       Judge:       Hon. Arthur S. Weissbrodt
20                                     Courtroom:   3020

21

22

23

24        I, Evan Meyer, do hereby state and declare as follows:

25        1.     I am over the age of 18 years and if called upon to testify could and

26  would testify competently to the matters set forth herein based upon my own personal

27  knowledge. I have a Bachelor's of Science degree from California State Polytechnic

28  University, Pomona, and a Masters of Business Administration from the University of

LA3:1138721.8                          1

                                       DECLARATION OF EVAN MEYER

RER-11        0676

1    Washington. I am also a Certified Public Accountant. I was a senior member of the
2    Corporate Finance, Recovery and Disputes group at Price Waterhouse LLP in San
3    Francisco, California, from 1994 to 1998 where I assisted management of financially
4    troubled companies to achieve financial and operational stability. In 1998, I became
5    Director of Finance of the debtor The Billing Resource dba Integretel ("BR") and later
6    became Vice President of Finance of BR. At BR, I was responsible for all finance,
7    treasury, legal, human resources, and administrative functions.

8         2.     I have been the Chief Financial Officer of PaymentOne Corporation
9    ("P1") since the formation of P1 in 2001. I am not an officer of BR, but continue to
10   provide financial services to them through a contract arrangement. P1 is a subsidiary of
11   BR, with BR owning more than ninety-seven percent (97%) of P1's voting stock. Both
12   P1 and BR are in substantially the same business, performing collection services for
13   customers. BR acts as a "clearing house" between telecommunications related service
14   providers (their customers) and local exchange carriers ("LECs"). P1 acts as a clearing
15   house for internet related service providers and local and broadband exchange carriers. P1
16   and BR receive billing records from customers (such as long distance companies, prison
17   telephone providers and internet access providers), which records are processed and
18   forwarded on to the LECs (for example, Verizon or ATT) for payment pursuant to the
19   terms of separate contracts with the LECs. In processing those transactions, P1 and BR
20   use certain "codes" with the LEC's that are necessary to process collections. Most of the
21   collections made by P1 are performed using its own codes with the LECs and those
22   proceeds flow into bank accounts that are separate from those owned by BR. However, a
23   portion of P1's business is collected through "codes" that are shared with and/or owned by
24   BR. With respect to that portion of the business, in the ordinary course, BR remits to P1
25   that portion of funds received by BR that relates to P1 customers when the code is shared
26   or owned by BR. Approximately $4,142,000 of P1's net collections were in this
27   "pipeline" as of the Petition Date, meaning that it has been submitted to the LECs using a
28   shared or BR code, but had not been remitted to P1 as of the Petition Date.

LA3:1138721.8

2

1         3.     In or about January of 2005, P1 was in the process of investigating

2 options for the sale of its business. In order to facilitate that effort, it was necessary to

3 separate the companies' respective businesses. At that time and continuing since, P1

4 made certain loans and other financial accommodations to its parent, BR. These loans are

5 in addition to the "pipeline" collections discussed above. P1 and BR documented these

6 loan transactions, including the provision of a security interest to P1.

7         4.     On or about January 26, 2005, BR (then known as Integretel,

8 Incorporated), executed a security agreement with P1 (the "Agreement") dealing with the

9 parties' relationship and intercompany obligations. A true and correct copy of the

10 Agreement is attached hereto as Exhibit A. The Agreement grants P1 a security interest in

11 substantially all of the personal property of BR to secure any and all "obligations and

12 liabilities of every nature of BR to P1." See Agreement, Section 2. On or about January

13 27, 2005, P1 filed a UCC financing statement in California to perfect its security interest.

14 A true and correct copy of that financing statement is attached as Exhibit B. At the time

15 the Agreement was negotiated and executed and the January 2005 financing statement

16 was filed, BR was registered and known as Integretel, Incorporated.

17         5.     I am informed and believe that during 2005, after the Agreement was

18 executed and the January 2005 financing statement was filed, Integretel, Incorporated may

19 have changed its registered name to "The Billing Resource," although it continued to

20 operate under the name Integretel. On or about October 18, 2006, P1 filed an amendment

21 to its UCC filing, noting the name change and identifying The Billing Resource as debtor.

22 A true and correct copy of that amendment is attached hereto as Exhibit C.

23         6.     As of September, 14, 2007, BR owed more than $16,616,000 to P1

24 on account of loans. As such, I am informed and believe that it is BR's largest creditor.

25 Of this amount, approximately $6,415,000 represents new borrowings extended by P1 to

26 BR after October 18, 2006 (the date that P1 filed its amended financing statement), which

27 loans P1 was not otherwise contractually obligated to make. Another $4,142,000 of this

28 debt represents the revolving "pipeline" of collections due from the LECs. Of the total

LA3:1138721.8                3

DECLARATION OF EVAN MEYER

1  debt owed to P1 by BR, only approximately $6 million represents loans that were

2  outstanding as of October 18, 2006 and are still owed today.

3      7.      In addition to providing the security interest discussed above, Section

4  21 of the Agreement deals with the proceeds of collections for P1 and its customers that

5  are processed through BR "codes" and deposited into BR bank accounts. Specifically,

6  Section 21 of the Agreement provides, *inter alia*, that all "Collection Property" is property

7  of P1. The Agreement defines the term "Collection Property" as "all accounts receivable,

8  proceeds and any other property in [BR's] possession in any way related to a Collection

9  Agreement." The term "Collection Agreement" is defined, in turn, to include a support

10 services agreement in place between the parties, as well as any other "written or unwritten

11 agreement or arrangement concerning collection services." Thus, those terms cover the

12 funds presently in the "pipeline."

13      8.      As noted above, P1 has investigated possible sales transactions with

14 third party buyers and is in negotiations concerning such a transaction. The management

15 of both P1 and BR believe that sale of the P1 business will benefit both entities. The

16 loans of approximately $16.6 million to BR from P1 have starved the P1 business for

17 working capital and prevented it from increasing its operations and improving

18 profitability. While P1's business currently operates at approximately a break-even

19 EBITDA basis, management is confident that a new owner who allows working capital to

20 remain with P1 (or infuses an investment) will be able to use the existing base of

21 customers to develop a much larger enterprise. Thus, the business would have more value

22 in the hands of another owner.

23      9.      As a result, P1 has reached substantial agreement on terms with a

24 potential buyer and negotiations are on-going. The parties have agreed on an exclusivity

25 provision. P1 anticipates receiving a purchase agreement from the proposed buyer within

26 a week. If for any reason that does not happen, there are several other potential buyers

27 who have expressed an interest in the P1 business. The sales effort is designed to

28 maximize the return of P1's stakeholders including BR. Among other things, I believe

LA3:1138721.8                                    4

DECLARATION OF EVAN MEYER

1   that a sale may result in substantial value being accorded to BR and its estate, including

2   possible forgiveness of debt owed by BR to P1. In order to maximize the value of its

3   business (and return to stakeholders), P1 is working to remain current on its obligations to

4   its customers. In order to do so, it is important that P1 obtain access to the collections that

5   are in the "pipeline" from the LECs as it would in the ordinary course of business. The

6   management team of P1 (including myself) believes that failure to do so could

7   catastrophically reduce the value of P1's business and thereby jeopardize the value that

8   may otherwise be obtained for the benefit of stakeholders, particularly BR. Unless P1

9   obtains access to the pipeline amounts, it will be unable to settle with its customers as

10  early as September 27, 2006. Accordingly, it is paramount that P1 be given access to the

11  pipeline funds sufficiently in advance of that date to permit the funds to be remitted to

12  customers.

13          10.     As noted above, the amount of the new loans made by P1 to BR after

14  the updated financing statement was filed substantially exceeds the amount currently in

15  the "pipeline." I am informed and believe that BR has reserved the right to assert that the

16  filing of the amended financing statement on or about October 18, 2006 may be subject to

17  attack as a preference to the extent that it secured any antecedent debt as of that date. P1

18  does not concede that any portion of its debt is unsecured or not otherwise subject to valid

19  property rights of P1. However, there is no dispute that after the October 18, 2006

20  amendment to the financing statement, P1 made new loans to BR in an amount that

21  exceeds the funds due to P1 that are presently in the "pipeline."

22          11.     As part of its negotiations with BR, P1 has agreed that if it continues

23  to get access to the funds presently in the pipeline and the cash collateral agreement

24  negotiated by the parties is approved, P1 will continue to follow customary practices

25  concerning the shared or BR codes for future collections while the negotiated cash

26  collateral agreement is in place. Ordinarily, that would mean that P1 would submit a

27  similar amount of new collections (on a net value basis) as it is getting paid through the

28  pipeline transactions. Thus, any funds paid to P1 from the "pipeline" will be replenished

LA3:1138721.8                                    5

                                                      DECLARATION OF EVAN MEYER

1   with new transactions submitted to BR. While these values may fluctuate from week to
2   week, they tend to average out over a short time period of time. If P1 does not get access
3   to the funds in the pipeline, it may not be able to continue to generate the new collections
4   necessary to refill the pipeline which new collections benefit both BR and P1.

5           12.     The projections of P1 and BR show that notwithstanding the
6   payments of the pipeline funds to P1, BR's cash will grow substantially during the
7   projected three week period. Attached as Exhibit D is a true and correct copy of a three
8   week projection showing the effect of the payment of the pipeline cash. When both
9   inflows and outflows are considered, BR's cash will grow to approximately $3.2 million
10  during the period. It is expected to continue to grow thereafter notwithstanding the
11  payment of any pipeline funds to P1.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LA3:1138721.8                              6

DECLARATION OF EVAN MEYER

1     Executed this 24TH day of September, 2007 in San Jose, California under

2   penalty of perjury.

3

4                                                    Evan Meyer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA3:1138721.8

DECLARATION OF EVAN MEYER

# SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "**Agreement**") is dated as of January 26, 2005 and entered into by and among **Integretel, Incorporated**, a California corporation ("**Company**"), and each **ADDITIONAL GRANTOR** that may become a party hereto after the date hereof in accordance with Section 23 hereof (each of Company and each Additional Grantor being a "**Grantor**" and collectively the "**Grantors**") and **PaymentOne Corporation** (the "**Secured Party**").

## PRELIMINARY STATEMENTS

A. The Company provides certain services to Secured Party and has heretofore and may hereafter incur obligations to Secured Party as a result of such services and other transactions, agreements, loans or debts. Among other things, the Company is in possession of (or has received the benefit of) certain accounts receivable and proceeds thereof that are the property of the Secured Party. The Company owes certain obligations to Secured Party concerning such accounts receivable and proceeds and owes (or may hereafter owe) certain additional obligations to the Secured Party concerning other transactions, loans, obligations and agreements. Secured Party provides certain services to the Company pursuant to that certain Direct Billing Services Agreement dated as of December 1, 2000.

B. It is a condition precedent to the continuing business relationship of the parties, the provision of services by the Secured Party to the Company and the performance under the Secured Party's agreements with the Company, including without limitation the Support Services Agreement dated as of July 1, 2000, as amended (the "**Support Services Agreement**"), that Grantors listed on the signature pages hereof shall have granted the security interests and undertaken the obligations contemplated by this Agreement to cover any and all obligations and liabilities heretofore or hereafter owed to the Secured Party.

NOW, **THEREFORE**, in consideration of the agreements set forth herein and in order to induce Secured Party to make loans and other extensions of credit and to provide services to Company and perform under its agreements with the Company, each Grantor hereby agrees with Secured Party as follows:

## SECTION 1. Grant of Security.

Each Grantor hereby assigns to Secured Party, and hereby grants to Secured Party a security interest in, all of such Grantor's right, title and interest in and to all of the personal property of such Grantor including the following, in each case whether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever the same may be located (the "**Collateral**"):

(a)     all Accounts;

(b)     all Chattel Paper;

LA3:1080475.4

## EXHIBIT A