(c)    all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(d)    all Documents;

(e)    all General Intangibles (including patents, trademarks, service marks, copyrights, and other intellectual property), Payment Intangibles and Software;

(f)    all Goods, including Inventory, Equipment and Fixtures;

(g)    all Instruments;

(h)    all Investment Property;

(i)    all Letter-of-Credit Rights and other Supporting Obligations;

(j)    all Records;

(k)    all Commercial Tort Claims; and

(l)    all Proceeds and Accessions with respect to any of the foregoing Collateral.

Each category of Collateral set forth above shall have the meaning set forth in the UCC, it being the intention of the Grantors that the description of the Collateral set forth above be construed to include the broadest possible range of assets.

## SECTION 2.  Security for Obligations.

This Agreement secures, and the Collateral is collateral security for, the prompt payment in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Secured Obligations of each Grantor.  "Secured Obligations" means any and all obligations and liabilities of every nature of Company now or hereafter existing, including without limitation any and all obligations under or arising out of or in connection with the extension of any credit, the making of any loans, the provision of any services by Secured Party to Company, the breach of any duty or reimbursement obligation owed to the Secured Party by Company, any other debt obligation of any kind or the Company's performance under its agreements with Secured Party, together with all extensions or renewals thereof, whether for principal, interest, reimbursement of amounts drawn under letters of credit, fees, expenses, indemnities or otherwise, whether voluntary or involuntary, direct or indirect, absolute or contingent, liquidated or unliquidated, whether or not jointly owed with others, and whether or not from time to time decreased or extinguished and later increased, created or incurred, and all or any portion of such obligations or liabilities that are paid, to the extent all or any part of such payment is avoided or recovered directly or indirectly from Secured Party as a preference, fraudulent transfer or otherwise, and all obligations of every nature of Grantors now or hereafter existing under this Agreement (including, without limitation, interest and other amounts that, but for the filing of a petition in bankruptcy with respect to Company or any other Grantor, would accrue on such obligations, whether or not a claim is allowed against Company or such Grantor for such amounts in the related bankruptcy proceeding).

RER-11        0684

**SECTION 3. Representations and Warranties.**

Each Grantor represents and warrants as follows:

(a)    **Jurisdiction of Organization.** Each Grantor's name as it appears in official filings in the state of its organization, type of organization (i.e. corporation, limited partnership, etc.), jurisdiction of organization and organization number provided by the applicable government authority of the jurisdiction of organization are set forth on Schedule 1 annexed hereto.

(b)    **Names.** No Grantor (or predecessor by merger or otherwise of such Grantor) has, within the five year period preceding the date hereof, or, in the case of an Additional Grantor, the date of the applicable Counterpart, had a different name from the name of such Grantor listed on the signature pages hereof, except as set forth on Schedule 2 annexed hereto.

(c)    **Due Authorization, etc.** Each Grantor is duly formed, validly existing and in good standing under the law of its jurisdiction of organization and has full entity power and authority to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement has been duly authorized by all necessary entity action. This Agreement constitutes a legally valid and binding obligation of each Grantor, enforceable against such Grantor in accordance with its terms, except as enforcement hereof may be limited by applicable bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally or by general equitable principles.

(d)    **No Conflict.** The execution, delivery and performance of this Agreement by each Grantor will not violate the organizational documents of such Grantor, any provision of law applicable to such Grantor or any order, judgment or decree of any court or other governmental agency binding on such Grantor.

(e)    **Security Interests.** The security interests in the Collateral granted hereunder constitute valid security interests in the Collateral, securing payment of the Secured Obligations.

**SECTION 4. Further Assurances.**

Each Grantor agrees that from time to time, at the expense of Grantors, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Secured Party may request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor will: (a) (i) execute (if necessary) and file such financing or continuation statements, or amendments thereto, (ii) execute and deliver, and cause to be executed and delivered, agreements establishing that Secured Party has control of Deposit Accounts and Investment Property of such Grantor, (iii) deliver to Secured Party all certificates or Instruments representing or evidencing Investment Property, accompanied by duly executed endorsements or instruments of transfer or assignment in blank, all in form and substance satisfactory to Secured Party and (iv) deliver such other

LA3:1080475.4                              3

RER-11        0685

instruments or notices, in each case, as may be necessary or desirable, or as Secured Party may request, in order to perfect and preserve the security interests granted or purported to be granted hereby; (b) furnish to Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Secured Party may reasonably request, all in reasonable detail; (c) at any reasonable time, upon request by Secured Party, exhibit the Collateral to and allow inspection of the Collateral by Secured Party, or persons designated by Secured Party; (d) at Secured Party's request, appear in and defend any action or proceeding that may affect such Grantor's title to or Secured Party's security interest in all or any part of the Collateral; and (e) use commercially reasonable efforts to obtain any necessary consents of third parties to the creation and perfection of a security interest in favor of Secured Party with respect to any Collateral. Each Grantor hereby authorizes Secured Party to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral (including any financing statement indicating that it covers "all assets" or "all personal property" of such Grantor).

**SECTION 5.** **Certain Covenants of Grantors.**

Each Grantor shall:

(a)    not use or permit any Collateral to be used unlawfully or in violation of any provision of this Agreement or any applicable statute, regulation or ordinance or any policy of insurance covering the Collateral;

(b)    give Secured Party at least 30 days' prior written notice of any change in such Grantor's name, identity or corporate structure;

(c)    give Secured Party at least 30 days' prior written notice of any reincorporation, reorganization or other action that results in a change of the jurisdiction of organization of such Grantor;

(d)    pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, services, materials and supplies) against, the Collateral except to the extent the validity thereof is being contested in good faith; provided that such Grantor shall in any event pay such taxes, assessments, charges, levies or claims not later than five days prior to the date of any proposed sale under any judgment, writ or warrant of attachment entered or filed against such Grantor or any of the Collateral as a result of the failure to make such payment; and

(e)    permit representatives of Secured Party at any time during normal business hours to inspect and make abstracts from Records of the Collateral, and each Grantor agrees to render to Secured Party, at such Grantor's cost and expense, such clerical and other assistance as may be reasonably requested with regard thereto.

**SECTION 6.** **Special Covenants with respect to Accounts.**

Except as otherwise provided in this section, each Grantor shall continue to collect, at its own expense, all amounts due or to become due to such Grantor under the Accounts. In connection with such collections, each Grantor may take (and, at Secured Party's

LA3:1080475.4                                        4

RER-11        0686

direction, shall take) such action as such Grantor or Secured Party may deem necessary or advisable to enforce collection of amounts due or to become due under the Accounts; provided, however, that Secured Party shall have the right at any time, upon the occurrence and during the continuation of an Event of Default and upon written notice to such Grantor of its intention to do so, to (a) notify the account debtors or obligors under any Accounts of the assignment of such Accounts to Secured Party and to direct such account debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to Secured Party, (b) notify each Person maintaining a lockbox or similar arrangement to which account debtors or obligors under any Accounts have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to Secured Party, (c) enforce collection of any such Accounts at the expense of Grantors, and (d) adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. After receipt by such Grantor of the notice from Secured Party referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including checks and other Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of Secured Party hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over or delivered to Secured Party in the same form as so received (with any necessary endorsement), and (ii) such Grantor shall not, without the written consent of Secured Party, adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any account debtor or obligor thereof, or allow any credit or discount thereon.

## SECTION 7. Secured Party Appointed Attorney-in-Fact.

Each Grantor hereby irrevocably appoints Secured Party as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, Secured Party or otherwise, from time to time in Secured Party's discretion to take any action and to execute any instrument that Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

      (a)    upon the occurrence and during the continuance of an Event of Default, to obtain and adjust insurance required to be maintained by such Grantor;

      (b)    upon the occurrence and during the continuance of an Event of Default, to ask for, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral;

      (c)    upon the occurrence and during the continuance of an Event of Default, to receive, endorse and collect any drafts or other Instruments, Documents, Chattel Paper and other documents in connection with clauses (a) and (b) above;

      (d)    upon the occurrence and during the continuance of an Event of Default, to file any claims or take any action or institute any proceedings that Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce or protect the rights of Secured Party with respect to any of the Collateral;

      (e)    to pay or discharge liens (other than liens permitted under this Agreement or the Credit Agreement) levied or placed upon or threatened against the Collateral, the legality

or validity thereof and the amounts necessary to discharge the same to be determined by Secured Party in its sole discretion, any such payments made by Secured Party to become obligations of such Grantor to Secured Party, due and payable immediately without demand;

(f)     upon the occurrence and during the continuance of an Event of Default, to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications and notices in connection with Accounts and other documents relating to the Collateral; and

(g)     upon the occurrence and during the continuance of an Event of Default, generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though Secured Party were the absolute owner thereof for all purposes, and to do, at Secured Party's option and Grantors' expense, at any time or from time to time, all acts and things that Secured Party deems necessary to protect, preserve or realize upon the Collateral and Secured Party's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

**SECTION 8.  Secured Party May Perform.**

If any Grantor fails to perform any agreement contained herein, Secured Party may itself perform, or cause performance of, such agreement, and the expenses of Secured Party incurred in connection therewith shall be payable by Grantors under Section 12(b) hereof.

**SECTION 9.  Standard of Care.**

The powers conferred on Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property.

**SECTION 10.     Remedies.**

(a)     **Generally.** If any Event of Default shall have occurred and be continuing, Secured Party may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Collateral), and also may (i) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of Secured Party forthwith, assemble all or part of the Collateral as directed by Secured Party and make it available to Secured Party at a place to be designated by Secured Party that is reasonably convenient to both parties, (ii) enter onto the property where any Collateral is located and take possession thereof with or without judicial process, (iii) prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any manner to the extent Secured Party deems appropriate, (iv) take possession of any Grantor's premises or place custodians in exclusive

RER-11     0688

control thereof, remain on such premises and use the same and any of such Grantor's equipment for the purpose of completing any work in process, taking any actions described in the preceding clause (iii) and collecting any Secured Obligation, (v) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Secured Party's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as Secured Party may deem commercially reasonable, (vi) exercise dominion and control over and refuse to permit further withdrawals from any Deposit Account maintained with Secured Party and provide instructions directing the disposition of funds in Deposit Accounts not maintained with Secured Party and (vii) provide entitlement orders with respect to Security Entitlements and other Investment Property constituting a part of the Collateral and, without notice to any Grantor, transfer to or register in the name of Secured Party or any of its nominees any or all of the Collateral constituting Investment Property. Secured Party may be the purchaser of any or all of the Collateral at any such sale and Secured Party, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by Secured Party at such sale. Each Grantor hereby waives any claims against Secured Party arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if Secured Party accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, Grantors shall be jointly and severally liable for the deficiency and the fees of any attorneys employed by Secured Party to collect such deficiency. Each Grantor further agrees that a breach of any of the covenants contained in this Section 10 will cause irreparable injury to Secured Party, that Secured Party has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and each Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities.

(b)     **Intellectual Property.**  In addition to, and not by way of limitation of, the granting of a security interest in the Collateral pursuant hereto, each Grantor, effective upon the occurrence and during the continuation of an Event of Default, hereby assigns, transfers and conveys to Secured Party the nonexclusive right and license to use all trademarks, tradenames, copyrights, patents or technical processes owned or used by such Grantor that relate to the Collateral, together with any goodwill associated therewith, all to the extent necessary to enable Secured Party to realize on the Collateral in accordance with this Agreement and to enable any transferee or assignee of the Collateral to enjoy the benefits of the Collateral. This right shall inure to the benefit of all successors, assigns and transferees of Secured Party and its successors, assigns and transferees, whether by voluntary conveyance, operation of law, assignment, transfer, foreclosure, deed in lieu of foreclosure or otherwise. Such right and license shall be granted free of charge, without requirement that any monetary payment whatsoever be made to such Grantor.

RER-11          0689

**SECTION 11.    Application of Proceeds.**

Except as expressly provided elsewhere in this Agreement, all proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in the following order of priority:

FIRST:  To the payment of all costs and expenses of such sale, collection or other realization, including reasonable compensation to Secured Party and its agents and counsel, and all other expenses, liabilities and advances made or incurred by Secured Party in connection therewith, and all amounts for which Secured Party is entitled to indemnification hereunder and all advances made by Secured Party hereunder for the account of Grantors, and to the payment of all costs and expenses paid or incurred by Secured Party in connection with the exercise of any right or remedy hereunder;

SECOND:  To the payment of all other Secured Obligations; and

THIRD:  To the payment to or upon the order of Company, or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

**SECTION 12.    Indemnity and Expenses.**

(a)    Grantors jointly and severally agree to indemnify Secured Party from and against any and all claims, losses and liabilities in any way relating to, growing out of or resulting from this Agreement and the transactions contemplated hereby (including, without limitation, enforcement of this Agreement), except to the extent such claims, losses or liabilities result solely from Secured Party's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

(b)    Grantors jointly and severally agree to pay to Secured Party upon demand the amount of any and all costs and expenses, including the fees and expenses of counsel and of any experts and agents, that Secured Party may incur in connection with the custody or preservation of the Collateral, the exercise of rights or remedies hereunder or the failure by any Grantor to perform or observe any of the provisions hereof.

(c)    The obligations of Grantors in this Section 12 shall survive the termination of this Agreement and the discharge of Grantors' other obligations under this Agreement.

**SECTION 13.    Amendments; Etc.**

No amendment, modification, termination or waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall in any event be effective unless the same shall be in writing and signed by Secured Party and, in the case of any such amendment or modification, by Grantors; provided this Agreement may be modified by the execution of a Counterpart by an Additional Grantor in accordance with Section 23 hereof and Grantors hereby waive any requirement of notice of or consent to any such amendment. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.

LA3:1080475.4

8

**SECTION 14.    Notices.**

Any notice or other communication herein required or permitted to be given shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service, upon receipt of telefacsimile, or three business days after depositing it in the United States mail with postage prepaid and properly addressed; provided that notices to Secured Party shall not be effective until received. For the purposes hereof, the address of each party hereto shall be set forth under such party's name on the signature pages hereof or such other address as shall be designated by such party in a written notice delivered to the other parties hereto.

**SECTION 15.    Failure or Indulgence Not Waiver; Remedies Cumulative; Severability.**

(a)    No failure or delay on the part of Secured Party in the exercise of any power, right or privilege hereunder shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude any other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

(b)    In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**SECTION 16.    Continuing Security Interest; Termination and Release.**

(a)    This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until the payment in full of the Secured Obligations (other than Unasserted Obligations), (ii) be binding upon each Grantor and its successors and assigns, and (iii) inure, together with the rights and remedies of Secured Party hereunder, to the benefit of Secured Party and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (iii), Secured Party may assign or otherwise transfer any of the Secured Obligations held by it to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Secured Party herein or otherwise.

(b)    Upon the payment in full of all Secured Obligations (other than Unasserted Obligations), the security interest granted hereby shall terminate and all rights to the Collateral shall revert to Grantors. Upon any such termination Secured Party will, at Grantors' expense, execute and deliver to Grantors such documents as Grantors shall reasonably request to evidence such termination.

**SECTION 17.    Headings.**

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

LA3:1080475.4                                    9

**SECTION 18.**    <u>Governing Law; Rules of Construction.</u>

THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA (INCLUDING, WITHOUT LIMITATION, SECTION 1646.5 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, EXCEPT TO THE EXTENT THAT THE UCC PROVIDES THAT THE PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF CALIFORNIA, IN WHICH CASE THE LAWS OF SUCH JURISDICTION SHALL GOVERN WITH RESPECT TO THE PERFECTION OF THE SECURITY INTEREST IN, OR THE REMEDIES WITH RESPECT TO, SUCH PARTICULAR COLLATERAL.

**SECTION 19.**    <u>Consent to Jurisdiction and Service of Process.</u>

ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY GRANTOR ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR ANY OBLIGATIONS HEREUNDER, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF CALIFORNIA. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH GRANTOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (I) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (II) WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*; (III) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO SUCH GRANTOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 14 HEREOF; (IV) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (III) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER SUCH GRANTOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; (V) AGREES THAT SECURED PARTY RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST SUCH GRANTOR IN THE COURTS OF ANY OTHER JURISDICTION; AND (VI) AGREES THAT THE PROVISIONS OF THIS SECTION 19 RELATING TO JURISDICTION AND VENUE SHALL BE BINDING AND ENFORCEABLE TO THE FULLEST EXTENT PERMISSIBLE UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 410.40 OR OTHERWISE.

**SECTION 20.**    <u>Waiver of Jury Trial.</u>

GRANTORS AND SECURED PARTY HEREBY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT

CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.

**SECTION 21.    Acknowledgment re Collection Property**

The Company acknowledges that it is in possession of certain accounts receivable, proceeds thereof and other property that belong to the Secured Party and that the Company will hereafter come into possession of additional accounts receivable, proceeds and other property that belong to the Secured Party. Without limiting the generality of the foregoing, the Company provides collection services for the Secured Party, including without limitation collection services under the Support Services Agreement (together with any other written or unwritten agreement or arrangement concerning collection services, a **"Collection Agreement"**). Company acknowledges that all accounts receivable, proceeds and other property in its possession in any way related to a Collection Agreement (the **"Collection Property"**) is property of Secured Party, is held in trust for the benefit of Secured Party and shall be segregated from the property of the Company and the other Grantors to the greatest extent possible. Nothing in this Agreement shall be interpreted as providing that any of the Collection Property belongs to the Company or the other Grantor; provided, however, to the extent that the Company or any Grantor is determined to have any interest in the Collection Property, such interest constitutes Collateral and any debts or obligations in any way related to a Collection Agreement constitute Secured Obligations.

**SECTION 22.    Counterparts.**

This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

**SECTION 23.    Definitions.**

(a)    Each capitalized term utilized in this Agreement that is not defined in this Agreement, but that is defined in the UCC, including the categories of Collateral listed in Section 1 hereof, shall have the meaning set forth in Divisions 1, 8 or 9 of the UCC.

(b)    In addition, the following terms used in this Agreement shall have the following meanings:

**"Additional Grantor"** means a Subsidiary of Company that becomes a party hereto after the date hereof as an additional Grantor by executing a Counterpart.

**"Collateral"** has the meaning set forth in Section 1 hereof.

"**Counterpart**" means a counterpart to this Agreement, in substantially the form set forth as Exhibit I attached hereto, entered into by a Subsidiary of Company pursuant to Section 23 hereof.

"**Event of Default**" means (i) any failure by Company to pay any amounts owed or owing to Secured Party, (ii) any failure by Company to transfer to Secured Party any amounts constituting funds held for the benefit of Secured Party, or (iii) any breach in Company's performance under any of its agreements with Secured Party; provided, however, that no such failure or breach shall constitute an Event of Default unless and until Secured Party shall have provided a written notice of default to Company stating that such a violation or breach has occurred and identifying the violation or breach with particularity and Company shall have failed to cure such violation or breach for 30 days after its receipt of the notice.

"**Secured Obligations**" has the meaning set forth in Section 2 hereof.

"**Subsidiary**", with respect to any person, means any corporation, partnership, trust, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the members of the governing body is at the time owned or controlled, directly or indirectly, by that person or one or more of the other Subsidiaries of that person or a combination thereof.

"**UCC**" means the Uniform Commercial Code, as it exists on the date of this Agreement or as it may hereafter be amended, in the State of California.

"**Unasserted Obligations**" means, at any time, obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities in respect of which no claim or demand for payment has been made (or, in the case of obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

## SECTION 24.    Additional Grantors.

The initial Grantors hereunder shall be Company and such of the Subsidiaries of Company as are signatories hereto on the date hereof. From time to time subsequent to the date hereof, additional Subsidiaries of Company may become Additional Grantors, by executing a Counterpart. Upon delivery of any such Counterpart to Secured Party, notice of which is hereby waived by Grantors, each such Additional Grantor shall be a Grantor and shall be as fully a party hereto as if such Additional Grantor were an original signatory hereto. Each Grantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Grantor hereunder, nor by any election of Secured Party not to cause any Subsidiary of Company to become an Additional Grantor hereunder. This Agreement shall be fully effective as to any Grantor that is or becomes a party hereto regardless of whether any other Person becomes or fails to become or ceases to be a Grantor hereunder.

IN WITNESS WHEREOF, Grantors and Secured Party have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

INTEGRETEL, INCORPORATED
as Grantor

By: _____

Name: _Ken Dawson_____

Title: _President_____

Notice Address:

_____

_____

PAYMENTONE CORPORATION,
as Secured Party

By: _____

Name: _Evan B. Heyer_____

Title: _CFO_____

Notice Address:

_5883 Rue Ferrari_____

_San Jose, CA    95138_____

*Signature Page to Security Agreement*

LA3:1080475.4

# SCHEDULE 1
# TO
# SECURITY AGREEMENT

## Type and Jurisdiction of Organization

| Name of Grantor | Type of Organization | Jurisdiction of Organization | Organization Number |
|---|---|---|---|
| Integretel, Incorporated | Corporation | California | C1554405 |

LA3:1080475.4

RER-11    0696

**SCHEDULE 2
TO
SECURITY AGREEMENT**

**Other Names**

| Name of Grantor | Other Names |
| --- | --- |
| | |

LA3:1080475.4

EXHIBIT I TO
SECURITY AGREEMENT

## [FORM OF COUNTERPART]

COUNTERPART (this "**Counterpart**"), dated as of _____, is delivered pursuant to Section 23 of the Security Agreement referred to below. The undersigned hereby agrees that this Counterpart may be attached to the Security Agreement, dated as of October __, 2004 (said Security Agreement, as it may heretofore have been and as it may hereafter be further amended, restated, supplemented or otherwise modified from time to time being the "**Security Agreement**"; capitalized terms used herein not otherwise defined herein shall have the meanings ascribed therein), among Integretel, Inc., the other Grantors named therein, and PaymentOne Corporation, as Secured Party. The undersigned by executing and delivering this Counterpart hereby becomes a Grantor under the Security Agreement in accordance with Section 23 thereof and agrees to be bound by all of the terms thereof. Without limiting the generality of the foregoing, the undersigned hereby:

(i)    authorizes the Secured Party to add the information set forth on the Schedule to this Agreement to the correlative Schedule attached to the Security Agreement;

(ii)    agrees that all Collateral of the undersigned, including the items of property described on the Schedules hereto, shall become part of the Collateral and shall secure all Secured Obligations; and

(iii)    makes the representations and warranties set forth in the Security Agreement, as amended hereby, to the extent relating to the undersigned.

**[NAME OF ADDITIONAL GRANTOR]**

By: _____
Name:
Title:

LA3:1080475.4

RER-11          0698



SECRETARY OF STATE
# KEVIN SHELLEY
STATE OF CALIFORNIA

## UCC Filing Acknowledgement

01/28/2005

Page 1 of 1

CT CORPORATION SYSTEM
111 EIGHTH AVENUE 13TH FLOOR
NEW YORK NY 10011

| | |
|---|---|
| Filing Fee: | $10.00 |
| Special Handling Fee: | $6.00 |
| Total Fee: | $16.00 |

The California Secretary of State's Office has received and filed your document. The information below reflects the data that was indexed in our system. Please review the information for accuracy. Included is an image of the filed document to assist you in your review. If you find a potential error, please notify the UCC Section at the number listed below at your earliest convenience.

Filing Type: **Financing Statement**          File Date: **01/27/2005**          File Time: **11:59**

Filing Number: **05-7013728538**          Lapse Date: **01/27/2010**

Debtor(s):
ORGANIZATION          **INTEGRETEL, INCORPORATED**
                      **5883 RUE FERRARI SAN JOSE CA USA 95138**

Secured Party(ies):
ORGANIZATION          **PAYMENTONE CORPORATION**
                      **5883 FUE FERRARI SAN JOSE CA USA 95138**

Filing by the Secretary of State is not conclusive proof that all conditions for securing priority have been met. Ensuring that accurate information is on the document to be filed is the responsibility of the filing party. If this filing is challenged, the Secretary of State does not guarantee that the filing is legally sufficient to secure priority under UCC Article 9 and expressly disclaims any liability for failure of the filing party to secure priority resulting from the information contained in the filed document, or the lack of information on the filed document.

UNIFORM COMMERCIAL CODE 1500 11TH STREET, 2ND FL. · SACRAMENTO, CA 95814 · PO BOX 942835 · SACRAMENTO, CA 94235-0001 · (916) 653-3516 · HTTP://WWW.UCCCONNECT.SS.CA.GOV

PROGRAMS ARCHIVES, BUSINESS PROGRAMS, ELECTIONS, INFORMATION TECHNOLOGY, GOLDEN STATE HISTORY MUSEUM, MANAGEMENT SERVICES, SAFE AT HOME, SPECIAL FILINGS, UNIFORM COMMERCIAL CODE, NOTARY PUBLIC, POLITICAL REFORM

## EXHIBIT B

RER-11        0699

JAN-27-2005  09:14        CT CORP UCC SERVICES                    800 828 3066    P.02/02

## UCC FINANCING STATEMENT
XLLOW INSTRUCTIONS (front and back) CAREFULLY
. NAME & PHONE OF CONTACT AT FILER (optional)

**05-7013728538**
**01/27/2005 11:59**

**FILED**
CALIFORNIA
SECRETARY OF STATE

. SEND ACKNOWLEDGMENT TO:  (Name and Address)

lease return copy to:
T CORPORATION SYSTEM
ttn:Michael Ruden/UCC/TEAM 2
295 Gateway Oaks Drive, Suite 185
acramento, CA  95833
6290427

2375020002    UCC 1 FILING

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| INTEGRETEL, INCORPORATED | | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| . MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 883 Rue Ferrari | San Jose | CA | 95138 | USA |

| . SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION CORPORATION | 1f. JURISDICTION OF ORGANIZATION CALIFORNIA | 1g. ORGANIZATIONAL ID #, if any C2304674 | ☐ NONE |

ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| . MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| . SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | ☐ NONE |

SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PAYMENTONE CORPORATION | | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |

| . MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 883 Rue Ferrari | San Jose | CA | 95138 | USA |

This FINANCING STATEMENT covers the following collateral:

l of Debtor's right, title and interest in and to all of the personal property of Debtor including the following, in each case
nether now or hereafter existing, whether tangible or intangible, whether now owned or hereafter acquired and wherever
e same may be located (the "Collateral"): all Accounts; all Chattel Paper; all Money and Deposit Accounts, together with
amounts of deposit from time to time in such Deposit Accounts; all Documents; all General Intangibles (including
tents, trademarks, service marks, copyrights, and other intellectual property), Payment Intangibles and Software; all
oods, including Inventory, Equipment and Fixtures; all Instruments; all Investment Property; all Letter-of-Credit Rights
d other Supporting Obligations; all Records; all Commercial Tort Claims; and all Proceeds and Accessions with respect
any of the foregoing Collateral. Each category of Collateral described herein shall have the meaning set forth in the
niform Commercial Code, as it exists on the date this Financing Statement is filed with the California Secretary of State
as it may hereafter be amended, in the State of California.

ALTERNATIVE DESIGNATION (if applicable): ☐ LESSEE/LESSOR  ☐ CONSIGNEE/CONSIGNOR  ☐ BAILEE/BAILOR  ☐ SELLER/BUYER  ☐ AG. LIEN  ☐ NON-UCC FILING

☐ THIS FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable]  7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional]  ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

OPTIONAL FILER REFERENCE DATA

CA SOS: 658,390-004

LING OFFICE COPY— UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

American Legalnet, Inc.
www.USCourtForms.com

TOTAL P.02

RER–11        0700

| FILING OFFICER STATEMENT | | DOCUMENT NUMBER: 2541280001 |
|---|---|---|

**FILING OFFICER STATEMENT**

**INTERNAL USE ONLY**

1. Identification of the Record to which this **FILING OFFICER STATEMENT** relates.

  1a. INITIAL FINANCING STATEMENT #: 057013728538

  1b. RECORD TO WHICH THIS STATEMENT RELATES:

**DOCUMENT NUMBER: 2541280001**
**FILING NUMBER: 0570154822**
**FILE DATE/TIME: 2/10/2005 11:12:00 AM**

THE ABOVE SPACE IS FOR THE CA FILING OFFICE USE ONLY

2. Describe the inaccuracy or mistake on the part of the file office:

  ☐ Debtor       ☒ Secured Party
  ☐ Name and Address not indexed.
  ☐ Name indexed incorrectly
  ☒ Address indexed incorrectly

  ☐ File Date entered incorrectly
  ☐ Wrong Action type entered
  ☐ Wrong Filing Type entered
  ☐ Filed in Error
  ☐ Other

3. Describe filing office administrative action taken as a result of inaccuracy or mistake (including date of each action).

  ☐ Added Name:
  ☐ Address:
  ☐ Corrected Name from:
  ☐ To:
  ☒ Corrected Address from: 5883 rue ferrari, san jose, CA, USA 95138
  ☒ To: 5883 rue ferrari, san jose, CA, USA 95138
  ☐ Corrected File Date from          to
  ☐ Re-entered the UCC3          as a
  ☐ Changed the Filing Type from          to
  ☐ Document Deleted
  ☐ Other:

4. Additional Explanation (if applicable)

02/10/2005 11:12

1

**UCC FINANCING STATEMENT AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER (optional)

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

> Please return copy to:
> CT CORPORATION SYSTEMS/UCC
> Attn: Melissa Guglielmana
> 2295 Gateway Oaks Drive, Suite 185
> Sacramento, CA 95833
> 800-874-8820

└─ 67608841 - 01

**06-70889580**

**10/18/2006 16:47**

FILED
CAL1069926
SOS  SECRETARY OF STATE

1a. INITIAL FINANCING STATEMENT FILE #
05-7815722636 filed January 27, 2006

2. □ TERMINATION

3. □ CONTINUATION

4. □ ASSIGNMENT

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☑ Debtor or □ Secured Party of record.

6. CURRENT RECORD INFORMATION:
   6a. ORGANIZATION'S NAME

   6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

7. CHANGED (NEW) OR ADDED INFORMATION:
   7a. ORGANIZATION'S NAME
   **THE BILLING RESOURCE**

   7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

   7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY
   **5883 RUE FERRARI** | **SAN JOSE** | **CA** | **95138** | **USA**

   7d. | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any
   | **CORPORATION** | **CALIFORNIA** | **C1304674** | □ NONE

8. AMENDMENT (COLLATERAL CHANGE):

The address may be: 5883 RUE FERRARI, SAN JOSE, CA 95138.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT
   9a. ORGANIZATION'S NAME
   **PAYMENTONE CORPORATION**

   9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

10. OPTIONAL FILER REFERENCE DATA
    CA SOS: 655,396-805

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

*EXHIBIT C*

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Three Week Period Ending October 5, 2007**

| Week Ending | 1 | 2 | 3 | |
|---|---|---|---|---|
| | 9/21/07 | 9/28/07 | 10/5/07 | Total |
| Inflows | | | | |
| 1  CIC 402 pipeline collections remitted to TBR by LECs | $ 918,762 | $ 1,727,641 | $ 1,242,446 | $ 3,888,849 |
| Outflows | | | | |
| 2  Total operating costs and expenses | (95,000) | (215,000) | (305,000) | (615,000) |
| 3  Bankruptcy costs (1) | 0 | 0 | 0 | 0 |
| 4  CIC 402 pipeline collections remitted to P1 | (580,432) | (994,684) | (433,265) | (2,008,381) |
| 5  Total Outflows | (675,432) | (1,209,684) | (738,265) | (2,623,381) |
| 6  Net cash flow | $ 243,330 | $ 517,957 | $ 504,181 | $ 1,265,468 |
| 7  Beginning available cash | $ 1,945,598 | $ 2,188,928 | $ 2,706,885 | $ 1,945,598 |
| 8  Net cash flow | 243,330 | 517,957 | 504,181 | 1,265,468 |
| 9  Ending cash | $ 2,188,928 | $ 2,706,885 | $ 3,211,066 | $ 3,211,066 |

NOTE:
(1) Assumes counsel paid through retainers previously established.

**EXHIBIT D**

RER–11    0703

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  TERRENCE V. PONSFORD, Cal. Bar No. 42648
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   Email:        mahrens@sheppardmullin.com
7                jrehfeld@sheppardmullin.com
                 okatz@sheppardmullin.com
8
   Proposed Attorneys for The Billing Resource,
9  dba Integretel

10

11                 UNITED STATES BANKRUPTCY COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                      SAN JOSE DIVISION

14

15  In re                               Case No. 07-52890 ASW

16  THE BILLING RESOURCE, dba            Chapter 11
    INTEGRETEL, a California corporation,
17                                       DECLARATION OF KEN DAWSON IN
                   Debtor.              SUPPORT OF SUPPLEMENTAL
18                                       MEMORANDUM OF DEBTOR IN
    Tax ID: 33-0289863                   SUPPORT OF MOTION TO APPROVE
19                                       USE OF CASH COLLATERAL
                                         AND IN REPLY TO CERTAIN FURTHER
20                                       OBJECTIONS TO SUCH USE

21
                                         Date:        September 26, 2007
22                                       Time:        2:15 p.m.
                                         Place:       United States Bankruptcy Court
23                                                    280 South First Street
                                                      San Jose, California
24                                       Judge:       Hon. Arthur S. Weissbrodt
                                         Courtroom:   3020
25

26

27

28

W02-WEST:FJR\400439200.2
                                                              DECLARATION

RER-11    0704

I, Ken Dawson, declare as follows:

1.      I am the President and Secretary of The Billing Resource, dba Integretel, a California corporation (the "Debtor"), the named debtor in this case. I make this declaration in that capacity. I was one of the Debtor's founders in 1988 and I have been with the company ever since. I have personal knowledge of the matters set forth below. Except for those statements made upon information and belief, the following facts are based upon my personal knowledge and if called to testify, I could and would competently testify to such facts. As to those statements made upon information and belief, I believe them to be true.

2.      This declaration is submitted in support of the Debtor's "Supplemental Memorandum Of Debtor In Support Of Motion To Approve Use Of Cash Collateral" (the "Supplement"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Supplement.

3.      It is my understanding that Thermo Credit has filed an opposition to the Debtor's motion for use of cash collateral and attached to its opposition a document which Thermo Credit calls the "tri-party agreement" dated June 14, 2004 (the "Tri-Party Agreement").

4.      Attached hereto as Exhibit 1 is a redacted copy of the Master Services Agreement between the Debtor and Inmate Calling Solutions ("ICS") dated as of July 1, 2002, together with its redacted Amendment Number One to the Master Services Agreement and redacted Amendment Number Two to the Master Services Agreement. The Master Services Agreement, as amended by the two foregoing amendments, currently remains in effect and has remained in effect at all times since the foregoing date. The Master Services Agreement dated as of July 1, 2002 between the Debtor and ICS was in effect at the time that the Tri-Party Agreement was entered into, and is referred to in the Tri-Party Agreement.

5.      ICS is a subsidiary of the Debtor. ICS, like P1, is also a customer of the Debtor. But, unlike P1, ICS has no security interest in any of the assets of the Debtor. In particular, ICS does not have a security interest in the accounts receivable of the Debtor. It also has no security interest in the cash of the Debtor.

W02-WEST:FJR\400439200.2

-1-

DECLARATION

6.    The Debtor from and after June 14, 2004 has made all payments to Thermo Credit, and not ISC, under the Tri-Party Agreement and the Master Services Agreement.

7.    In connection with its motion to authorize the Debtor to use cash collateral, the Debtor has requested the Bankruptcy Court approve that certain "First Amended Stipulation With PaymentOne Regarding Use Of Cash Collateral And Adequate Protection" (the "First Amended PaymentOne Stipulation").    Attached hereto as Exhibit 2 is a copy of the blacklined version of the First Amended Payment One Stipulation, which compares the First Amended PaymentOne Stipulation to the prior stipulation between the Debtor and PaymentOne which was attached as Exhibit E to the Cash Collateral Motion.    A copy of a revised three week operating budget (the "Revised Budget") is attached hereto as Exhibit 3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 24, 2007, at San Jose, California.


_____
        /s/ Ken Dawson
        KEN DAWSON

# EXHIBIT 1 – PART A

## MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into as of July 1, 2002 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Inmate Calling Solutions, LLC, a California limited liability company ("Client").

**WHEREAS,** Client is a provider of certain telecommunications related products and services within the inmate correctional segment of the telecommunications industry; and

**WHEREAS,** IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

**WHEREAS,** IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

**NOW, THEREFORE,** the parties hereto agree as follows:

1.    **DEFINITIONS.**  Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

2.    **IGT SERVICES.**  IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Schedule | Service Order Options | Initial Order |
|----------|----------------------|---------------|
| I | Validation/Registration | ( X ) |
| II | PhoneBill Services (Telco Billing) | ( X ) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( X ) |
| V | Automated Clearing House (ACH) | ( X ) |
| VI | End-User Inquiry (required with Service Order II or III) | ( X ) |
| VII | Collection Services | ( ) |
| VIII | Pre-Pay Service Support | ( X ) |

## EXHIBIT 1

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 2 of 11

RER-11    0708

3.    **TERM.**  The initial term of this Agreement shall be for six (6) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of two (2) years (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term". Throughout the Term of this Agreement, Client shall use IGT exclusively for all services covered hereunder and shall not engage any competitors of IGT for any such services.

4.    **CLIENT SUBMISSION AND IGT EDIT.**  Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

5.    **SERVICE FEES.**  IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

6.    **TAXES.**  Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either (check which applies): (i) [_____] include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; (ii) [_____] provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions; or (iii) [_X_] hereby direct IGT to cause its then-current taxing rates and logic to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the

appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

7.    **CLIENT REPRESENTATIONS AND WARRANTIES.**  Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

8.    **IGT's REPRESENTATION AND WARRANTY.**  IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

9.    **PROOF OF COMPLIANCE.**  Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance. Each party agrees to notify the other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

10.    **LIMITATION OF LIABILITY.**  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

11.    **INDEMNIFICATION.**

(a)    <u>By Client</u>.  Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands,

losses, damages, costs or expenses, including attorney's fees, arising out of or relating to: (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; (ii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

      (b)    <u>By IGT.</u> IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

      (c)    <u>Enforcement.</u> In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and, thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

    12.    <u>EVENTS OF DEFAULT.</u> Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):

      (a)    The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or

      (b)    The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or not reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or

      (c)    Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

      (d)    The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or

       (e)     Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or

       (f)     The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

**13.**    **EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees, for the most recent three months in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

**14.**    **CONFIDENTIALITY.**

       (a)     As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.

       (b)     Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.

       (c)     Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:

       (i)     Information that now or hereinafter comes into the public domain without breach of this Agreement;

       (ii)     Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 5 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 6 of 11

RER-11    0712

(iii)    Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;

(iv)    Information approved for release by the written authorization of the Disclosing Party; or

(vi)    Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d)    All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party. Upon written request by a Disclosing Party, the Receiving party shall return to the Disclosing Party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

15.    **CHOICE OF LAW AND VENUE.** THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

16.    **PUBLIC ANNOUNCEMENTS.** Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

17.    **NOTICES.** All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation. All notices and other communications shall be deemed given when actually

received by a party as evidenced by an appropriate confirmation. Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

Integretel, Incorporated                    Inmate Calling Solutions, LLC
5883 Rue Ferrari                             5883 Rue Ferrari
San Jose, CA 95138                           San Jose, CA 95138
Attention: General Counsel                   Attention: General Manager
FAX: 408-362-2795                            FAX: (408) 362-2795

18.    **DISPUTE RESOLUTION AND ARBITRATION**.  Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a)    Dispute Resolution.  At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement.  The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives.  Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute.  Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement, exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties.  Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b)    Arbitration.  If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules").  A party may demand such arbitration in accordance with the procedures set out in those Rules.  The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration.  The arbitration shall be held in San Jose, California.  Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction.  Each party shall bear its own costs of these procedures.  A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents.  The parties shall share equally the fees of the arbitration and the arbitrator.

19.    **GENERAL PROVISIONS**.

(a)    Attorney's Fees.  In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b)    Severability.  If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c)    Captions.  The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)    Assignment.  Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e)    Amendments; No Waiver.  Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto.  No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f)    Third Party Rights.  The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g)    Further Assurances.  The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h)    Force Majeure.  Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event"). Upon the occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

(i)    Counterparts.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(j)    Integration of Agreement.  This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k)    Relationship of the Parties.  Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party. In the performance of its obligations hereunder, IGT is acting as an independent contractor to Client.

(l)    Corporate Authority.  The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

{ - Signature page follows. Remainder of page intentionally left blank. - }

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 9 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 10 of 11

RER-11    0716

09/22/2007  08:42    4155079098                NICKERSON                    PAGE  11/49

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date set forth above.

Integretel, Inc. (IGT)                        Inmate Calling Solutions, LLC (Client)

By: _____               By: _____

Name: __Ken Dawson__                         Name: __BRENDAN PHILBIN__

Title: __President__                         Title: __COO__

Date: __7/24/03__                            Date: __7/23/03__

**EXHIBIT "A"**
**Definition of Certain Terms**
Page 1 of x

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User Inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

**EXHIBIT "B"**
<u>Fees</u>
Page 1 of 1

The following Fees shall apply:

**1)**      **Validation/Registration**                 *Redacted*

**2)**      **PhoneBill Services (Telco Billing)**

        a) Account setup fee (with sub-CIC):
           Account setup fee (without sub-CIC):

        b) IGT Processing Fees:

               <u>Transactions per Deposit Month</u>
               ALL VOLUME LEVELS



*Redacted*

**3)**      **DirectBill Services (Client-Branded Billing)**

**4)**      **Credit Card Processing**

**5)**      **Automated Clearing House (ACH)**          *Redacted*

**6)**      **End-User Inquiry**

        a) Verbal End-User Inquiry

        b) Written End-User Inquiry

        c) Written regulatory complaints

**7)**      **Collection Services**

**8)**      **Pre-Pay Services**

## EXHIBIT "C"
### Billing and Collections Guidelines
Page 1 of 3

IGT has adopted the anti-cramming consumer protection guidelines of the Coalition to Ensure Responsible Billing (CERB).  By adopting these guidelines, IGT is committed to billing standards and practices to ensure a maximum level of consumer protection.  Client hereby agrees to the following in consideration of IGT providing its billing services.

1.    COMPANY INFORMATION

Client shall provide IGT with the following information:

- Client's company name, including dba's, and address.
- Names of all officers, directors and principals of Client.
- Proof of corporate or partnership status.
- Copies of certifications as required.
- Foreign corporation filings as required.
- Any applicable tariffs upon request.
- The names and addresses of any telemarketing companies to be used by the Client.
- The names and addresses of any third party verification companies to be used by the Client.

2.    SCREENING OF PROGRAMS, PRODUCTS AND SERVICES

For all monthly subscription or other recurring services, Client shall provide IGT with the following information:

- Marketing materials relating  to the programs or services to be billed by IGT.
- Sample advertisements (print or other media) relating to the programs or services to be billed by IGT.
- Applicable fulfillment package (which must include cancellation information if not included elsewhere and a toll free Client service telephone number).
- Complete scripts for sales verification.  Client shall not change scripts or programs without first providing changes to IGT.
- Honest, clear, and understandable text phrase for appearance on the bill.

NOTE:  IGT will not provide billing for services employing the following practices and Client hereby agrees it will not provide Billing Transactions to IGT for the following:

- Box, sweepstakes, or contest – type entry forms.
- Negative option sale offers.
- 800 pay-per-call
- Collect callback
- Phantom billing (charging for calls never made or services never provided).
- Such other programs, products, or services that regulatory agencies, IGT or Telcos, where applicable, determine to be deceptive to consumers.

**EXHIBIT "C"**
**Billing and Collections Guidelines**
Page 2 of 3

3.   **COMPLIANCE MONITORING**

IGT requires Client to:

- Minimize End-User inquiries and complaints it receives.
- Minimize End-User complaints to government agencies.
- Maintain up-to-date records regarding complaints and inquiries that it receives.
- Promptly adopt action plans to respond to complaints and inquiries.
- Assist and cooperate with investigations of End-User disputes.
- Promptly cease billing any recurring charges to an End-user when there is a clear indication that such End-User is no longer utilizing Client's product or service.

4.   **MANDATORY AUTHORIZATION**

Where State or Federal agencies (or Telcos, where applicable) require consumer pre-authorization for the services, products or programs provided by Client, Client must employ one of the following forms of authorization. Such authorization must be retained for a period of two (2) years and made available upon request. Additionally, if State/Federal agencies or Telcos amend their requirements, Client is responsible for its full compliance thereto:

- Recorded independent third party verification
- Written or electronic sales order or letter of authorization (LOA)
- Voice Recording of telephone sales authorization.

An authorization must legibly include the following to be valid:

- The date of authorization.
- The telephone number and, if utilizing ANI capture, name and address of the consumer.
- Assurance that the consumer is responsible for the billing telephone number or is otherwise authorized to incur billing charges.
- A complete description of the product or service.
- A description of the applicable charges.
- An explicit acknowledgment by the consumer as to how the charges for the product or service will appear on his/her bill.
- Affirmative acceptance by the consumer of the offer.
- A toll-free number that subscribers may call to make inquiries concerning the service.

In addition, when verifying with an independent third party, authorization must include:

- An initial statement that the purpose of the verifications is to confirm the consumer's intention to accept the sales offer.
- A statement that the service provider is not affiliated with a LEC, where there is no affiliation.
- A unique consumer identifier.
- A review by third party personnel of the entire verification where the verification is automated.

An independent third party verifier must meet the following criteria:

- It must be completely independent of the service provider and the telemarketer.
- It must not be owned, managed, controlled or directed by Client or the telemarketer.

- It must not have any financial incentive in the completion of the sale.
- It must operate in a location physically separate from the service provider and the telemarketer.

### EXHIBIT "C"
#### Billing and Collections Guidelines
Page 3 of 3

5.   **HIGH STANDARD BILLING PRACTICES**

Central to a consumer's right to ensure that they have not been billed inappropriately is the ability to understand and read the bill.  Client shall use it's best efforts to ensure that the information provided to IGT fairly and accurately describes the service(s) provided to the End-User including, but not limited to:

- Identification of the Client providing the services.
- Detailed description of products or services.
- Detailed identification of the charges.

6.   **END-USER SATISFACTION**

As End-Users must be able to easily and quickly address potential billing disputes, IGT may provide the End-User or a regulatory agency on request:

- The name, address, phone number and fax number of the Client.
- The nature of any charge
- The method of authorization.
- Information as to how an End-User may cancel a service or product.

In conjunction with the Agreement IGT, or Client, will provide:

- A toll-free customer service number.
- Dedicated staff to respond to End-Users inquiries.
- Full and timely investigation of any written dispute.
- A credit or response to the End-User within 30 days of the End-User's dispute.

7.   **DISCLOSURE**

Client hereby agrees that IGT may share the following with federal and state enforcement agencies:

- Identifying information with respect to terminated billing for Client programs or services.
- A description of specific problems relating to "Slamming" or "Cramming" that IGT has encountered, and the steps taken to correct such problems.
- Summary and detailed data with regard to End-User complaints, inquiries and Adjustments.

8.   **REIMBURSEMENT TO IGT**

Client acknowledges and agrees to fully reimburse IGT, within ten (10) days, any fines or penalties charged IGT by Telcos and/or State/Federal agencies pursuant to Client's Billing Transactions billed by IGT.

(These guidelines may be amended from time-to-time by IGT providing thirty (30) days prior written notice.)

## SCHEDULE I – VALIDATION/REGISTRATION

This Service Order for Validation/Registration shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include the processing of validation requests from a Client's sales support application in order to determine the billable risk of End-User's billing telephone numbers (BTNs).

2.    **VALIDATION REQUESTS.** Client shall cause its call processing systems to log on to IGT's host validation server and deliver a validation request in accordance with specifications provided to Client by IGT.

3.    **VALIDATION RESPONSES.** IGT shall process Client's validation requests against proprietary databases that screen for, among other things, blocked BTN's, billing coverage, and known non-billable devices such as payphones. IGT shall provide a response to each request, including the original ANI together with a result code, in a format to be mutually agreed upon by the parties.

*{ - End of Schedule I. Remainder of page intentionally left blank. - }*

## SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)

This Service Order for PhoneBill Services shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1. **SERVICE ORDER SUMMARY**. This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

2. **TELCO SUBMISSION, UNBILLABLES**. IGT shall submit to the Telcos those Billing Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process. Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format. IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

3. **INQUIRY SUPPORT, ADJUSTMENTS**. A separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

4. **HOLDBACK, TRUE-UP, UNCOLLECTABLES**. Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due to Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at fifteen percent (15%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's Billing Transactions. From time to

time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up"). IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

**5.    OTHER DEDUCTIONS.**

a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at zero percent (0%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds. This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

**6.    SETTLEMENT OF AMOUNTS DUE.** Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice for same and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.