7.      **REPORTS.**

(a)      <u>Standard Reporting.</u>  IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein.  Client may request that IGT provide additional reports or a different formatted report.  To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)      <u>Report Review.</u>  Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client.  Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)      <u>Report Detail.</u>  Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)      <u>Audit.</u>  Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos.  The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.      **BILLING APPEARANCE.**  Where a Telco provides the capability, Client's Billing Transaction shall appear on such Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.      **RESALE OF ACCOUNTS.**  Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users.  Therefore, Client agrees, and does hereby transfer to IGT any rights in the Billing Transactions that may be necessary for IGT to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

10.     **TELCO CONFIDENTIALITY.**  Client hereby acknowledges and agrees that, without the express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services.  Client shall indemnify IGT

and hold it harmless from any and all claims and/or damages that may arise as a result of Client's violation of this Section 10.

*{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }*

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 21 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 11 of 11

RER-11    0728

# EXHIBIT 1 – PART B

09/22/2007  08:42    4155079098    NICKERSON                    PAGE  23/49

## EXHIBIT "II-A"
### Telco Billing Contracts
Page 1 of 1

**Ameritech**
- Ohio Bell
- Michigan Bell
- Indiana Bell
- Wisconsin Bell
- Illinois Bell

**NYNEX**
- New England Tel
- New York Tel

**Pacific Bell**
- Pacific Bell
- Nevada Bell

**Bell Atlantic**
- New Jersey Tel
- Bell PA
- Diamond State
- C&P DC
- C&P MD
- C&P VA
- C&P WVA

**Southwestern Bell**

**U.S. West**
- Northwest Bell
- Mountain Bell
- Pac NW Bell

**Alltel**

**Bell South**

**Cincinnati Bell**

**GTE**
- GTE North
- GTE Florida
- GTE South
- GTE South West
- GTE California
- GTE West
- GTE North West
- GTE Hawaii

**Illuminet**

**NECA**

**SNET**

**Sprint United**
- United Florida
- CT & T
- United Indiana
- United Midwest

**GTE Contel**
- GTE North Contel
- GTE South Contel
- GTE S-W Contel

**Telecom Canada**

**Citizens Telephone**

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 22 of 44

EXHIBIT "II-B"
<u>Telco Returns</u>
<u>Matching Process & Allocation Methodology</u>
Page 1 of 5

**<u>Rejects:</u>**

| | | |
|---|---|---|
| **Full Key:** | Bill To Number (BTN) | |
| | Originating Number | |
| | Terminating Number | |
| | Call Date | |
| | Call Time | (Seconds excluded) |
| | Call Duration | (Seconds excluded) |

A reject call record that matches a history record based on the above Full Key is considered an exact match and is returned to the Client with the IGT return code in position 70-71.

**<u>Unbillables:</u>**

| | | |
|---|---|---|
| **Full Key:** | Bill To Number (BTN) | |
| | Originating Number | |
| | Terminating Number | |
| | Call Date | |
| | Call Time | (seconds excluded) |
| | Call Duration | (seconds excluded) |

An unbillable call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable experience compared to the total specific unbillable amount for each particular Telco.

**<u>Adjustments 4501XX:</u>**

| | | |
|---|---|---|
| **Pass # 1-Full Key:** | Bill To Number (BTN) | |
| | Originating Number | |
| | Terminating Number | |
| | Call Date | |
| | Call Time | (seconds excluded) |
| | Call Duration | (seconds excluded) |

An adjustment call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the original call record that it matched.

| | | |
|---|---|---|
| **Pass # 2-Partial Key:** | Bill To Number (BTN) | - Optional\Required |
| | Originating Number | - Optional\Required |
| | Terminating Number | - Optional |
| | Call Date | - Optional |
| | Call Time | - Optional |
| | Call Duration | - Optional |

RER-11        0731

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology
Page 2 of 5

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional\Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

| Pass # 3-Matrix Key: | | |
|---|---|---|
| | Bill To Number (BTN) | – Optional/Required |
| | Originating Number | – Optional/Required |
| | Terminating Number | – Optional/Required |
| | Call Date | – Optional |
| | Call Time | – Optional |
| | Call Duration | – Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

## Adjustments 4550XX:

| Bulk Match Key: | |
|---|---|
| | Bill To Number (BTN) |
| | Call Date |
| | CIC |

Bulk logic is a one-to-many matching process and utilizes the call date to determine the calls eligible for matching. All call dates equal or older than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 3 of 5

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

　　　*Step 1* – Identify all Clients that deposit to that particular Telco for the given two month period.

　　　*Step 2* – Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

　　　*Step 3* – For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

　　　*Step 4* – Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

　　　*Step 5* – Determine each Client's percentage of the sum total of the Step 4 calculation.

　　　*Step 6* – Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

09/22/2007  08:42    4155079098                NICKERSON

EXHIBIT "II-B"
<u>Telco Returns</u>
<u>Matching Process & Allocation Methodology</u>
Page 4 of 5

*Redacted*

*Redacted*

*Redacted*

<u>Uncollectables 4601XX & 4650XX (Used for True-Ups):</u>

**Write-Off Match Logic:**          Bill To Number (BTN)
                                     Call Date
                                     CIC

Uncollectable write-off logic is a <u>one-to-many</u> matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off " is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Writer-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, for Telcos that do provide write-off detail, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

                     - CONFIDENTIAL -

### EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology
#### Page 5 of 5

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

**Step 1** – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

**Step 2** – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

**Step 3** – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

**Step 4** – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

**Step 5** – Determine each Client's percentage of the sum total of the Step 4 calculation.

**Step 6** – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner.

*Redacted*

*Redacted*

*Redacted*

**True-Up Procedure :**

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.

## EXHIBIT "II-C"
### Delivery Schedule of Reports & Data Files
Page 1 of 1

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

## The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |

Master Services Agreement
(REV. 12/02) ICS USA.doc        · CONFIDENTIAL ·                    Page 26 of 44

True up Summary (Actual) Report                Wednesday After 5:00pm PST

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 29 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 9 of 27

RER-11        0737

**EXHIBIT "II-D"**
<u>Telco Fees</u>
Page 1 of 1

*- INSERT CURRENT EXHIBIT -*

Master Services Agreement
(REV  12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 30 of 44

Case: 07-52890      Doc #: 53      Filed: 09/24/2007      Page 10 of 27

RER-11        0738

### Exhibit "II-E"
### Payment Instructions

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby instructed to remit any Net Proceeds to which Client is entitled under this Agreement to the account listed below. These wire instructions may only be modified or revoked by a written notice signed by Client. Client agrees to indemnify and hold IGT harmless from any and all claims or expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

Company       _____

Address       _____

              _____

              _____

Bank Name     _____

Bank Address  _____

              _____

              _____

Account Name  _____

Account Number _____

Bank (ABA)
Transfer Number _____


Signature:_____    Print name: _____

Title: _____    Date: _____

## SCHEDULE IV – Service Order for CREDIT CARD PROCESSING

This Service Order for Credit Card Processing shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.    **SERVICE ORDER SUMMARY.** This Service Order generally includes the provisioning of certain computerized capabilities to assist Client in the administration and processing of commercial credit card transactions for End-User's that select such method in payment for Client's Services, subject to Client maintaining a valid, ongoing merchant account with a participating financial institution.

2.    **HOSTED SERVICES.**

a)    IGT shall establish a hosted payment processing web page, branded and designed pursuant to written instructions from Client, to capture End-Users' credit card billing information (hereafter the "Payment Page"). Client and IGT shall establish an effective link from Client's online order-entry screen to IGT's hosted Payment Page.

b)    For each unique End-User entry made into the Payment Page, IGT shall initiate a validation event through its links to credit card industry databases, for the purpose of obtaining an authorization code, indicating acceptance (or rejection) of the transaction by the underlying financial institution. IGT shall promptly notify Client of the results of such authorization together with the information entered into the Payment Page by the End-User.

c)    All authorization and billing events shall be submitted by IGT using Client's established merchant account, which account shall be provided by Client to IGT in writing.

d)    IGT shall store all relevant End-User billing information including, without limitation, credit card numbers, charge amounts and authorization codes, for a period of not less than two (2) years.

3.    **INQUIRY & ADJUSTMENTS.** Client shall be responsible for all End-User inquiries that may arise regarding the billed transactions and shall communicate directly with its merchant bank regarding such matters. IGT shall provide reasonable support to Client including, without limitation, providing copies of information collected through the Payment Page, to assist Client in responding to End-User inquiries.

4.    **COLLECTION OF INFORMATION.** Client shall co-operate with IGT in the collection, maintenance and storage of any End-User data that may be required to satisfy any federal, state and local regulations applicable to the services contemplated herein.

*{ - End of Schedule IV. Remainder of page intentionally left blank. - }*

- CONFIDENTIAL -

## SCHEDULE V – Service Order for AUTOMATED CLEARINGHOUSE Services

This Service Order for Automated Clearinghouse services shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.  **SERVICE ORDER SUMMARY.**  IGT maintains a relationship with a third-party processor (the "Processor"), which is affiliated with an Originating Depository Financial Institution ("ODFI"). The Processor, and ODFI are associated with the National Automated Clearing House Association ("NACHA").  Client has requested that IGT cause its Processor to permit Client to initiate electronic fund transfer entries (each an "Entry" or collectively "Entries") through the ODFI for the deposit ("Credit") and/or collection ("Debit") of money to and from the accounts of Client's customers maintained at participating depository financial institutions, by means of the Automated Clearing House ("ACH") network.

2.  **OPERATING RULES.**

(a) Client shall comply with the operating rules of the NACHA, in existence as of the date of this Agreement and as amended from time to time (herein collectively referred to as the "NACHA Rules").  The duties of the Client set forth herein in no way limit the requirements of complying with the NACHA Rules.

(b) Client is subject to applicable U.S. law when initiating ACH Entries. This includes, among other things, that Client is not violating the Office of Foreign Assets Control ("OFAC") enforced sanctions, and is not acting on behalf of, or transmitting funds to or from, any party subject to such sanctions.  Client shall only originate lawful ACH Entries, and is strongly encouraged to obtain Specially Designated National ("SDN") and other compliance information directly from the OFAC at (800) 540-OFAC or at http://www.treas.gov/ofac/.

3.  **CLIENT AUTHORIZATIONS AND RECORDS RETENTION.** Before the initiation by Client of any Credit or Debit Entry to a customer's account, Client shall obtain from such customer an authorization to make one or more Entries to the customer's account.  Sample authorization forms are available in the ACH Rules or from IGT upon request.  Such authorization shall comply with the ACH Rules.  Each Entry thereafter will be made pursuant to such authorization.  Company will initiate no Entry after such authorization has been revoked or the arrangement between Company and such customer has terminated.  Client shall retain the original or copy of each authorization for a period of not less than two (2) years from the termination or revocation of the authorization, and will furnish such original or copy to IGT, or to any applicable ODFI, upon request.  The Processor and the ODFI will retain records of all Entries for six (6) years from the date the Entry was

transmitted, and will provide a related party requesting the information with a printout or reproduction of the information relating to the Entry.

**4.    CUSTOMER PRE-NOTIFICATION.** Client shall send pre-notification that it intends to initiate an Entry or Entries to a customer's account within the time limits prescribed by the ACH Rules. Such pre-notification shall be provided to IGT in the format and on the medium prescribed by the ACH Rules or otherwise as mutually agreed to by the parties. If Client has received notice that such pre-notification has been rejected within the prescribed period by a receiving depository financial institution ("RDFI") as defined by the ACH Rules, Client will not initiate any corresponding Entry to such customer's account until the cause for rejection has been corrected and another pre-notification has been submitted and accepted within the time limits prescribed by the ACH Rules.

**5.    DELIVERY OF ENTRY INFORMATION.** Client shall deliver each Entry or file of Entries to the location specified by IGT in accordance with the delivery method set forth in Exhibit V-A, attached hereto, and in accordance with the schedule set forth by the parties in the Time Specifications for File Delivery, attached hereto as Exhibit V-B. All Entry Information so delivered shall be in the medium required by the Processor and the format required by the ACH Rules or otherwise acceptable to IGT. All Entries shall be received, processed and transmitted by IGT's Processor pursuant to the ACH Rules.

**6.    SETTLEMENT BY CLIENT FOR ENTRIES.** Client shall maintain a checking account (the "Settlement Account" as further described in Exhibit V-D, attached hereto) with a balance sufficient to offset any Credit Entries submitted, any rejected Debit Entries and any other fees or charges to which IGT is entitled hereunder. IGT's Processor shall be authorized to immediately debit the Settlement Account as necessary to fund Entry deposits and any adjustments. If Client discovers that any Entry it has initiated was in error, it may notify IGT of such error and IGT will utilize all reasonable efforts on behalf of Client, consistent with the ACH Rules to correct the Entry. In all such cases, it shall be the responsibility of Client to notify its affected customers that an Entry has been made, which is at variance with the customer's authorization or is otherwise erroneous. NOTIFICATION OF ENTRIES, INCLUDING NOTIFICATION OF ENTRY ERRORS, MUST BE AUTHORIZED BY INDIVIDUALS NAMED IN EXHIBIT V-C. If at anytime Client's Settlement Account has an insufficient balance to cover transactions for which it is intended, IGT may, in addition to any other remedy, suspend all services under this Service Order until such time as the balance in the Settlement Account is properly funded.

**7.    CUSTOMER'S RIGHT TO REFUND FOR DEBIT ENTRIES.** Client acknowledges the right of a customer to obtain a refund of the funds debited from customer's account by such customer sending a notice to an RDFI or ODFI, as applicable, within sixty (60) days after any Debit Entry is made to customer's account or fifteen (15) days after customer's monthly statement is made available to customer, whichever occurs first.

Master Services Agreement
(REV. 12/02) ICS MSA.doc
- CONFIDENTIAL -
Page 35 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 15 of 27

RER-11    0743

identifying the Entry, stating it was an error, and demanding that the amount of the Debit Entry be credited back to customer's account. Client agrees to promptly reimburse IGT for all funds due to customers that have followed the notification procedure described in this paragraph 7.

*{ - End of Schedule V. Exhibits follow.  Remainder of page intentionally left blank. - }*

## Exhibit V-A: ACH File Transmission

1. File Specifications. Client shall deliver an ACH file in the NACHA Standard format as specified in the NACHA manual ACH Rules or such other format as the parties may mutually agree to.

2. Delivery of File to Processor. Client must deliver the ACH file to IGT's Processor using either: a) a modem approved by IGT running at speeds not below 2400 baud and not to exceed 56K baud; or b) through an online link to IGT's file transfer protocol site specifically established for such purpose.  Using the transmission program in the software provided by IGT or other suitable software approved by IGT, Client will be assigned, by IGT's Processor, a sign-on identification code and password to deliver files to IGT's Processor.  Any attempt to deliver a file without the proper sign-on and password will result in an unsuccessful file transmission. A successful transmission of an ACH file in no way means a successful receipt of an ACH file for processing by IGT's Processor. Client assumes responsibility for the receipt of a positive acknowledgment of successful file transmission.

3. Verification, Authorization. Client shall provide, by fax or on-line mail to IGT's Processor authenticating data, including, without limitation, file name, total number of transactions, total Debit Entries, total Credit Entries, file modifier, and an authorizing signature by an official of Client as defined in Exhibit V-E.  Client's authorizing official may be contacted by IGT's Processor to ascertain file validity before file is accepted for processing.  Processor assumes no responsibility for file rejection due to its inability to confirm file validity.

---

## Exhibit V-B: Time Specifications for File Delivery

Client shall deliver, to IGT's Processor, an ACH file in accordance with the time specifications set forth below:

> Credit Transactions shall be delivered on or before two business days prior to the Entry effective date of the transactions contained within the ACH file.

> Debit Transactions shall be delivered on or before two business days prior to the Entry effective entry date of the transactions contained within the ACH file.

All files must be delivered to IGT's Processor by 3:00 p.m. EST in order to be included in that day's submission.

- CONFIDENTIAL -

### Exhibit V-C: Authorized Signatures

The following personnel are authorized to create and transmit ACH files for Client:

| Authorized Person (please print) | Signature | Telephone # |
|---|---|---|
| Authorized Person (please print) | Signature | Telephone # |
| Authorized Person (please print) | Signature | Telephone # |
| Authorized Person (please print) | Signature | Telephone # |
| Authorized Person (please print) | Signature | Telephone # |
| Authorized Person (please print) | Signature | Telephone # |
| Authorized Person (please print) | Signature | Telephone # |

Client is responsible for notifying IGT in writing of any changes to Client's authorized personnel. IGT accepts no responsibility for files created by terminated employees, or personnel whose authorization has been revoked by Client, unless Client has notified IGT in writing of such termination or revocation at least two (2) business days prior to submission of ACH files for processing.

### Exhibit V-D: Settlement Information

All debit entries originated by Client will be settled via ACH credit by the Processor two (2) days following the Entry effective date or the settlement date assigned by the ACH operator whichever is later.

All returns received by Processor for Client shall be debited or credited to Company's settlement account immediately upon receipt of such return.

IGT and/or its Processor reserve the right to debit Client's Settlement Account for a period of ninety (90) business days after the termination of this contract. This debit is for the explicit purpose of reclaiming moneys owed IGT or its Processor for any fees or returns incurred during the term of the Agreement.

Settlement Account.

Bank Name _____

Bank ABA Number _____

Bank Account Number _____

Account Name _____

IGT is authorized to debit the above-named account for any fees and charges that are not otherwise paid by Client as and when due.


_____
Company Signature                 Title                           Date

## SCHEDULE VI - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the [Amendment Date/Effective Date of the Agreement] and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User inquiries to Client, ii) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

2.    **CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto and subject to Client reimbursing IGT's costs plus an administrative markup of 15% for its referral or transfer of End-User Inquiries to Client in accordance with mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User (i) fails to enter into IGT's call processing system a telephone number that was billed only by Client; (ii) refuses to be referred or transferred to Client; or (iii) initiates a subsequent Inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such Inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

3.    **IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT. IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries. When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) Adjustments. IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) Regulatory Complaints. IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

NICKERSON

PAGE   42/49

*{ - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - }*

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 41 of 44

Case: 07-52890     Doc #: 53     Filed: 09/24/2007     Page 21 of 27

RER-11      0749

09/22/2007  08:42    4155079098                    NICKERSON

PAGE   43/49

**EXHIBIT "VI-A"**
<u>**Inquiry Standards**</u>
Page 1 of 1

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

## SCHEDULE VIII -- PRE-PAY SERVICES

This Service Order for Pre-Pay Services shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include i) administration of a database containing all pre-pay End-User accounts; ii) a toll-free access number to allow End-Users to contact IGT's pre-pay support personnel; iii) technical interface to the call processing system necessary to maintain account balance integrity; iv) reconciliation and settlement of any amounts due to Client under this Service Order; and v) standard tracking and reporting for all pre-pay activity.

2.    **PRE-PAY INITIATION.** The pre-pay process works in conjunction with a validation service such as IGT's Validation/Registration Service set forth on Schedule I to this Agreement, if applicable. At the time of the initial call event, non-billable End-User accounts are routed to the pre-pay platform, which will signal the call processing system to complete a temporary call connection together with an audio message instructing the End-User to contact the pre-paid account setup center. The call processing system can be programmed to facilitate the End-User's pre-payment contact by automatically auto-dialing the toll-free contact number at the End-User's request.

3.    **ACCOUNT SETUP.** Upon contact with IGT's prepayment center, the End-User is offered a choice of pre-payment options including, without limitation, major credit card, "check-by-phone", Western Union™, bank cashier's check, or money order. In order to establish a pre-paid account, the End-User will be required to satisfy any outstanding amounts due for previously generated non-billable calls. Taxes will be applied to pre-paid amounts, in accordance with standard taxing logic, and remitted to the appropriate taxing authorities subject to the provisions of Section 6 of the Agreement. The End-User will be notified of their right and the process by which they can receive a refund of any unused pre-pay funds. Once receipt of funds has been confirmed, the pre-pay platform will notify the call processing system of the End-User's account and the amount to be applied.

3.    **ACCOUNT MAINTENTANCE.** The call processing system will maintain the running balance of each End-User's account and will reinitiate another pre-pay event if an End-User's account balance falls below a mutually agreeable level (default will be zero).

4.    **SETTLEMENT OF FUNDS.** On or before the 10ᵗʰ day of each month, Client shall be entitled to all funds actually received during the prior month, less any processed End-User refunds, taxes, bank and related

pass-through charges including, without limitation, charge-backs and fees related thereto, IGT's Fees as set forth on Exhibit B to the Agreement. All payments to Client shall be by bank wire and Client shall provide all wire instructions to IGT in writing.

5.    **REPORTING.** IGT shall provide Client with IGT's standard reports, which are listed on Exhibit VIII-A attached hereto. Client may request additional reports of a differently formatted report and, to the extent such request can be reasonably accommodated, IGT shall satisfy such request within the timeframe at additional cost, if any, that the parties shall mutually agree to in writing. Client shall be responsible for reviewing all reports and failure of Client to report any errors or discrepancies within sixty (60) days of receipt of a report shall constitute Client's acceptance thereof.

*{ - End of Schedule VIII. Remainder of page intentionally left blank. - }*

Master Services Agreement
(REV. 12/02) ICS MSA.doc

- CONFIDENTIAL -

Page 44 of 44

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 24 of 27

RER-11    0752

AMENDMENT NUMBER TWO
TO THE
MASTER SERVICES AGREEMENT ("Agreement")
BETWEEN
The Billing Resource f/k/a Integretel, Incorporated ("IGT")
AND
Inmate Calling solutions, LLC ("Client")
DATED July 1, 2002

WHEREAS, the parties have amended the Agreement as follows to be effective as of July 1, 2007:

1.  All capitalized terms not defined herein shall have the meaning ascribed to them under the Agreement.

2.  The last sentence of Section 3 of the Agreement is hereby deleted.

3.  Part 2) b) of Exhibit B to the Agreement is hereby amended to read as follows:

Redacted

4.  All other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this amendment to the Agreement to be effective as of the date first set forth above.

The Billing Resource

BY: _____

NAME: _____

TITLE: _President_

Inmate Calling Solutions, LLC

BY: _____

NAME: _BRENDAN PHILBIN_

TITLE: _C.O.O_

ICS MSA Amend Two                  - CONFIDENTIAL -                    Page 1 of 1

AMENDMENT NUMBER ONE
TO THE
MASTER SERVICES AGREEMENT ("Agreement")
BETWEEN
Integretel, Incorporated ("IGT")
AND
Inmate Calling solutions, LLC ("Client")
DATED July 1, 2002

WHEREAS, the parties agree to amend the Agreement as follows to be effective as of September 1, 2004:

1. All capitalized terms not defined herein shall have the meaning ascribed to them under the Agreement.

2. Exhibit B to the Agreement is hereby amended in its entirety to be replaced with the attached Exhibit B.

3. All other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this amendment to the Agreement to be effective as of the date first set forth above.

Integretel, Incorporated

BY: _____
NAME: Ken Dawson
TITLE: President
DATE: 10/5/04

Inmate Calling Solutions, LLC

BY: _____
NAME: BRENDAN PHILBIN
TITLE: CEO
DATE: 10/5/04

09/22/2007  08:42    4155079098                          NICKERSON

                                                                      PAGE  48/49

**EXHIBIT "B"**
**Fees**
Page 1 of 1

The following Fees shall apply:

1) **Validation/Registration**

    Internal look-ups
    External lookups

                                                          *Redacted*

2) **PhoneBill Services (Telco Billing)**

    a) Account setup fee (with sub-CIC):
        Account setup fee (without sub-CIC):

    b) IGT Processing Fees:

        Transactions per Deposit Month
        First 250,000
        Next 250,000
        Next 500,000
        All Remaining

                    *Redacted*

3) **DirectBill Services (Client-Branded Billing)**

                                                      *Redacted*
4) **Credit Card Processing**

5) **Automated Clearing House (ACH)**

6) **End-User Inquiry**

    a) Verbal End-User Inquiry                        *Redacted*
    b) Written End-User Inquiry
    c) Written regulatory complaints

7) **Collection Services**

8) **Pre-Pay Services**

Amendment of MSA - IGT          - CONFIDENTIAL -

                                                      Page 2 of 2

# EXHIBIT 2

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
GERALDINE A. FREEMAN, Cal. Bar No. 111483
JEFFREY K. REHFELD, Cal. Bar No. 188128
ORI KATZ, Cal. Bar No. 209561
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4106
Telephone:    415-434-9100
Facsimile:    415-434-3947

Proposed Bankruptcy Reorganization Counsel
for Debtor and Debtor-in-Possession
The Billing Resource, dba Integretel

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re: | Case No. 07-52890 |
| THE BILLING RESOURCE, dba INTEGRETEL, a California corporation | Chapter 11 |
| Debtor. | **FIRST AMENDED STIPULATION WITH PAYMENTONE CORPORATION REGARDING SHORT TERM USE OF CASH COLLATERAL AND ADEQUATE PROTECTION** |
| Tax ID: 33-0289863 | |

## EXHIBIT 2

W02-WEST:FBZ\400437999.1
092007

-1-

OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

1        IT IS HEREBY STIPULATED by and between THE BILLING RESOURCE, dba

2    INTEGRETEL (the "~~"~~Debtor~~"~~") and PAYMENTONE CORPORATION ("~~"~~PaymentOne~~"~~") as

3    follows:

4        <u>1.</u>   ~~1.~~——The Debtor commenced the above-captioned bankruptcy

5    reorganization case by filing a voluntary chapter 11 petition. The Debtor continues to operate and

6    manage its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. The

7    Debtor provides various billing and collection related services in the telecommunications industry

8    and the Debtor's revenues are generated from the Debtor's agreements related thereto.

9    PaymentOne is a ~~majority~~ <u>ninety-seven percent</u> owned subsidiary of the Debtor.

10        <u>2.</u>   ~~2.~~——On or about January 26, 2005, PaymentOne and the Debtor entered

11    into a security agreement (the "Security Agreement"), a copy of which is attached hereto as

12    Exhibit "~~"~~A.~~"~~". All ~~Capitalized~~<u>capitalized</u> terms used herein that are not otherwise defined have

13    the meanings ascribed to them in the Security Agreement. The Security Agreement granted

14    PaymentOne a security interest in the Collateral, as defined therein. Without limiting the

15    generality of the foregoing, Collateral includes Accounts, Chattel Paper, Money and Deposit

16    Accounts, General Intangibles, Payment Intangibles, Software, Goods, Inventory, Equipment,

17    Fixtures, Instruments, Investment Property, Letter of Credit Rights, Supporting Obligations,

18    Records, Commercial Tort Claims and all Proceeds and Accessions. PaymentOne asserts that it

19    perfected its security interest in the Collateral through UCC-1 financing statements filed on or

20    about January 27, 2005 and October 18, 2006. PaymentOne claims to hold valid, perfected

21    security interests in certain assets of the Debtor which constitute "~~"~~cash collateral~~"~~" as defined in

22    Bankruptcy Code section 363(a) (such assets of the Debtor shall be referred to herein as the

23    "~~"~~Cash Collateral~~"~~") as a result of the Security Agreement. Specifically, PaymentOne asserts a

24    claim against the Debtor in the approximate sum of ~~$15.4 million.~~[1] <u>approximately $16,616,000 as</u>

25    <u>of September 14, 2007.</u>[1] PaymentOne claims to hold valid, perfected security interests in various

26    assets of the Debtor including without limitation the Collateral. PaymentOne further asserts that

27

28   [1] The parties reserve all of their respective rights regarding the determination of the nature and amount of PaymentOne's claim.

W02-WEST:FBZ\400437999.1
092007

-1-

OLD: W02-West:400433123.1
NEW: W02-CARED#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 3 of 16

RER—11    0758

<table>
<tr><td>1</td><td>the Debtor is in possession of certain property (the ""Collection Property"") that belongs to</td></tr>
</table>

1  the Debtor is in possession of certain property (the ""Collection Property"") that belongs to

2  PaymentOne and is otherwise held in trust for it under one or more agreements, including without

3  limitation a Support Services Agreement dated as of July 1, 2000 (together with any written or

4  unwritten agreement or arrangement concerning collection services, a "Collection Agreement").

5  Debtor does not concede that the Collection Property exists, that it is in possession of such

6  Collection Property, that the Collection Property is held in trust for PaymentOne, or that the

7  Collection Agreements are effective.the foregoing.

8      3.    3.——The Debtor must use Cash Collateral in order to continue to operate

9  its business.  The terms and conditions for use of Cash Collateral set forth in this First Amended

10  Stipulation have been negotiated at arms length for reasonably equivalent value and are fair and

11  reasonable under the circumstances.  The Debtor and PaymentOne have acted in good faith in

12  connection with the negotiation of this First Amended Stipulation and in moving the above-

13  captioned Bankruptcy Court (the ""Court"") for an Order approving the First Amended

14  Stipulation.

15      4.    4.——PaymentOne consents to the Debtor's use of Cash Collateral and the

16  Debtor is immediately authorized to use Cash Collateral for the purpose of funding the expenses

17  of operating the Debtor's business set forth on the budget attached hereto as Exhibit "B" (the

18  ""Budget"") upon approval of this First Amended Stipulation by the Court.  In addition,

19  PaymentOne will consent to the use of its Cash Collateral on a final basis at the Final Hearing to

20  be held, in accordance with a budget that is reasonably satisfactory to PaymentOne.

21  Notwithstanding the foregoing or anything to the contrary herein, PaymentOne does not consent

22  to the use of Cash Collateral or Collection Property for the purposes of directly or indirectly

23  pursuing any claims or causes of action of any kind against PaymentOne, although all of the

24  Debtor's rights with respect to the direct or indirect pursuit of any claims or causes of action

25  against PaymentOne are reserved.

26      5.    5.——As adequate protection of PaymentOne's interests in the Collateral

27  and Cash Collateral and the Debtor's use of the same, the Debtor hereby grants to PaymentOne, to

28  the extent that PaymentOne's prepetition liens are valid, perfected and enforceable, replacement

W02-WEST:FBZ\400437999.1
092007

-2-

OLD: W02-West:400433123.1
NEW: W02-C:\RED#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 4 of 16

RER-11    0759

1   liens in all categories of assets of the Debtor's estate both real and personal, including without

2   limitation, the Collateral (subject only to valid, existing prepetition liens that are senior thereto up

3   to the amount of such senior claims existing on the Petition Date), including both existing and

4   after-acquired property, to the fullest extent necessary to realize all Cash Collateral and to protect

5   against any diminution in the amount or value of its Collateral (pre-petition and post-petition) in

6   which PaymentOne has an interest.  PaymentOne's replacement liens as provided in this First

7   Amended Stipulation shall be automatically perfected pursuant to the Court's Order approving

8   this First Amended Stipulation and PaymentOne shall not be required to take any further action to

9   perfect such liens.  Provided, however, the Debtor shall execute such further documents as

10  PaymentOne may reasonably request to evidence such perfection.  PaymentOne shall additionally

11  be entitled to a super-priority administrative expense pursuant to Bankruptcy Code Section

12  507(b).  The foregoing protections shall further secure and cover any damages under the

13  Collection Agreements to the extent such agreements are effective and damages accrue after the

14  Petition Date and during the term of this First Amended Stipulation.

15          6.    6.——Notwithstanding anything to the contrary, PaymentOne reserves all

16  rights it may have, as the alleged owner of the Collection Property and proceeds thereof or as

17  beneficiary of a trust concerning such alleged property.   If and to the extent it is determined that

18  the Collection Property exists and the Debtor uses any Collection Property, an equal amount of

19  other property held by the Debtor shall be deemed impressed with PaymentOne's trust and

20  ownership rights with the same validity as the trust and ownership claims concerning the original

21  Collection Property used, as well as the other rights set forth in this First Amended Stipulation.

22  Such protections are in addition to those provided above.  Notwithstanding anything to the

23  contrary, the Debtor reserves all rights it may have to dispute the validity or effectiveness of the

24  Collection Agreements, the existence of any Collection Property and the rights of any party in

25  and to the Collection Property.

26          7.    7.——PaymentOne's replacement liens on the post-petition property shall

27  have the same priority vis-a-vis other liens and interests as PaymentOne's pre-petition liens and

28  security interests have vis-a-vis such other liens and interests.  The replacement liens granted to

W02-WEST:FBZ\400437999.1
092007

-3-

OLD: W02-West:400433123.1
NEW: W02-C:\REDW\1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890     Doc #: 53     Filed: 09/24/2007     Page 5 of 16

RER-11     0760

1    PaymentOne pursuant to this <u>First Amended</u> Stipulation are intended to preserve PaymentOne's

2    position vis-a-vis the Debtor and other creditors of the estate so that PaymentOne's position vis-a-

3    vis the Debtor and such other creditors is neither diminished nor enhanced by Debtor's use of

4    Cash Collateral and PaymentOne's receipt of replacement liens.

5          8.     ~~8.~~———The replacement liens granted to PaymentOne pursuant to this <u>First</u>

6    <u>Amended</u> Stipulation are subordinated to the allowed fees and expenses of professionals retained

7    by the Debtor and any official committee appointed in this bankruptcy case as well as those of

8    any trustee subsequently appointed in the bankruptcy case and such trustee's professionals, but

9    only to the extent such fees and expenses are provided for in the Budget and were actually

10    incurred before this <u>First Amended</u> Stipulation terminated. In exchange for the benefit of the

11    foregoing subordination, the parties entitled to the benefits of the subordination shall not be

12    entitled, directly or indirectly, to charge the Collateral or the property covered by the replacement

13    liens, whether by operation of Sections 105 or 506(c) of the Bankruptcy Code or otherwise.

14    Notwithstanding anything to the contrary, PaymentOne does not subordinate its replacement liens

15    to any fees or expenses incurred in the direct or indirect effort to pursue any claims or causes of

16    action against it (whether pursuant to Chapter 5 of the Bankruptcy Code or otherwise) or to seek

17    to invalidate any of its liens in the Collateral or its rights related to the Collection Property.

18    PaymentOne reserves the right to object to any fees or expenses.

19          <u>9.</u>     <u>Concurrently with the execution and filing of this First Amended</u>

20    <u>Stipulation PaymentOne has filed a Declaration of Evan Meyer re certain transactions ("Meyer</u>

21    <u>Declaration"). That declaration fully discloses that during 2005 the Debtor changed its registered</u>

22    <u>name, and that the Debtor has taken the position that the failure of PaymentOne to file an</u>

23    <u>amendment to its UCC-1 financing statement changing the name of the Debtor thereon to the new</u>

24    <u>registered name within four months of the name change, gave to the Debtor the right to avoid the</u>

25    <u>security interest of PaymentOne as to antecedent debt secured by after-acquired property.</u>

26    <u>However, the Meyer Declaration also sets forth that the UCC amendment consistent with the</u>

27    <u>Debtor's registered name change was ultimately filed on October 18, 2006. It further discloses</u>

28    <u>that after the filing of such UCC amendment substantial new credit was extended by PaymentOne</u>

W02-WEST:FBZ\400437999.1
092007
-4-
OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890     Doc #: 53     Filed: 09/24/2007     Page 6 of 16

RER-11     0761

1   to the Debtor of approximately $6.4 million, which new credit PaymentOne was not otherwise

2   obligated to extend to the Debtor.  The Debtor believes that under the law due to these new value

3   advances by PaymentOne such new credit is not antecedent debt and may constitute a new value

4   and/or a contemporaneous exchange for new value.  Notwithstanding the Debtor's current belief

5   that the secured position of PaymentOne is valid and not subject to attack as to such new value,

6   the Debtor does not and will not in this First Amended Stipulation give up any argument it, an

7   Official Creditors Committee appointed in this case ("Committee"), or any other party may have

8   or will have concerning the validity of the claims of PaymentOne or the perfection of its security

9   interest.  The Debtor wants to preserve the rights of such parties to review these matters and

10   discuss it with the Debtor.  However, the Debtor believes that the facts set forth in the Meyer

11   Declaration justify the portions of this First Amended Stipulation that allow a certain portion of

12   the Collateral to be delivered immediately to PaymentOne as adequate protection.

13          10.    For the reasons set forth in the Meyer Declaration, the Debtor has

14   determined that it is in the best interest of the Debtor and its estate to provide the Pipeline

15   Collection Property to PaymentOne to preserve the value of the Debtor's investment in

16   PaymentOne and that failing to do so may imperil that value, particularly given the sale effort.

17   Among other things, the Debtor owns over ninety-seven percent of the equity in PaymentOne and

18   stands to substantially benefit if PaymentOne's business is healthy and the maximum value is

19   received for it.  PaymentOne has further agreed to continue to process its transactions through the

20   Debtor as it has done in the past.

21          11.    During the term of this First Amended Stipulation, and as further adequate

22   protection, the Debtor shall promptly but no later than the Wednesday of each week wire transfer

23   to PaymentOne an amount that is equal to PaymentOne's share of total collections received by the

24   Debtor from the LECs, provided however that the total aggregate amounts turned over by the

25   Debtor to PaymentOne post-petition with respect to outstanding accounts that PaymentOne

26   submitted to the Debtor for collection pre-petition (the "Pipeline Collection Property") shall not

27   exceed the amount of $4,142,044.  Notwithstanding the foregoing, the parties reserve their

28   respective rights to assert that PaymentOne's share of the Pipeline Collection Property is lesser

W02-WEST:FBZ\400437999.1
092007

-5-

OLD: W02-West:400433123.1
NEW: W02-C\RED#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 7 of 16

RER-11    0762

1  than or greater than $4,142,044.

2      12.    To the extent that it is determined by the Court that PaymentOne does not

3  have a valid and perfected security interest or property interest in the Pipeline Collection

4  Property, the Debtor reserves the right to reduce PaymentOne's asserted secured claim or

5  property interest in other assets in the possession of the Debtor (or any other recovery due to

6  PaymentOne by the Debtor) by the amount of Pipeline Collection Property turned over by the

7  Debtor to PaymentOne, or seek disgorgement of moneys paid to PaymentOne under this First

8  Amended Stipulation, or seek disgorgement of any moneys paid to PaymentOne prepetition as an

9  avoidable transfer.

10      13.    As consideration for the Debtor's agreement to turn over the Pipeline

11  Collection Property to PaymentOne as set forth in paragraph 11 hereof, and so long as the First

12  Amended Stipulation is in effect, PaymentOne shall continue to submit to the Debtor accounts for

13  payment processing in accordance with the parties' pre-petition business practice, and the

14  proceeds of such accounts shall be promptly remitted to PaymentOne.

15      14.    9.——Notwithstanding anything to the contrary set forth in this First

16  Amended Stipulation, the Debtor does not concede that PaymentOne has any valid, perfected or

17  enforceable prepetition liens or security interests in the Collateral or any of the Debtor's other

18  assets, and the Debtor and PaymentOne reserve all rights and defenses with respect thereto.  The

19  replacement liens granted to PaymentOne pursuant to this First Amended Stipulation are effective

20  only to the extent that PaymentOne's prepetition liens in the Collateral are valid, perfected and

21  enforceable or to the extent that PaymentOne has valid ownership rights, beneficial rights or other

22  rights concerning the Collection Property.

23      15.    Without limiting the reservation of rights of the Debtor on its own behalf

24  herein and any rights of a Committee and other parties in interest, the Debtor hereby reserves its

25  own right and the right of a Committee and any other party in interest to challenge any and all

26  claims of PaymentOne, including but not limited to its claims of security interest in the Collateral.

27  The Debtor preserves its own right, and the right of the Committee and any other party in interest

28  to make any arguments with respect to the Collateral, including but not limited to the argument

W02-WEST:FBZ:400437999.1
092007

-6-

OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 8 of 16

RER-11        0763

1   that the Debtor's change of registered name from "Integretel, Incorporated" to "The Billing

2   Resource" occurred more than four months before PaymentOne amended its UCC financing

3   statement on October 18, 2006 reflecting "The Billing Resource" as the debtor. PaymentOne

4   asserts various defenses to lack of perfection and avoidance of its lien. Without limitation,

5   between October 18, 2006 (the date of the amended UCC financing statement) and September 14,

6   2007, PaymentOne advanced new credit to the Debtor in the aggregate amount of more than

7   $6.415 million plus accounts submitted to the LECs pre-petition as to which collections have not

8   been remitted to PaymentOne as of the Petition Date. As such new credit was advanced by

9   PaymentOne after filing its October 18, 2006 UCC financing statement, the Debtor and

10  PaymentOne believe that such new credit is not antecedent debt and may constitute a

11  contemporaneous exchange of value and/or subsequent new value. The total amount of Pipeline

12  Collection Property that the Debtor may turn over to PaymentOne pursuant to paragraph 11 of

13  this First Amended Stipulation is capped at $4,142,044 (without limiting PaymentOne's rights to

14  assert a greater share of the Pipeline Collection Property), which amount is significantly less than

15  the aggregate amount of new credit advanced by PaymentOne to the Debtor after October 18,

16  2006.

17          16.    10.   The Debtor has informed PaymentOne that the Debtor is or will be

18  negotiating with any other parties who allege a security interest in the Debtor's Cash Collateral

19  (the "Other Liens") and, in connection therewith, may enter into stipulations with such entities or

20  otherwise move the Court for authority to grant other postpetition liens in assets of the Debtor's

21  estate, which requested postpetition liens may be senior to any liens or security interests

22  possessed by PaymentOne (but only to the extent that the Other Liens were senior to the security

23  interests or other rights and interests of PaymentOne as of the Petition Date, or pursuant to an

24  order of the Court) . PaymentOne reserves the right to review and object to any other agreement

25  that may be reached between the Debtor and other allegedly senior lienholders.

26          17.    11.   If any party in interest objects to the First Amended Stipulation and

27  such objection is sustained, or if the Court does not approve this First Amended Stipulation,

28  PaymentOne shall be fully protected to the extent of the Debtor's actual use of Cash Collateral in

W02-WEST:FBZ:400437999.1
092007

-7-

OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 9 of 16

RER-11        0764

1   which PaymentOne has an interest prior to entry of a Court Order curtailing or otherwise

2   modifying the provisions of this First Amended Stipulation.

3          18.   ~~12.~~   ~~PaymentOne may terminate this Stipulation and the Debtor's use of~~

4   ~~Cash Collateral pursuant thereto upon fifteen (15) days prior written notice to the Debtor and the~~

5   ~~Debtor's counsel. Notwithstanding the foregoing, this~~This First Amended Stipulation (including

6   without limitation PaymentOne's consent to the Debtor's use of Cash Collateral) shall terminate

7   immediately and automatically upon the occurrence of the following:

8          a.   Entry of an order dismissing or converting the Debtor's chapter 11

9   case to a chapter 7 case;

10          b.   Entry of an order appointing a chapter 11 trustee;~~ or~~

11          c.   Written agreement of the Debtor and PaymentOne to terminate this

12   First Amended Stipulation~~.~~;

13          d.   Filing of a contested matter or adversary proceeding challenging

14   PaymentOne's security interests in the Collateral~~.~~; or

15          e.   ~~November 9,~~December 31, 2007, provided, however, that this

16   period may be extended by written agreement of the parties.

17   Notwithstanding the foregoing, PaymentOne reserves the right to seek an order of the Court

18   terminating this First Amended Stipulation upon 15 days' notice, or upon such shortened notice

19   as the Court may order, in the event of the Debtor's default or breach of the terms and conditions

20   of this First Amended Stipulation.

21          19.   ~~13.~~   The termination of this First Amended Stipulation shall not affect

22   or in any way impair any right, interest or lien granted to PaymentOne under this First Amended

23   Stipulation and the Order approving the same. Any security interests and other rights granted

24   hereunder shall survive any termination of this First Amended Stipulation. Except as specifically

25   set forth in this First Amended Stipulation, neither the Debtor nor PaymentOne waive any rights

26   provided to them under the Bankruptcy Code or any other applicable law, including the Debtor's

27   right to move for authority to use Cash Collateral after termination of this Stipulation. Moreover,

28   by executing this First Amended Stipulation, the parties hereto have not waived any of their rights

W02-WEST:FBZ\400437999.1
092007

-8-

OLD: W02-West:400433123.1
NEW: W02-C:\RED#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 10 of 16

RER-11    0765

1  or remedies contained in any of the Security Agreements, the Collection Agreements or any other

2  agreements between the parties.

3       20.  ~~14.~~  The terms of this First Amended Stipulation shall be binding upon

4  the successors and assigns of the Debtor and PaymentOne and shall be binding upon any

5  superseding chapter 11 trustee in this case, or in the event of a conversion of the case to a chapter

6  7 case, upon the chapter 7 trustee.

7       21.  ~~15.~~  The Court shall retain exclusive jurisdiction over the subject matter

8  of this First Amended Stipulation in order to resolve any dispute in connection with the rights and

9  duties specified hereunder.

10       22.  ~~16.~~  This First Amended Stipulation is made and entered in the State of

11  California and shall be interpreted and enforced to the extent that State law is applicable under

12  and pursuant to the laws of said jurisdiction.

13       23.  ~~17.~~  All notices other correspondence or information to be transmitted to

14  the parties pursuant to this First Amended Stipulation shall be transmitted via email and also

15  deposited in the United States mail, postage prepaid, addressed as follows, or to such other

16  addresses as may hereinafter be designated in writing by respective parties hereto:

17       If to the Debtor:

18            The Billing Resource
          Attn:  Ken Dawson, President

19            5883 Rue Ferrari
          San Jose, CA  95138

20            Email:  kdawson@integretel.com

21       With a copy to:

22            Sheppard, Mullin, Richter & Hampton LLP

23            Attn:  Michael H. Ahrens, Esq.
              Jeffrey K. Rehfeld, Esq.

24            Four Embarcadero Center, 17th Floor

25            San Francisco, California  94111-4106
          Email:  mahrens@sheppardmullin.com

26                  jrehfeld@sheppardmullin.com

27

28

W02-WEST:FBZ:400437999.1
092007

-9-

OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890     Doc #: 53     Filed: 09/24/2007     Page 11 of 16

RER-11     0766

If to PaymentOne:

PaymentOne Corporation
Attn: Evan Meyer, Chief Financial Officer, ~~Managing or General Agent~~

5883 Rue Ferrari
San Jose, CA 95138
Email: _____ emeyer@paymentone.com

With a copy to:

O'Melveny & Myers LLP
Attn: Steve Warren, Esq.
and Victoria Newmark, Esq.
400 South Hope Street
Los Angeles, CA 90071-2899
Email: swarren@omm.com
        vnewmark@omm.com

24. ~~18.~~ No modification, amendment or waiver of any of the provisions of this First Amended Stipulation shall be effective unless in writing signed by the parties.

25. ~~19.~~ This First Amended Stipulation has been prepared and negotiations in connection therewith have been carried on by the joint efforts of the parties. This First Amended Stipulation is to be construed simply and fairly and not strictly for or against any of the parties hereto. Each of the parties acknowledges that it has been represented by independent legal counsel of its own choice during all of the negotiations which preceded the execution of this First Amended Stipulation and that is has executed this First Amended Stipulation with the consent and on the advice of such independent legal counsel.

26. ~~20.~~ This First Amended Stipulation may be executed in any number of counterparts, any and all of which shall be deemed to be the original.

27. ~~21.~~ Each person signing this First Amended Stipulation as a representative of a named party hereby represents and warrants that he or she is authorized to so sign; and that the execution, formation, and performance of this First Amended Stipulation by the parties is duly authorized, subject to Court approval, if necessary.

W02-WEST:FBZ\400437999.1
092007

-10-

OLD: W02-West:400433123.1
NEW: W02-C:\RED#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 12 of 16

RER-11    0767

1    28.    22.——This First Amended Stipulation is subject to and conditioned upon

2    approval of the Court. Each of the parties agree to make every reasonable effort to obtain such

3    approval.

4

5    Dated: _____ ___, 2007

6                                          THE BILLING RESOURCE, dba INTEGRETEL, a
7                                          California Corporation

8                                          By: _____
9                                              Ken Dawson
                                               President
10   Dated: _____ ___, 2007

11                                         PAYMENTONE CORPORATION, a Delaware
12                                         Corporation

13                                         By: _____
                                           Name: Evan B. Meyer
14                                         Its:   Chief Financial Officer

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:FBZ'400437999.1                    -11-                OLD: W02-West:400433123.1
092007                                                          NEW: W02-C:\REDW#1138593 v7 - Final Cash
                                                                Collateral Stipulation.doc

Case: 07-52890    Doc #: 53    Filed: 09/24/2007    Page 13 of 16

                                                                RER-11        0768

Document comparison done by Workshare DeltaView on Thursday, September 20, 2007 9:39:28 PM

| Input | |
|-------|--|
| Document 1 | interwovenSite://SFADMS1/West/400433123/1 |
| Document 2 | C:\RED\#1138593 v7 - Final Cash Collateral Stipulation.doc |
| Rendering set | Standard |

| Legend |
|--------|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics | Count |
|-----------|-------|
| Insertions | 89 |
| Deletions | 89 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 178 |

W02-WEST:FBZ:400437999.1
092007

-12-

OLD: W02-West:400433123.1
NEW: W02-C:\RED\#1138593 v7 - Final Cash
Collateral Stipulation.doc

Case: 07-52890     Doc #: 53     Filed: 09/24/2007     Page 14 of 16

RER-11     0769

# EXHIBIT 3

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Three Week Period Ending October 5, 2007**

| Week Ending | 1 9/21/07 | 2 9/28/07 | 3 10/5/07 | Total |
|---|---|---|---|---|
| **Inflows** | | | | |
| 1  CIC 402 pipeline collections remitted to TBR by LECs | $ 918,762 | $ 1,727,641 | $ 1,242,446 | $ 3,888,849 |
| **Outflows** | | | | |
| 2  Total operating costs and expenses | (95,000) | (215,000) | (305,000) | (615,000) |
| 3  Bankruptcy costs (1) | 0 | 0 | 0 | 0 |
| 4  CIC 402 pipeline collections remitted to P1 | (580,432) | (994,684) | (433,265) | (2,008,381) |
| 5  Total Outflows | (675,432) | (1,209,684) | (738,265) | (2,623,381) |
| 6  Net cash flow | $ 243,330 | $ 517,957 | $ 504,181 | $ 1,265,468 |
| 7  Beginning available cash | $ 1,945,598 | $ 2,188,928 | $ 2,706,885 | $ 1,945,598 |
| 8  Net cash flow | 243,330 | 517,957 | 504,181 | 1,265,468 |
| 9  Ending cash | $ 2,188,928 | $ 2,706,885 | $ 3,211,066 | $ 3,211,066 |

**NOTE:**
(1) Assumes counsel paid through retainers previously established.

**EXHIBIT 3**

**RER - 12**

1   HOWARD KOLLITZ (State Bar No. 059611)
    WALTER K. OETZELL (State Bar No. 109769)
2   STEVEN J. SCHWARTZ (State Bar No. 200586)
    DANNING, GILL, DIAMOND & KOLLITZ, LLP
3   2029 Century Park East, Third Floor
    Los Angeles, California 90067-2904
4   Telephone: (310) 277-0077
    Facsimile: (310) 277-5735
5   Email:    sschwartz@dgdk.com

6   JEFFREY C. SCHNEIDER
    TEW CARDENAS LLP
7   Four Seasons Tower, Fifteenth Floor
    1441 Brickell Avenue
8   Miami, Florida 33131-3407
    Telephone: (305) 539-2481
9   Facsimile:  (305) 536-1116

10  Co-Counsel for Creditor David R. Chase, Federal Receiver
    of Access One Communications, Inc., and Network One
11  Services, Inc.

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re | ) Case No. 07-52890-ASW |
| | ) |
| THE BILLING RESOURCE, dba Integretel, a | ) Chapter 11 |
| California corporation, | ) |
| | ) **FEDERAL RECEIVER'S** |
| [Taxpayer's Identification No. 33-0289863] | ) **SUPPLEMENTAL OPPOSITION TO** |
| | ) **MOTION FOR AUTHORITY TO USE** |
| | ) **CASH COLLATERAL WITH** |
| | ) **MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES** |
| | ) |
| | ) |
| Debtor. | ) Date:    September 26, 2007 |
| | ) Time:   2:15 p.m. |
| | ) Ctrm:   3020 |

TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES

BANKRUPTCY JUDGE:

PLEASE TAKE NOTICE that creditor David R. Chase, the United States District Court-

Appointed Receiver (the "Federal Receiver") of Access One Communications, Inc. ("Access One"),

and Network One Services, Inc. ("Network One") (collectively, the "Receiverships"), submits

herewith his Supplemental Opposition to the Emergency Motion of The Billing Resource, dba

-1-

314496.02 [XP]     24774

1  Integretel, a California corporation (the "Debtor") For Use of Cash Collateral and Granting
2  Replacement Liens (the "Cash Collateral Motion" or "Motion"), filed and served in this matter on
3  or about September 17, 2007. The grounds for such supplemental opposition are as described
4  below.

5                                              **I.**

6                                    **INTRODUCTION**

7          The Federal Receiver previously filed an opposition to this "Emergency" Cash Collateral
8  Motion drawing the Court's attention to Debtor's transparent attempt to circumvent at least two
9  orders (collectively, the "District Court Orders" or the "Orders") of the United States District Court
10 Judge Ryskamp for the Southern District of Florida (the "District Court") regarding approximately
11 $1,700,000.00 in Receivership Funds (the "Receivership Funds"). The hearing on that Motion was
12 continued, <u>inter alia</u>, for this Court to consider some of the issues raised. As this Court will see, the
13 facts and resolution of the issues in this case are quite clear, and, as respects the Receivership
14 Funds, this Motion remains an attempt by the Debtor to involve this Court in circumventing the
15 District Court's prior resolution of the issues.

16         Initially, the District Court has expressly made it clear beyond any argument that the
17 Receivership Funds are property of the Federal Receiver and not property of the Bankruptcy Estate.
18 The District Court has also ruled that enforcement of the various District Court Orders at issue do
19 not violate the automatic stay and are not affected by this bankruptcy case. For that reason alone,
20 granting any motion that would give the Debtor the impression or argument that it was somehow
21 authorized to use the Receivership Funds would contradict the express Order of the District Court
22 and be improper. The Debtor knows this, and it should not be requesting such an order from this
23 Court.

24         Nor is there any doubt that the District Court's actions are appropriate and in keeping with
25 applicable law. Judicial authority holds that the District Court has jurisdiction over the
26 Receivership Funds and its rulings take precedence because it exercised that jurisdiction first.
27 There can be no argument that the Orders at issue were anything but final adjudication of the
28 ownership of the Receivership Funds and that should Debtor wish to be relieved from such orders,

                                              -2-

1   its remedy is appeal in the Eleventh Circuit. Once again, the Debtor knows this. As the Court will

2   see, Debtor has already filed its appeal of the subject Orders, a matter about which the Debtor

3   should inform this Court.

4         In sum, the District Court has adjudicated ownership of the Receivership Funds and found

5   that they are not property of the Bankruptcy Estate in a proceeding that, itself, is not subject to the

6   automatic stay. This Court is respectfully requested to require that the Receivership Funds be paid

7   over to the Federal Receiver forthwith or, alternatively, that they be placed in a segregated account

8   and accounted for in order that the District Court may continue to exercise its jurisdiction

9   thereover, including taking the actions it feels necessary to compel Debtor to turn them over to the

10   Federal Receiver. In any event, this Court is respectfully requested to specifically exclude the

11   Receivership Funds from any approval of Debtor's use of cash collateral and to prohibit Debtor

12   from using, disposing of, transferring, or in any way exercising control over said Receivership

13   Funds.

14

15                                 **II.**

16                             **ARGUMENT**

17         At the September 21, 2007 hearing on this Cash Collateral Motion, the Court observed that

18   the issues here were complex. Fortunately, however, the District Court has clarified any doubts in

19   respect of its Orders, and judicial authority demonstrates the appropriateness of the District Court's

20   holdings and the Federal Receiver's requests.

21       A.   The Omnibus Order Holds that the Receivership Funds are Property of the Federal

22             Receivership and not Property of the Bankruptcy Estate

23         After reviewing the Omnibus Order ("District Court's September 14, 2007 Order"), which,

24   notwithstanding its critical role, Debtor failed to attach to the Cash Collateral Motion, this Court

25   inquired whether the District Court adjudicated the ownership of the Receivership Funds. Counsel

26   for the FTC directed the Court's attention to the first page of the District Court's September 21,

27   2007, Order Granting Motion for Clarification (the "Clarification Order") (See Exhibit "L" to

28   RJN), and stated that the language there could not be clearer.

-3-

1    The FTC's counsel was correct. The Clarification Order makes it clear beyond any
2    argument that the District Court found that the Receivership Funds are property of the Federal
3    Receivership Estate and not of the Bankruptcy Estate. A true and correct copy of the Clarification
4    Order is attached hereto as Exhibit "L". On the first page, the District Court states "on Friday,
5    September 14, 2007, this Court issued its Omnibus Order in which it ruled that the reserve funds
6    are the property of the Receivership Estate and ordered Integretel to pay the current reserve funds,
7    amounting to $1,762,762.56, immediately to the Receiver." On Page 4 of the Clarification Order,
8    the District Court states "[t]he Court has already ruled that the reserve funds are neither property of
9    the Bankruptcy Estate nor Integretel."

10    This language leaves no room for argument on this issue. And, since the Receivership
11    Funds are not property of the Bankruptcy Estate, they cannot be used by the Debtor by virtue of 11
12    U.S.C. § 363 or any other provision of the Bankruptcy Code. For this reason alone, the Motion of
13    the Debtor should be denied in respect of the Receivership Funds.

14    It should also be noted that the District Court also clarified that the proceeding against the
15    Debtor in that Court enjoining it to turn over the Receivership Funds under pain of contempt is not
16    subject to the automatic stay by virtue, inter alia, of the police powers or regulatory exception set
17    forth in 11 U.S.C. § 362(b)(4). In so holding, the District Court discussed the reason for such
18    exception to the automatic stay, as well as judicial authority interpreting that section. It discussed
19    the relief sought by the FTC and how it applies in this bankruptcy context. Finally it concluded
20    "[t]he commencement of Integretel's bankruptcy case does not stay either the pending contempt
21    proceeding against Integretel, including the turnover order, or the FTC's prosecution of the
22    consumer protection action against Integretel."

23    The timing of the Clarification Order of the District Court, the context in which it was
24    brought, and the language found in the Clarification Order demonstrates, again, beyond argument,
25
26
27
28

-4-

314496.02 [XP]    24774