1   Florida Action, including the Payment Order, is stayed.

2       The Debtor has submitted a budget to this Court in connection with the Debtor's
3   cash collateral motion. The budget shows that the Debtor had $1.9 million in cash at the
4   filing date and expects receivables to be paid in the next three weeks of $3.9 million. If
5   that cash is not used to meet secured creditors' claims on it and to make payments to the
6   Debtor's current customers in exchange for continuing to submit receivables to the Debtor,
7   then they may, as soon as they are able to do so, stop doing business with the Debtor and
8   bring its operations to a halt. The Chapter 11 filing has unsettled the Debtor's customer
9   relationships. For the Debtor to reorganize it needs to retain these customers. It cannot do
10  so if its scarce resources are used for past claims asserted by the Receiver and in
11  connection with litigation with the FTC.

12      Moreover, if the Prior Customers' claims are paid now, they would receive far more
13  than their pro rata share of any funds available to return reserves to customers. The
14  Debtor's current customers have no different entitlement to the Debtor's assets than the
15  Receiver. If the other customers are not afforded similar relief, then the Prior Customers
16  will have been preferred to the detriment of the Debtor's other creditors.

17      Obviously, the FTC claims it is acting in the public interest by proceeding with its
18  claims against the Debtor for its involvement with the Prior Customers some two years
19  ago. But the FTC cannot achieve any proper regulatory goal if continuing the Florida
20  Action merely puts the Debtor out of business, reducing competition in the marketplace
21  from three firms to two. The Debtor plays an important role in helping keep
22  telecommunication prices down, thereby serving the public interest. Unless the Florida
23  Action is stayed, the Debtor is likely to cease operations. A forced liquidation of the
24  Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much
25  worse off. A cessation of the business will also cost the Debtor's employees their
26  livelihoods. This will leave no regulatory purpose to the Florida Action.

27      Putting the Debtor out of business would also prejudice the Debtor's existing
28  customers. Unlike the two Prior Customers who are no longer operating, the Debtor's

W02-WEST:5SS1\400436007.4

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

RER-14       0829

1   other customers are still in business and likely would not be able to switch all of their

2   billing and collection needs over from the Debtor to one of the Debtor's competitors fast

3   enough to avoid substantial harm to their business operations.

4          Against the prospect of fatally injuring the Debtor by continuing the Florida Action

5   and enforcing the Payment Order, the FTC and the Receiver will suffer no comparable

6   injury if the Florida Action and the Payment Order are stayed.  The Debtor is now under

7   this Court's oversight.  It is not alleged to be continuing to engage in any improper conduct

8   that the Florida Action will remedy.  Delaying the Florida Action to give the Debtor a

9   breathing spell to reorganize threatens no important governmental or public interest that

10  has ever been articulated by the FTC.

11  D.      **The Debtor Has a Reasonable Likelihood of a Successful Reorganization.**

12         The Debtor believes it will be able to successfully confirm a plan of reorganization.

13  It bases that belief on the fact that on a going forward basis, the Debtor can be cash flow

14  positive if it maintains its existing level of revenue and does not incur extraordinary costs

15  arising from previous operations.  The Debtor has a number of avenues open to it to

16  reorganize.  It could propose a plan under which it establishes a pot from which unsecured

17  claims would be paid *pro rata*.  It could also propose to issue new common stock in

18  exchange for the unsecured debt, thus making its creditors into shareholders, with a stake

19  in outcome of future operations.  It could conclude a sale of its business to a competitor or

20  other buyer and the proceeds of that sale would comprise the distributions that unsecured

21  creditors would receive, after payment of secured claims and administrative costs.

22         Given sufficient time the Debtor can formulate a plan and negotiate that plan with

23  its creditors.  The Debtor faces no insuperable obstacles to successfully resolving this

24  bankruptcy case.

25                                        **III.**

26                              **RELIEF REQUESTED**

27         The Debtor seeks an order from the Court staying the Florida Action, including the

28  Payment Order, until the Court enters a preliminary injunction granting that same relief.

-10-

W02-WEST:5SS1\400436007.4

# IV.

## ARGUMENT

A.    **The Court Has Authority Under Section 105 to Stay the Florida Action.**

"Section 105(a) gives the bankruptcy courts the power to stay actions that are not subject to the 11 U.S.C. § 362(a) automatic stay but 'threaten the integrity of a bankrupt's estate.'" Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc., ___ F.3d ___, 2007 WL 2555941, 07 Cal. Daily Op. Serv. 10,857, 10,859 (9th Cir. 9/7/2007) (citations omitted).  Bankruptcy courts have the power to enjoin prosecution of governmental actions even if they fall under the police and regulatory power exception:

> There [is] a procedural avenue to forfend state actions that are not subject to the automatic stay but that threaten the bankruptcy estate:  a request for an injunction under 11 U.S.C. § 105.  The bankruptcy court's injunctive power is not limited by the delineated exceptions to the automatic stay . . .

Gruntz v. County of Los Angeles (In re Gruntz), 202 F.3d 1074, 1087 (9th Cir. 2000) (en banc).  See H.R.Rep. No. 95-595, at 342 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6298 ("The effect of the [police powers] exception is not to make the action immune from injunction.  The court has ample other powers to stay actions not covered by the automatic stay.  Section 105 . . .grants the power to issue [such an injunction].");  Walsh v. West Virginia (In re Security Gas & Oil, Inc.), 70 B.R. 786, 792 (Bankr. N.D. Cal. 1987) ("well established that the bankruptcy court may . . . affirmatively enjoin acts against a debtor that are not prohibited by the automatic stay").

Enforcement of the Payment Order and the Receiver's continued pursuit of the bankruptcy estate's assets in the Florida Action clearly threaten the integrity of the bankruptcy estate's assets and this Court's jurisdiction over such assets.  Accordingly, as shown below, the Debtor satisfies the standard for issuance of an injunction and this is a proper case for application of Section 105.

B.    **The Debtor Has Shown Entitlement to a Stay Under the Preliminary Injunction Standard in this Circuit.**

The Ninth Circuit clarified in a decision issued this month that it will apply the "usual preliminary injunction standard" in considering stays issued under Bankruptcy Code

-11-

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

1  section 105(a). Excel Innovations, 07 C.D.O.S. at 10860. Thus, in the bankruptcy context,

2  a party seeking a Section 105 stay must show: (1) a likelihood of success on the merits,

3  meaning that the debtor has a reasonable likelihood of a successful reorganization; (2) the

4  possibility of irreparable injury if relief is not granted; (3) a balance of hardships favoring

5  the plaintiff; and (4) that the requested injunction is in the public interest (if applicable).

6  Id. Alternatively, a party may be entitled to a preliminary injunction if the movant shows

7  "*either* a combination of probable success on the merits and the possibility of irreparable

8  injury *or* that serious questions are raised and the balance of hardships tips sharply in his

9  favor." Id. (emphasis in original). The tests are not separate, but instead "represent two

10 points on a sliding scale in which the required degree of irreparable harm increases as the

11 probability of success decreases." Id., quoting, Save Our Sonoran, Inc. v. Flowers, 408

12 F.3d 1113, 1120 (9th Cir. 2005).

13     The circumstances here justify the issuance of a Section 105(a) injunction in favor

14 of the Debtor evaluated under any of the relevant standards.

15     1.    **The Debtor Has a Reasonable Likelihood of a Successful**
16           **Reorganization.**

17     In Excel Innovations, the Ninth Circuit found that the ordinary test of "success on

18 the merits" means a reasonable likelihood of success in reorganizing if the requested

19 injunctive relief is granted, which "is not a high burden." Where the Debtor is a good

20 candidate for reorganization, has a proactive history while in bankruptcy and has a

21 potentially profitable operating business, it meets this standard. Homestead Holdings, Inc.

22 v. Broome & Wellington (In re PTI Holding Corp.), 346 B.R. 820, 830-31 (Bankr. D. Nev.

23 2006).

24     Enforcement of the Payment Order as well as the Receiver's continued pursuit of

25 relief in the Florida Action against the Debtor and property of the estate will have

26 devastating consequences on the Debtor and likely preclude its successful reorganization.

27 But, if such actions are enjoined the Debtor believes it will be able to successfully confirm

28 a plan of reorganization. See Dawson Declaration. As discussed above, the Debtor has a

-12-

MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

1  number of alternatives that can be pursued to resolve its past liabilities. In the short-term it

2  needs to maintain its ongoing business by convincing customers to continue doing business

3  with it and devoting maximum management attention to the reorganization effort.

4       **2.    The Debtor Will Suffer Irreparable and Severe Hardship if Required to**

5              **Defend the Florida Action or Comply with the Payment Order.**

6       The Debtor and its bankruptcy estate risk irreparable harm unless enforcement of

7  the Payment Order and the Receiver's continued pursuit in the Florida Action of the Debtor

8  and estate property are enjoined. The Payment Order requires that the Debtor pay over

9  $1.7 million to the Receiver in the Florida Action. By proceeding with the enforcement of

10  the Payment Order, the Receiver is seeking nothing less than actual control over the assets

11  of the estate. Doing so threatens "the bankruptcy court's exclusive jurisdiction over the *res*

12  of the debtor's estate and therefore can be enjoined." FTC v. First Alliance Mortgage Co.

13  (In re First Alliance Mortgage Co.), 264 B.R. 634, 655 (C.D. Calif. 2001).

14       Further, the Debtor cannot pay over the money sought by the Receiver and have any

15  likelihood of being able to continue operations. Enforcement of the Payment Order would

16  constitute "immediate threatened injury" and thus constitutes an ample basis for injunctive

17  relief. Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

18       The Debtor and its bankruptcy estate would also suffer significant harm from being

19  required to continue litigation of the Florida action with expected fees in amounts so high

20  relative to the Debtor's bankruptcy estate, that permitting the Florida Action to proceed

21  constitutes a threat to the bankruptcy estate and a threat to the bankruptcy process. See,

22  e.g., NLRB v. Superior Forwarding, Inc., 762 F.2d 695, 698-99 (8th Cir. 1985) (exposure

23  to three-week trial costing $65,000). Here, the cost of pursuing an appeal, combined with

24  the costs of responding to dispositive motions expected to be filed by the FTC, completing

25  discovery, preparing for and participating in trial will likely be about $1 million, a sum that

26  the Debtor cannot afford to pay and still continue its business.

27       Similarly, permitting the continued litigation of the Florida Action during the first

28  90 days of this bankruptcy case, particularly where the Florida Action is set to start trial in

-13-

W02-WEST:5SS1\400436007.4                  MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

RER-14      0833

1    less than five months, would have an extremely detrimental impact on the Debtor and the

2    bankruptcy estate due to the required diversion of the Debtor's management's limited time,

3    energy and resources. See Homestead Holdings, Inc. v. Broome & Wellington (In re PTI

4    Holding Corp.), 346 B.R. 820, 827-28 (Bankr. D. Nev. 2006) (diversion of time or

5    energies of key estate personnel during "crucial period in the operational life and

6    reorganization of the debtor" can constitute irreparable harm). This would have a

7    disproportionately prejudicial impact in this bankruptcy case. Unlike many larger

8    corporate debtors with well-staffed management teams who have the resources to

9    simultaneously operate their business, navigate the chapter 11 process and manage a

10   separate "bet the company" litigation occurring on the other side of the country, here the

11   Debtor's management consists of just a few individuals.

12      The Debtor's bankruptcy estate would also suffer other irreparable harm. If the

13   Debtor is required to pay over $1.7 million to the Receiver instead of using its cash on

14   hand to address current, post-bankruptcy liabilities, then the Receiver will have preferred

15   itself to the detriment of all of the Debtor's other creditors. Such an action violates one of

16   the bedrock foundations of bankruptcy law – equality of distribution among the debtor's

17   creditors. The inequality here will be heightened by the fact that the payment will likely

18   force the Debtor out of business, leaving the rest of the Debtor's creditors and the

19   bankruptcy estate much worse off, having lost the Debtor's intrinsic going concern value.

20      Moreover, if the Debtor is forced to cease business operations, such cessation would

21   have drastic prejudicial consequences on the Debtor's customers, many of whom likely

22   would not be able to switch all of their billing and collection needs over from the Debtor to

23   one of the Debtor's competitors fast enough to avoid substantial harm to their business

24   operations. The Debtor's employees would also suffer from the loss of their jobs.

25      3.     **No Serious Hardship will Befall the FTC or the Receiver if the Florida**

26                **Action is Stayed.**

27      In contrast, granting the requested injunctive relief presents relatively little hardship

28   to the Receiver. The two Prior Customers are no longer in business. The Receiver would

-14-

W02-WEST:5SS1\400436007.4           MEMORANDUM OF P&A'S RE EMERGENCY
MOTION FOR TRO . .

RER-14     0834

1   merely be precluded from obtaining an unfair advantage by enforcing that the Payment

2   Order and from continuing its pursuit of the prepetition contract claims the Receiver

3   asserts on behalf of the Debtor's two Prior Customers in the Florida Action. Instead, the

4   Receiver will be afforded the same opportunity to pursue the two Prior Customers' claims

5   as the Bankruptcy Code provides to every other similarly situated creditor – the ability to

6   file a proof of claim against the Debtor.

7        Nor will the FTC or consumers suffer any hardship comparable to that of the Debtor

8   as a consequence of delay in adjudicating the Florida Action. Aside from monetary

9   redress, the FTC's action addresses whether the Debtor should be subject to any injunctive

10   relief regulating its future business operations. Of course, if there are no future business

11   operations, then the continued prosecution of the Florida Action will be meaningless. And

12   there is no reason why the injunctive and monetary aspects of the Florida Action cannot be

13   delayed long enough to give the Debtor a chance to propose a reorganization plan under

14   which the Debtor addresses the claims asserted by the FTC, or which provides for the

15   resumption of that litigation post-confirmation.

16       4.    **Serious Questions Are Raised And The Balance Of Hardships Tips**

17              **Strongly In Favor Of Granting A TRO And Preliminary Injunction.**

18        The Debtor has indubitable rights under the Bankruptcy Code to pursue a

19   Congressionally-authorized bankruptcy reorganization and this Court has a strong interest

20   in effectuating the Code's principles concerning equitable treatment of similar creditors.

21   This case presents serious questions about how to protect these rights and interests in light

22   of the Receiver's claim to the Debtor's limited cash resources and the FTC's efforts to

23   enforce the FTCA. The Debtor seeks an injunction here to avoid having the interests of all

24   the other parties in this case put at risk by the FTC and the Receiver's claims, which

25   jeopardize the Debtor's entire chapter 11 case and its ability to reorganize. Moreover,

26   enforcement of the Payment Order and the continued pursuit of the Florida Action will

27   conflict with this Court's administration of the Debtor's bankruptcy case and its bankruptcy

28   estate. For these reasons, serious questions are raised which satisfy this prong.

-15-

W02-WEST:5SS1\400436007.4                             MEMORANDUM OF P&A'S RE EMERGENCY<br>MOTION FOR TRO . .

RER-14     0835

1    Similarly, for the reasons set forth above, the balance of the hardships tips strongly
2  in favor of the requested relief.  Failure to grant the requested relief will have disastrous
3  results for the Debtor, its bankruptcy estate, its creditors, its employees, its customers and
4  the public at large.  In contrast, granting the requested relief means that the claims of the
5  Prior Customers, asserted by the Receiver, will be treated in the same manner as other,
6  similarly situated creditors.  The balance of hardships clearly weighs in favor of granting
7  the requested relief.

8    Therefore, the Debtor has also satisfied this alternate test, and the Court should
9  accordingly grant the requested temporary restraining order and preliminary injunction.

10    5.    **Granting a Stay is not Inconsistent with the Public Interest.**

11    The public interest also weighs in favor of the requested injunctive relief.
12  Chapter 11 of the Bankruptcy Code codifies Congress' decision that reorganization and
13  rehabilitation of debtors is in the public interest.  Enforcement of the Payment Order and
14  the continued litigation of the Florida Action have potentially disastrous consequences to
15  the Debtor and its bankruptcy estate, forcing the Debtor to part with funds essential for the
16  continued operation of its business, jeopardizing its reorganization, and likely forcing it to
17  liquidate. The United States Supreme Court has stated that "the policy of Chapter 11 is to
18  permit successful rehabilitation of debtors." NLRB v. Bildisco & Bildisco, 465 U.S. 513,
19  527 (1984).  Reorganization of the debtor and maximizing the value of the bankruptcy
20  estate are two of the primary objectives of Chapter 11.  In re Bonner Mall Partnership,
21  2 F.3d 899, 915 (9th Cir. 1993), dismissed as moot, 513 U.S. 18 (1994).

22    Failure to grant the requested injunctive relief will likely result in cessation of the
23  Debtor's business and its liquidation, prejudicial impact on the Debtor's creditors,
24  significant harm to the Debtor's customers' businesses, and the loss of employment for the
25  Debtor's employees.  Absent the requested injunctive relief, the Receiver and the Prior
26  Customers' claims it is pursuing will be advantaged in ways not contemplated by the
27  Bankruptcy Code's carefully detailed priority distribution procedures.  In addition, the
28  public at large will be harmed by the loss of one of the three remaining billing aggregators

-16-

W02-WEST:5SS1\400436007.4                                       MEMORANDUM OF P&A'S RE EMERGENCY
                                                                                          MOTION FOR TRO . .

RER-14            0836

1 whose services help keep prices down in the telecommunications industry.

2    In contrast, if the requested injunctive relief is granted, the Payment Order will
3 simply be treated the same way as other orders for payment of money are treated under the
4 Bankruptcy Code.  Similarly, the two Prior Customers' claims pursued by the Receiver will
5 simply be treated the same way as other prepetition contract claims are treated under the
6 Bankruptcy Code.

7                                         **V.**

8                                     **<u>NOTICE</u>**

9    A copy of the Motion and supporting documents is being served by email or
10 facsimile on (a) the Receiver's counsel; (b) the FTC's counsel; and (c) the Office of the
11 United States Trustee.

12                                        **VI.**

13                                 **<u>CONCLUSION</u>**

14    The relief requested by the Debtor is absolutely essential for the Debtor's survival,
15 to protect its creditors, to protect its customers, to protect its employees, and to protect the
16 entire bankruptcy estate.  The Debtor is entitled to a temporary restraining order and a
17 preliminary injunction for the reasons set forth herein enjoining the Florida Action and the
18 enforcement of the Payment Order pending the Debtor's effort to confirm a plan of
19 reorganization.

20 Dated: September 24, 2007

21                        Respectfully submitted,

22                        SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

23

24                        By    _____/s/ Steven B. Sacks_____
25                                        STEVEN B. SACKS
                                Proposed Attorneys for Debtor The Billing
26                                     Resource, dba Integretel

27

28

                                        -17-

MEMORANDUM OF P&A'S RE EMERGENCY
                                                        MOTION FOR TRO . .

                                                        RER-14        0837

1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2 |    Including Professional Corporations
  | MICHAEL H. AHRENS, Cal. Bar No. 44766
3 | STEVEN B. SACKS, Cal. Bar N. 98875
  | JEFFREY K. REHFELD, Cal. Bar No. 188128
4 | ORI KATZ, Cal. Bar No. 209561
  | Four Embarcadero Center, 17th Floor
5 | San Francisco, California  94111-4106
  | Telephone:    415-434-9100
6 | Facsimile:    415-434-3947
  | Email:        mahrens@sheppardmullin.com
7 |         ssacks@sheppardmullin.com
  |         jrehfeld@sheppardmullin.com
8 |         okatz@sheppardmullin.com

9

10 | Proposed Attorneys for The Billing Resource,
   | dba Integretel

11

### UNITED STATES BANKRUPTCY COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 07-52890 |
| THE BILLING RESOURCE, dba INTEGRETEL, a California corporation, | Chapter 11 |
| Debtor. | **DECLARATION OF NEAL GOLDFARB IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Tax ID: 33-0289863 | |
| | Date:       September 26, 2007 |
| | Time:       2:15 p.m. |
| | Place:      United States Bankruptcy Court |
| |        280 South First Street |
| |        San Jose, California |
| | Judge:      Hon. Arthur S. Weissbrodt |
| | Courtroom: 3020 |

1    I, Neal Goldfarb, declare as follows:

2    1.    I am senior counsel to the law firm of Tighe Patton Armstrong Teasdale
3    PLLC in Washington, D.C., where I have been one of the principal attorneys representing
4    the Debtor in the litigation brought by the FTC in the United States District Court for the
5    Southern District of Florida ("the Florida Action"). My firm has been the Debtor's counsel
6    for regulatory-related matters since approximately 2002, when my co-counsel Richard
7    Gordin joined the firm and brought the Debtor with him as a client. A petition to have my
8    firm appointed as special counsel to the Debtor will be filed shortly.

9    2.    I have been in practice for almost 27 years, during which time I have
10    specialized in litigation, primarily in federal courts. I am admitted to practice in the District
11    of Columbia, Maryland, and Virginia, as well as in the United States Supreme Court; the
12    United States Courts of Appeals for the District of Columbia, Fourth, Sixth, Tenth, and
13    Eleventh Circuits; the United States District Courts for the District of Columbia and for the
14    District of Maryland; and the United States Court of Federal Claims. I am admitted *pro*
15    *hac vice* in the Florida Action.

16    3.    This declaration is submitted in support of the Debtor's "Emergency Motion
17    For Temporary Restraining Order And Order To Show Cause Re: Preliminary Injunction
18    And Declaratory Relief" ("the Motion"). Capitalized terms not defined herein shall have
19    the meanings ascribed to them in the Motion.

20    4.    If the Court does not grant the Bankruptcy Code section 105 injunction that
21    the Debtor seeks, the Debtor will most likely incur more than $870,000 in litigation costs
22    in the Florida litigation over the next six months. This amount does not include the
23    expenses to be incurred by the Debtor in having its personnel travel in connection with the
24    pre-trial and trial activities and other incidental expenses incurred by the Debtor directly.
25    The overwhelming bulk of that expense is attributable to the FTC's claim that the Debtor
26    violated the FTC Act, and is unrelated to any litigation regarding the reserves that the
27    District Court has ordered to be paid to the Receiver for Access One and Network One.
28    The fees and costs related to litigation regarding the reserves will likely bring the total

-1-

DECLARATION OF NEAL GOLDFARB RE
EMERGENCY MOTION FOR TRO

1  expense to between $920,000 and $1,020.000.

2      5.    The following is a summary of what will have to be done in the Florida

3  Action between now and March 2008:

4          a.    *Depositions*: Fourteen or fifteen depositions remain to be taken or

5              completed, some of which will require the Debtor's counsel to travel

6              to Florida. Although the Debtor may be able to skip some of the

7              depositions being taken by the other billing-aggregator defendant and

8              let that defendant take the lead at others, several of the depositions are

9              significant to the Debtor's defense and could not be skipped without

10             significant risk to the Debtor's ability to prevail in the litigation.

11         b.    *Discovery motions*: I anticipate that there will be a number of motions

12             relating to the depositions described above.

13         c.    *Dispositive motions*: The deadline for dispositive motions is Novem-

14             ber 6, with oppositions due on December 18. The Debtor does not

15             plan to file a dispositive motion, but I anticipate that the FTC will do

16             so and that opposing that motion will require a very substantial

17             investment of attorney and paralegal time. It will also require the

18             involvement of key employees of the Debtor.

19         d.    *Other motions*: It is likely that there will be additional motions

20             relating to procedural or evidentiary matters or to the conduct of the

21             trial.

22         e.    *Pretrial submissions*: There is a fairly extensive set of requirements

23             for pretrial submissions, including (1) designation of witnesses and

24             exhibits, (2) objections to other parties' exhibits, and (3) an extensive

25             joint pretrial statement. Some of these submissions will require

26             conferences with counsel for the opposing parties, who include not

27             only the FTC but another billing aggregator and nine individual

28             defendants and third-party defendants.

-2-

DECLARATION OF NEAL GOLDFARB RE
EMERGENCY MOTION FOR TRO

f.    *Trial*: Trial is scheduled to begin on February 25, 2008 in Florida, and will most likely take two to four weeks. Two or three attorneys from my firm would participate in the trial, and possibly a paralegal. In addition, key employees of the Debtor will have to attend at least parts of the trial, including the Debtor's president, its head of LEC relations (i.e., relations with the telephone companies to which the Debtor submits billing information), its head of sales, and its head of client relations. There will be substantial out-of-pocket expenses for travel, lodging, and food for all of these persons.

6.    The following is my best estimate of the fees that will be associated with my firm's work on the foregoing litigation tasks over the next six months:

| | | |
|---|---|---|
| Richard Gordin (partner) | 600 hours at $400/hour | 240,000 |
| Steven Lancellotta (partner) | 100 hours at $400/hour | 40,000 |
| Neal Goldfarb (senior counsel) | 1,200 hours at $290/hour | 348,000 |
| Joe Cosby (senior counsel) | 100 hours at $260/hour | 26,000 |
| Max Maccoby (of counsel) | 500 hours at $250/hour | 125,000 |
| Evi Georgiou (associate) | 40 hours at $165/hour | 6,600 |
| Paralegals | 300 hours at $120/hour | 36,000 |
| TOTAL | | 821,600 |

7.    In addition to these fees, there will most likely also be additional fees for work performed by our local counsel in Florida, who are with the firm of Holland & Knight. A conservative estimate of these fees would be $10,000. There will also be very substantial out-of-pocket costs, which will include travel costs (airfare, hotel, meals, and car rental) not only for the trial itself but also for travel to the Debtor's offices to prepare witnesses for trial, deposition and court transcript expenses, and litigation support costs. These costs will probably run in the range of $50,000-75,000.

8.    The fees and expenses described above represent the amount of work that would be required even if the Debtor did not have to deal with the various issues relating to the Receiver's claim to the reserves. Proceedings relating to those matters would add fees and expenses in the range of $50,000 to $150,000. (The actual amount of fees devoted

-3-

1  to these matters would be higher than that, but given the number of attorneys available to

2  work on the case, some of the time devoted to the reserve issues would be time that would

3  otherwise be devoted to working on the main litigation.)

4  I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct. Executed on September 24, 2007, at Washington, D.C.

/s/ Neal Goldfarb

NEAL GOLDFARB

-4-

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2        Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California 94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947

7  Proposed Attorneys for The Billing Resource, dba
   Integretel

8
                    UNITED STATES BANKRUPTCY COURT
9
                    NORTHERN DISTRICT OF CALIFORNIA
10
                         [SAN JOSE DIVISION]
11

12 | In re                                    | Case No. 07-52890

13 | THE BILLING RESOURCE, dba                | Chapter 11
   | INTEGRETEL, a California corporation,    |

14 |              Debtor.                     |

15 | Tax ID: 33-0289863                       |

16

17 | THE BILLING RESOURCE, dba                | Adv. Proc. No. 07-05156
   | INTEGRETEL, a California corporation,    |
18 |                                          | **DECLARATION OF KEN DAWSON IN
   |              Plaintiff,                   | SUPPORT OF EMERGENCY MOTION
19 |                                          | FOR TEMPORARY RESTRAINING
   |         v.                               | ORDER AND PRELIMINARY
20 |                                          | INJUNCTION**
   | FEDERAL TRADE COMMISSION, and            |
21 | DAVID R. CHASE, not individually, but    | Date:      September 26, 2007
   | solely in his capacity as receiver for   | Time:      2:15 p.m.
22 | Nationwide Connections, Inc., Access One | Place:     United States Bankruptcy Court
   | Communications, Inc., Network One Services,|            280 South First Street
23 | Inc., 411TXT, Inc., CELL-INFO-USA, INC., |            San Jose, California
   | Enhanced Billing Services, Inc., Toll Free| Judge:     Hon. Arthur S. Weissbrodt
24 | Connect, Inc., Cripple Creek Holdings, LLC,| Courtroom: 3020
   | Built to Last, LLC, Not Fade Away, LLC, He's|
25 | Gone, LLC, The Other One, LLC, Turn on   |
   | Your Love Light, LLC, China Cat Sunflower,|
26 | LLC, Lazy River Road Holdings, LLC,      |

27 |              Defendants.                 |

28

1      I, Ken Dawson, declare as follows:

2      1.      I am the President and Secretary of The Billing Resource, dba Integretel, a
3  California corporation (the "Debtor"), the named debtor in this case.    I make this
4  declaration in that capacity.    I was one of the Debtor's founders in 1988 and I have been
5  with the company ever since.  I have personal knowledge of the matters set forth below.  If
6  called upon to testify as to those matter I could and would do so competently.

7      2.      This declaration is submitted in support of the Debtor's "Emergency Motion
8  For Temporary Restraining Order And Order To Show Cause Re:  Preliminary Injunction
9  And Declaratory Relief" (the "Motion").    Capitalized terms not defined herein shall have
10  the meanings ascribed to them in the Motion.

11      3.      The Debtor has filed a voluntary petition for relief under Chapter 11 of the
12  Bankruptcy Code.    The Debtor is operating its business pursuant to Sections 1107 and
13  1108 of the Bankruptcy Code.

14      4.      The Debtor was formed in 1988 based on a need for aggregators to facilitate
15  billing and collections on behalf of smaller telecommunications companies that provided
16  "alternative operator services" ("AOS") which otherwise could not afford to compete with
17  the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

18      5.      AOS involves providing long-distance calling on an occasional or as-needed
19  basis in situations where often the consumer uses the service provider's assets or services
20  without the consumer or the service provider knowing each other's identity.  For example,
21  a service provider owning the service contract for a hotel chain has no idea  as to the
22  identity of the consumer using its phones.  If an AOS  provider facilitates a collect call it
23  needs a way to bill the consumer for that call.

24      6.      The Debtor addressed a significant industry void by creating a service bureau
25  focused entirely on billing-related services for AOS providers and others needing a means
26  of billing consumers for their services.  As the cornerstone to its billing capability, the
27  Debtor maintains a full complement of billing and collection agreements with an estimated
28  1,400 or more LECs and independent service providers so that it can place calls made

-1-

1  through an AOS on a LEC bill. This infrastructure enables telecommunication service
2  providers to incorporate their charges within the phone bills of more than 90% of business
3  and residential consumers throughout the United States and Canada.

4      7.    The Debtor quickly established itself as a leader in providing LEC billing
5  solutions for diverse and emerging products and services. The Debtor presently offers a
6  complete array of complementary services including internet-delivered management and
7  settlement reporting, direct billing, customer care and collection support. As a strategic
8  back-room business partner, the Debtor frees its clients to focus their efforts on promoting
9  and selling products and services.

10     8.    The Debtor has served thousands of service providers over the years. The
11  vast majority of the processed billings have been in support of smaller sized businesses
12  that otherwise would not have been able to compete. It is the competitive pressure of these
13  smaller companies that has forced down the rates charged to consumers by the larger
14  telecommunication companies.

15     9.    The Debtor has approximately thirty-seven employees. Twenty-two of those
16  employees have been with the company for over five years, and thirteen have been with
17  the Debtor for over ten years. In addition, the Debtor's services support, through
18  outsourced relationships, approximately 20-30 call center personnel in several different
19  call centers who are employed by a third-party vendor.

20     10.   Access One Communications, Inc. ("Access One") and Network One
21  Services, Inc. ("Network One") were two of the Debtor's prior AOS customers (Access
22  One and Network One are collectively referred to as the "Prior Customers").

23     11.   On February 27, 2006, the Federal Trade Commission (the "FTC")
24  commenced a lawsuit (i.e., the Florida Action) against three AOS providers, including the
25  Prior Customers, as well as their principals, alleging deceptive and unfair practices for
26  unauthorized billing of charges on phone bills – referred to as "cramming" – in violation of
27  the Federal Trade Commission Act (the "FTCA"). The Florida Action is captioned <u>Federal</u>
28  <u>Trade Commission v. Nationwide Connections, Inc., et al.</u>, Case No. 06-80180-Civ-

-2-

W02-WEST:5SS1\400439177.1

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1  Ryskamp, United States District Court for the Southern District of Florida.  The Florida
2  Court entered a temporary restraining order and later a preliminary injunction. The Florida
3  Court appointed the Receiver as the receiver for the defendants and certain of their
4  affiliates.  An "Amended Preliminary Injunction Order" was filed on September 25, 2006.
5  On or about September 21, 2006, the FTC filed an amended complaint which included
6  claims against the Debtor and another billing aggregator.

7        12.    The FTC alleged in its Amended Complaint that the Debtor caused certain of
8  the Prior Customers' fraudulent charges to be placed on end users' phone bills and that the
9  Debtor was liable under the FTCA in spite of the fact that the LECs, not the Debtor,
10  perform the billing.

11        13.    The FTC has sought injunctive relief against the Debtor as well as monetary
12  redress including restitution for the allegedly defrauded consumers.  There has been no
13  finding that the Debtor violated the FTCA.

14        14.    The Debtor voluntarily stopped providing services for the Prior Customers
15  over a year prior to the FTC's filing of its Amended Complaint.  At the time that it stopped
16  providing services, the Debtor  stopped making payments to the Prior Customers and
17  instead made a determination under the contracts with the Prior Customers that all further
18  amounts received from LECs on account of their billings should be booked as reserves.
19  This was done because of the Debtor's possible exposure to claims for refunds of the Prior
20  Customers' Billing Transactions.

21        15.    Whenever the Debtor allocated an amount to the reserves for the Prior
22  Customers, the Debtor made a bookkeeping entry for that amount.  However, the Debtor
23  does not have a corresponding asset, such as a bank account, that contains the monies that
24  were allocated as reserves from the Prior Customers.  Moreover, there is no segregated
25  account containing the reserves of any customer, including either of the Prior Customers.
26  The Debtor does not have enough monies to cover the full amount of reserves for all of the
27  Debtor's customers.

28        16.    In contrast to the FTC's allegations, the Debtor asserted that the Prior

-3-

1  Customers' wrongful conduct caused great injury to the Debtor, including by causing the
2  Debtor to incur fees and expenses to defend the FTC action.

3      17.    The Receiver is seeking to collect all assets of the Prior Customers. Toward
4  that end, the Receiver sought relief in the Florida Action by motion against the Debtor.
5  The Receiver asserted that the Debtor owes the Prior Customers the amount that the
6  Debtor booked as reserves for the Prior Customers, which the Receiver alleged was an
7  asset of the Prior Customers, in an amount in excess of $1.7 million. The Receiver further
8  alleged that the Debtor had violated the Amended Preliminary Injunction Order and should
9  be held in contempt for failing to turn over the sums demanded by the Receiver.

10     18.    The Debtor filed a response opposing such relief on numerous grounds,
11  including that at the most, any rights the Prior Customers—and therefore the Receiver,
12  who stood in their shoes—had with respect to the reserves were simply those rights of a
13  general, unsecured creditor. The Debtor also asserted that it had offsetting claims under
14  the Subject Contracts against the Prior Customers which exceeded the amount of the Prior
15  Customers' alleged reserves. In particular, to the extent the Debtor has any liability in the
16  Florida Action, it arises from the misconduct of the Prior Customers, not the Debtor, and
17  pursuant to the Subject Contracts, the Prior Customers are liable to the Debtor for such
18  liability, as well as the costs and fees incurred in the Florida Action. These costs and fees,
19  and the liability asserted against the Debtor in the Florida Action, far exceed the amount of
20  any sums withheld from the Prior Customers as reserves.

21     19.    The Debtor has expended over $700,000 in legal fees and costs to date in
22  defending the Florida Action. That case is set for trial in February 2008.

23     20.    The Debtor has also had to devote substantial and valuable management and
24  employee time and resources to the Florida Action. Given the schedule in that case, the
25  Debtor's management will need to be diverted even more is issue and would be forced to
26  further incur such items, to the detriment of its reorganization efforts, if this action were
27  not stayed as against the Debtor.

28     21.    The Debtor believes that it will ultimately prevail in the Florida Action, and

-4-

1  that it will ultimately be held to owe nothing to the Receiver. However, the Debtor could
2  not pay the money sought by the Receiver and still continue its normal operations. The
3  Debtor requested that the Receiver agree to a stay to the implementation and enforcement
4  of the Payment Order. The Receiver refused. The Debtor thereafter filed for bankruptcy
5  protection.

6      22.    The Debtor filed for bankruptcy protection because it could not continue its
7  operations and pay over $1.7 million to the Receiver. Nor can it afford to have the Florida
8  Action continue at the outset of this case, when it will divert its management's attention
9  from the reorganization effort and cost very significant attorneys' fees and costs that the
10 Debtor cannot afford. The Debtor can only proceed with a successful reorganization if the
11 Florida Action, including the Payment Order, is stayed.

12     23.    The Debtor has submitted a budget to this Court in connection with the
13 Debtor's cash collateral motion. The budget shows that the Debtor had $1.9 million in
14 cash at the filing date and expects receivables to be paid in the next three weeks of $3.9
15 million. If that cash is not used to meet secured creditors' claims on it and to make
16 payments to the Debtor's current customers in exchange for continuing to submit
17 receivables to the Debtor, then they may, as soon as they are able to do so, stop doing
18 business with the Debtor and bring its operations to a halt. The Chapter 11 filing has
19 unsettled the Debtor's customer relationships. For the Debtor to reorganize it needs to
20 retain these customers. It cannot do so if its scarce resources are used for past claims
21 asserted by the Receiver and in connection with litigation with the FTC.

22     24.    Moreover, if the Prior Customers' claims are paid now, they would receive
23 far more than their pro rata share of any funds available to return reserves to customers.
24 The Debtor's current customers have no different entitlement to the Debtor's assets than the
25 Receiver. If the other customers are not afforded similar relief, then the Prior Customers
26 will have been preferred to the detriment of the Debtor's other creditors.

27     25.    Obviously, the FTC claims it is acting in the public interest by proceeding
28 with its claims against the Debtor for its involvement with the Prior Customers some two

-5-

1   years ago.   But the FTC cannot achieve any proper regulatory goal if continuing the
2   Florida Action merely puts the Debtor out of business, reducing competition in the
3   marketplace from three firms to two.   The Debtor plays an important role in helping keep
4   telecommunication prices down, thereby serving the public interest.   Unless the Florida
5   Action is stayed, the Debtor is likely to cease operations.   A forced liquidation of the
6   Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much
7   worse off.   A cessation of the business will also cost the Debtor's employees their
8   livelihoods.  This will leave no regulatory purpose to the Florida Action.

9       26.    Putting the Debtor out of business would also prejudice the Debtor's existing
10  customers.   Unlike the two Prior Customers who are no longer operating, the Debtor's
11  other customers are still in business and likely would not be able to switch all of their
12  billing and collection needs over from the Debtor to one of the Debtor's competitors fast
13  enough to avoid substantial harm to their business operations.

14      27.    The Debtor believes it will be able to successfully confirm a plan of
15  reorganization.   It bases that belief on the fact that on a going forward basis, the Debtor
16  can be cash flow positive if it maintains its existing level of revenue and does not incur
17  extraordinary costs arising from previous operations.   The Debtor has a number of avenues
18  open to it to reorganize.   It could propose a plan under which it establishes a pot from
19  which unsecured claims would be paid *pro rata*.   It could also propose to issue new
20  common stock in exchange for the unsecured debt, thus making its creditors into
21  shareholders, with a stake in outcome of future operations.   It could conclude a sale of its
22  business to a competitor or other buyer and the proceeds of that sale would comprise the
23  distributions that unsecured creditors would receive, after payment of secured claims and
24  administrative costs.

25      28.    Given sufficient time the Debtor can formulate a plan and negotiate that plan
26  with its creditors.   The Debtor faces no insuperable obstacles to successfully resolving this
27  bankruptcy case.

28  I declare under penalty of perjury under the laws of the United States of America that the

-6-

1  foregoing is true and correct.

2  September 24, 2007

3

4                                         /s/ Ken Dawson

5                                         KEN DAWSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

# RER - 15

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2       Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   STEVEN B. SACKS, Cal. Bar No. 98875
    JEFFREY K. REHFELD, Cal. Bar No. 188128
4   ORI KATZ, Cal. Bar No. 209561
    Four Embarcadero Center, 17th Floor
5   San Francisco, California 94111-4106
    Telephone:     415-434-9100
6   Facsimile:     415-434-3947

7   Proposed Attorneys for The Billing Resource, dba
    Integretel

8                   UNITED STATES BANKRUPTCY COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        [SAN JOSE DIVISION]

11

12  | In re | Case No. 07-52890 |

13  | THE BILLING RESOURCE, dba | Chapter 11 |
    | INTEGRETEL, a California corporation, | |

14  |         Debtor. | |

15  | Tax ID: 33-0289863 | |

16

17  | THE BILLING RESOURCE, dba | Adv. Proc. No. 07-05156 |
    | INTEGRETEL, a California corporation, | |

18  |         Plaintiff, | **DECLARATION OF STEVEN B. SACKS IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

19  |         v. | |

20  | FEDERAL TRADE COMMISSION, and | Date:        September 26, 2007 |
    | DAVID R. CHASE, not individually, but | Time:        2:15 p.m. |

21  | solely in his capacity as receiver for | Place:       United States Bankruptcy Court |

22  | Nationwide Connections, Inc., Access One | 280 South First Street |
    | Communications, Inc., Network One Services, | San Jose, California |

23  | Inc., 411TXT, Inc., CELL-INFO-USA, INC., | Judge:       Hon. Arthur S. Weissbrodt |
    | Enhanced Billing Services, Inc., Toll Free | Courtroom: 3020 |

24  | Connect, Inc., Cripple Creek Holdings, LLC, | |

25  | Built to Last, LLC, Not Fade Away, LLC, He's | |
    | Gone, LLC, The Other One, LLC, Turn on | |

26  | Your Love Light, LLC, China Cat Sunflower, | |
    | LLC, Lazy River Road Holdings, LLC, | |

27  |         Defendants. | |

28

---

DECLARATION OF STEVEN B. SACKS RE
EMERGENCY MOTION FOR TRO

I, Steven B. Sacks, declare as follows:

1.    I am an attorney duly admitted to practice in the courts of this State and before this Court. I am a member of Sheppard, Mullin, Richter & Hampton LLP, proposed counsel to the Debtor herein.

2.    This declaration is submitted in support of the Debtor's "Emergency Motion For Temporary Restraining Order And Order To Show Cause Re: Preliminary Injunction And Declaratory Relief" (the "Motion"). Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3.    On September 24, 2007, the Receiver filed an "Emergency Motion in Furtherance of Pending Contempt Proceeding" with the Florida Court. A true and correct copy of this pleading is attached hereto as Exhibit A and incorporated herein.

4.    Also on September 24, 2007, the Florida Court issued a ruling denying the Receiver's Emergency Motion. A true and correct copy of this order is attached hereto as Exhibit B and incorporated herein.

5.    On September 19, 2007, the Debtor filed an adversary complaint against the FTC and the Receiver. A true and correct copy of the adversary complaint is attached hereto as Exhibit C and incorporated herein.

6.    The Florida Court entered an order on September 14, 2007 (the "Payment Order") requiring that the Debtor pay over the amounts sought by the Receiver into a segregated receivership account. The Payment Order was entered upon the motion of the Receiver, not the FTC. A true and correct copy of the Payment Order is attached hereto as Exhibit D and incorporated herein.

7.    The Florida Court has since ruled on September 21, 2007 that the Florida Action and the Payment Order are not subject to the automatic stay and that the Florida Court can continue with its contempt proceedings. A true and correct copy of the September 21, 2007 order is attached hereto as Exhibit E and incorporated herein.

-1-

W02-WEST:5SS1\400439713.1

DECLARATION OF STEVEN B. SACKS RE
EMERGENCY MOTION FOR TRO

1    I declare under penalty of perjury under the laws of the United States of America
2 that the foregoing is true and correct.
3 September 24, 2007
4
5                                              /s/ Steven B. Sacks
6                                          STEVEN B. SACKS
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-2-

# EXHIBIT A

RER-15          0854

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.  06-80180-CIV-RYSKAMP

FEDERAL TRADE COMMISSION,

       Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC.,
ACCESS ONE COMMUNICATIONS, INC.,
NETWORK ONE SERVICES, INC.,
WILLOUGHBY FARR,
MARY LOU FARR,
YARET GARCIA,
ERIKA RIABOUKHA,
QAADIR KAID,

BILLING CONCEPTS, INC.,
ACI BILLING SERVICES, INC., d/b/a OAN,
BSG CLEARING SOLUTIONS NORTH
AMERICA, LLC, and
THE BILLING RESOURCE,
d/b/a INTEGRETEL

       Defendants.

_____/

## RECEIVER'S EMERGENCY MOTION IN FURTHERANCE OF
## PENDING CONTEMPT PROCEEDING; MEMORANDUM OF LAW

David R. Chase, as Court-appointed receiver (the "Receiver"), respectfully requests that this

Court issue an Order, on an emergency basis, requiring that Defendant, The Billing Resource, d/b/a

Integretel ("Integretel"), wire transfer before 5:00 p.m., Eastern Standard Time, on Tuesday,

September 25, 2007, the $1,762,762.56 in reserve funds that this Court has specifically ordered

Integretel to "immediately" transfer to the Receiver, absent which Integretel's designed control

person, Ken Dawson, should be ordered to appear before this Court in person on September 26,

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

2007. Without this relief, as set forth more fully below, it is possible that the Bankruptcy Judge presiding over Integretel's Bankruptcy Case will allow Integretel, as early as September 27, 2007, to begin spending the funds that this Court has already ruled are "property of the receivership estate" that must be "immediately" transferred to the Receiver. *See* Order Granting Motion for Clarification as to Scope of Stay, at p. 1.

### INTRODUCTION

Despite the clear, unambiguous, and unequivocal directives contained in this Court's Omnibus Order dated September 13, 2007 [D.E. 610] and Order Granting Motion for Clarification as to Scope of Stay dated September 21, 2007 [D.E. 619], Integretel still refuses to transfer the $1,762,762.56 in reserve funds to the Receiver. Instead, Integretel has just filed – in its California Bankruptcy Case – a Complaint for Declaratory Relief, Temporary Restraining Order, and Preliminary Injunction against the Receiver (the "California Complaint"). A copy of Integretel's California Complaint is attached as Exhibit A. In its California Complaint, Integretel seeks to re-litigate every issue that has already been litigated before this Court, decided in the Omnibus Order, and reinforced in the Order Granting Motion for Clarification as to Scope of Stay.

For example, Integretel alleges in its California Complaint, just like it argued before this Court, that it "had no obligation to pay any funds to the Receiver . . . ." Complaint, at ¶ 34; *see also* ¶¶ 18-24 (Exhibit A). Integretel alleges in its California Complaint, just like it argued before this Court, that it "did not hold any specific funds allocable to reserves . . . ." *Id.* Integretel alleges in its California Complaint, just like it argued before this Court, that it "treated [the reserves] solely as balance sheet entries . . . ." *Id.* And Integretel alleges in its California Complaint, just like it argued before this Court, that the Receiver is nothing more that a "a general, unsecured creditor." *Id.*

2

Nowhere in Integretel's California Complaint does Integretel inform the Bankruptcy Court that this Court rejected these precise arguments. Nowhere in Integretel's California Complaint does Integretel inform the Bankruptcy Court that this Court found that the reserve funds are property of the Receivership Estate and not Integretel's property. And nowhere in Integretel's Complaint does Integretel attach copies of this Court's prior Orders. This is an outrage. The Receiver is now going to have to defend the California Complaint, which is going to further increase the attorneys' fees associated with Integretel's contumacious conduct.

But the California Complaint is just Integretel's way to distract attention from its real plan. Integretel's real plan is to spend the Receivership Estate's reserve funds – under the guise of its "Emergency" Motion for Use of Cash Collateral – before all of these issues are hashed out. And the most surprising part about this entire saga is that the Bankruptcy Judge presiding over Integretel's Bankruptcy Case is actually contemplating permitting it.

As this Court knows from the Federal Trade Commission's (the "FTC") Motion for Clarification That the Automatic Stay Does Not Apply to the FTC's Law Enforcement Action and the Ongoing Contempt Proceeding [D.E. 618], the Bankruptcy Court conducted a hearing on Friday, September 21, 2007, on Integretel's "Emergency" Motion for Use of Cash Collateral.[1] Despite having a copy of this Court's Order Granting Motion for Clarification as to Scope of Stay – which, in fact, was handed to Integretel's counsel by the Bankruptcy Judge himself at the beginning of the

---

[1] Integretel also failed to advise the California Bankruptcy Court in its Motion for Use of Cash Collateral that this Court had already ruled that the $1,762,762.56 million in reserve funds are property of the Receivership Estate and not Integretel's property. Integretel also did not attach a copy of this Court's Omnibus Order to its Motion for Use of Cash Collateral . The Receiver engaged bankruptcy counsel in California on an emergency basis to oppose Integretel's Motion and to advise the Bankruptcy Court of this Court's Orders. The Receiver will file, under separate cover, the papers that his California bankruptcy counsel filed in Bankruptcy Court.

3

RER-15        0857

hearing – Integretel nevertheless argued that it need not transfer the reserve funds to the Receiver and the Bankruptcy Judge is apparently considering supporting that decision. The Bankruptcy Judge has required that additional briefs be filed and served on Monday, September 24, 2007. The Bankruptcy Judge has reschedued the hearing on the Motion for Use of Cash Collateral for Wednesday, September 26, 2007, at 2:15 p.m., Pacific Time. A copy of the Notice of Continued Hearing is attached as Exhibit B.

Needless to say, if Integretel's "Emergency" Motion for Use of Cash Collateral is granted, Integretel will begin to deplete the funds that this Court has unequivocally ruled are "property of the receivership estate" that must be "immediately" transferred to the Receiver. *See* Order Granting Motion for Clarification as to Scope of Stay, at p. 1. Integretel reported in its bankruptcy filings that it had "beginning available cash" of only $1,945,598 as of the commencement of its Bankruptcy Case; this amount *included* the $1,762,762.56 in reserve funds. Integretel's attorneys stated at the cash collateral hearing that Integretel's payroll was due on Thursday, September 27, 2007. That is why the Bankruptcy Judge rescheduled the hearing on Integretel's "Emergency" Motion for Use of Cash Collateral for Wednesday, September 26, 2007.

In short, and as difficult as this may be to believe, this Court's clear directive commanding Integretel to "immediately" transfer the reserve funds to the Receiver is not working. Integretel continues to ignore this Court's Orders. So something more is apparently needed, and it is needed before Integretel receives permission from the Bankruptcy Judge to begin spending the Receivership Estate's reserve funds.

Accordingly, the Receiver respectfully requests that this Court – in furtherance of the pending contempt proceeding – order Integretel to comply with this Court's Temporary Restraining Order

4

("TRO") [D.E. 18], Amended Preliminary Injunction [D.E. 223], Omnibus Order, and Order

Granting Motion for Clarification as to Scope of Stay, on an emergency basis, by requiring Integretel

to wire transfer the reserve funds that are property of this Receivership Estate – $1,762,762.56 – to

the Receiver before 5:00 p.m., Eastern Standard Time, on Tuesday, September 25, 2007, absent

which Integretel's designated control person, Ken Dawson, should be ordered to appear before this

Court in person on September 26, 2007.[2]

### MEMORANDUM OF LAW

This Court has already specifically ruled – not once, but twice – that the reserve funds are

property of this Receivership that must immediately be turned over to the Receiver. This Court has

also ruled that Integretel's bankruptcy filing does not stay this contempt proceeding and does not

deprive this Court of its inherent power to enforce the integrity of its own orders. *See* Order

Granting Motion for Clarification as to Scope of Stay, at p. 4. But something more is needed,

because Integretel still refuses to transfer the reserve funds to the Receiver.

In *US Sprint Commc'ns Co. v. Buscher*, 89 B.R. 154 (D. Kan. 1988), the Court held that:

> It is within this court's inherent power to take whatever steps are
> necessary to ensure those persons within its power comply with its
> orders. The court cannot conceive that Congress intended to strip the
> court of this power, and instead **permit a party to blatantly violate**

---

[2] Mr. Dawson, incidentally, is Integretel's President who mislead the FTC in response to
this Court's TRO by submitting a letter that indicated that "no amounts are currently due and
owing" when, in fact, Integretel was holding, over $1.35 million in reserves. *See*
Omnibus Order, at p. 1. Mr. Dawson also submitted the declaration to the Bankruptcy Court in
support of Integretel's "Emergency" Motion for Use of Cash Collateral that failed to mention that
the "cash" that Integretel was trying to use had already been determined by this Court to be
property of this Receivership Estate. Like the Motion for Use of Cash Collateral itself, Mr.
Dawson's declaration to the Bankruptcy Court also failed to attach a copy of this Court's
Omnibus Order. Finally, Integretel has sought permission in the Bankruptcy Court to designate
Mr. Dawson as Integretel's "designated responsible individual."

TEW CARDENAS LLP

Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

RER-15        0859

> **direct orders of the court and then seek shelter from a**
> **bankruptcy judge**. If this were so, the court's orders could be
> rendered almost meaningless. The court must retain the ability to
> compel compliance with its orders; a party seeking relief from his
> creditors is **not free to run rampant in flagrant disregard of the**
> **powers of the court**.

*Id.* at 156 (emphasis added).

This Court should not permit Integretel to "blatantly violate direct orders of [this Court] and

then seek shelter from a bankruptcy judge." *See id.* This Court should not allow Integretel "to run

rampant in flagrant disregard of the powers of [this Court]." *See id.* Integretel cannot "seek shelter"

in the California Bankruptcy Court from this Court's TRO, Amended Preliminary Injunction,

Omnibus Order, and Order Granting Motion for Clarification as to Scope of Stay. *See id.* And

because this is a contempt proceeding in which this Court is upholding its dignity and vindicating

its authority to enforce its Orders, this Court has the power to ensure that Integretel *immediately*

transfers the reserve funds to the Receiver before they are depleted.

## CONCLUSION

Before Integretel dupes the California Bankruptcy Court into thinking that this Court did not

mean what it said when it ruled that the $1,762,762.56 in reserve funds were property of the

Receivership that must be immediately turned over, the Receiver respectfully requests that this Court

enter an Order in furtherance of these contempt proceedings and this Court's prior Orders, on an

emergency basis, requiring Integretel to wire transfer the reserve funds to the Receiver, who will

keep such funds in a segregated Receivership account, before 5:00 p.m., Eastern Standard Time, on

Tuesday, September 25, 2007, absent which Integretel's designated control person, Ken Dawson,

6

RER-15        0860

should be ordered to appear before this Court in person on September 26, 2007.[3]

Dated: September 24, 2007.

Respectfully submitted,

**TEW CARDENAS LLP**
Counsel for David R. Chase, Receiver [4]
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida 33131
Telephone: 305.536.1112
Facsimile: 305.536.1116

By:_____
**Jeffrey C. Schneider, P.A.**
Florida Bar No. 933244
E-mail:  jcs@tewlaw.com
**Patrick J. Rengstl, Esq.**
Florida Bar No. 0581631
E-mail:  pjr@tewlaw.com

@PFDesktop\::ODMA/MHODMA/DMS_NT;Miami;493612;1

---

[3] Rather than identify the wire transfer instructions in this Motion, the Receiver will provide them to Integretel's counsel by electronic mail.

[4] The Receiver was appointed to take control of the assets of Willoughby Farr and Mary Lou Farr, and serve as receiver for Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., 411TXT, Inc., CELL-INFO-USA, Inc., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC, Turn on Your Love Light, LLC, China Cat Sunflower, LLC, and Lazy River Road Holdings, LLC.

7

RER-15          0861

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-CIV-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC., et al.

      Defendants.

_____/

## ORDER DENYING RECEIVER'S EMERGENCY MOTION IN FURTHERANCE OF
## THE PENDING CONTEMPT PROCEEDING

THIS CAUSE comes before the Court pursuant to the Receiver's Emergency Motion in

Furtherance of Pending Contempt Proceeding, filed September 24, 2007 **[DE 623]**. Integretel

objected to the motion on September 24, 2007 **[DE 622]**.

On September 16, 2007, Integretel filed a petition for Chapter 11 bankruptcy in the

United States Bankruptcy Court, Northern District of California, San Jose Division, Case No. 07-

52890. The Bankruptcy Court conducted a hearing on Friday, September 21, 2007 on

Integretel's Motion for Use of Cash Collateral. During the hearing, Integretel argued that it need

not transfer the reserve funds to the Receiver. The Bankruptcy Judge has requested additional

briefing, with said briefs to be filed and served on Monday, September 24, 2007. A hearing on

the Motion for Use of Cash Collateral has been rescheduled for Wednesday, September 26, 2007

at 2:15 p.m., Pacific Time.

The Receiver requests that Integretel wire transfer before 5:00 p.m., Eastern Standard

2

Time, on Tuesday, September 25, 2007, the $1,762,762.56 in reserve funds that this Court had specifically ordered Integretel to "immediately" transferred to the Receiver. In the event that Integretel does not effect said transfer, the Receiver requests that Integretel's designated control person, Ken Dawson, appear before this Court in person on September 26, 2007.

The Court declines to grant the Receiver its requested relief on the grounds that the Bankruptcy Court should have the opportunity to make its own determination as to Integretel's motion. Accordingly, it is hereby

ORDERED AND ADJUDGED that the motion, filed September 24, 2007 **[DE 623]**, is DENIED.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 24th day of September, 2007.

> S/Kenneth L. Ryskamp
> KENNETH L. RYSKAMP
> UNITED STATES DISTRICT JUDGE

# EXHIBIT C



1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
      A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   email:  mahrens@sheppardmullin.com
7
   Proposed Attorneys for The Billing Resource, dba
8  Integretel

9                  UNITED STATES BANKRUPTCY COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      [SAN JOSE DIVISION]

12 | In re                                    | Case No. 07-052890
13 | THE BILLING RESOURCE, dba                | Chapter 11
14 | INTEGRETEL, a California corporation,    |
15 |                        Debtor.           |
16 | Tax ID: 33-0289863                       |
17 | THE BILLING RESOURCE, dba                | Adv. Proc. No. _____
   | INTEGRETEL, a California corporation,    |
18 |                                          | **COMPLAINT FOR DECLARATORY**
   |                        Plaintiff,        | **RELIEF, TEMPORARY RESTRAINING**
19 |                                          | **ORDER, AND PRELIMINARY**
   |         v.                               | **INJUNCTION**
20 |                                          |
   | FEDERAL TRADE COMMISSION, and            |
21 | DAVID R. CHASE, not individually, but    |
   | solely in his capacity as receiver for   |
22 | Nationwide Connections, Inc., Access One |
   | Communications, Inc., Network One Services, |
23 | Inc., 411TXT, Inc., CELL-INFO-USA, INC., |
   | Enhanced Billing Services, Inc., Toll Free |
24 | Connect, Inc., Cripple Creek Holdings, LLC, |
   | Built to Last, LLC, Not Fade Away, LLC, He's |
25 | Gone, LLC, The Other One, LLC, Turn on   |
   | Your Love Light, LLC, China Cat Sunflower, |
26 | LLC, Lazy River Road Holdings, LLC,      |
27 |                        Defendant.        |
28

W02-WEST:FJR\400435989.3

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1    The Billing Resource, dba Integretel, a California corporation, plaintiff herein (the

2    "Debtor"), alleges as follows:

3        1.    This is an adversary proceeding seeking declaratory and injunctive relief, pursuant

4    to 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. §§ 105, 108(b) and 362(a); Federal Rule of

5    Bankruptcy Procedure Rules 7001(7) and (9); and Federal Rule of Civil Procedure 65 incorporated

6    by Federal Rule of Bankruptcy Procedure 7065.

7                    **THE PARTIES**

8        2.    The Debtor is a corporation organized and existing under the laws of the State of

9    California with its principal place of business in San Jose, California. The Debtor performs data

10   processing, account reconciliation, customer service and related services in the

11   telecommunications industry. The Debtor is the debtor and debtor in possession in the above-

12   referenced chapter 11 bankruptcy case (the "Bankruptcy Case"), to which this adversary

13   proceeding "relates" pursuant to Federal Rule of Bankruptcy Procedure 7008(a). The Debtor

14   commenced this Bankruptcy Case by filing a voluntary petition under chapter 11 of the United

15   States Code (i.e., the "Bankruptcy Code"). The Bankruptcy Case is pending in the United States

16   Bankruptcy Court for the Northern District of California, San Jose Division.

17       3.    Defendant the Federal Trade Commission (the "FTC") is an independent agency of

18   the United States Government created by statute. 15 U.S.C. §§ 41, *et. seq.*

19       4.    David R. Chase (the "Receiver" and the Receiver and the FTC each a "Defendant"

20   and together the "Defendants") is the receiver for the following entities Nationwide Connections,

21   Inc., Access One Communications, Inc., Network One Services, Inc., 411TXT, Inc., CELL-INFO-

22   USA, INC., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek Holdings,

23   LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC, Turn on

24   Your Love Light, LLC, China Cat Sunflower, LLC, Lazy River Road Holdings, LLC, appointed

25   by the United States District Court for the Southern District of Florida in the lawsuit captioned

26   Federal Trade Commission v. Nationwide Connections, Inc., et al., Case No. 06-80180-Civ-

27   Ryskamp. The Debtor has brought this action against the Receiver, not individually, but solely in

28   the Receiver's capacity as receiver for the foregoing entities.

-1-

W02-WEST:FJR\400435989.3

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

**JURISDICTION AND VENUE**

5.    This adversary proceeding arises under title 11, or arises in or is related to the Bankruptcy Case, within the meaning of 28 U.S.C. Section 1334(b). This Court therefore has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. Sections 157(a), 157(b), 1334(b) and 1334(e) and Rule 5011-1 of the Bankruptcy Local Rules of the United States District Court for the Northern District of California.

6.    This Court also has jurisdiction pursuant to 28 U.S.C. Sections 2201 and 2202.

7.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. Sections 157(b)(2)(A), (G), & (O).

8.    Venue is proper in this district pursuant to 28 U.S.C. Section 1409(a).

9.    The FTC is subject to the jurisdiction of this Court.

10.    The Receiver is subject to the jurisdiction of this Court.

**GENERAL FACTUAL ALLEGATIONS**

**A.    The Debtor's Background and the Debtor's Business.**

11.    The Debtor was formed in 1988 based on a need for aggregators to facilitate billing and collections on behalf of smaller telecommunications companies that provided "alternative operator services" ("AOS") which otherwise could not afford to compete with the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

12.    AOS involves providing long-distance calling on an occasional or as-needed basis in situations where often the consumer uses the service provider's assets or services without the consumer or the service provider knowing each other's identity. For example, a service provider owning the service contract for a hotel chain has no idea as to the identity of the consumer using its phones. If an AOS provider facilitates a collect call it needs a way to bill the consumer for that call.

13.    The Debtor addressed a significant industry void by creating a service bureau focused entirely on billing-related services for AOS providers and others needing a means of billing consumers for their services. As the cornerstone to its billing capability, the Debtor maintains a full complement of billing and collection agreements with an estimated 1,400 or more

-2-

COMPLAINT FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION

1  LECs and independent service providers so that it can place calls made through an AOS on a LEC

2  bill. This infrastructure enables telecommunication service providers to incorporate their charges

3  within the phone bills of greater than 90% of business and residential consumers throughout the

4  United States and Canada. By using a billing aggregator like the Debtor, the fixed overhead is

5  already in place and the per unit billing cost is typically lower than the direct approach. Moreover,

6  the LEC bill adds credibility to the charge and provides a substantially higher collection rate.

7       14.     The Debtor quickly established itself as a leader in providing LEC billing solutions

8  for diverse and emerging products and services. The Debtor presently offers a complete array of

9  complementary services including internet-delivered management and settlement reporting, direct

10  billing, customer care and collection support. As a strategic back-room business partner, the

11  Debtor frees its clients to focus their efforts on promoting and selling products and services.

12       15.     In addition to AOS providers, the Debtor services customers offering enhanced

13  products and services such as voice mail, online directory listings and bundled calling plans.

14  While these services may be billed to credit cards, often consumers are hesitant to use their credit

15  cards for such intangible purchases and, therefore, may prefer alternate billing choices such as the

16  LEC phone bill.

17       16.     The Debtor has served thousands of service providers over the years. The vast

18  majority of the processed billings have been in support of smaller sized businesses that otherwise

19  would not have been able to compete. It is the competitive pressure of these smaller companies

20  that has forced down the rates charged to consumers by the larger telecommunication companies.

21       17.     The Debtor's office is in San Jose, California. The Debtor leases that office space.

22  The Debtor has no other offices or real estate leases. The Debtor owns no real estate. The Debtor

23  has approximately thirty-seven employees. Twenty-two of those employees have been with the

24  company for over five years, and thirteen have been with the Debtor for over ten years. In

25  addition, the Debtor's services support, through outsourced relationships, approximately 20-30 call

26  center personnel in several different call centers who are employed by a third-party vendor.

27

28

-3-

W02-WEST:FJR\400435989.3

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

0869

1        **B.    Access One and Network One.**

2        18.    Access One Communications, Inc. ("Access One") and Network One Services, Inc.

3    ("Network One") were two of the Debtor's prior AOS provider customers (Access One and

4    Network One collectively shall be referred to as the "Prior Customers").

5        19.    The relationship between the Debtor and its AOS provider customers, including

6    each of the Prior Customers, is governed by a contract between the Debtor and the customer.

7        20.    The Debtor's contracts with the Prior Customers (the "Subject Contracts") provide

8    that the customer submitted to the Debtor the customer's billing transactions (the "Billing

9    Transactions") in a data format acceptable to the Debtor.  The Billing Transaction became an

10   account receivable of the Debtor and not the customer.  The Debtor's Billing Contracts with the

11   LECs are structured as a purchase of accounts receivable between the Debtor and the LECs and

12   the Subject Contracts provided that all necessary rights were transferred to the Debtor.  In fact, the

13   Debtor's contract with Access One included a provision which explicitly recognizes this "Client

14   [i.e., the customer] acknowledges that the Billing Contracts with Telcos [i.e., LECs] are structured

15   as a purchase of accounts receivable..."

16       21.    The Prior Customers had no ownership interest in their Billing Transactions after

17   the Billing Transactions were submitted to the Debtor.  The Prior Customers were unsecured

18   creditors of the Debtor, with claims for certain "distributions" under the contract between the

19   Debtor and the customer.  Generally, those "distributions" were paid by the Debtor about 90 or so

20   days after the Billing Transaction is submitted to the Debtor by the customer.  The Debtor was

21   authorized to withhold from the Prior Customers its fees as well as amounts that may be used by

22   the Debtor to resolve disputes, make other adjustments and maintain reserves against future

23   disputes and adjustments.

24       22.    The Subject Contracts provide that each week the Debtor shall transfer by wire to

25   the customer's bank account the Net Proceeds identified in the prior week.  "Net Proceeds" is

26   defined as the gross value of the Billing Transactions that are remitted to the LECs, less amounts

27   withheld by the LECs, less amounts due to the Debtor, and less other fees and reserves.  This

28

-4-

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1    amount is due only as such amounts are determined from the information provided from the LECs,

2    and that is generally 90 days after submission of the Billing Transactions.

3        23.    Nowhere in either of the Subject Contracts is there any language purporting to give

4    the Prior Customers any rights against the Debtor with respect to payments due the Prior

5    Customers other than those of a general unsecured creditor. Neither of the Subject Contracts

6    contains language granting the Prior Customers a security interest – or any other property interest,

7    either legal or equitable – in any funds the Debtor receives from a LEC on account of a Billing

8    Transaction.

9        24.    When the Debtor withheld reserve amounts from the Net Proceeds paid to the Prior

10   Customers, the Debtor recorded that amount as a bookkeeping entry. However, the Debtor does

11   not have a corresponding asset, such as a bank account, that contains the monies that were

12   withheld as reserves from the Prior Customers. Moreover, there is no segregated account

13   containing the reserves of any customer, including either of the Prior Customers. The Debtor does

14   not have enough monies to cover the full amount of reserves for all of the Debtor's customers. All

15   "Net Proceeds" that could possibly have arisen from the Debtor's relationship with the Prior

16   Customer have long since passed through Debtor's bank accounts.

17                    **C.    The Florida Action.**

18       25.    On February 27, 2006, the FTC filed a complaint commencing the Florida Action

19   in the Florida Court against three AOS providers, Nationwide Connections, Inc. ("Nationwide"),

20   Access One and Network One (collectively, the "Nationwide Parties"), as well as their principals,

21   alleging deceptive and unfair practices for unauthorized billing of charges on phone bills –

22   referred to as "cramming" – in violation of the Federal Trade Commission Act (the "FTCA").

23       26.    The Florida Court entered a temporary restraining order and later a preliminary

24   injunction. The Florida Court appointed a receiver (i.e., the Receiver) for Nationwide, Access

25   One and Network One and certain of their affiliates. An "Amended Preliminary Injunction Order"

26   was filed on September 25, 2006.

27       27.    On or about September 21, 2006, the FTC filed an amended complaint (the

28   "Amended Complaint") which Amended Complaint now named as defendants the Debtor as well

-5-

COMPLAINT FOR DECLARATORY RELIEF,
                                                                                           TEMPORARY RESTRAINING ORDER, AND
                                                                                           PRELIMINARY INJUNCTION

RER-15      0871

1 | as another billing aggregator which is comprised of three related companies: Billing Concepts,

2 | Inc., ACI Billing Services, Inc. d/b/a OAN, and BSG Clearing Solutions North America, LLC

3 | (collectively, "BSG").

4 | 28. The FTC alleged in its Amended Complaint that the Debtor caused certain of the

5 | Prior Customers' fraudulent charges to be placed on end users' phone bills and that the Debtor was

6 | liable under the FTCA in spite of the fact that the LECs, not the Debtor, perform the billing.

7 | 29. The FTC has sought injunctive relief against the Debtor as well as monetary redress

8 | including restitution for the allegedly defrauded consumers.

9 | 30. The Debtor voluntarily stopped providing services for the Prior Customers over a

10 | year prior to the FTC filing of its Amended Complaint. At the time that it stopped providing

11 | services, the Debtor set the reserve at 100 percent of the Net Proceeds received on account of the

12 | Prior Customers' Billing Transactions and made no further payments to the Prior Customers. This

13 | was done because of the Debtor's possible exposure to claims for refunds of the Prior Customers'

14 | Billing Transactions.

15 | 31. The Debtor filed an answer denying the FTC's allegations.

16 | 32. The Receiver is seeking to collect all assets of the Prior Customers. Toward that

17 | end, the Receiver sought relief in the Florida Action by motion against the Debtor. The Receiver

18 | asserted that the Debtor owes the Prior Customers the amount of the reserves.

19 | 33. The Receiver's motion asserting the rights of the Prior Customers sought to compel

20 | the Debtor to turn over to the Receiver the amount of the reserves contained in the Debtor's

21 | bookkeeping entries, which the Receiver alleged was an asset of the Prior Customers in an amount

22 | in excess of $1.4 million. The Receiver further alleged that the Debtor had violated the Amended

23 | Preliminary Injunction Order and should be held in contempt for failing to turn over the sums

24 | demanded by the Receiver.

25 | 34. The Debtor filed a response opposing such relief on numerous grounds, including

26 | without limitation those set forth in this paragraph. The Debtor had no obligation to pay any funds

27 | to the Receiver under the Subject Contracts. In addition, the Debtor did not hold any specific

28 | funds allocable to reserves for the Prior Customers, because, consistent with the Debtor's general

-6-

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1   practice regarding reserves, the Debtor treated them solely as balance sheet entries, without

2   maintaining, segregating or otherwise designating specific funds for purposes of the reserves. At

3   the most, any rights the Prior Customers had with respect to the reserves were simply those rights

4   of a general, unsecured creditor. The Debtor also asserted that it had offsetting claims under the

5   Subject Contracts against the Prior Customers which exceeded the amount of the Prior Customers'

6   alleged reserves. In particular, to the extent the Debtor has any liability in the Florida Action, it

7   arises from the misconduct of the Prior Customers, not the Debtor, and pursuant to the Subject

8   Contracts, the Prior Customers are liable to the Debtor for such liability, as well as the costs and

9   fees incurred in the Florida Action. These costs and fees, and the liability asserted against the

10  Debtor in the Florida Action, far exceed the amount of any sums withheld from the Prior

11  Customers as reserves.

12      35.    The Florida Court entered an order on September 14, 2007 (the "Payment Order")

13  requiring that the Debtor pay over the amounts sought by the Receiver into a segregated

14  receivership account. Though the FTC is a party to the Florida Action, the Payment Order was

15  entered upon the motion of the Receiver, not the FTC. The Debtor intends to appeal the Payment

16  Order to the Eleventh Circuit Court of Appeals upon obtaining relief from the automatic stay to do

17  so.

18      36.    The Debtor has expended over $700,000 in legal fees and costs to date in defending

19  the Florida Action. That case is set for trial in February 2008. The Debtor expects that unless the

20  Florida Action is stayed or the FTC is enjoined from proceeding as to the Debtor that it will be

21  required to spend as much as $1 million in legal fees and costs in defending the matter. The

22  Debtor has also had to devote substantial and valuable management and employee time and

23  resources to this issue and would be forced to further incur such items, to the detriment of its

24  reorganization efforts, if this action were not stayed as against the Debtor.

25

26

27

28

W02-WEST:FJR\400435989.3

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

RER-15       0873

### FIRST CLAIM FOR RELIEF

**(Declaratory Relief Pursuant To 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. Sections 105, 362(a)(1), (2), (3) and (6); Rules 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure)**

37.     The Debtor repeats the allegations set forth in Paragraphs 1 through 36 as if fully set forth herein.

38.     This is a claim for declaratory relief brought under the provisions of 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. Sections 105, 362(a)(1), (2), (3) and (6); and Rules 7001(7) & (9) of the Federal Rules of Bankruptcy Procedure.

39.     An actual controversy has arisen and now exists between the Debtor and the Receiver relating to their legal rights and duties for which The Debtor seeks a judicial declaration of rights as to such matters, as well as further necessary or proper relief, including injunctive relief.

40.     A declaratory judgment is necessary and appropriate at this time in that the Debtor contends and the Receiver may deny that the implementation or enforcement of the Payment Order is automatically stayed including without limitation pursuant to 11 U.S.C. §§ 362(a)(1), (a)(2), (a)(3), and/or (a)(6).

WHEREFORE, the Debtor prays for relief as set forth below.

### SECOND CLAIM FOR RELIEF

**(Declaratory Relief Pursuant To 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. Sections 105, 362(a)(1), (2), (3) and (6); Rules 7001(7) and (9) of the Federal Rules of Bankruptcy Procedure)**

41.     The Debtor repeats the allegations set forth in Paragraphs 1 through 36 as if fully set forth herein.

42.     This is a claim for declaratory relief brought under the provisions of 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. Sections 105, 362(a)(1), (2), (3) and (6); and Rules 7001(7) & (9) of the Federal Rules of Bankruptcy Procedure.

-8-

COMPLAINT FOR DECLARATORY RELIEF, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION

1      43.    An actual controversy has arisen and now exists between the Debtor and the FTC

2 relating to their legal rights and duties for which the Debtor seeks a judicial declaration of rights as

3 to such matters, as well as further necessary or proper relief, including injunctive relief.

4      44.    A declaratory judgment is necessary and appropriate at this time in that the

5 Debtor contends and the FTC may deny that

6           a.    the claims made in the Florida Action against the Debtor, the Debtor's

7                property, property of the Debtor's estate, and/or property held by the

8                Debtor's estate, including without limitation the implementation or

9                enforcement of the Payment Order, are automatically stayed including

10                without limitation pursuant to 11 U.S.C. §§ 362(a)(1), (a)(2), (a)(3), and/or

11                (a)(6).

12           b.    while there is an exception, under 11 U.S.C. § 362(b)(4), for regulatory

13                actions, from the Bankruptcy Code's automatic stay provisions set forth in

14                11 U.S.C. § 362(a), the gist of the Florida Action and the claims made

15                therein against the Debtor, the Debtor's property, property of the Debtor's

16                estate, and/or property held by the Debtor's estate, are monetary in nature

17                and are therefore stayed.

18     WHEREFORE, the Debtor prays for relief as set forth below.

19                       **THIRD CLAIM FOR RELIEF**

20 **(Temporary Restraining Order and Preliminary Injunction Pursuant To 28 U.S.C. Sections**
**2201 and 2202; 11 U.S.C. Section 105; Rules 7001(7) and (9) of the Federal Rules of**
21 **Bankruptcy Procedure; and Federal Rule of Civil Procedure 65 incorporated by Federal**
**Rule of Bankruptcy Procedure 7065)**
22

23      45.    The Debtor repeats the allegations set forth in Paragraphs 1 through 36 as if fully

24 set forth herein.

25      46.    This is a claim for a temporary restraining order and preliminary injunction brought

26 under the provisions of 28 U.S.C. Sections 2201 and 2202; 11 U.S.C. Section 105; Rules 7001(7)

27 and (9) of the Federal Rules of Bankruptcy Procedure; and Federal Rule of Civil Procedure 65

28 incorporated by Federal Rule of Bankruptcy Procedure 7065.

-9-

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1    47.    If and to the extent that the Court determines that the Florida Action is not

2 stayed as to the Debtor, then the Debtor requests that the Court temporarily restrain and

3 preliminarily enjoin the FTC until a plan of reorganization is entered in this Bankruptcy Case from

4 proceeding against the Debtor in the Florida Action, including as to the claims made therein

5 against the Debtor, the Debtor's property, property of the Debtor's estate, and/or property held by

6 the Debtor's estate.

7    48.    Money damages will not be adequate and there exists no adequate remedy at law.

8    49.    Permitting the Florida Action to continue against the Debtor, threatens the Debtor's

9 ability to continue its business operations, affects whether the Debtor's other creditors receive their

10 appropriate share of monies paid by the Debtor to unsecured creditors, threatens the Debtor's

11 ability to successfully confirm a plan of reorganization, interferes with this Court's ability to

12 enforce its jurisdiction over the Debtor's assets and this bankruptcy case, and threatens the

13 integrity of the bankruptcy estate by, among other things, upsetting the well-established and

14 Congressionally-approved goals underlying the uniform bankruptcy laws of rehabilitation of

15 debtors and equality of treatment of creditors.  The objectives of the Bankruptcy Code would be

16 served by issuing a preliminary injunction staying the Defendants' continued pursuit in the Florida

17 Action of the Debtor, the Debtor's property, property of the Debtor's estate, and/or property held

18 by the Debtor's estate.

19    50.    The Debtor has a strong likelihood of successfully reorganizing if the requested

20 temporary restraining order and preliminary injunction are entered.

21    51.    The Debtor is threatened with the possibility of immediate irreparable injury if the

22 temporary restraining order and preliminary injunction are not granted.

23    52.    At the least, serious questions are raised with respect to the FTC's continued

24 pursuit in the Florida Action of claims against the Debtor, the Debtor's property, property of the

25 Debtor's estate, and/or property held by the Debtor's estate, and the balance of the hardships tip

26 strongly in the Debtor's favor.

27    53.    The requested preliminary injunction is in the public interest.  While the FTC

28 action seek to gain, at most five or six dollars for consumers, each or which may have been billed

-10-

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1 | a single collect call by the Prior Clients, the Debtor's efforts to reorganize its operations affects the

2 | livelihoods of its employees, the Debtor's ability to pay its creditors and the continued viability of

3 | its customers.

4 |      WHEREFORE, the Debtor prays for relief as set forth below.

5 |                                **PRAYER FOR RELIEF**

6 |      WHEREFORE, The Debtor, prays for relief as follows:

7 |      1.      For the FIRST CLAIM FOR RELIEF that the Court declare that the

8 | implementation or enforcement of the Payment Order is automatically stayed including

9 | without limitation pursuant to 11 U.S.C. §§ 362(a)(1), (a)(2), (a)(3), and/or (a)(6).

10 |      2.      For the SECOND CLAIM FOR RELIEF that:

11 |           a.      the claims made in the Florida Action against the Debtor, the Debtor's

12 |                  property, property of the Debtor's estate, and/or property held by the

13 |                  Debtor's estate, including without limitation the implementation or

14 |                  enforcement of the Payment Order, are automatically stayed including

15 |                  without limitation pursuant to 11 U.S.C. §§ 362(a)(1), (a)(2), (a)(3), and/or

16 |                  (a)(6).

17 |           b.      while there is an exception, under 11 U.S.C. § 362(b)(4), for regulatory

18 |                  actions, from the Bankruptcy Code's automatic stay provisions set forth in

19 |                  11 U.S.C. § 362(a), the gist of the Florida Action and the claims made

20 |                  therein against the Debtor, the Debtor's property, property of the Debtor's

21 |                  estate, and/or property held by the Debtor's estate, are monetary in nature

22 |                  and are therefore stayed.

23 |      3.      For the THIRD CLAIM FOR RELIEF that the Court temporarily restrain and

24 | preliminarily enjoin the FTC until a plan of reorganization is entered in this Bankruptcy Case

25 | from proceeding against the Debtor in the Florida Action, including as to the claims made

26 | therein against the Debtor, the Debtor's property, property of the Debtor's estate, and/or

27 | property held by the Debtor's estate

28 |

-11-

COMPLAINT FOR DECLARATORY RELIEF,
TEMPORARY RESTRAINING ORDER, AND
PRELIMINARY INJUNCTION

1        4.    That the Court grant such other and further relief as the Court deems just and

2    proper under the circumstances.

3

4    Dated:  September 19, 2007

5                          Respectfully submitted,

6                         SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8            By        _____
                                /s/ Michael H. Ahrens

9                              MICHAEL H. AHRENS
          Proposed Attorneys for Plaintiff and Debtor The Billing

10                           Resource, dba Integretel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                     -12-

W02-WEST:FJR\400435989.3                        COMPLAINT FOR DECLARATORY RELIEF,
                                  TEMPORARY RESTRAINING ORDER, AND
                                PRELIMINARY INJUNCTION

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-CIV-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC., et al.,

     Defendants.

_____/

### OMNIBUS ORDER

THIS CAUSE comes before the Court pursuant to a series of motions:

- The Receiver's Revised Motion for Order to Show Cause Why Integretel Should Not Be Held in Contempt of Court, filed October 16, 2006 **[DE 246]**;

- Integretel's Motion to Modify Prior Injunctive Orders, filed October 30, 2006 **[DE 294]**;

- Integretel's Motion to Stay Contract Claims, filed December 29, 2006 **[DE 363]**; and

- The Receiver's Motion Requesting BSG Defendants To Transfer Additional Reserves, filed January 12, 2007 **[DE 371]**.

The Court held a hearing on these motions on April 12, 2007. These motions are fully briefed and are ripe for adjudication.

Both BSG and Integretel had agreements in place with Nationwide and Access One/Network One that permitted them to withhold monies that were "owed to" Nationwide and/or Access One/Network One as "reserves," in the event that any users complained about