2

charges and requested refunds and/or credits directly from the Aggregators. Shortly after this
receivership was initiated, BSG advised the Receiver and the FTC of reserves that it was holding
relating to Nationwide as of the commencement of the receivership (slightly over $1 million).
BSG turned that money over to the Receiver.

    Integretel did not advise either the Receiver or the FTC that it was holding reserves.
Rather, its president informed the FTC on March 6, 2006 that "no amounts are currently due and
owing" to Access One or Network One. As of August 26, 2006, Integretel was holding
$1,186,430.36 in reserves for Access One and $173,918.66 in reserves for Network One. These
amounts have increased, and as of June 30, 2007, the reserve amount being held by Integretel
(and/or its affiliates) is $1,762,762.56. As of August 6, 2007, the reserve amount being held by
BSG (and/or its affiliates) is $930,052.99.

    The Receiver notes that the temporary restraining order required any business entity
served with a copy thereof to:

> provide to the Commission's counsel, within five (5) business days
> of receiving a copy of this [TRO], a sworn statement setting forth:
>
> 1.    The identification number of each such account or asset
> titled in the name, individually or jointly, of a Defendant, or held
> on behalf of, or for the benefit of a Defendant;
>
> 2.    The balance of each such account, or description of the
> nature and value of each such asset as of the close of business on
> the day on which this [TRO] is served...

    Exhibit A to the Integretel/Access One Master Services Agreement defines the reserve as
follows:

3

> an amount withheld, from the amount otherwise owed to Client
> with respect to Billing Transactions, to protect IGT for credit
> losses or otherwise to cover other reserves or offsets, other than
> Uncollectibles imposed by a Telco.

The Integretel/Network One Master Services Agreement contains an identical definition of the reserves.

Integretel maintains that "the reserves do not take the form of any actual funds that [Integretel] has segregated or otherwise set aside..." and maintains that it keeps the reserves in a pooled account it tracks via an internal accounting entry. Such is a distinction without a difference, since the TRO captures funds "held on behalf of, or for the benefit of, a Defendant."

Integretel also maintains that it was not Access One's or Network One's "agent, partner, joint venturer, trustee, fiduciary, or legal representative," and so was not "in any way acting 'on behalf of' of the two clients." An entity need not be an agent, partner, joint venturer, trustee, fiduciary, or legal representative to possess funds that one is holding "on behalf of" another person or entity, however.

Integretel also maintains that the "reserves have been set to account for, among other things, any liability that might be claimed against [Integretel] for any improper billings by Access One or Network One such as alleged by the FTC in the First Amended Complaint." The Court has reviewed the agreements in question. The agreements between Integretel and each of Access One and Network One allow Integretel either to notify the indemnifying party of the request to be indemnified and turn over the defense of the action to the indemnified party or defend itself and seek reimbursement of its attorneys' fees and costs from the indemnifying party. The agreements did not give it the right to use the reserves to fund the indemnity. Furthermore, the FTC has sued

4

Integretel for its own independent violations of the Federal Trade Commission Act. If the FTC succeeds, Integretel itself will be financially responsible for its actions and will not be able to look to Access One or Network One for indemnification under the operative agreements.

Finally, Integretel argues that "Access One and Network One failed to provide proof of their compliance with contract requirements..." Integretel evidently maintains that since it is of the opinion that Access One and Network One allegedly breached the agreements, it was entitled to keep the reserve monies. The agreements do not, however, contain a liquidated damages provision that would permit retention of those funds under the circumstances, nor do the agreements give it the right to make an independent, unilateral decision about Access One's or Network One's breach of the agreements without court involvement.

Integretel also moves to stay litigation of the aforementioned contract claims pending arbitration thereof, maintaining that the Receiver stands in the shoes of Access One and Network One and may assert only those rights and remedies that those entities themselves could have asserted. In particular, the Receiver is supposedly bound by the arbitration clause in each company's contract. The Receiver's claim is not a claim at law governed by pre-receivership contracts, however, but one governed by this Court's jurisdiction over receivership property based on the TRO and Amended Preliminary Injunction. The Receiver does not claim that the funds must be turned over according to, or by adopting, a contract signed between Integretel and Access One/Network One. The Receiver is seeking to recover the reserve funds pursuant to the Court's in rem jurisdiction over receivership property, as memorialized in the TRO and the Amended Preliminary Injunction. A federal court possesses broad authority to issue various ancillary relief measures in enforcing actions brought by federal agencies. See FTC v.

5

Productive Mktg., Inc., 136 F. Supp. 2d 1096, 1104 (C.D. 2001); SEC v. Wenke, 622 F.2d 1363,

1371 (9th Cir. 1980) ("the Supreme Court has repeatedly emphasized the broad equitable powers

of the federal courts to shape equitable remedies to the necessities of particular cases, especially

where a federal agency seeks enforcement in the public interest."). A receivership order issued to

preserve the assets of the receivership estate is a classic example of a district court's exercise of

in rem jurisdiction over receivership property. See Productive Mktg., 136 F. Supp. 2d at 1105;

Wenke, 622 F.2d at 1369 (stating that a federal district court's power to issue a stay against all

persons concerning all proceedings against the receivership entities "rests as much on its control

over the property placed in receivership as on its jurisdiction over the parties to the securities

fraud action"). "[R]eceivers are not bound by the contracts of the entity that they are appointed to

protect. The receiver becomes bound only when it affirmatively adopts the obligations of the

entity that it is protecting." City Bank, NA v. Nyland (CF8) Ltd., 839 F.2d 93, 98 (2d Cir. 1987).

The Court declines to stay adjudication of the contract claims.

Integretel argues that the TRO and Amended Preliminary Injunction would be invalid if

they enabled the Court to determine Integretel's ownership interest (or lack thereof) in the reserve

funds without first requiring the Receiver to institute a new, separate legal proceeding. Issues

concerning entitlement to disputed receivership property, in fact, are the types of issues typically

determined via summary proceedings in the federal court equity receivership context. See

Wenke, 783 F.2d at 837-38 (stating that claims of nonparties to property claimed by receivers can

be resolved via summary proceedings, which reduced the time necessary to settle disputes,

decrease litigation costs and prevent dissipation of receivership assets, as long as there is notice

to the non-party and an opportunity to be heard, thereby satisfying due process).

6

Integretel maintains that the Court deprived it of due process when it issued the TRO and Amended Preliminary Injunction without previously providing notice and an opportunity to be heard. A temporary restraining order or injunction is properly issued and binding so long as the party against whom it is being issued had a chance to defend fully the legitimacy of the eventual claim. Accordingly, it is irrelevant whether the party had been given a chance to oppose the order prior to its issuance. See FTC v. Assail, Inc., 410 F.3d 256, 268 (5th Cir. 2005) (finding that attorney for non-parties to receive fees that resulted from fraud had opportunity to defend self at hearing to determine whether disputed funds were subject to turnover order and thus had adequate notice and opportunity to be heard). Here, Integretel has briefed these issues in three separate briefs, its response, its motion to modify, and its motion to stay. It has, without question, had an opportunity to be heard on this issue.

Integretel argues that the TRO and Amended Preliminary Injunction are invalid because the FTC and the Receiver thereby have unbridled discretion to decide what cooperation is required and from whom, which is allegedly further compounded by the fact that the FTC and Receiver are interested in maximizing the amount of money, and subsequent recovery, in the receivership estate. While Integretel has accurately pinpointed the Receiver's and the FTC's goals, its attacks on the Court's orders fail. That cooperation clauses are standard in federal court receivership orders goes without saying. In Productive Mktg., when a non-party argued it was not bound by the cooperation clause, the district court disagreed because the injunction, as a receivership order, was required to be read reasonably in light of its stated purpose, to account for and preserve the assets of the receivership estate. 136 F. Supp. 2d at 1109-10. Otherwise stated, the receiver could not unreasonably use the cooperation clause for whatever purpose he wished.

Rather, the only reasonable interpretation of the clause was for it to be used consistently with the objective of the injunction, to require non-parties (and parties) that hold assets of the receivership estate to disclose information to the receiver relating to those assets and, if necessary, turn over such assets to the receiver. See id. at 1110. Cooperation clauses are enforceable, even against non-parties.

Integretel concedes that it was bound by the TRO if it acted in concert or participated with Access One and/or Network One, but Integretel claims that no such allegation has been made (or could be made, for that matter). The FTC has made such allegations in its First Amended Complaint, alleging that Integretel participated and acted in concert with Access One and Network One in the alleged fraud. (See First Amended Complaint, Paragraphs 24, 27, 28, 30, 37.)

Integretel also argues that the TRO is overbroad because it allows the Receiver to demand a turnover of disputed funds. To that end, Integretel posits that in rem jurisdiction only applies to undisputed receivership property and does not apply when funds are disputed and not in the possession of the Court. District courts have in rem jurisdiction over disputed receivership property and therefore can bind non-parties (such as Integretel), through orders to protect and preserve disputed receivership property, and district courts have jurisdiction to enforce orders against non-parties concerning ownership of disputed funds, whether or not such funds are in the non-parties' possession. See Productive Mktg., 136 F. Supp. 2d at 1106 ("if the Court cannot compel [the non-party] to turn over assets in its possession belonging to the receivership estate, the receiver will be unable to provide adequate redress to consumers who have been defrauded by

8

Defendants because [the non-party's] conduct imperiled the Court's ability to render an effective judgment, the Court may properly enjoin it, even though it is not a party to the action.").

Integretel also maintains that the turnover clause is invalid and, in any event, was never triggered, because the Receiver never made a "formal" demand for the reserve funds. The purpose of a federal district court's jurisdiction over receivership property via a preliminary injunction (or similar order) is to preserve the assets resulting from the improper actions of the receivership defendants, whether held by parties or non-parties, to provide redress for the legitimately defrauded investors. See Productive Mktg., 136 F.Supp. 2d at 1105-1106. Thus, it is not reasonable to expect the Receiver to know about the reserves, and thereafter make a "formal" demand for them if it had not been previously informed of their existence.

Integretel, as a party, also argues that the Amended Preliminary Injunction is invalid under Rule 65 because it did not receive notice of its issuance. Integretel also maintains that neither the FTC nor the Receiver has made the requisite showing in their unverified papers to enforce an injunction against it. An injunction is properly issued and binding so long as the party opposing it is given a chance to defend the legitimacy of the claim being made under it. It is of no consequence whether the party has been given a chance to oppose the injunction prior to its issuance. See SEC v. Elfindepan, S. A., 2002 WL 31165146 at*5 (finding that party in the context of contempt motion had been given full opportunity to defend ownership interest in disputed funds; that party did not have opportunity to defend itself prior to issuance of the injunction did not render the injunction invalid).

Integretel believes it has acted properly from "day one" and had no reason to ask for clarification of the subject Orders until the Receiver filed its show cause motion because it

9

believed that its interpretation of the Orders was proper, or at least in good faith. One's state of

mind is irrelevant for purposes of unilateral interpretation of court orders, however. See Goya

Foods, Inc. v. Wallack Management Co., 290 F.3d 63, 75-76 (1st Cir. 2002) ("When a legitimate

question exists as to the scope or effectiveness of the court's order, those who know of the

decree, yet act unilaterally, assume the risk of mistaken judgments. Adhering to this principle,

the appellants could have asked the district court for clarification…but they eschewed that

course….They chose instead to rely on their own judgment as to whether the orders remained in

effect. In so doing, the appellants acted at their peril.").

Integretel also seeks to modify the TRO, Preliminary Injunction and Amended

Preliminary Injunction. Because the subject Orders are valid for the reasons stated herein, there

is no reason to modify them. Furthermore, the requested modifications would unnecessarily

increase litigation costs by forcing the Receiver to obtain an extra precondition order by litigating

every potential act that constitutes proper cooperation and affect every potential target of such

corporation, thereby exponentially increasing the amount of time it would take for the Receiver

to obtain receivership property. The proposed modifications would also be unwieldy because

they would make pre-receivership contracts that the Receiver does not ratify nevertheless binding

on him, and would require separate, plenary proceedings when a summary proceeding can

adequately account for determination of these issues.

The Receiver also moves to request that the BSG Defendants transfer additional reserves

in the amount of $328,050.83 as of December 8, 2006, and, as noted $930,052.99 as of August 6,

2007. These Defendants previously transferred $952,045.67 in reserves to the Receiver on or

about March 24, 2006. The Receiver requests that these Defendants transfer these additional

10

reserves, produce all documents relating to the reserves withheld since March 24, 2006, and to produce any future reserves that they collect to the Receiver along with any documents relating thereto.

The BSG Defendants join in Integretel's arguments as to the validity of the TRO and the Amended Preliminary Injunction. Additionally, the BSG Defendants request modification of the injunctive orders and request a stay of the underlying contract claims. The Court has already rejected these arguments. As to the contract claims, the contracts the BSG Defendants attach in support of their argument to retain the Reserves are incomplete, undated, unsigned and do not reflect the parties thereto. The Court, based on these incomplete documents, cannot say that the BSG Defendants are entitled to retain the reserves. It is hereby

ORDERED AND ADJUDGED that the Receiver's Revised Motion for Order to Show Cause Why Integretel Should Not Be Held in Contempt of Court, filed October 16, 2006 [DE 246], is GRANTED. Integretel shall show cause in writing within 10 days of the date of this Order why it should not be held in contempt for failure to turn over the reserves. In addition, Integretel shall provide a sworn statement identifying the amount of reserves as of the issuance of the TRO. The Court further orders that these funds shall be placed in a segregated Receivership account. It is further

ORDERED AND ADJUDGED that Integretel's Motion to Modify Prior Injunctive Orders, filed October 30, 2006 [DE 294], is DENIED. It is further

ORDERED AND ADJUDGED that Integretel's Motion to Stay Contract Claims, filed December 29, 2006 [DE 363], is DENIED. It is further

11

ORDERED AND ADJUDGED that the Receiver's Motion Requesting BSG Defendants

To Transfer Additional Reserves, filed January 12, 2007 **[DE 371]**, is GRANTED. The BSG

Defendants are ordered to transfer the additional reserves they have withheld since their initial

transfer of reserves to the Receiver on or about March 24, 2006. The BSG Defendants shall also

produce any future reserves they collect so as to avoid future motions to this effect. The BSG

Defendants shall also produce all documents relating to the reserves held since March 24, 2006.

The Court requests that this money be placed in a segregated receivership account.

DONE AND ORDERED at Chambers in West Palm Beach, Florida this 13th day of

September, 2007.

<div style="margin-left: 40%;">

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

</div>

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80180-CIV-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.

NATIONWIDE CONNECTIONS, INC.,
et al.

     Defendants.

                                   /

## ORDER GRANTING MOTION FOR CLARIFICATION AS TO SCOPE OF STAY

THIS CAUSE comes before the Court pursuant to the FTC's Emergency Motion for

Clarification That the Automatic Stay Does Not Apply to the FTC's Law Enforcement Action

and the Ongoing Contempt Proceeding, filed September 21, 2007 **[DE 618]**.

Integretel became a Defendant in this action on September 21, 2006. Unbeknownst to the

Court, Integretel was holding more than $1.35 million in reserve funds that belonged to two of

the Nationwide defendants, Access One and Network One, in spite of several provisions of the

Temporary Restraining Order in Preliminary Injunction requiring it to turn said funds over to the

Receiver. When the Receiver learned of the existence of these funds, it filed its Motion for an

Order to Show Cause Why Integretel Should Not Be Held in Contempt. On Friday, September

14, 2007, this Court issued its Omnibus Order in which it ruled that the reserve funds are the

property of the receivership estate and ordered Integretel to pay the current reserve funds,

amounting to $1,762,762.56, immediately to the Receiver. The Court also ordered Integretel to

show cause in writing within 10 days why it should not be held in contempt for failing to turn

2

over the reserve funds. Two days later, on September 16, 2007, Integretel filed a petition for

Chapter 11 bankruptcy in the United States Bankruptcy Court, Northern District of California,

San Jose Division, Case No. 07-52890. Integretel maintains in its bankruptcy filings that it

"currently owes nothing to Receiver." Integretel further maintains that "it will ultimately

prevail... with respect to amounts which are the subject and required to be paid under the

[Omnibus Order]." On September 20, 2007 **[DE 617]**, the Court stayed this proceeding against

Integretel pursuant to 11 U.S.C. § 362(a). The FTC requests that this Court clarify that the

automatic bankruptcy stay does not apply to the prosecution of its enforcement action or the

ongoing contempt proceeding.

The FTC's prosecution of this action to protect consumers from unfair and deceptive

trade practices is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), the

governmental regulatory exception to the stay. The statute provides as follows:

> (b) the filing of a petition under section 30 1,302, or 303 of this
> title... does not operate as a stay-...
>
> (4) under (1), (2), (3), or (6) of subsection (a) of this section, of the
> commencement or continuation of an action or proceeding by a
> governmental unit...to enforce such governmental unit's...police
> power and regulatory power, including the enforcement of a
> judgment other than a money judgment....

Thus, to the extent provided in the aforementioned section, governmental regulatory or police

actions are excepted from the automatic stay of:

> (1)     the commencement or continuation... of a judicial,
>         administrative, or other action or proceeding against the
>         debtor...;

3

    (2)    the enforcement, against the debtor or against property of
the estate, of a judgment obtained before the
commencement of the [bankruptcy] case...;

    (3)    any act to obtain possession of property of the estate or of
property from the estate or to exercise control over property
of the estate;... [and]

    (6)    any act to collect, assess, or recover a claim against the
debtor that arose before the commencement of the
[bankruptcy] case....

11 U.S.C. § 362(a). The legislative history specifically states that this exception applies to suits

by the government "to prevent or stop violation of fraud, environmental protection, consumer

protection, safety, or similar regulatory laws." H.R. Rep. No. 989, 95th Cong., 2d Sess. 52,

*reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5838.

    Various courts have recognized that actions brought by the FTC pursuant to 15 U.S.C. §

53(b), Section 13(b) of the FTC Act, are not subject to the automatic stay. See In re First

Alliance Mortgage Co., 264 B.R. 634, 647-51 (C.D. Cal. 2001) (reversing the Bankruptcy Court

in holding that FTC's action to enforce consumer protection unfair lending loss falls within the

11 U.S.C. § 362(b)(4) exemption from the stay); FTC v. American Standard Credit Systems, 874

F. Supp. 1080, 1083 (C.D. Cal. 1994).

    The FTC also seeks monetary relief, including disgorgement, restitution and consumer

redress. The dual purposes of determining unlawful behavior by making such behavior more

expensive and holding violating parties accountable bring this action squarely within the police

and regulatory powers exemption. See SEC v. Brennan, 230 F.3d 65, 72 (2d Cir. 2000) ("When

the government seeks to impose financial liability on a party, it is plainly acting in its police or

regulatory capacity..."). Accordingly, the exemption permits continuation of this action for

4

injunctive relief against Integretel and the entry of a money judgment against same.

Nor is the contempt proceeding stayed. First, the automatic stay applies only to protect property of the bankruptcy estate or property of the debtor. See 11 U.S.C. § 362(a)(2). The Court has already ruled that the reserve funds are neither the property of the "bankruptcy estate" nor Integretel. Second, the 11 U.S.C. § 362(b)(4) exception also applies to civil contempt proceedings brought by a governmental unit in the exercise of its police or regulatory powers. See SEC v. Bilzerian, 131 F. Supp. 2d 10, 14 (D.D.C. 2001) (civil contempt proceeding falls within the exception; incarceration of debtor subsequent to failure to provide financial information as required by purgation provision in prior disgorgement order). Finally, the bankruptcy filing does not deprive this Court of its inherent power to enforce the integrity of its orders. "[C]ontempt orders to uphold the dignity of the court are excepted from the automatic stay." NRLB v. Sawulski, 158 B.R. 971, 975 (E.D. Mich. 1993). Accordingly, it is hereby

ORDERED AND ADJUDGED that the motion is GRANTED. The commencement of Integretel's bankruptcy case does not stay either the pending contempt proceeding against Integretel, including the turnover order, or the FTC's prosecution of this consumer protection action against Integretel. The September 20, 2007 Order staying proceedings against Integretel is VACATED.

DONE AND ORDERED at Chambers in West Palm Beach, Florida, this 21st day of September, 2007.

S/Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

**RER - 16**

1  HOWARD KOLLITZ (State Bar No. 059611)
   WALTER K. OETZELL (State Bar No. 109769)
2  STEVEN J. SCHWARTZ (State Bar No. 200586)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5  Email:   sschwartz@dgdk.com

6  JEFFREY C. SCHNEIDER
   TEW CARDENAS LLP
7  Four Seasons Tower, Fifteenth Floor
   1441 Brickell Avenue
8  Miami, Florida 33131-3407
   Telephone: (305) 539-2481
9  Facsimile:  (305) 536-1116

10 Co-Counsel for Creditor David R. Chase, Federal Receiver
   of Nationwide Connections, Inc., Access One
11 Communications, Inc., Network One Services, Inc.,
   411TXT, Inc., CELL-INFO-USA, Inc., Enhanced Billing
12 Services, Inc., Toll Free Connect, Inc., Cripple Creek
   Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC,
13 He's Gone, LLC, The Other One, LLC, Turn on Your Love
   light, LLC, China Cat Sunflower, LLC, and Lazy River Road
14 Holdings, LLC

15              UNITED STATES BANKRUPTCY COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17                    SAN JOSE DIVISION

| | |
|---|---|
| 18  In re | ) Case No. 07-52890-ASW |
| | ) |
| 19  THE BILLING RESOURCE, dba Integretal, a | ) [Chapter 11] |
|     California corporation, | ) |
| 20 | ) |
|          Debtor. | ) |
| 21 | ) |
|     [Taxpayer's Identification No. 33-0289863] | ) |
| 22 | ) |
| | |
| 23  THE BILLING RESOURCE, dba | ) Adv. No. 04-05156 |
|     INTEGRETAL, a California corporation, | ) |
| 24 | ) **FEDERAL RECEIVER'S** |
|          Plaintiff, | ) **MEMORANDUM OF POINTS AND** |
| 25      vs. | ) **AUTHORITIES IN OPPOSITION TO** |
| | ) **EMERGENCY MOTION FOR** |
| 26  FEDERAL TRADE COMMISSION, and | ) **TEMPORARY RESTRAINING ORDER** |
|     DAVID R. CHASE, not individually, but solely | ) **AND ORDER TO SHOW CAUSE RE:** |
| 27  in his capacity as receiver for Nationwide | ) **PRELIMINARY INJUNCTION AND** |
|     Connections, Inc., Access One Communications, | ) **DECLARATORY RELIEF** |
| 28  Inc., Network One Services, Inc., 411TXT, Inc., | ) |

-1-

| | |
|---|---|
| 1  CELL-INFO-USA, INC., Enhanced Billing<br>   Services, Inc., Toll Free Connect, Inc., Cripple<br>2  Creek Holdings, LLC, Built to Last, LLC, Not<br>   Fade Away, LLC, He's Gone, LLC, The Other<br>3  One, LLC, Turn on Your Love Light, LLC,<br>   China Cat Sunflower, LLC, Lazy River Road<br>4  Holdings, LLC,<br><br>                          Defendants.<br>5 | )  Date:    September 26, 2007<br>)  Time:    2:15 p.m.<br>)  Place   United States Bankruptcy Court<br>)              280 South First Street<br>)              San Jose, California<br>)  Judge: Hon Arthur S. Weissbrodt<br>)  Courtroom: 3020<br>) |

6      Defendant David R. Chase, the United States District Court-Appointed Receiver (the

7  "Federal Receiver"), submits herewith his Memorandum of Points and Authorities in Opposition

8  (the "Opposition") to the Emergency Motion For Temporary Restraining Order and Order to Show

9  Cause Re: Preliminary Injunction and Declaratory Relief filed by The Billing Resource, dba

10  Integretal, a California corporation (the "Debtor"), filed and served in this matter on or about

11  September 24, 2007 (the "TRO Motion").[1] The grounds for such opposition are as described below.

12                                        **I.**

13                         **SUMMARY OF ARGUMENT**

14      Debtor is seeking an order from this Court which will contradict and frustrate specific

15  unambiguous Orders and findings (collectively, the "District Court Orders") of the United States

16  District Court in the Southern District of Florida (the "District Court"). Initially, this attempt was

17  made through a Motion for Approval of Use of Cash Collateral, in which the Debtor failed to

18  disclose the true nature of those District Court Orders. The District Court, obviously concerned

19  with this tactic, issued a Clarification Order just prior to the hearing on the Cash Collateral Motion

20  specifically and unambiguously stating two matters that control any action herein. The first

21  ────────────────

22  [1] The Federal Receiver expressly reserves his right to file appropriate motions under Federal Rule
   of Civil Procedure 12(b) to dismiss the Debtor's complaint and the herein requested injunctive
23  relief as against all Receivership entities named therein that do not own or claim ownership to the
   subject receivership funds, which entities include: Nationwide Connections, Inc., 411TXT, Inc.,
24  CELL-INFO-USA, Inc., Enhanced Billing Services, Inc., Toll Free Connect, Inc., Cripple Creek
   Holdings, LLC, Built to Last, LLC, Not Fade Away, LLC, He's Gone, LLC, The Other One, LLC,
25  Turn on Your Love light, LLC, China Cat Sunflower, LLC, and Lazy River Road Holdings, LLC.
   In addition, the Receiver expressly objects to the exercise of jurisdiction by the United States
26  Bankruptcy Court over the subject matter of the Debtor's complaint and expressly reserves all of
   the Receiver's objections to the jurisdiction of the United States Bankruptcy Court to hear and
27  determine the matters in question as well as expressly reserves all of the Receiver's rights to trial by
   jury in the United States District Court.

28

                                        -2-

1  holding was that the District Court had ruled that the subject Receivership Funds were not property

2  of the Bankruptcy Estate. The second was that the contempt proceedings in the District Court (the

3  "District Court Proceedings") were not subject to the automatic stay herein, but, instead, fell under

4  the Regulatory Powers Exception set forth in 11 U.S.C. § 364(b)(4). Finally, the District Court

5  made its intent perfectly clear – the Debtor was to turn over the receivership funds to the Federal

6  Receiver "immediately" under pain of contempt. In so doing, it quoted judicial authority holding

7  that incarceration was an appropriate remedy in respect of such an order.

8      Debtor now comes before this Court, again, asking it to block the effect of and ignore the

9  expressed order of the District Court, this time by employing injunctive relief under section 105 of

10 the Bankruptcy Code. Its purported evidence is the assertions in the Declaration of Ken Dawson

11 (the "Dawson Declaration"). Section 105 has no application here and the Dawson Declaration does

12 not provide any evidence required for the relief requested.

13     Application of Bankruptcy Code Section 105 is only proper in situations where provisions

14 of the Bankruptcy Code are advanced. Here, there is no such provision. Cash collateral use is only

15 allowed in respect of property of the estate, and, as discussed above, the District Court has held that

16 the Receivership Funds are property of the Federal Receiver, and not property of the Bankruptcy

17 Estate. Nor can the Debtor rely on Bankruptcy Code Section 362. Again, the District Court has

18 specifically held that the District Court's proceedings are not barred by the automatic stay. Finally,

19 not only does the application of section 105 to the facts here not further provisions of the

20 Bankruptcy Code, but it contravenes a specific section of the Bankruptcy Code. 11 U.S.C. §

21 362(b)(4) excepts police power and regulatory actions from the automatic stay. Again, the District

22 Court has found that the District Court proceedings fall under this exception. Application of

23 Section 105 would run counter to section 362(b)(4) as well as, of course, the specific provisions of

24 the District Court Orders.

25     Now Debtor claims that the proceedings in the District Court (the "District Court

26 Proceedings") should be enjoined because of the expenses of litigation. However, the very case

27 that Debtor cites in its motion In re Alliance Mortgage, 264 B.R. 634 (C.D. Cal 2001) holds just the

28 opposite: litigation costs are not a sufficient threat to justify the relief sought nor do they establish

-3-

314573.01 [XP]    24774

1   irreparable harm. And while courts have entertained requests for such relief when assets of the
2   estate are threatened, the Receivership Funds have been adjudicated to not be assets of the
3   bankruptcy estate.

4         Debtor argues that it may go out of business if is not able to spend the Receivership Funds.
5   This, alone, demonstrates Debtor's game plan here, which is to obtain an Order from this Court in
6   derogation of the District Court and hide behind it, using it for an excuse on appeal as to why it
7   should not be held in contempt, while it does exactly what the District Court has ordered it not to
8   do, spend the Receivership Funds on its operations.

9         Further, the Dawson Declaration does not make the showing required to grant a section 105
10  injunction. It simply consists of paragraphs lifted from the Cash Collateral Motion. It asserts that
11  the Debtor believes it can confirm a plan of reorganization, but it gives this Court absolutely no
12  evidence upon which that assertion is based. What it does do, however, is to make it clear beyond
13  doubt that the Debtor, rather than preserving the status quo, intends to waste the Receivership
14  Funds.

15        The Debtor concedes that the automatic stay does not apply to the FTC's prosecution of the
16  Florida Action, but somehow attempts to carve out from that prosecution the actions of the
17  Receiver who was appointed by the District Court in furtherance of the FTC's prosecution. See
18  Footnote 1 to the TRO Motion. There is no distinction. The Receiver is, in effect, a
19  "representative and fiduciary" of the United States District Court in a federal receivership
20  proceeding, and the September 21, 2007 United States District Court Order specifically determined
21  that the Section 362 stay did not apply to that federal receivership proceeding and vacated its (the
22  District Court's) September 20, 2007 Order staying the proceeding.

23        In addition, the Debtor argues that this Court is the only court that can fashion appropriate
24  injunctive relief. See Introduction to TRO Motion at lines 19-20. However, the Debtor concedes
25  that it is seeking injunctive relief on identical issues not only from this court, but from District
26  Court in Florida and from the Court of Appeals for the 11th Circuit. The Debtor is clearly
27  attempting to re-litigate in this Court, by motion and by adversary proceeding, issues regarding the
28

-4-

1  application of the stay and determination of property of the estate already conclusively determined

2  by the District Court. The equitable powers of 11 U.S.C. § 105(a) are not designed for such relief.

3      This Court is respectfully requested to deny the request for temporary restraining order or,

4  if this Court is inclined to grant such a relief, to preserve the status quo by requiring the Debtor to

5  segregate, sequester and account for the Receivership Funds or to pay said funds into the registry of

6  this Court.

7

8                                    **II.**

9                                **ARGUMENT**

10  A.    INUNCTIVE RELIEF IS IMPROPER UNDER SECTION 105 OF THE BANKRUPTCY

11  CODE.

12      1. An Injunction Is Not Necessary to Carry Out the Purposes of the Bankruptcy Code.

13      Exercise of a bankruptcy court's discretionary authority to issue Section 105 injunctive

14  relief is appropriate only when necessary to carry out the provisions of the Bankruptcy Code. In re

15  Middleton Arms, Ltd. Partnership, 934 F.2d 723, 724 (6th Cir. 1991); see also Norwest Bank

16  Worthington v. Ahlers, 485 U.S. 197, 203 (1988) ("whatever equitable powers remain in the

17  bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

18  In Powerine Oil Co. v. Koch Oil Co., 59 F.3d 969, 973 (9th Cir. 1995), cert. denied, 516 U.S. 1140

19  (1996), the Ninth Circuit relied on Norwest Bank, holding that "[e]quity may not be invoked to

20  defeat clear statutory language, nor reach results inconsistent with the statutory scheme established

21  by the Code." Here, there are no provisions of the Bankruptcy Code which this injunction

22  promotes. It does not promote section 363. The Receivership Funds are not property of the estate,

23  and their use cannot be authorized by the cash collateral order or otherwise. The District Court

24  Orders could not be clearer. The Debtor is not to spend the Receivership Funds. Nor does the

25  requested relief promote section 362. Again, the District Court has already adjudicated that the

26  District Court proceedings are exempt from the automatic stay.

27      The power to issue injunctions under Section 105 does not extend to the issuance of orders

28  that conflict with other, specific federal statutory mandates. In re Rohnert Park Auto Parts, Inc.,

                                    -5-

314573.01 [XP]    24774

1  113 B.R. 610 (B.A.P. 9th Cir. 1990). Here, the injunctions sought by the Debtor conflict with the

2  FTC's Federally mandated obligations under the FTC Act, express orders of the District Court, and

3  with the Bankruptcy Code itself.

4        Moreover, Section 105 does not allow entry of orders that create rights or immunities that

5  are not otherwise available to the debtor under non-bankruptcy law. Matter of Schewe, 94 B.R.

6  938 (W.D. Mich. 1989); In re FCX, Inc., 60 B.R. 405 (E.D.N.C. 1986). Here, the judge presiding

7  over the Federal Receiverships has issued multiple orders determining that the $1.76 million being

8  held by the Debtor is property of the Receiverships and not property of the Debtor, and determining

9  that the automatic stay does not apply to the Payment Order or to the District Court Action, both of

10 which are an exercise of the FTC's Federal regulatory powers.

11       Because the Bankruptcy Code expressly exempts government police and regulatory actions

12 from the automatic stay, only in the rarest circumstances do courts find that a Section 105

13 injunction against a government agency is necessary to carry out the Code's provisions. See In Re

14 One Times Square Associates Limited Partnership, 159 B.R. 695, (S.D.N.Y. 1994), aff'd without

15 op., 41 F.3d 1502 (2d Cir. 1994), cert. denied, 513 U.S. 1153 (1995) ("11 U.S.C. 105 should be

16 used sparingly and then only to supplement the Bankruptcy Code, not supplant the Code."); In re

17 Oxford Management, Inc., 4 F.3d 1329, 1335 (5th Cir. 1993) ("The powers granted by" Section

18 105 "must be exercised in a manner that is consistent with the Bankruptcy Code") (citations

19 omitted); United States v. Sutton, 786 F.2d 1305, 1308 (5th Cir. 1986) (Section 105 "does not

20 authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under

21 applicable law, or constitute a roving commission to do equity"). "[S]ection 105 does not give

22 bankruptcy courts the authority to contravene specific provisions of the Code." In re Continental

23 Airlines, Inc., 61 B.R. 758, 781 n. 47 (S.D. Tex. 1986). "The bankruptcy court is limited by the

24 express terms of the Code; the court must apply bankruptcy law, not rewrite it." Id; See also, In re

25 Minor, 115 B.R. 609 (D. Colo. 1990) (Section 105 does not authorize issuance of orders that

26 conflict with other provisions of Bankruptcy Code)

27       The limited circumstances in which a bankruptcy court may enjoin a government action are:

28 (1) where that action seeks control over the assets of the estate, or (2) where it so severely threatens

-6-

1  the assets of the estate, that it directly conflicts with the Bankruptcy Code.    The Ninth Circuit held

2  in Co Petro that a "conflict" with the Bankruptcy Code is not established simply by showing that

3  the relief sought by the government's regulatory action may reduce the value of the bankruptcy

4  estate.  Commodity Futures Trading Com'n v. Co Petro Marketing 700 F.2d 1279, 1284 (9th Cir.

5  1983).  Distinguishing the Eighth Circuit's decision in Missouri v. Bankruptcy Court, 647 F.2d 768

6  (8th Cir. 1981), cert. denied, 454 U.S. 1162 (1982), the Co Petro court explained that the regulatory

7  action in that case conflicted with the Bankruptcy Code because it was a parallel state-law

8  insolvency proceeding:

9         [i]n Missouri, the regulatory law in question was a state law empowering the state to

10        operate and liquidate insolvent grain warehouses.  If the state court suit under that law had

11        been allowed to proceed, it would have conflicted with the administration of the debtors'

12        estate in the bankruptcy court.

13  Co Petro, 700 F.2d 1279, 1284 (9th Cir. 1983).  Here, no such conflict is present.  See, e.g.,

14  In re Tucson Yellow Cab Co., 27 B.R. 621, 624 (B.A.P. 9th Cir. 1982) (striking down bankruptcy

15  court's Section 105 injunction, holding that "we do not agree that the issuance of a[n NLRB] back

16  pay order, based upon a plain statutory right, forms [an enjoinable] threat to a debtor's estate, even

17  though that order may greatly enhance the amount of priority obligations payable from the estate").

18        First, it is clear that the so called, "Payment Order" does not seek control over assets of the

19  estate; rather, it seeks a return of property of the Receiverships back to the Receiver.  Second, the

20  required turnover of property of the Receiver does not threaten the assets of the estate in conflict

21  with the Bankruptcy Code.  The only argument articulated as to the potential damage the estate will

22  suffer as a result of the continuance of the Florida Action, is that the estate will have to expend

23  "substantial attorney's fees" and "divert the management's attention away from reorganization."

24  Debtor's Memo of Points and Authorities at p. 2.  In addition, the Debtor cannot rest on its

25  argument that if required to turn over funds that it does not own, it will be forced out of business.

26  The Debtor is simply asking, through this Motion and the Cash Collateral Motion, to use property

27  of the Receivership in aid of its reorganization efforts.  The Debtor has not offered any evidence

28  that it has sought other avenues of financing (other than the involuntary use of someone else's

-7-

1    property) in order to maintain its operations over the near term.  It is not the fault of the

2    Receivership that the Debtor entered reorganization proceedings without a clearly defined strategy

3    for maintaining its business other than to spend the Receivership's money.

4        2.  The Debtor is Improperly Attempting to Overturn the Prior Order from the District Court

5    Vacating the Stay as to the District Court Action.

6        The Court's equitable powers under 105(a) do not allow a party to re-litigate issues that

7    have previously been determined.  Only proof of a substantial change in circumstances will justify

8    changing what has been decreed.  Chrysler Capital Corp. v. Official Comm. of Unsecured Creditors

9    (In re Twenver, Inc.), 149 B.R. 950, 954 (D.Colo.1993); see also, In re Bryant 296 B.R. 516, 519

10    (Bankr. D.Colo.,2003.) (Debtor improperly seeking to re-impose the automatic stay after it was

11    already terminated by creditor's motion).

12        Here, the Debtor has not demonstrated any change in circumstances so as to justify the

13    relief requested.  The orders from the District Court, entered pre-petition, and reiterated post-

14    petition, require the turnover of property not owned by the Debtor, under penalty of contempt.

15    Having failed to convince the District Court that the automatic stay applies to the District Court

16    Action (and now conceding as such at least with respect to the FTC), the Debtor is now attempting

17    to obtain extraordinary relief of 105(a) to re-litigate and overturn the prior rulings from the District

18    Court that the automatic stay does not apply and that the Receivership's money should be turned

19    over to the Receiver.  The relief requested is simply a re-litigation of issues that have previously

20    been determined which is not appropriate or authorized under section 105.

21        3.    The Debtor Did Not Satisfy the Test for Injunctive Relief Under Section 105.

22        Not only must Section 105 injunctions be used only sparingly in respect of governmental

23    actions, under the principles discussed above, they may not be issued in the absence of the rigorous

24    showing required for any injunctions.  See EEOC v. Rath Packing Co., 787 F.2d 318, 325 (8th Cir.

25    1985), cert. denied, 479 U.S. 910 (1986); see also S. Rep. No. 95 989 at 51, reprinted in 1978

26    U.S.C.C.A.N. 5787, 5837.  The Court of Appeals for the Ninth Circuit employs either the

27    traditional four-point inquiry or an alternative balancing standard.  Stanley v. Univ. of S.

28    California, 13 F.3d 1313, 1319 (9th Cir. 1994).  Here, the Debtor satisfied neither standard --- nor

-8-

314573.01 [XP]    24774

1  can it. As discussed above, courts entertain such relief where assets of the estate are threatened.

2  Again, the Receivership Funds are not assets of the bankruptcy estate.

3       The Debtor relied exclusively on the balancing standard. Under this standard, the court

4  balances the debtor's likelihood of success against the relative hardships to the parties. Sun

5  Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999). The Debtor failed to

6  show "either a likelihood of success on the merits and the possibility of irreparable injury, or that

7  serious questions going to the merits were raised and the balance of hardships tips sharply in [their]

8  favor." Id. This is illustrated by the very case Debtor cites, Alliance Mortgage, supra.

9       The Debtor has not made any showing that it will prevail on the merits of the District Court

10 Action, which sets out clear violations of federal statutes. In re Commonwealth Oil Refining Co.,

11 Inc. 805 F.2d 1175, 1189, 805 F.2d at 1189 (courts must examine whether the debtors are likely to

12 succeed in the underlying enforcement action). Nor has the Debtor made any showing that it will

13 prevail on matters concerning the receivership funds (which matters specifically relate and refer to

14 orders entered on behalf of the FTC in addition to the Receiver) that are currently on appeal in the

15 11th Circuit.

16      In addition, the Debtor made no showing of irreparable harm. The Dawson Declaration is

17 conclusory and consists mainly of paragraphs from the Motion making arguments and assertions.

18 There is little evidence, if any. Litigation expenses do not alone allow injunctive relief nor do they

19 constitute as "irreparable harm". Alliance Mortgage, supra.

20      Congress by excepting certain actions from the automatic stay provision recognized that the

21 debtor would likely incur litigation expense as a result of any excepted lawsuit. . . .Congress has

22 therefore implicitly recognized that litigation expenses alone do not justify a stay of a proceeding.

23 Rath Packing Co., 787 F.2d at 325.

24      Finally, the balance of the hardships weighs in favor of the Receiver. The Receiver, if

25 enjoined, will be forced to "sit by and watch" while its funds are spent by the Debtor in aid of its

26 supposed reorganization efforts, thus rendering moot any relief afforded to the Receiver by the

27 District Court. The Debtor has not, and cannot, offer the Receiver any adequate protection for the

28 use of its money while the appeals filed by the Debtor are prosecuted. Nor does the Debtor offer to

-9-

1  post a bond or other form of protection for the Receiver's funds. The Debtor simply expects this
2  court to enjoin the Receiver from enforcement of its turnover orders while it concurrently spends
3  the Receiver's money. The Receivership Funds would be spent, contrary to the District Court order
4  and the District Court's remedy will be rendered meaningless

5
6                                          **III.**
7                                    **CONCLUSION**

8          For the foregoing reasons, the Debtor's Motion should be denied. The Federal Receiver
9  also respectfully requests that this Court order the Debtor to comply with the Orders of the District
10 Court and immediately turn over the $1,762,762.56 to the Federal Receiver. If this Court,
11 however, is inclined to grant the TRO, it is requested to order the segregation of the Receivership
12 Funds, enjoin the use or transfer thereof, or require their deposit with the Court. The Federal
13 Receiver further requests all other appropriate relief in the premises.

14 Dated: September 25, 2007              DANNING, GILL, DIAMOND & KOLLITZ, LLP

15
16
17                              By: _____
                                    STEVEN J. SCHWARTZ
18                                  Attorneys for David R. Chase, Court-
                                    Appointed Receiver
19
20
21
22
23
24
25
26
27
28

                                        -10-

314573.01 [XP]    24774

**RER - 17**

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2     Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  TERRENCE V. PONSFORD, Cal. Bar No. 42648
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   Email:        mahrens@sheppardmullin.com
7                jrehfeld@sheppardmullin.com
                 okatz@sheppardmullin.com
8
   Proposed Attorneys for The Billing Resource,
9  dba Integretel

10                UNITED STATES BANKRUPTCY COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

13  In re                             Case No. 07-52890

14  THE BILLING RESOURCE, dba Integretel, a   Chapter 11
15  California corporation,

16               Debtor.               **DEBTOR'S OMNIBUS REPLY TO
                                       OBJECTIONS TO DEBTOR'S
17  Tax ID: 33-0289863                 EMERGENCY CASH COLLATERAL
                                       MOTION**
18

19                                     Date:      September 26, 2007
                                       Time:      2:15 p.m.
20                                     Place:     United States Bankruptcy Court
                                                  280 South First Street
21                                                San Jose, California
                                       Judge:     Hon. Arthur S. Weissbrodt
22                                     Courtroom:  3020

23

24

25

26

27

28

W02-WEST:FJR\400440135.3            DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
                                        DEBTOR'S EMERGENCY CASH COLLATERAL
                                                                    MOTION

1   The above-captioned debtor and debtor in possession, The Billing Resource, dba

2   Integretel, a California corporation (the "Debtor"), hereby files this omnibus reply (the "Reply") to

3   various objections filed on September 24, 2007 to the Debtor's Emergency Cash Collateral

4   Motion.

5       Many of the objections have already been addressed by the Debtor in its supplemental

6   memorandum (the "Supplemental Memorandum") and its supporting pleadings which were filed

7   yesterday.  Other objections were simply a rehashing of arguments previously made to the Court

8   and they are not addressed in detail here again.

9       The objections are without merit and should be overruled.  The Debtor's cash collateral

10  papers as supplemented show that good cause exists to permit the Debtor's interim use of cash

11  collateral.  Of the Debtor's numerous creditors, only a handful of creditors have filed objections.

12  If the Debtor is unable to use cash collateral, it will be forced to cease operations, thereby

13  forfeiting the Debtor's going-concern value for the Debtor's bankruptcy estate and harming its

14  customers who depend upon its services, and also resulting in a loss of jobs for its employees.  It

15  will also remove one of the three remaining competitors from this industry.

16      The Debtor's inability to use cash collateral as requested in the First Amended

17  PaymentOne Stipulation would also have catastrophic consequences to the Debtor's subsidiary,

18  PaymentOne, by also forcing its closure; thereby resulting in the demise of one of the Debtor's

19  most valuable assets.  It would result in the loss of a potential sale of PaymentOne that is being

20  negotiated at this time.  Such a sale could result in a substantial reduction of the debtor's debt level

21  and an influx of funds – each of which are in the best interests of the Debtor's bankruptcy estate.

22      The Debtor should be permitted to use cash collateral on an interim basis pending a final

23  hearing, which will provide time for a Creditors' Committee to be appointed and speak with the

24  Debtor about the use of cash collateral on a final basis.  That Committee will represent all of the

25  Debtor's creditors, not just the self-interested few who have objected.

26                                    **ARGUMENT**

27  A.    **The Debtor has Provided a Satisfactory Budget.**

28      Certain of the objections complain that the three-week budget provided by the Debtor did

-1-

W02-WEST:FJR\400440135.3

DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
DEBTOR'S EMERGENCY CASH COLLATERAL
MOTION

1    not include appropriate detail. The Debtor, however, yesterday filed attached as Exhibit A to the

2    Declaration of Evan Meyer a more detailed 27-week cash flow which addressed many if not most

3    of those complaints (the "27-Week Analysis"). It shows the incoming funds the Debtor expects to

4    receive over the next 27 weeks from the payment of funds from the LECs and the Debtor's

5    proposed uses for those funds. That analysis reflects the amounts the Debtor expects to receive

6    from the LECs based upon the historic payment rate received by the Debtor from the LECs. The

7    Debtor is still exploring further cost-cutting measures which will allow it to refine the analysis and

8    which will redound to the benefit of the Debtor's creditors.

9    **B.      The Level of Adequate Protection Provided is Appropriate.**

10          Certain parties filed objections arguing that the Debtor's cash collateral motion should be

11   denied on the grounds that such parties are not provided with adequate protection. However, all of

12   these objections but one were filed by parties who do not possess a validly perfected interest in

13   cash collateral of the Debtor and who are not entitled to adequate protection payments. Only five

14   parties filed UCC-1 statements which might purport to give them an interest in the Debtor's cash

15   collateral. Specifically, Public Communications filed, Network Telephone Systems, Personal

16   Voice and Public Communications Services did not properly take an interest in the Debtor's cash

17   collateral. Moreover, each of these entities only filed UCC-1 statements against Integretel and not

18   The Billing Resource, and thus any security interests which may have been perfected lost that

19   status four months after the Debtor changed its name from "Integretel" to "The Billing Resource"

20   in early 2005. Also, there is no UCC-1 which shows on its face that Public Communications is a

21   secured party of the Debtor. Despite this clear lack of any valid security interests, the Debtor has

22   offered to provide to each of these creditors the same lien post-petition that it had pre-petition,

23   subject to the validity and perfection of their pre-petition liens. To the extent that such entities

24   have any valid and perfected lien, which the Debtor asserts they do not, the replacement liens

25   provided to them more than adequately protect them as demonstrated by the cash shown in the 27-

26   Week Analysis.

27          POL has also filed an objection stating it is not adequately protected. POL is currently

28   owed $186,000 and also has a contingent claim against the Debtor for what it previously asserted

-2-

W02-WEST:FJR\400440135.3

DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
DEBTOR'S EMERGENCY CASH COLLATERAL
MOTION

1    could be approximately $800,000 depending upon the Debtor's resolution of a certain tax claim

2    with the Debtor's largest unsecured creditor.  POL is more than adequately protected for the

3    amount it is currently owed plus its contingent claim.  Similarly, the level of adequate protection

4    provided to POL, as well as Network Telephone, Personal Voice and Public Communications

5    Services is such that the Debtor need not segregate any funds for such parties.

6          None of the other parties has filed UCC financing statements against the Debtor and none

7    is a secured creditor of the Debtor.

8    **C.    The Treatment Afforded to PaymentOne in the First Amended PaymentOne
9    Stipulation Is Proper and in the Best Interests of the Debtor's Bankruptcy Estate.**

10          Certain of the objections are based upon the treatment afforded to PaymentOne in the First

11    Amended PaymentOne Stipulation.  Generally, the objections assert that there is no evidence that

12    PaymentOne is secured and that no payments should be made on account of unsecured "insider"

13    claims.    Such objections were made prior to the time the Debtor filed its Supplemental

14    Memorandum and the supporting declaration of Mr. Evan Meyer.  As set forth in further detail in

15    the Supplemental Memorandum, PaymentOne has convinced counsel for the Debtor that it is

16    secured up to $6.4 million based on new value it provided to the Debtor after filing its UCC

17    amendment.    The amount proposed to be paid to PaymentOne under the First Amended

18    Stipulation is less than the total of the new value advanced to the Debtor by PaymentOne.  In light

19    of such new value, counsel for the Debtor believed that the adequate protection payments to be

20    provided to PaymentOne pursuant to the First Amended Stipulation were fair and appropriate.

21    Moreover, under the First Amended Stipulation PaymentOne is replenishing the payments it

22    receives with new transactions provided to the Debtor, all parties have reserved their rights and all

23    other parties in interest have the right to object at a later date.  As further discussed in the

24    Supplemental Memorandum, PaymentOne is an extremely valuable asset of the Debtor and unless

25    the First Amended Stipulation is approved PaymentOne will likely be forced to cease operations,

26    which will result in further damage to the Debtor's creditors and its entire bankruptcy estate.

27

28

-3-

**D.    The Receiver's Argument that this Court Cannot Allow the Debtor to use its Cash Collateral for Continuing Operations as the Result of the Florida Court's Rulings, is Without Merit.**

The opposition of the Receiver and the FTC to the use of cash collateral is premised on their mistaken belief that this Court has no ability to deal with "reserve funds" held by the Debtor because the District Court for the Southern District of Florida (the "Florida Court") ruled that the Receiver was entitled to have the Debtor turnover $1.7 million to the Receiver. Their belief is mistaken because "Bankruptcy courts have exclusive jurisdiction over a debtor's property, wherever located, and over the estate. See 28 U.S.C. § 1334(e)." Tennessee Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004). "A bankruptcy court's in rem jurisdiction permits it to 'determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is one against the world.'" Id., at 448 (citations omitted).

Based on this jurisdiction, "[t]he requirement of uniform application of bankruptcy law dictates that all legal proceedings that affect the administration of the bankruptcy estate be brought either in bankruptcy court or with leave of the bankruptcy court." In re Crown Vantage, Inc., 421 F.3d 963, 971 (9th Cir. 2005). Thus, once the Debtor began this bankruptcy proceeding in this Court, the Bankruptcy Court had exclusive jurisdiction to address issues concerning property of the estate and its disposition. See 28 U.S.C. § 157(b)(2)(A), (E), (M), (O) (core proceedings include administration of estate, turn over orders, use of property and other proceedings affecting the estate and debtor-creditor relationship). It is irrelevant whether the Florida Court had acquired *in rem* jurisdiction over any assets of the Debtor prior to the bankruptcy filing, as its jurisdiction nonetheless yielded to this Bankruptcy Court. See, e.g., In re Modern Boats, Inc., 775 F.2d 619, 620 (5th Cir. 1985) (admiralty court's jurisdiction over vessel yielded once bankruptcy filed). "The jurisdiction granted in 28 U.S.C. § 1334(d) [now (e)] indicates a conscious effort by Congress to grant the bankruptcy court special jurisdiction and to preclude the type of jurisdictional disputes evidenced in those cases." In re White, 851 F.2d 170, 172-73 (6th Cir. 1988).

Insofar as the Florida Court purported to continue its jurisdiction over property within the

-4-

DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
DEBTOR'S EMERGENCY CASH COLLATERAL
MOTION

1   Debtor's possession or control following its bankruptcy filing, it had no jurisdiction to do so.

2   Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon), 153 F.3d 991, 996 (9th Cir.

3   1998) ("estate is comprised of the debtor's legal or equitable interests in property 'wherever

4   located and by whomever held.' (Citation omitted). The district court in which the bankruptcy

5   case is commenced obtains exclusive in rem jurisdiction over all of the property in the estate.")

6   Nor does the Florida Court's decision concerning the applicability of the automatic stay affect the

7   result here. Regardless of the existence of a stay, a claimant must come to the Bankruptcy Court

8   to obtain possession of property that is in the possession or control of the Debtor. See In re

9   Murray, 350 B.R. 408, 418 (Bankr. S.D. Ohio 2006), where the Court said:

> The absence or termination of the automatic stay does not remove
> property from the Debtors' estate. In this case, the entry of an order
> confirming that the automatic stay is not in effect does not, during
> the pendency of this case, authorize any action against the Property,
> except in this court.

These authorities fully apply here. The Receiver argues that the Florida Court was

permitted to determine whether the automatic stay was applicable to that case. But the existence

of the automatic stay is not the issue—merely by concluding that the stay did not apply did not

give the Florida Court jurisdiction to deal with the Debtor's legal and equitable interests in

property.

In addition, unlike the cases cited by the Receiver, this Receiver is not appointed for the

benefit of the Debtor and its estate. Rather, the Receiver contends that some of the Debtor's assets

constitute the property of the receivership estate created by the Florida Court for certain former

customers of the Debtor. Under these circumstances, the FTC and the Receiver cannot interfere

with the Debtor's bankruptcy case, as doing so would prevent this Court from administering the

bankruptcy estate and the Debtor from confirming a plan. See In re Dolen, 265 B.R. 471, 483

(Bankr. M.D. Fla. 2001) (permitting enforcement of regulatory case injunction against post-

petition earnings would prevent reorganization and is therefore akin to enforcement of a judgment

that is not excepted from the automatic stay).

This Court therefore has the authority to consider whether, as the Receiver contends,

-5-

DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
DEBTOR'S EMERGENCY CASH COLLATERAL
MOTION

1  certain of the Debtor's funds are "property of the Federal Receivership Estate and not of the

2  Bankruptcy Estate."  Receiver's Supp. Opp., at 4:2-4.  As previously argued and briefed to this

3  Court, the Receiver's argument makes sense only if: (1) the Debtor was obligated set up separate

4  reserve accounts in the name of Network One and Access One, (2) the Debtor was obligated to put

5  "reserve" moneys into those accounts for the benefit of those two former customers, and (3) such

6  "reserve" accounts were actually established.

7       The Court probed the Receiver's counsel regarding these matters at the first hearing

8  regarding the use of cash collateral.  There, the Court asked whether the contracts of Access One

9  or Network One required the establishment of separate accounts.  As Debtor's counsel explained,

10  while there are arguments that such accounts should have been established, the contracts

11  themselves are unclear.[1]  For example, the Access One contract, at paragraph 4 of Schedule II,

12  references the withholding of a "reserve" amount, but provides little further detail regarding the

13  implementation of the reserves.  In contrast, it is entirely clear as a matter of undisputed fact that

14  no such accounts were ever actually set up for Access One or Network One.  This reality (that no

15  accounts were set up) relegates Access One and Network One to the role of unsecured creditors.

16  And the Receiver, standing in their shoes, can do no better.

17       The Debtor believes that it had no obligation to segregate any "reserve" funds.  So it comes

18  as no surprise that no funds were in fact segregated.  Nor were separate accounts set up.  The

19  monies the Debtor received from the LECs were commingled and held in an unsegregated account

20  by the Debtor.  On an ongoing basis those monies were either passed back in part to the customers

21  under their respective contracts, or held by the Debtor in a commingled account.  Many of the

22  Debtor's other current customers may take positions similar to the position the Receiver is now

23  taking on behalf of Network One and Access One.  The Debtor is not now trying to argue the

24  merits of that position.  Those are legal questions for another day.  But the factual question of

25  _____

[1]  See, e.g., Master Services Agreement, entered into as of June 30, 2004, between the Debtor and
26  Access One.  A copy of Master Services Agreement was attached as part of Exhibit I to the
Receiver's declaration in opposition to the Debtor's first day motions.  The Master Services
27  Agreement is found at Bates Range 00394 - 00415.  The agreement between the Debtor and
Network One is found in that same exhibit, beginning at Bates Number 00416

28

W02-WEST:FJR\400440135.3                              DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
                                                      DEBTOR'S EMERGENCY CASH COLLATERAL
                                                                                      MOTION

1    whether separate accounts existed is no mystery. The Debtor did not establish separate accounts
2    for each customer. Funds were commingled. To date, the Receiver has yet to come to terms with
3    this reality and its implications under the relevant law.

4         The Ninth Circuit Court of Appeals and the California courts have consistently held that a
5    party seeking to establish a trust over commingled funds must trace those funds. In re Advent
6    Management Corp., 178 B.R. 480, 491 (B.A.P. 9th Cir. 1995). The test to be applied with respect
7    to tracing trust funds is commonly referred to as the "lowest-intermediate-balance test." Under
8    that test, if trust funds are transferred into a commingled account and all the money in that account
9    is subsequently withdrawn, the beneficiary's equity is treated as lost. This is generally true even if
10   money from other sources is subsequently deposited into the same account. Here, the Receiver
11   has made no effort to trace its funds – funds which were undisputedly commingled.

12        Nor has the Receiver pointed to a contract provision that requires the establishment of a
13   separate account for reserves. He has yet to point to a provision requiring the segregation of funds
14   (or one prohibiting commingling). He has yet to point to an account control agreement that might
15   have provided him with an interest in the Debtor's funds. To the Debtor's knowledge, no such
16   provisions or agreements exist. Not in connection with the Access One or Network One contracts,
17   and not in connection with contracts with the Debtor's other customers. Practically speaking, the
18   suggestion that a separate account would have been required for each customer is absurd. Setting
19   up over 50 separate "reserve" accounts would be administratively impossible and, given that no
20   contract required this, totally unnecessary.

21        Even if this Court accepts the Receiver's argument that the Florida Court has already found
22   that separate accounts were needed, it does little to change the fact that such accounts were not set
23   up and do not exist. It also does not change the fact that funds were not segregated and
24   commingling occurred. These are the arguments that merit the Court's attention, and these are the
25   same arguments that neither the Receiver nor any other party in interest have addressed head on.

26        Under the circumstances of this case, no one creditor may reach the general funds of the
27   Debtor to the detriment of other similarly situated creditors. A result to the contrary would erode a
28   fundamental tenet of bankruptcy law that similarly situated creditors (in this case, general

-7-

1   unsecured creditors) be treated equally.

2   **E.      The Constructive Trust Arguments are Without Merit.**

3          POL, Inc. cites a case from the Northern District of Illinois (Almar Communs. v.

4   Telesphere Communs. (In re Telesphere Communs.), 205 B.R. 535 (N.D. Ill. 1997)) for the

5   assertion that reserves my be held in a constructive trust.  POL, however, has not shown that the

6   facts of that case apply to this case and moreover that case was being considered under Illinois

7   law.  11 U.S.C. section 541 (State law determines extent of debtor's property interest).  POL has

8   not carried its burden of supporting the imposition of a constructive trust in this case.  See Foothill

9   Capital Corp. v. Clare's Food Mkt. (In re Coupon Clearing Serv., 113 F.3d 1091 (9th Cir. 1997)

10  (no trust relationship found where debtor was not an agent and the proceeds were commingled

11  with debtor's general funds).  The Ninth Circuit Court of Appeals and the California courts "have

12  consistently held that a party seeking to establish a trust over commingled funds must trace those

13  funds."  In re Advent Management Corp., 178 B.R. 480, 491 (B.A.P. 9th Cir. 1995) (collecting

14  cases).  As the Debtor has previously demonstrated in its pleadings, claims for reserves are simply

15  unsecured claims against the Debtor.

16          ///

17          ///

18          ///

19

20

21

22

23

24

25

26

27

28

-8-

DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
DEBTOR'S EMERGENCY CASH COLLATERAL
MOTION

## CONCLUSION

For the reasons set forth in the Debtor's cash collateral motion and related papers, good cause exists to approve the Debtor's interim use of cash collateral, including approval of the First Amended PaymentOne Stipulation. If the Debtor is not permitted to use cash collateral, the result will be the forced cessation of the Debtor's business as well as the forced closure of its most valuable asset, PaymentOne. Such a result would be not be in the best interests of the Debtor's creditors or its bankruptcy estate. Granting the Debtor's use of its cash collateral on an interim basis will permit time for a Committee to be appointed representing all creditors prior to the final hearing on the Debtor's use of cash collateral to meet with the Debtor to discuss its business and this bankruptcy case, not just the few who have filed objections.

Dated: September 25, 2007         Respectfully submitted,

                                  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                                  By    _____
                                              /s/ Jeffrey K. Rehfeld
                                             JEFFREY K. REHFELD
                                        Proposed Attorneys for Debtor The Billing Resource,
                                                  dba Integretel

W02-WEST:FJR\400440135.3                              DEBTOR'S OMNIBUS REPLY TO OBJECTIONS TO
                                                      DEBTOR'S EMERGENCY CASH COLLATERAL
                                                                                    MOTION

**RER - 18**

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2       Including Professional Corporations
    MICHAEL H. AHRENS, Cal. Bar No. 44766
3   STEVEN B. SACKS, Cal. Bar No. 98875
    JEFFREY K. REHFELD, Cal. Bar No. 188128
4   ORI KATZ, Cal. Bar No. 209561
    Four Embarcadero Center, 17th Floor
5   San Francisco, California 94111-4106
    Telephone:    415-434-9100
6   Facsimile:    415-434-3947
    Email:        mahrens@sheppardmullin.com
7                 ssacks@sheppardmullin.com
                  jrehfeld@sheppardmullin.com
8                 okatz@sheppardmullin.com

9   Proposed Attorneys for THE BILLING RESOURCE,
    dba INTEGRETEL
10
                UNITED STATES BANKRUPTCY COURT
11
                NORTHERN DISTRICT OF CALIFORNIA
12
                        [SAN JOSE DIVISION]
13

14  In re                                    Case No. 07-52890

15  THE BILLING RESOURCE, dba                Chapter 11
    INTEGRETEL, a California corporation,
16
                Debtor.
17
    Tax ID: 33-0289863                       **NOTICE OF FILING**
18

19

20
            **PLEASE TAKE NOTICE** that on September 25, 2007, the Debtor filed an
21
    Emergency Motion for Stay Pending Appeal with the U.S. District Court for the Southern
22
    District of Florida in the matter pending there entitled <u>Federal Trade Commission v.</u>
23
    <u>Nationwide Connections, Inc.</u>, No. 06-806180.  A copy of the Emergency Motion is
24
    attached hereto as Exhibit A.
25

26

27

28
                                        -1-
    W02-WEST:5SS1\400440582.1                          NOTICE OF FILING

                                                        RER-18      0916

1  Dated:  September 25, 2007

2                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4                  By  _____
                                    /s/ Steven B. Sacks
5                                    MICHAEL H. AHRENS
                                     STEVEN B. SACKS
6                          Proposed Attorneys for Plaintiff and Debtor, The
                                Billing Resource, dba Integretel
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:5SS1\400440582.1

-2-

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

  vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.,*

        Defendants.

_____/

### Defendant The Billing Resource d/b/a Integretel's Emergency Motion for Stay Pending Appeal and Incorporated Memorandum in Support Thereof

Defendant The Billing Resource d/b/a Integretel ("Integretel") moves pursuant to Fed. R. Civ. P. 62(c), on an emergency basis, that the Court stay (1) the provisions of the Court's Omnibus Order entered Sept. 14, 2007 (D.E. 610) determining that the amounts shown on Integretel's books as the IGT Reserve for Access One and Network One constitute Receivership property and ordering Integretel to pay the reserve amounts to the Receiver ("the Payment Order") and ordering Integretel to show cause why it should not be held in contempt ("the Show Cause Order") and (2) its Order Granting Motion for Clarification as to Scope of Stay entered Sept. 21, 2007 ("the Clarification Order") (D.E. 619) pending the resolution of the appeal of those orders that Integretel has taken to the Eleventh Circuit. In the alternative, Integretel moves that these orders be stayed for a period of five days to allow Integretel to move for a stay from the Eleventh Circuit and that upon the filing of such a motion the stay be continued in effect until that motion is acted on.

### The Need for Emergency Relief

Emergency treatment is necessary because enforcing the Payment Order would most likely force Integretel out of business and because ongoing litigation over the reserve issues here and in the bankruptcy court will itself interfere with Integretel's ability to reorganize. We recognize that the Court denied the Receiver's recent emergency motion on the ground that "the

Bankruptcy Court should have the opportunity to make its own determination as to Integretel's [cash-collateral] motion."[1] However, Integretel believes that it is appropriate to present this motion on an emergency basis so that it is fully briefed and ripe to be decided quickly in case the bankruptcy court's decision does not fully meet Integretel's need for immediate relief.

### Background

The Payment Order directed Integretel to pay the Receiver the amount of the reserves as of the date of the TRO: "Integretel shall provide a sworn statement identifying the amount of reserves as of the issuance of the TRO. The Court further orders that these funds shall be placed in a segregated Receivership account."[2] The undisputed record evidence is that when the TRO was issued, the Integretel's books showed the amount of the IGT reserves for Access One and Network One—*i.e.*, the amount that Integretel was ordered to pay—to be $1,230,479.89.[3]

As we have previously told the Court, Integretel does not maintain reserve amounts in a separate account. Moreover, Integretel routinely has less cash on hand than would be required to cover the reserve amounts for its clients. Paying the reserve amounts for Access One and Network One to the Receiver would deplete Integretel's operating cash so drastically that Integretel would in all likelihood be forced out of business.[4] Rather than close down—thereby injuring numerous customers and vendors and putting its employees out of work—Integretel filed for bankruptcy protection under Chapter 11 in the Northern District of California (where it is based) on Sunday, September 16—i.e., before the first business day after the Omnibus Order was entered.[5] This action should not have been a surprise to the Receiver or the FTC, for they

---

1. Order Denying Receiver's Emergency Motion in Furtherance of the Pending Contempt Proceeding at 2 (D.E. 625). After that order was entered, Integretel moved in the bankruptcy court for a TRO under § 105 of the Bankruptcy Code, 11 U.S.C. § 105, temporarily barring future litigation in this action. That motion, which was being prepared when the Court denied the Receiver's emergency motion, has been set for a hearing on Wednesday, September 26.

2. Omnibus Order at 10 (D.E. 610).

3. Decl. of Ken Dawson in Opp. to Receiver's Show Cause Mtn. ("Dawson Show-Cause Decl.") ¶ 21 (D.E. 296-2).

4. Decl. of Ken Dawson from bankruptcy proceedings, submitted herewith as Ex. 1 ("Dawson Bankr. Decl.").

5. *In re The Billing Resource*, No. 07-bk-52890 (Bankr. N.D. Cal.).

RER-18    0920

had both known for at more than nine months that Integretel would have to go into bankruptcy if it were ordered to pay the Receiver the amount of the reserves.[6]

On Wednesday, September 19—the third business day after filing for bankruptcy—Integretel commenced an adversary proceeding in the bankruptcy court seeking a declaration as to the applicability of the automatic stay to this action and further seeking an injunction under 11 U.S.C. § 105 barring the further litigation of the FTC's claims.[7]

Later that day, the Receiver effectively acknowledged that the Payment Order was covered by the automatic stay and submitted the issue of whether the stay should remain in effect to the bankruptcy court. In his opposition to Integretel's bankruptcy motions seeking permission to use cash collateral and to continue using its existing bank accounts, the Receiver argued, "The Federal Receiver believes that the appropriate remedy is relief from the automatic stay in order to effectuate the orders of the District Court with respect to the Receiverships, which motion the Receiver intends to file forthwith, should the Court not *sua sponte* order such relief."[8]

On the morning of Thursday, September 20, the FTC informed the Court's chambers of its intent to file its emergency motion and faxed a copy of the motion to chambers.[9] The FTC's motion failed to disclose the fact that the Receiver had already acknowledged that the Payment Order was subject to the automatic stay.

At 11:33 a.m. on September 20—an hour and a half after the FTC had informed chambers of its emergency motion and faxed chambers a copy of the motion, the Court's ECF notification system sent an email reciting the following action by the Court: "Endorsed ORDER striking [579] Motion. Proceedings against The Billing Resource d/b/a Integretel are stayed due to the entity's recent bankruptcy filing. Integretel may refile its motion, if necessary."[10] And at 1:16 p.m. that day, the Court entered an order formally declaring that the case had been automatically stayed by Integretel's bankruptcy:

---

6. Decl. of Michael Ahrens from bankruptcy proceedings, submitted herewith as Ex. 2 ("Ahrens Bankr. Decl.").

7. *The Billing Resource v. Chase*, No. 07-ap-05156 (Bankr. N.D. Cal. filed Sept. 19, 2007).

8. Ex. 3 hereto at 9-10.

9. *See* Ex. 4 hereto.

10. D.E.616.

-3-

> [T]he instant action against The Billing Resource, d/b/a Integretel, is subject to
> the automatic stay set forth in 11 U.S.C. § 362. The automatic stay granted by 11
> U.S.C. § 362(a) will remain in effect until the bankruptcy case is dismissed or
> closed, or until such earlier times as set forth in 11 U.S.C. § 362(c), (d), (e) or
> (f).[11]

Based on the fact that chambers had been told about the motion, and had apparently
received a copy of it, almost three and a hours before this order was entered, Integretel and its
counsel reasonably believed that the Court had been aware of the FTC's motion when it issued
this order and had taken it into consideration. As a result, Integretel reasonably concluded that
the case was stayed and that there was no need for it to respond to the FTC's emergency motion
(at least not on an urgent basis). Indeed, undersigned counsel were not even sure whether in light
of the stay they were permitted to respond.

Counsel were therefore dumbfounded when they learned that at 4:11 p.m., the Court
had—without waiting for a response from Integretel, without giving Integretel a deadline for
responding, and without giving Integretel any warning that it was about to act inconsistently with
the two stay orders it had issued the day before—granted the FTC's motion, vacated the prior
day's orders, and held that the automatic stay did not apply. There was no genuine emergency
justifying this action. The only circumstances that the FTC had identified in its motion as
constituting an emergency was the fact that a hearing in the bankruptcy court was scheduled for
the next day.[12] That hardly constitutes an emergency, since the FTC could (and did) participate in
the hearing.

Integretel has now appealed both the Court's September 21 Clarification Order and its
September 14 Omnibus Order to the Eleventh Circuit, and it respectfully asks that the Court stay
its rulings pending the outcome of that appeal.

### Argument

In order to obtain a stay pending appeal, the movant must ordinarily satisfy one of two
alternative standards:

- Under the first standard, the movant must show (1) that it is likely to succeed on the
  merits on appeal, (2) that without a stay it will be irreparably injured, (3) that a stay

---

11. D.E. 617.

12. FTC Emergency Motion at 11 (D.E. 618).

RER-18        0922

will not substantially harm the opposing party, and (4) that a stay would serve the public interest.[13]

- Under the second standard, the movant must show (1) that it has a substantial case on the merits and (2) that the balance of the equities as determined by the other three factors weighs heavily in the movant's favor.

However, where, as in this case, the order being appealed from is a decision that the automatic stay does not apply, factors relating to the balance of the equities should assume much less importance in relation to the issue of likelihood of success on the merits. That is so because Congress has, by enacting the automatic stay, already balanced the equities. As the Eleventh Circuit has explained, "The metes and bounds of the automatic stay are provided by statute and systematically applied to all cases."[14] If the automatic stay applies to the creditor's conduct, it applies regardless of any other equities. In that event, consideration of equities becomes appropriate only at the stage of considering whether the stay should be lifted or modified—an decision that may be made only by the bankruptcy court.

### A. Integretel is likely to succeed on its appeal, and in any event it has a substantial case on the merits.

We discuss the two orders in reverse chronological order, since we did not have a chance to present argument in opposition

### 1. *The September 21 clarification order is procedurally improper and substantively erroneous.*

The Eleventh Circuit is likely to reverse the Court's September 21 clarification order regarding the automatic stay for several reasons.

*First*, the Court was mistaken in its conclusion that the automatic stay applies "only to protect property of the bankruptcy estate or property of the debtor."[15] Under 11 U.S.C. § 362(a)(3), which the Court did not cite, the stay extends to "any act to obtain possession of property of the estate *or of property from the estate*[.]"[16] Under this provision, a debtor is entitled

---

13. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. June 26, 1981) (binding in the Eleventh Circuit under *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc)).

14. *Jove Engineering, Inc. v. IRS*, 92 F.3d 1539, 1546 (11th Cir. 1996).

15. Clarification Order at 4 (D.E. 619).

16. 11 U.S.C. § 362(a)(3) (emphasis added).

-5-

to the benefit of the stay to protect property that is merely in his possession, regardless of whether he has a legal or equitable interest in it.[17] Thus, even though the Court has held (erroneously, we believe) that the funds belong to the Receivership estate, the Payment Order is nevertheless stayed because it is an act to obtain possession of property *from* Integretel's estate.

*Second*, the question whether the automatic stay applies to the Payment Order was not properly before the Court. The Receiver had already acknowledged that the stay applied and had sought relief from the stay from the only court authorized to grant such relief—the bankruptcy court.[18] The FTC did not have standing to seek a ruling about the application of the stay to the Payment Order. The order had been issued based on a motion by the Receiver, not by the FTC. And more fundamentally, the right to bring suit to recover property alleged to belong to the Receivership estate is vested solely in the Receiver. It was inappropriate for the FTC to second-guess the Receiver's judgment about how best to proceed in light of Integretel's bankruptcy.

*Third*, the Court was mistaken in saying that the Omnibus Order directed Integretel "to pay the current reserve funds, amounting to $1,762,762.56."[19] As discussed above, the Omnibus Order directed Integretel to pay the amount of the reserves as of the issuance of the TRO—*i.e.*, as of Feb. 27, 2006. That amount was more than half a million dollars lower than the figure cited by the Court.

*Fourth*, the Court was mistaken in holding that the civil contempt proceedings are covered by the "regulatory exception" under 11 U.S.C. § 362(b)(4). And to the extent that the Court ruled that the regulatory exception applies to the Payment Order, that conclusion was erroneous as well. The regulatory exception applies only to actions or proceedings "by a governmental unit to enforce such governmental unit's police and regulatory power[.]" The only motion before the Court seeking payment of the reserve amounts was the one filed by the Receiver, who is not a "governmental unit." Even if the Receiver could somehow be deemed a

---

17. *In re Atlantic Business and Community Corp.*, 901 F.2d 325, 328 (3d Cir. 1990) ("The language of Section 362 makes clear that mere possession of property at the time of filing is sufficient to invoke the protections of the automatic stay."); *Turbowind, Inc. v. Post Street Management, Inc. (In re Turbowind, Inc.)*, 42 B.R. 579, 585 (Bankr. S.D. Cal.1984) ("The operation of the automatic stay does not depend on the debtor having either a legal or equitable interest in the property, but applies to property merely in the debtor's possession at the time of filing").

18. Ex. 3 hereto at 9-10.

19. Clarification Order at 1 (D.E. 619).

governmental unit, the regulatory exception still does not apply, because it extends only to proceedings by a governmental unit "to enforce *such governmental unit's* police and regulatory power[.]"[20] The Receiver has no police or regulatory to enforce; his function is the purely pecuniary one of collecting, managing, and distributing the Receivership defendants' assets. This is the case even though the Receiver was appointed in an action brought by the FTC, because the Receiver cannot assert the FTC's rights or interests and because the Payment Order was not based on any finding that Integretel has violated the FTC Act. Furthermore, the Court has said that the Payment Order is based on its *in rem* jurisdiction over Receivership assets, and that jurisdiction derives, not from any regulatory power granted by the FTC Act, but from the Court's general equitable powers. Finally, even if the regulatory exception otherwise applied here, it would not permit enforcement of the Payment Order. Section 362(b)(4) expressly provides (and the FTC admits) that a governmental unit may not enforce a money judgment against a debtor. The Payment Order constitutes such a judgment.

*Fifth*, civil contempt proceedings whose purpose is merely to enforce a payment obligation that would otherwise be subject to the automatic stay are not exempted from the automatic stay. Because the Payment Order is subject to the automatic stay, contempt proceedings to enforce it are stayed as well.[21]

*Finally*, the order was issued in violation of Integretel's procedural rights under the due-process clause, this Court's local rules, and basic conceptions of fairness. The Court issued its ruling without waiting to hear from Integretel or even setting a deadline for Integretel to file a response. Moreover, the Court's stay orders of September 20 induced Integretel to believe that the FTC's motion was moot and that it was unnecessary to respond to it.

### 2.    The September 14 Omnibus Order is mistaken for numerous reasons.

The rejection of our arguments in the Omnibus Order was mistaken. We will focus here on the some of the most significant areas in which we believe the Court has erred.

*First*, and most important, the Court was mistaken in its conclusion that the reserves constitute Receivership property. Perhaps the most fundamental principle of the law of creditors'

---

20. 11 U.S.C. § 362(b)(4) (emphasis added).

21. *See, e.g., SEC v. Brennan*, 230 F.3d 65 (2d Cir. 2000) (automatic stay was violated by order in regulatory proceeding requiring repatriation of trust assets and setting contempt hearing to compel compliance).

-7-

rights is that a general unsecured creditor has no legal or equitable interest in any of the debtor's assets unless and until he reduces his claim to judgment and obtains a judgment lien or otherwise levies on the debtor's property.[22] As discussed below, there is no basis for concluding that Access One and Network One had any enforceable property interest in the reserve amounts before the Receiver was appointed—even if those amounts were, as the Court suggests "owed" under the contracts. And since they had no such property interest before the Receiver was appointed, the receivership order could not magically confer on the Receiver a property interest that had not previously been in existence.

One of the bases for the Court's erroneous conclusion was its characterization of the IGT Reserves as funds "held on behalf of, or for the benefit of, a Defendant."[23] The Court points to nothing in the contracts that supports that conclusion, and no such provision exists. On the contrary, the contracts expressly state that the purpose of the IGT Reserve is "to protect IGT[.]"[24]

The conclusion that the Reserve is not held on behalf of, or for the benefit of, Access One and Network One is also supported by other provisions of the contracts. Under the contract with Access One, the client expressly transferred its interest in the billing transactions to Integretel, so it could not have retained any interest in the proceeds of those transactions.[25] And both contracts expressly disclaimed any intent to create the sort of relationship whereby Integretel would be holding funds "on behalf of, or for the benefit of" the clients. Specifically, they provided that

---

22. *See, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund*, 527 U.S. 308, 330 (1999); *Pussey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923); *Adler v. Fenton*, 65 U.S. 407, 410–13 (1860); *381651 Alberta, Ltd. v. 279298 Alberta, Ltd.*, 675 So.2d 1385, 1387–88 (Fla. App. 1996) (citing *Adler, supra*).

23. Omnibus Order at 3 (D.E. 610).

24. Dawson Show- Cause Decl. Ex. 1 at 5 (Exhibit A), 10 (Schedule II, § 5.b) & Ex. 2 at 11 (Exhibit A), 19 (Schedule II, § 5.b) (D.E. 296-2).

25. Dawson Show-Cause Decl. Ex. 1 at 11 (Sched. II, § 10) (D.E. 296-2):

> Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users. Therefore, Client agrees, and does hereby transfer to [Integretel] any rights in the Billing Transactions that may be necessary for [Integretel] to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

-8-

Integretel is not the client's "agent, partner, joint venturer, trustee, fiduciary, or legal representative[.]"[26]

Although the Court is correct in stating that "[a]n entity need not be an agent, partner, joint venturer, trustee, fiduciary, or legal representative to possess funds that one is holding 'on behalf of' another person or entity,"[27] the decision is silent as to what other type of relationship the Court thinks existed between Integretel and its clients and as to the legal basis for finding that the relationship existed. There is, in short, no reason whatever for thinking that the Receiver (or Access One and Network One before him) had any legal or equitable interest in any of Integretel's assets.

Another basis for the Court's mistaken conclusion was its statement that the Receiver's claim "is not a claim at law governed by pre-receivership contracts, . . . but one governed by this Court's jurisdiction over receivership property based on the TRO and Amended Preliminary Injunction."[28] Neither the TRO nor the Amended Preliminary Injunction says a word about whether the IGT Reserve amounts are Receivership property. Although the Amended Preliminary Injunction does require anyone in possession of Receivership property to turn it over to the Receiver,[29] it does not purport to determine which specific assets belong to the Receivership estate.

To decide whether the Receiver has an interest in a given piece of property, therefore, one must look outside the injunction's four corners. But neither the Court nor the Receiver nor the FTC has pointed to anything other than the contracts that can serve that purpose. (On the contrary, the FTC acknowledged that "determining the ownership of the [reserves] . . . involves interpreting the contracts[.]"[30])

The Omnibus Opinion suggests that the Receiver's property interest somehow derives from the Court's power to grant equitable remedies. But no matter how broad that power might be, it does not go so far as to empower the Court to create legal rights and obligations without

---

26. Dawson Show-Cause Decl. Ex. 1 at 4, § 19(k) & Ex. 2 at 9, § 19(k) (D.E. 296-2).

27. Omnibus Order at 3 (D.E. 610).

28. Omnibus Order at 4 (D.E. 610).

29. The TRO imposed such an obligation only on the Nationwide defendants. (TRO § X.A.1 (D.E. 19).)

30. D.E. 399 at 21.

RER-18      0927

basing them on some other source such as a contract, a statute or regulation, or a common-law principle.

Nor is the Court's decision supported by the statement that the reserve amounts are within the Court's *in rem* jurisdiction. That conclusion puts the cart before the horse. Whether a particular asset is subject to the Court's *in rem* jurisdiction depends on whether the Receivership estate has a legal or equitable interest in it. The Court therefore may not start with the assumption that *in rem* jurisdiction applies and then rely on that assumption to justify a finding that the asset belongs to the Receiver.

And in any event, the Court was mistaken in the conclusion that it has *in rem* jurisdiction over the reserve amounts, as well as in its underlying premise that *in rem* jurisdiction extends to disputed assets held by third parties.[31] *In rem* jurisdiction attaches only to assets within the Court's actual or constructive possession.[32] And a long line of cases establishes that the Court has no such possession over assets that are in the hands of a third party who holds them under a substantial claim of right, as Integretel does here.[33] Even if the one case the Court relies on—a district court decision—could somehow be controlling in the face of contrary precedent from the Supreme Court and several appeals courts, the fact is that the case is irrelevant to the point for which it is cited, for in that case the receiver's ownership interest in the funds at issue was not in dispute.[34]

*Second*, the Court was mistaken in concluding that the Receiver is not bound by the contracts' ADR/arbitration provisions.[35] That conclusion was based in part on the premise that the Receiver's rights were not contractual, but were derived entirely from the Court's orders. The discussion immediately above has shown that premise to be unfounded.

---

31. Omnibus Order at 5, 7 (D.E. 610).

32. *See, e.g., Penn General Casualty Co. v. Commonwealth of Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935); *L'Invincible*, 14 U.S. 238, 246-47 (1816); *The Brig Ann*, 13 U.S. 289, 291 (1815); *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 964 (4th Cir. 1999).

33. *E.g., Taubel-Scott-Kitzmiller Co. v. Fox*, 264 U.S. 426, 432-34 (1924); *In re Reading Co.*, 711 F.2d 509, 515-16 (3d Cir. 1983); *In re Kansas City Journal-Post Co.*, 144 F.2d 812, 813 (8th Cir. 1944); *Wheaton v. Daily Telegraph Co.*, 124 F. 61, 62 (2d Cir. 1903).

34. *FTC v. Productive Marketing, Inc.*, 136 F. Supp. 2d 1096 (C.D. Cal. 2001); *see* D.E. 399 at 16 n.6; D.E. 394 at 9 n.8.

35. The discussion here also applies to the contracts' choice-of-venue provisions, which the Court does not discuss.

The conclusion that the ADR/arbitration clause did not bind the Receiver was also based on the statement that the Receiver is not bound by contracts he has not affirmatively adopted.[36] But that Receiver did affirmatively adopt the contracts here; he did so by seeking to enforce claims that arose, if at all, only under the contracts. By attempting to obtain benefits under the contracts, the Receiver implicitly ratified and adopted them.[37]

It is well established that receivers are bound by arbitration clauses included in the receivership entity's contracts.[38] That being the case, any contract-related issues must be resolved by arbitration.

*Third*, having erroneously undertaken to interpret the contracts, the Court's interpretation was also mistaken. In the Court's view, "Integretel had agreements in place with Access One/Network One that permitted [it] to withhold monies that were 'owed to' . . . Access One/Network One as 'reserves,' in the event that any users complained about charges and requested refunds and/or credits directly from [Integretel]."[39] This is wrong on several counts. To begin, with the contracts did not define the IGT Reserve as an amount withheld from amounts "that were 'owed to'" the clients; rather, it defined them as amounts withheld from "the amount *otherwise* owed to Client[.]"[40] Thus, amounts allocated to the IGT Reserves do not become owed to the client unless and until Integretel releases them. As the contracts state, "Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, *less any amount due and owing to [Integretel] hereunder, including, without limitation, . . . IGT Reserves . . . .*"[41] Moreover, the decisions whether to allocate funds to

---

36. Omnibus Order at 5 (D.E. 610).

37. *See, e.g., Clews v. Jamieson*, 182 U.S. 461, 483 (1901); *Gross v. Regnor Fin. Co.*, 96 F.2d 37, 38 (5th Cir. 1938); *URI Cogeneration Partners, L.P. v. Board of Gov. for Higher Educ.*, 915 F. Supp. 1267, 1280 (D.R.I. 1996); *Navrides v. Zurich Ins. Co.*, 488 P.2d 637, 704 (Cal. 1971).

38. *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 624-27 (6th Cir. 2003); *Capitol Life Ins. Co. v. Gallagher*, 839 F. Supp. 767, 769 (D. Colo. 1993); *ISP.COM LLC v. Theising*, 805 N.E.2d 767, 774–75 (Ind. 2004); *Theising v. ISP.COM LLC*, 805 N.E.2d 778, 780 (Ind. 2004).

39. Omnibus Order at 1-2 (D.E. 610).

40. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2) (emphasis added).

41. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 6) & Ex. 2 at 19 (Sched. II, § 6) (D.E. 296-2) (emphasis added).

RER-18    0929