the IGT Reserve and whether to release them are left to Integretel's reasonable discretion.[42] And the purpose of the IGT Reserve is not the narrow purpose suggested by the Court. Rather, the IGT Reserve was defined more broadly as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco."[43]

The Court was similarly mistaken in its conclusion that Integretel is not entitled to keep the reserve amounts because the contracts do not include liquidated damages provisions and supposedly do not "give it the right to make an independent, unilateral decision about Access One's or Network One's breach of the agreements without court involvement."[44] That conclusion ignores the fact funds that Integretel allocates to the IGT Reserve are *by definition* not owed to the client. Thus, it makes no sense to say that the lack of a liquidated damages provision somehow prevents Integretel from continuing to hold funds that it does not owe to its client. Nor does it make sense to suggest that Integretel must obtain a court's permission to retain reserve funds when the contract expressly commits the decision whether to adjust the IGT Reserve requirement for a particular account to Integretel's reasonable discretion.[45]

The Court was also incorrect in stating that Integretel has no right of indemnification because it is being sued for its own alleged wrongdoing. The violations of the FTC Act that Integretel is charged with committing resulted from its submission to LECs of the fraudulent charges generated by Access One and Network One, so that if Integretel violated the law, its violations were entirely derivative of Access One's and Network One's. And the Court previously held in its decision granting the aggregator defendants leave to plead cross-claims and third-party claims that they *are* allowed to seek indemnification from third parties for any liability they may incur beyond the disgorgement of profits.[46]

*Fourth*, the Court was mistaken in its conclusion that a preliminary injunction issued without prior notice and opportunity for a hearing is valid as long as the person sought to be

---

42. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2).

43. Dawson Show-Cause Decl. Ex. 1 at 5 (Exhibit A), 10 (Schedule II, § 5.b) & Ex. 2 at 11 (Exhibit A), 19 (Schedule II, § 5.b) (D.E. 296-2).

44. Omnibus Order at 4 (D.E. 610).

45. Dawson Show-Cause Decl. Ex. 1 at 10 (Sched. II, § 5.b) & Ex. 2 at 19 (Sched. II, § 5.b) (D.E. 296-2).

46. Order Granting Mtn. of Aggregator Defs.' for Lv. to Amend Answers at 2-4 (D.E. 536).

-12-

bound is subsequently given an adequate chance to defend against the charges.[47] That conclusion flies in the face of Fed. R. Civ. P. 65(a)(1), which provides, "No preliminary injunction shall be issued without notice to the adverse party." It also flies in the face of Supreme Court case law on preliminary injunctions[48] and on due process.[49] Neither of the two cases cited by the Court on this point is apposite.

*Fifth*, the Court is mistaken in its conclusion that an injunction can be binding on a nonparty based solely on the fact that the nonparty allegedly acted in concert with a named defendant at some time before the injunction was issued.[50] The concerted-action requirement is satisfied only when the nonparty participates with an enjoined party in violating the injunction, which of course can only occur after the injunction is issued.[51] It was therefore an error for the Court to find that Integretel could be bound as a nonparty based on its having provided services to Access One and Network One long before the TRO was issued.[52]

*   *   *

The discussion above lists only some of the ways in which we believe the Court's ruling is mistaken. But even that partial list is sufficient to show that Integretel is likely to succeed on appeal and that in any event the issues it intends to raise are very substantial indeed.

**B.    The balance of equities weighs heavily in Integretel's favor.**

*1.    Integretel will be irreparably injured if the Court's payment order is not stayed.*

Although a purely economic loss does not usually amount to irreparable injury, it does if it is so serious that it would significantly disrupt the defendant's business, cause the defendant to suffer a significant loss of revenue and customer goodwill, or force the defendant into bankruptcy.[53] The mere threat that the Court's payment order will be enforced has already forced

---

47. Omnibus Order at 6, 8 (D.E. 610).

48. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 438-39 (1974).

49. *E.g., Fuentes v. Shevin*, 407 U.S. 67, 82 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971).

50. Omnibus Order at 7 (D.E. 610).

51. *See, e.g., G & C Merriam Co. v. Webster Dictionary Co.*, 639 F.2d 29, 35 (1st Cir. 1980).

52. Omnibus Order at 7 (D.E. 610).

53. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) (bankruptcy); *BellSouth Telecommunications Inc. v. MCI Metro Access Transmission Services, LLC*, 425 F.3d 964, 970 (11th Cir. 2005)

-13-

Integretel into bankruptcy. Actually enforcing the order would in all likelihood make it impossible for Integretel to remain in business or to successfully reorganize and would therefore force it into liquidation.[54] For a corporation, injury does not get any more irreparable than that.

The harm to Integretel from having to participate in further contempt proceedings—by which we mean having to litigate the contempt issues—would obviously be less severe, but it would nevertheless be real. The proceedings would force Integretel to continue incurring litigation costs that would diminish the resources available for a reorganization. They would similarly continue to distract Integretel's management from the business of reorganizing the company. Although harms such as these would not ordinarily be regarded as irreparable injuries, they take on a different complexion when the alleged contemnor is in bankruptcy. And of course any contempt sanctions that might be imposed for the purpose of compelling compliance with the Payment Order would cause the same irreparable harm as the Payment Order itself.

### 2. *A stay would not substantially harm the Receiver.*

The only effect that staying the payment order would have on the Receiver would be to prevent him from receiving the money he seeks to recover from Integretel unless and until the Court's order is affirmed on appeal. In theory, the Receiver would face the possibility of two types of harms: the loss of use of the money during the appeal and the risk that Integretel's financial condition would deteriorate and that it would be unable to pay the money. The loss of use of the money would be fully compensable by awarding interest on the amount Integretel has been ordered to pay. And granting a stay would actually eliminate what is currently the biggest threat to Integretel's financial condition—the efforts of the Receiver and the FTC to enforce the Court's order.

Moreover, any marginal risk that the Receiver might incur as a result of a stay would have to be discounted when one recalls the Court's repeated statements that consumers are unlikely to ever see any significant recovery in this case because the individual amounts at issue are so small. That means that while the stakes for Integretel are a matter of its very survival, what

---

(loss of customers and goodwill); *Delta Air Lines, Inc. v. Airline Pilots Ass'n, International*, 238 F.3d 1300, 1308 n.18 (11th Cir. 2001); *Nermer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993) (major disruption of business; threat to continued existence of business).

54. Ex. 1 hereto.

RER-18     0932

is at stake on the other side is little more than the amount that will ultimately be paid to the Receiver, to his lawyers, and to the United States Treasury.

Nor would the Receiver be significantly harmed if the contempt proceedings are stayed. If the payment order is stayed, going forward with the contempt proceedings would serve no purpose: coercive sanctions would be unavailable, because they would be inconsistent with the stay of the payment order. And any compensatory award would be unenforceable against Integretel except as a prepetition claim to be submitted in the bankruptcy.

### 3. A stay would serve the public interest.

Staying the payment order would serve the public interest because Integretel would not be the only entity harmed by enforcing that order. If the order is enforced Integretel put out of business, Integretel's creditors would be harmed, because they would in all likelihood recover less on their prepetition claims than they would recover through a successful reorganization. And Integretel's employees would lose their jobs and their livelihoods.

Moreover, if Integretel was forced to go out of business, competition in the billing-aggregation industry would be significantly reduced. There are currently only three full-service billing aggregators, and without Integretel there would be only two. It would be ironic (to say the least) if an order enforcing an injunction obtained by the FTC resulted in diminishing competition.

Finally, the public interest would not be harmed by a stay of the contempt proceedings. This is so for much the same reason that civil contempt sanctions are subject to the automatic stay in the first place: the purpose of civil contempt is not to vindicate the court's power, but to provide the opposing party an effective remedy. Furthermore, the Receiver is hardly in a position to invoke the public interest in enforcing the FTC Act, for his role in this litigation is to assert what would, if he had not been appointed, be claims belonging to entities that were among the primary wrongdoers. And beyond that, there has been no finding that Integretel violated the law. Integretel stands before the Court as a defendant against which accusations have been made but not proved. In those circumstances, the contempt proceedings against Integretel do not implicate any significant public interest.

-15-

**Conclusion**

For the foregoing reasons, the Court should grant Integretel's motion. It should stay (a) the Sept. 21 Clarification Order, (2) the Payment Order, and (3) the contempt proceedings pending the completion of Integretel's appeal.

Alternatively it should enter a temporary stay in order to permit Integretel to request a stay from the court of appeals. Denying even such limited stay to permit Integretel to seek provisional relief from the Eleventh Circuit would "not [be] consistent with the fair, effective administration of justice[.]"[55]

Dated: September 25, 2007.

Respectfully submitted,

| | |
|---|---|
| /s/ Neal Goldfarb | /s/ Scott B. Newman |
| Richard H. Gordin, Pro hac vice | Scott B. Newman, Florida Bar No. 339717 |
| Neal Goldfarb, Pro hac vice | Martin J. Alexander, Florida Bar. No. 346845 |
| TIGHE PATTON ARMSTRONG TEASDALE PLLC | HOLLAND & KNIGHT LLP |
| 1747 Pennsylvania Ave., N.W., Suite 300 | 222 Lakeview Ave., Suite 1000 |
| Washington, D.C. 20006 | West Palm Beach, Florida 33401 |
| rgordin@tighepatton.com | scott.newman@hklaw.com |
| ngoldfarb@tighepatton.com | marty.alexander@hklaw.com |
| Tel.:   (202) 454-2800 | Tel.:   (561) 833-2000 |
| Fax:   (202) 454-2805 | Fax:   (561) 650-8399 |

*Counsel for The Billing Resource d/b/a Integretel*

**Statement Pursuant to Local Rule 7.1.A.3**

I HEREBY CERTIFY that counsel for Integretel attempted in good faith to resolve this matter without the need for filing this motion, but was unable to do so. Counsel for the FTC has stated that the FTC does not consent to any of the relief sought here. Counsel for the Receiver has not responded to undersigned counsel's email and voicemail message asking whether the Receiver would consent to a stay.

/s/ Neal Goldfarb

---

55. *FTC v. Weyerhauser Co.*, 665 F.2d 1072, 1076 (D.C. Cir. 1981). *See also* Mem. of Pts. & Auths. in Support of Pltff's Mtn. for Inj. Pending Appeal at 6, *FTC v. Whole Foods Market, Inc.*, No. 07-cv-01021-PLF (D.D.C. filed Aug. 17, 2007) (available at <http://www.ftc.gov/os/caselist/0710114/0710114injpendpub.pdf> (accessed Sept. 24, 2007)).

-16-

**Certificate of Service**

I HEREBY CERTIFY that on September 25, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Electronic Filing.

/s/ Scott B. Newman
Scott B. Newman

**SERVICE LIST**
**Federal Trade Commission vs. Nationwide Connection, Inc., et al**
**Case No. 06-80180-Civ-Ryskamp/Vitunac**

<u>**CM/ECF Notice List:**</u>

LAURA M. KIM, ESQ.
lkim@ftc.gov and ereid@ftc.gov
MICHAEL J. DAVIS, ESQ.
mdavis@ftc.gov
COLLOT GUERARD, ESQ.
cguerard@ftc.gov and cguerard@comcast.net
Federal Trade Commission
600 Pennsylvania Ave., N.W., Room 286
Washington, DC 20580
202-326-3734 telephone (Kim)
202-326-3395 facsimile
*Attorneys for Plaintiff Federal Trade
Commission*

MICHAEL GARRETT AUSTIN, ESQ.
maustin@mwe.com
305-347-6517 telephone
STEVEN E. SIFF, ESQ.
ssiff@mwe.com
305-347-6511 telephone
McDermott Will & Emery LLP
201 S Biscayne Boulevard
Suite 2200
Miami, FL 33131-4336
347-6500 facsimile
*Attorneys for Defendants Billing Concepts, Inc.,
ACI Billing Services, Inc. d/b/a OAN, and BSG
Clearing Solutions North America, LLC*

MARK DOUGLAS JOHNSON, ESQ.
MarkDJohnsonPA@bellsouth.net
Mark D. Johnson, P.A.
10 Central Parkway, Suite 210
Stuart, Florida 34994
772-223-7700 telephone
772-223-1177 facsimile
*Attorneys for Defendants, Yaret Garcia, Erika
Riaboukha and Qaadir Kaid*

JEFFREY C. SCHNEIDER, ESQ.
jcs@tewlaw.com
Tew Cardenas LLP
Four Seasons Tower—15th Floor
1441 Brickell Avenue
Miami, FL 33131
305-539-2481 telephone
305-536-1116 facsimile
*Attorneys for Receiver David R. Chase*

ANDREW G. BERG, ESQ.
ABerg@kslaw.com
202-626-2924 telephone
CAROLYN TAPIE, ESQ.
CTapie@kslaw.com
202-626-2919 telephone
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006-4704
202-626-3737 facsimile
*Attorneys for Defendants Billing Concepts,
Inc., ACI Billing Services, Inc. d/b/a OAN, and
BSG Clearing Solutions North America, LLC*

MICHAEL WOODBURY, ESQ.
michael.woodbury@woodbury-santiago.com
Two Datran Center—Penthouse 1A
9130 South Dadeland Boulevard
Miami, FL 33156
305-669-9570 telephone
305-669-8616 facsimile
*Attorneys for Grunspan Trust et. al*

JERRY M. MARKOWITZ, ESQ.
jmarkowitz@mdrtlaw.com
ROSS R. HARTOG, ESQ.
rhartog@mdrtlaw.com
Two Datran Center, Suite 1225
9130 South Dadeland Boulevard
Miami, FL 33156
305-670-5000 telephone
305-670-5011 facsimile
*Attorneys for First Churchill Way, LLC*

DIANE NOLLER WELLS, ESQ.
dwells@devinegoodman.com
Devine Goodman Pallet & Wells, PA
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-374-8200 telephone
305-374-8208 facsimile
*Attorneys for Second Churchill Way, LLC*

ROBERT M. WEINBERGER, ESQ.
rmw@fcohenlaw.com
Cohen Norris Scherer Weinberger & Wolmer
712 U.S. Highway 1, Suite 400
North Palm Beach, FL 33408
*Attorneys for Creditor Denise McCann*

CHAD A. DEAN, ESQ.
chad@schuylaw.com
118 West Adams Street, #800
Jacksonville, FL 32202
904-353-5884 telephone
904-353-5994 facsimile
*Attorneys for Primus Automotive Financial Services and Ford Motor Co. Credit Co.*

**Manual Notice List:  (via U.S. Mail)**

WILLOUGHBY FARR, Inmate No. 653974
Century Correctional Institution
400 Tedder Road
Century, Florida 32535-3659
*Defendant, Pro Se*

MARY LOU FARR
c/o James Stonehill
1006 Churchill Circle South
West Palm Beach, FL 33405
*Defendant, Pro Se*

GARY M. DUNKEL, ESQ.
dunkel@gtlaw.com
Greenberg Traurig
Phillips Point – East Tower, Suite 300-E
777 South Flagler Drive
West Palm Beach, FL 33401
561-650-7900 telephone
561-655-6222 facsimile
*Attorneys for BHD/WEB, LLC*

THOMAS G. LONG, ESQ.
tlong@barnettbolt.com
HILDEGUND P. WANDERS, ESQ.
Barnett Bolt Kirkwood & Long
601 Bayshore Boulevard, Suite 700
Tampa, FL 33606
813-253-2020 telephone
813-251-6711 facsimile
*Attorney for BMW Financial Services*

-2-

RER-18          0937

# Exhibit 1

1 │ SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  │   A Limited Liability Partnership
2 │   Including Professional Corporations
  │ MICHAEL H. AHRENS, Cal. Bar No. 44766
3 │ STEVEN B. SACKS, Cal. Bar No. 98875
  │ JEFFREY K. REHFELD, Cal. Bar No. 188128
4 │ ORI KATZ, Cal. Bar No. 209561
  │ Four Embarcadero Center, 17th Floor
5 │ San Francisco, California 94111-4106
  │ Telephone:    415-434-9100
6 │ Facsimile:    415-434-3947
  │
7 │ Proposed Attorneys for The Billing Resource, dba
  │ Integretel
8 │
  │               UNITED STATES BANKRUPTCY COURT
9 │
  │               NORTHERN DISTRICT OF CALIFORNIA
10│
  │                   [SAN JOSE DIVISION]
11│

| | |
|---|---|
| 12  In re | Case No. 07-52890 |
| 13  THE BILLING RESOURCE, dba | Chapter 11 |
| INTEGRETEL, a California corporation, | |
| 14 | |
| Debtor. | |
| 15  Tax ID: 33-0289863 | |
| 16 | |
| 17  THE BILLING RESOURCE, dba | Adv. Proc. No. 07-05156 |
| INTEGRETEL, a California corporation, | |
| 18 | **DECLARATION OF KEN DAWSON IN** |
| Plaintiff, | **SUPPORT OF EMERGENCY MOTION** |
| 19 | **FOR TEMPORARY RESTRAINING** |
| v. | **ORDER AND PRELIMINARY** |
| 20 | **INJUNCTION** |
| 21  FEDERAL TRADE COMMISSION, and | Date:      September 26, 2007 |
| DAVID R. CHASE, not individually, but | Time:      2:15 p.m. |
| solely in his capacity as receiver for | Place:     United States Bankruptcy Court |
| 22  Nationwide Connections, Inc., Access One | 280 South First Street |
| Communications, Inc., Network One Services, | San Jose, California |
| 23  Inc., 411TXT, Inc., CELL-INFO-USA, INC., | Judge:     Hon. Arthur S. Weissbrodt |
| Enhanced Billing Services, Inc., Toll Free | Courtroom: 3020 |
| 24  Connect, Inc., Cripple Creek Holdings, LLC, | |
| Built to Last, LLC, Not Fade Away, LLC, He's | |
| 25  Gone, LLC, The Other One, LLC, Turn on | |
| Your Love Light, LLC, China Cat Sunflower, | |
| 26  LLC, Lazy River Road Holdings, LLC, | |
| 27              Defendants. | |
| 28 | |

1    I, Ken Dawson, declare as follows:

2    1.    I am the President and Secretary of The Billing Resource, dba Integretel, a

3    California corporation (the "Debtor"), the named debtor in this case. I make this

4    declaration in that capacity. I was one of the Debtor's founders in 1988 and I have been

5    with the company ever since. I have personal knowledge of the matters set forth below. If

6    called upon to testify as to those matter I could and would do so competently.

7    2.    This declaration is submitted in support of the Debtor's "Emergency Motion

8    For Temporary Restraining Order And Order To Show Cause Re:  Preliminary Injunction

9    And Declaratory Relief" (the "Motion").  Capitalized terms not defined herein shall have

10    the meanings ascribed to them in the Motion.

11    3.    The Debtor has filed a voluntary petition for relief under Chapter 11 of the

12    Bankruptcy Code.  The Debtor is operating its business pursuant to Sections 1107 and

13    1108 of the Bankruptcy Code.

14    4.    The Debtor was formed in 1988 based on a need for aggregators to facilitate

15    billing and collections on behalf of smaller telecommunications companies that provided

16    "alternative operator services" ("AOS") which otherwise could not afford to compete with

17    the larger local exchange carriers ("LECs" or "Telcos") such as AT&T.

18    5.    AOS involves providing long-distance calling on an occasional or as-needed

19    basis in situations where often the consumer uses the service provider's assets or services

20    without the consumer or the service provider knowing each other's identity.  For example,

21    a service provider owning the service contract for a hotel chain has no idea as to the

22    identity of the consumer using its phones.  If an AOS provider facilitates a collect call it

23    needs a way to bill the consumer for that call.

24    6.    The Debtor addressed a significant industry void by creating a service bureau

25    focused entirely on billing-related services for AOS providers and others needing a means

26    of billing consumers for their services.  As the cornerstone to its billing capability, the

27    Debtor maintains a full complement of billing and collection agreements with an estimated

28    1,400 or more LECs and independent service providers so that it can place calls made

-1-

1  through an AOS on a LEC bill. This infrastructure enables telecommunication service
2  providers to incorporate their charges within the phone bills of more than 90% of business
3  and residential consumers throughout the United States and Canada.

4      7.      The Debtor quickly established itself as a leader in providing LEC billing
5  solutions for diverse and emerging products and services. The Debtor presently offers a
6  complete array of complementary services including internet-delivered management and
7  settlement reporting, direct billing, customer care and collection support. As a strategic
8  back-room business partner, the Debtor frees its clients to focus their efforts on promoting
9  and selling products and services.

10     8.      The Debtor has served thousands of service providers over the years. The
11  vast majority of the processed billings have been in support of smaller sized businesses
12  that otherwise would not have been able to compete. It is the competitive pressure of these
13  smaller companies that has forced down the rates charged to consumers by the larger
14  telecommunication companies.

15     9.      The Debtor has approximately thirty-seven employees. Twenty-two of those
16  employees have been with the company for over five years, and thirteen have been with
17  the Debtor for over ten years. In addition, the Debtor's services support, through
18  outsourced relationships, approximately 20-30 call center personnel in several different
19  call centers who are employed by a third-party vendor.

20     10.     Access One Communications, Inc. ("Access One") and Network One
21  Services, Inc. ("Network One") were two of the Debtor's prior AOS customers (Access
22  One and Network One are collectively referred to as the "Prior Customers").

23     11.     On February 27, 2006, the Federal Trade Commission (the "FTC")
24  commenced a lawsuit (i.e., the Florida Action) against three AOS providers, including the
25  Prior Customers, as well as their principals, alleging deceptive and unfair practices for
26  unauthorized billing of charges on phone bills – referred to as "cramming" – in violation of
27  the Federal Trade Commission Act (the "FTCA"). The Florida Action is captioned <u>Federal</u>
28  <u>Trade Commission v. Nationwide Connections, Inc., et al.,</u> Case No. 06-80180-Civ-

-2-

1  Ryskamp, United States District Court for the Southern District of Florida. The Florida
2  Court entered a temporary restraining order and later a preliminary injunction. The Florida
3  Court appointed the Receiver as the receiver for the defendants and certain of their
4  affiliates. An "Amended Preliminary Injunction Order" was filed on September 25, 2006.
5  On or about September 21, 2006, the FTC filed an amended complaint which included
6  claims against the Debtor and another billing aggregator.

7        12.    The FTC alleged in its Amended Complaint that the Debtor caused certain of
8  the Prior Customers' fraudulent charges to be placed on end users' phone bills and that the
9  Debtor was liable under the FTCA in spite of the fact that the LECs, not the Debtor,
10  perform the billing.

11        13.    The FTC has sought injunctive relief against the Debtor as well as monetary
12  redress including restitution for the allegedly defrauded consumers. There has been no
13  finding that the Debtor violated the FTCA.

14        14.    The Debtor voluntarily stopped providing services for the Prior Customers
15  over a year prior to the FTC's filing of its Amended Complaint. At the time that it stopped
16  providing services, the Debtor stopped making payments to the Prior Customers and
17  instead made a determination under the contracts with the Prior Customers that all further
18  amounts received from LECs on account of their billings should be booked as reserves.
19  This was done because of the Debtor's possible exposure to claims for refunds of the Prior
20  Customers' Billing Transactions.

21        15.    Whenever the Debtor allocated an amount to the reserves for the Prior
22  Customers, the Debtor made a bookkeeping entry for that amount. However, the Debtor
23  does not have a corresponding asset, such as a bank account, that contains the monies that
24  were allocated as reserves from the Prior Customers. Moreover, there is no segregated
25  account containing the reserves of any customer, including either of the Prior Customers.
26  The Debtor does not have enough monies to cover the full amount of reserves for all of the
27  Debtor's customers.

28        16.    In contrast to the FTC's allegations, the Debtor asserted that the Prior

-3-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1    Customers' wrongful conduct caused great injury to the Debtor, including by causing the
2    Debtor to incur fees and expenses to defend the FTC action.

3        17.    The Receiver is seeking to collect all assets of the Prior Customers. Toward
4    that end, the Receiver sought relief in the Florida Action by motion against the Debtor.
5    The Receiver asserted that the Debtor owes the Prior Customers the amount that the
6    Debtor booked as reserves for the Prior Customers, which the Receiver alleged was an
7    asset of the Prior Customers, in an amount in excess of $1.7 million. The Receiver further
8    alleged that the Debtor had violated the Amended Preliminary Injunction Order and should
9    be held in contempt for failing to turn over the sums demanded by the Receiver.

10        18.    The Debtor filed a response opposing such relief on numerous grounds,
11    including that at the most, any rights the Prior Customers—and therefore the Receiver,
12    who stood in their shoes—had with respect to the reserves were simply those rights of a
13    general, unsecured creditor. The Debtor also asserted that it had offsetting claims under
14    the Subject Contracts against the Prior Customers which exceeded the amount of the Prior
15    Customers' alleged reserves. In particular, to the extent the Debtor has any liability in the
16    Florida Action, it arises from the misconduct of the Prior Customers, not the Debtor, and
17    pursuant to the Subject Contracts, the Prior Customers are liable to the Debtor for such
18    liability, as well as the costs and fees incurred in the Florida Action. These costs and fees,
19    and the liability asserted against the Debtor in the Florida Action, far exceed the amount of
20    any sums withheld from the Prior Customers as reserves.

21        19.    The Debtor has expended over $700,000 in legal fees and costs to date in
22    defending the Florida Action. That case is set for trial in February 2008.

23        20.    The Debtor has also had to devote substantial and valuable management and
24    employee time and resources to the Florida Action. Given the schedule in that case, the
25    Debtor's management will need to be diverted even more is issue and would be forced to
26    further incur such items, to the detriment of its reorganization efforts, if this action were
27    not stayed as against the Debtor.

28        21.    The Debtor believes that it will ultimately prevail in the Florida Action, and

-4-

1  that it will ultimately be held to owe nothing to the Receiver. However, the Debtor could
2  not pay the money sought by the Receiver and still continue its normal operations. The
3  Debtor requested that the Receiver agree to a stay to the implementation and enforcement
4  of the Payment Order. The Receiver refused. The Debtor thereafter filed for bankruptcy
5  protection.

6      22.    The Debtor filed for bankruptcy protection because it could not continue its
7  operations and pay over $1.7 million to the Receiver. Nor can it afford to have the Florida
8  Action continue at the outset of this case, when it will divert its management's attention
9  from the reorganization effort and cost very significant attorneys' fees and costs that the
10 Debtor cannot afford. The Debtor can only proceed with a successful reorganization if the
11 Florida Action, including the Payment Order, is stayed.

12     23.    The Debtor has submitted a budget to this Court in connection with the
13 Debtor's cash collateral motion. The budget shows that the Debtor had $1.9 million in
14 cash at the filing date and expects receivables to be paid in the next three weeks of $3.9
15 million. If that cash is not used to meet secured creditors' claims on it and to make
16 payments to the Debtor's current customers in exchange for continuing to submit
17 receivables to the Debtor, then they may, as soon as they are able to do so, stop doing
18 business with the Debtor and bring its operations to a halt. The Chapter 11 filing has
19 unsettled the Debtor's customer relationships. For the Debtor to reorganize it needs to
20 retain these customers. It cannot do so if its scarce resources are used for past claims
21 asserted by the Receiver and in connection with litigation with the FTC.

22     24.    Moreover, if the Prior Customers' claims are paid now, they would receive
23 far more than their pro rata share of any funds available to return reserves to customers.
24 The Debtor's current customers have no different entitlement to the Debtor's assets than the
25 Receiver. If the other customers are not afforded similar relief, then the Prior Customers
26 will have been preferred to the detriment of the Debtor's other creditors.

27     25.    Obviously, the FTC claims it is acting in the public interest by proceeding
28 with its claims against the Debtor for its involvement with the Prior Customers some two

-5-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

1   years ago.  But the FTC cannot achieve any proper regulatory goal if continuing the
2   Florida Action merely puts the Debtor out of business, reducing competition in the
3   marketplace from three firms to two.  The Debtor plays an important role in helping keep
4   telecommunication prices down, thereby serving the public interest.  Unless the Florida
5   Action is stayed, the Debtor is likely to cease operations.  A forced liquidation of the
6   Debtor will forfeit the Debtor's going concern value, leaving the Debtor's creditors much
7   worse off.  A cessation of the business will also cost the Debtor's employees their
8   livelihoods.  This will leave no regulatory purpose to the Florida Action.

9       26.     Putting the Debtor out of business would also prejudice the Debtor's existing
10  customers.  Unlike the two Prior Customers who are no longer operating, the Debtor's
11  other customers are still in business and likely would not be able to switch all of their
12  billing and collection needs over from the Debtor to one of the Debtor's competitors fast
13  enough to avoid substantial harm to their business operations.

14      27.     The Debtor believes it will be able to successfully confirm a plan of
15  reorganization.  It bases that belief on the fact that on a going forward basis, the Debtor
16  can be cash flow positive if it maintains its existing level of revenue and does not incur
17  extraordinary costs arising from previous operations.  The Debtor has a number of avenues
18  open to it to reorganize.  It could propose a plan under which it establishes a pot from
19  which unsecured claims would be paid *pro rata*.  It could also propose to issue new
20  common stock in exchange for the unsecured debt, thus making its creditors into
21  shareholders, with a stake in outcome of future operations.  It could conclude a sale of its
22  business to a competitor or other buyer and the proceeds of that sale would comprise the
23  distributions that unsecured creditors would receive, after payment of secured claims and
24  administrative costs.

25      28.     Given sufficient time the Debtor can formulate a plan and negotiate that plan
26  with its creditors.  The Debtor faces no insuperable obstacles to successfully resolving this
27  bankruptcy case.

28  I declare under penalty of perjury under the laws of the United States of America that the

-6-

DECLARATION OF KEN DAWSON RE EMERGENCY
                                                              MOTION FOR TRO

1 | foregoing is true and correct.

2 | September 24, 2007

3

4 | _____
_/s/ Ken Dawson_

5 | KEN DAWSON

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

DECLARATION OF KEN DAWSON RE EMERGENCY
MOTION FOR TRO

RER-18        0946

# Exhibit 2

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2    Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  TERRENCE V. PONSFORD, Cal. Bar No. 42648
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5  San Francisco, California  94111-4106
   Telephone:    415-434-9100
6  Facsimile:    415-434-3947
   Email:       mahrens@sheppardmullin.com
7                jrehfeld@sheppardmullin.com
                okatz@sheppardmullin.com
8
   Proposed Attorneys for The Billing Resource,
9  dba Integretel

10                UNITED STATES BANKRUPTCY COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                     SAN JOSE DIVISION

13

14  In re                              | Case No. 07-52890 ASW
15
    THE BILLING RESOURCE, dba          | Chapter 11
16  INTEGRETEL, a California corporation,
                                        | **DECLARATION OF MICHAEL H.**
17              Debtor.                 | **AHRENS IN SUPPORT OF DEBTOR'S**
                                        | **REPLY TO OPPOSITIONS TO (1)**
18  Tax ID: 33-0289863                  | **EMERGENCY CASH COLLATERAL**
                                        | **MOTION; (2) EMERGENCY CASH**
19                                      | **MANAGEMENT MOTION; AND (3) EX**
                                        | **PARTE APPLICATION FOR**
20                                      | **APPOINTMENT OF KEN DAWSON AS**
                                        | **DEBTOR'S RESPONSIBLE INDIVIDUAL**
21                                      | **AND IN SUPPORT OF DEBTOR'S**
                                        | **MOTIONS**
22
23                                      | **Date:**    **Friday, September 21, 2007**
                                        | **Time:**    **1:30 p.m.**
24                                      | **Place:**   United States Bankruptcy Court
                                                       280 South First Street
25                                                     San Jose, California
                                          Judge:      Hon. Arthur S. Weissbrodt
26                                        Courtroom:   3020
27
28

W02-WEST:FJR\400436995.5

DECLARATION

1    I, Michael H. Ahrens, declare as follows:

2    1.    I am an attorney licensed to practice law in the State of California and am admitted

3    before this Court. I am a partner with the law firm of Sheppard, Mullin, Richter & Hampton LLP

4    ("Sheppard Mullin"), proposed bankruptcy reorganization and general insolvency counsel for The

5    Billing Resource, dba Integretel, a California corporation (the "Debtor"), the debtor in the above-

6    captioned chapter 11 bankruptcy case (the "Bankruptcy Case"). I make this declaration in that

7    capacity. Except for those statements made upon information and belief, the following facts are

8    based upon my personal knowledge and if called to testify, I could and would competently testify

9    to such facts. As to those statements made upon information and belief, I believe them to be true.

10    2.    I have been a practicing attorney for thirty-seven years. My practice has almost

11    exclusively been concentrated on bankruptcy law. I am a member of the American College of

12    Bankruptcy Lawyers.

13    3.    I have appeared in bankruptcy cases numerous parts of the country. I am admitted

14    to practice and have argued bankruptcy matters before the United States Supreme Court. I have

15    represented many companies in financial difficulty, and have represented as counsel for the debtor

16    in possession numerous companies who for bankruptcy protection under chapter 11 of title 11 of

17    the United States Code (i.e., the "Bankruptcy Code"). Among the chapter 11 bankruptcy cases in

18    which I have acted as the lead counsel for the debtor in possession in the Bankruptcy Court for the

19    Northern District of California are Dillingham Construction, Natural Wonders, Vista Properties,

20    iSyndicate, and Media Vision. I have also represented debtors in possession in many other

21    bankruptcy courts.

22    4.    This declaration is submitted in support of the Debtor's Reply (the "Reply") to the

23    Oppositions to (1) the Emergency Cash Collateral Motion; (2) Emergency Cash Management

24    Motion; and (3) Ex Parte Application for Appointment of Ken Dawson as Debtor's Responsible

25    Individual (the "Oppositions"), including without limitation the opposition filed by David R.

26    Chase, not individually, but solely as the receiver for certain entities (the "Receiver"), appointed

27    by the United States District Court for the Southern District of Florida in the lawsuit captioned

28    <u>Federal Trade Commission v. Nationwide Connections, Inc., et al.</u>, Case No. 06-80180-Civ-

W02-WEST:FJR\400436995.5

DECLARATION

1   Ryskamp (the "Florida Action") and the Opposition filed by Public Communications Services, Inc.

2   to the Debtor's Cash Collateral.

3       5.      Two of the entities for which the Receiver was appointed the Receiver were

4   Access One Communications, Inc. ("Access One") and Network One Services, Inc. ("Network

5   One"), which were two of the Debtor's prior AOS provider customers (Access One and Network

6   One collectively shall be referred to as the "Prior Customers").

7       6.      I was asked to give insolvency advice to the Debtor in October of 2006. At that

8   time the Debtor was a defendant in the Florida Action. Motions were pending at that time in that

9   case that I reviewed. I understood at that time that if the motions were granted an order might be

10  forthcoming in the Florida Action that would require the Debtor's payment of moneys in excess of

11  $1 million. I looked at financial information of the Debtor at the time, and it became apparent to

12  me that the Debtor was insolvent. If the Debtor was ordered to pay in excess of $1 million it was

13  obvious to me that such a payment would be a preference payment to one creditor while the

14  Debtor was in the zone of insolvency.

15      7.      After I was engaged as insolvency counsel by the Debtor, the Debtor's litigation

16  counsel in the Florida Action contacted the FTC and the Receiver in the Florida Action and

17  informed them that the Debtor wanted to inform the FTC and the Receiver about the realities that

18  the Debtor could not respond to a money judgment and could not pay a preference to one creditor

19  over another. That counsel requested that the FTC and the Receiver meet with me so that I could

20  discuss with them the financial situation of the Debtor and the Debtor's possible bankruptcy. That

21  counsel for the Debtor's in the Florida Action began efforts to set up a meeting between the FTC's

22  counsel, the Receiver's counsel, and me as the Debtor's bankruptcy counsel.

23      8.      I flew to Washington, D.C., and along with the Debtor's litigation counsel in the

24  Florida Action, met with the FTC at the FTC's offices in Washington, D.C. on November 21,

25  2006. A business representative of the Debtor was also present at this meeting. The Receiver's

26  counsel, Mr. Jeff Schneider, was present for the entire meeting by telephone.

27      9.      At that November 21, 2006 meeting, I informed the FTC and the Receiver's counsel

28  that I had been hired as the Debtor's bankruptcy lawyer. I told them that we had done a liquidation

1 analysis and determined that on a liquidation creditors would receive less than 100% on the dollar.

2 I said that if an order came down requiring a payment to the Receiver of Network One and Access

3 One, our client would have to file bankruptcy. I discussed with them the fact that our client was in

4 the "zone of insolvency" and my client could not allow one creditor to receive a preference over

5 another. I stated then that there were many other clients that had claims just like Network One and

6 Access One, and the Debtor could not allow one creditor to be paid in preference to another while

7 in the zone of insolvency. The FTC had an in-house bankruptcy lawyer at this meeting in

8 November 2006, and also had a bankruptcy lawyer at a follow-up meeting that I had with the FTC

9 in April of 2007. The FTC lawyers indicated then that they understood these positions, and

10 understood the developing case law about not paying preferences while in the "zone of

11 insolvency."

12    10.    For the full portion of the November 21, 2006 meeting the lawyer for the Receiver

13 of Access One and Network One was on the telephone line. That lawyer for the Receiver was Jeff

14 Schneider. He participated in that meeting, and I also informed him during the meeting that the

15 Debtor would have to file bankruptcy if a judgment for monetary relief was rendered against the

16 Debtor.

17    11.    Prior to the November 21, 2006 meeting, the Debtor's counsel had provided the

18 FTC's counsel with the financial statements of the Debtor. During the November 21, 2006

19 meeting, the FTC's counsel as well as a FTC accountant who attended the meeting asked questions

20 of me and the Debtor's senior financial representative who attended the meeting with me. We

21 responded with answers to those questions. For the few questions we could not answer at that

22 moment, we followed up and provided the FTC with additional information after the meeting.

23    12.    During the November 21, 2006 meeting Laura Kim, one of the FTC's attorneys,

24 stated that she would like to see a liquidation analysis. We did not have one to give her for that

25 meeting, but I emailed her one on December 18, 2006. The liquidation analysis was used to

26 demonstrate to the FTC and to the Receiver that even if a payment order was entered in the Florida

27 Action requiring a payment of the alleged reserves to Access One and Network One, there was not

28 enough money to pay all creditors and that the Debtor would have to file for bankruptcy

W02-WEST:FJR\400436995.5

-3-

DECLARATION

1   protection. I told them also at the November 21, 2006 meeting the type of plan the Debtor might

2   file in a bankruptcy case. I indicated that we might file a stock for debt plan to allow the company

3   to reorganize for the benefit of all creditors. I said that if any one creditor seized money the

4   Debtor's operations could not continue and the Debtor's reorganization would not be possible.

5        13.     The Debtor does intend to file a plan to preserve the business and reorganize. The

6   filing of the bankruptcy should not have been a surprise to the Receiver or the FTC, as I personally

7   had met and/or talked to them about the Debtor's plan and need to file bankruptcy if an order was

8   rendered requiring my client to pay substantial moneys to the Receiver. After the November 21,

9   2006 meeting I spoke by telephone may times to FTC representatives about bankruptcy questions

10  and questions about the financial status of the Debtor and its affiliates. I or one of my other

11  partners, also sent numerous emails to the FTC enclosing approximately 15 or more documents

12  the FTC representatives had requested about the Debtor and its financial condition.

13       14.     I also had a further follow-up meeting with the FTC's lawyers at the FTC's

14  headquarters in Washington, D.C. on April 18, 2007. At that meeting I again impressed upon the

15  FTC's counsel that that the Debtor was in the "zone of insolvency," could not allow one creditor to

16  receive a preference over another while in the zone of insolvency, and that if an order came down

17  requiring a payment to the Receiver of Network One and Access One, my `Debtor client would

18  have to file bankruptcy. The Receiver's counsel was not present at this April, 2007 meeting.

19  However, based upon statements made to me by the FTC's counsel, I understood that the FTC's

20  were in contact with the Receiver's counsel and would be communicating to him the statements

21  made and what had occurred at the meeting.

22       15.     The Debtor filed its voluntary petition under chapter 11 of title 11 of the United

23  States Code (i.e., the "Bankruptcy Code") on Sunday, September 16, 2007. Within hours of the

24  Debtor's filing of its bankruptcy petition, on Monday, September 17, 2007 at 7:25 a.m. Eastern

25  Time, the Debtor's counsel in the Florida Action emailed three of the FTC's attorneys in the

26  Florida Action and the Receiver's counsel notifying them that the Debtor had filed for bankruptcy

27  protection. A copy of that email is attached hereto as Exhibit A. That email also attached pdf

28  copies of most pleadings that the Debtor had filed in its bankruptcy case, including complete

1  copies of the Debtor's "Emergency Motion For Use Of Cash Collateral And Granting Replacement

2  Liens" (the "Cash Collateral Motion") and the Debtor's "Emergency Motion For Order

3  Authorizing Use Of Existing Cash Management System And Bank Accounts" (the "Cash

4  Management Motion").

5      16.    That same morning, the morning of Monday, September 17, 2007, I and my partner

6  Jeffrey Rehfeld telephoned the Receiver's counsel Mr. Schneider and spoke to Mr. Schneider. I

7  stated that the Debtor had filed for bankruptcy and understood that the Debtor's counsel in the

8  Florida Action had already emailed him most of the pleadings that the Debtor had filed in its

9  bankruptcy case. Mr. Schneider responded that he was aware of the Debtor's bankruptcy filing,

10  had received those pleadings, and in fact had already started to review them. Mr. Schneider

11  inquired about participating in the Debtor's bankruptcy process and I indicated that I believed a

12  Official Unsecured Creditors Committee would be appointed and that I thought that the Receiver

13  might serve as a valuable member of the Committee since he likely already had a good

14  understanding of the Debtor's business and circumstances from our prior discussions. I stated that

15  the Debtor continued believe that it made sense to keep the lines of communication open in the

16  hope of reaching an amicable resolution for the Receiver and the Debtor's bankruptcy estate.

17      17.    Immediately after our telephone discussion with the Receiver's counsel ended, Mr.

18  Rehfeld and I called Ms. Laura Kim, one of the FTC's lead counsel in the Florida Action and who

19  is also one of the FTC's lawyers who I met with during my prior meetings with the FTC in

20  Washington, D.C. I left Ms. Kim a voicemail stating that the Debtor had filed for bankruptcy

21  protection and requesting that if she would like to discuss the Debtor's bankruptcy filing she

22  should either call me back or call Mr. Rehfeld. I was out of the office Monday, September 17,

23  2007 and Tuesday, September 18, 2007, but did not receive a voicemail message from Ms. Kim

24  nor have I received a call from her since I returned to the office. Mr. Rehfeld has informed me

25  that he is not aware of having received a call or a voicemail from Ms. Kim.

26      18.    Later that afternoon, once the Bankruptcy Court had set a hearing for Thursday,

27  September 20, 2007 on the Debtor's Cash Collateral Motion and the Cash Management Motion,

28  the Debtor prepared a Notice of that hearing date and time on those motions. In an email sent later

-5-

DECLARATION

1  that same afternoon Monday, September 17, 2007, the Debtor forwarded a pdf copy of that Notice

2  along with additional pdf copies of the pleadings that the Debtor had previously filed in its

3  bankruptcy case (including additional copies of the Cash Collateral Motion and the Cash

4  Management Motion to Ms. Kim of the FTC, as well as three other attorneys at the FTC involved

5  in the Florida Action, as well as the Receiver's counsel Mr. Schneider.

6       19.   On Monday, September 17, 2007, the Debtor also had copies of many of its

7  bankruptcy pleadings, including the Cash Collateral Motion, the Cash Management Motion, and

8  the Notice of the hearing of those pleadings sent by Federal Express to Ms. Kim as well as two

9  other FTC attorneys involved in the Florida Action. Also served with those pleadings by Federal

10  Express was the Receiver and his counsel Mr. Schneider. Attached hereto as Exhibit C is the

11  certificate of service indicating those pleadings were served on the foregoing individuals by

12  Federal Express.

13       20.   In preparation for the November 21, 2006 meeting with the FTC, I started with my

14  client to prepare a liquidation analysis for my client. Although the liquidation analysis was not

15  finished by the time of the first meeting with the FTC, it was completed in December, 2006, and

16  was sent to the FTC's counsel at that time. In order to prepare a liquidation analysis, I needed to

17  determine the names of anyone who had a security interest in the accounts receivable of the

18  Debtor or other assets of the Debtor. I ordered and reviewed a UCC Search in October of 2006.

19  That search indicated that only the parties whose names are included in the Cash Collateral

20  Motion claimed a possible interest in the accounts receivable or cash collateral of the Debtor. I

21  have also checked with the Debtor and determined that all of the bank accounts of the Debtor are

22  in the Debtor's name. The Debtor has told me that there are no Control Agreements giving any

23  third party an interest in their bank accounts or cash. Therefore, I concluded then and now, that

24  the Receiver of Network One and Access One does not have any interest in the cash of the Debtor

25  or in its accounts receivable.

26       21.   Since the Debtor's bankruptcy filing both the Receiver and certain other customers

27  have claimed by emails or phone calls that they have an interest in the accounts receivable and

28  cash. However, neither the Receiver or these other customers have UCC-1 financing statements

-6-

DECLARATION

1  filed as of the Debtor's bankruptcy filing, and no parties have Control Agreements with the Debtor

2  giving them a right in the Debtor's cash.

3          22.    On Friday, September 14, I learned that the adverse order was rendered in the

4  Florida Action that required a payment of the substantial sums by the Debtor.  At that time I had

5  one of my partners, Mr. Rehfeld, order a further UCC 1 search.  It is attached as Exhibit D.  It

6  confirms that there are no UCC-1's filed by any parties other than the parties we had identified in

7  October of 2006.  These are those parties named in the Cash Collateral Motion.  We also

8  reconfirmed with our client that as of this date all of its cash accounts are in its name, and that no

9  Control Agreements have been signed giving any third party an interest in its accounts.

10         23.    On September 17, 2007, the Debtor filed in the Florida Action a Notice of

11 Bankruptcy.  On September 20, 2007, the judge in the Florida Action, United States District

12 Judge, the Hon. Kenneth L. Ryskamp, issued an "Order Staying Proceedings against Defendant

13 The Billing Resource, D/B/A Integretel" and a copy of that order is attached hereto as Exhibit E.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:FJR\400436995.5

DECLARATION

1  24.    The Debtor's Emergency Cash Collateral Motion only seeks an Interim Order

2  authorizing use of Cash Collateral.  When an official creditors committee (the "Committee") is

3  appointed, my firm intends to meet with the Committee and address the issues relating to the final

4  use of cash collateral.  If the Debtor is not allowed to use such cash collateral pending a Final

5  Hearing, the only alternative will be a Chapter 7 liquidation.  A Chapter 7 bankruptcy liquidation

6  will undoubtedly will not be the desire of the majority of the Debtor's customers.  Accounts have

7  been delivered by customers to the Debtor for processing.  If the Debtor discontinues business

8  now the Debtor's customers will only be further damaged as havoc would be created.  When a

9  Committee is formed, the Debtor is confident that such a Committee will support the continued

10  use of cash collateral at a Final Hearing.  But, if the Interim Motion is not granted, a Committee

11  will not be formed to review the Final Motion, as the only alternative will be a Chapter 7.  The

12  Debtor should be given the opportunity to meet with an official Committee and negotiate a Plan of

13  Reorganization that will benefit all parties in interest.

14

15      I declare under penalty of perjury under the laws of the United States of America that the

16  foregoing is true and correct.  Executed on September 20, 2007, at San Francisco, California.

17  _____ /s/ Michael H. Ahrens _____

18  MICHAEL H. AHRENS

19

20

21

22

23

24

25

26

27

28

RER-18      0956

# Exhibit 3

1  HOWARD KOLLITZ (State Bar No. 059611)
   WALTER K. OETZELL (State Bar No. 109769)
2  STEVEN J. SCHWARTZ (State Bar No. 200586)
   DANNING, GILL, DIAMOND & KOLLITZ, LLP
3  2029 Century Park East, Third Floor
   Los Angeles, California 90067-2904
4  Telephone: (310) 277-0077
   Facsimile: (310) 277-5735
5  Email:    sschwartz@dgdk.com

6  JEFFREY C. SCHNEIDER
   TEW CARDENAS LLP
7  Four Seasons Tower, Fifteenth Floor
   1441 Brickell Avenue
8  Miami, Florida 33131-3407
   Telephone: (305) 539-2481
9  Facsimile: (305) 536-1116

10 Co-Counsel for Creditor David R. Chase, Federal Receiver
   of Access One Communications, Inc., and Network One
11 Services, Inc.

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | | |
|---|---|---|
| In re | ) | Case No. 07-52890-ASW |
| | ) | |
| THE BILLING RESOURCE, dba Integretal, a | ) | Chapter 11 |
| California corporation, | ) | |
| | ) | **OPPOSITION OF FEDERAL** |
| [Taxpayer's Identification No. 33-0289863] | ) | **RECEIVER TO: (1) EMERGENCY** |
| | ) | **MOTION FOR USE OF CASH** |
| | ) | **COLLATERAL AND GRANTING** |
| | ) | **REPLACEMENT LIENS; (2)** |
| | ) | **EMERGENCY MOTION FOR ORDER** |
| | ) | **AUTHORIZING USE OF EXISTING** |
| | ) | **BANK ACCOUNTS AND CASH** |
| Debtor. | ) | **MANAGEMENT SYSTEMS; AND (3) EX** |
| | ) | **PARTE APPLICATION FOR ORDER** |
| | ) | **APPROVING KEN DAWSON AS** |
| | ) | **DEBTOR'S DESIGNATED** |
| | ) | **RESPONSIBLE INDIVIDUAL;** |
| | ) | **MEMORANDUM OF POINTS AND** |
| | ) | **AUTHORITIES** |
| | ) | |
| | ) | **[Declaration of David R. Chase, Federal** |
| | ) | **Receiver filed as a separate document** |
| | ) | **concurrently herewith]** |
| | ) | |
| | ) | Date:    September 21, 2007 |
| | ) | Time:    1:30 p.m. |
| | ) | Ctrm:    3020 |

-1-

314289.02 [XP]    23086

1     **TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES**

2 **BANKRUPTCY JUDGE:**

3     **PLEASE TAKE NOTICE** that creditor David R. Chase, the United States District Court-

4 Appointed Receiver (the "Federal Receiver") of Access One Communications, Inc. ("Access One"),

5 and Network One Services, Inc. ("Network One") (collectively, the "Receiverships"), submits

6 herewith his Opposition to the Motions of The Billing Resource, dba Integretal, a California

7 corporation (the "Debtor") (1) For Use of Cash Collateral and Granting Replacement Liens (the

8 "Cash Collateral Motion"); (2) For an Order Authorizing Use of Existing Bank Accounts and Cash

9 Management Systems (the "Motion for Use") and the (3) Ex Parte Application For Order

10 Approving Ken Dawson as Debtor's Designated Responsible Individual (the "Application"), filed

11 and served in this matter on or about September 17, 2007 (collectively, the "Motions"). The

12 grounds for such opposition are as described below.

13 **I.**

14 **INTRODUCTION**

15     This filing and "Emergency" Cash Collateral Motion is a transparent and outrageous

16 attempt to use this Court to negate at least two orders entered by the United States District Court

17 for the Southern District of Florida in respect of an action by the Federal Trade Commission (the

18 "FTC") against the Debtor and others for defrauding consumers. The first of these orders required

19 Debtor to disclose the existence of and turn over to a Federal Receiver, David R. Chase,

20 $1,762,762.56 in receivership assets (the Receivership Funds"). The second entered last Thursday,

21 September 13, 2007 (the "Omnibus Order"), required the Debtor to appear and show cause why it

22 should not be held in contempt of court for failing to do so. Because of the latter order, the Debtor

23 filed its Petition herein on Monday, September 17, 2007.

24     However, the Debtor went further in his scheme than simply filing its Petition. It crafted

25 and filed the subject "Emergency" Cash Collateral Motion, the purpose and the effect of which is

26 to deceive this Court into frustrating the District Court's Order and give permission to the Debtor to

27 spend that money. As this Court will see, if the Debtor is allowed to consummate this scheme, the

28

-2-

1   Receivership Funds, which constitute redress [restitution] of consumers, will be rapidly dissipated

2   rendering the District Court's orders ineffective and destroying a remedy to defrauded consumers.

3       This scheme becomes clear when the Debtor's actions and the Cash Collateral Motion are

4   examined.  Initially, it is clear that the Omnibus Order triggered the filing here, and the Debtor

5   admits this.  However, the Debtor does not get around to discussing this until eight pages into the

6   Cash Collateral Motion, and when it does, its discussion and its statements misstate the terms and

7   import of the orders.  The Debtor never attaches the September 13 Order as an Exhibit. If it had, the

8   Court would see this is more than a simple "Payment Order" as Debtor describes it.  Instead, it

9   orders the Debtor to show cause why it should not be held in contempt of court for failing to pay

10  over the funds to the Federal Receiver, something that had long since been required. The Court

11  would see that the Debtor will not "ultimately prevail in the Florida Action." In fact, the District

12  Court, in addition to requiring the turnover of the Receivership Funds has held that neither

13  indemnification nor contractual claims allow the Debtor to retain them. The Court would see that

14  the District Court is exercising its in rem jurisdiction over the funds, inter alia, as an ancillary relief

15  measure in an action by a Federal agency.  Finally, the Court would see that the District Court has

16  held the procedure it has employed is proper and there is no further need for separate proceedings,

17  and that this in rem jurisdiction and procedure is proper against Debtor to provide an ancillary

18  redress for defrauded consumers, where the Debtor's conduct may imperil the District Court's

19  ability to render effective judgment.

20      The "Emergency" Cash Collateral Motion here is designed to frustrate the District Court's

21  ability to render an effective judgment.  It is clear from the proposed budget that the Debtor will

22  spend almost 40% of these funds in the next three weeks.  No where in the Cash Collateral Motion

23  is there any attempt at adequately protecting the Federal Receiver's interests in the funds.  Finally,

24  the "Emergency" nature of this Motion and its treatment as a "First Day Order" is obviously

25  designed to catch the Federal Receiver unaware.  However, it did not.

26      This Court is respectfully requested to deny the Cash Collateral Motion before it and to

27  order the Debtor to comply with the District Court's Order or require the Debtor to segregate and

28  account for the funds.

-3-

314289.02 [XP]    23086

## II.

### FACTS

The history of the Federal Receivership and the September 14, 2007 District Court Order are set forth in detail in the Declaration of David R. Chase (the "Receiver's Declaration") filed herewith.  To summarize, the FTC filed the United States District Court for the Southern District of Florida in the case entitled Federal Trade Commission v. Nationwide Connections, Inc., et. al., Case no. 06-80180-CIV-RYSKAMP/VITUNAC (the "District Court Action") against numerous entities including Access One and Network One, claiming that they were running a fraudulent billing scheme that generated more than $25 million in bogus call charges in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 53(b).  David R. Chase was appointed by the District Court on the FTC's motion as receiver for Access One and Network One, among others. The Debtor was added as a defendant to the District Court Action on or about September 14, 2006.

On February 27, 2006, the District Court issued a Temporary Restraining Order and Order to Show Cause,[1] which required any business entity served therewith to provide to the FTC a sworn statement identifying each account or asset held in the name of or on behalf of, or for the benefit of a Defendant, and the balance or description of the nature and value of each such asset.[2]  On March 6, 2006, in response to the TRO, the Debtor wrote a misleading letter to the FTC (which letter was not a "sworn statement") that "no amounts are currently due and owing" to the Receiverships.  This statement was a lie.  In fact, the Debtor was holding over $1.35 million in reserves that belonged to the Receiverships. The Receiver learned of this fact on October 11, 2006 and on October 16, 2006, filed a revised motion for an Order to Show Cause why the Debtor should not be held in contempt of court for violating the TRO and failing to disclose the reserves, among other things (the "Contempt Motion").[3]  The Debtor countered with several motions, including a motion to modify

---

[1] A copy of the TRO is attached to the Receiver's Declaration, marked as Exhibit "B" and incorporated herein by this reference.

[2] See TRO at Section VI(C)(1)

[3] See, Exhibit "F" to the Receiver's Declaration

-4-

1  prior injunctive orders, a motion to stay contract claims, as well as a pending appeal to the 11th

2  Circuit Court of Appeals.[4]

3      Last Thursday, on September 13, 2007, the District Court Judge issued the Omnibus Order

4  granting the Contempt Motion, denying the Debtor's motions, and ordering the Debtor to transfer

5  the reserve funds to the Receiver, and ordering the Debtor to show cause, within 10 days, why it

6  should not be held in contempt for "failure to turn over the reserves." The Omnibus Order

7  recognized that "[t]he Receiver is seeking to recover the reserve funds pursuant to the Court's in

8  rem jurisdiction over receivership property, as memorialized in the TRO and the Amended

9  Preliminary Injunction."[5]

10      On Monday, September 17, 2007, the Debtor filed the herein bankruptcy case.

11                                III.

12                            ARGUMENT

13  A.    **The Filing of an "Emergency" Cash Collateral Order and Motion Was a Scheme to**

14  **Render Orders of the District Court Ineffective.**

15      The instant "emergency" cash collateral motion is a transparent attempt to render

16  ineffective at least two orders of the U.S. District Court for the Southern District of Florida in

17  respect of the Receivership Funds. As set forth in the Declaration of David R. Chase, the Federal

18  Receiver (the "Chase Declaration"), in 2006, the FTC instituted an action against several telecom

19  companies for fraudulent liability of consumers (the "FTC Action") and Mr. Chase was appointed

20  Receiver (Chase Declaration, paras. 4 and 5). Debtor was joined as a defendant (Chase

21  Declaration, para. 7).

22      The District Court issued several orders in the FTC Action which, inter alia, required

23  Debtor to identify and turn over funds which it was holding for the benefit of the Federal Receiver

24  (Chase Declaration, paras. 3, 5 to 15).

25  _____

26  [4] See, Exhibits "G" through "I" to the Receiver's Declaration.

27  [5] See, Exhibit "A" at p. 4.

28

                                -5-

1       Finally, on Friday September 14, 2007, after the Debtor's failure to comply, the District

2  Court entered an '"Omnibus Order" discussing the action and previous orders, requiring the Debtor

3  to show cause if it did not turn over the Receivership Funds, and making it clear that the Debtor

4  would not prevail in the FTC action in respect of the Receivership Funds. (Chase Declaration,

5  paras. 3, 11-16, and Exhibit " A"). On Monday, September 17, 2007, the Debtor filed its Petition

6  and the "Emergency" Cash Collateral Motion herein.

7       It is clear that this "emergency" motion is designed to render the District Court's orders

8  ineffective. Initially, the Debtor fails to disclose to this Court the true nature of the Omnibus

9  Order. Although Debtor makes reference to the order, it does not discuss its terms nor attach a

10  copy. Instead, it brushes it off as a "Payment Order" and makes the incredible assertion that it will

11  ultimately prevail. The most cursory review of the Omnibus Order (Exhibit "A") demonstrates

12  how incorrect this description and assertions are. Payment had long since been required and the

13  Court rejected each of Debtor's arguments.

14       The order was also clear that there is no issue as to the ownership of the $1,762,762.56.

15  Those funds are not property of the Bankruptcy Estate of the Debtor; rather, the Debtor has been

16  ordered to immediately transfer those funds to the Federal Receivership Estate. The District Court

17  recognized the propriety of the proceedings. Finally it found that its exercise of in rem jurisdiction

18  and the procedures were proper to insure a remedy for defrauded consumers.

19       The "Emergency" Cash Collateral Motion renders the orders ineffective. The budget

20  attached calls for nearly 40% of the Receivership Funds to be spent in the next three weeks. It

21  offers no adequate protection at all for the use of these funds. Finally, it is difficult to see why this

22  motion should be heard as an "emergency" if it were not to catch the Federal Receiver unaware.

23  **B.    The Receiver is not Adequately Protected.**

24       Section 363(e) of the Bankruptcy Code provides that, at any time, on request of an entity

25  with an interest in property which is proposed to be used, the court, with or without a hearing, shall

26  prohibit or condition such use, as is necessary to provide adequate protection.

27       The requirement of adequate protection is mandatory. In re Heatron, Inc., 6 B.R. 493

28  (Bankr. W.D. Mo. 1980); Lyons v. Fed. Savs. Bank (In re Lyons), 193 B.R. 637 (Bankr. D. Mass.

-6-

314289.02 [XP]    23086

1   1996). Adequate protection, by its nature, must be determined on a case-by-case basis. In re

2   Martin, 761 F.2d 472 (8th Cir. 1985), In re Belco, Inc., 38 B.R. 525, 527 (Bankr. W.D. Okla.

3   1984). This inquiry as to adequate protection is limited to the interest of the creditor in the

4   property involved. First Bank of Miller v. Wieseler, 45 B.R. 871, 875 (D. S.D. 1985).

5       Adequate protection means that the interests of the secured creditor are adequately

6   protected by such use or other collateral is provided to secure any diminution and loss by such use.

7   A preliminary step in determining whether adequate protection is afforded the secured creditor for

8   the use of cash collateral is to conduct a valuation of the cash collateral. See In re George Ruggiere

9   Chrysler - Plymouth, Inc., 727 F.2d 1017, 1020 (11th Cir. 1984). Typically, this valuation is to be

10   made as at the date of the filing of the Debtor's chapter 11 petition. Id.

11       In the case of In re Bear River Orchards, 56 B.R. 976, 978 (Bankr. E.D. Cal. 1986) the court

12   described the analysis that should be made in determining whether the debtor-in-possession is

13   entitled to use cash collateral, as follows:

14       In any given case, the bankruptcy court must necessarily (1) establish the value of

15       the secured creditor's interests, (2) identify the risk to the secured creditor's value resulting

16       from the debtor's request for use of cash collateral; and (3) determine whether the debtor's

17       adequate protection proposal protects value as nearly as possible against risk to that value

18       consistent with the concept of indubitable equivalence.

19       Additionally, the Debtor in Possession is obligated to segregate and account for any cash

20   collateral in its possession, custody or control. 11 U.S.C. § 363(c)(4).

21       As evidenced by the District Court's rulings, at least $1,762,762.56 of the $1,945,598 that

22   the Debtor intends to use as cash collateral is not cash collateral at all, as it is property of the

23   Federal Receivership Estate and must be returned to the Federal Receiver forthwith. Nevertheless,

24   the Debtor does not even attempt to offer the Federal Receiver adequate protection in the form of

25   replacement liens, or otherwise, since it knows that the only form of adequate protection that would

26   be the indubitable equivalent of the Federal Receiver's interest in cash in the hands of the Federal

27   Receiver in the amount of $1,762,762.56, which is precisely what the District Court determined in

28   its Omnibus Order.

-7-

1        Moreover, the Debtor offers no evidence of the value or collectible nature of the accounts

2 receivable that the Debtor proposes to offer as adequate protection in the form of replacement liens.

3 The only "evidence" presented, other than self-serving, conclusory statements of Ken Dawson, is a

4 "Preliminary and Unaudited" Balance Sheet which shows total accounts receivable of

5 approximately $26 million. See, Exhibit "B" to the Cash Collateral Motion. Dawson "believes"

6 that $13.8 million in LEC Accounts Receivable should be collectible "on a rolling basis over the

7 next ninety (90) days." Dawson Declaration at para. 25. Dawson does not offer any projections,

8 forecasts or historical evidence to support this belief, other than his own assertion. If it is in fact

9 true that $13.8 million will be collected "on a rolling basis" over the next 90 days, then there is no

10 need for the Debtor to use the Receivership Funds which were ordered to be delivered to the

11 Federal Receiver to operate its business. The Debtor should be able to find post-petition financing

12 to continue to operate in the near term. Of course, any lender would require more evidence of the

13 value and collectibility of those accounts than was furnished to the Court in support of the Cash

14 Collateral Motion.

15        The Federal Receiver requests "adequate protection." The Federal Receiver hereby requests

16 this Bankruptcy Court to direct the Debtor to comply with the Omnibus Order of the District Court

17 and turn over the $1,762,762.56 to the Federal Receiver.

18 **C.**     **Immediate Relief from the Automatic Stay is the Only Remedy to Protect the**

19 **Diminution of the Receivership Property.**

20        Section 363(p) expressly provides that the trustee (or debtor in possession) has the burden

21 of proof on the issue of adequate protection but that the entity asserting an interest in the property

22 has the burden of proof on the issue of the validity, priority and extent of such interest. 11 U.S.C.

23 363(p).

24        When a creditor seeks relief under section 362 of the Bankruptcy Code, it is entitled to

25 protection against all of the risks of the trustee's continued possession of the collateral. Alan N.

26 Resnick and Henry J. Sommer, Collier on Bankruptcy, ¶ 363.05[1] (15th Ed. Rev. 2007). This

27 encompasses any decline in market value that occurs during the delay as well as any depreciation

28 that results from the continued use of the collateral. See, e.g., In re Continental Airlines, Inc., 154

-8-

314289.02 [XP]    23086

1   B.R. 176 (Bankr. D. Del. 1993), *appeal dismissed as moot*, 91 F. 3d 553 (3rd Cir. 1996); In re Best

2   Products Co., Inc., 138 B.R. 155 (Bankr. S.D.N.Y. 1992).

3       This Bankruptcy Case follows a pattern of deceit on the part of this Debtor. The Debtor,

4   through its president Ken Dawson, lied to the Receiver, the FTC and the District Court as to the

5   existence of money in reserves held for the benefit of the Receiverships. Now, the Debtor is asking

6   this Court to approve the use of not less than $615,000 of cash held by the estate, in order to

7   continue its business operations, with Mr. Dawson at the helm. The Debtor does so without so

8   much as an offer of adequate protection to the Federal Receiver or a segregation or accounting of

9   the cash sought to be used, or evidence that the Federal Receiver (or any other secured creditor, for

10  that matter) is adequately protected. The Debtor's is unable to satisfy its burden of proof regarding

11  adequate protection.

12      By contrast, the Federal Receiver has already satisfied his burden of proof regarding his

13  interest in the property sought to be used as cash collateral. Accordingly, the only rights that the

14  Debtor might have with regard to the Federal Receiver's property must be asserted in the District

15  Court and/or the 11th Circuit Court of Appeals. For this Court to compel the parties to re-litigate

16  their disputes in this Bankruptcy Case would be a waste of judicial resources and would be contrary

17  to the principles underlying the doctrine of Collateral Estoppel. MCA Records, Inc. v. Charly

18  Records, Ltd. 865 F.Supp. 649. 654 (C.D.Cal.,1994) ("[I]n deciding whether to apply collateral

19  estoppel, the court must balance the rights of the party to be estopped against the need for applying

20  collateral estoppel in the particular case, in order to promote judicial economy by minimizing

21  repetitive litigation, to prevent inconsistent judgments which undermine the integrity of the judicial

22  system, or to protect against vexatious litigation"); Montana v. United States, 440 U.S. 147, 153, 99

23  S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

24                                    **IV.**

25                                 **CONCLUSION**

26      For the foregoing reasons, the Debtor's Motions, and each of them, should be denied. The

27  Federal Receiver believes that the appropriate remedy is relief from the automatic stay in order to

28  effectuate the orders of the District Court with respect to property of the Receiverships, which

                                    -9-

314289.02 [XP]    23086

1    motion the Federal Receiver intends to file forthwith, should the Court not *sua sponte* order such

2    relief. The Federal Receiver also respectfully requests that this Court order the Debtor to comply

3    with the Omnibus Order of the District Court and immediately turn over the $1,762,762.56 to the

4    Federal Receiver. The Federal Receiver further requests all other appropriate relief in the premises.

5

6    Dated: September 19, 2007                    DANNING, GILL, DIAMOND & KOLLITZ, LLP

7

8                                                 By: _____

9                                                     STEVEN J. SCHWARTZ
                                                     Attorneys for David R. Chase, Court-
10                                                   Appointed Receiver of Access One
                                                     Communications, Inc., and Network One
11                                                   Services, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-10-

314289.02 [XP]    23086

RER-18        0967

# Exhibit 4

FTC v. Nationwide, emergency motion                                Page 1 of 1

## Neal Goldfarb

| | |
|---|---|
| **From:** | Kim, Laura [LKIM@ftc.gov] |
| **Sent:** | Thursday, September 20, 2007 9:49 AM |
| **To:** | markdjohnsonpa@bellsouth.net; agberg@kslaw.com; kdinan@kslaw.com; ctapie@kslaw.com; jthomas@kslaw.com; jpollack@kslaw.com; JCS@tewlaw.com; maustin@mwe.com; ssiff@mwe.com; drodgers@lawdcm.com; michael.woodbury@woodbury-santiago.com; chad@schuylaw.com; tlong@barnettbolt.com; hwanders@barnettbolt.com; Richard Gordin; Steve Lancellotta; Neal Goldfarb; Max Maccoby; marty.alexander@hklaw.com; scott.newman@hklaw.com; Rosanne@macalusolaw.com; peter@macalusolaw.com |
| **Cc:** | Guerard, Collot; Schoshinski, Robert; McKewen, Richard; Mora, Michael |
| **Subject:** | FTC v. Nationwide, emergency motion |
| **Attachments:** | FTC Emergency Motion for Clarification.pdf; SCAN1590_000.pdf; Exhibit 1.pdf; Exhibit 2.pdf |

Counsel: I am attaching a copy of the FTC's Emergency Motion for Clarification that the Automatic Stay Does Not Apply to the FTC's Law Enforcement Action and the Ongoing Contempt Proceeding and Supporting Memorandum of Law, with exhibits and emergency certification. I expect that this Motion will be filed soon in hard copy. I called chambers to let them know that I would shortly be filing an emergency motion, and I am simultaneously faxing a copy of the motion to Judge Ryskamp's chambers, per Kari's suggestion.

<<FTC Emergency Motion for Clarification.pdf>> <<SCAN1590_000.pdf>> <<Exhibit 1.pdf>> <<Exhibit 2.pdf>>

Laura Kim
Attorney, Division of Marketing Practices
Federal Trade Commission
600 Pennsylvania Avenue, NW Room H-288
Washington, DC 20580
t.202.326.3734
f.202.326.3395

9/24/2007

(Rev. 10/2002) Certification of Emergency

# UNITED STATES DISTRICT COURT

## Southern District of Florida

Case Number: 06-80180-CV-Ryskamp

Federal Trade Commission

Plaintiff

v.

Nationwide Connections, Inc.
et al.

Defendant

## CERTIFICATION OF EMERGENCY

I hereby certify that, ~~as a member of the Bar of this Court,~~ *as an attorney admitted pro hac vice in This action,* I have carefully examined this matter and it is a true emergency.

I further certify that the necessity for this emergency hearing has not been caused by a lack of due diligence on my part, but has been brought about only by the circumstances of this case. The issues presented by this matter have not been submitted to the Judge assigned to this case or any other Judge or Magistrate Judge of the Southern District of Florida prior hereto.

I further certify that I have made a bona fide effort to resolve this matter without the necessity of emergency action.

Dated this 25th day of September , 20 07 .

Signature: _____

Printed Name: Neal Goldfarb, Counsel for The Billing Resource dba Integretel

Florida Bar Number: Pro hac vice

Telephone Number: (202) 454-2826

I hereby certify that the Judge assigned to this case is unavailable for this emergency (a copy of his/her notification to the Clerk is on file). In accordance with Local Rule 3.7, the Honorable _____ was randomly drawn from the Emergency Wheel.

Dated this _____ day of _____ , 20 _____ .

CLARENCE MADDOX

Court Administrator • Clerk of Court

By: _____
                    **Deputy Clerk**

# RER - 19

Entered on Docket
September 26, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1   SHEPPARD, MULLIN, RICHTER &
    HAMPTON LLP
2     A Limited Liability Partnership
      Including Professional Corporations
3   MICHAEL H. AHRENS,
    Cal. Bar No. 44766
4   JEFFREY K. REHFELD,
    Cal. Bar No. 188128
5   ORI KATZ
    Cal. Bar No. 209561
6   Four Embarcadero Center, 17th Floor
    San Francisco, CA 94111
7   Telephone:    415-434-9100
    Facsimile:    415-434-3947
8   Email: mahrens@sheppardmullin.com
         jrehfeld@sheppardmullin.com
9        okatz@sheppardmullin.com

10  Proposed Attorneys for Debtor and
    Debtor-in-Possession
11  The Billing Resource, dba Integretel

The following constitutes the
Order of the Court. Signed _9/24_ 20_07_

HON. ARTHUR S. WEISSBRODT
United States Bankruptcy Judge

12              UNITED STATES BANKRUPTCY COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                      SAN JOSE DIVISION

15

16  In re:                           )   Case No. 07-52890
                                     )
17  THE BILLING RESOURCE, dba        )   Chapter 11
18  INTEGRETEL, a California corporation )
                                     )   **ORDER APPROVING INTERIM USE OF**
19              Debtor.              )   **CASH COLLATERAL AND GRANTING**
                                     )   **REPLACEMENT LIENS AND**
20                                   )   **APPROVING FIRST AMENDED**
                                     )   **STIPULATION WITH PAYMENTONE**
21                                   )   **CORPORATION REGARDING USE OF**
                                     )   **CASH COLLATERAL AND ADEQUATE**
22                                   )   **PROTECTION ON AN INTERIM BASIS**
                                     )
23                                   )   Date:      September 26, 2007
                                     )   Time:      2:15 p.m.
24                                   )   Place:     United States Bankruptcy Court
                                     )              280 South First Street
25                                   )              San Jose, California
                                     )   Judge:     Hon. Arthur S. Weissbrodt
26                                       Courtroom:   3020

27

28

W02-WEST:FJR\400438031.3

                                    ORDER APPROVING INTERIM USE OF
                                    CASH COLLATERAL AND GRANTING
                                    REPLACEMENT LIENS

1    The Billing Resource, dba Integretel, a California corporation (the "Debtor") filed

2  its "Emergency Motion For Use Of Cash Collateral And Granting Replacement Liens" (the

3  "Motion") in the above-referenced bankruptcy case (the "Bankruptcy Case"). Capitalized terms

4  not otherwise defined herein shall have the meanings ascribed to them in the Motion. A continued

5  hearing (the "Interim Hearing") with respect to the Motion duly came on for hearing before the

6  undersigned United States Bankruptcy Judge at the above-noted place and time. Appearances

7  were made as noted in the record at the Interim Hearing.

8       At the hearing, counsel for the Debtor presented to the Court a First Amended

9  Stipulation With PaymentOne Corporation Regarding Use Of Cash Collateral And Adequate

10  Protection (the "First Amended PaymentOne Stipulation"), a blacklined version of which the

11  Debtor had previously presented to the Court at an initial hearing held on September 21, 2007, and

12  requested that the Court approve the First Amended PaymentOne Stipulation on an interim basis

13  at the Interim Hearing.

14
        Pursuant to the Motion, as revised in light of the First Amended PaymentOne

15  Stipulation and statements made by the Debtor's counsel at the Interim Hearing, and Bankruptcy

16  Code Sections 105, 361, and 363, the Debtor seeks an order from the Court: (1) authorizing the

17  Debtor to use certain assets of the Debtor which constitute "cash collateral" as defined in

18  Bankruptcy Code section 363(a) (such assets of the Debtor shall be referred to herein as the "Cash

19  Collateral"); (2) granting approval of the First Amended PaymentOne Stipulation and the terms

20  and conditions set forth therein on an interim basis; (3) granting PaymentOne Corporation

21  ("PaymentOne"), POL, Inc. ("POL")[1], Network Telephone Services, Inc. ("Network Telephone"),

22

23

24  [1] The following entities are collectively referred to in this Order as "POL": Access Programs, Inc.;

25  Action Date Connections, Inc.; Benchmark Communications, Inc.; Blazen Communications, Inc.;
   Call Transfer Services, Inc.; Cassiopeia Group, Inc.; Clear Command Telecommunications, Inc.;

26  Country Club Network Services, Inc.; Date Finders Singles, Inc.; Enhanced Phone Services, Inc.;
   Inovate Telecommunications, Inc.; Invesco Telecommunications, Inc.; Listen Com. Inc.; LJ

27  Internet, Inc.; Love Dating Network, Inc.;Lunar Tel, Inc.; Messenger Com, Inc.; Omnipresent

28  Digital, Inc.; Palisade Telcom, Inc.; POL, Inc.; Psychic, Inc.; Rebound Communications, Inc.;
   Singles Date Match, Inc.; Special Comtel, Ltd.; Spring Telecom, Inc.; Vesstone

W02-WEST:FJR\400438031.3                    -1-

                                            ORDER APPROVING INTERIM USE OF
                                            CASH COLLATERAL AND GRANTING
                                            REPLACEMENT LIENS

1  Personal Voice, Inc. ("Personal Voice") and Public Communication Services, Inc. ("Public

2  Communication") (collectively, the "Alleged Cash Collateral Secured Creditors"), as adequate

3  protection for the use by the Debtor of Cash Collateral in which the Alleged Cash Collateral

4  Secured Creditors have an alleged interest, a replacement lien upon certain of the Debtor's

5  personal property as set forth in the Motion (and in the case of PaymentOne as set forth in the First

6  Amended PaymentOne Stipulation), but only to the extent each respective Alleged Cash Collateral

7  Secured Creditors possessed valid, perfected and enforceable prepetition liens in the Cash

8  Collateral; and (4) the setting of a final hearing on the Motion (the "Final Hearing") pursuant to

9  Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10        The Court, having reviewed and considered the Motion, the Notice of the Motion,

11  the Introductory Statement filed in support of the Motion, the Declaration of Ken Dawson filed in

12  support of the Motion (the "Dawson Declaration"), the Debtor's Stipulation with PaymentOne

13  Corporation regarding the Debtor's use of Cash Collateral which was attached as an exhibit to the

14  Motion, the First Amended PaymentOne Stipulation presented at the Interim Hearing, the two

15  Declarations of Evan Meyer in support of the Motion, the Declaration of Joe Lyman in support of

16  the Motion, the oppositions to the Motion, including the oppositions filed by David R. Chase as

17  receiver to Access One and Network One, Public Communication Services, POL, Inc., Thermo

18  Credit, Network Telephone Systems, the Federal Trade Commission, American Premium

19  Warehouse, Total I Project, Horizon Telecom, Inc., RRV Enterprises, D.D.D. Calling, Inc.,

20  Telecom Access Network, Inc., National Toll Free, and Norstar Marketing aka NS Marketing

21  LLC, the joinder to certain of the oppositions filed by Email Discount Network, (collectively, the

22  foregoing oppositions and joinder the "Oppositions") as well as any other oppositions filed with

23  the Court prior to the Interim Hearing or raised at the Interim Hearing, the replies to the

24  oppositions and in support of the Motion including the replies filed by the Debtor and

25

26

27

28  Telecommunications, Inc.; Voicemail, Inc.; Voice Services, Ltd.; Vortex Communications &
Telephone, Inc.; Wonder Network, Inc.

W02-WEST:FJR\400438031.3                -2-

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

1  PaymentOne, the other matters of record in this Bankruptcy Case, the arguments and
2  representations of counsel at the Interim Hearing, having completed an interim hearing in
3  accordance with Rule 4001 of the Bankruptcy Rules, and good cause appearing therefor,

4              **THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**

5              1.      The Debtor filed a voluntary petition for relief under Chapter 11 of the
6  Bankruptcy Code.  No trustee or examiner has been appointed in this case, and the Debtor is
7  authorized to operate its business as a debtor-in-possession.

8              2.      The Court has jurisdiction over these proceedings and the parties and
9  property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding
10  within the meaning of 28 U.S.C. § 157(b)(2).

11              3.      Pursuant to §§ 102(1) and 363 of the Bankruptcy Code and Bankruptcy
12  Rule 4001(d), the Debtor has provided such notice as was practicable and appropriate under the
13  circumstances of the time, place and nature of the Interim Hearing and opportunity to object to the
14  entry of this Order to among others: (1) the Alleged Cash Collateral Secured Creditors; (2) each
15  creditor on the List of 30 Largest Creditors filed pursuant to Bankruptcy Rule 1007(d); (3) the
16  Office of the United States Trustee, and (4) other significant parties in interest, including the
17  Receiver and the FTC (as those terms are defined in the Motion).  The foregoing notice is
18  adequate and sufficient in light of the nature of the relief requested in the Motion.

19              4.      The Debtor must have the use of cash generated from the Debtor's
20  prepetition assets which each of the Alleged Cash Collateral Secured Creditors claims to be its
21  Cash Collateral in order to continue to operate and preserve the value of Debtor's estate.

22              5.      Unless the Debtor is permitted to use the Cash Collateral, the Debtor's
23  ability to operate its business, pay expenses of this Bankruptcy Case, and to preserve and maintain
24  the property and assets of its estate and to reorganize will be immediately and irreparably
25  jeopardized, and the Debtor's use of the Cash Collateral is necessary to avoid immediate and
26  irreparable harm to the Debtor and the Debtor's bankruptcy estate.

27              6.      The level of adequate protection for the Alleged Cash Collateral Secured
28

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

RER-19      0974

1    Creditors proposed to be provided by the Debtor in the Motion and more particularly set forth
2    below, in return for the use of the Cash Collateral, is reasonable.

3           7.     Good cause has been shown for entry of this Order, including without
4    limitation the approval of the First Amended PaymentOne Stipulation and the terms and
5    conditions set forth therein on an interim basis.  Among other things, entry of this Order will
6    preserve each of the Alleged Cash Collateral Secured Creditor's position vis-a-vis the Debtor and
7    other creditors of the estate so that each of the respective Alleged Cash Collateral Secured
8    Creditor's position vis-a-vis the Debtor and such other creditors is neither diminished nor
9    enhanced by Debtor's use of Cash Collateral.

10          8.     To the extent that any of the foregoing findings constitute or include
11   conclusions of law, they shall be so deemed.

12                      **ACCORDINGLY, IT IS HEREBY ORDERED AS FOLLOWS:**

13          1.     The Motion, as amended by the relief sought in connection with
14   PaymentOne as set forth in the First Amended PaymentOne Stipulation, is approved on an interim
15   basis, and the First Amended PaymentOne Stipulation and terms and conditions set forth therein
16   are approved on an interim basis.  Notwithstanding anything to the contrary contained in the First
17   Amended PaymentOne Stipulation, no super-priority administrative expense claim pursuant to
18   Bankruptcy Code Section 507(b) is granted or provided to PaymentOne or to any other party on an
19   interim basis, provided, however, that such claim will be determined at the Final Hearing.
20   Furthermore, PaymentOne (and any other creditor beneficiary of this Order), reserves statutory
21   rights it may have as a matter of law under Bankruptcy Code section 507(b) or any other provision
22   of the Bankruptcy Code, and the Debtor and its bankruptcy estate reserve all defenses thereto.
23   This Order is valid immediately and is fully effective upon its entry.

24          2.     Oppositions to the Motion, including without limitation the Oppositions, as
25   well as any other oppositions filed with the Court prior to the Interim Hearing or raised at the
26   Interim Hearing, to the extent not withdrawn, are overruled.

27          3.     The Debtor may use Cash Collateral in which PaymentOne Corporation
28

W02-WEST:FJR\400438031.3                        -4-

1    ("PaymentOne") has an alleged interest in accordance with the First Amended PaymentOne

2    Stipulation.

3             4.      The Debtor is authorized to pay PaymentOne the Pipeline Collection

4    Property in accordance with the terms and conditions of the First Amended PaymentOne

5    Stipulation and the "Declaration of Evan Meyer re Certain PaymentOne Transactions in Support

6    of Motion to Approve Cash Collateral Stipulation and Ordinary Course Transfers" dated

7    September 24, 2007 filed in this Bankruptcy Case.

8             5.      PaymentOne is granted, pursuant to Bankruptcy Code sections 361(2) and

9    363(e), valid, perfected and enforceable replacement liens upon all post-petition property of the

10    Debtor as provided in the First Amended PaymentOne Stipulation. The replacement liens granted

11    to PaymentOne shall be automatically perfected pursuant to this Order and PaymentOne shall not

12    be required to take any further action to perfect such liens.

13             6.      PaymentOne's replacement liens on the post-petition property shall have the

14    same priority vis-a-vis other liens and interests as PaymentOne's pre-petition liens and security

15    interests have vis-a-vis such other liens and interests. The replacement liens granted to

16    PaymentOne by this Order are intended to preserve PaymentOne's position vis-a-vis the Debtor

17    and other creditors of the estate so that PaymentOne's position vis-a-vis the Debtor and such other

18    creditors is neither diminished nor enhanced by Debtor's use of Cash Collateral and PaymentOne's

19    receipt of replacement liens.

20

21             7.      The replacement liens granted to PaymentOne shall be subordinated to any

22    expenses of this bankruptcy case including without limitation fees and expenses of professionals

23    retained by the Debtor and any official committee appointed in this bankruptcy case as well as

24    those of any trustee subsequently appointed in the bankruptcy case and such trustee's

25    professionals, subject to the terms and conditions set forth in the First Amended PaymentOne

26    Stipulation.

27             8.      Notwithstanding anything to the contrary set forth in this Order, this Order

28    does not determine whether PaymentOne has any valid, perfected or enforceable prepetition liens

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

1  or security interests in the Cash Collateral or any of the Debtor's other assets, and both the Debtor

2  and PaymentOne reserve all rights and defenses with respect thereto.  The replacement liens

3  granted to PaymentOne pursuant to this Order are effective only to the extent that PaymentOne's

4  prepetition liens in the Cash Collateral are valid, perfected and enforceable.

5           9.      The Debtor may use Cash Collateral in which POL has an alleged interest.

6           10.     POL is granted, pursuant to Bankruptcy Code sections 361(2) and 363(e),

7  valid, perfected and enforceable replacement liens upon all post-petition property of the Debtor of

8  the same type and character of any pre-petition property as to which POL had valid, perfected and

9  enforceable security interests or liens, but only to the extent of Cash Collateral used by the Debtor.

10  The replacement liens granted to POL shall be automatically perfected pursuant to this Order and

11  POL shall not be required to take any further action to perfect such liens.

12          11.     POL's replacement liens on the post-petition property shall have the same

13  priority vis-a-vis other liens and interests as POL's pre-petition liens and security interests have

14  vis-a-vis such other liens and interests.  The replacement liens granted to POL by this Order are

15  intended to preserve POL's position vis-a-vis the Debtor and other creditors of the estate so that

16  POL's position vis-a-vis the Debtor and such other creditors is neither diminished nor enhanced by

17  Debtor's use of Cash Collateral and POL's receipt of replacement liens.

18

19          12.     The replacement liens granted to POL shall be subordinated to any expenses

20  of this bankruptcy case including without limitation fees and expenses of professionals retained by

21  the Debtor and any official committee appointed in this bankruptcy case as well as those of any

22  trustee subsequently appointed in the bankruptcy case and such trustee's professionals.

23          13.     Notwithstanding anything to the contrary set forth in this Order, this Order

24  does not determine whether POL has any valid, perfected or enforceable prepetition liens or

25  security interests in the Cash Collateral or any of the Debtor's other assets, and both the Debtor

26  and POL reserve all rights and defenses with respect thereto.  The replacement liens granted to

27  POL pursuant to this Order are effective only to the extent that POL's prepetition liens in the Cash

28  Collateral are valid, perfected and enforceable.

-6-

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

RER-19    0977

1          14.    The Debtor may use Cash Collateral in which Network Telephone has an

2  alleged interest.

3          15.    Network Telephone is granted, pursuant to Bankruptcy Code

4  sections 361(2) and 363(e), valid, perfected and enforceable replacement liens upon all post-

5  petition property of the Debtor of the same type and character of any pre-petition property as to

6  which Network Telephone had valid, perfected and enforceable security interests or liens, but only

7  to the extent of Cash Collateral used by the Debtor. The replacement liens granted to Network

8  Telephone shall be automatically perfected pursuant to this Order and Network Telephone shall

9  not be required to take any further action to perfect such liens.

10          16.    Network Telephone's replacement liens on the post-petition property shall

11  have the same priority vis-a-vis other liens and interests as Network Telephone's pre-petition liens

12  and security interests have vis-a-vis such other liens and interests. The replacement liens granted

13  to Network Telephone by this Order are intended to preserve Network Telephone's position vis-a-

14  vis the Debtor and other creditors of the estate so that Network Telephone's position vis-a-vis the

15  Debtor and such other creditors is neither diminished nor enhanced by Debtor's use of Cash

16  Collateral and Network Telephone's receipt of replacement liens.

17

18          17.    The replacement liens granted to Network Telephone shall be subordinated

19  to any expenses of this bankruptcy case including without limitation fees and expenses of

20  professionals retained by the Debtor and any official committee appointed in this bankruptcy case

21  as well as those of any trustee subsequently appointed in the bankruptcy case and such trustee's

22  professionals.

23          18.    Notwithstanding anything to the contrary set forth in this Order, this Order

24  does not determine whether Network Telephone has any valid, perfected or enforceable

25  prepetition liens or security interests in the Cash Collateral or any of the Debtor's other assets, and

26  both the Debtor and Network Telephone reserve all rights and defenses with respect thereto. The

27  replacement liens granted to Network Telephone pursuant to this Order are effective only to the

28  extent that Network Telephone's prepetition liens in the Cash Collateral are valid, perfected and

-7-

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

1  enforceable.

2       19.    The Debtor may use Cash Collateral in which Personal Voice has an alleged

3  interest.

4       20.    Personal Voice is granted, pursuant to Bankruptcy Code sections 361(2) and

5  363(e), valid, perfected and enforceable replacement liens upon all post-petition property of the

6  Debtor of the same type and character of any pre-petition property as to which Personal Voice had

7  valid, perfected and enforceable security interests or liens, but only to the extent of Cash Collateral

8  used by the Debtor.  The replacement liens granted to Personal Voice shall be automatically

9  perfected pursuant to this Order and Personal Voice shall not be required to take any further action

10  to perfect such liens.

11       21.    Personal Voice's replacement liens on the post-petition property shall have

12  the same priority vis-a-vis other liens and interests as Personal Voice's pre-petition liens and

13  security interests have vis-a-vis such other liens and interests.  The replacement liens granted to

14  POL by this Order are intended to preserve Personal Voice's position vis-a-vis the Debtor and

15  other creditors of the estate so that Personal Voice's position vis-a-vis the Debtor and such other

16  creditors is neither diminished nor enhanced by Debtor's use of Cash Collateral and Personal

17  Voice's receipt of replacement liens.

18

19       22.    The replacement liens granted to Personal Voice shall be subordinated to

20  any expenses of this bankruptcy case including without limitation fees and expenses of

21  professionals retained by the Debtor and any official committee appointed in this bankruptcy case

22  as well as those of any trustee subsequently appointed in the bankruptcy case and such trustee's

23  professionals.

24       23.    Notwithstanding anything to the contrary set forth in this Order, this Order

25  does not determine whether Personal Voice has any valid, perfected or enforceable prepetition

26  liens or security interests in the Cash Collateral or any of the Debtor's other assets, and both the

27  Debtor and Personal Voice reserve all rights and defenses with respect thereto. The replacement

28  liens granted to Personal Voice pursuant to this Order are effective only to the extent that Personal

ORDER APPROVING INTERIM USE OF
CASH COLLATERAL AND GRANTING
REPLACEMENT LIENS

RER-19      0979