*Motions Hearing*                                                      27

1          And so I have a budget here and I don't think I have

2    to discuss the budget because we're not asking for any relief

3    today.

4          THE COURT:  Right.

5          MR. AHRENS:  I would like to send out the budget and

6    the revised stipulation later tonight, as quick service as we

7    can.  And if the Court would indulge, have a hearing next

8    Wednesday if the Court is available on an emergency basis, to

9    consider the revised cash collateral stipulation.  And maybe by

10   then I will have talked to the FTC and the receiver to see if

11   there's something we can work out.

12         THE COURT:  Sure.  You're talking about the 26th?

13         MR. AHRENS:  I am, Your Honor.

14         THE COURT:  Two o'clock?

15         MR. AHRENS:  That's fine, Your Honor.

16         THE COURT:  Actually made it 2:15.  That would be

17   better for me.

18         MR. AHRENS:  2:15 —

19         THE COURT:  Yeah.

20         MR. AHRENS:  — is just fine, Your Honor.

21         THE COURT:  Okay.

22         MR. AHRENS:  And then I would ask that the Court

23   consider the motion to appoint Mr. Dawson as responsible party

24   and the cash management.  Although the receiver had in his title

25   he objected to the cash management motion, the receiver did not

1    have any argument on it.  And we're not going to be able to use

2    the cash until next Wednesday anyway because the cash collateral

3    hearing hasn't been ruled upon, but I'd just like to get that

4    behind me if I could.

5          THE COURT:  Yeah.  And with respect to that I've

6    reviewed it and anybody is going to be entitled to say whatever

7    they want.  But we don't have to agree that they can keep it in

8    place forever, but the question is whether this should be kept

9    in place for the foreseeable future.  And then if for some

10   reason with the stipulations that were agreed to by Mr. Ahrens

11   modifying the present cash management system, then I just want

12   everybody to know that I'm not necessarily by approving this, if

13   I approve it, agreeing that it can stay that way for the next

14   year or two, or whatever length of time the debtor may be in

15   Chapter 11.  We're just talking about for the indefinite future

16   and without prejudice.

17         MR. AHRENS:  That's understood, Your Honor.  Thank

18   you.

19         THE COURT:  Does anybody want to talk specifically

20   about the motion to retain cash management?  First the lawyers

21   and then if there's a nonlawyer I'll listen to that person.

22         MS. MOUNGER-LUM:  Good afternoon, Your Honor.  Shannon

23   Mounger for the U.S. Trustee.  I think our main concern is that

24   there be a distinct separation between a prepetition activity

25   and —

1          THE COURT:  Mr. Ahrens, I want you to listen to this

2   because I want to be able to ask you what you think, because

3   it's going to be important to me.

4          MS. MOUNGER-LUM:  We would like a distinct separation

5   between the prepetition activity and the postpetition activity.

6   We don't have a problem with retaining the same cash management

7   systems.  They're with Comerica.  They're in that authorized

8   depository.  We're able to monitor them.  And if Mr. Ahrens,

9   like he says in his paper, will designate those as debtor-in-

10  possession accounts, we don't have a problem with that.

11         We've looked at the proposed order and the only issue

12  that I have is there is no — there is nothing in the proposed

13  order stating that any prepetition debts that happen to be paid

14  postpetition, whether intentionally or otherwise, they would

15  seek approval from this Court, if that — if that, in fact,

16  happens.  And that's our main concern —

17         THE COURT:  Well, wait, wait, wait.  If it's

18  unintentional what does seek approval from the Court mean?  Mean

19  come in after the fact?

20         MS. MOUNGER-LUM:  Come in after the fact and

21  acknowledge that it was done either intentionally or

22  unintentionally and get this Court's approval, which is

23  generally what we have people do if in the interim period maybe

24  employment employee payments are made and they cross over the

25  prepetition and postpetition period.  And so we're just —

*Motions Hearing*                                                    30

1          THE COURT:  So as I understand it, anything that is

2    paid prepetition intentionally or unintentionally, the debtor

3    will seek Court approval at a later time for that payment to

4    have been made?

5          MS. MOUNGER-LUM:  Anything that is paid postpetition

6    on a prepetition debt.

7          THE COURT:  Right.

8          Any problem with that?

9          MR. AHRENS:  None, Your Honor.

10         THE COURT:  Okay.  You got it.

11         MS. MOUNGER-LUM:  Thank you, Your Honor.

12         THE COURT:  Does anybody else wish to speak to this

13   particular motion?  Any lawyer in court, and then I'm going to

14   take lawyers on the phone and then I'll take unrepresented

15   parties.

16         Ms. Diemer.

17         MS. DIEMER:  Yes, Your Honor.  I represent the, as I

18   understand it, the only unobjected-to secured creditor in this

19   matter.  We have a concern about the money management as in the

20   segregation, as the — as Ms. Mounger mentioned.  We just want to

21   make sure we have accurate reporting of that.

22         We know from past history that Integretal has one of

23   the most sophisticated computer accounting systems that I've

24   ever become aware of it.  And it shouldn't pose much of a

25   problem for them to do that.

1       THE COURT:  To do what exactly?

2       MS. DIEMER:  To provide some segregation so that

3   there's at least reporting of postfiling moneys.

4       THE COURT:  Okay.  Any problem with that?

5       MR. AHRENS:  I don't think so, Your Honor, but I'll

6   have to check with my client.  And Ms. Diemer and I have talked.

7   And my partner, Terry Ponsford, has talked to Ms. Diemer and I

8   think we've been able to work with this creditor.

9       THE COURT:  Okay.  Well, they'll continue to try to

10  make sure that what you want is done.

11      MS. DIEMER:  I hope so.  I would also like to point

12  out on the record that our client is listed in the debtor's

13  schedules as being owed $186,000.  And my understanding of my

14  conversation with Mr. Ponsford was that the debtor has

15  recognized that, in fact, we're owed up to $986,000.

16      MR. AHRENS:  I recognize that they have a claim.  I'm

17  not agreeing to anybody's claim on the record here in our fourth

18  day of the case, but I do recognize they have a contingent claim

19  with respect to the tax fund claim in New York and that your

20  claim exceeds 850,000, $900,000.

21      MS. DIEMER:  It's 186,- fixed plus potential $800,000

22  from a settlement with the New York State Taxation Board.

23      THE COURT:  Okay.

24      MS. DIEMER:  Fully secured against both debtor and his

25  wholly-owned subsidiaries.

*Motions Hearing*                                                      32

1        THE COURT:  That's Ms. Diemer's position.

2        MS. DIEMER:  Yes.

3        MR. AHRENS:  Just for the record, while we have not in

4   our papers set forth any grounds for objection to their secured

5   claim, we are not at this early stage of the case waiving any

6   objections.

7        THE COURT:  Of course not.

8        Counsel.

9        MS. CORDELL:  Thank you, Your Honor.  For Thermo

10  Credit we would make the same request —

11       THE COURT:  Can you state your name again, please?

12       MS. CORDELL:  Dolores Cordell, Clark and Trevithick.

13       THE COURT:  Thank you.

14       MS. CORDELL:  On behalf of Thermo Credit we would also

15  like to request that the funds be accurately reported.  It's our

16  position that our client is the owner of those funds.

17       THE COURT:  Thank you.

18       MS. CORDELL:  Thank you.

19       THE COURT:  Is there any lawyer on the phone who

20  wishes to say anything with respect to the emergency motion to

21  retain the cash management system?

22       MR. MORA:  Yes, Your Honor.  Michael —

23       THE COURT:  Go ahead, sir.

24       MR. MORA:  — Mora for the Federal Trade Commission.

25       THE COURT:  Yes.

1          MR. MORA:  Your Honor, I just want to point out that

2     the order that the district court previously issued last week,

3     titled the Omnibus Order in the contempt proceeding, the

4     district court essentially ordered Integretal to turn over the

5     reserve funds attributable to the equity receivership defendants

6     in the Nationwide Connections case, or that they would be held

7     in contempt.  And, further, that they had to provide an

8     accounting of those reserves and that those funds once turned

9     over to the receiver would be segregated.

10          So we think that any — any relief that's going to be

11     ordered today certainly should — should reflect that.

12          THE COURT:  I'm not sure what it means, Mr. Mora.

13     Perhaps you can help me.  If there is no reserve — you know,

14     holding aside whether there should or shouldn't have been, if

15     there indeed is no reserve, as Mr. Ahrens states, what is the

16     import of that order?

17          MR. MORA:  The order is that there is a reserve, Your

18     Honor.  All of —

19          THE COURT:  But that presumes a fact which may not be

20     correct.

21          MR. MORA:  Well, Your Honor, if I may.  All of the

22     arguments that the debtor is making today and made in their

23     introduction, all of those arguments were presented to the

24     district court in the contempt proceeding, fully considered, and

25     adjudicated.

1          THE COURT:  Okay.  But, Mr. Mora, —

2          MR. MORA:  The district court proceeding and what the

3    contempt proceeding revolves around is an equity receivership in

4    which the receiver is the receiver for the receivership

5    entities.  And the district court had before it a motion to hold

6    Integretal in contempt for failing to turn over reserve funds

7    that they are holding that are property of the receivership

8    estate.  And the district court considered all of these

9    contractual-based arguments that the debtor is attempting to

10   rehash now before this Court and rejected them, every single one

11   of them.

12         THE COURT:  Did the district court address whether or

13   not there might be competing claims to these funds by other

14   creditors other than the particular creditors represented by

15   this one receiver?  Did the district court address on the merits

16   that issue?

17         MR. MORA:  Yeah.  The district court had knew before

18   it in the record before it, Your Honor, that the court —

19         THE COURT:  I'm sorry.  I didn't understand what — Mr.

20   Mora, can you start your sentence again, please?

21         MR. MORA:  Sure, Your Honor.  The district court had

22   in the record before it the debtor's position that it had never

23   segregated any funds.  This was supposedly a mere bookkeeping

24   entry in their books.  And so all of those arguments were made

25   by the debtor before the district court.

1    THE COURT:  No.  I —

2    MR. MORA:  And, Your Honor, —

3    THE COURT:  I don't think you understood my question.

4  You didn't answer it.  It's one thing outside of a bankruptcy to

5  go after assets and have them held by a receiver and basically

6  it's first come, first served, you know, outside of a

7  bankruptcy.  But in the context of a bankruptcy where there may

8  be competing claims to funds, you're in a totally different

9  ballgame.  And I don't see how the district court could have

10  addressed the possibility of competing claims in a bankruptcy

11  case until the bankruptcy case was filed.  The issue wasn't

12  before the district court.

13    Now the district court may have said that it's okay

14  for the receiver to hold these funds because the receiver is

15  just going to hold them until the disputes are all resolved and

16  that may have made sense outside the context of the bankruptcy.

17  I can understand that completely.  But I don't understand it at

18  all in the context of a bankruptcy case.  So I don't know if you

19  are prepared to address that, Mr. Mora, or not.

20    MR. MORA:  I'm not prepared to fully address it at

21  this time, Your Honor.  But what I would like to communicate to

22  the Court is that what the district court — the equity

23  receivership proceeding in the district court is an equity

24  proceeding.  It is done pursuant to the FTC's ability to obtain

25  equitable relief from the district court in the form of, among

*Motions Hearing*                                                                36

1    other things, preliminary injunctions and appointment of an

2    equity receiver.

3              THE COURT:  Of course.  I understand —

4              MR. MORA:  So that is the type of proceeding it was

5    before the Court.  And the nature of the contempt order that has

6    been issued against the debtor is an injunctive order.  It is

7    not a money judgment.  It is even more than that.

8              The district court has found, first, the money in the

9    reserve funds, the money that has been established as the

10   reserve funds are property of the receivership.  Second, —

11             THE COURT:  Wait.  Did the district court —

12             MR. MORA:  — that — that —

13             THE COURT:  Wait, wait.  Mr. Mora, —

14             MR. MORA:  Yes, Your Honor.

15             THE COURT:  — stop a second, please.

16             MR. MORA:  Yes.

17             THE COURT:  My understanding is that the district

18   court did not make a final decision on the merits that the

19   receiver ultimately will keep those funds, that it was just an

20   interim decision instructing the debtor to turn them over to the

21   receiver to essentially hold them until the relative rights of

22   the properties was resolved.  It was not a decision that the

23   receiver and the people that the receiver represented were, by

24   final judgment, entitled to those funds.

25             MR. MORA:  Well, Your Honor, on the very first page of

1   the order that the district court issued today, the Court noted

2   that the reserve funds are the property of the receivership

3   estate and ordered Integretal to pay those funds, amounting at

4   the time of entry of the order to approximately $1.7 million

5   immediately.

6                THE COURT:  But how is that possible —

7                MR. MORA:   (Indecipherable) —

8                THE COURT:  Let me — I understand the language of the

9   order and I — and I'm looking at it as you speak, but my

10  understanding that this came up in the context of a preliminary

11  injunction, it didn't come up in the context of a permanent

12  injunction.  It — and so the district court could reasonably

13  make findings of fact and conclusions of law as to likelihood of

14  success, but is it your position that the district court has

15  determined by final judgment, final appealable judgment that

16  these funds belong to the receivers, the people — the receiver

17  is representing?  That these funds —

18               MR. MORA:  The district — Your Honor, —

19               THE COURT:  — by final order, final appealable order

20  is making a determination on the merits that these are those

21  people's funds?

22               MR. MORA:  The district court has issued an order that

23  the funds are property of the receivership estate, yes, Your

24  Honor.  And the district court was not entering a preliminary

25  injunctive order in the first instance.  It was more than that.

*Motions Hearing*                                              38

1  There already was a preliminary injunction in place for

2  sometime.

3          THE COURT:  Ordering that the funds be turned over for

4  safekeeping?  I mean that's really what —

5          MR. MORA:  Order — ordering — ordering the —

6          THE COURT:  — I — the way I read the situation.  I

7  read the situation that the district court ordered the funds

8  turned over for safekeeping and not as a final decision on the

9  merits.

10         MR. MORA:  Well, Your Honor, the Court couldn't have

11 been any clearly in its order today in its determination that

12 the funds are receivership property.  The nature of this order

13 was a contempt order.  It was an order binding that the debtor

14 Integretal was holding funds that they were supposed to turn

15 over to the receiver —

16         THE COURT:  Right, because the receiver ordered them

17 to be turned over for safekeeping.  And so if the debtor didn't

18 do what the receiver told the debtor to do, the debtor could be

19 in violation of the order.  I understand that.  But that doesn't

20 mean that the district court made a final determination on the

21 merits as who's the ult- — who ultimately was going to be the

22 recipient of these funds, who was entitled to them.

23         But, anyway, Mr. Mora, say whatever else you want to

24 say and I'll move onto some of the other lawyers.  I

25 appreciate —

1       MR. MORA:  All right, Your Honor.  I'll just go back

2   to my beginning point which is that the cash manager order, we

3   think, should incorporate the requirements of the district

4   court's omnibus order issued last week, that Integretal must

5   provide a full accounting of the reserve funds owed to the

6   receivership estate and that they should be segregated and paid

7   over to the receiver.

8       THE COURT:  Okay.  Let's take them one step at a time.

9   With respect to an accounting for any funds, do you have any

10  problem with that, Mr. Ahrens?

11      MR. AHRENS:  Your Honor, first let's — this is the

12  cash management order.

13      THE COURT:  Yes.

14      MR. AHRENS:  It has nothing to do with turning funds

15  over.  It just has how do we set up our bank accounts.  So if he

16  wants to make these arguments, I think they're preserved.  And I

17  would agree that any arguments are preserved — I think he's

18  wrong — but preserved for next Wednesday.

19      THE COURT:  Okay.  Counsel, did you want to say

20  something?  And if you'd be kind enough to say your name before

21  you speak.

22      MR. OETZELL:  Walter Oetzell, Your Honor, on behalf of

23  the receiver.  Obviously what's happening here is we're sort of

24  blurring as between the cash management and the cash collateral

25  requests.

*Motions Hearing*                                          40

1          THE COURT:  Not necessarily.

2          MR. OETZELL:  But if — if it be in the cash

3   management, as Mr. Mora is asking for the turnover, I would

4   posit that, and I will repeat this again in the cash — in the

5   cash collateral request, the preservation of this $1.7 million

6   is paramount here and that the appropriate remedy be instituted

7   that this money is not spent, particularly in respect to Mr.

8   Ahrens' argument, erroneous argument I would say, that we are

9   simply an unsecured creditor.

10         THE COURT:  Okay.  But he's not going to spend any of

11  it between now and Wednesday.  He's told me that.  And so we're

12  just talking about the maintenance of the bank accounts, the way

13  they always have been for the next few days, until next

14  Wednesday.  Do you have any problem with that, as long as we

15  separate it out that way?

16         MR. OETZELL:  I — I have no problem with the

17  preservation of the funds as long as we have Mr. Ahrens'

18  representation or the appropriate remedy that that $1.7 million

19  will be held inviolate and not spent.

20         THE COURT:  To the extent that it's now held

21  separately it will be held.  Nothing different will be done

22  between now and Wednesday.

23         MR. OETZELL:  That is fine, Your Honor.

24         THE COURT:  Is that right?

25         MR. AHRENS:  That's correct, Your Honor.  That's what

*Motions Hearing*                                                    41

1    I said.

2          THE COURT:  Okay.  So that's fine.  We can put that in

3    the order.  Nothing different will be done with any $1.7

4    million.  There will be no change in the status and everybody

5    reserves their rights.

6          MR. AHRENS:  There will be no change in the status of

7    anything because we can't spend any cash because it may be

8    proceeds of cash collateral.

9          THE COURT:  Very good.

10          Anybody else on the phone want to make a statement?

11          MS. COHEN:  Yes, Your Honor.  Leslie Cohen of Liner,

12    Yankelevitz on behalf of Public Communications.

13          THE COURT:  Go ahead, Ms. Cohen.

14          MS. COHEN:  Thank you, Your Honor.  We're really

15    echoing some of what was stated by some of the other secured

16    creditors, that we'd like to see our — the receipts on our

17    accounts be properly account for.  We would like them to be

18    segregated as well.  And I don't know if the Court is going to

19    order that today, but I would like that request in the record as

20    well as a proper accounting so that we kind of know who — whose

21    money is whose while we're figuring out, you know, later on who

22    actually owns it or has a security interest in it.

23          MR. AHRENS:  Your Honor, I think that is appropriate

24    for Wednesday and not for this limited order.

25          THE COURT:  I agree.

*Motions Hearing*                                                                   42

1              Anybody else on the phone?

2        (No audible response.)

3              THE COURT:  Okay.  Sir, I don't remember your name.

4    If you'd step forward and state your name for the record,

5    please?  My understanding is that you're not represented.

6              MR. MORRISON:  My name is John Morrison.  I'm the

7    president and CEO of Agora Solution.

8              THE COURT:  Is that a corporation?

9              MR. MORRISON:  Yes, it is.

10             THE COURT:  You can't appear without counsel.  As a

11   corporation you cannot — by Local Rule — I didn't make up the

12   rule.  If you want to make — say a couple of sentences now, I'll

13   let you say them, but I won't let you appear again without

14   counsel.

15             MR. MORRISON:  Okay.  But I didn't have time to get

16   counsel.

17             THE COURT:  Well, I understand.  And you're going to

18   have time between now and Wednesday.  So if you want to make a

19   couple of sentences, —

20             MR. MORRISON:  Okay.

21             THE COURT:  — I'll let you do that.  But — but because

22   of the time constraint, I'll let you do it.

23             MR. MORRISON:  Fine.

24             THE COURT:  But I'm not going to let you do it again.

25             MR. MORRISON:  Okay.

*Motions Hearing* 43

1          THE COURT:  The Local Rules require that any

2    corporation is represented by counsel.

3          MR. MORRISON:  Okay.  Very quickly.  I have a Harvard

4    MBA and I run major companies and small companies.  The cash

5    management system is too complex.  I can't understand it.  And I

6    never could get to their controller to understand it.  I didn't

7    think they had any controller and et cetera in there.

8          There is no clear business rules, as stated in these

9    documents, for any of their accounts as to how the moneys are

10   going to be paid out.  We need business rules in that wired out.

11   Do the moneys go to us guys, who are supplying that money?

12   They're a middle man.  Those are our customers.  We have — the

13   debt that we have, that they say our debt is 400 — 840 — that is

14   1.4 million.  Multiply that by 1.5, is the total cost of getting

15   that moneys in there.

16         It should go to the customer first, tax, and then the

17   operating.  I'm willing to wager it goes to the operating

18   expenses first and then bad debt, which happens to be, in my

19   opinion, I apologize, a slushfund.

20         Or the majority owns the subsidiaries, you know,

21   participating in that cash pool.  When a company owns 97 percent

22   and you try to tell me that there is a free exchange, I never

23   heard of that.  I've never seen that.  It doesn't happen.

24         THE COURT:  Sir, they've been doing it this way since

25   1988, or something.

*Motions Hearing*                                    44

```
 1          MR. AHRENS:  The —

 2          MR. MORRISON:  There is the management —

 3          THE COURT:  And don't talk when I —

 4          MR. MORRISON:  Sorry.  Excuse me.

 5          MR. AHRENS:  Yes, Your Honor, —

 6          THE COURT:  How long has this system been in place?

 7          MR. AHRENS:  Since 1988 Integretal has been in
```
existence.  PaymentOne has been in existence since 2000.  I can
represent to the Court that they — PaymentOne has its own
separate bank accounts.
```
11          THE COURT:  Okay.

12          MR. MORRISON:  Then why does — is PaymentOne totally
```
integrat- — why is there $15.4 million of UCC, which was — which
was perfected at the time of the Florida — just before the
Florida lawsuit, which is kind of interesting.
```
16          THE COURT:  Sir, —

17          MR. MORRISON:  And if the management of UC- —

18          THE COURT:  — you're —

19          MR. MORRISON:  — of — of —

20          THE COURT:  You — I'm cutting you off, sir.

21          MR. MORRISON:  — PaymentOne also the management of —

22          THE COURT:  I can't — you are going to have to get a
```
lawyer —
```
24          MR. MORRISON:  Okay.

25          THE COURT:  — and do whatever it is that you want to
```

*Ruling on Motion for Authority to Use Existing Cash Management System*     45

1  do.  And if you —

2        MR. MORRISON:  I intend to do that.

3        THE COURT:  And I'll be glad to hear from counsel and

4  you can set it all up for me.  We're just talking about what —

5  I'm not saying your points don't have any validity because I

6  don't understand them yet.  Hire a lawyer, file whatever papers

7  you deem appropriate, give the debtor a chance to respond, and

8  I'll be glad to hear from you.

9        MR. MORRISON:  I didn't have an opportunity to do

10 that.

11       THE COURT:  I understand.  And so I let you say — you

12 gave me a flavor of what you were —

13       MR. MORRISON:  Thank you very much.

14       THE COURT:  Sure.

15       Does anybody wish to say anything before I rule on the

16 motion to retain cash management and the motion to appoint Mr.

17 Dawson?

18    (No audible response.)

19       THE COURT:  No.

20            <u>THE RULING OF THE COURT</u>

21       THE COURT:  Before the Court are debtor's emergency

22 motions for interim use of cash collateral and for authority to

23 continue using the debtor's existing cash management system and

24 bank accounts.  Mr. Ahrens has requested and nobody's opposed

25 continuing this hearing on the motion for use of cash collateral

1  until next Wednesday.  It's going to be scheduled at 2:15, and
2  so we're only going forward on the motion for authority to use
3  the existing cash management system and bank accounts.

4       The Court has heard from the United States Trustee and
5  various creditors.  Obviously the concern is that the best
6  records be kept if we maintain the existing cash management
7  system and bank accounts; and Mr. Ahrens is going to make sure
8  that the debtor does the best possible job with respect to that
9  both in the short term and in the longer term.

10      The Court finds notice to interested parties adequate
11 under the circumstances.

12      With respect to the debtor's emergency motion for
13 authority to continue using the existing cash management system
14 and bank accounts, the Court finds that the motion should be
15 granted under the circumstances.

16      There is no stated opposition to this motion.  Even
17 though the caption of the opposition of Creditor David Chase, as
18 Federal Receiver of AccessOne Communications, Inc. and
19 NetworkOne Services, Inc., which I shall refer to as receiver,
20 states that the receiver opposes the motion; the receiver's
21 opposition seems to be directed to the debtor's motion for
22 interim use of cash collateral.

23      And counsel, Mr. Oetzell, clarified that he has no
24 objection to the motion that the Court is discussing at this
25 point, as it's been discussed.

1    Based on the evidence before the Court, the debtor's

2  business is to receive billing transaction information from

3  debtor's clients and then to provide that information to local

4  exchange carriers who billed the end user and remit funds back

5  to debtor, who then pays a portion of those funds to debtor's

6  clients.  Debtor has contractual relationships with numerous

7  local exchange carriers that deposit funds into debtor's wire-in

8  account on a daily basis.

9    It would be an imposing burden for debtor to have to

10 alter the wiring instructions to the various local exchange

11 carriers, as well as disruptive to debtor's business to have to

12 change that.  The debtor has explained to the satisfaction of

13 the Court the debtor's need to maintain its current cash

14 management system and bank accounts, at least for the immediate

15 future, the foreseeable future.

16    Based on debtor's proposal to maintain its cash

17 management system with the following changes that have been

18 proposed by the debtor:  One, all signature cards will be

19 changed to reflect debtor's debtor-in-possession status; two,

20 debtor will work with the bank to ensure that no prepetition

21 checks or other prepetition claims are honored other than to the

22 extent authorized by the Court, to honor prepetition priority

23 obligations to employees; and, three, all billing transactions

24 submitted to the debtor prior to the bankruptcy filing will be

25 treated as prepetition claims.

*Ruling on Motion for Authority to Use Existing Cash Management System*          48

1          In addition, the debtor has made an agreement with the

2     U.S. Trustee's Office that to the extent that the debtor pays

3     any prepetition claim postpetition inadvertently or on purpose,

4     the debtor will subsequently seek approval of the Court to have

5     made that payment.

6          The Court grants the debtor's emergency motion for

7     authority to continue using debtor's existing cash management

8     system and bank accounts.

9          The Court has reviewed debtor's proposed order related

10    to this motion and finds it's appropriate.

11         The receiver in his opposition requests immediate

12    relief from stay to effectuate the orders of the Florida

13    District Court with respect to property that's subject to the

14    district court order filed on September 14.  It is that very

15    order that prompted the debtor to file this bankruptcy case.

16    This Court will not grant relief from stay *sua sponte* at this

17    time.  The receiver apparent- — has received an order from the

18    Florida District Court — United States District Court for the

19    Southern District of Florida, and that order is whatever it is.

20    And if the receiver wants this Court to take any action with

21    respect to relief from stay, the receiver is free to file

22    whatever motion the receiver deems appropriate and set if the

23    hearing on the cash — on the Court's calendar.

24         There being no opposition, Mr. Dawson is appointed

25    representative of the debtor for purposes of the bankruptcy

1  case.

2         Is there anything else that we could usually

3  accomplish today?

4         MR. AHRENS:  I think that's it, Your Honor.

5         THE COURT:  Very good.

6         Anybody on the phone or in the court wish to say

7  anything at this time?

8         Court is adjourned.  I'll see you Wednesday at 2:15.

9         MR. AHRENS:  Thank you, Your Honor.

10        THE COURT:  Now let me — but before — wait.  Let's go

11  back on the record, please.

12         I just want to have some kind of understanding.  The

13  reason I put this hearing off till today is because papers were

14  flying in and so there was no way to know whether I was going to

15  have oppositions and then response by the debtor to the

16  oppositions.  And I basically wanted to be able to read

17  everything before I came into court rather than having to listen

18  to it in court for the very first time.  I do better if I can

19  read papers before I come into court than if I have to take

20  arguments on the fly.  I don't do badly on the fly, but I do

21  better if I have the papers.

22         So the question is between now and Wednesday does

23  anybody have any idea what's going to happen?  Am I going to get

24  papers Wednesday morning?  Because I have a relief-from-stay

25  calendar Wednesday morning and I'm not going to be sitting up

1   here waiting for papers to fly in Wednesday morning.

2            So I understand that you're going to try to negotiate

3   and try to work things out as best you can, Mr. Ahrens, but the

4   reality is that I'm here and I'm not going to have a clue what's

5   going to happen.

6            MR. AHRENS:  I can tell you what we can do right now,

7   Your Honor.  We can distribute to the Court and anybody that's

8   present in court copies of the Revised Cash Collateral

9   Stipulation, so you can look at that right now.  It has been

10  redlined from the Cash Collateral Stipulation that we worked out

11  with PaymentOne over last weekend, so you can see the changes

12  from the document that you had before you.

13           We will also distribute to all parties that are

14  present in court and we are going to serve tonight, if we can,

15  or tomorrow at the latest the copies of this document.  And we

16  also will distribute the budget.  So you will see the budget

17  under the Revised Cash Collateral Stipulation and you will see

18  the Revised Cash Collateral Stipulation.

19           We may or may not file a brief, and I mean very, very

20  brief memo on Monday that sort of brings this all together.

21           THE COURT:  Monday's okay.  Wednesday's not okay.

22           MR. AHRENS:  Yes.  It will be a very brief — and we

23  will serve it on the parties-in-interest and file it with the

24  Court.

25           And that's it, Your Honor.  We're — I have explained

1  what the stipulation does.  It allows certain funds to flow from

2  Integretal or The Billing Resources to its subsidiary so that

3  the valuable subsidiary can remain in existence.  And it does

4  not set up any separate funds for any creditors and so it's

5  basically the same.

6           So if anybody hasn't objected already, I think what

7  the Court is saying is let's get those objections in maybe by

8  Monday or so.  I'm not ordering it, obviously.

9           THE COURT:  No, no.  That would be helpful if

10 everybody could file whatever it is they're going to file by

11 Wednesday now — by Monday.

12          Now obviously you're going to have to read whatever it

13 is Mr. Ahrens distributes today, but Monday close of business

14 should be the last time anybody files any papers absent some

15 extraordinary problem.  And then the debtor can respond on

16 Tuesday.

17          MR. AHRENS:  Thank you, Your Honor.

18          MR. OETZELL:  Your Honor, Walter Oetzell.  Mr. Ahrens

19 has made an assertion in his papers and here that we believe is

20 erroneous.  And Your Honor has made crystal clear various

21 concerns that Your Honor has —

22          THE COURT:  I have one more, too.

23          MR. OETZELL:  Okay.  We would intend to brief those as

24 best we can by that time.  We appreciate that Your Honor can't

25 hear this on the fly.  We would like a little — enough time to

1    do it.  We were hoping that perhaps Tuesday would be sufficient

2    time for you to review them and —

3            THE COURT:  No, because he has to reply and then I

4    have no time.  He has to be able to respond to whatever it is

5    all of you file.  And I have to then review it.  And, as I say,

6    I have a morning calendar on Wednesday already.  So I'm jammed

7    up as you are.

8            MR. OETZELL:  Then we will work for Monday, Your

9    Honor.

10            THE COURT:  Thanks.

11            Let me just mention, the only concern among — with

12    respect to the — I don't want to say the only.  A concern I had

13    with respect to the cash collateral motion was as follows.

14    Everything's backed up by the argument that there's this $24

15    million worth of accounts receivable and therefore everybody's

16    protected.  But there's very little discussion about the value

17    of these $24 million in accounts receivable.  And that point was

18    raised in the opposition and it wasn't lost on me.

19            And so to the extent that that can be clarified as to

20    whether we're talking about $24 million, which is collectable,

21    we have nothing in the history of the debtor in the papers that

22    says as the debtor's been doing this all along whether the —

23    what percentage of the accounts receivable are collectable, what

24    the aging is of the accounts receivable, such that we could be

25    comfortable that people really are adequately protected — I'm

1  holding aside of course the district court order — but they're

2  adequately protected by the motion.

3          MR. AHRENS:  I understand that point, Your Honor, and

4  we will address it in our papers on Monday.

5          THE COURT:  Okay.  It should be by declaration

6  obviously because it's fact.

7          MR. AHRENS:  Yes, obviously.  Would you like to —

8  shall I mark as an exhibit or just hand up to the Court the

9  papers that I was referring to?

10          THE COURT:  Well, Tanya will mark it.  We'll mark it.

11  We'll call it — you don't have any other exhibits

12          MR. AHRENS:  No.  No, Your Honor.

13          THE COURT:  So we call it Exhibit 1, Tanya?

14          MR. AHRENS:  Yes.  I submit as Debtor's Exhibit Number

15  1 that certain First Amended Stipulation with PaymentOne

16  Corportion regarding Use of Cash Collateral and Adequate

17  Protection.  And I will represent it is marked to show the

18  changes from the Cash Collateral exhibit attached to the Dawson

19  Declaration.

20          THE COURT:  All right.  Now the other question I had —

21          MR. AHRENS:  And I have — and as Exhibit Number 2,

22  Debtor's 2, the Revised Budget.

23          THE COURT:  Thank you.  Exhibit 1 and 2 are accepted,

24  and then she'll distribute those.

25          (Debtor's Exhibits 1 and 2 received in evidence.)

1    THE COURT:  The other — can you — Ms. Diemer, sit

2    down.  I'll call on you in a minute.

3    MS. DIEMER:  Thank you.

4    THE COURT:  Can you tell me, does this debtor make

5    money, lose money?  What is this debtor doing aside from this

6    flurry of activity in Florida about the $1.7 million, what is

7    the debtor's financial health or lack thereof?

8    MR. AHRENS:  It's insolvent.  That being said, with

9    the help of Chapter 11, and we've already talked about a

10   possible plan.  The plan we're thinking about would have some

11   type of debt for equity.  But the bottom line is all of the

12   customers can be assured that we have plenty of cash to continue

13   to operate during these Chapter 11s.

14   THE COURT:  And are you losing money on a daily basis?

15   MR. AHRENS:  We think — we think, and I can't

16   represent to the Court because you know that I would not make a

17   representation I'm not sure of, we think that when we have our

18   business reorganized and postpetition we can make money, yes.

19   We can make money, but —

20   THE COURT:  You didn't answer my question.

21   MR. AHRENS:  I didn't because I don't know the answer,

22   Your Honor.

23   THE COURT:  You don't know whether they're losing

24   money as we speak?

25   MR. AHRENS:  I will talk to my client, but I don't

1    think we know the answer to that.  But I'll be ready to address

2    that next Wednesday also.  That's a good —

3             THE COURT:  And that's critical, it seems to me.

4             MR. AHRENS:  Yes.

5             THE COURT:  I mean what are we saving here.  We're

6    saving the hope that in a reorganized debtor we can — we can

7    have an ongoing business, but it would be nice to know whether

8    we're losing money now and, if so, how much money we're losing.

9    And that also affects questions of adequate protection, maybe.

10   I mean it —

11            MR. AHRENS:  I understand.

12            THE COURT:  But those should be addressed on a factual

13   basis, not just on an opinion or brief basis.

14            MR. AHRENS:  We will address that to the best we can

15   on Monday.  I do know that PaymentOne is making money because

16   they've loaned us a lot of money.  And that's our valuable

17   asset, so we want to preserve that asset.

18            THE COURT:  Do they need you to exist for them to make

19   money?

20            MR. AHRENS:  Yes, today they do.  They do.  And we'll

21   address that in a declaration.  I agree, the declaration — I

22   mean the papers were filed — obviously we had advance papers

23   prepared because we knew this might happen.

24            THE COURT:  Right.

25            MR. AHRENS:  I represented to the Court I've been on

1   this case for 12 — or nine months, but it still is a rush over a

2   weekend to finalize the dollar amounts as of that day.  But

3   we'll have something for you Monday morning, Your Honor.

4   Monday.

5           THE COURT:  But you must have some historical

6   perspective —

7           MR. AHRENS:  We do.

8           THE COURT:  — your — and so that's —

9           MR. AHRENS:  We do.

10          THE COURT:  That I think would be helpful to everybody

11  to understand what we're dealing with here.

12          Ms. Diemer.

13          MR. AHRENS:  Thank you, Your Honor.

14          MS. DIEMER:  Yes, Your Honor.  I have long experience

15  of litigating with this company over these accounts and I think

16  that they have reports which they normally generate and at

17  various points during my career, which Mr. Dawson and his

18  various counsel have provided to me.

19          I asked Mr. Ahrens or Mr. Ahrens' partner if he could

20  provide to me certain accounting documentation so that I could

21  have the sort of information that you're asking for.  My concern

22  here today is that if I don't get those from Mr. Ahrens before

23  Monday I can't provide a response.  Whether we object or don't

24  object is specifically tailored to the information that we

25  receive.

1    I personally don't perceive that the budget answers

2   any of my questions, but I know that they have available to them

3   documentation which would.  And that is what I asked for.

4       I left messages as soon as I got notice.  I think I

5   got notice fairly quickly.  I left messages for Mr. Ahrens and I

6   also sent emails to Mr. Ahrens.  I didn't hear back from anyone

7   until late last night —

8       THE COURT:  They'll call you.  I'll ask them to call

9   you.  You will get a call.

10      MR. AHRENS:  Mr. Ponsford did talk to her yesterday,

11  Your Honor, because we were busy writing briefs today.

12      THE COURT:  Yeah, not that you're not going to be busy

13  over the weekend, too.  But they'll call you, Ms. Diemer, and

14  they'll —

15      MR. AHRENS:  Okay.  I —

16      THE COURT:  — say, you know, whatever their position

17  is with respect to what you want.  And of course are you an

18  unsecured creditor, as you perceive yourself —

19      MS. DIEMER:  No, I am not, Your Honor.  I am not.

20      THE COURT:  So you won't be part of an unsecured

21  creditors committee?

22      MS. DIEMER:  Not as far as I'm aware, Your Honor.  We

23  represent a secured creditor.

24      THE COURT:  I see, okay.  I was wondering whether you

25  would be getting information in that context, but —

1      MS. DIEMER:  We — right now I'm a secured creditor,

2   Your Honor.

3      THE COURT:  I understand, okay.  Have a wonderful

4   afternoon, everybody, and a good weekend.

5      MR. AHRENS:  Thank you, Your Honor.

6      THE COURT:  Court is adjourned.

7      MS. COHEN:  Question?

8      THE COURT:  Yes.

9      MS. COHEN:  Thank you.  Sorry to break it up before

10  it's over, but I just wanted to confirm that we would be getting

11  this Revised Stipulation, if we would get that by email this

12  afternoon so that we can work on our objections, if any, or our

13  analysis over the weekend and get something to Your Honor by

14  Monday.

15     MR. AHRENS:  We are trying to get it out tonight, at

16  the latest tomorrow.  We're down —

17     THE COURT:  Why can't we get it out by fax?  Can

18  everybody here give Mr. Ahrens their fax number, and I guess

19  I'll just do this over the phone.

20     MR. AHRENS:  Yes.

21     THE COURT:  So I want to make sure Mr. Rehfeld and Mr.

22  Ahrens have everybody's fax number.  So here in the court if you

23  just pass around a yellow pad or give him your card, we can take

24  care of them.

25     But on the phone let's go through this, just to make

*Discussion of the Hearing Scheduled for September 26, 2007*　　　59

1   sure.  I'm going to ask Mr. Rehfeld to help me, because as I

2   call them, I'm going to ask you, Mr. Rehfeld, whether you have a

3   valid fax, if you can do that.

4   　　　　MR. REHFELD:  And just to be sure, Your Honor, I think

5   we better just — because we have some people —

6   　　　　THE COURT:  We'll take them.

7   　　　　MR. REHFELD:  Yes.

8   　　　　THE COURT:  All right.  That's fine.  So I'm going to

9   go through everybody who's appeared.  So let's start.

10  　　　　Mr. Mora, what's your fax number?

11  　　　　Mike Mora?

12  　　　　Operator?

13  　　　　MR. MORA:  Yes, Your Honor.

14  　　　　THE COURT:  Where is —

15  　　　　MR. MORA:  Area code —

16  　　　　THE COURT:  Where is Michael Mora?

17  　　　　MR. MORA:  Here, Your Honor.

18  　　　　THE COURT:  May I have your fax number?

19  　　　　MR. MORA:  202-326-2558.

20  　　　　THE COURT:  Mr. Garfinkle.  Jeff Garfinkle.

21  　　　　MR. GARFINKLE:  Yes, Your Honor.  949-224-6400.

22  　　　　THE COURT:  Mr. Miller.

23  　　　　MR. MILLER:  Yes, Your Honor.  Area code 513-381-0205.

24  　　　　THE COURT:  Ms. Taub.

25  　　　　MS. TAUB:  404-572-5129.

*Discussion of the Hearing Scheduled for September 26, 2007*     60

1          THE COURT:  Mr. Pardo.

2          MR. PARDO:  The same as Ms. Taub's.

3          THE COURT:  Mr. Little.

4          MR. LITTLE:  Yes, Your Honor.  727-443- — or 441-2793.

5          THE COURT:  Okay.  441-2793?

6          MR. LITTLE:  Yes, Your Honor.

7          THE COURT:  And the area code again?

8          MR. LITTLE:  727.

9          THE COURT:  All right.  Repeat the whole number again

10   once.

11          MR. LITTLE:  Yes, sir.  727-441-2793.

12          THE COURT:  Ms. Cohen.

13          MS. COHEN:  310-500-3501.

14          THE COURT:  Mr. Coleman.

15          MR. COLEMAN:  818-594-3803.

16          THE COURT:  Mr. Chiang.

17          MR. CHIANG:  415-227-0770.

18          THE COURT:  Say it again.

19          MR. CHIANG:  415-227-0770.

20          THE COURT:  0770.

21          MR. REHFELD:  Your Honor, could I just ask the

22   question who is the person before Mr. Chiang —

23          THE COURT:  Craig Chiang — oh, —

24          MR. REHFELD:  Before.

25          THE COURT:  — Daniel Coleman.

1           Mr. Coleman, say your fax again.

2           MR. COLEMAN:  Area code 818-594-3803.  And I'm inhouse

3    with Network Telephone Services.

4           THE COURT:  Thank you.

5           Tanya, he would have been done better with a phone

6    list, I think.  You don't have the phone list.  I'm operating

7    off the phone list.  That's how I'm doing it.

8           Ms. Horowitz.

9           MR. HOROWITZ:  It's 213- —

10          THE COURT:  Oh, it's Mr. Horowitz.

11          MR. HOROWITZ:  That's all right, Your Honor.

12          213-624-9441.

13          THE COURT:  Very good.  And there were other people on

14   the phone who didn't appear but stated their names.  I want all

15   of them.  May I have — and anybody else who is on the phone and

16   their fax number.

17          MR. ROBIN:  Yes, Your Honor.  Bruce Robin, —

18          THE COURT:  R-o-b-i-n?

19          MR. ROBIN:  R-o-b-i-n.

20          THE COURT:  Okay.  And your fax?

21          MR. ROBIN:  808-526-0745.

22          THE COURT:  Tell me who you represent.

23          MR. ROBIN:  RRB Enterprises.

24          THE COURT:  Thank you.

25          Anybody else?

1          Nobody else.

2          Tanya, could you give him this phone list so that

3     he'll have the full names of the people.

4          MR. REHFELD:  Your Honor, could I ask one request?  I

5     can give my email address.  Also if people want to email me

6     their address, I can also pdf it to them.

7          THE COURT:  Yes.  Good.

8          MR. REHFELD:  Because that — because a lot of times

9     the fax machines are — have problems with —

10         THE COURT:  Right, and you can't read it.  The

11    district court order was hard to read.

12         MR. REHFELD:  Yes.

13         THE COURT:  Okay.  So everybody send Mr. Rehfeld an

14    email and it's Jeffrey Rehfeld.

15         How do you spell Rehfeld?

16         MR. REHFELD:  It's R-e-h-f-e-l-d, as in David.  And my

17    — my email —

18         THE COURT:  Jeffrey is spelled J-e-...

19         MR. REHFELD:  ...-f-f-r-e-y.

20         THE COURT:  Thank you.

21         And now he's giving his email.  Everybody in court

22    should be writing it down and everybody on the phone should be

23    writing it down.  And he's going to do it real slowly.

24         MR. REHFELD:  JRehf — as in Frank — eld — as in David

25    — @SheppardMullin.com.  And that's spelled

1  S-h-e-p-p-a-r-d-M-u-l-l-i-n dot com. So once again from the

2  beginning JRehfeld@SheppardMullin — S-h-e-p-p-a-r-d-M-u-l-l-i-n

3  — dot com.

4         MR. AHRENS:  And, Your Honor, I will represent that we

5  have passed out to all those in court a copy of Exhibits 1 and

6  2.

7         THE COURT:  Okay.  Now is there any reason why we

8  can't just set these up on the fa- — Exhibits 1 and 2 on the fax

9  machine and send them out right away, call your secretary and

10 send them out?

11        MR. AHRENS:  We'll —

12        THE COURT:  You can — I could fa- — if you want me to

13 fax the list to your secretary, I'll send it from my chambers,

14 to make sure people get it.

15        MR. AHRENS:  Your Honor, that would be helpful.

16        THE COURT:  Okay.  I'm not faxing it.  I'm just faxing

17 the list to your chambers.  I'm not faxing it to — I'm not

18 agreeing to fax it to all these folks.  I'm fa- — I say your

19 chambers.  To your offices.  I've been hanging around judges too

20 long.

21        MR. REHFELD:  Just so I'm clear, the one you're going

22 to fax down is the one that — your list, Your Honor, of the fax

23 numbers you took down.  You want me to —

24        THE COURT:  I didn't take any fax numbers down.

25        MR. REHFELD:  Okay.  I have it right here.  So I can

1    give mine —

2         MR. AHRENS:  Your Honor, am I suggest — present to the

3    Court the name of the person who should receive it, and that is

4    the fax number.

5         THE COURT:  Fine.  And I'll ask my Deputy to fax her.

6    She can fax both pages.  The phone list, which shows the phone

7    numbers and the fax list, which you're going to write "fax list"

8    on in big letters.  And then you call her and deal with it.

9         MR. REHFELD:  Yes, Your Honor.

10        THE COURT:  I'm just faxing the paper.

11        MR. REHFELD:  Yes, Your Honor.

12        MR. AHRENS:  Thank you so much for your help, Your

13    Honor.

14        THE COURT:  Thank you.  Court is adjourned.

15        MR. AHRENS:  Thank you.

16        THE COURT:  Have a good afternoon and a good weekend.

17        Mr. Fiero, you were noticed you know.

18        MR. FIERO:  Thank you, Your Honor.

19        (The hearing was adjourned at 3:03 o'clock p.m.)

20                              —o0o—

21

22

23

24

25

State of California              )
                                )    SS.
County of San Joaquin           )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Northern District of California, of the

proceedings taken on the date and time previously stated in the

above matter.

        I further certify I am not a party to nor in any way

interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

through the American Association of Electronic Reporters and

Transcribers, Certificate No. 00124.  Palmer Reporting Services

is approved by the Administrative Office of the United States

Courts to officially prepare transcripts for the U.S. District

and Bankruptcy Courts.


                        _____
                        Susan Palmer
                        Palmer Reporting Services

                        Dated October 2, 2007

**RER - 24**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARTHUR S. WEISSBRODT, JUDGE

In Re:                    ) Case No. 07-52890-ASW
                         ) Chapter 11
                         )
THE BILLING RESOURCE, dba    ) <ins>CONTINUED HEARING on</ins>
Integretal, a California     ) <ins>EMERGENCY MOTION for</ins>
corporation,                ) <ins>USE of CASH COLLATERAL and</ins>
                         ) <ins>GRANTING REPLACEMENT LIENS</ins>
                  Debtor.  )
_____ )
                         )
THE BILLING RESOURCE,        ) Adv. 07-5156
                         )
             Plaintiff,  ) <ins>EMERGENCY MOTION for</ins>
                         ) <ins>TEMPORARY RESTRAINING ORDER</ins>
      v.                   ) <ins>and ORDER to SHOW CAUSE re</ins>
                         ) <ins>PRELIMINARY INJUNCTION and</ins>
CHASE, et al.,            ) <ins>DECLARATORY RELIEF</ins>
                         ) Wednesday,
           Defendants.  ) September 26, 2007
_____ ) San Jose, California

<u>Appearances</u>:

For the Debtor           Michael H. Ahrens, Esq.
and Movant:             Jeffrey K. Rehfeld, Esq.
                      Steven B. Sacks, Esq.
                      Sheppard Mullin Richter & Hampton
                      Four Embarcadero Center, 17th Floor
                      San Francisco, California  94111

For the Federal         Walter K. Oetzell, Esq.
Trustee:               Danning, Gill, Diamond & Kollitz, LLP
                      2029 Century Park East, Third Floor
                      Los Angeles, California  90067-2904

From the U.S. Trustee:   Shannon Mounger-Lum, Attorney
                      United States Trustee, Region 17
                      United States Department of Justice
                      280 South First Street, Room 268
                      San Jose, California  95113

Appearances continued on next page.

Appearances <u>continued</u>:

| | |
|---|---|
| From the Federal Trade Commission: | Michael Mora, Attorney<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20580 |
| For PaymentOne Corporation: | Steven H. Warren, Esq.<br>Victoria A. Newmark, Esq.<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, California  90071-2899 |
| For Creditor Thermo Credit LLC: | Dolores Cordell, Esq.<br>Clark & Trevithick, PLC<br>456 Montgomery Street, 20th Floor<br>San Francisco, California  94104 |
| | Jack V. Eumont, Jr., Executive<br> Vice-President of Internal Operations<br>Thermo Credit LLC |
| For POL, Inc.: | Kathryn S. Diemer, Esq.<br>Law Offices of Diemer & Whitman<br>2 North Second Street, Suite 290<br>San Jose, California  95113 |
| For Creditors/Customers American Premium Warehouse; D.D.D. Calling, Inc.; Horizon Telecom, Inc.; Norstar Marketing; RRB Enterprises; and Total Project, LLC: | Peter J. Benvenutti, Esq.<br>Michaeline Correa, Esq.<br>HellerEhrman LLP<br>333 Bush Street<br>San Francisco, California  94104 |
| For Creditors Email Discount Network and Intelicom Messaging: | Austin P. Nagel, Esq.<br>Law Offices of Austin P. Nagel<br>111 Deerwood Road, Suite 388<br>San Ramon, California  94583 |

<u>Telephonic Appearances</u>:

| | |
|---|---|
| Also present: | Jeff Garfinkle, Esq.<br>Craig Chiang, Esq.<br>Buchalter Nemer Fields & Younger<br>333 Market Street, Twenty-Fifth Floor<br>San Francisco, California  94105-2130 |

Appearances continued on next page.

3

Telephonic Appearances continued:

For Creditor Thermo
Credit LLC:
Leslie R. Horowitz, Esq.
John A. Lapinski, Esq.
Clark & Trevithick
800 Wilshire Boulevard, 12th Floor
Los Angeles, California  90017

W. Timothy Miller, Esq.
Taft Stettinius & Hollister
425 Walnut Street, Suite 1800
Cincinnati, Ohio  45202

For Interested Party
Personal Voice:
Thomas C. Little, Esq.
Law Offices of Thomas C. Little

For Interested Party
King & Spalding:
James Pardo, Jr., Esq.
King & Spalding
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309

For the Federal
Trustee:
Jeffrey Schneider, Esq.
Tew Cardenas, LLP
Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida  33131-3407

From the Federal
Trade Commission:
Collot Guerard, Esq.
Richard McKuen, Esq.
600 Pennsylvania Avenue, N.W.
Washington, D.C.  20580

For Interested Party
RRB Enterprises:
Bruce Robin, Esq.
RRB Enterprises

For Creditors Teleco
Billing and Live Deal,
Inc.:
Joseph C. McDaniel, Esq.
Joseph C. McDaniel & Associates, PLLC
4840 E. Jasmine Street, Suite 110
Mesa, Arizona  85205

For Creditor Network
Telephone Services:
Daniel Hagan Coleman, Esq.
Law Offices of Daniel Coleman
6233 Variel Avenue
Woodland Hills, California  91367-2544


Appearances continued on next page.

RER-24        1076

<u>Telephonic Appearances continued</u>:

For Creditor Public                Leslie A. Cohen, Esq.
Communications                     Enid M. Colson, Esq.
Services, Inc.:                    Liner, Yankelevitz, Sunshine &
                                    Regenstreif, LLP
                                   1100 Glendon Avenue, 14th Floor
                                   Los Angeles, California  90024-3503


For POL, Inc.:                     Joel Dichter, Esq.
                                   Dichter Law LLC
                                   10 Rockefeller Plaza, Suite 816
                                   New York, New York  10020



Digital Court                      United States Bankruptcy Court
Recorder:                          Clerk of the Court
                                   Lupe Barron
                                   280 South First Street, Room 3035
                                   San Jose, California  95113
                                   (408) 535-5003








Certified Electronic               Palmer Reporting Services
Transcriber:                       P. O. Box 30727
                                   Stockton, California  95213-0727


            Proceedings recorded by digital recording;
    transcript produced by federally-approved transcription service.

RER-24        1077

1    Wednesday, September 26, 2007.                    3:18 o'clock p.m.

2                          P R O C E E D I N G S

3          THE CLERK:  Please rise.

4          THE COURT:  Thank you, ladies and gentlemen.  Please

5    be seated.

6          I have three externs.  I'd like them to introduce

7    themselves so you know who they are and I have a law clerk here,

8    Jennifer Niemann, who all of you know.

9          So please go ahead.

10          MS. AUBURN:  I'm Tracy Auburn (phonetic).

11    (Inaudible.)  I graduated from (inaudible) State University

12    School of Law.

13          MR. [SPEAKER]:  (Inaudible) student at (inaudible).

14          MS. WILLIAMS:  (Inaudible) Williams, also a third-year

15    student at Lincoln (phonetic).

16          THE COURT:  Okay.  This is The Billing Resource.  May

17    I have appearances of counsel?  First those in the courtroom and

18    then I'll call the people on the phone.

19          MR. AHRENS:  Good afternoon, Your Honor.  Michael

20    Ahrens and Jeffrey Rehfeld of Sheppard Mullin Richter and

21    Hampton, appearing on Item Number 1.  Also — and that is the

22    cash collateral motion — also appearing in court is my partner

23    Steve Sacks, who will argue the temporary restraining order,

24    which is item Number 2.

25          THE COURT:  Thank you.

1    MR. OETZELL:  Good morning, Your Honor.  Walter

2  Oetzell of Danning, Gill, Diamond and Kollitz on behalf of the

3  federal trustee.  It is the afternoon.  Good afternoon, Your

4  Honor.  We also have Jeffrey Schneider of Tew Cardenas on the

5  phone, but he will introduce himself.

6    THE COURT:  Thank you, sir.

7    MR. MORA:  Good afternoon, Your Honor.  Michael Mora,

8  counsel for the Federal Trade Commission.

9    THE COURT:  Mr. Mora.

10    MR. WARREN:  Good afternoon, Your Honor.  Stephen

11  Warren of O'Melveny and Myers on behalf of PaymentOne

12  Corporation.

13    THE COURT:  Good afternoon.

14    MS. CORDELL:  Good afternoon, Your Honor.  Dolores

15  Cordell of Clark and Trevithick on behalf of Thermo Credit.  We

16  also have attorneys on the phone.  And Mr. Jack Eumont of Thermo

17  Credit is present in the courtroom.

18    THE COURT:  Very good.  Welcome.

19    MS. DIEMER:  Good afternoon, Your Honor.  Kathryn

20  Diemer on behalf of POL, Inc.

21    THE COURT:  Good afternoon.

22    MS. MOUNGER-LUM:  Good afternoon, Your Honor.  Shannon

23  Mounger-Lum for the U.S. Trustee.

24    THE COURT:  Good afternoon.

25    MR. BENVENUTTI:  Good afternoon, Your Honor.  Peter

1    Benvenutti from HellerEhrman for the following

2    creditor/customers:  American Premium Warehouse; D.D.D. Calling,

3    Inc.; Horizon Telecom, Inc.; Norstar Marketing; RRB Enterprises;

4    and Total Project, LLC.

5              THE COURT:  Good afternoon.

6              MR. NAGEL:  Good afternoon, Your Honor.  Austin Nagel

7    for Intelicom Messaging and Email Discount Network.

8              THE COURT:  Good afternoon.

9              Now on the phone I have Leslie Horowitz, please.

10             MR. HOROWITZ:  Yes.  Leslie Horowitz and John Lapinski

11   for Thermo Credit, Your Honor.

12             THE COURT:  Timothy Miller?

13             MR. MILLER:  Yes, Your Honor.  Tim Miller, Taft

14   Stettinius and Hollister in Cincinnati on behalf of Thermo

15   Credit.

16             THE COURT:  Jeff Garfinkle?

17             MR. GARFINKLE:  Yes, Your Honor.  Jeff Garfinkle of

18   Buchalter Nemer.

19             THE COURT:  For?

20             MR. GARFINKLE:  Your Honor, we are not authorized to

21   make an appearance.  We're just listening in.

22             THE COURT:  That'll be fine.

23             Mr. Thomas Little.

24             MR. LITTLE:  Yes, Your Honor.  Thomas Little for

25   Personal Voice, Inc.

*Emergency Motion for Use of Cash Collateral*                                    8

1              THE COURT:  Thank you.

2              Craig Chiang.

3              MR. CHIANG:  Good afternoon, Your Honor.  Craig

4   Chiang, Buchalter Nemer.

5              THE COURT:  James Pardo.

6              MR. PARDO:  Jim Pardo with King and Spalding in

7   Atlanta for BSG, Billing Solutions, Your Honor.

8              THE COURT:  Thank you.

9              Jeff Schneider.

10             MR. SCHNEIDER:  Yes, Your Honor.  Jeff Schneider in

11  Miami on behalf of the court-appointed receiver David Chase.

12             THE COURT:  Collot Guerard.

13             MS. GUERARD:  Yes, Your Honor.  Collot Guerard from

14  the Federal Trade Commission and Richard McKuen (phonetic) from

15  the Federal Trade Commission.

16             THE COURT:  Thank you.

17             Bruce Robins.

18             MR. ROBIN:  Good afternoon, Your Honor.  Bruce Robin

19  for D.D.D. Calling, RRB Enterprises.  Just observing.

20             THE COURT:  Joe McDaniel.

21             MR. MCDANIEL:  This is Joseph McDaniel for Creditor

22  and Customer Teleco Billing, Inc. and Live Deal, Inc.

23             THE COURT:  Daniel Coleman.

24             MR. COLEMAN:  Good afternoon, Your Honor.  Daniel

25  Coleman on behalf of Network Telephone Services.

*Emergency Motion for Use of Cash Collateral*                    9

1            THE COURT:  Leslie Cohen.

2            MS. COHEN:  Good afternoon, Your Honor.  Leslie Cohen

3    and Enid Colson, Liner Yankelevitz in Los Angeles, on behalf of

4    PCS.

5            THE COURT:  Is there anybody else on the phone who has

6    not yet stated an appearance?

7            MR. DICHTER:  Yes, Your Honor.  This is Joel Dichter,

8    Dichter Law in New York.

9            THE COURT:  I can barely hear you, sir.  Could you

10   speak up and directly into the phone?

11           MR. DICHTER:  Joel Dichter of Dichter Law in New York

12   on behalf of POL, Inc., along with Ms. Diemer in the courtroom.

13           THE COURT:  And can you spell your last name?

14           MR. DICHTER:  D-, as in David, -i-c-h-t-e-r.

15           THE COURT:  Thank you.

16           Anybody else?

17      (No audible response.)

18           THE COURT:  Excuse me.  Everyone, please make sure

19   your cellphones are switched off.  It will affect our sound

20   system.  So it should be turned to off, not vibrate, just off,

21   if you would please.

22           Okay.  I've just handed out an opinion by the district

23   court or a decision by the district court in Florida.  Does

24   everybody in the courtroom have a copy?

25           Yes.  Okay.  Mr. Ahrens, can you summarize it for

1    those on the phone?

2          MR. AHRENS:  Yes.  The order conditionally grants —

3    well, background.  Counsel for Integretal or for The Billing

4    Resource, the debtor, filed a motion in the district court after

5    it filed a notice of appeal of the district court's order.

6          In that district court it sought a stay of the

7    district court's order from the district court because of the

8    requirement that you must seek a stay from the lower court first

9    before seeking it in the Eleventh Circuit.  The court

10   conditionally denied — conditionally granted that stay pending

11   appeal, but provided that it only is granted if Integretal

12   transfers the amount of $1,762,762.56 to the receiver within

13   three days of the date of this order and says that the receiver

14   shall hold those funds into a segregated account during the

15   pendency of the appeal.

16         And if — the way I read it is if the funds are not

17   transferred, then the court has denied the stay.  That's —

18         THE COURT:  I'm sorry?

19         MR. AHRENS:  Then the court, the district court has

20   denied the request for a stay.  And I can inform the Court then

21   the intention would be unless this Court grants, which is Number

22   2 on the docket, the temporary restraining order, then the

23   debtor would go to the Eleventh Circuit because the stay has

24   been denied in the lower court.

25         Your Honor, would you like me to sum- — there's two

1   matters before Your Honor.  One is a cash collateral motion and

2   the other is a motion for a temporary restraining order in

3   connection with an adversary complaint.  I would suggest that we

4   take the cash collateral matter first.  And then people, after

5   you rule on that, may or may not be interested in the adversary

6   complaint matter.

7           THE COURT:  Thank you.  That will be fine.

8           MR. AHRENS:  Your Honor, I would like to summarize

9   what's happened since the last court hearing.  There's been a

10  lot of pleadings filed in the last two days, and I will not

11  repeat what's been in our pleadings.  And I will stand here and

12  answer any questions of the Court.  But the bottom line is when

13  we first filed this case we filed a very brief budget for the

14  first three weeks.  And then we filed a better budget and now we

15  have filed a 27-week ruling budget with the Court.

16          And I think we've answered a lot of the questions of

17  the Court, and we did this also so we could get this financial

18  information to our creditors.

19          Before the court hearing today we had a meeting with a

20  number of our customers.  And the Court accommodated us and

21  allowed us to use this room as a conference room, basically, to

22  meet with our customers.  And thank you very much for doing

23  that, because it was very helpful.

24          Not only were our customers present in court but we

25  also were able to talk to a number of customers through a

speakerphone here in the court.

And, to make a long story short, Your Honor, we met with 14 of our customers. We talked to them about questions that they had about our financial information and we informed them of our intention in going forward. It is my opinion and the opinion of many of the other creditors' lawyers and customers' lawyers that I have been talking to that we have the right in the ordinary course of business to pay for the receivables that we are buying.

And the contract provides that — a certain mechanism for paying for those receivables and we are in current discussions with our customers about a way if they transfer receivables to us in the ordinary course, as I think they will. And if we have customer support we would prepay for a certain portion of it, just like in bankruptcy you're allowed to prepay for matters.

And it's my opinion that we do not need Court approval for this because it's ordinary course, but whatever we do we are going to inform the Court and we are going to inform all of our customers. And probably by tomorrow or the next day we are going to send to the customers the plan that we've been discussing.

And during the last few days, this is not just our plan, it's been a negotiated plan, a negotiated plan, small "p," with our creditors. A plan whereby they would continue to do

1   business with us.  I'm happy to report to the Court that since

2   we filed we're getting in our receivables from the LECs like

3   normal and business has not been disrupted.  The only thing we

4   of course need is our cash.  And hopefully the Court will grant

5   the use of cash collateral.

6        We've answered all the questions we think of the

7   customers, and they're well represented in court today on the

8   phone — and on the phone about the deal with PaymentOne.  We

9   filed declarations since last time about PaymentOne, about its

10  operations, and about attempts to sell it on a going-concern

11  basis.  Many of the creditors have been extremely interested in

12  the identity of that person in the negotiations.

13       We formed — we informed the customers today that those

14  discussions are ongoing but that there is a confidentiality

15  agreement with the purchaser.  And so we did not want to

16  disclose the name of that party without a committee being formed

17  and without the confidentiality that is attendant to the

18  committee.

19       However, Mr. Benvenutti asked me to represent on the

20  record, and I will, that I've talked to the principals of

21  PaymentOne and they have confirmed that the discussions are with

22  — are not with an insider.  It's a true, good faith

23  negotiations.

24       So with that being said, Your Honor, I think we have

25  met with our creditors.  We have a budget that I think shows

1   that there's plenty of cash that will be left in the company,

2   even after paying the amounts for the next three weeks necessary

3   to pay PaymentOne.

4           Creditors have asked us in the last few days how much

5   is PaymentOne delivering to you in the next month.  It's going

6   to get close — or a little bit in excess of $2 million itself

7   out of your cash collateral adequate protection payment.  And

8   we've represented to them that we believe that PaymentOne will

9   deliver to Integretal billings of in excess of $2.3 million.  So

10  we've been in negotiation with creditors, discussions with

11  creditors, talking to them about these financial numbers.

12          And I submit to the Court that even if there may be

13  some other parties, and I would anticipate the receiver and the

14  FTC might still be objecting to use of cash collateral, we have

15  done what a debtor does in the first week of a case; and that is

16  talk to creditors, improve on financial information, give more

17  financial information to the Court.

18          And with this budget alone, Your Honor, you see that

19  in the next three weeks, the cash is going to build on a

20  substantial basis.

21          Now we've said in our papers that this might be an

22  invitation to the FTC to say, well, give me my $1.7 million.  I

23  can assure you we need that for our continuing operations.  I

24  can assure you that I've already briefed everything I think that

25  is needed to be briefed in connection with why it simply isn't

*Emergency Motion for Use of Cash Collateral*                                    15

1   their money, and I will address that in a few minutes if the

2   Court has any more questions. But the money is needed for other

3   things, for this prepayment plan, that we need to retain most of

4   our creditors. And the money is creditor money. And it is not

5   money of a specific creditor, namely the FTC or the receiver.

6           Your Honor, we feel we have two valid creditors that

7   have security interests that are not subject to attack. That is

8   the debtor's feeling. But we're not taking a dive on either one

9   of them. We are not agreeing to the validity of a security

10  interest of either one of them.

11          With respect to PaymentOne we think there are

12  arguments that they did not properly perfect because of the name

13  change, but they did perfect. And we think eventually and we

14  think that they have a very good new value exception argument of

15  $6.5 million. And we're giving them a cap of $4 million under

16  the stipulation, so at least Sheppard Mullin Richter and Hampton

17  is satisfied that this is fair. But once again I stress we are

18  not binding a committee, a successor trustee. We're not even

19  binding the debtor. I have the right to object to their claim

20  later on.

21          The other creditor that we think has a good security

22  agreement is a creditor known as Omni and also known as POL,

23  represented by Ms. Diemer. We have a done a deal with her that

24  I will describe to the Court, and Ms. Diemer can confirm it, for

25  adequate protection. And that is that we feel that they have a

1  good security interest.  They're owed approximately $162,000 on

2  a direct claim and about another — they may be owed a contingent

3  claim depending on a tax claim in New York — of up to $800,000,

4  maybe a little more, maybe a little less.

5          We will agree that we will pay them as adequate

6  protection the $162,000 and — probably on Monday, I think on

7  Monday.  And then I will at least confirm — the debtor will

8  confirm that the debtor feels they have a good security

9  interest.  But again that's not binding on the trustee, not

10  binding on the committee.

11          With respect to other objections, Your Honor, we think

12  we've addressed them in our brief.  And I'm available to answer

13  any questions.  I don't think I have to again argue, unless the

14  Court wants me to, why I don't think the receiver should be

15  entitled to $1.7 million.  That might come up in the argument on

16  the adversary complaint as to whether we're entitled to a stay,

17  but I think with respect to use of cash collateral they don't

18  have a UCC1.  They don't have any interest in our general

19  account.

20          I don't think we had to segregate.  In our briefs we

21  put forth the reasons.  Here's the language of the contract.  It

22  says that they — we are entitled to hold back reserves.  It

23  never says we're going to set up a separate bank account.  But

24  regardless of that argument, Your Honor, the fact of the matter

25  is, the fact of the matter is we never set up a separate reserve

*Emergency Motion for Use of Cash Collateral*                    17

1    bank account for either one, two, or 54 of our customers.  So

2    there is no se- — everything's been commingled.  So we think

3    that's an asset of the estate.

4              I don't have anything to add to my briefs on that

5    point, Your Honor.  I think we've shown at least enough — more

6    than enough showing to last for three weeks, so that we can have

7    a committee formed, talked to the committee on a confidential

8    basis, and get the opinion of an official committee, Your Honor.

9              THE COURT:  Thank you.  You may sit down.  I'm going

10   to have questions for you, but I have a couple of questions for

11   Ms. Mounger.

12             What is the status of the formation committee?  What

13   has been done?

14             MS. MOUNGER-LUM:  We are currently accepting the forms

15   that the committee members submit to our office.  We do have

16   enough for a committee at this time, but we only have three,

17   which is the minimum that we would form a committee with.  I

18   understand that there are more coming, and so we were intending

19   to wait for a few days to make sure we had all that was coming

20   so we could form the committee and we wouldn't have to do it

21   piecemeal and in multiple steps.

22             THE COURT:  Well, do you want to announce by when

23   you're going to make your decision so people know that if — they

24   better get their form in by x date so it's clear what's going

25   on?

*Emergency Motion for Use of Cash Collateral*                                    18

1      MS. MOUNGER-LUM:  We intend to have a committee formed

2  by next Friday, Your Honor.

3      THE COURT:  So you're going to let it go another week?

4      MS. MOUNGER-LUM:  We were — well, yeah, unless —

5      THE COURT:  That's ten days.

6      MS. MOUNGER-LUM:  — unless —

7      THE COURT:  That's not a couple of days, that's ten

8  days.

9      MS. MOUNGER-LUM:  Well, at this point we only have

10  three.  I understand there are a lot of creditors out there and

11  the creditors that are out there may have a lot more claims than

12  the creditors that have currently submitted forms.  You know,

13  we'd be happy to do it on Wednesday.  I just want to make sure

14  that we don't have to incur the time and expense of

15  reconstituting the committee or adding members on as they come

16  in.  We would like to do it, you know, as seamlessly as possible

17  and have an answer that this is the committee at this point and

18  we would like to keep it, the committee, so they could do some

19  good work.  So if the Court would prefer, we could —

20      THE COURT:  I don't have a strong preference and I

21  don't know how difficult it is for you to add somebody.  I don't

22  — is that a big deal?

23      MS. MOUNGER-LUM:  It's not a big deal except for the

24  resources of our office.  Because there are a lot of creditors

25  and every time we do this the creditors would get notice.  And I

1   — I mean if someone would like to inform me as to the disruption

2   to the committee once you add people and need to get them up to

3   speed or remove people, if necessary, I haven't been part of the

4   committee so I don't know that.

5              THE COURT:  Do you think waiting till next Friday is

6   reasonable or you think it's too long?

7              MR. AHRENS:  Your Honor, we are quite anxious to meet

8   with the formal committee and have committee select counsel.

9   But I — I'm not in the business of forming committees, so I

10  don't know.  If it's a big task, there are — we listed at least

11  30 creditors.

12             THE COURT:  Yeah.  Mr. Benvenutti, I know you

13  represent some unsecured creditors.

14             MR. BENVENUTTI:  I do, Your Honor, at least some of

15  whom are interested in serving on a committee.  If I may, I

16  think waiting until next Friday is too long, for reasons which I

17  will address when I explain why —

18             THE COURT:  Don't wait.  Just tell me now, because —

19             MR. BENVENUTTI:  All right.  Fine.  Here's the

20  situation, Your Honor.  My clients —

21             THE COURT:  It seems long to me given the

22  circumstances.

23             MR. BENVENUTTI:  It definitely is.

24             THE COURT:  This case is —

25             MR. BENVENUTTI:  This is a case which may be real and

1  may not be real.  My clients approached this with a fair measure

2  of skepticism.  My clients are withdrawing their objection to

3  the use of cash collateral because the information that we've

4  been given by the debtors subject to the strictures of this

5  confidentiality agreement that they have described suggest that

6  the PaymentOne transaction may be a real deal.  But we can't

7  find out, we can't get beyond — behind the veil to probe and to

8  try to make some independent judgments about whether it's worth

9  keeping the company going —

10          THE COURT:  The debtor alive.

11          MR. BENVENUTTI:  — in order to go after that

12  transaction.

13          THE COURT:  And as soon as you have a committee,

14  they'll provide the information.

15          MR. BENVENUTTI:  That's correct, Your Honor.  So I

16  think it's critical that we get a committee up and running just

17  as soon as possible.

18          THE COURT:  And it outweighs the problem if you have

19  to add somebody down the road.

20          MR. BENVENUTTI:  Well, that's true.  But I also think,

21  Your Honor, that there's a lot of talk about this case in the

22  industry.  And I think that it would be possible to accelerate

23  the process of getting responses by a communication to the

24  people on the list.  If Ms. Mounger wanted to have expressions

25  of interest in, say, by the end of the day tomorrow or Friday, —

1          THE COURT:  By the end of this — right.  By the end

2    of —

3          MR. BENVENUTTI:  — I think — I think that would — that

4    would be fine.

5          THE COURT:  And then she could do it Monday.

6          MR. BENVENUTTI:  That's correct.

7          THE COURT:  By the end of Friday and doing it Monday,

8    that's what I would think.

9          MR. BENVENUTTI:  And we're happy that — we're happy to

10   help with that communication, if that's what Ms. Mounger would

11   like.

12         THE COURT:  It's a paragraph, isn't it, Mr.

13   Benvenutti?

14         MR. BENVENUTTI:  Yes, Your Honor.  It really — I'm

15   assuming we have either fax — fax addresses or email addresses

16   for the representatives of the committee.  I don't know that we

17   could get it out this afternoon, but we certainly could get it

18   out tomorrow morning.

19         THE COURT:  And say that papers in by either close of

20   business Friday or close of business Monday, and committee by

21   Tuesday and be done with this so we have somebody the debtor can

22   negotiate with; and so that all this information can become

23   public to the committee.

24         MR. BENVENUTTI:  I think that's very important, Your

25   Honor.

1     MR. AHRENS:  I just checked with my client and

2  obviously we support that, Your Honor.

3     MS. MOUNGER-LUM:  And, Your Honor, we're —

4     MR. BENVENUTTI:  Thank you.

5     MS. MOUNGER-LUM:  — we are prepared to form the

6  committee as soon as one is able to be formed.  I think our main

7  concern is that it's as representative as possible.  And at this

8  point we've got three creditors.  There are a lot of attorneys

9  here in this room today who are representing unsecured creditors

10  and I don't believe we've heard from those people, so the so- —

11     THE COURT:  But they know, and we're here.

12     MS. MOUNGER-LUM:  Right.

13     THE COURT:  And if we give them notice, they better

14  get everything in by Friday or they're — if they're not likely

15  to be on the committee, then they have fair notice.  People on

16  the phone, you have people in court.  Presumably most of the

17  people who are interested are represented here and can be on

18  notice, —

19     MS. MOUNGER-LUM:  I agree.

20     THE COURT:  — so if you're — if you're comfortable

21  saying they should get their papers into you by Friday, we'll

22  make that announcement here and you can follow it up with a

23  written.  If you prefer and do it — have the papers in by

24  Monday, then, you know, it's really your game, but this case

25  screams for prompt action.