1    MS. MOUNGER-LUM:  I understand, Your Honor.  And I

2   think that attorneys that are in this room also have to take

3   prompt action.  And I've heard a lot about creditors that are

4   interested, but we haven't seen the action.  So, you know, if

5   they would get us the papers by Friday, close of business, we

6   will form a committee on Monday, and that's not a problem.

7        THE COURT:  Right.  But I'd like to make the

8   announcement that you're going to form a committee on Monday and

9   whosever's in is in and whoever's not in, you know, won't be on

10  Monday.

11       MS. MOUNGER-LUM:  I don't — I can't — I can't

12  represent to the Court that whoever wants to be on the committee

13  will be —

14       THE COURT:  No, of course.

15       MS. MOUNGER-LUM:  — put on the committee.

16       THE COURT:  Of course.

17       MS. MOUNGER-LUM:  But, yes, the people that are

18  qualified to be on the committee that we think are

19  representative of the creditor body will be put on a committee

20  on Monday.

21       THE COURT:  And they should let you know by Friday?

22       MS. MOUNGER-LUM:  Yes, please.

23       THE COURT:  Okay.  So everybody's on notice that if

24  you want to be on this committee, your papers should be into the

25  U.S. Trustee's office by Friday and that the U.S. Trustee's

1   Office, if they can, will form a committee on Monday and that

2   will get things moving much faster, which I think is very

3   helpful.  Now —

4           MR. AHRENS:  Your Honor, is there a fax number she

5   wants to read on the record?

6           THE COURT:  Yes.  Why don't you read the fax number?

7           MS. MOUNGER-LUM:  Area code 408-535-5532.

8           THE COURT:  All right.  So that's 535-5532.  And

9   address it to Ms. Mounger, and I'm going to ask her to spell her

10  full name for you.

11          MS. MOUNGER-LUM:  It's S-h-a-n-n-o-n.  And the last

12  name is M-o-u-n-g-e-r.

13          THE COURT:  Okay.  Everybody on the phone was able to

14  hear that, I assume.  If anybody needs it repeated, you should

15  tell me now.

16          MR. [SPEAKER] (on the telephone):  Please repeat it.

17          THE COURT:  Okay.  Repeat the name and then the fax

18  number.

19          MS. MOUNGER-LUM:  The name is Shannon, S-h-a-n-n-o-n.

20  The last name is Mounger, M-o-u-n-g-e-r.  And the fax number is

21  area code 408-535-5532.

22          MR. [SPEAKER] (on the telephone):  Thank you.

23          THE COURT:  Now — thank you very much, Ms. Mounger.

24  You can sit down if you want.

25          Aside from the FTC's specific situation vis-a-vis the

*Emergency Motion for Use of Cash Collateral*                    25

1    Florida court, is there anybody who still opposes the use of

2    cash collateral?  Now let me clarify something that may be

3    helpful to everybody.

4              The week of October 8th is the week of the National

5    Conference of Bankruptcy Judges, and I'm going.  Indeed, so I

6    have my tickets, I have my hotel reservation.  I am there.

7              Now having said that, if an emergency arose in this or

8    any of my cases, I would handle it by phone.  But this is too

9    complicated to want to handle cash collateral in this case by

10   phone, you know, from Orlando, Florida.  So — so that I'm

11   looking at the week of the 15th, perhaps as early as October

12   15th itself.  The 19th — no, the 19th is not a good day.

13   October 15th is probably my best date.  So that's the date that

14   I'm looking to get to till our next hearing.

15             Now papers can be easily FedExed to me in Florida.

16   It's not — I'm there, and that's no problem.  But I'll probably

17   have the hearing on the afternoon of the 15th to allow me time

18   to come consult with my staff in the morning, because I'll be in

19   Florida prior to that.

20             So, having said that, we need to talk about the use of

21   cash collateral through at least October 15.  And now I'll say

22   the same thing again.

23             Except for the FTC's specific issues regarding the

24   district court action in Florida, does anybody oppose the use of

25   cash collateral?

*Emergency Motion for Use of Cash Collateral*                26

1    MS. COHEN:  I'm ready to speak whenever it's my turn,

2  Your Honor.

3    THE COURT:  Okay.  But first I'm going to take those

4  in court.

5    Ms. Diemer.

6    MS. DIEMER:  Yes.

7    THE COURT:  You need to be at a microphone.

8    MS. DIEMER:  We have reached agreement and formally

9  withdraw our objection based upon our agreement with the debtor

10  for the payment as adequate protection.  We are —

11    THE COURT:  That Mr. Ahrens announced?

12    MS. DIEMER:  Yes.  That there are a couple of things

13  we had also worked out, but I trust that we will be able to do

14  those privately afterwards.  So, yes, I wanted to formally

15  withdraw my objection.

16    THE COURT:  Thank you.

17    Counsel.

18    MS. CORDELL:  Dolores Cordell for Thermo Credit.  We

19  are not supporting the motion, but we will not object at this

20  time.  Our only concern is that our right to assert what may be

21  a secured creditor's claim be preserved.

22    THE COURT:  And you agree to that, Mr. Ahrens?

23    MR. AHRENS:  Oh, of course, Your Honor.

24    THE COURT:  Right.

25    Does anybody on the phone wish to make a statement at

*Emergency Motion for Use of Cash Collateral* 27

1  this time?  There was a lawyer's voice, but I didn't recognize

2  it.  So if you could is that your name, please, the lawyer who

3  spoke previously?

4       MS. COHEN:  Thank you very much, Your Honor.  That was

5  me, Leslie Cohen, from Liner in Los Angeles.  We are

6  representing PCS and we did file an objection as well as a

7  supplemental objection.  And we are still — we've heard what the

8  debtor had to say, we appreciate that, but we are still

9  objecting to the use of cash collateral.

10      THE COURT:  Okay.  And have — has your objection

11  changed in any way?  In other words, have you withdrawn some of

12  your concerns and are you going forward with others?

13      MS. COHEN:  That's an excellent question, Your Honor.

14  Thank you.  The answer is that initially we did file the two

15  objections and the debtor filed some papers in the interim.  And

16  one of our earlier points was that we didn't understand the

17  budget.  There were line items that simply weren't covered, so

18  we couldn't really figure it out.  And we also had some specific

19  questions.

20      The debtor did file a more detailed budget which

21  helped clarify things and they also answered some of our

22  questions.  So sort of the — the vagueness argument is no longer

23  part of our objection.  Our remaining objection really are sort

24  of our main point in a nutshell is that we object to the whole

25  super-priority program that's been suggested, whether they put

1   us on a par with them or not.

2         THE COURT:  That's been withdrawn.

3         MS. COHEN:  Pardon me?

4         THE COURT:  Ms. Cohen?

5         MS. COHEN:  Yes.

6         THE COURT:  There's no effort to give a super-priority

7   anymore.  It is out of the issue at this point.

8         MR. AHRENS:  At this point, Your Honor, I will say

9   that various creditors reserve the right on — on or after

10  October 15th to raise it, but it's out at this point.

11        THE COURT:  Right.

12        Ms. Cohen, that's not an issue.

13        MS. COHEN:  Thank you, Your Honor.  I didn't realize

14  that was off the table.

15        THE COURT:.  It's off the table.

16        MS. COHEN:  And then, secondly, Your Honor, our

17  concern is that we still believe that they are preferring one —

18  basically one customer, one creditor over the others.  Basically

19  taking the money of my client, our receipt, our cash as well as

20  that of others, and instead of paying it out pro rata to people

21  like us that are similarly situated with similar cash collateral

22  rights, that they are funneling it all to their wholly-owned

23  subsidiary.

24        And we have — the debtor's been very — very candid

25  with us.  And they have told us that that money — they were

1   taking basically their customer's money, my client's money, and

2   using it to give to PaymentOne's creditors.  It's

3   disproportionate.  In other words, they're not taking just a

4   piece that might be attributable to PaymentOne, but receipts

5   that are attributable to PaymentOne and everybody else and

6   giving it all to PaymentOne or a large part of it.

7          Again, the debtor's been candid.  I don't think

8   they're trying to hide the ball at all.  But, quite candidly,

9   taking our money and giving it to PaymentOne so PaymentOne can

10  take that customers' money and give it to their customers

11  instead.

12         We are definitely conscious of the need to — the

13  interest in preserving the going concern and wanting to keep

14  PaymentOne alive for the debtor too — and that the debtor

15  apparently needs to do this in order to keep PaymentOne alive.

16  We haven't seen, and perhaps it's too soon, is some showing of,

17  you know, why any of this makes sense.  We get that they might

18  sell it, that they're in negotiations, but, quite candidly, from

19  the standpoint of a secured creditor sitting, you know, just

20  sort of sitting with money out of pocket, watching it go into

21  someone else's hands who also happens to be an insider, with

22  questions — and again they're questions.  And they're not going

23  to be resolved today, and we certainly understand that — but

24  questions about the validity of their positions and us watching

25  truly our money going out the door to them is something that's

1   just — it's objectionable to our client.  And we don't believe

2   that there's been proper adequate protection demonstrated.

3           THE COURT:  Do you feel that there isn't enough cash

4   to protect you over and above the payment to PaymentOne?

5           MS. COHEN:  Well, that is our concern, Your Honor.

6   And we see large dollar numbers, and that is helpful.  And,

7   again, you know, a very good point, Your Honor.  Thank you.

8           I think the problem that we're having is that we don't

9   know whose money is whose.  So part of our concern is at the end

10  of the day there might be enough money left, but somebody else

11  may somehow have a claim to it that we don't.  And we don't know

12  how they're doing it.  They're not segregating, they're not

13  identifying.  So we're concerned that we could get sort of lost

14  in the crossfires.

15          THE COURT:  You're not sure you will be.  You're

16  concerned you might be?

17          MS. COHEN:  We're concerned that there's a significant

18  risk that that would happen.  And we're not — we're not able to

19  figure out a way to get ourselves adequate protection to prevent

20  that short of segregating our money.

21          Now if they could segregate the money that's

22  attributable to us, we'd be happy.  We'd find, you know, that

23  would be adequate protection.  We'd retain a position and an

24  interest in that money.  We'd rather just get it paid like

25  PaymentOne one is.  But if we can't get that, if we can't get

*Emergency Motion for Use of Cash Collateral*                                    31

1   the same good treatment that PaymentOne gets, if we could get at

2   least our money segregated for our benefit, that would certainly

3   help the situation.

4           THE COURT:  Can you analyze for me the numbers with

5   respect to PCS?  How big a deal are they in terms of numbers,

6   dollars, and compare that to PaymentOne?

7           MS. COHEN:  I —

8           THE COURT:  No, I was asking Mr. Ahrens.

9           MS. COHEN:  Thank you, Your Honor.  I was going to say

10  that he might be better off to do it than me.

11          MR. AHRENS:  Yes.

12          MS. COHEN:  Thank you.

13          MR. AHRENS:  Yes, Your Honor.  Public Communication is

14  owed allegedly $576,000.  We have in our budget demonstrated

15  that at the end of the week that you're talking about, Your

16  Honor, putting aside the moneys that we will pay to customers

17  that's not in the budget, we'll have over $5 million or close to

18  $5 million in the bank.

19          In addition to that, the claim of PaymentOne is $16

20  million plus, 16.6.  And in addition to that, Public

21  Communication has the most unperfected — if you want to call it

22  — most unperfected security interest.  I have the UCC1 right

23  here, now he argued this.  The UCC1 is a UCC1 between Integretal

24  and PaymentOne.  They're not even a secured creditor.  It says

25  in this UCC1 that there's a grant to them of a security

1   interest, and they're not even on the line.  So you wouldn't

2   even know they're a secured creditor if you searched the

3   records.  I only found out because I read what is on my search.

4            So I'm giving them a replacement lien, but they have —

5            THE COURT:  To the extent that they have a prepetition

6   lien.

7            MR. AHRENS:  To the extent they have — but they have

8   the most unperfected of all five of these that have a claim.

9   And I mean at least the others — the other two, Network

10  Telephone —

11       (Static.)

12            THE COURT:  Does somebody have a cellphone on?  That's

13  what causes this often.

14       (Comments off the record.)

15            THE COURT:  It has to be off.

16       (Comments off the record.)

17            THE COURT:  Does anybody on the phone have a cellphone

18  on?  If so, please turn it off.

19            Okay.  Thank you.

20            MR. AHRENS:  Okay.  So, Your Honor, of the — I mean

21  PaymentOne and POL we feel as debtor's counsel have good

22  arguments for a perfected security interest.  Network Telephone

23  and Personal Voice, who are not standing here objecting, they at

24  least have a UCC1 of Integretal itself, and they're a secured

25  party themselves.  And my problem with them is they didn't file

*Emergency Motion for Use of Cash Collateral*                    33

1  a statement of name change.

2          But Public Communications, Your Honor, they're — they

3  don't even have a UCC1 in their name.  But, notwithstanding

4  that, we're giving them a replacement lien.  And,

5  notwithstanding that, we think they're adequately protected.

6  And this will give them the opportunity and all other creditors

7  the opportunity in the next few weeks to talk to the committee,

8  to talk to us, and to keep it at existence.  What they're saying

9  is they want us out of business.  It seems like most of the

10 other creditors are saying the opposite.

11         THE COURT:  Is there anybody else — did you want to

12 speak?

13         MR. WARREN:  Your Honor, Stephen Warren of O'Melveny

14 and Myers on behalf of PaymentOne.  Just briefly, if I might.

15         Thank you, Your Honor.  And I'm cognizant of the fact

16 that a lot of paper has been filed here.  I did want to hit just

17 on a couple of highlight issues, if I could.

18         I know that it's in the papers, but I wanted to

19 underscore how important timing is here with respect to

20 PaymentOne.  Tomorrow is the settlement date with our own

21 customers and a payroll date for PaymentOne one as well.

22         The management teams — the separate management teams

23 of both Integretal and PaymentOne have come to the conclusion

24 that if those obligations are not met, it will have severe

25 repercussions for the value of that business.

1       As I've said, Your Honor, and as we've said in the

2  papers, this is a situation where you do have a subsidiary with

3  a separate management team.  And both the debtor and PaymentOne

4  have been cognizant of protecting the interests of their

5  respective customers.  And we've really treated this almost as

6  an honest broker working together with Mr. Ahrens to try and

7  fashion the solution the Court finds before it.

8       We started out with an idea of not doing any harm in

9  terms of preserving everybody's rights, but in light of the

10  necessity for preserving the PaymentOne asset, we have gone

11  further in the amended stipulation to provide for the flow of

12  funds.  That flow of funds will preserve value for all the

13  creditors of the estate, here as well the creditors of

14  PaymentOne.

15       I know Mr. Ahrens talked — talked a little bit about

16  the security interests and the position that PaymentOne has.  I

17  didn't want the moment to pass without reasserting of course

18  that PaymentOne's view is that it is a fully secured creditor at

19  $16.6 million.  We very briefly touched on our reasons for

20  believing that in the reply brief that was filed yesterday

21  afternoon.

22       I know a lot of paper was filed.  I don't know whether

23  the Court — I hope the Court —

24       THE COURT:  I read every word three or four times.

25      (Laughter.)

*Emergency Motion for Use of Cash Collateral*                                    35

1    THE COURT:  I — I synthesized it.  I've made 50

2  charts.

3    MR. WARREN:  Excellent.

4    THE COURT:  And I've reduced it — and I've reduced it

5  to a single question.  It's either yea or nay on the use of cash

6  collateral.  So I've synthesized it down to the appropriate

7  issue.

8    MR. WARREN:  Well, if, Your Honor, — then what I would

9  say, Your Honor, is again both separate management teams and

10  their counsel have looked at this and come to conclusion on how

11  to maximize value.  It may be that all of the very difficult

12  issues that people have spoken about in terms of the claims, the

13  liens, the property rights may all be resolved through a sale

14  process.  And that is really where we plan to focus our efforts.

15    THE COURT:  Do you have an idea of the timing?

16    MR. WARREN:  You know, Your Honor, what I can tell you

17  — and, again, I've been cautioned that we're subject to a

18  nondisclosure agreement.  We are in an exclusivity period with

19  one potential party in diligence.

20    I have to be candid.  Obviously what's happened with

21  Integretal is a fair amount — is a fair amount of curve has been

22  thrown our way and —

23    THE COURT:  I'm sorry.  What?

24    MR. WARREN:  A fair amount of curves have been thrown

25  our way in terms of the sale process, among other things,

1   knowing whether we will be able to make settlements tomorrow and

2   make our payroll tomorrow obviously raises questions and would

3   legitimately raise questions in the mind of anybody who was

4   negotiating for the purchase of the assets.  Obviously if the

5   cash collateral agreement isn't approved, what one might

6   purchase will be very different on Friday than otherwise would

7   be the case.

8           So we are in close negotiations.  The management team

9   of both Integretal and PaymentOne, if things don't move forward

10  quickly with the party that we are currently in an exclusive

11  arrangement with, upon the termination of that exclusive

12  diligence arrangement, we will be looking at other parties who

13  have expressed an interest.

14          THE COURT:  Right.  Just address yourself to that

15  party.  Do you have an idea of whether that — when that will

16  come to a yes or no?

17          MR. WARREN:  Your Honor, I — I know that the parties

18  have had discussions even including today.  My understanding is

19  the exclusivity period terminates either at the end of this week

20  or at the beginning of next week.  I think the concept here is

21  that if we are not making progress with that party and

22  comfortable that we are moving down a road that ultimately gets

23  to a resolution that works for everybody, we will reopen that

24  process up.  So that really is the timeframe of the

25  exclusivity —

1    THE COURT:  That's helpful.  Okay.  Thank you, sir.

2    MR. WARREN:  Thank you, Your Honor.

3    THE COURT:  Mr. Ahrens, you can stay seated because I

4    may go around the room a little bit.

5    Assuming that the debtor hadn't filed its bankruptcy

6    petition how much money would the debtor have paid to PaymentOne

7    on the billing transactions PaymentOne had already submitted to

8    the debtor for the period from the petition date through the end

9    date through which — for which the debtor requested interim use

10   of cash collateral?

11   MR. AHRENS:  It's approximately two million o-eight.

12   The same amount that we're asking for, Your Honor.  Nothing

13   different.

14   THE COURT:  What percentage of the billing

15   transactions that have been submitted to the local exchange

16   carriers but haven't been paid are billing transactions that

17   were submitted by PaymentOne?

18   MR. AHRENS:  I think approximately — and I'll be

19   correct if I'm wrong — 21 to 24 percent.  Twenty-four percent,

20   Your Honor.

21   THE COURT:  What about PCS?  Now where do they fall in

22   all of this?

23   MR. AHRENS:  We understand a small fraction, Your

24   Honor.

25   THE COURT:  Counsel on the phone for PCS, do you have

1   some idea of what the dollar amount is?

2          MS. COHEN:  In terms of what would have been paid

3   during that period?

4          THE COURT:  Right.

5          MS. COHEN:  I'm not sure, Your Honor.  I could — we

6   haven't been able to get that number.  We know there were some

7   payments.  It looks like it was coming in at around — like the

8   last payment was around, I think, 200,000, if I recall

9   correctly.  So if that represents a cycle, I don't really know.

10  I could probably get that information while we're on the phone,

11  though.

12         MR. AHRENS:  But I can tell the Court the claim of

13  PaymentOne is 16.6 and the claim of PCS is 576,000.

14         MS. COHEN:  Yes, it's 576,000 —

15         THE COURT:  All right.  So that's a big —

16         MS. COHEN:  — that's how much it is now.

17         MR. AHRENS:  It's a big difference.

18         THE COURT:  Right.  Okay.  Has there been any decrease

19  in the amount of billing transactions submitted to the debtor

20  postpetition by its approximately other 53 customers?

21         MR. AHRENS:  Your Honor, that's what we were talking

22  about today, to try to ensure there is not.  I don't think...

23  They're all waiting on this hearing, Your Honor, and this

24  meeting that we had today.

25         MS. COHEN:  Pardon me for interrupting.  We can't

*Emergency Motion for Use of Cash Collateral*                                     39

1    hear.

2                THE COURT:  Talk — talk closer to the mic, Mr. Ahrens.

3                MR. AHRENS:  Apparently many of the customers are

4    awaiting this hearing to see if we have the use of cash

5    collateral or not.  Because if we don't have the use of cash

6    collateral, they will not transfer their billings to us, Your

7    Honor.

8                THE COURT:  Okay.  Are there any other adequate — are

9    there any adequate assurance issues that have been raised by any

10   of the local exchange carriers with whom you have contractual

11   relationships?

12               MR. AHRENS:  No, Your Honor.  And they — and I'm

13   delighted to say that we've been receiving payments since the

14   filing pretty much like clockwork.

15               THE COURT:  The debtor's proposed three-week budget,

16   which is attached to the first amendment cash collateral —

17   amended cash collateral stipulation indicates that the debtor

18   has $1,945,598 in cash as of the petition date and projects to

19   having over 3.2 million in cash at the end of the budget period.

20   The debtor also proposes using $615,000 of cash for debtor's

21   operating expenses during this period and paying PaymentOne over

22   two million during this time.

23               Does this budget cover the entire period for the

24   interim use of cash collateral?  And, if not, what additional

25   moneys will be needed and what are the additional estimated

1   revenues?

2          MR. AHRENS:  I'm going to answer it and turn around to

3   make sure I'm right.  Yes, Your Honor, it covers the entire

4   period.  There are no additional amounts needed, unless, except

5   for the payments to the customers that I discussed earlier.  We

6   will agree to a 50-percent prepayment.  And to that extent there

7   will be reduction.  I've already seen those numbers run and

8   there will be still significant cash left over at the end of the

9   three-week period.

10          Is that a correct answer?

11          Yes, that's a correct answer.

12          THE COURT:  What does the debtor estimate will be the

13   increase in prepetition liabilities due to the debtor's

14   nonpayment of billing transactions submitted prepetition by the

15   debtor's other approximately 53 customers that the debtor will

16   not be forwarding to those customers during the first

17   approximately 90 days of the debtor's case?

18          MR. AHRENS:  I don't think there will be any increase

19   because whatever it is as the petition date will remain the

20   same.  The billing transaction submitted we will owe them for

21   that amount of money.

22          THE COURT:  Do you want to turn around and ask if

23   you're right?

24          MR. AHRENS:  I'm right.

25          MS. COHEN:  And, Your Honor, if you wouldn't mind

1    asking him to again speak —

2         THE COURT:  Why don't you ask him the question you

3    want and I'll let him answer.

4         MR. AHRENS:  I'm sorry.  Maybe I should stand up here.

5         THE COURT:  You don't have to.

6         MR. AHRENS:  Well, —

7         THE COURT:  You're farther from your source.

8         MR. AHRENS:  That's true.  I'll do what I was doing

9    earlier.  This microphone works really well.

10         THE COURT:  Okay, that's fine.  Go ahead, counsel.

11   This is Ms. Cohen?

12         MS. COHEN:  Yes.

13         THE COURT:  Go ahead, shoot, Ms. Cohen.

14         MR. AHRENS:  Do you have a question?

15         MS. COHEN:  Oh, I was just asking him to speak up

16   because I couldn't hear.  The words were getting —

17         THE COURT:  Okay.  I'm sorry.  I thought you had a

18   question specifically.

19         MR. AHRENS:  Okay.  Well, —

20         THE COURT:  Speak up, Mr. Ahrens.

21         MR. AHRENS:  Okay.  If you have no other, further

22   questions I'll sit down, Your Honor.

23         THE COURT:  No, no, no.  I have additional questions.

24        (Laughter.)

25         THE COURT:  Ms. Cohen didn't have an additional

1    question.

2              MR. AHRENS:  Okay.

3              THE COURT:  You're doing well, Mr. Ahrens.  You don't

4    have to be concerned.  I'm just the Court.

5              I guess I have a question.  It's really not — oh, are

6    there any financial changes that would impact the projections in

7    the proposed three-week budget attached to the first amended

8    cash collateral stipulation or the projected 27-week budget

9    filed with the debtor's supplemental papers on September 24?

10   Are there any — is there anything that we're concerned about

11   very seriously?

12             MR. AHRENS:  I've asked those questions and that's why

13   I think I know the answer to all of those.  The only two

14   significant financial changes that my client is aware of, and

15   I'll look back after I say this, is:  One, they do desire to pay

16   customers, prepay 50 percent on all billings delivered to them.

17   And — so that the numbers will change.  There, I've already

18   answered that.

19             And if they had to pay a million seven to the receiver

20   today, there would be a significant impact, and they could not

21   operate the way that they have projected.

22             Other than those two, — is there anything else —

23             THE COURT:  No.  Sit down, Mr. Benvenutti.  I'll call

24   on you.  I promise.

25             MR. BENVENUTTI:  Thank you, Your Honor.

1    THE COURT:  Thank you.

2    MR. AHRENS:  Pardon me?

3    (Counsel confer off record.)

4    MR. AHRENS:  Yes, yes.  We have a done a client

5  sensitivity analysis.  And there is a possibility that we won't

6  get a hundred percent.  This assumes a hundred percent of

7  prepetition pipeline.  The realistic thing will probably be

8  something less than that.  We hope to get a hundred percent, but

9  the client has run the numbers at a hundred percent, 75 percent,

10  and 50 percent.  And we still operate, we still continue to

11  operate.  And these —

12    THE COURT:  Mr. Ben- —

13    MR. AHRENS:  And these are the type of numbers that we

14  want — we do want to go over with the committee.

15    THE COURT:  Mr. Benvenutti, if you would come forward

16  to the center microphone.

17    MR. BENVENUTTI:  That was my question.

18    THE COURT:  No, no.  Sir, — oh, you've got your

19  answer.

20    MR. BENVENUTTI:  That — that was my question, Your

21  Honor.

22    THE COURT:  Okay.  Very good.  Thank you, sir.

23    What other means does PaymentOne have of funding its

24  ongoing operating expenses other than the payments from the

25  debtor?

*Emergency Motion for Use of Cash Collateral*                    44

1    MR. REHFELD:  Your Honor, I'll — again I'll look at my

2  client, as Mr. Ahrens has, after I make this answer, to make

3  certain I'm correct.

4    Your Honor, I don't think there is any means to do so.

5  The PaymentOne settled with its customers last Thursday, using a

6  substantial amount of its cash reserves, not having received

7  payment from the debtor.  That has put substantial stress upon

8  it in terms of its remaining cash.  PaymentOne does not have a

9  line of credit from a bank and consequently the failure to get

10  this money in all understanding of the management would be the

11  termination of its business.

12    THE COURT:  Now you want to check and see if you're

13  right?

14    MR. REHFELD:  It turns out that I was, Your Honor.

15  Yes.

16    THE COURT:  Good.  This overlaps the TRO issue, but

17  it's to some extent related to the cash collateral issue.  Let's

18  assume for purposes of discussion, and perhaps these

19  conversations have been had, that you and the FTC could agree

20  that you would take $1.7 million and put it in a blocked account

21  for three weeks, not turn it over to the FTC, just put it in a

22  blocked account without prejudice to all of your arguments that

23  these are commingled funds, that they don't really belong to the

24  FTC, that they — that they're not really the FTC's funds.  And

25  the FTC would have to agree that it's without prejudice to all

1   of your arguments to that effect.

2          Just for these three weeks, are you capable of doing

3   that?

4          MR. AHRENS:  Yes.

5          THE COURT:  Now turning to the FTC under that

6   circumstance, and I understand we have two lawyers here, and I'm

7   not sure — I know Mr. Oetzell speaks for the receiver and you

8   speak for the FTC, but there's an overlap in terms of your

9   interest, maybe they're identical, I'm not sure.  But if they

10  were to put a million seven in a blocked account which couldn't

11  be touched absent further order of this Court for the three

12  weeks or whatever this period is for the cash collateral, would

13  you agree to stop everything in Florida and to let this proceed

14  for three weeks to see where we are, so that you and everybody

15  will have a better idea of what the status is of the sale of

16  PaymentOne is, what's happening with all the money, knowing that

17  these moneys are fully protected?  We could put them in

18  counsel's trust account.

19         We could — you know, whatever you need to ensure

20  yourselves that these moneys were safe.  Would that prevent at

21  least temporarily a lot of very difficult litigation where you

22  have this overlap of courts and, you know, frankly the

23  uncomfortable position of me being asked to enjoin you from

24  proceeding in district court and you're being sure that the

25  money's safe or any amount of money is safe?

*Emergency Motion for Use of Cash Collateral*                                      46

1       They say, the debtor says these are not anybody's

2   specific funds.  And you would have to agree that they would be

3   put — that everybody's rights are as they are now, with the

4   debtor saying that these are not anybody's special's funds.

5   They're the debtor's funds.  And you saying, you know, these

6   funds or some funds or your funds.  And that the fact — the mere

7   fact that they put them in escrow, if you will, or they put them

8   up for three weeks did not enhance your position and it didn't

9   enhance the debtor's position with respect to that.  No argument

10  could be made.  It would just be to preserve everybody's rights

11  so that the case could proceed for three weeks and you can be a

12  hundred percent sure a million seven is safe, would that appeal

13  to you?  Would that be something you would consider?

14       MR. OETZELL:  Your Honor, I have three responses.  The

15  first is — is I have to say that it's a pretty incredible

16  statement on behalf of Mr. Ahrens that they believe it is their

17  funds in the face of the specific terms —

18       MR. [SPEAKER] (on the telephone):  Your Honor, we

19  can't hear counsel.

20       THE COURT:  He can't hear you.  And it's because it's

21  not — no, sir, you don't have to get up.  Just pull it close to

22  you so it's an inch from you, and talk directly into it.  And

23  say it all over again.

24       MR. OETZELL:  Okay.  I was going to say I have three

25  responses, Your Honor.  The first is that Mr. Ahrens' statement

1  that they believe that it is not the receivership funds, that it

2  is the debtorship funds is a pretty incredible statement in view

3  of the specific wording of the district court order.  It

4  couldn't be clearer.  It has held that they are the receivership

5  funds and that they are not the debtor's funds.

6          Having said that, I will say that preservation of

7  those funds is paramount.  And I will say if that is what Your

8  Honor is proposing to do here, I will call the client and I will

9  come back to you with an answer.

10          THE COURT:  Can you do that now?

11          MR. OETZELL:  I will do it with bells on.

12          THE COURT:  Yes, sir.  With your bells, would you be

13  kind enough to do it?

14          Is that okay with you, Mr. Mora?

15          MR. MORA:  Yes, Your Honor.  My position is much the

16  same except that I have my colleagues, Ms. Guerard and Mr.

17  McKuen, on the phone, and I am asking them to please consult

18  with our client, and I will contact them on a recess.

19          THE COURT:  Okay.  So if I recess for ten minutes will

20  that give you some sufficient time to talk to your client and,

21  you know, — directly or indirectly?

22          MR. MORA:  I believe so.

23          Ms. Guerard, are you — are you on the line?

24          MS. GUERARD:  Yes, I'm here.  And I believe ten

25  minutes will be sufficient, Your Honor.

1        THE COURT: Very good. We're going to be in recess.

2            Now let me just ask you a question before we recess,

3    because I might as well as cover all bases. If they say yes to

4    this, Mr. Ahrens, are we done today?

5        MR. AHRENS: Your Honor, —

6        THE COURT: If I authorize the use of cash collateral?

7        MR. AHRENS: If —

8        THE COURT: If I were to overrule PCS' objection, and

9    I'm not going to saying that I'm going to do that. But if I

10   were and if they agree to this, are we done? Is there anything

11   else left?

12       MR. AHRENS: Your Honor, what I would think we would

13   do, because this is a good suggestion from the Court to solve

14   this problem, is we would continue our request for a restraining

15   order because we wouldn't need the temporary restraining order —

16       THE COURT: Right.

17       MR. AHRENS: — because they would agree to do nothing.

18   They would agree —

19       THE COURT: Oh, that wasn't lost on me, Mr. Ahrens. I

20   understood that.

21       (Laughter.)

22       MR. AHRENS: So, yes, I think we're done today. But

23   they said something about their funds. I have to make it clear

24   that it would still be in a segregated debtor's account, that it

25   could not be used without further order of this Court. That's

1  what this Court said.

2         THE COURT:  Absolutely.

3         MR. AHRENS:  That's not what they said.

4         THE COURT:  No, no, no.  But —

5         MR. AHRENS:  But as long as it's in a —

6         THE COURT:  And they —

7         MR. AHRENS:  — segregated debtor's account, yes, we

8  would be done today.

9         MR. MORA:  And everybody reserving their respective

10  rights.

11         THE COURT:  Oh, right.  Everybody reserving —

12         MR. MORA:  Yeah.

13         THE COURT:  — all their rights.  And the mere fact

14  that it was being segregated now would not enhance either the

15  FTC's position that they're really separate funds or that — your

16  position, that they're really not.  People's positions are what

17  they are now before they're segregated and, in fact, they would

18  be segregated for the period, this interim period of three weeks

19  while we try to proceed with the bankruptcy case and try to take

20  care of the concerns of the Federal Trade Commission at the same

21  time.

22         MR. AHRENS:  Yes, Your Honor, we would be done today.

23         THE COURT:  Okay.  Now — okay.  We'll be in recess for

24  ten minutes —

25         MS. COHEN:  Your Honor, just —

*Emergency Motion for Use of Cash Collateral*                    50

1    THE COURT:  Yes.

2    MS. COHEN:  — recess.  I apologize for interrupting.

3  I would have just stood up if I had been in the room, so,

4  anyway, it's Leslie Cohen again.  I do have —

5    THE COURT:  Your virtual standup, Ms. Cohen.

6    MS. COHEN:  I'm standing now.

7    THE COURT:  Right.

8    MS. COHEN:  I do have the information from my client.

9  My colleague was able to get it, in terms of how much money

10  would be paid — payable to PCS during the three-week period.

11  And I'll give that information when the Court's ready.

12    And I also —

13    THE COURT:  Oh, I'll take it.  You're here and we're

14  here.

15    MS. COHEN:  Thank you very much, Your Honor.  The

16  payments are averaging about 14,000 per week.  So for — assuming

17  it's one week from the filing date to the next hearing date,

18  it's the three upcoming weeks plus the prior week, it would be

19  about $56,000, if I'm doing my math right.

20    THE COURT:  All right.  So you would — let me just see

21  if I'm correct about something.  If the debtor reserved $56,000

22  for you over three weeks, would you be comfortable with the

23  understanding it's without prejudice?  They just put $56,000 in

24  a segregated account, would you be happy and would you withdraw

25  your objection?

1        MS. COHEN:  I think I would do the same as the FTC and

2   call my client, but it certainly goes a long way based on the

3   arguments that we've made before Your Honor.

4        THE COURT:  Thank you.

5        Court is in recess for ten minutes.

6        MS. COHEN:  Should we call back in then?

7        THE COURT:  Well, you can stay on the line or call

8   back in.  It's just there are going to be a lot of people

9   calling back in.

10        MS. COHEN:  We'll put it on mute.

11        THE COURT:  My preference would be that you just leave

12   the phone open and that you go off and do whatever you have to

13   do and then come back.

14        It's now a quarter after 4:00 my time.  And so we're

15   going to reconvene at 25 after.

16        MS. COHEN:  Thank you very much, Your Honor.

17        THE COURT:  Thank you.  Court is in recess.

18      (Recess taken from 4:11 p.m. to 5:15 p.m.)

19        THE COURT:  Thank you, ladies and gentlemen.  Please

20   be seated.

21        Mr. Ahrens, do you want to report on the status?

22        MR. AHRENS:  Yes.  I would like to, Your Honor.

23        We thank the Court for the hours of indulgence while

24   discussions were held.  I will report to the Court that almost

25   immediately after the suggestion of the Court the receiver and

*Emergency Motion for Use of Cash Collateral*                                    52

1   the debtor entered into a stipulation as suggested by the Court.

2   So the receiver will stipulate that —

3           MR. PARDO:  Your Honor, we can't hear the speaker.

4           THE COURT:  Go one mic — mic one — one mic.

5           MR. AHRENS:  One, one.  Is this better?  Is this

6   better?

7           MR. [SPEAKER] (on the telephone):  Yes, it is.

8           MR. AHRENS:  Okay.  Virtually — we thank the Court for

9   its indulgences in waiting the last hour.  Virtually the minute

10  after the Court left the bench the receiver and the debtor

11  entered into the stipulation that the Court had suggested.  And

12  that stipulation would be basically that we will put into a

13  separate segregated account, debtor-in-possession account, the

14  amount of 1.7 million plus, as suggested by the Court, with all

15  the reservations suggested by the Court.  However, and that the

16  receiver asked for contempt in that court.  And there was an

17  order to show cause re contempt, which is returnable on Friday

18  of this week on the court down in —

19          MS. COHEN:  I'm sorry.  We can't hear.

20          MR. AHRENS:  There is an order — there is an order to

21  show cause re contempt that is returnable on Friday of this week

22  and the receiver and the debtor have stipulated that the entire

23  case — and that was requested by the receiver, Your Honor, that

24  order to show cause re contempt — and the receiver and the

25  debtor have stipulated that the entire case, so we may have a

*Emergency Motion for Use of Cash Collateral*                     53

1   period of peace and discussion and discuss with the committee

2   may be stayed under the terms suggested by this Court.  However,

3   notwithstanding an hour of discussion, the FTC has not

4   stipulated.

5           MR. OETZELL:  Well, Your Honor, hold on just a half a

6   second.  Let me — let me —

7           THE COURT:  Okay.  Make sure that the mic — people are

8   complaining they can't hear, so make sure you're — the mic is

9   right at your mouth.

10          MR. OETZELL:  Okay.  Walter Oetzell of Danning, Gill,

11  Diamond and Kollitz on behalf of the receiver.  I wanted to go

12  over the actual provisions that we would be willing to stipulate

13  to.

14          First of all, obviously the receivership funds would

15  be excluded from any cash collateral order that Your Honor —

16          THE COURT:  Okay.  You're calling them receivership

17  funds and they're calling them debtor funds, and so you have to

18  pick a neutral word for the disputed funds, or whatever you want

19  to call it, for purposes of the order.

20          MR. OETZELL:  Let's call them the subject funds.

21          THE COURT:  Fine.

22          MR. OETZELL:  The subject funds of course will be

23  excluded from any cash collateral order that the Judge would

24  like to enter today.  They will be placed in a block — a blocked

25  account.  They can't be touched.  They can't be spent without

1   further order of this Court.  This is without prejudice to any

2   position we've taken, any position that Mr. Ahrens has taken of

3   course.  It's for a period of three weeks.

4           Now as to — and we'd like to be kept informed by Mr.

5   Ahrens of the budget and —

6           THE COURT:  Sure.

7           MR. OETZELL:  — obviously what's going on here.  But

8   as to the action, we are onboard with the idea that we will

9   stay, voluntarily stay this thing for three weeks.  However, we

10  do have a slight glitch here and that is that the omnibus order

11  requires debtor to comply by Friday or Monday, I'm not quite

12  sure it was stayed, but it's very soon.  And as simple litigants

13  in a courtroom, I think Your Honor understands that we're not in

14  a position to go ahead and stipulate away what the Court has

15  ordered.

16          THE COURT:  But you can stipulate to go tomorrow

17  morning to the court and ask to modify its order so that you can

18  carry out the stipulation that you agreed in this Court without

19  prejudice to the court telling you you can't do that.

20          MR. OETZELL:  What we —

21          THE COURT:  You could stipulate to —

22          MR. OETZELL:  Right.

23          THE COURT:  — to asking the court to modify its order.

24          MR. OETZELL:  What we can do, Your Honor, and what

25  we're prepared to do and what we're offering to do is that the

1  debtor may go ahead, go in, ask for a continuance of that for

2  the three weeks and we will not oppose it.

3          THE COURT:  But you have to support it.  It has to be

4  you.  It doesn't make any sense for the debtor to go in with his

5  hat in his hand if you've reached a stipulation.  If you both

6  got on the phone and asked the law clerk to schedule a

7  telephonic hearing with the court and told the court what

8  happened here, no more, no less, and — and said that you didn't

9  feel comfortable stipulating to it without the court approving

10 it, since you were asking, in essence, the court to modify its

11 order, the court would likely to do that.

12         To have — to send the debtor in without you there

13 suggests that you don't even agree to this — that you're not

14 agreeing to it.

15         MR. OETZELL:  Well, Your Honor, we're not trying to be

16 coy here.  We're not going to sit there and say, well, you know,

17 we sort of don't —

18         THE COURT:  But when you say the debtor can go in,

19 you're not going to accompany the debtor?

20         MR. OETZELL:  We will agree to it, Your Honor.

21         THE COURT:  So why don't you get on the phone tomorrow

22 morning and agree to call — to call the law clerk and then try

23 to get a telephonic hearing first thing in the morning, in which

24 you both ask the court to modify its order in this very limited

25 respect.

*Emergency Motion for Use of Cash Collateral*                                56

1    MR. OETZELL:  That'll work, Your Honor.

2    THE COURT:  Thank you.

3    MR. AHRENS:  Thank you.  And we would just like to be

4    able to represent to the court that we have a stipulation here

5    that's approved by this Court so we don't have any

6    jurisdictional problems, Your Honor.

7    THE COURT:  Well, the stipulation is approved by this

8    Court, but the district court — I — unless I issue a TRO, which

9    I may have to do, and I'm not saying I will or won't, but I

10   can't tell the district court what to do at this juncture, I'm —

11   in the absence of a TRO.  And then I'm really telling the

12   parties, I'm telling the FTC what to do.  I'm not telling the

13   district court what to do.  So if this works, and I assume it

14   will work, then you'll let me know tomorrow morning.

15   MR. AHRENS:  That's fine, Your Honor.

16   MR. OETZELL:  That will be fine.

17   MR. AHRENS:  And then if there is no — if there is no

18   such continuance, if the FTC approves it, then we would like to

19   have a hearing on the TRO maybe on Friday.

20   THE COURT:  Yes, I agree.

21   MR. AHRENS:  And, Your Honor, just one

22   language-smithing here.  He said that the cash collateral order

23   would not apply.  Your Honor, there would be no party that would

24   waive any of their interest in this.  It's cash collateral.

25   Everybody contends they have —

1          THE COURT:  Oh, absolutely.

2          MR. AHRENS:  — interests.  And — and —

3          THE COURT:  Everybody — everybody retains all rights

4     to the —

5          MR. AHRENS:  Yes.

6          THE COURT:  — to this 1.7 million.  All the parties in

7     the court, all the parties that are on the phone, and every

8     creditor in the case reserves its respective rights vis-a-vis

9     this 1.7 million.  It's only being placed for safekeeping as a

10    temporary measure.  And everybody in the Earth — on the Earth

11    retains his or her respective rights.

12         MR. AHRENS:  Thank you, Your Honor.

13         MR. OETZELL:  Okay.

14         MR. AHRENS:  And in light of this does the FTC now

15    agree to support this three-week continuance?

16         MR. MORA:  Your Honor, let me for the record state the

17    FTC's position.  And we did have discussions amongst the three

18    of us during recess —

19         THE COURT:  Can I make a suggestion?

20         MR. MORA:  Yes, Your Honor.

21         THE COURT:  Can you and Mr. Oetzell try to agree, and

22    then come and tell me what your position is, —

23         MR. MORA:  Well, Your —

24         THE COURT:  — rather than you stating a different

25    position?  Because it's confusing here.

1          MR. MORA:  It's not that different except that there's

2     two different animals we're dealing with here.  One is the

3     contempt proceeding and the other is the entire enforcement

4     action that's pending before the district court.  Here is what —

5     what the parties discussed during the recess and what the FTC is

6     willing and not willing to do.

7          We are willing to live with the separate account as

8     described by the receiver and the debtor.  We also agree that

9     the debtor is required by the district court order to return to

10    that court and at least ask that court for a stay.  And I

11    understand now that the receiver and the debtor will do that

12    together.  The FTC will not oppose that request.

13          THE COURT:  Fine.

14          MR. AHRENS:  Then it looks like we're there.

15          MR. MORA:  That's right.

16          THE COURT:  Right.

17          MR. MORA:  But the enforcement action is pending.

18    That's the rest of the action that's pending before the district

19    court, that — we never understood that to be a part of all this.

20    We —

21          THE COURT:  Right, but except that.  We've got — Mr.

22    Mora, for three weeks they're going to try to sell this company

23    and put something together so that all the creditors can have an

24    advantage.  You've got a committee that's being formed.  You

25    don't want to carry the debtor down to Florida for — during this

1  three-week period where they're trying to maximize this asset

2  they have.

3         All I'm saying — it's without prejudice to your

4  enforcement action after three weeks, but you should all them

5  concentrate on what needs to be done, on business for three

6  weeks, and try to sell — or finalize a sale with this company.

7  It becomes a side show if you have to deal with this action in

8  Florida and counsel has to fly back and forth to Florida.  It's

9  not like we're in Delaware and they're flying to Florida.  We're

10  in California and they're flying to Florida in order to deal

11  with this complicated proceeding in the middle of what could be

12  the beginning and the end of the case.  As Mr. Benvenutti says,

13  this case may go away very quickly.

14         Don't — please don't put this — have two fora

15  operating for three weeks.  After three weeks, you know, when

16  you see what's going on, reserve your rights.  But to have them

17  be actively engaged with you in litigation for three weeks makes

18  no sense.

19         MR. MORA:  Well, Your Honor, we don't — we disagree

20  with that, respectfully.  An enforcement action is an entirely

21  separate matter.  There are more than ten other parties to that

22  proceeding.  We are right in the middle of discovery, in the

23  last few weeks of the throes of discovery.

24         THE COURT:  But why —

25         MR. MORA:  And, Your Honor, — Your Honor, —

*Emergency Motion for Use of Cash Collateral*                                    60

1    THE COURT:  — can't that be stayed for three weeks?

2    MR. MORA:  Your Honor, the debtors have been

3  participating in discovery until just a few days ago.  They were

4  taking deposition.  They were sitting in on depositions.  They

5  have a while army of lawyers on the other coast who have been

6  covering this case.

7    And while this arrangement that has been agreed to

8  temporarily, the FTC will not object to and is willing to live

9  with as a way to deal with a temporary stay of the contempt

10  proceeding, but the enforcement action at large, it must go

11  forward.

12    THE COURT:  I beg you, Mr. Mora, talk to your client.

13  And for three weeks stay activity.  You don't have — just stay

14  it on a voluntary basis.  They'll agree to an extension of

15  discovery for three weeks.  Just don't — it's — what you're

16  suggesting affects every creditor.  It affects everybody in the

17  case.  It's going to cost a lot of money for the debtor.  Why

18  don't you see what the situation is in three weeks, and then

19  decide if you want to continue with your enforcement action.

20    I really beg you to talk to your client.  It makes no

21  sense to do that.

22    MR. MORA:  I can do that, Your Honor.  I've done that

23  already.  And just —

24    THE COURT:  But you haven't told the client what I've

25  said.  And I wouldn't mind if your client was on the phone with

1    me, if you put them in. I don't have to talk to your client. I

2    would only talk to you, but I could make this plea.

3            I'm trying to manage a whole case and you're an

4    important component of it. But to have this go on for these

5    three weeks when they're trying to sell the debtor is not good

6    for everybody in the case. And it's not going to prejudice you

7    in the slightest, three weeks.

8            MR. MORA: Your Honor, I can — I can understand where

9    the Court is coming from from the perspective of this case. But

10   you have to understand, we've been litigating the other case,

11   the law enforcement action in Florida for —

12           THE COURT: I do.

13           MR. MORA: — over a year now.

14           THE COURT: It's only three weeks.

15           MR. MORA: There — Your Honor, there are many parties

16   to that proceeding and it is in the last few weeks of discovery.

17   And so to except all of those parties, including the FTC, to

18   simply abandon things because —

19           THE COURT: Not abandon. Stay for three weeks.

20           MS. GUERARD: Your Honor?

21           THE COURT: Yes.

22           MS. GUERARD: This is Collot Guerard from the Federal

23   Trade Commission in Washington.

24           THE COURT: Yes.

25           MS. GUERARD: Can you hear me?

1          THE COURT:  Very well.

2          MS. GUERARD:  All right.  We have a discovery deadline

3    of October 5th.  We have — the judge's scheduling order is very

4    clear, that we have summary judgment papers that are due in

5    mid-November and we have a trial that is in February 2008.  Any

6    extension of discovery is going to disrupt a very carefully

7    crafted order dictating the trial — the discovery and the trial

8    schedule.  And that's why we cannot agree to a three-week

9    postponement, as much as you want us to.  We have depositions

10   scheduled this next week.  So that's why we cannot agree to a

11   postponement of three weeks.  I'm very sorry.

12         THE COURT:  Okay.  So they won't agree.  Is that the

13   subject, is that necessarily the subject of the TRO?  These

14   three —

15         MR. AHRENS:  Yes.  Your Honor, we think you have — we

16   think you have jurisdiction.  We would, as the Court said — as

17   the Court said, we have a stipulation with the receiver.  And

18   that we think is the real party-in-interest with respect to the

19   money.  And they're talking about enforcement.  If they over

20   enforce us, we're out of business anyway, Your Honor, because if

21   they require us, for instance, to do things economically we

22   can't do, we're out of business.  So —

23         THE COURT:  I have no such showing by you that you

24   can't do it.  I have no declarations as to —

25         MR. AHRENS:  That's — that's —

*Emergency Motion for Use of Cash Collateral*                    63

1          THE COURT: Let me finish, Mr. Ahrens.

2          I have no declarations as to how much time is

3  involved, how much money is involved.  I have no support from

4  you for a TRO, as far as I can tell.  I mean maybe you've seen

5  my record and that I'm not aware of it, but it would have to

6  basically be why the next three weeks you can't do this

7  litigation.  And it may be I have the authority and maybe I

8  would exercise the authority, but I would need the evidentiary

9  support for why you can't do whatever is required for three

10  weeks.

11          Do I have that support in my record?

12          MR. AHRENS:  I think you do, but I think you also have

13  another alternative.  I think we would stipulate to an extension

14  of the discovery, as the Court said.  So maybe the receiver and

15  the debtor could go through their local counsel to the Court

16  tomorrow to see if there would be an extension based on those

17  terms.

18          THE COURT:  That's fine with me.

19          MR. AHRENS:  And even over the objection of the FTC.

20          THE COURT:  Fine with me.

21          MR. AHRENS:  And then if we don't then we could come

22  back and argue this on Friday on the TRO.

23          THE COURT:  Well, but you might need to support your

24  position with more declarations, specifically focusing on three

25  weeks worth of work and the financial ability of the debtor to

*Emergency Motion for Use of Cash Collateral*

1  do that.

2          MR. SCHNEIDER:  Your Honor, —

3          THE COURT:  Wait a second, please.  Wait a second.

4          MR. AHRENS:  Yes, Your Honor.  I understand for three

5  weeks.  It's not the three weeks.  I'll be very honest and

6  candid.  It's the — if we start three weeks, then four weeks,

7  then the trial, it's — we do already have established there's

8  going to be close to a million dollars of attorney's fees.

9          THE COURT:  Okay.

10         MR. AHRENS:  And that is in the record, Your Honor.

11  We do have declarations on the TRO.

12         And I want to try to do a deal.  I'm trying to avoid

13  arguing the TRO.  I know the Court has not indicated which way

14  it would rule.  And so my suggestion would possibly avoid it, if

15  the judge down there gave us more time.

16         THE COURT:  Absolutely.

17         MR. AHRENS:  If the judge didn't, then maybe we have

18  to argue this on Friday or Monday or Tuesday.  But if there's no

19  lifting — if there's no stay granted by this Court, well, let's

20  spend the money.

21         THE COURT:  Okay.

22         MR. AHRENS:  And it'll come out of creditors' pockets.

23         THE COURT:  Okay.  I understand.

24         Did you want to say something, counsel on the phone?

25         MR. SCHNEIDER:  Yes, Your Honor.  Thank you.  This is

1   Jeff Schneider.  I am the receiver's counsel in the district

2   court action.  I appreciate Mr. Ahrens' attempt to be creative,

3   I really do.  But the receiver has not been participating in the

4   active litigation of the enforcement action.  We have not

5   attended any of the depositions.  We have not taken any of the

6   depositions.  So I am certain that we would not be able to join

7   Integretal in asking for those discovery deadlines to be

8   extended.  That doesn't mean Integretal couldn't do it on its

9   own, but I just didn't want the Court to be under the impression

10  that because of Mr. Ahrens's suggestion that the receiver would

11  be able to support that.  He would not —

12          THE COURT:  Well, can the receiver take a neutral

13  position?

14          MR. SCHNEIDER:  The receiver in either event would

15  take a neutral position.  The receiver has —

16          THE COURT:  Now can the FTC take a neutral position if

17  Mr. Ahrens makes that request?

18          MS. GUERARD:  Your Honor, this is Collot Guerard from

19  the Federal Trade Commission.

20          THE COURT:  Go ahead, please.

21          MS. GUERARD:  We cannot agree to postpone the

22  discovery deadline for the reasons that I explained before.

23  There's a very tight schedule that is imposed on all parties.

24  And there's more than just Integretal in this litigation.

25          THE COURT:  Okay.  All right.  So, Mr. Ahrens, it will

1   be up to you whether you want to go in alone or whether you want

2   to put the matter up for a TRO with the understanding that we'll

3   have a hearing in a day or two and I'll issue a decision.  And

4   then the next question is do you want to submit any additional

5   evidence.

6            MR. AHRENS:  Could I have a minute to talk to my

7   partner?

8            THE COURT:  Absolutely.

9            MR. AHRENS:  Thank you.

10           MS. COHEN:  Your Honor, I realize the Court — this is

11  Leslie Cohen speaking.  I realize the Court is talking about

12  much bigger pieces of this puzzle than me, but I'm ready to

13  respond to the Court's suggestion as to whether I would withdraw

14  PCS' objection based on the segregation of $56,000.

15           THE COURT:  Yeah.  Counsel are talking, so I'll come

16  back to you when I can, Ms. Cohen.

17           MS. COHEN:  That's fine.  Thanks very much, Your

18  Honor.

19       (Pause in the proceedings.)

20           MR. AHRENS:  Your Honor, we would request, since it's

21  getting late right now, and we think we have enough evidence but

22  we want to look at our pleadings to make sure we have enough.

23  We don't have it for the three.  We have it for the whole

24  period.  But we would request a hearing on the TRO some time

25  around Tuesday.

*Emergency Motion for Use of Cash Collateral*                67

1      THE COURT:  Tanya, may I see your calendar?

2      I think Tuesday's fine.

3      THE COURT:  Yeah.  Go off the record.

4   (Momentarily off the record at 5:33 p.m.)

5      THE COURT:  On October 2nd.

6      MR. AHRENS:  That's fine, Your Honor.  And we would

7   request permission after we look at our evidence to submit

8   anything by noontime on Monday, with service —

9      THE COURT:  They have to be able to respond, Mr.

10  Ahrens.  They have to have a chance to respond and I have to be

11  able to read it.

12     MR. AHRENS:  Then how about —

13     THE COURT:  Want it to be 9:00 a.m. Monday and they

14  can respond —

15     MR. AHRENS:  That — that would be fine, Your Honor.

16     THE COURT:  They have everything and then they'll —

17  then — well, —

18     MR. [SPEAKER]:  Well, Your Honor, —

19     THE COURT:  — it would be better for me if you could

20  do it Friday, frankly, Mr. Ahrens, because I want to give them

21  an opportunity to respond.

22     MR. AHRENS:  That — that's fine, Your Honor.  Could

23  we —

24     THE COURT:  Close of business Friday?

25     MR. AHRENS:  Yes.  And I work late.

*Emergency Motion for Use of Cash Collateral*                                     68

1          THE COURT:  10:00 p.m., I don't care.

2          MR. AHRENS:  Yes.  Yes.  Thank you, Your Honor.

3          THE COURT:  10:00 p.m. Friday.

4          MR. AHRENS:  That — that's fine, Pacific Time.

5          THE COURT:  Midnight Friday, Mr. Ahrens.

6          MR. AHRENS:  That's — that's fine, Your Honor.

7  Midnight Friday.  That's fine.  Thank you.

8          THE COURT:  That's fine.  And then the FTC's response

9  would have to be into the Court by no later than 3:00 p.m. on

10  October 1st.

11          MR. AHRENS:  Thank you, Your Honor.

12          And then as to the cash collateral order, we assume

13  that that is being entered because we need cash tomorrow.  I

14  mean there's —

15          THE COURT:  Well, I wanted to hear Ms. Cohen.

16          MS. COHEN:  Thank you very much, Your Honor.  Leslie

17  Cohen on behalf of PCS.  I want to thank the Court and counsel

18  also and very much appreciate the Court's suggestion.  I did

19  have a chance to speak with my client.  And if the $56,000,

20  representing the amount that would otherwise be payable during

21  this period were segregated under the same reservation-of-rights

22  terms that everyone else has discussed as far as the FTC and so

23  on, that that amount were segregated for PCS on, again, the same

24  terms, then we would withdraw our objection and we would support

25  the use of cash collateral during this interim period.

1        MR. AHRENS:  Your Honor, we will accept that.  We

2    don't see the reason for doing that for her — but we will accept

3    that just because it's such a small amount and we want to get

4    this order entered.

5                    RULING OF THE COURT

6        THE COURT:  Okay.  All oppositions to the use of cash

7    collateral have been withdrawn.  And, therefore, the Court has

8    reviewed this situation in great depth and the debtor is

9    authorized to use cash collateral in accordance with the budget

10   that's been submitted in the cash collateral motion that has

11   been submitted to the Court.  Essentially we have a debtor's

12   emergency motion for interim use of cash collateral and the

13   debtor seeking authority to use at least $615,000 in cash

14   collateral on an interim basis for the next three weeks and pay

15   its 97-percent owned subsidiary over two million during that

16   time in exchange for debtor's stipulated use of that creditor's

17   cash collateral.

18        All objections have been resolved.

19        The standard is under 363(c)(2).  The debtor may use

20   cash collateral with consent of an entity that has an interest

21   in that cash collateral or upon authorization of the Court after

22   notice of a hearing.

23        We have consent of all the secured creditors pursuant

24   to various deals that have been made that have been made part of

25   the record.  And, indeed, we've also had a notice of hearing as

*Ruling of the Court*                                                        69

1          MR. AHRENS:  Your Honor, we will accept that.  We

2    don't see the reason for doing that for her — but we will accept

3    that just because it's such a small amount and we want to get

4    this order entered.

5                          RULING OF THE COURT

6          THE COURT:  Okay.  All oppositions to the use of cash

7    collateral have been withdrawn.  And, therefore, the Court has

8    reviewed this situation in great depth and the debtor is

9    authorized to use cash collateral in accordance with the budget

10   that's been submitted in the cash collateral motion that has

11   been submitted to the Court.  Essentially we have a debtor's

12   emergency motion for interim use of cash collateral and the

13   debtor seeking authority to use at least $615,000 in cash

14   collateral on an interim basis for the next three weeks and pay

15   its 97-percent owned subsidiary over two million during that

16   time in exchange for debtor's stipulated use of that creditor's

17   cash collateral.

18          All objections have been resolved.

19          The standard is under 363(c)(2).  The debtor may use

20   cash collateral with consent of an entity that has an interest

21   in that cash collateral or upon authorization of the Court after

22   notice of a hearing.

23          We have consent of all the secured creditors pursuant

24   to various deals that have been made that have been made part of

25   the record.  And, indeed, we've also had a notice of hearing as

*Ruling of the Court*                                                      70

1   well.

2           And therefore in accordance with applicable law, the

3   Court approves the use of cash collateral pursuant to the

4   debtor's motion.

5           MR. AHRENS:  Thank you, Your Honor.  We have a form of

6   order.

7           THE COURT:  That's fine.

8           MR. AHRENS:  Thank you.

9           THE COURT:  Thank you.

10          MR. AHRENS:  I think that's all.

11          THE COURT:  Now — right.  So we've got a schedule for

12  the TRO — I know, Mr. Mora, that you and counsel in Washington —

13  counsel in Washington for the FTC, tell me your name again.

14          MS. GUERARD:  Your Honor?

15          THE COURT:  Yes.

16          MS. GUERARD:  My name is Collot Guerard.

17          THE COURT:  Guerard.  Ms. Guerard.

18          MS. GUERARD:  G-u-e-r-a-r-d —

19          THE COURT:  Yes.  I understand.  I would ask you to

20  please go back to your client, whoever the client is at the FTC

21  — are you with the Bureau of Consumer Protection?

22          MR. MORA:  Yes, Your Honor.

23          THE COURT:  Okay.  So whoever the director of the

24  Bureau of Consumer Protection is, to please go to that person,

25  with my request, my specific request to the head of the Bureau

1    of Consumer Protection, that for three weeks you try to see if

2    you can't agree to hold the enforcement action so this whole

3    bankruptcy case can be held together.

4            We're talking about a very limited amount of time.

5    And the district court's calendar may be perfectly free three

6    weeks later for your trial.  And all the dates may be able to be

7    pushed out three weeks.  District courts do it all the time.

8    This involves not only the FTC and its limited interests, but it

9    involves lots of other people.  It involves an ongoing business

10   and — and it really may well be resolved within a relatively

11   short period of time.  It's a very unusual case.

12           This is the kind of case that may, as Mr. Benvenutti

13   said, make itself very clear within a very short period of time.

14   And so I really would ask the head of the Bureau through counsel

15   to please reconsider and see if you can't agree to let this

16   enforcement action be stayed for three weeks, with the debtor

17   fully agreeing to an extension of discovery and go to the

18   district court and see if those times are available and if

19   you're comfortable doing it.

20           If the head of the Bureau says no and you say no with

21   whatever authority you have, settlement authority you might

22   have, I'll understand.  But it's an area that I'm very —

23   consumer protection is very important to me, too.  I don't know

24   if you know anything about my background, but consumer

25   protection and the government's enforcement is very important to

*Ruling of the Court*                                                    72

1   me, too.  But we're only talking about three weeks and where

2   nobody is really going to be prejudiced by a three-week

3   extension of the district court.  And lots of people could be

4   prejudiced by an enforcement action here, and that's the issue

5   that I'm going to have to decide on a TRO.  Lots of people could

6   be prejudiced by what you're proposing to do, including jobs,

7   including a company's viability, including lots of other

8   creditors.

9         I don't think it's in the government's interest,

10  frankly, it's not my place to say, it's your place to say, but I

11  don't think it's in the Federal Trade Commission's interest to

12  block — to continue to do this enforcement action for three

13  weeks while we're trying to put things together here, if

14  possible.

15        Thank you.

16        MR. OETZELL:  Your Honor, —

17        MR. AHRENS:  That's all we have.  Thank you, Your

18  Honor.

19        MR. OETZELL:  Who did you want to do the order in

20  respect of the — did you want just a stipulation and order

21  between Mr. Ahrens and myself in respect of the blocked

22  account —

23        THE COURT:  Do you have a preference, Mr. Ahrens?

24        MR. AHRENS:  Pardon me.  I was talking to Mr. Rehfeld.

25  What's the question?

*Ruling of the Court*                                                73

1          THE COURT:  Say your question again, Mr. Oetzell.

2          MR. OETZELL:  Just a stipulation and order between Mr.

3   Ahrens and myself in respect of the blocked account and then

4   we —

5          MR. AHRENS:  We — to show our good faith, we are

6   setting those funds aside.  I thought that was assumed by the

7   Court.

8          THE COURT:  Sure, but we need an order, Mr. Ahrens.

9          MR. AHRENS:  Oh, sure.  We'll do it.

10         THE COURT:  So that he — you need to draft one or Mr.

11  Oetzell —

12         MR. AHRENS:  Yes.

13         THE COURT:  — needs to draft one.

14         MR. AHRENS:  I will draft one.  I will draft one.

15         THE COURT:  And get it over to Mr. Oetzell.

16         MR. AHRENS:  Yes.

17         MS. COHEN:  And for PCS, if that's okay, Your Honor.

18         THE COURT:  And for PCS, too.  You're going to do the

19  PCS order, Mr. Ahrens?

20         MR. AHRENS:  We'll do them both, and Mr. Rehfeld has

21  an order to submit up in the cash collateral —

22         THE COURT:  And don't forget Ms. Diemer's order.

23         MR. AHRENS:  Oh, I'm sure I won't.

24         THE COURT:  I'm sure you —

25         MS. DIEMER:  Nor would I allow you to.

*Ruling of the Court*                                                          74

1          MR. AHRENS:  I know you wouldn't.

2          THE COURT:  Okay.

3          MR. REHFELD:  Your Honor?

4          THE COURT:  Does — yes, sir.

5          MR. REHFELD:  I'm sorry.  I didn't mean to interrupt

6    you.  Jeff Rehfeld of Sheppard Mullin on behalf of the debtor.

7          Your Honor, there are some time commitments —

8          THE COURT:  Do you want me to sign that now?

9          MR. REHFELD:  Yeah.  To sign the order now, I would

10   also ask Your Honor if we could hand in the signed stipulation

11   because there was not one that was filed with the Court.  One is

12   signed behind me, or we can have that filed with the Court,

13   signed —

14         THE COURT:  I'm not sure what you're asking for.

15         MR. REHFELD:  We want to — we want to file with the

16   Court the signed stipulation.

17         THE COURT:  Between you and whom?

18         MR. REHFELD:  PaymentOne and the debtor.

19         THE COURT:  Okay.  And have copies been distributed?

20         MR. AHRENS:  Oh, yes.  That's the thing we

21   distributed —

22         THE COURT:  That would — no, the final copy as signed

23   has been distributed?

24         MR. REHFELD:  The copy that was distributed was the

25   blackline showing all the changes.  No changes have been made

1    since then.  That was the thing we talked about on Friday, Your

2    Honor, that you had me fax to people.  And I did a notice on

3    Saturday and did — and attached that and the new budget, so.

4            THE COURT:  Mr. Benvenutti.

5            MR. BENVENUTTI:  Yes, Your Honor.  I have one request

6    which has to do with the timing.  And that is that the Court set

7    a deadline for parties to oppose continued use of — to oppose

8    the arrangement becoming final as close as possible to the

9    hearing, because we don't have a lot of time between now and the

10   hearing on the 15th.

11           On the one hand, we — we're not interested in having —

12           THE COURT:  You're talking about scheduling, I

13   understand.

14           MR. BENVENUTTI:  Yes.

15           THE COURT:  So we need a hearing on the 15th and we

16   need a time for parties to oppose and for the debtor to reply.

17           MR. REHFELD:  Yes, Your Honor.

18           THE COURT:  Do you have a suggestion, Mr. Ahrens?  I'm

19   probably going to have the hearing in the afternoon because —

20           MR. AHRENS:  Your Honor, I want to give as much time

21   as possible for parties to negotiate.  I would say you're going

22   to have it in the afternoon.  If it suits the Court, objections

23   by October 11th and replies by —

24           THE COURT:  I mean you're going to put us in a

25   position where we have to review everything over the weekend?

*Ruling of the Court*                                                    76

1          MR. AHRENS:  No, I don't want to do that.

2          THE COURT:  I mean give me one working day, a full

3    working day at least.

4          MR. AHRENS:  Oppositions by the 10th and replies by

5    the 11th, Your Honor.  We can do it in a day.

6          THE COURT:  Will that work for you?

7          MR. BENVENUTTI:  Your Honor, it would.  I just ask the

8    Court to be sensitive to the possibility that it may still be a

9    dynamic situation at that point.  In fact, I think it's more

10   likely than not it will be a dynamic situation.

11         THE COURT:  I don't care how dynamic it is.  But if I

12   get papers flying in the day of and the night before, you know,

13   the question is whether I'll be able to read them and get

14   through them.

15         MR. BENVENUTTI:  I understand.  But what I'm — what

16   I'm saying, Your Honor, is that this schedule is the best I

17   think that can be done given those requirements, but I just want

18   to —

19         THE COURT:  You want me to be gentle if —

20         MR. BENVENUTTI:  Let —

21         THE COURT:  — somebody files late and not to —

22         MR. BENVENUTTI:  No, no, no.  No, Your Honor, no.

23         THE COURT:  — have the Marshals drag them out?

24         MR. BENVENUTTI:  No, Your Honor.  What I'm saying is

25   it's quite possible that what the response will be is we don't

1   have enough information yet and we need more time.  That's

2   possible —

3           THE COURT:  Then what you're going to try to negotiate

4   is another interim.

5           MR. BENVENUTTI:  That's correct.

6           MR. AHRENS:  That's correct.

7           THE COURT:  And I'm not adverse to your working out

8   another interim.  What I don't want is to — frankly, Mr.

9   Benvenutti, what I don't want is not be — to not be prepared.

10  So to get a lot of garbage coming in here at the last second,

11  and I don't mean the garbage negatively, it's just stuff that I

12  don't have time to read and digest and walk into court prepared.

13  So that's extremely frustrating for me and I can't be a good

14  judge if I get that.

15          MR. BENVENUTTI:  Your Honor, I'm not suggesting a

16  different schedule.

17          THE COURT:  I understand.

18          MR. BENVENUTTI:  What I'm — all I'm saying, Your

19  Honor, is that I anticipate a very distinct possibility that

20  what you'll get when you get the papers filed by other than the

21  debtor is:  We don't know enough yet.

22          THE COURT:  Okay.  But I'm saying to everybody now if

23  that's what I'm going to get, then have a plan b and plan b —

24  and you can start working on plan b at the same time you're

25  trying to work out final use of cash collateral.  You're a very

1    experienced lawyer.  Mr. Ahrens is very experienced.  Many of

2    the lawyers in this court are extremely experienced.

3    Simultaneously, if that's the situation, keep plan b alive.

4               MR. BENVENUTTI:  I think we can do that.

5               MR. AHRENS:  That sounds fine, Your Honor.

6               MR. BENVENUTTI:  We can do that, Your Honor.

7               THE COURT:  Thank you.

8               MR. AHRENS:  Thank you, Your Honor.

9               THE COURT:  Okay.  So hearing, two o'clock on the

10   15th, and the debtor's papers by the 10th, responses by the 11th

11   — is that what you want?

12              MR. AHRENS:  No.  It's —

13              THE COURT:  Responses by the 10th and the reply by the

14   debtor by the 11th.

15              MR. AHRENS:  By midnight on the 11th, yes, Your Honor.

16              THE COURT:  Okay, that's fine.

17              MR. AHRENS:  Thank you, Your Honor.

18              THE COURT:  And you don't need to fax your reply to

19   chambers because we'll get it — if you upload it, that's the

20   best thing for us.

21              MR. AHRENS:  Thank you, Your Honor.

22              MR. REHFELD:  Your Honor, Jeff Rehfeld once again on

23   behalf of the debtor.

24              THE COURT:  He gives you the dirty work, right?  So

25   you have to get this order signed by the Court.  It's at the

1   last minute —

2           MR. REHFELD:  Indulgence —

3           THE COURT:  He has all this easy stuff to negotiate

4   and then he gives you this stack of paper and said:  Get the

5   Judge to sign it tonight, Mr. Rehfeld.

6         (Laughter.)

7           THE COURT:  It's 5:30 — it's almost six o'clock, the

8   staff wants to leave, and you're here with a stack of paper

9   wanting me to sign all this stuff, right?

10          MR. REHFELD:  Yes, Your Honor.

11          THE COURT:  I got it.

12          MR. REHFELD:  So if I could just recap, Your Honor,

13  what I have is the first amended stipulation, which has been

14  signed by the parties, and what I'm asking for the Court to do

15  is if I could present it for filing to the Court —

16          THE COURT:  I'll sign it.  Just pass it up.  And then

17  we can stamp it.

18          MR. REHFELD:  Yeah.  You don't need to sign the

19  stipulation.  This just gets filed, but I do have an order that

20  goes along with it, which I will be handing up also, Your Honor.

21          THE COURT:  Thank you very much.

22          Mr. Mora, you have your work cut out for you.

23          MR. MORA:  Yes, indeed, Your Honor.

24          THE COURT:  Are you going to pass that to me, Tanya?

25          THE CLERK:  The stip.

*Ruling of the Court*                                                    80

1          THE COURT:  One of them.  Unless they have a signature

2   page.

3          MR. MORA:  There's no signature page on the

4   stipulation, Your Honor.

5       (The Court and Clerk confer off record.)

6          THE COURT:  We'll stay on the record for this

7   procedure.  Not that anything any of you would file would be

8   garbage.

9       (Laughter.)

10         THE COURT:  But if I don't have time to read it, it's

11  garbage.

12         Go off the record.

13      (Off the record from 5:47 p.m. to 5:50 p.m.)

14         THE COURT:  It's an interesting case.  Okay.

15         Tanya.

16         MR. REHFELD:  Thank you, Your Honor.

17         THE COURT:  I've signed that order.  Is there anything

18  else you need to —

19         MR. REHFELD:  Yeah.  Just one more — with the Court's

20  indulgence, one more thing, Your Honor.  If we could — if the

21  Court could upload those orders so they're entered on the docket

22  today, that would be very helpful, the stipulation.

23         THE COURT:  Can we do that?

24      (The Court and Clerk confer off record.)

25         MR. REHFELD:  There's also, Your Honor, —

1    THE COURT:  Lester was here a few minutes ago.

2    MR. REHFELD:  — the cash — there was a cash management

3  order that you had signed too that hasn't been uploaded yet

4  either, and that would have to be —

5    THE COURT:  Well, Tanya, listen to this.

6    MR. REHFELD:  The cash management —

7    THE COURT:  I definitely signed a cash management

8  order.

9    MR. REHFELD:  As of earlier this afternoon it had not

10  been —

11    THE COURT:  I had it faxed to you.

12    MR. REHFELD:  Yes.  It just hasn't been entered on the

13  docket yet, and we're —

14    THE COURT:  Okay.  Now does it — does it really matter

15  whether it gets entered first thing tomorrow morning or tonight?

16  I mean we'll try to accommodate you if there's somebody here.

17    Can you do it?

18    THE CLERK:  No.

19    THE COURT:  Okay.  So are you going to check if

20  there's somebody here from docketing?

21    Go off the record.

22    (The hearing was adjourned at 5:51 o'clock p.m.)

23                          —o0o—

24

25

PALMER REPORTING  SERVICES
P. O. Box 30727   Stockton, California   95213-0727   (800) 665-6251

State of California                )
                                   )    SS.
County of San Joaquin              )

 

 

I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify I am not a party to nor in any way interested in the outcome of this matter.

I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124. Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated October 2, 2007

**RER - 25**