# VOLUME 3 OF 7

# RER-28   1207 through RER-32   1849

**RER - 28**

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
MICHAEL H. AHRENS, Cal. Bar No. 44766
TERRENCE V. PONSFORD, Cal. Bar No. 42648
JEFFREY K. REHFELD, Cal. Bar No. 188128
ORI KATZ, Cal. Bar No. 209561
Four Embarcadero Center, 17th Floor
San Francisco, California  94111-4106
Telephone:    415-434-9100
Facsimile:     415-434-3947
Email:         mahrens@sheppardmullin.com
               jrehfeld@sheppardmullin.com
               okatz@sheppardmullin.com

Attorneys for The Billing Resource,
dba Integretel

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re | Case No. 07-52890 ASW |
| THE BILLING RESOURCE, dba Integretel, a California corporation, | Chapter 11 |
| Debtor. | **DEBTOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF USE OF CASH COLLATERAL ON A FURTHER INTERIM BASIS INCLUDING APPROVAL OF FIRST AMENDED PAYMENTONE STIPULATION THROUGH AND INCLUDING NOVEMBER 2, 2007 AND OMNIBUS REPLY TO OBJECTIONS TO DEBTOR'S CASH COLLATERAL MOTION** |
| Tax ID: 33-0289863 | |
| | Date:      October 15, 2007<br>Time:      2:00 p.m.<br>Place:     United States Bankruptcy Court<br>               280 South First Street<br>               San Jose, California<br>Judge:     Hon. Arthur S. Weissbrodt<br>Courtroom:  3020 |

W02-WEST:FJR\400462520.6

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1   The above-captioned debtor and debtor in possession, The Billing Resource, dba

2   Integretel, a California corporation (the "Debtor"), hereby files this memorandum of points and

3   authorities in support of the Debtor's use of cash collateral on a further interim basis through and

4   including November 2, 2007, or as soon thereafter as the Court and counsel are available for a

5   further hearing on the motion and omnibus reply (the "Reply") to various objections filed on

6   October 10, 2007 (the "Objections") to the Debtor's Cash Collateral Motion.[1]

7   Of the Debtor's numerous creditors, only a handful of creditors have filed objections. The

8   Objections filed by those few parties merely consist of a rehashing of arguments previously made

9   to the Court, previously addressed by the Debtor, and previously withdrawn.

10   In contrast, good cause exists to grant the Debtor's continued use of cash collateral *for the*

11   *very limited period of approximately the next three weeks, through and including November 2,*

12   *2007.* To that end, the Committee, the entity appointed and charged by statute with looking after

13   the best interests of the Debtor's unsecured creditors, supports the Debtor's request. Granting the

14   Debtor this further breathing spell will provide the Debtor the opportunity to further explore with

15   the Committee more concrete terms for a possible plan of reorganization contemplating a

16   continuation of business operations, with the goal of allowing the Debtor to exit bankruptcy as

17   quickly as possible, while also maximizing value to unsecured creditors.

18   **ARGUMENT**

19   **A.    The Committee Supports the Debtor's Further Interim Use of Cash Collateral Until
         November 2, 2007.**

20

21   The Debtor filed its voluntary bankruptcy petition less than a month ago on September 16,

22   2007. On September 26, 2007, the Court entered its "Order Approving Interim Use of Cash

23   Collateral and Granting Replacement Liens and Approving First Amended Stipulation with

24   PaymentOne Corporation Regarding Use of Cash Collateral and Adequate Protection on an

25   ───────────────
     [1] This memorandum is supported by the concurrently filed declarations of Ken Dawson (the
     "October 11 Dawson Declaration") and Paul Weber (the "October 11 Weber Declaration"). A

26   revised 27-week budget with respect to the Debtor's cash collateral motion is attached as an
     exhibit to the October 11 Weber Declaration as Exhibit B thereto (the "Debtor's Budget") and a

27   revised cash collateral order in substantially the form the Debtor intends to present to the Court at
     the October 15 hearing is attached as an exhibit to the October 11 Dawson Declaration.

28

-1-

1    Interim Basis" (the "Interim Cash Collateral Order").  At the September 26, 2007 hearing the

2    Court requested that the Office of the United States Trustee expeditiously appoint a committee.

3    Just 10 days ago, on October 1, 2007, the Office of the United States Trustee promptly appointed

4    an Official Committee of Unsecured Creditors (the "Committee") in this case.  The Committee is

5    presently comprised of the following seven members:  (1) Agora Solution Corp., (2) Email

6    Discount Network, LLC, (3) Horizon Telecom, Inc., (4) NTE, (5) Telco Billing, Inc., (6) Toll Free

7    Voice Mail, Inc., and (7) Total I Protect, LLC.  The Chairman of the Committee is Nelson Gross

8    of Toll Free Voice Mail, Inc. and the Vice-Chairman is Eli Bakofsky of Email Discount Network,

9    LLC.

10    Since its recent inception, the Committee has moved swiftly to retain professionals and to

11    familiarize itself with the Debtor's financial and business affairs.  On October 3, 2007, the

12    Committee selected Pachulski Stang Ziehl & Jones LLP as its counsel, subject to the approval of

13    this Court.  On October 5, 2007, the Committee selected GlassRatner Advisory and Capital Group,

14    LLC ("GlassRatner") as its financial advisors, subject to the approval of the Court.

15    Within the last week:  (a) the Debtor and the Committee have executed a confidentiality

16    agreement; (b) the Committee requested and the Debtor provided various documents and

17    information; and (c) the Committee began the process of analyzing the documents and information

18    provided to the Committee to date.  Both the Debtor and the Committee prepared for a meeting

19    between the two parties and their representatives.

20    On October 10, 2007, the Committee participated in an initial face-to-face meeting with

21    the Debtor.   Several Committee members flew across the country and others attended by

22    telephone.   Also present at the meeting was the Committee's proposed financial advisor

23    GlassRatner.  The meeting lasted approximately five hours.  Prior to and at the meeting, the

24    Debtor provided the Committee with financial information including projections, a report

25    regarding the background and status of the Debtor's bankruptcy case and the claims alleged

26    against the Debtor, a plan for prepayment of the Debtor's pre-petition customers,[2] information

27    _____

28    [2] The Committee agreed to support the Debtor's prepayment plan, which the Debtor considers to

-2-

W02-WEST:FJR\400462520.6

1    regarding the Debtor's relationship with its long-distance exchange carriers (i.e., "LECs"), a

2    litigation report including a report regarding the Florida Action involving the Federal Trade

3    Commission and the Receiver appointed for two of the Debtor's prior customers, the financial and

4    business affairs of the Debtor's subsidiaries, and various other types of information.  The Debtor

5    and its representatives and the Committee and its representatives discussed each of these issues, as

6    well as various other issues, including discussions concerning possible plan of reorganization

7    issues.

8         The Committee and the Debtor each believe that the October 10 meeting was productive.

9    At the October 10 meeting, it was agreed that the Committee would consent to the Debtor's

10   continued use of cash collateral on the terms proposed by the Debtor in its latest budget *on an*

11   *interim basis for a period of two to three weeks*.  During this time, the Debtor has committed to

12   negotiate with the Committee a term sheet for a plan of reorganization contemplating a

13   continuation of business operations with the goal of allowing the Debtor to exit bankruptcy as

14   quickly as possible, while also maximizing value to unsecured creditors.

15        Based on the information provided and the discussion during the October 10 meeting, the

16   Committee believes that the Debtor has a reasonable chance to successfully reorganize.  As set

17   forth in the Committee Support Stipulation, the Committee intends to use the balance of this

18   month to conduct further due diligence with the help of the Committee's financial and legal

19   advisors on the Debtor's assets, liabilities and financial affairs.  The Committee expects to have a

20   better understanding of the Debtor's business and its prospects by the end of this month.  By then,

21   the Committee believes it should be in a much better position to evaluate an exit strategy including

22   a possible plan of reorganization contemplating a continuation of business operations and to make

23   recommendations to this Court on cash collateral and other issues in the case.  Meetings will

24   continue with the Committee's financial advisor including meetings which will be taking place at

25   the same time the Court is conducting its October 15 hearing on this Motion.

26

27   be a very favorable result.  A summary of the Debtor's prepayment plan is attached as Exhibit "2"
     to the October 11 Dawson Declaration.

28
                                              -3-

DEBTOR'S MEMORANDUM OF POINTS AND
                                                       AUTHORITIES IN SUPPORT OF USE OF CASH
                                                       COLLATERAL ON A FURTHER INTERIM BASIS

1    The Debtor likewise believes that it will successfully reorganize. The Debtor intends to
2    use the next three weeks to further explore with the Committee more concrete terms for a possible
3    plan of reorganization.

4    The Committee's support makes eminent sense. LEC holdbacks and reserves
5    approximating $18 million need to be collected by Debtor to avoid offsets and increases or delays
6    by LECs. The Debtor is only entity that can effectively perform this function. In addition, the
7    Debtor's customers' businesses need the Debtor to continue to process billing transactions. A key
8    component determining the recovery to creditors in this bankruptcy case depends upon the need to
9    promptly establish amount of unsecured claims, which is an extremely complicated function
10    which the Debtor is by far the best, and likely the only, party able to quickly and properly perform
11    such function. The Debtor also has the necessary institutional knowledge required to negotiate
12    with substantial New York and Tennessee tax claimants in order to attempt to reduce priority tax
13    claims. In addition, without continued operations the subsidiary PaymentOne is out of business,
14    and its continued operations are important to Debtor. Moreover, as a majority owned subsidiary
15    PaymentOne is a valuable asset of the bankruptcy estate. Similarly, without continued operations,
16    Inmate Calling Solutions' business is severely threatened, and its operations are also important to
17    Debtor. Granting the Debtor the requested further interim use of cash collateral for the next few
18    weeks, through and including November 2, 2007, or as soon thereafter as the Court and counsel
19    are available for a further hearing on the motion, is clearly the correct course of action and is
20    overwhelmingly in the best interest of the Debtor's bankruptcy estate.

21   **B.    PaymentOne Supports the Debtor's Further Interim Use of Cash Collateral Until
           November 2, 2007.**
22

23    PaymentOne has consented to the Debtor's further interim use of cash collateral through
24    and including November 2, 2007, or as soon thereafter as the Court and counsel are available for a
25    further hearing on the motion. PaymentOne consents to the Debtor's further interim use of cash
26    collateral, and agrees that the First Amended PaymentOne Stipulation remains in effect for the
27    interim period, except as revised in the proposed Order approving such interim use by the Debtor.

28    Certain of the filed October 10 Objections are based upon the treatment afforded to

-4-

W02-WEST:FJRV400462520.6            DEBTOR'S MEMORANDUM OF POINTS AND
                                     AUTHORITIES IN SUPPORT OF USE OF CASH
                                     COLLATERAL ON A FURTHER INTERIM BASIS

                                                             RER-28    1211

1  PaymentOne in the First Amended PaymentOne Stipulation. Generally, the objections assert that
2  there is no evidence that PaymentOne is secured and that no payments should be made on account
3  of unsecured "insider" claims. Such objections were previously made and thereafter addressed by
4  the Debtor in its prior pleadings in support of its cash collateral motion. Thus the Debtor's
5  response will not be completely restated herein, but instead the Debtor will simply summarize
6  again why these objections should be overruled.

7        As set forth in further detail in the Debtor's Supplemental Memorandum filed on
8  September 24, 2007, PaymentOne has presented a credible legal argument that at the least it is
9  secured for all new credit it provided to the Debtor since the filing of its UCC amendment, which
10 amount is in excess of $6 million. In addition, the amount proposed to be paid to PaymentOne
11 under the First Amended Stipulation is less than the total of the new value advanced to the Debtor
12 by PaymentOne. In light of such new value, counsel for the Debtor believed that the adequate
13 protection payments to be provided to PaymentOne pursuant to the First Amended Stipulation
14 were fair and appropriate. Moreover, under the First Amended Stipulation PaymentOne is
15 replenishing the payments it receives with new transactions provided to the Debtor, all parties
16 have reserved their rights and all other parties in interest have the right to object at a later date. As
17 further discussed in the Supplemental Memorandum, PaymentOne is an extremely valuable asset
18 of the Debtor and unless the First Amended Stipulation is approved PaymentOne will likely be
19 forced to cease operations, which will result in further damage to the Debtor's creditors and its
20 entire bankruptcy estate.

21 **C.    POL Is Adequately Protected and Its Objection Is Without Merit.**

22        The only creditor in addition to PaymentOne with any sort of valid security interest claim
23 in the Debtor's cash collateral is POL, Inc. ("POL"). POL is adequately protected by the treatment
24 proposed to be afforded to it until November 2 and, in any event, its objection should be
25 overruled.

26        It is helpful to recall the size and character of POL's claim when evaluating its objection.
27 POL's claim consists of two components. Under a note executed in a settlement agreement, the
28 Debtor was obligated to pay POL a series of monthly installment payments totaling $2,196,445.

-5-

1   The Debtor has made all of those payments except for the final installment payment in the amount
2   of $63,721.52[3] due under the note on November 1, 2007. The other component of POL's claim is
3   a contingent right to certain funds based upon the resolution of certain tax disputes between the
4   Debtor and two taxing authorities. POL is thus not entitled to any such funds now, but to the
5   extent the Debtor reaches a favorable outcome with those taxing authorities, POL could be entitled
6   to an additional amount which at the most would be in excess of $800,000 but less than $1
7   million. However, if a favorable outcome is not obtained, POL may be entitled to nothing with
8   respect to such claims. Thus, right now, the only non-contingent, non-liquidated amount the
9   Debtor owes to POL is $63,721.52.

10          POL asserts numerous objections to the Debtor's Motion. POL asserts that the Debtor has
11  not shown that it has any viable prospects. Yet, the Debtor has met with the Committee and
12  discussed its business and related issues including the Debtor's current and projected financial
13  condition, and the Committee supports the Debtor's continued interim use of cash collateral. POL
14  also contends that the Debtor fails to reflect a number of items including the possibility of LECs
15  holding back additional funds and the Debtor allegedly failing to clearly identify accounts
16  receivable. Once again the Debtor met with the Committee and discussed LEC issues and
17  information concerning the Debtor's financial condition, and the Committee supports the Debtor's
18  ability to continue to use cash collateral on at least a further interim basis. Moreover, the Debtor's
19  Budget attached to the October 11 Weber Declaration already takes into account the LEC
20  holdback possibility issue. See Line 16 of the Debtor's Budget which anticipates an increased
21  reserve by the Debtor's major LEC, Verizon. In contrast to POL's assertions that the Debtor has
22  not made sufficient showings to permit it to continue to use cash collateral to survive, the Debtor
23  and the Committee are already discussing a possible plan of reorganization which contemplates
24  ongoing operations.

25

26  [3] The amount of that final monthly installment payment was actually $65,721.52, however, the
27  Debtor paid POL $2,000 more than it was required to when the Debtor made its October 2007
    monthly installment payment to POL, thus leaving the balance the Debtor is required to pay POL
    for the final installment $2,000 smaller.
28

-6-

W02-WEST:FJR\400462520.6                DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

RER-28    1213

1    Finally, POL, a secured creditor currently owed slightly more than $60,000, again throws

2    out a halfhearted, less than one-page argument that reserves held by the Debtor may be subject to a

3    constructive trust.   Thermo Credit makes a similar baseless argument.   Their arguments are

4    incorrect. "The effect of a constructive trust in bankruptcy is profound." In re Flanagan, No. 04-

5    5638, 2007 U.S. App. LEXIS 23622, *14 (2d Cir. Oct. 9, 2007) (a copy of which decision is

6    attached hereto as Exhibit 1).   Consequently, "bankruptcy courts have been reluctant, absent a

7    compelling reason, to impose a constructive trust on the property in the estate." Id. at *18; In re

8    First Cent. Fin. Corp., 377 F.3d 209, 217 (2d Cir. 2004) (stating that the "tension between

9    constructive trust law and bankruptcy law is a[] reason to proceed with caution" and collecting

10   cases).   To impose a constructive trust in this case would be especially remarkable because, as

11   Thermo Credit notes in its objection, California law requires the putative trustee to have

12   "wrongfully" detained funds of an owner. See GHK Assoc. v. Mayer Group, Inc., 224 Cal.App.3d

13   856, 878 (1990) (explaining Cal. Civ. Code §§ 2223 & 2224).   The Debtor has not "wrongfully"

14   detained reserves.

15   In addition, "[b]oth the Ninth Circuit Court of Appeals and California courts have

16   consistently held that a party seeking to establish a trust over commingled funds must trace those

17   funds." In re Advent Mgmt. Corp., 178 B.R. 480, 488 (B.A.P. 9th Cir. 1995), aff'd, 104 F.3d 293

18   (9th Cir. 1997).   No creditor has yet undertaken this duty to trace and thus there is no basis to

19   assert the existence of a constructive trust. In fact, the October 11 Weber Declaration makes clear

20   that tracing is impossible as no funds received from LECs were placed in separate accounts for the

21   Debtor's customers, but rather all funds were commingled in the Debtor's "Wire-in-Account" and

22   if not remitted to customers were almost immediately used for other purposes.

23   In its brief, POL unhelpfully cites to an Illinois court's recitation of Illinois law in In re

24   Telesphere Communs., 205 B.R. 535 (N.D. Ill. 1997).   Telesphere tells us nothing about

25   California law and is, thus, completely inapposite. In any event, Telesphere reflects mere dicta on

26   the point of constructive trusts; after supposing such a trust might be appropriate, the Telesphere

27   Court remanded for further consideration of whether the putative trustee had served as an agent for

28   the putative principal. See In re Coupon Clearing Serv., 113 F.3d 1091, 1099 (9th Cir. 1997)

-7-

W02-WEST:FJR\400462520.6

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1   (noting the unpersuasiveness of <u>Telesphere</u> due to its procedural posture, and reversing the
2   imposition of a constructive trust in a similar case).

3          Even if California law permits a constructive trust in this case, this Court still should not
4   impose one. The "mere fact state law would impose a constructive trust does not end the analysis
5   of whether such a trust should be recognized in bankruptcy." In re Advent Mgmt. Corp., 178 B.R.
6   at 490. Confronted with the request for a constructive trust, a bankruptcy court must weigh the
7   advantages of the trust "against bankruptcy's equitable policy of ratable distribution." In re
8   Golden Triangle Capital, Inc., 171 B.R. 79, 82 (B.A.P. 9th Cir. 1994); In re Flanagan, No. 04-
9   5638, 2007 U.S. App. LEXIS 23622 at *18. As previously detailed, imposing a constructive trust
10  here would benefit selected creditors at the expense of other similarly situated creditors.

11         POL's arguments should be overruled. Moreover, in light of the relatively small size of its
12  remaining installment claim (approximately $60,000) and the contingency of its tax claims, as
13  well as the Debtor's lack of any other validly secured creditors other than PaymentOne's claim as
14  described in the preceding section, the Debtor's Budget attached to the October 11 Weber
15  Declaration shows that POL is more than adequately protected by the grant to it of a replacement
16  lien of the same character, validity and priority as the prepetition lien it possessed.

17  **D.     Public Communications Does Not Have a Valid Security Interest Against the Debtor
         and, In Any Event, Is Adequately Protected by the Relief Afforded to It.**
18

19         As previously set forth in the Motion filed at the commencement of this case, Public
20  Communications does not have a security interest in the Debtor's cash collateral because Public
21  Communications' alleged security interest is not in any assets of the Debtor, but instead purports
22  simply to be in amounts to which Public Communications may be entitled under its contract with
23  the Debtor. Similarly, Public Communications does not possess a security interest in the Debtor's
24  cash collateral based upon an alleged security interest in any reserves under the parties' contract
25  because there were and are no segregated reserves. As was further noted in the Motion,
26  irrespective of Public Communications' lack of a security interest in any of the Debtor's assets or
27  cash collateral, the Debtor proposes to give Public Communications a replacement lien on the
28  same assets, if any, that it had an interest in pre-petition.

-8-

W02-WEST:FJR\400462520.6

1  Second, not only are "Net Proceeds", in which Public Communications apparently asserts a
2  secured interest, not an asset of the Debtor, but "Net Proceeds" are not an asset or property at all,
3  of the Debtor, Public Communications, or anyone else.  In the contract between the Debtor and
4  Public Communications, "Net Proceeds" is simply a method to calculate the cash consideration to
5  which Public Communications is entitled under the contract.  Public Communications attempting
6  to take a security interest in "Net Proceeds" would be analogous to a seller of an asset attempting
7  to take a security interest in the purchase price to be determined under a formula and paid at a later
8  time (as opposed to taking a security interest in the asset itself).  Public Communications has only
9  an unsecured claim against the Debtor for Net Proceeds.

10  Moreover, Public Communications does not have a security interest in any assets of the
11  Debtor because Public Communications has not properly described the collateral as required by
12  UCC Sections 9203(b)(3)(A) and 9108, which require the collateral to be sufficiently described in
13  the security agreement for the secured party to have a security interest.  The common way for a
14  creditor to describe the assets which it is taking a security interest in is something as easy as "all
15  accounts receivable of the [debtor]."  Public Communications did not do that.

16  Public Communications does not address in its opposition any of these deficiencies, each
17  of which by itself precludes Public Communications' secured status as against the Debtor.  Instead,
18  Public Communications argues that it should not be considered unperfected as against the Debtor
19  by Public Communications' failure to ever have filed a UCC-1 financing statement against the
20  Debtor which names Public Communications as a secured party of the Debtor.

21  A further reason that Public Communications does not have a perfected security interest, or
22  any security interest at all, in any assets of the Debtor is because, as is evident from the
23  declarations of Tommie Joe submitted by Public Communication in opposition to the Motion,
24  Public Communication never filed a financing statement against Debtor.  As admitted by Public
25  Communications, Public Communications entered into a contract with, and filed a financing
26  statement against, Ebillit (now known as PaymentOne), one of Debtor's subsidiaries.  As permitted
27  by Section 20(d) of the contract between Ebillit/PaymentOne and Public Communications without
28  notice to or the consent Public Communications, Ebillit/PaymentOne assigned the contract to the

-9-

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

RER-28    1216

1  Debtor.[4]  Public Communications never filed a financing statement with Public Communications

2  named as the secured party which named the Debtor as the debtor.[5]  Public Communications' only

3  financing statement runs against Ebillit/PaymentOne, a separate entity.  Moreover, the Debtor

4  never granted Public Communications a security interest in any property, including Net Proceeds.

5  Therefore, Public Communications does not have any security interest, let alone a perfected

6  security interest, in any assets of the Debtor.

7       Public Communications' other arguments similarly miss the mark.  Public

8  Communications' attacks on the treatment being provided to PaymentOne have been previously

9  addressed by both the Debtor and PaymentOne, and as discussed above in this document are

10  without merit. Similarly, Public Communications' asserts that the Debtor has not made a sufficient

11  showing that its business is viable.  That argument is meritless.  In contrast, the Debtor has met

12  with the fiduciary for the Debtor's unsecured creditors, and the Committee supports the Debtor's

13  continued use of cash collateral on an interim basis.

14       Public Communications simply does not possess a valid, perfected and enforceable

15  security interest in the Debtor's cash collateral.  Moreover, Public Communications' claim is for

16  ─────────────
    [4]     In its Second Supplemental Objection and supporting Tommie Joe Declaration filed
17  October 10, 2007 (the "Recent Objection"), Public Communications states that
    Ebillit/PaymentOne assigned the agreement to Debtor without Public Communications' consent.
18  Notice of and consent to the assignment were not required, however, because the Debtor holds at
    least a majority ownership interest in Ebillit/PaymentOne.  As such, Ebillit/PaymentOne had the
19  right to assign the agreement to the Debtor without the prior written consent of Public
    Communications.  Moreover, nothing in the agreement required Ebillit/PaymentOne to provide
20  notice of the assignment to Public Communications.  Curiously, Public Communications never
    mentions these facts.  Nonetheless, the Debtor provided notice of the assignment to Public
21  Communications on June 8, 2004, right after the assignment.  See October 11 Dawson
    Declaration.  Moreover, Public Communications admits that it had knowledge of the assignment
22  right after the assignment was made, stating, "PaymentOne and the Debtor switched places and
    PCS was required to use the Debtor for its billing and collections services" (Recent Objection,
23  page 4, lines 21-22).
    [5]     In the Recent Objection, Public Communications argues that under the agreement, the
24  Debtor and PaymentOne, not Public Communications, were responsible for filing a financing
    statement. Even if Public Communications is correct, which the Debtor does not concede, at most
25  Public Communications would have a claim for breach of contract. Public Communications knew
    of the assignment no later than June 8, 2004, and certainly could have filed a financing statement
26  against the Debtor.  The bottom line is that (i) the Debtor never granted a security interest in any
    assets to Public Communications, and (ii) no financing statement was ever filed against the Debtor
27  in favor of Public Communications.  Therefore, Public Communication has no security interest at
    all, let alone a perfected security interest, in any of the Debtor's assets.

28
                                         -10-
    ─────────────────────────────────────────────
    W02-WEST:FJR\400462520.6          DEBTOR'S MEMORANDUM OF POINTS AND
                                      AUTHORITIES IN SUPPORT OF USE OF CASH
                                      COLLATERAL ON A FURTHER INTERIM BASIS

1    approximately $500,000.    To the extent that Public Communications does possess a valid,

2    perfected and enforceable security interest in Debtor's cash collateral, which it does not for any

3    one of the numerous foregoing reasons, Public Communications is more than adequately protected

4    by the grant of a replacement lien of the same type and character which it possessed pre-petition.

5    **E.      Personal Voice's Arguments Fail for Many of the Same Reasons as Public**

     **Communications' Arguments, Moreover, Personal Voice's UCC-1 Financing**

6    **Statement Lapsed Before the Debtor's Petition Date.**

7          Personal Voice also filed an objection to the Debtor's continued motion to use cash

8    collateral.    Personal Voice lacks a security interest in the Debtor's cash collateral for many of the

9    same reasons Public Communications lacks such an interest.[6]

10         As previously set forth in the Debtor's Motion, Personal Voice does not have a security

11   interest in the Debtor's cash collateral because Personal Voice's alleged security interest is not in

12   any assets of the Debtor, but instead purports simply to be in amounts to which Personal Voice

13   may be entitled under its contract with the Debtor.    Similarly, Personal Voice does not possess a

14   security interest in the Debtor's cash collateral based upon an alleged security interest in any

15   reserves under the parties' contract because there were no segregated reserves.    As further noted in

16   the Motion, irrespective of Personal Voice's lack of a security interest in any of the Debtor's assets

17   or cash collateral, the Debtor proposes to give Personal Voice a replacement lien on the same

18   assets, if any, that it had an interest in pre-petition.

19         In addition to these prior arguments made by Debtor in the Motion, there are further

20   reasons why Personal Voice does not have a perfected security interest in any of the Debtor's

21   assets, including "Net Proceeds" or cash collateral.    First, Personal Voice's UCC financing

22   statement, which was filed March 12, 2002, lapsed on March 12, 2007 (over 6 months before

23   Debtor filed bankruptcy), and Personal Voice did not file a continuation statement.    Under UCC

24   Sections 9515(a) and (c), the effectiveness of a filed financing statement lapses 5 years after filing

25   unless before lapsing, a continuation statement is filed.    Because Personal Voice failed to file a

26   

27   [6] Though it did not file a supplemental opposition on October 10, any alleged secured claim by
     Network Telephone Systems also suffers from many of the same deficiencies.

28

-11-

W02-WEST:FJR\400462520.6    DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

RER-28    1218

1   continuation statement, its security interest no longer is perfected and Personal Voice is not

2   entitled to adequate protection. Bankruptcy Code Section 544(a) (trustee or debtor in possession

3   is senior to unperfected security interest); In Re: 1726 Washington, D.C. Partners, 120 B.R. 1, 2

4   (Bankr. D.D.C. 1990) (rents are not cash collateral where secured party's lien was unperfected); In

5   Re: Scottsdale Medical Pavilion, 159 B.R. 295, 298 (9th Cir. BAP 1993) (because an unperfected

6   security interest is subject to avoidance under Bankruptcy Code Section 544, such interest is not

7   entitled to much in the way of adequate protection).

8       Also, what Personal Voice purported to take a security interest in were not "all accounts

9   receivable of the [debtor]" but instead were "Net Proceeds," which are not an asset of the Debtor,

10  and in fact "Net Proceeds" are not an asset or property at all, of Debtor, Personal Voice, or anyone

11  else. In the contract between Debtor and Personal Voice, "Net Proceeds" is simply a method to

12  calculate the cash consideration to which Personal Voice is entitled under the contract. As with

13  Public Communications, Personal Voice attempting to take a security interest in "Net Proceeds"

14  would be analogous to a seller of an asset attempting to take a security interest in the purchase

15  price to be determined under a formula and paid at a later time (as opposed to taking a security

16  interest in the asset itself). Personal Voice has only an unsecured claim against Debtor for Net

17  Proceeds.[7]

18      Personal Voice simply does not possess a valid, perfected and enforceable security interest

19  in the Debtor's cash collateral. Notwithstanding that, the Debtor will provide Personal Voice with

20

21  [7] Personal Voice's opposition asserts that accounts receivable generated from Personal Voice
    providing services to end users remained property of Personal Voice and were not transferred to
22  Debtor when Personal Voice submitted Billing Transactions to Debtor. This assertion is belied by
    the facts. Nothing in the agreement between Debtor and Personal Voice states that Personal Voice
23  is maintaining ownership of anything. In fact, as noted by Personal Voice in its opposition,
    Personal Voice attempted to take a security interest in "Personal Voice Receivables", indicating
24  that the parties believed that Personal Voice did not own any receivables generated. The lapsed
    financing statement does not indicate that it is "precautionary". If the parties had believed that
25  Personal continued to own receivables, Personal Voice would not have attempted to obtain a
    security interest from Debtor. Moreover, as the Debtor has previously stated, it is common
26  knowledge in this industry that the Debtor would be selling the billing transaction receivables to
    the LECs and that the Debtor's contracts with the LECs are structured as the purchase by the LECs
27  of the Debtor's accounts receivable, which obviously could not be done if Personal Voice retained
    title to the receivables. See October 11 Dawson Declaration.

28
                                    -12-
W02-WEST:FJR\400462520.6                    DEBTOR'S MEMORANDUM OF POINTS AND
                                    AUTHORITIES IN SUPPORT OF USE OF CASH
                                    COLLATERAL ON A FURTHER INTERIM BASIS

                                    RER-28    1219

1 | a replacement lien of the same type and character which it possessed pre-petition. Personal Voice
2 | is entitled to no more.

3 | **F.    The Debtor Has Adequately Addressed the U.S. Trustee's Objection.**

4 |       The U.S. Trustee filed an objection to the Motion contending that the a portion of the
5 | carve-out for professionals contained in the First Amended PaymentOne Stipulation was illusory
6 | as to any subsequently appointed trustee or its professionals.  The Debtor has addressed with
7 | PaymentOne the U.S. Trustee's objection, and PaymentOne agreed to change the carve-out
8 | language contained in the proposed order in a manner which the Debtor believes addresses and
9 | resolves the U.S. Trustee's objection.  PaymentOne has granted a full carveout to professionals for
10 | the Debtor, the Committee and any subsequently appointed trustee – retroactive to the filing of
11 | this case.

12 | **G.    Thermo Credit Is Not A Secured Creditor of the Debtor and Has No Standing to
13 |       Object to the Debtor's Cash Collateral Motion.**

14 |       The Thermo Credit Opposition does nothing at all to respond to the Debtor's Supplemental
15 | Memorandum filed on September 24 (the "Supplemental Memorandum").  In that Supplemental
16 | Memorandum the Debtor fully explained why Thermo Credit has absolutely no security interest in
17 | the accounts receivable of this Debtor.  Without repeating the entire argument the Supplemental
18 | Memorandum made clear the following facts, which are uncontested:

19 |       1.     Thermo Credit entered into a Factoring Agreement with ICS, an affiliate of the
20 | Debtor;

21 |       2.     Thermo Credit has received an uncontested assignment of the receivables of ICS,
22 | as a factor of ICS;

23 |       3.     Thermo Credit admits it entered into the Tri Party Agreement dated June 14, 2004,
24 | which it attached to its Original Objection;

25 |       4.     The receivables of ICS that were factored and transferred to Thermo Credit were
26 | thereafter transferred under the Tri Party Agreement and the Master Services Agreement ("MSA")
27 | to the Debtor for aggregation;

28 |       5.     The Tri Party Agreement provides that the Debtor will make all payments under the

-13-

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1  MSA to the Factor, Thermo Credit, and not to ICS;

2      6.      The Debtor has always honored the claim of Thermo Credit under the Factoring

3  Agreement with ICS, and paid Thermo Credit under the MSA, not ICS;

4      7.      The Debtor has never paid ICS on account of the ICS receivables transferred to it

5  under the Master Services Agreement as the Debtor acknowledged the validity of the Factoring

6  Agreement and that Thermo Credit owned all of the rights to the ICS receivables; and

7      8.      Thermo Credit never filed a UCC-1 as to receivables of the Debtor. Thermo Credit

8  only filed a UCC-1 as to receivables of ICS.

9      None of the above points made in the Debtor's Supplemental Memorandum were

10 addressed in the latest Thermo Objection. Thermo Credit ignores the facts. Thermo Credit tries to

11 confuse matters in their latest Objection. It points to an opinion letter delivered by Sheppard

12 Mullin in 2004 on behalf of ICS. In that opinion letter Sheppard Mullin opined that the Factoring

13 Agreement between ICS and Thermo Credit was duly executed and binding.[8]

14     That has never been contested by anyone. The Factoring Agreement whereby the

15 receivables of ICS were sold to Thermo Credit is not contested by anyone. But, under the Tri

16 Party Agreement those receivables were sold to the Debtor and Thermo Credit has no interest in

17 any receivables of the Debtor. The opinion letter says nothing different. The fact is that Thermo

18 Credit has only an interest in the receivables of ICS and no recorded UCC-1 and no security

19 interest in any receivables of this Debtor. Thermo Credit has no standing to object as a secured

20 creditor.

21     Thermo Credit does complain that there should be a constructive trust. That argument

22 must also fail for reasons addressed above in Section C of this memorandum.

23 **H.      The Receiver's Sole Argument Which Is Appropriately the Subject of the October 15
         Cash Collateral Motion Hearing, Rather than the Subject of the October 17
24       Adversary Proceeding Hearing, Is Simply Wrong.**

25     The Receiver was appointed as receiver for two of the Debtor's prior customers. In

26 _____

[8] Sheppard Mullin disclosed the Opinion Letter in its Employment Application filed and served on
27 September 25, 2007. Sheppard Mullin does not currently represent ICS and will not represent
   ICS.

28
                                          -14-
_____
W02-WEST:FJR\400462520.6                    DEBTOR'S MEMORANDUM OF POINTS AND
                                            AUTHORITIES IN SUPPORT OF USE OF CASH
                                            COLLATERAL ON A FURTHER INTERIM BASIS

1  connection with a prior hearing on the Debtor's cash collateral motion, with the stipulation of the
2  Debtor, a segregated, blocked account debtor in possession bank account in the Debtor's name was
3  established into which the Debtor deposited approximately $1.7 million, which funds cannot be
4  moved absent further order of this Court (the "Blocked Account").   Since the last hearing the
5  Debtor has met with the Committee and prepared the Debtor's Budget attached to the October 11
6  Weber Declaration.  The Debtor has also analyzed the need for use of the Blocked Account and
7  concluded that the Debtor needs such funds and can demonstrate that need.  Therefore, the Debtor,
8  with the support of the Committee is now asking the Court to unblock the Blocked Account.  The
9  Debtor recognizes that these issues are properly addressed in adversary proceeding 07-5156 (the
10 "Adversary Proceeding") commenced in this case.  The Debtor will be filing tomorrow, Friday,
11 October 12 for the upcoming October 17 hearing in the Adversary Proceeding the Debtor's further
12 pleadings as to why the Court should issue a preliminary injunction against the Receiver and the
13 FTC, and in those pleadings the Debtor will demonstrate why the Court should properly unblock
14 the account and permit the Debtor to use the funds contained therein in its operations and
15 reorganization efforts.

16      The Debtor has previously shown that the Receiver is not a secured creditor of the Debtor,
17 has no security interest in the Debtor's assets, is entitled to no greater status than the Debtor's other
18 unsecured creditors, and is not entitled to adequate protection.  In his opposition the Receiver
19 again recycles the same arguments he has made throughout this case.  However, those arguments
20 properly belong in the Adversary Proceeding and should be considered therein, not in the context
21 of the Debtor's motion to use cash collateral on a further interim basis.  The Receiver himself
22 acknowledges this in his objection.  See Receiver Objection at 2:13-17.  The Receiver's objections
23 should be deferred to the October 17 hearing in the Adversary Proceeding rather than considered
24 at the October 15 hearing on the Debtor's motion to use cash collateral on a further interim basis.

25      The Receiver's sole argument that may properly be the subject of the October 15 cash
26 collateral hearing is the Receiver's contention that the Debtor does not need to use the funds
27 presently in the Blocked Account as cash collateral.  Wrong.

28      The Debtor has engaged the services of FTI Consulting to review the reasonableness of the

-15-

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1  Debtor's Budget that is filed herein. Mr. Paul Weber, an experienced workout consultant, has

2  reviewed the Debtor's Budget and concluded that it is reasonable and constitutes a reasonable

3  forecast of the post-petition transactions of the Debtor. See October 11 Weber Declaration at¶ 15.

4          Mr. Weber also conducted an analysis of the Debtor's Budget which shows that the

5  Blocked Account funds are needed by the Debtor and that the Debtor cannot remain

6  administratively solvent if it pays $1 million in fees to defend the Florida Action and litigate with

7  the Receiver. The "Alternative Budget" attached to the October 11 Weber Declaration assumes

8  the Blocked Account is not available to the Debtor and the Florida Action continues. It shows that

9  in that case there would not be sufficient funds at all times to cover unremitted funds that are due

10 to customers. The Debtor wants to comply with the U.S. Trustee's guidelines for post-petition

11 operations by being able to pay its post-petition debts. It therefore has to retain sufficient cash to

12 cover both administrative operating expenses and its administrative obligation to remit funds to

13 customers. Hence, the Blocked Account funds are needed and the Debtor should be allowed to

14 reorganize without expending substantial legal fees to defend the Florida Action.

15         Accordingly, the Receiver's sole argument which should be considered at the October 15

16 cash collateral hearing rather than the October 17 Adversary Proceeding hearing is incorrect, and

17 should be overruled.

18 I.       **Similarly, the FTC's Opposition Is Not Properly the Subject of the October 15 Cash
            Collateral Motion Hearing, But Rather Is the Subject of the October 17 Adversary
19          Proceeding Hearing and will be Addressed and Should be Resolved in that Context.**

20         The FTC also filed an objection to the Debtor's continued use of cash collateral. For the

21 same reasons as just discussed with respect to the Receiver's objection, the FTC's arguments are

22 not properly the subject of the October 15 cash collateral hearing, but instead are properly the

23 subject of the Adversary Proceeding and the October 17 hearing therein, and will be addressed by

24 the Debtor in the pleadings it files tomorrow in the Adversary Proceeding. The Debtor will

25 demonstrate at the hearing on the Adversary Proceeding that a stay of the FTC action should be

26 granted to eliminate the need to spend extensive funds defending that action. Nothing in the FTC's

27 opposition demonstrates why a three week use of cash collateral supported by the Committee

28

-16-

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1 | should not be granted.

2 | **CONCLUSION**

3 |     For the reasons set forth herein as well as the Debtor's other cash collateral motion papers,

4 | good cause exists to approve the Debtor's use of cash collateral, including approval of the First

5 | Amended PaymentOne Stipulation, for a further interim period through and including November

6 | 2, 2007, or as soon thereafter as the Court and counsel are available for a further hearing on the

7 | motion. If the Debtor is not permitted to use cash collateral, the result will be the forced cessation

8 | of the Debtor's business as well as the forced closure of its most valuable asset, PaymentOne.

9 | Such a result would be not be in the best interests of the Debtor's creditors or its bankruptcy estate.

10 | The Committee recognizes this, and supports the Debtor's continued ability to use cash collateral

11 | on that interim basis. Granting the Debtor's use of its cash collateral on an interim basis will

12 | permit time the Debtor to further explore with the recently-appointed Committee more concrete

13 | terms for a possible plan of reorganization contemplating a continuation of business operations,

14 | with the goal of allowing the Debtor to exit bankruptcy as quickly as possible, while also

15 | maximizing value to unsecured creditors.

16 |

17 | Dated: October 11, 2007        Respectfully submitted,

18 |     SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

19 |

20 |     By     _____/s/ Jeffrey K. Rehfeld_____

21 |                JEFFREY K. REHFELD
               Attorneys for Debtor The Billing Resource, dba

22 |                      Integretel

23 |

24 |

25 |

26 |

27 |

28 |

W02-WEST:FJR\400462520.6                      DEBTOR'S MEMORANDUM OF POINTS AND
                                 AUTHORITIES IN SUPPORT OF USE OF CASH
                             COLLATERAL ON A FURTHER INTERIM BASIS

# EXHIBIT 1

# (PART A)

04-5638-bk
In Re: Charles Atwood Flanagan

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term, 2006

(Argued September 14, 2006          Decided: October 9, 2007)

Docket Nos. 04-5638-bk(L), 06-0731-bk(XAP)

———————————

In Re: Charles Atwood Flanagan

***************************************************

Cadle Co., D.A.N. Joint Venture, L.P.,

Appellants-Cross-Appellees,

v.

Bonnie C. Mangan, Trustee. Charles Atwood Flanagan,
John C. Flanagan,

Appellees-Cross-Appellants,

U.S. Trustee,

Trustee.

———————————

Before:

CARDAMONE, MINER, and STRAUB,
Circuit Judges.

———————————

Appellants the Cadle Company and D.A.N. Joint Venture, L.P.
appeal from a September 30, 2004 judgment of the United States
District Court for the District of Connecticut (Arterton, J.),
affirming the July 3, 2003 decisions of the United States
Bankruptcy Court for the District of Connecticut (Dabrowski,
B.J.), which denied appellants' request for the imposition of a

**EXHIBIT 1**
(Part A)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

constructive trust over certain securities.  Appellee-Cross-Appellant Bonnie C. Mangan, trustee, cross-appeals from the same judgment insofar as it found that a payment of $99,542.87 made by the debtor Charles Flanagan to appellants was partially protected from avoidance by the earmarking doctrine.

Affirmed.

---

EDWARD C. TAIMAN, Jr., Sabia, Taiman, Moskey, Albano & Shea, LLC, Hartford, Connecticut, for Appellants-Cross-Appellees.

JOSEPH L. RINI, New Haven, Connecticut, for Appellee-Cross-Appellant John C. Flanagan.

JAMES C. GRAHAM, Pepe & Hazard, LLP, Hartford, Connecticut, for Appellee-Cross-Appellant Bonnie C. Mangan, Trustee.

---

1  CARDAMONE, <u>Circuit Judge</u>:

2        This appeal arises from two separate but related adversary

3  bankruptcy proceedings that we will describe in a moment.

4  Charles A. Flanagan (debtor) filed a petition under Chapter 11 of

5  the U.S. Bankruptcy Code, 11 U.S.C. § 101 <u>et</u> <u>seq</u>., for bankruptcy

6  relief in the United States Bankruptcy Court for the District of

7  Connecticut (Dabrowski, B.J.) on February 17, 1999.  While

8  debtor-in-possession under Chapter 11, Flanagan instituted the

9  first adversary proceeding (Preference Action) in the bankruptcy

10  court against Cadle Company to avoid and recover for the bankrupt

11  estate a $99,542.87 payment he had made to Cadle Company.

12  Following the conversion of Flanagan's Chapter 11 case to one

13  under Chapter 7, Bonnie C. Mangan was appointed trustee of

14  Flanagan's bankrupt estate and substituted as party plaintiff in

15  the Preference Action.

16        Cadle Company and D.A.N. Joint Venture, L.P. (collectively

17  Cadle Creditors or appellants) then brought a second separate

18  adversary proceeding (Constructive Trust Action) seeking a

19  declaratory judgment and the imposition of a constructive trust

20  over certain securities that Flanagan owned prior to the

21  bankruptcy filing.  In two memorandum decisions issued on May 22,

22  2003, the bankruptcy court denied the equitable relief requested

23  by the Cadle Creditors and ruled the trustee could avoid the

24  payment from Flanagan to Cadle only to the extent of $14,542.87.

25  The bankruptcy court went on to hold that the payment was

26  partially protected from avoidance by the earmarking doctrine.

                                    2

1  Following a motion for reconsideration, the bankruptcy court
2  affirmed its original decisions on July 3, 2003.  Both parties
3  appealed.  The United States District Court for the District of
4  Connecticut (Arterton, J.) affirmed the decisions of the
5  bankruptcy court on September 30, 2004.

6      As Sir Walter Scott observed "Oh, what a tangled web we
7  weave, when first we practise to deceive."  <u>Marmion</u>, Canto VI,
8  Stanza 17 (1808).  Such well describes the circumstances of the
9  debtor's conduct revealed by the record in the appeal before us.
10 Fortunately, these tangled facts were carefully sorted out in the
11 bankruptcy court in its decisions and in the district court's
12 September 30, 2004 decision affirming the judgment of the
13 bankruptcy court.  We now in turn affirm the judgment of the
14 district court.

15                              BACKGROUND
16     The facts of this case were laid out in detail by the
17 district court in <u>Cadle Co. v. Mangan</u>, 316 B.R. 11, 14-17 (D.
18 Conn. 2004).  Nonetheless, for purposes of clarity and analysis,
19 we include a summary of those facts relevant to the disposition
20 of this appeal.

21     Prior to Flanagan's bankruptcy filing of February 17, 1999,
22 the Cadle Creditors obtained several money judgments against
23 Flanagan in federal and state court.  Most significant for our
24 purposes is a judgment obtained by Cadle against Flanagan on
25 March 20, 1997 in the United States District Court for the
26 District of Connecticut (Covello, J.) in the amount of $90,747.87

                                3

1    (federal judgment).  Among Flanagan's assets at the time of the

2    federal judgment was a 50 percent equity interest in Thompson &

3    Peck, Inc. and Flanagan/Prymus Insurance Group, Inc.

4    (collectively Thompson & Peck), valued in excess of $100,000.

5    Flanagan had possession of the Thompson & Peck stock certificates

6    at the time of the federal judgment in March 1997.  In September

7    1997 he transferred the certificates to Socrates Babacas as

8    security for loans made by Babacas to him in the amount of

9    $85,000 (Babacas loan).

10        Cadle's attempts to locate assets with which to satisfy its

11   federal judgment focused principally upon Flanagan's equity

12   interest in Thompson & Peck.  In March 1998 Cadle subpoenaed

13   Flanagan to appear before Judge Covello for an examination of the

14   debtor and for Flanagan to produce, _inter alia_, "[a]ll documents

15   and communications related to or evidencing any interest which

16   [Flanagan] may hold in Thompson & Peck, Inc."  Flanagan appeared

17   for the hearing but did not produce any documents that would

18   reveal his interest in Thompson & Peck.  On March 12, 1998 Cadle

19   made a motion for a turnover order commanding Flanagan to "turn

20   over all evidence of . . . ownership and/or other interest in

21   Thompson & Peck . . . including any and all stock certificates in

22   [his] possession, under [his] control and/or available to [him]."

23   The turnover order was granted by the district court on April 13,

24   1998 and upheld on reconsideration.

25        Despite this court order, Flanagan persistently failed to

26   comply with its instructions.  Consequently, on November 16, 1998

4

1  a hearing was held at which Flanagan was ordered to show cause
2  why he should not be held in contempt for his failure to comply
3  with the court's turnover order.  At the conclusion of the
4  hearing, Judge Covello found Flanagan had willfully and
5  intentionally not complied with the turnover order and ordered
6  him committed to the Bureau of Prisons until he complied.  The
7  execution of the contempt order was stayed and a hearing
8  scheduled a week later to allow Flanagan one final opportunity to
9  comply.

10      When Flanagan's father, John Flanagan, learned that his son
11  was facing contempt sanctions, he lent him $100,222.87 for the
12  purpose of satisfying the federal judgment (family loan).  John
13  Flanagan had never loaned money to his son before and did so on
14  this occasion only to prevent Charles Flanagan from being
15  imprisoned and to protect the family's reputation.  The family
16  loan was secured by the debtor's equity interest in Thompson &
17  Peck and Flanagan arranged for Babacas to deliver the stock
18  certificates to his father's home.  Immediately upon receipt of
19  the family loan, Flanagan delivered the funds to his lawyer so
20  that the federal judgment could be satisfied.  On November 20,
21  1998 Flanagan's attorney deposited the funds into the registry of
22  the district court and Cadle received payment on December 3, 1998
23  (Payment).

24      Following Flanagan's bankruptcy and the filing of the
25  Preference Action to avoid and recover the Payment as a
26  preferential transfer under 11 U.S.C. § 547, the Cadle Creditors

5

1    mounted a two-pronged defense.  In the Preference Action and in

2    the Constructive Trust Action instituted by appellants, the Cadle

3    Creditors sought the imposition of a constructive trust over the

4    Thompson & Peck stock for their benefit.  Appellants argued it

5    was solely because of Flanagan's wrongful concealment of his

6    equity interest in Thompson & Peck that they had been unable to

7    execute upon the stock and secure the federal judgment and other

8    judgments they had obtained prior to the 90-day preference

9    period.  Thus, they sought the imposition of a constructive trust

10   over the Thompson & Peck stock to restore them to the secured

11   position they would have occupied absent Flanagan's misconduct.

12   The Cadle Creditors asserted the Payment did not improve their

13   position relative to other creditors (as required by 11 U.S.C.

14   § 547(b)(6)) because, due to their constructive possession of the

15   Thompson & Peck stock, the Cadle Creditors possessed a fully

16   secured lien in the stock prior to the preference period.

17        The second prong of the Cadle Creditors' defense against the

18   Preference Action was their argument that the family loan funds

19   had been earmarked by John Flanagan for the sole and specific

20   purpose of satisfying the federal judgment against his son.

21   Accordingly, they maintained that the family loan funds had never

22   constituted an "interest of the debtor in property" as required

23   by § 547(b).

24        The bankruptcy court resolved the Preference Action and the

25   Constructive Trust Action in two decisions issued on May 22,

26   2003.  Both decisions were upheld on reconsideration and a

6

1   modified opinion was issued in the Preference Action on July 3,
2   2003.  In response to Cadle's constructive trust claim, the
3   bankruptcy court found the imposition of a trust inappropriate in
4   the circumstances.  It noted the Cadle Creditors possessed "only
5   an expectation of the potential fruits of execution [on the
6   stock]," and concluded that a constructive trust should not be
7   imposed to "protect property rights which may or may not have
8   become vested and indefeasible."

9        The bankruptcy court also ruled the Payment was partially
10  protected from avoidance by the earmarking doctrine because the
11  family loan was made for the sole and specific purpose of
12  enabling Flanagan to satisfy the federal judgment.  But the
13  bankruptcy court further held that "even though the transaction
14  fits the earmarking defense insofar as it replaced one creditor
15  (Cadle) with another ([John] Flanagan), the substitution of a
16  secured for an unsecured obligation attenuates that defense
17  because, and to the extent, it caused a diminution to Flanagan's
18  personal estate."  As a consequence, the bankruptcy court entered
19  judgment in favor of the trustee to avoid the transfer but only
20  to the extent of $14,542.87, an amount equal to the difference
21  between the family loan and the Babacas loan whose security
22  interest had been supplanted.

23       The Preference Action and the Constructive Trust Action were
24  consolidated on appeal to the district court.  On September 30,
25  2004 Judge Arterton of the United States District Court for the
26  District of Connecticut affirmed the decisions of the bankruptcy

                                7

1  court.  The Cadle Creditors appealed, and the trustee, Bonnie C.

2  Mangan, together with John and Charles Flanagan (appellees)

3  cross-appealed.

4      Meanwhile, the Cadle Creditors instituted two additional

5  proceedings against Charles Flanagan:  (1) a civil RICO action in

6  the United States District Court for the District of Connecticut

7  (Covello, J.) alleging, <u>inter alia</u>, fraud and conspiracy in

8  connection with resisting creditors' collection efforts, and (2)

9  an adversary proceeding in bankruptcy court seeking denial of

10  discharge.  In 2004, the discharge action was withdrawn from the

11  bankruptcy court and consolidated with the RICO action in the

12  district court before Judge Covello.

13      On April 8, 2005 while the instant appeal was pending, the

14  Cadle Creditors and Flanagan entered into a proposed settlement

15  agreement in the consolidated RICO/discharge action.  As part of

16  the proposed settlement, the Cadle Creditors and Flanagan entered

17  into a "Mutual Release of All Claims" (General Release) which

18  stated

19                Upon execution of this Release, both Cadle
20                and Flanagan hereby release each other of and
21                from any and all claims, whether now known or
22                unknown, whether now in existence or arising
23                hereafter, which each has or may have against
24                each other from the beginning of time until
25                the date of the execution of this Release.
26
27  Judge Covello entered an order approving the proposed settlement

28  on May 5, 2005, and dismissing the RICO/discharge action with

29  prejudice.

8

DISCUSSION

I   Jurisdiction

The first issue we address is whether, in light of the General Release, we retain subject matter jurisdiction over that portion of the appeal relating to the Constructive Trust Action. Appellees assert that by executing the General Release the Cadle Creditors relinquished all claims against Flanagan, including claims against Flanagan's bankrupt estate.  The trustee thus reasons the Cadle Creditors have extinguished the basis for the relief sought in the Constructive Trust Action, rendering that portion of the appeal moot.

In order for there to be a valid exercise of subject matter jurisdiction, a federal court must have before it an actual controversy at all stages of review, not simply at the time the complaint was filed.  Steffel v. Thompson, 415 U.S. 452, 459 n.10 (1974).  In general, if an event occurs while an appeal is pending that renders it impossible for the court to grant any form of effectual relief to plaintiff, the matter becomes moot and subject matter jurisdiction is lost.  Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 69 (2d Cir. 2001); see also Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992).  However, when an appellant retains an interest in a case so that a favorable outcome could redound in its favor, the case is not moot.  See Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 568-72 (1984).

9

1    The crux of the trustee's contention is that the Cadle

2    Creditors' claims against Flanagan's bankrupt estate became

3    unenforceable when they entered into the post-petition settlement

4    agreement with the debtor that included a mutual general release

5    of all claims.  In making this argument, appellees rely on

6    language in § 502(b)(1) of the Bankruptcy Code.  That section

7    states a claim is disallowed in bankruptcy to the extent that it

8    is "unenforceable against the debtor and property of the debtor,

9    under any agreement or applicable law for a reason other than

10   because such claim is contingent or unmatured."  11 U.S.C.

11   § 502(b)(1).  The trustee asserts that § 502(b)(1) should be read

12   to disallow not only claims that are unenforceable against the

13   debtor at the time the bankruptcy petition is filed but also

14   those claims that become unenforceable against the debtor over

15   the course of the bankruptcy and prior to discharge.

16       We think the trustee's interpretation of § 502(b)(1) is an

17   untenable reading of the statutory text because it ignores the

18   provision's context within the Bankruptcy Code.  Section 502(b)

19   instructs the bankruptcy court to "determine the amount of such

20   claim . . . as of the date of the filing of the petition" except

21   to the extent that "such claim is unenforceable against the

22   debtor."  11 U.S.C. § 502(b), (b)(1) (emphasis added).  A plain

23   reading of the statute thus suggests that the bankruptcy court

24   should determine whether a creditor's claim is enforceable

25   against the debtor as of the date the bankruptcy petition was

26   filed.  Were this Court to adopt the trustee's interpretation of

10

1 § 502(b)(1), we would be forced to conclude that all pre-petition
2 unsecured claims are disallowed to the extent they did not
3 represent non-dischargeable debts.  For, as the bankruptcy court
4 aptly noted in In re Strangis, 67 B.R. 243 (Bankr. D. Minn.
5 1986), "[a]bsent a finding of nondischargeability, no such
6 unsecured claim is enforceable post-petition against a debtor and
7 property of a debtor."  Id. at 246.

8    The General Release could not have impacted any claims held
9 by or against Flanagan's bankrupt estate for an additional and
10 related reason.  Flanagan simply did not have the authority to
11 settle any claims against the bankrupt estate.  It is well
12 established that once a trustee is appointed, a debtor loses all
13 authority to litigate any claim for or against the estate.  As
14 noted in Collier on Bankruptcy

15      The trustee, as representative of the
16 estate, has the exclusive capacity to sue and
17 be sued on behalf of the estate, and is
18 charged by law with representing the interest
19 of the estate against third parties claiming
20 adversely to it. . . .

22      . . . After appointment of a trustee, a
23 debtor no longer has standing to pursue a
24 cause of action that existed at the time the
25 order for relief was entered.  Only the
26 trustee has the authority and discretion to
27 prosecute, defend and settle, as appropriate
28 in its judgment, such a cause of action.

30 3 Collier on Bankruptcy ¶ 323.03, .03[1], at 323-7 to -9 (Alan N.
31 Resnick et al. eds., rev. 15th ed. 2007); see also 10 Collier on
32 Bankruptcy ¶ 6009.03, at 6009-3 to -6.1.

11

1    Here, not only was the trustee not a party to the General

2    Release, but there is no indication the bankruptcy court was ever

3    presented with a motion to settle, compromise, disallow, or

4    otherwise dismiss the Cadle Creditors' claims. See Fed. Bankr.

5    R. 9019 ("On motion by the trustee and after notice and a

6    hearing, the court may approve a compromise or settlement."); 10

7    Collier on Bankruptcy ¶ 9019.01, at 9019-2 (noting that any

8    "settlement must be approved by the court"). While Flanagan may

9    have had the authority to settle civil claims that arose against

10   him after his bankruptcy filing, he had no authority to settle

11   claims against the bankrupt estate.

12   Having established that the bases for the relief sought by

13   the Cadle Creditors in the Constructive Trust Action have not

14   been extinguished, and that a favorable result could redound in

15   their favor, we conclude those claims are not moot. Hence, we

16   retain subject matter jurisdiction to review them.

17                    II   Standard of Review

18   In an appeal from a district court's review of a bankruptcy

19   court's decision, we conduct an independent examination of the

20   bankruptcy court's decision. Supplee v. Bethlehem Steel Corp.

21   (In re Bethlehem Steel Corp.), 479 F.3d 167, 172 (2d Cir. 2007).

22   The bankruptcy court's factual findings will be upheld unless

23   clearly erroneous, and its legal conclusions are reviewed de

24   novo. Id. The ultimate determination of whether or not to

25   impose an equitable remedy -- such as a constructive trust or an

26   equitable lien -- is reviewed for abuse of discretion. See

                          12

1   <u>Adelphia Bus. Solutions, Inc. v. Abnos</u>, 482 F.3d 602, 607 (2d

2   Cir. 2007) (bankruptcy court's decision whether to exercise its

3   equitable authority is reviewed only for abuse of discretion);

4   <u>see also</u> <u>Burkhart Grob Luft und Raumfahrt GmbH v. E-Systems,</u>

5   <u>Inc.</u>, 257 F.3d 461, 469 (5th Cir. 2001) ("Because a constructive

6   trust is an equitable remedy, the decision whether to impose it

7   is entrusted to the discretion of the district court, and we

8   review the district court's decision only for an abuse of

9   discretion.").  However, legal determinations upon which the

10  dispensation of equitable relief may depend are reviewed <u>de novo</u>.

11  See <u>Superintendent of Ins. v. Ochs (In re First Cent. Fin.</u>

12  <u>Corp.)</u>, 377 F.3d 209, 213 (2d Cir. 2004) (reviewing <u>de novo</u> the

13  legal conclusion as to whether a party has been unjustly

14  enriched).

15              III  General Law on Transfer Avoidance

16       Pursuant to § 547(b) of the Bankruptcy Code, a trustee in

17  bankruptcy may avoid certain transfers if the following criteria

18  are met:

19              (1) the transfer is of an interest of the
20              debtor in property;
21              (2) to or for the benefit of a creditor;
22              (3) on account of an antecedent debt;
23              (4) made while the debtor was insolvent;
24              (5) within 90 days of bankruptcy or within a
25              year of bankruptcy if the creditor was an
26              insider;
27              (6) and the transfer enabled the creditor to
28              receive more than it would have received in a
29              chapter 7 liquidation had the transfer not
30              taken place.

13 .

1    11 U.S.C. § 547(b).  The burden of proof to establish each of

2    these elements by a preponderance of the evidence rests on the

3    trustee in bankruptcy.  Lawson v. Ford Motor Co. (In re Roblin

4    Indus., Inc.), 78 F.3d 30, 34 (2d Cir. 1996).  The Cadle

5    Creditors do not contest that the Payment was made within 90 days

6    of Flanagan's bankruptcy, while he was insolvent, on account of

7    an antecedent debt, and for the benefit of a creditor.  It is

8    therefore only the first and sixth of these criteria that are at

9    issue in this appeal.

10       IV  Transfer Improves Cadle Creditors' Position in Bankruptcy

11              A.   The Constructive Trust Claim

12       Concerning the sixth criterion required by 11 U.S.C.

13   § 547(b), the Cadle Creditors aver that the Payment did not

14   improve their position in bankruptcy.  They allege that as a

15   result of their constructive possession of the Thompson & Peck

16   stock, they possessed a fully secured lien in the stock.  The

17   imposition of a constructive trust is necessary, they insist, to

18   remedy the harm caused by Flanagan's willful failure to comply

19   with the turnover order, which prevented them from perfecting

20   their judgments more than 90 days prior to the bankruptcy filing.

21   We believe the lower courts' refusal to impose a constructive

22   trust on the Thompson & Peck stock was well founded.

23       The effect of a constructive trust in bankruptcy is

24   profound.  While the bankrupt estate is defined very broadly

25   under § 541(a)(1) of the Bankruptcy Code to include all legal or

26   equitable interests of the debtor, any property that the debtor

                              14.

# EXHIBIT 1

# (PART B)

1   holds in constructive trust for another is excluded from the

2   estate pursuant to § 541(d), which states

3           Property in which the debtor holds, as of the
4           commencement of the case, only legal title
5           and not an equitable interest . . . becomes
6           property of the estate . . . only to the
7           extent of the debtor's legal title to such
8           property, but not to the extent of any
9           equitable interest in such property that the
10          debtor does not hold.

11
12  11 U.S.C. § 541(a)(1), (d); see also Sanyo Elec., Inc. v.

13  Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874

14  F.2d 88, 93 (2d Cir. 1989).  A constructive trust thus places its

15  beneficiary ahead of other creditors with respect to the trust

16  res.

17      The question of whether the imposition of a constructive

18  trust is appropriate in a particular set of circumstances is

19  governed, in the first instance, by state law.  See id.; see also

20  Butner v. United States, 440 U.S. 48, 54-55 (1979).  The Supreme

21  Court of Connecticut has stated:

22          [A] constructive trust arises contrary to
23          intention and in invitum, against one who, by
24          fraud, actual or constructive, by duress or
25          abuse of confidence, by commission of wrong,
26          or by any form of unconscionable conduct,
27          artifice, concealment, or questionable means,
28          or who in any way against equity and good
29          conscience, either has obtained or holds the
30          legal right to property which he ought not,
31          in equity and good conscience, hold and
32          enjoy.
33
34  Wendell Corp. Tr. v. Thurston, 680 A.2d 1314, 1317 (Conn. 1996).

35  It is uncontested that Flanagan wrongfully concealed evidence of

36  his equity interest in Thompson & Peck.  While such conduct could

                          15

                      **EXHIBIT 1**
                      ( PART B)

1    potentially give rise to a constructive trust in other

2    circumstances, it did not do so here because the Cadle Creditors

3    would not be the proper beneficiaries of such a trust.

4         A constructive trust has been imposed most often by

5    Connecticut courts "to restore to the plaintiff property of which

6    he has been unjustly deprived." Cadle Co. v. Gabel, 794 A.2d

7    1029, 1037 (Conn. App. Ct. 2002) (quoting Restatement (First) of

8    Restitution § 160 cmt. d (1937)); see also Starzec v. Kida, 438

9    A.2d 1157 (Conn. 1981) (affirming imposition of constructive

10   trust for benefit of testator's children where testator gave

11   property to second wife on condition she devise property to his

12   children); Cohen v. Cohen, 438 A.2d 55 (Conn. 1980) (affirming

13   imposition of constructive trust over condominium property where

14   plaintiff conveyed property to son under oral agreement pursuant

15   to which son was to reconvey property back to plaintiff at her

16   request).

17        Here, the Cadle Creditors were never entitled to an

18   ownership interest in the Thompson & Peck stock.  Rather, under

19   Connecticut's post-judgment remedy statute, the turnover order

20   only entitled appellants to gain possession of the stock as the

21   first of several steps in executing a levy upon it.  See Mangan,

22   316 B.R. at 20-21 (describing and applying to the facts of this

23   case Connecticut's post-judgment remedy statute).  As the

24   district court aptly noted:

25              [Appellants'] interests in the stock were
26              subject to a series of contingencies, in
27              which other creditors with secured interests

16

```
 1              in the stock were entitled to prevent
 2              execution or gain priority status over
 3              Appellants.  The distinction here -- that the
 4              turnover order did not entitle Appellants to
 5              own Flanagan's stock, just to gain possession
 6              as an aid to execution of a levy upon it --
 7              is one that Appellants appear to have
 8              blurred.
 9
```

10    Id. at 21.  Indeed, once the federal judgment had been satisfied

11    by Flanagan with the family loan funds, Cadle lost any

12    expectation interest in the Thompson & Peck stock it might have

13    once had as a result of the district court's turnover order.

14         The Cadle Creditors point out Connecticut courts have in

15    some situations imposed a constructive trust when the plaintiff

16    was not entitled to an ownership interest in the trust property

17    and had not suffered a loss commensurate to the benefit received

18    by the defendant.  See, e.g., Gabel, 794 A.2d at 1039 (allowing

19    for constructive trust over property in favor of plaintiff

20    unsecured creditor because defendant had been unjustly enriched

21    by sham transactions used to shield property from creditors).  In

22    these situations, "the defendant is compelled to surrender the

23    benefit on the ground that he would be unjustly enriched if he

24    were permitted to retain it."  Id. at 1037.

25         However, the argument that Flanagan would be unjustly

26    enriched absent the imposition of a constructive trust is

27    unconvincing when made in the context of a bankruptcy proceeding.

28    See First Cent., 377 F.3d at 218 ("[W]e believe it important to

29    carefully note the difference between constructive trust claims

30    arising in bankruptcy as opposed to those that do not . . . .").

17    .

1   It has been observed that the "equities of bankruptcy are not the

2   equities of the common law." XL/Datacomp, Inc. v. Wilson (In re

3   Omegas Group, Inc.), 16 F.3d 1443, 1452 (6th Cir. 1994). This is

4   particularly true in the context of constructive trust law. As

5   discussed above, the effect of a constructive trust in bankruptcy

6   is to take the property out of the debtor's estate and to place

7   the constructive trust claimant ahead of other creditors with

8   respect to the trust res. 11 U.S.C. § 541(a)(1), (d); Howard's

9   Appliance, 874 F.2d at 93. It is therefore not the debtor who

10  generally bears the burden of a constructive trust in bankruptcy,

11  but the debtor's general creditors. This type of privileging of

12  one unsecured claim over another clearly thwarts the principle of

13  ratable distribution underlying the Bankruptcy Code. As a

14  consequence bankruptcy courts have been reluctant, absent a

15  compelling reason, to impose a constructive trust on the property

16  in the estate. See First Cent., 377 F.3d at 217-18 (collecting

17  cases); Haber Oil Co. v. Swinehart (In re Haber Oil Co.), 12 F.3d

18  426, 436 (5th Cir. 1994); Omegas Group, 16 F.3d at 1452

19  ("Constructive trusts are anathema to the equities of bankruptcy

20  since they take from the estate, and thus directly from competing

21  creditors, not from the offending debtor.").

22      The Cadle Creditors make no argument as to why Flanagan's

23  bankrupt estate or, more to the point, Flanagan's general

24  creditors, would be unjustly enriched by the estate's continued

25  ownership interest in the Thompson & Peck stock. Accordingly, we

18.

1   affirm the bankruptcy court's refusal to impose a constructive

2   trust on the stock.

3                   B.   Availability of an Equitable Lien

4        In the alternative, the Cadle Creditors declare that an

5   equitable lien should be imposed on the Thompson & Peck stock to

6   the extent of their claims.  This point was not raised before the

7   bankruptcy court, but appears to have been prompted by language

8   in the district court's opinion.  In noting that the appellants

9   were not claiming they rightfully owned the stock, but only that

10  they were entitled to reach the stock as security for their

11  claims, the district court observed that an "equitable remedy

12  that would give Cadle a perfected lienholder status might be best

13  described as an 'equitable lien.'"  Mangan, 316 B.R. at 22.  The

14  district court then went on to dismiss the possibility of

15  imposing an equitable lien because it concluded that "an

16  equitable lien, even if enforceable, would not relate back" to

17  before the preference period.  Id. at 23.

18       We generally will not consider arguments raised for the

19  first time on appeal.  Universal Church v. Geltzer, 463 F.3d 218,

20  228 (2d Cir. 2006).  We do, however, retain discretion to

21  consider an argument not presented to the trial court in order to

22  prevent a manifest injustice or where the argument presents a

23  question of law and additional factfinding is unnecessary.  Id.

24  Because the district court considered the equitable lien issue

25  and because the imposition of an equitable lien on the facts of

19

1    this case raises only a question of law, we briefly consider the

2    matter.

3        Connecticut law recognizes the equitable lien remedy.  See,

4    e.g., Hansel v. Hartford-Conn. Trust Co., 49 A.2d 666, 673 (Conn.

5    1946); Bassett v. City Bank & Trust Co. (In re Judd), 165 A. 557,

6    561-62 (Conn. 1933).  The equitable remedy was aptly described by

7    the Connecticut Supreme Court in Hansel

8            An equitable lien creates merely a charge
9            upon the property and when the person
10           entitled to it is not in possession of that
11           property, he has no right to obtain
12           possession from another unless by virtue of
13           some authority to do so expressly granted to
14           him; his remedy to enforce the lien is by a
15           proceeding in equity to bring about its sale
16           and the application of the proceeds to the
17           satisfaction of the obligation secured, or,
18           in some other manner, by order of the court,
19           to make the property available for the
20           discharge of that debt.
21
22   Hansel, 49 A.2d at 673.

23       Equitable liens arise in a variety of circumstances.  For

24   example, an equitable lien may arise by express or implied-in-

25   fact agreement of the parties.  See, e.g., Bassett, 165 A. at

26   561; see also Dan B. Dobbs, 1 Law of Remedies § 4.3(3), at 601

27   (2d ed. 1993).  Most often, however, equitable liens are imposed

28   to prevent unjust enrichment.  See Dep't of the Army v. Blue Fox,

29   Inc., 525 U.S. 255, 262-63 (1999).  In this sense, equitable

30   liens and constructive trusts share the same substantive basis;

31   both are remedies in equity to redress unjust enrichment.  See

32   Dobbs, supra, § 4.3(3), at 601 ("The [equitable] lien is imposed

                                20

1   for reasons that, in principle, are the same as those that

2   warrant the constructive trust . . . .").

3       The traditional distinction between a constructive trust and

4   an equitable lien is that the beneficiary of a constructive trust

5   receives complete title to the asset whereas the holder of an

6   equitable lien receives only a lien on the asset through which it

7   may satisfy a money claim.  See Airwork Corp. v. Markair Express,

8   Inc. (In re Markair, Inc.), 172 B.R. 638, 643 (B.A.P. 9th Cir.

9   1994); Dobbs, supra, § 4.3(3), at 601.  Yet, in some states --

10  including Connecticut -- there is little practical difference

11  between the two remedies because courts have held that a

12  constructive trust beneficiary does not necessarily obtain a

13  right to possess the trust property, but may only receive a lien

14  on the property equal to the amount of the plaintiff's claim.

15  See Wendell 680 A.2d at 1320 ("To say that the . . . property is

16  subject to a constructive trust in Wendell's favor is not to say

17  that Wendell owns the property.  On the contrary, it is to say

18  only that Wendell may seek satisfaction of its debt, and no more,

19  out of that property . . . .").  Thus, in Connecticut, the right

20  to recover under a constructive trust is limited in a similar way

21  as it would be under an equitable lien theory.

22      The Cadle Creditor's contention that they should receive an

23  equitable lien on the stock fails for the same reason as their

24  constructive trust argument.  Both the equitable lien and

25  constructive trust remedies are equitable devices to prevent

26  unjust enrichment.  But, as discussed above, appellants have

                              21

failed to demonstrate how Flanagan's bankrupt estate would be
unjustly enriched by its continued ownership interest in the
Thompson & Peck stock.  Because no equitable lien arises in these
circumstances, we need not review the district court's conclusion
that, even if an equitable lien did arise, it would not relate
back to a time before the preference period.

                         V  Earmarking Doctrine

     In order for a transfer to be avoidable by a trustee in
bankruptcy, it must be of "an interest of the debtor in
property."  11 U.S.C. § 547(b).  The requirement that the
transfer be of an interest of the debtor in property is not
defined in the Bankruptcy Code and has therefore been left to the
courts to interpret.  In so doing, courts have crafted a doctrine
that has come to be known as the earmarking doctrine.

     The earmarking doctrine applies "where a third party lends
money to the debtor for the specific purpose of paying a selected
creditor."  Glinka v. Bank of Vt. (In re Kelton Motors, Inc.), 97
F.3d 22, 28 (2d Cir. 1996).  In such situations, the loan funds
are said to be "earmarked" and the payment is held not to
constitute a voidable preference.  McCuskey v. Nat'l Bank of
Waterloo (In re Bohlen Enters.), 859 F.2d 561, 565 (8th Cir.
1988).

     Early applications of the earmarking doctrine concerned
situations in which the debtor's obligation was secured by a
guarantor.  See id.  Where the guarantor paid the creditor on
behalf of a debtor, the courts rejected the proposition that the

                                  22

1  payment could be avoided by the trustee. _Id._ The rationale for

2  such an outcome was that the property transferred belonged to the

3  guarantor and thus the transfer of that property in no way

4  diminished the debtor's estate. _See Nat'l Bank of Newport, N.Y._

5  _v. Nat'l Herkimer County Bank_, 225 U.S. 178, 185 (1912) ("Neither

6  directly nor indirectly was this payment to the bank made by the

7  [debtor], and the property of [the debtor] was not thereby

8  depleted."). It is likely that courts were also mindful that the

9  opposite result would have the inequitable effect of forcing the

10 guarantor to pay the same obligation twice. _See McCuskey_, 859

11 F.2d at 565.

12      Today, the earmarking doctrine has been extended beyond the

13 guarantor context and several courts have held that it applies

14 whenever a third party provides funds to the debtor for the

15 express purpose of enabling the debtor to pay a specified

16 creditor, that is substituting a new creditor for an old

17 creditor. _See Glinka_, 97 F.3d at 28; _Adams v. Anderson (In re_

18 _Superior Stamp & Coin Co.)_, 223 F.3d 1004, 1008 (9th Cir. 2000);

19 _Buckley v. Jeld-Wen, Inc. (In re Interior Wood Prods. Co.)_, 986

20 F.2d 228, 231 (8th Cir. 1993); _In re Smith_, 966 F.2d 1527, 1533

21 (7th Cir. 1992); _Mandross v. Peoples Banking Co. (In re Hartley)_,

22 825 F.2d 1067, 1070 (6th Cir. 1987); _Coral Petrol., Inc. v._

23 _Banque Paribas-London_, 797 F.2d 1351, 1356 (5th Cir. 1986). _But_

24 _see Manchester v. First Bank & Trust Co. (In re Moses)_, 256 B.R.

25 641, 646-49 (B.A.P. 10th Cir. 2000) (stating that the earmarking

26 doctrine should not be extended beyond guarantor situations);

23

1   <u>McCuskey</u>, 859 F.2d at 566 (expressing doubt as to whether
2   earmarking doctrine should be extended beyond guarantor
3   situations but ultimately adopting test that allows for
4   application of earmarking doctrine outside that limited context).
5       Several formulations have been developed to determine
6   whether the earmarking doctrine applies in a particular case.
7   <u>See Manchester</u>, 256 B.R. at 649-50 (discussing various approaches
8   to application of earmarking doctrine).  An oft cited approach is
9   that adopted by the Eighth Circuit in <u>McCuskey</u>.  <u>McCuskey</u> held
10  that in order for a transaction to qualify under the earmarking
11  doctrine, three requirements must be satisfied:  "(1) the
12  existence of an agreement between the new lender and the debtor
13  that the new funds will be used to pay a specified antecedent
14  debt, (2) performance of that agreement according to its terms,
15  and (3) the transaction viewed as a whole (including the transfer
16  in of the new funds and the transfer out to the old creditor)
17  does not result in any diminution of the estate."  859 F.2d at
18  566; <u>see also Kaler v. Cmty. First Nat'l Bank (In re Heitkamp)</u>,
19  137 F.3d 1087, 1088-89 (8th Cir. 1998) (applying <u>McCuskey</u>
20  formulation).  Other courts have focused primarily on whether the
21  debtor lacked control over the funds supplied by the new
22  creditor.  <u>See</u>, <u>e.g.</u>, <u>Hansen v. MacDonald Meat Co. (In re Kemp</u>
23  <u>Pac. Fisheries, Inc.)</u>, 16 F.3d 313, 316 (9th Cir. 1994); <u>Coral</u>,
24  797 F.2d at 1358.
25      We have long recognized the earmarking doctrine, though our
26  early cases did not refer to it by that name.  <u>See</u>, <u>e.g.</u>, <u>Smyth</u>

24