

Paul J. Weber

project, Mr. Weber participated in determining purchase accounting and push-down accounting reserves and adjustments, tax structuring, and location monetization.

- Served as advisor (and de facto CFO) to the debtor for a national home furnishings chain in an out-of-court restructuring. Project involved finalizing year-end financial statements (public company), including the assessment of store closure and restructuring reserves, financial and operational forecasting, store closure/location sale analyses, bank covenant and debt renegotiation and ultimate sale of new ownership position in the company.

- Served as advisor to debtor (effectively became CFO when serving CFO became terminally ill) to a national footwear chain, which went out of business through the bankruptcy process. Oversaw the company-led liquidation of inventory through to final outside GOB process. Secured creditors were paid in full and unsecured creditors received a recovery in excess of three times original estimates. Role included significant involvement in preparation of the company's periodic financial statements and public filings.

- Served as project partner in providing both pre-bankruptcy restructuring and bankruptcy advisory services to debtor companies/creditor constituencies in approximately 10 other matters in the retail arena, in which the debtor company was sold, liquidated or completed a successful reorganization. Services included evaluating company feasibility, cash flows and business plans; preparing companies to file for bankruptcy; assistance in preparing plans of reorganization and disclosure statements; claims and preference analysis; and evaluating business and asset sale alternatives.

- Construction

  - Served as financial advisor to the surety companies in monitoring (and in certain cases directly overseeing) completion of more than $2.4 billion of work to be completed by a construction services provider. This workout involved the sureties funding more than $300 million and recovering a substantial portion of that through the sale of various business units and assets of the company. The company filed for Chapter 11 bankruptcy and we served as financial adviser to the surety group during and after such proceedings. We currently are overseeing the direct completion of four specific projects and are involved in claim adjudication in such projects, as well as four to five others. The ultimate loss to the sureties is expected to be less than eight percent of the original cost to complete at inception of the project.

  - Assisted the surety companies in monitoring completion of over $2.5 billion of work to be completed by an engineering and construction firm. In doing this work, emphasis was placed on maintaining contractor viability and liquidity to allow for orderly completion of the backlog. We participated in the sale of approximately five of the company's business units and were responsible for monitoring the company's performance on more than 100 bonded projects and an additional 50 un-bonded projects. This included understanding and validating the periodic job cost estimates and outlook for each specific project. An inability to resolve certain high value/long-term claims ultimately led to the company filing for Chapter 11 bankruptcy, and we served as financial adviser to the sureties during that process as well. The ultimate loss to be incurred by the sureties is expected to be less than three percent of the original cost to complete at inception of the project.



RER-30    1291



- High Technologies/Telecommunications

  - Served as advisor to the debtor on a restructuring engagement for a computer peripherals company in the high-tech industry, which filed for Chapter 11 and successfully emerged from bankruptcy in less than five months. Work involved direct participation in the daily operational and financial management of the company and the development of a comprehensive business operating plan. In addition, Mr. Weber was involved in development of all bankruptcy related matters, including plan negotiations, individual constituency considerations, resolution of business disputes, financial presentations to the court and various constituencies, and direct court testimony.

  - Served as advisor to unofficial trade creditors' committee on an out-of-court restructuring for a large peripherals company, where approximately $50 million of trade debt was exchanged for new equity. Specific work involved analyzing the companies' various business units (and potential sales values of such units) and assessing the companies' overall financial and operating viability.

  - Served as advisor to the unofficial creditors' committee of three computer peripheral products resellers and manufacturers. Project involved assessing the company's continuing viability and the appropriateness of proposed alternative business strategies.

  - Served as project partner providing restructuring consulting services to the unsecured creditors' committee of a large computer manufacturer. The project has involved the analysis and review of the debtor's operating plan, the valuation of certain operating subsidiaries, determining liquidation values and creditor projected payouts.

  - **Software** - involved in multiple bankruptcy and out-of-court restructuring engagements and distressed sale situations, involving software enterprises in the retail software, network, computing, business-to-business and middleware areas. Matters included Quintus Corporation, Borland, and certain Sega entities. Experience includes serving as de facto CFO/CRO in shepherding a troubled company through to a sale of its assets.

  - **Internet/E-Commerce** - involved in several bankruptcy and out-of-court restructuring engagements, including quick asset sales in the e-commerce/internet area. Specific sectors include retail e-commerce, such as HealthCentral, or e-commerce operations for a major retail chain and site services and management, such as Quokka Sports.

  - **Telecommunications** - involved in several bankruptcies in the telecommunications sector, primarily as an advisor to the debtor-in-possession with a resulting sale of the remaining assets. In addition, Mr. Weber has acted as estate manager for two such companies' past confirmation.

  - **Hardware, Semiconductors, and General High Technology** - involved in multiple bankruptcy/out-of-court restructuring engagements and operational wind-downs involving semiconductor manufacturers, specialty and OEM board products developers and retailers, computer peripheral product manufacturers, a large manufacturer/distributor of telecommunications devices, high-tech financial companies and a computer manufacturer. A number of the matters involved restructuring outstanding public bond obligations.

- Other Notable Engagements

  - Served as advisor to a debtor in the leasing industry, where the role was to implement cash processing/lender reporting controls for the ultimate liquidation of a series of



www.fticonsulting.com

 

Paul J. Weber

portfolios in excess of $1 billion. Work included an assessment of all of the debtor's functional operations, including new deal origination, credit approval/monitoring, collections and back-end remarketing activities.

- Served as de facto treasurer and head of business planning for a debtor on a restructuring engagement in regulated industry. Project involved performance of certain crisis management functions, performance of the treasury function, preparation of detail business plans for over 40 subsidiaries (and submission of rate proposals to government boards), capital budgeting, oversight and development of comprehensive business forecast/re-structuring alternatives.

- Served as advisor to multiple lender groups on a restructuring engagement involving a $100 million defense contractor/aerospace manufacturer. The project involved the critical analysis of the debtor's overall business plan (and the individual business plans of its four manufacturing subsidiaries), performing sensitivity analysis with respect to the plan and the valuation of certain operating subsidiaries.

- Served as de facto CFO/COO in two high technology–related financial entities (computer leasing/telephone record billing) in out-of-court debt/equity restructurings, including direct management of complex cash processing and cash management functions, trade creditor negotiation and compromise and taxing authority negotiations. In one such instance, the role also included highly detailed lender monitoring, ensuring lender proceeds were properly identified and remitted.

- Served as advisor to financial institutions in one large agribusiness bankruptcy and one out-of-court restructuring. The project included critical analysis of company's business plan, valuation and analysis of branded products, valuation of specific growing properties and analysis of alternative debt restructuring plans.

- Participated in a number of bankruptcy and restructuring engagements for medium-sized, privately held companies, assisting both debtor and creditor interests. Specific tasks included the review and analysis of cash flow projections and business plans, assessment of business valuation and claim distribution and review of alternative reorganization or restructuring scenarios, including the assessment of income tax consequences.

### Other Relevant Experience

- Participated in a number of other projects and engagements involving real estate matters, business interruption and insurance claims and various litigation matters.

## Employment History

- **FTI Consulting, Inc.** - San Francisco office, 2002 to present

- **PricewaterhouseCoopers, LLP** - 1981 to 2002

  - Served on a tour of duty in Lima, Peru, for approximately 20 months on the firm's International Service Program (1985-1987)



RER-30      1293

# EXHIBIT B

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

## DEBTOR'S BUDGET

| | Actual 1 | Actual 2 | Actual 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 9/21/07 | 9/28/07 | 10/5/07 | 10/12/07 | 10/19/07 | 10/26/07 | 11/2/07 | 11/9/07 | 11/16/07 | 11/23/07 | 11/30/07 |
| **Cash Flows from Client Settlement Activities - PRE-PETITION** | | | | | | | | | | | |
| CID 402 cash payments from LEC for pre-petition pipeline | $1,393,130 | $1,673,013 | $895,277 | $1,713,182 | $1,746,332 | $996,767 | 0 | 0 | 0 | 0 | 0 |
| Less: withheld LEC payments (7) | | (562,578) | (521,219) | (340,000) | (60,313) | (60,313) | 1,423,797 | 0 | 0 | 0 | 0 |
| Less: Verizon reserve increase related to bankruptcy (4) | | | | (60,313) | (60,313) | (60,313) | 0 | 0 | 0 | 0 | 0 |
| Net CID 402 cash payments from LEC for pre-petition pipeline | 1,393,130 | 1,110,435 | 374,058 | 1,312,870 | 1,686,020 | 936,455 | 1,423,797 | 0 | 0 | 0 | 0 |
| Payment/One adequate protection payments | | (578,016) | (994,868) | (433,265) | (495,421) | (491,859) | (605,991) | (302,996) | (239,812) | | |
| Florida receiver blocked account transfer (5) | | (1,762,763) | (521,219) | (340,000) | (60,313) | 1,782,763 | 0 | 1,423,797 | 0 | 0 | 0 |
| PDI adequate protection payment | | (65,000) | (132,530) | (60,313) | (60,313) | (60,313) | (78,740) | (60,313) | (60,313) | (60,313) | (60,313) |
| PDI blocked account transfer | | 0 | 0 | (478,473) | (53,022) | (40,892) | (109,325) | (116,038) | (145,877) | (145,877) | (55,019) |
| TBR service fees earned | | 0 | 0 | (53,022) | (53,022) | (87,604) | (385,842) | (194,464) | (161,111) | (202,540) | (284,559) |
| Net CID 402 cash received from LEC for post-petition pipeline | 1,393,130 | 1,110,435 | 374,058 | 403,132 | 1,137,576 | 2,166,376 | 667,274 | 1,234,026 | 1,011,920 | 1,287,637 | 475,604 |
| Beginning PRE-PETITION settlement cash balance | 1,978,736 | 3,371,866 | 2,085,522 | 1,332,182 | 1,735,314 | 2,872,890 | 5,039,266 | 4,365,652 | 5,130,134 | 4,796,126 | 4,690,542 |
| Net PRE-PETITION settlement cash flow | 1,393,130 | (1,285,344) | (753,340) | 403,132 | 1,137,576 | 2,166,376 | (673,615) | 764,483 | (334,008) | (105,584) | (103,130) |
| Ending PRE-PETITION settlement cash balance | 3,371,866 | 2,085,522 | 1,332,182 | 1,735,314 | 2,872,890 | 5,039,266 | 4,365,652 | 5,130,134 | 4,796,126 | 4,690,542 | 4,587,412 |
| **Cash Flows from Client Settlement Activities - POST-PETITION** | | | | | | | | | | | |
| Gross CIC 402 pipeline submitted to LECs post-petition (8) | | | | | | | 1,301,494 | 2,315,289 | 1,917,991 | 2,411,189 | 956,995 |
| Less: LEC Reserve | 0 | 0 | 0 | 0 | 0 | 0 | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) |
| Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | 0 | 0 | 0 | (78,740) | (140,015) | (116,038) | (145,877) | (55,019) |
| Less: LEC Holdback | 0 | 0 | 0 | 0 | 0 | 0 | (109,325) | (194,464) | (161,111) | (202,540) | (84,556) |
| Less: LEC fees (2) | 0 | 0 | 0 | 0 | 0 | 0 | (385,842) | (686,392) | (569,609) | (714,822) | (284,304) |
| Less: LEC Dilution | 0 | 0 | 0 | 0 | 0 | 0 | | | | | |
| Net CIC 402 cash received from LEC for post-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 667,274 | 1,234,026 | 1,011,920 | 1,287,637 | 475,604 |
| TBR service fees earned | 0 | 0 | 0 | 0 | 0 | (212,119) | (466,907) | (267,107) | (250,413) | (403,442) | (807,882) |
| Pre-payment of post-petition pipeline | 0 | 0 | 0 | (1,242,780) | (618,056) | (212,119) | 200,367 | (267,107) | | | |
| Settlement of remaining portion of post-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 200,367 | 966,918 | 761,507 | 884,195 | (332,078) |
| Net POST-PETITION settlement cash flow | 0 | 0 | 0 | (1,242,780) | (618,056) | (212,119) | 200,367 | 966,918 | 761,507 | 884,195 | (332,078) |
| Beginning POST-PETITION settlement cash balance | 0 | 0 | 0 | 0 | (1,242,780) | (1,860,816) | (2,072,935) | (1,872,568) | (905,650) | (144,143) | 740,052 |
| Ending POST-PETITION settlement cash balance | 0 | 0 | 0 | (1,242,780) | (1,860,816) | (2,072,935) | (1,872,568) | (905,650) | (144,143) | 740,052 | 407,974 |
| Ending POST + PRE-PETITION cash balance | 3,371,866 | 2,085,522 | 1,332,182 | 492,534 | 1,012,074 | 2,966,331 | 2,493,083 | 4,224,485 | 4,651,983 | 5,430,594 | 4,995,386 |
| Collected and unremitted funds | | | | 492,534 | 1,012,074 | 2,966,331 | 2,493,083 | 1,901,300 | 2,913,220 | 3,533,583 | 2,775,361 |
| Obligation to customers for collected & unremitted funds | | | | | | | 667,274 | 950,650 | 1,456,610 | 1,766,791 | 1,387,681 |
| Funds held in excess (deficit) of customer obligations | | | | | | | 2,159,447 | 3,273,835 | 3,195,573 | 3,665,803 | 3,607,706 |

**EXHIBIT B**

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

## DEBTOR'S BUDGET

| Week Ending | Actual 1 8/21/07 | Actual 2 8/28/07 | Actual 3 10/5/07 | 4 10/12/07 | 5 10/19/07 | 6 10/26/07 | 7 11/2/07 | 8 11/9/07 | 9 11/16/07 | 10 11/23/07 | 11 11/30/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities** | | | | | | | | | | | |
| 33 TBR service fees earned (PhoneBill + Inquiry) | 0 | 0 | 0 | 476,473 | 53,032 | 40,982 | 67,624 | 356,319 | 94,196 | 105,584 | 103,130 |
| 34 Other TBR service fees earned | 0 | 0 | 0 | 38,200 | 0 | 0 | 38,200 | 0 | 0 | 0 | 0 |
| 35 Intercompany inflows (3) | 11,357 | 11,357 | 0 | 67,665 | 0 | 0 | 67,665 | 0 | 0 | 0 | 0 |
| 36 Miscellaneous inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 37 Total inflow | 11,357 | 11,357 | 0 | 582,338 | 53,032 | 40,982 | 173,489 | 356,319 | 94,196 | 105,584 | 103,130 |
| 38 Court approved pre-petition costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 39 Payroll | 0 | (112,960) | 0 | (113,000) | (17,300) | (107,350) | (107,350) | (107,350) | (17,300) | (107,350) | (107,350) |
| 40 Employee benefits | 0 | 0 | 0 | (33,400) | 0 | (30,000) | 0 | (30,000) | 0 | 0 | (30,000) |
| 41 Direct costs | 0 | 0 | 0 | (78,000) | 0 | 0 | (78,000) | 0 | 0 | 0 | 0 |
| 42 Occupancy | 0 | 0 | 0 | (25,581) | (25,000) | (25,000) | 0 | (25,000) | (25,000) | 0 | (25,581) |
| 43 Intercompany G&A outflows | 0 | 0 | 0 | (50,000) | 0 | 0 | 0 | 0 | 0 | 0 | (50,000) |
| 44 Other G&A outflows | (120) | (40) | (255) | (27,660) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 45 Total outflows | (120) | (113,030) | (255) | (325,621) | (42,300) | (132,350) | (209,281) | (132,350) | (42,300) | (107,350) | (105,621) |
| 46 Net operating cash flow | 11,237 | (113,030) | (255) | 256,716 | 10,722 | (91,368) | (35,793) | 223,969 | 51,896 | (1,766) | (2,491) |
| 47 Bankruptcy costs (1) (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (350,000) |
| 48 Beginning operating cash balance | 177,276 | 188,513 | 75,483 | 75,228 | 331,944 | 342,667 | 251,299 | 215,506 | 439,475 | 491,371 | 489,605 |
| 49 Net operating cash flow (including bk costs) | 11,237 | (113,030) | (255) | 256,716 | 10,722 | (91,368) | (35,793) | 223,969 | 51,896 | (1,766) | (352,491) |
| 50 Ending operating cash balance | 188,513 | 75,483 | 75,228 | 331,944 | 342,667 | 251,299 | 215,506 | 439,475 | 491,371 | 489,605 | 137,114 |
| 51 Ending total cash balance | 3,560,379 | 2,161,005 | 1,407,410 | 824,478 | 1,354,741 | 3,217,630 | 2,708,589 | 4,883,969 | 5,143,354 | 5,920,199 | 5,132,500 |

**NOTES:**

(1) Assumes counsel paid through retainers previously established through October 5, 2007.

(2) Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflow and outflows related to process not reflected on this schedule.

(3) Consistent w/ prior months, P1 and ICS invoiced for services performed by accounting, finance, treasury, human resources, facilities, and settlement personnel on TBR's payroll.

(4) Effective immediately, Verizon will begin holding additional reserves totaling $995k over a 16 week period. Will reduce LEC inflows accordingly.

(5) Budget assumes debtor will obtain use of $1.7MM from a blocked account as a result of Debtor's Adversary Complaint for an injunction.

(6) Budget assumes fees for Debtor and Creditors Committee Insolvency Counsel and financial consultant to the Debtor. It also assumes the Debtor will obtain a preliminary injunction with respect to the Florida litigation. Otherwise, substantial additional fees would be included in budget.

(7) The following LECs held payments: Verizon = $562,578 (9/28), ATT = $105,154 (10/4), and Verizon = $416,063 (10/9).

(8) Assumes 100% of pre-petition pipeline submitted by customers post-petition.

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| Week Ending | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/7/07 | 12/14/07 | 12/21/07 | 12/28/07 | 1/4/08 | 1/11/08 | 1/18/08 | 1/25/08 | 2/1/08 | 2/8/08 | 2/15/08 |
| **Cash Flows from Client Settlement Activities – PRE-PETITION** | | | | | | | | | | | |
| 1  CIC 402 cash payments from LEC for pre-petition pipeline | 2,054,980 | 1,643,992 | 1,095,995 | 1,643,465 | 3,090,374 | 2,222,466 | 3,064,510 | 3,123,608 | 1,782,999 | 1,219,028 | 1,219,028 |
| 2  Less: withheld LEC payments (7) | | | | | | | | | | | |
| 3  Less: Verizon reserve increase related to bankruptcy (4) | | | | | | | | | | | |
| 4  Net CIC 402 cash payments from LEC for pre-petition pipeline | | | | | | | | | | | |
| 5  PaymentOne adequate protection payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6  Florida receiver blocked account transfer (8) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7  Less: Adequate protection payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8  PCS blocked account transfer | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9  TBR service fees earned | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 Beginning PRE-PETITION settlement cash balance | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 |
| 12 Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 Ending PRE-PETITION settlement cash balance | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 |
| **Cash Flows from Client Settlement Activities – POST-PETITION** | | | | | | | | | | | |
| 14 Gross CIC 402 pipeline submitted to LECs post-petition (8) | 2,054,980 | 1,643,992 | 1,095,995 | 1,643,465 | 3,090,374 | 2,222,466 | 3,064,510 | 3,123,608 | 1,782,999 | 1,219,028 | 1,219,028 |
| 15 Less: LEC Reserve | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (107,871) | (73,751) | (73,751) |
| 16 Less: Verizon reserve increase related to bankruptcy (4) | | | | | | | | | | | |
| 17 Less: LEC Holdback | (124,327) | (99,462) | (66,308) | (99,450) | (186,968) | (134,459) | (185,403) | (189,990) | (149,772) | (102,398) | (102,398) |
| 18 Less: LEC fees (2) | (172,619) | (138,095) | (92,064) | (138,085) | (259,591) | (186,687) | (257,419) | (282,400) | (528,589) | (361,394) | (361,394) |
| 19 Less: LEC Dilution | (609,223) | (487,379) | (324,919) | (487,223) | (916,174) | (658,873) | (908,506) | (926,089) | | | |
| 20 Net CIC 402 cash received from LEC for post-petition pipeline | 1,088,506 | 858,744 | 552,592 | 858,460 | 1,667,329 | 1,182,134 | 1,652,870 | 1,665,020 | 995,787 | 681,485 | 681,485 |
| 21 TBR service fees earned | (154,695) | (324,530) | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) |
| 22 Pre-payment of post-petition pipeline | (428,802) | (800,652) | (472,601) | (472,601) | (314,960) | (178,477) | (333,011) | (484,804) | (510,334) | (648,192) | (242,276) |
| 23 Settlement of remaining portion of post-petition pipeline | (1,242,780) | (618,086) | (466,907) | (466,907) | (287,107) | (250,413) | (403,442) | (807,682) | (428,602) | (900,652) | (617,227) |
| 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 25 Net POST-PETITION settlement cash flow | (737,788) | (884,474) | (528,520) | (132,623) | 1,033,697 | 428,713 | 859,852 | 341,669 | 6,066 | (818,925) | (702,548) |
| 26 Beginning POST-PETITION settlement cash balance | 407,974 | (329,794) | (1,214,268) | (1,742,788) | (1,875,411) | (841,715) | (413,002) | 446,850 | 788,519 | 794,585 | (24,340) |
| 27 Net POST-PETITION settlement cash flow | (737,788) | (884,474) | (528,520) | (132,623) | 1,033,697 | 428,713 | 859,852 | 341,669 | 6,066 | (818,925) | (702,548) |
| 28 Ending POST-PETITION settlement cash balance | (329,794) | (1,214,268) | (1,742,788) | (1,875,411) | (841,715) | (413,002) | 446,850 | 788,519 | 794,585 | (24,340) | (726,889) |
| 29 Ending POST + PRE-PETITION cash balance | 4,257,618 | 3,373,144 | 2,844,624 | 2,712,001 | 3,745,697 | 4,174,410 | 5,034,262 | 5,375,931 | 5,381,997 | 4,563,072 | 3,860,523 |
| 30 Collected and unremitted funds | 2,851,949 | 2,423,056 | 2,499,644 | 2,269,586 | 3,076,170 | 3,707,912 | 4,502,332 | 4,521,023 | 4,335,656 | 3,364,271 | 2,359,736 |
| 31 Obligation to customers for collected & unremitted funds | 1,425,975 | 1,211,528 | 1,249,822 | 1,134,793 | 1,539,085 | 1,853,956 | 2,251,166 | 2,260,511 | 2,167,828 | 1,682,138 | 1,179,868 |
| 32 Funds held in excess (deficit) of customer obligations | 2,851,643 | 2,161,616 | 1,594,802 | 1,577,208 | 2,206,612 | 2,320,454 | 2,783,096 | 3,115,419 | 3,214,169 | 2,880,936 | 2,880,655 |

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 12/7/07 | 12/14/07 | 12/21/07 | 12/28/07 | 1/4/08 | 1/11/08 | 1/18/08 | 1/25/08 | 2/1/08 | 2/8/08 | 2/15/08 |
| | **Cash Flow from Operating Activities** | | | | | | | | | | | |
| 33 | TBR service fees earned (Provide Bill + Inquiry) | 154,695 | 324,530 | 51,565 | 51,565 | 51,565 | 324,530 | 51,565 | 51,565 | 51,565 | 51,565 | 324,530 |
| 34 | Other TBR service fees earned | 38,200 | 0 | 0 | 0 | 38,200 | 0 | 0 | 0 | 38,200 | 0 | 0 |
| 35 | Intercompany inflows (3) | 67,665 | 0 | 0 | 0 | 67,665 | 0 | 0 | 0 | 67,665 | 0 | 0 |
| 36 | Miscellaneous inflows (3) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 37 | Total inflows | 260,560 | 324,530 | 51,565 | 51,565 | 157,430 | 324,530 | 51,565 | 51,565 | 157,430 | 51,565 | 324,530 |
| 38 | Court approved pre-petition costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 39 | Payroll | (107,350) | 0 | (107,350) | 0 | (107,350) | 0 | (107,350) | 0 | (107,350) | 0 | (107,350) |
| 40 | Employee benefits | 0 | (17,300) | 0 | (30,060) | 0 | 0 | (17,300) | 0 | (30,060) | 0 | 0 |
| 41 | Direct costs | (76,000) | 0 | 0 | 0 | (76,000) | 0 | 0 | 0 | (76,000) | 0 | 0 |
| 42 | Occupancy | 0 | 0 | 0 | (25,561) | 0 | 0 | 0 | 0 | (25,561) | 0 | 0 |
| 43 | Intercompany G&A outflows | (27,660) | 0 | 0 | 0 | (27,660) | 0 | 0 | 0 | (27,660) | 0 | 0 |
| 44 | Other G&A outflows | (25,000) | (25,000) | 0 | (50,000) | (25,000) | (25,000) | 0 | 0 | (50,000) | (25,000) | (25,000) |
| 45 | Total outflows | (236,010) | (42,300) | (107,350) | (105,621) | (236,010) | (25,000) | (124,650) | 0 | (316,631) | (25,000) | (132,350) |
| 46 | Net operating cash flow | 24,549 | 282,230 | (55,785) | (54,056) | (78,581) | 299,530 | (73,085) | 51,565 | (159,202) | 26,565 | 192,180 |
| 47 | Bankruptcy costs (1) (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (250,000) | 0 | 0 | 0 |
| 48 | Net operating cash flow (including bk costs) | 24,549 | 282,230 | (55,785) | (54,056) | (78,581) | 299,530 | (73,085) | (198,435) | (159,202) | 26,565 | 192,180 |
| 49 | Beginning operating cash balance | 137,114 | 161,663 | 443,893 | 388,108 | 334,052 | 255,472 | 555,002 | 481,917 | 283,482 | 124,280 | 150,845 |
| 50 | Ending operating cash balance | 161,663 | 443,893 | 388,108 | 334,052 | 255,472 | 555,002 | 481,917 | 283,482 | 124,280 | 150,845 | 343,025 |
| 51 | Ending total cash balance | 4,419,281 | 3,817,037 | 3,232,732 | 3,046,053 | 4,001,169 | 4,729,412 | 5,516,179 | 5,659,412 | 5,906,277 | 4,713,917 | 4,203,549 |

**NOTES:**

(1) Assumes counsel paid through retainers previously established through October 5, 2007.

(2) Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process not reflected on this schedule.

(3) Consistent w/ prior months, P1 and ICS invoiced for services performed by accounting, finance, treasury, human resources, facilities, and settlement personnel on TBR's payroll.

(4) Effective immediately, Verizon will begin holding additional reserves totaling $965k over a 16 week period. Will reduce LEC inflows accordingly.

(5) Budget assumes debtor will obtain use of $8.7MM from a blocked account as a result of Debtor's Adversary Complaint for an Injunction.

(6) Budget assumes fees for Debtor and Creditors Committee Insolvency Counsel and financial consultants to the Debtor. It also assumes the Debtor will obtain a preliminary injunction with respect to the Florida litigation. Otherwise, substantial additional fees would be included in budget.

(7) The following LECs hold payments: Verizon = $562,578 (9/28), AT&T = $105,154 (10/4), and Verizon = $416,065 (10/5).

(8) Assumes 100% of pre-petition pipeline submitted by customers post-petition.

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | Week Ending | 23 | 24 | 25 | 26 | 27 | |
|---|---|---|---|---|---|---|---|
| | | 2/22/08 | 2/29/08 | 3/7/08 | 3/14/08 | 3/21/08 | Total |
| | **Cash Flows from Client Settlement Activities – PRE-PETITION** | | | | | | |
| 1 | CIC 402 cash payments from LEC for pre-petition pipeline | 0 | 0 | 0 | 0 | 0 | $ 8,417,701 |
| 2 | Less: withheld LEC payments (7) | 0 | 0 | 0 | 0 | 0 | (180,938) |
| 3 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | 0 | 0 | |
| 4 | Net CIC 402 cash payments from LEC for pre-petition pipeline | 0 | 0 | 0 | 0 | 0 | 8,235,764 |
| 6 | PaymentOne adequate protection payments | 0 | 0 | 0 | 0 | 0 | (4,142,228) |
| 7 | Florida receiver blocked account transfer (6) | 0 | 0 | 0 | 0 | 0 | (132,530) |
| 8 | PCS adequate protection payment | 0 | 0 | 0 | 0 | 0 | (55,000) |
| 9 | PCS blocked account transfer | 0 | 0 | 0 | 0 | 0 | |
| 10 | TBR service fees earned | 0 | 0 | 0 | 0 | 0 | (1,287,330) |
| | Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | 2,608,676 |
| 11 | Beginning PRE-PETITION settlement cash balance | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 1,978,736 |
| 12 | Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | 2,608,676 |
| 13 | Ending PRE-PETITION settlement cash balance | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 | 4,587,412 |
| | **Cash Flows from Client Settlement Activities – POST-PETITION** | | | | | | |
| 14 | Gross CIC 402 pipeline submitted to LECs post-petition (8) | 1,301,494 | 2,315,289 | 1,917,991 | 2,441,169 | 958,995 | 39,970,570 |
| 15 | Less: LEC Reserve | 0 | 0 | 0 | 0 | 0 | 0 |
| 16 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | 0 | 0 | (11,849,695) |
| 17 | Less: LEC Holdback | (78,740) | (140,075) | (116,038) | (145,877) | (58,019) | (784,069) |
| 18 | Less: LEC fees (2) | (109,325) | (194,484) | (161,111) | (202,540) | (80,556) | (2,418,220) |
| 19 | Less: LEC Dilution | (385,842) | (666,392) | (568,609) | (714,822) | (284,304) | (3,357,528) |
| 20 | Net CIC 402 cash received from LEC for post-petition pipeline | 727,586 | 1,294,338 | 1,072,233 | 1,347,950 | 536,116 | 21,551,065 |
| 21 | TBR service fees earned | (51,565) | (324,530) | (51,565) | (51,565) | (51,565) | |
| 22 | Less: LEC Reserve | (548,628) | (433,746) | (144,087) | (433,599) | (889,603) | |
| 23 | Pre-payment of post-petition pipeline | (472,601) | (314,960) | (178,477) | (338,011) | (464,904) | (11,954,785) |
| 24 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | 0 | 0 | (2,020,030) |
| 25 | Settlement of remaining portion of post-petition pipeline | 0 | 0 | 0 | 0 | 0 | (8,104,321) |
| | Net POST-PETITION settlement cash flow | (345,207) | 221,102 | 698,103 | 524,775 | (889,956) | (518,071) |
| 26 | Beginning POST-PETITION settlement cash balance | (726,888) | (1,072,095) | (850,994) | (152,890) | 371,885 | 0 |
| 27 | Net POST-PETITION settlement cash flow | (345,207) | 221,102 | 698,103 | 524,775 | (889,956) | (518,071) |
| 28 | Ending POST-PETITION settlement cash balance | (1,072,095) | (850,994) | (152,890) | 371,885 | (518,071) | (518,071) |
| 29 | Ending POST + PRE-PETITION cash balance | 3,515,316 | 3,736,418 | 4,434,522 | 4,959,297 | 4,069,341 | 4,069,341 |
| 30 | Collected and unremitted funds | 2,090,556 | 2,703,409 | 3,094,157 | 3,714,520 | 2,956,299 | |
| 31 | Obligation to customers for collected & unremitted funds | 1,045,278 | 1,351,705 | 1,547,079 | 1,857,260 | 1,478,149 | |
| 32 | Funds held in excess (deficit) of customer obligations | 2,470,038 | 2,384,714 | 2,887,443 | 3,102,037 | 2,591,192 | |

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | Week Ending | 23 | 24 | 25 | 26 | 27 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2/22/2008 | 2/29/08 | 3/7/08 | 3/14/08 | 3/21/08 | Total |
| 33 | Cash Flows from Operating Activities | | | | | | |
| 34 | Other TBR service fees earned (PhoneBill + Inquiry) | 51,565 | 324,530 | 51,565 | 51,565 | 51,565 | 3,317,360 |
| 35 | Intercompany inflows (3) | 0 | 0 | 38,200 | 0 | 0 | 232,200 |
| 36 | | 0 | 0 | 67,865 | 0 | 0 | 405,989 |
| 37 | Miscellaneous inflows | 0 | 0 | 0 | 0 | 0 | 11,367 |
| 37 | Total inflows | 51,565 | 324,530 | 157,430 | 51,565 | 51,565 | 3,963,906 |
| 38 | Court approved pre-petition costs | 0 | 0 | 0 | 0 | 0 | (69,200) |
| 39 | Payroll | 0 | (107,350) | 0 | (107,350) | 0 | (1,406,840) |
| 40 | Employee benefits | 0 | (30,000) | 0 | 0 | 0 | (183,700) |
| 41 | Direct costs | 0 | (76,000) | 0 | 0 | 0 | (496,000) |
| 42 | Occupancy | 0 | 0 | (27,660) | 0 | 0 | (153,366) |
| 43 | Intercompany G&A outflows | 0 | (25,550) | (25,000) | (25,000) | 0 | (165,963) |
| 44 | Other G&A outflows | 0 | (50,000) | 0 | 0 | 0 | (600,415) |
| 45 | Total outflows | 0 | (212,971) | (128,660) | (132,350) | 0 | (3,035,484) |
| 46 | Net operating cash flow | 51,565 | 111,559 | 28,769 | (80,785) | 51,565 | 928,423 |
| 47 | Bankruptcy costs (1)(6) | 0 | 0 | 0 | 0 | (200,000) | (800,000) |
| 48 | Beginning operating cash balance | 343,025 | 394,590 | 505,149 | 534,919 | 454,134 | 177,276 |
| 49 | Net operating cash flow (including bk costs) | 51,565 | 111,559 | 28,769 | (80,785) | (148,435) | 128,423 |
| 50 | Ending operating cash balance | 394,590 | 505,149 | 534,919 | 454,134 | 305,699 | 305,699 |
| 51 | Ending total cash balance | 3,909,906 | 4,242,558 | 4,969,440 | 5,413,431 | 4,375,040 | 4,375,040 |

NOTES:

(1) Assumes counsel paid through retainers previously established through October 5, 2007.

(2) Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process not reflected on this schedule.

(3) Consistent w/ prior months, P.F and ICS invoiced for services performed by accounting, finance, treasury, human resources, facilities, and settlement personnel on TBR's payroll.

(4) Effective immediately, Verizon will begin holding additional reserves totaling $958k over a 16-week period. Will reduce LEC inflows accordingly.

(5) Budget assumes debtor will obtain use of $7.7MM from a blocked account as a result of Debtor's Adversary Complaint for an injunction.

(6) Budget assumes fees for Debtor and Creditors Committee Insolvency Counsel and financial consultants to the Debtor. It also assumes the Debtor will obtain a preliminary injunction with respect to the Florida litigation. Otherwise, substantial additional fees would be included in budget.

(7) The following LECs held payments: Verizon = $562,578 (9/28), ATT = $105,154 (10/4), and Verizon = $416,065 (10/5).

(8) Assumes 100% of pre-petition pipeline submitted by customers post-petition.

# EXHIBIT C

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

## DEBTOR'S BUDGET ASSUMING NO PRELIMINARY INJUNCTION

| # | Week Ending | Actual 1 9/21/07 | Actual 2 9/28/07 | Actual 3 10/5/07 | 4 10/12/07 | 5 10/19/07 | 6 10/26/07 | 7 11/2/07 | 8 11/9/07 | 9 11/16/07 | 10 11/23/07 | 11 11/30/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Cash Flows from Client Settlement Activities - PRE-PETITION** | | | | | | | | | | | |
| 1 | CIC 402 cash payments from LEC for pre-petition pipeline | $1,393,130 | $1,673,013 | $895,277 | $1,713,182 | $1,748,332 | $966,767 | | | | | |
| 2 | Less: withheld LEC payments (7) | | (562,578) | (521,219) | | | | | | | | |
| 3 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) |
| 4 | Net CIC 402 cash payments from LEC for pre-petition pipeline | 1,393,130 | 1,110,435 | 374,058 | 1,652,870 | 1,688,019 | | | | | | |
| 5 | Payment/One adequate protection payments | 0 | (578,016) | (994,668) | (433,285) | (495,421) | (491,869) | (605,991) | (302,996) | (238,812) | | |
| 6 | Florida receiver blocked account transfer (5) | 0 | (1,762,763) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6a | Additional legal costs in Florida action (6) | 0 | 0 | (132,500) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | PCL adequate protection payment | 0 | 0 | 0 | 0 | 0 | 0 | (333,333) | | | | |
| 8 | PCS blocked account transfer | 0 | (66,000) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | TBR service fees earned | 0 | 0 | 0 | 0 | 0 | 0 | (67,520) | | | | |
| 10 | Net PRE-PETITION settlement cash flow | 1,393,130 | (1,286,344) | (753,340) | 743,132 | 1,137,576 | 1,487,410 | (1,006,948) | (659,314) | (334,008) | (105,584) | (103,130) |
| 11 | Beginning PRE-PETITION settlement cash balance | 1,978,736 | 3,371,666 | 2,085,522 | 1,332,182 | 2,075,314 | 3,212,890 | 4,700,300 | 3,693,352 | 3,034,038 | 2,700,030 | 2,594,446 |
| 12 | Net PRE-PETITION settlement cash flow | 1,393,130 | (1,286,344) | (753,340) | 743,132 | 1,137,576 | 1,487,410 | (1,006,948) | (659,314) | (334,008) | (105,584) | (103,130) |
| 13 | Ending PRE-PETITION settlement cash balance | 3,371,666 | 2,085,522 | 1,332,182 | 2,075,314 | 3,212,890 | 4,700,300 | 3,693,352 | 3,034,038 | 2,700,030 | 2,594,446 | 2,491,316 |
| | **Cash Flows from Client Settlement Activities - POST-PETITION** | | | | | | | | | | | |
| 14 | Gross CIC 402 pipeline submitted to LECs post-petition (8) | 0 | 0 | 0 | | | | 1,301,494 | 2,315,289 | 1,917,991 | 2,411,189 | 955,995 |
| 15 | Less: LEC Reserve | 0 | 0 | 0 | | | | | | | | |
| 16 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | | | | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) |
| 17 | Less: LEC Holdback | 0 | 0 | 0 | | | | (78,740) | (140,019) | (116,038) | (145,877) | (54,019) |
| 18 | Less: LEC fees (2) | 0 | 0 | 0 | | | | (108,325) | (194,404) | (191,111) | (202,540) | (206,555) |
| 19 | Less: LEC Dilution | 0 | 0 | 0 | | | | (385,642) | (686,392) | (568,629) | (714,822) | (284,304) |
| 20 | Net CIC 402 cash received from LEC for post-petition pipeline | 0 | 0 | 0 | | | | 657,274 | 1,234,026 | 1,011,920 | 1,287,637 | 475,804 |
| 21 | TBR service fees earned | 0 | 0 | 0 | | | | (456,907) | (267,107) | (250,413) | (403,442) | (807,882) |
| 22 | Pre-payment of post-petition pipeline | 0 | 0 | 0 | (1,242,780) | | | | | | | |
| 23 | Settlement of remaining portion of post-petition pipeline | 0 | 0 | 0 | | | | | | | | |
| 24 | Net POST-PETITION settlement cash flow | 0 | 0 | 0 | (1,242,780) | (618,036) | (212,119) | 200,367 | 966,918 | 761,507 | 884,195 | (332,078) |
| 26 | Beginning POST-PETITION settlement cash balance | 0 | 0 | 0 | 0 | (1,242,780) | (1,860,816) | (2,072,935) | (1,872,568) | (905,650) | (144,143) | 740,052 |
| 27 | Net POST-PETITION settlement cash flow | 0 | 0 | 0 | (1,242,780) | (618,036) | (212,119) | 200,367 | 966,918 | 761,507 | 884,195 | (332,078) |
| 28 | Ending POST-PETITION settlement cash balance | 0 | 0 | 0 | (1,242,780) | (1,860,816) | (2,072,935) | (1,872,568) | (905,650) | (144,143) | 740,052 | 407,974 |
| 29 | Ending POST + PRE-PETITION cash balance | 3,371,666 | 2,085,522 | 1,332,182 | 832,534 | 1,352,074 | 2,627,365 | 1,820,784 | 2,128,388 | 2,555,887 | 3,334,498 | 2,899,290 |
| 30 | Collected and unremitted funds | | | | | | | 667,274 | 1,901,300 | 2,913,220 | 3,533,583 | 2,776,361 |
| 31 | Obligation to customers for collected & unremitted funds | | | | | | | 333,537 | 950,650 | 1,455,610 | 1,766,791 | 1,387,681 |
| 32 | Funds held in excess (deficit) of customer obligations | | | | | | | 1,820,784 | 1,177,739 | 1,099,277 | 1,587,706 | 1,511,609 |

**EXHIBIT C**

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

## DEBTOR'S BUDGET ASSUMING NO PRELIMINARY INJUNCTION

| | Week Ending | Actual 1 9/21/07 | Actual 2 9/28/07 | Actual 3 10/5/07 | 4 10/12/07 | 5 10/19/07 | 6 10/26/07 | 7 11/2/07 | 8 11/9/07 | 9 11/16/07 | 10 11/23/07 | 11 11/30/07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | Cash Flows from Operating Activities | | | | | | | | | | | |
| 34 | TBR service fees earned (PhoneBill * Inquiry) | 0 | 0 | 0 | 476,473 | 53,022 | 40,982 | 67,624 | 356,319 | 94,196 | 105,564 | 103,130 |
| 35 | Other TBR service fees earned | 0 | 0 | 0 | 38,200 | 0 | 0 | 38,200 | 0 | 0 | 0 | 0 |
| 36 | Intercompany inflows (3) | 0 | 0 | 0 | 67,665 | 0 | 0 | 67,665 | 0 | 0 | 0 | 0 |
| 37 | Miscellaneous inflows (3) | 11,357 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 37 | Total inflows | 11,357 | 0 | 0 | 582,338 | 53,022 | 40,982 | 173,489 | 356,319 | 94,196 | 105,564 | 103,130 |
| 38 | Court approved pre-petition costs | 0 | 0 | 0 | 0 | (17,300) | 0 | 0 | 0 | (17,300) | 0 | 0 |
| 39 | Payroll | 0 | (112,950) | 0 | (113,000) | 0 | (107,350) | 0 | (107,350) | 0 | (107,350) | 0 |
| 40 | Employee benefits | 0 | 0 | 0 | (33,400) | 0 | (30,060) | (30,060) | 0 | 0 | 0 | (30,060) |
| 41 | Direct costs | 0 | 0 | 0 | (76,000) | 0 | 0 | (76,000) | 0 | 0 | 0 | 0 |
| 42 | Occupancy | 0 | 0 | 0 | (25,561) | (25,000) | (25,000) | (25,561) | (25,000) | (25,000) | 0 | (25,561) |
| 43 | Intercompany G&A outflows | 0 | 0 | 0 | (27,660) | 0 | 0 | (27,660) | 0 | 0 | 0 | 0 |
| 44 | Other G&A outflows | (40) | 0 | (255) | (50,000) | 0 | 0 | (50,000) | 0 | 0 | 0 | (50,000) |
| 45 | Total outflows | (120) | (113,030) | (255) | (325,621) | (42,300) | (132,350) | (209,281) | (132,350) | (42,300) | (107,350) | (105,621) |
| 46 | Net operating cash flow | 11,237 | (113,030) | (255) | 256,716 | 10,722 | (91,368) | (35,793) | 223,969 | 51,896 | (1,760) | (2,491) |
| 47 | Bankruptcy costs (1) (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (350,000) |
| 48 | Beginning operating cash balance | 177,276 | 188,513 | 75,483 | 75,228 | 331,944 | 342,667 | 251,299 | 215,506 | 439,475 | 491,371 | 489,605 |
| 49 | Net operating cash flow (including bk costs) | 11,237 | (113,030) | (255) | 256,716 | 10,722 | (91,368) | (35,793) | 223,969 | 51,896 | (1,760) | (352,491) |
| 50 | Ending operating cash balance | 188,513 | 75,483 | 75,228 | 331,944 | 342,667 | 251,299 | 215,506 | 439,475 | 491,371 | 489,605 | 137,114 |
| 51 | Ending total cash balance | 3,550,979 | 2,161,005 | 1,407,410 | 1,154,478 | 1,694,741 | 2,878,664 | 2,096,290 | 2,587,863 | 3,047,258 | 3,824,103 | 3,036,404 |

**NOTES:**

(1) Assumes counsel paid through retainers previously established through October 5, 2007.

(2) Assumes LEC costs relied from PAR and recovered from customer through settlement process, but inflows and outflows related to process not reflected on this schedule.

(3) Consistent w/ prior months, P1 and ICS invoiced for services performed by accounting, finance, treasury, human resources, facilities, and settlement personnel on TBR's payroll.

(4) Effective immediately, Verizon will begin holding additional reserves totaling $866k over a 16 week period. Will reduce LEC inflows accordingly.

(5) Budget assumes $1.7 MM will remain in blocked account.

(6) Budget assumes fees for Debtor and Creditor's Committee Insolvency Counsel and financial consultants to the Debtor. It also assumes the Debtor will not obtain a preliminary injunction with respect to the Florida litigation. As a result, an additional $1MM in fees will be incurred for the Florida action.

(7) The following LECs held payments: Verizon = $562,579 (9/28), AT&T = $105,154 (10/4), and Verizon = $416,065 (10/5).

(8) Assumes 103% of pre-petition pipeline submitted by customers post-petition.

# The Billing Resource dba Integretel
## Weekly Operating Cash Budget
### For the Period Ending March 21, 2008

| | Week Ending | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/7/07 | 12/14/07 | 12/21/07 | 12/28/07 | 1/4/08 | 1/11/08 | 1/18/08 | 1/25/08 | 2/1/08 | 2/8/08 | 2/15/08 |
| | **Cash Flows from Client Settlement Activities - PRE-PETITION** | | | | | | | | | | | |
| 1 | Gross CIC 402 cash payments from LEC pre-petition pipeline | 2,054,990 | 1,643,932 | 1,096,995 | 1,643,465 | 3,090,374 | 2,222,466 | 3,064,510 | 3,123,808 | 1,782,999 | 1,219,028 | 1,219,028 |
| 2 | Less: Verizon reserve increase related to bankruptcy (7) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 | Less: withheld LEC payments (7) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 | Net CIC 402 cash payments from LEC for pre-petition pipeline | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 | Payment for adequate protection payments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | Florida receiver blocked account transfer (8) | (333,333) | 0 | 0 | 0 | (333,333) | 0 | 0 | 0 | 0 | 0 | 0 |
| 6a | Additional legal costs in Florida action (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 | PCS adequate protection payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | PCS blocked account transfer | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9 | TBR service fees earned | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10 | Less: LEC Dilution | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Net PRE-PETITION settlement cash flow | (333,333) | 0 | 0 | 0 | (333,333) | 0 | 0 | 0 | 0 | 0 | 0 |
| 11 | Beginning PRE-PETITION settlement cash balance | 2,491,316 | 2,157,982 | 2,157,982 | 2,157,982 | 2,157,982 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 |
| 12 | Net PRE-PETITION settlement cash flow | (333,333) | 0 | 0 | 0 | (333,333) | 0 | 0 | 0 | 0 | 0 | 0 |
| 13 | Ending PRE-PETITION settlement cash balance | 2,157,982 | 2,157,982 | 2,157,982 | 2,157,982 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 |
| | **Cash Flows from Client Settlement Activities - POST-PETITION** | | | | | | | | | | | |
| 14 | Gross CIC 402 pipeline submitted to LECs post-petition (8) | | | | | | | | | | | |
| 15 | Less: LEC Reserve | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | (60,313) | | | |
| 16 | Less: Verizon reserve | (90,313) | (90,313) | (90,313) | (90,313) | (90,313) | (54,459) | (195,403) | (189,590) | (107,071) | (73,751) | (73,751) |
| 17 | Less: LEC Holdback | (124,327) | (99,462) | (66,308) | (99,430) | (186,868) | (186,687) | (262,400) | (262,400) | (149,772) | (102,398) | (102,398) |
| 18 | Less: LEC fees (2) | (172,619) | (138,095) | (92,064) | (138,051) | (259,591) | (659,873) | (928,506) | (928,506) | (525,989) | (361,394) | (361,394) |
| 19 | Less: LEC Dilution | (609,223) | (487,379) | (324,919) | (487,223) | (916,174) | (1,182,134) | (1,652,870) | | (525,989) | (361,394) | (361,394) |
| 20 | Net CIC 402 cash received from LEC for post-petition pipeline | 1,088,508 | 898,744 | 552,392 | 858,450 | 1,667,329 | 1,182,134 | 1,652,870 | 1,696,020 | 996,767 | 681,485 | 681,485 |
| 21 | TBR service fees earned | (154,695) | (324,530) | (51,565) | (51,565) | (51,565) | (324,530) | (51,565) | (51,565) | (51,565) | (51,565) | (324,530) |
| 22 | Pre-payment of post-petition pipeline | (428,802) | (800,682) | (817,227) | (472,601) | (314,980) | (178,477) | (338,011) | (484,904) | (510,334) | (648,192) | (242,276) |
| 23 | Settlement of remaining portion of post-petition pipeline | (1,242,760) | (618,036) | (212,119) | (466,907) | (267,107) | (250,413) | (403,442) | (807,882) | (428,802) | (800,652) | (817,227) |
| | Net POST-PETITION settlement cash flow | (737,768) | (884,474) | (528,520) | (132,623) | 1,033,697 | 428,713 | 859,852 | 341,669 | 6,066 | (818,925) | (702,549) |
| 26/27 | Beginning POST-PETITION settlement cash balance | 407,974 | (329,794) | (1,214,268) | (1,742,788) | (1,875,411) | (841,715) | (413,002) | 446,850 | 788,519 | 794,585 | (24,340) |
| | Net POST-PETITION settlement cash flow | (737,768) | (884,474) | (528,520) | (132,623) | 1,033,697 | 428,713 | 859,852 | 341,669 | 6,066 | (818,925) | (702,549) |
| 28 | Ending POST-PETITION settlement cash balance | (329,794) | (1,214,268) | (1,742,788) | (1,875,411) | (841,715) | (413,002) | 446,850 | 788,519 | 794,585 | (24,340) | (726,889) |
| 29 | Ending POST + PRE-PETITION cash balance | 1,828,188 | 943,714 | 415,194 | 282,571 | 982,934 | 1,411,647 | 2,271,499 | 2,613,168 | 2,619,234 | 1,800,309 | 1,097,760 |
| 30 | Collected and unremitted funds | 2,851,949 | 2,423,085 | 2,499,644 | 2,299,586 | 3,078,170 | 3,707,912 | 4,500,332 | 4,521,023 | 4,335,656 | 3,384,271 | 2,359,736 |
| 31 | Obligation to customers for collected & unremitted funds | 1,425,975 | 1,211,528 | 1,249,822 | 1,134,793 | 1,539,085 | 1,853,956 | 2,251,166 | 2,260,511 | 2,167,828 | 1,682,136 | 1,178,868 |
| 32 | Funds held in excess (deficit) of customer obligations | 402,213 | (267,814) | (834,628) | (852,222) | (556,151) | (442,309) | 20,333 | 352,656 | 451,406 | 118,173 | (82,106) |

The Billing Resource dba Integretel
Weekly Operating Cash Budget
For the Period Ending March 21, 2008

| Week Ending | | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 12/7/07 | 12/14/07 | 12/21/07 | 12/28/07 | 1/4/08 | 1/11/08 | 1/18/08 | 1/25/08 | 2/1/08 | 2/8/08 | 2/15/08 |
| **Cash Flow from Operating Activities** | | | | | | | | | | | | |
| 33 | Court approved pre-petition service fees earned (PhoneBill + Inquiry) | 154,895 | 324,530 | 51,565 | 51,565 | 51,565 | 324,530 | 51,565 | 51,565 | 51,565 | 51,565 | 324,530 |
| 34 | Other TBR service fees earned | 38,200 | 0 | 0 | 0 | 38,200 | 0 | 0 | 0 | 38,200 | 0 | 0 |
| 35 | Intercompany inflows (3) | 67,665 | 0 | 0 | 0 | 67,665 | 0 | 0 | 0 | 67,665 | 0 | 0 |
| 36 | Miscellaneous inflows | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 37 | Total inflows | 260,560 | 324,530 | 51,565 | 51,565 | 157,430 | 324,530 | 51,565 | 51,565 | 157,430 | 51,565 | 324,530 |
| 38 | Court approved pre-petition costs | 0 | (17,300) | 0 | 0 | 0 | 0 | (17,300) | 0 | 0 | 0 | 0 |
| 39 | Payroll | (107,350) | | (107,350) | | (107,350) | | (107,350) | | (107,350) | | (107,350) |
| 40 | Employee benefits | (76,000) | | | (30,060) | (76,000) | | | | (30,060) | | |
| 41 | Direct costs | 0 | | | | 0 | | | | (76,000) | | |
| 42 | Occupancy | (27,660) | | | (25,561) | (27,660) | | | | (25,561) | | |
| 43 | Intercompany G&A outflows | (25,000) | (25,000) | | | (25,000) | (25,000) | | | (27,660) | (25,000) | (25,000) |
| 44 | Other G&A outflows | 0 | | | (50,000) | 0 | | | | (50,000) | | |
| 45 | Total outflows | (236,010) | (42,300) | (107,350) | (105,621) | (236,010) | (25,000) | (124,650) | 0 | (316,631) | (25,000) | (132,350) |
| 46 | Net operating cash flow | 24,549 | 282,230 | (55,785) | (54,056) | (78,581) | 299,530 | (73,085) | 51,565 | (159,202) | 26,565 | 192,180 |
| 47 | Bankruptcy costs (1) (6) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (250,000) | (159,202) | 0 | 0 |
| 48 | Beginning operating cash balance | 137,114 | 161,663 | 443,893 | 388,108 | 334,052 | 255,472 | 555,002 | 481,917 | 283,482 | 124,280 | 150,845 |
| 49 | Net operating cash flow (including bk costs) | 24,549 | 282,230 | (55,785) | (54,056) | (78,581) | 299,530 | (73,085) | (198,435) | (159,202) | 26,565 | 192,180 |
| 50 | Ending operating cash balance | 161,663 | 443,893 | 388,108 | 334,052 | 255,472 | 555,002 | 481,917 | 283,482 | 124,280 | 150,845 | 343,025 |
| 51 | Ending total cash balance | 1,988,852 | 1,937,607 | 803,302 | 616,623 | 1,238,406 | 1,966,649 | 2,753,416 | 2,898,649 | 2,743,514 | 1,951,154 | 1,440,786 |

NOTES:
(1) Assumes counsel paid through retainers previously established through October 5, 2007.
(2) Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process not reflected on this schedule.
(3) Consistent w/ prior months, P1 and ICS invoiced for services performed by personnel on TBR's payroll.
(4) Effective immediately, Verizon will begin holding additional reserves totaling $865k over a 16 week period. Will reduce LEC inflows accordingly.
(5) Budget assumes 5.1 MM will remain in blocked account.
(6) Budget assumes fees for Debtor and Creditors Committee Insolvency Counsel and financial consultants to the Debtor. It also assumes the Debtor will not obtain a preliminary injunction with respect to the Florida litigation. As a result, an additional $1MM in fees will be incurred for the Florida action.
(7) The following LECs hold payments: Verizon = $562,578 (9/28), AT&T = $105,154 (10/4), and Verizon = $416,065 (10/5).
(8) Assumes 100% of pre-petition pipeline submitted by customers post-petition.

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| Week | | 23 | 24 | 25 | 26 | 27 | Total |
|---|---|---|---|---|---|---|---|
| Week Ending | | 2/22/08 | 2/29/08 | 3/7/08 | 3/14/08 | 3/21/08 | |
| | **Cash Flows from Client Settlement Activities - PRE-PETITION** | | | | | | |
| 1 | CIC 402 cash payments from LEC for pre-petition pipeline | | | | | | $ 8,417,701 |
| 2 | Less: withheld LEC payments (7) | | | | | | (180,938) |
| 3 | Less: Verizon reserve increase related to bankruptcy (4) | | | | | | 0 |
| 4 | Net CIC 402 cash payments from LEC for pre-petition pipeline | 0 | 0 | 0 | 0 | 0 | 8,236,764 |
| 5 | Payment/One adequate protection payments | 0 | 0 | 0 | 0 | 0 | (4,142,228) |
| 6 | Florida receiver blocked account transfer (4) | 0 | 0 | 0 | 0 | 0 | (1,762,783) |
| 6a | Additional legal costs in Florida action (5) | 0 | 0 | 0 | 0 | 0 | (1,000,000) |
| 7 | PCL adequate protection payment | 0 | 0 | 0 | 0 | 0 | (132,500) |
| 8 | PCS blocked account transfer | 0 | 0 | 0 | 0 | 0 | (96,000) |
| 9 | TBR service fees earned | 0 | 0 | 0 | 0 | 0 | (1,297,330) |
| 10 | Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | (154,087) |
| 11 | Beginning PRE-PETITION settlement cash balance | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,978,736 |
| 12 | Net PRE-PETITION settlement cash flow | 0 | 0 | 0 | 0 | 0 | (154,087) |
| 13 | Ending PRE-PETITION settlement cash balance | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 | 1,824,649 |
| | **Cash Flows from Client Settlement Activities - POST-PETITION** | | | | | | |
| 14 | Gross CIC 402 pipeline submitted to LECs post-petition (8) | 1,301,494 | 2,315,269 | 1,917,991 | 2,411,189 | 958,995 | 39,970,570 |
| 15 | Less: LEC Reserve | (78,740) | (140,075) | (116,038) | (145,877) | (58,019) | (784,063) |
| 16 | Less: Verizon reserve increase related to bankruptcy (4) | 0 | 0 | 0 | 0 | 0 | (2,418,220) |
| 17 | Less: LEC Holdback | (109,528) | (194,494) | (161,111) | (202,540) | (80,586) | (3,357,828) |
| 18 | Less: LEC fees (2) | (395,942) | (688,392) | (588,609) | (714,822) | (284,304) | (11,848,968) |
| 19 | Less: LEC Dilution | | | | | | |
| 20 | Net CIC 402 cash received from LEC for post-petition pipeline | 727,588 | 1,294,338 | 1,072,233 | 1,347,950 | 536,116 | 21,561,066 |
| 21 | TBR service fees earned | (51,565) | (51,565) | (51,565) | (51,565) | (51,565) | |
| 22 | Pre-payment of post-petition pipeline | (546,628) | (433,746) | (144,087) | (433,599) | (868,603) | |
| 23 | Settlement of remaining portion of post-petition pipeline | (472,601) | (314,960) | (178,477) | (388,011) | (484,904) | |
| 25 | Net POST-PETITION settlement cash flow | (345,207) | 221,102 | 698,103 | 524,775 | (889,956) | (518,071) |
| 26 | Beginning POST-PETITION settlement cash balance | (726,889) | (1,072,096) | (850,994) | (152,880) | 371,885 | 0 |
| 27 | Net POST-PETITION settlement cash flow | (345,207) | 221,102 | 698,103 | 524,775 | (889,956) | (518,071) |
| 28 | Ending POST-PETITION settlement cash balance | (1,072,096) | (850,994) | (152,880) | 371,885 | (518,071) | (518,071) |
| 29 | Ending POST + PRE-PETITION cash balance | 752,553 | 973,655 | 1,671,759 | 2,196,534 | 1,306,578 | 1,306,578 |
| 30 | Collected and unverified funds | 2,050,556 | 2,703,409 | 3,094,157 | 3,714,520 | 2,956,299 | 2,956,299 |
| 31 | Obligation to customers for collected & unverified funds | (2,343,279) | (3,081,455) | (2,969,267) | (3,375,246) | (3,127,870) | (3,127,870) |
| 32 | Funds held in excess (deficit) of customer obligations | (292,723) | (378,046) | 124,890 | 339,274 | (171,571) | (171,571) |

**The Billing Resource dba Integretel**
**Weekly Operating Cash Budget**
**For the Period Ending March 21, 2008**

| | Week Ending | 23 2/22/08 | 24 2/29/08 | 25 3/7/08 | 26 3/14/08 | 27 3/21/08 | Total |
|---|---|---|---|---|---|---|---|
| | **Cash Flows from Operating Activities** | | | | | | |
| 33 | Court approved pre-petition fees earned (PhoneBill + Inquiry) | 51,565 | 324,530 | 51,565 | 51,565 | 51,565 | 3,317,360 |
| 34 | Other TBR service fees earned | 0 | 0 | 38,200 | 0 | 0 | 229,200 |
| 35 | Intercompany inflows (3) | 0 | 0 | 67,665 | 0 | 0 | 405,989 |
| 36 | Miscellaneous inflows | 0 | 0 | 0 | 0 | 0 | 11,357 |
| 37 | Total inflows | 51,565 | 324,530 | 157,430 | 51,565 | 51,565 | 3,963,906 |
| 38 | Court approved pre-petition costs | 0 | 0 | 0 | 0 | 0 | (69,200) |
| 39 | Payroll | 0 | (107,350) | 0 | (107,350) | 0 | (1,408,840) |
| 40 | Employee benefits | 0 | (30,060) | 0 | 0 | 0 | (183,700) |
| 41 | Direct costs | 0 | 0 | (76,000) | 0 | 0 | (465,000) |
| 42 | Occupancy | 0 | (25,561) | 0 | 0 | 0 | (153,388) |
| 43 | Intercompany G&A outflows | 0 | 0 | (27,660) | 0 | 0 | (165,983) |
| 44 | Other G&A outflows | 0 | (50,000) | (25,000) | (25,000) | 0 | (600,415) |
| 45 | Total outflows | 0 | (212,971) | (128,660) | (132,350) | 0 | (3,035,484) |
| 46 | Net operating cash flow | 51,565 | 111,559 | 28,769 | (80,785) | 51,565 | 928,423 |
| 47 | Bankruptcy costs (11) (6) | 0 | 0 | 0 | 0 | (200,000) | (800,000) |
| 48 | Beginning operating cash balance | 343,025 | 394,590 | 505,149 | 534,919 | 454,134 | 177,276 |
| 49 | Net operating cash flow (including bk costs) | 51,565 | 111,559 | 28,769 | (80,785) | (148,435) | 128,423 |
| 50 | Ending operating cash balance | 394,590 | 505,149 | 534,919 | 454,134 | 305,699 | 305,699 |
| 51 | Ending total cash balance | 1,147,143 | 1,479,605 | 2,205,677 | 2,650,668 | 1,612,277 | 1,612,277 |

**NOTES:**
(1) Assumes counsel paid through retainers previously established through October 5, 2007.
(2) Assumes LEC costs netted from PAR and recovered from customer through settlement process, but inflows and outflows related to process not reflected on this schedule.
(3) Consistent w/ prior months, PI and UCS invoiced for services performed by accounting, finance, treasury, human resources, facilities, and settlement personnel on TBR's payroll.
(4) Effective immediately, Verizon will begin holding additional reserves totaling $965k over a 16 week period. Will reduce LEC inflow accordingly.
(5) Budget assumes $1.7 MM will remain in blocked account.
(6) Budget assumes fees for Debtor and Creditors Committee Insolvency Counsel and financial consultants to the Debtor. It also assumes the Debtor will not obtain a preliminary injunction with respect to the Florida litigation. As a result, an additional $1MM in fees will be incurred for the Florida section.
(7) The following LECs held payments: Verizon = $582,576 (9/28), AT&T = $105,154 (10/4), and Verizon = $416,065 (10/5)
(8) Assumes 100% of pre-petition pipeline submitted by customers post-petition.

**RER - 31**

1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
   A Limited Liability Partnership
2 |   Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3 | STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4 | ORI KATZ, Cal. Bar No. 209561
   Four Embarcadero Center, 17th Floor
5 | San Francisco, California 94111-4106
   Telephone:    415-434-9100
6 | Facsimile:    415-434-3947

7 | Proposed Attorneys for The Billing Resource, dba
   Integretel

8 |

9 | UNITED STATES BANKRUPTCY COURT

   NORTHERN DISTRICT OF CALIFORNIA
10 |
   [SAN JOSE DIVISION]
11 |

12 | In re                                          | Case No. 07-52890

13 | THE BILLING RESOURCE, dba                      | Chapter 11
   INTEGRETEL, a California corporation,
14 |
                      Debtor.
15 | Tax ID: 33-0289863

16 |

17 | THE BILLING RESOURCE, dba                      | Adv. Proc. No. 07-05156
   INTEGRETEL, a California corporation,
                                                   | **SUPPLEMENTAL MEMORANDUM OF
18 |                   Plaintiff,                    | POINTS AND AUTHORITIES IN
                                                   | SUPPORT OF MOTION FOR
19 |         v.                                      | PRELIMINARY INJUNCTION**

20 | FEDERAL TRADE COMMISSION, and                  | Date:       October 17, 2007
   DAVID R. CHASE, not individually, but          | Time:       2:00 p.m.
21 | solely in his capacity as receiver for         | Place:      United States Bankruptcy Court
   Nationwide Connections, Inc., Access One       |             280 South First Street
22 | Communications, Inc., Network One Services,    |             San Jose, California
   Inc., 411TXT, Inc., CELL-INFO-USA, INC.,       | Judge:      Hon. Arthur S. Weissbrodt
23 | Enhanced Billing Services, Inc., Toll Free     | Courtroom: 3020
   Connect, Inc., Cripple Creek Holdings, LLC,
24 | Built to Last, LLC, Not Fade Away, LLC, He's
   Gone, LLC, The Other One, LLC, Turn on
25 | Your Love Light, LLC, China Cat Sunflower,
   LLC, Lazy River Road Holdings, LLC,
26 |
27 |                   Defendants.

28 |

W02-WEST:5SS1\400468507.1                           SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                                              INJUNCTION ..

# I.

## **INTRODUCTION**

The Court has issued an Order to Show Cause on Integretel's motion for a preliminary injunction against the Federal Trade Commission ("FTC") and David Chase (the "Receiver") staying pursuant to Section 105 of the Bankruptcy Code the proceedings against the Debtor in the action brought by the Federal Trade Commission (the "FTC") in the United States District Court for the Southern District of Florida (the "Florida Court"), including the enforcement of orders made in the Florida Action for the payment of money. Integretel has previously submitted evidence that it needs this relief in order to continue in business, pursue reorganization under Chapter 11, and treat its unsecured prepetition creditors equally.

Integretel submits herewith additional evidence of the financial effect that continued litigation of the Florida Action and enforcement of the payment order would have on its business. That evidence demonstrates that Integretel needs the funds sought by the Receiver to continue operations and that it cannot afford the likely costs of continued litigation of the Florida Action.

Integretel also offers further evidence of the fact that it is not holding any property that belongs to the Receiver and did not do so even as of the entry in the Florida Action of the injunction that the Receiver claims to be enforcing. Rather, any property that could conceivably be an asset of the Debtor's former customers for whom the Receiver was appointed was dissipated at or about the time that it was received, long before the issuance of any injunctive relief in the Florida Action. Accordingly, the Florida Court's orders to pay the Receiver over $1.7 million represent an ordinary judgment against the Debtor which constitutes an unsecured claim in this bankruptcy case. From the issuance of the temporary restraining order and preliminary injunction by the Florida Court to the filing of Integretel's bankruptcy petition, no money was ever set aside for the Receiver's claim. While the Florida Court nonetheless entered its orders in September 2007 commanding that Integretel pay over the amount denominated on its books as reserves to the Receiver,

-1-

SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                                                          INJUNCTION . .

1   those orders cannot create a "property interest" where none exists. The Debtor has
2   withheld "reserve" amounts from each of its past and current customers. None are being
3   afforded the right to invade the Debtor's bank account to retrieve funds that they might
4   wish to call their own. The Receiver's claim is not superior to that of any other creditor
5   even though he has obtained a judgment from the Florida Court.

6        As previously outlined by the Debtor, the Florida Action and the Florida Court's
7   Omnibus Order "threaten[s] the integrity" of the bankruptcy estate, which is "precisely" the
8   instance in which "Section 105 contemplates injunctive relief." Canter v. Canter (In re
9   Canter), 299 F.3d 1150, 1155 (9th Cir. 2002) (citation omitted). This is an appropriate
10  case to issue a stay under Section 105 because the Debtor can only have an opportunity to
11  reorganize if it preserves its existing resources while it operates in Chapter 11.

12  **II.**

13  **FACTUAL STATEMENT**

14  <u>A.</u>    **The Debtor's Chapter 11 Case.**[1]

15       During the first month of this Chapter 11 case, the Debtor has moved aggressively
16  to pursue a reorganization. It has obtained the support of the Official Unsecured Creditors'
17  Committee (the "Committee") to continue operations at this time while continuing to
18  expeditiously negotiate with interested parties concerning its future. During this period,
19  the Debtor has functioned without over $1.7 million that was placed in a blocked account
20  pending further rulings of this Court (the "Blocked Account"). The Debtor has also
21  continued to litigate the Florida Action during this period.

22       The Debtor met with the full Committee at a meeting on October 10. The
23  Committee consented to the Debtor's continued use of cash collateral on the terms
24  proposed by the Debtor in its latest budget on an interim basis for a period of two to three
25  weeks. During this time, the Debtor has committed to negotiate with the Committee a

26  _____

27  [1] The facts set forth herein are supported by the accompanying Declaration of Ken
    Dawson.

28

W02-WEST:5SS1\400468507.1      SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
     INJUNCTION ..

1 term sheet for a plan of reorganization contemplating a continuation of business operations
2 with the goal of allowing the Debtor to exit bankruptcy as quickly as possible, while also
3 maximizing value to unsecured creditors. Based on the information provided and the
4 discussion during the October 10 meeting, the Committee concluded that the Debtor has a
5 reasonable chance to successfully reorganize.

6 **B.** **The Debtor's Ability to Operate Without a Preliminary Injunction.**

7      The Debtor has submitted a budget showing that it can operate in Chapter 11 and
8 remain administratively solvent so long as it does not have to turn over $1.7 million to the
9 Receiver, nor expend at least $1 million in litigation with the FTC and the Receiver.[2] The
10 Debtor has engaged the services of FTI Consulting to review the reasonableness of the
11 Debtor's Budget. Mr. Paul Weber, an experienced workout consultant, reviewed the
12 Debtor's Budget and concluded that it is reasonable and constitutes a reasonable forecast of
13 the post-petition transactions of the Debtor. See Weber Declaration at ¶ 15.

14      Mr. Weber also conducted an analysis of the Debtor's Budget which shows that the
15 Blocked Account funds are needed by the Debtor and that the Debtor cannot remain
16 administratively solvent if it pays $1 million in fees to defend the Florida Action and
17 litigate with the Receiver and satisfies the Receiver's $1.7 million claim. The "Alternative
18 Budget" attached to the Weber Declaration assumes the Blocked Account is not available
19 to the Debtor and the Florida Action continues. It shows that in that case there would not
20 be sufficient funds at all times to cover the Debtor's post-petition obligations to customers.
21 The Debtor wants to comply with the U.S. Trustee's guidelines for post-petition operations
22 by being able to pay its post-petition debts. It therefore has to retain sufficient cash to
23 cover both administrative operating expenses and its administrative obligation to remit
24 funds to customers. Hence, the Blocked Account funds are needed and the Debtor should
25 be allowed to reorganize without expending substantial legal fees to defend the Florida

26 _____

27 [2] The facts in this section and in section D. below are supported by the accompanying
    Declaration of Paul Weber.

28

1   Action.

2   C.      **The Florida Court's Orders.**

3           The Florida Court ruled in its Payment Order filed on September 14, 2007 that the

4   Debtor was required to turn over the reserves held on account of the former customers "as

5   of the issuance of the TRO." The Payment Order nowhere fixes the amount of the liability

6   imposed by the Florida Court.  On September 21, 2007, after the Debtor's bankruptcy

7   filing, the Florida Court issued an order holding the automatic stay inapplicable to the

8   Florida Action in which it said that the Payment Order had "ruled that the reserve funds are

9   the property of the receivership estate." That order further said that Integretel had been

10  "ordered to pay the current reserve funds, amounting to $1,762,762.56, immediately to the

11  Receiver."  Thus, to the Florida Court, the accounting entries made by the Debtor

12  constituted assets of the receivership estate.  The Florida Court was unconcerned with

13  whether the Debtor in fact had any actual funds that were reserves of the former customers,

14  segregated or otherwise, dismissing as "a distinction without a difference" the Debtor's

15  contention that there were no actual funds. The Florida Court's order thus concluded that

16  the existence of accounting entries for reserves on the Debtor's books was sufficient to

17  require the Debtor to pay over the amount stated to the Receiver.

18  D.      **The Debtor Has no Funds that Belong to the Receiver.**

19          While the FTC claims that what it calls the "Reserve Funds" "are funds generated

20  from Integretel's billing and collection of unauthorized charges,"[3] the fact is that the

21  Debtor has not had any reserve funds belonging to the Debtor's former customers since

22  almost the same time that funds were received by the Debtor on account of accounts

23  receivable purchased from these customers, as once the Debtor did not remit funds to the

24  former customers it used them for other purposes in the Debtor's business.

25          Under the Debtor's Settlement Process as it worked before the filing of this

26  Bankruptcy Case, when the Debtor received payments from the LECs it would in turn

27  ─────────────
    [3] FTC Memorandum in Opposition to Cash Collateral Motion, at 5.

28

W02-WEST:5SS1\400468507.1          SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY INJUNCTION ..

RER-31    1312

1  settle its obligations to its customers. Under the Debtor's contracts with its customers, it
2  had the right to retain some portion of those proceeds and pay the part that was held back
3  and unremitted to the customer at a later time. All of the funds received from the LECs
4  were commingled by the Debtor in its general "Wire-In Account," used by the Debtor in its
5  normal operations. It is called the "Wire-In Account" as the LECs were directed to wire all
6  moneys into this account. Except in a few unique instances, and not with regard to the
7  Debtor's former customers Access One and Network One, there never was a separate
8  "reserve" or "withhold" account set up for individual customer funds.

9      In connection with the Settlement Process, sometimes the Debtor withheld funds
10 that otherwise could have gone to a customer. There are various reasons under the
11 customer contracts that the Debtor was entitled to do so. The Debtor did not set up any
12 separate accounts for money withheld from individual customers and at best only made
13 bookkeeping entries for these sums.

14     When money with respect to any specific customer was transferred under the
15 Settlement System to the Debtor by the LECs, it was commingled in the Wire-In Account.
16 The money in the Wire-In Account was used within days by the Debtor, not staying in the
17 account more than two weeks. There is no means by which money paid by the LECs into
18 the Wire-In Account on account of a particular receivable that was not remitted to that
19 customer of the Debtor could then be traced. Because the Debtor did not segregate any
20 money that it withheld, but merely made accounting entries reflecting its liabilities, the
21 withheld money would immediately be used for other obligations of the Debtor.

22     The Debtor discontinued business with Access One and Network One over a year
23 before any FTC action was brought against the Debtor or the former customers. Any
24 money transferred by the LECs to the Debtor with respect to those two customers was
25 commingled into the Wire-In Account with all other funds of the Debtor and was spent
26 long before the Debtor was served with a temporary restraining order or a preliminary
27 injunction in the FTC's action against Access One and Network One.

28

SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                           INJUNCTION ..

**III.**

**ARGUMENT**

A.   **The Court Should Utilize its Authority Under Section 105 to Stay the Florida
Action.**

The first month of this case has provided additional evidence of the Debtor's need
for the preliminary injunction, as well as the probability that it would benefit from it.  The
time during which this motion has been pending has afforded the Debtor with additional
opportunity to begin the reorganization process, meet with the official Committee, develop
a comprehensive budget for a six-month period, and evaluate whether it can operate if it
satisfies the Payment Order and litigates with the FTC during this period.  The Debtor has
demonstrated genuine prospects for reorganization.   It has started a dialogue with the
Committee and obtained support for continued operations and further interim use of cash
collateral.  Its budget demonstrates that it operate successfully and maintain administrative
solvency, though only if it is not required to expend $1.76 million to satisfy the Payment
Order and approximately $1 million to litigate the Florida Action.

In addition, the Debtor has previously provided ample evidence of the threat to this
Debtor's continued existence posed by the Payment Order and the Florida Action in terms
of the diversion that will be required of management's attention from the reorganization
and toward litigating with the Receiver and the FTC as the trial date set in the Florida
Court looms closer.

In Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.,
___ F.3d ___, 2007 WL 2555941, *7, 07 Cal. Daily Op. Serv. 10,857, (9th Cir. Sept. 7,
2007), the Ninth Circuit found that the ordinary test of "success on the merits" means a
reasonable likelihood of success in reorganizing if the requested injunctive relief is
granted, which "is not a high burden." The facts here demonstrate probability of success on
the merits—i.e., through a successful reorganization—as the Court has already indicated.
Indeed, in the last month the Debtor has commenced a productive working relationship
with the Committee and is seeking an operating plan of reorganization.  The facts also
demonstrate that the Debtor has satisfied the remaining standard for issuance of a

-6-

W02-WEST:5SS1\400468507.I          SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
INJUNCTION ..

RER-31          1314

1  preliminary injunction, i.e., that it will suffer irreparable injury unless the preliminary

2  injunction is granted, that the balance of hardships tips in its favor, and that the public

3  interest favors an injunction.

4  B.      **The Receiver has no More than an Unsecured Claim Against the Debtor.**

5          The Court correctly suggested in its findings in support of issuance of an order to

6  show cause in connection with this motion that the Receiver is almost certainly only an

7  unsecured creditor of the Debtor.  The Receiver instead urges that it is entitled to payment

8  of $1.76 million based on the Payment Order issued by the Florida Court and that the

9  Receiver should therefore not be enjoined from enforcing that order.[4]

10         The Receiver continues in this Court to base his claim on the theory that the Debtor

11 holds the "Subject Funds" that should be turned over to the Receiver under the Payment

12 Order.  The Receiver defines as being the $1.7 million which the Florida Court "ordered

13 Debtor to turn over."  By defining Subject Funds with reference to the Payment Order and

14 not to any property actually held by the Debtor, the Receiver effectively admits that the

15 Payment Order is merely a money judgment.  There are no "Subject Funds," only the

16 Debtor's bank accounts containing undifferentiated monies received long after any

17 relationship with the Prior Customers had ended.[5]

18         By referring to "Subject Funds" when there are no such funds, the Receiver seeks to

19 avoid the effect of the Debtor's bankruptcy filing on the Debtor's obligations to the

20 Receiver.[6]  Outside of bankruptcy, the Receiver could compel adherence to the Florida

21

22 [4] See Receiver's Second Supplemental Opposition to Motion for Authority to Use Cash

23 Collateral, filed October 10, 2007, at p. 2, line 13 and thereafter.

24 [5] The same is true with regard to the FTC's use of the term "Reserve Funds," as the Debtor
   no longer has, and did not have at the time of the Florida Court's preliminary injunction,

25 any of the money that generated by allegedly unauthorized charges

26 [6] The Receiver also erroneously suggests that all matters with regard to its rights to recover
   against the Debtor in this Court have already been determined by the Florida Court's

27 orders.  That is not correct, as the Debtor continued in possession of all of its property
   when it filed for bankruptcy protection and once it did so, this Court's jurisdiction over the

28

-7-

W02-WEST:5SS1\400468507.1                    SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                                        INJUNCTION ..

                                                          RER-31        1315

1    Court's order regardless of whether or not any actual, segregated fund existed from which
2    to make the payment ordered by the Florida Court.  However, once the Debtor filed for
3    bankruptcy protection, the Payment Order's command could only be enforced at the
4    expense of all unsecured creditors other than the Receiver.  This distinction has generally
5    been discussed by courts in the context of a constructive trust remedy, where courts have
6    often expressed that "privileging of one unsecured claim over another clearly thwarts the
7    principle of ratable distribution underlying the Bankruptcy Code."  In re Flanagan, 2007
8    U.S. App. LEXIS 23622, *18 (2d Cir. Oct 9, 2007)

9         The Ninth Circuit has recognized the distinction between the enforceability of
10   judgments like the Payment Order outside of bankruptcy and within that realm for over 40
11   years.  In its decision in Elliott v. Bumb, 356 F.2d 749, 754-55 (9th Cir. 1966), the court
12   refused to allow state law to control whether a creditor would be entitled to claim a trust
13   existed over the debtor's commingled funds, saying that state law yields to bankruptcy
14   principles, which require tracing.  The court followed Elliott in Matter of Esgro, Inc., 645
15   F.2d 794, 798 (9th Cir. 1981), saying "Even if California imposes a trust on commingled
16   funds, this trust cannot be enforced in a federal bankruptcy proceeding."  See also In re
17   North American Coin & Currency, Ltd., 767 F.2d 1573, 1575 (9th Cir. 1985) ("state law
18   must be applied in a manner consistent with federal bankruptcy law").  In addition, "[b]oth
19   the Ninth Circuit Court of Appeals and California courts have consistently held that a party
20   seeking to establish a trust over commingled funds must trace those funds."  In re Advent
21   Mgmt. Corp., 178 B.R. 480, 488 (B.A.P. 9th Cir. 1995), aff'd, 104 F.3d 293 (9th Cir.

22   ─────────────────────────────────────────────────────────
     Debtor's assets was exclusive and ousted any prior in rem jurisdiction asserted by the
23   Florida Court.  See 28 U.S.C. § 1334(e); Tennessee Student Assistance Corp. v. Hood,
     541 U.S. 440, 448 (2004) ("A bankruptcy court's in rem jurisdiction permits it to
24   'determin[e] all claims that anyone, whether named in the action or not, has to the property
25   or thing in question.); In re Crown Vantage, Inc., 421 F.3d 963, 971 (9th Cir. 2005)
     ("requirement of uniform application of bankruptcy law dictates that all legal proceedings
26   that affect the administration of the bankruptcy estate be brought either in bankruptcy court
     or with leave of the bankruptcy court."); In re Modern Boats, Inc., 775 F.2d 619, 620 (5th
27   Cir. 1985) (admiralty court's jurisdiction over vessel yielded once bankruptcy filed).  .
28

─────────────────────────────────────────────────────────
W02-WEST:5SS1\400468507.1                    SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                          INJUNCTION ..

                                                                    RER-31    1316

1   1997). Thus, as the Second Circuit recently noted, the "'equities of bankruptcy are not the
2   equities of the common law.'" In re Flanagan, 2007 U.S. App. LEXIS 23622, *18 (2d Cir.
3   Oct 9, 2007), quoting In re Omegas Group, Inc., 16 F.3d 1443, 1452 (6th Cir. 1994).

4       The Payment Order is nothing more than a money judgment determining the
5   Debtor's purported liability to the Receiver.  While it is based on the concept that the
6   Receiver had a property interest in the Debtor's bank accounts as of the issuance of the
7   Florida Court's injunction, the Payment Order does not and could not call for the turnover
8   of any actual, identifiable property to the Receiver but merely directs the Debtor to pay
9   over the amount of its reserve liability from any funds the Debtor has available to it.  The
10  Receiver has never claimed that it can trace the funds received by the Debtor from the
11  former customers to an identifiable fund that still exists. Rather, he correctly interprets the
12  Payment Order as being a judgment commanding the payment of money.[7]  The Debtor has
13  demonstrated that whether measured at the outset of the injunctive relief granted by the
14  Florida Court, or today, the Debtor holds no funds that can be traced from the Former
15  Customers to the Debtor's existing bank accounts.    Under these circumstances, the
16  Receiver's claim, however denominated by the Florida Court, is only an unsecured claim in
17  this bankruptcy case.  While that order may be fully enforceable but for the Debtor's
18  bankruptcy filing, it must be considered in this Court in accord with the principles
19  established under the Bankruptcy Code.

20  _____
    [7] In light of the nature of the Payment Order as creating an unsecured obligation, this Court
21  can issue a stay of the enforcement of that order whether or not that decision is a final
    adjudication. The Payment Order itself stated that "District courts have in rem jurisdiction
22  over *disputed* receivership property and therefore can bind non-parties (such as Integretel),
23  through *orders to protect and preserve disputed receivership property. . .*" Payment
    Order, at 7 (emphasis added).    In its post-bankruptcy Order Granting Motion for
24  Clarification as to Scope of Stay, the Florida Court adopted the FTC's characterization of
25  the Payment Order, saying "The Court has already ruled that the reserve funds are neither
    the property of the 'bankruptcy estate' nor Integretel."  Whether or not the Florida Court
26  has issued a final order does not affect whether in fact there exists any Subject Funds that
    the Florida Court could exercise jurisdiction over.  As noted above, the Florida Court
27  expressly held that it was irrelevant to its decision whether any actual fund existed.
28

SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                              INJUNCTION ..

1  Accordingly, this Court should enjoin further enforcement of the Payment Order, as
2  the Receiver is seeking nothing less than actual control over the assets of the estate.  Doing
3  so threatens "the bankruptcy court's exclusive jurisdiction over the *res* of the debtor's estate
4  and therefore can be enjoined."  <u>FTC v. First Alliance Mortgage Co. (In re First Alliance</u>
5  <u>Mortgage Co.)</u>, 264 B.R. 634, 655 (C.D. Calif. 2001).

6  **C.      The FTC Should be Enjoined from Prosecuting the Florida Action as to the**
7  **Debtor.**

8  The Debtor has also demonstrated that it cannot both reorganize and litigate the
9  action brought by the FTC.  Not only would the expenses of doing so be more than the
10  estate could bear, the effect of having to litigate an intensive, hard fought battle with the
11  FTC during the next five months would be completely inconsistent with achieving a
12  reorganization in the same time period.  At the end of the day, the regulatory purpose to
13  the Florida Action would elude all of the FTC's efforts because there would be no Debtor
14  left to regulate.  In addition, any money judgment that the FTC might obtain would be one
15  more unsecured claim unlikely to realize any substantial dividend.

16
17
18
19
20
21
22
23
24
25
26
27
28

-10-

SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
INJUNCTION ..

**IV.**

**CONCLUSION**

The Court should exercise its jurisdiction under Section 105 to protect the Debtor's property for the benefit of all of its creditors and to protect the Debtor's right to reorganize without diversion and the waste of estate assets that would result from its continued participation in the Florida Action.

Dated: October 12, 2007

Respectfully submitted,

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By            /s/ Steven B. Sacks
                STEVEN B. SACKS
        Proposed Attorneys for Debtor The Billing
           Resource, dba Integretel

W02-WEST:5SS1\400468507.1                 SUPP. MEMORANDUM OF P&A'S RE PRELIMINARY
                                                           INJUNCTION ..

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2      Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  JEFFREY K. REHFELD, Cal. Bar No. 188128
   ORI KATZ, Cal. Bar No. 209561
4  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4106
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6  Email:        mahrens@sheppardmullin.com
                 jrehfeld@sheppardmullin.com
7                okatz@sheppardmullin.com

8  Attorneys for The Billing Resource,
   dba Integretel
9

10              UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF CALIFORNIA
11                    [SAN JOSE DIVISION]

12 | In re                                | Case No. 07-52890
13 | THE BILLING RESOURCE, dba            | Chapter 11
14 | INTEGRETEL, a California corporation, |
15 |                    Debtor.           |
16 |                                      |
17 | THE BILLING RESOURCE, dba            |
   | INTEGRETEL, a California corporation, | Adv. Proc. No. 07-05156
18 |                    Plaintiff,        | **DECLARATION OF KEN DAWSON IN**
19 |         v.                           | **SUPPORT OF SUPPLEMENTAL**
                                          | **MEMORANDUM OF POINTS AND**
20 |                                      | **AUTHORITIES IN SUPPORT OF**
   | FEDERAL TRADE COMMISSION, and        | **MOTION FOR PRELIMINARY**
21 | DAVID R. CHASE, not individually, but | **INJUNCTION**
   | solely in his capacity as receiver for |
22 | Nationwide Connections, Inc., Access One | Date:      October 17, 2007
   | Communications, Inc., Network One Services, | Time:      2:00 p.m.
23 | Inc., 411TXT, Inc., CELL-INFO-USA, INC., | Place:     United States Bankruptcy Court
   | Enhanced Billing Services, Inc., Toll Free |            280 South First Street
24 | Connect, Inc., Cripple Creek Holdings, LLC, |            San Jose, California
   | Built to Last, LLC, Not Fade Away, LLC, He's | Judge:     Hon. Arthur S. Weissbrodt
25 | Gone, LLC, The Other One, LLC, Turn on | Courtroom: 3020
   | Your Love Light, LLC, China Cat Sunflower, |
26 | LLC, Lazy River Road Holdings, LLC,  |
27 |                    Defendant.        |
28 |                                      |

W02-WEST:FJR\400327504.2                                    DECLARATION

1    I, Ken Dawson, declare as follows:

2        1.    I am the President and Secretary of The Billing Resource, dba Integretel, a

3  California corporation (the "Debtor"), the named debtor in this case. I make this declaration in

4  that capacity. I was one of the Debtor's founders in 1988 and I have been with the company ever

5  since. I have personal knowledge of the matters set forth below. If called upon to testify as to

6  those matter I could and would do so competently.

7        2.    On September 16, 2007, I executed a declaration ("Prior Declaration") in support of

8  Debtor's "Emergency Motion for Use of Cash Collateral and Granting Replacement Liens" (the

9  "Motion"). Capitalized terms not defined herein have the same definitions set forth in my Prior

10  Declaration. Since the Debtor filed the Motion and my Prior Declaration, various parties have

11  filed objections to the Motion. I submit this supplemental declaration in support of Debtor's use of

12  cash collateral on a further interim basis.

13        3.    Public Communication is one of Debtor's customers asserting an interest in cash

14  collateral. In Public Communication's supplemental objection filed October 10, 2007, Public

15  Communication states that in 2004, PaymentOne, the subsidiary of Debtor that had a contractual

16  relationship with Public Communication, assigned the contract to Debtor without Public

17  Communication's consent. As set forth in Debtor's reply to which this declaration is attached,

18  PaymentOne was authorized under Section 20(d) of its contract with Public Communication to

19  make the assignment without Public Communication's consent. Moreover, on June 8, 2004, right

20  after the assignment, I sent a letter to Public Communication notifying Public Communication of

21  the assignment. I included a copy of the assignment with my letter. A true and correct copy of

22  my June 8, 2004 letter is attached hereto as Exhibit "1".

23        4.    Personal Voice is a customer of Debtor that filed an opposition to the Motion on

24  October 11, 2007. Personal Voice asserts that it maintained ownership of billing transaction

25  receivables generated from Personal Voice providing services to end users, and did not transfer the

26  receivables to Debtor. This is not true. Nothing in the agreement between Debtor and Personal

27  Voice states that Personal Voice is maintaining ownership of anything. Moreover, it is common

28  knowledge in this industry that the Debtor would be selling the billing transaction receivables to

-1-

1  the LECs and that the Debtor's contracts with the LECs are structured as the purchase by the LECs

2  of the Debtor's accounts receivable, which obviously could not be done if Personal Voice retained

3  title to the receivables.

4      5.    At the October 10 meeting with the Committee, the Committee agreed to support

5  the Debtor's prepayment plan with respect to the Debtor's pre-petition customers, which the

6  Debtor considers to be a very favorable result.  A summary of the Debtor's prepayment plan is

7  attached hereto as Exhibit "2."

8      6.    Attached hereto as Exhibit "3" is a further proposed cash collateral order in

9  substantially the form the Debtor currently intends to present to the Court at the October 15

10 hearing.

11     I declare under penalty of perjury under the laws of the United States of America that the

12 foregoing is true and correct. Executed this 11th day of October, 2007, at San Jose, California.

13

14

15                                          KEN DAWSON

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"



**Integretel**
BILLING SOLUTIONS

June 8, 2004

Mr. Paul Jennings                                    VIA FAX (310) 473-4714
Public Communications Services, Inc.                 and standard U.S. mail
11859 Wilshire Blvd., Suite 600
Los Angeles, CA 90025

RE: Master Services Agreement dated ("Agreement")

Dear Mr. Jennings:

Notice is hereby given that PaymentOne Corporation (f/k/a eBillit, Inc.) has assigned all of its rights and obligations under the above captioned Agreement to Integretel, Incorporated as evidenced on the attached assignment. Please direct any notices that may be required under Section 17 of the Agreement to my attention. Your day-to-day contacts will remain the same since Integretel was previously providing service support to PCS on behalf of PaymentOne through an inter-company contract.

Sincerely,

Ken Dawson,
President

CC:    B. Neitzel
       B. Philbin
       H. Claus
       C. Parlove (Pay1)

INTEGRETEL, INC. • 5883 RUE FERRARI • SAN JOSE • CA • 95138 • 408.362.4000 TEL

**EXHIBIT "1"**

## ASSIGNMENT OF MASTER SERVICES AGREEMENT

WHEREAS, Public Communication services, Inc., a California corporation ("PCS") and PaymentOne Corporation, a Delaware corporation f/k/a eBillit, Inc. ("PAY1") are parties to that certain Master Services Agreement dated October 1, 2002 ("Agreement"); and

WHEREAS, PAY1 wishes to assign all of its rights and obligations under the Agreement to Integretel, Incorporated, a California corporation ("Integretel") and Integretel holds a majority ownership interest in PAY1 and, therefore, qualifies as a permitted assignee under the Agreement.

NOW, THEREFORE, in consideration of the foregoing:

Pursuant to Section 20(d) of the Agreement, PAY1 does hereby assign all of its rights and obligations under the Agreement to Integretel, effective as of June 1, 2004. Integretel does hereby accept such assignment from PAY1.

IN WITNESS WHEREOF:

PaymentOne Corporation

By _____

EVAN B. MEYER

Its CFO _____

Integretel, Incorporated

By _____

Ken Dawson

Its President _____

# EXHIBIT "2"

## PREPAYMENT FOR BILLING TRANSACTIONS

This memo will summarize the prepayment that The Billing Resource d/b/a Integretel ("TBR") intends to pursue with respect to Billing Transactions submitted to it after it filed its Bankruptcy Petition.

All post-petition billing transactions will be paid in two installments with a final reconciliation done at the normal settlement time. Specifically, each week TBR will pay 50% of the Estimated Net Diluted Value of the billing transactions processed the prior week. For this purpose, "Estimated Net Diluted Value" shall mean the average return rate established for each client account based on the recent settlement periods. On or about sixty (60) days following the Deposit Date, we will pay the remaining 50% of the Estimated Diluted Value. The term Deposit Date as used herein refers to the date the Billing Transactions are shipped to the LECs. The customary settlement reporting will be done around 90 days after the Deposit Date. The actual results will be compared to the prepayments, and any difference will be reconciled on the next prepayment date.

By way of example, assume a client submits $100,000 in gross billings in Week 1 having an Estimated Net Diluted Value of Seventy Percent (70%). In Week 2, we will prepay $35,000, and in Week 9, we will prepay an additional $35,000. Around Week 14, we will complete the settlement reporting, and any delta between the two advances and the actual results will be applied as an adjustment to the next scheduled prepayment event.

By way of further example, a Billing Transaction submitted on September 17 would be eligible since it is submitted "post-petition." A typical Deposit Date would be September 21. The prepayment of 50% would be made on September 27.

To further maximize trailing cash flow, the IGT Reserve rate will be set to zero on all client accounts. The IGT Reserve rate will remain at zero unless an extraordinary event occurs, including (a) a substantial (25% or more) decrease in post-petition billings; (b) an investigation or subpoena is initiated by a regulatory or law enforcement agency; (c) a lawsuit is filed against Integretel concerning the client's billings; (d) a lawsuit is filed against the client, and Integretel is expected to incur significant expenses supporting discovery efforts; or (e) LECs increase their current cash reserved as of the petition date. In the event the need arises to withhold an IGT Reserve pursuant to the applicable contract, the amount, if any, that is in excess of the client's pro-rata share of amounts held by LECs will be deposited into a segregated account for the benefit of the client.

**EXHIBIT "2"**

# EXHIBIT "3"