Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

    vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

        Defendants.

_____/

### Declaration of Ken Dawson

1. I am president of The Billing Resource, d/b/a Integretel (formerly known as Integretel, Incorporated) ("Integretel"). I submit this declaration in opposition to the receiver's motion for an order requiring Integretel to show cause why it should not be held in contempt of court.

2. Integretel is a California corporation with its only place of business in San Jose, California.[1] Integretel recently changed its corporate name from "Integretel, Incorporated" to "The Billing Resource," but it continues to do business under the name Integretel. I will refer to the company by that name here.

3. Integretel is a billing aggregator. As such, it provides services that enable its clients, who are independent telecommunications companies and other service providers, to have charges for their services appear on consumers' local telephone bills. Integretel also provides additional services to some of its clients.

---

1. Eight employees on Integretel's payroll work out of their homes in other states (though not in Florida), but they actually work for one of Integretel's subsidiaries, not for Integretel itself.

4. The billing-aggregation process is extremely complicated, but it can be explained in very general terms as follows. Integretel receives transaction data from its clients and forwards that data to the telephone companies (often referred to as "LECs" which stands for "Local Exchange Carriers"). The LECs then include these transactions on their bills unless the LECs determine that it is unable or unwilling to bill a particular transaction for some reason. Based on a variety of accounting and transactional factors, including gross LEC fees, holdback, edit rejects, adjustments, and bad debt, the LECs periodically send payments to Integretel that are based on all submissions by Integretel that the LECs had previously accepted for billing. The LEC payments to Integretel are based on the combined submissions and receipts for all of Integretel's clients and are neither made nor segregated on a client-by-client basis by any of the LECs. From the proceeds received from the LECs, Integretel applies various accounting mechanisms to attribute funds and deductions to particular clients. Integretel then determines pursuant to its contracts with the clients how much, if any, is due each client.

5. Integretel formerly provided billing-aggregation and other services to Access One Communications, Inc. and Network One Services, Inc. True and correct copies of Integretel's contracts with Access One Communications, Inc. and Network One Services, Inc. are attached hereto as Exhibits 1 and 2, respectively.

6. Integretel discontinued services to Access One and Network One after questions arose as to whether some of the charges were properly authorized. Integretel asked each client to provide documentation supporting the charges, and when the clients failed to provide an adequate response, Integretel immediately discontinued its services.

7. As provided in its contracts, Integretel is entitled to withhold from Access One and Network One any amounts necessary to cover the "IGT Reserve," which is defined in the

00062

RER-33    1914

contracts as "an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover reserves or offsets, other than Uncollectibles imposed by a Telco." The contracts authorize Integretel to adjust the amount of the IGT Reserve from time to time.

8.   Once Integretel discontinued its services for Access One and Network One, it set the amount of the IGT Reserve for each client at 100%. As a result, Integretel stopped sending any payments to either client. My understanding of the contracts, and Integretel's interpretation as a party to the contracts, is that the amount allocated to the IGT Reserve is not owed to the client. Rather, it is an amount that would, in the language of the contract, "otherwise [be] owed" if it had not been allocated to the IGT Reserve.

9.   The IGT Reserves relating to Access One and Network One do not take the form of a segregated fund of money. Rather, they represent nothing more than a bookkeeping entry. Thus, Integretel holds no identifiable pool of money that one can point to as constituting the IGT Reserves for these clients.

10. A client's right to receive any of the sums allocated to the IGT Reserve is contingent, on a variety of factors, and the amount the client is entitled to, if any, can only be finally determined after all expenses, costs, and other charges against the reserve are fully and finally taken account of. Thus, the IGT Reserve is a running balance that does not result in an amount due until a final accounting can be taken based on all outstanding costs, contingencies, expenses and obligations attributable under the contract to the IGT Reserve. That has not yet occurred with respect to Access One and Network One.

11. Integretel's contracts with Access One and Network One require that any disputes be submitted to alternative-dispute-resolution procedures that include a period of negotiations

00063

followed, if necessary, by arbitration in San Jose, California. Neither Access One nor Network One invoked these provisions before the receiver was appointed. The receiver has not invoked them, either.

12. At no time since the receiver was appointed has Integretel had any communications or other dealings with Access One, Network One, or any other of the original defendants in this action. In declining to pay the receiver the money he claims that Access One and Network One are owed, Integretel has acted independently of Access One, Network One, and the other original defendants. Integretel's purpose in declining to pay the receiver is not to assist any of the original defendants in evading their duties under any of the Court's orders, or to cooperate with any of the original defendants in any way.

13. The FTC sent a copy of the temporary restraining order in this case to me by fax on March 3, 2006. Attached as Exhibit 3 is a true and correct copy of the fax I received, consisting of the fax cover sheet, a cover letter, and the order.

14. When I received the order, I did not notify or consult with Integretel's counsel. Instead, I prepared a response on my own, which I sent to the FTC by fax and express courier on March 6. A true and correct copy of my response is attached hereto as Exhibit 4.

15. I believed then and believe now that my letter to the FTC was both honest and accurate. I believed and continue to believe that under its contracts with Network One and Access One, Integretel was neither holding any funds that belonged to either of those entities nor holding any funds on behalf of either entity. I believed and continue to believe that the balances reflected in the IGT Reserve for each entity were merely bookkeeping entries and that Integretel had not segregated, earmarked, or otherwise set aside any specific funds corresponding to those

-4-

reserves. I believed and continue to believe that no funds were then due and owing to either entity.

16. To the best of my recollection, nobody from the FTC ever asked or instructed me to transfer any funds to the receiver. Although I have a vague recollection of having spoken with one of the FTC's lawyers shortly after I received the temporary restraining order, I believe that any conversation that might have occurred was nonsubstantive, and did not involve any request that Integretel turn funds over to the receiver. Certainly, if someone from the FTC had asked or instructed Integretel to turn over funds to the receiver, I would remember it. In addition, I would have contacted Integretel's counsel.

17. At no time after receiving the temporary restraining order was I contacted by the receiver, by the receiver's lawyer, or by anyone else acting on the receiver's behalf.

18. To the best of my knowledge, Integretel was not notified before the preliminary injunction in this case was entered on March 8, 2006 that the preliminary injunction would include language stating that all persons served with a copy of the injunction were required to turn over to the receiver any assets of the defendants that they held. I did not receive any such notification, and I did not receive any information indicating that Integretel had received such notification by any other means. If Integretel *had* received such notification, under Integretel's customary business practice I would have been made aware of it.

19. To the best of my knowledge, Integretel was never served with the preliminary injunction that was entered on March 8, 2006. I was not served with a copy of that order, and it never came to my attention that Integretel had been served by any other means. If Integretel *had* been served by some other means, under Integretel's customary business practice I would have been made aware of it.

00065

RER-33    1917

20. If Integretel were to pay the receiver the amount of the IGT Reserves for Access One and Network One, it would be exposed to the risk of liability on multiple fronts:

a. If telephone companies give refunds to consumers for charges originated by Access One or Network One, the telephone companies will charge the amount of the refunds back to Integretel, and on top of that will charge Integretel a substantial fee for processing the refund, in most cases greater than the refund itself.

b. If telephone companies are sued by consumers on account of charges billed by Access One and Network One, they have the right under their contracts with Integretel to seek indemnification from Integretel both for any liability they may incur and for their attorney's fees. At least one such lawsuit has been filed—a class action against Sprint that includes allegations relating to charges by Access One that were processed by Integretel. Sprint has put Integretel on notice of its intention to enforce its indemnification rights.

c. The FTC is seeking monetary relief from Integretel in this case. I understand that the FTC's position is that Integretel is liable for the entire amount of the charges billed by Access One and Network One that were processed by Integretel, less amounts already refunded to consumers. Although Integretel does not believe that it violated the FTC Act or that if it did violate the Act it could be held liable in the amount sought by the FTC, the FTC contends otherwise and its claims have not yet been decided.

d. Finally, Integretel faces the risk of being named as a defendant in class-action suits on behalf of consumers. This risk is increased by the fact that the FTC has

00066

RER-33    1918

publicized its claims against Integretel. It has issued a press release describing

those claims and has posted the press release on its website, along with a copy of

its first amended complaint. (A true and correct copy of the relevant page from the

FTC website is attached as Exhibit 5.) I understand that when a government

agency takes enforcement action against a company, class-action lawyers file

lawsuits piggybacking on the agency's suit.

21. As of February 27, 2006, the day the receiver was appointed, the amount of the IGT

Reserve for Access One was $1,035,525.76 and the amount for Network One was $194,954.13.

22. As of October 25, 2006, the amount reflected on Integretel's books as the IGT

Reserve for Access One was $1,383,435.51 and the amount for Network One was $191,445.50.[1]

The reason the Access One amount is higher than at the time the receivership began is that

Integretel has made certain internal bookkeeping adjustments in the ordinary course of its

business relating primarily to the allocation of the independent reserves, based on gross billings,

held by LECs. Those reserves are known as "Telco Reserves." These periodic adjustments

reallocate the amount of the Telco Reserves among Integretel's clients based on a formula having

to do with each client's share of the aggregate factors used by the LECs to determine their

respective Telco Reserve held against Integretel as a whole. The effect of the most recent

reallocation was to decrease the requirement for Telco Reserves relating to Access One and

thereby increase the amount of the IGT Reserve relating to Access One.

---

1. These amounts do not reflect certain items that Integretel believes that it is entitled to charge against
   the reserves but that are not currently being charged against them. Integretel's decision not to charge
   these items against the reserves at this time is not an admission that Integretel thinks it is not entitled
   to make the charges. Rather, Integretel has decided, in its discretion, to withhold such charges until
   the Court can rule on the pending relevant motions.  Subject to this Court's order, Integretel reserves
   the right to make the charges in the future.

00067

RER-33    1919

I DECLARE under penalty of perjury that the foregoing is true to the best of my

knowledge, information, and belief.

Executed on October 27, 2006.

Ken Dawson

00068

RER-33    1920

# Exhibit 1

## MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") is entered into as of 6/30, 2004 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Access One Communications, a Florida corporation ("Client").

**WHEREAS,** Client [has and will purchase certain accounts receivable, as evidenced by, the Billing Transactions, from ____N/A____, a ____N/A____, who] is a provider of certain telecommunications related products and services; and

**WHEREAS,** IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

**WHEREAS,** IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein;

**NOW, THEREFORE,** the parties hereto agree as follows:

**1.   DEFINITIONS.** Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

**2.   IGT SERVICES.** IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Sched# | Service Order Options | Included |
|--------|----------------------|:--------:|
| I | Validation/Registration | ( ) |
| II | PhoneBill Services (Telco Billing) | (X) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry (required with Service Order II or III) | (X) |
| VII | Collection Services | ( ) |
| VIII | Pre-Pay Services | ( ) |

**3.   TERM.** The initial term of this Agreement shall be for two (2) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of two (2) years (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

**4.   CLIENT SUBMISSION AND IGT EDIT.** Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time. IGT shall provide reasonable notification of any changes or restrictions in its edit criteria. Client shall use commercially reasonable efforts to screen its Billing

Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

**5.   SERVICE FEES.** IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

**6.   TAXES.** Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; or provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions. IGT shall otherwise cause the then-current taxing rates and logic, including such rates and logic of applicable LECs, to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

**7.   CLIENT REPRESENTATIONS AND WARRANTIES.** Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

**8.   IGT's REPRESENTATION AND WARRANTY.** IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

**9.   PROOF OF COMPLIANCE.** Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request. Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance. Each party agrees to notify the

TBR_NCI 000262
00070

RER-33     1922

other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

**10. LIMITATION OF LIABILITY.** IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

**11. INDEMNIFICATION.**
(a) **By Client.** Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to: (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; (ii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

(b) **By IGT.** IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

(c) **Enforcement.** In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why Indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and, thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

**12. EVENTS OF DEFAULT.** Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):
(a) The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or

(b) The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or not reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or

(c) Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

(d) The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or

(e) Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or

(f) The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

**13. EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees, for the most recent three months, in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

**14. CONFIDENTIALITY.**
(a) As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.

(b) Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.

(c) Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:
(i) Information that now or hereinafter comes into the public domain without breach of this Agreement;

(ii) Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;

(iii) Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;

(iv) Information approved for release by the written authorization of the Disclosing Party; or

(vi) Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party

TBR_NCI 000263
00071

RER-33        1923

to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d) All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party. Upon written request by a Disclosing Party, the Receiving party shall return to the Disclosing Party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

**15. CHOICE OF LAW AND VENUE.** THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

**16. PUBLIC ANNOUNCEMENTS.** Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

**17. NOTICES.** All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation.    All notices and other communications shall be deemed given when actually received by a party as evidenced by an appropriate confirmation. Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

Integretel, Incorporated
5883 Rue Ferrari
San Jose, CA 95138
Attention: General Counsel
FAX: 408-362-2795

Access One Communications
222 Lakeview Ave., 157-160
West Palm Beach, FL  33401
Attention: German Miranda
FAX: 561-366-9734

**18. DISPUTE RESOLUTION AND ARBITRATION.** Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a) Dispute Resolution. At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement,

exempt from discovery and production, and which shall be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b) Arbitration. If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules.  The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration.  The arbitration shall be held in San Jose, California.  Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures.  A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents.  The parties shall share equally the fees of the arbitration and the arbitrator.

**19. GENERAL PROVISIONS.**

(a) Attorney's Fees. In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b) Severability. If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c) Captions. The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d) Assignment. Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e) Amendments; No Waiver.    Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto.  No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f) Third Party Rights.  The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g) Further Assurances.  The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h) Force Majeure.  Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event").  Upon the

TBR_NCI 000264
00072

RER-33        1924

occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

(i). Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(j) Integration of Agreement. This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k) Relationship of the Parties. Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party. In the performance of its obligations hereunder, IGT is acting as an independent contractor to Client.

(l) Corporate Authority. The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the Effective Date set forth above.

Integretel, Inc. (IGT)

By: _____

Name: _Ken Danson_

Title: _President_

Date: _7/7/04_

Access One Communications (Client)

By: _____

Name: _German Miranda_

Title: _PRESIDENT_

Date: _06/30/04_

TBR_NCI 000265 00073

RER-33        1925

## EXHIBIT "A"
### Definition of Certain Terms

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User Inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

TBR_NCI 000266
00074

RER-33    1926

)

## EXHIBIT "B"
### Fees

The following Fees shall apply:

**2)    PhoneBill Services (Telco Billing)**

a) Initial Account setup (sub-CIC) fee:                              $3,500.00  one time
   - each additional Account:                              $1,750.00  one time

b) IGT Processing Fees:

| Transactions per Deposit Month | | Fee Rate per Transaction |
|---|---|---|
| FIRST | 250,000 | $ 0.070 each |
| NEXT | 250,000 | $ 0.065 each |
| NEXT | 250,000 | $ 0.060 each |
| ALL REMAINING | | $ 0.055 each |

A Minimum monthly fee shall apply consisting of the greater of: i) 1% of the gross value of the Billing Transactions in each Deposit Month; or ii) $5,000 per Account commencing September 2004.

**6)    End-User Inquiry**

a) Verbal End-User Inquiry                              $ 3.95 each
b) Transferred or auto-referred                         $ 0.08 per minute
c) Written End-User Inquiry                             $40.00 each
d) Written regulatory complaints                        $95.00 each
e) Adjustment record processing                         $ 0.75 each

TBR_NCI 000267
00075

RER-33    1927

## EXHIBIT "C"
## Billing and Collections Guidelines

IGT has adopted the anti-cramming consumer protection guidelines of the Coalition to Ensure Responsible Billing (CERB). By adopting these guidelines, IGT is committed to billing standards and practices to ensure a maximum level of consumer protection. Client hereby agrees to the following in consideration of IGT providing its billing services.

1. **COMPANY INFORMATION.** Client shall provide IGT with the following information:

   - Client's company name, including dba's, and address.
   - Names of all officers, directors and principals of Client.
   - Proof of corporate or partnership status.
   - Copies of certifications as required.
   - Foreign corporation filings as required.
   - Any applicable tariffs upon request.
   - The names and addresses of any telemarketing companies to be used by the Client.
   - The names and addresses of any third party verification companies to be used by the Client.

2. **PROGRAM, PRODUCT AND SERVICE SCREENING.** For all monthly subscription or other recurring services, Client shall provide IGT with the following information:

   - Marketing materials relating to the programs or services to be billed by IGT.
   - Sample advertisements (print or other media) relating to the programs or services to be billed by IGT.
   - Applicable fulfillment package (which must include cancellation information if not included elsewhere and a toll free Client service telephone number).
   - Complete scripts for sales verification. Client shall not change scripts or programs without first providing changes to IGT.
   - Honest, clear, and understandable text phrase for appearance on the bill.

   <u>NOTE:</u> IGT will not provide billing for services employing the following practices and Client hereby agrees it will not provide Billing Transactions to IGT for the following:

   - Box, sweepstakes, or contest – type entry forms.
   - Negative option sale offers.
   - 800 pay-per-call
   - Collect callback
   - Phantom billing (charging for calls never made or services never provided).
   - Such other programs, products, or services that regulatory agencies, IGT or Telcos, where applicable, determine to be deceptive to consumers.

3. **COMPLIANCE MONITORING.** IGT requires Client to:

   - Minimize End-User inquiries and complaints it receives.
   - Minimize End-User complaints to government agencies.
   - Maintain up-to-date records regarding complaints and inquiries that it receives.
   - Promptly adopt action plans to respond to complaints and inquiries.
   - Assist and cooperate with investigations of End-User disputes.
   - Promptly cease billing any recurring charges to an End-user when there is a clear indication that such End-User is no longer utilizing Client's product or service.

4. **MANDATORY AUTHORIZATION.** Where State or Federal agencies (or Telcos, where applicable) require consumer pre-authorization for the services, products or programs provided by Client, Client must employ one of the following forms of authorization. Such authorization must be retained for a period of two (2) years and made available upon request.

Additionally, if State/Federal agencies or Telcos amend their requirements, Client is responsible for its full compliance thereto:

- Recorded independent third party verification
- Written or electronic sales order or letter of authorization
- Voice Recording of telephone sales authorization

An authorization must legibly include the following to be valid:

- The date of authorization.
- The telephone number and, if utilizing ANI capture, name and address of the consumer.
- Assurance that the consumer is responsible for the billing telephone number or is otherwise authorized to incur billing charges.
- A complete description of the product or service.
- A description of the applicable charges.
- An explicit acknowledgment by the consumer as to how the charges for the product or service will appear on his/her bill.
- Affirmative acceptance by the consumer of the offer.
- A toll-free number that subscribers may call to make inquiries concerning the service.

In addition, when verifying with an independent third party, authorization must include:

- Initial statement that the purpose of the verifications is to confirm the consumer's intention to accept the sales offer.
- A statement that the service provider is not affiliated with a LEC, where there is no affiliation.
- A unique consumer identifier.
- A review by third party personnel of the entire verification where the verification is automated.

An independent third party verifier must meet the following criteria:

- It must be completely independent of the service provider and the telemarketer.
- It must not be owned, managed, controlled or directed by Client or the telemarketer.
- It must not have any financial incentive in the completion of the sale.
- It must operate in a location physically separate from the service provider and the telemarketer.

5. **HIGH STANDARD BILLING PRACTICES.** Central to a consumer's right to ensure that they have not been billed inappropriately is the ability to understand and read the bill. Client shall use it's best efforts to ensure that the information provided to IGT fairly and accurately describes the service(s) provided to the End-User including, but not limited to:

- Identification of the Client providing the services.
- Detailed description of products or services.
- Detailed identification of the charges.

6. **END-USER SATISFACTION.** As End-Users must be able to easily and quickly address potential billing disputes, IGT may provide the End-User or a regulatory agency on request:

- The name, address, phone & fax number of the Client.
- The nature of any charge
- The method of authorization.
- Information as to how an End-User may cancel a service or product.

In conjunction with the Agreement IGT, or Client, will provide:

- A toll-free customer service number.

TBR_NCI 000268
00076

RER-33     1928

- Dedicated staff to respond to End-Users inquiries.
- Full and timely investigation of any written dispute.
- A credit or response to the End-User within 30 days of the End-User's dispute.

7. DISCLOSURE. Client hereby agrees that IGT may share the following with federal and state enforcement agencies:

- Identifying information with respect to terminated billing for Client programs or services.
- A description of specific problems relating to "Slamming" or "Cramming" that IGT has encountered, and the steps taken to correct such problems.

- Summary and detailed data with regard to End-User complaints, inquiries and Adjustments.
- This Agreement and any sales and/or promotional materials related to Client's services.

8. REIMBURSEMENT TO IGT. Client acknowledges and agrees to fully reimburse IGT, within ten (10) days, any fines or penalties charged IGT by Telcos and/or State/Federal agencies pursuant to Client's Billing Transactions billed by IGT.



(These guidelines may be amended from time-to-time by IGT providing thirty (30) days prior written notice.)

TBR_NCI 000269
00077

RER-33        1929

## SCHEDULE I – VALIDATION/REGISTRATION

This Service Order for Validation/Registration shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.     SERVICE ORDER SUMMARY.** This Service Order shall generally include the processing of validation requests from a Client's sales support application in order to determine the billable risk of End-User's billing telephone numbers (BTNs).

**2.     VALIDATION REQUESTS.** Client shall cause its prospective End-User to dial in and log on to IGT's host validation server and deliver a validation request in accordance with specifications provided to client by IGT. This dial in step will allow IGT to also capture the dialed from number, or ANI, for each End-User to be validated.

**3.     VALIDATION RESPONSES.** IGT shall process Client's validation requests against proprietary databases that screen for, among other things, blocked BTN's, billing coverage, and known non-billable devices such as payphones. IGT shall provide a response to each request, including the original ANI together with a result code, in a format to be mutually agreed upon by the parties.

*{ - End of Schedule I. Remainder of page intentionally left blank. - }*

TBR_NCI 000270
00078

RER-33     1930

## SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)

This Service Order for PhoneBill Services shall be effective as of the [Amendment Date/Effective Date of the Agreement]. This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

**1.    SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

**2.    TELCO SUBMISSION; UNBILLABLES.** IGT shall submit to the Telcos those Billing Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process.   Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format.  IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**3.    INQUIRY SUPPORT; ADJUSTMENTS.    A** separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

**4.    HOLDBACK, TRUE-UP, UNCOLLECTABLES.** Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due to Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at eight percent (8%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up").

IGT shall include the results of such True-Ups on a summary report to Client.  True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

**5.    OTHER DEDUCTIONS.**
a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve.  The IGT Reserve rate for each Account under this Agreement will initially be established at five percent (5%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account; (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds.  This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos.  The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

**6.    SETTLEMENT OF AMOUNTS DUE.** Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.

**7.    REPORTS.**
(a)  Standard Reporting.  IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein.  Client may request that IGT provide additional reports or a different formatted report.  To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)  Report Review.    Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client. Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)  Report Detail. Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a

TBR_NCI 000271
00079

RER-33        1931

)

higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)  Audit.  Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos.  The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.    BILLING APPEARANCE.    Where a Telco provides the capability, Client's Billing Transaction shall appear on such

Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.    RESALE OF ACCOUNTS.  Client acknowledges that the Billing Contracts with Telcos are structured as a purchase of accounts receivable, with recourse, in order for the Telco to be empowered to bill and collect the underlying charge amounts from End-Users. Therefore, Client agrees, and does hereby transfer to IGT any rights in the Billing Transactions that may be necessary for IGT to fulfill its obligations hereunder in compliance with the Billing Contracts with Telcos.

10.   TELCO CONFIDENTIALITY. Client hereby acknowledges and agrees that, without the express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services.    Client shall indemnify IGT and hold it harmless from any and all claims and/or damages that may arise as a result of Client's violation of this Section 10.

{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }

TBR_NCI 000272
00080

RER-33      1932

**EXHIBIT "II-A"**
**Telco Billing Contracts**
Page 1 of 1

| | | |
|---|---|---|
| **Alltel** | **Sprint United** | – United Florida |
| | | – CT & T |
| **Bell South** | | – United Indiana |
| | | – United Midwest |
| **Cincinnati Bell** | | |
| | **Telecom Canada** | |
| **Citizens Telephone** | | |
| | **Verizon – GTE** | – GTE North |
| **Illuminet** | | – GTE Florida |
| | | – GTE South |
| **NECA** | | – GTE South West |
| | | – GTE California |
| **Qwest** | – Northwest Bell | – GTE West |
| | – Mountain Bell | – GTE North West |
| | – Pac NW Bell | – GTE Hawaii |
| | | – GTE North Contel |
| **SBC – Ameritech** | – Ohio Bell | – GTE South Contel |
| | – Michigan Bell | – GTE S-W Contel |
| | – Indiana Bell | |
| | – Wisconsin Bell | **Verizon – North** | – New England Tel |
| | – Illinois Bell | | – New York Tel |
| **SBC – Pacific Bell** | – Pacific Bell | **Verizon – South** | – New Jersey Tel |
| | – Nevada Bell | | – Bell PA |
| | | | – Diamond State |
| **SBC – Southwestern Bell** | | | – C&P DC |
| | | | – C&P MD |
| **SBC – SNET** | | | – C&P VA |
| | | | – C&P WVA |

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.

TBR_NCI 000273
00081

RER–33      1933

## EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology
Page 1 of 5

**Rejects:**

**Full Key:**  Bill To Number (BTN)
Originating Number
Terminating Number
Call Date
Call Time        (Seconds excluded)
Call Duration    (Seconds excluded)

A reject call record that matches a history record based on the above Full Key is considered an exact match and is returned to the Client with the IGT return code in position 70-71.

**Unbillables:**

**Full Key:**  Bill To Number (BTN)
Originating Number
Terminating Number
Call Date
Call Time        (seconds excluded)
Call Duration    (seconds excluded)

An unbillable call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable experience compared to the total specific unbillable amount for each particular Telco.

**Adjustments 4501XX:**

**Pass # 1-Full Key:**  Bill To Number (BTN)
Originating Number
Terminating Number
Call Date
Call Time        (seconds excluded)
Call Duration    (seconds excluded)

An adjustment call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the original call record that it matched.

**Pass # 2-Partial Key:**  Bill To Number (BTN) – Optional\Required
Originating Number   – Optional\Required
Terminating Number – Optional
Call Date            – Optional
Call Time            – Optional
Call Duration        – Optional

TBR_NCI 000274
00082

RER-33    1934

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 2 of 5

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional\Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

| | |
|---|---|
| **Pass # 3-Matrix Key:** | Bill To Number (BTN) - Optional/Required |
| | Originating Number   - Optional/Required |
| | Terminating Number  - Optional/Required |
| | Call Date          - Optional |
| | Call Time          - Optional |
| | Call Duration      - Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

**Adjustments 4550XX:**

| | |
|---|---|
| **Bulk Match Key:** | Bill To Number (BTN) |
| | Call Date |
| | CIC |

Bulk logic is a <u>one-to-many</u> matching process and utilizes the call date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.

TBR_NCI 000276 0083

RER-33        1935

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 3 of 5

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

> *Step 1* – Identify all Clients that deposit to that particular Telco for the given two month period.

> *Step 2* – Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

> *Step 3* – For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

> *Step 4* – Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

> *Step 5* – Determine each Client's percentage of the sum total of the Step 4 calculation.

> *Step 6* - Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

TBR_NCI 00002684

RER-33      1936

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 4 of 5

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|--------|--------|---|--------|---|--------|--------|--------|
| Client # | Billings Deposited With XYZ Telco for Sept & October | X | Historical Adjust % Telco >50% supporting detail for June, July & August | = | Step 2 x Step 3 | Each Client contribution in relation to total in Step 4 (% of $123,200) | $ Allocated (% in Step 5 x $50,000) |
| 444 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| 445 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00% | $50,000 |

**Uncollectables 4601XX & 4650XX (Used for True-Ups):**

| | |
|---|---|
| **Write-Off Match Logic:** | Bill To Number (BTN) |
| | Call Date |
| | CIC |

Uncollectable write-off logic is a <u>one-to-many</u> matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off " is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Writer-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, for Telcos that do provide write-off detail, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

TBR_NCI 0000085

RER-33    1937

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**
Page 5 of 5

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

*Step 1* – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

*Step 2* – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

*Step 3* – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

*Step 4* – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

*Step 5* – Determine each Client's percentage of the sum total of the Step 4 calculation.

*Step 6* – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner:

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|---|---|---|---|---|---|---|---|
| Client # | Actual Billing Deposited in XYZ Telco | X | Historical Write-Off % with Telco > 50% supporting detail | = | Step 2 x Step 3 | Each Clients' contribution in relation to total in Step 4 (% of 123,200) | $ Allocated (% in Step 5 x $50,000) |
| 111 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| | | | | | | | |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| | | | | | | | |
| 444 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00 | $50,000 |

**True-Up Procedure :**

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.

TBR_NCI 000278
00086

RER-33    1938

}

**EXHIBIT "II-C"**
**Delivery Schedule of Reports & Data Files**
Page 1 of 1

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |
| True up Summary (Actual) Report | Wednesday After 5:00pm PST |

TBR_NCI 000279
00087

RER-33      1939

### EXHIBIT "II-D"
#### Telco Fees

| Group | SID | Telco Name | Bill Render | Interstate Per Msg. | Intrastate Per Msg. | Bulk 4250 Per Msg. | SSM 010118 Per Msg. | Pay/Call 010116 Per Msg. | End-User Adjust |
|---|---|---|---|---|---|---|---|---|---|
| Ameritech | 9321 | Ohio Bell | 0.4879 | 0.0535 | 0.0535 | 0.1070 | 0.1070 | 1.7000 | 9.63 |
| | 9323 | Michigan Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9325 | Indiana Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9327 | Wisconsin Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| | 9329 | Illinois Bell | 0.4560 | 0.0500 | 0.0500 | 0.1000 | 0.1000 | 1.7000 | 9.00 |
| Verizon | 9102 | New Eng Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.3000 | 15.00 |
| | 9104 | New York Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.3000 | 15.00 |
| | 9206 | New Jersey Tel | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9208 | Bell Penn. | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9210 | Diamond State | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9211 | C&P DC | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9212 | C&P MD | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9213 | C&P VA | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 9214 | C&P WVA | 1.1000 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| Bell South Companies | 9417 | Bell South | 0.5800 | 0.0475 | 0.0475 | .04+2.85% | 0.0475 | 2.85% | 6.40 |
| | 169 | GTE North | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 328 | GTE Florida | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 479 | GTE South | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2080 | GTE S-West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2319 | GTE California | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2320 | GTE West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2416 | GTE N- West | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 3100 | GTE Hawaii | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| TE Contel | 170 | GTE N-Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 480 | GTE S-Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| | 2081 | GTE SW Contel | 0.9500 | 0.0200 | 0.0200 | 0.2000 | 0.2000 | 0.2500 | 15.00 |
| Citizens Tel | 2308 | Citizens Tel | - | 0.1275 | 0.1275 | 0.3775 | 0.3775 | 0.3775 | - |
| Pacific Bell | 9740 | Pacific Bell | 0.3632 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| Nevada Bell | 9742 | Nevada Bell | 0.4632 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| SW Bell | 9533 | S-West Bell | 0.4132 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 1.7000 | 9.00 |
| QWEST | 9631 | North West Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| | 9636 | Mountain Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| | 9638 | PAC N-W Bell | 1.5300 | 0.0000 | 0.0000 | 0.0500 | 0.0000 | 0.0000 | 1.250 |
| Alltel | 9995 | Alltel | 0.6890 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | - |
| Cinnati Bell | 9348 | Cinn. Bell - 402 | 0.6820 | 0.0309 | 0.0309 | 0.3309 | 0.0309 | 0.0809 | 15.00 |
| Cinnati Bell | 9348 | Cinni Bell - 903 | 0.7300 | 0.0330 | 0.0330 | 0.0330 | 0.0330 | 0.0830 | 15.00 |
| Illuminet | 9999 | Illuminet | - | 0.8000 | 0.8000 | 0.8000 | 0.8000 | 0.8000 | - |
| NECA | 9996 | NECA | - | 0.5500 | 0.5500 | 0.5500 | 0.5500 | 0.5500 | - |
| SNET | 9147 | SNET | 0.5406 | 0.1174 | 0.1174 | 0.1174 | 0.1174 | 1.7000 | - |
| Int United | 341 | United Florida | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 470 | Carolina T&T* | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 832 | United Indiana | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| | 9993 | United Midwest* | 0.4100 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 0.2000 | 2.00 |
| n Canada | 8050 | Telcom Canada | - | 0.5600 | 0.5600 | 0.5600 | 0.5600 | 0.5600 | - |

The above information is current at the time of printing and is to be used for informative purposes only. The information contained in this exhibit is not constant, permanent, all inclusive and/or final and is subject to change without notice.

Note: The US West End-User Adjustment Fee is based on each line item adjusted

TBR_NCI 000280
00088

RER-33    1940

**Exhibit "II-E"**
**Payment Instructions**

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby instructed to remit any Net Proceeds to which Client is entitled under this Agreement to the account listed below. These wire instructions may only be modified or revoked by a written notice signed by Client. Client agrees to indemnify and hold IGT harmless from any and all claims or expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

| | |
|---|---|
| Company | Access One Communications, Inc. |
| Address | 222 Lakeview Ave |
| | Suite 157-160 |
| | West Palm Beach, Fl. 33401 |
| Bank Name | Wachovia Bank |
| Bank Address | 1801 Palm Beach Lakes Blvd |
| | West Palm, Beach, FL 33401 |
| | |
| Account Name | Access One Communications, Inc |
| Account Number | 2000016108431 |
| Bank (ABA) Transfer Number | 063000021 |

Signature: _____  Print name: German Miranda

Title: President    Date: 06/30/04

TBR_NCI 000281
00089

RER-33        1941

## SCHEDULE VI - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the [Amendment Date/Effective Date of the Agreement] and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

**1.   SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User Inquiries to Client, ii) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

**2.   CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto.    IGT shall auto-refer or transfer End-User Inquiries to Client based on mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User (i) fails to enter into IGT's call processing system a telephone number that was billed only by Client; (ii) refuses to be referred or transferred to Client; or (iii) initiates a subsequent Inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such Inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

**3.   IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT.  IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries. When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) Adjustments. IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) Regulatory Complaints. IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

*{ - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - }*

TBR_NCI 000282
        00090

RER-33      1942

## EXHIBIT "VI-A"
### Inquiry Standards

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

TBR_NCI 000283
00091

RER-33      1943

# Exhibit 2

)

# MASTER SERVICES AGREEMENT

THIS MASTER SERVICES AGREEMENT (the "Agreement") is entered into as of **March 1** 2003 ("Effective Date"), by and between Integretel, Incorporated, a California corporation ("IGT"), and Network One Services, Inc. a Florida corporation ("Client").

WHEREAS, Client is a provider of certain telecommunications related products and services; and

WHEREAS, IGT is engaged in the business of providing validation, billing, collection and related services to the telecommunications industry; and

WHEREAS, IGT is willing to provide its services to Client, and Client desires to obtain such services from IGT, upon the terms and conditions stated herein:

NOW, THEREFORE, the parties hereto agree as follows:

1.    **DEFINITIONS.**  Certain terms used herein are defined in the attached Exhibit A and are incorporated herein by reference.

2.    **IGT SERVICES.**  IGT shall provide one or more of the following services (each a "Service Order") as more fully described on the referenced Schedules, attached hereto and made a part hereof. Unless marked as initially ordered below, additional Service Orders may be included under this Agreement by execution of an applicable amendment hereto along with the applicable Schedule and any changes to the Fees set forth on Exhibit B.

| Schedule | Service Order Options | Initial Order |
|---|---|---|
| I | Validation/Registration | (X) |
| II | PhoneBill Services (Telco Billing) | (X) |
| III | DirectBill Services (Client-Branded Billing) | ( ) |
| IV | Credit Card Processing | ( ) |
| V | Automated Clearing House (ACH) | ( ) |
| VI | End-User Inquiry (required with Service Order II or III) | (X) |
| VII | Collection Services | ( ) |

3.    **TERM.**  The initial term of this Agreement shall be for two (2) years from the Effective Date ("Initial Term"), and shall automatically renew for successive terms of one (1) year (each a "Renewal Term") unless either party gives the other party written notice of its desire to not renew at least ninety (90) days prior

TBR_NCI 000292

00093

RER-33        1945

to a scheduled renewal, or otherwise terminates this Agreement in accordance with Section 12. The Initial Term and any Renewal Term shall be referred to collectively herein as "Term".

4.   **CLIENT SUBMISSION AND IGT EDIT.**   Where applicable to a Service Order, Client shall submit to IGT its Billing Transactions in a data format acceptable to IGT. Upon receipt of Client's Billing Transactions, IGT shall subject the Billing Transactions to its proprietary edit process (the "IGT Edit Process"), which may screen the Billing Transactions for, among other things, compliance with IGT's billing policies, billing coverage, regulatory requirements, syntax errors and other requirements as IGT may reasonably determine from time to time.   IGT shall provide reasonable notification of any changes or restrictions in its edit criteria.   Client shall use commercially reasonable efforts to screen its Billing Transactions to exclude records that are not likely to pass the IGT Edit Process. If any of Client's Billing Transactions fail to satisfy the criteria of the IGT Edit Process, IGT shall return such Billing Transactions to Client and IGT shall have no further responsibility for any such returned Billing Transactions.

5.   **SERVICE FEES.**   IGT shall be entitled to withhold from its disbursements to Client, or otherwise invoice Client, the fees set forth on Exhibit B, attached hereto (collectively "Fees"). In the event IGT invoices Client for its Fees, such invoices shall be due and payable within five (5) business days of receipt by Client. IGT shall be entitled to interest on any past-due Fees, or other amounts owing to IGT, at the rate of 18% per annum or the maximum rate allowable by law, whichever is less. After the first annual anniversary of this Agreement, IGT may adjust its Fees with thirty (30) days prior written notice to Client, provided, however, that the aggregate effect of such adjustment shall not exceed ten percent (10%) in any 12 month period.

6.   **TAXES.**   Each party shall be responsible for the timely remittance of such party's applicable Taxes (if any) to the appropriate taxing authorities. In no event shall either party be responsible for the other party's obligation to remit such other party's Taxes. Client shall either (initial which applies): (i) [ _____ ] include, in the face amount of each Billing Transaction, the amount of any applicable Taxes and format such Billing Transactions so as to be exempt from any additional Taxes; (ii) [ _____ ] provide written instructions to IGT directing IGT to apply specific Taxes to the Billing Transactions; or (iii) [ X ] direct IGT to cause its then-current taxing rates and logic to be applied to Client's Billing Transactions. In the event that IGT is providing services to Client under a PhoneBill Service Order, attached hereto as Schedule II, then IGT shall cause any Taxes collected by a Telco in relation to Client's Billing Transactions to be remitted to the appropriate taxing authorities. Client agrees to indemnify and hold IGT, its directors, officers, employees, agents, and representatives harmless from and against any liability or loss resulting from any Taxes including, without limitation, any penalties, interest, additions to Tax, Tax surcharges and other Tax-related costs payable or incurred in relation to Client's Services or the Billing Transactions.

TBR_NCI 000293

00094

RER-33      1946

7.    **CLIENT REPRESENTATIONS AND WARRANTIES**.  Client represents and warrants to IGT that, throughout the Term of this Agreement, Client shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements and the billing and collection guidelines contained in Exhibit C, attached hereto, applicable to any of Client's Services. This warranty is in lieu of any other warranty, express, implied or statutory.

8.    **IGT's REPRESENTATION AND WARRANTY**.  IGT represents and warrants to Client that, throughout the Term of this Agreement, IGT shall be in compliance with all rules, regulations and policies including, but not limited to, federal, state, and local legal and regulatory requirements applicable to the Services to be provided hereunder. This warranty is in lieu of any other warranty, express, implied or statutory.

9.    **PROOF OF COMPLIANCE**.  Each party agrees to provide written proof of its compliance, with respect to its respective obligations under Sections 7 or 8 above, to the other party within five (5) business days of such other party's written request.  Each party shall have the right to immediately suspend its performance under this Agreement, whether in whole or in part, without liability to the other party in the event that such other party does not provide satisfactory written evidence of such compliance.  Each party agrees to notify the other party in writing, as soon as reasonably possible, of any instances where such party is not in compliance with applicable obligations under Sections 7 and 8.

10.    **LIMITATION OF LIABILITY**.  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF PROFITS, LOSS OF USE, LOSS OF GOODWILL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ANY CLAIM, WHETHER IN CONTRACT OR IN TORT OR WHETHER FROM BREACH OF THIS AGREEMENT, IRRESPECTIVE OF WHETHER SUCH PARTY HAS BEEN ADVISED OR SHOULD BE AWARE OF THE POSSIBILITY OF SUCH DAMAGES.  CLIENT HEREBY ACKNOWLEDGES AND AGREES THAT IGT'S LIABILITY WITH RESPECT TO THE PERFORMANCE OF ITS SERVICES SHALL BE LIMITED TO THE AMOUNT OF FEES PAID BY CLIENT TO IGT FOR THE SERVICES THAT ARE THE SUBJECT OF ANY CLAIM.

11.    **INDEMNIFICATION**.

(a)    **By Client**.  Client hereby agrees to indemnify and hold IGT and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands, losses, damages, costs or expenses, including attorney's fees, arising out of or relating to:  (i) Client's material breach of any representation, warranty, covenant or obligation hereunder; (ii) Client's Services; or (iii) the Billing Transactions processed by IGT in accordance with the terms of this Agreement.

(b)    **By IGT**.  IGT hereby agrees to indemnify and hold Client and its directors, officers, employees, agents, and representatives harmless from and against all obligations, liabilities, claims, demands,

TBR_NCI 000294

00095

RER-33    1947

losses, damages, costs or expenses, including attorney's fees, arising out of or relating to IGT's material breach of any representation, warranty, covenant or obligation hereunder.

(c)    Enforcement. In the event that either party (in this context an "Indemnified Party") is served as a defendant in any Claim arising out of any of the foregoing, the Indemnified Party shall promptly provide written notice thereof (the "Claim Notice") to the other party (in this context the "Indemnifying Party"). The Claim Notice shall include a complete copy of the claim together with an explanation by the Indemnified Party of why indemnification is being sought. The Indemnifying Party, within ten (10) business days of receipt of the Claim Notice, shall acknowledge, in writing, its obligation under this Section 11 and, thereafter, the Indemnifying Party shall control all aspects of the defense of the claim. In the event that the Indemnifying Party fails to provide such written acknowledge within the specified timeframe then, at its option and without waiving its rights to indemnification hereunder, the Indemnified Party may defend itself, and the Indemnifying Party shall pay all reasonable attorney fees, costs and expenses incurred by the Indemnified Party in such defense.

12.    EVENTS OF DEFAULT. Either party may suspend its obligations hereunder or otherwise terminate this Agreement, effective immediately with written notice to the other party upon any of the following events (each an "Event of Default"):

(a)    The other party defaults on any payment obligation hereunder and fails to cure such payment default within five (5) business days of written notice of such payment default to the defaulting party by the non-defaulting party; or

(b)    The other party has violated a representation or warranty contained in this Agreement and such violation remains uncured or reasonably mitigated, to the satisfaction of the other party, after five (5) business days following written notice of such violation from the non-defaulting party specifying the nature of the violation; or

(c)    Either party determines, in its reasonable discretion, that its business image, reputation or goodwill is being harmed by the services of the other party and such other party has not satisfactorily cured the indicated problem within ten (10) business days of notice thereof from the first party; or

(d)    The other party has (i) filed a voluntary petition in bankruptcy or voluntary petition or an answer seeking reorganization, arrangement, readjustment of its debts, or any other relief under the Federal Bankruptcy Code or under any other insolvency act or law, now or hereafter existing, or (ii) a receiver or trustee appointed involuntarily, and any petition or action is not suspended, stayed or dismissed within sixty (60) days after its filing or appointment, as the case may be; or

(e)    Client ceases to submit Billing Transactions at a level that would satisfy Client's monthly minimum Fee obligations and fails to cure such condition within ten (10) business days of written notice from IGT; or

TBR_NCI 000295

00096

RER-33    1948

(f)    The other party defaults with respect to any other provision of this Agreement and fails to cure such default within thirty (30) days of written notice of such default to the defaulting party by the non-defaulting party.

13.    **EFFECT OF TERMINATION.** The parties agree that the termination of this Agreement for any reason whatsoever, shall not affect or terminate any obligation or liability incurred or assumed by either party prior to the effective date of termination including, without limitation, payment of amounts accrued or owing hereunder and the parties' respective obligations regarding Confidential Information. In the event that IGT terminates this Agreement for an Event of Default by Client, Client shall pay to IGT, as liquidated damages and not as penalty, in addition to any Fees otherwise due hereunder, an amount equal to the average monthly Fees, for the most recent three months in which Client had submitted its Billing Transactions, times the number of full months that would have otherwise remained under the Term.

14.    **CONFIDENTIALITY.**

(a)    As used in this Agreement "Confidential Information" of either party shall mean any information including, without limitation, trade secrets, technical and other information relating to the service or business operations of a party (the "Disclosing Party") that is disclosed either verbally or in writing to the other Party (the "Receiving Party") and is marked "Confidential", bears a marking of like import, or would, by the application of a reasonable standard, understood by the Disclosing Party to be of a confidential nature at the time of disclosure. "Confidential Information" shall expressly include any equipment, hardware or software made available to a Receiving Party by a Disclosing Party that includes or represents a tangible manifestation of a Party's "Confidential Information", whether or not such equipment bears any confidential legend or marking.

(b)    Each party agrees that Confidential Information of the other party which is disclosed or obtained by it hereunder or otherwise, shall, subject to the terms and conditions of this Agreement, be retained in confidence and shall be protected to the same extent and in the same manner as comparable Confidential Information of the Receiving Party, but no less than a reasonable standard of care.

(c)    Information shall not be deemed Confidential Information, and Receiving Party shall have no obligation under this provision with respect to any:

(i)    Information that now or hereinafter comes into the public domain without breach of this Agreement;

(ii)    Information rightfully and lawfully received by a Receiving Party from a third party without breach of this Agreement or any other agreement as evidenced by existing written documentation thereof;

(iii)    Information developed independently or discovered by a Receiving Party without use of the Disclosing Party's Confidential Information as evidenced by existing written documentation thereof;

Master Services Agreement
(REV. 01/02) 103-045
E03-045

Page 5

TBR_NCI 000296

00097

RER-33    1949

(iv)    Information approved for release by the written authorization of the Disclosing Party; or

(vi)    Information disclosed pursuant to the requirement or request of a governmental agency or court of competent jurisdiction to the extent such disclosure is required by a valid law, regulation or court order provided, however that reasonable prior written notice is given by the Receiving Party to the Disclosing party of any such requirement or request sufficient to permit the Disclosing party to seek an appropriate protective order or exemption from such requirement or request.

(d)    All tangible forms of information, including, but not limited to documents, drawings, specifications, prototypes, samples and the like received hereunder by a Receiving party shall remain the property of the Disclosing Party. Upon written request by a Disclosing Party, the Receiving party shall return to the Disclosing Party all tangible forms of the Disclosing Party's Confidential Information received by Receiving party, together with all copies thereof.

15.    **CHOICE OF LAW AND VENUE.** THE VALIDITY OF THIS AGREEMENT, ITS CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT, AND THE RIGHTS OF THE PARTIES HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND NOT OTHERWISE SUBJECT TO RESOLUTION BY ARBITRATION HEREUNDER, SHALL BE BROUGHT EXCLUSIVELY IN AND VENUE SHALL BE PROPER ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA. EACH OF THE PARTIES HERETO WAIVES, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

16.    **PUBLIC ANNOUNCEMENTS.** Neither party may use the other party's name in any public announcements or public disclosures nor shall either party disclose the terms of this Agreement, without the prior written consent of the other party.

17.    **NOTICES.** All notices and other communications that are required or may be given hereunder shall be in writing and shall be delivered personally, sent by U.S. mail with return receipt requested, by facsimile if receipt is confirmed by means other than the facsimile's electronic confirmation, or by an express carrier with receipt confirmation. All notices and other communications shall be deemed given when actually received by a party as evidenced by an appropriate confirmation. Notice shall be directed to a party at its address set forth below or such other address as shall be given in writing by such party.

TBR_NCI 000297

00098

RER-33        1950

Integretel, Incorporated
5883 Rue Ferrari
San Jose, CA 95138
Attention: General Counsel
FAX: 408-362-2795

Network One Services, Inc.
222 Lakeview Ave., STE 160-157
West Palm Beach, FL 33401
Attention: Ronny Morillo
FAX: _____

**18.    DISPUTE RESOLUTION AND ARBITRATION.** Except for an action seeking a temporary restraining order or injunction related to the purposes of this Agreement, or a suit to compel compliance with this dispute resolution process, the parties shall use the following alternative dispute resolution procedures as their sole remedy with respect to any claim, dispute, or other controversy arising out of or relating to this Agreement or its breach.

(a)    Dispute Resolution.  At the written request of a party to the other party, each party shall appoint an officer or employee representative to meet, negotiate in good faith, and attempt to resolve any dispute arising under this Agreement. The location, format, frequency, duration, and conclusion of these discussions shall be left to the discretion of the parties' representatives. Upon the mutual agreement of the parties, the designated representatives may elect to utilize non-binding mediation to assist in the settlement of the dispute. Discussions and correspondence among the representatives, for purposes of these negotiations, shall be treated as Confidential Information developed for purposes of settlement, exempt from discovery and production, and which shall not be admissible in any arbitration or related action absent the mutual written agreement of the parties. Documents identified in, or provided with such communications, that are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted as evidence in any arbitration or related action hereunder.

(b)    Arbitration.  If the negotiations do not resolve the dispute within sixty (60) calendar days of the initial written request for a meeting pursuant to Section 18 (a) hereof, the dispute shall be submitted to binding arbitration by a single arbitrator pursuant to the Commercial Arbitration rules of the American Arbitration Association then in effect (the "Rules"). A party may demand such arbitration in accordance with the procedures set out in those Rules. The arbitration hearing shall be commenced within sixty (60) calendar days of the date of the demand for arbitration. The arbitration shall be held in San Jose, California. Judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction. Each party shall bear its own costs of these procedures. A party seeking discovery shall reimburse the responding party the reasonable costs of production of documents. The parties shall share equally the fees of the arbitration and the arbitrator.

TBR_NCI 000298

00099

RER-33    1951

19.    **GENERAL PROVISIONS**.

(a)    Attorney's Fees.  In the event of any legal proceeding, other than arbitration, arising out of or relating to this Agreement, the prevailing party thereto shall be entitled to reimbursement from the other of all reasonable attorney's fees and costs incurred in connection therewith.

(b)    Severability.  If any provision of this Agreement is found to be invalid by any court, the invalidity of such provision shall not affect the validity of the remaining provisions hereof.

(c)    Captions.  The paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)    Assignment.  Either party may assign this Agreement to an entity holding a majority ownership interest in the assigning party or in which the assigning party holds a majority ownership interest. In addition, Client may assign, in whole or in part, its right to payments hereunder to a third party. Neither party may otherwise assign any of its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. All assignments shall be in writing, duly signed by an officer of the assigning party. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns.

(e)    Amendments; No Waiver.  Except as otherwise provided herein, this Agreement may be amended or modified only by a written instrument executed and delivered by duly authorized representatives of the parties hereto.  No waiver of any right hereunder shall be deemed to be a waiver of the same or any other right on any other occasion.

(f)    Third Party Rights.  The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto.

(g)    Further Assurances.  The parties agree to do such further acts and to execute and deliver such additional agreements and documents as the other(s) may reasonably request to consummate, evidence or confirm the agreements contained herein and the matters contemplated hereby.

(h)    Force Majeure.  Neither party shall be deemed in default of this Agreement to the extent that any delay or failure in performance of its obligation results, without its fault or negligence, from any cause beyond its control, including, but not limited to, acts of God, acts of civil or military authority, government regulation, embargoes, epidemics, war, terrorist acts, riots, insurrections, fires, floods, earthquakes, nuclear accidents, strikes, power losses, unusually severe weather conditions, inability to secure third party products, services, communication or transportation facilities, Internet hacking, viruses or similar acts of sabotage, or act of or omission of common carriers (each an "Interrupt Event"). Upon the occurrence of an Interrupt Event that causes either party to be unable to perform its obligations hereunder, such party shall: (i) immediately notify the other party in writing of such Interrupt Event and its expected duration; and (ii) take all commercially reasonable steps to recommence performance of its obligations hereunder. In the event that an Interrupt Event delays a party's performance of its obligations by more than fifteen (15) days following notice by such party, then such event shall be deemed a default hereunder and shall be subject to the rights and remedies of the parties.

QK

TBR_NCI 000299    00100

(i)     Counterparts.  This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

(j)     Integration of Agreement.  This Agreement, together with the Exhibits and Schedules hereto, contains the entire understanding of the parties with respect to its subject matter and supersedes all prior and contemporaneous agreements, representations and understandings among the parties, whether verbal or written, relating to the subject matter hereof.

(k)     No Agency.  Neither IGT nor Client is an agent, partner, joint venturer, trustee, fiduciary or legal representative of the other party and neither IGT nor Client has authority to act for or incur any obligation on behalf of or in the name of the other party other than as expressly set forth in this Agreement.

(l)     Corporate Authority.  The parties hereto represent and warrant that they have the capacity, power and authority to enter into this Agreement, and that the individuals signing on behalf of both parties have the authority to so sign.

*{ - Signature page follows. Remainder of page intentionally left blank. - }*

Master Services Agreement
(REV. 01/02)  K03-045
E03-045

Page 9

TBR_NCI 000300
00101

RER-33      1953

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date set forth above.

Integretel, Inc. (IGT)

By: _____

Name: _Kea Dawson_

Title: _President_

Date: _3/4/03_

Network One Services, Inc. (Client)

By: _____

Name: _Qaadir Kaid_

Title: _President_

Date: _Feb. 25, 2003_

TBR_NCI 000301    00102

RER-33    1954

## EXHIBIT "A"
### Definition of Certain Terms

The following terms shall have the meaning ascribed thereto throughout this Agreement and any Exhibits and Schedules attached hereto:

"Account" shall mean a separate account of Client under which Billing Transactions and settlement funds are tracked and reported.

"Account Number" shall mean the number, assigned by IGT, which is used to reference a particular Account.

"Adjustment" shall mean a post-billing deduction made to an End-User's bill with respect to Client's Billing Transactions, usually arising from End-User disputes regarding a billed amount. Adjustments may be initiated by (i) Telcos, where applicable, in accordance with the Billing Contracts, (ii) by Client at its discretion, or (iii) by IGT in accordance with this Agreement.

"ANI" shall mean Automatic Number Identification, which refers to the network capture of a dialing party's originating telephone number. For many dialed services, the ANI is used as the BTN (see below).

"Billing Contract" shall mean a billing and collection agreement entered into between IGT and a LEC and/or certain third parties that contract directly with such LEC. Billing Contracts permit the inclusion of approved types of Billing Transactions on the LEC's local telephone bill to business and residential consumers. A current list of existing Billing Contracts as of the Effective Date is attached to Schedule II as Exhibit II-A.

"BTN" shall mean a billing telephone number, which identifies the telephone line to which a Billing Transaction was charged by an End-User.

"Billing Transaction" shall mean an electronic data record evidencing the use by an End-User of Client's Service, which includes relevant information regarding such use.

"Client's Service" shall mean a service provided by a Service Provider which gives rise to a Billing Transaction or otherwise results in or necessitates a service to be performed by IGT hereunder.

"Deposit Month" shall mean a particular calendar month within which Billing Transactions are processed and submitted by IGT to the applicable Telcos.

"IGT Edit Process" shall mean IGT's internal edit checks applicable to the formatting and/or content of Billing Transactions as further described under Section 4 of the Agreement.

"IGT Reserve" shall mean an amount withheld, from the amount otherwise owed to Client with respect to Billing Transactions, to protect IGT from credit losses or otherwise to cover other reserves or offsets, other than Uncollectables imposed by a Telco.

"IGT Systems" shall mean all of IGT's proprietary systems developed and owned by IGT or licensed to IGT, including but not limited to any software, processes and procedures related thereto that are used by IGT in the performance of its obligations hereunder. IGT Systems shall also include any improvements, enhancements, customizations, and upgrades thereto whether jointly developed or otherwise. IGT shall own all Intellectual Property Rights in the IGT Systems.

"End-User" shall mean a consumer of Client's Service, including, but not limited to, an individual, corporation or other entity.

"End-User Inquiry" shall mean verbal or written contact from an End-User regarding a billing charge usually as a result of the End-User disputing such charge or otherwise seeking an explanation. End-User

TBR_NCI 000302
00103

RER-33    1955

Inquiries are either handled by IGT or Client in accordance with the attached Schedule IV, or handled by a Telco in accordance with such Telco's inquiry policies and applicable regulations.

"Fees" shall mean those fees set forth on Exhibit B to the Agreement, which are applicable to the Service Orders defined by the Schedules attached hereto.

"Intellectual Property Rights" shall mean all forms of proprietary rights, titles, interests, and ownership relating to patents, copyrights, trademarks, service marks, trade names, trade dresses, trade secrets, know-how, mask works, moral rights, and all similar rights of every type that may exist now or in the future under the laws of any jurisdiction.

"LEC" shall mean a local exchange carrier within the telecommunications industry that, among other things, provides dial tone service to business and/or residential consumers.

"Reject" shall mean any Client Billing Transaction that fails to pass the IGT Edit Process as described in paragraph 4(a) hereof.

"Service Provider" shall mean either Client or Client's customer, as applicable, where such entity provides services to End-Users giving rise to Billing Transactions. In the event that Service Provider is not Client, Client is responsible for all actions, inactions, errors and omissions of Service Provider with respect to the Billing Transactions.

"Taxes" shall mean all federal, state or local sales, use, excise, gross receipts or other taxes or tax-like charges imposed on or with respect to any service or transaction which is the subject of this Agreement.

"Telco" shall mean a LEC with which IGT, directly or indirectly, maintains a Billing Contract. A current list of such Telcos as of the Effective Date is attached to Schedule II as Exhibit II-A.

"Term", "Initial Term" & "Renewal Term" are each defined in Section 3 of the Agreement.

TBR_NCI 000303
00104

RER-33   1956

## EXHIBIT "B"
### Fees

The following Fees shall apply:

**I**     **Validation/Registration**

a) Integration Development & setup            TBD

b) Processing Validation Events               TBD


**II**     **PhoneBill Services (Telco Billing)**

a) Initial Account setup (sub-CIC) fee:                     $3,000.00  one time

   - each additional Account:                              $1,500.00  one time

b) IGT Processing Fees:

| Transactions per Deposit Month | | Fee Rate per Transaction |
|---|---|---|
| FIRST | 250,000 | $ 0.0525 each |
| NEXT | 250,000 | $ 0.0475 each |
| NEXT | 250,000 | $ 0.0425 each |
| ALL REMAINING | | $ 0.0375 each |

A Minimum monthly fee shall apply consisting of the greater of  i) 1% of the gross value of the Billing Transactions in each Deposit Month; or ii) $3,500.00 per Account commencing June 2003.


**III**     **End-User Inquiry**

a) Verbal End-User Inquiry                     $ 3.95 each

b) Referral (live agent)                       $ 1.75 each

c) Transferred or auto-referred                $ 0.90 each

d) Written End-User Inquiry                    $40.00 each

e) Written regulatory complaints               $95.00 each

f) Adjustment record processing                $ 0.75 each

TBR_NCI 000304    00105

RER-33     1957