## EXHIBIT "C"
### Billing and Collections Guidelines

IGT has adopted the anti-cramming consumer protection guidelines of the Coalition to Ensure Responsible Billing (CERB).  By adopting these guidelines, IGT is committed to billing standards and practices to ensure a maximum level of consumer protection.  Client hereby agrees to the following as consideration for IGT billing for its services.

1.    COMPANY INFORMATION

Client shall provide IGT with the following information:

- Client's company name, including dba's, and address.
- Names of all officers, directors and principals of Client.
- Proof of corporate or partnership status.
- Copies of certifications as required.
- Foreign corporation filings as required.
- Any applicable tariffs upon request.
- The names and addresses of any telemarketing companies to be used by the Client.
- The names and addresses of any third party verification companies to be used by the Client.

2.    SCREENING OF PROGRAMS, PRODUCTS AND SERVICES

Prior to IGT's billing for any Client services, Client shall provide IGT with the following information:

- A complete set of its marketing materials pursuant to the programs or services to be billed by IGT.
- A complete set of its advertisements (print or other media) pursuant to the programs or services to be billed by IGT.
- Applicable fulfillment package (which must include cancellation information if not included elsewhere and a toll free Client service telephone number).
- Complete scripts for sales verification.  Client shall not change scripts or programs without first providing changes to IGT.
- Honest, clear, and understandable text phrase for appearance on the bill.

NOTE:  IGT will not provide billing for services employing the following practices and Client hereby agrees it will not provide Billing Transactions to IGT for the following:

- Box, sweepstakes, or contest – type entry forms.
- Negative option sale offers.
- 800 pay-per-call
- Collect callback
- Phantom billing (charging for calls never made or services never provided).
- Such other programs, products, or services that regulatory agencies, IGT or Telcos, where applicable, determine to be deceptive to consumers.

TBR_NCI 000305

00106

RER-33    1958

## EXHIBIT "C"
### Billing and Collections Guidelines

3.    **COMPLIANCE MONITORING**

IGT requires Client to:

- Minimize End-User inquiries and complaints it receives.
- Minimize End-User complaints to government agencies.
- Maintain up-to-date records regarding complaints and inquiries that it receives.
- Promptly adopt action plans to respond to complaints and inquiries.
- Assist and cooperate with investigations of End-User disputes.
- Promptly cease billing any recurring charges to an End-user when there is a clear indication that such End-User is no longer utilizing Client's product or service.

4.    **MANDATORY AUTHORIZATION**

Where State or Federal agencies (or Telcos, where applicable) require consumer pre-authorization for the services, products or programs provided by Client, Client must employ one of the following forms of authorization. Such authorization must be retained for a period of two (2) years and made available upon request. Additionally, if State/Federal agencies or Telcos amend their requirements, Client is responsible for its full compliance thereto:

- Recorded independent third party verification
- Written or electronic letter of authorization (LOA)
- Written or electronic sales order
- Voice Recording of telephone sales authorization.

An authorization must legibly include the following to be valid:

- The date of authorization.
- The telephone number and, where practical, name and address of the consumer.
- Assurance that the consumer is qualified to authorize billing.
- A complete description of the product or service.
- A description of the applicable charges.
- An explicit acknowledgment by the consumer as to how the charges for the product or service will appear on his/her bill.
- Affirmative acceptance by the consumer of the offer.
- A toll-free number that subscribers may call to make inquiries concerning the service.

In addition, authorization verified by an independent third party must include:

- An initial statement that the purpose of the verifications is to confirm the consumer's intention to accept the sales offer.
- A statement that the service provider is not affiliated with a LEC, where there is no affiliation.
- A unique consumer identifier.
- A review by third party personnel of the entire verification where the verification is automated.

An Independent third party verifier must meet the following criteria:

- It must be completely independent of the service provider and the telemarketer.
- It must not be owned, managed, controlled or directed by Client or the telemarketer.
- It must not have any financial incentive in the completion of the sale.

TBR_NCI 000306
00107

RER-33    1959

- It must operate in a location physically separate from the service provider and the telemarketer.

## EXHIBIT "C"
### Billing and Collections Guidelines

5.    HIGH STANDARD BILLING PRACTICES

Central to a consumer's right to ensure that they have not been billed inappropriately is the ability to understand and read the bill. Client shall use it's best efforts to ensure that the information provided to IGT fairly and accurately describes the service(s) provided to the End-User including, but not limited to:

- Identification of the Client providing the services.
- Detailed description of products or services.
- Detailed identification of the charges.

6.    END-USER SATISFACTION

As End-Users must be able to easily and quickly address potential billing disputes, IGT may provide the End-User or a regulatory agency on request:

- The name, address, phone number and fax number of the Client.
- The nature of any charge
- The method of authorization.
- Information as to how an End-User may cancel a service or product.

In conjunction with the Agreement IGT, or Client, will provide:

- A toll-free customer service number.
- Dedicated staff to respond to End-Users inquiries.
- Full and timely investigation of any written dispute.
- A credit or response to the End-User within 30 days of the End-User's dispute.

7.    DISCLOSURE

Client hereby agrees that IGT may share the following with federal and state enforcement agencies:

- Identifying information with respect to terminated billing for Client programs or services.
- A description of specific problems relating to "Slamming" or "Cramming" that IGT has encountered, and the steps taken to correct such problems.
- Summary and detailed data with regard to End-User complaints, inquiries and Adjustments.

8.    REIMBURSEMENT TO IGT

Client acknowledges and agrees to fully reimburse IGT, within ten (10) days, any fines or penalties charged IGT by Telcos and/or State/Federal agencies pursuant to Client's Billing Transactions billed by IGT.

(These guidelines may be amended from time-to-time by IGT providing thirty (30) days prior written notice.)

TBR_NCI 000307
00108

RER-33      1960

## SCHEDULE I – VALIDATION/REGISTRATION

This Service Order for Validation/Registration shall be effective as of the Effective Date of the Agreement ("Order Date"). This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include the processing of validation requests from a Client's sales support application in order to determine the billable risk of End-User's billing telephone numbers (BTNs).

2.    **VALIDATION REQUESTS.** Client shall cause its prospective End-User to dial in and log on to IGT's host validation server and deliver a validation request in accordance with specifications provided to client by IGT. This dial in step will allow IGT to also capture the dialed from number, or ANI, for each End-User to be validated.

3.    **VALIDATION RESPONSES.** IGT shall process Client's validation requests against proprietary databases that screen for, among other things, blocked BTN's, billing coverage, and known non-billable devices such as payphones. IGT shall provide a response to each request, including the original ANI together with a result code, in a format to be mutually agreed upon by the parties.

*{ - End of Schedule I. Remainder of page intentionally left blank. - }*

Master Services Agreement
(REV. 01/02) K03-045
E03-045

Page 17

QK

TBR_NCI 000308

00109

RER-33    1961

## SCHEDULE II - PhoneBill SERVICES (TELCO BILLING)

This Service Order for PhoneBill Services shall be effective as of the Effective Date of the Agreement (the "Order Date"). This Service Order may be terminated by either party, as of the end of the then current Term of the Agreement, by providing written notice to the other party at least 90 days prior to the end of such current Term. Otherwise, this Service Order shall remain in full force and effect until termination of the Agreement.

1.    **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) submission of Client's valid Billing Transactions to Telcos for billing and collection, ii) processing of Unbillables, Adjustments and Uncollectables as such terms are defined herein, iii) database administration to support End-User Inquiry, iv) reconciliation and settlement of amounts due to Client with respect to the Billing Transactions, and v) standard reporting and tracking for each Account established by Client.

2.    **TELCO SUBMISSION, UNBILLABLES.** IGT shall submit to the Telcos those Billing Transactions of Client that have passed the IGT Edit Process and represent Client Services that have been pre-approved by IGT and/or the Telcos where applicable. Telcos may subject Client's Billing Transactions, submitted to it by IGT, to its own edit process and either be unable or unwilling to bill certain transactions (each an "Unbillable") even though such Unbillable transactions passed the IGT edit process. Unbillables returned to IGT in an electronic format by the Telco will be returned to Client in a similar format. IGT shall have no further responsibility for such Unbillable transactions except, however, if Billing Transactions are deemed Unbillable due to IGT's error or omission, IGT shall correct and resubmit such Billing Transactions at no additional charge to Client. Unbillables shall be applied to the settlement of amounts due Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

3.    **INQUIRY SUPPORT, ADJUSTMENTS.** A separate service order to cover End-User Inquiry is attached to the Agreement as Schedule VI. Notwithstanding the previous sentence, each Telco reserves the right to perform End-User Inquiry pursuant to the applicable Billing Contract. As a result of End-User Inquiry services or otherwise as initiated by either party or a Telco, IGT shall process Adjustments, as such term is defined on Exhibit A to the Agreement, and incorporate the amount of such Adjustments into the settlement of amounts due to Client. Adjustments reported by a Telco to IGT shall be applied to Client in accordance with the methodology set forth on Exhibit II-B attached hereto.

4.    **HOLDBACK, TRUE-UP, UNCOLLECTABLES.** Telcos may withhold, from the gross deposited dollars, a reserve amount to cover anticipated write-offs of uncollectable End-User accounts ("Uncollectables"), which may be realized some time in the future. IGT shall withhold a similar amount from funds otherwise due to Client (the "Telco Holdback") in order to cover amounts withheld by Telcos. The Telco Holdback rate shall be initially set at six percent (6%) of the gross value of Client's Billing Transactions. The Telco Holdback rate may be modified from time to time by IGT based on a reasonable analysis of Client's

TBR_NCI 000309

00110

RER-33        1962

Billing Transactions. From time to time, Telcos will conduct a reconciliation of the amounts held back compared to actual Uncollectables realized for a particular period (a "Telco True-Up") and may subsequently revise their reserve rates as well as collect from or refund to IGT any difference between the amounts withheld by such Telcos and the actual Uncollectables. After a Telco performs its Telco True-Up and reports the results to IGT, IGT will similarly reconcile the Telco Holdback amount with the realized Uncollectables pursuant to the methodology contained in Exhibit II-B (each such reconciliation a "True-Up"). IGT shall include the results of such True-Ups on a summary report to Client. True-Up results reflected on the summary report shall be incorporated into the settlement of amounts due to Client, as further described in Section 7, hereunder.

5.    **OTHER DEDUCTIONS**.

        a) Telco Fees. IGT shall be entitled to recover from, or pass-through to Client, all Telco-imposed processing and other charges associated with Client's Billing Transactions ("Telco Fees"). The Telco Fees are set forth on Exhibit II-D hereto.

        b) IGT Reserve. IGT may withhold, from any amounts otherwise due to Client, an amount necessary to fund the IGT Reserve. The IGT Reserve rate for each Account under this Agreement will initially be established at zero percent (0%) of gross value of Client's Billing Transactions. IGT may, in its reasonable discretion, adjust the IGT Reserve requirement for any Account. Such adjustment may be accomplished by either: (i) adjusting the previously established reserve percentage for such Account;  (ii) adjusting or offsetting the IGT Reserve for another Account; (iii) invoicing Client directly for additional amounts required; or (iv) reimbursing Client for excess amounts, if applicable.

        With respect to Client's Billing Transactions, certain Telco's may require a reserve for Unbillables and/or Adjustments exceeding certain thresholds. This requirement may necessitate an increase in the IGT Reserve. If applicable, this increase shall be based on Client's actual Unbillable and/or Adjustment experience over a three (3) month period for the subject Telcos. The adequacy of this component of the IGT Reserve shall be reviewed on a quarterly basis and determined based on Client's actual experience of Unbillables and/or Adjustments in the prior quarter for the relevant Telcos.

6.    **SETTLEMENT OF AMOUNTS DUE**. Client shall be entitled to all collected amounts, up to and including the gross value of the Billing Transactions remitted to the Telcos, less any amounts due and owing to IGT hereunder including, without limitation, Unbillables, Adjustments, Telco Holdback, excess Uncollectables (pursuant to any True-up), Fees, Telco Fees and IGT Reserves (such difference being the "Net Proceeds"). Each week IGT shall transfer, by wire to Client's bank account (as set forth on Exhibit II-E, attached hereto), the Net Proceeds identified the prior week. In the event that the calculation of Net Proceeds yields a negative amount, IGT's reporting to Client of such negative amount shall be deemed an invoice for same and Client shall, within five (5) business days, reimburse IGT for such negative amount. In addition to the Net Proceeds, Client shall be entitled to any excess IGT Reserve as determined from time to time in accordance with Section 5, above.

TBR_NCI 000310

00111

RER-33    1963

7.    **REPORTS**.

(a)    Standard Reporting.  IGT agrees to provide Client with IGT's standard reports identified in Exhibit II-C attached hereto and incorporated herein.  Client may request that IGT provide additional reports or a different formatted report.  To the extent IGT can comply with such request with reasonable effort, IGT shall supply such reports at an additional charge based upon the time and expense to be mutually agreed upon by the parties.

(b)    Report Review.  Client agrees that it is solely responsible for inspecting and reviewing all reports provided by IGT within sixty (60) days of receipt by Client.  Client's failure to report any errors or inconsistencies with respect to such reports within such timeframe shall constitute acceptance by Client.

(c)    Report Detail.  Client acknowledges and agrees that (i) the individual Telcos may not always provide definitive detail to IGT for amounts the Telco deems to be Unbillables, Adjustments, or Uncollectables, (ii) IGT shall not be held to a higher standard of accounting pertaining to Telco performance as that provided by the individual Telco, and (iii) IGT's methodology contained in Exhibit II-B associated with the determination of Client's share of Unbillables, Adjustments or Uncollectables is reasonable and appropriate given the detail received from the individual Telco.

(d)    Audit.  Upon 30 days prior written notice by Client, but no more frequently than once during a twelve (12) month period, Client shall have access to IGT's records pertaining to Client's Billing Transactions, including, but not limited to, the information IGT receives from Telcos.  The audits conducted hereunder shall be at Client's sole cost and expense provided, however, if an audit reveals that amounts due to Client were understated by more than 10% for the period audited, then IGT shall, in addition to promptly paying to Client the understated amount, reimburse Client for all reasonable out-of-pocket audit costs. Notwithstanding any of the foregoing, Client shall have no right to audit any IGT records pertaining to periods more than twelve (12) months prior to the date of notice of such audit.

8.    **BILLING APPEARANCE**.  Where a Telco provides the capability, Client's Billing Transaction shall appear on such Telco's subscriber bills within IGT's billing page, under the name designated in writing by Client for each Account Number.

9.    **TELCO CONFIDENTIALITY**.  Client hereby acknowledges and agrees that, without express authorization from a Telco, Client shall not publish or use the name, service mark or trademark of any Telco in its advertising, telemarketing, direct mail or other promotions or make any misrepresentations concerning an affiliation with any Telco with regard to the Billing Transactions or Client's Services.  In the event of a violation of this section, Client shall pay to IGT, as liquidated damages, for loss of reputation and business good will, and not as a penalty, $10,000 for each such violation.

*{ - End of Schedule II. Exhibits follow. Remainder of page intentionally left blank. - }*

TBR_NCI 000311

00112

RER-33    1964

**EXHIBIT "II-A"**
**Telco Billing Contracts**
Page 1 of 1

| Ameritech | - Ohio Bell | **NYNEX** | - New England Tel |
| | - Michigan Bell | | - New York Tel |
| | - Indiana Bell | | |
| | - Wisconsin Bell | **Pacific Bell** | - Pacific Bell |
| | - Illinois Bell | | - Nevada Bell |
| | | | |
| **Bell Atlantic** | - New Jersey Tel | **Southwestern Bell** | |
| | - Bell PA | | |
| | - Diamond State | **U.S. West** | - Northwest Bell |
| | - C&P DC | | - Mountain Bell |
| | - C&P MD | | - Pac NW Bell |
| | - C&P VA | | |
| | - C&P WVA | **Alltel** | |
| | | | |
| **Bell South** | | **Cincinnati Bell** | |
| | | | |
| **GTE** | - GTE North | **Illuminet** | |
| | - GTE Florida | | |
| | - GTE South | **NECA** | |
| | - GTE South West | | |
| | - GTE California | **SNET** | |
| | - GTE West | | |
| | - GTE North West | **Sprint United** | - United Florida |
| | - GTE Hawaii | | - CT & T |
| | | | - United Indiana |
| **GTE Contel** | - GTE North Contel | | - United Midwest |
| | - GTE South Contel | | |
| | - GTE S-W Contel | **Telecom Canada** | |
| **Citizens Telephone** | | | |

All programs are subject to initial and continuing Telco approval and can be terminated at any time. Additional Telcos may be available for service, subject to Telco approval, upon IGT review and recommendation. The above information is generally current at the time of printing and is to be used for informative purposes only. The information contained in this Exhibit is subject to change without notice. Inclusion in the above list does not indicate or imply that the named Telcos approve the program(s) contemplated under this Agreement. IGT makes no promise or guarantee that this information is constant, permanent, all inclusive and/or final.

TBR_NCI 000312

00113

RER-33      1965

### EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology

**Rejects:**

**Full Key:**    Bill To Number (BTN)
              Originating Number
              Terminating Number
              Call Date
              Call Time         (Seconds excluded)
              Call Duration     (Seconds excluded)

A reject call record that matches a history record based on the above Full Key is considered an exact match and is returned to the Client with the IGT return code in position 70-71.

**Unbillables:**

**Full Key:**    Bill To Number (BTN)
              Originating Number
              Terminating Number
              Call Date
              Call Time         (seconds excluded)
              Call Duration     (seconds excluded)

An unbillable call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the IGT return code in position 70-71.

If the total matched data is less than the unbillable amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific unbillable experience compared to the total specific unbillable amount for each particular Telco.

**Adjustments 4501XX:**

**Pass # 1-Full Key:**    Bill To Number (BTN)
                       Originating Number
                       Terminating Number
                       Call Date
                       Call Time      (seconds excluded)
                       Call Duration  (seconds excluded)

An adjustment call record that matches a history record based on the above Full Key is considered matched and is returned to the Client with the original call record that it matched.

**Pass # 2-Partial Key:**    Bill To Number (BTN) - Optional\Required
                          Originating Number   - Optional\Required
                          Terminating Number   - Optional
                          Call Date            - Optional
                          Call Time            - Optional
                          Call Duration        - Optional

TBR_NCI 000313

00114

RER-33      1966

## EXHIBIT "II-B"
### Telco Returns
### Matching Process & Allocation Methodology

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional\Required keys in the above Partial Key, is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

**Pass # 3-Matrix Key:**
| | |
|---|---|
| Bill To Number (BTN) | - Optional/Required |
| Originating Number | - Optional/Required |
| Terminating Number | - Optional/Required |
| Call Date | - Optional |
| Call Time | - Optional |
| Call Duration | - Optional |

An adjustment call record that matches a history record based on matching a minimum of four (4) keys, which must include one (1) of the Optional/Required keys in the above Matrix Key is considered matched and is returned to the Client with the original call record that it matched. The adjustment amount may not be greater than the history record amount.

All BTN's contained in Telco Returns are compared to a BTN split table to determine if the BTN was involved in an area code split. If the BTN was involved in an area code split, the previous & current NPA is utilized in the matching process.

All adjustment call records that fail the Full, Partial or Matrix Key matching process are combined with the 4550XX adjustment records and are matched utilizing the Bulk Match process.

#### Adjustments 4550XX:

**Bulk Match Key:**    Bill To Number (BTN)
                        Call Date
                        CIC

Bulk logic is a <u>one-to-many</u> matching process and utilizes the call date to determine the calls eligible for matching. All call dates <u>equal or older</u> than the Telco tape date are considered eligible. Matching is conducted in LIFO order up to the value of the adjustment call record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco within a particular run.

An adjustment call record that matches a history record based on Bulk Match logic is returned to the Client with the original call record or records that it matched. Because the Bulk Match logic will allow matching to many records, it also allows matching to one or more Clients. Therefore, the returned 4550XX adjustment record may be included in more than one Clients return detail information.

If the total combined matched data is less than the adjustment amount charged by the Telco, a non-specific allocation is applied to the shortfall. The non-specific allocation methodology is based on each Client's specific adjustment percentage in comparison to the total specific adjustment.

TBR_NCI 000314

00115

RER-33    1967

**EXHIBIT "II-B"**
**Telco Returns**
**Matching Process & Allocation Methodology**

If the Telco fails to provide data for the End-User adjustments, and therefore no matching can be performed for that particular Telco, IGT will utilize the following methodology to allocate the adjustment amount reflected on the Telco PAR statement. The non-specific allocation methodology is based on the understanding that when a Telco reports End-User adjustments on the PAR statement, those adjustments are generally related to billings from both the PAR month and the month prior to the PAR month. Therefore, IGT uses each Client's billing activity for these two months, coupled with an historical adjustment percentage for each Client, as the basis for the allocation of the non-specific adjustments.

For instance, if the Telco reports End-User adjustments on the October PAR statement, IGT would use June, July and August to derive an historical adjustment experience percentage by Client. This would result in a basis for allocation applied to September and October billing which would generate the non-specific allocation percentage for each Client that is utilized in the reconciliation of the October PAR.

To determine the non-specific adjustment allocation percentage for each Client, IGT performs the following steps:

Step 1 – Identify all Clients that deposit to that particular Telco for the given two month period.

Step 2 – Determine the actual billings deposited for each Client to that particular Telco as the basis for allocation.

Step 3 – For all Clients identified in Step 2, determine the historical adjustment percentage. This percentage is based on the Telcos that have provided each Client with a 50% or higher of detailed adjustments.

Step 4 – Multiply the actual billings amount in Step 2 by the historical adjustment percentage in Step 3 for each Client.

Step 5 – Determine each Client's percentage of the sum total of the Step 4 calculation.

Step 6 – Allocate the non-specific adjustment for that particular Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 adjustment amount to the PAR without supporting data. The Clients who deposited in XYZ Telco would receive allocation in the following manner:

Master Services Agreement
(REV. 01/02) I03-045
E03-045

Page 24

TBR_NCI 000315
00116
RER-33   1968

EXHIBIT "II-B"
Telco Returns
Matching Process & Allocation Methodology

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|---|---|---|---|---|---|---|---|
| Client # | Billings Deposited With XYZ Telco for Sept & October | X | Historical Adjust % Telco >50% supporting detail for June, July & August | = | Step 2 x Step 3 | Each Client contribution in relation to total in Step 4 (% of $123,200) | $ Allocated (% in Step 5 x $50,000) |
| 444 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| 445 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00% | $50,000 |

**Uncollectables 4601XX & 4650XX (Used for True-Ups):**

Write-Off Match Logic:    Bill To Number (BTN)
                          Call Date
                          CIC

Uncollectable write-off logic is a one-to-many matching process and utilizes the write-off date to determine the calls eligible for matching. All call dates equal or older than the write-off record date are considered eligible. Matching is conducted in "last-in-first-out" order up to the value of the write-off record. Matched call records are eliminated from the eligible pool after they have been adjusted to their original value. This elimination is based on the process run date regardless of the number of files (tapes) being processed for a given Telco for a particular run.

A write-off record that matches a history record based on write-off logic is returned to the Client with the BTN, write-off date and matched amount. The total of all matched write-offs is referred to as the "Specific Write-Off".

If the total of all Client's Specific Write-Offs is less than the write-off amount charged by the Telco, a "Non-Specific Write-Off" is applied to each Client for the shortfall. The Non-Specific Write-Off is based on each Client's Specific Write-Off in comparison to the total of all Specific Write-Offs. For example, if a Client's Specific Write-Off is 10% of the total of all Specific Write-Offs, then they will be allocated a Non-Specific Writer-Off of 10% of the aforementioned shortfall. The Client's Specific Write-Off and Non-Specific Write-Off together make up the Client's "Write-Off Allocation" for a particular True-Up.

If the Telco fails to provide adequate data for the write-off matching and, therefore, no matching can be performed for that particular Telco, IGT will utilize the following methodology to determine the Write-Off Allocation, used to apply the write-off amount reflected on the Telco PAR statement. This non-specific write-off allocation methodology is based on each Client's experience of detailed write-offs over a 12 month period, for Telcos that do provide write-off detail, coupled with each Client's billing activity for the three months prior to the Telco write-off date.

TBR_NCI 000316

00117

RER-33    1969

EXHIBIT "II-B"
**Telco Returns**
**Matching Process & Allocation Methodology**

To determine the non-specific write-off allocation percentage for each Client, IGT performs the following steps:

**Step 1** – Identify all Clients that deposited to the particular Telco for the applicable Deposit Months.

**Step 2** – Identify each Client's deposited dollars to the particular Telco for the applicable Deposit Months.

**Step 3** – For all Clients identified in Step 1, determine each Client's historical write-off percentage based on the various Telcos that have provided each Client with 50% or greater of actual write-off detail over a 12 month period.

**Step 4** – Multiply the deposit amount in Step 2 by the write-off percentage in Step 3 for each Client.

**Step 5** – Determine each Client's percentage of the sum total of the Step 4 calculation.

**Step 6** – Allocate the non-specific write-off amount for the Telco based on the weighted percentages determined in Step 5.

For example, XYZ Telco has applied $50,000 write-off amount to the PAR statement without supporting detail. The Clients who deposited in XYZ Telco for this time period would receive allocation of the $50,000 in the following manner:

| Step 1 | Step 2 | X | Step 3 | = | Step 4 | Step 5 | Step 6 |
|---|---|---|---|---|---|---|---|
| Client # | Actual Billing Deposited in XYZ Telco | X | Historical Write-Off % with Telco > 50% supporting detail | = | Step 2 x Step 3 | Each Clients' contribution in relation to total in Step 4 (% of 123,200) | $ Allocated (% in Step 5 x $50,000) |
| 111 | $ 55,000 | X | 10% | = | $ 5,500 | 4.46% | $ 2,230 |
| 222 | $160,000 | X | 15% | = | $24,000 | 19.48% | $ 9,740 |
| | | | | | | | |
| 333 | $ 35,000 | X | 22% | = | $ 7,700 | 6.25% | $ 3,125 |
| | | | | | | | |
| 444 | $220,000 | X | 35% | = | $77,000 | 62.5% | $31,250 |
| 555 | $300,000 | X | 3% | = | $ 9,000 | 7.31% | $ 3,655 |
| | | | | | $123,200 | 100.00 | $50,000 |

**True-Up Procedure :**

Once Clients Write-Off Allocation has been determined, it is compared to the Telco Holdback reserved for the period being trued-up, and the difference, if any, is reported on a True-Up Summary report. A positive difference (i.e. Telco Holdback was greater than the Write-Off Allocation) will be remitted to Client, while a negative difference (i.e. Telco Holdback was less than the Write-Off Allocation) will be paid by Client.

TBR_NCI 000317

00118

RER-33    1970

### EXHIBIT "II-C"
### Delivery Schedule of Reports & Data Files

The following reports and data files are available via FTP:

| Report/Data File | Day Available |
|---|---|
| Confirmation Report | Within 24 hours of Client posting |
| Call Acceptance Transmittal Data File | Friday and/or Tuesday by 5:00pm PST |
| Edit Reject Data File | Friday and/or Tuesday by 5:00pm PST |
| | |
| IGT Inquiry Services Data Files | Monday After 5:00pm PST |
| IGT Cancellation Request Data Files | Monday thru Friday (if applicable) by 5:00pm PST |
| | |
| Telco Unbillable Data Files | Friday After 5:00pm PST |
| Telco Adjustment Data Files | Friday After 5:00pm PST |
| Credit Unbill Data File | Thursday After 5:00pm PST |
| | |
| Telco Uncollectable Data Files | Friday by 5:00pm PST |
| | |
| Payment Summary Data File | Thursday After 5:00 PST |
| Payment Unbill Data File | Thursday After 5:00 PST |
| Payment Recourse\Holdback Data File | Thursday After 5:00 PST |

The following reports are available on the "NetImpact" web directory

**Deposit**

| | |
|---|---|
| Call Acceptance Summary | Friday and/or Tuesday by 5:00pm PST |
| Special Message Summary | Friday and/or Tuesday by 5:00pm PST |

**Chargeback**

| | |
|---|---|
| Integretel Adjustment Summary | Monday After 5:00pm PST |
| Integretel Inquiry Comments | Monday After 5:00pm PST |
| LEC Adjustment Summary | Monday After 5:00pm PST |
| LEC Unbills Summary | Monday After 5:00pm PST |
| LEC Write Off Summary | Monday After 5:00pm PST |
| LEC Recovery Summary | Monday After 5:00pm PST |

**Settlement**

| | |
|---|---|
| Monthly Performance Status Report | Wednesday After 5:00pm PST |
| Settlement Statement Report | Wednesday After 5:00pm PST |
| Settlement Status Report | Wednesday After 5:00pm PST |
| Settlement Status Excel Spreadsheet | Wednesday After 5:00pm PST |
| Payment Summary Report | Wednesday After 5:00pm PST |
| Payment Summary Excel Spreadsheet | Wednesday After 5:00pm PST |
| Unbill Report | Wednesday After 5:00pm PST |
| Unbill Excel Spreadsheet | Wednesday After 5:00pm PST |
| Recourse\Holdback Report | Wednesday After 5:00pm PST |
| Recourse\Holdback Excel Spreadsheet | Wednesday After 5:00pm PST |
| True-Up Summary Reports | Wednesday After 5:00pm PST |
| Telco Returns Detail Listing Spreadsheet | Wednesday After 5:00pm PST |
| Detail Reconciliation Report | Wednesday After 5:00pm PST |
| True up Summary (Actual) Report | Wednesday After 5:00pm PST |

TBR_NCI 000318
00119

RER-33    1971

## EXHIBIT "II-D"
### Telco Fees

| Telco Group | SID | Telco Name | Bill Render | Interstate Per Msg. | Intrastate Per Msg. | Bulk 4250 Per Msg. | SSM 010118 Per Msg. | Pay/Call 010116 Per Msg. | End-User Adjust |
|---|---|---|---|---|---|---|---|---|---|
| Ameritech | 9321 | Ohio Bell | 0.4879 | 0.0535 | 0.0535 | 0.1070 | 0.1070 | 0.7200 | 9.63 |
| | 9323 | Michigan Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9325 | Indiana Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| | 9327 | Wisconsin Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 07200 | 9.00 |
| | 9329 | Illinois Bell | 0.4560 | 0.050 | 0.050 | 0.100 | 0.100 | 0.7200 | 9.00 |
| Verizon | 9102 | New Eng Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9104 | New York Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.3000 | 15.00 |
| | 9206 | New Jersey Tel | 1.0600 | 0.020 | 0.020 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9208 | Bell Penn. | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9210 | Diamond State | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9211 | C&P DC | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9212 | C&P MD | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 9213 | C&P VA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1360 | 0.2500 | 15.00 |
| | 9214 | C&P WVA | 1.0600 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| Bell South | 9417 | Bell South | 0.5800 | 0.0475 | 0.0475 | .04+2.85% | 0.0475 | 2.85% | 6.40 |
| GTE Companies | 169 | GTE North | 0.9100 | 0.0200 | 0.0200 | 0.135 | 0.135 | 0.2500 | 15.00 |
| | 328 | GTE Florida | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 479 | GTE South | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2080 | GTE S-West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2319 | GTE California | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2320 | GTE West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2416 | GTE N- West | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 3100 | GTE Hawaii | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| GTE Contel | 170 | GTE N-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 480 | GTE S-Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| | 2081 | GTE SW Contel | 0.9100 | 0.0200 | 0.0200 | 0.1350 | 0.1350 | 0.2500 | 15.00 |
| Citizens Tel | 2308 | Citizens Tel | - | 0.1275 | 0.1275 | 0.3775 | 0.3775 | 03775 | - |
| Pacific Bell | 9740 | Pacific Bell | 0.3632 | 0.0300 | 0.0300 | 0.0300 | 0.0300 | 0.7200 | 9.00 |
| Nevada Bell | 9742 | Nevada Bell | 0.4632 | 0.0300 | 0.0300 | 0.0300 | 0.0300 | 07200 | 9.00 |
| SW Bell | 9533 | S-West Bell | 0.4132 | 0.0300 | 0.0300 | 0.2800 | 0.0300 | 0.7200 | 9.00 |
| QWEST | 9631 | North West Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9636 | Mountain Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| | 9638 | PAC N-W Bell | 1.4500 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 0.0000 | 1.250 |
| Alltel | 9995 | Alltel | 0.6890 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | 0.0925 | - |
| Cincinnati Bell | 9348 | Cinn. Bell - 402 | 0.6820 | 0.0309 | 0.0309 | 0.3309 | 0.0309 | 0.0809 | 15.00 |
| Cincinnati Bell | 9348 | Cinni Bell - 903 | 0.7300 | 0.0330 | 0.0330 | 0.0330 | 0.0330 | 0.0830 | 15.00 |
| Illuminet | 9999 | Illuminet | - | 0.800 | 0.800 | 0.800 | 0.800 | 0.800 | - |
| NECA | 9996 | NECA | - | 0.550 | 0.550 | 0.550 | 0.550 | 0.550 | - |
| SNET | 9147 | SNET | 0.5406 | 0.1174 | 0.1174 | 0.1174 | 0.1174 | 0.7200 | - |
| Sprint United | 341 | United Florida | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 470 | Carolina T&T | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 832 | United Indiana | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| | 9993 | United Midwest | 0.4100 | 0.200 | 0.200 | 0.200 | 0.200 | 0.200 | 2.00 |
| Telcom Canada | 8050 | Telcom Canada | - | 0.560 | 0.560 | 0.560 | 0.560 | 0.560 | - |

The above information is current at the time of printing and is to be used for informative purposes only. The information contained in this exhibit is not constant, permanent, all inclusive and/or final and is subject to change without notice.

Note: The US West End-User Adjustment Fee is based on each line item adjusted

TBR_NCI 000319

00120

RER-33     1972

**Exhibit "II-E"**
**Payment Instructions**

Until receipt of a subsequent written notice executed by the undersigned Client, IGT is hereby instructed to remit any Net Proceeds to which Client is entitled under this Agreement to the account listed below. These wire instructions may only be modified or revoked by a written notice signed by Client. Client agrees to indemnify and hold IGT harmless from any and all claims or expenses arising, directly or indirectly, from IGT complying with the instructions contained herein.

**Wire Transfer Designation**

Company         Network One Services, Inc.

Address         222 Lakeview Ave. Suite 160-157

                West Palm Beach, FL 33401


Bank Name       Wachovia

Bank Address    303 Banyan Blvd

                West Palm Beach, FL 33401


Account Name    Network One Services, Inc.

Account Number  20000156605553

Bank (ABA)
Transfer Number 067006432


Signature: R MM        Print name: Ronny Morillo

Title: Secretary / Treasurer  Date: 2/25/03

TBR_NCI 000320
00121

RER-33      1973

## SCHEDULE III - END-USER INQUIRY

This Service Order for End-User Inquiry shall be effective as of the Effective Date of the Agreement ("Order Date") and shall remain in full force and effect as long as there is in effect a valid Service Order for either PhoneBill or DirectBill services.

1.      **SERVICE ORDER SUMMARY.** This Service Order shall generally include: i) Referral or transfer of End-User inquiries to Client, ii) Handling by IGT of End-User Inquiries under certain circumstances in accordance with Inquiry Guidelines and Inquiry Standards, each as defined herein.

2.      **CLIENT-HANDLED INQUIRIES.** Client may elect, by written notice to IGT, to provide its own End-User Inquiry support provided, however, that Client is able to continually meet the performance requirements set forth on Exhibit VI-A (the "Inquiry Standards"), attached hereto. IGT shall refer or transfer End-User Inquiries to Client based on mutually agreeable procedures. Notwithstanding the previous sentence, in the event that an End-User refuses to be referred or transferred to Client or otherwise initiates a subsequent Inquiry and expresses dissatisfaction with Clients handling of such End-User's original Inquiry, then IGT may handle such subsequent Inquiry in accordance with the Inquiry Guidelines. If IGT determines, in its reasonable discretion, that Client's End-User Inquiry support is unsatisfactory, IGT may elect to provide End-User Inquiry support immediately upon written notice to Client.

3.      **IGT-HANDLED INQUIRIES.** In the event Client has not elected to handle End-User Inquiries or if otherwise Client has been unable to meet the performance requirements set forth above, then IGT shall handle End-User Inquiries in accordance with its standard procedures or otherwise as mutually agreed to by the parties (the "Inquiry Guidelines"). Client agrees to cooperate with IGT with respect to End-User Inquiries including, without limitation, providing originating numbers, locations, applicable rate tables, and detailed written and/or electronic End-User authorizations, such as letters of agency, as requested by IGT. IGT and Client shall establish a contact within each organization for the purpose of resolving End-User Inquiries. When subscription authorization is required, Client shall provide IGT with a toll-free number and/or a data file to access End-User subscription information.

(a) Adjustments. IGT shall use reasonable efforts to sustain billing charges in accordance with the Inquiry Guidelines. However, IGT shall not be required hereunder to commence any litigation or take any other form of action to enforce collection of bills rendered to End-Users except as expressly provided in an applicable service order between the parties.

(b) Regulatory Complaints. IGT shall respond to any regulatory complaints made by End-Users and forwarded to IGT by a regulatory agency and shall provide a copy of such response to Client upon request.

*{ - End of Schedule VI. Exhibits follow. Remainder of page intentionally left blank. - }*

TBR_NCI 000321
00122

RER-33      1974

### EXHIBIT "III-A"
### Inquiry Standards

End-User Inquiry shall be performed by Client or IGT (each in this context a "Provider") in accordance with the following Inquiry Standards:

1. Provider shall maintain a toll-free telephone number through which End-User's initiate inquiries. Where practical, such number shall be prominently displayed on the End-User's bill.

2. Provider shall answer 80% of all End-User Inquiries, with a live Client service agent, within 90 seconds.

3. Provider shall have adequate Client service staff available to support End-User Inquiries between the hours of 8:00 am and 5:00pm for all time zones where End-Users reside.

4. Provider shall not allow calls to be routed to a voicemail function during required service hours (live agent must answer all calls).

5. Provider shall maintain a call abandon rate less than or equal to 5% of inbound calls.

6. Provider shall respond to written End-User Inquiries, in writing, within 15 days of receipt.

TBR_NCI 000322
00123

RER-33        1975

# Exhibit 3

00124

RER-33    1976



# FEDERAL TRADE COMMISSION

### Division of Marketing Practices - Room 238
### 6th & Pennsylvania Avenue, N.W., Washington, D.C. 20580
### FAX Number: (202) 326-3395

## Facsimile Transmittal Sheet

| To: | Ken Dawson<br>Integretel<br>5883 Rue Ferrari<br>San Jose, California 95138<br>Bus: (408) 362-4000<br>Fax: (408) 362-2795 | Sending Organization Code: 1144<br>Total Pages (including cover sheet):<br>*31* |
|---|---|---|
| From: | Roberto Menjivar<br>Investigator<br>Federal Trade Commission<br>Telephone Number: (202) 326-3687 | Date: *March 3, 2006*<br><br>Time: |
| Subject: | ASSET FREEZE: PLEASE PROCESS IMMEDIATELY | |
| | Attached is Temporary Restraining Order | |

**THIS COMMUNICATION, INCLUDING ANY ATTACHMENTS, IS PRIVILEGED AND CONFIDENTIAL.** It is intended only for the use of the addressee(s) named above. All others are prohibited from reading, distributing, copying, and retaining it. Any person receiving this communication in error should promptly notify the sender by phone at the number provided, and mail it back to the address above. In case of transmission errors, please call the Division at: (202) 326-3439.

00125



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Marketing Practices
Roberto C. Menjivar
Investigator
Phone: 202-326-3687
Fax: 202-326-3395

March 1, 2006

## ATTENTION:
### Asset Freeze Issued in FTC v. Nationwide Connections, et al.

Dear Sir or Madam:

   Please be advised that the United States District Court for the Southern District of Florida has issued the attached Temporary Restraining Order ("TRO"). The Order freezes the assets of **Nationwide Connections, Access One Communications, Network One Services, Willoughby Farr, Mary Lou Farr, Yaret Garcia, Erika Riaboukha and Qaadir Kaid.** The Order freezes assets held by financial institutions, broker-dealers and other entities and individuals on behalf of these defendants, and it specifically authorizes service of the Order on any person or entity by facsimile.

   The Order requires you to hold and retain within your control and prohibit the withdrawal, removal, assignment, transfer, pledge, hypothecation, encumbrance, or other disposal of any assets, funds or other property presently held by you or under your control on behalf of any defendant in any account or safe deposit box maintained in the name of, or for the benefit of, any defendant in this lawsuit. Please refer to the TRO itself for the exact provisions contained therein. The attached Fact Sheet concerning the defendants in this matter should aid you in identifying relevant accounts and/or assets.

   The Order requires you to provide counsel for the Commission with certain information about each account or asset titled or maintained in the names of any of the defendants within five (5) business days of receipt of a copy of the Order.

   Please send the statement to me via fax at (202) 326-3395 and to the following address via FedEx or courier, as current postal mail is being delayed due to irradiation procedures:

Federal Trade Commission
Attn: Roberto C. Menjivar
600 Pennsylvania Avenue, N.W., Room 238
Washington, D.C. 20580

If, after a thorough search of your records, you find that you do not have any accounts or assets titled or maintained in the names of any of these defendants, please send a sworn statement to that effect to me via fax at (202) 326-3395 and an original signature to the address above.

Thank you for your prompt assistance in this matter.

Sincerely,

Roberto C. Menjivar
Federal Trade Investigator

Enclosure:
Copy of Temporary Restraining Order
Fact Sheet (2 pages)

## FTC v. NATIONWIDE CONNECTIONS, INC., et al.

### FACT SHEET

## CORPORATE DEFENDANTS:

1.  NATIONWIDE CONNECTIONS, INC.(NWC)
    Primary Address:
    215 5th Street, Suite 306,
    West Palm Beach, FL 33401

    Secondary Addresse:
    222 Lakeview Ave, Suite 160-157,
    West Palm Beach, FL 33401

2.  ACCESS ONE COMMUNICATIONS, INC. (AOC)
    Primary Address:
    222 Lakeview Ave., Suite 160-157,
    West Palm Beach, FL 33401

    Secondary Address:
    215 5th Street, Suite 306,
    West Palm Beach, FL 33401

3.  NETWORK ONE SERVICES, INC.
    Primary Address:
    222 Lakeview Ave., Suite 160-157,
    West Palm Beach, FL 33401

    Secondary Address:
    215 5th Street, Suite 306,
    West Palm Beach, FL 33401

## INDIVIDUAL DEFENDANTS:

1.  MARY LOU FARR a.k.a. Marie L. Farr, Marylou Farr, Mary Louis Farr
    SSN: 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 and 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
    DOB: 10/19/1939
    Current Address:
    6611 S. Flagler Drive,
    West Palm Beach, FL 33405

2.  WILLOUGHBY FARR a.k.a. Will Farr
    SSN: 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
    DOB: 1/7/64
    Current Address:
    Sheriff's Headquarters Complex
    Main Detention Center
    3228 Gun Club Road
    West Palm Beach, FL 33416-4681.

3.  YARET IVON GARCIA
    SSN: 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
    DOB: 11/30/77
    Current Address:
    2302 Ridgewood Circle,
    Royal Palm Beach, FL 33411-6158
    Previous Address:
    232 Arcadia Drive,
    Wellington, FL 33414

4.  QAADIR KAID a.k.a. Rasheed, Kaid Q.
    SSN: 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 (Associated w/Cornell Madison)
    DOB: 03/08/1974
    Current Address:
    2302 Ridgewood Circle,
    Royal Palm Beach, FL 33411-6158

5.  ERICKA RIABOUKHA a.k.a Erika Garcia and Erika G. Riaoukha
    SSN: 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
    DOB: 12/19/81
    Current Address:
    904 Brightwood Way,
    Wellington, FL 33414-4915
    Previous Address:
    306 Woodland Road,
    Lake Worth, FL 33461

FILED by _JU_ D.C.

FEB 27 2006

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____ - CIV- ( _____

**MAGISTRATE JUDGE
VITUNAC**

## 06-80180

FEDERAL TRADE COMMISSION,

       Plaintiff,

vs.

NATIONWIDE CONNECTIONS, INC.,
ACCESS ONE COMMUNICATIONS, INC.,
NETWORK ONE SERVICES, INC.,
WILLOUGHBY FARR,
MARY LOU FARR,
YARET GARCIA,
ERIKA RIABOUKHA,
QAADIR KAID,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CIV-RYSKAMP**

▇▇▇▇▇ TEMPORARY
RESTRAINING ORDER AND
ORDER TO SHOW CAUSE

FILED UNDER
SEAL

Plaintiff, the Federal Trade Commission ("FTC" or the "Commission"), pursuant to

Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), has filed a

Complaint for Injunctive and Other Equitable Relief, including consumer redress, and has moved

*ex parte* for a temporary restraining order and for an order to show cause why a preliminary

injunction should not be granted pursuant to Rule 65(b) of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

       The Court has considered the pleadings, declarations, exhibits, and memoranda filed in

support of the Commission's motion and finds that:

1.      This Court has jurisdiction over the subject matter of this case, and there is good cause to

      believe that it will have jurisdiction over all parties hereto;

2.      There is good cause to believe that Defendants Nationwide Connections, Inc., Access

One Communications, Inc., Network One Services, Inc.; Willoughby Farr, Mary Lou

Fair, Yaret Garcia, Erika Riaboukha, and Qaadir Kaid have engaged and are likely to

engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

and that the Plaintiff is therefore likely to prevail on the merits of this action;

3.     The evidence set forth in the Commission's Memorandum of Points and Authorities in

Support of its *Ex Parte* Motion for TRO ("Memorandum"), and the accompanying

declarations and exhibits, demonstrates that Defendants have engaged in deceptive and

unfair acts or practices in violation of Section 5 of the FTC Act by engaging in

widespread unauthorized billing of collect telephone calls. There is good cause to believe

that Defendants will continue such illegal actions if not restrained from doing so by Order

of this Court;

4.     There also is good cause to believe that immediate and irreparable damage to the Court's

ability to grant effective final relief will result from the sale, transfer, or other disposition

or concealment by Defendants of their assets or business records, unless Defendants are

immediately restrained and enjoined by Order of this Court;

5.     The Commission has not provided notice to Defendants due to the likelihood that

advance notice of this action will cause Defendants to abscond with or destroy

discoverable evidence and conceal or dissipate assets. The Commission's request for this

emergency *ex parte* relief is not the result of any lack of diligence on the Commission's

part, but instead is based upon the nature of Defendants' unlawful conduct;

6.     Weighing the equities and considering the FTC's likelihood of ultimate success, a

temporary restraining order, including an asset freeze, appointment of a temporary

2

receiver, immediate access to Defendants' business premises, an accounting of assets, preservation of business records, and providing other equitable relief is in the public interest; and

7.   Fed. R. Civ. P. 65(c) does not require security of the United States or an officer or agency thereof for the issuance of a restraining order.

## DEFINITIONS

For the purpose of this temporary restraining order ("TRO" or "Order"), the following definitions shall apply:

A.   "Assets" means any legal or equitable interest in, right to, or claim to any real or personal property of any Defendant, or held for the benefit of any Defendant, wherever located, including, but not limited to, "goods," "instruments," "equipment," "fixtures," "general intangibles," "inventory," "checks," "notes" (as these terms are defined in the Uniform Commercial Code), chattels, leaseholds, contracts, mails, other deliveries, shares of stock, lists of participants, intellectual property, accounts, credits, receivables, cash, and trusts, including, but not limited to, any other trust held for the benefit of any Defendant, any Defendant's minor children, or any Defendant's spouse.

B.   "Defendants" means Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc., Willoughby Farr, Mary Lou Farr, Yaret Garcia, Erika Riaboukha, and Qaadir Kaid.

C.   "Document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34(a), and includes, but is not limited to, writings, drawings, graphs, charts, Internet sites, Web pages, Web sites, electronic correspondence,

3

including e-mail and instant messages, photographs, audio and video recordings, computer records, whether active or inactive, and any other data compilations from which information can be obtained and translated, if necessary, through detection devices into reasonably usable form. A draft or non-identical copy is a separate document within the meaning of the term.

D.  **"Long Distance Service Provider"** means an entity that transports long distance telephone calls.

E.  **"Plaintiff"** means the Federal Trade Commission.

F.  **"Receiver"** shall mean the temporary receiver appointed in Paragraph VII of this Order. The term "receiver" also includes any deputy receivers as may be named by the temporary receiver.

G.  **"Receivership Defendants"** means Nationwide Connections, Inc., Access One Communications, Inc., Network One Services, Inc. and any d/b/as of the aforementioned entities.

## PROHIBITED BUSINESS ACTIVITIES

### I.

IT IS THEREFORE ORDERED that Defendants, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are temporarily restrained and enjoined from directly or indirectly misrepresenting, expressly or by implication, that a consumer is obligated to pay any charge on a telephone bill that has not been expressly authorized by the consumer.

4

## ASSET FREEZE

## II.

IT IS FURTHER ORDERED that Defendants, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby temporarily restrained and enjoined from:

A.    Transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien or security interest or other interest in, or otherwise disposing of any funds, real or personal property, accounts, contracts, consumer lists, shares of stock, or other assets, or any interest therein, wherever located, that are: (1) owned or controlled by any Defendant, in whole or in part, for the benefit of any Defendant; (2) in the actual or constructive possession of any Defendant; or (3) owned, controlled by, or in the actual or constructive possession of any corporation, partnership, or other entity directly or indirectly owned, managed, or controlled by any Defendant, including, but not limited to, Cripple Creek Holdings, LLC, and any assets held by or for, or subject to access by, any of Defendants, at any bank or savings and loan institution, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metals dealer, or other financial institution or depository of any kind;

B.    Opening or causing to be opened any safe deposit boxes titled in the name of any Defendant or any Defendant's minor child or any Defendant's spouse, or subject to access by any of them;

C.    Incurring charges or cash advances on any credit card issued in the name, singly or jointly, of any Defendant;

5

    D.     Obtaining a personal or secured loan; and

    E.     Incurring liens or other encumbrances on real property, personal property or other

assets in the name, singly or jointly, of any Defendant.

    *Provided further*, the assets affected by this Paragraph shall include: (1) all assets of

Defendants as of the time this Order was entered; and (2) for assets obtained after the time this

Order was entered, only those assets of Defendants that are derived from the actions alleged in the

Commission's Complaint.

## FINANCIAL REPORTS AND ACCOUNTING

## III.

    **IT IS FURTHER ORDERED** that Defendants, within five (5) days of service of this

Order, shall:

    A.     Prepare and deliver to counsel for the FTC completed financial statements on the

forms attached to this Order as Attachments A and B, for themselves, individually or as

corporations, and for each business entity under which they conduct business, or of which they are

an officer, and for each trust of which they are a trustee. The financial statements shall be

accurate as of the date of entry of this Order; and

    B.     Provide the Commission with a statement, verified under oath and accurate as of

the date of entry of this Order, detailing the name, address, and telephone number for each

accountant, financial planner, investment advisor, stock broker, or other person who provided any

Defendant with financial, business, or tax advice or services since January 1, 2004.

    *Provided further,* the Commission and the Temporary Receiver are immediately

authorized to issue subpoenas to demand the production of documents from any person or entity

00135

RER-33          1987

relating to the nature, status, extent, location or other relevant information relating to Defendants'

assets, income, and financial records.

## FOREIGN ASSET REPATRIATION

### IV.

IT IS FURTHER ORDERED that, within five (5) business days following the service of

this Order, the Defendants shall:

A.     Provide the Commission and the Receiver with a full accounting of all funds,

documents, and assets outside of the United States that are: (1) titled in the name, individually or

jointly, of the Defendants or the spouse of any Defendant; or (2) held by any person or entity for

the benefit of the Defendants; or (3) under the direct or indirect control, whether jointly or singly,

of the Defendants;

B.     Transfer to the territory of the United States and deliver to the Receiver all funds,

documents, and assets located in foreign countries that are: (1) titled in the name, individually or

jointly, of any Defendant; or (2) held by any person or entity, for the benefit of any Defendant; or

(3) under any Defendant's direct or indirect control, whether jointly or singly; and

C.     Provide the Commission access to all records of accounts or assets of the

Defendants held by financial institutions located outside the territorial United States by signing

the Consent to Release of Financial Records attached to this Order (Attachment C).

## INTERFERENCE WITH REPATRIATION

### V.

IT IS FURTHER ORDERED that Defendants, and those persons in active concert or

participation with them who receive actual notice of this Order by personal service or otherwise,

7

are hereby temporarily restrained and enjoined from taking any action, directly or indirectly, which may result in the encumbrance or dissipation of foreign assets, or in the hindrance of the repatriation required by the preceding Paragraph IV of this Order, including but not limited to:

    A.    Sending any statement, letter, fax, e-mail or wire transmission, telephoning or engaging in any other act, directly or indirectly, that results in a determination by a foreign trustee or other entity that a "duress" event has occurred under the terms of a foreign trust agreement until such time that all assets have been fully repatriated pursuant to Paragraph IV of this Order; and

    B.    Notifying any trustee, protector or other agent of any foreign trust or other related entities of either the existence of this Order, or of the fact that repatriation is required pursuant to a Court Order, until such time that all assets have been fully repatriated pursuant to Paragraph IV of this Order.

## RETENTION OF ASSETS AND RECORDS BY FINANCIAL INSTITUTIONS

### VI.

    IT IS FURTHER ORDERED that, pending determination of the Plaintiff's request for a preliminary injunction, any financial or brokerage institution, business entity, or person served with a copy of this Order that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset at any time since the date of entry of this Order, shall:

    A.    Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset except by further order of the Court;

    B.    Deny the Defendants access to any safe deposit box that is:

8

    1.     titled in any Defendants' name, individually or jointly; or

    2.     otherwise subject to access by any Defendant;

C.    Provide the Commission's counsel, within five (5) business days of receiving a copy of this Order, a sworn statement setting forth:

    1.     the identification number of each such account or asset titled in the name, individually or jointly, of a Defendant, or held on behalf of, or for the benefit of a Defendant;

    2.     the balance of each such account, or a description of the nature and value of each such asset as of the close of business on the day on which this Order is served, and, if the account or other asset has been closed or removed, the date closed or removed, the total funds removed in order to close the account, and the name of the person or entity to whom such account or other asset was remitted; and

    3.     the identification of any safe deposit box that is titled in the name, individually or jointly, of a Defendant, or is otherwise subject to access by a Defendant.

D.    Upon request by the Commission, promptly provide the Commission with copies of all records or other documentation pertaining to each such account or asset, including but not limited to originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs. Any such financial institution, account custodian, or other aforementioned entity may arrange for the Commission to

9

obtain copies of any such records which the Commission seeks.

## APPOINTMENT OF TEMPORARY RECEIVER

### VII.

IT IS FURTHER ORDERED that _David Chase, esq._ is appointed

Temporary Receiver for the Receivership Defendants. The Receiver shall be the agent of this

Court, and solely the agent of this Court, in acting as Receiver under this Order. The Receiver

shall be accountable directly to this Court. The Receiver shall comply with all Local Rules and

laws governing federal equity receivers.

## RECEIVER'S DUTIES

### VIII.

IT IS FURTHER ORDERED that the Temporary Receiver is authorized and directed to

accomplish the following:

A.    Assume full control of the Receivership Defendants by removing, as the Receiver

deems necessary or advisable, any director, officer, independent contractor, employee, or agent of

any of the Receivership Defendants, including any Defendant, from control of, management of, or

participation in, the affairs of the Receivership Defendants;

B.    Take exclusive custody, control, and possession of all assets and documents of, or

in the possession, custody, or under the control of, the Receivership Defendants, wherever

situated. The Receiver shall have full power to divert mail and to sue for, collect, receive, take in

possession, hold, and manage all assets and documents of the Receivership Defendants and other

persons or entities whose interests are now held by, or are under the direction, possession,

custody, or control of, the Receivership Defendants. The Receiver shall assume control over the

10

00139

income and profits therefrom and all sums of money now or hereafter due or owing to the Receivership Defendants. *Provided, however*, that the Receiver shall not attempt to collect any amount from a consumer if the Receiver believes the consumer was a victim of the unfair or deceptive acts or practices alleged in the Complaint in this matter, without prior Court approval;

    C.    Take all steps necessary to secure each location from which the Receivership Defendants operate their business. Such steps may include, but are not limited to, any of the following, as the Receiver deems necessary or advisable: (1) serving this Order; (2) completing a written inventory of all receivership assets; (3) obtaining pertinent information from all employees and other agents of the Receivership Defendants, including, but not limited to, the name, home address, social security number, job description, passwords or access codes, method of compensation, and all accrued and unpaid commissions and compensation of each such employee or agent; (4) photographing and video taping any or all portions of the location; (5) securing the location by changing the locks and disconnecting any computer modems or other means of access to the computer or other records maintained at that location; and (6) requiring any persons present on the premises at the time this Order is served to leave the premises, to provide the Receiver with proof of identification, or to demonstrate to the satisfaction of the Receiver that such persons are not removing from the premises documents or assets of the Receivership Defendants. Law enforcement personnel, including, but not limited to, police or sheriffs, may assist the Receiver in implementing these provisions in order to keep the peace and maintain security;

    D.    Conserve, hold, and manage all assets of the Receivership Defendants, and perform all acts necessary or advisable to preserve the value of those assets in order to prevent any irreparable loss, damage, or injury to consumers or creditors of the Receivership Defendants,

11

00140

RER-33      1992

including, but not limited to, obtaining an accounting of the assets and preventing unauthorized transfer, withdrawal, or misapplication of assets;

   E.     Enter into contracts and purchase insurance as advisable or necessary;

   F.     Prevent the inequitable distribution of assets and determine, adjust, and protect the interests of consumers and creditors who have transacted business with the Receivership Defendants;

   G.     Manage and administer the business of the Receivership Defendants until further order of this Court by performing all incidental acts that the Receiver deems to be advisable or necessary, which includes retaining, hiring, or dismissing any employees, independent contractors, or agents;

   H.     Choose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by this Order;

   I.     Have the sole authority to hire legal counsel on behalf of any of the Receivership Defendants;

   J.     Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of or exercising the authority granted by this Order. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure assets of the Receivership Defendants, such as rental payments;

   K.     Institute, compromise, adjust, appear in, intervene in, or become party to such

actions or proceedings in state, federal or foreign courts or arbitration proceedings as the Receiver

deems necessary and advisable to preserve or recover the assets of the Receivership Defendants,

or that the Receiver deems necessary and advisable to carry out the Receiver's mandate under this

Order, including but not limited to, actions challenging fraudulent or voidable transfers;

   L.   Defend, compromise, adjust, or otherwise dispose of any or all actions or

proceedings instituted in the past or in the future against the Receiver in his role as Receiver, or

against the Receivership Defendants, as the Receiver deems necessary and advisable to preserve

the assets of the Receivership Defendants, or as the Receiver deems necessary and advisable to

carry out the Receiver's mandate under this Order;

   M.   Continue to conduct the business, or cease operation of the business, of the

Receivership Defendants in such manner, to such extent, and for such duration as the Receiver

may in good faith deem to be necessary or appropriate to operate the businesses profitably and

lawfully, if at all; *provided that*, the continuation and conduct of the business shall be conditioned

upon the Receiver's good faith determination that the businesses can be lawfully operated at a

profit using the assets of the receivership estate;

   N.   Immediately issue subpoenas and conduct discovery, including depositions, to

obtain documents, records, and information pertaining to the receivership on behalf of the

receivership estate;

   O.   Open one or more bank accounts as designated depositories for funds of the

Receivership Defendants. The Receiver shall deposit all funds of the Receivership Defendants in

such a designated account and shall make all payments and disbursements from the receivership

estate from such an account. The Receiver shall serve copies of monthly account statements on

13

all parties;

P.    Maintain accurate records of all receipts and expenditures that he makes as Receiver; and

Q.    Cooperate with reasonable requests for information or assistance from any state or federal law enforcement agency.

## COOPERATION WITH THE TEMPORARY RECEIVER

### IX.

IT IS FURTHER ORDERED that Defendants and all other persons or entities served with a copy of this Order shall fully cooperate with and assist the Receiver. This cooperation and assistance shall include, but not be limited to, providing information to the Receiver that the Receiver deems necessary in order to exercise the authority and discharge the responsibilities of the Receiver under this Order; providing any password required to access any computer, electronic file, or telephonic data in any medium; and advising all persons who owe money to the Receivership Defendants that all debts should be paid directly to the Receiver. Defendants and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby restrained and enjoined from directly or indirectly:

A.    Transacting any of the business of the Receivership Defendants;

B.    Destroying, secreting, defacing, transferring, or otherwise altering or disposing of any documents of the Receivership Defendants, including, but not limited to, books, records, accounts, writings, drawings, graphs, charts, photographs, audio and video recordings, computer records, and other data compilations, electronically-stored records, or any other papers of any kind or nature;

14

00143

C.    Transferring, receiving, altering, selling, encumbering, pledging, assigning, liquidating, or otherwise disposing of any assets owned, controlled, or in the possession or custody of, or in which an interest is held or claimed by, the Receivership Defendants, or the Receiver;

D.    Excusing debts owed to the Receivership Defendants;

E.    Failing to notify the Receiver of any asset, including accounts, of a Receivership Defendant held in any name other than the name of the Receivership Defendant, or by any person or entity other than the Receivership Defendant, or failing to provide any assistance or information requested by the Receiver in connection with obtaining possession, custody, or control of such assets; and

F.    Doing any act or refraining from any act whatsoever to interfere with the Receiver managing, or taking custody, control, or possession of, the assets or documents subject to this receivership; or to harass or interfere with the Receiver in any way; or to interfere in any manner with the exclusive jurisdiction of this Court over the assets or documents of the Receivership Defendants; or to refuse to cooperate with the Receiver or the Receiver's duly authorized agents in the exercise of their duties or authority under any order of this Court.

## DELIVERY OF RECEIVERSHIP PROPERTY

## X.

IT IS FURTHER ORDERED that:

A.    Immediately upon service of this Order upon them, or within such period as may be permitted by the Receiver, Defendants shall transfer or deliver possession, custody, and control of the following to the Receiver:

15

00144

1.     All assets of the Receivership Defendants;

2.     All documents of the Receivership Defendants, including, but not limited to, books and records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other papers;

3.     All assets belonging to members of the public now held by the Receivership Defendants; and

4.     All keys, codes, and passwords necessary to gain or to secure access to any assets or documents of the Receivership Defendants, including, but not limited to, access to their business premises, means of communication, accounts, computer systems, or other property.

B.     In the event any person or entity fails to deliver or transfer any asset or otherwise fails to comply with any provision of this Paragraph, the Receiver may file *ex parte* an Affidavit of Non-Compliance regarding the failure. Upon filing of the affidavit, the Court may authorize, without additional process or demand, Writs of Possession or Sequestration or other equitable writs requested by the Receiver. The writs shall authorize and direct the United States Marshal or any sheriff or deputy sheriff of any county, or any other federal or state law enforcement officer, to seize the asset, document, or other thing and to deliver it to the Receiver.

16

## TRANSFER OF FUNDS TO THE RECEIVER

### XI.

IT IS FURTHER ORDERED that, upon service of a copy of this Order, all banks, broker-dealers, savings and loans, escrow agents, title companies, commodity trading companies, precious metals dealers and other financial institutions and depositories of any kind, and all third-party billing agents, local exchange carriers, common carriers, and other telecommunications companies shall cooperate with all reasonable requests of the FTC and the Receiver relating to implementation of this Order, including transferring funds at the Receiver's direction and producing records related to the assets and sales of the Receivership Defendants.

## COMPENSATION OF RECEIVER

### XII.

IT IS FURTHER ORDERED that the Receiver and all personnel hired by the Receiver, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the assets now held by, in the possession or control of, or which may be received by, the Receivership Defendants. The Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty (60) days after the date of this Order. The Receiver shall not increase the hourly rates used as the bases for such fee applications without prior approval of the Court.

17

00146

03/03/2006 12:06 FAX
Case 9:06-cv-80180-KLR    Document 296-2    Entered on FLSD Docket 10/30/2006    Page 87 of 102

## RECEIVER'S BOND

### XIII.

IT IS FURTHER ORDERED that the Receiver shall file with the Clerk of this Court a bond in the sum of $ _10,000.00_ with sureties to be approved by the Court, conditioned upon the Receiver well and truly performing the duties of the office, and abiding by and performing all acts the Court directs.

## ACCESS TO BUSINESS OFFICES AND RECORDS

### XIV.

IT IS FURTHER ORDERED that the FTC and the Receiver, and their representatives, agents, and assistants, shall have immediate access to all business premises and storage facilities, owned, controlled, or used by Defendants, including, but not limited to, 215 Fifth Street, Suite 306, West Palm Beach, Florida 33401. The FTC and the Receiver are authorized to employ the assistance of law enforcement officers, as they deem necessary to effect service and peacefully implement this Order. The FTC and the Receiver may exclude Defendants and Defendants' employees from the business premises during the immediate access. The purpose of the immediate access shall be to effect service and to inspect and copy documents and computer data, including but not limited to, correspondence, emails, financial data, and other documents concerning Defendants' business practices and assets.

A.    The FTC and the Receiver and its representatives, agents, and assistants, shall have the right to remove documents from the above-listed premises in order that they may be inspected, inventoried, and copied.

B.    The FTC shall return any removed documents to the Receiver within five (5)

18

00147

RER-33    1999

business days, or such time as is agreed upon by the FTC and the Receiver.

    C.    Defendants and all employees or agents of Defendants shall provide the FTC and the Receiver with any necessary means of access to documents and records, including, without limitation, the locations of Defendants' business premises, keys and combinations to locks, computer access codes, and storage area access information.

    D.    If any computers containing information related to the business practices or finances of the Defendants are at a location other than those listed herein, including, but not limited to the personal residences of the Defendants, then immediately upon service of this Order upon them Defendants shall produce to the Receiver all such computers. In order to prevent the destruction of computer data, upon service of this order upon Defendants, any computers containing such information shall be powered down (turned off) in the normal course for the operating systems used on such computers and shall not be used until produced for copying and inspection, along with any codes needed for access.

    E.    Within forty-eight (48) hours of service of this Order each Defendant shall produce to the Receiver a list of all agents, employees, officers, servants and those persons in active concert and participation with them, who have been associated or done business with the Receivership Defendants.

## DEFENDANTS' ACCESS TO THEIR BUSINESS PREMISES

## XV.

    **IT IS FURTHER ORDERED** that the Receiver shall allow the Defendants and their representatives reasonable access to the premises of the Receivership Defendants. The purpose of this access shall be to inspect and copy any and all books, records, accounts, and other property

19

owned by or in the possession of the Receivership Defendants. The Receiver shall have the discretion to determine the time, manner, and reasonable conditions of such access.

## PRESERVATION OF RECORDS

## XVI.

**IT IS FURTHER ORDERED** that Defendants, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are hereby temporarily restrained and enjoined from destroying, erasing, mutilating, concealing, altering, transferring, writing over, or otherwise disposing of, in any manner, directly or indirectly, any documents or records of any kind that relate to the business practices or business or personal finances of Defendants, including but not limited to, computerized files and storage media, contracts, accounting data, correspondence, advertisements, handwritten notes, telephone logs, telephone scripts, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, appointment books, copies of federal, state or local business or personal income or property tax returns, and other documents or records of any kind that relate to the business practices or business or personal finances of Defendants.

## RECORD KEEPING/BUSINESS OPERATIONS

## XVII.

**IT IS FURTHER ORDERED** that Defendants are hereby temporarily restrained and enjoined from:

       A.      Failing to create and maintain documents that, in reasonable detail, accurately, fairly, and completely reflect their incomes, disbursements, transactions, and use of money; and

       B.      Creating, operating, or exercising any control over any business entity, including

20

any partnership, limited partnership, joint venture, sole proprietorship or corporation, without first

providing the Commission with a written statement disclosing: (1) the name of the business

entity; (2) the address and telephone number of the business entity; (3) the names of the business

entity's officers, directors, principals, managers and employees; and (4) a detailed description of

the business entity's intended activities.

## IDENTIFICATION OF PROVIDERS AND CUSTOMERS

### XVIII.

IT IS FURTHER ORDERED that Defendants shall:

A.      Within five (5) days of service of this Order, prepare and deliver to Plaintiffs a

completed statement, verified under oath and accurate as of the date of entry of this Order,

identifying each long distance service provider that provided services to consumers in connection

with any collect calls that were billed on behalf of Defendants; and

B.      Within ten (10) days of service of this Order, prepare and deliver to counsel for

Plaintiff a completed statement, verified under oath and accurate as of the date of entry of this

Order, detailing the collect calls that were billed on behalf of Defendants during 2005, including

the calling telephone numbers, the recipient telephone numbers, and the date and time of the calls.

## RECORD KEEPING/BUSINESS OPERATIONS

### XIX.

IT IS FURTHER ORDERED that Defendants are hereby temporarily restrained and

enjoined from:

A.      Failing to create and maintain documents that, in reasonable detail, accurately,

fairly, and completely reflect their incomes, disbursements, transactions, and use of money; and

21

B.    Creating, operating, or exercising any control over any business entity, including

any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without

first providing the Commission with a written statement disclosing:  (1) the name of the business

entity; (2) the address and telephone number of the business entity; (3) the names of the business

entity's officers, directors, principals, managers and employees; and (4) a detailed description of

the business entity's intended activities.

### STAY OF ACTIONS

### XX.

**IT IS FURTHER ORDERED** that:

A.    Except by leave of this Court, during pendency of the receivership ordered herein,

Defendants, and all customers, principals, investors, creditors, stockholders, lessors, and other

persons seeking to establish or enforce any claim, right, or interest against or on behalf of the

Defendants, and all others acting for or on behalf of such persons, including attorneys, trustees,

agents, sheriffs, constables, marshals, and other officers and their deputies, and their respective

attorneys, servants, agents and employees, be and are hereby stayed from:

1.    Commencing, prosecuting, continuing, entering, or enforcing any suit or

proceeding against a Receivership Defendant, except that such actions may

be filed to toll any applicable statute of limitations;

2.    Accelerating the due date of any obligation or claimed obligation against a

Receivership Defendant; filing or enforcing any lien against a Receivership

Defendant; taking or attempting to take possession, custody, or control of

any asset of a Receivership Defendant; attempting to foreclose, forfeit,

22

alter, or terminate any interest in any asset of a Receivership Defendant,

whether such acts are part of a judicial proceeding, are acts of self-help, or

otherwise;

3.  Executing, issuing, serving, or causing the execution, issuance or service

of, any legal process against a Receivership Defendant, including, but not

limited to, attachments, garnishments, subpoenas, writs of replevin, writs of

execution, or any other form of process whether specified in this Order or

not;

4.  Causing any Receivership Defendant to be placed in involuntary

bankruptcy; or

5.  Doing any act or thing whatsoever to interfere with the Receiver managing,

or taking custody, control, or possession of, the assets or documents subject

to this receivership, or to harass or interfere with the Receiver in any way,

or to interfere in any manner with the exclusive jurisdiction of this Court

over the assets or documents of the Receivership Defendants.

B.  This paragraph does not stay the commencement or continuation of a criminal action

or proceeding.

## DISTRIBUTION OF ORDER BY DEFENDANTS

## XXI.

IT IS FURTHER ORDERED that Defendants shall immediately provide a copy of this

Order to each affiliate marketer, sub-affiliate marketer, affiliate, subsidiary, division, sales entity,

successor, assign, officer, director, employee, independent contractor, client company, agent,

23

attorney, spouse and representative of Defendants, and shall, within ten (10) days from the date of

entry of this Order, provide the Commission with a sworn statement that Defendants have

complied with this provision of the Order, which statement shall include the names, physical

addresses, and e-mail addresses of each such person or entity who received a copy of the Order.

## SERVICE OF ORDER

### XXII.

**IT IS FURTHER ORDERED** that copies of this Order may be served by any means,

including facsimile transmission or email, upon any financial institution or other entity or person

that may have possession, custody, or control of any documents of any Defendant, or that may

otherwise be subject to any provision of this Order. Service upon any branch or office of any

financial institution shall effect service upon the entire financial institution.

## CONSUMER CREDIT REPORTS

### XXIII.

**IT IS FURTHER ORDERED** that, pursuant to Section 604(1) of the Fair Credit

Reporting Act, 15 U.S.C. § 1681b(1), any consumer reporting agency may furnish a consumer

report concerning Defendants to the Commission.

## SERVICE OF PLEADINGS

### XXIV.

**IT IS FURTHER ORDERED** that Plaintiff shall serve on Defendants copies of this

Order, complaint, and supporting memoranda, affidavits and other evidence. Defendants shall

serve on the Commission all memoranda, affidavits and other evidence on which Defendants

intend to rely at the preliminary injunction hearing set in this matter not later than 4:00 p.m.

24

(Eastern time) on the third calendar day prior to the hearing date. The Commission shall file with the Court and deliver to counsel that have entered an appearance any additional affidavits upon which it intends to rely in connection with the Commission's request for a preliminary injunction no later than 24 hours before the time scheduled for the preliminary injunction hearing.

## DURATION OF TEMPORARY RESTRAINING ORDER

### XXV.

**IT IS FURTHER ORDERED** that the Temporary Restraining Order granted herein shall expire on _March 9_, 2006 at _5:00_ p.m., unless within such time, the Order, for good cause shown, is extended for an additional period not to exceed ten (10) days, or unless it is further extended pursuant to Federal Rule of Civil Procedure 65.

## ORDER TO SHOW CAUSE REGARDING
## PRELIMINARY INJUNCTION

### XXVI.

**IT IS FURTHER ORDERED**, pursuant to Federal Rule of Civil Procedure 65(b), that Defendants shall appear before this Court on the _8_ day of _March_, 2006, at _10:00_ o'clock _a_.m., to show cause, if there is any, why this Court should not enter a Preliminary Injunction, pending final ruling on the Complaint against Defendants, enjoining them from further violations of Section 5(a) of the Federal Trade Commission Act, continuing the freeze of their assets, and imposing such additional relief as may be appropriate.

## SERVICE UPON PLAINTIFF

### XXVII.

**IT IS FURTHER ORDERED** that, with regard to any correspondence or pleadings

25

related to this Order, service on the Commission shall be performed electronically or by overnight

mail to the attention of Laura Kim at the Federal Trade Commission, 600 Pennsylvania Avenue,

NW, Room H-238, Washington, DC 20580.

## RETENTION OF JURISDICTION

### XXVIII.

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all

purposes.

SO ORDERED, this 27 day of February , 2006, at 11:45 am.

_____
UNITED STATES DISTRICT JUDGE.

Kenneth L. Ryskamp

CC: Laura M. Kim, Esg.
Robert S. Kaye, Esg.

Certified to be a true and
correct copy of the document on file
Clarence Maddox, Clerk,
U.S. District Court
Southern District of Florida
by _____ Deputy Clerk
Date 2/27/06

26

RER-33        2007

# Exhibit 4



**Integretel**

BILLING SOLUTIONS

March 6, 2006

Mr. Roberto C. Menjivar                          Via FAX (202) 326-3395
Federal Trade Commission                         and express courier
600 Pennsylvania Avenue NW. Room 238
Washington, DC 20580

RE:    FTC v. Nationwide Connections, Inc. et al
       TRO and Order to Show Cause dated February 27, 2006 ("Order")

Dear Mr. Menjivar:

Please be advised of the following with respect to the above captioned Order:

1)  To the best of our knowledge, we have not conducted any business with defendant
    Nationwide Connections, Inc.

2)  We have a service contract with a Florida corporation called Access One
    Communications ("AOC"). Pursuant to this contract, AOC would be entitled to certain
    proceeds from billing transactions. However, AOC is in default of this contract and,
    therefore, no amounts are currently due and owing. We have not processed any
    billing for AOC since May of 2005. To the extent proceeds become due to AOC in
    the future, we will establish a separate bank account into which such funds will be
    deposited and notify your office accordingly.

3)  We have a service contract with a Florida corporation called Network One Services,
    Inc. ("NOSI"). Pursuant to this contract, NOSI would be entitled to certain proceeds
    from billing transactions. However, NOSI is in default of this contract and, therefore,
    no amounts are currently due and owing. We have not processed any billing for
    NOSI since June of 2003. To the extent proceeds become due to NOSI in the future,
    we will establish a separate bank account into which such funds will be deposited
    and notify your office accordingly.

Except as noted above, we are in possession of no assets relating to any defendant in
this matter. If you wish additional information or need to discuss any of the foregoing,
please call me directly at 408-362-4177.

Sincerely,

Ken Dawson,
President

INTEGRETEL, INC • 5883 RUE FERRARI • SAN JOSE • CA • 95138 • 408.362.4000 TEL.

00157

03/06/2008 15:27 FAX  408 362 2795        Integretel,Inc.                    ☑001
Case 9:06-cv-80180-KLR    Document 296-2    Entered on FLSD Docket 10/30/2006    Page 98 of 102

```
                    *********************
                    ***  TX REPORT  ***
                    *********************


        TRANSMISSION OK

        TX/RX NO              0680
        DESTINATION TEL #     912023263395
        DESTINATION ID
        ST. TIME             03/06 15:26
        TIME USE             00'23
        PAGES SENT              2
        RESULT               OK
```



**Integretel**
BILLING SOLUTIONS

# *Facsimile:*

To: Robert Menjivar     From: Ken Dawson

Fax: _____     Pages: 2

Phone: _____     Date: _____

Re: _____     CC: _____

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● Comments:

00158

PULL AND RETAIN THIS COPY BEFORE AFFIXING TO TH    AGE.

**FedEx**
Express

**USA Airbill**

FedEx
Tracking
Number    8426 2103 1274

**Sender's Copy**

**1 From** Please print and press hard.

Date 3/10/06

Sender's FedEx
Account Number    1499-3361-1

Sender's
Name    Ken Dawson

Phone ( 408 ) 362-4000

Company    INTEGRETEL INC

Address    5883 RUE FERRARI

City    SAN JOSE    State CA    ZIP 95138-1857

Dept/Floor/Suite/Room

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.    OPTIONAL

Roberto Menjivar

**3 To**
Recipient's
Name    Roberto Menjivar    Phone ( )

Company    Federal Trade Commission

To "HOLD" at FedEx location, print FedEx address.    We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address    1000 Pennsylvania Ave NW Rm 238

Address

Dept/Floor/Suite/Room

City    Washington DC    State    ZIP 20580

**Try online shipping at fedex.com.**

By using this Airbill you agree to the service conditions on the back of this Airbill
and in our current Service Guide, including terms that limit our liability.

**Questions? Visit our Web site at fedex.com**
or call 1.800.Go.FedEx® 800.463.3339.

0257534121

**4a Express Package Service**    *Packages up to 150 lbs.*
*Delivery commitment may be later in some areas.*

☐ FedEx Priority Overnight    ☐ FedEx Standard Overnight    ☐ FedEx First Overnight

☐ FedEx 2Day    ☐ FedEx Express Saver

**4b Express Freight Service**    *Packages over 150 lbs.*
*Delivery commitment may be later in some areas.*

☐ FedEx 1Day Freight*    ☐ FedEx 2Day Freight
*Call for Confirmation.

**5 Packaging**
☒ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling**
☐ SATURDAY Delivery
☐ HOLD Weekday    ☐ HOLD Saturday

Does this shipment contain dangerous goods?

☒ No    ☐ Yes    ☐ Yes    ☐ Dry Ice    ☐ Cargo Aircraft Only

**7 Payment** Bill to:
☒ Sender    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

**8 Release Signature** Sign to authorize delivery without obtaining signature.

Total Packages    Total Weight    Total Declared Value†
$    .00

447

# Exhibit 5