1    In arguing that it will be irreparably harmed by litigation expenses, Integretel continues

2  to rely on the same generalized and rather conclusory estimate in Neal Goldfarb's scant three-

3  page declaration, devoid of sufficient detail to support the supposed estimate, which the Court

4  found to be lacking when it denied Integretel's request for a TRO.  The Court's ruling was

5  premised on the Declaration of FTC Counsel Laura Kim submitted by the Commission, which

6  amply demonstrated the invalidity and lack of support in Mr. Goldfarb's declaration for the

7  TRO that Integretel sought.

8    With this Supplemental Opposition, the FTC has submitted the Declaration of FTC

9  Counsel Collot Guerard, further demonstrating that Integretel's litigation cost estimate is highly

10  speculative and vastly overstated.  As Ms. Guerard's Declaration shows, Integretel's estimate of

11  its projected litigation cost is unreasonably high because it assumes that there will be a full,

12  lengthy trial.  In fact, the FTC intends to move for summary judgment.  Grant of the motion will

13  result in no trial costs for Integretel.  An order that narrows the issues for trial could

14  substantially reduce the length and costs associated with a trial.  The Commission further notes

15  that the uncontested facts show that Integretel billed consumers $4,408,186 for collect calls that

16  were completely fabricated.  Collot Dec. ¶¶ 5-6.

17    In her declaration, Ms. Guerard also points out other specific and fatal flaws in Mr.

18  Goldfarb's now clearly outdated declaration:

19  •    First, contrary to the Goldfarb Declaration, it is not at all clear that any more depositions
20        will be taken because discovery has closed and the District Court has not ruled on the
        motion of the other Billing Aggregator to take an additional ten depositions, or on the
21        motion of Integretel to take one additional deposition.  The FTC has opposed these
        motions.  Collot Dec. ¶ 8.
22
  •    Second, it is unlikely that there will be any motions regarding the depositions, especially
23        if the Court denies the motion to take additional depositions.  *Id.*

24  •    Third, Mr. Goldfarb's analysis ignores the significant number of admissions that the
        defendants in the Enforcement Action have made.  This will make any trial abbreviated,
25        in the unlikely event that the FTC loses a summary judgment motion.  *Id.*

26  •    Fourth, in his Declaration, Mr. Goldfarb estimates the trial may last as long as four
        weeks.  This is highly unlikely.  In submitting their Joint Scheduling Report, the FTC
27

28                                            -6-

and two of the individual defendants estimated the trial would only last up to nine days at most. Counsel for the Billing Aggregator defendants, including Mr. Goldfarb, estimated the trial to last 10 to 15 days. Contrary to Mr. Goldfarb's baseless statement in his Declaration, there was <u>never</u> an estimate of four weeks, by Integretel or any other party. Collot Dec. ¶ 9.

In its zeal to misuse this Bankruptcy Court and its discretionary, equitable injunctive powers as a haven from their wrongdoing, Integretel also makes the same fatal mistake here that the debtor – and the bankruptcy court — made in *FAMCO*. It completely fails to address the likelihood that its litigation costs, in the event that a preliminary injunction is entered, will be equaled or exceeded by the litigation costs it will incur in any event by reason of (i) litigation in the bankruptcy court over the FTC's monetary claim related to the Enforcement Action, and (ii) litigation, after Integretel emerges from bankruptcy and the injunction is dissolved, over non-monetary injunctive relief that the FTC will continue to seek. *See FAMCO*, 264 B.R. at 656.

If the Court enjoins the Enforcement Action and the Contempt Proceeding, Integretel will still have to incur the costs of litigating the Commission's monetary claims, but in the bankruptcy court proceeding. The FTC will assert a proof of claim against the estate for the full amount of equitable monetary relief arising from the cramming scheme. Moreover, under the recently enacted § 1141(d)(6)(A) of the Code, certain fraud-type debts as defined in § 523(a)(2)(A), owed by a corporate debtor to a "domestic governmental unit" such as the FTC, are <u>not dischargeable</u> in a Chapter 11 reorganization. Because the evidence against Integretel in the Enforcement Action is so strong, the Commission could file a nondischargeability action against Integretel for its monetary claim. *See In re Lederman*, 1995 WL 792072 (Bankr. C.D. Cal.) (debt to FTC arising from consumer fraud case found to be nondischargeable under § 523(a)(2)(A) in an individual debtor's bankruptcy case). And assuming the FTC prevailed, Integretel would have to provide for full payment of the FTC's claim in order to confirm a feasible plan of reorganization.

Moreover, as Integretel itself recognizes, it can only seek a preliminary injunction through the hypothetical date of confirmation of any plan of reorganization and its emergence

-7-

1    from bankruptcy, after which the Commission would be free to resume the Enforcement Action

2    as to the <u>non-monetary</u> injunctive relief it seeks against Integretel. In that regard, Integretel is

3    simply mistaken in its belief that its alleged cessation of the unlawful activities at issue in the

4    Enforcement Action moots the need for any permanent, prospective injunctive relief. That is

5    not the law. If it were, then Integretel would simply be free to return to its old ways. *See FTC v.*

6    *Affordable Media, LLC*, 179 F.3d 1228, 1237 (9th Cir. 1999).

7         Thus, the same facts would have to be established, before another court unfamiliar with

8    the facts and voluminous record of the Enforcement Action and the Contempt Proceeding.

9    Judicial resources that would have been conserved will instead be wasted, and additional

10   litigation costs that would have been avoided by allowing the proceedings to go forward will

11   instead be incurred. And Integretel would incur yet additional litigation expenses post-

12   confirmation when the Enforcement Action resumes, all of which would have to be taken into

13   account in determining whether any plan of reorganization proposed by Integretel were feasible,

14   *i.e.*, not likely to be followed by liquidation or a subsequent bankruptcy filing.

15        2.    **Integretel Will Not Be Irreparably Harmed By the Continuation of the**
             **Contempt Proceeeding or By Turning Over Property of the Receivership**
16           **Estate**

17        With respect to the Contempt Proceeding, moreover, Integretel cannot show any

18   immediate irreparable harm at this juncture for additional reasons. In its Omnibus Order in the

19   Contempt Proceeding, the District Court ruled that the Reserve Funds are property of the

20   Receivership, and not Integretel's property, and issued an order to show cause why Integretel

21   should not be held in civil contempt for failing to turn over the Reserve Funds to the Receiver.

22   In the next phase of the proceeding, if Integretel fails to purge itself of its contempt by turning

23   over the funds, as they presumably will based on their past contumacious conduct, the burden

24   will shift to Integretel as the contemnor to demonstrate – if they can – why they are allegedly

25   unable to comply. Inability to comply is a defense, if it can be adequately established. *See*

26   *Affordable Media*, 179 F.3d at 1239. If Integretel ultimately prevails, it will not have to turn

27

28                                              -8-

1    over the disputed funds and will not have incurred the irreparable harm it alleges. If the

2    Receiver ultimately prevails, there will be no cognizable irreparable harm either, because the

3    property of the Receivership will have been rightly restored to the Receivership, at no cost to

4    Integretel's estate.

5        Moreover, Integretel's claim of irreparable harm rings especially hollow given that

6    Integretel only has itself to blame for any predicament it now finds itself in. Integretel was

7    served with the TRO including the turnover order in March 2006 and has faced the Receiver's

8    contempt motion since October 2006. Integretel, therefore, has had 18 months to get its affairs

9    in order and to plan for the turnover of the Reserve Funds to the Receiver. Integretel had ample

10   opportunity to seek clarification from the Florida District Court concerning the Reserve Funds

11   or, e.g., to secure a letter of credit, borrow from one of its affiliated companies, cut costs, or

12   simply put away some money into savings. Instead, Integretel chose to do nothing other than to

13   ignore the turnover order. Integretel cannot now legitimately be heard to complain about a harm

14   that is, in essence, self-inflicted. *See Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320

15   F.3d 1081, 1106 (10th Cir. 2003) ("We will not consider a self-inflicted harm to be

16   irreparable.") *citing Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d

17   Cir. 1995); *Ventura County Christian High School v. City of San Buenaventura*, 233 F.Supp.2d

18   1241, (C.D.Cal. 2002) (plaintiffs faced no irreparable harm because their "financial peril is due

19   in part to their own failure to obtain a judicial determination of their rights and obligations at

20   some earlier point in time."); *Lee v. Christian Coalition of America, Inc.*, 160 F. Supp. 2d 14, 33

21   (D.D.C. 2001); 11A Wright, Miller & Kane, Federal Practice & Procedure § 2948.1, at 152-53

22   (2d ed. 1995).

23        **3.    The Declaration of Integretel's Accounting Consultant Does Not Establish**
24                **that Integretel Will Be Irreparably Harmed**

25       Integretel has submitted the declaration of an accountant that it retained "only a few days

26   ago" – from whom neither the Commission nor the Receiver have had any opportunity for

27

28                                              -9-

1    discovery – for the proposition that it will suffer irreparable harm if the Enforcement Action and

2    Contempt Proceeding are not enjoined. Weber Dec. ¶ 1. The analysis in this declaration is

3    based on fatally flawed assumptions. It assumes the validity of Mr. Goldfarb's highly

4    speculative and overstated litigation cost estimate, which is fraught with errors, as the

5    Commission has shown above. It fails to take into account the litigation costs related to the

6    Commission's claims that Integretel is likely to incur in any event if the injunction is granted. It

7    assumes that the "prepayment" program posited by Integretel, which appears to be a radical

8    departure from its historical business practices, is fully implemented and sustained through

9    March 2008. Under its early pay proposal, each week, Integretel proposes to pay its customers

10   50% of the adjusted value of billing transactions processed the prior week, without holding back

11   any reserve funds whatsoever. There is no indication that he ran any alternative scenarios or

12   performed any sensitivity analysis as to that assumption, as he did for another key, dubious

13   assumption that he was uncertain about. Weber Dec. ¶ 15. For instance, Weber fails to discuss

14   whether the LECs, i.e., the phone companies, to whom Integretel submits billing data for

15   posting on consumers' phone bills, will agree to do business with an aggregator that has failed

16   to adequately hedge against the risk of consumer refund requests. Moreover, despite the faulty

17   assumptions and critical flaws in his analysis, the "Alternative Budget" that he prepared, which

18   assumes that the $1.7 million in Reserve Funds are unavailable to Integretel and that Integretel

19   will incur $1 million in litigation costs, indicates that Integretel would have a positive "post and

20   prepetition" cash balance throughout the forecast period. Weber Dec., Exhibit C, Line 29.

21   C.    **Integretel Has Failed to Account for All of the Harms to the FTC and the Public**
22   **Interest If the Enforcement Action and Contempt Proceeding Are Preliminarily**
     **Enjoined**
23
            In its Supplemental Opposition to the TRO, supported by the Declaration of FTC
24
     Counsel Laura Kim submitted in conjunction therewith, the Commission pointed out the
25
     multiple harms to the agency – as well as the public in general, and the consumer victims of
26

27
                                              -10-
28

1  Integretel's alleged unlawful trade practices in particular – should this Court issue a § 105

2  injunction stopping the Enforcement Action in its tracks.

3      In addition to monetary equitable relief, the Commission seeks multiple forms of non-

4  monetary equitable monetary relief against Integretel in the Enforcement Action.  Such relief

5  includes a permanent injunction against pertinent law violations and other non-monetary

6  "fencing-in" injunctive relief, rescission of contracts, and a claims procedure whereby

7  consumers can be redressed for the harm they have suffered.  As the Commission pointed out in

8  its prior brief, this Bankruptcy Court would not be the proper forum for granting such relief.

9  Apart from the limited scope of the Bankruptcy Court's referral jurisdiction under 28 U.S.C. §

10 157, as the Ninth Circuit succinctly held in *San Francisco v. PG&E Corp.*:

11          Through various provisions of the Bankruptcy Code, Congress has evidenced its
            intent that a governmental unit's police or regulatory action not be litigated in
12          federal bankruptcy court. Section 362(b)(4) of the Bankruptcy Code exempts
            such an action from the reach of the automatic stay; 28 U.S.C. § 1452(a) exempts
13          such an action from removal to bankruptcy court.  433 F.3d 1115, 1127 (9th Cir.
            2006).
14

15     Analogously, the Eighth Circuit recently held in *CFTC v. NRG Energy, Inc.*, that given

16 the limited jurisdiction of bankruptcy courts, and the limits of its power under § 105 of the

17 Code, a bankruptcy court has no authority to enjoin a government agency from bringing an

18 enforcement action against a reorganized debtor, post-confirmation, for injunctive relief against

19 future law violations.  457 F.3d 776 (8th Cir. 2006).

20     The Commission explained in its prior brief how the agency's consumer protection

21 mission would be undermined in other critical ways that cannot be quantified in dollars and

22 cents if the Enforcement Action is enjoined.  This further tilts the scales of equity heavily

23 towards denying a discretionary § 105 injunction against the Commission's police or regulatory

24 powers action.  As the court held in *FAMCO*, being enjoined from proceeding in its chosen

25 forum – here, the Florida District Court – seriously impairs the Commission from attaining the

26 very goals that Congress sought to recognize when it created the regulatory and police powers

27

28                                         -11-

RER-37    2562

1    exception. Those goals include carrying out the Commission's consumer protection mission

2    through vigorous law enforcement, redress for consumers, and deterrence of unlawful activity,

3    which sometimes conflict with the bankruptcy goals of maximizing an individual estate's assets

4    and efficiently processing claims. 264 B.R. at 659.

5        In particular, the harm caused to the deterrent effect of the Commission's law

6    enforcement actions by setting the precedent that a defendant can escape prosecution for

7    committing deceptive and unfair trade practices by simply filing for bankruptcy, contrary to a

8    specific exception in the Bankruptcy Code itself, is immeasurable. *See id.*

9        These same potential harms would arise if the Contempt Proceeding were enjoined, with

10   the added dimension that the most hard core defendants and third parties who violate

11   preliminary injunctive orders issued by district courts in FTC law enforcement actions, would

12   likewise view bankruptcy as an escape hatch from the district court's inherent powers of civil

13   contempt.

14       The Commission's need for permanent injunctive relief from the Florida District Court

15   barring Integretel's allegedly unlawful business practices and other equitable relief, and the

16   important public policy goals at stake, are particularly acute here.   As set forth in the previously

17   submitted Declaration of FTC Counsel Laura Kim, pursuing phone billing aggregators such as

18   Integretel is a vital enforcement strategy that the Commission has pursued to curb the insidious

19   and unlawful practice of "cramming" unauthorized charges on consumers' phone bills. Kim

20   Dec. ¶ 22. Aggregators, after all, are the ones who provide unscrupulous, alleged service

21   providers with the access and ability to abuse the telephone billing system. Since 1998, the FTC

22   has filed numerous actions against telephone billing aggregators and obtained appropriate

23   injunctive and monetary equitable relief. *Id.*

24       And, this is not the first time that the FTC has sued Integretel. In 2000, the FTC sued

25   Integretel for its role in billing and collecting charges in an international internet pornography

26   case. Kim Dec. ¶ 19. That litigation was settled as to Integretel in 2002 pursuant to a stipulated

27

28                                          -12-

1    final order and permanent injunction. Despite that court order, in 2006, the Commission had to

2    file suit against Integretel yet again in the subject Enforcement Action, for unlawful telephone

3    billing and collection practices.

4    　　　Integretel also acted as the telephone billing aggregator for the defendants in at least

5    three cramming cases that the FTC brought between 2000-2002. Kim Dec. ¶ 20. A number of

6    state law enforcement authorities have also commenced regulatory proceedings in the past

7    against Integretel. Kim Dec. ¶ 21. In addition, the Declaration of Collot Guerard further

8    describes how two Integretel clients who are among its largest unsecured creditors – Email

9    Discount Network, and Telco Billing, Inc. – who have also been appointed to the Creditors

10   Committee, were recently prosecuted by state attorneys general for cramming unauthorized

11   charges on consumers' phone bills and other alleged deceptive trade practices. Collot Dec. ¶ 10.

12   　　　Moreover, although the Enforcement Action at issue here concerns unauthorized charges

13   billed by the Nationwide Connections defendants and Integretel in May and June 2003, and

14   from October 2004 to June 2005, the FTC has obtained strong evidence indicating that

15   Integretel billed unauthorized charges for a daisy chain of predecessor entities controlled by the

16   Nationwide defendants and their principals over a period of nearly 5 years, dating back to at

17   least 2000. Kim Dec. ¶¶ 23-27.

18   **D.    The Balance of Hardships Tips in Favor of Denying the Requested Injunction**

19   　　　As the foregoing discussion amply demonstrates, the cognizable harms alleged by

20   Integretel from allowing the Enforcement Action and the Contempt Proceeding to proceed are

21   outweighed by the harms to the Commission and the public that would stem from enjoining the

22   Enforcement Action and the Contempt Proceeding.

23   **E.    Granting a preliminary injunction is most assuredly not in the public interest.**

24   　　　Finally, this is not a case where issuing a discretionary § 105 injunction against the

25   government's law enforcement action is in the public interest, or at all warranted. This is a case

26   where the Court should allow the FTC's Enforcement Action, as well as the Contempt

27

28                                            -13-

1    Proceeding collateral to that action, to run their course, as Congress clearly intended under §

2    362(b)(4).

3                                          **CONCLUSION**

4          Integretel has failed to satisfy the stringent standard for granting discretionary injunctive

5    relief pursuant to § 105 against the Commission's regulatory and police power action and

6    related civil contempt proceeding at issue.  Accordingly, the Commission respectfully requests

7    that the Court deny Integretel's Motion for a Preliminary Injunction.

8

9

10   Dated: October 15, 2007                          Respectfully submitted,

11

12                                                     WILLIAM BLUMENTHAL
                                                       General Counsel

13

14                                                     /s/ Michael P. Mora

15                                                     ───────────────────────────
                                                       MICHAEL P. MORA
                                                       Federal Trade Commission
16                                                     600 Pennsylvania Ave. NW, Room NJ-2121
                                                       Washington, DC  20580
17                                                     Telephone:  (202) 326-3373
                                                       Facsimile:   (202) 326-2558
18                                                     Email: mmora@ftc.gov

19                                                     ATTORNEY FOR FEDERAL TRADE
                                                       COMMISSION
20

21

22

23

24

25

26

27

28                                          -14-

RER-37        2565

1  WILLIAM BLUMENTHAL
   General Counsel
2  MICHAEL P. MORA
   Federal Trade Commission
3  600 Pennsylvania Ave. NW, Room NJ-2121
   Washington, DC 20580
4  Telephone: (202) 326-3373
   Facsimile: (202) 326-3258
5  Email: mmora@ftc.gov
6
7  COUNSEL FOR FEDERAL TRADE COMMISSION
8
9              UNITED STATES BANKRUPTCY COURT
              NORTHERN DISTRICT OF CALIFORNIA
10                  SAN JOSE DIVISION
11
12
13  In re:  THE BILLING RESOURCE d/b/a          Case No. 07-052890
           INTEGRETEL, a California
14         Corporation,                         Chapter 11
15         Debtor.
16
           Tax ID: 33-0289863
17
18
19  THE BILLING RESOURCE, d/b/a
        INTEGRETEL, a California corporation,   Adv. Proc. No. 07-05156
20
21      Plaintiff,                              **DECLARATION OF
                                                COLLOT GUERARD
22  v.                                          IN OPPOSITION TO PLAINTIFF'S
                                                MOTION FOR A PRELIMINARY
23  FEDERAL TRADE COMMISSION, et al.            INJUNCTION**
24
        Defendants.
25
26
27
28
    DECLARATION OF COLLOT GUERARD
    IN OPPOSITION TO PLAINTIFF'S MOTION
    FOR A PRELIMINARY INJUNCTION

I, Collot Guerard, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am an attorney employed by the Federal Trade Commission ("FTC" or "Commission") in its Bureau of Consumer Protection, Division of Marketing Practices. My work address is: Federal Trade Commission, 600 Pennsylvania Avenue, NW, Room H-288, Washington, DC 20580. Unless otherwise stated, I have personal knowledge of the facts stated in this Declaration, and if called as a witness, could competently testify thereto.

2.  I submit this Declaration in response to the Motion for a Preliminary Injunction recently filed by The Billing Resource d/b/a Integretel ("Integretel") in the above-captioned adversary proceeding.

3.  I am an attorney representing the Commission in a civil action captioned *Federal Trade Commission v. Nationwide Connections, Inc., et al.*, No. 06-Civ-80180-Ryskamp-Vitunac (the "Enforcement Action"), currently pending in the United States District Court for the Southern District of Florida. Integretel is a defendant in the Enforcement Action.

4.  The FTC expects to file a motion for summary judgment against all defendants in the Enforcement Action. Motions for summary judgment are due November 6, Oppositions must be filed by December 4, and Replies by December 18, 2007.

5.  Integretel's estimate of its projected litigation costs, as set forth in the Neal Goldfarb declaration dated September 24, 2007, if the Enforcement Action is not preliminarily enjoined, appears to be unreasonably high because Integretel's estimate assumes that there will be a lengthy trial. In fact, the FTC believes it is likely to win summary judgment that the defendants violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by cramming more than $30 million in unauthorized collect call charges onto consumers'

DECLARATION OF COLLOT GUERARD
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION        Page 2 of 6

telephone bills between 2003 and the end of 2005. The FTC expects to win on liability

because it is undisputed that most, if not all, of the collect calls were never made or

accepted.

6. The FTC also expects to win on the amount of monetary relief against the defendants for

consumer injury, which is the amount consumers paid to the telephone companies less

any refunds or credits the consumers received. With respect to Integretel, the

approximate dollar amount of injury associated with the collect calls billed by Integretel

is undisputed. Integretel estimates that the net amount consumers paid associated with

the Integretel- Network One charges is $425,493 and the net amount consumers paid

associated with the Integretel-Access One charges is $4,408,186, for a total consumer

injury amount of $4,833,679. *See* Integretel Response to FTC Interrogatory No. 11,

dated June 26, 2007, annexed hereto as **Guerard Attachment A**.

7. Integretel's estimate of its projected litigation costs also fails to address the costs of

defending itself from the monetary claims that the FTC would assert in the bankruptcy

court, regardless of whether the Court were to enjoin the FTC from prosecuting the

Enforcement Action in the Florida District Court as to Integretel. Although the same

facts and legal arguments that would be made in the Enforcement Action would be made

by the FTC before this Court, Integretel's costs of defending itself in the bankruptcy

proceeding are likely to be as high or higher than the costs of defending itself in the

Enforcement Action, for the following reasons.

a. In the bankruptcy proceeding, Integretel will have to defend against both the

FTC's proof of claim, and a separate nondischargeability action. Because the

DECLARATION OF COLLOT GUERARD
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION  Page 3 of 6

1    entire body of evidence against Integretel and its codefendants is so strong, the

2    Commission may assert that its monetary claim against Integretel related to the

3    phone bill cramming scheme at issue in the Enforcement Action constitutes a

4    nondischargeable debt for money obtained by false pretenses, a false

5    representation, or actual fraud.

6

7    b.   The Florida District Court is already familiar with the parties, the legal issues, the

8    basic facts, and some of the evidence through the numerous discovery and other

9    motions on which it has had to rule.  By contrast there will be significant costs

10   incurred by Integretel (and the FTC) in enlightening this Court with respect to a

11   case that already has more than 640 docket entries.

12

13   c.   Moreover, on information and belief, it is the FTC's understanding that Integretel

14   and the other Billing Aggregator defendant in the Enforcement Action have been

15   sharing costs, such as the costs of deposition transcripts.  If Integretel has to

16   defend against the FTC's monetary claims in the Bankruptcy Court, it will no

17   longer be able to turn to the other Billing Aggregator defendant to help subsidize

18   the costs of litigation.

19

20   8.   Integretel's generalized estimate of the litigation costs associated with the non-bankruptcy

21   case appears to be based on the declaration of Neal Goldfarb dated September 24, 2007,

22   submitted in support of Integretel's Emergency Motion for Temporary Restraining Order

23   and Preliminary Injunction.  Some of Mr. Goldfarb's observations are misplaced.  First, it

24   is not at all clear that any more depositions will be taken because discovery has closed

25   and the Florida Court has not ruled on the motion of the other Billing Aggregator to take

26

27

28

DECLARATION OF COLLOT GUERARD
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION          Page 4 of 6

1    an additional ten depositions or on the motion by Integretel to continue one deposition.

2    The FTC has opposed both motions.  Second, it is unlikely that there will be any more

3    motions regarding the depositions, especially if the Court denies the motion to take

4    additional depositions.  Third, Mr. Goldfarb's analysis ignores the significant number of

5    admissions that the defendants in the Enforcement Action, including Integretel, have

6    made.  This will make any trial abbreviated, in the unlikely event that the FTC loses a

7    summary judgment motion.  Fourth, Integretel estimates the trial may last as long as four

8    weeks.  This is highly unlikely.  In submitting their Joint Scheduling Report, the FTC and

9    two of the individual defendants estimated the trial would only last up to nine days.

10   Counsel for the Billing Aggregator defendants, including Mr. Goldfarb, estimated the

11   trial to last 10 to 15 days.  There was never an estimate of four weeks.

12

13   9.    In addition to the law enforcement actions brought against Integretel clients by the FTC

14   and/or States that are listed in the Declaration of Laura Kim dated October 1, 2007, filed

15   by the FTC in opposition to Integretel's Motion for a Temporary Restraining Order and

16   Preliminary Injunction [*See* Kim Decl. ¶¶ 19-21, 23-25], two of Integretel's largest

17   creditors have also been targets of law enforcement proceedings:

18

19   a.    Another Integretel client by the name of **Email Discount Network**, which is

20         listed in this Court's docket [DE 3] as Integretel's second largest unsecured

21         creditor and is now a member of the Creditors' Committee, was prosecuted by the

22         Florida Attorney General for a fraudulent cramming scheme.  Attached hereto as

23         **Guerard Attachment B** are true and accurate copies of the complaint and

24         stipulated order in that action;

25

26

27

28

b.   Several years after being sued by the FTC, Integretel client **Telco Billing, Inc.**, an affiliate of YP.Com (formerly known as YP.Net), was prosecuted by California and 33 other state attorneys general for deceptively marketing Internet yellow pages advertising services through mass mailings of "activation checks" that businesses and non-profits unwittingly deposited.  Victims were then billed on their phone bills for the allegedly unauthorized charges.  Telco Billing is listed as one of Integretel's largest creditors, and is also on the Creditors' Committee.  Attached hereto as **Guerard Attachments C-E** are copies of a related press release, stipulated facts, and settlement order issued by the California Attorney General.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 15 , 2007
in Washington, DC

COLLOT GUERARD

DECLARATION OF COLLOT GUERARD
IN OPPOSITION TO PLAINTIFF'S MOTION
FOR A PRELIMINARY INJUNCTION          Page 6 of  6

# ATTACHMENT A
## TO DECLARATION OF COLLOT GUERARD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80180-Civ-RYSKAMP/VITUNAC

FEDERAL TRADE COMMISSION,

        Plaintiff,

  vs.

NATIONWIDE CONNECTIONS, INC.,
*et. al.*,

        Defendants.

_____/

### Defendant The Billing Resource d/b/a Integretel's Amended Answers to Plaintiff's First Set of Interrogatories

Defendant The Billing Resource d/b/a Integretel ("Integretel") answers the plaintiff's first set of interrogatories as follows.

### General Objections

The following objections apply to all of the FTC's interrogatories and are hereby incorporated by reference in each response to the FTC's specific request, below, without regard to whether the objection is repeated in a particular response to which it may be applicable.

1. Integretel objects to the instructions and definitions incorporated in the interrogatories to the extent that they purport to impose obligations other than or in addition to those imposed by the Federal Rules of Civil Procedure and/or the Court's local rules, or would have the effect of imposing such obligations.

2. Integretel objects to the first set of interrogatories as a whole on the ground that it is cumulatively unduly burdensome.

3. Integretel objects to the interrogatories to the extent that they call for production of documents that are protected by the attorney–client, work-product privileges, and/or joint-defense privileges. Integretel will not disclose any responsive information (a) that constitutes, discloses, or relates to communications regarding this action between Integretel's counsel on the one hand and Integretel or its officers, employees, agents, consultants, or other representatives on the other, (b) that was prepared by Integretel or its attorneys, employees, agents, consultants, or other representatives in anticipation of or preparation for this litigation, or (c) that constitutes, discloses, or relates to communications regarding this action between counsel for Integretel on the one hand and counsel for the BSG defendants on the other.

**Guerard Attachment A**
**p. 1**

11. Please identify the dollar amount consumers paid for the Integretel-Access One charges and the Integretel-Network One charges, including in your answer the dollar amount of Integretel-Access One charges and Integretel-Network One charges successfully placed on consumers' telephone bills, the dollar amount of Adjustments issued to consumers on behalf of Access One and Network One, the dollar amount of Bad Debt that is associated with Access One and Network One, and the dollar amount of true up, if any, associated with Access One and Network One. Please identify all documents that relate to, and all persons who have knowledge of, your response, including the person(s) who responded to this Interrogatory.

**Response:** Integretel objects to this interrogatory on the following grounds: (a) it is vague and ambiguous in that the terms "Integretel-Access One charges" and "Integretel-Network One charges" are each apparently intended to refer to a separate set of charges (because otherwise the use of two different terms would be redundant), but they are defined identically to one another and therefore both apply to the same set of charges; (b) each of the FTC's interrogatories has multiple subparts, and the total number of interrogatories, including subparts, exceeds the limitation imposed by the Court's local rules; and (c) the request that Integretel provide "the dollar amount of true up" as a component of "the dollar amount consumers paid" makes no sense because "true up" is a process rather than a number and because "the dollar amount of true up" does not play any meaningful role in determining or estimating the dollar amount consumers paid.

Without waiving those objections, Integretel states as follows.

Integretel does not know (and cannot precisely determine) the dollar amount paid by consumers for charges on their telephone bills, because the LECs do not report that information to Integretel. The amount can be estimated, however, by subtracting unbills, write-offs, and adjustments from the total client billings. The resulting number represents the estimated amount that was paid by consumers. With respect to Access One and Network One, as of May 2, 2007 those computations are as follows (rounded to the nearest dollar)

|                       | Access One | Network One |
|-----------------------|-----------:|------------:|
| Total client billings | 5,516,211  | 588,466     |
| Unbills               | -58,160    | -99,907     |
| Write-offs            | -45,782    | -4,012      |
| Adjustments           | -1,004,083 | -59,054     |
| Est'd amt. pd.        | 4,408,186  | 425,493     |

The only documents that relate to this response (under the definition of "relate" provided in the interrogatories) are (a) drafts of this response prepared by Integretel and its counsel, (b) comments on and edits to those drafts, which were also prepared by Integretel and its counsel, (c) notes made by Integretel's counsel or employees in connection with the preparation of this response, and (d) communications between or among Integretel employees and/or counsel for Integretel in connection with the preparation of this response. All such documents are privileged under the attorney–client and/or work-product privileges.

The following persons have knowledge of this response: Ken Dawson, Richard Gordin, and Neal Goldfarb.[11]

12. Please describe the reports and summaries Integretel generated with respect to Network One, Access One, and the Predecessor companies, as referenced in Integretel's response to FTC RPD No. 12, including in your answer an explanation of how Integretel used the reports and summaries and to whom they were distributed. Please identify all documents that relate to, and all persons who have knowledge of, your response, including the person(s) who responded to this Interrogatory.

**Response:** Integretel objects to this interrogatory on the ground that each of the FTC's interrogatories has multiple subparts, and the total number of interrogatories, including subparts, exceeds the limitation imposed by the Court's local rules. In addition, Integretel objects to this interrogatory to the extent that it calls for Integretel to explain how each report is used by Integretel, on the ground that to that extent, (a) the interrogatory is overbroad and unduly burdensome; (b) the burden or expense of answering (including the inquiry that would be required in order to answer) outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues; and (c) it is not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving those objections, Integretel states as follows:

The report referred to in Integretel's response to the FTC's document request no. 12 is the Monthly Performance Summary, which provides the following information: new billing, unbill amount, net billing, client refunds, Integretel refunds, LEC chargebacks, LEC write-offs, and net receipts (which represent net billing less client refunds, Integretel refunds, LEC chargebacks, and LEC write-offs). The Monthly Performance Summaries for each client are made available to that client on a password-protected website. They are also available to Integretel employees. The primary purpose for which Integretel uses them is as a discussion tool with clients to help the client understand where revenue may be getting lost so that the client can investigate the potential causes. The reports are a summarized way to view client accounts and identify favorable and unfavorable trends over the passage of time.

The Monthly Performance Summaries for Access One, Network One, and the Predecessor companies were made available to the FTC among the electronic records that were made available in response to the FTC's first document request.

---

11. Integretel's answer with respect to documents relating to this answer and persons having knowledge of this answer is based on the plain language of the interrogatory, which includes the interrogatories' definition of "relate." Under that interpretation, the request for identification of documents relating to the answer and persons having knowledge of the answer is not objectionable. However, if the Court adopts the interpretation advocated by the FTC in its pending motion to compel, Integretel would object to the request on the ground that it is unduly burdensome and unreasonably cumulative in light of discovery already provided.

**Guerard Attachment A p. 3**

The only documents that relate to this response (under the definition of "relate" provided in the interrogatories) are (a) drafts of this response prepared by Integretel and its counsel, (b) comments on and edits to those drafts, which were also prepared by Integretel and its counsel, (c) notes made by Integretel's counsel or employees in connection with the preparation of this response, and (d) communications between or among Integretel employees and/or counsel for Integretel in connection with the preparation of this response. All such documents are privileged under the attorney–client and/or work-product privileges.

The following persons have knowledge of this response: Ken Dawson, Richard Gordin, and Neal Goldfarb.[12]

Dated: June 26, 2007.

### As to objections:

/s/ Neal Goldfarb

| | |
|---|---|
| Richard H. Gordin, Pro hac vice | Scott B. Newman, Florida Bar No. 339717 |
| Neal Goldfarb, Pro hac vice | Martin J. Alexander, Florida Bar. No. 346845 |
| TIGHE PATTON ARMSTRONG TEASDALE PLLC | HOLLAND & KNIGHT LLP |
| 1747 Pennsylvania Ave., N.W., Suite 300 | 222 Lakeview Ave., Suite 1000 |
| Washington, D.C. 20006 | West Palm Beach, Florida 33401 |
| rgordin@tighepatton.com | scott.newman@hklaw.com |
| ngoldfarb@tighepatton.com | marty.alexander@hklaw.com |
| Tel.:   (202) 454-2800 | Tel.:   (561) 833-2000 |
| Fax:   (202) 454-2805 | Fax:   (561) 650-8399 |

*Counsel for The Billing Resource d/b/a Integretel*

---

12. Integretel's answer with respect to documents relating to this answer and persons having knowledge of this answer is based on the plain language of the interrogatory, which includes the interrogatories' definition of "relate." Under that interpretation, the request for identification of documents relating to the answer and persons having knowledge of the answer is not objectionable. However, if the Court adopts the interpretation advocated by the FTC in its pending motion to compel, Integretel would object to the request on the ground that it is unduly burdensome and unreasonably cumulative in light of discovery already provided.

interrogatory answers on behalf of The Billing Resource, d/b/a Integretel and that the foregoing answers to interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June 26, 2007.

Ken Dawson, President

-20-

# ATTACHMENT B
## TO DECLARATION OF COLLOT GUERARD

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

STATE OF FLORIDA,
OFFICE OF THE ATTORNEY GENERAL,

     Plaintiff,

v.                              Case No. _____

EMAIL DISCOUNT NETWORK,
ITAI KATHEIN and EYAL YEZCHEKELL,

     Defendants.

_____/

## COMPLAINT

Plaintiff STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, ("the

Attorney General") sues Defendants EMAIL DISCOUNT NETWORK, ITAI KATHEIN and

EYAL YEZCHEKELL, and alleges:

    1.     This is an action for damages on behalf of consumers, injunctive relief, civil

penalties, attorney's fees and costs and other statutory relief pursuant to the Florida Deceptive

and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes (2005).

    2.     The Attorney General is an enforcing authority of the Florida Deceptive and

Unfair Trade Practices Act.

    3.     The Attorney General has determined that an enforcement action serves the public

interest as required by Section 501.207.

    4.     This Court has jurisdiction pursuant to Section 501.207(3).

5.    EMAIL DISCOUNT NETWORK, LLC, ("EDN") is a Florida corporation doing business at 1844 Nob Hill Road, No. 142, Plantation, Florida 33322.

6.    ITAI KATHEIN ("KATHEIN'), whose address is 329 East 94th Street, New York, New York 10128, is the president of EDN.

7.    EYAL YEZCHEKELL ("YEZCHEKELL"), whose address is 110 Hudson Avenue, Tenafly, New Jersey 07670, is an officer of EDN.

8.    The injurious activities of EDN, KATHEIN AND YEZCHEKELL affect consumers in more than one judicial circuit in Florida as well as throughout the United States and in foreign countries.

## DEFENDANTS' UNLAWFUL COURSE OF CONDUCT

### Overview

9.    EDN, KATHEIN and YEZCHEKELL tricked many thousands of consumers into paying them for services that the consumers did not want and did not use.

10.    The scheme devised by KATHEIN and YEZCHEKELL, and utilized by EDN and other Internet businesses created by KATHEIN and YEZCHEKELL, affects nearly a million consumers and has netted KATHEIN and YEZCHEKELL millions of dollars.

11.    Implemented in July 2004, their plan is still in effect and continues to victimize consumers.

12.    The plan uses deception, lack of conspicuous disclosure and extraction of money from consumers in a manner they did not anticipate -- through their phone bills.

13.    EDN, KATHEIN and YEZCHEKELL are able to obtain funds from consumers by failing to tell them clearly that they will be charged after they visit web pages maintained by EDN, KATHEIN and YEZCHEKELL.

2

14.     The web pages maintained by EDN, KATHEIN and YEZCHEKELL do not request a credit card, check, money order, cash, Pay Pall or any other method of payment from consumers.

15.     EDN, KATHEIN and YEZCHEKELL are able to use telephone numbers given to them by consumers to add charges to the consumers' phone bills.

16.     Many consumers tricked by EDN, KATHEIN and YEZCHEKELL do not know that the charges are on their bills and inadvertently pay the charges month after month.

17.     Some consumers who become aware of the charges are able to get the charges stopped by EDN, KATHEIN and YEZCHEKELL, but they lose the money they have already paid.

18.     Other consumers who learn of the charges are able to get refunds or credits from EDN, KATHEIN and YEZCHEKELL or the telephone companies, but these consumers are soon replaced as new paying consumers are lured into EDN, KATHEIN and YEZCHEKELL's ongoing scheme.

19.     By simply obtaining phone numbers, EDN, KATHEIN and YEZCHEKELL have billed even consumers who have never visited their web pages or expressed any interest in their services.

**EDN's representations**

20.     KATHEIN and YEZCHEKELL began operating Email Discount Network on the Internet in July 2004.

21.     Since July 2004, KATHEIN and YEZCHEKELL have set up many other Internet businesses; these include Consumer Email Service, Consumer Guard Network, Email Music

3

Network, Intelicom Messaging, Messaging Plus, Orbit Telecom, Residential Email, TDI

Communications, Voice Connection USA and Voicemail Direct USA.

22.    The Internet companies created by KATHEIN and YEZCHEKELL, which use the

same deceitful business plan as EDN, have billed approximately 1 million consumers.

23.    Consumers are exposed to EDN on the Internet in one of two ways.

24.    First, consumers on the Internet are taken to EDN by other websites, which are

paid by EDN, KATHEIN and YEZCHEKELL to convey consumers to them.

25.    For example, the website Iwon.com, on which consumers can sign up for contests,

automatically transports consumers to EDN if they make certain choices on the Iwon.com

website, such as not asking for information about discounts from other companies identified on

this website.

26.    Upon landing at the EDN page, many consumers do not realize that they are no

longer at the site sponsored by Iwon.com.

27.    Until mid-2006, the EDN "landing page" at which such consumers arrived stated

in large text, "$1000.00 Worth of Online Coupons!  Good for Major Brand Stores Such as…

BARNES & NOBLE, Circuit City, JCPenney … And More!"  and "30 Day risk FREE Trial."

28.    The representation that consumers who signed up for the coupons would be at no

risk for 30 days was false.

29.    Consumers who gave information to the EDN page would have had to cancel

within 3 days, not 30 days, in order to avoid being charged by EDN, KATHEIN and

YEZCHEKELL.

30.    The landing page states in small, faint grey type:

4

I understand and agree that if I don't cancel my account within 72 hours, Email Discount Network (TM) will submit a $12.95 non-refundable set up fee to my local telephone bill. Thereafter, if I do not cancel within 30 days, Email Discount Network (TM) will automatically submit the monthly service fee of $14.95 to my local telephone bill each month until I cancel my account. All charges will appear on the Integretel bill page as charges on behalf of "Email Discount Network (TM):". For questions, comments or inquiries about the Email Discount Network or if you would like to terminate your membership, please contact us at 1-800-730-8199 or you may email us at Support@emaildiscountnetwork.com. You can also send us a letter to Email Discount Network, 1844 Nob Hill Road, #142, Plantation, FL 33322.

31.    The faint block of information purportedly explaining the EDN payment plan is not clear and conspicuous and appears on the EDN web page underneath blank spaces for consumers' personal information; it would have been noticed, if at all, only after consumers decided to fill in the blanks.

32.    The representation of a "30 Day risk FREE trial" on the landing page was removed by EDN, KATHEIN and YEZCHEKELL after the Attorney General told them it was deceptive in June 2006; by that time, however, EDN, KATHEIN and YEZCHEKELL had already enrolled more than 200,000 customers.

33.    Consumers are also exposed to EDN when they go directly to its website, which offers "CASH BACK EVERY TIME YOU SHOP ONLINE" and "Get a Cash Bonus Prize of Up To $50,000 Just For Signing up to Email Discount Network…. Once you sign up to be a member … with a Risk-Free 30-Day Trial you … are also automatically entered into Our Online Sweepstakes!"

34.    The claim of 30 days "risk free" was still made on the EDN website as of September 21, 2006.

5

35.    A link for signing up to EDN is at the top of the sweepstakes web page, but disclosure in small type of the phone-bill charges and requirement to cancel within 72 hours is not visible unless the consumer chooses to scroll down.

36.    In addition to billing consumers who visit the EDN web pages, EDN, KATHEIN and YEZCHEKELL bill many consumers who have not visited these web pages and have not made contact with EDN in any manner.

**EDN consumers**

37.    As of August 2006, close to 258,727 consumers had been enrolled as customers by EDN, KATHEIN and YEZCHEKELL.

38.    Investigators for the Attorney General made thousands of calls to the EDN consumers, and not one person contacted by the Attorney General had knowingly signed up for a paid service from EDN.

39.    Approximately one third of the EDN customers contacted by the Attorney General were not aware that EDN charges were appearing on their phone bills, in some cases for protracted periods of time.

40.    When asked how EDN could have obtained personal information about themselves, such as their phone numbers, most consumers contacted by the Attorney General said they had no idea.

41.    Some of the EDN consumers contacted by the Attorney General recalled having provided personal information including phone numbers somewhere on the Internet because they believed they were entering a contest, such as contests available at Iwon.com and the EDN sweepstakes.

Guerard Attachment B
p. 6

42.    Other EDN customers contacted by the Attorney General recalled having started to provide personal information at a website promising coupons; but these consumers believed that they did not press a location on the page labeled "submit" and that they did not submit their phone numbers at the site.

43.    A heavy preponderance of the EDN customers terminated the EDN service soon after the first EDN charge appeared on their bills, indicating that many cancelled after realizing the EDN service was not free.

44.    A huge proportion of EDN customers -- 100,562 of the total 258,727 -- asked for refunds, indicating strong dissatisfaction that EDN was billing them for something they did not intend to purchase.

45.    About a third of the customers who asked for refunds were not able to get the "activation fee" of $12.95 returned to them.

**EDN "services"**

46.    EDN is a barebones operation, with few employees, and administrative functions are performed by inexpensive third parties, making costs low and profit margins high.

47.    EDN paid minimal sums to provide the services promised to consumers.

48.    The Attorney General requested evidence that the 258,727 customers purportedly signed up for EDN had used it, but EDN, KATHEIN and YEZCHEKELL provided no evidence that consumers had used its email service, no evidence that consumers had used its "cash back" program and information that consumers had used its coupon service that was found to be inaccurate by the Attorney General.

Email accounts

49.    EDN advertises on the Internet that it provides email accounts.

7

**Guerard Attachment B p. 7**

50.    EDN, KATHEIN and YEZCHEKELL were unable to provide evidence to the Attorney General that a single customer opened an email account.

### Cash back

51.    Along with email accounts, EDN advertises a second service on the Internet -- cash back on purchases that consumers make online from third parties such as Barnes & Noble and J.C. Penney.

52.    EDN, KATHEIN and YEZCHEKELL were unable to provide evidence to the Attorney General that a single customer received cash back under the EDN program.

### Coupons

53.    EDN, KATHEIN and YEZCHEKELL claimed that 123, 408 of the 258,727 customers had been provided with coupons -- that is, by their own admission, less than half of EDN's customers had ever been provided with a service.

54.    The Attorney General telephoned consumers who, according to EDN, KATHEIN and YEZCHEKELL, had received coupons.

55.    Not one of the consumers contacted by the Attorney General who reportedly received coupons said they knew anything about EDN or recalled receiving coupons from EDN.

### Charges on phone bills

56.    Major phone companies in the United States place charges by third parties on consumers' phone bills.

57.    The phone companies place charges on bills pursuant to agreements with companies called "billing aggregators," who in turn have agreements with companies such as EDN, which provide products or services and are called "product providers."

8

58.     Under Florida and federal law, charges on consumers' phone bills must have been authorized by the consumers.

59.     The phone companies and billing aggregators fail to monitor adequately whether product providers are seeking charges that were not authorized by the consumers who are billed.

60.     A system of verifying whether consumers had authorized charges -- such as requiring product providers to obtain written or audio-taped permission -- has not been adopted.

61.     Instead of determining in advance whether consumers have authorized charges, the phone companies, which are required by law to issue refunds or credits to consumers who have not authorized charges, merely wait for consumers to complain.

62.     Telephone bills are usually complicated, with a wide assortment of charges and fees, and often vary from month to month in the total sums requested.

63.     Many consumers who had not authorized charges by EDN did not complain because they were not aware that the charges were on their bills.

64.     EDN, KATHEIN and YEZCHEKELL entered into agreements with billing aggregators who in turn entered into agreements with phone companies, and charges submitted by EDN, KATHEIN and YEZCHEKELL were added to the phone bills of hundreds of thousands of consumers.

65.     According to consumers contacted by the Attorney General, EDN, KATHEIN and YEZCHEKELL charged many consumers who had never visited EDN web pages and who, in some instances, did not even own computers.

66.     EDN, KATHEIN and YEZCHEKELL failed to verify whether the persons who entered information on their web pages were in fact phone subscribers at the phone numbers that were also entered on the web pages.

9

67.    Some people who entered information made up phone numbers, with the result that the actual subscribers at those numbers were charged on their phone bills by EDN, KATHEIN and YEZCHEKELL.

68.    By obtaining phone numbers, EDN, KATHEIN and YEZCHEKELL billed consumers who never visited their web pages or expressed any interest in their services.

69.    Clearly false information was submitted to EDN, KATHEIN and YEZCHEKELL, yet they still used it to charge consumers on their phone bills, including customer names listed in EDN records as "The Daredevil" and "Jane Doe." These names do not correspond to the phone numbers that were billed.

### COUNT ONE
### DECEPTIVE AND UNFAIR TRADE PRACTICES
### IN VIOLATION OF CHAPTER 501, PART II, FLORIDA STATUTES

70.    The Attorney General re-alleges paragraphs 1 through 69.

71.    "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful under Section 501.204(1) of the Florida Unfair and Deceptive Trade Practices Act, Chapter 501, Part II, Florida Statutes (2005).

72.    At all times material hereto, Defendants EDN, KATHEIN AND YEZCHEKELL engaged in "trade or commerce" as defined by Section 501.203(8), Florida Statutes.

73.    EDN, KATHEIN AND YEZCHEKELL engaged and continue to engage in unfair and deceptive practices including:

    (a)    charging consumers for services they had not authorized;

10

Guerard Attachment B
p. 10

(b)    failing to clearly and conspicuously disclose that EDN services required payment; that payment would be on phone bills; and that cancellation was required to avert charges;

(c)    failing to put in place systems showing definitively that consumers had requested their services;

(d)    failing to adopt procedures to prevent phone subscribers whose numbers were submitted by other people from being charged;

(e)    failing to provide promised services; and

(f)    failing to give full refunds to consumers who asked for their money back.

74.    EDN, KATHEIN AND YEZCHEKELL knew or should have known that their conduct was unfair and deceptive.

75.    All of the practices engaged in by EDN, KATHEIN AND YEZCHEKELL, as alleged herein, are unfair and deceptive to consumers in violation of the Florida Unfair and Deceptive Trade Practices Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, State of Florida, Department of Legal Affairs, Office of the Attorney General respectfully requests that this Court:

(a)    Temporarily and permanently enjoin Defendants EDN, KATHEIN AND YEZCHEKELL  from violating the Florida Unfair and Deceptive Trade Practices Act, Chapter 501, Part II, Florida Statutes;

(b)    Order Defendants EDN, KATHEIN AND YEZCHEKELL to reimburse all consumers injured by their unfair and deceptive practices.

11

(c)    Order Defendants EDN, KATHEIN AND YEZCHEKELL to pay fines of

$10,000 for each of their violations of the Florida Unfair and Deceptive Trade Practices Act;

(d)    Award the Attorney General reasonable attorney's fees and costs; and

(e)    Grant such other relief as this Court deems proper and just.

Respectfully submitted this _____ day of September 2006.

CHARLES J. CRIST, JR.
ATTORNEY GENERAL


_____
ALLISON FINN
ASSISTANT ATTORNEY GENERAL
Florida Bar No. 0493805
Office of the Attorney General
Economic Crimes Division
The Capitol, PL-01
Tallahassee, Florida 32399-1050
Tel.  (850)414-3600
Fax  (850)488-4483

12

Guerard Attachment B
p. 12

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

STATE OF FLORIDA,
OFFICE OF THE ATTORNEY GENERAL,

     Plaintiff,

v.                           Case No. 2006 CA 2475
                                   Civil Division - Judge Bateman

EMAIL DISCOUNT NETWORK,
ITAI KATHEIN and EYAL YEZCHEKELL,

     Defendants.

_____

## SETTLEMENT AGREEMENT

Pursuant to Chapter 501, Part II, Florida Statutes, the STATE OF FLORIDA,

DEPARTMENT OF LEGAL AFFAIRS, OFFICE OF THE ATTORNEY GENERAL, ("the

Attorney General") filed suit against Defendant EMAIL DISCOUNT NETWORK, LLC

("EDN"), ITAI KATHEIN and EYAL YEZCHEKELL in connection with charges placed on

consumers' phone bills. This Settlement Agreement is intended to resolve the suit against

Defendants, who enter into this Settlement Agreement without admission of liability.

## STIPULATED FACTS

1.    At its own website and other websites, EDN, a Florida company, offers (a) email

accounts, (b) coupons and (c) cash back on purchases.

2.    ITAI KATHEIN and EYAL YEZCHEKELL are corporate officers of EDN and

direct its operations.

3.    Upon becoming EDN customers, consumers are assigned email accounts, through

which they are thereby provided with electronic newsletters offering coupons and cash back

**Guerard Attachment B
p. 13**

when purchases are made from participating vendors, as well as access to the EDN website through which coupons and cash back offers are also available.

    4.    Prior to July 2006, text at the EDN website, and at other websites offering EDN services, stated:

        (a)    that consumers who signed up would be charged on their phone bills,

        (b)    that consumers had 72 hours after signing up to cancel their participation and, if they failed to do so, would be charged a non-refundable set-up fee of $12.95 and, if they did not cancel within 30 days, a fee of $14.95 a month, and

        (c)    that the service was "risk free."

    5.    For customer identification, information security, fraud prevention and verification purposes, the consumer has provided EDN with personal information, including his/her first name, last name, postal address, email address, home telephone number, date of birth, gender and mother's maiden name, prior to applying for EDN services.

    6.    After the consumer submits his or her order for EDN services, EDN, within twenty-four (24) hours, emails the consumer a "confirmation" email followed by an "activation" email. No response to the "confirmation e-mail" is required from the consumers.

## MATTERS INVESTIGATED

The Attorney General's Office investigated the following allegations:

    7.    Florida consumers told the Attorney General that they had not knowingly signed up for services offered by EDN and that their phone bills included unauthorized charges by EDN.

2

Guerard Attachment B
p. 14

8.    Other Florida consumers who were being charged by EDN told the Attorney General that they were not aware of the EDN charges on their bills and had not authorized these charges.

9.    As of August 2006, of 20,516 Florida consumers charged by EDN, only 872 -- less than 5 percent -- had ever requested or used EDN's coupon or cash-back services.

10.    According to EDN's records, about 40 percent of the Florida consumers charged by EDN requested refunds.

11.    The Attorney General also investigated whether:

(a)    Florida consumers did not realize that EDN had signed them up because disclosures on the EDN and related websites were not clear and conspicuous,

(b)    The fact that EDN's services are not free was not clear and conspicuous,

(c)    The fact that that Florida customers would be charged on their phone bills was not clear and conspicuous,

(d)    EDN's disclosure of Florida consumers' right to cancel was not clear and conspicuous,

(e)    Florida consumers incurred a financial risk sooner than 30 days after being signed up, and

(f)    Line subscribers who were charged by EDN did not personally authorize the charges.

## DEFINITIONS

12.    "Clear and conspicuous" means that a statement is made in a manner readily noticeable and understandable to the persons to whom it is directed. To determine whether a statement is clear and conspicuous, factors to consider include whether:

{00082861;1}                                  3                    **Guerard Attachment B
                                                                   p. 15**

(a)    It is located sufficiently near any other statement that clarifies, modifies or explains it, or any other statement that it clarifies, modifies, or explains,

(b)    It contradicts, or renders confusing or ambiguous, any other statement contained in the representation, and

(c)    It is or appears to be inconsistent with any other statement contained in the representation.

13.    "EDN Affiliate" is an online entity or website, which has a relationship with EDN and/or EDN's advertising agent, which Affiliate, for a commission or other consideration, will advertise the EDN service.

**IT IS HEREBY AGREED BY THE PARTIES:**

### COMPLIANCE

14.    EDN, its employees and any other persons who act on behalf of EDN, directly or indirectly, shall comply with the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes (2005).

15.    EDN, whether acting directly or through it advertising agent(s), agrees to require in all contracts with Affiliates that said Affiliates are prohibited from making any changes to EDN's creatives, including any changes to EDN's disclosures.  EDN shall monitor Affiliates to assure compliance and require any Affiliates to cure any violations within forty-eight (48) hours and shall maintain records of such violations by Affiliates for production to the Florida Attorney General upon request.

16.    All terms and conditions related to EDN services on the Internet, and in any other promotional materials aimed at the public, shall be clear and conspicuous.

4

**Guerard Attachment B
p. 16**

17.    All disclosures related to the following shall be clear and conspicuous:

(a)    EDN may not represent that any services are free or "risk free" if they are not in fact free or "risk free;"

(b)    EDN services will be billed directly to the consumers' telephone bill,

(c)    Consumers will be charged unless they cancel within a certain period of time, stating that period of time,

(d)    If a non-refundable fee is to be charged, the amount of that fee and the fact that it will be non-refundable, and

(e)    Consumers will incur a monthly charge, stating the amount of that charge.

18.    On the Internet, and in any other promotional materials, EDN shall clearly and conspicuously disclose all material terms of the offer, including those contained in paragraph 17 hereof in a location above the "Submit" button. The price component shall be made in a short stand alone sentence directly above the "submit" button and shall not be part of a lengthy paragraph. The parties agree that the following example of language related to the price component will satisfy this requirement: "I understand and agree that Email Discount Network will charge a monthly fee of $14.95 to my local telephone bill unless I cancel my account within 72 hours."

It is understood that EDN has a reasonable time, not to exceed ten (10) business days from the date of execution of the consent judgment to institute the above mentioned changes to its creatives.

19.    On the Internet, and in any other promotional materials, EDN shall not:

(a)    Request consumers' mothers' maiden names, or

**Guerard Attachment B
p. 17**

(b)     Represent that signing up for any of its services is "risk free" if Consumers must cancel their participation in order to avoid being charged or if Consumers will incur a non-refundable set-up fee.

20.     EDN shall not charge any consumer unless EDN has clearly and conspicuously provided the disclosures as required by paragraph 17 and 18 hereof, and the consumer has clicked on the "Submit" button.

21.     As set forth in paragraph 22, consumers who request refunds of amounts paid to EDN prior to the date of execution of the consent judgment, will be issued refunds of such amounts requested.

### CONSUMER REFUNDS

22.     EDN shall voluntarily make available a consumer refund for those consumers who believe that they are entitled to a refund of amounts paid to EDN prior to the execution of the consent judgment as follows:

(a)     Within thirty (30) days of entry of the Consent Judgment, EDN shall send all Florida consumers who paid for services EDN offered on the Internet but did not retrieve coupons or receive cash back, and who have not received already full refunds, a letter with a subject line that shall read as follows: "Email Discount Network, LLC Settlement Benefit Notice."

(b)     The letter referenced in subsection (a) above shall read as follows:

Dear Florida Consumer:

Our records reflect that you are or were an Email Discount Network, LLC ("EDN") customer and have been billed for EDN services through your phone bill. Pursuant to a court-approved voluntary settlement, you are entitled to a refund of amounts previously paid to EDN

6

**Guerard Attachment B
p. 18**

for EDN services, for which you have not previously received a credit. If you believe you are

entitled to such a refund, simply enter your full name, the telephone number billed by EDN and

your current mailing address and the number of months of service for which you seek a refund,

in the space provided below, and print and mail the completed form to EDN at: 1844 Nob Hill

Road, #142, Plantation, FL 33322, Attention Consumer Refund Manager.

Full Name: _____

Telephone Number Billed: _____

Current Mailing Address: _____

_____

Number of Months to be Refunded: _____

All refund request forms must be received within sixty (60) days of the date of

this letter.

(c)     In addition to the foregoing, EDN will make refunds available for

consumers outside of the State of Florida. Within thirty (30) days of entry of the Consent

Judgment, EDN shall send to any consumer outside the State of Florida who paid for services

EDN offered on the internet but did not retrieve coupons or receive cash back, and who has not

received already full refunds prior to the entry of judgment, an e-mail, with the same form as set

forth in subsection (b) above, informing them of this refund offer and that they have sixty (60)

days to send the refund request to EDN at the address listed in subsection (b) above. Refunds

will be made to the satisfaction of the Florida Attorney General and consistent with those sent to

Florida consumers.

(d)     Within one hundred twenty (120) days of the entry of the Consent

Judgment, EDN shall mail refund checks for amounts previously billed and not credited to all of

**Guerard Attachment B
p. 19**

those eligible Florida consumers or out of state consumers from whom EDN has received refund request forms as described in subsection (b) and (c) above. EDN shall not be obligated to send checks to Florida or out of state consumers that have not submitted refund request forms, or in instances where the letter or email originally sent to the Florida or out of state consumer is returned as undeliverable.

(e)    Within one hundred fifty (150) days of the entry of the Consent Judgment, EDN shall make a report to the Attorney General identifying the names, amounts, addresses and dates of refunds made to all Florida and out of state consumers that were sent checks pursuant to subsection (c) hereof.

(f)    EDN shall report to the Florida Attorney General the names of Florida Consumers who returned refund forms to EDN who were not provided refunds.

### MONITORING

23.    For two (2) years after the date of execution of this Settlement Agreement, EDN shall compile and maintain records, to be made available upon request to the Attorney General, of (a) web pages at the EDN website and all other websites used by EDN and any of its Affiliates to offer services, (b) contact information for all persons signed up, including their telephone numbers, (c) usage of EDN services by persons signed up, (d) consumer complaints, (e) refunds to Florida consumers and (f) the gross amounts processed and billed monthly by EDN.

### CONTRIBUTION

24.    EDN shall pay the Attorney General the sum of Two Hundred Thousand Dollars ($200,000.00) for attorney's fees and costs incurred in connection with this investigation, made payable to the Legal Affairs Revolving Trust Fund and sent to Allison Finn, Assistant Attorney

8

**Guerard Attachment B p. 20**

General, Office of the Attorney General, Department of Legal Affairs, PL-01, The Capitol,

Tallahassee, Florida 32399-1050, pursuant to Section 501.2101, Florida Statutes.

### FUTURE VIOLATIONS

25.    Any future violations of this Settlement Agreement shall subject EDN to civil

penalties and all sanctions provided by law.  Pursuant to Section 501.207, Florida Statutes, a

violation of this Settlement Agreement is *prima facie* evidence of a violation of the Florida

Deceptive and Unfair Trade Practices Act, Section 501, Part II, Florida Statutes.

### APPLICABILITY

26.    This Settlement Agreement shall apply to and bind EDN's officers, directors,

employees, agents, representatives, independent contractors, successors and assigns.

27.    EDN shall be responsible for making the substantive terms and conditions of this

Settlement Agreement known to its officers, directors, supervisors, employees, agents,

representatives, successors and assigns.

### FINAL CONSENT JUDGMENT

28.    The parties agree that upon execution of the Settlement Agreement, the parties

shall present this Court with an agreed-upon Final Consent Judgment and that this Settlement

Agreement shall be attached to the Judgment and incorporated therein.  The parties further agree

that the Final Consent Judgment may be entered immediately by the Court without necessity of

hearing.

29.    Upon entry of the Final Consent Judgment, the Attorney General agrees to

dismiss its above-titled lawsuit with prejudice.

30.    This Settlement Agreement shall become effective upon its execution by all

persons whose signatures appear below.  The Deputy Attorney General may refuse to accept it at

{00082861;1}                                   9

**Guerard Attachment B
p. 21**

his discretion. The receipt or deposit by the Attorney General of any monies pursuant to the

Settlement Agreement does not constitute acceptance by the Department, and any monies

received will be returned if the Settlement Agreement is not accepted.

IN WITNESS WHEREOF, Email Discount Network has caused this Agreement to be executed

by _Itai Kathein_ as ___President___, a duly authorized representative of

EDN, as a true act and deed, in _Broward_ County, State of _Florida_, this

_15th_ day of _February_ 2007.

BY MY SIGNATURE I hereby affirm that I am acting in my capacity as _President_ of

Email Discount Network and that by my signature I am binding said corporation to this

Agreement.

BY _____

STATE OF _FLORIDA_
COUNTY OF _BROWARD_

BEFORE ME, an officer duty authorized to take acknowledgments in the State of _FLORIDA_,
personally appeared _ITAI KATHEIN_ as _PRESIDENT_ and duly
authorized representative of Email Discount Network, and acknowledged before me that he
executed the foregoing instrument for the purposes therein stated, on this _15_ day of
_Feb_ 2007.

Personally Known ____ or ____        Notary Public (signature) _____
Produced Identification ____
Type of Identification Produced
_FL DL_
(print, type or stamp commissioned name of Notary)

Ira Jacobson
My Commission DD242812
Expires November 27 2007

10

**Guerard Attachment B**
**p. 22**

ITAI KATHEIN

STATE OF _FLORIDA_
COUNTY OF _BROWARD_

BEFORE ME, an officer duty authorized to take acknowledgments in the State of _FLORIDA_, personally appeared _ITAI KATHEIN_ and acknowledged before me that he executed the foregoing instrument for the purposes therein stated, on this _15_ day of _FEB_ 2008.

Personally Known ____ or
Produced Identification _✓_
Type of Identification Produced
_FL D/L_
(print, type or stamp commissioned name of Notary)

Notary Public (signature) _____

Ira Jacobson
My Commission DD242612
Expires November 27 2007

{00082861;1}     11     **Guerard Attachment B
p. 23**

EYAL YEZCHEKELL

STATE OF New York
COUNTY OF Queens .

BEFORE ME, an officer duty authorized to take acknowledgments in the State of New York personally appeared Eyal Yechezkell and acknowledged before me that he executed the foregoing instrument for the purposes therein stated, on this 16th day of February 2007.

Personally Known _____ or                    Notary Public (signature)
Produced Identification ✓
Type of Identification Produced                     SOPHIA CELIS
NJ Driver's License                         NOTARY PUBLIC-STATE OF NEW YORK
(print, type or stamp commissioned name of Notary)      No. 01-CE6106731
                                            Qualified in Queens County
                                            Commission Expires March 15, 2008

12

Guerard Attachment B
p. 24

**FOR THE OFFICE OF THE ATTORNEY GENERAL:**

_Michael A. Belenki_
ALLISON FINN
ASSISTANT ATTORNEY GENERL
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LEGAL AFFAIRS
The Capitol, PL-01
Tallahassee, Florida 32399-1050

_Robert A. Hannich_
DEPUTY ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LEGAL AFFAIRS
The Capitol, PL-01
Tallahassee, Florida 32399-1050
850-245-0140

# ATTACHMENT C
## TO DECLARATION OF COLLOT GUERARD

# News & Alerts

Contact Press Office
(916) 324-5500

---

## Attorney General Lockyer Announces California Businesses Eligible for Res
## Under $2 Million-Plus Settlement of Internet Yellow Pages Case
### *YP.com Will Stop Using Account Activation Checks Under Settlement with 34 States*

December 14, 2006                                                                                    **View**

06-107
FOR IMMEDIATE RELEASE
(916) 324-5500

(SAN DIEGO) – Attorney General Bill Lockyer today announced YP.com (YP) and affiliate Telco Billing, In
restitution to businesses and nonprofit groups in California and 33 other states under a $2 million-plus s
that resolves allegations YP deceptively marketed enhanced advertising in its Internet yellow pages dire

"Thousands of California businesses and nonprofits bought these services, many times unwittingly, or w
understanding how the program worked, or the extent of their financial obligation," said Lockyer. "We b
marketing practices caused these problems. The settlement advances consumers' interests because it pi
restitution to victims and imposes court-enforced reforms of YP's business practices."

Incorporated in Nevada, YP provides standard online business listings, using information purchased from
sources. Additionally, YP offers enhanced listings, called Internet Advertising Packages (IAP)." The IAPs
businesses "preferred status" and listings that include links to a "mini-web page which may contain addi
information about the business or organization," according to an Agreed Statement of the Facts" that Lo
today in San Diego County Superior Court along with the settlement.

YP's direct mail marketing of IAPs included the use of "activation checks" that ranged from $3.25 to $3.!
depositing the check, recipients activated an IAP account and agreed to pay monthly fees for the enhanc
services. The activation checks included a statement above the endorsement line which informed prospe
customers that by depositing the check, they agreed to pay monthly IAP fees, which would be collected
automatically through the customer's bank account or phone bill.

Despite the disclosure, "some businesses and some nonprofit organizations, including churches ... were
remain unaware that they deposited an 'activation check' which resulted in an obligation towards YP, (oi
unaware that there was automatic withdrawal from the checking account for YP services," the Statemen
says. Additionally, according to the Statement of Facts, some businesses or nonprofits mistakenly depos
checks, or did not notice the disclosure statement above the endorsement line.

Lockyer's office alleges the defendants' marketing practices related to the activation checks violated stat
prohibiting unfair businesses practices, and false or misleading advertising.

In California, more than 65,500 businesses and nonprofits have received and deposited the activation cl
January 1, 2003. Under the settlement, California will receive $200,996 to provide restitution to former

**Guerard Attachment C**
**p. 1**

customers who deposited the checks, plus $75,000 to cover the state's investigation costs.

Former customers will have six months to file claims for restitution. Each former customer could receive
for up to four months of IAP fees, which ranged from $24 to $29 per month. The Attorney General will u
money remaining from the $200,996 in restitution to fund the investigation of consumer protection case

The settlement also requires YP to notify current customers (those still paying IAP fees), that they have
opportunity to cancel and that they are eligible to receive a refund of their prior two months payment. A
to current customers would be paid separately from the $2 million, which will be used solely to reimburs
customers and recoup the states' costs.

Aside from the monetary payments, the settlement prohibits YP from using activation checks in marketi
services. Additionally, YP cannot pursue collection of unpaid IAP fees from customers whose accounts wo
by depositing an activation check.

Businesses or nonprofit organizations who believe they may be eligible for restitution should contact the
Inquiry Unit of the Attorney General's Office at P.O. Box 944255, Sacramento, CA 94244-2550 or by e-r
http://ag.ca.gov/contact/complaint_form.php?cmplt=PL .

### Attachments for this Release

- Agreed Statement of Facts.pdf ⚖ [PDF 276 kb / 6 pg]
- Settlement Judgment.pdf ⚖ [PDF 573 kb / 12 pg]

**Guerard Attachment C**
**p. 2**

# ATTACHMENT D
## TO DECLARATION OF COLLOT GUERARD

1  BILL LOCKYER
   Attorney General of the State of California
2  HERSCHEL T. ELKINS,
   Special Assistant Attorney General
3  ALBERT NORMAN SHELDEN
   Senior Assistant Attorney General
4  DAVID M. TIEDE
   Deputy Attorney General
5  State Bar No. 167008
      110 West "A" Street, Suite 1100
6     San Diego, California 92101
      P.O. Box 85266
7     San Diego, California 92186-5266
      Telephone: (619) 645-2093
8     Fax: (619) 645-2012
   Attorneys for The People of the State of California
9

10                    SUPERIOR COURT OF CALIFORNIA

11                       COUNTY OF SAN DIEGO

12

13

14  ┌─────────────────────────────────────────┬──────────────────────────
15  │ **In the Matter of the Agreed Case:**    │ No.
    │                                          │
16  │ **THE PEOPLE OF THE STATE OF CALIFORNIA,**│
    │                                          │ **AGREED STATEMENT OF**
17  │ **and**                                  │ **FACTS AND JOINT**
    │                                          │ **AFFIDAVIT PURSUANT TO**
18  │ **YP CORP., d/b/a YP.COM, YP.NET, and**   │ **CODE OF CIVIL**
    │ **YELLOW-PAGE.NET, A Nevada Corporation, and** │ **PROCEDURE SECTION 1138,**
19  │ **TELCO BILLING, INC., a Nevada Corporation,** │ **ET SEQ.**
    └─────────────────────────────────────────┴──────────────────────────

20          The People of the State of California (hereinafter "People") are represented by Bill

21  Lockyer, Attorney General of the State of California, by and through Herschel T. Elkins, Special

22  Assistant Attorney General and David M. Tiede, Deputy Attorney General. YP Corp., d/b/a

23  YP.com, YP.net, and Yellow-Page.net, A Nevada Corporation, and Telco Billing, Inc., a Nevada

24  Corporation, (YP Corp. and Telco Billing, Inc. are hereinafter collectively referred to as "YP")

25  are represented by Perkins Coie LLP, by and through Katherine M. Dugdale.

26          The People of the State of California and YP have a question in difference which

27  might be the subject of a civil action. Said Parties have agreed to submit to this honorable Court

28  for determination and judgment pursuant to section 1138, et seq., of the Code of Civil Procedure.

                                              1
   ─────────────────────────────────────────────────────────────────────
   Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

1    For the limited purpose of this action alone, and for no other purpose whatsoever, the

2    parties agree, and as indicated, disagree, as follows:

3    1.    The Attorney General, representing the People, is charged with the responsibility

4    of enforcing the laws of the State of California, and is particularly charged with the

5    responsibility of enforcing Business and Professions Code sections 17200 et seq. (which prohibit

6    the use of unfair, unlawful or deceptive practices) and 17500 et seq. (which prohibit the use of

7    untrue or misleading representations when attempting to sell or dispose of goods or services).

8    2.    YP Corp., a Nevada corporation doing business within the State of California,

9    operates an Internet yellow pages website and sells Internet Advertising Packages which provide

10    an enhanced listing on its yellow pages website.  YP Corp. transacts business in the State of

11    California, and in the county of San Diego, under the names YP.com, YP.net, Yellow-Page.net,

12    and through its wholly-owned subsidiary, Telco Billing, Inc., a Nevada corporation (YP Corp.

13    and Telco Billing, Inc. are hereinafter collectively referred to as "YP")

14    3.    YP's on-line yellow pages contain standard business listings which set forth

15    business and organization names, addresses and telephone numbers YP has purchased or

16    procured from various other sources.  In addition to those standard business listings, YP's on-

17    line yellow pages contain enhanced listings which reflect YP's Internet Advertising Packages or

18    "IAP's." These enhanced listings purport to provide a preferred status for the listing and link that

19    listing to a Mini-Web Page which may contain additional information about the business or

20    organization.  The IAP is YP's principal product or service, and sales of IAP's constitute YP's

21    principal source of revenue.

22    4.    Since at least January, 2003, and continuing to October, 2006, YP's principal

23    method of advertising IAP's has been through direct mail, which method has accounted for a

24    majority of the sales of IAP's during that period and, thus, a majority of YP's revenues.

25    / / /

26    / / /

27    / / /

28    / / /

---

2

Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

**Guerard Attachment D
p. 2**

1      5.    YP adopted as its direct mail marketing program the use of an "activation check,"

2  typically in the amount of $3.25 or $3.50, which is an unsolicited "live" or negotiable check

3  made payable to the prospective customer that, upon being deposited by that prospective

4  customer, activates the customer's account and is treated by YP as that customer's agreement to

5  purchase an IAP and related services from YP.

6      6.    On the back of the check is a pre-printed statement above the endorsement line

7  which reveals that by depositing the check the prospective customer agrees to pay a monthly fee

8  to YP and that this fee will likely be collected through the customer's local telephone bill or the

9  bank account into which the "activation check" has been deposited. Also contained within the

10  solicitation envelope is information relating to the IAP and the "terms of service" if a

11  prospective customer were to order the services. YP used this solicitation method and practice

12  since at least January 1, 2003, and until October, 2006.

13      7.    YP has mailed many of its "activation checks" each year to businesses and

14  organizations across the country, including to businesses within the State of California and the

15  County of San Diego.

16      8.    YP has, for several years, billed for monthly charges primarily through Local

17  Exchange Carriers (the customer's local telephone company's bill) also referred to as "LEC"

18  billing. YP's charges appear in various formats in the customer's telephone bill, reflecting an

19  additional miscellaneous charge on their bill. After the customer pays their telephone bill to the

20  LEC, the billed amount is then remitted by the LEC to an aggregator and then to YP, subject to

21  various fees, reserves, and hold-backs.

22      9.    More recently, YP has been using a second billing channel which presents its

23  monthly charges directly to the customer's bank account (the account into which the customer

24  had originally deposited the "activation check"). Working through automated clearing houses,

25  YP presents recurring direct bank account withdrawals to those bank accounts, also referred to as

26  the "ACH" billing channel. YP's charges appear in various formats on the customers' bank

27  accounts statements, reflecting that the customer's bank has paid the monthly fee which was

28  presented to that account by the third party ACH processor. The ACH processor receives

3

Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

1  payment from the customer's bank and then remits the payment to YP, subject to various fees,

2  reserves, and hold-backs.

3      10.  The question in difference submitted for determination by the Court is as follows:

4          (a)  The People assert that following the deposit of the "activation check", YP

5          posted an enhanced listing (the IAP) in their on-line yellow pages by creating a

6          Mini-WebPage for the business or other organization that deposited the check and

7          began the billing process for collecting monthly charges for their IAP advertising

8          services through one of several billing channels.

9          (b)  The People assert that some businesses and some non-profit organizations,

10          including churches, within the State of California were unaware or remain

11          unaware that they deposited an "activation check" which resulted in an

12          obligation towards YP, were unaware that there was an automatic withdrawal

13          from the checking account for YP services or that YP, through an aggregator, was

14          charging the business or organization through its telephone bill; some businesses

15          or organizations deposited such an "activation check" by mistake or error and in

16          the absence of any deliberate decision to purchase any of YP's advertising

17          services.

18          (c)  The People assert that some recipients of YP's solicitation that have

19          deposited the "activation check" did not notice and therefore were not aware of

20          the content of the statement placed on the back of the "activation check" or the

21          other information enclosed in the mailing; some recipients assumed the

22          "activation check" related to some other business, such as an existing advertising

23          purchase with a local yellow pages publisher.

24          (d)  The People assert that some above-referenced businesses or other

25          organizations which deposited YP's "activation checks" without knowing or

26          intending to purchase YP's IAP services, paid monthly charges to YP through

27          LEC or ACH billing channels for various periods of time, although unaware of

28          the inclusion of those charges in their local telephone bill or the debiting of those

4

Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

**Guerard Attachment D
p. 4**

Case: 07-05156     Doc #: 29     Filed: 10/15/2007     Page 40 of 55

RER-37     2611

1   charges from their bank accounts.

2      (e)   The People assert that the methods described above have been used

3   deceptively and unfairly and in violation of Business and Profession Code

4   sections 17200 and 17500, to cause businesses and non-profit organizations to

5   become obligated to YP and to pay YP for advertising services they neither want

6   nor realize they have purchased.

7      (f)   YP asserts that it has utilized "activation checks" to encourage potential

8   customers to read and consider their solicitation, and that in its solicitations it has

9   fully and fairly disclosed the obligations of each potential customer should that

10  customer choose to purchase its services.

11     (g)   YP asserts that before billing a customer that has deposited the activation

12  check, YP has routinely contacted the customer to discuss the customer's

13  enhanced billing or other services.

14     (h)   YP asserts that to assure that customers understand the agreement with it, YP

15  has given its customers 120 days to cancel the yellow page advertising contract

16  and obtain refunds of the amount already paid.

17     (i)   YP asserts that none of YP's acts or practices is, or has been, in violation of

18  Business and Professions Code sections 17200 or 17500.

19     11.   Under the circumstances, and in view of the differences in beliefs, the People and

20  YP are willing to consent to the entry of a judgment as set forth in a document entitled "Final

21  Judgment Pursuant to Agreed Case," a copy of which is attached hereto as Exhibit A and which

22  is incorporated herein by reference.  The parties submit for the Court's final determination the

23  issue of whether the proposed judgment is a fair, just and reasonable disposition of the question

24  in difference.

25     The People and YP each verify and declare, under penalties of perjury, that the controversy

26  is real and that this proceeding is brought in good faith to determine the rights of the parties.

27  / / /

28  / / /

5

Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

1  ///

2

3                    DECLARATION OF DAVID M. TIEDE

4        I,  David M. Tiede, declare that I am a Deputy Attorney General for the State of

5  California and am one of the attorneys for the People of the State of California in the above

6  captioned matter.  I further declare that the controversy set forth in the Agreed Case is real and

7  that these proceedings are brought in good faith to determine the rights of the parties.

8        I declare under penalty of perjury that the foregoing is true and correct.  Executed this

9  _____ day of _____, 2006, at San Diego, California

10

11                                    _____

12                                    DAVID M. TIEDE

13

14                DECLARATION OF KATHERINE M. DUGDALE

15        I,  [Local Counsel], declare that I am an attorney duly licensed to practice law in the

16  State of California and represent YP in the above captioned matter.  I further declare that the

17  controversy set forth in the Agreed Case is real and that these proceedings are brought in good

18  faith to determine the rights of the parties.

19        I declare under penalty of perjury that the foregoing is true and correct.  Executed this

20  _____ day of _____, 2006, at  Santa Monica, California.

21

22

23                                    _____
                                        Katherine M. Dugdale
24                                      Perkins Coie LLP
                                        16020-26th Street, 6th Floor
25                                      Santa Monica, CA 90404

26

27

28

                                    6
Agreed Statement of Facts and Joint Affidavit [CCP § 1138, et. seq.]

**Guerard Attachment D
p. 6**

# ATTACHMENT E
## TO DECLARATION OF COLLOT GUERARD

1
2
3
4
5
6
7
8
9
10
11
12

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN DIEGO**

13

14

15 | In the Matter of the Agreed Case:

16 | THE PEOPLE OF THE STATE OF CALIFORNIA,

17 | and

18 | YP CORP., d/b/a YP.COM, YP.NET, and
    | YELLOW-PAGE.NET, A Nevada Corporation, and
19 | TELCO BILLING, INC., a Nevada Corporation,

20

Case No.

**FINAL JUDGMENT
PURSUANT TO AGREED
CASE [C.C.P. § 1138, ET SEQ.]**

21       The People of the State of California (hereinafter "People") are represented by Bill

22   Lockyer, Attorney General of the State of California, by and through Herschel T. Elkins, Special

23   Assistant Attorney General and David M. Tiede, Deputy Attorney General.  YP Corp., d/b/a

24   YP.com, YP.net, and Yellow-Page.net, A Nevada Corporation, and Telco Billing, Inc., a Nevada

25   Corporation, (YP Corp. and Telco Billing, Inc. are  hereinafter collectively referred to as "YP")

26   are represented by Perkins Coie LLP, by and through Katherine M. Dugdale.

27       The People of the State of California and YP have submitted a controversy without action

28   upon an agreed case to the Court for determination and judgment pursuant to section 1138, et

1

Final Judgment Pursuant to Agreed Case

1   seq., of the Code of Civil Procedure.  The parties have agreed to submit the controversy prior to

2   the taking of any proof and without this Final Judgment Pursuant to Agreed Case constituting

3   evidence or an admission of any kind by YP regarding any issue set forth in the Agreed

4   Statement, without YP admitting any liability or wrongdoing, or an admission by the People that

5   it will be unable to prove its case at trial.

6      The Court having examined the Agreed Case and after due deliberation finds upon the facts

7   submitted that judgment should be entered as follows:

8      IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that:

9      1.    **JURISDICTION AND VENUE**.  The Court has jurisdiction over the parties to this

10   action, and finds that venue is proper.

11      2.    **SCOPE**.  The injunctive provisions of this Final Judgment Pursuant to Agreed Case

12   ("Judgment") are entered pursuant to Business and Professions Code sections 17203 and 17535

13   relating to the use of activation checks in connection with the sale of advertising services and are

14   applicable to YP Corp., a Nevada Corporation, and Telco Billing, Inc., a Nevada corporation,

15   their officers, directors, employees, agents, servants, representatives, their successors and

16   assigns, and all persons, corporations, partnerships, and other entities acting in concert or

17   participating with either of them who have actual or constructive knowledge of this Judgment.

18   This Judgment applies to natural persons only in their respective capacities as directors, officers,

19   employees, agents, servants or representatives of YP Corp. or Telco Billing, Inc., or other

20   relevant entity.

21      3.    **DEFINITIONS**.  The following definitions shall be used in interpreting the terms of

22   this Judgment:

23        A.    **Activation Check** means a negotiable instrument in the form of a check that, by

24        its deposit, is intended by the sender or payor to evidence the acceptance by the

25        recipient or payee of an offer to sell goods or services or the acceptance of an

26        obligation to pay for any goods or services, or the establishment or activation of a

27        relationship, which is reasonably expected to create a future obligation on the recipient

28        or payee to pay for goods or services.

2