1  cash collateral simultaneously.

2       MR. OETZELL: Your Honor, if I might, I'm going to

3  answer that, and in answering that, I would like to answer

4  the question that I deferred to Mr. Mora, because I think

5  it has a determinative effect or at least I think Your

6  Honor would benefit in his decision from the answer.  And

7  the answer is consistent with every pleading that we have

8  filed.   It's consistent with every position that we have

9  taken, and it is consistent with every order that is

10  presently before this Court.  The answer is, if as between

11  the FTC and Integretal, the FTC loses, those funds, at 1.7

12  million dollars, still go to the receiver.  The District

13  Court has determined that those funds belong to Access One

14  and Network One.  They've committed a massive fraud --

15       THE COURT: Wait a second.  Is that greater than

16  Access One and Network One -- is that the name of that --

17       MR. OETZELL: That is correct, Your Honor.  Those

18  are --

19       THE COURT: Is that greater than them having a

20  judgment?

21       MR. OETZELL: It is their funds, Your Honor, that

22  is greater than them having a judgment.  The orders are

23  merely reflective of reality.  Those are their funds.  Now

24  if Integretal wins as against the FTC, those funds still

25  remain Access One's and Network One's.  They still remain

1   the receivers.  If Integretal loses against the FTC, then

2   absent a bankruptcy, it would be putting up new funds.  So

3   those funds are the property of the receiver, and that's

4   what was determined by the District Court.  And, Your

5   Honor, that's perfectly consistent with what we have put

6   forth in our papers and what we will be arguing about on

7   Wednesday, that there are two proceedings here.  There's

8   the FTC proceeding where they are deciding Integretal's

9   complicity in this fraud, and there is the contempt

10  proceeding in which our receiver participates.  The

11  contempt proceeding is to turn over the funds that this

12  Court has determined are property of Access One and Network

13  One and will remain --

14          THE COURT: Not this court.

15          MR. OETZELL: No, Your Honor.

16          THE COURT: You said "that this court has

17  determined."

18          MR. OETZELL: Did I say "this court"?  I mean the

19  District Court, Your Honor, has determined clearly,

20  unambiguously, are the property of Network One and Access

21  One and the property of the receiver, and also clearly and

22  unambiguously has decided in an order, post-petition and

23  knowing fully about this cash collateral motion that they

24  are not the Debtor's funds, that they are not property of

25  the estate.

1    Now, with that in mind, Your Honor, the answer

2  about the stay is, there's nothing that we can do about

3  that.   That is in the hands of the District Court.   We have

4  already asked the District Court for the one stay in

5  accordance with our agreement three weeks ago.   The

6  District Court hasn't even granted that yet.   My

7  understanding is usually the District Court is quite quick

8  with that, but it has not granted that.   And we are not in

9  the position to, shall we say, bargain for the District

10  Court at the moment.

11    THE COURT: No, of course not.   But you could say

12  that you'll request the District Court just like you

13  requested it before.   You either will or you won't.

14    MR. OETZELL: We're not in a position to do that,

15  I'm sorry, Your Honor.

16    THE COURT: So now, if you're not, then it seems

17  to me you put everybody in a position of having to go

18  forward Wednesday with everything.

19    MR. OETZELL: Well, Your Honor, certainly the

20  Debtor is free to go forward with the preliminary

21  injunction hearing, and since Your Honor sua sponte called

22  both the FTC and the receiver in, then we go forward on

23  Wednesday with it.

24    THE COURT: I'm sorry.   I sua spone did what?

25    MR. OETZELL: If Your Honor recalls, you were

46

1  deciding the issue as to whether the FTC should be subject

2  to a TRO, and then you said, no, there was insufficient

3  evidence, but there is sufficient evidence to bring them in

4  on a preliminary injunction --

5      THE COURT: To set a preliminary injunction

6  hearing.

7      MR. OETZELL: Right.  And then, you know, I was on

8  the phone as an observer, and you said, and oh by the way,

9  get us the receiver as well.  So the answer is yes, we will

10  be in on Wednesday to argue that.

11      THE COURT: Could I just clarify, wasn't the

12  Debtor seeking an injunction against the receiver and the

13  FTC on the TRO, and then all I did was say, no TRO, but

14  yes, we're going to have a P.I. hearing.  I wasn't aware

15  that I brought in a new party.

16      MR. OETZELL: No, you did not bring in a new

17  party, Your Honor.

18      THE COURT: I just -- I just said no TRO, but

19  we're going to have a P.I. hearing.

20      MR. OETZELL: Right.

21      THE COURT: They had asked for a TRO and a P.I.,

22  and so I said no TRO; we'll have a hearing on the P.I., and

23  that's all I did.  I scheduled a hearing on the P.I.

24      MR. OETZELL: Yes, Your Honor, and we will be

25  going forward on Wednesday.

1    THE COURT: So I didn't do anything sua sponte.

2    MR. OETZELL: But what I'm trying to say, Your

3    Honor, is that there is nothing conceptual, and there is

4    nothing factual that requires you to decide the unblocking

5    of the account on Wednesday. There's nothing that

6    necessarily links them together. There's nothing

7    conceptual because the Debtor is under a District Court

8    order to turn over the funds or show cause. If the

9    receiver is restrained, those orders still exist. Those

10   duties still exist. The compulsion still exists. There's

11   nothing that staying us will do in respect of the

12   proceedings in the District Court. Those proceedings are

13   largely complete. There is an order. There is an order

14   requiring the Debtor to turn over the property or show

15   cause why it should not be held in contempt.

16   So the unblocking of the funds will only

17   complicate matters. It does not have to be decided at that

18   particular time.

19   THE COURT: Well, stop a second. Let's -- are you

20   going to move to a different point?

21   MR. OETZELL: Yeah.

22   THE COURT: So let me -- I want to -- Mr. Ahrens

23   is turning red, and so I'd like to know what he has to say

24   about this point. So let me come back to you on that.

25   If the District Court has preempted the court and

1   has already determined that those funds are not property of

2   the Debtor, don't you need an injunction from the Court of

3   Appeals over the Florida District Court?

4           MR. AHRENS: No, Your Honor, and what I was going

5   to say is, he's starting to argue his case on Wednesday.

6           THE COURT: He is.  He is.

7           MR. AHRENS: And we briefed this, and we're ready

8   to argue and address all these questions on Wednesday, and

9   I just suggest we defer this until Wednesday because he's

10  made an eloquent opening argument for his case on

11  Wednesday.

12          THE COURT: Okay.  All right.

13          MR. AHRENS: And I think I have an answer as to

14  the cash collateral to your questions.  I've had three to

15  five minutes to think about it.

16          THE COURT: Okay.  Let Mr. Oetzell finish, though.

17          MR. OETZELL: Okay.  Your Honor, I believe -- I do

18  not know if the Debtor has informed you or not, but, you

19  know, the Debtor did bring a motion to stay in front of the

20  Eleventh Circuit, and that was rejected this morning.

21          THE COURT: A motion to stay what?

22          MR. OETZELL: A motion to stay the proceedings.

23          THE COURT: A motion to stay the contempt

24  proceedings or everything?

25          MR. OETZELL: In Florida.  It was the contempt

49

1  proceedings.

2          THE COURT: Only.

3          MR. OETZELL: I don't know if it was only, Your

4  Honor.

5          THE COURT: Have you read the decision of the

6  Eleventh Circuit?

7          MR. OETZELL: No.  I was just informed about it

8  this morning.  I don't know that it's actually --

9          THE COURT: Do you know anything about it?

10          MR. AHRENS: I don't, Your Honor.  I know -- yes,

11  of course, we did bring a motion to stay down there, and

12  that was in our papers, but I don't know the results yet.

13          THE COURT: Does somebody have a copy that could

14  be faxed to my chambers now, and then I could make copies

15  and give them to everybody?

16          MR. MORA: Your Honor, this is Michael Mora for

17  the FTC.

18          THE COURT: Yes, sir.

19          MR. MORA: Your Honor, my co-counsel, Ms. Guerard,

20  can address the Court on this matter.

21          THE COURT: I would rather get a written decision

22  if you have one and then --

23          MR. AHRENS: I don't think there is --

24          MS. GUERARD: Your Honor?

25          THE COURT: Yes.

50

 1              MS. GUERARD: Can you hear me?

 2              THE COURT: I hear you well.

 3              MS. GUERARD: There is -- to the best of my

 4    knowledge, there is no written decision.

 5              THE COURT: What is there?

 6              MS. GUERARD: There is a -- several lawyers,

 7    including the appellate attorney at the FTC, received a

 8    call from the deputy clerk of the Eleventh Circuit and to

 9    the best of my understanding, the Eleventh Circuit is not

10    going to consider Integretal's emergency motion for a stay.

11              MR. SACKS: Your Honor, maybe I can address that,

12    to fill in what I understand to be the blanks here, from

13    what I understand from our counsel who was representing

14    Integretal in the Florida action.  What I understand

15    happened is that the clerk informed our counsel that they

16    believed that because a co-defendant on the September 14th

17    order had filed a motion for reconsideration of that order,

18    that therefore we could not seek a stay of the September

19    21st order which is the one that said no stay applied to the

20    payment order, to the requirement that we pay over the

21    money now.

22              We think that's a mistake.  We think they're

23    confused.  The September 14th orders and the September 21st

24    orders, we were going to file something to try and sort

25    that out to point out that even if the September 14th order

2788

51

1   wasn't final because of a motion for reconsideration by a

2   different party, that it would still be appropriate to take

3   up our request for a stay with respect to our appeal of the

4   September 21st order.

5        THE COURT: I see. So as far as you know, it's a

6   procedural decision that they've made, based on the pending

7   motion for reconsideration.

8        MR. SACKS: Correct. On a different order, and so

9   that's why we think this is going to get sorted out, and

10  that's why I don't think anything formal has happened. I

11  certainly haven't seen anything in writing that says the

12  motion for stay has been denied for any reason -- or for no

13  reason.

14       MR. OETZELL: But my point is, they are fighting

15  this on two fronts. They're fighting this here, and

16  they're fighting this in Florida. They're asking for the

17  same -- the same relief here. They're asking for the same

18  relief in Florida. It's being fought on two fronts.

19       I did also want to say, Your Honor, in respect of

20  this unblocking issue, that there's no factual reason why

21  this should be addressed now or should be addressed

22  Wednesday. We've got a three-week cash collateral order.

23  They don't need the money for at least -- in respect to

24  their Exhibit C, it doesn't show that they need the money

25  until mid December. They didn't need it last week. They

1  don't need it for ten days, and they certainly don't need

2  it for three weeks.  So there's no factual issue and

3  there's no factual reason why we have to address it today.

4  There's no factual reason why we have to address it

5  Wednesday.  I think to the extent that it's addressed at

6  all, it should be addressed in the next cash collateral

7  order cycle.

8          MR. AHRENS: Your Honor, I would like to address

9  that comment.  First, we are not seeking the same relief in

10  this Bankruptcy Court that our client is seeking in the

11  Appellate Courts.  In the Appellate Court, they are simply

12  asking for a stay because the lower court was wrong.  In

13  this court, and only in this court, are we seeking a

14  bankruptcy decision that looks at the rights of other

15  creditors.  It looks at, under 541, whether it is the

16  property of the estate.  But I hesitate to get into that,

17  because once again, those are the issues teed up for

18  Wednesday and not for today.

19          THE COURT; Okay.  Well, just to tell you that I'm

20  struggling, and we're into Wednesday to some extent, pro or

21  con, here we are.  If there's a District Court order that

22  says you have to turn over these funds and that they're not

23  property of the estate and that they are property of the

24  receivers for the benefit of the receivers, are they

25  clients?  What are they called?

1        MR. OETZELL: They're defrauded consumers.

2        THE COURT: No, no, no.  That's too --

3        MR. OETZELL: Well, that's -- there's no

4   reflection on Integretal.

5        THE COURT: I know, but what are they -- even if

6   they weren't defrauded, what are they called?

7        MR. AHRENS: Former customers.

8        THE COURT: Is that what they are>

9        MR. OETZELL: Former customers works.

10       THE COURT: Well, okay.  So that they're the

11  property of these particular former customers.  Now, can

12  you pass the microphone to Mr. Fiero.

13       MR. FIERO: Your Honor, this is the race to the

14  courthouse problem.

15       THE COURT: But they got there though.  The

16  receiver got to the Florida courthouse, got an order that

17  says that these are not property of the estate -- these

18  funds are not property of the estate.  They belong to the

19  receivers, to the former customers who are now championed

20  by this receiver, and the question is, what jurisdiction do

21  I have to, quote, "free up" or not free up these funds?

22       MR. FIERO: Well, Your Honor, I don't think that

23  the District Court was trying to decide whether or not it

24  was property of the estate under Bankruptcy Code Section

25  541.

1        THE COURT: I don't either.  But here we have

2    this -- this transpired while the Debtor was in bankruptcy.

3    And here you are, in San Jose, with all due respect, rather

4    than in Florida, trying to explain to the District Court

5    what the status us.  Now that's -- I don't mean that by way

6    of criticism, but I have a problem with this, because I

7    have to now decide whether I can, quote, what it means to

8    free up funds that a Federal District Court has found

9    belong to somebody else.  I'm not asking you to decide, you

10   know, what your opinion is today.  I'm just telling you

11   that it seems to me you're -- you and -- as well as the

12   Debtor and to some extent, I guess, PaymentOne, are key

13   players in all of this, and I'm interested in your view.

14   Because what I don't want to do is I don't want to take

15   action which is clearly ultra vires, and I'm looking to

16   you, all of you at this table, to caution me if potentially

17   this Court is taking action which I don't have the

18   authority to do.

19        And I don't want to be in a position -- I mean

20   obviously you can't predict what an Appellate Court is

21   going to say about any action I take, but I'm looking to

22   this table to take care of this Court, and to make sure

23   that I have a fair and objective evaluation of whether I

24   should or shouldn't be deciding this, free up the 1.7

25   million dollar issue in the face of the current orders of

1    the District Court.

2              Now you and I may agree that the District Court

3    may not fully understand all the ramifications of a

4    bankruptcy and property of the estate under 541 and all of

5    that, but -- so does that give me any power to get in the

6    middle of this or am I stuck with honoring whatever the

7    District Court has done, and it's up to this table to go

8    clear that up to the extent that you can in the Eleventh

9    Circuit?  And you don't have to answer me now, Mr. Fiero,

10   but I want you to know that that question is going to be

11   addressed specifically to each person at that table, which,

12   you know, for the record, is Ahrens, Sacks -- tell me your

13   name again, sir?

14              MR. WARREN: Warren.

15              THE COURT: Mr. Warren, and Fiero.  I mean because

16   I don't want -- I don't want to do anything that's

17   inappropriate for a Bankruptcy Court under these

18   circumstances.

19              MR. FIERO: Your Honor, I understand the Court's

20   concern, and we will work to address that when the time

21   comes.  I do want the Court to know --

22              THE COURT: The time is going to come real soon.

23              MR. FIERO: Yes, Your Honor.  I do want the Court

24   to know that every creditor on my Committee has reserves --

25   that's a huge chunk of their claim is unpaid reserves, and

1  they sit today before this Court as unsecured creditors,

2  and why someone in Florida should have a better advantage,

3  is just -- it doesn't make any sense to any Committee

4  member.

5          THE COURT: Fine.  But that doesn't answer my

6  question.

7          MR. FIERO: I recognize that, Your Honor.

8          THE COURT: Okay.

9          MR. AHRENS: Your Honor, this, quote, unquote,

10 "fund" was established after these District Court orders.

11 It was established without --

12         THE COURT: Of course.  I understand.  It was

13 commingled funds.  You just took 1.7 million dollars out of

14 your general treasury and stuck it in a blocked account.  I

15 understand what you did.

16         MR. AHRENS: Thank you, Your Honor.  We have the

17 Court's suggestions.  We will fully argue this on

18 Wednesday, and we are prepared because we feel very

19 strongly.  I felt -- I said this for a long time, that I

20 did not want to have one creditor preferred over another,

21 and that's why we filed bankruptcy.

22         THE COURT: But doesn't give -- that's fine, Mr.

23 Ahrens, and I even agree with you mostly, but that doesn't

24 give me power as an Appellate Court over a District Court

25 in Florida, and so the question is -- and it would be

1    interesting to know what the U.S. Trustee's position is if

2    you have a position -- it would be interesting to know

3    whether I have the power to, quote, "free up funds" that

4    the District Court has held --

5            MR. AHRENS: No, Your Honor, I don't want to

6    interrupt, Your Honor.

7            THE COURT: Go ahead.  It's all right.

8            MR. AHRENS: The District Court did not hold that

9    specific assets, specific funds, were property of the

10   receivership.  This is like -- and this would be argued on

11   Wednesday.  This is a payment order, and we knew the judge

12   may come down with a payment order.  But on that day, when

13   that judge entered an order, there wasn't even a dollar

14   amount in that sentence.  It says pay over a certain

15   amount, but it didn't have the dollar amount.  And we're

16   going to argue a lot about this on Wednesday, and so that

17   is the same thing as an order to pay.  But it didn't say,

18   oh, you have this bank account that's set aside for this.

19   The funds at that time were at all times, were in the past

20   and continue to be commingled.  And so therefore there was

21   no order that you are holding a specific asset, like the

22   cases that are cited and we're going to argue.  Sometimes

23   it's stock; sometimes it's real property.  Those things are

24   traceable.  Those things are --

25           THE COURT: I understand, but am I the Court to

1  resolve this, or is the Eleventh Circuit the Court to
2  resolve this?

3         MR. AHRENS: Your Honor, you are the only Court
4  that can resolve this, and we're going to tell you more on
5  Wednesday why because you're the only Court to consider
6  rights of other creditors.  The court down in Florida
7  cannot, should not, and does not consider the rights of
8  anybody but --

9         THE COURT: The parties before it.

10         MR. AHRENS: That's right, Your Honor.

11         MR. WARREN: Your Honor, Stephen Warren, if I
12  might.  I agree wholeheartedly with what Mr. Ahrens said,
13  but I think it is important to distinguish.  This is not a
14  fund being administered by the District Court in Florida.
15  The 1.7 million dollars is only there because of a
16  stipulation with respect to cash collateral, period.  Full
17  stop.  So this Court is the one that has jurisdiction over
18  those proceeds.

19         MS. DIEMER: And, Your Honor, if I may address
20  this.  I apparently sat at the wrong table today.  I am a
21  secured creditors, and I am concerned the way this argument
22  is going, is what is happening to my security.  The reality
23  is this situation is no different than if a court, any
24  District Court here in the State of California, or a State
25  Court, had entered a writ of attachment.  This court in

1    Florida has no more power than a State Court or a District
2    Court here in California, in which an attachment had been
3    entered, shortly before a filing of a bankruptcy.  You would
4    not be acting in a ultra vires manner should you not choose
5    to honor a writ of attachment in a local court, not any more
6    than you would for this court down there.  These were not
7    the action that was taken by the Florida court as an
8    enforcement for monetary purposes and is affected by the
9    stay, just as it would in any court.

10            THE COURT: No, the court has already determined
11   that the stay doesn't apply, and nobody is suggesting that I
12   am supposed to review that, or I'm supposed to reconsider
13   that.  Nobody is telling me that I ought to consider whether
14   there is or isn't an automatic stay.  It's not an issue on
15   the table.

16            MS. DIEMER: I would like to know how an unsecured
17   creditor with a non-final judgment somehow has priority over
18   the security over the monies of a debtor that precedes,
19   predates, and somehow jumps ahead of me, a properly
20   perfected fully secured creditor.

21            THE COURT: All right.  There are two answer to
22   that.  One --

23            MR. SACKS: They don't.

24            THE COURT: Pardon me?

25            MR. SACKS:  I'm sorry.  They don't.

1    THE COURT: Well, one is, whether they do or not,

2 the only question I'm asking and you've answered it in the

3 first instance is, will I be acting ultra vires to act in

4 the face of the District Court orders to, quote, "free up"

5 the 1.7 million that we've blocked.  Now, arguably, as you

6 said, and I think it's true or I think Mr. Ahrens -- one of

7 you said it.  I don't remember -- no, Mr. Warren said it --

8 the 1.7 million didn't exist as a fund until bankruptcy and

9 until we work that out for the interim cash collateral.

10    MS. DIEMER: Right.

11    THE COURT: So that particular 1.7 million is just

12 a creation of the Bankruptcy Court and the stipulation.  It

13 otherwise didn't exist, that particular segregated fund.  So

14 if I unsegregate that fund, then I haven't done anything

15 that I haven't created.  But anyway, I think everybody

16 understands the concerns and, you know, Mr. Fiero's

17 arguments are essentially that the District Court is wrong.

18 The District Court is wrong in the face of a bankruptcy to

19 do what it did.  Fine.  Now what?  And that's the question.

20    MR. OETZELL: Your Honor, if you would indulge me

21 for just a second.

22    THE COURT: Not on the merits of this anymore.  I

23 really think that we ought to move on.

24    MR. OETZELL: I listened to two people, I believe

25 it was Mr. Fiero, and I've listened to Mr. Ahrens talk about

1   determining whether there we were just an unsecured

2   creditor, and Mr. Ahrens talking as Mr. Ahrens has talked

3   since the beginning of this thing about the effect of

4   commingling.   Both those matters were brought up --

5           THE COURT: I know, were considered by the District

6   Court.

7           MR. OETZELL: Okay.   Then if I could just -- if you

8   just indulge me, Your Honor --

9           THE COURT: I know that they were -- that has been

10  asserted to me many times.   The question is -- I guess the

11  question is, so what, in terms of the law.   And I mean no

12  disrespect to the District Court.   So what?   Where does that

13  get you in terms of my ability to free up the very funds

14  that we, by stipulation, segregated?

15          MR. OETZELL: Your Honor, you would be moving in

16  the clear face of a District Court order that specifically

17  says, and I quote:

18              "On Friday, September 14th, 2007, this court

19              issued its omnibus order in which it ruled that

20              the reserved funds are the property of the

21              receivership."

22  And I quote again:

23              "The court has already ruled that the reserved

24              funds are neither property of the bankruptcy

25              estate nor the property of Integretal."

1    THE COURT: I understand.

2    MR. OETZELL: And this is why I said last time that

3  Mr. Ahrens was making a pretty bold statement about the

4  status of those funds.

5    THE COURT: Okay.

6    MR. OETZELL: This is clear, as clear can be and

7  all you are being asked to do, Your Honor, is sit in review

8  of the District Court order which Your Honor eschewed last

9  week.

10    THE COURT: I understand.  You've basically just

11  expressed the very concern that I expressed to them.  You

12  haven't said anything --

13    MR. MORA: Your Honor, Michael Mora for the FTC.

14  May I be heard for one moment, please?

15    THE COURT: Yes, sir.

16    MR. MORA: And I'm not going to argue today, Your

17  Honor.  I want to suggest something that maybe will help us

18  sharpen the focus of these issues for Wednesday.  As we see

19  it, there's really two dimensions to the answer to Your

20  Honor's question.  One is jurisdiction, and the other is

21  power.  Those are two separate things, and, Your Honor,

22  everybody is aware --

23    THE COURT: I agree.  I agree.

24    MR. MORA: And everybody is aware of our position

25  on it, and I just wanted to state that.

63

1          THE COURT: Thank you, sir.  They should both be
2    addressed, jurisdiction and power.  The ultra vires question
3    goes to power.

4          MR. AHRENS: We will, Your Honor.  I'm not going to
5    reply to any of the arguments.

6          THE COURT: Right.  I agree.  I agree.

7          MR. AHRENS:  I think we should put an end to --

8          THE COURT: I think we've articulated it, but, you
9    know, even though you're saying, well, we ought to put
10   everything off to Wednesday, my own impression is, it's
11   better to know what we're all thinking about, at least know
12   what the Court's concerns are now, rather than telling you
13   Wednesday.  So you've got some of the concerns that I have.

14         MR. AHRENS: I understand.

15         THE COURT:  And I'm not saying that I don't think
16   you're right; I'm just -- I have these concerns.

17         MR. AHRENS: This table appreciates that, so that
18   we can prepare better for Wednesday.

19         THE COURT: Thank you.

20         MR. AHRENS: Your Honor, to answer your first
21   question, what I opened a book and I have what I thought it
22   was, and it states under Rule 7001.2, that any proceeding to
23   determine the validity or any interest in property has to be
24   by way of adversary complaint.  What we are talking about is
25   two parties who we vehemently feel have no interest in our

64

1  assets because we've already established through lots of

2  pleadings that the way this business operates is to assign

3  the accounts receivable to the Debtor.  The Debtor then

4  assigns them and collects.

5       There is a question of fact that was posed by

6  Personal Voice as to theirs, and we think that we are freely

7  using our own money that has been commingled.  It's not

8  their money.  But the bottom line is that they did assign

9  the accounts receivable to us.  Now if they want to bring on

10  a hearing -- I think they said they're going to be bringing

11  on a hearing -- then they'll get that determined.  And

12  they're not going to lose anything in the interim, Your

13  Honor, because what they asked for was $40,000 a week.  They

14  said they're going to be filing something next week.  We

15  would agree to an expedited hearing on that to determine

16  that issue.  We'll put in our declarations.  They put in

17  theirs.  If they want witnesses, we'd agree to it.

18       But they're not being prejudiced, Your Honor, at

19  $40,000 a week.  There's plenty of cash for $40,000 a week.

20  But we don't think we should set up any more segregated

21  accounts because we don't think -- now that we have a

22  Creditors' Committee that supports us on this issue --

23  anybody is entitled to any more segregations.

24       With respect to Public Communications, Your Honor,

25  that's $14,000 a week.  They too, if they want to join in

1   the adversary complaint, they have I think different issues,

2   but, you know, they're free to do so.  And they have a

3   remedy under Rule 7001.

4           THE COURT: Yeah.  Joining in an adversary may or

5   may not be useful if you've got possibility of reaching

6   independent settlements, but that's fine.

7           MR. AHRENS: Thank you, Your Honor.  And if you

8   have any other questions, we have a form of order on the use

9   of cash collateral.  I would like to call the Court's

10  attention to at least two changes in it.

11          THE COURT: Yes, please.  But, Mr. Ahrens, here's

12  the question, I guess, that you haven't answered.  You've

13  finessed my question.

14          MR. FIERO: I hope it was intentional.

15          THE COURT: You judge for yourself.  In the face of

16  an argument under 541, property of the estate, I can say to

17  them, that's nice.  But you have to do that by way of

18  adversary.  And their response can be, yeah, but you can't

19  use money that we've alleged is not property of the estate

20  in the meantime.  And so I said to you, is it sufficient --

21  I'll change it slightly -- is it sufficient for me to just

22  say, file an adversary; you're not prejudiced, or do I have

23  to make some kind of finding that there is or isn't property

24  of the estate or that it is or isn't likely property of the

25  estate, or is it sufficient for me to just allow you to use

1 property for cash collateral purposes that they claim is not

2 property of the estate, merely with a statement file an

3 adversary.  And until you prevail, they can use it, even in

4 the face of your allegation.  So that's the question, and

5 that's the question I asked earlier.

6      MR. AHRENS: I think since -- well, first, I think

7 cash is fungible.  I mean it's all in the same bank account,

8 and so we're using the cash we have and we have cash to last

9 us for the next three weeks and so I think it is -- I don't

10 think you have to make a finding, but if you do have to make

11 a finding, I think we've made more than an adequate showing.

12 Without -- they tried to get a perfected security interest.

13 They filed a UCC-1, and it was imperfect.  It lapsed --

14      THE COURT: We're not talking about a security

15 interest.  They're saying it's not property of the estate

16 because of the way you've set up your business.  I

17 understand your arguments that they're unsecured at best.

18      MR. AHRENS: But what I'm saying is -- I'm going to

19 the merits -- I said I think you have plenty of facts to

20 make a finding of -- I don't think you have to -- but I

21 think you have plenty of facts to make a finding that it is

22 our assets and not their assets, and the reason is, is

23 because they made a UCC-1 filing, and in some documents you

24 say this is a protective filing, and they didn't say that.

25 They could have said this is a protective filing.  It's

1  really our asset.  But they didn't say that.  They let it
2  lapse.

3          THE COURT: Who is "they"?

4          MR. AHRENS: That is Personal Voice, Your Honor,
5  what we're talking about.

6          THE COURT: Well, what about the other two?

7          MR. AHRENS: The other two haven't raised these
8  same issues as to it's their asset.  It's my recollection
9  this is a Personal Voice issue that they attached their
10 contract to their declaration, and they said, look at this
11 contract.  My client read it and said I read that to be my
12 asset.  They're saying I read that to be their asset.  So
13 I'm only addressing Personal Voice in this one, Your Honor.

14         But I think you have more than enough facts today
15 to enter a finding that's likely we will prevail on the
16 merits because they tried to get a security interest.  You
17 don't try to get a security interest in your own property.
18 Like when there's a leasehold, sometimes you have a personal
19 property lease.  You do a protective filing.  They didn't do
20 a protective filing.  But that being said, this is a cash
21 collateral use.  We will not use $40,000 -- for the next
22 three weeks, if they want to, they have more than adequate
23 time to come to this court and seek the declaration that
24 they said they're going to seek.  So I think you don't need
25 a finding.  I think if you were inclined to disagree with

1   me, that you have more than sufficient facts to make that

2   finding.

3              THE COURT: Mr. Fiero, do you agree with both of

4   those?

5              MR. FIERO: Yes, Your Honor.  I think that the

6   question of ownership in this instance can be resolved by

7   the concept of adequate protection.  It's no different from,

8   I put something fungible in your warehouse, and it's a

9   bailment.  As long as you know that something just like it

10  is going to be there afterward, there's no risk to you

11  whatsoever.   What we're talking about here at the very most

12  is a bailment of cash.

13             THE COURT: Does anybody on the phone wish to say

14  anything before I take a brief recess?   No.  Okay, I'm

15  going to take a recess and then I'll come back, and I'll let

16  you know where we are in terms of issuing a decision on cash

17  collateral.  Are we finished with papers for the P.I.?  Are

18  we done?  Am I going to get any last-minute stuff?  No.

19  Everybody is saying no.

20             MS. DIEMER: Your Honor, in the sense that you've

21  just asked whether or not -- you've just sort of asked the

22  creditors, the secured creditors like myself for some

23  information about whether or not it would be an ultra vires

24  act.  We may want to file something addressing that issue.

25  We had not thought we needed to chime in, until the Court

1    addressed those questions.

2            THE COURT: Well, I assume they're going to be

3    addressed orally at the hearing.

4            MS. DIEMER: In that case, we'd be happy to do

5    that.

6            THE COURT: So I just -- I guess probably more

7    paper at this point unless we're going to put off the

8    hearing would be problematic.

9            MS. DIEMER: No, I'd be happy to address them

10   orally; it would be easier for me.

11           THE COURT: Okay.

12           MR. OETZELL: Your Honor?

13           THE COURT:  Did you want to say something?

14           MR. OETZELL: Yes, if I might, Your Honor.  Excuse

15   me for stating the obvious, but obviously we are here to

16   request that the subject funds be excluded from any cash

17   collateral order, clear and solid --

18           THE COURT: But my understanding is that Mr. Ahrens

19   has agreed that the subject funds are excluded until

20   Wednesday.

21           MR. AHRENS: That is correct.

22           THE COURT: So that you have a two-day agreement,

23   and then all -- everything is open as of Wednesday.

24           MR. OETZELL: Well, we have a three-week cash

25   collateral order that Your Honor is considering signing.  I

1  believe that those funds should be excluded for the whole

2  three weeks.

3          THE COURT: I'm not going to do that.  Unless you

4  reach some kind of agreement, I'm not going to do that.

5  They're on the table just like everything else starting

6  Wednesday.  They're not today, but starting Wednesday, it's

7  all open.  And you had a way of stopping that, but you

8  declined.

9          MR. OETZELL: I understand, Your Honor.  I would

10 also object that we have had inadequate notice of a motion

11 to unblock this account.

12         THE COURT: What does that mean?

13         MR. OETZELL: It means that there was no -- that

14 the account was supposed to be unblocked only upon --

15         THE COURT: The account was blocked for three weeks

16 by mutual agreement only, on a settlement.

17         MR. OETZELL: Unblocked on motion, Your Honor.

18 There was no formal motion brought before you.  There was no

19 motion to shorten time.  It's --

20         THE COURT: Wait a second.  Okay.  I should let you

21 finish.  Just finish.

22         MR. OETZELL: All that happened was on Friday, and

23 this is after we had to reply to the cash collateral, this

24 is before they got their pleadings in on the cash

25 collateral, they made it obvious on Friday that they were

1   going to go ahead and ask the Court to unblock it on an oral

2   motion.

3           THE COURT: But, sir, the blocking only occurred as

4   part of a quid pro quo agreement for three weeks.  It wasn't

5   that we agree to block these indefinitely.  The agreement

6   was we agree to block these for three weeks in return for

7   your agreement to do something for three weeks.  It was a

8   contract.  It was a settlement.  It was a three-week deal.

9   And so at the end of the three weeks, everybody is back to

10  square one.  And you knew that your deal was only good for

11  three weeks, and they knew that their deal was only good for

12  three weeks.  You had no blocked permanent account.  You had

13  a three-week deal, and that was the Court's intention; that

14  was the Court's understanding, and I'd given you a way to

15  have more time if you want it, and you've declined it.  But

16  my understanding of what has occurred is that you made a

17  three-week deal.  They've honored their three-week deal.

18  You've honored the three-week deal.  And now we're back to

19  square one, and that's where we are.  There's no agreement

20  to block funds more than those three weeks.

21          MR. OETZELL: Your Honor, that's not what it reads.

22  The agreement reads that the funds are blocked until further

23  order of the court.  An order of the court would presuppose

24  a motion, and this is a highly improper motion, Your Honor,

25  absolutely no notice whatsoever.

72

1        THE COURT: I told you how to stop it, and you've

2  chosen not to do it.  We're going forward on Wednesday.

3        MR. OETZELL: Okay.  For the record, Your Honor, we

4  would object to that motion --

5        THE COURT: I understand.  I respectfully

6  understand, but I --

7        MR. OETZELL: -- on the grounds that it does not

8  comply with the Local Rules, and it does not comply with the

9  rules --

10        THE COURT: The deal was a blocked account for

11  three weeks, and that's what you got, and that's all you

12  bargained for.

13        MR. OETZELL: Your Honor, respectfully, that's not

14  what the order says, but --

15        THE COURT: That's the way the Court interprets its

16  own order.

17        MR. OETZELL: I understand, Your Honor.

18        THE COURT: Okay.  We're in recess.

19        MR. AHRENS: Thank you, Your Honor.

20        THE CLERK: Please rise.

21     (Whereupon, a recess is taken at 4:08 p.m., and the

22  court is reconvened at 4:23 p.m.)

23        THE COURT: Ladies and gentlemen -- you can stay

24  where you are -- relax.  Sit down.  Do whatever you need to

25  do.

1    The Court's going to grant the motion for use of

2  cash collateral over the objections.  But given the lateness

3  of the hour, the Court would prefer to issue its oral

4  findings of fact and conclusions of law tomorrow at 2:00

5  o'clock on the record, and so unless that's going to make

6  terrible problems for the Debtor, that's what I propose to

7  do.  Is that okay?

8    MR. AHRENS: Could I check with my client for one

9  minute?

10    THE COURT: Yes.

11    (Pause.)

12    MR. AHRENS: Your Honor, that's fine.

13    THE COURT: Okay.  Anybody who wants to appear by

14  phone should make your arrangements.  Nobody has to come.

15  I'm just going to read the findings -- I'm not going to have

16  argument.  I'm just going to read the findings of fact and

17  conclusions of law into the record and then hang up.  So --

18    (Laughter.)

19    THE COURT: And that's it.  And so nobody has to

20  feel like -- if you want to order a copy of the CD and not

21  appear, you can do that.  Whatever you want to do.  I'll

22  look forward to having some of you on the phone.  If -- go

23  off the record, please?

24    (Off the record.)

25    MR. AHRENS: The only changes we have is on page 2.

74

1  We changed the definition of the budget to "that certain

2  budget attached to the Weber declaration," to that certain

3  budget attached as Exhibit B, because we want to make clear

4  it's the Debtor's budget and not the other budget that we

5  had attached.

6          And then as to service, Federal Express is getting

7  quite expensive, so we are proposing the service, Your

8  Honor, be by e-mail to those that appeared, and I think

9  virtually everybody gets our e-mail, and U.S. Mail, because

10 Federal Express is getting awfully expensive.  And then the

11 last change is --

12         THE COURT: If anybody wants to get e-mail service

13 who's not on Mr. Ahrens' list, could you please fax Mr.

14 Ahrens your e-mail as soon as possible.

15         MR. AHRENS: Yes.  And then the last change is we

16 just changed the name of the person from the Office of the

17 U.S. Trustee with John Wesolowski because he's substituting

18 in.  That's it, Your Honor.

19         THE COURT: That's fine.

20         MS. DIEMER: Mr. Ahrens?  POL?  The POL monies?

21         THE COURT: Are you not on e-mail?

22         MS. DIEMER: I am on e-mail, but there was a change

23 to the order I believe, that the budget would include the

24 POL payment.

25         MR. AHRENS: Oh yes.  That's the fourth one I've

75

1  already said it.  It's the POL --

2           THE COURT: Yes, the payment.

3           MR. AHRENS: Yes.

4           MS. DIEMER: Right.

5           THE COURT: Very good.  Thank you ladies and

6  gentlemen.  Court is --

7           MR. PARDO: Your Honor?

8           THE COURT: Yes.

9           MR. PARDO: Excuse me, John Pardo.  One question.

10 When is the continued hearing on cash collateral?

11          THE COURT: Oh, we haven't done that.  We need to

12 do that.

13    (Laughter.)

14          MR. AHRENS: Your Honor, I have talked to a number

15 of parties.  Because of various schedules, the best day

16 seems to be, if the Court has it, November 2.

17          THE COURT: Okay.  We'll do it.  November 2.  I

18 know, we have a trial.  November 2 -- how much time do you

19 think we're going to need?

20          MR. AHRENS: Your Honor, it's generally taken three

21 hours.

22          THE COURT: Okay.  How's 1:00 o'clock?

23          MR. AHRENS: That's fine, Your Honor.  Thank you.

24          THE COURT: Okay.  November 2, 1:00 o'clock.

25          MR. SACKS: Do you want us to leave you written

76

1  copies of the order or --

2          THE COURT: Sure.

3          MR. SACKS:  -- just do it by uploading it.

4          THE COURT: Well, you should upload it, if Tanya

5  wants you to upload it.  What's the easiest for you, Tanya?

6  Whatever is easiest for you.

7          THE CLERK: There's going to be no more changes; is

8  that right, so I'll take it.

9          THE COURT: Okay.  Yeah, that's fine.

10         MR. AHRENS: Since we won't be talking much

11 tomorrow and only listening, we probably ought to talk about

12 the other dates for the order.  On paragraph 31, the Debtor

13 shall on or before a certain date serve a copy of this

14 order -- we could probably do that by the end of this

15 week -- and such order shall state that any party in

16 interest objecting to the approval of the motion on a final

17 basis shall file it by a certain time.

18         MR. SACKS: Mr. Ahrens is looking at paragraph 31

19 where there are blanks to be inserted in the order.

20         THE COURT: I understand.  I understand.  So I

21 should give him back this order because it's going to have

22 the same blanks, right?

23         MR. AHRENS: Yes, Your Honor.

24         THE COURT: Tanya, can you give him back this

25 order, please?

1          MR. AHRENS: I have one right here.

2          THE COURT: Right. But I want you to insert it on

3     mine too.

4          MR. AHRENS: I would think that any objections on a

5     final basis to the hearing should be filed by the 29th of

6     October.

7          THE COURT: No, the 26th.

8          MR. AHRENS: The 26th, Your Honor, that's fine.

9          THE COURT: And then your response is going to have

10    to come in very soon by the 30th.

11         MR. AHRENS: Yes, that's fine, Your Honor. The

12    30th is plenty of time.

13         THE COURT: All right.

14         MR. AHRENS: And I think that's the only dates we

15    need to --

16         THE COURT: That's fine.

17         MR. AHRENS: Thank you, Your Honor. You know,

18    they're uploading and so rather than the 26th, somebody

19    might want to work over the weekend, so I'll say the 28th,

20    but as long as we have it first thing Monday morning, that's

21    the key. So if they want to upload it by the 28th, that's

22    okay, but they can't file it -- if they're not e-filers, it

23    has to be filed by the 26th. But if you're an e-filer, you

24    can use -- you can upload it to the court.

25         MR. SACKS: That's the objection deadline?

1          THE COURT: Right.

2          MR. SACKS: Okay.

3          THE COURT: I want to have it Monday morning, the

4    objection.

5          MR. SACKS: I'm going to cross out "file" then and

6    write "e-filed," or "electronically filed."

7          THE COURT: Electronically filed by the close of

8    business on the 28th or regularly filed, paper filed, by the

9    26th.   Thank you.

10         MR. AHRENS: Thank you, Your Honor.

11         THE COURT: Make it on my copy so when I sign it,

12   I'm signing the right thing.

13         MR. SACKS: That's what I'm trying to do.

14         THE COURT: Thank you.   Court is adjourned.

15         ALL COUNSEL: Thank you, Your Honor.

16      (Whereupon, the proceedings are concluded at 4:29 p.m.)

17

18

19

20

21

22

23

24

25

1

2

3

4                    CERTIFICATE OF TRANSCRIBER

5

6          I certify that the foregoing is a correct

7  transcript from the digital sound recording of the

8  proceedings in the above-entitled matter.

9

10  DATED: October 21, 2007

11

12                        By:    /s/  Jo McCall

13

14

15

16

17

18

19

20

21

22

23

24

25

**RER - 45**

1   WILLIAM BLUMENTHAL
    General Counsel

2

3   MICHAEL P. MORA
    Federal Trade Commission
    600 Pennsylvania Ave. NW, Room NJ-2121
4   Washington, DC 20580
    Telephone: (202) 326-3373
5   Facsimile: (202) 326-2558
    Email: mmora@ftc.gov

6

7   ATTORNEY FOR FEDERAL
    TRADE COMMISSION

8

9                  UNITED STATES BANKRUPTCY COURT
                   NORTHERN DISTRICT OF CALIFORNIA
10                        SAN JOSE DIVISION

11

12  In re:
                                                Case No. 07-52890
13  THE BILLING RESOURCE, dba Integretel, a
    California corporation,                     Chapter 11
14
                        Debtor
15

16  THE BILLING RESOURCE, dba INTEGRETEL,
17  a California corporation,

18                      Plaintiff,

19                        v.                    Adv. Pro. No. 07-05156

20  FEDERAL TRADE COMMISSION, and DAVID
    R. CHASE, not individually, but solely in his
21  capacity as receiver for Nationwide Connections,   ANSWER OF FEDERAL
    Inc., Access One Communications, Inc., Network     TRADE COMMISSION TO
22  One Services, Inc., 411TXT, Inc.,                   DEBTOR'S COMPLAINT FOR
    CELL-INFOUSA, INC., Enhanced Billing              DECLARATORY AND
23  Services, Inc., Toll Free Connect, Inc., Cripple   INJUNCTIVE RELIEF
    Creek Holdings, LLC, Built to Last, LLC, Not
24  Fade Away, LLC, He's Gone, LLC, The Other
    One, LLC, Turn on Your Love Light, LLC, China
25  Cat Sunflower, LLC, Lazy River Road Holdings,
    LLC,
26
                        Defendant.
27

28
            The Federal Trade Commission ("Commission") answers the Complaint as follows:

RER-45         2818

1.    ¶ 1 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

2.    Admit.

3.    Admit.

4.    Admit that David R. Chase is the court-appointed Receiver for the entities listed in ¶ 4.  The last sentence states a conclusion of law to which no response is required.

5.    ¶ 5 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

6.    ¶ 6 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

7.    ¶ 7 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

8.    ¶ 8 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

9.    ¶ 9 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

10.    ¶ 10 states legal conclusions to which no answer is required.  If a response is required, the allegations are denied.

11.    Admit that Debtor was formed in 1988.  The Commission lacks knowledge or information sufficient to admit or deny the remainder of ¶ 11.

12.    The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 12.

13.    The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 13.

14.    The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 14.

-2-

RER-45          2819

15.     The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 15.

16.     The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 16.

17.     Admit that the Debtor's office is in San Jose, California.  The Commission lacks knowledge or information sufficient to admit or deny the remainder of ¶ 17.

18.     Admit that the Debtor served as the telephone billing aggregator for Access One and Network One.  Otherwise deny.

19.     Admit the Debtor entered into contracts with Access One and Network One.  The contracts speak for themselves.  Deny that those contracts govern the rights of the Receiver and the receivership estate in the Enforcement Action (as defined below in ¶ 25).  The Commission lacks knowledge or information sufficient to admit or deny the remaining allegations in ¶ 19.

20.     The Debtor's contracts with Access One and Network One speak for themselves.  The Commission denies the remaining allegations of ¶ 20 to the extent inconsistent with those contracts.

21.     The allegations in ¶ 21 relate to Debtor's contracts with Access One and Network One.  The contracts speak for themselves.  The Commission denies the remaining allegations of ¶ 21 to the extent inconsistent with those contracts.

22.     The Debtor's contracts with Access One and Network One speak for themselves.  The Commission denies the remaining allegations of ¶ 22 to the extent inconsistent with those contracts.

23.     The Debtor's contracts with Access One and Network One speak for themselves.  The Commission denies the remaining allegations of ¶ 23 to the extent inconsistent with those contracts.

24.     The Commission lacks knowledge or information sufficient to admit or deny the allegations in ¶ 24.

-3-

RER-45    2820

25.    Admit that the Commission filed a complaint against Nationwide, Access One, Network One, and other defendants on February 27, 2006, in the United States District Court for the Southern District of Florida, pursuant to Sections 5(a) and 13(b) of the Federal Trade Commission Act, 15 U.S.C. §§ 45(a) and 53(b) (the "Enforcement Action").[1]  The complaint alleged that Nationwide Connections, Inc. and its co-defendants, including two of Integretel's clients, Access One Communications ("Access One") and Network One Services ("Network One"), engaged in a massive telephone billing scam in which more than $30 million in phony collect call charges were "crammed" onto consumers' telephone bills.

26.    Admit that the Florida district court entered a temporary restraining order ("TRO") in the Enforcement Action on the same day that the Commission filed suit, shutting down the defendants' unlawful operation, freezing all of their assets, and appointing David R. Chase (the "Receiver") as the temporary receiver for the corporate defendants.  The TRO created a federal equity receivership encompassing all "all assets of the Defendants as of the time this Order was entered" including  funds "owned or controlled by any Defendant, in whole or in part, for the benefit of any Defendant."  This included all funds owned or held for the benefit of defendants Access One and Network One by, *inter alia*, Integretel.

The Commission further avers that upon service of the TRO, all entities holding assets of any defendant were required to submit to the Commission, within five business days, "a sworn statement setting forth the identification * * * of each * * * asset * * * held on behalf of, or for the benefit of a Defendant" including "a description of the nature and value of each such asset."  The TRO also included a turnover order, requiring any entity served with the TRO to transfer to the Receiver "immediately upon service of this Order * * * or within such time period permitted by the Receiver * * * all assets of the Receivership Defendants" in its possession.  Additionally, "all third party billing agents" (such as Integretel) were ordered to "cooperate with all reasonable

---

[1]    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce."

-4-

requests of the FTC and the Receiver relating to the implementation of this Order, including the

transfer of funds at the Receiver's direction." Since Integretel processed unauthorized telephone

charges for Access One and Network One, the FTC served the TRO on Integretel by fax on

March 3, 2006. In response, Mr. Ken Dawson, the president of Integretel, submitted an unsworn

statement, dated March 6, 2006, claiming that "no amounts are currently due and owing" to

defendants Access One and Network One. Admit that on March 8, 2006, after a hearing, the

district court issued a Preliminary Injunction that, *inter alia*, made the Receiver permanent and

continued the asset freeze and turnover order. Admit that on September 25, 2006, after an

additional hearing, the district court entered an Amended Preliminary Injunction that continued

the asset freeze and turnover order.

27.    Admit that on September 21, 2006, the Commission filed an amended complaint

in the Enforcement Action adding additional defendants, including Integretel. The claims against

Integretel were based on its processing of unauthorized telephone charges for original defendants

Access One and Network One. Under its contracts with local telephone companies, Integretel

was able to have the unauthorized charges included on consumers' telephone bills.

28.    Admit that in its amended complaint, the Commission alleged the same causes of

action against Integretel as it had against the original defendants: (1) that it deceptively

represented that consumers were obligated to pay charges appearing on their telephone bills for

collect calls that were never made or authorized; and (2) that it unfairly billed consumers for

collect telephone calls that consumers never received or authorized. Deny the remainder of ¶ 28.

29.    Admit that the FTC seeks solely equitable relief in the Enforcement Action in the

form of a permanent injunction and equitable monetary relief in the form of, *inter alia*, restitution

for consumers and disgorgement of ill-gotten gains. Deny the remainder of ¶ 29.

30.    Admit that the Debtor stopped providing services for Network One and Access

One over a year prior to the Commission's filing of its Amended Complaint in the Enforcement

-5-

RER-45    2822

1  Action. The Commission lacks knowledge or information sufficient to admit or deny the

2  remaining allegations in ¶ 30.

3       31.    The answer filed by the Debtor speaks for itself. The Commission denies the

4  allegations in ¶ 31 to the extent inconsistent with the answer filed by the Debtor.

5       32.    Admit that the Receiver learned that Integretel had been holding, as a reserve

6  against claims by consumers who were alleged customers of Access One and Network One,

7  funds that were property of the receivership estate ( the "Reserve Funds"). Pursuant to the TRO,

8  Integretel was required to turn over the Reserve Funds to the Receiver in March 2006, after

9  service of the TRO on Integretel. On October 16, 2006, the Receiver filed a motion for an order

10  to show cause why Integretel should not be held in contempt, for failing to comply with the

11  turnover provision and other provisions of the TRO and the preliminary injunctive orders

12  subsequently entered by the district court.

13  

14       33.    The Receiver's contempt motion against Integretel speaks for itself. The

15  Commission denies the allegations in ¶ 33 to the extent inconsistent with that motion.

16       34.    Admit that the Debtor filed a response to the Receiver's contempt motion on

17  October 30, 2006. The Debtor's response speaks for itself. The Commission denies the

18  remaining allegations in ¶ 34 to the extent inconsistent with that response.

19       35.    Admit that on September 14, 2007, the Florida district court entered an Omnibus

20  Order in the Enforcement Action. The Omnibus Order, *inter alia*, granted the Receiver's motion

21  and required Integretel to show cause why it should not be held in contempt for failure to comply

22  with the disclosure and turnover requirements of the district court's prior injunctive orders.

23  Admit that on September 24, 2007, Integretel filed a notice of appeal from the Omnibus Order to

24  the Eleventh Circuit.

25       The Commission further avers that on September 16, 2007, two days after entry of the

26  Omnibus Order, Integretel filed a voluntary petition for Chapter 11 bankruptcy relief. On

27  September 17, 2007, Integretel filed a Notice of Bankruptcy in the Enforcement Action alleging

28  

-6-

RER-45    2823

that § 362 of the Bankruptcy Code acted as an automatic stay concerning all proceedings against Integretel. On September 20, 2007, the district court entered an order holding that the bankruptcy automatic stay under 11 U.S.C. § 362(a) applied to the Commission's enforcement action and related proceedings, including the Receiver's contempt proceeding. After the Commission filed an emergency motion for clarification of the September 20 Order, the district court entered an order on September 21, 2007, holding that, under the regulatory exception to the automatic bankruptcy stay, 11 U.S.C. § 362(b)(4), and its inherent civil contempt powers, Integretel's bankruptcy filing does not stay either the Commission's Enforcement Action against Integretel or the contempt proceeding against Integretel. It also affirmed that Integretel must still comply with the Show Cause Order's turnover provision directing Integretel to transfer the Reserve Funds (which, at that time, amounted to approximately $1.7 million) to the Receiver.

36.    Admit that the Enforcement Action is set for trial in February 2008. The Commission lacks knowledge or information sufficient to admit or deny the remaining allegations in ¶ 36.

37.    The Commission repeats and realleges its answers to ¶¶ 1-36.

38.    ¶ 38 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

39.    ¶ 39 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

40.    ¶ 40 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

41.    The Commission repeats and realleges its answers to ¶¶ 1-36.

42.    ¶ 42 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

43.    ¶ 43 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

-7-

44.    ¶ 44 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

45.    The Commission repeats and realleges its answers to ¶¶ 1-36.

46.    ¶ 46 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

47.    ¶ 47 is a prayer for relief to which no answer is required.    If a response is required, the allegations are denied.

48.    ¶ 48 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

49.    ¶ 49 states legal conclusions to which no answer is required.    If a response is required, the allegations are denied.

50.    Deny.

51.    Deny.

52.    Deny.

53.    Deny.

FURTHER RESPONDING to the Complaint, ¶¶ 1-4 on pages 11-12, beneath the heading "Prayer for Relief," do not contain any allegations that require a response.  If a response is required, the allegations are denied.  The Commission denies that Plaintiff is entitled to any relief against the Commission whatsoever.

FURTHER RESPONDING to the Complaint, the Commission denies each and every allegation of the Complaint not specifically admitted or otherwise answered.

FIRST DEFENSE

The Complaint fails to state a claim against the Commission upon which relief can be granted.

-8-

1

## SECOND DEFENSE

2    The First Claim for Relief in the Complaint is barred by res judicata, collateral estoppel,

3    and/or the law of the case.

4

5

## THIRD DEFENSE

6    The Second Claim for Relief in the Complaint is barred by res judicata, collateral

7    estoppel, and/or the law of the case.

8

9    Dated: October 24, 2007                    Respectfully submitted,

10

11                                              WILLIAM BLUMENTHAL
                                                General Counsel
12

13                                              /s/ Michael P. Mora

14                                              _____
                                                MICHAEL P. MORA
15                                              Federal Trade Commission
                                                600 Pennsylvania Ave. NW, Room NJ-2121
16                                              Washington, DC  20580
                                                Telephone:  (202) 326-3373
17                                              Facsimile:   (202) 326-2558
                                                Email: mmora@ftc.gov
18
                                                ATTORNEY FOR FEDERAL TRADE
19                                              COMMISSION

20

21

22

23

24

25

26

27

28

-9-

RER-45          2826

**RER - 46**

1   HOWARD KOLLITZ (State Bar No. 059611)
    WALTER K. OETZELL (State Bar No. 109769)
2   STEVEN J. SCHWARTZ (State Bar No. 200586)
    DANNING, GILL, DIAMOND & KOLLITZ, LLP
3   2029 Century Park East, Third Floor
    Los Angeles, California 90067-2904
4   Telephone: (310) 277-0077
    Facsimile: (310) 277-5735
5   E-mail    sschwartz@dgdk.com
              woetzell@dgdk.com
6
    JEFFREY C. SCHNEIDER (Pro Hac Vice)
7   TEW CARDENAS LLP
    Four Seasons Tower, Fifteenth Floor
8   1441 Brickell Avenue
    Miami, Florida 33131-3407
9   Telephone: (305) 539-2481
    Facsimile: (305) 536-1116
10
    Attorneys for David R. Chase, Federal Receiver of Access
11  One Communications, Inc., and Network One Services, Inc.

12              UNITED STATES BANKRUPTCY COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                      SAN JOSE DIVISION

15  In re                              )  Case No. 07-52890-ASW
                                       )
16  THE BILLING RESOURCE, dba Integretal, a  )  Chapter 11
    California corporation,            )
17                                     )  **SIXTH REQUEST FOR JUDICIAL**
                                       )  **NOTICE OF DAVID R. CHASE,**
18                                     )  **FEDERAL RECEIVER IN OPPOSITION**
    [Taxpayer's Identification No. 33-0289863]  )  **TO DEBTOR'S MOTIONS FOR USE OF**
19                                     )  **CASH COLLATERAL; TO PAY**
                                       )  **PREPETITION WAGES, SALARIES**
20                                     )  **AND BENEFITS; AND TO AUTHORIZE**
                    Debtor.            )  **USE OF CASH MANAGEMENT**
21                                     )  **SYSTEM AND BANK ACCOUNTS**
                                       )
22                                     )  Date:    November 2, 2007
                                       )  Time:    1:00 p.m.
23                                     )  Place:   United States Bankruptcy Court
                                       )           280 S. First Street
24                                     )           San Jose, CA
                                       )           Ctrm: 3020
25                                     )
                                       )  Judge: Hon. Arthur S. Weissbrodt
26                                     )
                                       )
27  _____ )

28

                            -1-

1   **TO THE HONORABLE ARTHUR S. WEISSBRODT, UNITED STATES BANKRUPTCY**

2   **JUDGE:**

3          Pursuant to Rule 201(d) of the Federal Rules of Evidence, David R. Chase, the duly

4   appointed, qualified and acting Receiver serving under the authority of the United States District

5   Court for the Southern District of Florida in pending case number 06-80180-CIV-RYSKAMP,

6   entitled Federal Trade Commission vs. Nationwide Connections, Inc., Access One

7   Communications, Inc., Network One Connections, Inc., et al. (the "District Court Action"), hereby

8   requests that this Court take judicial notice of the following:

9          1.      Order from the United States Court of Appeals for the Eleventh Circuit filed on

10  October 17, 2007 re: *Federal Trade Commission v. Nationwide Connections, Inc.,* No. 07-14531-E,

11  attached hereto as **Exhibit "X"**.

12

13  Dated:  October 25, 2007                         DANNING, GILL, DIAMOND & KOLLITZ, LLP

14

15                                                   By:

16                                                       STEVEN J. SCHWARTZ
                                                         Attorneys for David R. Chase, Court-
17                                                       Appointed Receiver of Access One
                                                         Communications, Inc., and Network One
18                                                       Services, Inc.

19

20

21

22

23

24

25

26

27

28

                                            -2-

# EXHIBIT X

0/17/2007 13:30 FAX 404 335 5503        CI Section USCA ATLANTA                              @002

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

```
FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

OCT 1 7 2007

THOMAS K. KAHN
CLERK
```

No. 07-14531-E

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

DAVID R. CHASE,

Receiver-Appellee,

versus

THE BILLING RESOURCE,
d.b.a. Integretel,

Defendant-Appellant.

On Appeal from the United States District Court for the
Southern District of Florida

O R D E R :

Appellant's motion for stay or injunction pending appeal is

TEMPORARILY GRANTED pending further order of the Court.

UNITED STATES CIRCUIT JUDGE

# EXHIBIT X

03

**RER - 47**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARTHUR S. WEISSBRODT, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 07-52890-ASW |
| | ) Chapter 11 |
| | ) |
| THE BILLING RESOURCE, dba | ) <u>VIA TELEPHONE:  FINAL</u> |
| Integretel, a California | ) <u>HEARING on EMERGENCY</u> |
| corporation, | ) <u>MOTION for USE of CASH</u> |
| | ) <u>COLLATERAL and GRANTING</u> |
| Debtor. | ) <u>REPLACEMENT LIENS, by</u> |
| | ) <u>DEBTOR; and SUPPLEMENTAL</u> |
| | ) <u>OPPOSITIONS</u> |
| | ) |
| | ) Tuesday, October 16, 2007 |
| | ) San Jose, California |

Appearances:

| | |
|---|---|
| For the Debtor: | Michael H. Ahrens, Esq. |
| | Steven B. Sacks, Esq. |
| | Sheppard Mullin Richter & Hampton |
| | Four Embarcadero Center, 17th Floor |
| | San Francisco, California  94111 |
| | |
| For the Federal | Walter K. Oetzell, Esq. |
| Receiver: | Danning, Gill, Diamond & Kollitz, LLP |
| | 2029 Century Park East, Third Floor |
| | Los Angeles, California  90067-2904 |
| | |
| | Jeffrey Schneider, Esq. |
| | Tew Cardenas, LLP |
| | Four Seasons Tower, 15th Floor |
| | 1441 Brickell Avenue |
| | Miami, Florida  33131-3407 |
| | |
| From the Federal | Collot Guerard, Esq. |
| Trade Commission: | Julie Mack, Esq. |
| | 600 Pennsylvania Avenue, N.W. |
| | Washington, D.C.  20580 |
| | |
| For Creditor Thermo | Dolores Cordell, Esq. |
| Credit LLC: | Clark & Trevithick, PLC |
| | 456 Montgomery Street, 20th Floor |
| | San Francisco, California  94104 |

Appearances continued on next page.

2

Appearances continued:

| | |
|---|---|
| For PaymentOne<br>Corporation: | Victoria A. Newmark, Esq.<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, California  90071-2899 |
| For POL, Inc.: | Kathryn S. Diemer, Esq.<br>Diemer Whitman & Cardosi, LLP<br>75 East Santa Clara Street, Suite 290<br>San Jose, California  95113-1806 |
| For United Online: | Jeff Garfinkle, Esq.<br>Craig Chiang, Esq.<br>Buchalter Nemer<br>333 Market Street, Twenty-Fifth Floor<br>San Francisco, California  94105-2130 |
| For Personal Voice: | Thomas C. Little, Esq.<br>Law Offices of Thomas C. Little<br>2123 N.E. Coachman Road, Suite A<br>Clearwater, Florida  33765 |
| For Creditor Thermo<br>Credit LLC: | W. Timothy Miller, Esq.<br>Taft Stettinius & Hollister<br>425 Walnut Street, Suite 1800<br>Cincinnati, Ohio  45202 |
| For Creditor Public<br>Communications<br>Services, Inc.: | Enid M. Colson, Esq.<br>Liner, Yankelevitz, Sunshine &<br>  Regenstreif, LLP<br>1100 Glendon Avenue, 14th Floor<br>Los Angeles, California  90024-3503 |
| For the Committee: | John D. Fiero, Esq.<br>Pachulski Stang Ziehl Young & Jones<br>3 Embarcadero Center, Suite 1020<br>San Francisco, California  94111-5994 |
| Digital Court<br>Recorder: | United States Bankruptcy Court<br>Clerk of the Court<br>Erin Coyle<br>280 South First Street, Room 3035<br>San Jose, California  95113<br>(408) 535-5003 |
| Certified Electronic<br>Transcriber: | Palmer Reporting Services<br>1948 Diamond Oak Way<br>Manteca, California  95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

*Final Hearing on Emergency Motion for Use of Cash Collateral*          3

1 | Tuesday, October 16, 2007                    1:59 o'clock p.m.

2 |                     P R O C E E D I N G S

3 |          THE COURT:  This is the case of The Billing Resource.

4 | I'm going to take appearances and I'll call your names.

5 |          THE OPERATOR:  Your Honor, I'm sorry.  I didn't

6 | realize we were actually starting.  Let me bring them live.

7 | Quite a few attorneys here.

8 |          Okay, go ahead, Your Honor.

9 |          THE COURT:  This is the case of The Billing Resource.

10 | I'm going to take appearances and I will call out the names.

11 |          Michael Ahrens.

12 |          MR. AHRENS:  Yes, Your Honor.  Present.

13 |          THE COURT:  May I have your formal appearance, please?

14 |          MR. AHRENS:  Yes, Your Honor.  Michael Ahrens and

15 | Steven Sacks of Sheppard Mullin Richter and Hampton, appearing

16 | for the debtor.

17 |          THE COURT:  John Fiero.

18 |          MR. FIERO:  Good afternoon, Your Honor.  John Fiero of

19 | Pachulski Stang appearing for the committee.

20 |          THE COURT:  Katie Diemer.

21 |          MS. DIEMER:  Kathryn Diemer, appearing on behalf of

22 | Secured Creditor POL.

23 |          THE COURT:  Walter Oetzell.

24 |          MR. OETZELL:  Walter Oetzell of Danning, Gill, Diamond

25 | and Kollitz, appearing upon — appearing on behalf of the federal

*Final Hearing on Emergency Motion for Use of Cash Collateral*          4

1    receiver.

2              THE COURT:  Howard Kollitz.

3              MR. OETZELL:  I'm appearing for Howard.  He's not

4    here.

5              THE COURT:  Who was that?

6              MR. OETZELL:  Howard Kollitz is an attorney with our

7    firm.

8              THE COURT:  No, no.  Who —

9              MR. OETZELL:  This is Walter Oetzell.

10             THE COURT:  Oh, that's what I needed.

11             MR. OETZELL:  Yes, sir.

12             THE COURT:  Because the record wouldn't recognize —

13             MR. OETZELL:  I understand.

14             THE COURT:  Craig Chang.

15             MR. CHANG:  I'm Craig Chang, Buchalter Nemer, and I'm

16   making an appearance, Your Honor.

17             THE COURT:  Enid Colson.

18             MS. COLSON:  Enid Colson of Liner, Yankelevitz,

19   appearing on behalf of Creditor Public Communications Services,

20   Inc.

21             THE COURT:  Anthony Franco?  Anthony Franco?

22        (No audible response.)

23             THE COURT:  Thomas Little.

24             MR. LITTLE:  Thomas Little appearing on behalf of

25   Personal Voice, Inc.

*Final Hearing on Emergency Motion for Use of Cash Collateral*                    5

1          THE COURT:  Dolores Cordell.

2          THE OPERATOR:  Your Honor, Ms. Cordell should be

3    dialing in soon.

4          THE COURT:  You'll let me know.

5          THE OPERATOR:  Yes.

6          THE COURT:  Jeff Garfinkle.

7          MR. GARFINKLE:  Yes, Your Honor.  Jeff Garfinkle of

8    Buchalter Nemer appearing on behalf of United Online.

9          THE COURT:  Jeffrey Schneider.

10         MR. SCHNEIDER:  Good afternoon, Your Honor.  Jeff

11   Schneider, Tew Cardenas in Miami on behalf of the federal

12   receiver.

13         THE COURT:  Victoria Newmark.

14         MS. NEWMARK:  Victoria Newmark, O'Melveny and Myers,

15   appearing on behalf of PaymentOne.

16         THE COURT:  Timothy Miller.

17         MR. MILLER:  W. Timothy Miller, Taft, Stettinius and

18   Hollister, on behalf of Thermo Credit, LLC.

19         THE COURT:  Collot Guerard.  Collot Guerard.

20         THE OPERATOR:  Your Honor, —

21         MS. GUERARD:  Collot Guerard appearing on behalf of

22   the Federal Trade Commission.  And with me is another attorney,

23   Julie Mack.

24         THE COURT:  Thank you.

25         Is there anybody else on the phone whose name I have

*Final Hearing on Emergency Motion for Use of Cash Collateral*        6

1    not called?

2             MS. CORDELL:  Yes, Your Honor.  Dolores Cordell for

3    Thermo Credit.

4             THE COURT:  Yes.  I actually did call your name but

5    you weren't on when I called it.

6             MS. CORDELL:  Yes.

7             THE COURT:  Very good.

8             THE OPERATOR:  Your Honor, we also have Mr. Franco.

9    He was there when you called his name, but you just didn't hear

10   anything.  Possibly his phone was on mute.

11            THE COURT:  Please state your appearance, sir.

12            THE OPERATOR:  Mr. Franco, your line is live, but

13   we're not hearing anything.

14            THE COURT:  Anthony Franco, are you on the line?

15       (No audible response.)

16            THE COURT:  Operator, he's not on the line.

17            THE OPERATOR:  Okay.  His line just disconnected.  He

18   must be having technical difficulties.

19            THE COURT:  All right.  Will you dial out to him

20   again, please?

21            THE OPERATOR:  I sure will.

22            THE COURT:  All right.  Is there anybody else on the

23   line?

24       (No audible response.)

25            THE COURT:  Very good.

1    <u>THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

2          THE COURT:  As I mentioned, I was going to give my

3    oral findings of fact and conclusions of law in support of my

4    decision to grant interim use of cash collateral to the debtor.

5    The purpose of this telephonic hearing is merely for the Court

6    to state its findings of fact and conclusions of law orally on

7    the record.

8          Before the Court is debtor's motion for final use of

9    cash collateral.  However, pursuant to debtor's papers filed on

10   October 11th, 2007, debtor seeks authority from this Court for a

11   further interim use of cash collateral through November 2, 2007,

12   when this Court has set a further hearing on this motion.

13         Debtor currently seeks authority to use cash

14   collateral on an interim basis, pursuant to debtor's proposed

15   budget for the next three weeks and pay its 97-percent-owned

16   subsidiary nearly 1.6 million during that time in exchange for

17   debtor's stipulated use of that creditor's cash collateral.

18         Numerous creditors have filed objections to debtor's

19   motion.  Debtor has resolved the objections of the United States

20   Trustee; POL, P-O-L, Inc.; and the receiver.

21         The parties do not dispute the legal standard, that

22   is, pursuant to Bankruptcy Code Section 363(c)(2), debtor may

23   use cash collateral with the consent of an entity that has an

24   interest in that cash collateral or upon authorization of the

25   Court after notice and a hearing.  If the Court authorizes the

*The Court's Findings of Fact and Conclusions of Law*                    8.

1   use of cash collateral, under Bankruptcy Code Section 363(e),

2   this Court must condition such use on the providing of adequate

3   protection to any entity requesting such adequate protection.

4        Under Bankruptcy Code Section 361, adequate protection

5   requires that debtor grants a replacement lien or other such

6   relief such that the use of cash collateral does not decrease

7   any entity's interest in that cash collateral.

8        The parties dispute first whether or not certain

9   entities are even required to be provided adequate protection,

10  the debtor and the Creditors' Committee taking the position that

11  the objectors, the remaining objectors, are not secured

12  creditors at all and are not entitled to adequate protection;

13  and, in addition, second, whether it is in the best interests of

14  creditors and debtor's bankruptcy case to permit the interim use

15  of cash collateral under the current cash collateral stipulation

16  with PaymentOne.

17       The objection of Public Communication Services, which

18  I will refer to as PCS, argues that there is no evidence before

19  the Court regarding whether PaymentOne holds a perfected

20  security interest in debtor's assets.  Debtor filed the

21  Declaration of Evan Meyer in relation to the September 26th

22  hearing regarding the support for PaymentOne's security

23  interest.

24       In the Meyer Declaration Meyer declares that

25  PaymentOne has lent debtor approximately $6.4 million since

*The Court's Findings of Fact and Conclusions of Law*                    9

1    PaymentOne filed its amended UCC-1 financing statement and

2    PaymentOne is secured to the amount of this new value, as that

3    term is understood in bankruptcy law.

4         Based on the record before the Court, the Court finds

5    that it is highly likely that PaymentOne is a secured creditor

6    in the amount of at least $6.4 million; and debtor's proposal to

7    pay PaymentOne nearly $1.6 million on account of the billing

8    transactions submitted prepetition is not likely to be a

9    preference of one unsecured creditor over another, at least up

10   to the amount of 6.4 million.  And the Court notes the first

11   amended cash collateral stipulation caps those payments at

12   approximately $4.1 million.

13        Additionally, debtor argues and has submitted

14   declarations testifying that PaymentOne is either in the process

15   of being sold or will be incorporated into a plan of ongoing

16   operations for the debtor, as explained by counsel for the

17   debtor on the record at the October 15th hearing, and that

18   PaymentOne depends heavily on payments from debtor to fund

19   PaymentOne's operations.

20        Moreover, debtor depends heavily on billing

21   transactions submitted by PaymentOne to provide ongoing revenue

22   to the debtor.

23        The Court finds based on the record before the Court,

24   including but certainly not limited to the analysis done by —

25   done by and reported to the Court by the Unsecured Creditors'

*The Court's Findings of Fact and Conclusions of Law*          10

1   Committee, that PaymentOne is a valuable asset of debtor's

2   bankruptcy estate them that it is in the interests of debtor and

3   debtor's creditors to ensure that PaymentOne retains its value,

4   especially at this critical time in this bankruptcy case.

5          The Court finds that it is in the best interests of

6   debtor's bankruptcy estate and debtor's creditors to approve the

7   further interim payment of the nearly $1.6 million to PaymentOne

8   under the current cash collateral stipulation, especially in

9   light of the fact that PaymentOne has agreed to continue

10  providing billing transactions to debtor sufficient to cover any

11  postpetition payments made to PaymentOne.

12         Thermo Credit asserts that debtor holds the accounts

13  receivable in trust for Thermo Credit such that the accounts

14  receivable are not property of the debtor's bankruptcy estate,

15  citing *FTC versus Crittenden*, 823 F.Supp. 699 at 703, Central

16  District of California, 2003.

17         The Ninth Circuit and California courts have

18  consistently held that a party seeking to establish a trust over

19  commingled funds must trace those funds, as the term "trace" is

20  used in the constructive trust cases. *In re Advent Management*

21  *Corp.*, 178 B.R. 480 at 491, Ninth Circuit BAP 1995.

22         Here there is no dispute that the funds held by the

23  debtor are commingled. To trace commingled funds, the test is

24  the lowest intermediate balance test. Thermo Credit has not

25  made any effort to trace any funds over which there may be an

*The Court's Findings of Fact and Conclusions of Law*    11

1    alleged constructive trust.

2          On the record before the Court, there is no basis to

3    deny debtor's interim use of cash collateral on the improbable,

4    even remote possibility that there may be a constructive trust

5    over the funds.

6          FTC asserts that because the Florida District Court

7    has found that the "reserve" funds, which the Court will refer

8    to as the "subject funds," to be turned over to the receiver

9    under the Florida District Court's omnibus order, are property

10   of the receivership estate and not property of the debtor.  That

11   this Court shall therefore deny the final use of cash collateral

12   and require the debtor to turn over $1.7 million that is the

13   subject of that order.

14         Since the supplemental opposition of the FTC was

15   filed, debtor has amended its application to seek another

16   three-week interim use of cash collateral and delay debtor's

17   request for final approval of debtor's use of cash collateral

18   until November 2nd, 2007.  The parties agree that the subject

19   funds — and those are funds that this Court pursuant to the

20   agreement of counsel ordered held, shall remain in the blocked

21   account until the hearing on the preliminary injunction on

22   October 17, this Wednesday.  Pursuant to that agreement, FTC is

23   adequately protected and FTC's objection is overruled for the

24   present time.

25         Disputed secured creditors PCS and Personal Voice

*The Court's Findings of Fact and Conclusions of Law*        12

1  object to debtor's use of cash collateral even for three weeks.

2  Both PCS and Personal Voice assert a security interest in

3  debtor's assets.  In addition, Personal Voice objects to

4  debtor's permanent use of cash collateral to the extent that

5  such request fails to recognize Personal Voice's ownership of

6  Personal Voice's accounts receivable.

7       Personal Voice asserts that when the accounts

8  receivables were forwarded to debtor for collection, the

9  proceeds of collection remained the property of Personal Voice

10  and were not transferred to the debtor.

11       Personal Voice requests that debtor's further use of

12  cash collateral be conditioned on debtor placing $40,000 aside

13  per week into a segregated account for the benefit of Personal

14  Voice.  PCS requests that debtor's further use of cash

15  collateral be conditioned upon debtor placing $14,000 aside per

16  week into a segregated account for the benefit of PCS.

17       It appears very likely to the Court, based on the

18  record before the Court, that neither PCS nor Personal Voice

19  hold a valid security interest in debtor's assets.  Rather, it

20  appears that both creditors only really assert a security

21  interest in the net proceeds owed to those respective creditors.

22  And debtor argues that there is no security interest in such net

23  proceeds.

24       Under Bankruptcy Code Section 363(p), PCS and Personal

25  Voice each have the burden of proof on the issue of the

*The Court's Findings of Fact and Conclusions of Law*          13

1  validity, priority, and extent of that respective creditor's

2  interest in debtor's property.  Based on the record before the

3  Court, neither PCS nor Personal Voice has met that burden.

4          In any event, debtor proposes to grant each creditor a

5  replacement lien in the same assets, if any, that each of these

6  creditors had an interest in prepetition as adequate protection

7  for any alleged security interest.

8          The Court finds that the granting of the replacement

9  lien adequately protects both PCS and Personal Voice for the

10  next three weeks of debtor's further interim use of cash

11  collateral and the Court overrules PCS' request for continued

12  segregation of funds in the amount of 14,000 per week and

13  Personal Voice's request for segregation of funds in the amount

14  of $40,000 per week.  Debtor's proposed budget shows sufficient

15  cashflow to adequately protect these creditors for the next

16  three weeks.

17          Finally, Thermo Credit asserts a security interest in

18  debtor's assets by virtue of a security agreement with one of

19  debtor's major-owned — majority-owned subsidiaries, Inmate

20  Calling Solutions LLC, which the Court will refer to as ICS.

21          Thermo Credit factors accounts receivable by various

22  telecommunication companies through ICS.  Thermo Credit asserts

23  that pursuant to its security agreement with ICS, Thermo Credit

24  holds a security interest in debtor's property and requests that

25  this Court segregate the funds at issue until the Court is able

1 | to evaluate the ownership interests in those funds at issue.

2 |         The Court has reviewed the documents submitted

3 | regarding Thermo Credit's alleged security interest.  Thermo

4 | Credit's UCC-1 financing statement is for ICS' receivables only.

5 | There is no UCC-1 financing statement as to receivables of the

6 | debtor and there's no indication in the record that Thermo

7 | Credit holds a security interest in debtor's property.

8 |         The Court agrees with debtor's analysis at pages 13

9 | and 14 of debtor's Memorandum of Points and Authorities filed on

10 | October 11th, 2007 that, based on the record before the Court,

11 | Thermo Credit does not hold a valid security interest in

12 | debtor's property.  Thermo Credit has not met its burden under

13 | Bankruptcy Code Section 363(p).  And there is no basis to

14 | require debtor to provide adequate protection for any alleged

15 | use of Thermo Credit's cash collateral.

16 |         For all of the above reasons the Court holds that

17 | nonconsenting secured creditors are adequately protected.  The

18 | Creditors' Committee consents to a further interim use of cash

19 | collateral.  The Court finds that there is a likelihood of

20 | successful reorganizing.  The Court finds that debtor's

21 | continued use of cash collateral is in the best interests of

22 | creditors and debtor's bankruptcy estate.  Debtor's request for

23 | further interim use of cash collateral pursuant to the current

24 | stipulation with PaymentOne is granted.

25 |         Now just to clarify, it's my understanding that to the