*The Court's Findings of Fact and Conclusions of Law*    15

1  extent that Thermo Credit ultimately were able to prove up a

2  security agreement, that they would be entitled to the same

3  replacement lien now.  Isn't that your position, Mr. Ahrens?

4          MR. AHRENS:  Yes, Your Honor.

5          THE COURT:  Thank you.

6          With that clarification, court is adjourned.

7          MR. OETZELL:  Your Honor?  Your Honor?

8          THE COURT:  Yes.  Who's speaking?

9          MR. OETZELL:  Walter Oetzell.  Just — I am not asking

10 you to change any of the substantive ruling, but just a point of

11 clarification here.  You had stated early that the receiver and

12 the debtor settled the receiver's objection.  That is not the

13 case.  Mr. Sacks offered something in settlement and Mr. Ahrens

14 pulled it back.  I think it's probably best dealt with this as

15 being the same as the FTC's objection.

16         THE COURT:  Is that your understanding, Mr. Ahrens?

17         MR. AHRENS:  Yes, Your Honor.

18         THE COURT:  That's fine.  That — that clarification is

19 now made.

20         MR. AHRENS:  Thank you, Your Honor.

21         MR. OETZELL:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Court is in recess.  Go off the record.

24     (The hearing was adjourned at 2:16 o'clock p.m.)

25                       —o0o—

State of California          )
                             )    SS.
County of San Joaquin        )


      I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify I am not a party to nor in any way interested in the outcome of this matter.

      I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124. Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


Susan Palmer
Palmer Reporting Services

Dated October 26, 2007

**RER - 48**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE ARTHUR S. WEISSBRODT, JUDGE

| | |
|---|---|
| In Re:<br><br>THE BILLING RESOURCE, dba<br>Integretel, a California<br>corporation,<br><br>               Debtor. | ) Case No. 07-52890-ASW<br>) Chapter 11<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| THE BILLING RESOURCE,<br><br>               Plaintiff,<br><br>      v.<br><br>DAVID R. CHASE, Federal Receiver,<br>et al.,<br><br>               Defendants. | )<br>) Adv. No. 07-5156<br>)<br>) <u>PLAINTIFF'S MOTION for</u><br>) <u>ORDER to SHOW CAUSE</u><br>) <u>REGARDING PRELIMINARY</u><br>) <u>INJUNCTION and DECLARATORY</u><br>) <u>RELIEF</u><br>)<br>)<br>)<br>) Wednesday, October 17, 2007<br>) San Jose, California |

<u>Appearances</u>:

| | |
|---|---|
| For the Debtor<br>and Plaintiff/Movant: | Michael H. Ahrens, Esq.<br>Steven B. Sacks, Esq.<br>Sheppard Mullin Richter & Hampton<br>Four Embarcadero Center, 17th Floor<br>San Francisco, California  94111 |
| From the Federal Trade<br>Commission: | Michael Mora, Attorney<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C.  20580 |
| For POL, Inc.: | Kathryn S. Diemer, Esq.<br>Diemer Whitman & Cardosi, LLP<br>75 East Santa Clara Street, Suite 290<br>San Jose, California  95113-1806 |
| For the Federal<br>Receiver, David R.<br>Chase: | Walter K. Oetzell, Esq.<br>Danning, Gill, Diamond & Kollitz, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California  90067-2904 |

Appearances continued on next page.

2

Appearances continued:

For the Committee:          John D. Fiero, Esq.
Pachulski Stang Ziehl Young & Jones
3 Embarcadero Center, Suite 1020
San Francisco, California  94111-5994

Appearances via telephone:

For the Federal         Jeffrey Schneider, Esq.
Receiver, David R.     Tew Cardenas, LLP
Chase:                Four Seasons Tower, 15th Floor
1441 Brickell Avenue
Miami, Florida  33131-3407

From the Federal       Collot Guerard, Esq.
Trade Commission:      Richard McKuen, Esq.
600 Pennsylvania Avenue, N.W.
Washington, D.C.  20580

For United Online:     Jeff Garfinkle, Esq.
Buchalter Nemer
333 Market Street, 25th Floor
San Francisco, California  94105-2130

For PaymentOne        Steven H. Warren, Esq.
Corporation:           O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071-2899

For BSG Clearing       James Pardo, Jr., Esq.
Solution:             King & Spalding
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309

For Billing           Felton Parrish, Esq.
Solutions:           James Pardo, Jr., Esq.
King & Spalding
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309

Digital Court          United States Bankruptcy Court
Recorder:            Clerk of the Court
Erin Coyle
280 South First Street, Room 3035
San Jose, California  95113
(408) 535-5003

Certified Electronic
Transcriber:          Palmer Reporting Services

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

RER-48          2848

*Plaintiff's Motion for Order to Show Cause*                3

1   Wednesday, October 17, 2007                 2:05 o'clock p.m.

2                    P R O C E E D I N G S

3        THE CLERK:  Please rise.

4        THE COURT:  Thank you, ladies and gentlemen.  Please

5   be seated.  This is the case of The Billing Resource and

6   Adversary The Billing Resource versus Chase, et al.  May I have

7   appearances?

8        MR. SACKS:  Your Honor, Steven Sacks and Michael

9   Ahrens, Sheppard, Mullin, Richter and Hampton, for the debtor.

10       THE COURT:  Good afternoon, gentlemen.

11       MR. AHRENS:  Good afternoon, Your Honor.

12       MS. DIEMER:  Good afternoon, Your Honor.  Kathryn

13  Diemer on behalf of secured creditor POL, Inc.

14       THE COURT:  Good afternoon, Ms. Diemer.  You've

15  switched tables, Ms. Diemer.

16       MS. DIEMER:  I have switched tables for today, Your

17  Honor.

18       MR. OETZELL:  Good afternoon, Your Honor.  Walter

19  Oetzell of Danning, Gill, Diamond and Kollitz on behalf of the

20  federal receiver.

21       THE COURT:  Good afternoon, Mr. Oetzell.

22       MR. FIERO:  Your Honor, John Fiero, Pachulski Stang,

23  for the committee.  I understand that there is going to be some

24  sort of challenge to whether or not the committee can properly

25  appear here today.  Associated not with the fact that this is an

*Plaintiff's Motion for Order to Show Cause*                                    4

1    adversary proceeding but instead associated with the suggestion

2    that some confidential information was delivered to my firm,

3    which is something we hotly dispute, but we'll take it up in

4    time.  I just wanted to make the appearance and let you know

5    that I'm here if the Court will let me be here and otherwise

6    I'll just sit there very quietly.

7            THE COURT:  Thank you.  You'll sit there very quietly,

8    but not be here?

9        (Laughter.)

10           THE COURT:  Can you do that, Mr. Fiero?

11           MR. FIERO:  I'll either argue or I won't, Your Honor.

12           THE COURT:  Are you capable of sitting very quietly

13   and not being here?

14           MR. FIERO:  I — no.  No, Your Honor, I'm not.

15           THE COURT:  Thank you.

16           MR. MORA:  Good afternoon, Your Honor.  Michael Mora

17   for the Federal Trade Commission.

18           THE COURT:  Welcome, Mr. Mora.  Good afternoon.

19           All right.

20           MR. [SPEAKER]:  Good afternoon, —

21           THE COURT:  Wait a second, please.

22           Jeffrey Schneider.

23           MR. SCHNEIDER:  Good afternoon, Your Honor.

24           THE COURT:  Why don't you state a formal appearance?

25           MR. SCHNEIDER:  Good afternoon.  Jeff Schneider from

1   Tew Cardenas in Miami on behalf of the federal receiver David R.

2   Chase.

3          THE COURT:  Collot Guerard?

4          MS. GUERARD:  Yes, Your Honor.  Collot Guerard from

5   the Federal Trade Commission.

6          THE COURT:  Jeff Garfinkle.

7          MR. GARFINKLE:  Yes, Your Honor.  Jeffrey Garfinkle,

8   Buchalter Nemer, appearing on behalf of United Online.

9          THE COURT:  Steven Warren.

10          MR. WARREN:  Good afternoon, Your Honor.  Steven

11   Warren of O'Melveny and Myers, appearing on behalf of secured

12   creditor PaymentOne.

13          THE COURT:  James Pardo.

14          MR. PARDO:  Yes, Your Honor.  Jim Pardo with King and

15   Spaulding representing BSG Billing Solutions.

16          THE COURT:  Felton Parrish.

17          MR. PARRISH:  Yes, Your Honor.  Felton Parrish of King

18   and Spaulding, also on behalf of BSG.

19          THE COURT:  Thank you.

20          Is there anybody else on the phone?

21      (No audible response.)

22          THE COURT:  Very good.  Mr. Ahrens or Mr. Sacks.

23          MR. SACKS:  Thank you, Your Honor.  We are here today

24   on slightly changed circumstances, but we think that despite the

25   fact that we have benefitted today from an Eleventh Circuit,

1    that we should go forward on all issues.

2            THE COURT:  All right.  Why don't you tell me what the

3    stay means, and then we'll decide what we should go forward with

4    and what we shouldn't.  But I want to understand the context of

5    the stay and your interpretation of the stay.

6            MR. SACKS:  Sure.  And, Your Honor, we've given you

7    the brief that we submitted to the Eleventh Circuit that

8    resulted in the stay.  Because the stay is so brief as not to

9    incorporate, it doesn't — doesn't say what it's exactly staying.

10           We believe that the proper way to interpret it is to

11   look at that brief.  What we asked for and what we think we got

12   was a stay of the omnibus order and the September 21st order

13   insofar as the Court ruled that the payment order was not

14   automatically stayed.  In other words, —

15           THE COURT:  Does that mean that the only thing that

16   was stayed was the contempt order?  What about the enforcement

17   action?  Tell me what's — what you think is stayed and what you

18   think isn't stayed.

19           MR. SACKS:  Sure.  The enforcement action is not

20   stayed.  We conceded for purposes of our stay application that

21   we were not asking for a stay as to the District Court's ruling

22   that the automatic stay —

23           MS. GUERARD:  Your Honor, could you please ask the

24   attorney to speak into the microphone like you have in the past

25   two hearings?

1      THE COURT:  He is.

2      Just get closer to it.

3      MR. SACKS:  Maybe this —

4      THE COURT:  And, Tanya, I really beg you to get Lester

5  to listen to these, because they're not being able to hear.  It

6  doesn't have to be this minute, but they need to sit down and

7  listen to this.

8      MR. SACKS:  Let me try sitting down because I can get

9  closer to the microphone if I'm not bending over it.

10      THE COURT:  Because we have this repeated problem.

11      MR. SACKS:  Your Honor, what I was saying was that we

12  do not believe that the Eleventh Circuit stay encompasses the

13  enforcement action.

14      THE COURT:  Okay.

15      MR. SACKS:  It encompasses the contempt order and the

16  enforcement — I'm sorry — it encompasses the omnibus order and

17  the proceedings to — regarding contempt that would lead to

18  requiring us to pay over money to the federal receiver.

19      THE COURT:  All right.  Stop.

20      Mr. Oetzell, do you agree?

21      MR. OETZELL:  Your Honor, I would defer to Mr.

22  Schneider on the scope of the...

23      THE COURT:  The stay?

24      MR. OETZELL:  ...the stay.  But I will say, Your

25  Honor, that I think it pretty well dispenses with what federal

*Plaintiff's Motion for Order to Show Cause*                                    8

1   receiver is here for today in respect of the potential

2   preliminary injunction and certainly the unblocking of the

3   account.

4          And I guess what I would suggest is that, at least in

5   respect to the federal receiver's participation in this, that

6   this be put off for a couple of weeks or until something happens

7   in the Eleventh Circuit and makes it necessary to bring this up

8   again.

9          MS. GUERARD:  Your Honor, could you please ask the

10  attorneys to sit in front of the microphone?  Because —

11         THE COURT:  He is.  Mr. —

12         MS. GUERARD:  — we're not hearing anything.

13         THE COURT:  Ms. Guerard, he is.  He is.

14         Can you have Lester turn the sound up?

15         MS. GUERARD:  Thank you.

16         MR. OETZELL:  It's my fault, Your Honor.  I shouldn't

17  be pulling away from the microphone while I'm sitting down.

18         THE COURT:  Ms. Guerard, are you on a headset?

19         MS. GUERARD:  I am on a — yeah, I'm on a headset.

20  That's correct, I'm not —

21         THE COURT:  You're not — you're not on a — you're not

22  on a speaker phone?

23         MS. GUERARD:  I am on a speaker phone because I —

24         THE COURT:  You got to get off the speaker phone, or

25  then they should get on separate phones and be called in.

1   That's why you're having the problem you're having.

2            MR. OETZELL:  Your Honor, I was pulling away from the

3   microphone as I was speaking.  I think it's — I think it was my

4   fault.

5            THE COURT:  Okay.  But Mr. Sacks was speaking directly

6   into the microphone, too.  So I'm just — they shouldn't be on a

7   speaker.  The rule is that there are no speakers.  So they

8   should set it up so that they're not on speaker phone.

9            All right.  Go ahead, Mr. Oetzell.  I didn't

10  understand what you said and I'll tell you why.  Perhaps I don't

11  understand.

12           The debtor is asking me to release the $1.7 million.

13  The fact that the stay of the Eleventh Circuit stays the

14  requirement to turn it over to you doesn't mean that the debtor

15  doesn't want to use the $1.7 million in its business.

16           So when you made the statement you did you confused

17  me.  It's still on the table for the debtor to use the $1.7

18  million.  That's the request on the table.  So tell me why you

19  think that your role is over and that this hearing doesn't

20  relate to the receiver.

21           MR. OETZELL:  Your Honor, two reasons and they boil

22  down to the same thing.  As we said in our opposition to this

23  motion for preliminary injunction, allowing them to unblock the

24  account does not serve the purpose of a preliminary injunction

25  which is maintaining the status quo.  It changes things.

1    THE COURT:  Well, it — it only changes things in that

2  the stipulation that you and the debtor reached has expired and

3  therefore the status quo is prestipulation.

4    MR. OETZELL:  Your Honor, the status quo is the money

5  being preserved and the debtor not having to spend the money

6  that they're complaining of in litigation.  That is our view of

7  it and that is the debtor's view of it.  And —

8    THE COURT:  Is that true?

9    MR. OETZELL:  Your Honor, —

10    MR. AHRENS:  No, Your Honor.  You were right.

11    MR. OETZELL:  May —

12    MR. AHRENS:  The status quo was status quo

13  prestipulation.  There was no blocked funds when we filed this

14  case.  It was filed simply at the suggestion of this Court by

15  stipulation of the debtor.

16    THE COURT:  Okay.  Now, Mr. Oetzell, I'm going to give

17  you a chance to say whatever you want.  It's perfectly clear to

18  me that there's a dispute and that dispute will be argued in the

19  context of today's motion.  But you don't win by default.

20  There's a dispute and you're going to have to argue like any

21  other party here for or against the preliminary injunction.  Mr.

22  Ahrens has told you what his position is.  And you're free to

23  make — make whatever arguments you want.  But at this juncture

24  you don't go first, they go first because they're arguing for

25  the injunction.

*Plaintiff's Motion for Order to Show Cause*                           11

1       MR. OETZELL:  Your Honor, you've asked me —

2       THE COURT:  Well, I'm going to take it back because I

3  now know there's a dispute.

4       MR. OETZELL:  Your Honor, I do not believe that Mr.

5  Ahrens' statement reflects what the debtor's position is and I

6  will quote from the letter to Mr. Thomas Cohn (phonetic) from

7  Mr. Goldfarb, attempting to get jurisdiction in the Eleventh

8  Circuit attempting to get this stay.

9       THE COURT:  All right.  So make that argument in the

10  context of the opposition to the preliminary injunction.

11       MR. OETZELL:  Well, Your Honor, —

12       THE COURT:  You're here and I want to run my own

13  hearing and not have you run it.  Thank you.

14       Okay.  So we're here on the request for preliminary

15  injunction.  Why do you think I should consider anything about

16  contempt at this point?  I can't imagine that I would do that

17  with the Eleventh Circuit having stayed that.

18       MR. SACKS:  Well, Your Honor, the —

19       THE COURT:  Why would I get involved in something

20  where you don't need it at the present time.  You may need it at

21  the drop of a hat, but you don't need it now.  And why would I

22  get involved in issuing an order staying contempt where the

23  Eleventh Circuit has already stayed contempt by both of your

24  agreements?  I can't imagine doing that.

25       MR. SACKS:  Then there may not be much point in my

*Plaintiff's Motion for Order to Show Cause*                    12

1    arguing for it, but —

2              THE COURT:  You can if you convince me, but I can't

3    imagine why I would get involved where you — where you now have

4    a stay.  You know I have to find irreparable injury and you're

5    not irreparably harmed if you have a stay.

6              MR. SACKS:  Well, there has to be a threat of

7    irreparable injury, Your Honor.  And the threat is that —

8              THE COURT:  The stay would be lifted, but the stay now

9    is until further order of the Court.  It's not even a time —

10   time, it's just an indefinite stay.

11             MR. SACKS:  That's worse because on any day, tomorrow

12   for example, the Court could say we've now looked at that stay

13   application.  We lift the stay that we granted yesterday and we

14   wouldn't be in front of Your Honor, but we'd be subject to a

15   contempt proceeding.

16             THE COURT:  So, Mr. Oetzell, would you agree that if

17   the Eleventh Circuit lifts the stay that they don't have to

18   function for enough time to get in here, say three business

19   days?  That you will not press contempt for — or request it.

20   And you will say that you have an agreement not to do that for

21   at least three business days, to give them a chance to get back

22   to here.

23             MR. OETZELL:  Just to be safe, would you give me three

24   minutes to go out and call my client?

25             THE COURT:  Yes, absolutely.

1      MR. OETZELL:  Three business days is what you're

2  asking, Your Honor?

3      THE COURT:  Three business days.  And if for some

4  reason, you know, I'm not available, it may be five.  But if I'm

5  available I'll do it in three.

6      MR. OETZELL:  I understand, Your Honor.

7      THE COURT:  Court is in recess.

8      THE CLERK:  Please rise.

9    (Off the record from 2:18 p.m. to 2:23 p.m.)

10      THE COURT:  Mr. Oetzell.

11      MR. OETZELL:  Your Honor, in response to your

12  question, if the request is that — that everything be at a

13  standstill, everything be stayed subject to three days' notice

14  if and when the Eleventh Circuit moves, including of course the

15  preservation of that funds in a blocked account, —

16      MR. SACKS:  No.

17      MR. OETZELL:  — the answer is yes, Your Honor, we will

18  agree to that.

19      THE COURT:  Right.  And what if it doesn't?

20      MR. OETZELL:  If it doesn't include the preservation

21  of the funds.

22      THE COURT:  Right.  You can appeal me, you can seek a

23  stay of me.  You can do whatever you want with respect to that.

24      MR. OETZELL:  Well, Your Honor, that — that would

25  cause exactly the problems that the debtor is complaining of.

*Plaintiff's Motion for Order to Show Cause*                    14

1    We would have attorneys up all night filing in the Eleventh

2    Circuit, in the Ninth Circuit, and it would involve the debtor

3    as well.

4         The idea, Your Honor, I believe is to preserve the

5    status quo.  And the status quo is to preserve those funds, if

6    for nothing else then to preserve it to appellate jurisdiction

7    and not hand the District Court and/or the Eleventh Circuit a

8    fait accompli where the funds are dissipated.

9         THE COURT:  Is that a no?

10        MR. OETZELL:  The answer is:  If it does not include

11   the funds not being dissipated, not being spent, being blocked,

12   the answer is no.

13        THE COURT:  Okay.

14        MR. SACKS:  That's exactly the problem, Your Honor, is

15   that they — we can't turn on a dime.  We can't have use of the

16   funds and then be subject to contempt if the Eleventh Circuit

17   does something different.  And so I think the other side of the

18   coin here also is that the Court's 105 powers should be used to

19   further the reorganization process by making sure we don't have

20   to go litigate these things in Florida.  We don't have to be

21   dealing with the appeal at all.  We should be reorganizing and

22   seeing whether we can get that done, whether the parties can

23   come together in a consensual resolution of these matters, and

24   the Court's 105 power would further that.

25        So even though we might have a temporary stay there, I

1  think the Court should still go forward, and for that reason as

2  well.

3          THE COURT:  And we'll talk about that, but go ahead

4  with whatever argument you have.

5          MR. SACKS:  Okay.  Your Honor, the first point I want

6  to make is that, as I've suggested, an injunction in this case

7  in general furthers the policy of the Code.  There's been a lot

8  of debate in the papers by the parties as to whether use of 105

9  would be here contrary to or in furtherance of the purposes of

10  the Code.  And we think —

11          THE COURT:  Can I ask you to do me a favor?

12          MR. SACKS:  Certainly.

13          THE COURT:  There's no question that the Court has the

14  power to enjoin the FTC.  The receiver was a different issue.

15  And so let's start with the receiver.  Do I have the power —

16  jurisdiction or power to enjoin the receiver under the *Barton*

17  Doctrine?

18          MR. SACKS:  Yes, Your Honor.  The —

19          THE COURT:  And what case do you have that says that?

20          MR. SACKS:  Well, I think the Ninth Circuit's decision

21  in the *Crown Vantage* case specifically delineates what the

22  *Barton* Doctrine is and isn't.

23          THE COURT:  Okay.  Then you run through that very

24  slowly and carefully for me, —

25          MR. SACKS:  Okay.

1    THE COURT: — so that you make it clear. And is *Crown*

2    *Vantage* your only case?

3    MR. SACKS: Well, *Crown Vantage* I think is enough. I

4    don't think the Court —

5    THE COURT: I didn't ask you that. I asked you

6    whether *Crown Vantage* is your only case.

7    MR. SACKS: I think it's the only case we need to talk

8    about, Your Honor.

9    THE COURT: All right. So now you run through the

10   *Crown Vantage* argument very slowly and carefully so that I

11   understand exactly why you think that *Crown Vantage* says that

12   this Court has the power to enjoin a federal receiver without

13   getting permission from the Florida District Court.

14   MR. SACKS: Okay. Well, there's two issues here, Your

15   Honor. First is whether the *Barton* Doctrine applies at all.

16   And I think that looking at *Crown Vantage* tells you that it does

17   not apply in this instance.

18   THE COURT: Okay.

19   MR. SACKS: The *Crown Vantage* case says — and I'm

20   looking at page 970 — "We join our sister circuits in holding

21   that a party must first obtain leave of the bankruptcy court

22   before it initiates an action in another forum" —

23   THE COURT: Say that again slowly. Go slow.

24   MR. SACKS: I'm sorry. I'm sorry.

25   THE COURT: Go really slow. Slowly and loudly so

1   everybody can hear you.

2          MR. SACKS:  "We join our sister circuits in holding

3   that a party must first obtain leave of the bankruptcy" — and

4   here we're talking about a bankruptcy receiver, and so that's

5   why they're talking about leave of the bankruptcy court.

6          THE COURT:  They've extended the *Barton* Doctrine to

7   the bankruptcy court, right?

8          MR. SACKS:  Correct.

9          THE COURT:  All right.

10         MR. SACKS:  Right.

11         THE COURT:  So we can pretend, we can substitute the

12   words "receiver" for "bankruptcy court" in your sentence.

13         MR. SACKS:  Well, actually we'd substitute the words —

14   if it applied, we'd substitute the words "district court."  In

15   other words, you're suggesting if the *Barton* Doctrine applied

16   here, —

17         THE COURT:  And they — then you have to go beg the

18   district court for permission to sue the receiver.

19         MR. SACKS:  Right.  Now the question — the rest of the

20   sentence tells you why we don't have to do that.  "...before it

21   initiates an action in another forum against a bankruptcy

22   trustee or other officer appointed by the bankruptcy court for

23   acts done in the officer's official capacity."

24         In other words, what the *Barton* —

25         THE COURT:  So are we talking about acts done by the

1    receiver in the receiver's official capacity?

2    MR. SACKS:  No.

3    THE COURT:  What are we talking about?

4    MR. SACKS:  We're talking about stopping the receiver

5    from continuing efforts to hold us in contempt and to collect

6    money from the estate that is not the receiver's property but is

7    the estate's property.  And so —

8    THE COURT:  But I can't decide it's the estate's

9    property or not the estate's property until we get an appeal

10    from — we have this — we have the Florida District Court saying

11    it isn't the estate's property.  That's on appeal.

12    So am I supposed to say the Florida District Court is

13    wrong and I hold that it is estate property; is that the way I

14    get around it?

15    MR. SACKS:  Well, Your Honor, the question is what it

16    is in this case.  And we — I would respectfully ask that we

17    start with that before we get to what we're enjoining and why

18    the *Barton* Doctrine doesn't apply, —

19    THE COURT:  Fine.

20    MR. SACKS:  — because the receiver's papers and the

21    FTC's papers talk about — the receiver talks about subject funds

22    and the FTC talks about reserve funds.  There are neither.

23    There is just nothing in this estate or in the debtor's

24    possession that is a fund of any kind other than the debtor's

25    bank account with undifferentiated money in it.  That has no —

1      THE COURT:   The debtor has commingled funds and the

2   district court says, 'It doesn't matter.   Turn over 1.7 million

3   of your commingled funds to the receiver.'

4      MR. SACKS:   Right.   And when the district court does

5   that, it's telling us that in fact this is not a property issue

6   and a property ruling it's making at all.   In fact what it's

7   making is a judgment, a payment order that you shall pay the

8   money.   Whether you have a fund or not, the district court

9   didn't care.   It said that under its view of the law we had to

10  pay $1.7 million.

11      And, as the FTC points out, if we'd have been better

12  businessmen or something we would have saved 1.7 million to turn

13  over to the receiver, if we were able to do so.   But we didn't.

14  And so we came into bankruptcy court not having reserved $1.7

15  million.   But the only way we could comply with the order would

16  have been to write a check from commingled funds.

17      So when they — when we talk about —

18      THE COURT:   So how does that — that gets you somehow

19  into the fact that the *Barton* Doctrine doesn't apply?

20      MR. SACKS:   Well, it — it gets us into the fact that

21  this Court can decide what constitutes property of the

22  bankruptcy estate.   And even if property is not property of the

23  bankruptcy estate, this Court has jurisdiction under its

24  related-to power to decide what the effect is of the district

25  court's order.

1      THE COURT:  Okay.  Wait a second.  So I would now hold

2  that the district court was wrong, right?

3      MR. SACKS:  No.

4      THE COURT:  It is property of the estate.  How could I

5  hold that it is property of the estate?  Would I just ignore the

6  district court order that the property belongs to the receiver?

7      MR. SACKS:  Well, —

8      THE COURT:  How do I do that?

9      MR. SACKS:  There —

10      THE COURT:  I would — now serving as a review court of

11  the district court.  If I have to reach the question — I mean I

12  could certainly say that there — without a problem, there's no

13  problem — first of all, I believe they're property of the

14  estate.  But, you know, that goes as far as it goes.

15      I could certainly say there are certainly serious

16  questions as to whether it's property of the estate or not.  The

17  debtor has raised serious questions.  And I now have this

18  district court order which, you know, in my personal opinion is

19  incorrect in that these do appear to be funds that belong to the

20  estate.  But now what do I do with that?

21      MR. SACKS:  Well, that's the question, is:  Did the

22  district court have before it the question that Your Honor is

23  assuming it did.  And I don't think — I don't think it did.  It

24  was not looking at the rights of creditors and saying, 'This

25  property belongs to you, federal court receiver, as opposed to

*Plaintiff's Motion for Order to Show Cause*                              21

1   all of the other unsecured creditors or even secured creditors

2   of this estate.

3            THE COURT:  So how do I get around *Barton*, by

4   interpreting the district court order as to not having — not

5   have considered the effects of the bankruptcy?

6            MR. SACKS:  No.

7            THE COURT:  How do I get around it?

8            MR. SACKS:  I'm sorry.  I don't think you have to get

9   around *Barton* at all.  The answer to the question about *Barton*

10  is that we're not suing the receiver for any dereliction of his

11  duties.  We're not stopping him from doing something other than

12  what he shouldn't be doing under the Bankruptcy Code.  And the

13  *Barton* Doctrine's been applied in every instance that I can find

14  to suits against a receiver, to collect money from them, to say

15  you are negligent, that you breached your fiduciary duty, you

16  committed torts.

17            And the courts have said:  Sorry, you can't do that

18  without first going to the appointing court and getting

19  permission to sue the receiver for that.  But if you look at the

20  Bankruptcy Code, for instance, 543 says that a custodian, i.e.,

21  a receiver has to turn over property of the estate to the — to

22  the debtor or to the trustee.  And if that's the case and the

23  receiver doesn't — if that's the statute and the receiver

24  doesn't do that, then the receiver gets sued for turnover.

25            MR. AHRENS:  Your Honor, just to expand.  What Mr.

1   Sacks is doing, it's a two-step process.  First:  Why do you

2   have jurisdiction to protect the assets of the estate.  Answer:

3   541.  That's why we gave you today these cases that go a long

4   way to explain why this Court has power under 541, because the

5   first time we saw *Barton* was in the pleading that was filed

6   yesterday.

7           THE COURT:  I understand and I just —

8           MR. AHRENS:  So — so we are going —

9           THE COURT:  I'm trying to catch up, too.

10          MR. AHRENS:  And so I am trying to go very slow

11  because we were up late last night analyzing this ourselves.

12  I've been involved in many cases for receivers.  I represented

13  the FDIC as a receiver in San Diego for 10 or 15 years and other

14  FDIC receiverships.  And I've known of the *Barton* Doctrine or

15  the theories for a long time.  And it's:  You can't sue my

16  receiver.  You can't sue my trustee unless you get permission of

17  the court for damages.  That's what all the cases talk about.

18          THE COURT:  At least on actions that the receiver has

19  taken that are inappropriate?

20          MR. AHRENS:  Yes, Your Honor.  Yes.  Because if — if

21  you're going to sue and get damages from my receiver, I got to

22  give you permission.  So it's a two-step process to explain the

23  *Barton* Doctrine.  That's we have to go first back to 541.  And

24  we have four cases in here which Mr. Sacks is ready to explain,

25  all of which explain why under 541 of the Bankruptcy Code this

1    is an asset of the estate and something that you have

2    jurisdiction, to do only one thing:  Stay.  Because the receiver

3    never got it.  It's like a payment order.  And these other

4    counsel to my left are ready to supplement that.  Because we

5    have to go through the analysis of 541 to show why this Court

6    has the jurisdiction.

7            In the papers seeking a stay down in Florida, the —

8    Integretal said to the Eleventh Circuit:  There's this case

9    going on right here.  They informed the court of this stay.  And

10   they said there's two different questions.  One is whether the

11   judge was right in the lower court, which is being handled

12   there.  And the second is whether you get — whether you get a

13   stay in this Court, which is being handled here.  So the debtor

14   has been very open with the two courts, and there is no

15   inconsistency.

16           We say just in summary, and then I'll — I'm sorry for

17   interrupting my partner, that step number one, 541 applies.

18   There's four cases, some of which are directly in point that say

19   that this Court has the jurisdiction to protect its asset which

20   it can find is its asset.  Even in the case by Judge Newsome in

21   the East Bay where we talk about — where you talked about the

22   *Barton* Doctrine.  In that case it talked about the universal

23   power of a bankruptcy court to look over all the assets of the

24   case.

25           But 541 is reason number one why you should have the

1   jurisdiction to issue the stay.  And the reason *Barton* doesn't

2   apply is quite simple:  Because you have that universal power

3   you're dealing with an asset of the estate.  You're not dealing

4   with whether the receiver did it wrong.  And that's what the

5   other cases say.  If you — we're not testing — the receiver's

6   done nothing wrong.  He was very aggressive.  Got a very good

7   judgment, in fact, against my client.  But when it comes to

8   getting a judgment, a payment judgment and whether or not we

9   should be paying, that should be your decision.

10          The second thing that's on appeal down there that

11   really should be resolved here, not there, is whether the

12   automatic stay applied.  And that's on appeal and maybe the —

13   the stay of the lower court was issued because the lower court

14   didn't properly say that it shouldn't apply, but this is a

15   bankruptcy case, Your Honor, and all the stays should be issued

16   against the receiver so that we can get with our reorganization.

17   But that gets on with our argument.  Under the *Barton* Doctrine,

18   it's a two-step process:  One, this Court has jurisdiction over

19   the assets under 541; and, two, the *Barton* Doctrine only applies

20   to suing receivers for wrongdoing.

21          THE COURT:  Okay.  And it's not wrongdoing for the

22   receiver to either continue an enforcement action against you or

23   to seek contempt by you in refusing to turn over $1.7 million?

24   That's not wrongdoing?

25          MR. AHRENS:  That's not wrongdoing, Your Honor.

*Plaintiff's Motion for Order to Show Cause*                    25

1  That's being an aggressive party.  Just like Ms. Diemer's client

2  was trying to do things and get money representing a creditor.

3  But that's the reason for a bankruptcy stay, so that everybody

4  can be stopped from that.

5            THE COURT:  Well, let's not —

6            MR. AHRENS:  But that's not — no, —

7            THE COURT:  — confuse the automatic stay, because

8  that's not what we're about.

9            MR. AHRENS:  Right.

10           THE COURT:  We're not about a stay, we're about an

11  injunction.

12           MR. AHRENS:  We are not alleging that the receiver did

13  anything wrong.  We're just alleging that the action should be

14  stopped because it's an asset of the estate under 541.  And

15  whether it's either legal or equitable that 541 says, this Court

16  is the one that decides.  And even the *Crown Vantage* case says

17  that.  It says that the power of a bankruptcy court should be

18  universal to decide these things.

19           THE COURT:  Is there any other case or law review

20  article or anything, and I understand you've had this for a

21  matter of hours, that makes the distinction between the

22  receiver, quote, doing something wrong and suing the receiver

23  that takes that larger category of suing the receiver and breaks

24  it down for purposes of the *Barton* Doctrine to mean only suing

25  the receiver when the receiver has done something wrong?

1        MR. AHRENS:  Your Honor, we've looked at a number of

2    cases since we saw the brief.  And that's what all the cases

3    are.  There is no case that we could find that asserted —

4        THE COURT:  Do they say that, though?

5        MR. AHRENS:  Yes.  Yes.

6        THE COURT:  They make that distinction?

7        MR. AHRENS:  Yes — no distinction.  They say that it's

8    when you sue the receiver for wrongdoing or for money.  That —

9    those are facts of those cases.

10       THE COURT:  In other words, to collect money from the

11   receiver, which of course is the reverse of what's happening

12   here.

13       MR. AHRENS:  Yes.  Yes, Your Honor.  And this isn't

14   the first time I've heard of the *Barton* Doctrine.  As I said

15   before, I've heard of it before.  It wasn't inserted in their

16   papers.  But we looked at it before filing this complaint.  We

17   researched it before — Mr. Rehfeld did research this and we were

18   aware of the *Barton* Doctrine.  We didn't think it applied.  We

19   still don't.

20       THE COURT:  Okay.  Obviously that's going to be a

21   point that the other side will deal with after your argument.

22       Go ahead, Mr. Sacks.

23       MR. SACKS:  Well, Your Honor, Mr. Ahrens introduced

24   the property point.  And I think we should review the cases that

25   we've provided to the Court before the hearing, in particular

1   the Third Circuit's decision in *Strategic Technologies*, which is

2   — let me see if I can — there's some confusion in the tabulation

3   of the cases and I want to make sure I tell you which one is

4   which.   *Strategic Technologies* is the first case under tab 4.

5   And unfortunately there's a second case under tab 4 which is the

6   *Graphics Technology* case.

7            In *Strategic Technologies* the Third Circuit said that

8   "The question of whether the funds were part of the bankruptcy

9   estate is distinct from the question of whether the bankruptcy

10  court had jurisdiction over the disposition of the funds."  And

11  they go on to say, "Even if Gulf Stream were able to establish

12  that all the funds in the Commerce Funding account were trust

13  assets, the bankruptcy court would still retain jurisdiction to

14  return those funds to their rightful owners."  And they cite the

15  case of *Canal Corp. versus Finman*, which is a Fourth Circuit

16  case, which also attached.  And that is under tab number 3.

17           And in that case the court said that the proper forum

18  for deciding what the assets of the debtor were is the

19  bankruptcy court.  That the bankruptcy court is the one that has

20  to determine whether there's a trust, whether there's assets

21  there that belong to somebody, and also what distribution to

22  make of those funds.  So that, again, it's the power of the

23  bankruptcy court even if it determines that these are

24  constructive trust funds that don't come into the estate.  And

25  that's —

*Plaintiff's Motion for Order to Show Cause*                    28

1      THE COURT:  In the first instance the bankruptcy court

2  decides whether they are property of the estate under 541.

3      MR. SACKS:  That's — that's correct.

4      And then the —

5      THE COURT:  So do I need to find that they're property

6  of the estate or do I just need to say that in the first

7  instance I have to have that jurisdiction?  Do I need to make

8  the ultimate finding that these are definitely property — these

9  funds are property of the estate or is it sufficient to say that

10  it's this Court's decision, and that will be done in good time,

11  to determine whether these are property of the estate or not and

12  we can have an evidentiary hearing if we need to.  But that —

13  that decision is within the Court's exclusive jurisdiction

14  you're saying.

15      MR. SACKS:  That's correct.  And the Court doesn't

16  need in order to rule on this issue to find first that they're

17  property of the estate.  That is where we believe that the

18  receiver and the FTC have gone wrong here.

19      They start out with the proposition that some other

20  court has determined what the property of the estate is.  And

21  that's not possible.  Only the bankruptcy court could determine

22  what's property of the bankruptcy estate.

23      And, second, they say that once that finding has been

24  made, that cuts off your jurisdiction, and that's not the case.

25  And I think the best illustration of that might be in the

1    *Celotex* case, which is tab 1 in our appendix, and *Celotex* dealt

2    with a bond that had been posted by a third party, by an

3    insurer, and the bankruptcy court enjoined collection against

4    that third party.

5            In other words, the bankruptcy court said, 'This is

6    not property of the estate, but nonetheless, to further my

7    reorganization that's in' — rather, 'further the reorganization

8    that's in my court of the Celotex Company, I'm going to enjoin

9    people who have these bonds from collecting on them, because

10   that will have adverse consequences on the reorganization.'

11           And the Supreme Court said that there was jurisdiction

12   there in the bankruptcy court to make that 105 injunction even

13   without property of the estate being in front of the bankruptcy

14   court, clearly was not property of the estate, but yet they

15   could issue — the bankruptcy court could issue a 105 injunction

16   that had to be obeyed by all the parties whether or not they

17   thought that that was valid or not.

18           THE COURT:   Okay.   Tanya.

19           MR. AHRENS:   And, Your Honor, from the cases he cited

20   I would just like to add two different things:   The *Graphic*

21   *Technologies* case says that to reclaim money or property from a

22   bankruptcy estate on the basis that the property belongs to a

23   reclaiming party and not to the debtor, the reclaiming party

24   must be able to trace that property.   That's — and they discuss

25   541.   That's *Graphic Technology*.

1      The *Ames* case, which is in the documents, says that

2  when funds are in the bank account in the name of the debtor,

3  then under 541 there's a presumption that they're property of

4  the estate.

5      And so this leads — this is why we wanted to discuss

6  541 in response to *Barton* before we got into 541, because this

7  is a question of who is the court that determines that.  And we

8  believe these cases says it's this Court.

9      Your Honor, just like 543 of the Bankruptcy Code, if a

10 receiver is appointed, the receiver is under compulsion by the

11 Bankruptcy Code to turn over assets of the estate or proceeds to

12 this Court.

13      So neither the Congress nor the *Barton* Doctrine have

14 presumed to say anything about property of the estate.  And now

15 I'll let Sacks get —

16      THE COURT:  Well, I have an intermediary question.

17      MR. AHRENS:  Yes.

18      THE COURT:  Intermediate.  When the district court

19 ruled that these funds, these commingled funds, 1.7 million in

20 commingled funds, were not property of the debtor, was the

21 debtor in bankruptcy?

22      MR. SACKS:  I'm sorry.  Can you say that again?

23      MR. AHRENS:  Yes.  There are two orders:  September

24 14th and September 21st, and that second order was when we were

25 in bankruptcy.

1    THE COURT:  And was the issue as to the effect of the

2    order on other creditors briefed?

3    MR. AHRENS:  I don't think the debtor responded, no.

4    MR. SACKS:  Well, Your Honor, are you talking about

5    the September 21st order —

6    MR. AHRENS:  Yes.

7    THE COURT:  Yes.

8    MR. SACKS:  — after bankruptcy?  There was no briefing

9    by the debtor because it was an emergency motion by the FTC that

10   was granted without an opportunity for us to respond.

11   THE COURT:  So the debtor qua debtor, meaning the —

12   the bankruptcy debtor, at no time had an opportunity to brief

13   the effect of the earlier order or the idea of turning over $1.7

14   million on the bankruptcy estate to the district court before

15   the September 21st order was issued?

16   MR. AHRENS:  That is correct, Your Honor.  We — the

17   order came out on a Friday.  We filed on a Sunday, and then you

18   may recall we were in here on an emergency motion and that order

19   was put at our counsel table and we did not brief those issues.

20   THE COURT:  Were those issues briefed to the Eleventh

21   Circuit?

22   MR. AHRENS:  The — on the automatic stay, the issues

23   of us coming before this Court and the fact that this Court

24   would be deciding issues on the automatic stay and property of

25   the estate, yes, those issues were in the brief that we gave to

1  the Court this afternoon, because we thought you needed that to

2  see what the court order was all about.

3        But, yes, the issues of the fact that we are seeking a

4  stay from this Court and that the judge was wrong in the lower —

5  in the two orders, was briefed to the Eleventh Circuit, seeking

6  the stay.

7        THE COURT:  Can everybody on the telephone hear

8  everybody?

9        MR. [SPEAKER]:  Yes, Your Honor.

10       MR. [SPEAKER]:  Yes, Your Honor.

11       MS. GUERARD:  Yes.  It's much better, Your Honor.

12       THE COURT:  Okay.  Thank you.

13       Let's just take a hypothetical.  Let's assume that

14  there had been a trial in the Florida District Court and the

15  Florida District Court had determined that...  We'll take it two

16  ways.  That the receiver or the FTC had proven a constructive

17  trust and was entitled to a specific race, in other words, a

18  specific bank account, a specific race of funds, and had issued

19  a final decision, judgment, findings of fact, conclusions of

20  law, saying that that race belonged to the receiver.  I know

21  that's not the case, but let's just assume for purposes of

22  discussion so I understand how far this goes.

23       It's on appeal.  That's on appeal.  Debtor files for

24  bankruptcy and the receiver gets an order from the district

25  court requiring the debtor to transfer those funds over.  Would

1    I still have the power to enjoin that?

2            MR. SACKS:  Well, Your Honor, I think you would

3    because I think in the first instance this Court has the power

4    to determine what the effect is in bankruptcy.  And you might

5    not have the ultimate power to say those were property of the

6    estate such that the constructive trust judgment didn't apply,

7    but I think in the first instance the Court could say, 'To

8    effectuate my jurisdiction I may need to enjoin the receiver

9    from a turnover.'  That it would be discretionary to do that.

10   Just — I think that's really the *Celotex* situation, is that

11   ultimately those bonds were going to be payable by third

12   parties.  But in the meantime the bankruptcy court had

13   jurisdiction to protect its reorganization.

14           THE COURT:  Let me state it to you slightly

15   differently.  It seems to me that if the debtor is required to

16   turn over $1.7 million to the receiver, that there's nothing to

17   stop the receiver from distributing those funds.  And so the

18   issue as to whether those funds are property of the estate or

19   not is mooted out by allowing the debtor to turn those funds

20   over to the receiver.  There's no — status quo is not protected.

21   And if those funds are ultimately determined to be property of

22   the estate, the whole issue becomes moot because they have been

23   distributed.  You can't get them back from customers, at least I

24   assume you can't.  The FTC hasn't alleged that if for some

25   reason they distribute funds that they can get them back, or

*Plaintiff's Motion for Order to Show Cause*                                    34

1    they're certainly not going to make good on those funds.  The

2    receiver isn't agreeing to make good on those funds.

3           So that if I don't enjoin the distribution about the

4    $1.7 million by the receiver or, in other words, don't enjoin

5    the debtor — don't enjoin the proceeding that would require the

6    debtor to turn over the $1.7 million, that there's no way to

7    protect the estate in the event that those funds are determined

8    by this Court or even by the Eleventh Circuit or by the Ninth

9    Circuit to be property of the estate.

10          So the real concern is that the FTC or the receiver,

11   they're not — they're not saying 'We'll hold the funds

12   indefinitely, until it's determined whether they're property of

13   the estate or not.'  They're saying they're not property of the

14   estate and they waive this Florida Court order and, 'Therefore,

15   turn them over to us and we can do whatever we want with them,

16   whatever we — whatever we deem appropriate.'  And that to me is

17   critical to the whole situation.

18          I don't know whether you agree or not.

19          MR. AHRENS:  We agree.

20          THE COURT:  Okay.

21          MR. [SPEAKER]:  Your Honor?

22          THE COURT:  Yes, — I'm not hearing anybody but the

23   debtor right now.  And then I promise to give everybody a chance

24   to respond.

25          MR. [SPEAKER]:  Forgive me then.  Thank you.

1        THE COURT:  We're basically going through the debtor's

2    argument in favor of the injunction, with me taking an active

3    participation.

4        MR. AHRENS:  And for the hypothetical, the cases we

5    have cited, I know, I could find it if you want, but in the

6    cases there is an example where somebody held bare legal title.

7    And 541 says, "The property the estate consists of all legal,

8    equitable," et cetera, et cetera.  So the court explains that

9    even if you just have title of record, legal title and no

10   beneficial interest, this estate has jurisdiction.  That's why

11   541 is so strong, gives this Court so much power.  And the cases

12   surrounding it say that the bottom line is that it is this Court

13   in this situation, where you have a judgment such as we got to

14   pay money, should be deciding all those rights.

15       And the Court may — we disagree, the Court may say we

16   don't have rights, for whatever reason.  Now we —

17       THE COURT:  Right.

18       MR. AHRENS:  — briefed, we had briefed why we think we

19   do.  But that's the prelude to getting into *Barton*, to explain

20   how strong the power of this Court is.  Even *Crown Vantage*

21   mentioned how strong that power is.  Of course that's a little

22   different because that's a bankruptcy court where the receiver

23   was appointed.

24       But I'll now let Mr. Sacks get into the *Barton*

25   Doctrine and why, you know, after discussing why this Court has

1  the jurisdiction to do what we think it does, why the *Barton*

2  doesn't apply.  We've already said it, but the language of the

3  case is quite clear.

4          THE COURT:  Okay.  I want you to do that, but I want

5  you to remember, put down the note to answer this question:

6  Your budget doesn't show you needing the $1.7 million until

7  about six weeks from now.  So given that I'm thinking in terms

8  of possibly granting a preliminary injunction of a limited

9  duration, why wouldn't I require those funds to be withheld,

10  say, for four weeks with the understanding that we'll have

11  another hearing in a month and how can you show irreparable

12  injury for four weeks by having the funds held for four weeks

13  when your own budget doesn't show you needing them for six

14  weeks?  And if I did that, then my own rationale, which is if I

15  turn it over to the FTC — I'm sorry — to the RTC, if I allow —

16  if I don't enjoin the receiver and the receiver is able to get a

17  million seven from you, then the funds are lost for sure.

18  There's no guaranty that the funds will be kept.  There's no

19  guaranty that anything will be there.  The receiver can do

20  whatever the receiver deems appropriate.

21          Whereas if — again, just for four weeks, if I order

22  you to hold those funds, and I understand they're just

23  commingled funds and I understand that the money we escrowed is

24  just a creation of this Court, it's nothing more than that, it

25  doesn't mean that those funds were funds that you reserved for

1   in any other way, how are you harmed and how can you show

2   irreparable injury if I were to craft a decision that both

3   enjoined the receiver and ordered you to keep the 1.7 for four

4   weeks with the understanding that you might need the funds in

5   six weeks and we'd have another hearing?

6         You don't have to answer that now.  You can go into

7   the *Barton* Doctrine.  The *Barton* Doctrine's a very important

8   doctrine for me.  I need to understand that because I have — I'm

9   having trouble with the issue.  So I don't want to knock you off

10  of that issue.  But I just want to make sure that you understand

11  that the next hard question for you will be the one I just

12  asked.

13        MR. SACKS:  Well, let's deal with the hard question

14  that you've just asked rather than trying to go back and forth.

15  I think the answer, Your Honor, is that we need to establish

16  creditor confidence in order to go forward.  There was a

17  reference to this at the last hearing, the hearing on Monday

18  that we need creditors to give us their business.  And in order

19  for them to do that, they need some assurance that we're not

20  going to be gone in six weeks.  And looking at a budget that

21  shows us not being able to pay what we've committed to pay from

22  our postpetition moneys in six weeks is not very reassuring to

23  the creditor base or to potential customers.

24        And so I think we can't wait till the last minute and

25  say, 'Okay, now we finally have the 1.7 million.'  We need

*Plaintiff's Motion for Order to Show Cause*                    38

1   assurance that's it's there, just like it was until we

2   segregated it at the request of the Court.

3           THE COURT:  What if I were to issue an order that said

4   you can't use it for one — for four weeks but you can use it in

5   six weeks when you need it?  I wouldn't say that — I wouldn't

6   say that we'd have another hearing.  I would just say that you

7   can use it when you need it.

8           MR. SACKS:  Well, Your Honor, that —

9           THE COURT:  When you say you need it.

10          MR. SACKS:  Cash is fungible.  The debtor is operating

11  under a cash collateral budget —

12          THE COURT:  You're not answering my question.

13          MR. SACKS:  Well, I —

14          THE COURT:  The cash is fungible, sure.  But you

15  wouldn't have the use of the 1.7 up until, you know, whatever

16  date in the budget you needed it.  And maybe a few days before

17  that, the order would say as of that date you have use for it,

18  you have the right to use it.  What if I were to construct an

19  order that said that?  Then you have the creditor confidence

20  now of course that — that you will have the money when you need

21  it.

22          MR. AHRENS:  That sounds fine.

23          THE COURT:  Mr. Sacks wasn't going to say that.

24          MR. SACKS:  Well, I'm — I'm too honest.

25          THE COURT:  Okay.

*Plaintiff's Motion for Order to Show Cause*                               39

1        MR. SACKS:  Well, Your Honor, I mean —

2        THE COURT:  The only problem would be of course that

3   it gives the receiver the opportunity to try to appeal me or do

4   whatever they're going to do in the meantime.  And — and, you

5   know, once you've used the money, the 1.7 you're in a stronger

6   position, arguably, in the case.

7        But, on the other hand, it allows — it allows sort of

8   the maximum protection that's possible with the debtor still

9   able to function and provide corresponding rationale for

10  blocking the receiver from potentially dissipating the funds.

11       MR. AHRENS:  Your Honor, the reason I so quickly said

12  it is fine is this.  They will not win on getting a stay pending

13  appeal because the budget shows that we need the money now and

14  we need it in December.  But it also shows that with creditor

15  confidence we're going to get through all this and we're going

16  to get in January, February, and March, and that fund's going to

17  go back up.

18       So if there's — if — if there is an appeal, we're

19  going to say to the appeal court, 'Look, we have creditor

20  confidence now.  There was irreparable injury without it.  But

21  the money comes back in January, February, March.'  And if they

22  win their appeal, the money will be there then.

23       THE COURT:  Okay.  Back to you, Mr. Sacks.

24       MR. SACKS:  Your Honor, I actually wanted to turn to

25  what I think is the crucial point here about the subject funds.

1  We kind of lost that thread —

2              THE COURT:  Are we now back to *Barton* or are we going

3  somewhere else?  Because you were starting to say *Barton* when I

4  dragged you into this other area that I now feel like we've

5  explored.

6              MR. SACKS:  Okay.

7              THE COURT:  So it's — you can talk about subject funds

8  or you can go back to *Barton*.  Just don't forget *Barton*.

9              MR. SACKS:  Okay.  Well, I think with regard to

10  *Barton*, we've told you what we can, which is that we don't think

11  it applies here, based on what we see in the Ninth Circuit cases

12  about how it applies.  And there is a case, by the way, in

13  addition to *Crown Vantage*.  It's a BAP case that *Barton* — I'm

14  sorry — that *Crown Vantage* relies on, where they offer a set of

15  factors that the Court looks at.  I think the Court should look

16  at those and I think when you look at those you see how

17  different these circumstances are from the ones in which *Barton*

18  has typically come up, and I think it's called *Kashani*.  And the

19  factors are quoted in *Crown Vantage*.  If the Court gives me a

20  second, I think I can — yes.

21              All right.  The decision on page 976 says, "The BAP

22  has identified," and they're referring to the decision in

23  *Kashani*, "The BAP has identified a series of factors for the

24  bankruptcy court to consider in exercising its discretion to

25  decide whether or not to enjoin litigation in another