1   jurisdiction pursuant to the *Barton* Doctrine."

2          And then you look at those factors and the first one

3   is whether the acts or transactions relate to the carrying on of

4   the business connected with the property of the bankruptcy

5   estate, and that's the exception under 959(a), that would only

6   apply if the receiver was conducting a business here.

7          And then the second one is, "Do the claims pertain to

8   actions of the trustee while administering the estate."  And

9   that deals with it's a core proceeding or a proceeding which is

10  related to Title 11.

11         Number 3, "Do the claims involve the individual acting

12  within the scope of his or her authority under the statute or

13  orders of the bankruptcy court so the trustee is entitled to

14  quasi-judicial or derived-judicial immunity."

15         Number 4, "Are the movants or proposed plaintiffs

16  seeking to surcharge the trustee, that is, seeking a judgment

17  against the trustee personally."

18         5, "Do the claims involve the trustee's breaching her

19  fiduciary duty either through negligence or willful misconduct."

20         And so the last — the first one is just a question of

21  whether the case should be in the bankruptcy court and the last

22  three are all about whether — what kind of liability you're

23  asserting against the trustee, whether that kind of liability

24  should be allowed at all.  Does the trustee — rather, does the

25  receiver have immunity and is it a personal judgment and is it a

1  fiduciary duty breach.  None of these kinds of factors would

2  have any connection at all to the case in front of the Court

3  here.  There would be no point in applying those factors.

4       And so that leads me to conclude that this is not a

5  situation that the *Barton* Doctrine was intended to cover.  In

6  fact, if we went back and if the Court — you know, the final

7  point I think on *Barton* would be if we had to go back to the

8  district court in Florida, what is it we would be asking them to

9  do, the judge there to do.  We'd be asking them, 'Judge, we want

10  to get a Section 105 injunction that only the bankruptcy court

11  can issue.  Would you please let us go to the bankruptcy court

12  and do that.'  And so we'd be asking a court that has no, A,

13  familiarity with those issues, but, B, any — any connection to

14  them.  They're not issues that arise outside of the bankruptcy

15  court to give us permission to go do something in the bankruptcy

16  court.

17       And I've certainly never seen a *Barton* Doctrine case

18  that has any similar facts and don't understand that that's what

19  *Barton* was intended to cover.

20       THE COURT:  I want to go back to Mr. Oetzell for one

21  question.  And that is:  If I craft a decision that allows the

22  month for the funds to stay, then based on what you said, my

23  understanding is that if for some reason the Eleventh Circuit

24  lifts the stay during that month, you will still give the debtor

25  the three to five days' time before asking for contempt, to come

*Plaintiff's Motion for Order to Show Cause*                                43

1   back to me?

2           In other words, if the stay were lifted tomorrow you

3   would have to come back to me.  You wouldn't be able to go ask

4   for contempt.

5           MR. OETZELL:  If the stay were lifted tomorrow would

6   we have a situation — I'm asking is — the Court — Your Honor

7   say, but —

8           THE COURT:  It's not my stay I'm talking about.  I'm

9   talking about the Eleventh Circuit stay —

10          MR. OETZELL:  If the Eleventh Circuit stay were

11  lifted, would we cease — would we refrain from taking action for

12  the period of time that you're talking about, —

13          THE COURT:  Yes.

14          MR. OETZELL:  — three days, to give them a chance to

15  come in here —

16          THE COURT:  Back to me.

17          MR. OETZELL:  And you're asking assuming of course

18  that the funds were protected for that period of time.

19          THE COURT:  Yes.

20          MR. OETZELL:  Answer:  Yes.

21          THE COURT:  Okay.

22          MR. SACKS:  But, Your Honor, that seems inconsistent

23  to me.  Because if I understood your earlier proposal that you

24  would release the funds after four weeks —

25          THE COURT:  Yes.  I would release the funds after four

1    weeks.  And he was perfectly free to do anything.  I would — if

2    I enjoined him as of four weeks from now, I don't have to enjoin

3    him, you see.  Why do I need to enjoin him and have — set him up

4    for an appeal?  I don't have to enjoin him.  I can enjoin him

5    four weeks from now, based on withholding the funds and his

6    agreement.  I don't need to enjoin him today.  I can enjoin him

7    — I'm sorry.

8        I have to — for what you want, you want me to issue

9    the order, which would enjoin him effective four weeks from now.

10       MR. SACKS:  Well, that's what I thought the Court was

11   saying, —

12       THE COURT:  That's just what I was talking about.

13       MR. SACKS:  — which — which would be a judgment —

14       THE COURT:  It would be — it would be — it would be an

15   order enjoining him four weeks from now.

16       MR. SACKS:  Right.  And —

17       THE COURT:  But I don't need to — I don't need to have

18   it be in effect immediately, because with your holding the funds

19   and his agreement, it doesn't have to be in effect right away,

20   right?

21       MR. SACKS:  Well, I think the parties are going to

22   need final — a final order.

23       THE COURT:  That is a final order.

24       MR. SACKS:  A final order not subject to appeal is

25   what I was going to say.  And so if you issue a —

1    THE COURT:  A final order not subject to appeal?

2    MR. SACKS:  In other words, that has gone through the

3  appellate process.  If you issue an order today that we can use

4  the 1.7 million, I am relative —

5    THE COURT:  Effective 30 — 30 days from now.

6    MR. SACKS:  And even if it's effective 30 days from

7  now, I assume that they can pursue their appellate rights.  They

8  probably don't need a stay immediately because they have 30 days

9  in which to at least —

10    THE COURT:  Right.

11    MR. SACKS:  — start that process.  And then —

12    THE COURT:  I don't know whether they can pursue their

13  appellate rights or not.

14    MR. SACKS:  No, —

15    THE COURT:  But that's not — that's not what I'm

16  worried about.

17    MR. AHRENS:  But, Your Honor, when I answered that

18  question, I quite candidly assumed that you would be issuing a

19  stay today and then I argued what I —

20    THE COURT:  Why do I need to issue a stay?  Why can't

21  I have it — issue it — I don't know if I can do it today, but

22  issue it —

23    MR. AHRENS:  Well, —

24    THE COURT:  — and have it be in effect 30 days from

25  now to stop them, because if they are agreeing not to do

1    anything for 30 days, why do I have to enjoin them?

2        MR. AHRENS:  When I answered the question I thought

3    they had agreed to nothing, and then you asked them and —

4        THE COURT:  Okay.

5        MR. AHRENS:  But —

6        THE COURT:  So how does this change anything?

7    Tanya.

8        MR. AHRENS:  I'd like to think — I do agree with Mr.

9    Sacks that we — I thought we were — we would get some order that

10   we would end all of this and get on with it, because —

11       THE COURT:  Well, we would.

12       MR. AHRENS:  And what I wanted — what I wanted was an

13   order of stay so that if they are going to take it up they'll

14   take it up to appeal.  And — because we think we can withstand

15   that.  And that would give them plenty of time to argue that

16   they're entitled to a stay.  We'd oppose it for the reasons I

17   just stated, that there will be plenty of money in the estate

18   after December.

19       THE COURT:  I'm sorry.  Mr. Ahrens, if I stay them —

20   if I don't — if I keep the funds — as I asked you, if I keep the

21   funds protected for 30 days, then why do I need to stay them

22   from seeking contempt if he says, 'I agree to it'?

23       He said, 'I agree to it.'

24       MR. AHRENS:  Well, he — on the second question he did,

25   so I think we should continue —

*Plaintiff's Motion for Order to Show Cause*                    47

1    THE COURT:  So you need to think about that.

2    MR. AHRENS:  Yeah, I — I think we do —

3    THE COURT:  You need to think about why I need to stay

4  a man who sits up here and says, 'I agree.'

5    MR. AHRENS:  Okay.

6    THE COURT:  Okay.

7    MR. SACKS:  But it's —

8    THE COURT:  Enjoin, not stay.  I'm enjoining.

9    MR. AHRENS:  Enjoin.

10    THE COURT:  And we're using those words incorrectly,

11  but —

12    MR. AHRENS:  So what you're — just so I have this

13  clear, Your Honor, what you're saying is you would consider

14  enjoining effective 30 days from now.

15    THE COURT:  Right.

16    MR. AHRENS:  That — that would be about the middle of

17  November.  We need the moneys the beginning of December.

18    THE COURT:  Right.

19    MR. AHRENS:  Okay.  I would like to look at the budget

20  and talk to my client, Your Honor.

21    THE COURT:  That's fine.

22    MR. AHRENS:  All right.

23    MR. OETZELL:  Your Honor, just as long as, you know,

24  we can get in here on a hearing and argue the point —

25    THE COURT:  Yes, absolutely.  Absolutely.

1          MR. OETZELL:  And it would be effectively putting this

2     off for 30 days and preserving the funds —

3          THE COURT:  Maybe.  I mean who knows what's going to

4     happen in 30 days in this case.  This case is a very interesting

5     case.  And who knows what's going to happen in the Eleventh

6     Circuit.

7          I mean you don't — that's the interesting part of all

8     of this.  We don't know what's going to happen.  And so there's

9     a way in which it appeals to me to take it in bite-sized pieces.

10    But, you know, if there were a countervailing argument that I

11    shouldn't, I should just issue my decision and have it be there

12    indefinitely, then taking it in bite-size pieces wouldn't

13    necessarily make sense.

14         But just like we're taking cash collateral in

15    bite-size pieces, there are aspects of this case that indicate

16    to me that — for example, rather than giving a preliminary

17    injunction of indefinite duration, that maybe I don't really

18    need to do that.  Maybe I should take a look at it 120 days from

19    now.  That's — that's the question.

20         MR. WARREN:  Your Honor, Steven Warren of O'Melveny on

21    behalf of PaymentOne.  I'm sorry to interject, but I would — if

22    — if possible, we'd like to be heard on that issue before the

23    Court reaches its final determination.

24         THE COURT:  That's fine.  You will be.

25         MR. WARREN:  Thank you.

1    Go ahead.

2    MR. SACKS:  Your Honor, I'm puzzled, though, because

3    when you asked Mr. Oetzell the question, you put in there that

4    so long as it's subject to the three days — three business days

5    coming back to this Court, and I don't understand why we would

6    ever — if the Court has issued an order that says on December —

7    I mean on November 15th the money is freed from the segregated

8    account, then it doesn't matter what the Eleventh Circuit does —

9    THE COURT:  That's true.  It's true.  It doesn't

10   matter what the Eleventh Circuit does.  Even if the Eleventh

11   Circuit frees you up, as long as I've protected the funds for 30

12   days, you shouldn't do anything.  Isn't that right?

13   MR. OETZELL:  Well, let's —

14   THE COURT:  Get to the mic.

15   MR. OETZELL:  Okay.

16   THE COURT:  Get to the mic.

17   MR. OETZELL:  They needed to talk to their client.

18   Maybe we should work out a — maybe — maybe we should talk

19   about —

20   THE COURT:  Okay.  That's fine.  I think he's right.

21   MR. OETZELL:  — what you've got in mind, what we've

22   got in mind here, and we'll both get on the phone and —

23   THE COURT:  Talk to your clients.

24   MR. OETZELL:  Yeah.

25   THE COURT:  Okay.  I don't want to hear it from

*Plaintiff's Motion for Order to Show Cause*                              50

1  anybody but the debtor until we get then, and then I'll open it

2  up.

3          Do you have anything else you want to talk about?

4          MR. SACKS:  The other topic that we need to talk

5  about, Your Honor, is the injunction with respect to the Florida

6  action.

7          THE COURT:  The enforcement action.

8          MR. SACKS:  The enforcement action in Florida which we

9  haven't really dealt with yet.  And I would propose Mr. Ahrens

10  address that.

11          THE COURT:  That's fine.

12          MR. AHRENS:  Okay.  Your Honor, I think we've made

13  clear in our papers why we are entitled to a stay of the Florida

14  action with respect to the FTC.  I will only make very brief

15  comments to the papers we got from the FTC.

16          First they say that under the FAMCO test, the test for

17  enjoining a regulatory or police powers action under 105 is

18  whether the government action will threaten the assets of the

19  estate.  Well, we agree and we think we've established through

20  our declarations that we will be threatened.

21          We put in the Declaration of Mr. Weber.  Mr. Weber,

22  they said, has no experience.  Mr. Weber's in court.  The

23  declaration itself says he has a lot of experience with this

24  debtor, having been hired by them before as an outside

25  consultant.

1    And he says that one of the problems with this debtor,

2    Your Honor, was because it never held enough cash to pay its

3    customers, and it's over a long period of time.  And this debtor

4    administratively does not want to do that.

5         It met with the committee and it said, 'We have a

6    prepayment plan and under this prepayment plan we're going to

7    have enough cash to give you 50 percent upfront and then to give

8    you whatever you're due during this Chapter 11 administrative

9    case."

10        And that's going to get confidence in those creditors.

11   We're starting a new company now and we're going to reorganized.

12   And so we do need not to fight a battle down in Florida with the

13   FTC.  So we will be threatened —

14        THE COURT:  Let me just ask you a question.  To what

15   extent do I have evidence supporting what it would cost both in

16   terms of the time of the principals and the cost of litigation

17   over, say, the next 120 days?

18        MR. AHRENS:  Your Honor, you have the Declaration of

19   Mr. Goldfarb that says that it would be extremely expensive to

20   fight this battle.  It would cost a million dollars in fees.

21        THE COURT:  Over what period of time?

22        MR. AHRENS:  That's — that's —

23        THE COURT:  Over years?

24        MR. AHRENS:  That's until the February trial, Your

25   Honor.  That's what the declaration says.

*Plaintiff's Motion for Order to Show Cause*                            52

1    THE COURT:  Prior to the February trial — or through

2    the February trial.

3    MR. AHRENS:  Yes, through — through the February

4    trial.

5    And you have the Declaration of Mr. Dawson that says

6    that he is needed for this reorganization, and he really is.

7    And so is Mr. Meyer.

8    And while we have hired an outside consultant, they're

9    very expensive.  And so those declarations are all before the

10   Court.

11   THE COURT:  Go ahead.

12   MR. AHRENS:  Your Honor, in addition, before I hit any

13   of the other key points, the FTC says that — in their papers —

14   that they might — we might be able to get a stay, we might be

15   able to stay the enforcement.  But under any plan of

16   reorganization, after we confirm our plan they're going to be

17   coming after us again for enforcement.

18   Your Honor, I've done a lot of this work in the past

19   and I've cited this to many courts:  The purpose of

20   reorganization is to get a stay, a respite.

21   In the case of *In re RRR Holdings*, 134 B.R. 382 —

22   THE COURT:  Is this in your papers or am I taking

23   notes?

24   MR. AHRENS:  No, this is a new case, Your Honor.  This

25   is not in our papers.

1    THE COURT: So let's go through it slowly.

2    MR. AHRENS: Yes.

3    This is in reply to the positions of the FTC, that

4    under the plan of reorganization we may get a brief respite.  We

5    may get a stay, but then when we confirm the plan they will be

6    back for the enforcement action.

7    And I'm going to have a couple of responses to that

8    point.  The first point are two cases:  *In re RRR Holdings*, 134

9    B.R. 382.  That's a bankruptcy court decision, Judge Morgan,

10   Northern District of California, 1991.  It was reversed on other

11   grounds, 145 B.R. 57.  But it was not the ground as follows.

12   It was a reverse because of the *In re Outlook* decision

13   of Judge Carlson about single-asset bankruptcies.  But this is

14   still well established law, and I'm going to cite another case

15   on it, that it is well accepted that the policy of the Code is

16   to force negotiations and consensual plans of reorganization.

17   The other case that I would cite to this Court is *In*

18   *re Reed*, 179 Bankruptcy Reports 169 at 176, where it says that

19   the intent of the Bankruptcy Code is to encourage consensual

20   resolution of claims through a plan-negotiation process.

21   Your Honor, we want to sit down with the FTC.  We need

22   some time to do that.  There are bankruptcy issues that we want

23   to talk to them about.  Can we confirm a plan that stops the

24   regulatory suit against us.  Do we want to.  Can we confirm a

25   plan that might be an asset sale, which does not affect them and

1   their regulatory power.  What does 1129 say about this.

2           Your Honor, we want to deal with them not only for

3   their $5 million claim but also for their regulatory claim,

4   because that claim will impact the reorganization of this

5   debtor.  Will they continue to pursue us.  If they do, if they

6   can, it'll have one value.  If we can settle, it'll have another

7   value.

8           So I submit that these cases — and also the typical

9   case, the *Texaco* case stands for the proposition that you should

10  be given a respite not only from claims of creditors but also

11  from regulatory claims, such as this, to talk to your claimants.

12  And that's what — that's the main response to all of the

13  contentions of the FTC, that they're going to still be around.

14  They're still going to be looking after us.

15          Your Honor, they then went on to talk about the

16  irreparable harm and that we haven't shown irreparable harm.

17  They criticized us for not setting funds aside prepetition when

18  they knew that — that — when we knew that they had a claim.

19          Mr. Sacks has basically already said that, that we

20  were insolvent.  I put in a declaration that said that I, you

21  know, met with the FTC and told them we were insolvent nine

22  months ago, and if a judgment came down, we had to file.  We're

23  trying to protect creditors here, so there is irreparable harm

24  if we have to continue and fight hours and hours of litigation

25  in Florida and fight on some — a battle we may not have to win.

1   Because if we do a plan, for instance, on a sale of assets, the

2   company may not be around any longer.  There may be no company

3   to regulate or maybe we can do a plan that in some — some manner

4   does not subject to us to the regulatory powers of the FTC.  But

5   that's too early in the case.

6           These are the issues that I've already discussed with

7   Mr. Fiero.  And they — they say that it's too uncertain in their

8   papers.  They say that we didn't take into account the LECs

9   might discount us.  Not true.

10          If you look at the budget, the debtor's budget, it

11  shows a reduction of funds from Verizon because we've already

12  been negotiating with them, talking to the committee about.  So

13  we've taken those matters into consideration and we still cause

14  exist.

15          Now we've been — and it's not unusual that they say,

16  'Oh, the committee only gave three weeks' respite.'  That's not

17  unusual for a committee appointed only a few days before the

18  final hearing to say, 'I want another three weeks.'

19          They have their financial advisor in there now.

20  They're looking at the documents.  I'm sure everything will be

21  fine.  It's been fine so far.

22          But the thing that has been unusual in this case and

23  we put this in the record, we put it in our papers, Mr. Dawson

24  has testified to it, we're talking about a plan.  That's pretty

25  early in the case.  Only three, four weeks into a case to be

1   talking to a plan of reorganization.  And I can tell the Court
2   we're making some progress already.  We're talking details.
3          So with that representation I think we've replied to
4   all of the — let me check my notes — to all of the points raised
5   in the brief filed yesterday or the day before yesterday by the
6   FTC.
7          They attacked the Weber declaration, and I said that
8   he fully discussed in the budget how the LECs have required some
9   discount and how the money is needed in the future.
10         Oh, the *PG&E* case.  They cited the *PG&E* case, which I
11  was involved with.  I represented a member of the PG&E
12  Creditors' Committee, Your Honor, before Judge Montali.  And the
13  *PG&E* case only says that regulatory matters should not be
14  withdrawn to the bankruptcy court.  And we're not asking that
15  the FTC matter be withdrawn.  We're only asking that it be
16  stayed.
17         Your Honor, those are our replies —
18         THE COURT:  And only stayed as to the debtor.
19         MR. AHRENS:  And only — and only stayed as to the
20  debtor, Your Honor, that is correct.  So, Your Honor, that is
21  our reply to the FTC's papers.
22         THE COURT:  Okay.  I have to take another hearing in a
23  different courtroom at 3:30.  So we're going to take a 15-minute
24  break.  Hopefully I'll be back in about 15 minutes.  It may be
25  20 minutes, but I don't think it'll be much longer than that.

1   So if you could become at 20 off, and my — whoever's here will

2   tell you whether I need a few more minutes.

3          Thank you.  We're in recess.

4          MR. AHRENS:  Thank you.

5          THE CLERK:  Please rise.

6     (Recess taken from 3:23 p.m. to 3:44 p.m.)

7          THE COURT:  Okay.  You've concluded your arguments,

8   have you, for the preliminary injunction?

9          MR. AHRENS:  Yes, Your Honor.

10         THE COURT:  Okay.  Mr. Oetzell and then Mr. Mora, how

11  do you want to divide your time?  Who wants to go first?

12         MR. MORA:  I'll defer to Mr. Oetzell, Your Honor.

13         MR. OETZELL:  I — I can go first, Your Honor.  I have

14  a couple things to say.

15         Your Honor, you asked Mr. Sacks and you asked Mr. Bar-

16  — and you asked Mr. Ahrens about the *Barton* Doctrine.

17  Specifically you asked does it block me, does it block me from

18  suing.  And you — and they told you —

19         THE COURT:  I'm not suing.

20         MR. OETZELL:  Excuse — does it — that is correct.

21         THE COURT:  I'm not suing anybody, Mr. Oetzell.  I'm

22  the Judge.

23         MR. OETZELL:  I understand.

24         THE COURT:  You're — you're a lawyer and you're in

25  court.

*Plaintiff's Motion for Order to Show Cause*                    58

1         MR. OETZELL:  Does it block me from enjoining because

2    the debtor did not get permission of the appointing Court.  And

3    they said no, the *Barton* Doctrine doesn't apply.

4         And you asked for them to go slowly and show you why.

5    They told you something that is totally inaccurate.  They told

6    you that the *Barton* Doctrine only applies in situations where,

7    for example, the receiver is being sued for wrongdoing.  That is

8    not the *Barton* Doctrine.  That is not any exception to the

9    *Barton* Doctrine.

10        I would direct Your Honor's attention to our brief

11   where we — where we quote the *Barton* Doctrine, Your Honor.  Give

12   me half a second to find it.  I believe this is *Crown Vantage*,

13   Your Honor — no, excuse me — it's *Carter*.   "Joining the other

14   circuits that have considered this issue, we hold" —

15        MR. AHRENS:  What — what page?

16        THE COURT:  Yeah.  I need it, too.

17        MR. OETZELL:  Oh, excuse me.  It's on page 6 of —

18   beginning on line 1.

19        "Joining the other circuits that have considered this

20   issue, we hold that a debtor must obtain leave of the bankruptcy

21   court before initiating an action in the district court where

22   that action is against a trustee or the bankruptcy

23   court-appointed officer for acts done in the actor's official

24   capacity."

25        Now of course that is exactly what is being asked

1   here.  You are being asked to enjoin the federal receiver from

2   acting in accordance with the order that was — that gave him his

3   duties.  Gave him his powers and directed him to take action

4   from the district court.

5           Now Your Honor's question still is not answered or the

6   question that is implied, which is official acts in

7   contravention to what.  And the answer is official acts in

8   contravention to the debtor's acts in running the business,

9   running the debtor, running the receivership itself.

10          This is why — where you will find the action in this

11  area is where the *Barton* Doctrine has been applied to trustees.

12  And you will see that in many if not most instances that

13  doctrine's protection is denied to Chapter 7 trustees because

14  they do not have the right to operate the business unless of

15  course the Court orders it.

16          That's the difference in the *Barton* Doctrine.  We fall

17  squarely within the *Barton* Doctrine.  They did not get approval

18  or permission from the appointing court and they cannot sue us.

19          Secondly, you order asked about the timing of the

20  decisions from the district court.  And the answer is is in the

21  omnibus order that predated the bankruptcy.  The court decided

22  that the subject funds were the receiver's and not the debtor's.

23  That is the whole purpose of the clarification order, and you

24  will see on page 1 and page 4 of the clarification order the

25  exact orders.  They are clear.  They're just beyond argument,

*Plaintiff's Motion for Order to Show Cause*                    60

1    Your Honor.  And I'll quote them.

2            On page 1, "On Friday, September 14th, 2007, this

3    court issued its omnibus order which ruled that the reserve

4    funds are the property of the receivership estate and ordered

5    Integretal to pay the current reserve funds."

6            On page 4, "The court has already ruled that the

7    reserve funds are neither property of the bankruptcy estate nor

8    Integretal."

9            Now obviously it could not have ruled earlier before

10   bankruptcy that it was not property of the bankruptcy estate,

11   but I think you'll see that one follows from the other.  If

12   they're not property of Integretal, they're not property of the

13   bankruptcy estate.

14           THE COURT:  I don't know whether I follow that or not,

15   but...

16           MR. OETZELL:  Okay.  Okay.  Your Honor, has also

17   expressed the concern that if the money, if the subject funds

18   are turned over to the receiver, that they will disappear,

19   they're no longer be available in the event that the debtor goes

20   ahead on appeal in the Eleventh Circuit.  I will let Mr.

21   Schneider address that and I think he will assuage your

22   concerns.  But, Your Honor, what you stated is the concerns that

23   we have.

24           THE COURT:  I understand.  The flipside.

25           MR. OETZELL:  Exactly.  And what we are asking for is

1   preservation of those funds.  We understand obviously there is

2   an appellant process to go forth in the Eleventh Circuit.

3   Nobody's planning on dissipating those funds except the debtor.

4   And that is not what we can accept, Your Honor.

5          We wish to have the status quo.  And segwaying into

6   the status quo, as I was mentioning earlier, in respect of the

7   Eleventh Circuit decision, this was a decision where two things

8   happened.  One, the debtor went up and they explained our

9   voluntary agreement to the Eleventh Circuit and said it's about

10  to expire.  And then they made the representation to the

11  Eleventh Circuit that they would be holding the funds.  This is

12  why I was getting so exorcised earlier when Mr. Ahrens was

13  saying that wasn't their idea of the status quo.  That indeed is

14  their idea of the status quo and that's found in the letter that

15  we put — that we filed in front of Your Honor in our fifth

16  request for judicial notice.  And let me see if I can turn to

17  it.

18         That letter is from Mr. Goldfarb.  And I'm looking at

19  page 4, the second full paragraph, the debtor mentions the

20  status quo three times in one sentence — or excuse me — three

21  times in as many sentences and then says in the fourth

22  paragraph, "The court should use that power in this case.  The

23  status quo is the enforcement of the" — "omnibus order is stayed

24  and that Integretal still holds the disputed funds."

25         That's the status quo represented by the debtor, Your

1    Honor. Notwithstanding what Mr. Ahrens says, that's the status

2    quo we seek.

3              THE COURT:  Thank you, sir.

4              Mr. Mora.

5              MR. MORA:  Thank you, Your Honor.

6         Your Honor, the debtor is seeking in this hearing

7    today an order preliminary enjoining the FTC from prosecuting

8    the enforcement action against them. And they're seeking an

9    order preliminary enjoining both the receiver and the FTC from

10   enforcing the district court's order to show cause in an

11   contempt proceeding.

12             The district court has ruled that the 1.7 million in

13   reserve funds at issue in the contempt proceeding —

14             THE COURT:  You call them reserve funds, but of course

15   that's just a misnomer. There is — there were no funds

16   reserved, but go ahead. You're calling them that, but it

17   doesn't make it so.

18             MR. MORA:  — and held by Integretal must be turned

19   over, or they have to show cause where they shouldn't be held in

20   contempt.

21             The district court also held in a separate order that

22   the enforcement action and the contempt proceeding are accepted

23   from the automatic stay under Section 362(b)(4), the

24   Governmental Police or Regulatory Powers Exception.

25             Integretal has —

1          THE COURT:  Was that held while the debtor was in

2     bankruptcy?

3          MR. MORA:  Yes, Your Honor.

4          THE COURT:  That the —

5          MR. MORA:  The September 20- — it was — I will refer

6     to that —

7          THE COURT:  It had to be.  It had to be.  Go ahead.

8          MR. MORA:  I will refer to that as the September 21st

9     order, —

10          THE COURT:  Right.

11          MR. MORA:  — to make it clear.

12          THE COURT:  My — my mistake.

13          MR. MORA:  And, as Your Honor knows, Integretal has

14     appealed both of those orders to another court, the Eleventh

15     Circuit.  And they've sought an emergency stay of the September

16     21st order from the Eleventh Circuit.  And, as they explained to

17     you today, their position is that they are only seeking a stay

18     of the September 21st order, which was the ruling on the

19     automatic stay.

20          Just today the Eleventh Circuit, as you know, granted

21     a temporary stay pending that court's decision on the merits of

22     Integretal's motion for a stay pending appeal.  That is what

23     that order issued today was, the one-page, one-sentence order.

24     And —

25          THE COURT:  The merits of the stay of the contempt

1    proceeding only?

2            MR. MORA:  No, Your Honor.  The merits —

3            THE COURT:  Is your enforcement —

4            MR. MORA:  Until — un- —

5            THE COURT:  — action stayed?

6            MR. MORA:  No, Your Honor, it's not.

7            THE COURT:  So the — then if the enforcement action

8    isn't stayed, then how can the Eleventh Circuit be reviewing the

9    merits of anything other than the contempt proceeding?

10           MR. MORA:  Your Honor, what — what the Eleventh

11   Circuit has before it immediately is Integretal's motion for a

12   stay pending appeal.

13           THE COURT:  Stay of what?

14           MR. MORA:  Motion for a stay of the September 21st

15   order.

16           THE COURT:  Does the September 21st order deal only

17   with contempt or does it deal with your enforcement action?

18           MR. MORA:  It deals with both.

19           THE COURT:  So what is stayed?

20           MR. MORA:  Well, temporarily —

21           THE COURT:  By the Eleventh Circuit, —

22           MR. MORA:  Yes.

23           THE COURT:  — what exactly is stayed and what exactly

24   isn't stayed in your opinion?

25           MR. MORA:  Temporarily the September 21st order is

1   stayed.

2                THE COURT:  And what does that provide?

3                MR. MORA:  The September 21st order provides that both

4   the enforcement action, the FTC's enforcement action, and the

5   contempt proceeding are excepted from the automatic stay.  That

6   is what that order provides —

7                THE COURT:  If that is stayed, then what is the effect

8   of that, first, on the contempt proceeding and, second, on the

9   enforcement action?

10               MR. MORA:  I think my answer to that, Your Honor, is I

11  don't — I'm not familiar with all of the details of the

12  appellate record for the Eleventh Circuit, but I take Mr. Ahrens

13  at his word that the debtor in its — in its motion for a stay to

14  the Eleventh Circuit, the debtor took the position that they

15  were only seeking a stay — Mr. Ahrens correct me when — when I

16  get this wrong — of the district court's September 21st order,

17  only insofar as it pertained to the contempt proceeding and only

18  for purposes of the motion for stay pending appeal.

19               Did I describe that correctly, Mr. Ahrens?

20               MR. AHRENS:  I think you're wrong.  I think —

21               MR. MORA:  Where was I —

22               MR. AHRENS:  — the notice of appeal related to both

23  orders, the September 14th order and the September 21st order.

24  The debtor did not seek a stay of any enforcement action with

25  respect to the FTC.  It only sought a stay of the portions of

1    those two orders that related to the contempt.

2            THE COURT:  So the merits of the FTC's enforcement

3    action are not presently being considered by the Eleventh

4    Circuit, if what you say is correct.

5            MR. AHRENS:  That is correct, Your Honor.

6            THE COURT:  And, therefore, Mr. Mora, your position is

7    not correct, that there are no merits of the stay or anything

8    else vis-a-vis the FTC enforcement action presently pending

9    before the Eleventh Circuit.

10            So to the extent that you're arguing that I should

11   stay my hand because the Eleventh Circuit is presently

12   considering the issue, Mr. Ahrens and you disagree.  He says the

13   Eleventh Circuit is not, and you've just deferred to Mr. Ahrens.

14            MR. MORA:  Well, Your Honor, let me just say one more

15   point and I'll move on.

16            THE COURT:  Unless I'm wrong, and then you should

17   correct me.

18            MR. MORA:  All right, Your Honor.  And my

19   understanding is that Integretal has appealed not only the

20   September 21st order but they've also — which — which says that

21   both the enforcement action and the contempt proceeding are

22   exempt from the stay.  They've also appealed the omnibus order,

23   which was the order related to the contempt proceeding, the

24   order that was entered before the bankruptcy case was filed.  So

25   they have appealed both orders.  But to the extent that there

*Plaintiff's Motion for Order to Show Cause*                          67

1    were adverse rulings against Integretal in their — in notices of

2    appeal that they filed, and I — the point I wanted to make, Your

3    Honor, was this, from this discussion.  Is that they are seeking

4    simultaneously with this proceeding a stay before the Eleventh

5    Circuit, as — as to the contempt proceeding.

6            THE COURT:  Simultaneously — yes, they're seeking a

7    stay —

8            MR. MORA:  Yes.

9            THE COURT:  — of the contempt proceeding before the

10   Eleventh Circuit.  That's correct.  And the Eleventh Circuit has

11   stayed the contempt proceeding pending that, the Eleventh

12   Circuit's decision.

13           MR. AHRENS:  That's correct, Your Honor.

14           MR. MORA:  And, Your Honor, I'll move on.  In this

15   proceeding IGT is — they're simply seeking — I'm sorry —

16   Integretal, they're simply seeking to relitigate and

17   collaterally attack before this Bankruptcy Court in the guise of

18   a Section 105 proceeding and in the Section 363 cash collateral

19   proceeding the orders that the district court entered that are

20   on appeal before the Eleventh Circuit.

21           The Court's discretionary powers under Section 105

22   should not be used in circumstances like this, simply should not

23   be used.  It is contrary to the Bankruptcy Code itself, the

24   362(b)(4) exception.  It's contrary to the FTC Act and it's

25   contrary to principles of comity under the circumstances here,

*Plaintiff's Motion for Order to Show Cause*                                68

1   Your Honor, where the Court is really, as Your Honor was

2   postulating when the debtor was arguing, the Court is really

3   being asked to essentially reverse what the district court has

4   already ruled on and what's on appeal before the Eleventh

5   Circuit.  Section 105 simply should not be used in circumstances

6   like these.

7           THE COURT:  Is the issue as to 541, property of the

8   estate, properly before the Eleventh Circuit?

9           MR. MORA:  I — I'm not aware, Your Honor.  I don't

10  know.

11          THE COURT:  Thank you.  Go ahead.

12          MR. MORA:  Your Honor, if you do decide to consider

13  exercising your Section 105 powers, transfer a preliminary

14  injunction, you must find that particularly in the case of the

15  contempt proceeding, as we've all been discussing, that you have

16  jurisdiction and you must find in both cases that there is a

17  sufficiently appropriate threat, serious threat that the debtor

18  has proven to the estate.  And you must find that the

19  traditional four-part injunctive standard has been met.

20          Here there is not a sufficient threat and they haven't

21  met the standard, so Your Honor should not enter the preliminary

22  injunction.

23          I'm going to cut right to the chase, because we've

24  covered all of this in our brief.  But what I'd like to

25  emphasize are the factors that we think are really controlling

1   here.  So let's just go right to the irreparable injury part.

2         They claim two sources of irreparable injury.  First

3   is litigation costs, and for that they claim irreparable injury

4   as to both proceedings.  And the second is the 1.7 million

5   reserve funds at issue in the contempt.

6         Let's do the litigation costs first.  First of all, —

7         THE COURT:  Well, that's not all they claim.  That's —

8   that's one part of what they claim.  It's only 50 percent, if

9   you will.  I don't want — by 50 percent, I just mean it's only

10  one of their arguments.

11        The other argument that's very strong is that you tie

12  up their principals in a time when they're trying to negotiate a

13  plan of reorganization with all these various parties, including

14  the Creditors' Committee, secured creditors, a potential buyer,

15  the — the subsidiary.

16        I mean they're — we're talking about a multiple-party

17  negotiation which is at its crucial stage with everybody telling

18  me, including the Creditors' Committee that they're on a very

19  fast track to try to reach resolution in a case that's going to

20  affect employees, it's going to affect the people they buy from,

21  they people they sell to.  You know, that's a simplistic word in

22  this financial case, but all the people they deal with it.  It's

23  going to affect all the creditors of the case.  And — and now is

24  the time where they need the, to the extent possible,

25  uninterrupted work of their principals in doing this, not to be

1    involved in two different fora with a receiver and the FTC in

2    complex litigation.

3            MR. MORA:  Yes, Your Honor.  And Congress in enacting

4    the (b)(4) exception took that into account and still legislated

5    that actions such as this, Governmental Police or Regulatory

6    Powers actions, should not be stayed —

7            THE COURT:  Well, I understand —

8            MR. MORA:  — by bankruptcy.

9            THE COURT:  — that to the extent that this is

10   correctly a 362(b)(4), that the stay doesn't apply.  But that

11   doesn't mean that the Court is without power to issue an

12   injunction.

13           MR. MORA:  Yes, Your Honor.  Getting back then to the

14   issue of litigation costs, as the Court noted in *FAMCO*, there's

15   strong authority for the proposition that litigation costs

16   really as a matter of law should not constitute irreparable harm

17   when determining whether an injunction is required.  And it

18   cited to the case of *Rath Packing*, *EEOC versus Rath Packing*, one

19   of the lead cases in this area.

20           And the *FAMCO* court further went on to say that

21   there's some authority for the proposition that it could be a

22   factor.  And there it pointed to the *NLRB versus Superior*

23   *Forwarding* case, which is the case that the debtor heavily

24   relies on.

25           But, Your Honor, they have not met their evidentiary

1    burden to show that litigation costs here would constitute

2    irreparable harm.  They have submitted the Declaration of Neal

3    Goldfarb, an attorney in the enforcement action matter.  This

4    was submitted with their original temporary restraining order

5    papers back on September 21st.

6           Your Honor found at the TRO hearing that that

7    declaration did not suffice to meet their burden on a temporary

8    restraining order and, Your Honor, it still doesn't today.  They

9    have submitted anything to supplement that declaration.  It's

10   outdated.  It's conclusory and vague.  And it's inflated.

11          We've submitted two declarations to the Court.  In the

12   TRO hearing we submitted the Declaration of Laura Kim, that

13   demonstrated to this Court why that evidence that they submitted

14   was woefully insufficient to support a TRO.  And Your Honor

15   agreed with us.

16          For the preliminary injunction hearing we've submitted

17   the Declaration of Ms. Collot Guerard, also an attorney for the

18   FTC in the enforcement action, which details and updates the

19   Court on exactly what's happening in that proceeding and the

20   posture of it, and shows why Mr. Goldfarb's dec. has a number of

21   faulty assumptions on it, things that he doesn't address.

22          Number one, the major thing is he fails to take into

23   account at all that the FTC will be filing a motion for summary

24   judgment.  If we prevail, there won't be a trial at all.  If we

25   prevail in part, at least the issues will be narrowed and will

1    eliminate the need for substantial trial time.  He totally

2    ignores that.

3           Second, discovery is closed.  Much of the detail that

4    he does put or manage to put in his declaration talks about

5    deposition time and expense.  Discovery's closed.  There is

6    deposition motions, motions for additional depositions pending

7    before the district court, but none of them have been granted.

8    There's simply no support for that statement.

9           THE COURT:  Well, they have to be fought over, right?

10          MR. MORA:  Yes, Your Honor.  They've been fully

11   briefed.

12          As to the contempt proceeding, Your Honor, Mr.

13   Goldfarb's dec. has simply a conclusory paragraph stating that

14   he estimates that 150,000 to 200,000 in additional expenses will

15   be incurred by the debtor, but that proceeding has largely been

16   concluded.  It was litigated for months.  And he doesn't explain

17   where those expenses will come from.  It's just a conclusory

18   statement.  So that part of his declaration is insufficient as

19   an evidentiary matter.

20          Most importantly, just like the debtor did in *FAMCO*,

21   and this was also an error in the bankruptcy court's ruling that

22   the district court found, he totally fails to take into account

23   the costs of litigation that is likely to occur anyway if the

24   FTC is enjoined from prosecuting its action in the Florida

25   District Court.

1    As we've pointed out in our brief, we would assert in

2    this proceeding monetary claims against the debtor, a proof of

3    claim, just like any other creditor.  But also we have grounds,

4    now since BAPCPA was enacted, to bring an action to accept

5    claims for fraud against corporate debtors under the

6    nondischargeability provisions of Section 523.  They totally

7    fail to take that into account.

8    We think our evidence is strong enough in this case to

9    do the same thing we do when individuals file for bankruptcy

10   preBAPCPA, which is to bring such an action to get our claim

11   excepted from the stay and to preserve our ability to collect on

12   those monetary claims.  They totally fail to take that into

13   account.

14   As to the contempt proceeding, Your Honor, their —

15   their assertion that having to turn over the 1.7 million causes

16   them irreparable injury is simply wrong.  It's not cognizable

17   injury at all under these circumstances.

18   The district court ruled prepetition before this

19   bankruptcy case was filed, before the estate was created, before

20   this Court had any jurisdiction under 541 to rule otherwise,

21   that they had violated the order by not turning over the reserve

22   funds when the injunction was first entered 18 months ago, that

23   they had continued to violate it for that entire period.  And

24   that unless they turned it over within ten days or showed cause

25   why they couldn't, they would be held in contempt.

1    So, in the event, the district court found that that

2 property, those funds were supposed to be turned over 18 months

3 previously, pursuant to the court's injunctive orders, and that

4 Integretal had to turn it over because it wasn't theirs.

5    If that order is upheld on appeal before the Eleventh

6 Circuit, then the district court's ruling will be affirmed.    It

7 will become a final order and the money will be turned over and

8 property of the receivership will be restored to the

9 receivership.    If they win on their appeal to the Eleventh

10 Circuit, then there's no injury in that case either because they

11 will keep their money or get their money back.

12    THE COURT: But what if they need the money to stay in

13 business?

14    MR. MORA: Well, Your Honor, they shouldn't be able to

15 use the money that the district court has already ruled is not

16 theirs to operate their business.  It's that simple.  I mean if

17 they're saying, 'The only way we can reorganize is by using the

18 money that the district court said I have to turn over, on

19 punishment, under punishment of contempt,' I think that's

20 absurd.  It's truly absurd.

21    So in either case it would not be cognizable

22 irreparable injury under the — under the strict injunctive

23 standard.

24    Further, Your Honor, this is, to the extent that they

25 can claim that it's an injury, it's one that was self-inflicted.

1    They had an order that — is this on?

2           THE COURT:  I can hear you well.

3           MR. MORA:  Sorry.  The original injunctive order was

4    issued against anybody holding assets of the receivership 18

5    months ago.  And in response to that order they submitted a

6    statement from their president and CEO that simply was not true.

7    He said, 'We are not holding any money.  We don't owe them

8    anything.  And if we do, we'll put it in a separate account.'

9    They never did that.  They never came forward and said, 'We're

10   holding the reserve funds.'

11          They never went to the district court and asked, 'What

12   should we do?  We'd like some clarification.'  They never did

13   that.

14          It wasn't until the receiver took action and filed the

15   contempt motion against them.  And in response to that motion,

16   they made all of the same arguments that they are making to Your

17   Honor in this Court.  And they lost.

18          THE COURT:  Yeah, that's not exactly true.  They don't

19   make all of those same arguments because there was no

20   bankruptcy.  There were no other creditors.  There was no — if

21   you — there was no — there weren't all these competing parties

22   to those funds in existence at that time, so some of the

23   arguments were made, but many of the arguments, many of the

24   arguments of which this Court is particularly sensitive weren't

25   made at all.

1          MR. MORA:  Well, I — I don't know for certain, Your

2    Honor.  I believe that they did make those arguments —

3          THE COURT:  Before the bankruptcy?

4          MR. MORA:  No, before the district court.  But, in any

5    event, at that time there was no bankruptcy case.

6          THE COURT:  I understand.

7          MR. MORA:  There was no stay.

8          THE COURT:  So therefore they're not making the same

9    arguments that they're making now.

10          MR. MORA:  No, they are, Your Honor.  They've made the

11   same arguments.  They've said that we cannot, that the receiver

12   cannot recover these funds because it's a contract claim —

13          THE COURT:  No, no, are those — I understand.

14          MR. MORA:  Yes, Your Honor.

15          THE COURT:  We're quibbling, but the truth is I

16   acknowledge that they made some of the arguments to the district

17   court that they're making now and I think you'll acknowledge

18   that they couldn't have made all of the arguments that they're

19   making now because they weren't in bankruptcy then.  Then we —

20   then we agree.

21          MR. MORA:  Except that I would need to go back and

22   check in detail their records.  I'm pretty sure they did make

23   bankruptcy-like arguments before the district court.

24          THE COURT:  Even before they were in bankruptcy?

25          MR. MORA:  Yes.

1      THE COURT:  Okay.

2      MR. MORA:  Yes.

3      THE COURT:  I don't know how much weight anybody would

4  give them if they weren't in bankruptcy.

5      MR. MORA:  None.

6      THE COURT:  Well, and perhaps rightfully so.

7      MR. MORA:  Right.  And, Your Honor, this harm was

8  self-inflicted on them.  They could have taken action long ago

9  to rectify this, to address it, to follow the district court's

10  orders, and they didn't.  And that's why we're here today before

11  in this Court.  It was a self-inflicted harm.  Self-inflicted

12  harm does not constitute irreparable injury under the Injunctive

13  Standard.  It's that simple.

14      Next, Your Honor, in their most recent submission they

15  attached for the first time a declaration from an accountant,

16  Mr. Weber.  There's numerous problems with Mr. Weber's

17  statement.  First of all, it's based on the same faulty

18  assumption that Mr. Goldfarb's Declaration suffers from.  It

19  totally relies and takes for granted his 1 million estimate that

20  lacks sufficient detail as an evidentiary matter.

21      It also fails to take into account, just like Mr.

22  Goldfarb, the litigation costs that would be incurred in any

23  event if the preliminary injunction is granted, just like Mr.

24  Goldfarb's Declaration.

25      And, Your Honor, in any event, even — even though —