*Plaintiff's Motion for Order to Show Cause*                    78

1    even when he relies on those faulty assumptions, his analysis

2    shows that throughout the entire budget forecast period, the

3    debtor still has a positive cash balance for every week during

4    that period.

5            And, Your Honor, one thing that — another thing that

6    the debtor has totally failed to take into account in meeting

7    its burden are the harms to the FTC and to the receivership that

8    would be caused by preliminary enjoining either the enforcement

9    action or the contempt proceeding or both.  Let's do the FTC

10   first.

11           Our action is not just for monetary relief.  There is

12   significant and quite necessary nonmonetary injunctive relief

13   that we need.  And not —

14           THE COURT:  You say you need it, Mr. Mora.

15           MR. MORA:  Yes.

16           THE COURT:  But we don't know what the plan will be.

17   There may not be a debtor.  They may flip PaymentOne and there —

18   and then the debtor may or may not go out of business.  So we

19   don't know what you're going to need or not need until we see

20   who's on the other side of the table.  And at this point that's

21   what they're negotiating.

22           MR. MORA:  That's fine, Your Honor, but it wouldn't

23   matter because a permanent injunction is binding not just on the

24   — on the entity on the defendant, but also on persons,

25   individuals, such as presidents and CEOs who act in concert with

1   the person who's been enjoined, the entity that's been

2   enjoined —

3            THE COURT:  But, as I'm saying, we don't know if

4   they're going to be even around.  Those people may well go off

5   and, you know, operate grocery stores or go into some other

6   business.  We don't know what's going to happen this debtor and

7   we should know that within a matter of months, but we don't know

8   that now.

9            MR. MORA:  And, Your Honor, we submit that's no reason

10  to preliminary enjoin the FTC's enforcement action or the

11  contempt proceeding.

12           THE COURT:  And the other thing I'll mention to you,

13  and I understand, I'm going to let you finish, but the other

14  thing I'll mention to you is that while it is true that there —

15  some of this other litigation may have to occur, it may not have

16  to occur because we don't know how much money is going to be

17  available down the road for unsecured creditors.  And if you're

18  an unsecured creditor you may or may not be entitled to a

19  recovery from the bankruptcy estate, or the receiver may or may

20  not be entitled to a recovery from the bankruptcy estate.  We

21  just don't know that.

22           And one of the wonderful accepts of a bankruptcy court

23  or any court is that they can control the litigation before it.

24  And so it doesn't necessarily mean that funds will be expended

25  in these various pieces of litigation.

*Plaintiff's Motion for Order to Show Cause*                                        80

1     First of all, you may settle.  And, second of all,

2   there may not be need to liquidate a claim of the receiver if in

3   fact there's no money available for unsecured creditors.  And if

4   in fact the receiver's claim is deemed to be an unsecured claim.

5   It's all premature right now to talk about this other litigation

6   because it may not have to occur at all.  It may yet settle and

7   it — and it may not have to occur at all because of the posture

8   of the bankruptcy case.  It may, and you're right, it may, but

9   it's only a big may.

10     MR. MORA:  All right, Your Honor.  Well, we

11   respectfully disagree because we think to properly apply the

12   strict injunctive standard, Your Honor must take into account

13   the harms, including the possible harms, —

14     THE COURT:  Yes.

15     MR. MORA:  — to the FTC.  And so —

16     THE COURT:  We don't disagree.

17     MR. MORA:  And so the harms that we have pointed out

18   must be considered.

19     THE COURT:  The potential harms you've pointed out

20   will be considered.

21     MR. MORA:  Thank you, Your Honor.

22     MR. PARDO:  Your Honor, excuse me.  This is Jim Pardo.

23   May I have leave to be excused for the balance of the hearing?

24     THE COURT:  Yes, sir.

25     MR. PARDO:  Thank you, Your Honor.

1    THE COURT:  Anybody who wants to disconnect can just

2  ask me at any time and I'll be glad to excuse you.

3    MR. MORA:  And then, Your Honor, other — other

4  tangible things are that justice delayed in a case like this is

5  justice denied.  Every day that we don't get this company under

6  order, permanently enjoined from continuing its past unlawful

7  practices, it's causing risk and potential injury to the public,

8  to consumers, and that's why — that's another important reason

9  why the case should not be stayed.

10    And then in the litigation itself a delay will lead to

11  losing witnesses, will lead to faded memories, will also

12  constitute a harm to the FTC's ability to later litigate this

13  case.

14    THE COURT:  It's not necessarily so even there,

15  because if I enjoin the proceeding against the debtor, whether

16  or not I allow discovery against the debtor so that you could

17  make, you know, testimony permanent is a different issue.  I've

18  enjoined proceedings against parties, but still allowed

19  discovery to be taken against them so that you can preserve your

20  record.  That's a different issue.  So memories and people

21  disappearing and all of that can be taken care of in this

22  context.

23    MR. MORA:  Another important consideration, Your

24  Honor, is that if the Court preliminarily enjoins the FTC from

25  proceeding in the Florida District Court action, you will be

*Plaintiff's Motion for Order to Show Cause*                                    82

1    stopping in its tracks a proceeding that — I'm sorry — I don't —

2    is this microphone —

3           THE COURT:  I don't think it's working very well.

4           Why don't you give him your mic, Mr. Oetzell, as

5    you're doing.

6           MR. MORA:  Thank you.

7           THE COURT:  You can switch.  Give Mr. Oetzell — Mr.

8    Oetzell the lousy mic.

9        (Laughter.)

10          THE COURT:  He can use — he can you use the center

11   mic.  He's done — he's done his argument.

12          MR. MORA:  Well, Your Honor — Your Honor will be

13   enjoining us from proceeding in our chosen forum.  Now that is a

14   harm that you can't quantify and yet because it is so

15   significant to the government in circumstances like these, our

16   statute says that we can go to district courts to seek

17   appropriate injunctive relief in cases like the one before the

18   Florida Court.  We would be stopped in our tracks from doing

19   that.  Not only that, but it would be in circumstances where

20   it's a law enforcement proceeding that is excepted from the

21   automatic stay, as Congress has recognized —

22          THE COURT:  You're starting to repeat yourself.

23          MR. MORA:  All right, Your Honor.  And yet — and yet

24   this Court will be enjoining it nevertheless.  It will send the

25   wrong signal to the wrong people, exactly what the (b)(4)

1    exception was enacted to prevent, what Congress enacted it to

2    prevent, what the Ninth Circuit says it's supposed to prevent.

3    Bankruptcy will become a haven for wrongdoers.  And we are very

4    concerned about the harm to the FTC and to its enforcement

5    program by such a decision.

6              And, Your Honor, as to the contempt proceeding, yet

7    another dimension is added there because there not only is that

8    part and parcel of our law enforcement proceeding, but an

9    injunction against a civil contempt proceeding by a district

10   court, it effectively eviscerates that court's inherent power to

11   hold the parties before it accountable to obey its orders.

12   That's what a preliminary injunction will do.  And that also is

13   a harm that simply cannot be measured, but it is quite

14   significant in weight.

15             THE COURT:  Thank you, Mr. Mora.  Do you have

16   something else to say?

17             MR. MORA:  Yes, Your Honor.

18             And so going to the last two factors, Your Honor, we

19   think that the balance of hardships tips in favor of the FTC and

20   the receivership.  The cognizable harms that are alleged by

21   Integretal neither are irreparable nor rise to the level to

22   constitute a sufficient threat to the estate, to justify

23   overriding the 362(b)(4) exception.  And they're outweighed by

24   the harms to the Federal Trade Commission, to the receivership,

25   and to the public that would stem from preliminarily enjoining

*Plaintiff's Motion for Order to Show Cause*                                    84

1    both proceedings.

2            And finally, Your Honor, for all of these same

3    reasons, preliminarily enjoining these proceedings is decidedly

4    not in the public interest.  It's it opposite.  It's against the

5    public interest because it sends the message that somebody can

6    just file for bankruptcy and escape prosecution and that the FTC

7    can be foreclosed by a bankruptcy court from protecting

8    consumers from deceptive and unfair trade practices that harm

9    the public.

10           THE COURT:  Thank you, sir, very much.

11           MR. MORA:  Thank you, Your Honor.

12           THE COURT:  Okay.  Mr. Schneider, you wanted to make

13   one point of clarification.

14           MR. SCHNEIDER:  Very quickly, Your Honor.  Thank you

15   very much.

16           Your Honor expressed concern earlier about the

17   possibility of the receiver rendering this proceeding moot.

18   What Your Honor stated was that if the debtor turns over the 1.7

19   million, there is nothing preventing the receiver from

20   distributing those funds.  And the issue has been mooted out by

21   turning over the money.  And Mr. Ahrens agreed with the Court.

22   But that's not true, Your Honor, because Judge Ryskamp's

23   September 14th order, the omnibus order, specifically requires

24   the receiver to place these funds in a segregated receivership

25   account.

1           In other words, —

2           THE COURT:  Well, wait a minute.  Mr. Schneider, let

3    me interrupt.  Wouldn't I lose control of the funds, I meaning

4    the Judge in the bankruptcy case, and the funds would go by way

5    of the district court or the FTC or the receiver but certainly

6    this Court, which is responsible for all assets of the estate,

7    would lose control over them?

8           MR. SCHNEIDER:  I don't think so, Your Honor, for the

9    same reason that I don't think Judge Ryskamp and the district

10   court have lost control, jurisdiction over these funds by virtue

11   of what's happened in the last month.

12          The fact of the matter is there is simply no

13   possibility and it's built into Judge Ryskamp's omnibus order of

14   this being rendered moot by requiring the debtor to comply with

15   those orders.  In fact, the opposite —

16          THE COURT:  Wait, wait, wait.  Mr. — I'm not talking

17   about simply requiring them to comply with the orders.  But what

18   would allow me to control those funds for the indefinite future

19   while we figure out what's happening with this reorganization?

20   And what would — what would prevent me from determining that

21   these are property of the estate and then wanting these funds to

22   be able to administer as part of the estate?

23          MR. SCHNEIDER:  Because —

24          THE COURT:  I would have no control over them anymore

25   at all.

*Plaintiff's Motion for Order to Show Cause*                                    86

1          MR. SCHNEIDER:  But it's built into Judge Ryskamp's

2    order, because the receiver is precluded from distributing that

3    money, and those funds —

4          THE COURT:  Unless Judge Ryskamp changes his order.

5          MR. SCHNEIDER:  Integretal has been actively

6    participating in that case.  If any —

7          THE COURT:  So what?  But I'm the Judge.  And I have —

8          MR. SCHNEIDER:  But any —

9          THE COURT:  And I have to control property of the

10   estate.  I have a duty to myself and to the — and to the estate.

11   The debtor can participate all it wants.

12         MR. SCHNEIDER:  And that's understood, but with all

13   due respect to the Court, Judge Ryskamp has already twice

14   determined that this is not property of the bankruptcy estate.

15   And — and —

16         THE COURT:  And that may or may not be upheld.

17         MR. SCHNEIDER:  And here is the receiver's fear:  If

18   Your Honor unblocks that account and this money is depleted, and

19   Your Honor has said in just the last 30 minutes we don't know

20   what's going to happen to this debtor, the debtor may go out of

21   business, what if the Eleventh Circuit at that point affirms

22   Judge Ryskamp's order?  It's a completely Pyrrhic victory and

23   the appeal has been rendered moot and the contempt proceedings

24   have been made a complete mockery of by the debtor.

25         Our concern is simply the preservation of the funds.

1    THE COURT:  I understand that argument.  Thank you,

2  Mr. Schneider.

3    MR. SCHNEIDER:  Thank you.

4    THE COURT:  Okay.  Do you have any reply, Mr. Sacks?

5    MR. SACKS:  I could, Your Honor, but —

6    THE COURT:  I'd like you to make it brief because I'd

7  like to release the staff.  I want you to reply, but I would

8  like to make — you to make it brief.

9    MR. SACKS:  Okay.  I will try to make it brief.

10    Your Honor, Mr. Schneider's comments, just to start at

11  the end, begged the question of whether there are any funds.

12  And that's the problem, there aren't any funds.  And the more

13  they talk about the funds, the more it becomes obvious that it

14  is just an unsecured obligation.

15    And any judgment creditor —

16    THE COURT:  It looks like there are funds because we

17  created it by this — by my suggestion in the agreement.  It

18  looks like there are funds, but there aren't any funds.

19    MR. SACKS:  That's right.

20    THE COURT:  There are just these commingled funds that

21  to get through the first part of the case, we agreed to put a

22  certain amount of money in escrow.

23    MR. SACKS:  That's right, and we really shouldn't —

24    THE COURT:  And it —

25    MR. SACKS:  — refer to that account at all because we

1    all agreed that creating that was without prejudice to

2    everybody's arguments.  And so —

3              THE COURT:  Absolutely.

4              MR. SACKS:  — as far as I think we're all —

5              THE COURT:  Those aren't the funds.

6              MR. SACKS:  That's correct.  So —

7              THE COURT:  Certainly not the funds that the district

8    court was talking about.

9              MR. SACKS:  And I think it's illustrative when Mr.

10   Mora talks about how we made allegedly the same arguments or

11   many of the same arguments before.

12             What happened when we made those arguments was not

13   that the Court agreed with them.  The district court in Florida

14   did not find that there was a separate, traceable asset here

15   that was being preserved for the benefit of the receiver.

16             THE COURT:  He said hand it over anyway.

17             MR. SACKS:  Exactly.  And by saying that he

18   illustrated this was an unsecured obligation, it was not a fund.

19   It was not a race.  It wasn't a Ming vase that you could

20   identify or anything else.  And that's the fundamental problem

21   the receiver has, is that no matter how much you talking about

22   it being a fund, it has to be one.  And unless it is it's just

23   an unsecured payment obligation that any judgment creditor could

24   obtain in a state or federal court.

25             Let me also go to the litigation costs briefly.

1   Obviously nobody can exactly predict how much it will cost to

2   litigation a lawsuit in federal court of this type.  It's a

3   complex proceeding.  It's cost lots of money.  We've spent, I

4   think we showed over $700,000 prepetition on the case.  And that

5   was before we got to the final stage of discovery, the summary

6   judgment proceedings in the trial, and so I think it's entirely

7   reasonable that Mr. Goldfarb made the estimates he did.  And you

8   have evidence from others as to the kind of time that this is

9   going to take from them.  And, as the Court points out, that's

10  at least as important as the money.

11          They also brought up the discharge action.  I don't

12  see how their ability to argue about whether any claim that the

13  FTC has is discharged affects the need for a stay of the Florida

14  action.  If they have a claim, they have one.  This Court

15  resolves claims.  It's either dischargeable or not.  That's no

16  reason to litigate there.

17          THE COURT:  And it may be settled long before.

18          MR. SACKS:  Exactly.

19          I don't have I have anything further, Your Honor.

20          MR. AHRENS:  I only have one thing for the record,

21  Your Honor.  I would like to have marked as an exhibit, and I

22  apologize for not standing up and approaching the Court, what we

23  gave to all parties, Appellant's Time-Sensitive Motion for

24  Immediate Interim Stay.  And I'd also like — as Exhibit 1 at

25  this — at this hearing — and as Exhibit 2 I would like to have

1   marked the stay issued by the Eleventh Circuit. And as Exhibit

2   3 — I'm not sure we'd need to have it marked. It's only cases,

3   but the Appendix of Supplemental Cases so that if the record

4   does go up, the parties can see what we were talking about.

5           THE COURT: Any objection to 1, 2, or 3, Mr. Mora?

6       MR. MORA: No objection.

7           THE COURT: Any objection, Mr. Oetzell?

8       MR. OETZELL: No, Your Honor.

9           THE COURT: They're admitted.

10      (Debtor's Exhibits 1, 2, and 3 received in evidence.)

11          MR. AHRENS: And just my last comment is on footnote 1

12  on Exhibit 1 it says that this is the debtor's brief that shows

13  what we're asking for. We do not challenge the September 21

14  order insofar as it held that the Federal Trade Commission's

15  claims under the FTC Act were not automatically stayed.

16          Your Honor, we have nothing further.

17          THE COURT: Mr. Fiero, do I have power under *Barton* to

18  do what the debtor wants me to do?

19          MR. FIERO: Your Honor, I think that the debtor's

20  position is correct. I think that the real question here is not

21  so much *Barton* as it is — or the question that's important to

22  the committee at this time is the money, the ability to use the

23  funds.

24          Several times it was called *the* $1.7 million. There's

25  no *the* $1.7 million. There's only $1.7 million. And we think

1   that this Court has the ability to interpret other courts'

2   orders, it does so every day.

3          Every — half the debtors that come to you come to Your

4   Honor with preexisting litigation and a history, and it's your

5   job to sort it out.  And if you sort out this one, what you'll

6   find is no court ever said, 'This fund, this race is property of

7   this receivership estate.'  It's just never happened.

8          And given that, that disconnect, Your Honor, between

9   what the Court did in its prior orders — and I've read that

10  omnibus order over and over and over again, and there's just no

11  sentence which says that, these funds —

12         THE COURT:   There's no race.

13         MR. FIERO:   Exactly, Your Honor.  And — and with that,

14  that's the end of the inquiry.

15         THE COURT:   Well, but the question is much simpler,

16  and that — and that is:  Does the debtor need the approval of

17  the Florida District Court to sue the receiver.

18         MR. FIERO:   I don't think so, Your Honor, not on — not

19  on these grounds.  All it's trying to do is —

20         THE COURT:   Wait a minute.  Either he — not on these

21  grounds.  You know, you're — you're — if they don't have the

22  power to sue the receiver at all, then they don't have the power

23  to sue the receiver.  If they have the power to sue the receiver

24  on certain types of cases but not others, then I want you to

25  articulate what you think the law is.

1          MR. FIERO:  Your Honor, I'm going to defer to the

2  debtors with respect to the scope of *Barton* —

3          THE COURT:  That's not what I asked you to do.

4          MR. FIERO:  Yes, I understand, Your Honor, but I think

5  it's more appropriate, given the way — the amount of time that

6  the committee has had to look at this was — is shrunk.  We

7  didn't expect to be a party responding here today in advance of

8  Monday's hearing —

9          THE COURT:  I told you I was going to ask you this

10  question.  You couldn't have not anticipated this.

11          MR. FIERO:  Well, no, Your Honor, you didn't say

12  *Barton*.  You said I'm interested in whether or not I have the

13  authority and my — my —

14          THE COURT:  Right.  I have the authority.

15          MR. FIERO:  — my response, Your Honor, is that when it

16  comes to 541, the Court always has the authority.  All right.

17  There's a million cases in which, all sorts of cases where

18  leases have expired and tenant's possessory interest in property

19  are deemed to be, in leasehold property, are deemed to be

20  property of the estate and subject to the Court's authority

21  pending some further determination of the rights of the

22  landlord.

23          I mean this — this sort of situation is not new to

24  anyone who spends time in bankruptcy court.  And were you not to

25  have that power, then you couldn't possibly administer this

1    estate.  You couldn't possibly predict — protect all of the

2    other parties who stand in exactly the same shoes of the

3    receiver, not being able to account for their reserve funds, and

4    wanting very much to be repaid.

5           THE COURT:  I understand.

6           MR. AHRENS:  I know I closed, but I forgot one thing

7    about *Barton*.  May I have permission to add one point?

8           THE COURT:  Sure.

9           MR. AHRENS:  In reply.  The counsel for the receiver

10   cited the case of *Carter versus Rogers* and then made the

11   admission, made the admission that *Barton* does not apply to a

12   Chapter 7 trustee —

13          THE COURT:  Right.

14          MR. AHRENS:  — because a chapter trustee is not

15   running an operation.  Something just gets ingrained in you

16   after 37 of bankruptcy, and it's that that is what *Barton* is all

17   about.  That's why because you're not running in the state

18   you're not going to get sued for liability.  And, as I've said

19   20 times, we are not suing the receiver for liability.  So that

20   example given by counsel for the receiver shows that the *Barton*

21   Doctrine doesn't apply when you're talking about 541 looking

22   after the assets of the estate.

23          That was the reply I forgot to make.

24          THE COURT:  You had your hand up a long time ago.  I'm

25   willing to hear from you, but I want it to be extremely brief

1   because I want to end today's hearing.

2           MS. DIEMER:   I promise that I'll keep it short, Your

3   Honor.  As you know and as you commented when I sat down here

4   today, I'm at a different table and I am here uneasily.

5           I say that because we do not agree with the debtor on

6   many things, but we do believe that it is in the best interests

7   of all creditors but particularly the secured creditor, me, my

8   client, to move forward and allow this money to be used.

9           I am very troubled by the position that the FTC is

10  taking might matter.  Specifically, their arguments are that

11  because the debtor caused its own harm, that the FTC should be

12  allowed to go forward wasting the assets, which are essentially

13  my assets.

14          If you looked at the time line of what happened, there

15  was an order by the court in Florida.  The order by the court in

16  Florida predates the bankruptcy.  Bankruptcy — it does not

17  attach to a specific race, as is required, so that money is

18  still in the debtor's custody and control.  Bankruptcy is filed.

19          The action of filing a bankruptcy radically changes

20  the relationship of all the parties to the money and the action,

21  at which point the secured creditors, like myself, no one

22  objects to my security interest, now have very specific

23  interests and obligations that have been changed by the action

24  of the filing of the bankruptcy.

25          They then argued that as an unsecured claimant in a

1   nonfinal dispute that they have the power over my security

2   interest, which is absolutely antithetical to the entire

3   Bankruptcy Code.  It's something this Court rules on all the

4   time.

5          And, frankly, if in fact this case of the FTC is

6   allowed to go forward, that is going to strongly influence the

7   actions of this particular secured creditor.  I will be very

8   uncomfortable about the use of wastage of money to pursue a suit

9   and may well have to feel compelled by that to take action

10  against, for example, PaymentOne and ICS, which I have

11  co-collateralized in my judgment.

12         If — if the FTC had wanted to ensure that it had the

13  right to that particular money that was discussed in that

14  omnibus order for a year and whatever it was down in the

15  district court, it could have done what litigants do all the

16  time.  It could have asked for a writ of attachment, a writ of

17  possession in that specific fund and then it could file the

18  UCC-1 so people like myself would have had notice of it.  That's

19  what you do if you want to make sure that you stand in a secured

20  position.  That's what I did.

21         I didn't get here as a secured creditor because they

22  like me.  Trust me, they don't.  I've sued them many times.  I'm

23  not their favorite person, and that's why I sit here

24  uncomfortably.  But we sued them, litigated, settled, got the

25  right, and filed the UCC-1.  And it is unfortunate that the FTC

1  sits in that position, but they could have cured the problem

2  they have now by their acts.

3          And to use my money against my will, my client's

4  money, my secured client's money against my secured client's

5  will to further their interests seems grossly unfair and

6  antithetical to the Bankruptcy Code.

7          THE COURT:  Thank you.

8          Okay.  Since I let her speak I'll — if you want to

9  speak for a minute, I'd be glad to hear from you.

10          MR. OETZELL:  Your Honor, just simply Mr. Ahrens is

11  mistaken about *Barton*.  Mr. Ahrens is —

12          THE COURT:  Oh, you're not going to do — no, no.  They

13  get the reply.  It's their motion.

14          MR. OETZELL:  Okay.

15          THE COURT:  If you're just going to repeat that — I

16  thought you wanted to say something —

17          MR. OETZELL:  No.  I have nothing to say —

18          THE COURT:  — in response to what Ms. Diemer said,

19  because I gave her —

20          MR. OETZELL:  — about what she said.  I just —

21          THE COURT:  — that last shot.  And I didn't want —

22          MR. OETZELL:  No.  I understand, no.

23          THE COURT:  — I didn't want to let it go.

24          MR. OETZELL:  My comment is Mr. Ahrens' —

25          THE COURT:  Yeah, yeah.  Well, you had your chance on

1    that.

2            MR. OETZELL:  — incorrect assertion on *Barton* —

3    *Barton*.

4            THE COURT:  Mr. Mora.

5            MR. MORA:  Yes, Your Honor, I would like to respond to

6    that argument.  And I'll just say this, I'll keep it short,

7    because it's all in our briefs.

8            What we think everyone is fundamentally

9    misunderstanding here is that the contempt proceeding and the

10   injunctive relief that's been entered in the Florida District

11   Court action and receivership is a federal equity receivership

12   proceeding.  There's a whole body of law that's incorporated

13   pursuant to statute and rules of receivership law that applies.

14   That's the law that determines the rights of the receiver and

15   the rights of the FTC subsequently to the receivership funds —

16           THE COURT:  Have a Bankruptcy Code, too.  Both of

17   those are operating here.  Thank you, sir.

18           Go ahead, say it, even with Mr. Ahrens pulling on your

19   arm.

20           MR. SACKS:  Well,, Your Honor, I think there's

21   something fundamental about that receivership law that's missing

22   here.  In the ordinary case when the receiver takes custody of

23   assets of the estate, there's no dispute.  We know what assets

24   there are.  They have cars, they have bank accounts.  They're

25   titled in the name of those people and they get them.  But when

1    they go out to a third party and say, 'We want you to do this,'

2    then they have to prove that's really the asset of somebody

3    else, that even though it's titled in our name, that it's really

4    theirs.  And that — that never happened here.  And that's the

5    fundamental disconnect.

6            MR. OETZELL:  Your Honor.

7            THE COURT:  Do you want to respond?

8            MR. OETZELL:  Yes, Your Honor.  And — and my response

9    is obvious.  To address that Your Honor will have to sit in

10   review of the district court, and that's something that you're —

11           THE COURT:  Thank you very much.

12           MR. OETZELL:  And I would like to say something else,

13   Your Honor.  One thing that has never been spoken to is the

14   exclusive in rem jurisdiction of the district court in equity

15   receiverships that's converted by statute and conferred by — and

16   conferred by judicial authority.  That is not divested by the

17   bankruptcy.

18           THE COURT:  Do you want to say anything in response to

19   that?

20           MR. AHRENS:  No, Your Honor.

21           THE COURT:  Thank you.

22           Just so you know what's going to happen, I will

23   probably have a decision out within a few days.  It's not going

24   to be today and it's not going to be tomorrow and it's more

25   likely to be about Tuesday of next week.  So you're not likely

1    to get a decision out of me. This is an important issue. It's

2    obvious that whatever I decide will likely be appealed. And I'm

3    going to take a little time with it. And so you should know so

4    you're not sitting up at night, you know, on Saturday checking

5    your email or whatever you do as lawyers, you know, at the

6    movies or at the theater, or wherever you are, or at some

7    ballgame. It's not likely to come out before Tuesday.

8             Is there anything else you want to say?

9        (No audible response.)

10            THE COURT: Thank you very much. Court is adjourned.

11            MR. AHRENS: Your Honor, I would like to —

12            THE COURT: Wait, wait, wait.

13            MR. AHRENS: I would like to mark the exhibits that

14   I —

15            THE COURT: Yes, yes. Tanya will take care of that.

16            MR. SACKS: I'm sorry. Mr. Rehfeld will have my head

17   if I don't ask whether the —

18            MR. WARREN: Your Honor?

19            THE COURT: Yes.

20            MR. WARREN: I'm sorry. Steven Warren. I did want to

21   say just a couple of things. I know the Court's been very

22   patient with the parties.

23            THE COURT: What do you need to say, Mr. Warren?

24            MR. WARREN: Your Honor, as the Court has noted

25   several times, that the funds that were being held here are a

1   creature of the short-term cash collateral agreement which has

2   expired.  One of the things that concerned me in court the other

3   day was the way in which the receiver attempted to extend that

4   as a property interest.  And I'm very concerned if those funds

5   remain segregated that we will continue to have the camel's nose

6   in the tent.  That is the collateral of PaymentOne.  And we

7   agreed to a very short-term period for that to be sequestered,

8   and that period has ended.

9          THE COURT:  Thank you, sir.

10         MR. WARREN:  Thank you.

11         THE COURT:  We'll go off the record, please.

12         MR. SACKS:  Can I —

13         THE COURT:  Wait.  Did you want to say something?

14         MR. SACKS:  I just want to bring up one housekeeping

15  matter with regard to the Court's October 26th status

16  conference, to determine if the Court wanted to hold that or

17  whether we ought to —

18         THE COURT:  Can I see your calendar, Tanya — oh, I

19  have a calendar.  I'm sorry.

20         October 26th.

21         MR. AHRENS:  There are two suggestions we have with

22  respect to that.  Either put it on the November 2 hearing date

23  for the final cash collateral or just take it off calendar since

24  you have an active committee.

25         THE COURT:  Either one you want.  What do you want,

*Plaintiff's Motion for Order to Show Cause*                    101

1   Mr. Fiero?  We need to have a — what did you want to say?  Just

2   say it, Tanya.  I need to hear you.

3       (The Court and Clerk confer.)

4           THE COURT:  Yeah.  They want to either push it to the

5   2nd or they want to —

6           MR. AHRENS:  I'd say we take it off.  The —

7           THE COURT:  — take it off.  But we have to have a

8   status conference set because we keep one in all cases.  And I

9   can move it to December.

10          MR. FIERO:  Your Honor, we're coming back on the 2nd.

11  The 2nd ought to be just fine.

12          MR. AHRENS:  Thank you, Your Honor.

13          THE COURT:  All right.  So we'll move the status

14  conference to the 2nd at one o'clock.

15          Court is adjourned.

16      (The hearing was adjourned at 4:46 o'clock p.m.)

17                          —oOo—

18

19

20

21

22

23

24

25

State of California          )
                             )     SS.
County of San Joaquin        )


       I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

       I further certify I am not a party to nor in any way interested in the outcome of this matter.

       I am a Certified Electronic Reporter and Transcriber through the American Association of Electronic Reporters and Transcribers, Certificate No. 00124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.


                    Susan Palmer
                    Palmer Reporting Services

                    Dated October 26, 2007

**RER - 49**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

| In re: THE BILLING RESOURCE, dba INTEGRETEL, a California corporation | Case No. ___07-52890___ |
|---|---|
| | **CHAPTER 11**<br>**MONTHLY OPERATING REPORT**<br>**(GENERAL BUSINESS CASE)** |

## SUMMARY OF FINANCIAL STATUS

**PERIOD:** ___9/16/07 through 9/30/07___    **PETITION DATE:** ___09/16/07___

1. Debtor in possession (or trustee) hereby submits this Monthly Operating Report on the Accrual Basis of accounting (or if checked here __ the Office of the U.S. Trustee or the Court has approved the Cash Basis of Accounting for the Debtor). Dollars reported in ___$1___

| 2. | Asset and Liability Structure (1) | End of Current Month | End of Prior Month | As of Petition Filing |
|---|---|---|---|---|
| | a. Current Assets | TBD | N/A | |
| | b. Total Assets | TBD | N/A | TBD |
| | c. Current Liabilities | TBD | N/A | |
| | d. Total Liabilities | TBD | N/A | TBD |

| 3. | Statement of Cash Receipts & Disbursements for Month | Current Month | Prior Month | Cumulative (Case to Date) |
|---|---|---|---|---|
| | a. Total Receipts | $ 2,514,924 | N/A | $ 2,514,924 |
| | b. Total Disbursements | $ 692,210 | N/A | $ 692,210 |
| | c. Excess (Deficiency) of Receipts Over Disbursements (a - b) | $ 1,822,714 | N/A | $ 1,822,714 |
| | d. Cash Balance Beginning of Month | $ 2,162,926 | N/A | $ 2,162,926 |
| | e. Cash Balance End of Month (c + d) | $ 3,985,640 | N/A | $ 3,985,640 |

| | | Current Month | Prior Month | Cumulative (Case to Date) |
|---|---|---|---|---|
| 4. | Profit/(Loss) from the Statement of Operations | $ (360,093) | N/A | $ (360,093) |
| 5. | Account Receivables (Pre and Post Petition) (1) | $ - | N/A | |
| 6. | Post-Petition Liabilities (1) | $ - | N/A | |
| 7. | Past Due Post-Petition Account Payables (over 30 days) (1) | $ - | | |

| | At the end of this reporting month: | Yes | No |
|---|---|---|---|
| 8. | Have any payments been made on pre-petition debt, other than payments in the normal course to secured creditors or lessors? (if yes, attach listing including date of payment, amount of payment and name of payee) | X (2) | |
| 9. | Have any payments been made to professionals? (if yes, attach listing including date of payment, amount of payment and name of payee) | | X |
| 10. | If the answer is yes to 8 or 9, were all such payments approved by the court? | | X (3) |
| 11. | Have any payments been made to officers, insiders, shareholders, relatives? (if yes, attach listing including date of payment, amount and reason for payment, and name of payee) | X (4) | |
| 12. | Is the estate insured for replacement cost of assets and for general liability? | X | |
| 13. | Are a plan and disclosure statement on file? | | X |
| 14. | Was there any post-petition borrowing during this reporting period? | | X |

15. Check if paid: Post-petition taxes __X__ ;    U.S. Trustee Quarterly Fees _____ ;  Check if filing is current for: Post-petition tax reporting and tax returns: _____
    (Attach explanation, if post-petition taxes or U.S. Trustee Quarterly Fees are not paid current or if post-petition tax reporting and tax return filings are not current.)

I declare under penalty of perjury I have reviewed the above summary and attached financial statements, and after making reasonable inquiry believe these documents are correct.

Date: ___10/26/07___

_____
Ken Dawson
Responsible Individual

(1) Debtor is currently compiling balance sheet information. The details will be provided with the Statement of Assets and Liabilities and the Statements of Financial Affairs due November 15, 2007 and with the Oct. 31, 2007 monthly operating reports.
(2) Please refer to attached statement.
(3) Motion for payment has been filed for approval and is set for hearing on November 2, 2007.
(4) Payment made to Ken Dawson for normal salary in the amount of $8,946.

**THE BILLING RESOURCE dba Integretel**
**PRE PETITION PAYROLL**

Date of Payment:  9/28/07

| | For Pay Period from 9/8/07 to Petition Date | | | | |
|---|---|---|---|---|---|
| | Reg Hours (1) | Reg Pay | OT Hours (1) | OT Pay (1) | Total Payroll |
| 1) | | $  5,532.94 | | $    - | $  5,532.94 |
| 2) | 36.50 | 584.00 | | | 584.00 |
| 3) | | 1,188.40 | | | 1,188.40 |
| 4) | 40.00 | 667.20 | 0.50 | 12.51 | 679.71 |
| 5) | 38.45 | 841.29 | 0.50 | 16.41 | 857.70 |
| 6) | 40.00 | 936.40 | 1.25 | 43.89 | 980.29 |
| 7) | | 1,923.20 | | | 1,923.20 |
| 8) | | | | | - |
| 9) | | 1,923.20 | | | 1,923.20 |
| 10) | | 1,730.80 | | | 1,730.80 |
| 11) | | 2,317.20 | | | 2,317.20 |
| 12) | | 800.00 | | | 800.00 |
| 13) | | 1,455.60 | | | 1,455.60 |
| 14) | 30.25 | 541.48 | 0.50 | 13.43 | 554.90 |
| 15) | | 923.20 | | | 923.20 |
| 16) | | 1,502.00 | | | 1,502.00 |
| 17) | | 715.40 | | | 715.40 |
| 18) | | 1,254.00 | | | 1,254.00 |
| 19) | | 1,644.40 | | | 1,644.40 |
| 20) | | 1,096.00 | | | 1,096.00 |
| 21) | 40.00 | 761.60 | | | 761.60 |
| 22) | | 1,330.80 | | | 1,330.80 |
| 23) | 40.00 | 880.00 | 10.75 | 354.75 | 1,234.75 |
| 24) | | 2,380.80 | | | 2,380.80 |
| 25) | | 2,005.60 | | | 2,005.60 |
| 26) | 33.00 | 709.17 | | | 709.17 |
| 27) | | 1,990.40 | | | 1,990.40 |
| 28) | | 2,184.80 | | | 2,184.80 |
| 29) | | 1,232.60 | | | 1,232.60 |
| 30) | 40.00 | 709.60 | | | 709.60 |
| 31) | | 1,128.80 | | | 1,128.80 |
| 32) | 40.00 | 700.00 | | | 700.00 |
| 33) | 32.00 | 656.96 | | | 656.96 |
| 34) | | 1,717.20 | | | 1,717.20 |
| 35) | | 1,063.60 | | | 1,063.60 |
| 36) | | 1,298.00 | | | 1,298.00 |
| | 410.20 | $  48,326.63 | 13.50 | $  440.99 | $  48,767.62 |

(1) Shown only for hourly employees.

## STATEMENT OF OPERATIONS
### (General Business Case)
For the Period    9/16/07 through 9/30/07

| Actual | Forecast (1) | Variance | | | Cumulative (Case to Date) | Next Month Forecast (1) |
|---|---|---|---|---|---|---|
| | **Current Month** | | | | | |
| | | | | **Revenues:** | | |
| $   469,670 | N/A | N/A | 1 | Gross Sales | $   469,670 | N/A |
| - | N/A | N/A | 2 | less: Sales Returns & Allowances | - | N/A |
| 469,670 | N/A | N/A | 3 | Net Sales | 469,670 | N/A |
| 345,207 | N/A | N/A | 4 | less: Cost of Sales | 345,207 | N/A |
| 124,463 | N/A | N/A | 5 | Gross Profit | 124,463 | N/A |
| - | N/A | N/A | 6 | Interest | - | N/A |
| 11,357 | N/A | N/A | 7 | Other Income: | 11,357 | N/A |
| | N/A | N/A | 8 | | | N/A |
| | N/A | N/A | 9 | | | |
| $   135,820 | N/A | N/A | 10 | **Total Revenues** | $   135,820 | N/A |
| | | | | **Expenses:** | | |
| $   11,423 | N/A | N/A | 11 | Compensation to Owner(s)/Officer(s) | $   11,423 | N/A |
| 55,815 | N/A | N/A | 12 | Salaries | 55,815 | N/A |
| - | N/A | N/A | 13 | Commissions | - | N/A |
| 3,560 | N/A | N/A | 14 | Contract Labor | 3,560 | N/A |
| | | | | Rent/Lease: | | |
| - | N/A | N/A | 15 | Personal Property | - | N/A |
| 12,285 | N/A | N/A | 16 | Real Property | 12,285 | N/A |
| 18,222 | N/A | N/A | 17 | Insurance | 18,222 | N/A |
| - | N/A | N/A | 18 | Management Fees | - | N/A |
| 1,782 | N/A | N/A | 19 | Depreciation | 1,782 | N/A |
| | | | | Taxes: | | |
| 5,127 | N/A | N/A | 20 | Employer Payroll Taxes | 5,127 | N/A |
| - | N/A | N/A | 21 | Real Property Taxes | - | N/A |
| - | N/A | N/A | 22 | Other Taxes | - | N/A |
| - | N/A | N/A | 23 | Other Selling | - | N/A |
| 14,965 | N/A | N/A | 24 | Other Administrative | 14,965 | N/A |
| - | N/A | N/A | 25 | Interest | - | N/A |
| | | | 26 | Other Expenses: | | |
| | | | 27 | | | |
| | | | 28 | | | |
| | | | 29 | | | |
| | | | 30 | | | |
| | | | 31 | | | |
| | | | 32 | | | |
| | | | 33 | | | |
| | | | 34 | | | |
| $   123,179 | N/A | N/A | 35 | **Total Expenses** | $   123,179 | N/A |
| $   12,641 | N/A | N/A | 36 | **Subtotal** | $   12,641 | N/A |
| | | | | **Reorganization Items:** | | |
| $   368,984 | N/A | N/A | 37 | Professional Fees | $   368,984 | N/A |
| - | N/A | N/A | 38 | Provisions for Rejected Executory Contracts | - | N/A |
| - | N/A | N/A | 39 | Interest Earned on Accumulated Cash from Resulting Chp 11 Case | - | N/A |
| - | N/A | N/A | 40 | Gain or (Loss) from Sale of Equipment | - | N/A |
| 3,750 | N/A | N/A | 41 | U.S. Trustee Quarterly Fees | 3,750 | N/A |
| - | N/A | N/A | 42 | | | |
| $   372,734 | N/A | N/A | 43 | **Total Reorganization Items** | $   372,734 | N/A |
| $   (360,093) | N/A | N/A | 44 | **Net Profit (Loss) Before Federal & State Taxes** | $   (360,093) | N/A |
| $   - | N/A | N/A | 45 | Federal & State Income Taxes | - | N/A |
| $   (360,093) | N/A | N/A | 46 | **Net Profit (Loss)** | $   (360,093) | N/A |

Attach an Explanation of Variance to Statement of Operations (For variances greater than +/- 10% only):

(1) See Debtor's cash basis budget filed with the Bankruptcy Court.

RER-49    2951

Schedule E
Aging of Post-Petition Taxes
(As of End of the Current Reporting Period)

| Taxes Payable | 0-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Total |
|---|---|---|---|---|---|
| **Federal** | | | | | |
| Income Tax Withholding | $ 5,586 | | | | |
| FICA - Employee | 2,736 | | | | |
| FICA - Employer | 2,817 | | | | |
| Unemployment (FUTA) | 23 | | | | |
| Income | - | | | | |
| Other - Medicare | 1,467 | | | | |
| **Total Federal Taxes** | $ 12,629 | | | | |
| **State and Local** | | | | | |
| Income Tax Withholding | $ 1,826 | | | | |
| Unemployment (UT) | 178 | | | | |
| Disability Insurance (DI) | 217 | | | | |
| Empl. Training Tax (ETT) | - | | | | |
| Sales | - | | | | |
| Excise | - | | | | |
| Real property | - | | | | |
| Personal property | - | | | | |
| Income | - | | | | |
| Other (Attach List) | - | | | | |
| **Total State & Local Taxes** | $ 2,221 | | | | |
| **Total Taxes** | $ 14,850 | | | | |

Schedule F
Pre-Petition Liabilities (1)

| List Total Claims For Each Classification - | Claimed Amount | Allowed Amount (b) |
|---|---|---|
| Secured claims  (a) | | |
| Priority claims other than taxes | | |
| Priority tax claims | | |
| General unsecured claims | | |

(a)   List total amount of claims even it under secured.

(b)   Estimated amount of claim to be allowed after compromise or litigation. As an example, you are a defendant in a lawsuit alleging damage of $10,000,000 and a proof of claim is filed in that amount. You believe that you can settle the case for a claim of $3,000,000. For Schedule F reporting purposes you should list $10,000,000 as the Claimed Amount and $3,000,000 as the Allowed Amount.

Schedule G
Rental Income Information
Not applicable to General Business Cases

Schedule H
Recapitulation of Funds Held at End of Month

| | Account 1 | Account 2 | Account 3 | Account 4 |
|---|---|---|---|---|
| Bank | Please refer to attached statement | | | |
| Account Type | | | | |
| Account No. | | | | |
| Account Purpose | | | | |
| Balance, End of Month | | | | |
| Total Funds on Hand for all Accounts | $3,985,640 | | | |

Attach copies of the month end bank statement(s), reconciliation(s), and the check register(s) to the Monthly Operating Report.

(1) Debtor is currently compiling balance sheet information.  The details will be provided with the Statement of Assets and Liabilities and the Statements of Financial Affairs due November 15, 2007 and with the Oct. 31, 2007 monthly operating reports.

**Bank Account Listing**

| Account Description | Bank Account # | Bank Balance as of 9/30/07 | | Book Balance as of 9/30/07 | |
|---|---|---|---|---|---|
| **Comerica Bank:** | | | | | |
| Wire In | 1890-647-140 | $ | 1,907,176 | $ | 1,907,176 |
| Operating | 1890-602-426 | | 166,360 | | 166,360 |
| 401K | 1892-474-758 | | 25,933 | | 25,933 |
| Tax Checking | 1890-602-442 | | 19,128 | | 19,128 |
| Future Bad Debt | 1890-636-358 | | 18,893 | | 18,893 |
| Inquiry Svcs / Vouchers | 1890-602-434 | | 18,628 | | 18,628 |
| Payroll | 1890-621-194 | | 9,300 | | 9,300 |
| Wire Out | 1890-602-418 | | 1,460 | | 1,460 |
| **Restricted Cash:** | | | | | |
| Blocked Account - Florida Disputed Funds | | | 1,762,763 | | 1,762,763 |
| Blocked Account - PCS Disputed Funds | | | 56,000 | | 56,000 |
| **Total** | | $ | 3,985,640 | $ | 3,985,640 |

## STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
### Increase/(Decrease) in Cash and Cash Equivalents
**For the Period**     9/16/07 through 9/30/07

| | | Actual Current Month | Cumulative (Case to Date) |
|---|---|---|---|
| | **Cash Receipts** | | |
| 1 | Rent/Leases Collected | $          - | $          - |
| 2 | Cash Received from LECs | 2,503,567 | 2,503,567 |
| 3 | Interest Received | - | - |
| 4 | Borrowings | - | - |
| 5 | Funds from Shareholders, Partners, or Other Insiders | - | - |
| 6 | Capital Contributions | - | - |
| 7 | Other - Miscellaneous | 11,357 | 11,357 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | **Total Cash Receipts** | $     2,514,924 | $     2,514,924 |
| | **Cash Disbursements** | | |
| 13 | Payments for Inventory | $          - | $          - |
| 14 | Selling | - | - |
| 15 | Administrative | 1,202 | 1,202 |
| 16 | Capital Expenditures | - | - |
| 17 | Principal Payments on Debt | - | - |
| 18 | Interest Paid | - | - |
| | Rent/Lease: | | |
| 19 | Personal Property | - | - |
| 20 | Real Property | - | - |
| | Amount Paid to Owner(s)/Officer(s) | | |
| 21 | Salaries | 8,946 | 8,946 |
| 22 | Draws | - | - |
| 23 | Commissions/Royalties | - | - |
| 24 | Expense Reimbursements | - | - |
| 25 | Other | - | - |
| 26 | Salaries/Commissions (less employee withholding) | 68,727 | 68,727 |
| 27 | Management Fees | | |
| | Taxes: | | |
| 28 | Employee Withholding | 26,769 | 26,769 |
| 29 | Employer Payroll Taxes | 8,548 | 8,548 |
| 30 | Real Property Taxes | - | - |
| 31 | Other Taxes | - | - |
| 32 | Other Cash Outflows: | | |
| 33 | PaymentOne (payment per 9/26/07 interim cash collateral order) | $     578,018 | $     578,018 |
| 34 | | | |
| 35 | | | |
| 36 | | | |
| 37 | | | |
| 38 | **Total Cash Disbursements:** | $     692,210 | $     692,210 |
| 39 | **Net Increase (Decrease) in Cash** | $     1,822,714 | $     1,822,714 |
| 40 | **Cash Balance, Beginning of Period** | $     2,162,926 | $     2,162,926 |
| 41 | **Cash Balance, End of Period** | $     3,985,640 | $     3,985,640 |

## STATEMENT OF CASH FLOWS
(Optional) Increase/(Decrease) in Cash and Cash Equivalents
For the Period _____ 9/16/07 through 9/30/07 _____

| | | Actual Current Month | Cumulative (Case to Date) |
|---|---|---|---|
| | **Cash Flows From Operating Activities** | | |
| 1 | Cash Received from LECs | $ 2,503,567 | $ 2,503,567 |
| 2 | Rent/Leases Collected | - | - |
| 3 | Interest Received | - | - |
| 4 | Cash Paid to Suppliers | - | - |
| 5 | Cash Paid for Selling Expenses | - | - |
| 6 | Cash Paid for Administrative Expenses | 1,202 | 1,202 |
| | Cash Paid for Rents/Leases: | | |
| 7 | Personal Property | - | - |
| 8 | Real Property | - | - |
| 9 | Cash Paid for Interest | - | - |
| 10 | Cash Paid for Net Payroll and Benefits | 68,727 | 68,727 |
| | Cash Paid to Owner(s)/Officer(s) | | |
| 11 | Salaries | 8,946 | 8,946 |
| 12 | Draws | - | - |
| 13 | Commissions/Royalties | - | - |
| 14 | Expense Reimbursements | - | - |
| 15 | Other | - | - |
| | Cash Paid for Taxes Paid/Deposited to Tax Acct. | | |
| 16 | Employer Payroll Tax | 8,548 | 8,548 |
| 17 | Employee Withholdings | 26,769 | 26,769 |
| 18 | Real Property Taxes | - | - |
| 19 | Other Taxes | - | - |
| 20 | Cash Paid for General Expenses | - | - |
| 21 | Cash paid to PaymentOne (payment per 9/26/07 interim cash collateral order) | 578,018 | 578,018 |
| 22 | Cash received - Miscellaneous | 11,357 | 11,357 |
| 23 | | | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | **Net Cash Provided (Used) by Operating Activities before Reorganization Items** | $ 1,822,714 | $ 1,822,714 |
| | **Cash Flows From Reorganization Items** | | |
| 28 | Interest Received on Cash Accumulated Due to Chp 11 Case | $ - | $ - |
| 29 | Professional Fees Paid for Services in Connection with Chp 11 Case | - | - |
| 30 | U.S. Trustee Quarterly Fees | - | - |
| 31 | | | |
| 32 | **Net Cash Provided (Used) by Reorganization Items** | $ - | $ - |
| 33 | **Net Cash Provided (Used) for Operating Activities and Reorganization Items** | $ 1,822,714 | $ 1,822,714 |
| | **Cash Flows From Investing Activities** | | |
| 34 | Capital Expenditures | $ - | $ - |
| 35 | Proceeds from Sales of Capital Goods due to Chp 11 Case | - | - |
| 36 | | | |
| 37 | **Net Cash Provided (Used) by Investing Activities** | $ - | $ - |
| | **Cash Flows From Financing Activities** | | |
| 38 | Net Borrowings (Except Insiders) | $ - | $ - |
| 39 | Net Borrowings from Shareholders, Partners, or Other Insiders | - | - |
| 40 | Capital Contributions | - | - |
| 41 | Principal Payments | - | - |
| 42 | | | |
| 43 | **Net Cash Provided (Used) by Financing Activities** | $ - | $ - |
| 44 | **Net Increase (Decrease) in Cash and Cash Equivalents** | $ 1,822,714 | $ 1,822,714 |
| 45 | **Cash and Cash Equivalents at Beginning of Month** | $ 2,162,926 | $ 2,162,926 |
| 46 | **Cash and Cash Equivalents at End of Month** | $ 3,985,640 | $ 3,985,640 |

RER−49                 2955

**RER - 50**

1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
       A Limited Liability Partnership
2        Including Professional Corporations
   MICHAEL H. AHRENS, Cal. Bar No. 44766
3  STEVEN B. SACKS, Cal. Bar No. 98875
   JEFFREY K. REHFELD, Cal. Bar No. 188128
4  Four Embarcadero Center, 17th Floor
   San Francisco, California 94111-4106
5  Telephone:    415-434-9100
   Facsimile:    415-434-3947
6  Email:        mahrens@sheppardmullin.com
                 jrehfeld@sheppardmullin.com
7                ssacks@sheppardmullin.com

8  Attorneys for The Billing Resource,
   dba Integretel
9

10              UNITED STATES BANKRUPTCY COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                      SAN JOSE DIVISION

| | |
|---|---|
| 13  In re | Case No. 07-52890 ASW |
| 14  THE BILLING RESOURCE, dba Integretel, a California corporation, | Chapter 11 |
| 15                     Debtor. | **DEBTOR'S MEMORANDUM OF POINTS** |
| 16  Tax ID: 33-0289863 | **AND AUTHORITIES IN SUPPORT OF USE OF CASH COLLATERAL ON A** |
| 17 | **FURTHER INTERIM BASIS INCLUDING APPROVAL OF FIRST AMENDED** |
| 18 | **PAYMENTONE STIPULATION THROUGH AND INCLUDING** |
| 19 | **NOVEMBER 16, 2007 AND OMNIBUS REPLY TO OBJECTIONS TO DEBTOR'S** |
| 20 | **CASH COLLATERAL MOTION** |
| 21 | |
| 22 | Date:      November 2, 2007<br>Time:      1:00 p.m. |
| 23 | Place:     United States Bankruptcy Court<br>           280 South First Street<br>           San Jose, California |
| 24 | Judge:     Hon. Arthur S. Weissbrodt<br>Courtroom:  3020 |
| 25 | |

26

27

28

W02-WEST:FJR\400509216.4

1       The above-captioned debtor and debtor in possession, The Billing Resource, dba

2 Integretel, a California corporation (the "Debtor"), hereby files this Memorandum of Points and

3 Authorities in support of the Debtor's use of cash collateral on a further interim basis through and

4 including November 16, 2007, or as soon thereafter as the Court and counsel are available for a

5 further hearing on the motion, and Omnibus Reply (the "Reply") to various objections filed on or

6 about October 26, 2007 (the "Objections") to the Debtor's Cash Collateral Motion.[1]

7       Of the Debtor's numerous creditors, only three entities filed objections to the Debtor's

8 continued motion for use of cash collateral beyond November 2, 2007.  Each of these three

9 remaining objections was previously made to the Court, previously addressed by the Debtor, and

10 properly overruled by the Court.

11       Consistent with the Court's prior determinations, good cause exists to grant the Debtor's

12 continued use of cash collateral *for the very limited period of the next two weeks, through and*

13 *including November 16, 2007*.  The Official Unsecured Creditors' Committee (the "Committee")

14 supports the Debtor's request.  Granting the Debtor this further breathing spell will provide the

15 Debtor the needed time to meet with the Committee to further explore the terms for a possible plan

16 of reorganization contemplating a continuation of business operations, with the goal of allowing

17 the Debtor to exit bankruptcy as quickly as possible, while also maximizing value to unsecured

18 creditors.

19                 **ARGUMENT**

20 **A.**   **The Committee Supports the Debtor's Further Interim Use of Cash Collateral Until November 16, 2007.**

21

22       The Debtor filed its voluntary bankruptcy petition six weeks ago on September 16, 2007.

23

24 _____

[1] The budget corresponding to the Debtor's requested continued interim use of cash collateral

24 through and including November 16, 2007 is the budget which was attached as <u>Exhibit B</u> to the Declaration of Paul Weber dated October 11, 2007 (the "Debtor's Budget"), a copy of which

25 budget was also attached as <u>Exhibit B</u> to the "Notice of Signing of Further Order Approving Interim Use of Cash Collateral and Granting Replacement Liens and Approving First Amended

26 Stipulation With PaymentOne Corporation Regarding Use of Cash Collateral and Adequate Protection on an Interim Basis Through and Including November 2, 2007."  A revised cash

27 collateral order in substantially the form the Debtor currently intends to present to the Court at the November 2 hearing is attached hereto as <u>Exhibit 1</u>.

28

-1-

DEBTOR'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF USE OF CASH COLLATERAL ON A FURTHER INTERIM BASIS

1   On September 26, 2007, the Court entered its "Order Approving Interim Use of Cash Collateral

2   and Granting Replacement Liens and Approving First Amended Stipulation with PaymentOne

3   Corporation Regarding Use of Cash Collateral and Adequate Protection on an Interim Basis."

4       On October 1, 2007, the Office of the United States Trustee appointed the Official

5   Committee of Unsecured Creditors (the "Committee") in this case pursuant to section 1102(a)(2).

6   On October 10, 2007, the Committee participated in an initial face-to-face meeting with the

7   Debtor and its representatives for which several Committee members flew across the country and

8   for which others attended by telephone. A quorum of the Committee was present. Prior to and at

9   the October 10 meeting, the Debtor provided the Committee with financial information including

10  projections, and various other types of information. Following the October 10 meeting the Debtor

11  has provided the Committee with additional information.

12      At the October 10 meeting, it was agreed that the Committee would consent to the

13  Debtor's continued use of cash collateral on the terms proposed by the Debtor in its budget on an

14  interim basis for a period of two to three weeks. The Debtor and the Committee entered into a

15  stipulation regarding the Debtor's use of cash collateral on an interim basis through and including

16  November 2, 2007. During that time it was contemplated that the Debtor would negotiate with the

17  Committee a term sheet for a plan of reorganization contemplating a continuation of business

18  operations with the goal of allowing the Debtor to exit bankruptcy as quickly as possible, while

19  also maximizing value to unsecured creditors.

20      On October 16, 2007, the Court signed its "Further Order Approving Interim Use of Cash

21  Collateral and Granting Replacement Liens and Approving First Amended Stipulation with

22  PaymentOne Corporation Regarding Use of Cash Collateral and Adequate Protection on an

23  Interim Basis Through and Including November 2, 2007."

24      Due to scheduling issues, the Debtor and the Committee have not yet had a subsequent

25  meeting to further explore with more concrete terms for a possible plan of reorganization. The

26  Debtor and the Committee have scheduled such a meeting in the immediate future. The

27  Committee has consented to the Debtor's continued use of cash collateral in its current budget on

28  an interim basis for a period of two weeks.

-2-

W02-WEST:FJR\400509216.4

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

RER-50      2958

1   Continued use of cash collateral makes eminent sense.  By continuing to operate, the

2   Debtor is able to deal with the LECs in the ordinary course of business and thus avoids offsets,

3   increases in reserves claimed by LECs or delays in payments.  The Debtor is only entity that can

4   effectively perform this function.  In addition, the Debtor's customers need the Debtor to continue

5   to process billing transactions.  A key component for any recovery to creditors in this bankruptcy

6   case will be the ability to establish the amount of each unsecured claim, which is an extremely

7   complicated function which the Debtor is by far the best, and likely the only, party able to quickly

8   and properly perform.  The Debtor also has the necessary institutional knowledge required to

9   negotiate with New York and Tennessee tax claimants.  In addition, without continued operations

10  the subsidiary PaymentOne is out of business, and its continued operations are important to the

11  Debtor and its creditors.  Moreover, as a majority-owned subsidiary PaymentOne is a valuable

12  asset of the bankruptcy estate.  Likewise, without continued operations, Inmate Calling Solutions'

13  business is severely threatened, and its operations are also important to the Debtor.  Granting the

14  Debtor the requested further interim use of cash collateral for the next two weeks, through and

15  including November 16, 2007, or as soon thereafter as the Court and counsel are available for a

16  further hearing on the motion, is both the prudent course of action and in the best interest of the

17  Debtor's bankruptcy estate.

18  **B.    PaymentOne Supports the Debtor's Further Interim Use of Cash Collateral Until
        November 16, 2007.**

19

20  PaymentOne has consented to the Debtor's further interim use of cash collateral through

21  and including November 16, 2007, or as soon thereafter as the Court and counsel are available for

22  a further hearing on the motion.  PaymentOne also agrees that the First Amended PaymentOne

23  Stipulation remains in effect for the interim period, except as revised in the proposed Order

24  approving such interim use by the Debtor.

25  **C.    Personal Voice Does Not Have a Valid Security Interest Against the Debtor and, In
        Any Event, Is Adequately Protected by the Relief Afforded to It.**

26

27  Personal Voice filed a renewed objection to the Debtor's continued motion to use cash

28  collateral.  Personal Voice's renewed objection is the same as its prior objection filed on October

-3-

W02-WEST:FJR\400509216.4

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1  10 and the arguments raised by Personal Voice at the October 15 Interim Hearing.

2      As previously set forth in the Debtor's Motion, Personal Voice does not have a security

3  interest in the Debtor's cash collateral because Personal Voice's alleged security interest is not in

4  any assets of the Debtor, but instead purports simply to be in amounts to which Personal Voice

5  may be entitled under its contract with the Debtor. Similarly, Personal Voice does not possess a

6  security interest in the Debtor's cash collateral based upon an alleged security interest in any

7  reserves under the parties' contract because there were no segregated reserves. As further noted in

8  the Motion, irrespective of Personal Voice's lack of a security interest in any of the Debtor's assets

9  or cash collateral, the Debtor proposes to give Personal Voice a replacement lien on the same

10  assets, if any, that it had an interest in pre-petition.

11      In addition to these prior arguments made by Debtor in the Motion, there are further

12  reasons why Personal Voice does not have a perfected security interest in any of the Debtor's

13  assets, including "Net Proceeds" or cash collateral. First, Personal Voice's UCC financing

14  statement, which was filed March 12, 2002, lapsed on March 12, 2007 (over 6 months before

15  Debtor filed bankruptcy), and Personal Voice did not file a continuation statement. Under UCC

16  Sections 9515(a) and (c), the effectiveness of a filed financing statement lapses 5 years after filing

17  unless before lapsing, a continuation statement is filed. Because Personal Voice failed to file a

18  continuation statement, its security interest no longer is perfected and Personal Voice is not

19  entitled to adequate protection. 11 U.S.C. § 544(a) (trustee or debtor in possession is senior to

20  unperfected security interest); In re: 1726 Washington, D.C. Partners, 120 B.R. 1, 2 (Bankr.

21  D.D.C. 1990) (rents are not cash collateral where secured party's lien was unperfected); In re:

22  Scottsdale Medical Pavilion, 159 B.R. 295, 298 (9th Cir. BAP 1993) (because an unperfected

23  security interest is subject to avoidance under Bankruptcy Code Section 544, such interest is not

24  entitled to much in the way of adequate protection).

25      Also, what Personal Voice purported to take a security interest in were not "all accounts

26  receivable of the [debtor]" but instead were "Net Proceeds," which are not an asset of the Debtor,

27  Personal Voice, or anyone else. In the contract between Debtor and Personal Voice, "Net

28  Proceeds" is simply a method to calculate the cash consideration to which Personal Voice is

-4-

W02-WEST:FJR\400509216.4

DEBTOR'S MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF USE OF CASH
COLLATERAL ON A FURTHER INTERIM BASIS

1    entitled under the contract. Personal Voice's attempted security interest in "Net Proceeds" is

2    analogous to a seller of an asset attempting to take a security interest in the purchase price to be

3    determined under a formula and paid at a later time (as opposed to taking a security interest in the

4    asset itself). Personal Voice has only an unsecured claim against Debtor for Net Proceeds.[2]

5        Personal Voice's renewed objection simply restates its prior arguments which have been

6    previously addressed and properly rejected by the Court. Personal Voice has not provided any

7    support for a different result. Nor has Personal Voice met its burden of proof on the issue of the

8    validity, priority and extent of its alleged interest in the Debtor's property. 11 U.S.C. § 363(p).

9        Personal Voice simply does not possess a valid, perfected and enforceable security interest

10   in the Debtor's cash collateral. Notwithstanding that, the Debtor will provide Personal Voice with

11   a replacement lien of the same type and character which it possessed pre-petition. Personal Voice

12   is entitled to no more.

13   **F.    The Debtor Has Adequately Addressed the U.S. Trustee's Concern.**

14       The U.S. Trustee raised a concern about the Motion in connection with a portion of the

15   carve-out for professionals contained in the First Amended PaymentOne Stipulation and its effect

16   as to any subsequently appointed trustee or its professionals. The Debtor has addressed with

17   PaymentOne the U.S. Trustee's objection, and PaymentOne agreed to change the carve-out

18   language contained in the proposed order in a manner which the Debtor believes addresses and

19   resolves the U.S. Trustee's objection. PaymentOne has agreed during the continued interim period

20

---

21   [2] Personal Voice's opposition asserts that accounts receivable generated from Personal Voice
     providing services to end users remained property of Personal Voice and were not transferred to
22   Debtor when Personal Voice submitted Billing Transactions to Debtor. This assertion is belied by
     the facts. Nothing in the agreement between Debtor and Personal Voice states that Personal Voice
23   is maintaining ownership of anything. In fact, as noted by Personal Voice in its opposition,
     Personal Voice attempted to take a security interest in "Personal Voice Receivables", indicating
24   that the parties believed that Personal Voice did not own any receivables generated. The lapsed
     financing statement does not indicate that it is "precautionary". If the parties had believed that
25   Personal continued to own receivables, Personal Voice would not have attempted to obtain a
     security interest from Debtor. Moreover, as the Debtor has previously stated, it is common
26   knowledge in this industry that the Debtor would be selling the billing transaction receivables to
     the LECs and that the Debtor's contracts with the LECs are structured as the purchase by the LECs
27   of the Debtor's accounts receivable, which obviously could not be done if Personal Voice retained
     title to the receivables. See Declaration of Ken Dawson dated October 11.

28

W02-WEST:FJR\400509216.4                    -5-
                                    DEBTOR'S MEMORANDUM OF POINTS AND
                                    AUTHORITIES IN SUPPORT OF USE OF CASH
                                    COLLATERAL ON A FURTHER INTERIM BASIS

Case: 07-52890    Doc #: 211    Filed: 10/30/2007    Page 6 of 28

RER-50    2961

1    until November 16 to a full carveout to professionals for the Debtor, the Committee and any

2    subsequently appointed trustee – retroactive to the filing of this case.

3    **H.    The Receiver's Arguments Are and Were Appropriately the Subject of the Adversary
         Proceeding Hearing, Not the November 2 Cash Collateral Motion Hearing.**

4

5           The Receiver was appointed as receiver for two of the Debtor's prior customers.    In

6    connection with a prior hearing on the Debtor's cash collateral motion, with the stipulation of the

7    Debtor, a segregated, blocked account debtor in possession bank account in the Debtor's name was

8    established into which the Debtor deposited approximately $1.7 million, which funds cannot be

9    moved absent further order of this Court (the "Blocked Account").  In connection with the October

10   15 Interim Hearing, the Debtor demonstrated the need for use of the funds in the Blocked

11   Account.[3]  Therefore, the Debtor, with the support of the Committee, asked the Court to unblock

12   the Blocked Account.    These issues are being addressed in adversary proceeding 07-5156 (the

13   "Adversary Proceeding") commenced in this case.  This Court properly found in its October 16,

14   2007 findings that the FTC's and the Receiver's objections to the Debtor's continued use of cash

15   collateral would be considered resolved in the context of the Adversary Proceeding.  The Debtor

16   filed further pleadings for the October 17 hearing in the Adversary Proceeding as to why the Court

17   should issue a preliminary injunction against the Receiver and the FTC, and in those pleadings the

18   Debtor demonstrated why the Court should properly unblock the account and permit the Debtor to

19   use the funds contained therein in its operations and reorganization efforts.  The Receiver and the

20   FTC opposed such relief, and the Court held the October 17 hearing in the Adversary Proceeding

21   on those issues

22           The Debtor has previously shown that the Receiver is not a secured creditor of the Debtor,

23   has no security interest in the Debtor's assets, is entitled to no greater status than the Debtor's other

24   unsecured creditors, and is not entitled to adequate protection.    In his latest opposition the

25   Receiver again renews the same arguments he has made throughout this case.  However, those

26   ───────────────
     [3] See The "Alternative Budget" attached to the Declaration of Paul Weber dated October 11, 2007;
27   Debtor's October 11 Omnibus Reply to Cash Collateral Objections at 16:4-17.  The Blocked
     Account funds are needed and the Debtor should be allowed to reorganize without expending
28   substantial legal fees to defend the Florida Action.

                                            -6-
DEBTOR'S MEMORANDUM OF POINTS AND
                                                          AUTHORITIES IN SUPPORT OF USE OF CASH
                                                          COLLATERAL ON A FURTHER INTERIM BASIS