# VOLUME 6 OF 7

## RER-52  3002  through  RER-76  3445

**RER - 52**

Entered on Docket
**November 02, 2007**
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

FILED

NOV 0 2 2007

CLERK
United States Bankruptcy Court
San Jose, California

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re:                                    Case No. 07-52890-ASW

THE BILLING RESOURCE, dba
INTEGRETEL, a California                  Chapter 11
corporation,

                        Debtor.
_____
THE BILLING RESOURCE, dba
INTEGRETEL, a California                  Adversary No. 07-5156
corporation,

                        Plaintiff,
vs.

FEDERAL TRADE COMMISSION, et al.,

                        Defendants.
_____

MEMORANDUM DECISION RE ORDER TO SHOW CAUSE
REGARDING PRELIMINARY INJUNCTION

Before the Court is an Order to Show Cause ("OSC") why a

preliminary injunction should not issue enjoining the Federal Trade

Commission ("FTC") and David R. Chase ("Receiver"), not

individually, but solely in his capacity as receiver for Access One

Communications, Inc. ("Access One") and Network One Services, Inc.

("Network One")[1] from taking actions against The Billing Resource,

---

[1] In addition to these two entities, Receiver is also the receiver for several other entities in
(continued...)

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.

1  dba Integretel ("Integretel" or "Debtor")[2] in the action captioned

2  <u>Federal Trade Commission v. Nationwide Connections, Inc., et al.,</u>

3  Case No. 06-80180-Civ-Ryskamp ("Florida Action") pending in the

4  United States District Court for the Southern District of Florida

5  ("Florida Court").  Debtor seeks to enjoin the FTC from prosecuting

6  the enforcement aspect of the Florida Action ("Enforcement Action")

7  against Debtor (and <u>not</u> against the other defendants in that

8  action) as well as enjoining the Receiver from implementing or

9  enforcing the Omnibus Order entered in the Florida Action on

10 September 14, 2007 ("Omnibus Order") (as it relates solely to

11 Debtor, and not to any other defendants).  Debtor also seeks to

12 unblock $1,762,762.56 currently held by Debtor in a blocked account

13 ("Blocked Account").  These funds were taken from Debtor's general

14 commingled funds and placed temporarily in the Blocked Account

15 pursuant to a stipulation between Debtor and Receiver -- at the

16 suggestion of the Court -- entered into at the September 26, 2007

17 hearing on Debtor's interim motion for use of cash collateral.

18     A hearing on the OSC was held on October 17, 2007 and the

19 matter has been submitted for decision.  Debtor is represented by

20 Michael H. Ahrens, Esq. and Steven B. Sacks, Esq. of Sheppard,

21 Mullin, Richter & Hampton, LLP.  FTC is represented by Michael P.

22 Mora, Esq. and Collot Guerard, Esq.  Receiver is represented by

23 Walter K. Oetzell, Esq. of Danning, Gill, Diamond & Kollitz, LLP

24 and Jeffrey C. Schneider, Esq. of Tew Cardenas LLP.  The Official

25 ──────────────────────

26 [1](...continued)
   the litigation brought by FTC in which Receiver was appointed. The only two receivership entities

27 that are relevant to these proceedings are Access One and Network One.

28    [2] This Court will use Integretel to differentiate actions taken by or events related to Debtor
   that occurred pre-petition.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.               2

1  Committee of Unsecured Creditors ("Committee") is represented by

2  John D. Fiero, Esq. of Pachulski Stang Ziehl & Jones LLP.   Creditor

3  POL, Inc. is represented by Kathryn S. Diemer, Esq. of Diemer,

4  Whitman & Cardosi, LLP.   Creditor PaymentOne Corporation

5  ("PaymentOne") is represented by Stephen H. Warren, Esq. of

6  O'Melveny & Myers LLP.   Creditor United Online, Inc. is represented

7  by Jeffrey K. Garfinkle, Esq. of Buchalter Nemer.   BSG Billing

8  Solutions is represented by James A. Pardo, Jr., Esq. and Felton E.

9  Parrish, Esq. of King & Spalding LLP.

10      This Memorandum Decision constitutes the Court's findings of

11  fact and conclusions of law, pursuant to Rule 7052 of the Federal

12  Rules of Bankruptcy Procedure.

13

14                              I.

15                            FACTS

16  **A.  Debtor's Business**[3]

17      Debtor provides billing-related and other services for smaller

18  private telecommunications companies that compete with large local

19  exchange carriers ("LECs") in niche areas such as public pay

20  phones, hotels and prisons ("Alternative Operator Services").

21  Private telecommunications companies that provide Alternative

22  Operator Services have difficulty billing for "collect" and other

23  types of calls, since most individuals do not pay invoices from

24  these unknown companies and those companies cannot bill the

25  individuals through the individual's normal telephone bill.   Debtor

26

27  _____

28      [3] While "Debtor" refers to the post-petition business entity and "Integretel" refers to the pre-petition business entity, the Court uses Debtor in the following section rather than Integretel because the section describes Debtor's business both pre- and post-petition.

RER-52        3004

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  was created in 1988 to address this void in the marketplace.
2  Debtor has billing and collection agreements with an estimated
3  1,400 LECs -- both major local exchange companies and numerous
4  independents.  Debtor's infrastructure permits private
5  telecommunications providers to incorporate such providers' charges
6  into the phone bills of more than 90% of business and residential
7  consumers throughout the United States and Canada.

8      The typical service contract between Debtor and its service
9  provider customers provides that the customer submits to Debtor the
10 customer's billing transaction in a data format acceptable to
11 Debtor.  In the typical service contract, the customers acknowledge
12 that these billing transactions are structured as a purchase of
13 accounts receivable.  Debtor contends that its customers have no
14 ownership interest in the proceeds of the billing transaction after
15 the billing transactions are submitted to Debtor and its customers
16 hold only an unsecured claim against the distributions payable by
17 Debtor to the customer under the service contracts -- usually in 90
18 or so days.  The service contracts provide detailed formulas for
19 computing the amounts Debtor owes to its customers.  Debtor
20 maintains certain reserves for disputes, fees and other adjustments
21 as bookkeeping entries only.

22     The service contracts provide that each week Debtor transfer
23 by wire to its customers' bank accounts the net proceeds identified
24 in the prior week as defined by the service contracts.  This amount
25 is forwarded approximately 90 days after the submission of the
26 billing transaction.  Once Debtor receives a billing transaction,
27 Debtor submits the billing information to the LECs and the LECs in
28 turn bill the end user. At varying intervals, the LECs make

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.        4

1  payments into Debtor's "wire in" account based on the billing

2  transactions previously submitted to the LEC.  Funds are

3  transferred into this account every day throughout the day.

4      Once a week -- typically on a Thursday -- Debtor settles its

5  accounts with its customers.  To settle accounts, Debtor disburses

6  funds from the "wire in" account to the "wire out" account.  The

7  "wire out" account is a zero balance account meaning that all funds

8  transferred into that account are generally transferred out to

9  several other accounts on the same day.  It is from these other

10 accounts that Debtor: (1) pays its vendors, employees and other

11 operating expenses; (2) collects taxes that Debtor is required to

12 collect in connection with Debtor's business; (3) makes payments to

13 LEC end users that are entitled to a cash voucher for a refund;[4]

14 and (4) holds excess funds, if any, from weekly settlements to

15 cover subsequent operating shortfalls including settlement

16 obligations that exceed available funds in the "wire in" account.

17     Debtor has approximately thirty-seven employees.  In 2000,

18 Debtor formed PaymentOne as a subsidiary to address the specialized

19 billing and support requirements of the internet.  Debtor owns 97%

20 of PaymentOne.  In 2002, Debtor formed another majority-owned

21 subsidiary known as Inmate Calling Solutions, LLC to target the

22 correctional industry and in 2004, Debtor formed yet another

23 majority-owned subsidiary known as Information Services 900 LLC to

24 target 900 call traffic.

25

26 _____

   [4] Certain individual or business consumers are occasionally entitled to a refund or a credit.

27 This results, inter alia, from an error in billing. Debtor asserts that 95% of these cases are corrected
   electronically through an automated credit transaction. In the 5% of errors handled through the

28 issuance of a voucher to the consumer, the voucher -- redeemable for cash -- is drawn from the
   voucher account.

**B.    Florida Action**

On February 27, 2006, the FTC commenced the Florida Action in the Florida Court against three Alternative Operator Services providers as well as their principals (not Integretel or its principals) for alleged deceptive and unfair practices for unauthorized billing of charges on phone bills in violation of the Federal Trade Commission Act. The FTC alleged that these defendants had defrauded consumers throughout the United States of more than $30 million by placing unauthorized collect call charges onto consumers' telephone bills. At the request of the FTC, the Florida Court entered an *ex parte* temporary restraining order ("TRO") that shut down the defendants' alleged unlawful operation, froze the defendants' personal and corporate assets and appointed Receiver as temporary receiver for the corporate defendants. Two of the corporate defendants -- Access One and Network One -- were prior customers of Integretel (collectively, "Prior Customers"). On March 8, 2006, a preliminary injunction was entered ("Preliminary Injunction") and Receiver was permanently appointed.

Both the TRO and the Preliminary Injunction provided, <u>inter alia</u>, that any business entity served with a copy of the TRO or Preliminary Injunction

> that holds, controls, or maintains custody of any account or asset of any Defendant, or has held, controlled or maintained custody of any such account or asset at any time since the date of entry of this Order, shall:
>
> A.    Hold and retain within its control and prohibit the withdrawal, removal, assignment, transfer, pledge, encumbrance, disbursement, dissipation, conversion, sale, or other disposal of any such asset except by further order of the Court;
>
> .    .    .

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

RER-52        3007

1   TRO at page 8; Preliminary Injunction at page 9.  The FTC asserts

2   that the FTC served Integretel with the TRO within days of the

3   entry of the TRO.

4        On March 6, 2006, Integretel's president, Ken Dawson,

5   submitted a letter to the FTC stating in relevant part that:

6   (a) Integretel had service contracts with the Prior Customers;

7   (b) pursuant to the service contract with the respective Prior

8   Customer, each Prior Customer was entitled to certain proceeds from

9   billing transactions; however (c) each Prior Customer was in

10  default under the service contract and no amounts were currently

11  due and owing.  Mr. Dawson noted that Integretel had not processed

12  any billing for Access One since May 2005 nor for Network One since

13  June 2003.  With respect to each Prior Customer, Mr. Dawson stated:

14  "[t]o the extent proceeds become due to [Prior Customer] in the

15  future, we will establish a separate bank account into which such

16  funds will be deposited and notify your office accordingly."[5]  Pre-

17  petition Integretel did not establish any such separate bank

18  account.

19       On September 21, 2006, the FTC filed an amended complaint

20  asserting claims against Integretel for Integretel's collection of

21  alleged fraudulent charges.  Specifically, the complaint asserts

22  that Integretel deceptively billed consumers for collect calls that

23  were never made, received or authorized.  In its complaint, the FTC

24  seeks a monetary judgment as well as multiple forms of non-monetary

25  relief such as a permanent injunction against pertinent law

26

27  ───────────────

28       [5] Letter dated March 6, 2006 from Ken Dawson to Roberto Menjivar, Attachment B to
    Declaration of Laura Kim in Opposition to Plaintiff's Motion for a Temporary Restraining Order and
    Preliminary Injunction filed on October 1, 2007.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                7

1  violations, "fencing-in" injunctive relief, rescission of contracts
2  and a claims procedure for consumer redress.   Integretel filed an
3  answer denying the FTC's allegations.   Integretel's principals were
4  not named in the amended complaint.

5       On October 16, 2006, Receiver filed a motion in the Florida
6  Court seeking to hold Integretel in contempt of court for
7  Integretel's alleged failure to turn over to the Receiver on behalf
8  of the Prior Customers certain "reserves" under the service
9  contracts with the Prior Customers in an alleged amount in excess
10 of $1.4 million.   Integretel opposed the motion on various grounds,
11 including: (a) Integretel did not hold any such reserves in a
12 separate account; (b) the service contracts in place with the Prior
13 Customers permitted Integretel to withhold certain monies owed to
14 the Prior Customers as "reserves"; and (c) Integretel was not
15 obligated to turn over those funds under the respective service
16 contracts.   Integretel also filed its own motions to modify the
17 Florida Court's injunctive orders and to stay the contract claims
18 pending arbitration.   A hearing on these motions was held on
19 April 12, 2007.

20      On September 14, 2007, the Florida Court entered the Omnibus
21 Order.   In the Omnibus Order, the Florida Court found that
22 Integretel held reserves in the amount of $1,762,762.56 on behalf
23 of the Prior Customers as of June 30, 2007 ("Commingled Funds").
24 The Florida Court stated that Integretel's assertion that the
25 "reserves" were not held as segregated funds but rather were kept
26 in a pooled account and tracked via an internal accounting entry
27 was "a distinction without a difference, since the TRO captures
28 funds 'held on behalf of, or for the benefit of, a Defendant.'"

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
 ORDER TO SHOW CAUSE, ETC.                  8

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  Omnibus Order at 3.  The Florida Court noted that "[a]n entity need

2  not be an agent, partner, joint venturer, trustee, fiduciary, or

3  legal representative to possess funds that one is holding 'on

4  behalf of' another person or entity..."   Id.   The Florida Court

5  also rejected Integretel's arguments that Integretel could retain

6  the "Commingled Funds" to fund Integretel's assertion of an

7  indemnity claim or liquidated damages for breach of contract

8  against the Prior Customers.  Id. at 4.

9        Regarding Integretel's motions, the Florida Court denied

10  Integretel's request to stay the contract claims pending

11  arbitration of those claims pursuant to the service contract

12  arbitration clause, since the Florida Court concluded that Receiver

13  was not bound by the those clauses.  The Florida Court stated in

14  particular:

15        The Receiver's claim is not a claim at law governed by
         pre-receivership contracts, however, but one governed by
16        this Court's jurisdiction over receivership property
         based on the TRO and Amended Preliminary Injunction.  The
17        Receiver does not claim that the funds must be turned
         over according to, or by adopting, a contract signed
18        between Integretel and Access One/Network One.  The
         Receiver is seeking to recover the reserve funds pursuant
19        to the Court's in rem jurisdiction over receivership
         property, as memorialized in the TRO and the Amended
20        Preliminary Injunction.

21  Omnibus Order at 4.  In response to Integretel's argument that the

22  TRO and Preliminary Injunction would be invalid if those orders

23  permitted the Florida Court to determine Integretel's ownership

24  interest -- or lack thereof -- in the Commingled Funds without a

25  new, separate legal proceeding, the Florida Court stated: "[i]ssues

26  concerning entitlement to disputed receivership property, in fact,

27  are the types of issues typically determined via summary

28  proceedings in the federal court equity receivership context."

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.              9

1    Id. at 5.  The Florida Court rejected Integretel's arguments that

2    Integretel was deprived of due process when the Florida Court

3    issued the TRO and Preliminary Injunction and also rejected

4    Integretel's various arguments that those orders are invalid.  The

5    Florida Court also denied Integretel's request to modify those

6    orders.  Finally the Florida Court:

7         ORDERED AND ADJUDGED that the Receiver's Revised
     Motion for Order to Show Cause Why Integretel Should Not
8    Be Held in Contempt of Court, filed October 16, 2006 [DE
     246], is GRANTED.  Integretel shall show cause in writing
9    within 10 days of the date of this Order why it should
     not be held in contempt for failure to turn over the
10   reserves.  In addition, Integretel shall provide a sworn
     statement identifying the amount of reserves as of the
11   issuance of the TRO.  The Court further orders that these
     funds shall be placed in a segregated Receivership
12   account.  It is further

13        ORDERED AND ADJUDGED that Integretel's Motion to
     Modify Prior Injunctive Orders, filed October 30, 2006
14   [DE 294], is DENIED.  It is further

15        ORDERED AND ADJUDGED that Integretel's Motion to
     Stay Contract Claims, filed December 29, 2006 [DE 363],
16   is DENIED. . . .

17   Omnibus Order at 10.  On September 16, 2007, promptly after

18   receiving the Omnibus Order, Integretel filed its bankruptcy

19   petition.

20        Debtor is one of seventeen defendants in the Florida Action.

21   Other than two pending motions regarding depositions, discovery is

22   complete in the Enforcement Action.[6]  Dispositive motions are

23   scheduled to be filed very soon -- by November 6, 2007, with

24   opposition to those motions to be filed by December 4, 2007, and

25   replies due by December 18, 2007.  Debtor asserts that Debtor will

26

27   ────────────────

28        [6] Integretel filed a motion to continue one deposition and another billing aggregator
     defendant filed a motion requesting ten additional depositions.  The FTC opposed both motions and
     the Florida Court had not ruled on those motions as of October 15, 2007.

1  not be filing any dispositive motions, but anticipates having to
2  respond to dispositive motions filed by other parties.  The FTC has
3  stated that the FTC <u>will</u> seek summary judgment against Debtor.
4  Debtor asserts that a two- to four-week trial is set to commence in
5  the Florida Action on February 25, 2008.  The FTC predicts that the
6  FTC will prevail on the liability aspect in summary judgment and if
7  not, the FTC estimates that the trial will be no more than nine
8  days, and other defendants contend that the trial will take ten to
9  fifteen days at most.  The FTC does not contend that a preliminary
10 injunction against Debtor interferes with the FTC from proceeding
11 with the Enforcement Action against any of the other sixteen
12 defendants.

13      Debtor anticipates having to spend $821,600 in litigation
14 costs over the next six months related to depositions, discovery
15 motions, dispositive motions, other motions, pre-trial submissions
16 and trial.[7]  Debtor does not break out the estimated fees into the
17 various subcategories.  Debtor estimates that in addition to those
18 fees there will be an estimated $10,000 in fees for local counsel
19 and an estimated $50,000 to $75,000 in costs.[8]  In addition to
20 these estimated fees and costs, Debtor estimates that Debtor will
21 incur an additional $50,000 to $150,000 in fees related to
22 Receiver's request for turnover of the Commingled Funds.[9]

---

[7] Declaration of Neal Goldfarb in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction filed on September 24, 2007 ("Goldfarb Dec.") at ¶¶ 5-6.

[8] Goldfarb Dec. at ¶ 7.

[9] Goldfarb Dec. at ¶ 8.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    11

## C.  Events since Debtor Filed Its Bankruptcy Petition

As noted above, Debtor filed this chapter 11 bankruptcy case on September 16, 2007.  On September 17, 2007, Debtor filed a Notice of Bankruptcy in the Florida Action.  On September 18, 2007, this Court generated a Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines setting, *inter alia*, a meeting of creditors for October 17, 2007 and a deadline for filing a proof of claim for non-governmental units of January 15, 2008 and for governmental units of March 14, 2008.  On September 20, 2007, the Florida Court issued an order stating that the Florida Action was stayed by the automatic stay.

On September 21, 2007, the FTC filed an emergency motion for clarification that the automatic stay did not apply to the Enforcement Action and the contempt proceedings.  On the same day, without granting Debtor an opportunity to respond to the FTC's emergency motion either in writing or orally, the Florida Court issued its Order Granting Motion for Clarification as to Scope of Stay ("Clarification Order").  In the Clarification Order, the Florida Court stated that in the Omnibus Order the Florida Court had "ruled that the reserve funds are the property of the receivership estate and ordered Integretel to pay the current reserve funds, amounting to $1,762,762.56, immediately to the Receiver."  Clarification Order at 1.

Furthermore, the Florida Court held that Bankruptcy Code section 362(b)(4)[10] did not stay the Enforcement Action.  The

---

[10] Unless otherwise noted, all statutory references are to Title 11, United States Code, as amended in 2005 ("Bankruptcy Code").

1    Florida Court also stated with respect to the contempt proceedings

2    brought by the Receiver:

3         Nor is the contempt proceeding stayed. First, the
4    automatic stay applies only to protect property of the
     bankruptcy estate or property of the debtor. See
5    11 U.S.C. § 362(a)(2). The Court has already ruled that
     the reserve funds are neither the property of the
6    "bankruptcy estate" nor Integretel. Second, the
     11 U.S.C. § 362(b)(4) exception also applies to civil
7    contempt proceedings brought by a governmental unit in
     the exercise of its police or regulatory powers. See SEC
8    v. Bilzerian, 131 F. Supp. 2d 10, 14 (D.D.C. 2001)(civil
     contempt proceeding falls within the exception;
9    incarceration of debtor subsequent to failure to provide
     financial information as required by purgation provision
10   in prior disgorgement order). Finally, the bankruptcy
     filing does not deprive this Court of its inherent power
11   to enforce the integrity of its orders. "[C]ontempt
     orders to uphold the dignity of the court are excepted
12   from the automatic stay." NRLB v. Sawulski, 158 B.R.
     971, 975 (E.D. Mich. 1993).

13   Clarification Order at 4. Thus, even though the newly extant

14   bankruptcy estate had no opportunity to respond to the FTC's

15   emergency motion, the Florida Court granted the FTC's emergency

16   motion. The Florida Court stated that the commencement of Debtor's

17   bankruptcy case did not stay the contempt proceedings against

18   Debtor or FTC's prosecution of the Enforcement Action and the

19   Florida Court vacated the September 20, 2007 order staying

20   proceedings against Debtor.

21        Also on September 21, 2007, this Court held a hearing on

22   Debtor's emergency motion for interim use of cash collateral and

23   Debtor's request for authority to maintain Debtor's pre-petition

24   bank accounts. In its motion for interim use of cash collateral,

25   Debtor requested court authority to use cash collateral pursuant to

26   a stipulation with its secured creditor PaymentOne. Debtor

27   asserted that PaymentOne was a secured creditor based on more than

28   $6.4 million PaymentOne had loaned to Debtor between October 18,

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.          13

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   2006 and the petition date (the "new value" provided by PaymentOne,

2   in bankruptcy parlance).  The motion for authority to maintain

3   Debtor's pre-petition bank accounts was granted and the motion on

4   the interim use of cash collateral was continued to September 26,

5   2007.

6       Prior to the September 26, 2007 hearing, seven objections were

7   filed in opposition to Debtor's motion for interim use of cash

8   collateral.  Some of the oppositions raised questions regarding

9   Debtor's viability and ability to operate successfully as a going

10  concern.  Prior to and at the hearing, Debtor obtained the consent

11  of all parties to Debtor's use of cash collateral.  In particular,

12  Debtor and Receiver agreed to set up the Blocked Account whereby

13  Debtor agreed to deposit $1,762,762.56 of its commingled funds into

14  a blocked account and Debtor and Receiver agreed that the

15  establishment of the Blocked Account did not in any way affect the

16  merits of either parties' rights, claims or defenses with respect

17  to the funds in the Blocked Account.  Based in part on the consent

18  of all parties, this Court granted Debtor interim use of cash

19  collateral through October 15, 2007 and set a further hearing on

20  the use of cash collateral for that day.

21      In papers relating to the September 26, 2007 hearing and at

22  that hearing, Debtor informed this Court that negotiations were

23  underway for a possible sale of PaymentOne to a third party.

24  Debtor also requested the expedited appointment of the unsecured

25  creditors' committee so that Debtor would have an entity with which

26  Debtor could talk on a confidential basis with, and obtain the

27  opinions regarding, possible reorganization scenarios, including

28  the possible sale of PaymentOne.  On October 1, 2007, the United

MEMORANDUM DECISION RE
 ORDER TO SHOW CAUSE, ETC.          14

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    States Trustee filed a notice that a committee of seven unsecured

2    creditors of Debtor had been appointed.  Two days later the

3    Committee selected the law firm of Pachulski Stang Ziehl & Jones

4    LLP as its counsel, subject to approval of this Court.  Within a

5    week, Debtor and the Committee executed a confidentiality

6    agreement; Debtor provided the Committee with various documents and

7    information requested by the Committee; and the Committee began the

8    process of analyzing that information.

9         On October 10, 2007, the Committee and Debtor participated in

10   a five hour face-to-face meeting.  Discussions at that meeting

11   included Debtor's financial information -- including projections,

12   claims against Debtor, Debtor's plan for post-petition pre-payment

13   to Debtor's pre-petition customers, Debtor's relationship with the

14   LECs, the status of the Florida Action, as well as plan of

15   reorganization issues.  At that meeting, the Committee agreed to

16   consent to Debtor's continued use of cash collateral through

17   November 2.  Debtor committed to negotiate with the Committee a

18   term sheet for a plan of reorganization contemplating a

19   continuation of Debtor's business operations with the goal of

20   allowing Debtor to exit bankruptcy as quickly as possible, while

21   maximizing the value to unsecured creditors.  The Committee stated

22   its intention to use the time between October 10 and November 2 to

23   conduct further due diligence on Debtor's assets, liabilities and

24   financial affairs in an effort to be in a better position to

25   evaluate an exit strategy for Debtor from bankruptcy.

26        On October 15, 2007, this Court held a second hearing on

27   Debtor's interim use of cash collateral.  In support of Debtor's

28   continued use of such cash collateral, Debtor submitted budgets

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.            15

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  showing Debtor's actual and projected post-petition finances.

2  Debtor submitted one budget assuming that Debtor could use the

3  funds in the Blocked Account as well as the assumption that the

4  Enforcement Action and related proceedings were stayed.  Debtor

5  also submitted another budget without those assumptions.  Regarding

6  the projected $1 million in litigation expenses related to the

7  Florida Action, Debtor projected incurring $333,333 for the weeks

8  ending November 2, 2007, December 7, 2007, and January 4, 2008.

9  Debtor asserted at that hearing, and continues to assert, that

10  Debtor needs the funds in the Blocked Account and that without the

11  ability to use the funds in the Blocked Account, Debtor will not

12  have sufficient cash flow as of mid-December 2007.

13      Debtor's continued use of cash collateral again drew seven

14  objections, but the primary concern of the objecting creditors was

15  with respect to the alleged secured nature of their respective

16  claims, and not on Debtor's ability to stay in business.  In

17  addition, as noted above, Debtor's continued use of cash collateral

18  had the support of the Committee.  On October 16, 2007, this Court

19  granted Debtor's continued interim use of cash collateral.  A

20  hearing for final authority for Debtor to use cash collateral is

21  set for November 2, 2007.

22      Meanwhile, on October 1, 2007, Debtor requested additional

23  time -- until November 15, 2007 -- to file its schedules of assets

24  and liabilities ("Schedules") and statement of financial affairs

25  ("Statement").  In its application, Debtor noted the size and

26  complexity of Debtor's business operations, coupled with the

27  limited number of employees, who, in addition to their regular

28  duties, were capable of preparing the Statement and Schedules.  On

1  October 23, 2007, this Court granted Debtor's request.  Debtor's

2  Schedules and Statement are currently due on November 15, 2007.

3       On October 2, 2007, Debtor sought a temporary restraining

4  order from this Court enjoining the Enforcement Action and seeking

5  an order to show cause for the issuance of a preliminary

6  injunction.  At that hearing, this Court denied Debtor's request

7  for a temporary restraining order of the Enforcement Action on the

8  basis that for the period from October 2, 2007 through October 17,

9  2007, Debtor had not demonstrated that the threatened injury to

10 Debtor outweighed the harms of a temporary restraining order

11 against the FTC.[11]  However, the Court found that there was cause to

12 issue the OSC and the OSC was issued as to why a preliminary

13 injunction should not issue.

14      On October 11, 2007, Debtor filed in the Eleventh Circuit a

15 motion for an immediate interim stay of the Clarification Order in

16 as far as that order held that the Florida Action -- other than the

17 Enforcement Action -- was not automatically stayed.  On October 17,

18 2007, the Eleventh Circuit temporarily granted Debtor's motion

19 pending further order of the court ("Stay Order").

20

21                              II.

22                        APPLICABLE LAW

23          In the non-bankruptcy context, [the Ninth Circuit
            has] consistently required trial courts deciding
24          preliminary injunction motions to balance the moving
            party's likelihood of success on the merits and the
25

26 ────────────────────────────

27     [11] While Debtor originally sought a temporary restraining order against Receiver's continued
   enforcement of the Omnibus Order, the stipulation at the September 26 cash collateral hearing that
28 resulted in the temporary establishment of the Blocked Account resolved that need to both parties'
   satisfaction.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.              17

1    relative hardship of the parties.  The moving party must
2    show:

3        (1) a strong likelihood of success on the
     merits, (2) the possibility of irreparable
4        injury to plaintiff if preliminary relief is
     not granted, (3) a balance of hardships
5        favoring the plaintiff, and (4) advancement of
     the public interest (in certain cases).
6        Alternatively, a court may grant the injunction
     if the plaintiff demonstrates *either* a
7        combination of probable success on the merits
     and the possibility of irreparable injury *or*
8        that serious questions are raised and the
     balance of hardships tips sharply in his favor.

9        As we have said many times regarding the two
     alternative formulations of the preliminary
10       injunction test:  These two formulations
     represent two points on a sliding scale in
11       which the required degree of irreparable harm
     increases as the probability of success
12       decreases.  They are not separate tests but
     rather outer reaches of a single continuum.

13

14   Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120
     (9th Cir. 2005) (citations and internal quotation marks
15   omitted).

16   Solidus Networks, Inc. v. Excel Innovations, Inc., (In re Excel

17   Innovations, Inc.), --- F.3d ---, 2007 WL 2555941 at *5 (9th Cir.

18   Sept. 7, 2007) (emphasis in original).  The usual preliminary

19   injunction standard applies to stays of proceedings under 11 U.S.C.

20   § 105(a) ("Section 105").  Excel, 2007 WL 2555941 at *7.  In Excel,

21   a reorganization case, the Ninth Circuit stated that in granting or

22   denying an injunction under Section 105, "a bankruptcy court must

23   consider whether the debtor has a reasonable likelihood of a

24   successful reorganization, the relative hardship of the parties,

25   and any public interest concerns if relevant."  Excel, 2007 WL

26   2555941 at *7.

27

28

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                18

1                                III.

2                             ANALYSIS

3  **A.  Reasonable Likelihood of a Successful Reorganization**

4        In a reorganization context, a debtor seeking a stay against a

5  non-debtor must show a reasonable likelihood of a successful

6  reorganization.  Excel, 2007 WL 2555941 at *7.  This is not a high

7  burden, id. at *8, and a strong showing on the likelihood of a

8  successful reorganization lowers the burden to show irreparable

9  harm.  Id. at *11.

10       The FTC argues that the Committee's unwillingness to consent

11  to a final cash collateral order speaks volumes about Debtor's

12  prospects -- or lack thereof -- of successfully reorganizing and

13  that it remains to be seen whether this will be a "real"

14  reorganization case.  Citing general statistics, the FTC asserts it

15  is more likely that Debtor's case will fall into the 90% or more of

16  chapter 11 cases that are converted to liquidations or dismissed.

17  The FTC argues that overall the record at this point demonstrates

18  that Debtor's fate hangs precariously in the balance and a

19  liquidation scenario is more, or at least as likely as, a

20  successful reorganization and Debtor has not shown by a

21  preponderance of the evidence a likelihood of success on the

22  merits.[12]

23       Receiver asserts that Debtor has not shown a likelihood of

24  success on the merits on the basis that Debtor's support by the

25  Committee fails to address the numerous objections by creditors

26

27  _____

28  [12] A bankruptcy case may have an excellent result for creditors, even in a liquidation context. For example, a successful sale of a debtor's business and subsequent liquidation of that debtor's assets in a chapter 11 or a chapter 7 may result in a substantial distribution to creditors.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.            19

1  claiming a security interest in Debtor's assets to Debtor's
2  continued use of cash collateral. In addition, Debtor's strategy
3  over the near-term presupposes Debtor will be able to use the
4  Commingled Funds to fund Debtor's business operations, so Debtor
5  cannot show a likelihood of success on the merits.

6      The Court disagrees with the FTC and Receiver. The Court
7  finds that, at this juncture, Debtor has made a strong showing that
8  Debtor has a reasonable likelihood of a successful reorganization.
9  It is very early in Debtor's bankruptcy case -- Debtor's bankruptcy
10 case is only six weeks old. In that short period of time, Debtor
11 has obtained the confidence of its creditors that Debtor is a
12 viable business and has a reasonable likelihood of reorganizing
13 successfully. This is demonstrated in several ways. First,
14 following strenuous initial objections, Debtor's creditors
15 consented to Debtor's first interim use of cash collateral as soon
16 as Debtor demonstrated its viability to the objecting creditors.
17 Second, the LECs have for the most part continued to forward funds
18 to Debtor. Third, in an effort to retain customers, Debtor is
19 negotiating with its customers to provide a 50% pre-payment of the
20 transferred accounts receivables at the time of transfer rather
21 than having the customers wait 90 days, as those customers did pre-
22 petition. Debtor has obtained the Committee's support of that
23 plan. Fourth, the Committee is confident enough in Debtor's
24 prospects of reorganization that the Committee supported Debtor's
25 continued use of cash collateral for an additional three weeks to
26 enable the Committee and Debtor to work together on the terms of a
27 plan of reorganization.
28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    In addition, Debtor and Debtor's 97%-owned subsidiary
2 PaymentOne are diligently exploring both a reorganization with
3 Debtor and a sale of PaymentOne's business to prospective
4 purchasers.  The proceeds of such a sale could help Debtor fund a
5 plan of reorganization.  Alternatively, Debtor is exploring the
6 possibility of a pot plan providing a pro-rata distribution to
7 unsecured creditors or a plan that would have Debtor continue its
8 operations and issue new stock in exchange for Debtor's unsecured
9 debt.

10    At this early stage of Debtor's bankruptcy case, Debtor's
11 reasonable likelihood of a successful reorganization is evident
12 from the support of Debtor's creditors and the Committee, Debtor's
13 clear pursuit of several viable avenues of possible reorganization,
14 Debtor's projections of positive cash flow for the next six months,
15 Debtor's retention of its customers and the continued success of
16 Debtor's business.  Thus, Debtor has met its burden of showing a
17 reasonable likelihood of a successful reorganization.[13]

18 **B.   The FTC's Enforcement Action**

19    The parties do not dispute for the purposes of the current
20 dispute that, under Bankruptcy Code section 362(b)(4), the
21 automatic stay does not stay the Enforcement Action.[14]  However, the
22

23    [13] Although the issue is not presented here, a court might appropriately enjoin an
enforcement action, like the FTC's, against a chapter 7 estate.  The chapter 7 trustee might well
24 convince the court not to allow the enforcement action to proceed until the trustee and the court
knew what assets and liabilities there were in the estate.  There would be no point, for example, in
25 allowing an enforcement action seeking a monetary judgment to proceed if the estate did not have
any money in it above the amount needed to pay administrative claims.  There also might be no
26 purpose in enjoining a chapter 7 debtor from engaging in certain business practices, if that debtor
27 was out of business.

28    [14] While the Clarification Order in which the District Court held that Bankruptcy Code
(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  FTC argues that this Court does not have authority to stay that

2  litigation against Debtor under Section 105.  This Court disagrees.

3  Under In re First Alliance Mortg. Co., 264 B.R. 634 (C.D. Cal.

4  2001) ("FAMCO") and the myriad of authorities cited therein, this

5  Court has the legal authority to enjoin prosecution of governmental

6  actions against a debtor that falls within the regulatory and

7  police powers exception of Bankruptcy Code section 362(b)(4).

8  FAMCO, 264 B.R. at 652 n.18.

9      This Court may enjoin the prosecution of the Enforcement

10  Action under Section 105 if the Enforcement Action "threatens" the

11  assets of the bankruptcy estate.   FAMCO, 264 B.R. at 652.   Under

12  FAMCO, a Section 105 injunction could be appropriate against a

13  regulatory action in two types of situations.

14          First, a governmental action that seeks actual
       physical control over the assets of the debtor's estate
15     threatens the bankruptcy court's exclusive jurisdiction
       over the res of the debtor's estate and therefore can be
16     enjoined. . . .

17          Second, a § 105 injunction of a regulatory or police
       powers action could be appropriate in other circumstances
18     that severely threaten the integrity of the bankruptcy
       process.   A few courts have enjoined regulatory or police
19     powers actions on the grounds that the costs of defending
       the actions at issue, both in terms of money spent on
20     lawyers' fees and time taken away from focusing on
       reorganization, were so high in comparison to the assets
21     of the estate that allowing the actions to continue
       constituted a "threat" to the estate.   E.g., NLRB v.
22     Superior Forwarding, Inc., 762 F.2d 695, 698-99 (8th Cir.
       1985).   Because the bankruptcy court has the obligation
23     to protect and marshal the estate's assets, a severe
       enough threat to the assets of the estate constitutes a
24     threat to the bankruptcy process.

25

26 ─────────────────────

27     [14](...continued)
    section 362(b)(4) did not apply to the Florida Action is on appeal, in that appeal, Debtor has not
28  challenged that Order insofar as the Clarification Order holds that the Enforcement Action is not
    automatically stayed.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  <u>Id.</u> at 655.  In balancing the hardships between the parties, "[a]

2  bankruptcy court must 'identify the harms which a preliminary

3  injunction might cause to defendants and ... weigh these against

4  plaintiff's threatened injury.'  <u>Caribbean Marine Servs. Co. v.</u>

5  <u>Baldridge</u>, 844 F.2d 668, 676 (9th Cir. 1988)(citation omitted)."

6  <u>Excel</u>, 2007 WL 2555941 at *9.

7      **1.  Harms to FTC**

8      The FTC articulates that the FTC would be harmed by the

9  granting of a preliminary injunction because the FTC only seeks

10  what the FTC terms as "equitable" relief in the Enforcement Action

11  and this Court cannot grant all of the relief requested by the

12  FTC.[15]  But there is no doubt that the FTC seeks to collect monies

13  from Debtor.  Specifically, the FTC seeks monetary injunctive

14  relief in the form of disgorgement of monies received from

15  consumers and restitution to the consumers.  In addition, the FTC

16  seeks a permanent injunction halting Debtor's allegedly unlawful

17  practices, rescission of contracts and a claims procedure to

18  provide restitution to the consumers who allegedly paid for

19  unauthorized charges on their phone bills.

20      The FTC also asserts that being enjoined from proceeding in

21  its chosen forum -- the Florida Court -- would harm the FTC in

22  other critical ways.  The FTC quotes extensively from <u>FAMCO</u> which

23  states in this regard:

24      [T]he hardship to the governmental units of not being
     allowed to proceed with their actions in their chosen

25      forums includes harms different in character from the

26   

27      [15] While this Court does not necessarily agree with the FTC that this Court could not grant

28  all equitable relief requested by the FTC in the Enforcement Action, due to the limited nature of the
     preliminary injunction being granted at this time, there is no reason for this Court to address the
     FTC's assertion.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  harms normally considered on motions for injunctions
2  under § 105.  Being able to have a claim determined by
   the bankruptcy court is qualitatively different from
3  proceeding with a lawsuit in home forums.  As Congress
   recognized when it created the regulatory and police
4  powers exception, the goals of public policy, punishment,
   and deterrence may sometimes conflict with the goals of
5  maximizing an individual estate's assets and efficiently
   processing claims.  It is the former goals, which are
6  difficult if not impossible to measure in dollars and
   cents, that are impaired when a governmental unit loses
7  the ability to enforce its laws in its own forum.

8          Considering deterrence in particular, the harm to
   the governmental units must be measured with a broader
9  perspective in mind than these parties alone.  The
   bankruptcy court and First Alliance are undoubtedly
10 correct that there will be more money to distribute to
   borrowers in this case if the separate actions are not
11 allowed to proceed.  However, the governmental units are
   entitled to make the choice that, over time, similarly
12 situated borrowers and consumers benefit more when
   companies do not violate the law in part because they
13 know that bankruptcy will not provide a way out when
   their wrongs are discovered.  In any given case,
14 reasonable minds could disagree about the marginal costs
   and the marginal benefits of different approaches and
15 which will maximize the wealth and happiness of the
   greatest number of people.  The point is that it is the
16 governmental units charged with enforcing consumer
   protection laws, governmental units that are responsive
17 to the political will of the people, that should be the
   ones to make the choice, not the bankruptcy court.

18 FAMCO, 264 B.R. at 659.

19     The FTC asserts that the FTC's need for permanent injunctive

20 relief is particularly acute here because the FTC needs permanent

21 injunctive relief from the Florida Court barring Debtor's allegedly

22 unlawful business practices.  The FTC asserts that the FTC's

23 pursuit of phone billing aggregators such as Debtor is a vital

24 enforcement strategy that the FTC has pursued to curb the allegedly

25 insidious and unlawful practice of placing unauthorized charges on

26 consumers' phone bills.  During the past nine years, the FTC has

27 filed numerous actions against telephone billing aggregators and

28 has obtained injunctive and monetary equitable relief.  The FTC

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                    24

1  notes that this is not the first time that the FTC has sued Debtor

2  (the previous suit was settled) and some of Debtor's current

3  customers were recently prosecuted by state attorneys general for

4  placing unauthorized charges on consumers' phone bills and other

5  alleged deceptive trade practices.

6      **2.    Harms to Debtor**

7      Debtor has filed a chapter 11 bankruptcy petition.  "The

8  purpose of title 11 protection is to allow an entity to

9  'restructure ... finances' and enter a plan of reorganization so

10  that it is able to 'continue to operate, provide its employees with

11  jobs, pay its creditors, and produce a fair return for its

12  stockholders.'"  <u>CFTC v. NRG Energy, Inc.</u>, 457 F.3d 776, 779 (8th

13  Cir. 2006) (internal citation omitted).  Said a different way,

14  "[t]he purpose of Chapter 11 reorganization is to assist

15  financially distressed business enterprises by providing them with

16  breathing space in which to return to a viable state."  <u>In re</u>

17  <u>Little Creek Dev. Co.</u>, 779 F.2d 1068, 1073 (5th Cir. 1986) (quoting

18  <u>In re Winshall Settlor's Trust</u>, 785 F.2d 1136, 1137 (6th Cir.

19  1985)).  Here "Debtor 'is a real company with real debt, real

20  creditors and a compelling need to reorganize in order to meet

21  these obligations' and is therefore, exactly the type of debtor for

22  which chapter 11 was enacted."  <u>In re Dow Corning Corp.</u>, 244 B.R.

23  673, 677 (Bankr. E.D. Mich. 1999), <u>aff'd</u>, 255 B.R. 445 (E.D. Mich.

24  2000) (internal citation omitted).  In determining irreparable

25  injury to Debtor, this Court must consider the impact of permitting

26  the Enforcement Action to proceed against Debtor at this point in

27  Debtor's bankruptcy case.

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    Debtor raises two main harms that would cause irreparable

2  injury should this Court not preliminarily enjoin the Enforcement

3  Action.  First, Debtor anticipates having to spend over $900,000 in

4  fees and costs over the next six months in the Enforcement Action.

5  Debtor estimates it will incur $821,600 in litigation fees related

6  to depositions, discovery motions, dispositive motions, other

7  motions, pre-trial submissions and trial.  In addition, Debtor

8  estimates that there will be an estimated $10,000 in fees for local

9  counsel and an estimated $50,000 to $70,000 in costs.  Debtor's

10  budgets show that Debtor will not be able to operate on an

11  administratively solvent[16] basis if Debtor is forced to incur these

12  substantial fees over the next six months.

13    The FTC argues that Debtor overestimates its costs to defend

14  against the Enforcement Action.  The FTC asserts that the

15  declaration of Neal Goldfarb submitted by Debtor in support of its

16  request lacks sufficient detail to support Debtor's proposed

17  estimate.  Moreover, the FTC argues that the estimate overstates

18  the amount of estimated trial time and fails to consider that some

19  of the issues in the Enforcement Action will be narrowed, if not

20  eliminated, by summary judgment since the FTC's position is that

21  the uncontested facts establish Debtor's liability.

22    The FTC further contends that the relevant comparison under

23  FAMCO is not between Debtor's costs of defending itself against the

24

25    [16] In a chapter 11 bankruptcy case, all post-petition obligations have administrative priority
26  status. This means that those claims are paid prior to most other claims in a bankruptcy estate,
    namely other priority claims and pre-petition unsecured claims. In addition, those claims must be
27  paid in full on the effective date of a confirmed plan of reorganization. The effective date is usually
    30 days after an order confirming a plan of reorganization is entered, but can be in as few as eleven
28  days. To stay administratively solvent, a debtor would insure that debtor retains sufficient cash
    reserves on hand to pay all administrative claims in full on the effective date of a plan.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                    26

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    FTC in the Florida Court or not defending itself at all, but rather

2    between Debtor defending itself in the Florida Court and defending

3    itself in this Court.  According to the FTC, unless the Enforcement

4    Action is concluded as to Debtor, the same facts will have to be

5    litigated in this Court to establish a bankruptcy claim against

6    Debtor.[17]  Moreover, under the recently enacted changes to the

7    Bankruptcy Code, the FTC can pursue a non-dischargeability action

8    against Debtor for the FTC's monetary claim.  Finally, the FTC

9    alleges that it would pursue the non-monetary aspects of the

10   Enforcement Action after confirmation of Debtor's plan.  NRG

11   Energy, 457 F.3d at 780-81 (holding that a bankruptcy court has no

12   authority to enjoin a government agency from bringing a post-

13   confirmation enforcement action against a reorganized debtor for

14   injunctive relief against future law violations).[18]

15       The FTC does not address the second harm raised by Debtor: the

16   impact of the continuation of the Enforcement Action on Debtor's

17   reorganization efforts.  Debtor has relatively few employees and

18   Debtor's president, Mr. Dawson -- one of the founders of Debtor --

19   is and will continue to be very closely involved in Debtor's

20   defense in the Enforcement Action.  Mr. Dawson is also the main

21   contact for all of Debtor's reorganization efforts in addition to

22   _____

23   [17] This argument is incorrect, or at least premature, because the Court is only enjoining the
     Enforcement Action for a few months and has not determined whether the Enforcement Action will
24   be adjudicated in the Florida Court or in this Court, if it ultimately needs to be adjudicated at all.  It
     might well settle in the bankruptcy context in connection with a plan of reorganization or otherwise.
25   In this connection, the desire of the post-petition Debtor and the FTC to resolve their disputes may
26   be significantly greater than the situation before Debtor filed for bankruptcy.
         Furthermore, even if the matter were tried in the bankruptcy court, this Court would
27   determine when the trial should take place.

28   [18] However, as noted, Debtor and the FTC may well settle those disputes in the context of
     Debtor's plan of reorganization or otherwise.

1   his duties overseeing normal operational issues.  The bankruptcy

2   filing unsettled Debtor's customers and Debtor is working on a

3   proposed pre-payment plan whereby Debtor would pay 50% of the

4   receivables represented by post-petition billing submissions.

5   Because this is a new program, the program will be time-consuming

6   to implement and monitor.  In addition, Mr. Dawson needs to be

7   available to work with Debtor's reorganization counsel, the various

8   secured and unsecured creditors, the Committee and the United

9   States Trustee.

10       Further, the Committee supports Debtor's use of cash

11  collateral through November 2, 2007.  In exchange, Debtor has

12  committed to negotiate with the Committee a term sheet for a plan

13  of reorganization contemplating a continuation of Debtor's business

14  operations with the goal of allowing Debtor to exit bankruptcy as

15  quickly as possible.  Debtor is also monitoring the possible sale

16  of PaymentOne to a third party.

17       Finally, upon Debtor filing its chapter 11 bankruptcy

18  petition, Debtor became a "debtor-in-possession."  As a debtor-in-

19  possession, Debtor acts as a fiduciary to the bankruptcy estate and

20  owes a duty of care and loyalty to the bankruptcy estate's

21  creditors.  <u>In re McConville</u>, 110 F.3d 47, 50 (9th Cir. 1997).

22  Thus, Debtor thus is a new entity with different and additional

23  responsibilities, concerns and pressures than it had when Debtor

24  operated solely as Integretel.  Debtor, the Committee and Debtor's

25  other creditors need time to evaluate the merits and strengths of

26  the FTC's positions and decide whether the bankruptcy estate should

27  try to settle the Enforcement Action with the FTC.  Giving Debtor

28  and Debtor's creditors a few months to do that is critical at this

1  juncture -- particularly in the context of negotiating a plan of

2  reorganization.

3      **3.   Balancing of the Harms and the Public Interest**

4      Based on the unique facts of this case and in consideration

5  of the relative hardship of the parties and the public interest

6  concerns, the Court finds that continued prosecution of the

7  Enforcement Action severely threatens the integrity of the

8  bankruptcy process and Debtor's prospects for reorganization and a

9  preliminary injunction of the Enforcement Action against Debtor

10  through March 14, 2008 is warranted.  On March 7, 2008 at

11  1:00 p.m., the Court will hold a further hearing on whether the

12  preliminary injunction of the Enforcement Action should be

13  continued beyond March 14, 2008.  Either the FTC or Debtor may

14  request that the preliminary injunction be lifted before March 7,

15  2008 for good cause based on facts that are not currently before

16  this Court.

17      The FTC is concerned that this Court's granting of a

18  preliminary injunction against the Enforcement Action will set a

19  precedent that a defendant can escape prosecution for committing

20  deceptive and unfair trade practices by simply filing for

21  bankruptcy.  The Court is keenly aware of the FTC's concern and

22  that is not what this Court intends.  Rather, it is the unusual

23  convergence -- almost a perfect storm -- of the trial schedule in

24  the Enforcement Action and the critical first few months of a

25  viable chapter 11 bankruptcy case that warrant a limited

26  preliminary injunction at this time.

27      First, the next several months are a critical time for Debtor

28  in its effort to reorganize, and the immediate continuation of the

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                    29

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Enforcement Action seriously threatens Debtor's ability to

2   reorganize.  Debtor has only 37 employees to service its 58 pre-

3   petition customers and manage Debtor's relations with over 1400

4   LECs.  Moreover, Debtor's president, Mr. Dawson, is and will

5   continue to be closely involved in Debtor's defense in the

6   Enforcement Action.  If the Enforcement Action is not temporarily

7   stayed, Mr. Dawson would be required to divert his time and

8   attention from Debtor's reorganization between November 6 and

9   December 4, 2007 to assist Debtor's counsel in the Enforcement

10  Action in preparing an opposition to a motion for summary judgment

11  that the FTC has stated it will file against Debtor.  There may

12  also be eleven or more additional depositions in which Debtor will

13  need to participate if the Florida Court grants the pending motions

14  requesting additional discovery.  In addition, Mr. Dawson will be

15  required to fly to Florida during February 2008 to prepare for and

16  participate in the trial in the Enforcement Action scheduled to

17  commence on February 25, 2008.[19]  The diversion of Debtor's

18  management -- and Mr. Dawson in particular -- in defending the

19  Enforcement Action during the next few months seriously threatens

20  Debtor's reorganization.

21      Mr. Dawson is the main contact for all of Debtor's

22  reorganization efforts in addition to his duties overseeing normal

23  operational issues.  Debtor's reorganization efforts -- especially

24  at this early stage of Debtor's bankruptcy case -- are time-

25  consuming.  First, under the Bankruptcy Code, Debtor is required to

26

27  ──────────────

28      [19] The trial situation could possibly change if FTC does file a summary judgment motion and it is granted in part or in full.  However, Debtor will still need to prepare for trial because Debtor cannot know in advance what the result will be of any as yet to be filed FTC motions.

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                    30

1    obtain court approval for the use of its cash collateral post-

2    petition.   This is a marked difference from how Debtor operated

3    pre-petition.   Pre-petition Debtor could use any cash that came

4    into Debtor's accounts subject only to claims of various creditors.

5    Post-petition, however, Debtor must obtain the consent of all

6    creditors who have an interest in that cash collateral or court

7    approval for the use of that cash collateral.   In this instance,

8    the Court has approved Debtor's use of cash collateral on an

9    interim basis at three-week intervals.   Debtor has scheduled a

10   final hearing for use of cash collateral for November 2, which

11   depending on the status of its negotiations with its creditors,

12   Debtor may or may not change to another interim request for use of

13   cash collateral.

14       It is not unusual in a chapter 11 bankruptcy case for a debtor

15   to seek multiple interim requests for use of cash collateral while

16   a debtor negotiates with secured and unsecured creditors for final

17   consent to a debtor's use of cash collateral.   In the early stages

18   of a bankruptcy case, creditors are getting up to speed regarding a

19   debtor's business operations and the relative likelihood of

20   recoveries for creditors pursuant to various reorganization

21   proposals.   During this time, creditors, debtors and the bankruptcy

22   court strike a balance among the parties' interests and grant

23   limited permission for a debtor to use post-petition cash

24   collateral until the parties are comfortable with a debtor's plans

25   to operate and can resolve a debtor's use of cash collateral on a

26   final basis.   The early, limited permission to use cash collateral

27   is in part why a chapter 11 bankruptcy case is so time-intensive

28   for a debtor, and indeed all parties in the early stages.

UNITED STATES BANKRUPTCY COURT
For The Northern District of California

1    Second, the bankruptcy filing unsettled Debtor's customers and

2    Debtor is actively working on a proposed pre-payment plan whereby

3    Debtor would pay 50% of the receivables represented by post-

4    petition billing submissions.  This is a marked change from

5    Debtor's pre-petition operations where Debtor paid its customers

6    approximately 90 days after the billing transactions were submitted

7    to Debtor.  Because the pre-payment program is new, Mr. Dawson and

8    Debtor's other employees will have to spend a great deal of time

9    implementing and monitoring the new program.

10    Further, the Committee was appointed on October 1, 2007 and on

11    October 10, 2007, the Committee had a five hour face-to-face

12    meeting with Debtor.  At that meeting the Committee supported

13    Debtor's use of cash collateral through November 2, 2007 and in

14    exchange Debtor has committed to negotiate with the Committee a

15    term sheet for a plan of reorganization contemplating a

16    continuation of Debtor's business operations with the goal of

17    allowing Debtor to exit bankruptcy as quickly as possible.  Debtor

18    is also monitoring the possible sale of PaymentOne to a third

19    party.  Mr. Dawson is a, and probably the, critical participant in

20    those discussions and negotiations.

21    Finally, Debtor has complex business operations and over 1,200

22    creditors on its creditor matrix.  Due to the size and complexity

23    of Debtor's business operations, Debtor requires -- and has been

24    granted -- additional time to complete its Schedules and Statement

25    of Financial Affairs.  Those documents are currently due on

26    November 15, 2007.  The Schedules consist of seven separate

27    schedules that require Debtor to: (a)  list in detail all real and

28    personal property, the value of each piece or category of property,

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  and the security interest held against that property; (b) provide

2  separate lists of Debtor's creditors -- secured creditors, priority

3  unsecured creditors and unsecured creditors that includes an

4  address for each creditor, information regarding when the claim was

5  incurred and consideration for the claim, whether the claim is

6  contingent, unliquidated or disputed, and the amount of the claim;

7  (c) provide a detailed list of all executory contracts and

8  unexpired leases; and (d) provide a list of all entities that are

9  co-debtors with Debtor.  The Statement requires Debtor to answer

10 twenty-five questions in detail regarding Debtor's financial

11 affairs.  The questions require Debtor to detail, _inter alia_, all

12 payments or transfers Debtor made in the 90 days immediately

13 preceding the commencement of the case that aggregate more than

14 $5,475 to any creditor, and all payments or transfers Debtor made

15 within one year immediately preceding the commencement of the case

16 to any creditor that is an insider (all of the majority-owned

17 subsidiaries of Debtor are considered to be insiders).

18     Based on these projected activities, Debtor's management --

19 and Mr. Dawson in particular -- will spend the next few months

20 dealing with Debtor's customers and creditors, completing Debtor's

21 Schedules and Statement, negotiating with the Committee over the

22 terms for a plan of reorganization and, if successful, most of

23 November and early December will be spent negotiating a draft plan

24 of reorganization and overseeing the preparation of a proposed

25 disclosure statement.  Both of these documents will require

26 substantial amounts of time on the part of Mr. Dawson and Debtor's

27 other personnel.  The plan of reorganization is Debtor's contract

28 with its creditors as to how Debtor intends to restructure itself

MEMORANDUM DECISION RE
   ORDER TO SHOW CAUSE, ETC.              33

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    using the Bankruptcy Code.  In addition, the proposed disclosure

2    statement is similar to a prospectus and will require, _inter alia_,

3    a description of Debtor's background, the events that caused Debtor

4    to file its bankruptcy case, what has changed such that Debtor will

5    be able to complete its proposed plan of reorganization, a

6    description of the proposed plan, and financial projections in

7    support of the plan if Debtor proposes to present a plan that

8    permits Debtor to operate as a going concern.  Debtor must submit

9    its proposed disclosure statement to this Court for approval.  11

10   U.S.C. § 1125(b).  Such activities will consume a huge portion of

11   the available time of Debtor's management over the next few months.

12        However, should Debtor be required to proceed to trial in the

13   Enforcement Action at the end of February 2008, Mr. Dawson and

14   other of Debtor's personnel will be required to travel to Florida

15   and spend many days -- if not weeks in the case of Mr. Dawson --

16   preparing for and participating in the trial in the Enforcement

17   Action.  This activity will take place at a critical juncture of

18   Debtor's bankruptcy case where Debtor should instead be seeking

19   confirmation of a plan of reorganization.  Debtor is committed to

20   proposing a plan of reorganization on an expeditious basis.  Under

21   the notice requirements of the Bankruptcy Code and Rules, it is

22   highly likely that Debtor will seek approval of a disclosure

23   statement during January 2008, and could set a confirmation hearing

24   on a proposed plan of reorganization during February or March 2008.

25        Confirmation of a chapter 11 plan requires an enormous amount

26   of work for both a debtor and its counsel.  In addition to

27   resolving and addressing any objections by any parties to approval

28   of a disclosure statement and confirmation of a plan, this Court

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                34

1   has an independent duty to ensure that a disclosure statement

2   contains adequate information, In re Main Street AC, Inc., 234 B.R.

3   771, 774 (Bankr. N.D. Cal. 1999), and an affirmative duty to ensure

4   that a plan satisfies all sixteen requirements of Bankruptcy Code

5   section 1129 for confirmation.    In re Ambanc La Mesa Ltd. P'ship.,

6   115 F.3d 650, 653 (9th Cir. 1997).    Just one of the requirements is

7   that this Court must determine that confirmation of Debtor's plan

8   will not likely be followed by the liquidation or further financial

9   reorganization.    11. U.S.C. § 1129(a)(11).    Mr. Dawson will almost

10  certainly be required to testify before this Court as to Debtor's

11  plan and the financial projections on which it is based, as well as

12  other evidence this Court requires to confirm any proposed plan

13  submitted for confirmation by Debtor.

14      In addition to the impact of the Enforcement Action on

15  Debtor's president and other personnel, it would be highly

16  injurious to Debtor and Debtor's prospects for reorganization if

17  Debtor had to spend the bulk of the estimated $1 million in legal

18  fees and costs associated with the Enforcement Action during this

19  same critical period.    Such an outlay of funds at a critical time

20  of confirmation would seriously impair, if not strike a death

21  knell, to Debtor's prospects for a reorganization.    Debtor is

22  required under the Bankruptcy Code to pay all administrative claims

23  as of the effective date of a confirmed plan.    11 U.S.C.

24  § 1129(a)(9)(A).    Debtor may well not have sufficient funds to both

25  pay the litigation costs of defending the Enforcement Action and

26  pay administrative claims on the effective date of a confirmed

27  plan.

28

1    The FTC likely holds only a pre-petition unsecured claim

2    against Debtor in the Enforcement Action. Any monetary claims FTC

3    asserts against Debtor arise only from Debtor's alleged pre-

4    petition placing of unauthorized collect call charges onto

5    consumers' telephone bills. There is no showing that at this point

6    there is any reason for Debtor to spend $1 million litigating an

7    unsecured claim in the next five months. First, at this juncture

8    it is unclear what unsecured creditors will receive in Debtor's

9    reorganization and it is unknown if spending $1 million to defend

10   against the FTC's claims makes sense, especially in this case where

11   secured and other unsecured creditors desperately need for all

12   resources to be devoted to Debtor's reorganization efforts.

13   Second, over the next five months Debtor may negotiate a resolution

14   of the FTC's claims without the need for litigation. This Court is

15   not determining at this juncture where the FTC's claims will be

16   liquidated. Rather, this Court is merely delaying briefly the

17   Enforcement Action against Debtor only.[20] It is this Court's

18   experience that in chapter 11 cases such as Debtor's, a debtor

19   typically negotiates with the various creditors to reach a

20   consensus as to the structure of a plan of reorganization. It is

21   generally less expensive and easier if a debtor can negotiate a

22   plan of reorganization than if a debtor has to confirm a plan of

23   reorganization over the objections of numerous creditors. At the

24   early stages of Debtor's case and under the facts of this case, a

25   preliminary injunction of limited duration is warranted.

26

27   [20]This Court's decision stays the Enforcement Action against Debtor for a few months. This
     decision does not determine whether (1) the FTC may recommence the Enforcement Action in the
28   Florida Court after those few months, or (2) whether the FTC should be required to pursue Debtor by
     filing a claim with, and litigating that claim in, the bankruptcy court.

MEMORANDUM DECISION RE
ORDER TO SHOW CAUSE, ETC.                36

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1    By limiting the duration of the preliminary injunction and

2  requiring Debtor to provide further updated evidence in mid-

3  February 2008 to support the continued injunction of the

4  Enforcement Action, this Court eliminates or at least reduces

5  substantially the alleged harms of the FTC.  The FTC cites three

6  harms from a possible injunction of the Enforcement Action: (1) the

7  inability of the FTC to obtain the non-monetary equitable relief it

8  seeks against Debtor; (2) the inability of the FTC to pursue the

9  claims in the Enforcement Action against Debtor in the Florida

10 Court; and (3) the public interest in permitting the FTC to pursue

11 a vital enforcement strategy to curb the unlawful practice of

12 placing unauthorized charges on consumers' phone bills.  However,

13 this Court has not eliminated, and is not eliminating, the

14 possibility that at a later date this Court would permit the FTC to

15 prosecute the Enforcement Action in the Florida Court, including

16 the ability of the FTC to obtain the non-monetary equitable relief

17 it seeks against Debtor.  The FTC itself notes that it will seek

18 such relief against Debtor post-confirmation.  This Court is merely

19 delaying for a few months the FTC's prosecution of the Enforcement

20 Action against Debtor.  No decision has yet been made as to where

21 the FTC's claims will be litigated if indeed those claims need to

22 be litigated at all.

23   Granting a preliminary injunction of limited duration also

24 renders premature the FTC's argument that this Court must consider

25 Debtor's costs of Debtor defending itself in the Florida Court and

26 defending itself in this Court rather than Debtor's costs of

27 defending itself against the FTC in the Florida Court or not

28 defending itself at all.  First, Debtor will not likely be

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.          37

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  prosecuting an objection to the FTC's claim in the next few months.

2  Indeed, March 14, 2008 is the claims bar date for governmental

3  units in Debtor's bankruptcy case.  Thus, for this limited duration

4  preliminary injunction, Debtor almost certainly will not incur any

5  costs defending itself in this Court against the FTC's claims.[21]

6  **C.  Contempt Proceedings and Turnover Action**

7  **1. Debtor's Ability to Sue the Receiver**

8  Receiver argues that this Court lacks subject matter

9  jurisdiction over this adversary proceeding as to Receiver because

10  Debtor has not obtained permission from the Florida Court to bring

11  this action -- or any action -- against Receiver.  Receiver asserts

12  that for over 100 years, legal authority holds that a litigant must

13  obtain permission from the court appointing a receiver before

14  bringing an action against that receiver.  Carter v. Rodgers, 220

15  F.3d 1249, 1252 (11th Cir. 2000) (holding that under Barton v.

16  Barbour, 104 U.S. 126 (1881), a debtor must obtain leave from the

17  bankruptcy court before the debtor can initiate an action in

18  district court against a bankruptcy-court appointed trustee for

19  breach of fiduciary duties); In re Crown Vantage, Inc., 421 F.3d

20  963, 970 (9th Cir. 2005) (a bankruptcy-court appointed trustee of a

21  liquidating trust cannot be sued in a foreign jurisdiction for

22  violating a settlement agreement without the permission of the

23  court appointing the trustee).

24  Debtor asserts that the Barton doctrine applies only if Debtor

25  were suing Receiver for dereliction of duties, which Debtor is not

26  doing in this adversary proceeding.  Moreover, Debtor argues that

27  Crown Vantage stands for the proposition that Debtor does not need

28

[21] See footnote 17, supra.

1    leave from the Florida Court to sue Receiver in this instance

2    because this Court has exclusive in rem jurisdiction to determine

3    the property of Debtor's bankruptcy estate and the injunctive

4    relief requested by Debtor is a stay specifically designed to

5    protect the assets of the bankruptcy estate, so the Barton doctrine

6    is not invoked.

7        This Court agrees with Debtor that once Debtor filed its

8    bankruptcy petition on September 16, 2007, this Court obtained

9    exclusive in rem jurisdiction over the property in Debtor's

10   bankruptcy estate, and particularly over any legal and equitable

11   interest Debtor held in the Commingled Funds as of the commencement

12   of the case.  While none of the parties or this Court have found

13   any cases directly on point, the Court finds Gilchrist v. General

14   Elec. Capital Corp., 262 F.3d 295 (4th Cir. 2001), particularly

15   instructive.

16       In Gilchrist, Spartan International, Incorporated and its

17   subsidiaries (collectively, "Spartan") closed their doors for

18   business.  Spartan's major creditor ("GE") commenced a state law

19   debt-collection action invoking the diversity jurisdiction of the

20   district court of South Carolina ("South Carolina Court").  To

21   facilitate the foreclosure of the creditor's lien, the South

22   Carolina Court appointed a federal receiver for all of Spartan's

23   assets ("Receiver Order").  The Receiver Order enjoined all persons

24   from commencing or prosecuting any action, suit or proceeding that

25   affected the receivership estate or Spartan.  Gilchrist, 262 F.3d

26   at 297-98.

27       One week later and with actual notice of the Receiver Order,

28   50 creditors ("Georgia Creditors") filed an involuntary bankruptcy

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.          39

1  petition in the bankruptcy court in the Southern District of
2  Georgia ("Georgia Court") and a request for the appointment of an
3  interim bankruptcy trustee.  GE objected to the appointment of an
4  interim bankruptcy trustee and filed a motion to dismiss the
5  involuntary bankruptcy petition or transfer venue to the district
6  of South Carolina.  The receiver filed a similar motion.  Following
7  a hearing, the Georgia Court overruled the objections, denied the
8  motions and appointed an interim bankruptcy trustee.  <u>Gilchrist</u>,
9  262 F.3d at 298.

10      While that hearing was in progress, the receiver obtained a
11 temporary restraining order from the South Carolina Court enjoining
12 38 of the Georgia Creditors from undertaking any action in
13 furtherance of the involuntary bankruptcy petition.  Four days
14 later the South Carolina Court found the Georgia Creditors in
15 contempt of the Receiver Order and allowed the Georgia Creditors to
16 purge their contempt by withdrawing the bankruptcy petition.  The
17 interim bankruptcy trustee argued that the automatic stay precluded
18 the South Carolina Court's actions, but the South Carolina Court
19 refused to recognize the automatic stay of its proceedings.  The
20 South Carolina Court asserted that it had jurisdiction to determine
21 the scope of the automatic stay, and it had the authority to issue
22 an injunction to prevent the collateral attack of that court's
23 Receiver Order appointing the receiver.  In an effort to purge
24 their contempt, the Georgia Creditors subsequently filed a petition
25 in the Georgia Court to withdraw the involuntary petition, which
26 the Georgia Court denied.  The Georgia Court stayed further
27 proceedings pending a review of the South Carolina Court's orders
28 by the Fourth Circuit.  <u>Gilchrist</u>, 262 F.3d at 298-99.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

MEMORANDUM DECISION RE
  ORDER TO SHOW CAUSE, ETC.                    40

Entered on Docket
November 02, 2007
GLORIA L. FRANKLIN, CLERK
U.S BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

1   In reviewing the South Carolina Court's orders, the Fourth

2   Circuit noted that the South Carolina Court was within the scope of

3   that court's equitable powers in appointing the receiver and

4   asserting in rem jurisdiction over Spartan's assets, even those

5   located in other districts.  Gilchrist, 262 F.3d at 302.  However,

6   once the Georgia Creditors filed the involuntary bankruptcy

7   petition,

8       [b]y virtue of the jurisdictional provisions of the
        United States Code, and the commencement of a bankruptcy
9       case against Spartan, the bankruptcy court obtained
        "exclusive jurisdiction of all of the property, wherever
10      located, of [Spartan] as of the commencement of such
        case, and of property of the estate."  28 U.S.C.
11      § 1334(e) (emphasis added).  In addition, the filing of
        the petition in bankruptcy "operates as a stay,
12      applicable to all entities, of the ... continuation ...
        of a judicial, administrative, or other action or
13      proceeding against the debtor that was commenced before"
        the bankruptcy petition.  11 U.S.C. § 362(a)(1).  To give
14      effect to its jurisdiction, the bankruptcy court is given
        broad equitable powers, see 11 U.S.C. § 105, with
15      nationwide service of process, see Bankr. R. 7004(d).

16  Gilchrist, 262 F.3d at 303.

17      The Fourth Circuit then found that the South Carolina Court

18  had properly determined that the South Carolina Court had

19  jurisdiction to determine its own jurisdiction and the scope of the

20  automatic stay.  However, the Fourth Circuit stated that:

21      The [South Carolina] court provided no explanation of
        why, as a matter of equity, the bankruptcy process was
22      not superior to a receivership in the liquidation of a
        large business, with assets in several jurisdictions and
23      with thousands of creditors, some of whom were claiming
        liens superior to the lien relied upon by GE when it
24      initiated the receivership proceeding.  More importantly,
        it provided no explanation of why the terms of § 362(a)
25      were not applicable.

26          Similarly, in their briefs and arguments presented
        to us, counsel for GE and the receiver advanced no
27      exception to § 362(a) that would be applicable.  Instead,
        they argued for a "first-filed" principle, urging that
28      the court which first takes custody of assets for
        liquidation should be given priority.

MEMORANDUM DECISION RE
 ORDER TO SHOW CAUSE, ETC.                41

1    We cannot agree.  Our examination of the Bankruptcy
2    Code reveals that Congress intended that the bankruptcy
     process be favored in circumstances such as these.
3    Section 1334(e) of title 28 is unequivocal in its grant
     of exclusive jurisdiction to the bankruptcy court, and
4    § 362(a) imposes an automatic stay on all proceedings
     merely upon the filing of a bankruptcy petition.  If we
5    were to frustrate these express provisions to further a
     first-filed policy, we would have to deny bankruptcy
6    jurisdiction to every bankruptcy court in which
     foreclosure proceedings had already commenced against the
7    debtor's property, on the grounds that the *in rem* nature
     of the foreclosure proceeding precludes the bankruptcy
8    court from taking custody of the *res*.  Such a
     jurisdictional limitation on bankruptcy proceedings would
9    severely limit the efficacy of bankruptcy.  In the
     absence of express language suggesting that Congress
10   intended for bankruptcy jurisdiction to be so limited, we
     believe it would frustrate Congressional intent to imply
11   such a limitation based solely on consideration of a
     first-filed policy.

12        Even if general equitable principles could modify
     the application of statutory jurisdictional grants, we do
13   not believe that the equities favor the common-law
     receivership process over the highly developed and
14   specific bankruptcy process.  The procedural requirements
     for liquidating a large corporation with thousands of
15   creditors, many of whom might challenge the priority of
     liens and the adequacy of asset sales, present a task
16   that would push the receivership process to its limits.
     *See* [In re Baldwin-United Corp. Litigation], 765 F.2d
17   [343, 348 (2nd Cir. 1985)] ("[T]o whatever extent a
     conflict may arise between the authority of the
18   Bankruptcy Court to administer this complex
     reorganization and the authority of the District Court to
19   administer consolidated pretrial proceedings, the
     equities favor maintenance of the unfettered authority of
20   the Bankruptcy Court").  In this case it can be seen,
     even from the initial transactions in the receivership,
21   that the customized receivership mechanisms are wanting
     in comparison with established bankruptcy process.  For
22   example, when the receiver in this case sold a mill in
     Georgia for $4.2 million, the creditors had no advance
23   notice of the transaction, and some have challenged the
     adequacy of compensation, proffering evidence that the
24   mill was worth over $20 million.  More important to the
     Georgia creditors in this case, the district court did
25   not have in place a mechanism to adjudicate the relative
     priority of liens.  GE claims a first lien by reason of
26   its perfected security interest in most of the assets of
     Spartan and proffered an order by which the proceeds of
27   liquidation would be paid to it as the superior lien
     holder.  But Spartan's employees claim a prior statutory
28   lien in assets produced by them at the manufacturing
     plants at which they worked, as created by state law.