10

1   Florida District Court allegedly has found that the so-
2   called reserve funds which this Court will refer to as the
3   subject funds are property of the receivership estate and
4   not property of the Debtor or the Debtor's bankruptcy
5   estate, that this Court should deny Debtor the final use of
6   cash collateral and require Debtor to turn over the 1.7
7   million dollars that is in a blocked account that was set
8   up pursuant to a stipulation, here in this court not in the
9   District Court.  At the suggestion of the Court, it was set
10  up on a voluntary basis between the Debtor and the
11  Receiver, and the FTC agreed.
12          Since this Court has ruled that the subject funds
13  shall remain in the blocked account until at least a
14  hearing on December 7th, 2007 at 10:00 a.m. and since Debtor
15  is only requesting the use of cash collateral until
16  November 30th, 2007, the FTC and the Receiver are certainly
17  adequately protected, and the FTC's and Receiver's
18  objections are overruled.  I wish to make it perfectly
19  clear that nothing in granting the use of cash collateral
20  implicates the issue of whether those funds should or
21  should not be unblocked at a later time.  The Court is not
22  proposing that by authorizing the use of cash collateral,
23  that the Court is in any way suggesting that those funds
24  will become unblocked in the future or that they won't.
25  It's without prejudice to everybody having a right at a

11

1   noticed hearing to make all the arguments they want to with

2   respect to that issue.

3        Because the Creditors' Committee consents to

4   further interim use of cash collateral, non-consenting

5   creditors are adequately protected and the Court finds that

6   there is a likelihood of Debtor successfully reorganizing.

7   The Court finds that Debtor's continued use of cash

8   collateral -- that wasn't very well said.

9        Because the Creditors' Committee consents to a

10  further interim use of cash collateral because non-

11  consenting creditors are adequately protected, and that the

12  Court finds that there is a likelihood of Debtor's

13  successfully reorganizing, the Court finds that Debtor's

14  continued use of cash collateral is in the best interest of

15  creditors and the Debtor's bankruptcy estate.  Debtor's

16  request for further interim use of cash collateral pursuant

17  to the current stipulation with PaymentOne through November

18  30 is granted.

19        Okay.  We'll get to the Pachulski Stang issue

20  last.  Let's turn now to the preliminary injunction

21  request.  Do you wish to make any arguments that are not in

22  the papers?

23        MR. SACKS: No, Your Honor.

24        THE COURT: Counsel?

25        MR. OETZELL: Your Honor, I would just state

12

1    that --

2            THE COURT: Are you now going to make an argument

3    that's in the papers?

4            MR. OETZELL: I don't think so.

5            THE COURT: Okay.

6        (Laughter.)

7            MR. OETZELL: I would just state, Your Honor that

8    my understanding is that the position that's being urged on

9    Your Honor and the position that was in Your Honor's

10   November 2nd memorandum is that the fact that this Court has

11   exclusive jurisdiction over property of the estate,

12   property of the Debtor, obviates the need to rely on the

13   Barton Doctrine.  Everything is predicated on this all-

14   pervasive exclusive jurisdiction.  Obviously we've argued

15   in the papers, and I won't repeat again here, Your Honor,

16   that there's been no ruling, except by the District Court,

17   concerning whether this property -- the subject funds are

18   property of the Debtor, and in fact, the District Court has

19   ruled against that.

20           However, in respect of this all-pervasive

21   jurisdiction argument and its effect, I would point out

22   that a) there's no -- well, I've said this in my papers --

23   that there's no case that really holds that in rem

24   jurisdiction as being exercised by a District Court is

25   divested by filing of a bankruptcy, except as it pertains

13

1  to a situation where that Receiver has control over all the

2  Debtor's property, and then the Debtor goes ahead and files

3  bankruptcy.

4          But more importantly, I'll say, that I don't

5  believe that the Eleventh Circuit sees this as all-

6  pervasive Bankruptcy Court jurisdiction.  The Eleventh

7  Circuit has taken on a number of matters for all intents

8  and purposes every matter upon which this Court is going to

9  rule here, and it is going to decide it.  And stemming from

10  that, and I said in my papers, we run a real risk that if

11  the Debtor's scheme here which is a two-step process, one,

12  to keep us from going into court in Florida; and then

13  secondly, unblocking the account, is allowed to proceed and

14  they dissipate those funds, that we're going to render

15  meaningless everything that the Eleventh Circuit is doing,

16  all the issues that the Eleventh Circuit is going to

17  decide.  And I would ask, Your Honor, that it makes sense

18  if you intend to issue a stay, that it be predicated --

19  that it be conditioned upon preservation of those funds and

20  non-dissipation of those funds.

21          THE COURT:  Okay.  Before I let Mr. Sacks respond,

22  I want to go through a few issues with you because there is

23  no two-step process on today, and so your argument is

24  focused almost exclusively on preservation of the funds,

25  and that's not at issue today.  Your papers in my view

14

1   improperly conflate two very different issues, and so I

2   want to make sure that you and I agree as to what the Court

3   is doing here or is being asked to do, and what I think

4   you're saying in your papers.

5           As I see it, the issue before the Court is simply

6   whether to grant a preliminary injunction.  In doing that,

7   this Court has to decide at a minimum whether the standards

8   for a preliminary injunction have been met.  There's no

9   question in my mind that if the subject funds -- and these

10  subject funds are the Debtor's commingled funds and we've

11  just taken an arbitrary 1.7 million in cash and put it in a

12  blocked account -- but there's no question if those funds

13  are taken out of the blocked account and turned over to the

14  Receiver that this Court loses complete control over them

15  and they can be dissipated and lost to the estate forever.

16          So the Debtor has made a very convincing

17  argument for irreparable injury.  Now, the next issue in

18  dealing with an injunction is whether at a minimum, there

19  are serious questions going to the merits.  Now I think

20  there's a likelihood of success on the merits, but given

21  the strong irreparable injury, I don't have to find that

22  there's a likelihood of success on the merits.  I do intend

23  to find that, but I don't need to find that to issue a

24  preliminary injunction.  All I need to find is that there

25  are substantial questions going to the merits.

15

1        In deciding whether there's substantial questions
2    going to the merits, I have to examine whether the
3    Debtor -- whether there are substantial questions going to
4    the Debtor's position that the 1.7 million that was in
5    commingled funds is property of the estate on a substantive
6    level, simply whether there are serious questions going to
7    that; and two, whether there are serious questions about
8    the way the District Court made its decision in the order
9    issued post-petition where the Debtor was given
10   absolutely -- the Debtor meaning the bankruptcy estate, was
11   given absolutely no opportunity to even address the Court.
12   There was no argument; there was no briefing; there was no
13   creditor representation; there was nothing, and whether
14   that creates serious questions going to the merits.
15       Now, you characterize what I'm saying I think
16   unfairly as I'm putting myself in a position to review what
17   the District Court did.  But that's not true at all.  I
18   have no ability to affirm or deny what the District Court
19   did.  I'm not the Appellate Court for the District Court.
20   But I'm in a separate role with the responsibility of
21   deciding merely or at a minimum whether there are serious
22   questions, whether the Debtor has stated serious questions
23   going to the merits.  It will be the Eleventh Circuit that
24   will decide whether what the District Court did was
25   appropriate or not, but it may not rest with the Eleventh

16

1   Circuit because many of these issues are fairly new issues

2   and this issue may ultimately reach the Supreme Court,

3   unless it's settled or unless some other -- somebody

4   decides not to try to take it to the Supreme Court.

5         So I don't know where the ultimate issue will be

6   decided, but I have the responsibility of deciding now

7   whether there are serious questions going to the merits, at

8   a minimum, or whether the Debtor has a likelihood of

9   success on the merits.  And that is not a substantive

10  review of the District Court actions.  Now clearly it

11  involves looking at what the District Court did and what

12  the Debtor's position is in making that determination, but

13  that doesn't make me a reviewing court because the issue

14  before me is simply to determine whether or not there's a

15  substantial question going to the merits or, as I see it, a

16  likelihood of success on the merits.  But as I say, I don't

17  have to find the likelihood of success on the merits here.

18  I only have to find that there are substantial questions

19  going to the merits because of the degree of irreparable

20  injury.  And as you know, it's a sliding scale test.

21        The balance of hardships -- and this isn't my

22  decision; this is just an opening for our discussion; it

23  will become part of my decision, but it's not my decision,

24  and, you know, it will become part of my decision if I

25  determine after our conversation that it should -- I also

1   think that I have to balance the hardships of the parties

2   and if the Debtor is required to turn over 1.7 million

3   dollars to the Receiver and the Receiver dissipates it,

4   that that would be an enormous hardship for the debtor,

5   whereas now presently those funds, the 1.7 million dollars,

6   are in a blocked account and they stay there pending

7   further order of this Court.

8          So all of your fears about what will or won't

9   happen are speculative based on what will or won't happen

10  with the blocked funds because you will have an opportunity

11  to come before me on December 7th and make whatever

12  arguments you want and you'll have your opportunity in the

13  papers to make whatever arguments you want and there's no

14  guaranty those funds will be released.  And so to argue

15  that it's somehow a two-step process where it's a foregone

16  conclusion that the funds will be released is not a fair

17  argument because it's premature.

18         So the key to what I'm saying is that my role in

19  deciding whether there's substantial questions going to the

20  merits or likelihood of success on the merits does not

21  constitute a substantive review as an appellate court, but

22  it absolutely is my function to make that determination for

23  purposes of the injunction.  Now do you disagree with that

24  latter point?

25         MR. OETZELL: The latter point being, Your Honor?

18

1    THE COURT: The latter point being that in making
2    a decision as to whether or not to grant a preliminary
3    injunction, the Court is required to determine whether at a
4    minimum there are substantial questions going to the
5    merits, and in taking -- in reaching that, I'm not serving
6    in the role of an appellate court over the District Court's
7    decisions.

8    MR. OETZELL: The answer is, is that is one of the
9    criteria in the Ninth Circuit, and that in so deciding, the
10   Court should not act as a reviewing court.

11   THE COURT: But I'm not -- I'm saying you are not
12   acting as a reviewing court in determining whether or not
13   there are substantial questions going to the merits.  That
14   is not -- that is not a function that is the function of a
15   reviewing court.  I'm just determining whether the
16   standard, that standard for a preliminary injunction, has
17   been met.  So telling me I shouldn't doesn't answer the
18   question.

19   MR. OETZELL: The answer is, Your Honor, I guess,
20   is that if you look at the record and you say, my, there
21   are some important questions here, does not necessarily
22   mean that you are acting as a reviewing court.  However, as
23   things progress, and as the decision is made, there is a
24   danger of stepping into that role.

25   THE COURT: I don't understand.

19

1          MR. OETZELL: And indeed, Your Honor articulated

2    it yourself when you talked about the issues of tracing and

3    about the issues of how the District Court handled the

4    order.  Those are all being taken care of in Florida.

5          THE COURT: But those all go into the issue as to

6    whether or not the Debtor has raised substantial questions.

7          MR. OETZELL: I understand.

8          THE COURT: All those issues go into that

9    analysis.  Do you agree?

10          MR. OETZELL: As I said, Your Honor, looking at

11   the record and making the decision based on the record,

12   hmm, there are serious questions here.  Yes, that's not

13   necessarily sitting in review of another court.  But --

14          THE COURT: And it's my function to do that now.

15   Being asked for a preliminary injunction, I have to do

16   that, right?

17          MR. OETZELL: That is one of the things that you

18   may decide.  But --

19          THE COURT: Must.  No, no, I must look at that

20   issue and decide whether or not at a minimum, there are

21   serious questions going to the merits.  I have to do that.

22   It's my function, and it's not like I can choose not to.  I

23   have to do it.

24          MR. OETZELL: I will concede that, Your Honor.

25          THE COURT: Okay.

20

1       MR. OETZELL: But I will also again say that as
2  things progress, there is a very real danger that the
3  ruling has the effect of sitting in review of the District
4  Court.

5       THE COURT: But not as of today in deciding
6  whether or not a preliminary injunction should issue.
7  There is no risk of that today.

8       MR. OETZELL: Let me say, Your Honor, back in --

9       THE COURT: Can you please answer that? Is there
10 any risk today that I would exceed that function, if all I
11 do is determine that there either is a likelihood of
12 success on the merits or substantial questions going to the
13 merits.

14      MR. OETZELL: I think that if you restrain us
15 based upon all the things that you have to consider in this
16 matter, including a balancing of the equities, that it is
17 likely, if not possible, that you in effect will be sitting
18 in review of the District Court.

19      THE COURT: I don't understand. Don't I have to
20 determine -- you're saying if I come out one way, I'm in
21 review of the District Court. If I come out the other way,
22 I'm not? That's baloney. I have to decide whether or not
23 there are serious questions going to the merits. And
24 you've conceded that. So if I decide that there are, then
25 I will be in review of the District Court. If I decide

1    there aren't, then I'm not in review of the District Court?

2            MR. OETZELL: That's not what I said, Your Honor.

3            THE COURT: Well, I don't understand what you

4    said.

5            MR. OETZELL: I said, as you go forward in this

6    ruling --

7            THE COURT: But I'm talking about just today, the

8    issue before me today, the preliminary injunction only.

9    I'm not talking about what may or may not happen

10   speculatively in the future.  I'm talking about the issue

11   today.  There is nothing that is being asked of me today

12   that would put me in the role of reviewing the District

13   Court, just determining whether or not there's a

14   substantial likelihood of success on the merits or serious

15   questions going to the merits.

16           MR. OETZELL: Your Honor, you're being asked to

17   restrain --

18           THE COURT: Yes.

19           MR. OETZELL:  -- the actions of an appointed

20   agent of a District Court in carrying out duties that that

21   District Court has directed that agent to carry out.

22           THE COURT: And one of the factors that I'm

23   required to consider is whether or not the Debtor has

24   demonstrated serious questions going to the merits.

25           MR. OETZELL: And we both are in agreement with

22

1  that.  But I'm not in agreement with the idea that in the

2  other things that you have to consider and in passing on

3  that, that that line may not be passed.

4        THE COURT: Well, you haven't explained it.

5        MR. OETZELL: Okay.  Your Honor, let me back up to

6  sort of what I see the context here is.  I appreciate Your

7  Honor's desire to sort of limit these issues because

8  they're all encompassing and you sort of have to --

9        THE COURT: Oh no, no, no, just the opposite.  I

10 want to say that just -- I want to limit my decision to

11 what I've been asked to do today, which is to issue a

12 preliminary injunction.

13       MR. OETZELL: Right.

14       THE COURT: I don't have to decide, for example,

15 that this Court has exclusive jurisdiction over property of

16 the estate.  I don't have to decide that the District Court

17 was or wasn't wrong.  I don't have to sit as a reviewing

18 court.  I have to determine whether there are serious

19 questions going to the merits and whether or not the Debtor

20 has a likelihood of success on the merits.  And that's all

21 I have to decide within that one test for a preliminary

22 injunction, and then I have to consider the other tests.

23       MR. OETZELL: Your Honor also has to pass upon the

24 application of the Barton Doctrine.

25       THE COURT: Yes.

23

1        MR. OETZELL; And as I understand --

2        THE COURT: But I've done that already and in a

3    very extensive decision.

4        MR. OETZELL: Right.  And as I understand your

5    November 2nd memorandum, it is your exclusive in rem

6    jurisdiction over this property that obviates the need for

7    the application of the Barton Doctrine.

8        THE COURT: I've explained why I think the Barton

9    Doctrine is inapplicable or is not to this situation in

10    detail, so I don't need to go back through all that.

11        MR. OETZELL: But that exclusive jurisdiction

12    comes from Section 28 U.S.C. 1334(e).  28 U.S.C. Section

13    1334(e) gives you exclusive jurisdiction over property of

14    the Debtor or property of the estate.  There has been no

15    ruling from Your Honor that this is either property of the

16    Debtor or property of the estate in a final adversary

17    proceeding as is required under Rule 7004.  But there has

18    been a ruling from the District Court that this is not

19    property of the Debtor.  Therefore if you predicate the

20    lack of application of the Barton Doctrine on that, you are

21    in effect sitting in review of the District Court's ruling

22    and you are actually contradicting the District Court's

23    ruling.

24        Now, as I read your memorandum, you get to there

25    by talking about issues of tracing and the like, but those

24

1   issues were decided in the District Court.  They were

2   brought up by the Debtor in the District Court.

3           THE COURT: They weren't brought up by the Debtor.

4           MR. OETZELL: Well, they were brought up --

5           THE COURT: They were brought up by the pre-

6   petition Debtor.  The post-petition Debtor, the estate,

7   never had an opportunity to say anything to the District

8   Court.

9           MR. OETZELL: Yes.  But, Your Honor, the property

10  of the estate comes from it being property --

11          THE COURT: It didn't exist.  The estate didn't

12  exist when the Debtor was before the District Court.  The

13  estate didn't exist in any form.

14          MR. OETZELL: But the only way that property would

15  have become property of the estate would be if it was

16  property of the Debtor or they got it post-petition.  They

17  didn't get it post-petition, and indeed the District Court

18  has ruled that it was not property of the Debtor.  And it

19  was --

20          THE COURT: Yes.  The District Court ruled that

21  after the petition was filed.

22          MR. OETZELL: No.

23          THE COURT: Yes.

24          MR. OETZELL: No.

25          THE COURT: That's when the District Court said

25

1  it.

2          MR. OETZELL: The District Court ruled it on its

3  September 14th omnibus ruling.  It clarified it in its

4  September 21st omnibus --

5          THE COURT: Yeah.  We're getting terrible feedback

6  here.

7          MR. OETZELL: Let me pull back.  It clarified --

8          THE COURT: That's better.

9          MR. OETZELL: -- it clarified its ruling in its

10 September 21st ruling, but it ruled on September 14th and

11 indeed that was the whole matter that precipitated this

12 bankruptcy, that this property is not property of the

13 Debtor.  And in the proceedings leading up --

14         THE COURT: That was done pre-petition.

15         MR. OETZELL: Yes, Your Honor.  And in the

16 proceedings leading up to that ruling, the argument of

17 tracing was made and I can give you citations to it if you

18 would like.

19         THE COURT: Is it your position that the tracing

20 argument is different when you're in a bankruptcy

21 situation, that the standards are different?

22         MR. OETZELL: I really haven't had a chance to

23 research it.  I would expect that the standards are pretty

24 much the same.  But I would say that the issue has been

25 brought up and I would commend Your Honor to page 10 of the

26

1   declaration of David Chase where the District Court

2   actually decided the issue.

3          THE COURT: This is pre-petition.

4          MR. OETZELL: Right.  And I would commend Your

5   Honor to the declaration of Mr. Dawson which is on page 246

6   of the Chase declaration where Mr. Dawson made that

7   argument that indeed this was not, you know, property that

8   was set aside and it was just, you know, a bookkeeping

9   entry, et cetera, et cetera.  That was all decided in the

10  District Court.  So this connection, if you will, that's

11  being urged upon you that Section 1334(e) does apply

12  because the District Court never really considered the

13  issue of tracing is simply not correct.  It was considered,

14  and this is why I say you run the very real danger of

15  sitting in review of the District Court, at worst, or at

16  best, completely contradicting the District Court's orders.

17         THE COURT: On the Barton Doctrine.

18         MR. OETZELL: Yes, Your Honor.

19         THE COURT: Okay.  I understand your argument.

20         MR. OETZELL: And I suppose if we look at this,

21  you know, we can find some other --

22         THE COURT: Well, you haven't done it.  You've had

23  plenty of opportunity to find whatever you want to find.

24  You're here having had a lot of time to think about these

25  issues.

27

1          MR. OETZELL: Well, certainly, Your Honor, the

2   Barton Doctrine is pretty important here.  It does

3   represent a rather absolute bar, and if Your Honor is

4   actually sitting in review of the District Court in

5   deciding that the Barton Doctrine does not apply, I think

6   I've answered Your Honor's question.

7          THE COURT: But I have to have -- well, okay --

8   but I have to have my own review in the context of what's

9   before me of whether the Barton Doctrine applies.  I'm not

10  bound by the Florida District Court's decision about

11  whether the Barton Doctrine applies in this bankruptcy

12  situation.  He didn't even make a decision about the Barton

13  Doctrine with the Debtor having had an opportunity to file

14  a brief or having the opportunity to make an argument,

15  having an opportunity to do anything.

16         MR. OETZELL: I'm not saying that he did, Your

17  Honor, but he did decide that the property was not property

18  of the Debtor --

19         THE COURT: But he didn't decide about the Barton

20  Doctrine post-petition.

21         MR. OETZELL: No, he did not, Your Honor.

22         THE COURT: So I'm not reviewing that.  I'm not

23  reviewing his decision that the Barton Doctrine -- whether

24  the Barton Doctrine did or didn't apply post-petition.

25         MR. OETZELL: The issue is, Your Honor --

28

1           THE COURT: Isn't that right?  He didn't even

2  decide that.

3           MR. OETZELL: Well, of course, Honor, but --

4           THE COURT: He didn't talk about whether the

5  Barton Doctrine applied post-petition.

6           MR. OETZELL: There was no debtor post-petition.

7  Nobody was suing the Debtor at that point.

8           THE COURT: Right.  So I'm not reviewing the

9  District Court's decision on Barton.

10          MR. OETZELL: Your Honor, to the extent -- and it

11  does, you're obviating the Barton Doctrine --

12          THE COURT: I'm not obviating it; I'm saying it

13  doesn't apply.

14          MR. OETZELL: You're not applying it because, Your

15  Honor, you have to find that Section 1334(e) applies, and

16  to find that Section 1334(e) applies, you have to either

17  ignore the District Court's order -- you have to sit in

18  review of the District Court's order; you have to ignore

19  the District Court's order; or you have to find that

20  there's something in the District Court's order that shows

21  that he didn't -- that things were not appropriately

22  decided, and that is sitting in review of the District

23  Court.  There's just -- I'm sorry, Your Honor, but there's

24  no way of escaping that.

25          THE COURT: Okay.  What did you want to say, Mr.

29

1  Mora?

2          MR. MORA: May I be heard, Your Honor?

3          THE COURT: Sure.

4          MR. MORA: Thank you.  Your Honor, getting back to

5  your original question, I don't believe I have anything

6  further than what's in our papers, but I do want to point

7  out that in this last brief that we filed, we had pointed

8  out to the Court that we did brief and argue the

9  jurisdiction issue previously and that we had cited to the

10  Court and we've cited again in our briefs the cases

11  starting with CFTC versus Kopetro (Phonetic) that stand for

12  the proposition that the filing of a bankruptcy case does

13  not oust the jurisdiction of a District Court that has a

14  Federal receivership before it in a government enforcement

15  action fraud case.

16          THE COURT: Yeah, I'm aware of that.  That's in

17  your brief, sir.

18          MR. MORA: Thank you, Your Honor.  And also the

19  collateral estoppel issue, which I think goes to the heart

20  of what Your Honor has been discussing with counsel for the

21  Receiver.

22          THE COURT: You're again raising an issue that was

23  in your brief.  I'm glad to hear you but I want to hear

24  arguments that aren't in the brief.  I'm very familiar with

25  what you say.

30

1          MR. MORA: All right, Your Honor.  Thank you.

2          THE COURT: I don't mean to be rude to you, I just

3   would like you to try to restrict your arguments to

4   arguments that haven't been raised in the brief today.  Is

5   there anything else?

6          MR. MORA: No, Your Honor.

7          THE COURT: Okay.  Anything from this side that is

8   not covered, particularly in relation to the colloquy that

9   took place with Mr. Oetzell?

10         MR. SACKS: Your Honor, I just want to note, at

11  least for the record, that we don't concede that the

12  Eleventh Circuit is deciding a question that is the same as

13  this Court needs to decide, and so I agree with the Court

14  obviously that your decision today need not go that far,

15  but I think ultimately it will never need to go that far.

16  You will never need to be in review of the District Court.

17  You will be deciding bankruptcy questions as to what

18  constitutes property of the estate, and that's all you'll

19  need to do.

20         And I'd also point out, secondly, that the fact

21  that the tracing argument was brought up to the District

22  Court illustrates that no tracing occurred, that it's

23  important for exactly the opposite of the reason that Mr.

24  Oetzell raises it, which is that the District Court found

25  that without tracing, without having any identifiable res

31

1   or property that anybody could point to, that nonetheless

2   the court in Florida could enter a judgment, an order to

3   pay, against the pre-petition Debtor.  And having done

4   that, that illustrates that the Debtor entered bankruptcy

5   with all of its bank accounts unencumbered, and therefore

6   it's up to this Court to decide what interest the Receiver

7   has in the Debtor's property.

8           THE COURT: Did you want to say something?

9           MR. WARREN: Your Honor, if I could -- after

10  counsel is done, there were a couple of points I wanted to

11  respond to as well, if I could.

12          THE COURT: Sure.

13          MR. WARREN: Your Honor, I've read the orders that

14  came out of District Court in Florida.  I've heard the

15  characterization from the other side of the room, and I

16  know the orders say that the reserve, whatever that is --

17          THE COURT: Right.  It's not quantified.  We don't

18  know what it is.

19          MR. WARREN: We don't know what it is.  That's a

20  totally different question from whether the cash accounts

21  that came into the estate and this Court's jurisdiction are

22  the reserve.  To say that the reserves are the property of

23  the Receiver does not address the question of the money

24  that came into this estate that's administered by this

25  Court.  This Court is the one that will decide whether

32

 1   those funds are the reserve, very different from saying in

 2   the abstract that the reserve, whatever it is, if it

 3   exists, is property of the Receiver.

 4         I also want to touch on the Barton Doctrine

 5   because I've watched this argument from the Receiver and I

 6   have to say it's surreal.  The Court and the Debtor I think

 7   have appropriately identified the fact that the Barton

 8   Doctrine doesn't apply.  But I want to suspend this belief

 9   for a minute and say, well, what if it did, what if the

10   Receiver is right.  The cases that we've seen and that have

11   been cited are bankruptcy cases.  There's a Ninth Circuit

12   case I found very interesting -- it was cited by the

13   Receiver -- holding that a bankruptcy trustee is an entity

14   protected by the Barton Doctrine.  Under Section 1107, IGT

15   is a bankruptcy trustee.  If the Receiver is right, not

16   only does this argument not help his cause, I think it

17   supports the Debtor's cause, because what it would mean is,

18   that Receiver would have had to come into this court to

19   pursue a claim against this Receiver, this trustee, that's

20   protected by the Barton Doctrine.

21         THE COURT: And this trustee controls the funds.

22         MR. WARREN: And this trustee controls the funds.

23   So there are only two options I think, Your Honor.  One is

24   that the Barton Doctrine doesn't apply at all, in which

25   case it's irrelevant, and the other is that Mr. Oetzell is

33

1    correct about his characterization of the Barton Doctrine,

2    in which case it is another ground to impose an injunction.

3    They've never come to this Court and asked for the right to

4    pursue this trustee in a foreign jurisdiction, something

5    they would have to do.

6              THE COURT: For money that is clearly now,

7    physically, in this estate.

8              MR. WARREN: Absolutely, Your Honor.

9              MS. DIEMER: Under Ninth Circuit law because this

10   Debtor is here in the Ninth Circuit.

11             THE COURT: Right.  So the Ninth Circuit law

12   applies to what this Court does.

13             MR. DIEMER: Yeah.

14             MR. WARREN: Yes, Your Honor.

15             MR. OETZELL: Your Honor, Ms. Diemer is not a

16   party to this.  I --

17             THE COURT: I've been so liberal.  I've let -- I

18   let you speak and I let Ms. Guerard speak; I let Mr. Mora

19   speak.  I let almost anybody speak.  It hasn't gotten out

20   of hand.  I've maintained control, so if I allow her a

21   sentence, you'll forgive me, but --

22             MR. OETZELL: I understand, Your Honor.  I just

23   don't want to be accused of waiving anything.

24             THE COURT: You haven't waived anything, and if

25   you want me to have her dragged out and humiliated by the

34

1    marshals or whatever --

2        (Laughter.)

3        -- you know, would be appropriate for having

4    spoken up to the Court, you'll let me know, but otherwise,

5    I've tried to be polite to all the lawyers.

6        MR. OETZELL: Your Honor, the issue --

7        THE COURT: By the way, I want to tell you

8    something about her?  Do you know about her?

9        MR. OETZELL: No.

10        THE COURT: Oh.  Ms. Diemer is a leading -- am I

11    allowed to tell this in court?

12        MS. DIEMER: Yes, you are.  I was going to say,

13    would Mr. Oetzell care to be the person who tried to drag

14    me out of court.  I think I could take the dragging, but

15    I'm not sure --

16        MR. OETZELL: Well, I know she plays hockey.

17        THE COURT: Well, not only does she play hockey,

18    but she plays hockey on a male team, and apparently does

19    very well.  So she's tough, Mr. Oetzell.

20        (Laughter.)

21        Go ahead.  It's a co-ed team, but I think it's

22    only co-ed because of her.  Go ahead.

23        MR. OETZELL: Your Honor, I appreciate the comment

24    about the Barton Doctrine and, you know, what's good for

25    the goose is good for the gander, but what's before this

35

1    Court today is an adversary proceeding in respect to the

2    Debtor against the Receiver, and we're worried about the

3    Barton Doctrine being applied here.

4            I would also say, Your Honor --

5            THE COURT: But it's relevant, right?  It's

6    certainly relevant if the funds are sitting in the estate

7    physically and the Receiver is seeking an order in another

8    court forcing -- a contempt order forcing the Debtor to

9    turn over funds to the Receiver without having sought

10   permission from this Court to do so.

11           MR. OETZELL: The suit is already pending, Your

12   Honor.

13           THE COURT: So what?

14           MR. OETZELL: And the judgment is already --

15           THE COURT: The bankruptcy was filed.

16           MR. OETZELL: Well, you know, I'm not --

17           THE COURT: And you're seeking to pursue the

18   contempt arguably -- arguably in accordance with counsel's

19   argument in violation of the Barton Doctrine.

20           MR. OETZELL: I'm not so sure that that's the

21   case, but --

22           THE COURT: I don't know what the sanctions are

23   for violating the Barton Doctrine, Mr. Oetzell, but I

24   assume counsel will do some research on that.

25           MR. OETZELL: But I will say, Your Honor, I mean

36

1   this is an issue and forgive me for going into our papers,

2   but this is in our earlier papers, we're not going afresh

3   into the District Court and asking for relief.  There is an

4   order that --

5           THE COURT: But would the Barton Doctrine only

6   apply if somebody was going afresh rather than pursuing

7   something after a Receiver was appointed?  Let's say the

8   Receiver hadn't been appointed, and so somebody was

9   pursuing whoever the Receiver's protectorate, those

10  companies, and then the Receiver was appointed and then

11  they sued the Receiver, you'd scream Barton Doctrine.  The

12  fact that there was a preexisting suit wouldn't stop you

13  from screaming Barton.

14          MR. OETZELL: Well, Your Honor, I'm not going to

15  speculate on the law that I'm not aware of.  There's been

16  too many, shall we say, aggressive statements made about

17  the law here that have turned out not to be quite the case.

18  So I'm not going to be -- I'm not going to fall into that

19  at the moment.  All I know is --

20          THE COURT: All I can tell you is that what he

21  argues sounds correct to me.

22          MR. OETZELL: All I know, Your Honor, is that as I

23  said in our -- as we said in our first papers, there is

24  already an order entered by this District Court, and it

25  compels the Debtor to turn over the funds or to show cause

37

1  why it hasn't.  Now, you know, the Receiver may be sort of

2  a moving force in causing the District Court to enforce

3  that, but that doesn't mean that the District Court isn't

4  going to enforce it on its own.  It could come tomorrow.

5  My point is, is that the compulsion is there.  It exists.

6           THE COURT: Right.  Which is another -- I

7  understand, but isn't that the problem with your proposal

8  that you won't do anything until the Eleventh Circuit

9  decides because you don't have any control over what the

10  District Court does?  You can't make that promise.  You can

11  only promise what you'll recommend, but you can't promise

12  to protect the 1.7 million dollars.  I can tell you that

13  subject to my order, the 1.7 million dollars here is

14  protected.  But you can't control what the District Court

15  does.

16           MR. OETZELL: You know, Your Honor --

17           THE COURT: And you can't control what happens

18  after the Eleventh Circuit decides if, for example, there's

19  a petition for sur.

20           MR. OETZELL: You know, Your Honor is correct that

21  we can go into the District Court and the District Court

22  can just say that's nice, I'm not interested in dealing

23  with that today or any other day, and at that point, what

24  do we do.  There's not much to be said about the whole

25  thing.  But, you know, Your Honor has the power here to do

38

1    the ultimate thing that we're looking for and to balance

2    the equities appropriately and make certain that the

3    District Court's orders aren't frustrated and make certain

4    that we don't have a situation where the Eleventh Circuit's

5    efforts are going to be rendered meaningless, and that is,

6    to protect those funds, to make --

7               THE COURT: But they are protected now.

8               MR. OETZELL: But, Your Honor, I don't know --

9               THE COURT: And they'll be protected until you

10   have an opportunity to make another argument on December

11   7th.

12              MR. OETZELL: But, Your Honor, now is one thing.

13   December 7th is another thing altogether, and everybody in

14   this courtroom knows what the Debtor intends to do here.

15   It is clear beyond doubt from the records, from the

16   pleadings.  The debtor intends to go in on the 7th and it

17   will dissipate those funds.

18              THE COURT: No, sir.  The Debtor at best can

19   request that the Court unblock the funds.  The Debtor has

20   no power to dissipate anything.

21              MR. OETZELL: The Debtor has included those funds

22   in its budget.  The Debtor has asked you for permission to

23   spend cash collateral in accordance with that budget.  That

24   catches up those funds --

25              THE COURT: Only now through November 30.

39

1          MR. OETZELL: Yes, but I do not know what's going
2    to happen after 11:30 --
3          THE COURT: We'll talk about it.  You and I I'm
4    sure will have a wonderful conversation about what should
5    happen after November 30, on November 30, and then again on
6    December 7th.  But it's not before me today.
7          MR. OETZELL: But you know, Your Honor, you have
8    to balance the equities in this thing.  The Debtor asked
9    the Eleventh Circuit to preserve the status quo, and that's
10   all we're asking here.  Does it matter to us so much that
11   the Receiver has in its hands the funds?  Well, we
12   certainly would prefer it.  But if Your Honor fashions
13   something that preserves those funds as long as it takes
14   the Eleventh Circuit to go ahead and rule because the
15   Eleventh Circuit is going to rule on those things, and
16   those things are the matters that are before this Court,
17   well then I think that works for all the parties.  And on
18   top of it, Your Honor, it saves what the Debtor has come to
19   you and complained about for this injunction.  The Debtor
20   has come and has complained to you that oh, my goodness,
21   we're going to have to spend all this money in litigation
22   costs.  We're going to take Mr. Dawson's time away from the
23   reorganization.  He's going to have to appear in Florida,
24   et cetera.  They haven't considered what's going to happen
25   if we are restrained and we are put in very real danger

40

1  that they can dissipate those funds.  What's going to

2  happen is we're going to go up --

3          THE COURT: They can't dissipate the funds based

4  on anything that's going to happen today.

5          MR. OETZELL: They will spend a good deal of money

6  on appeal as well.  If Your Honor freezes this thing, if

7  Your Honor fashions a remedy that preserves the status quo,

8  that makes certain that we aren't going to have the rug

9  pulled out from under us on December 7th and they're going

10  to dissipate the funds, that preserves those funds until

11  the time that the Eleventh Circuit rules on the issues, I

12  think that that would work.

13          THE COURT: Well, it's not just that.  I keep

14  telling you that.  I don't know what's going to happen,

15  what the Eleventh Circuit will rule or whether that will be

16  the final say.  The fact that the Eleventh Circuit rules

17  one way or another, may not be the end of the game at all,

18  as you well know.

19          MR. OETZELL: Well, but we do know if the Debtor

20  is in a position to dissipate those funds, and I sure

21  wouldn't bet my house on the idea that they're not going to

22  dissipate those funds --

23          THE COURT: They're not going to have access to

24  the funds, absent a further court hearing here.

25          MR. OETZELL: Well, I don't know what's going to

41

1   happen on December 7th, but I do know that they are

2   anticipated to be spent or they wouldn't be in that cash

3   collateral order.   Take them out of the cash collateral

4   order then.   Then we're, you know, then we're --

5            THE COURT: It's not in the cash collateral order.

6   The cash collateral order will only be til November 30.

7   That's all we have before us.

8            MR. OETZELL: Right.   And in any final cash

9   collateral order, Your Honor --

10           THE COURT: But we don't have that before us now.

11           MR. OETZELL: Okay.   Well, you know, somehow I

12  don't think that the budget is going to change, taking

13  those things out when they come in with the final cash

14  collateral order.

15           THE COURT: Let me just say to you, Mr. Oetzell, I

16  really don't know whether that's true, and I'll tell you

17  why.   One of the reasons is, because I don't know what the

18  Plan of Reorganization is going to look like two weeks from

19  now, because if the deal is, for example, to sell

20  PaymentOne, then they may not need that 1.7 million dollars

21  immediately.   I don't know whether they're going to need

22  that or not, and I don't know whether the Debtor is going

23  to be turned upside down on its head if it doesn't have the

24  1.7 million dollars, and they're going to have to make a

25  showing to me that I should release those funds.   They

42

1   haven't done that at this point.  I blocked the funds and

2   the funds remain blocked.  So I understand you're nervous,

3   because you don't have a guaranty of the future and they

4   don't have a guaranty of the future, but that's where you

5   are.  And I want to emphasize to you that I'm only deciding

6   the preliminary injunction and I'm not unblocking the

7   funds.

8           MR. OETZELL: Your Honor, just let me say this and

9   I'll shut up.

10          THE COURT: I don't try to shut you up at all, Mr.

11  Oetzell.  I feel bad that I stopped Mr. Mora because he was

12  just arguing the positions from the brief, so I may go back

13  and let him argue his positions from the brief if he wants

14  to.

15          MR. OETZELL: Seriously, Your Honor, this cannot

16  be viewed in a narrow vacuum that is --

17          THE COURT: It has to be.  I have to decide only

18  the issue before the Court today in order to have this case

19  continue to make sense.

20          MR. OETZELL: The issue before this Court is

21  whether you're going to restrain the Receiver from doing

22  what the Receiver has to do in the District Court --

23          THE COURT: I'm not restraining the Receiver at

24  all -- oh, the Receiver, I'm sorry, not the court.

25          MR. OETZELL: Yes, Your Honor.

43

1          THE COURT: Yes, I am.

2          MR. OETZELL: The question before this Court is

3    whether you're going to restrain the Receiver from doing

4    what the Receiver believes is necessary to preserve those

5    funds.   That's what is before this Court.

6          THE COURT: But I have the funds blocked.   So the

7    Receiver can think it's necessary, but the funds are

8    blocked pursuant to my order and the Receiver is saying, I

9    don't trust your order; I want more security.   Okay.   You

10   want more security.   That's nice.   But my statement to you

11   is that the funds are now blocked.   They only can be

12   unblocked on further order of the Court, and you'll have

13   plenty of chance to address me with all of these factors

14   when we see where we are on December 7th.

15         And I think there's a good chance that the Debtor

16   won't look exactly the same as it looks now on December 7th

17   and maybe it will and maybe it won't.   But we'll see.   But

18   the facts may well be very different.   And I have taken the

19   approach in this case and I frankly think it was an

20   intelligent approach although the Debtor may rue the day

21   the Debtor agreed to it -- is to take this case in bite

22   size -- and certainly PaymentOne's counsel is concerned --

23   but to take this case only the issues before me, and so

24   when you first came before me and you had this big flurry

25   of fight, and I said, why don't we put the 1.7 aside and

44

1  we'll block it and you go on your merry way, Debtor, and do

2  what you can do, and is that okay with you, and you said

3  yes.  So you trusted me there.

4         We did that.  Then we took another step.  Now

5  we're in this step.  You are not threatened at all by this

6  step.  You'd like to hammer it down and have, you know,

7  have more security than the Court's order which presently

8  keeps the funds blocked, and I understand that.  And I

9  understand your argument, but you're not entitled to it,

10  and it's not required, and it's not before me.  So I am

11  taking the case in very small bite size pieces, deciding

12  only the issue before me at the time, and that I can do

13  today without dealing any further with the blocked funds.

14         Mr. Mora, did you want to say something, because

15  I felt bad for stopping you.

16         MR. MORA:  No, that's fine, Your Honor.  Your

17  Honor said you would consider all the arguments that we

18  made in all of our briefs and that's -- we respect that.

19         THE COURT:  Okay.  Anybody else want to say

20  anything before I adjourn for a few minutes.  I'm going to

21  try to get out a decision, you know, within a half hour or

22  so, but I need a little time.  I have to go back and figure

23  out whether I can do it.  We can have our status conference

24  though on the Pachulski Stang matter.  Look, unless you

25  guys can work it out, you disagree, you and Mr.

45

1    Schneider -- Mr. Schneider, you're on, right?

2                MR. SCHNEIDER: Yes, I am, Your Honor.

3                THE COURT: All right.  Mr. Fiero and Mr.

4    Schneider disagree on facts.  They disagree on who said

5    what in a telephone conversation.  The facts are critical.

6    Why the two of you think that I could somehow decide this

7    on conflicting statements of fact is beyond me.  As far as

8    I can tell, this requires an evidentiary hearing.  Mr.

9    Schneider has to be here on the stand.  Mr. Fiero is going

10   to have to take the stand.  If you're going to pursue this,

11   both of you, I'm going to have to decide on your

12   credibility, and I don't see how else I can decide this.

13   It's a factual dispute about what took place during your

14   conversation and then I have to make inferences from that.

15   Maybe it won't be inferences; maybe I'll decide simply on

16   who said what to whom.

17                I hate to be in that situation.  I don't want to

18   be in a position like that where I have to judge Mr.

19   Schneider's credibility and Mr. Fiero's credibility.  But

20   this is a fact-driven dispute.  I can't decide on the law.

21   It's a fact, purely fact-driven dispute, and it's very

22   unpleasant, but I don't know how else to decide it.

23                MR. FIERO: Your Honor, John Fiero for Pachulski

24   Stang.  Mindful of the Court's concerns, it was our

25   intention to submit an additional quantum of evidence and

46

1   essentially replying to the opposition raised by the

2   Receiver, which would establish we believe conclusively

3   that on three different occasions within hours of first

4   speaking with my partner, Ms. Grassgreen, that Ms.

5   Grassgreen advised the Receiver to hire the Danning Gill

6   firm and that three times -- and allow this firm to pursue

7   a Committee representation, and that three times Mr.

8   Schneider agreed with that suggestion.  That was the

9   evidence that we sought to put forward with regard to the

10  e-mails.  That said, Your Honor, we're happy --

11          THE COURT: I don't know whether -- I don't know

12  how to do it.

13          MR. FIERO: We're happy to present the full

14  picture, all of the evidence, and I guess then we just need

15  to figure out what day that hearing would occur, and then

16  we can tee it up.  Obviously --

17          THE COURT: Are you going to bring Ms. Grassgreen

18  here?

19          MR. FIERO: If that's required, Your Honor,

20  certainly.

21          THE COURT: It seems like if that's important for

22  me to consider, she'd have to be here to be subject to

23  cross-examination.

24          MR. FIERO: Yes, Your Honor.

25          THE COURT: I mean anybody who you want me to

47

```
 1   consider the testimony of would have to be here for an
 2   evidentiary hearing.
 3             MR. FIERO: Understood, Your Honor.
 4             THE COURT: Okay.  I think I'm going to recess and
 5   go try to work on this decision, and maybe the two of you
 6   can talk about this, both in terms of whether we should
 7   have an evidentiary hearing and also the scheduling of it,
 8   and -- okay.  Thank you.
 9             MR. SINGER: Your Honor?
10             THE COURT: Yes.
11             MR. SINGER: This is John Singer, and I'm sorry --
12   I'm very reticent because I hate being a disembodied voice,
13   but there's just one point that I would like to raise to
14   have --
15             THE COURT: Sir, I can't hear you very well.  I
16   can't hear you very well.  Are you on a regular phone?
17             MR. SINGER: I'm on a regular phone, Your Honor,
18   by myself.
19             THE COURT: Okay.  You're doing a little better
20   now.
21             MR. SINGER: I will try to speak up as loudly as I
22   can.
23             THE COURT: Okay.  If you'll just please yell into
24   the phone.
25             MR. SINGER: I will do that, and if it comes out
```

48

1    too loudly, I apologize.

2            THE COURT: It's not.  It's just fine now.

3            MR. SINGER: This is one concern that the

4    Commission has, and perhaps Your Honor can just give us

5    some comfort which would help us with this.  I think you've

6    been honest and very blunt with us, and I think we need to

7    be equally blunt with you, if that's permitted, which is

8    this.  The Eleventh Circuit as you know, denied its stay I

9    guess a week ago Monday, and within three and a half hours,

10   you issued the TRO, and I'm not going to argue the merits

11   as to whether you should have done that or not.

12           The concern we have is this, concerning the 1.7

13   million dollars, as a practical matter, and indicated

14   that -- maybe I'm just a little slow on the point -- and

15   it's this, Your Honor.  We are concerned that Integretel

16   could be in a situation where it's going to come and say,

17   Your Honor, we essentially need the money now or we're

18   going to be out of business.  I wouldn't envy Your Honor

19   for being in the position where you have to answer that

20   question.  However, having said that, the concern we have

21   is, if Integretel is in that situation and you're in a

22   position where you say you release the money, saying that

23   they are going to go out of business, the Receiver as well

24   as the Commission will be in a situation where they won't

25   even have an opportunity to go to District Court and seek

49

1  an emergency stay.  As the Receiver's counsel has quite

2  well put it, once the money is gone; it's gone.

3        THE COURT: Yeah, and it works both ways.  If the

4  money is turned over to the Receiver, it's gone.

5        MR. SINGER: Well, Your Honor, I would disagree

6  with that -- with you in that sense.  The Receiver can only

7  hold the money subject to any order of the District Court.

8  I appreciate that Integretel can't do anything with the

9  blocked account subject to your order.  The concern, as I

10  said that I have is, if things are moving quickly, I do

11  feel I can say with utter confidence that if the Receiver

12  was holding the money, nothing is going to be happening

13  until the final judgment in the -- with that money -- until

14  a final judgment and any appeal if necessary in the

15  District Court in the enforcement action.

16        In contrast here, as I said, what if -- as an

17  example, say on December 5th, you receive a letter from

18  Integretel saying our settlement with our clients is on

19  Thursday the 6th.  We don't have the money to do it.  We

20  need that 1.7 million dollars today, or we're going to be

21  in default tomorrow.

22        THE COURT: Our settlement -- wait a minute.  I

23  just don't understand your hypothetical.  Our settlement

24  with our client?

25        MR. SINGER: Pardon me?

50

1          THE COURT: You said our settlement with --

2          MR. SINGER: No, Integretel could settle with its

3    client, the people who they had settled with on Thursday

4    when it paid money out.

5          MR. FIERO: Settlement, Your Honor, is when the

6    payments occur weekly.  It's simply --

7          THE COURT: Oh, oh, I'm sorry.  I was thinking of

8    settlement in the traditional sense.

9          MR. SINGER: I'm sorry if I was unclear on that.

10   But I'm saying if, for example, on December 5th Integretel

11   came in and said we need that 1.7 million dollars in order

12   to do the settlements tomorrow, Your Honor, we know it's

13   tough, but we need a decision today or we're going to be

14   defaulting with our clients tomorrow, and we need that

15   money right away.  At that point, we could be -- if you

16   choose not to release the money, that's obviously a problem

17   for Integretel.  If you would choose to release the money

18   to Integretel, then that's a problem for the Receiver and

19   the Commission because that money would be dissipated by

20   Integretel, as it would indicate in my hypothetical, the

21   next day.

22          And there wouldn't even be an opportunity for the

23   Commission, depending upon what time that took place and

24   the settlements are done, to even, you know -- with due

25   respect assuming you were to grant -- to release the money,

51

1   to go to a District Court and get relief, to attempt to

2   seek a stay.  So I hear what you're saying, Your Honor, and

3   I have no doubt you're dealing with us as best as you can

4   and I appreciate your bluntness with us, but I also think I

5   need to be equally candid with you about the Commission's

6   concerns that because this case could move very quickly,

7   that the money could be gone, and you may be forced in a

8   situation -- as I said, I don't envy -- I wouldn't envy you

9   having to be in that situation if you got that type of

10  emergency call from Integretel.

11          THE COURT: Oksy.  So my suggestion is that I'm

12  going to take a break and go work on this decision and in

13  the meantime why don't you talk to the Debtor and see if

14  they'll agree to enough time for you to get up to your

15  District Court.  I mean that's all that you have to do,

16  right?  You're asking for enough time, and you understand

17  that this is all going to play up.  You could have your

18  papers pretty much ready so if you needed to go to the

19  District Court on December 7th or thereafter, or December 5th

20  or whenever, you would be ready.  You wouldn't say, well

21  now, we need two weeks to write a brief.  This is all

22  moving in a certain direction and so there's a

23  possibility -- I'm not saying I would ever necessarily

24  unfreeze these funds, but you don't want to be put in a

25  situation where you have to ask for too much time.